**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

--------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WOLFSPEED, INC., *et al.*, | : | Case No. 25-90163 (CML) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

--------------------------------------------------------- x

**NOTICE OF FILING OF PLAN SUPPLEMENT**
**FOR THE JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**REORGANIZATION OF WOLFSPEED, INC. AND ITS DEBTOR AFFILIATE**

As contemplated by the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as may be amended, modified, or supplemented from time to time, and including all exhibits and supplements thereto, the "***Plan***"),[2] the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") hereby file certain of the documents comprising the Plan Supplement as the exhibits attached to this Notice with the United States Bankruptcy Court for the Southern District of Texas (the "***Court***"). Capitalized terms used but not defined herein have the meanings set forth in the Plan.

The Plan Supplement includes the following exhibits (in each case, as may be amended, modified, or supplemented from time to time):

| EXHIBIT | DOCUMENT |
|---|---|
| A | Schedule of Retained Causes of Action |
| B | Schedule of Rejected Executory Contracts and Unexpired Leases |
| C | Intercreditor Agreements |
| C-1 | 1L/2L Intercreditor Agreement |
| C-2 | Pari Passu Intercreditor Agreement |
| D | New Notes Documents |
| D-1 | New Senior Secured Notes Indenture |

---

[1] The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: Wolfspeed, Inc. (2719) and Wolfspeed Texas, LLC (0339). The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

[2] Capitalized terms used but not defined herein have the meanings given to them in the Plan.

| EXHIBIT | DOCUMENT |
|:---:|:---|
| **D-2** | Form of New 2L Indenture |
| **E** | Investor Rights and Disposition Agreement |
| **F** | Registration Rights Agreement |
| **G** | Renesas Warrants Agreement |
| **H** | Restructuring Transactions Exhibit |
| **I** | Amended Rights Offering Procedures |

The remaining exhibits to the Plan Supplement will be filed with separate notices.

These documents remain subject to continuing negotiations in accordance with the terms of the Plan and the Restructuring Support Agreement and the final versions may contain material differences from the versions filed herewith. For the avoidance of doubt, the parties thereto have not consented to such document as being in final form and reserve all rights in that regard. Such parties reserve all of their respective rights with respect to such documents and to amend, modify, or supplement the Plan Supplement and any of the documents contained therein through the Effective Date in accordance with the terms of the Plan and the Restructuring Support Agreement. To the extent material amendments or modifications are made to any of these documents, the Debtors will file a revised version with the Court prior to the hearing to consider confirmation of the Plan and the adequacy of the Disclosure Statement (the "***Confirmation Hearing***").

The Plan Supplement is integral to, part of, and incorporated by reference into the Plan. Please note, however, these documents have not yet been approved by the Court. If the Plan is confirmed, the documents contained in the Plan Supplement (including any amendments, modifications, or supplements thereto) will be approved by the Court pursuant to the order confirming the Plan.

The deadline for filing objections to the adequacy of the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 7] (the "***Disclosure Statement***") and/or confirmation of the Plan is **5:00 p.m. (Central Time) on August 22, 2025** (the "***Objection Deadline***"). Any objections to the adequacy of the Disclosure Statement and/or confirmation of the Plan shall: (a) be in writing; (b) conform to the applicable Bankruptcy Rules and the Bankruptcy Local Rules; (c) set forth the name of the objecting party, the basis for the objection, and the specific grounds thereof; and (d) be filed with the Clerk of the Court no later than the Objection Deadline.

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

The Confirmation Hearing is scheduled to commence **on September 8, 2025 at 1:00 p.m. (Prevailing Central Time)** before Judge Christopher M. Lopez of the United States Bankruptcy Court, Southern District of Texas, 4th Floor, Courtroom 401, 515 Rusk Street, Houston, Texas

77002.  **The Confirmation Hearing may be continued by the Court or by the Debtors without further notice other than by announcement of the same in open court and/or by filing and serving a notice of adjournment.**

In the event of a timely filed objection that is not settled by the parties, the Court shall hear such objection at the Confirmation Hearing or on a later date as may be fixed by the Court.

Copies of the documents included in the Plan Supplement or the Plan, or any other document filed in the Chapter 11 Cases, may be obtained free of charge by visiting the website maintained by the Debtors' claims and noticing agent, Epiq Corporate Restructuring LLC, at https://dm.epiq11.com/Wolfspeed.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases through the Court's electronic case filing system at https://www.txs.uscourts.gov/page/bankruptcy-court using a PACER password (to obtain a PACER password, go to the PACER website at http://pacer.psc.uscourts.gov).

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT BY (A) CALLING (888) 818-4267 OR NON U.S./CANADA AT +1 (971) 606-5246, OR (B) EMAILING WOLFSPEED@EPIQGLOBAL.COM.  <u>PLEASE NOTE THAT THE NOTICE AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE</u>.**

Dated:  August 12, 2025
       Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
       ashleyharper@hunton.com
       pguffy@hunton.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Keith A. Simon (NY Bar No. 4636007)
Eric L. Einhorn (NY Bar No. 5568845)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:  ray.schrock@lw.com
       alex.welch@lw.com
       keith.simon@lw.com
       eric.einhorn@lw.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on August 12, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

<u>*/s/ Timothy A. ("Tad") Davidson II*</u>
Timothy A. ("Tad") Davidson II

## EXHIBIT A

### Schedule of Retained Causes of Action

In accordance with and as provided by section 1123(b) of the Bankruptcy Code, Article 10.8 of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate*, dated June 30, 2025 [Docket No. 8] (including any exhibits, schedules, and supplements thereto, and as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "***Plan***")[1] and the Confirmation Order, and except as otherwise set forth herein and in the Plan, any and all claims or Causes of Action of the Debtors, whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated herein, and such rights to commence, pursue, prosecute, and/or settle such claims or Causes of Action (including, without limitation, any Avoidance Action, preference, or other claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, but excluding any claim against any Released Party released pursuant to Article 10.6(a) of the Plan) (collectively, the "***Retained Causes of Action***") shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors shall retain and may enforce in their sole discretion all rights to commence, pursue, prosecute, and/or settle, as appropriate, each of the Retained Causes of Action.

To the extent provided by Article 10.8 of the Plan and the Confirmation Order, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order in the Chapter 11 Cases, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan.

**No Person or Entity (other than the Released Parties) may rely on the absence of a specific reference in the Confirmation Order, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.[2]**

In accordance with section 1123(b)(3) of the Bankruptcy Code and Article 10.1 of the Plan, except as otherwise provided in the Plan, herein, or in the Confirmation Order, any Causes of

---

[1]    Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

[2]    The Special Investigation Committee's Independent Investigation is ongoing, and for the avoidance of doubt, the Debtors reserve the right to modify this Schedule of Retained Causes of Action.

Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine, initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Any claim or Cause of Action that is not expressly released under the Plan[3] is deemed retained by the Reorganized Debtors, including the following:

- claims related to insurance contracts, insurance policies, occurrence policies and occurrence contracts, in each case, to which any Debtor is or was a party or pursuant to which any Debtor or any of its Related Parties has any rights whatsoever including, but not limited to, (a) indemnity, contribution, reimbursement, overpayment of premiums and fees and (b) Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, overpayment of premiums and fees, breach of contract, or any other matters;

- claims related to tax obligations and refunds, including, without limitation, claims against or related to all Entities that owe or that may in the future owe money related to tax refunds, credits (including, but not limited to, section 48D tax credits), overpayments, recoupments, offsets, disputes, rebates, offsets, incentives, exemptions, or other claims that may be due and owing to the Debtors or the Reorganized Debtors, as applicable. Furthermore, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all claims against or related to all entities who assert or may assert that the Debtors owe tax obligations;

- claims, defenses, cross-claims, indemnification, third-party claims, and counterclaims related to litigation and possible litigation, as well as all claims against or related to all Entities that are party to or that may in the future become party to arbitration or any other type of adversarial dispute resolution proceeding, whether formal or informal, or judicial or nonjudicial, regardless of whether such proceeding is disclosed in the Debtors' schedules of assets and liabilities and statements of financial affairs (if any) filed in the Chapter 11 Cases and regardless of whether such entity is identified in the Plan, the Plan Supplement, or any amendments thereto, including, without limitation, all actual or potential (a) contract and tort actions that may exist or subsequently arise; (b) actions relating to environmental and product liability matters; (c) actions arising out of, or relating to, the Debtors' or Reorganized Debtors', as applicable, intellectual property rights; and (d) actions relating to any conduct that constitutes fraud. For the avoidance of doubt, nothing herein shall be read as an admission as to the validity or allowance of any claim against any Debtor, and

---

[3]   For the avoidance of doubt, any Cause of Action against any Released Party subject to Article 10.6(a) of the Plan shall be deemed expressly released under the Plan. In the event of a conflict between the terms of the Plan and this Schedule of Retained Causes of Action, the terms of the Plan shall control; if any conflict remains thereafter, it shall be resolved in favor of the claim or Cause of Action being deemed released rather than retained by the Reorganized Debtors.

any and all prepetition claims against the Debtors that may be identified herein shall be treated in accordance with the Plan and the Bankruptcy Code;

- claims related to any and all contracts and leases to which the Debtors have any rights whatsoever, including, but not limited to, any Executory Contracts or Unexpired Leases. Furthermore, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all claims against or related to vendors, dealers, suppliers of goods or services, customers, or any other parties or Persons: (a) for prepayments, credits, overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens; (f) counter-claims and defenses related to any contractual obligations; (g) any turnover actions arising under Sections 542 or 543 of the Bankruptcy Code; and (h) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims;

- claims based in whole or in part upon tort against any entity;

- claims related to all entities that owe or that may in the future owe money to the Debtors or the Reorganized Debtors, as applicable, regardless of whether such entity is expressly identified in the Plan, the Plan Supplement, or any amendments thereto, including claims for late or denied payments. Furthermore, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all claims against or related to all entities who assert or may assert that the Debtors or Reorganized Debtors owe money to them;

- claims related to postings of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral regardless of whether such posting of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral is specifically identified herein;[4]

- claims related to liens regardless of whether such lien is specifically identified herein;

- related party claims and Intercompany Claims;

---

[4]   For the avoidance of doubt, the Debtors reserve all rights with respect to any deposit provided in accordance with the *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers; (II) Establishing Procedures for Resolving Objections by Utility Providers; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* [Docket No. 69] or otherwise provided as "adequate assurance of payment" (as that term is used by section 366 of the Bankruptcy Code).

- claims, defenses, appeals, cross-claims, and counterclaims related to any claims or actions asserted by any Governmental Unit;

- claims related to grants payable by any Governmental Unit, including, without limitation, related to the Creating Helpful Incentives to Produce Semiconductors for America (CHIPS) Act, the New York State Urban Development Corporation, and the Siler City Finance Department;

- equitable subordination claims against any Holders of Claims;

- claims related to current or former employee matters (other than those released pursuant to the Plan), including any claims against current or former employees and claims against any providers or administrators in connection with any compensation or benefit programs of the Debtors;

- claims related to environmental matters, including claims, defenses, appeals, cross-claims, and counterclaims against any environmental regulator or any other Entity asserting environmental claims against the Debtors and any Entity that may be liable, co-liable, or required to indemnify the Debtors in connection with any environmental matters;

- claims related to avoidance actions, preferences, or other claims arising under chapter 5 of the Bankruptcy Code, including, without limitation, sections 502, 510, 542, 544, 547–553, and 724(a) of the Bankruptcy Code;

- claims related to Claims objections, including any Claim filed against the Debtor in the Chapter 11 Cases and all rights of setoff or other legal or equitable rights and defenses with respect to any Claim; and

- all other Causes of Action.

**The Debtors reserve all rights to amend, supplement, or otherwise modify this <u>Exhibit A</u> to the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.**

## EXHIBIT B

### Schedule of Rejected Executory Contracts and Unexpired Leases

The Debtors hereby provide notice that, pursuant to section 365 of the Bankruptcy Code, the Debtors propose to reject the Executory Contracts listed on the rejection schedule below (the "***Rejection Schedule***") as of the Petition Date (if any).

The Plan Supplement Documents, or portions thereof, remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  Subject to the terms and conditions set forth in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "***Plan***")[1] and the Restructuring Support Agreement, the Debtors reserve the right to amend or supplement this **Exhibit B**, and any of the documents and designations contained herein, as provided for by the Plan or by order of the Court.

The Debtors' listing of an Executory Contract or Unexpired Lease on the Rejection Schedule shall not be deemed or construed as (a) a promise by the Debtors to seek the rejection of such contract or lease; (b) a limitation or waiver on the Debtors' ability to amend, modify or supplement the Rejection Schedule; (c) a limitation or waiver on the Debtors' ability to seek, assume, or reject any Executory Contract or Unexpired Lease; or (d) an admission that any potential Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.  Moreover, the Debtors explicitly reserve their rights, in their sole discretion, to reject or assume each Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code and nothing herein (a) alters in any way the prepetition nature of such agreements or the validity, priority, or amount of any claims of a counterparty such agreements against the Debtors that may arise under such agreements, (b) creates a postpetition contract or agreement, or (c) elevates to administrative expense priority any claims of a counterparty to an Executory Contract or Unexpired Lease against the Debtors that may arise under such agreements. Any General Unsecured Claim for rejection of Executory Contracts or Unexpired Leases that the Debtors elect to reject shall be treated in accordance with the Plan and applicable provisions of the Bankruptcy Code.

The Debtors reserve all their rights, claims, and causes of action with respect to the Executory Contracts listed on the Rejection Schedule, including the right to amend, revise, or supplement the Rejection Schedule for any reason whatsoever, including based on objections received to Article VIII of the Plan or otherwise.

---

[1]   Capitalized terms used but not defined herein have the meanings given to them in the Plan.

**Rejection Schedule**

None.

# EXHIBIT C

**Intercreditor Agreements**

**<u>EXHIBIT C-1</u>**

**1L/2L Intercreditor Agreement**

*[Plan Supplement Filing Version 8/12/2025]*

***DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT***

## FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT

dated as of

[__], 2025

among

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,

as First Lien Notes Trustee, as First Lien Collateral Agent and as First-Priority Collateral Agent,

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,

as Second Lien Convertible Notes Trustee and as Second Lien Convertible Notes Collateral Agent,

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,

as Second Lien Renesas Convertible Notes Trustee and as Second Lien Renesas Convertible Notes Collateral Agent,

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,

as Second Lien Non-Convertible Notes Trustee and as Second Lien Non-Convertible Notes Collateral Agent,

and

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,

as initial Controlling Second-Priority Collateral Agent,

and

WOLFSPEED, INC.

# TABLE OF CONTENTS

**Page**

**Section 1.**    Definitions ...........................................................................2

    *1.1*    Defined Terms .........................................................................2

    *1.2*    Terms Generally .....................................................................11

**Section 2.**    Lien Priorities .......................................................................12

    *2.1*    Subordination of Liens ..........................................................12

    *2.2*    Prohibition on Contesting Liens ............................................12

    *2.3*    No New Liens .........................................................................13

    *2.4*    Perfection of Liens ................................................................13

    *2.5*    Nature of First-Priority Obligations ......................................14

    *2.6*    Certain Cash Collateral .........................................................14

    *2.7*    Second-Priority Collateral Documents ..................................14

**Section 3.**    Enforcement ..........................................................................15

    *3.1*    Exercise of Remedies ...........................................................15

    *3.2*    Cooperation ...........................................................................17

    *3.3*    Second-Priority Representatives and Second-Priority Secured Parties Waiver .17

**Section 4.**    Payments ...............................................................................18

    *4.1*    Application of Proceeds .........................................................18

    *4.2*    Payments Over ......................................................................18

**Section 5.**    Other Agreements .................................................................19

    *5.1*    Releases .................................................................................19

    *5.2*    Insurance ...............................................................................20

    *5.3*    Amendments. ........................................................................20

    *5.4*    Rights as Unsecured Creditors ..............................................22

    *5.5*    First-Priority Representatives as Gratuitous Bailees/Agents for Perfection .......23

    *5.6*    Controlling Second-Priority Collateral Agent as Gratuitous Bailee/Agent  for Perfection ..........................................................................25

    *5.7*    When Discharge of First-Priority Obligations Deemed to Not Have Occurred .26

    *5.8*    No Release if Event of Default ..............................................27

    *5.9*    Purchase Right .......................................................................27

**Section 6.**    Insolvency or Liquidation Proceedings .................................29

    *6.1*    Financing Issues ....................................................................29

    *6.2*    Relief from the Automatic Stay .............................................30

*6.3*      Adequate Protection......................................................................................30

*6.4*      Preference Issues ........................................................................................31

*6.5*      Application ..................................................................................................32

*6.6*      506(c) Claims..............................................................................................32

*6.7*      Reorganization Securities ...........................................................................32

*6.8*      Voting ..........................................................................................................32

*6.9*      Post-Petition Interest...................................................................................32

*6.10*    Separate Grants of Security and Separate Classifications. ..................32

**Section 7.**      Reliance; Waivers; etc ...............................................................33

*7.1*      Reliance .......................................................................................................33

*7.2*      No Warranties or Liability...........................................................................33

*7.3*      Obligations Unconditional...........................................................................34

**Section 8.**      Miscellaneous .............................................................................35

*8.1*      Conflicts......................................................................................................35

*8.2*      Continuing Nature of this Agreement; Severability ...................................35

*8.3*      Amendments; Waivers..................................................................................35

*8.4*      Information Concerning Financial Condition of the Company and its Subsidiaries..................................................................................................36

*8.5*      Subrogation ..................................................................................................37

*8.6*      Application of Payments...............................................................................37

*8.7*      Consent to Jurisdiction; Waivers ................................................................37

*8.8*      Notices .........................................................................................................37

*8.9*      Further Assurances ......................................................................................38

*8.10*    Governing Law ............................................................................................38

*8.11*    Binding on Successors and Assigns ............................................................38

*8.12*    Specific Performance ..................................................................................38

*8.13*    Section Titles ...............................................................................................38

*8.14*    Counterparts ................................................................................................38

*8.15*    Authorization ...............................................................................................39

*8.16*    No Third Party Beneficiaries; Successors and Assigns ..............................39

*8.17*    Effectiveness ................................................................................................39

*8.18*    First-Priority Representatives and Second-Priority Representatives.................39

*8.19*    Relative Rights.............................................................................................40

*8.20*    Collateral Agents ........................................................................................40

*8.21*    Joinder Requirements ..................................................................................41

*8.22*    Intercreditor Agreements ............................................................................41

**Exhibits and Annexes**

Annex I          Consent of Subsidiary Grantors
Exhibit A        Form of Joinder Agreement (Other First-Priority Obligations)
Exhibit B        Form of Joinder Agreement (Other Second-Priority Obligations)

**FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT**

FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT, dated as of [__], 2025 (the "***Effective Date***"), among U.S. Bank Trust Company, National Association ("***U.S. Bank***"), as First Lien Notes Trustee and as First Lien Collateral Agent, U.S. Bank, as Second Lien Convertible Notes Trustee and Second Lien Convertible Notes Collateral Agent, U.S. Bank, as Second Lien Renesas Convertible Notes Trustee and Second Lien Renesas Convertible Notes Collateral Agent, U.S. Bank, as Second Lien Non-Convertible Notes Trustee and Second Lien Non-Convertible Notes Collateral Agent, U.S. Bank, as initial Controlling Second-Priority Collateral Agent and Wolfspeed, Inc., a [Delaware] corporation (the "***Company***"), and as consented to by the Subsidiary Grantors in the Consent of Subsidiary Grantors.

A.     The Company, certain Subsidiaries of the Company party thereto from time to time, and U.S. Bank, as First Lien Notes Trustee and First Lien Collateral Agent, are party to that certain Indenture, dated as of the Effective Date, governing the Company's Senior Secured Notes due 2030 (as amended, restated, amended and restated, supplemented, replaced, refinanced, extended or otherwise modified from time to time, the "***First Lien Indenture***"). The Obligations of the Company and certain of its Subsidiaries under the First Lien Indenture and the First Lien Note Documents constitute First-Priority Obligations hereunder.

B.     The Company, certain of its Subsidiaries, the Second Lien Convertible Notes Trustee, Second Lien Convertible Notes Collateral Agent, and others are party to that certain Indenture (Convertible Notes), dated as of the Effective Date (as amended, restated, amended and restated, supplemented, replaced, refinanced, extended or otherwise modified from time to time, the "***Second Lien Convertible Notes Indenture***"). The Obligations of the Company and certain of its Subsidiaries under the Second Lien Convertible Notes Indenture and the other Second Lien Convertible Notes Documents constitute Second-Priority Convertible Notes Obligations hereunder.

C.     The Company, certain of its Subsidiaries, the Second Lien Renesas Convertible Notes Trustee, the Second Lien Renesas Notes Collateral Agent and others are party to that certain Indenture, dated as of the Effective Date (as amended, restated, amended and restated, supplemented, replaced, refinanced, extended or otherwise modified from time to time, the "***Second Lien Renesas Convertible Notes Indenture***"). The Obligations of the Company and certain of its Subsidiaries under the Second Lien Renesas Convertible Notes Indenture and the other Second Lien Renesas Convertible Notes Documents constitute Second-Priority Renesas Convertible Notes Obligations hereunder.

D.     The Company, certain of its Subsidiaries, the Second Lien Non-Convertible Notes Trustee, the Second Lien Non-Convertible Collateral Agent and others are party to that certain Indenture (Non-Convertible Notes), dated as of the Effective Date (as amended, restated, amended and restated, supplemented, replaced, refinanced, extended or otherwise modified from time to time, the "***Second Lien Non-Convertible Notes Indenture***"). The Obligations of the Company and certain of its Subsidiaries under the Second Lien Non-Convertible Notes Indenture and the other Second Lien Non-Convertible Notes Documents constitute Second-Priority Non-Convertible Notes Obligations hereunder.

E.      The Grantors may from time to time become parties to Other First-Priority Documents and/or Other Second-Priority Documents.

Accordingly, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.**      Definitions.[1]

*1.1*      Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"***Agreement***" means this First Lien/Second Lien Intercreditor Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"***Bankruptcy Code***" means Title 11 of the United States Code, as now or hereinafter in effect.

"***Bankruptcy Law***" means the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"***Collateral Agent***" means the First-Priority Collateral Agent or any Second-Priority Collateral Agent, as applicable.

"***Common Collateral***" means all of the assets of any Grantor with respect to which a Lien is granted or purported or required to be granted as security for one or more Series of First-Priority Obligations and one or more Series of Second-Priority Obligations.

"***Company***" has the meaning set forth in the preamble.

"***Comparable Second-Priority Collateral Document***" means, in relation to any Common Collateral subject to any Lien created under any First-Priority Collateral Document, those Second-Priority Collateral Documents that create a Lien on the same Common Collateral, granted by the same Grantor.

"***Consent of Subsidiary Grantors***" means the Consent of Subsidiary Grantors in the form of <u>Annex I</u> attached hereto.

"***Controlled***" means, with respect to any Person at any time, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Controlling Second-Priority Collateral Agent***" means the "Controlling Collateral Agent" under the Equal Priority Intercreditor Agreement.

---

[1]      **Note to Draft**: The document will be scrubbed for the correct defined terms prior to execution.

"***Controlling Second-Priority Secured Parties***" means the "Controlling Secured Parties" under the Equal Priority Intercreditor Agreement.

"***Deposit Account***" has the meaning set forth in the Uniform Commercial Code.

"***Deposit Account Collateral***" means that part of the Common Collateral (if any) comprised of or contained in Deposit Accounts or Securities Accounts.

"***DIP Financing***" has the meaning set forth in Section 6.1.

"***Discharge of First-Priority Obligations***" means, except to the extent otherwise provided in Section 5.7 and Section 6.4, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations, in each case, to the extent no claim has been made) of (a) all Obligations in respect of all outstanding First-Priority Obligations and, with respect to letters of credit or letter of credit guaranties outstanding thereunder, delivery of cash collateral or backstop letters of credit in respect thereof in compliance with the First-Priority Debt Documents, in each case after or concurrently with the termination of all commitments to extend credit thereunder and (b) any other First-Priority Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid; <u>provided</u>, that the Discharge of First-Priority Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First-Priority Obligations that constitute an exchange or replacement for or a refinancing of such First-Priority Obligations.

"***Effective Date***" shall have the meaning set forth in the recitals.

"***Equal Priority Intercreditor Agreement***" means that certain Equal Priority Intercreditor Agreement, dated as of the Effective Date, by and among the Company, the subsidiaries of the Company party thereto, the initial Controlling Collateral Agent, each Second-Priority Representative, and each Second-Priority Collateral Agent.

"***First Lien Collateral Agreement***" means that certain Collateral Agreement, dated as of the Effective Date, among the Company, each other Subsidiary of the Company from time to time party thereto, and the First Lien Collateral Agent, as amended, restated, amended and restated, supplemented, replaced or modified from time to time.

"***First Lien Collateral Agent***" means U.S. Bank, in its capacity as collateral agent for the First Lien Note Secured Parties and the other "Secured Parties" (as defined in the First Lien Collateral Agreement), together with its successors and permitted assigns in such capacity.

"***First Lien Collateral Documents***" means the First Lien Collateral Agreement and any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any First Lien Note Obligations and other "Secured Obligations" (as defined in the First Lien Collateral Agreement), including the other "Security Documents" (as defined in the First Lien

Indenture) in respect of the First Lien Note Obligations and any similar defined term as defined in such Other First-Priority Documents.

"*First Lien Indenture*" shall have the meaning set forth in the recitals.

"*First Lien Notes*" means the Company's Senior Secured Notes due 2030 issued pursuant to the First Lien Indenture.

"*First Lien Note Documents*" means the First Lien Indenture, the First Lien Collateral Documents and the other "Note Documents" as defined in the First Lien Indenture.

"*First Lien Note Obligations*" means all "Note Obligations" (as such term is defined in the First Lien Indenture).

"*First Lien Note Secured Parties*" means the "Secured Parties" as defined in the First Lien Indenture.

"*First Lien Notes Trustee*" means U.S. Bank in its capacity as trustee under the First Lien Indenture, and its permitted successors and assigns in such capacity.

"*First-Priority Collateral*" means all of the assets of any Grantor with respect to which a Lien is granted as security for one or more Series of First-Priority Obligations pursuant to any First-Priority Collateral Document.

"*First-Priority Collateral Agent*" means the First Lien Collateral Agent (or if there is more than one First-Priority Debt Document, the First Lien Collateral Agent or such Other First-Priority Collateral Agent, as applicable, as is designated "First-Priority Collateral Agent" for purposes of this Agreement by the First-Priority Secured Parties pursuant to the terms of the First-Priority Documents, including pursuant to any intercreditor (or similar) agreement as among the First-Priority Secured Parties or their respective representatives); it being understood that as of the date of this Agreement, the First Lien Collateral Agent is the First-Priority Collateral Agent.

"*First-Priority Collateral Documents*" means (a) the First Lien Collateral Documents and (b) any other documents entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Series of First-Priority Obligations.

"*First-Priority Debt Documents*" means (a) the First Lien Indenture and (b) any Other First-Priority Documents.

"*First-Priority Documents*" means (a) the First Lien Note Documents and (b) the Other First-Priority Documents.

"*First-Priority Lien*" means any Lien on any assets of the Company or any other Grantor securing any Series of First-Priority Obligations.

"*First-Priority Obligations*" means (a) the First Lien Note Obligations and (b) the Other First-Priority Obligations.

["**First-Priority Obligations Cap**" means, as of any date of determination $1,830,000,000]² [plus/minus] (b) [_____]]³.

"**First-Priority Representatives**" means (a) in the case of the First Lien Note Obligations, the First Lien Notes Trustee and the First Lien Collateral Agent and (b) in the case of any Series of Other First-Priority Obligations or a separate facility within such series, the Other First-Priority Representatives with respect thereto.

"**First-Priority Secured Parties**" means (a) the First Lien Note Secured Parties and (b) the Other First-Priority Secured Parties, including the First-Priority Representatives.

"**Grantors**" means each of the Company and such of the Subsidiaries of the Company that, in each case, has granted a lien on its assets to secure one or more Series of First-Priority Obligations and one or more Series of Second-Priority Obligations.

"**Insolvency or Liquidation Proceeding**" means (a) any voluntary or involuntary case or proceeding under any Bankruptcy Law with respect to any Grantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to any of its assets, (c) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy (except for any voluntary liquidation, dissolution or other winding up to the extent permitted by the applicable First-Priority Documents and Second-Priority Documents) or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar monetary encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; provided, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"**Obligations**" means any principal, interest, premiums, fees, expenses (including any interest, premiums, fees and expenses accruing after the commencement of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such proceeding), penalties, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any indebtedness.

"**Other First-Priority Collateral Agent**" means, with respect to any Series of Other First-Priority Obligations or any separate facility within such Series, any agent,

---

[2]     **Note to Draft**: Equal to 120% of First Priority Obligations as of the date of this Agreement.

[3]     **Note to Draft**: Subject to ongoing negotiation.

5

trustee, collateral agent or other applicable representative that acts in the capacity of a collateral agent (or its equivalent) with respect thereto (which, with respect to any Other First-Priority Obligations that are secured under the First Lien Collateral Documents, shall be the First Lien Collateral Agent).

"**Other First-Priority Documents**" means each of the agreements, documents and instruments providing for, evidencing or securing any Other First-Priority Obligations and any other related document or instrument executed or delivered pursuant to any Other First-Priority Document at any time or otherwise evidencing or securing any indebtedness arising under any Other First-Priority Document.

"**Other First-Priority Obligations**" means any other indebtedness or Obligations (other than First Lien Note Obligations) of the Grantors that are to be secured with a Lien on the Common Collateral senior to the Liens securing the Second-Priority Obligations and are designated by the Company as Other First-Priority Obligations hereunder; provided, however, that the requirements set forth in Section 8.21 shall have been satisfied.

"**Other First-Priority Representative**" means, with respect to any Series of Other First-Priority Obligations or any separate facility within such Series, the Persons elected, designated or appointed as the administrative agent, trustee, collateral agent and/or other representative of such Series or facility by or on behalf of the holders of such Series or facility, and its respective successors in substantially the same capacity as may from time to time be appointed (which, with respect to any Other First-Priority Obligations that are secured under the First Lien Collateral Documents, shall include the First Lien Collateral Agent), and in each case except in the case of the First Lien Collateral Agent, who has executed and delivered a Joinder Agreement.

"**Other First-Priority Secured Parties**" means any other Persons holding Other First-Priority Obligations, including the Other First-Priority Representatives.

"**Other Second-Priority Collateral Agent**" means, with respect to any Series of Other Second-Priority Obligations or any separate facility within such Series, any agent, trustee, collateral agent or other applicable representative that acts in the capacity of a collateral agent (or its equivalent) with respect thereto, and in each case, who has executed and delivered a Joinder Agreement to this Agreement.

"**Other Second-Priority Documents**" means each of the agreements, documents and instruments providing for, evidencing or securing any Other Second-Priority Obligations and any other related document or instrument executed or delivered pursuant to any Other Second-Priority Document at any time or otherwise evidencing or securing any indebtedness arising under any Second-Priority Obligations.

"**Other Second-Priority Obligations**" means any other indebtedness or Obligations (other than the Second Lien Convertible Notes Obligations, Second Lien Renesas Convertible Notes Obligations and the Second Lien Non-Convertible Notes Obligations) of the Grantors that are to be secured with a Lien on the Common Collateral junior to the Liens securing the First-Priority Obligations and are designated by the

Company as Other Second-Priority Obligations hereunder; provided, however, that the requirements set forth in Section 8.21 shall have been satisfied.

"**Other Second-Priority Representative**" means, with respect to any Series of Other Second-Priority Obligations or any separate facility within such Series, the Persons elected, designated or appointed as the administrative agent, trustee, collateral agent and/or other representative of such Series or facility by or on behalf of the holders of such Series or facility, and its respective successors in substantially the same capacity as may from time to time be appointed, and in each case, who has executed and delivered a Joinder Agreement to this Agreement.

"**Other Second-Priority Secured Parties**" means any other Persons holding Other Second-Priority Obligations, including the Other Second-Priority Representatives.

"**Person**" or "**person**" means any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"**Pledged Collateral**" means the Common Collateral in the possession of the First-Priority Collateral Agent (or its agents or bailees), to the extent that possession thereof is necessary to perfect a Lien thereon under the Uniform Commercial Code.

"**Recovery**" has the meaning set forth in Section 6.4.

"**Representatives**" means any of the First-Priority Representatives or Second-Priority Representatives, as applicable.

"**Required Parties**" means, with respect to any First-Priority Debt Document, those First-Priority Secured Parties the approval of which is required to approve an amendment or modification of, termination or waiver of any provision of or consent to any departure from such First-Priority Debt Document (or would be required to effect such consent under this Agreement if such consent were treated as an amendment of such First-Priority Debt Document).

"**Second Lien Convertible Notes Collateral Agent**" means U.S. Bank, in its capacity as collateral agent for the Second Lien Convertible Note Secured Parties and the other "Secured Parties" (as defined under the Second Lien Convertible Notes Collateral Agreement), together with its successors and permitted assigns in such capacity.

"**Second Lien Convertible Notes Collateral Agreement**" means the Second Lien Convertible Notes Collateral Agreement, dated as of the Effective Date, among the Company, each other Subsidiary of the Company from time to time party thereto, and the Second Lien Convertible Notes Collateral Agent, as amended, restated, amended and restated, supplemented, replaced or modified from time to time.

"**Second Lien Convertible Notes Indenture**" has the meaning set forth in the recitals.

"**Second Lien Convertible Notes Collateral Documents**" means the Second Lien Convertible Notes Collateral Agreement and any other documents now existing or

7

entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Second Lien Convertible Notes Obligations or other "Secured Obligations" (as defined in the Second Lien Convertible Notes Collateral Agreement), including the other "Notes Security Documents" (as defined in the Second Lien Convertible Notes Indenture) in respect of the Second Lien Convertible Notes Obligations.

"***Second Lien Convertible Notes Documents***" means the Second Lien Convertible Notes Indenture, the Second Lien Convertible Notes Collateral Documents and the other "Indenture Documents" as defined in the Second Lien Convertible Notes Indenture.

"***Second Lien Convertible Notes Obligations***" means all "Obligations" (as such term is defined in the Second Lien Convertible Notes Indenture).

"***Second Lien Convertible Notes Secured Parties***" means the "[Secured Parties]" as defined in the [Second Lien Convertible Notes Indenture].

"***Second Lien Convertible Notes Trustee***" means U.S. Bank, in its capacity as trustee under the Second Lien Convertible Notes Indenture, and its permitted successors and assigns in such capacity.

"***Second Lien Non-Convertible Notes Collateral Agent***" means U.S. Bank, in its capacity as collateral agent for the Second Lien Non-Convertible Note Secured Parties and the other "Secured Parties" (as defined under the [Second Lien Non-Convertible Notes Collateral Agreement]), together with its successors and permitted assigns in such capacity.

"***Second Lien Non-Convertible Notes Collateral Agreement***" means the Second Lien Non-Convertible Notes Collateral Agreement, dated as of the Effective Date, among the Company, each other Subsidiary of the Company from time to time party thereto, and the Second Lien Non-Convertible Notes Collateral Agent, as amended, restated, amended and restated, supplemented, replaced or modified from time to time.

"***Second Lien Non-Convertible Notes Indenture***" has the meaning set forth in the recitals.

"***Second Lien Non-Convertible Notes Collateral Documents***" means the Second Lien Non-Convertible Notes Collateral Agreement and any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Second Lien Non-Convertible Notes Obligations or other "Secured Obligations" (as defined in the [Second Lien Non-Convertible Notes Collateral Agreement]), including the other "Notes Security Documents" (as defined in the Second Lien Non-Convertible Notes Indenture) in respect of the Second Lien Non-Convertible Notes Obligations.

"***Second Lien Non-Convertible Notes Documents***" means the Second Lien Non-Convertible Notes Indenture, the Second Lien Non-Convertible Notes Collateral Documents and the other "Indenture Documents" as defined in the Second Lien Non-Convertible Notes Indenture.

"***Second Lien Non-Convertible Notes Obligations***" means all "Obligations" (as such term is defined in the Second Lien Non-Convertible Notes Indenture).

"***Second Lien Non-Convertible Notes Secured Parties***" means the "[Secured Parties]" as defined in the [Second Lien Non-Convertible Notes Indenture].

"***Second Lien Non-Convertible Notes Trustee***" means U.S. Bank, in its capacity as trustee under the Second Lien Non-Convertible Notes Indenture, and its permitted successors and assigns in such capacity.

"***Second Lien Renesas Convertible Notes Collateral Agent***" means U.S. Bank, in its capacity as collateral agent for the Second Lien Renesas Convertible Notes Secured Parties and the other "Secured Parties" (as defined under the [Second Lien Renesas Convertible Notes Collateral Agreement]), together with its successors and permitted assigns in such capacity.

"***Second Lien Renesas Convertible Notes Collateral Agreement***" means the Second Lien Renesas Convertible Notes Collateral Agreement, dated as of the Effective Date, among the Company, each other Subsidiary of the Company from time to time party thereto, and the Second Lien Renesas Convertible Notes Collateral Agent, as amended, restated, amended and restated, supplemented, replaced or modified from time to time.

"***Second Lien Renesas Convertible Notes Indenture***" has the meaning set forth in the recitals.

"***Second Lien Renesas Convertible Notes Collateral Documents***" means the Second Lien Renesas Convertible Notes Collateral Agreement and any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Second Lien Renesas Convertible Notes Obligations or other "Secured Obligations" (as defined in the [Second Lien Renesas Convertible Notes Collateral Agreement]), including the other "Notes Security Documents" (as defined in the Second Lien Renesas Convertible Notes Indenture) in respect of the Second Lien Renesas Convertible Notes Obligations.

"***Second Lien Renesas Convertible Notes Documents***" means the Second Lien Renesas Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Collateral Documents and the other "Indenture Documents" as defined in the Second Lien Renesas Convertible Notes Indenture.

"***Second Lien Renesas Convertible Notes Obligations***" means all "Obligations" (as such term is defined in the Second Lien Renesas Convertible Notes Indenture).

"***Second Lien Renesas Convertible Notes Secured Parties***" means the "[Secured Parties]" as defined in the [Second Lien Renesas Convertible Notes Indenture].

"***Second Lien Renesas Convertible Notes Trustee***" means U.S. Bank, in its capacity as trustee under the Second Lien Renesas Convertible Notes Indenture, and its permitted successors and assigns in such capacity.

"***Second-Priority Collateral***" means all of the assets of any Grantor with respect to which a Lien is granted as security for one or more Series of Second-Priority Obligations pursuant to any Second-Priority Collateral Document.

"***Second-Priority Collateral Agent***" means each of the Second Lien Convertible Notes Collateral Agent, Second Lien Renesas Convertible Notes Collateral Agent, Second Lien Non-Convertible Notes Collateral Agent and each Other Second-Priority Collateral Agent, as applicable.

"***Second-Priority Collateral Documents***" means (a) the Second Lien Convertible Notes Collateral Documents, (b) the Second Lien Renesas Convertible Notes Collateral Documents, (c) the Second Lien Non-Convertible Notes Collateral Documents and (d) any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Series of Second-Priority Obligations.

"***Second-Priority Documents***" means (a) the Second Lien Convertible Notes Documents, (b) the Second Lien Renesas Convertible Notes Documents, (c) the Second Lien Non-Convertible Notes Documents and (d) the Other Second-Priority Documents.

"***Second-Priority Lien***" means any Lien on any assets of the Company or any other Grantor securing any Series of Second-Priority Obligations.

"***Second-Priority Obligations***" means (a) the Second Lien Convertible Notes Obligations, (b) the Second Lien Renesas Convertible Notes Obligations, (c) the Second Lien Non-Convertible Notes Obligations and (d) the Other Second-Priority Obligations.

"***Second-Priority Representatives***" means (a) in the case of the Second Lien Convertible Notes Obligations, the Second Lien Convertible Notes Trustee, (b) in the case of the Second Lien Renesas Convertible Notes Obligations, the Second Lien Renesas Convertible Notes Trustee, (c) in the case of the Second Lien Non-Convertible Notes Obligations, the Second Lien Non-Convertible Notes Trustee, and (d) in the case of any Series of Other Second-Priority Obligations or a separate facility within such series, the Other Second-Priority Representative with respect thereto.  The term "Second-Priority Representatives" shall include each Second-Priority Collateral Agent and the Other Second-Priority Collateral Agents as the context requires.

"***Second-Priority Secured Parties***" means (a) the Second Lien Convertible Notes Secured Parties, (b) the Second Lien Renesas Convertible Notes Secured Parties, (c) the Second Lien Non-Convertible Notes Secured Parties and (d) the Other Second-Priority Secured Parties, including the Second-Priority Representatives.

10

"**Secured Parties**" means the First-Priority Secured Parties and the Second-Priority Secured Parties.

"**Securities Account**" has the meaning set forth in the Uniform Commercial Code.

"**Series**" means (a) the First Lien Note Obligations and each series of Other First-Priority Obligations, each of which shall constitute a separate Series of First-Priority Obligations and (b) the Second Lien Convertible Notes Obligations, the Second Lien Renesas Convertible Notes Obligations, the Second Lien Non-Convertible Notes Obligations and each series of Other Second-Priority Obligations, each of which shall constitute a separate Series Second-Priority Obligations.

"**Subsidiary**" means, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**U.S. Bank**" has the meaning set forth in the preamble.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

*1.2*    Terms Generally.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified in accordance with this Agreement, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (f) any reference to a defined term in the First Lien Indenture, the First Lien Collateral Agreement, the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture, the Second Lien Convertible Notes Collateral Agreement, the Second Lien Renesas Convertible Notes Collateral Agreement, or the Second Lien Non-Convertible Notes Collateral Agreement shall include similar or equivalent defined terms in any document that refinances or replaces the First

11

Lien Indenture, the First Lien Collateral Agreement, the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture, the Second Lien Convertible Notes Collateral Agreement, the Second Lien Renesas Convertible Notes Collateral Agreement, or the Second Lien Non-Convertible Notes Collateral Agreement, as applicable.

**Section 2.**     Lien Priorities.

*2.1*     Subordination of Liens.  Notwithstanding the date, time, manner or order of filing or recordation of any document or instrument or grant, attachment or perfection (including any defect or deficiency or alleged defect or deficiency in any of the foregoing) of any Liens granted to the Second-Priority Secured Parties on the Common Collateral or of any Liens granted to the First-Priority Secured Parties on the Common Collateral and notwithstanding any provision of the UCC, or any applicable law or the Second-Priority Documents or the First-Priority Documents, the fact that any Liens granted to secure the Second-Priority Obligations or any Liens granted to secure any First-Priority Obligations may be subordinated, voided, avoided, invalidated or lapsed, or any other circumstance whatsoever, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, hereby agrees that: (a) any Lien on the Common Collateral securing or purporting to secure any First-Priority Obligations now or hereafter held by or on behalf of the any First-Priority Secured Parties or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall have priority over and be senior in all respects and prior to any Lien on the Common Collateral securing or purporting to secure any Second-Priority Obligations, and (b) any Lien on the Common Collateral securing or purporting to secure any Second-Priority Obligations now or hereafter held by or on behalf of any Second-Priority Secured Parties or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Common Collateral securing or purporting to secure any First-Priority Obligations.  All Liens on the Common Collateral securing or purporting to secure any First-Priority Obligations shall be and remain senior in all respects and prior to all Liens on the Common Collateral securing or purporting to secure any Second-Priority Obligations for all purposes, whether or not such Liens securing or purporting to secure any First-Priority Obligations are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.

*2.2*     Prohibition on Contesting Liens.  Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, and each First-Priority Representative, for itself and on behalf of each applicable First-Priority Secured Party, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, allowability, perfection, priority or enforceability of (a) a Lien securing, or claim asserted with respect to, any First-Priority Obligations held (or purported to be held) by or on behalf of any of the First-Priority Secured Parties or any agent or trustee therefor in any First-Priority Collateral or Common Collateral or under the First-Priority Collateral Documents or (b) a Lien securing, or claim asserted with respect to, any Second-Priority Obligations held (or purported to be held) by or on behalf of any Second-Priority Secured Party in the Common Collateral or under the Second-Priority

12

Collateral Documents, as the case may be; provided, however, that nothing in this Agreement shall be construed to prevent or impair the rights of any First-Priority Secured Party or any agent or trustee therefor to enforce this Agreement (including the priority of the Liens securing the First-Priority Obligations as provided in Section 2.1) or any of the First-Priority Documents.

        *2.3*    No New Liens.

        (a)    So long as the Discharge of First-Priority Obligations has not occurred, the parties hereto agree that, after the date hereof, if any Second-Priority Representative shall hold any Lien on any assets intended to be Common Collateral of the Company or any other Grantor securing any Second-Priority Obligations that are not also subject to the first-priority Lien in respect of the First-Priority Obligations under the First-Priority Documents, such Second-Priority Representative shall notify the First-Priority Collateral Agent promptly upon becoming aware thereof and, upon demand by the First-Priority Collateral Agent or the Company, will, unless the First-Priority Collateral Agent with respect to the First-Priority Obligations has affirmatively rejected such Lien acting at the direction of the Required Parties under each First-Priority Debt Document (1) assign such Lien to the First-Priority Collateral Agent (and/or its designee) as security for the applicable First-Priority Obligations (and, in the case of an assignment, each Second-Priority Representative may retain a junior lien on such assets subject to the terms hereof) and (2) until such assignment or such grant of a similar Lien to the First-Priority Collateral Agent (and/or its designee), shall be deemed to hold and have held such Lien for the benefit of the First-Priority Collateral Agent and the other First-Priority Secured Parties as security for the First-Priority Obligations, subject to the relative priorities in this Agreement. To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First-Priority Representatives and/or the First-Priority Secured Parties, each Second-Priority Representative, on behalf of itself and the applicable Second-Priority Secured Parties, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2. Notwithstanding anything to the contrary herein, no Second-Priority Representative may hold any Lien on any assets or property that constitute "Excluded Property" (as defined in the First Lien Indenture as in effect as of the Effective Date).

        (b)    So long as the Discharge of Second-Priority Obligations has not occurred, the parties hereto agree that, after the date hereof, if any First-Priority Representative shall hold any Lien on any assets intended to be Common Collateral of the Company or any other Grantor securing any First-Priority Obligations that are not also subject to the second-priority Lien in respect of the Second-Priority Obligations under the Second-Priority Documents, such First-Priority Representative shall notify the Controlling Second-Priority Collateral Agent promptly upon becoming aware thereof and shall be deemed to hold and have held such Lien, in accordance with Section 5.6 hereof, for the benefit of each Second-Priority Collateral Agent and the other Second-Priority Secured Parties as security for the Second-Priority Obligations, subject to relative priorities in this Agreement, including Section 2.1.

        *2.4*    Perfection of Liens. Except to the extent set forth in Section 5.5, none of the First-Priority Secured Parties shall be responsible for perfecting and

maintaining the perfection of Liens with respect to the Common Collateral for the benefit of the Second-Priority Secured Parties. The provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First-Priority Secured Parties and the Second-Priority Secured Parties and shall not impose on the First-Priority Secured Parties or the Second-Priority Secured Parties or any agent or trustee therefor any obligations in respect of the disposition of proceeds of any Common Collateral which would conflict with prior perfected claims therein in favor of any other Person or any order or decree of any court or governmental authority or any applicable law.

      *2.5*    Nature of First-Priority Obligations. Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, acknowledges that (a) a portion of the First Lien Note Obligations include certain obligations set forth in the First Lien Note Documents, (b) the terms of the First-Priority Documents and the First-Priority Obligations, or a portion thereof, may be refinanced at any time or from time to time and (c) subject to Section 5.3(c), the aggregate amount of the First-Priority Obligations may be increased, in each case, without notice to or consent by any Second-Priority Representative or the Second-Priority Secured Parties and without affecting the provisions hereof. The Lien priorities provided for in Section 2.1 shall not be altered or otherwise affected by any amendment, supplement or other modification, or any refinancing of either the First-Priority Obligations or the Second-Priority Obligations, or any portion thereof. As between the Grantors and the Second-Priority Secured Parties, the foregoing provisions will not limit or otherwise affect the obligations of the Grantors contained in any Second-Priority Document.

      *2.6*    Certain Cash Collateral. Subject to the First Priority Documents and Second Priority Documents, collateral consisting of cash and deposit account balances pledged to secure First-Priority Obligations consisting of reimbursement obligations in respect of letters of credit or otherwise held by any First-Priority Representative shall be applied as specified in the applicable First-Priority Document and will not constitute Common Collateral.

      *2.7*    Second-Priority Collateral Documents. Notwithstanding in this Agreement or any other Second-Priority Document to the contrary, so long as the Discharge of First-Priority Obligations has not occurred, the parties hereto agree that no Second-Priority Representative or other Second-Priority Secured Party shall demand from any Grantor and no Grantor shall be required to obtain, deliver and/or execute (a) any lender's title insurance (or irrevocable commitment therefor) to insure any real property of any Grantor constituting Common Collateral in favor of any Second-Priority Secured Party, (b) any mortgage, deed of trust or similar instrument in favor of any Second-Priority Representative or any other Second-Priority Secured Party with respect to any fee-owned real property constituting Common Collateral that is acquired by any Grantor after the Effective Date located in a jurisdiction that imposes a mortgage recording tax, documentary tax or similar tax in connection with the filing or recordation of mortgage, deed of trust or other instrument in favor of such Second-Priority Representative or any other Second-Priority Secured Party, or (c) any deposit account control agreements or securities account control agreements to or with any Second-Priority Secured Party in respect of any deposit accounts or securities accounts constituting Common Collateral.  As further set forth in Section 5.5 herein, the First-Priority Collateral Agent agrees to act as bailee for the Second-

Priority Representatives and other Second-Priority Secured Parties for the benefit of such Second-Priority Representatives and other Second-Priority Secured Parties.

**Section 3.** Enforcement.

*3.1* Exercise of Remedies.

(a) So long as the Discharge of First-Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, (i) no Second-Priority Representative or any Second-Priority Secured Party will (x) exercise or seek to exercise any rights or remedies (including setoff or recoupment) with respect to any Common Collateral in respect of any applicable Second-Priority Obligations or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or action brought with respect to the Common Collateral by the First-Priority Collateral Agent or any First-Priority Secured Party in respect of the First-Priority Obligations, the exercise of any right by the First-Priority Collateral Agent or any First-Priority Secured Party (or any agent or sub-agent on their behalf) in respect of the First-Priority Obligations under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any Second-Priority Representative or any Second-Priority Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party, of any rights and remedies relating to the Common Collateral under the First-Priority Documents, or otherwise in respect of First-Priority Obligations, or (z) object to the forbearance by the First-Priority Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Common Collateral in respect of First-Priority Obligations and (ii) until the Discharge of First-Priority Obligations, the First-Priority Collateral Agent and the First-Priority Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including setoff, recoupment, and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Common Collateral without any consultation with or the consent of any Second-Priority Representative or any Second-Priority Secured Party; provided, however, that (A) any Second-Priority Representative and the Second-Priority Secured Parties represented by it may exercise any or all such rights after the passage of a period of 150 days from the occurrence of both (i) an Event of Default (under and as defined in the applicable Second-Priority Documents) and as a result of such Event of Default, the principal and interest under the applicable Second-Priority Documents have become due and payable (whether as a result of acceleration thereof or otherwise) and (ii) the date of delivery of a notice in writing to each First-Priority Representative by such Second-Priority Representative or Second Priority Secured Party, which notice shall specify that each event described in the immediately preceding clause (i) has occurred (the "***Second-Priority Standstill Period***") unless (x) a First-Priority Representative has commenced and is diligently pursuing remedies in good faith with respect to any Common Collateral (or such attempt is stayed by an Insolvency or Liquidation Proceeding), (y) the Grantor that has granted a security interest in such Common Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (z) the acceleration of the applicable Second-Priority Obligations is rescinded in accordance with the terms of the applicable Second-

Priority Documents, and (B) (1) in any Insolvency or Liquidation Proceeding commenced by or against the Company or any other Grantor, each Second-Priority Representative may file a proof of claim or statement of interest with respect to the applicable Second-Priority Obligations, (2) each Second-Priority Representative may take any action (not adverse to the Liens on the Common Collateral securing the First-Priority Obligations, or the rights of either First-Priority Representatives or the First-Priority Secured Parties to exercise remedies in respect thereof) as necessary in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and perfection and priority of its Lien on, the Common Collateral, and (3) in any Insolvency or Liquidation Proceeding commenced by or against the Company or any other Grantor, each Second-Priority Representative may file any necessary or responsive pleadings in opposition to any motion, adversary proceeding or other pleading filed by any Person objecting to or otherwise seeking disallowance of the claim or Lien of such Second-Priority Representative or Second-Priority Secured Party, in each case (B)(1) through (3) above to the extent such action is not inconsistent with, or could not result in a resolution inconsistent with or otherwise in contravention of, the terms of this Agreement. In exercising rights and remedies with respect to the First-Priority Collateral, the First-Priority Secured Parties may enforce the provisions of the First-Priority Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Common Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code or other applicable law of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)      So long as the Discharge of First-Priority Obligations has not occurred, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that it will not take or receive any Common Collateral or any proceeds of Common Collateral in connection with the exercise of any right or remedy (including setoff or recoupment) with respect to any Common Collateral in respect of the applicable Second-Priority Obligations. Without limiting the generality of the foregoing, unless and until the Discharge of First-Priority Obligations has occurred, except as expressly provided in the proviso in clause (ii) of Section 3.1(a), the sole right of the Second-Priority Representatives and the Second-Priority Secured Parties with respect to the Common Collateral is to hold a Lien on the Common Collateral in respect of the applicable Second-Priority Obligations pursuant to the Second-Priority Documents, as applicable, for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First-Priority Obligations has occurred and, except as otherwise specifically provided herein and solely prior to the expiration of the Second-Priority Standstill Period, no Second-Priority Representative or Second Priority Secured Party will be entitled to exercise any rights as a secured creditor, whether in connection with an Insolvency or Liquidation Proceeding or otherwise.

(c)      Subject to the proviso in clause (ii) of Section 3.1(a), (i) each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, agrees that no Second-Priority Representative or Second-Priority Secured Party will take any action that would hinder or delay any exercise of remedies undertaken by any First-Priority Representative or the First-Priority Secured Parties with respect to the

Common Collateral under the First-Priority Documents, including any sale, lease, exchange, transfer or other disposition of the Common Collateral, whether by foreclosure or otherwise, and (ii) each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby waives any and all rights it or any Second-Priority Secured Party may have as a junior lien creditor or otherwise to object to the manner in which any First-Priority Representative or the First-Priority Secured Parties seek to enforce or collect the First-Priority Obligations or the Liens granted in any of the First-Priority Collateral, regardless of whether any action or failure to act by or on behalf of any First-Priority Representative or First-Priority Secured Parties is adverse to the interests of the Second-Priority Secured Parties.

(d)    Each Second-Priority Representative hereby acknowledges and agrees that no covenant, agreement or restriction contained in any applicable Second-Priority Document shall be deemed to restrict in any way the rights and remedies of the First-Priority Collateral Agent or the First-Priority Secured Parties with respect to the First-Priority Collateral as set forth in this Agreement and the First-Priority Documents.

3.2    Cooperation.  Subject to the proviso in clause (ii) of Section 3.1(a), each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that, unless and until the Discharge of First-Priority Obligations has occurred, it will not commence, or join with any Person (other than the First-Priority Secured Parties and the First-Priority Collateral Agent upon the request thereof) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it in the Common Collateral under any of the applicable Second-Priority Documents or otherwise in respect of the applicable Second-Priority Obligations.

3.3    Second-Priority Representatives and Second-Priority Secured Parties Waiver.  Each Second-Priority Representative and the Second-Priority Secured Parties hereby waive any claim they may now or hereafter have against the First-Priority Representatives or any First-Priority Secured Parties arising out of (i) any actions which any First-Priority Representative (or any of its representatives) takes or omits to take (including actions with respect to the creation, perfection or continuation of Liens on any Common Collateral, actions with respect to the foreclosure upon, disposition, release or depreciation of, or failure to realize upon, any of the Common Collateral and actions with respect to the collection of any claim for all or any part of the First-Priority Obligations from any account debtor, guarantor or any other party) in accordance with any relevant First-Priority Collateral Documents or any other agreement related thereto, or to the collection of the First-Priority Obligations or the valuation, use, protection or release of any security for the First-Priority Obligations, (ii) any election by any First-Priority Representative (or any of its agents), in any Insolvency or Liquidation Proceeding, of the application of Section 1111(b) of the Bankruptcy Code (or any similar provision of any other applicable Bankruptcy Law), or (iii) subject to Section 6, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code (or any similar provision of any other applicable Bankruptcy Law) by, the Company or any of its Subsidiaries, as debtor-in-possession.

**Section 4.**     Payments.

*4.1*     Application of Proceeds.  After an Event of Default under (and as defined in) any First-Priority Documents has occurred with respect to which the First-Priority Collateral Agent has provided written notice to each Second-Priority Representative, and until such event of default is cured or waived, so long as the Discharge of First-Priority Obligations has not occurred, the Common Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Common Collateral upon the exercise of remedies, shall be applied by the First-Priority Collateral Agent to the payment of fees, expenses and indemnities incurred by the Representatives and then to each applicable First-Priority Representative to the payment of First-Priority Obligations in such order as specified in the relevant First-Priority Documents until the Discharge of First-Priority Obligations has occurred. Upon the Discharge of First-Priority Obligations, each First-Priority Representative shall deliver promptly to the Controlling Second-Priority Collateral Agent any Common Collateral or proceeds thereof held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Controlling Second-Priority Collateral Agent ratably to the Second-Priority Obligations in such order as specified in the relevant Second-Priority Documents. Whenever a Collateral Agent shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any Obligations of any Series, or the Common Collateral subject to any Lien securing the Obligations of any Series, it may request that such information be furnished to it in writing by each other applicable Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that (a) any information provided by any Collateral Agent as to the Common Collateral subject to any Lien securing such Obligations of any Series may be provided to the knowledge of such Collateral Agent and (b) if a Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Collateral Agent shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company.  Each Collateral Agent may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First-Priority Secured Party or any other Person as a result of such determination

*4.2*     Payments Over.  Any Common Collateral or proceeds thereof received by any Second-Priority Representative or any Second-Priority Secured Party in connection with the exercise of any right or remedy (including setoff or recoupment) relating to the Common Collateral in contravention of this Agreement or (except as otherwise provided in Section 6) in any Insolvency or Liquidation Proceeding, shall be segregated and held in trust for the benefit of and forthwith paid over to the First-Priority Collateral Agent (and/or its designees) for the benefit of the applicable First-Priority Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The First-Priority Collateral Agent is hereby authorized to make any such endorsements as agent for any Second-Priority Representative or any such Second-Priority Secured Party.  This authorization is coupled with an interest and is irrevocable.

**Section 5.**     Other Agreements.

*5.1*     Releases.

(a)     If, at any time any Grantor, the First-Priority Collateral Agent or the holder of any First-Priority Obligation delivers notice to each Second-Priority Representative that any specified Common Collateral (including all or substantially all of the equity interests of a Grantor or any of its Subsidiaries) is sold, transferred or otherwise disposed of (x) by the owner of such Common Collateral in a transaction not prohibited by, or consented to in accordance with, any First-Priority Debt Document or any Second-Priority Document, (y) by way of enforcement by any First-Priority Secured Party under any applicable law, or (z) during the existence of any Event of Default under (and as defined in) the First Lien Indenture or any other First-Priority Debt Document, in the case of this clause (z), to the extent the First-Priority Collateral Agent is exercising remedies or has consented to such sale, transfer or disposition, including a sale pursuant to Section 363 of the Bankruptcy Code or any similar provision in any other applicable Bankruptcy Law, the entry of an order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code or any similar provision in any other applicable Bankruptcy Law, or in connection with the confirmation of a plan of reorganization or a similar dispositive restructuring plan in any Insolvency or Liquidation Proceeding, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the Second-Priority Secured Parties upon such Common Collateral will automatically be released and discharged as and when such Liens on such Common Collateral securing First-Priority Obligations are released and discharged.   Upon delivery to each Second-Priority Representative of a notice from the First-Priority Collateral Agent or the Company stating that any release of Liens securing or supporting the First-Priority Obligations has become effective (or shall become effective upon each First-Priority Representative's release), whether in connection with a sale of such assets by the relevant owner pursuant to the preceding clauses or otherwise, each Second-Priority Representative will promptly execute and deliver such instruments, releases, termination statements or other documents confirming such release on customary terms.  In the case of the sale of all or substantially all of the equity interests of a Grantor or any of its Subsidiaries, the guarantee in favor of the Second-Priority Secured Parties, if any, made by such Grantor or Subsidiary will automatically be released and discharged as and when, but only to the extent, the guarantee by such Grantor or Subsidiary of First-Priority Obligations is released and discharged.

(b)     Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby irrevocably constitutes and appoints (which appointment is coupled with an interest and is irrevocable) the First-Priority Collateral Agent and any officer or agent of the First-Priority Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of each Second-Priority Representative or such Second-Priority Secured Party or in the First-Priority Collateral Agent's own name, from time to time in the First-Priority Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Section 5.1, including any termination statements, endorsements or other instruments of transfer or release.

(c)     Unless and until the Discharge of First-Priority Obligations has occurred, each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby consents to the application, [whether prior to or][4] after an Event of Default (under and as defined in the applicable First-Priority Documents), of Deposit Account Collateral or proceeds of Common Collateral to the repayment of First-Priority Obligations pursuant to the First-Priority Documents.

5.2     Insurance.   Unless and until the Discharge of First-Priority Obligations has occurred, the First-Priority Collateral Agent and the First-Priority Secured Parties shall have the sole and exclusive right, subject to the rights of the Grantors under the First-Priority Documents, to adjust settlement for any insurance policy covering the Common Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral and to obtain any lender's title insurance (or irrevocable commitment therefor) on any real property constituting Common Collateral. All proceeds of any such policy and any such award if in respect of the Common Collateral shall be paid, subject to the rights of the Grantors under the First-Priority Documents and the Second-Priority Documents, (a) first, prior to the occurrence of the Discharge of First-Priority Obligations, to the First-Priority Collateral Agent for the benefit of First-Priority Secured Parties pursuant to the terms of the First-Priority Documents, (b) second, after the occurrence of the Discharge of First-Priority Obligations, to the Controlling Second-Priority Collateral Agent for the benefit of the Second-Priority Secured Parties pursuant to the terms of the applicable Second-Priority Documents and the Equal Priority Intercreditor Agreement and (c) third, if no Second-Priority Obligations are outstanding, to the owner of the subject property, such other person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If any Second-Priority Representative or any Second-Priority Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the First-Priority Collateral Agent in accordance with the terms of Section 4.2.

5.3     Amendments.

(a)     Unless otherwise agreed to by the First-Priority Collateral Agent, each Second-Priority Representative agrees that each applicable Second-Priority Collateral Document shall include language substantially the same as the following paragraph (or language to similar effect approved by the First-Priority Collateral Agent, such approval not to be unreasonably withheld):

"Notwithstanding anything herein to the contrary, (i) the liens and security interests granted to the [insert the relevant Second-Priority Representative] for the benefit of the [Secured Parties] pursuant to this Agreement are expressly subject and subordinate to the liens and security interests granted to (a) U.S. Bank Trust Company, National Association, as collateral agent (and its permitted successors), pursuant to the [insert the relevant Second Lien Collateral Agreement], dated as of [__], 2025 (as amended, restated, amended

---

[4] Subject to review.

and restated, supplemented or otherwise modified from time to time), by and among Wolfspeed, Inc., certain of its subsidiaries and U.S. Bank Trust Company, National Association, as collateral agent, or (b) any agent or trustee for any Other First-Priority Secured Parties (as defined in the First Lien/Second Lien Intercreditor Agreement referred to below) and (ii) the exercise of any right or remedy by the [insert the relevant Second-Priority Representative] hereunder or the application of proceeds (including insurance proceeds and condemnation proceeds) of any Common Collateral (as defined in the First Lien/Second Lien Intercreditor Agreement) is subject to the limitations and provisions of the First Lien/Second Lien Intercreditor Agreement dated as of [__], 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "First Lien/Second Lien Intercreditor Agreement"), by and among U.S. Bank Trust Company, National Association ("**U.S. Bank**"), as First Lien Notes Trustee, U.S. Bank, as First Lien Collateral Agent and First-Priority Collateral Agent, U.S. Bank, as Second Lien Convertible Notes Trustee, U.S. Bank, as Second Lien Renesas Convertible Notes Trustee, U.S. Bank, as Second Lien Non-Convertible Note Trustees, U.S. Bank, as Second Lien Convertible Notes Collateral Agent, U.S. Bank, as Second Lien Renesas Convertible Notes Collateral Agent, U.S. Bank as Second Lien Non-Convertible Notes Collateral Agent and U.S. Bank, as the initial Controlling Second-Priority Collateral Agent.  In the event of any conflict between the terms of the First Lien/Second Lien Intercreditor Agreement and the terms of this Agreement, the terms of the First Lien/Second Lien Intercreditor Agreement shall govern."

(b)     In the event that the First-Priority Collateral Agent or the First-Priority Secured Parties enter into any amendment, waiver or consent in respect of, or replace any of the First-Priority Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First-Priority Collateral Document or changing in any manner the rights of the First-Priority Collateral Agent, the First-Priority Secured Parties, the Company or any other Grantor thereunder (including the release of any Liens in First-Priority Collateral), then such amendment, waiver or consent shall apply automatically to any comparable provision of each Comparable Second-Priority Collateral Document without the consent of any Second-Priority Representative or any Second-Priority Secured Party and without any action by any Second-Priority Representative, Second-Priority Secured Party, the Company or any other Grantor; provided, however, that (A) such amendment, waiver or consent does not adversely affect the rights of the Second-Priority Secured Parties or the interests of the Second-Priority Secured Parties in the Second-Priority Collateral and not the First-Priority Collateral Agent or the First-Priority Secured Parties, as the case may be, that have a security interest in the affected collateral in a like or similar manner (other than by virtue of their relative priorities and rights and obligations hereunder), (B) such amendment, waiver or consent does not materially adversely affect the rights, protections, benefits, immunities and indemnities of any Second-Priority Representative, in its capacity as such,

21

without its written consent, and (C) written notice of such amendment, waiver or consent shall have been given to each Second-Priority Representative.

(c)    Any First-Priority Document may be modified without notice to or consent by any Second-Priority Representative or any Second-Priority Secured Party; provided, however, that the consent of each Second-Priority Representative shall be required with respect to any modification of any First-Priority Document that (i) [_____], (ii) [subordinates any First-Priority Obligations or any First-Priority Liens (other than in connection with a DIP Financing that is permitted hereunder or to the extent that such Obligation or Lien to which the First-Priority Obligations or First-Priority Liens are being subordinated constitute First-Priority Obligations or First-Priority Liens permitted hereunder)]⁵, (iii) amends the maturity date of any First-Priority Obligations to be earlier than the maturity date of any First-Priority Obligations under the First-Priority Documents in effect as of the Effective Date or brings forward the required date of payment of principal or interest with respect to the First-Priority Obligations, (iv) increases the payment-in-kind interest rate applicable to the First-Priority Obligations as of the Effective Date in an amount in excess of 3.0% per annum or (v) [_____]⁶.  The aggregate amount of First-Priority Obligations may be increased without notice to or consent by any Second-Priority Representative or any Second-Priority Secured Party; provided, however, that without the consent of each Second-Priority Representative, no First-Priority Document may be modified, and no Other First-Priority Obligations may be incurred, to the extent such modification or such incurrence of Other First-Priority Obligations would increase the amount of First-Priority Obligations above the First-Priority Obligations Cap (it being understood and agreed that any First-Priority Obligations incurred in contravention of this sentence shall be subordinated to the Second-Priority Obligations and the Second-Priority Liens on the same terms that the Second-Priority Obligations and Second-Priority Liens are subordinated to the First-Priority Obligations and the First-Priority Liens pursuant to the terms hereof); provided, further, it being agreed that the First-Priority Obligations Cap shall not apply to (x) any DIP Financing,  (y) any First-Priority Obligations arising under the First Lien Indenture as in effect on the Effective Date (including, for the avoidance of doubt, any interest paid in kind), or (z) [●].

(d)    Without the prior written consent of the First Lien Notes Trustee (acting at the direction of the Required Parties under the First Lien Indenture), no Second-Priority Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second-Priority Document, would be prohibited by or inconsistent with any of the terms of this Agreement or the First Lien Indenture.  For the avoidance of doubt, this Section 5.3(d) shall automatically terminate and have no further force or effect upon the repayment or refinancing in full or discharge of the First Lien Indenture.

5.4    Rights as Unsecured Creditors.  The Second-Priority Representatives and the Second-Priority Secured Parties may exercise rights and remedies as an unsecured creditor against the Company or any other Grantor in accordance with the terms of the applicable Second-Priority Documents and applicable law, in each case to the

---

⁵    **Note to Draft**:  Anti-layering subject to ongoing review.

⁶    **Note to Draft**:  Amendments and other restrictions subject to ongoing review.

extent not inconsistent with, prohibited by, or otherwise in contravention of the provisions of this Agreement. Subject to Section 4 of this Agreement, no other provision of this Agreement shall prohibit the receipt by any Second-Priority Representative or any Second-Priority Secured Party of the required payments of interest and principal in respect of the Second-Priority Obligations so long as such receipt is not the direct or indirect result of (a) the exercise by any Second-Priority Representative or any Second-Priority Secured Party of rights or remedies as a secured creditor in respect of Common Collateral or (b) enforcement in contravention of this Agreement of any Lien on Common Collateral in respect of Second-Priority Obligations held by any of them. In the event any Second-Priority Representative or any Second-Priority Secured Party becomes a judgment lien creditor or other secured creditor in respect of Common Collateral as a result of its enforcement of its rights as an unsecured creditor in respect of Second-Priority Obligations or otherwise, such judgment or other lien shall be subordinated to the Liens securing First-Priority Obligations on the same basis as the other Liens securing the Second-Priority Obligations are so subordinated to such Liens securing First-Priority Obligations under this Agreement. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First-Priority Representative or the First-Priority Secured Parties may have with respect to the First-Priority Collateral.

　　　　*5.5*　　　First-Priority Representatives as Gratuitous Bailees/Agents for Perfection.

　　　　　　　(a)　　　Each Second-Priority Representative and Second-Priority Secured Party agrees to turn over possession of any Pledged Collateral that is part of the Common Collteral in possession of Second-Priority Representative or such other Second-Priority Secured Party to the First-Priority Collateral Agent. Each First-Priority Representative agrees to hold the Pledged Collateral that is part of the Common Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee and/or gratuitous agent for the benefit of each Other First-Priority Representative and each Second-Priority Representative and any assignee solely for the purpose of perfecting the security interest granted in such Pledged Collateral pursuant to the respective First-Priority Collateral Documents and the Second-Priority Collateral Documents, subject to the terms and conditions of this Section 5.5.

　　　　　　　(b)　　　Each First-Priority Representative agrees to hold the Deposit Account Collateral (if any) that is part of the Common Collateral and controlled by such First-Priority Representative as gratuitous bailee and/or gratuitous agent for the benefit of each Second-Priority Representative and any assignee solely for the purpose of perfecting the security interest granted in such Deposit Account Collateral pursuant to the Second-Priority Collateral Documents, subject to the terms and conditions of this Section 5.5.

　　　　　　　(c)　　　In the event that any First-Priority Representative (or its agent or bailees) has Lien filings against Intellectual Property (as defined in the Second Lien Collateral Agreement) that is part of the Common Collateral that are necessary for the perfection of Liens in such Common Collateral, such First-Priority Representative agrees to hold such Liens as gratuitous bailee and/or gratuitous agent for the benefit of each Second-Priority Representative and any assignee solely for the purpose of perfecting the security interest granted in such Liens pursuant to the Second-Priority Collateral Documents, subject to the terms and conditions of this Section 5.5.

23

(d)     Except as otherwise specifically provided herein (including Sections 3.1 and 4.1), until the Discharge of First-Priority Obligations has occurred, the First-Priority Representatives shall be entitled to deal with the Pledged Collateral in accordance with the terms of the First-Priority Documents as if the Liens under the Second-Priority Collateral Documents did not exist. The rights of the Second-Priority Representatives and the Second-Priority Secured Parties with respect to such Pledged Collateral shall at all times be subject to the terms of this Agreement.

(e)     The First-Priority Representatives shall have no obligation whatsoever to any Second-Priority Representative or any Second-Priority Secured Party to assure that the Pledged Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Common Collateral except as expressly set forth in this Section 5.5. The duties or responsibilities of the First-Priority Representatives under this Section 5.5 shall be limited solely to holding the Pledged Collateral as gratuitous bailee and/or gratuitous agent for the benefit of each Second-Priority Representative for purposes of perfecting the Lien held by the Second-Priority Secured Parties.

(f)     The First-Priority Representatives shall not have by reason of the Second-Priority Collateral Documents or this Agreement or any other document a fiduciary relationship in respect of any Second-Priority Representative or any Second-Priority Secured Party and the Second-Priority Representatives and the Second-Priority Secured Parties hereby waive and release the First-Priority Representatives from all claims and liabilities arising pursuant to the First-Priority Representatives' role under this Section 5.5, as gratuitous bailee and/or gratuitous agent with respect to the Common Collateral.

(g)     Upon the Discharge of First-Priority Obligations, each First-Priority Representative shall deliver to the Controlling Second-Priority Collateral Agent, to the extent that it is legally permitted to do so, the Pledged Collateral (if any) and the Deposit Account Collateral (if any) that is part of the Common Collateral together with any necessary endorsements (or otherwise allow the Controlling Second-Priority Collateral Agent to obtain control of such Pledged Collateral and Deposit Account Collateral) or as a court of competent jurisdiction may otherwise direct. The Company shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify the First-Priority Representatives for any loss or damage suffered by the First-Priority Representatives as a result of such transfer except for any loss or damage suffered by any First-Priority Representative as a result of its own willful misconduct, gross negligence or bad faith as determined by a final non-appealable judgment of a court of competent jurisdiction. The First-Priority Representatives have no obligation to follow instructions from any Second-Priority Representative in contravention of this Agreement.

(h)     Neither the First-Priority Representatives nor the First-Priority Secured Parties shall be required to marshal any present or future collateral security for the Company's or any other Grantor's obligations to the First-Priority Representatives or the First-Priority Secured Parties under the First-Priority Debt Documents or the First-Priority Collateral Documents or any assurance of payment in respect thereof or to resort to such collateral security or other assurances of payment in any particular order, and all of their rights in respect of such collateral security or any assurance of payment in respect thereof shall be cumulative and in addition to all other rights, however existing or arising.

(i)      The agreement of the First-Priority Representatives to act as gratuitous bailee and/or gratuitous agent pursuant to this Section 5.5 is intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-104(a)(2) and 9-313(c) of the UCC.

5.6      Controlling Second-Priority Collateral Agent as Gratuitous Bailee/Agent  for Perfection.

(a)      Upon the Discharge of First-Priority Obligations, the Controlling Second-Priority Collateral Agent agrees to hold the Pledged Collateral that is part of the Common Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee and/or gratuitous agent for the benefit of the other Second-Priority Representatives and any assignee solely for the purpose of perfecting the security interest granted in such Pledged Collateral pursuant to the applicable Second-Priority Collateral Document, subject to the terms and conditions of this Section 5.6.

(b)      Upon the Discharge of First-Priority Obligations, the Controlling Second-Priority Collateral Agent agrees to hold the Deposit Account Collateral (if any) that is part of the Common Collateral and controlled by the Controlling Second-Priority Collateral Agent as gratuitous bailee and/or gratuitous agent for the benefit of other Second-Priority Representatives and any assignee solely for the purpose of perfecting the security interest granted in such Deposit Account Collateral pursuant to the applicable Second-Priority Collateral Document, subject to the terms and conditions of this Section 5.6.

(c)      In the event that any Second-Priority Collateral Agent (or its agent or bailees) has Lien filings against Intellectual Property (as defined in the Second Lien Collateral Agreement) that is part of the Common Collateral that are necessary for the perfection of Liens in such Common Collateral, upon the Discharge of First-Priority Obligations, such Second-Priority Collateral Agent agrees to hold such Liens as gratuitous bailee and/or gratuitous agent for the benefit of other Second-Priority Representatives and any assignee solely for the purpose of perfecting the security interest granted in such Liens pursuant to the applicable Second-Priority Collateral Document, subject to the terms and conditions of this Section 5.6.

(d)      Each Second-Priority Collateral Agent, in its capacity as gratuitous bailee and/or gratuitous agent, shall have no obligation whatsoever to the other Second-Priority Representatives to assure that the Pledged Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Common Collateral except as expressly set forth in this Section 5.6. The duties or responsibilities of each Second-Priority Collateral Agent under this Section 5.6 upon the Discharge of First-Priority Obligations shall be limited solely to holding the Pledged Collateral as gratuitous bailee and/or gratuitous agent for the benefit of other Second-Priority Representatives for purposes of perfecting the Lien held by the applicable Second-Priority Secured Parties.

(e)      Each Second-Priority Collateral Agent shall not have by reason of the Second-Priority Collateral Documents or this Agreement or any other document a fiduciary relationship in respect of the other Second-Priority Representatives

25

(or the Second-Priority Secured Parties for which such other Second-Priority Representatives are agent) and the other Second-Priority Representatives hereby waive and release each Second-Priority Collateral Agent from all claims and liabilities arising pursuant to such Second-Priority Collateral Agent's role under this Section 5.6, as gratuitous bailee and/or gratuitous agent with respect to the Common Collateral.

(f)     In the event that the Controlling Second-Priority Collateral Agent shall cease to be so designated a Controlling Second-Priority Collateral Agent pursuant to the definition of such term, the then such Controlling Second-Priority Collateral Agent shall deliver to the successor Controlling Second-Priority Collateral Agent to the extent that it is legally permitted to do so, the Pledged Collateral (if any) and the Deposit Account Collateral (if any) together with any necessary endorsements (or otherwise allow such successor Controlling Second-Priority Collateral Agent to obtain control of such Pledged Collateral and Deposit Account Collateral) or as a court of competent jurisdiction may otherwise direct, and such successor Controlling Second-Priority Collateral Agent shall perform all duties of a Controlling Second-Priority Collateral Agent, as set forth herein. The Company shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify each Controlling Second-Priority Collateral Agent for any loss or damage suffered by such Controlling Second-Priority Collateral Agent as a result of such transfer except for any loss or damage suffered by such Controlling Second-Priority Collateral Agent as a result of its own willful misconduct, gross negligence or bad faith. The Controlling Second-Priority Collateral Agent has no obligation to follow instructions from any successor Controlling Second-Priority Collateral Agent in contravention of this Agreement.

(g)     The agreement of each Second-Priority Collateral Agent to act as gratuitous bailee and/or gratuitous agent pursuant to this Section 5.6 is intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-104(a)(2) and 9-313(c) of the UCC.

5.7     When Discharge of First-Priority Obligations Deemed to Not Have Occurred.  If, at any time substantially concurrently with or after the Discharge of First-Priority Obligations has occurred, the Company incurs and designates any First-Priority Obligations, then such Discharge of First-Priority Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of First-Priority Obligations), and the applicable agreement governing such First-Priority Obligations shall automatically be treated as a First-Priority Debt Document (and, upon designation by the Company thereof, the "First Lien Indenture" hereunder) for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Common Collateral set forth herein and the granting by the First-Priority Collateral Agent of amendments, waivers and consents hereunder. Upon receipt of notice of such designation (including the identity of the new First-Priority Collateral Agent), each Second-Priority Representative shall promptly (i) enter into such documents and agreements (at the expense of the Company), including amendments or supplements to this Agreement, as the Company or such new First-Priority Collateral Agent shall reasonably request in writing in order to provide the new First-Priority Representative the rights of the First-Priority Collateral Agent contemplated hereby and (ii) to the extent then held by any

26

Second-Priority Representative, deliver to the First-Priority Collateral Agent the Pledged Collateral that is Common Collateral together with any necessary endorsements (or otherwise allow such First-Priority Collateral Agent to obtain possession or control of such Pledged Collateral).

5.8    No Release if Event of Default.    Notwithstanding any other provisions contained in this Agreement, if an Event of Default (as defined in any Second-Priority Document) exists on the date on which all First-Priority Obligations are repaid in full and terminated (including all commitments and letters of credit thereunder) resulting in a Discharge of First-Priority Obligations, the Second-Priority Liens on the Second-Priority Collateral securing the Second-Priority Obligations relating to such Event of Default will not be released, except to the extent such Second-Priority Collateral or any portion thereof was disposed of in order to repay the First-Priority Obligations secured by such Second-Priority Collateral, and thereafter the Controlling Second-Priority Collateral Agent will have the right to foreclose upon such Second-Priority Collateral.

5.9    Purchase Right.

(a)    Without prejudice to the enforcement of any of the First-Priority Secured Parties' remedies under the First-Priority Documents, this Agreement, at law or in equity or otherwise, the First-Priority Secured Parties agree at any time following the occurrence of (i) an acceleration of any of the First-Priority Obligations in accordance with the terms of the applicable First-Priority Documents, (ii) the exercise of any enforcement action (including setoff or recoupment) by any First-Priority Secured Party with respect to any Common Collateral on or after an Event of Default (as defined under any First-Priority Document), (iii) a payment default under any First-Priority Document that has not been cured or waived by the applicable First-Priority Secured Parties within 45 days of the occurrence thereof or (iv) the commencement of any Insolvency or Liquidation Proceeding with respect to any Grantor (each date on which any such event occurs, a "**Purchase Option Date**"), the Controlling Second-Priority Secured Parties shall have the option to purchase the entire aggregate amount (but not less than the entirety) of outstanding First-Priority Obligations (including unfunded commitments under any First-Priority Document that have not been terminated at such time) at the Purchase Price without warranty or representation or recourse except as provided in Section 5.9(d), on a pro rata basis among the First-Priority Secured Parties, which option may be accepted by less than all of the Controlling Second-Priority Secured Parties so long as all the accepting Controlling Second-Priority Secured Parties shall when taken together purchase such entire aggregate amount as set forth above.

(b)    The "**Purchase Price**" will equal the sum of (1) the full amount of all First-Priority Obligations then-outstanding and unpaid (including principal, accrued but unpaid interest, premiums, fees, expenses, and any other unpaid amounts, including, without limitation, any breakage costs and, in the case of any secured hedging obligations, the amount that would be payable by the relevant Grantor thereunder if such Grantor were to terminate the hedge agreement in respect thereof on the date of the purchase or, if not terminated, an amount determined by the relevant First-Priority Secured Party to be necessary to collateralize its credit risk arising out of such agreement) plus (i) if the Controlling Second-Priority Secured Parties are purchasing First Lien Note Obligations, the applicable make-whole premium, prepayment premium, or redemption

27

premium provided under the applicable First Lien Note Documents (as in effect on the Effective Date) had such First Lien Note Obligations been prepaid or redeemed in full on the date of purchase and [(ii) if the Controlling Second-Priority Secured Parties are purchasing any Other First-Priority Obligations, to the extent the Controlling Second-Priority Secured Parties receive amounts sufficient to pay any applicable make-whole premium, prepayment premium, or redemption premium payable under such Other First-Priority Documents, after the payment in full in cash to the Controlling Second-Priority Secured Parties of all Second-Priority Obligations and the Other First-Priority Obligations purchased by the Controlling Second-Priority Secured Parties pursuant to this Section 5.9, any applicable make-whole premium, prepayment premium, or redemption premium payable pursuant to such Other First-Priority Documents][7], (2) the cash collateral to be furnished to the First-Priority Secured Parties providing letters of credit under the First-Priority Documents in such amount (not to exceed 103% thereof) as such First-Priority Secured Parties determine is reasonably necessary to secure such First-Priority Secured Parties in connection with any such outstanding and undrawn letters of credit and (3) all accrued and unpaid fees and expenses (including reasonable attorneys' fees and expenses) owed to the First-Priority Secured Parties under or pursuant to the First-Priority Documents.

(c)     If any Controlling Second-Priority Secured Parties choose to exercise the purchase option, the applicable Controlling Second-Priority Secured Parties shall irrevocably exercise such purchase option by providing notice thereof to each First-Priority Representative within fifteen (15) days of the Purchase Option Date and the parties shall endeavor to close promptly thereafter.  If the Controlling Second-Priority Secured Parties (or any subset of them) exercise such right, it shall be exercised pursuant to documentation mutually acceptable to each of the First-Priority Representatives (acting at the direction of Required Parties) and such Controlling Second-Priority Secured Parties.  If the Controlling Second-Priority Secured Parties elect not to exercise such rights (or do not so irrevocably exercise such rights within the required timeframe), the First-Priority Secured Parties shall have no further obligations pursuant to this Section 5.9 and may take any further actions in their sole discretion in accordance with the First-Priority Documents and this Agreement.    Each First-Priority Secured Party will retain all rights to indemnification provided in the relevant First-Priority Documents for all claims and other amounts relating to periods prior to the purchase of the First-Priority Obligations pursuant to this Section 5.9.  The First-Priority Representatives shall have no liability for any delay or failure of any First-Priority Secured Parties in cooperating with the Controlling Second-Priority Secured Parties in closing such purchase.

(d)     The purchase and sale of the First-Priority Obligations under this Section 5.9 will be without recourse and without representation or warranty of any kind by the First-Priority Secured Parties, except that the First-Priority Secured Parties shall severally and not jointly represent and warrant to the Controlling Second-Priority Secured Parties that on the date of such purchase, immediately before giving effect to the purchase, solely with respect to such First-Priority Secured Party:

---

[7]     **Note to Draft**:  Subject to review.

(i)    the principal of and accrued and unpaid interest on the First-Priority Obligations, and the fees, premiums, expenses and other amounts owed to the respective First-Priority Secured Parties are as stated in any assignment agreement or other trade documentation prepared in connection with the purchase and sale of the First-Priority Obligations; and

(ii)    each First-Priority Secured Party owns the First-Priority Obligations purported to be owned by it free and clear of any Liens (other than participation interests not prohibited by the First-Priority Documents, in which case the Purchase Price will be appropriately adjusted so that the Controlling Second-Priority Secured Parties do not pay amounts represented by participation interests to the extent that the Controlling Second-Priority Secured Parties expressly assume the obligations under such participation interests).

**Section 6.**    Insolvency or Liquidation Proceedings.

*6.1*    Financing Issues.  Until the Discharge of First-Priority Obligations has occurred, if the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First-Priority Collateral Agent shall desire to permit the use, sale or lease of cash collateral or to permit the Company or any other Grantor to obtain financing under Section 363 or Section 364 of the Bankruptcy Code or any similar provision in any other applicable Bankruptcy Law ("***DIP Financing***"), then each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that it will raise no objection to (and will not otherwise contest), and will be deemed to have consented to, such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection therewith (except to the extent permitted by the proviso in clause (ii) of Section 3.1(a) and Section 6.3) and, to the extent the Liens securing the First-Priority Obligations under the First-Priority Documents are subordinated or pari passu with the Liens securing such DIP Financing, will subordinate its Liens in the Common Collateral (x) to the Liens securing such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Priority Obligations are so subordinated to the Liens securing the First-Priority Obligations under this Agreement, (y) to any adequate protection Liens granted to the First-Priority Secured Parties, and (z) to any "carve-out" for professional and United States Trustee fees agreed to by the First-Priority Collateral Agent, <u>provided</u>, that [(1) no more than [●]% of the aggregate principal amount of the First-Priority Obligations under the First-Priority Documents as of the commencement of such Insolvency or Liquidation Proceeding may be "rolled up" or refinanced into any such DIP Financing and] (2) subject to the priority of any adequate protection claims or Liens granted to the First-Priority Secured Parties, the "carve-out" described in any DIP Financing, and the priority of any claims or Liens granted to secure the DIP Financing, the Second-Priority Representatives retain their Liens on the Common Collateral and priority relative to the First-Priority Obligations (including proceeds thereof but excluding any proceeds which are applied to repay the First-Priority Obligations)).  Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, further agrees that it will raise no (a) objection to (and will not otherwise contest), and will be deemed to have consented to, any motion for relief from

the automatic stay or from any injunction against foreclosure or enforcement in respect of First-Priority Obligations made by the First-Priority Collateral Agent or any holder of First-Priority Obligations, (b) objection to (and will not otherwise contest), and will be deemed to have consented to, any lawful exercise by any holder of First-Priority Obligations of the right to credit bid First-Priority Obligations at any sale in foreclosure of First-Priority Collateral or otherwise under Section 363(k) of the Bankruptcy Code or any similar provision of any other applicable Bankruptcy Law, (c) objection to (and will not otherwise contest), and will be deemed to have consented to, any other request for judicial relief made in any court by any holder of First-Priority Obligations relating to the lawful enforcement of any Lien on First-Priority Collateral or (d) objection to (and will not otherwise contest), and will be deemed to have consented to, any order relating to a sale of assets of any Grantor for which the First-Priority Collateral Agent has consented that provides, to the extent the sale is to be free and clear of Liens, that the Liens securing the First-Priority Obligations and the Second-Priority Obligations will attach to the proceeds of the sale on the same basis of priority as the Liens securing the First-Priority Collateral rank to the Liens securing the Second-Priority Collateral in accordance with this Agreement; provided, however, that notwithstanding anything to the contrary herein, (i) but subject to Section 6.8 hereof, the Second-Priority Secured Parties shall be permitted to vote in favor of or against a plan of reorganization in a manner consistent with this Agreement and (ii) [_____][8]; provided, further, that the Second-Priority Secured Parties are not deemed to have waived any rights to credit bid on the Common Collateral in any such sale or disposition in accordance with Section 363(k) of the Bankruptcy Code or any similar provision of any other applicable Bankruptcy Law so long as any such credit bid provides for the payment in full in cash of the First-Priority Obligations substantially concurrently with the consummation of any such sale.  If the First-Priority Collateral Agent (at the direction of the First-Priority Secured Parties) has confirmed in writing (which confirmation shall not be unreasonably withheld or delayed) to the Second-Priority Secured Parties that the First-Priority Secured Parties decline to provide a DIP Financing, subject to the Equal Priority Intercreditor Agreement, any Second-Priority Secured Party may, directly or indirectly, provide or offer to provide DIP Financing to the Company, any other Grantor or any of their Subsidiaries, any of their respective direct or indirect parents or any affiliate of any of the foregoing, and may propose, support or enter into any DIP Financing, provided, that (i) [_____][9] and (ii) no Second-Priority Obligations may be "rolled up" or refinanced into any such DIP Financing.

       *6.2*    **Relief from the Automatic Stay.**  Until the Discharge of First-Priority Obligations has occurred, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Common Collateral, without the prior written consent of the First-Priority Collateral Agent and its Required Parties.

       *6.3*    **Adequate Protection.**  Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that none of them shall contest (or support any other Person contesting) (a) any request by the First-Priority

---

[8]    **Note to Draft**:  Subject to review.

[9]    **Note to Draft:**  Subject to review.

Collateral Agent or the First-Priority Secured Parties for adequate protection or (b) any objection by the First-Priority Collateral Agent or the First-Priority Secured Parties to any motion, relief, action or proceeding based on the First-Priority Collateral Agent's or the First-Priority Secured Parties' claiming a lack of adequate protection. Notwithstanding the foregoing, in any Insolvency or Liquidation Proceeding, (i) if the First-Priority Secured Parties (or any subset thereof) are granted adequate protection in the form of a Lien on additional collateral in connection with any DIP Financing or use of cash collateral under Section 363 or Section 364 of the Bankruptcy Code or any similar provision of any other applicable Bankruptcy Law, then each Second-Priority Representative, on behalf of itself and any applicable Second-Priority Secured Party, may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien is subordinated to the Liens securing and providing adequate protection for the First-Priority Obligations and such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Priority Obligations are so subordinated to the Liens securing First-Priority Obligations under this Agreement; (ii) in the event any Second-Priority Representative, on behalf of itself or any applicable Second-Priority Secured Party, seeks or requests adequate protection and such adequate protection is granted in the form of a Lien on additional collateral, then such Second-Priority Representative, on behalf of itself or each such Second-Priority Secured Party, agrees that the First-Priority Representatives shall also be granted a senior Lien on such additional collateral as security and adequate protection for the applicable First-Priority Obligations and any such DIP Financing and that any Lien on such additional collateral securing or providing adequate protection for the Second-Priority Obligations shall be subordinated to the Liens on such collateral securing the First-Priority Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the First-Priority Secured Parties as adequate protection on the same basis as the other Liens securing the Second-Priority Obligations are so subordinated to such Liens securing First-Priority Obligations under this Agreement; and (iii) if the First-Priority Secured Parties (or any subset thereof) are granted adequate protection in the form of current post-petition interest, fees, expenses or other cash payments, then then each Second-Priority Representative, on behalf of itself and any applicable Second-Priority Secured Party, may seek or request adequate protection in the form of current post-petition interest, fees, expenses or other cash payments; provided, however, that (A) any such request for adequate protection must be consistent with the terms of this Agreement, and (B) the First-Priority Secured Parties shall be entitled to oppose any such request for adeqaute protection in the form of current post-petition interest, fees, expenses or other cash payments.

       *6.4*    Preference Issues. If any First-Priority Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Company or any other Grantor (or any trustee, receiver or similar person therefor), because the payment of such amount was declared to be or avoided as fraudulent or preferential in any respect or for any other reason, any amount (a "***Recovery***"), whether received as proceeds of security, enforcement of any right of setoff or recoupment or otherwise, then the First-Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First-Priority Secured Parties shall remain entitled to a Discharge of First-Priority Obligations with respect to all such recovered amounts and shall have all rights hereunder until such time. If this Agreement shall have been terminated prior to such Recovery, this Agreement

31

shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.

*6.5*    Application.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code or any similar provision of any other applicable Bankruptcy Law, shall be applicable prior to and after the commencement of any Insolvency or Liquidation Proceeding. All references herein to any Grantor shall apply to any trustee for such Person and such Person as debtor in possession. The relative rights as to the Common Collateral and proceeds thereof shall continue after the filing thereof on the same basis as prior to the date of the petition, subject to any court order approving the financing of, or use of cash collateral by, any Grantor.

*6.6*    506(c) Claims.  Until the Discharge of First-Priority Obligations has occurred, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code or any similar provision of any other applicable Bankruptcy Law senior to or on a parity with the Liens securing the First-Priority Obligations for costs or expenses of preserving or disposing of any Common Collateral.

*6.7*    Reorganization Securities. If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan on account of both the First-Priority Obligations and the Second-Priority Obligations, then, to the extent the debt obligations distributed on account of the First-Priority Obligations and on account of the Second-Priority Obligations are secured by Liens upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

*6.8*    Voting. Without the prior written consent of the First-Priority Representatives, neither the Second-Priority Representatives nor any other Second-Priority Secured Party may propose, support or vote in favor of any plan of reorganization or similar dispositive restructuring plan that is inconsistent with the terms of this Agreement unless such plan (a) pays off, in cash in full, all First-Priority Obligations or (b) is accepted by the class of holders of First-Priority Obligations voting thereon in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision under any other applicable Bankruptcy Law).

*6.9*    Post-Petition Interest.  None of the Second-Priority Representative or any other Second-Priority Secured Party shall oppose or seek to challenge any claim by any First-Priority Representative or any other First-Priority Secured Party for allowance in any Insolvency or Liquidation Proceeding of First-Priority Obligations consisting of post-petition interest, fees, or expenses under Section 506(b) of the Bankruptcy Code or otherwise.

*6.10*    Separate Grants of Security and Separate Classifications.  Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, acknowledges and agrees that (a) the grants of Liens pursuant to the First-

Priority Collateral Documents and the Second-Priority Collateral Documents constitute separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the Second-Priority Obligations are fundamentally different from the First-Priority Obligations and must be separately classified in any plan of reorganization or similar dispositive restructuring plan proposed, confirmed, or adopted in any Insolvency or Liquidation Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that any claims of the First-Priority Secured Parties and the Second-Priority Secured Parties in respect of the Common Collateral constitute a single class of claims (rather than separate classes of senior and junior secured claims), then each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby acknowledges and agrees that all distributions from the Common Collateral shall be made as if there were separate classes of senior and junior secured claims against the Grantors in respect of the Common Collateral, with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the Second-Priority Secured Parties), the First-Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest, fees, and expenses, and other claims, all amounts owing in respect of post-petition interest, fees, and expenses (whether or not allowed or allowable in such Insolvency or Liquidation Proceeding) before any distribution is made from the Common Collateral in respect of the Second-Priority Obligations, with each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby acknowledging and agreeing to turn over to the First-Priority Collateral Agent amounts otherwise received or receivable by them from the Common Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second-Priority Secured Parties.

**Section 7.**     Reliance; Waivers; etc.

*7.1*     Reliance.  The consent by the First-Priority Secured Parties to the execution and delivery of the First-Priority Documents to which the First-Priority Secured Parties have consented and all loans, notes and other extensions of credit made or deemed made or issued on and after the date hereof by the First-Priority Secured Parties to the Company shall be deemed to have been given and made or issued in reliance upon this Agreement. Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, acknowledges that it and the applicable Second-Priority Secured Parties have, independently and without reliance on the First-Priority Collateral Agent or any First-Priority Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the applicable Second-Priority Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the applicable Second-Priority Documents or this Agreement.

*7.2*     No Warranties or Liability.  Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, acknowledges and agrees that neither the First-Priority Collateral Agent nor any First-Priority Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the

First-Priority Documents, the ownership of any Common Collateral or the perfection or priority of any Liens thereon. The First-Priority Secured Parties will be entitled to manage and supervise their respective loans, notes and extensions of credit under the First-Priority Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate, and the First-Priority Secured Parties may manage their loans, notes and extensions of credit without regard to any rights or interests that any Second-Priority Representative or any of the Second-Priority Secured Parties have in the Common Collateral or otherwise, except as otherwise provided in this Agreement. Neither the First-Priority Collateral Agent nor any First-Priority Secured Party shall have any duty to any Second-Priority Representative or any Second-Priority Secured Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Company or any other Grantor (including the Second-Priority Documents), regardless of any knowledge thereof that they may have or be charged with. Except as expressly set forth in this Agreement, the First-Priority Representatives, the First-Priority Secured Parties, the Second-Priority Representatives and the Second-Priority Secured Parties have not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectibility of any of the Second-Priority Obligations, the First-Priority Obligations or any guarantee or security which may have been granted to any of them in connection therewith, (b) the Company's or any other Grantor's title to or right to transfer any of the Common Collateral or (c) any other matter except as expressly set forth in this Agreement.

        *7.3*     Obligations Unconditional.  All rights, interests, agreements and obligations of the First-Priority Representatives and the First-Priority Secured Parties, and the Second-Priority Representatives and the Second-Priority Secured Parties, respectively, hereunder shall remain in full force and effect irrespective of:

        (a)     any lack of validity or enforceability of any First-Priority Documents or any Second-Priority Documents;

        (b)     any change in the time, manner or place of payment of, or in any other terms of, all or any of the First-Priority Obligations or Second-Priority Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of the First Lien Indenture or any other First-Priority Document or of the terms of the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture or any other Second-Priority Document;

        (c)     any exchange of any security interest in any Common Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First-Priority Obligations or Second-Priority Obligations or any guarantee thereof;

        (d)     the commencement of any Insolvency or Liquidation Proceeding in respect of the Company or any other Grantor; or

        (e)     any other circumstances that otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the

First-Priority Obligations, or of any Second-Priority Representative or any Second-Priority Secured Party in respect of this Agreement.

**Section 8.**     Miscellaneous.

*8.1*     Conflicts.  Subject to Section 8.19, in the event of any conflict between the terms of this Agreement and the terms of any First-Priority Document or any Second-Priority Document, the terms of this Agreement shall govern.

*8.2*     Continuing Nature of this Agreement; Severability.  Subject to Section 5.7 and Section 6.4, this Agreement shall continue to be effective until the Discharge of First-Priority Obligations shall have occurred or such later time as all the Obligations in respect of the Second-Priority Obligations shall have been paid in full. This is a continuing agreement of lien subordination and the First-Priority Secured Parties may continue, at any time and without notice to each Second-Priority Representative or any Second-Priority Secured Party, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any other Grantor constituting First-Priority Obligations in reliance hereon. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding, any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

*8.3*     Amendments; Waivers.  No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Second-Priority Representative (or its authorized agent), each First-Priority Representative (or its authorized agent) [and  ●][10] and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding anything in this Section 8.3 to the contrary, this Agreement may be amended from time to time at the request of the Company, at the Company's expense, and without the consent of any First-Priority Representative, any Second-Priority Representative, any First-Priority Secured Party or any Second-Priority Secured Party to (i) add other parties holding Other First-Priority Obligations (or any agent or trustee therefor) and Other Second-Priority Obligations (or any agent or trustee therefor) in each case to the extent such Obligations are not prohibited by any First-Priority Debt Document or any Second-Priority Document, (ii) in the case of Other Second-Priority Obligations, (a) establish that the Lien on the Common Collateral securing such Other Second-Priority Obligations shall be junior and subordinate in all respects to all Liens on the Common Collateral securing any First-Priority Obligations, and (b) provide to the holders of such Other Second-Priority Obligations (or any agent or trustee thereof) the comparable rights and benefits (including any improved rights and benefits that have been consented to by the First-Priority Collateral Agent) as are provided to the holders of Second-Priority Obligations under this Agreement (subject to the terms of the Second-Priority Documents), and (iii) in the case of

---

[10]     **Note to Draft**:  Amendments provisions subject to ongoing review.

35

Other First-Priority Obligations, (a) establish that the Lien on the Common Collateral securing such Other First-Priority Obligations shall be superior in all respects to all Liens on the Common Collateral securing any Second-Priority Obligations, and (b) provide to the holders of such Other First-Priority Obligations (or any agent or trustee thereof) the comparable rights and benefits as are provided to the holders of First-Priority Obligations under this Agreement (subject to the terms of the First-Priority Documents), in each case so long as such modifications are not prohibited by any First-Priority Debt Document or any Second-Priority Document. Any such additional party and each Representative shall be entitled to rely on the determination of an officer of the Company that such modifications are not prohibited by any First-Priority Debt Document or any Second-Priority Document if such determination is set forth in an officer's certificate delivered to such party, the First-Priority Collateral Agent and each Second-Priority Representative. At the request (and sole expense) of the Company, without the consent of any First-Priority Secured Party or Second-Priority Secured Party, (i) each of the First-Priority Collateral Agent, the Controlling Second-Priority Collateral Agent and each other First-Priority Representative and Second-Priority Representative shall execute and deliver an acknowledgment and confirmation of such permitted modifications and/or enter into an amendment, a restatement or a supplement of this Agreement to facilitate such permitted modifications (it being understood that such actions shall not be required for the effectiveness of any such modifications) and (ii) each First-Priority Representative and Second-Priority Representative shall deliver any instruction or direction required by the First-Priority Collateral Agent pursuant to this Agreement; provided, that each of the First-Priority Collateral Agent, the Controlling Second-Priority Collateral Agent and each other First-Priority Representative and Second-Priority Representative shall be entitled to an Officer's Certificate and Opinion of Counsel to the extent required by the applicable First-Priority Documents and Second-Priority Documents (if applicable).

8.4    Information Concerning Financial Condition of the Company and its Subsidiaries. Each First-Priority Representative, the First-Priority Secured Parties, each Second-Priority Representative and the Second-Priority Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of the Company and its Subsidiaries and all endorsers and/or guarantors of the Second-Priority Obligations or the First-Priority Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Second-Priority Obligations or the First-Priority Obligations. Each First-Priority Representative, the First-Priority Secured Parties, each Second-Priority Representative and the Second-Priority Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that any First-Priority Representative, any First-Priority Secured Party, any Second-Priority Representative or any Second-Priority Secured Party, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it or they shall be under no obligation (w) to make, and the First-Priority Representatives, the First-Priority Secured Parties, the Second-Priority Representatives and the Second-Priority Secured Parties shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information that, pursuant to

accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

8.5     Subrogation.  Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First-Priority Obligations has occurred.

8.6     Application of Payments.  Except as otherwise provided herein, all payments received by the First-Priority Secured Parties may be applied, reversed and reapplied, in whole or in part, to such part of the First-Priority Obligations as the First-Priority Secured Parties, in their sole discretion, deem appropriate, consistent with the terms of the First-Priority Documents. Except as otherwise provided herein, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, assents to any extension or postponement of the time of payment of the First-Priority Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security that may at any time secure any part of the First-Priority Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

8.7     Consent to Jurisdiction; Waivers.  The parties hereto irrevocably and unconditionally agree that they will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the First-Priority Secured Parties or the First-Priority Representatives, or any affiliate of the foregoing in any way relating to this Agreement or the transactions relating hereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof.  The parties hereto consent to the jurisdiction of any state or federal court located in New York County, New York, and consent that all service of process may be made by registered mail directed to such party as provided in Section 8.8 for such party. Service so made shall be deemed to be completed three days after the same shall be posted as aforesaid. The parties hereto waive any objection to any action instituted hereunder in any such court based on forum non conveniens, and any objection to the venue of any action instituted hereunder in any such court. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO IN CONNECTION WITH THE SUBJECT MATTER HEREOF.

8.8     Notices.  All notices to the First-Priority Secured Parties and the Second-Priority Secured Parties permitted or required under this Agreement may be sent to the First-Priority Collateral Agent, the Controlling Second-Priority Collateral Agent, each Second-Priority Collateral Agent, or any other First-Priority Representative or Second-Priority Representative as provided in the First Lien Indenture, the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture, the relevant First-Priority Document or the relevant Second-Priority Document, as applicable. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall

37

be in writing and may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties. Each First-Priority Representative hereby agrees to promptly notify each Second-Priority Representative upon payment in full in cash of all indebtedness under the applicable First-Priority Documents (except for contingent indemnities and cost and reimbursement obligations to the extent no claim therefor has been made).

      *8.9*     Further Assurances.  Each of the Second-Priority Representatives, on behalf of itself and each applicable Second-Priority Secured Party, and each of the First-Priority Representatives, on behalf of itself and each applicable First-Priority Secured Party, agrees that each of them shall take such further action and shall execute and/or deliver to the First-Priority Collateral Agent and the First-Priority Secured Parties such additional instructions, directions, documents and instruments (in recordable form, if requested) as the First-Priority Collateral Agent or the First-Priority Secured Parties may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement.

      *8.10*    Governing Law.  THIS AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLE OF CONFLICTS OF LAW THAT COULD REQUIRE THE APPLICATION OF ANY OTHER LAW.

      *8.11*    Binding on Successors and Assigns.  This Agreement shall be binding upon the First-Priority Collateral Agent, the other First-Priority Representatives, the First-Priority Secured Parties, the Controlling Second-Priority Collateral Agent, each Second-Priority Collateral Agent, the other Second-Priority Representatives and the Second-Priority Secured Parties and their respective permitted successors and assigns.

      *8.12*    Specific Performance.  The First-Priority Collateral Agent may demand specific performance of this Agreement. Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the First-Priority Collateral Agent.

      *8.13*    Section Titles.  The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

      *8.14*    Counterparts.  This Agreement may be executed in one or more counterparts, including by means of facsimile or in portable document format (pdf), each

of which shall be an original and all of which shall together constitute one and the same document.

*8.15*   Authorization.   By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. Each First-Priority Representative represents and warrants that this Agreement is binding upon the applicable First-Priority Secured Parties for which such First-Priority Representative is acting. Each Second-Priority Representative represents and warrants that this Agreement is binding upon the applicable Second-Priority Secured Parties for which such Second-Priority Representative is acting.

*8.16*   No Third Party Beneficiaries; Successors and Assigns.   This Agreement and the rights and benefits hereof shall inure to the benefit of, and be binding upon, each of the parties hereto, the Company and the Grantors and their respective successors and assigns and shall inure to the benefit of each of, and be binding upon, the holders of First-Priority Obligations,  Second-Priority Obligations, the Company and the Grantors.

*8.17*   Effectiveness.   This Agreement shall become effective when executed and delivered by the parties hereto. This Agreement shall be effective both before and after the commencement of any Insolvency or Liquidation Proceeding. All references to the Company or any other Grantor shall include the Company or any such Grantor as debtor and debtor-in-possession and any receiver or trustee for the Company or any such other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.

*8.18*   First-Priority Representatives and Second-Priority Representatives. It is understood and agreed that (a) U.S. Bank is entering into this Agreement in its respective capacities as trustee and collateral agent under the First Lien Indenture and as collateral agent under the First Lien Collateral Agreement and rights, benefits, protections, immunities and indemnities granted to it in  the First Lien Indenture and the other First Lien Note Documents shall also apply to U.S. Bank as First Lien Notes Trustee and First-Priority Collateral Agent hereunder, (b) U.S. Bank is entering into this Agreement in its respective capacities as trustee and collateral agent under the Second Lien Convertible Notes Indenture and the rights, benefits, protections, immunities and indemnities granted to it in the Second Lien Convertible Notes Indenture and the other Second Lien Convertible Notes Documents shall also apply to U.S. Bank as Second Lien Convertible Notes Trustee and Second Lien Convertible Notes Collateral Agent hereunder, (c) U.S. Bank is entering into this Agreement in its respective capacities as trustee and collateral agent under the Second Lien Renesas Convertible Notes Indenture and the rights, benefits, protections, immunities and indemnities granted to it in the Second Lien Renesas Convertible Notes Indenture and other Second Lien Renesas Convertible Notes Documents shall also apply to U.S. Bank as Second Lien Renesas Convertible Notes Trustee and Second Lien Renesas Convertible Notes Collateral Agent hereunder, (d) U.S. Bank is entering into this Agreement in its respective capacities as trustee and collateral agent under the Second Lien Non-Convertible Notes Indenture and the rights, benefits, protections, immunities and indemnities granted to it in the Second Lien Non-Convertible Notes Indenture and other Second Lien Non-Convertible Notes Documents shall also apply to U.S. Bank as Second

Lien Convertible Notes Trustee and Second Lien Non-Convertible Notes Collateral Agent hereunder.

8.19    Relative Rights.  Notwithstanding anything in this Agreement to the contrary (except to the extent contemplated by Sections 2.7, 5.1 and 5.3(b)), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of the First Lien Indenture, the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture or any other First-Priority Document or Second-Priority Document entered into in connection with the First Lien Indenture, the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture or any other First-Priority Document or Second-Priority Document or permit the Company or any Subsidiary of the Company to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, the First Lien Indenture, the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture or any other First-Priority Document or Second-Priority Document entered into in connection with the First Lien Indenture, the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture or any other First-Priority Document or Second-Priority Document, (b) change the relative priorities of the First-Priority Obligations or the Liens granted under the First-Priority Documents on the Common Collateral (or any other assets) as among the First-Priority Secured Parties or (c) otherwise change the relative rights of the First-Priority Secured Parties in respect of the Common Collateral as among such First-Priority Secured Parties or (d) obligate the Company or any other Grantor to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, the First Lien Indenture, the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture or any other First-Priority Document or Second-Priority Document entered into in connection with the First Lien Indenture, the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture or any other First-Priority Document or Second-Priority Document.

8.20    Collateral Agents.  The First-Priority Collateral Agent is executing and delivering this Agreement solely in its capacity as such and pursuant to directions set forth in the First Lien Indenture and the First Lien Collateral Agreement; and in so doing, the First-Priority Collateral Agent shall not be responsible for the terms or sufficiency of this Agreement for any purpose.  The First-Priority Collateral Agent shall not have duties or obligations under or pursuant to this Agreement other than such duties expressly set forth in this Agreement as duties on its part to be performed or observed.  In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, the First-Priority Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the First Lien Indenture and the First Lien Collateral Agreement.  Each Second-Priority Collateral Agent is executing and delivering this Agreement solely in its capacity as such and pursuant to directions set forth in the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture, the Second Lien Convertible Notes Collateral Agreement, the Second Lien Renesas

40

Convertible Notes Collateral Agreement, and the Second Lien Non-Convertible Notes Collateral Agreement, as applicable; and in so doing, such Second-Priority Collateral Agent shall not be responsible for the terms or sufficiency of this Agreement for any purpose. Each Second-Priority Collateral Agent shall not have duties or obligations under or pursuant to this Agreement other than such duties expressly set forth in this Agreement as duties on its part to be performed or observed. In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, such Second-Priority Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the Second Lien Convertible Notes Indenture, the Second Lien Renesas Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture, the Second Lien Convertible Notes Collateral Agreement, the Second Lien Renesas Convertible Notes Collateral Agreement, and the Second Lien Non-Convertible Notes Collateral Agreement.[11]

   *8.21*    Joinder Requirements.

          (a)    The Company may designate additional obligations as Other First-Priority Obligations or Other Second-Priority Obligations pursuant to this Section 8.21 if (x) the incurrence of such obligations is not prohibited by any First-Priority Document or Second-Priority Document then in effect and (y) the Company shall have delivered an officer's certificate to each Representative certifying the same. If not so prohibited, the Company shall (i) notify each Representative in writing of such designation and (ii) cause the applicable new First-Priority Representative, Other First-Priority Collateral Agent, Second-Priority Representative or Other Second-Priority Collateral Agent to execute and deliver to each other First-Priority Representative and Second-Priority Representative a Joinder Agreement substantially in the form of Exhibit A or Exhibit B, as applicable, hereto.

          (b)    Notwithstanding anything in this Agreement to the contrary, the Company shall not be permitted to designate any additional obligations as Other First-Priority Obligations without the prior written consent of the First Lien Notes Trustee (acting at the direction of the Required Parties under the First Lien Indenture [as in effect on the Effective Date, and any amendments or supplements thereof]). For the avoidance of doubt, this Section 8.21(b) shall automatically terminate and have no further force or effect upon the repayment or refinancing in full or discharge of the First Lien Notes issued on the Effective Date.

   *8.22*    Intercreditor Agreements.

          (a)    Each party hereto agrees that the First-Priority Secured Parties (as among themselves) and the Second-Priority Secured Parties (as among themselves) may each enter into intercreditor agreements (or similar arrangements) with the applicable First-Priority Representatives or Second-Priority Representatives, as the case may be, governing the rights, benefits and privileges as among the First-Priority Secured Parties or as among the Second-Priority Secured Parties, as the case may be, in respect of any or all of the Common Collateral, this Agreement and the other First-Priority

---

[11] To be updated.

Collateral Documents or the other Second-Priority Collateral Documents, as the case may be, including as to application of proceeds of any Common Collateral, priority in respect of any Common Collateral, voting rights, control of any Common Collateral and waivers with respect to any Common Collateral, in each case so long as the terms thereof do not violate or conflict with the provisions of this Agreement or the First-Priority Collateral Documents or Second-Priority Collateral Documents, as the case may be. In any event, if a respective intercreditor agreement (or similar arrangement) exists, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any First-Priority Collateral Document or Second-Priority Collateral Document, and the provisions of this Agreement and the First-Priority Collateral Documents and Second-Priority Collateral Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, modified or otherwise supplemented from time to time in accordance with the terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

(b)     In addition, in the event that the Company or any other Grantor incurs any Obligations secured by a Lien on any Common Collateral that is junior to Liens thereon securing any First-Priority Obligations or Second-Priority Obligations, as the case may be, and such Obligations are not designated by the Company as Second-Priority Obligations hereunder, then the First-Priority Collateral Agent and/or each Second-Priority Collateral Agent shall upon the request of the Company enter into an intercreditor agreement with the agent or trustee for the creditors with respect to such secured Obligations to reflect the relative Lien priorities of such parties with respect to the relevant portion of the Common Collateral and governing the relative rights, benefits and privileges as among such parties in respect of such Common Collateral, including as to application of the proceeds of such Common Collateral, priority in respect of any Common Collateral, voting rights, control of such Common Collateral and waivers with respect to such Common Collateral, in each case, so long as such secured Obligations are not prohibited by, and the terms of such intercreditor agreement do not violate or conflict with, the provisions of this Agreement or any of the First-Priority Documents or Second-Priority Documents, as the case may be. If any such intercreditor agreement (or similar arrangement) is entered into, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any First-Priority Documents, and the provisions of this Agreement, the First-Priority Documents and the Second-Priority Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, modified or otherwise supplemented from time to time in accordance with the respective terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

[Remainder of page intentionally left blank]

42

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

<div style="margin-left:40%">

U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION
as First Lien Notes Trustee


By: _____
    Name:
    Title:


U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION,
as First Lien Collateral Agent and First-
Priority Collateral Agent


By: _____
    Name:
    Title:


U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION,
as Second Lien Convertible Notes Trustee,
Second Lien Convertible Notes Collateral
Agent and
initial Controlling Second-Priority Collateral
Agent


By: _____
    Name:
    Title:


U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION,
as Second Lien Renesas Convertible Notes
Trustee and Second Lien Renesas
Convertible Notes Collateral Agent


By: _____
    Name:
    Title:

</div>

U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION,
as Second Lien Non-Convertible Notes
Trustee and Second Lien Non-Convertible
Notes Collateral Agent


By: _____
    Name:
    Title:


WOLFSPEED, INC.,
as the Company


By: _____
    Name:
    Title:

**Annex I**
**to First Lien/Second Lien Intercreditor Agreement**

**[Form of]**
**CONSENT OF SUBSIDIARY GRANTORS**

Dated: [_____]

Reference is made to the First Lien/Second Lien Intercreditor Agreement, dated as of [_____], 2025, among U.S. Bank Trust Company, National Association ("**U.S. Bank**"), as First Lien Notes Trustee, First Lien Collateral Agent and First-Priority Collateral Agent, U.S. Bank, as Second Lien Convertible Notes Trustee and Second Lien Convertible Notes Collateral Agent, U.S. Bank, as Second Lien Renesas Convertible Notes Trustee and Second Lien Renesas Convertible Notes Collateral Agent, U.S. Bank, as Second Lien Non-Convertible Notes Trustee and Second Lien Non-Convertible Notes Collateral Agent, U.S. Bank, as initial Controlling Second-Priority Collateral Agent and Wolfspeed, Inc. (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "**Intercreditor Agreement**"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

Each of the Grantors party hereto has read the foregoing Intercreditor Agreement and consents thereto. Each of the Grantors party hereto agrees that it will not take any action that would be contrary to the express provisions of the foregoing Intercreditor Agreement, agrees to abide by the requirements expressly applicable to it under the foregoing Intercreditor Agreement and agrees that, except as otherwise expressly provided therein, no Secured Party shall have any liability to any Grantor for acting in accordance with the provisions of the foregoing Intercreditor Agreement. Each of the Grantors party hereto confirms that the foregoing Intercreditor Agreement is for the sole benefit of the Secured Parties and their respective successors and assigns, and that no Grantor is an intended beneficiary or third party beneficiary thereof except to the extent otherwise expressly provided therein.

Each of the Grantors party hereto agrees to take such further action and to execute and/or deliver such additional instructions, directions, documents and instruments (in recordable form, if requested) as the First-Priority Collateral Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by the Intercreditor Agreement.

The Company agrees that, if any Subsidiary of the Company shall become a Grantor after the date hereof, it will promptly cause such Subsidiary to execute and deliver an instrument in the form of this Annex I.

This Consent of Subsidiary Grantors shall be governed and construed in accordance with the laws of the State of New York. Notices delivered to the Grantors pursuant to this Consent of Subsidiary Grantors shall be delivered in accordance with the notice provisions set forth in the Intercreditor Agreement.

IN WITNESS HEREOF, this Consent of Subsidiary Grantors is hereby executed by each of the Grantors as of the date first written above.

[GRANTORS]

By: _____
    Name:
    Title:

EXHIBIT A
**Joinder Agreement**

JOINDER AGREEMENT
(Other First-Priority Obligations)

JOINDER AGREEMENT (this "***Agreement***") dated as of [__], among [__] (the "***New Representative***"), as an Other First-Priority Representative, [[__] (the "***New Collateral Agent***")] [12], as an Other First-Priority Collateral Agent, U.S. Bank Trust Company, National Association ("***U.S. Bank***"), as First Lien Notes Trustee, First Lien Collateral Agent and First-Priority Collateral Agent, U.S. Bank, as Second Lien Convertible Notes Trustee and Second Lien Convertible Notes Collateral Agent, U.S. Bank, as Second Lien Renesas Convertible Notes Trustee and Second Lien Renesas Convertible Notes Collateral Agent, U.S. Bank, as Second Lien Non-Convertible Notes Trustee and Second Lien Non-Convertible Notes Collateral Agent, U.S. Bank, as initial Controlling Second-Priority Collateral Agent and Wolfspeed, Inc.

This Agreement is supplemental to that certain First Lien/Second Lien Intercreditor Agreement, dated as of [__], 2025 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***First Lien/Second Lien Intercreditor Agreement***"), by and among the parties (other than the New Representative [and the New Collateral Agent]) referred to above.  This Agreement has been entered into to record the accession of the New Representative[s] as Other First-Priority Representative[s] under the First Lien/Second Lien Intercreditor Agreement [and to record the accession of the New Collateral Agent as an Other First-Priority Collateral Agent under the First Lien/Second Lien Intercreditor Agreement].

ARTICLE I

**Definitions**

SECTION 1.01    Capitalized terms used but not defined herein shall have the meanings assigned thereto in the First Lien/Second Lien Intercreditor Agreement.

ARTICLE II

**Accession**

SECTION 2.01  [The][/Each] New Representative agrees to become, with immediate effect, a party to and agrees to be bound by the terms of, the First Lien/Second Lien Intercreditor Agreement as an Other First-Priority Representative as if it had originally been party to the First Lien/Second Lien Intercreditor Agreement as an Other First-Priority Representative.

---

[12] To be included if applicable.

SECTION 2.02   [The New Collateral Agent agrees to become, with immediate effect, a party to and agrees to be bound by the terms of, the First Lien/Second Lien Intercreditor Agreement as an Other First-Priority Collateral Agent as if it had originally been party to the First Lien/Second Lien Intercreditor Agreement as an Other First-Priority Collateral Agent.]

SECTION 2.03  The New Representative[s] [and the New Collateral Agent] confirm[s] that their address details for notices pursuant to the First Lien/Second Lien Intercreditor Agreement [is][/are] as follows: [_____].

SECTION 2.04   Each party to this Agreement (other than the New Representative[s] [and the New Collateral Agent]) confirms the acceptance of the New Representative[s] [and the New Collateral Agent] as an Other First-Priority Representative [and Other First-Priority Collateral Agent, respectively,] for purposes of the First Lien/Second Lien Intercreditor Agreement.

SECTION 2.05  [_____] [is][/are] acting in the capacities of Other First-Priority Representative[s] [and [_____] is acting in its capacity as Other First-Priority Collateral Agent solely] for the Secured Parties under [_____].

ARTICLE III

**Miscellaneous**

SECTION 3.01  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

SECTION 3.02  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[INSERT SIGNATURE BLOCKS]

<div align="right">**EXHIBIT B**
**Joinder Agreement**</div>

<div align="center">JOINDER AGREEMENT
(Other Second-Priority Obligations)</div>

JOINDER AGREEMENT (this "***Agreement***") dated as of [__], 2025, among [__] (the "***New Representative***"), as an Other Second-Priority Representative, [[__] (the "***New Collateral Agent***")][13], as an Other Second-Priority Collateral Agent, U.S. Bank Trust Company, National Association ("***U.S. Bank***"), as First Lien Notes Trustee, First Lien Collateral Agent and First-Priority Collateral Agent, U.S. Bank, as Second Lien Convertible Notes Trustee and Second Lien Convertible Notes Collateral Agent, U.S. Bank, as Second Lien Renesas Convertible Notes Trustee and Second Lien Renesas Convertible Notes Collateral Agent, U.S. Bank, as Second Lien Non-Convertible Notes Trustee and Second Lien Non-Convertible Notes Collateral Agent, U.S. Bank, as initial Controlling Second-Priority Collateral Agent and Wolfspeed, Inc..

This Agreement is supplemental to that certain First Lien/Second Lien Intercreditor Agreement, dated as of [__], 2025 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***First Lien/Second Lien Intercreditor Agreement***"), by and among the parties (other than the New Representative [and the New Collateral Agent]) referred to above.  This Agreement has been entered into to record the accession of the New Representative[s] as Other Second-Priority Representative[s] under the First Lien/Second Lien Intercreditor Agreement [and to record the accession of the New Collateral Agent as an Other Second-Priority Collateral Agent under the First Lien/Second Lien Intercreditor Agreement].

<div align="center">ARTICLE I</div>

<div align="center">**Definitions**</div>

SECTION 1.01  Capitalized terms used but not defined herein shall have the meanings assigned thereto in the First Lien/Second Lien Intercreditor Agreement.

<div align="center">ARTICLE II</div>

<div align="center">**Accession**</div>

SECTION 2.01  [The][/Each] New Representative agrees to become, with immediate effect, a party to and agrees to be bound by the terms of, the First Lien/Second Lien Intercreditor Agreement as an Other Second-Priority Representative as if it had

---

[13] To be included if applicable.

originally been party to the First Lien/Second Lien Intercreditor Agreement as an Other Second-Priority Representative.

SECTION 2.02   [The New Collateral Agent agrees to become, with immediate effect, a party to and agrees to be bound by the terms of, the First Lien/Second Lien Intercreditor Agreement as an Other Second-Priority Collateral Agent as if it had originally been party to the First Lien/Second Lien Intercreditor Agreement as an Other Second-Priority Collateral Agent.]

SECTION 2.03   The New Representative[s] [and the New Collateral Agent] confirm[s] that their address details for notices pursuant to the First Lien/Second Lien Intercreditor Agreement [is][/are] as follows: [_____].

SECTION 2.04   Each party to this Agreement (other than the New Representative[s] [and the New Collateral Agent]) confirms the acceptance of the New Representative[s] [and the New Collateral Agent] as an Other Second-Priority Representative [and an Other Second-Priority Collateral Agent, respectively,] for purposes of the First Lien/Second Lien Intercreditor Agreement.

SECTION 2.05   [_____] [is][/are] acting in the capacities of Other Second-Priority Representative[s] [and [_____] is acting in its capacity as Other Second-Priority Collateral Agent solely] for the Secured Parties under [_____].

ARTICLE III

**Miscellaneous**

SECTION 3.01   This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

SECTION 3.02   This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[INSERT SIGNATURE BLOCKS]

# EXHIBIT C-2

**Pari Passu Intercreditor Agreement**

*[Plan Supplement Filing Version 8/12/2025]*

*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

EQUAL PRIORITY INTERCREDITOR AGREEMENT

Among

WOLFSPEED, INC.,

THE OTHER GRANTORS PARTY HERETO,

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Second Lien Convertible Notes Trustee and as Second Lien Convertible Notes Collateral Agent for the
Second Lien Convertible Notes Secured Parties,
and the Controlling Collateral Agent,

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Second Lien Non-Convertible Notes Trustee and as Second Lien Non-Convertible Notes Collateral
Agent for the Second Lien Non-Convertible Notes Secured Parties,

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Renesas Convertible Notes Trustee and as Renesas Collateral Agent for the Renesas Secured Parties,

and

each Additional Agent from time to time party hereto

dated as of [●], 2025

TABLE OF CONTENT

**ARTICLE I** Definitions ........................................................................................................ 1

SECTION 1.01.    Certain Defined Terms .......................................................... 1
SECTION 1.02.    Terms Generally .................................................................... 8
SECTION 1.03.    Impairments .......................................................................... 8

**ARTICLE II** Priorities and Agreements with Respect to Shared Collateral .................... 8

SECTION 2.01.    Priority of Claims .................................................................. 8
SECTION 2.02.    Actions with Respect to Shared Collateral; Prohibition on Contesting Liens ..... 10
SECTION 2.03.    No Interference; Payment Over ........................................... 11
SECTION 2.04.    Automatic Release of Liens; Amendments to Equal Priority Security
                 Documents ............................................................................ 11
SECTION 2.05.    Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings..... 12
SECTION 2.06.    Reinstatement ...................................................................... 13
SECTION 2.07.    Insurance .............................................................................. 13
SECTION 2.08.    Refinancings ........................................................................ 13
SECTION 2.09.    Possessory Collateral Agent as Gratuitous Bailee for Perfection ...... 13

**ARTICLE III** Existence and Amounts of Liens and Obligations .................................... 15

SECTION 3.01.    Determinations with Respect to Amounts of Liens and Obligations ............ 15

**ARTICLE IV** The Controlling Collateral Agent ........................................................... 15

SECTION 4.01.    Appointment and Authority ................................................ 15
SECTION 4.02.    Rights as an Equal Priority Secured Party .......................... 17
SECTION 4.03.    Exculpatory Provisions ....................................................... 17
SECTION 4.04.    Collateral and Guaranty Matters ........................................ 18

**ARTICLE V** Miscellaneous ......................................................................................... 18

SECTION 5.01.    Notices .................................................................................. 18
SECTION 5.02.    Waivers; Amendment; Joinder Agreements ........................ 19
SECTION 5.03.    Parties in Interest ................................................................ 19
SECTION 5.04.    Survival of Agreement ........................................................ 19
SECTION 5.05.    Counterparts ........................................................................ 19
SECTION 5.06.    Severability .......................................................................... 20
SECTION 5.07.    Authorization ....................................................................... 20
SECTION 5.08.    Submission to Jurisdiction Waivers; Consent to Service of Process .......... 20
SECTION 5.09.    **GOVERNING LAW; WAIVER OF JURY TRIAL** ....................... 20
SECTION 5.10.    Headings ............................................................................... 21
SECTION 5.11.    Conflicts ............................................................................... 21
SECTION 5.12.    Provisions Solely to Define Relative Rights ...................... 21
SECTION 5.13.    Additional Equal Priority Obligations ................................ 21
SECTION 5.14.    Integration ............................................................................ 22
SECTION 5.15.    Information Concerning Financial Condition of Issuer and the other
                 Grantors ............................................................................... 22
SECTION 5.16.    Additional Grantors ............................................................ 22

SECTION 5.17.   Further Assurances .............................................................................. 22

SECTION 5.18.   Second Lien Convertible Notes Collateral Agent, Second Lien Non-
Convertible Notes Collateral Agent and Renesas Collateral Agent ................... 23

**ANNEX I**   GRANTORS

EQUAL PRIORITY INTERCREDITOR AGREEMENT, dated as of [●], 2025 (the "**Effective Date**" and this agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), by and among Wolfspeed, Inc., a Delaware corporation ("**Issuer**"), the other Grantors (as defined below) from time to time party hereto, U.S. Bank Trust Company, National Association, a national banking association ("**U.S. Bank**"), not in its individual capacity but solely as collateral agent and trustee for the Second Lien Convertible Notes Secured Parties (as defined below) (in such capacities and together with its successors and permitted assigns in such capacities, the "**Second Lien Convertible Notes Collateral Agent**" and the "**Second Lien Convertible Notes Trustee**," as applicable) and as Controlling Collateral Agent, U.S. Bank, not in its individual capacity but solely as collateral agent and trustee for the Second Lien Non-Convertible Notes Secured Parties (as defined below) (in such capacities and together with its successors and permitted assigns in such capacities, the "**Second Lien Non-Convertible Notes Collateral Agent**" and the "**Second Lien Non-Convertible Notes Trustee**," as applicable), U.S. Bank, not in its individual capacity but solely as collateral agent and trustee for the Renesas Secured Parties (as defined below) (in such capacities and together with its successors and permitted assigns in such capacities, the "**Renesas Collateral Agent**" and the "**Renesas Convertible Notes Trustee**," as applicable), and each Additional Agent from time to time party hereto for the Additional Equal Priority Secured Parties of the Series with respect to which it is acting in such capacity.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Second Lien Convertible Notes Collateral Agent (for itself and on behalf of the Second Lien Convertible Notes Secured Parties), the Second Lien Non-Convertible Notes Collateral Agent (for itself and on behalf of the Second Lien Non-Convertible Notes Secured Parties), the Renesas Collateral Agent (for itself and on behalf of the Renesas Secured Parties), and each Additional Agent (for itself and on behalf of the Additional Equal Priority Secured Parties of the applicable Series) agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01.    Certain Defined Terms.  Capitalized terms used but not otherwise defined herein have the meanings set forth in the Second Lien Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture, or the Renesas Indenture, as applicable, with the Second Lien Convertible Notes Indenture controlling in the event of discrepancies, or, if defined in the New York UCC, the meanings specified therein.  As used in this Agreement, the following terms have the meanings specified below:

"**Additional Agent**" means the collateral agent and the administrative agent and/or trustee (as applicable) or any other similar agent or Person which is named as the Pari Passu Class Debt Representative in the applicable Joinder Agreement with respect to any Series of Additional Equal Priority Obligations, in each case, together with its successors in such capacity.

"**Additional Equal Priority Debt Facility**" means one or more debt facilities, commercial paper facilities or indentures with respect to which the requirements of Section 5.13 of this Agreement have been satisfied, in each case with banks, other lenders, noteholders or trustees providing for revolving credit loans, term loans, letters of credit, notes or other borrowings, in each case, as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time; provided, that none of the Second Lien Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture or the Renesas Indenture shall constitute an Additional Equal Priority Debt Facility at any time.

"**Additional Equal Priority Documents**" means, with respect to any Series of Additional Equal Priority Obligations, the notes, credit agreements, indentures, purchase agreements, security documents and other operative agreements evidencing or governing such indebtedness, and each other agreement entered into for the purpose of securing any Series of Additional Equal Priority Obligations.

"**Additional Equal Priority Obligations**" means, with respect to any Additional Equal Priority Debt Facility, (a) all principal of, and interest (including any interest, fees and other amounts that accrue after the commencement of any Bankruptcy Case, whether or not allowed or allowable as a claim in any such proceeding) payable with respect to, such Additional Equal Priority Debt Facility, (b) all other amounts payable to the related Additional Equal Priority Secured Parties under the related Additional Equal Priority Documents and (c) subject to Section 2.08, any Refinancing of the foregoing.

"**Additional Equal Priority Secured Party**" means, with respect to any Series of Additional Equal Priority Obligations, the holders of such Additional Equal Priority Obligations, the Additional Agent with respect thereto, any trustee or agent or any other similar agent or Person therefor under any related Additional Equal Priority Documents and the beneficiaries of each indemnification obligation undertaken by any borrower or issuer (as applicable) or any guarantor under any related Additional Equal Priority Documents.

"**Additional Intercreditor Agreement**" has the meaning assigned to such term in the Second Lien Convertible Notes Indenture, the Second Lien Non-Convertible Notes Indenture and the Renesas Indenture, as applicable.

"**Agreement**" has the meaning assigned to such term in the preamble hereto.

"**Bankruptcy Case**" has the meaning assigned to such term in Section 2.05(b).

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.).

"**Bankruptcy Law**" means Title 11 of the United States Code or any similar U.S. federal or state or non-U.S. law for the relief of debtors.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Collateral**" means all of the assets of any Grantor with respect to which a Lien is granted or purported or required to be granted for one or more Series of Equal Priority Obligations.

"**Collateral Agent**" means (a) in the case of any Second Lien Non-Convertible Notes Obligations, the Second Lien Non-Convertible Notes Collateral Agent, (b) in the case of the Second Lien Convertible Notes Obligations, the Second Lien Convertible Notes Collateral Agent, (c) in the case of the Renesas Notes Obligations, the Renesas Collateral Agent and (d) in the case of any Series of Additional Equal Priority Obligations or Additional Equal Priority Secured Parties that become subject to this Agreement after the date hereof, the Additional Agent named for such Series in the applicable Joinder Agreement.

"**Control Agreement Requirement**" has the meaning assigned to such term in Section 5.18(c).

"**Controlling Collateral Agent**" means, with respect to any Shared Collateral, (a) until the Controlling Collateral Agent Change Date, the Second Lien Convertible Notes Collateral Agent and

(b) from and after the Controlling Collateral Agent Change Date, the Major Non-Controlling Collateral Agent.

"**Controlling Collateral Agent Change Date**" means the earlier of (a) the Discharge of Second Lien Convertible Notes Obligations and (b) the Non-Controlling Collateral Agent Enforcement Date.

"**Controlling Secured Parties**" means, with respect to any Shared Collateral, the Series of Equal Priority Secured Parties whose Collateral Agent is the Controlling Collateral Agent for such Shared Collateral.

"**DIP Financing**" has the meaning assigned to such term in Section 2.05(b).

"**DIP Financing Liens**" has the meaning assigned to such term in Section 2.05(b).

"**DIP Lenders**" has the meaning assigned to such term in Section 2.05(b).

"**Discharge**" means, with respect to any Shared Collateral and any Series of Equal Priority Obligations, the date on which such Series of Equal Priority Obligations is no longer secured by such Shared Collateral.  The term "Discharged" shall have a corresponding meaning.

"**Discharge of Equal Priority Obligations**" means, with respect to any Shared Collateral, the Discharge of all Equal Priority Obligations with respect to such Shared Collateral.

"**Discharge of Second Lien Convertible Notes Obligations**" means, with respect to any Shared Collateral, the Discharge of all Second Lien Convertible Notes Obligations with respect to such Shared Collateral; provided, that a Discharge of Second Lien Convertible Notes Obligations shall be deemed not to have occurred in connection with a Refinancing of such Second Lien Convertible Notes Obligations with additional Equal Priority Obligations secured by such Shared Collateral under an agreement that has been designated in writing by the Second Lien Convertible Notes Collateral Agent or by the Issuer, in each case, to each other Collateral Agent as the "Second Lien Convertible Notes Indenture" for purposes of this Agreement.

"**Effective Date**" has the meaning assigned to such term in the preamble hereto.

"**Equal Priority Obligations**" means, collectively, (a) the Second Lien Convertible Notes Obligations, (b) the Second Lien Non-Convertible Notes Obligations, (c) the Renesas Obligations and (c) each Series of Additional Equal Priority Obligations.

"**Equal Priority Secured Parties**" means (a) the Second Lien Convertible Notes Secured Parties, (b) the Second Lien Non-Convertible Notes Secured Parties, (c) the Renesas Secured Parties and (d) the Additional Equal Priority Secured Parties with respect to each Series of Additional Equal Priority Obligations.

"**Equal Priority Security Documents**" means the Second Lien Convertible Notes Security Agreement, the other [Security Documents] (as defined in the Second Lien Convertible Notes Indenture), the Second Lien Non-Convertible Notes Security Agreement, the other [Security Documents] (as defined in the Second Lien Non-Convertible Notes Indenture), the Renesas Security Agreement, the other [Security Documents] (as defined in the Renesas Indenture), and each other agreement entered into in favor of any Collateral Agent for the purpose of securing any Series of Equal Priority Obligations on the Shared Collateral.

"**Event of Default**" means an "Event of Default" (or any other similarly defined term) as defined in any Secured Notes Document.

"**First Lien/Second Lien Intercreditor Agreement**" means that certain First Lien/Second Lien Intercreditor Agreement, dated as of the date hereof, among U.S. Bank, as First Lien Notes Trustee, U.S. Bank as First Lien Collateral Agent and First-Priority Collateral Agent, U.S. Bank as Second Lien Convertible Notes Trustee and Second Lien Convertible Notes Collateral Agent, U.S. Bank as Second Lien Renesas Convertible Notes Trustee and Second Lien Renesas Convertible Notes Collateral Agent, U.S. Bank as Second Lien Non-Convertible Notes Trustee and Second Lien Non-Convertible Notes Collateral Agent, U.S. Bank as Second-Priority Collateral Agent.

"**First Priority Collateral Agent**" means the First-Priority Collateral Agent as defined in the First Lien/Second Lien Intercreditor Agreement.

"**Grantors**" means the Issuer and each Subsidiary of Issuer that has granted a security interest pursuant to any Equal Priority Security Document to secure any Series of Equal Priority Obligations. The Grantors existing on the date hereof are set forth in Annex I hereto.

"**Impairment**" has the meaning assigned to such term in Section 1.03.

"**Insolvency or Liquidation Proceeding**" means (a) any voluntary or involuntary case or proceeding under any Bankruptcy Law with respect to any Grantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to any of its assets, (c) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy (except for any voluntary liquidation, dissolution or other winding up to the extent permitted by the applicable Secured Notes Documents) or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Intervening Creditor**" shall have the meaning assigned to such term in Section 2.01(a).

"**Issuer**" has the meaning assigned to such term in the preamble hereto.

"**Joinder Agreement**" means a supplement to this Agreement in the form of Annex II hereof required to be delivered by an Additional Agent to the Controlling Collateral Agent pursuant to Section 5.13 hereto in order to establish a Series of Additional Equal Priority Obligations and become Additional Equal Priority Secured Parties hereunder.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar monetary encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; *provided* that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"**Major Non-Controlling Collateral Agent**" means, with respect to any Shared Collateral and at any time, the Collateral Agent (other than the Second Lien Convertible Notes Collateral Agent) of the Series of Equal Priority Obligations that constitutes the largest outstanding aggregate principal amount of any then outstanding Series of Equal Priority Obligations (excluding the Series of Second Lien

4

Convertible Notes Obligations and any principal amount deemed not to constitute "Equal Priority Obligations" pursuant to Section 2.08 of this Agreement) with respect to such Shared Collateral.

"**Mortgage Requirement**" has the meaning assigned to such term in Section 5.18(c).

"**New York UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"**Non-Controlling Collateral Agent**" means, at any time with respect to any Shared Collateral, any Collateral Agent that is not the Controlling Collateral Agent at such time with respect to such Shared Collateral.

"**Non-Controlling Collateral Agent Enforcement Date**" means, with respect to any Non-Controlling Collateral Agent, the date that is 120 days (throughout which 120-day period such Non-Controlling Collateral Agent was the Major Non-Controlling Collateral Agent) after the occurrence of both (a) an Event of Default under and as defined in the Secured Notes Documents for the applicable Series of Equal Priority Obligations under which such Non-Controlling Collateral Agent is the Collateral Agent, but only for so long as such Event of Default is continuing and (b) the Controlling Collateral Agent and each other Collateral Agent's receipt of written notice from such Non-Controlling Collateral Agent certifying that (i) such Non-Controlling Collateral Agent is the Major Non-Controlling Collateral Agent and that an Event of Default under and as defined in the Secured Notes Documents under which such Non-Controlling Collateral Agent is the Collateral Agent has occurred and is continuing and (ii) the Equal Priority Obligations of the Series with respect to which such Non-Controlling Collateral Agent is the Collateral Agent are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Secured Notes Documents for that Series of Equal Priority Obligations; provided, that the Non-Controlling Collateral Agent Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any Shared Collateral and such time period set forth above shall be tolled and deemed not to have started (x) at any time the Controlling Collateral Agent is prohibited or otherwise restricted from pursuing any enforcement action with respect to such Shared Collateral as a result of the First Lien/Second Lien Intercreditor Agreement, (y) at any time the Controlling Collateral Agent has commenced and is diligently pursuing any enforcement action with respect to a material portion of the Shared Collateral, or (z) at any time that the Grantor that has granted a security interest in such Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"**Non-Controlling Secured Parties**" means, with respect to any Shared Collateral, the Equal Priority Secured Parties that are not Controlling Secured Parties with respect to such Shared Collateral.

"**Pari Passu Class Debt**" shall have the meaning assigned to such term in Section 5.13.

"**Pari Passu Class Debt Parties**" shall have the meaning assigned to such term in Section 5.13.

"**Pari Passu Class Debt Representative**" shall have the meaning assigned to such term in Section 5.13.

"**Pari Passu Liens**" means the Liens on the Collateral in favor of the Equal Priority Secured Parties under the Equal Priority Security Documents.

"**Possessory Collateral**" means any Shared Collateral in the possession of any Collateral Agent (or its agents or bailees) or the First Priority Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction.

Possessory Collateral includes any certificated Securities, Instruments and Tangible Chattel Paper, in each case, delivered to or in the possession of the Collateral Agent under the terms of the Equal Priority Security Documents.

"**Proceeds**" has the meaning assigned to such term in Section 2.01(a).

"**Refinance**" means, with respect to any Indebtedness, to refinance, extend, renew, defease, amend, increase, restate, modify, supplement, restructure, refund, replace, repay, redeem, repurchase, acquire, prepay, retire or extinguish such Indebtedness or to enter into alternative financing arrangements to exchange or replace (in whole or in part) such Indebtedness, including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, or, after the original instrument giving rise to such Indebtedness has been terminated, by entering into any credit agreement, loan agreement, note purchase agreement, indenture or other agreement.  "Refinanced" and "Refinancing" have correlative meanings.

"**Renesas Collateral Agent**" has the meaning assigned to such term in the preamble hereto.

"**Renesas Convertible Notes Trustee**" means U.S. Bank, in its capacity as trustee under the Renesas Indenture, and its permitted successors and assigns in such capacity.

"**Renesas Indenture**" means that certain Indenture, dated as of the date hereof, between the Grantors and U.S. Bank, as Renesas Convertible Notes Trustee and Renesas Collateral Agent, as such Indenture may be amended, restated, supplemented, increased or otherwise modified, Refinanced or replaced from time to time.

"**Renesas Obligations**" means the "Secured Obligations" as defined in the Renesas Security Agreement.

"**Renesas Secured Parties**" means the "Secured Parties" as defined in the Renesas Security Agreement.

"**Renesas Security Agreement**" means the "Security Agreement" as defined in the Renesas Indenture.

"**Second Lien Convertible Notes Collateral Agent**" has the meaning assigned to such term in the preamble hereto.

"**Second Lien Convertible Notes Indenture**" means that certain Indenture (Convertible Notes), dated as of the date hereof, between the Grantors and U.S. Bank, as Second Lien Convertible Notes Trustee and Second Lien Convertible Notes Collateral Agent, as such Indenture may be amended, restated, supplemented, increased or otherwise modified, Refinanced or replaced from time to time.

"**Second Lien Convertible Notes Obligations**" means the "Secured Obligations" as defined in the Second Lien Convertible Notes Security Agreement.

"**Second Lien Convertible Notes Secured Parties**" means the "Secured Parties" as defined in the Second Lien Convertible Notes Security Agreement.

"**Second Lien Convertible Notes Security Agreement**" means the "Security Agreement" as defined in the Second Lien Convertible Notes Indenture.

"**Second Lien Convertible Notes Trustee**" means U.S. Bank, in its capacity as trustee under the Second Lien Convertible Notes Indenture, and its permitted successors and assigns in such capacity.

"**Second Lien Non-Convertible Notes Collateral Agent**" has the meaning assigned to such term in the preamble hereto.

"**Second Lien Non-Convertible Notes Indenture**" means that certain Indenture (Non-Convertible Notes), dated as of the date hereof, between the Grantors and U.S. Bank, as Second Lien Non-Convertible Notes Trustee and Second Lien Non-Convertible Notes Collateral Agent, as such Indenture may be amended, restated, supplemented, increased or otherwise modified, Refinanced or replaced from time to time.

"**Second Lien Non-Convertible Notes Obligations**" means the "Secured Obligations" as defined in the Second Lien Non-Convertible Notes Security Agreement.

"**Second Lien Non-Convertible Notes Secured Parties**" means the "Secured Parties" as defined in the Second Lien Non-Convertible Notes Security Agreement.

"**Second Lien Non-Convertible Notes Security Agreement**" means the "Security Agreement" as defined in the Second Lien Non-Convertible Notes Indenture.

"**Second Lien Non-Convertible Notes Trustee**" means U.S. Bank, in its capacity as trustee under the Second Lien Non-Convertible Notes Indenture, and its permitted successors and assigns in such capacity.

"**Secured Notes Document**" means (a) the Second Lien Convertible Notes Indenture and each other Indenture Document (as defined in the Second Lien Convertible Notes Indenture), (b) the Second Lien Non-Convertible Notes Indenture and each other Indenture Document (as defined in the Second Lien Non-Convertible Notes Indenture), (c) the Renesas Indenture and each other Indenture Document (as defined in the Renesas Indenture) and (d) each Additional Equal Priority Document.

"**Series**" means (a) with respect to the Equal Priority Secured Parties, each of (i) the Second Lien Convertible Notes Secured Parties (in their capacities as such), (ii) the Second Lien Non-Convertible Notes Secured Parties (in their capacity as such), (iii) the Renesas Secured Parties (in their capacity as such) and (iv) the Additional Equal Priority Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Collateral Agent (in its capacity as such for such Additional Equal Priority Secured Parties) and (b) with respect to any Equal Priority Obligations, each of (i) the Second Lien Convertible Notes Obligations, (ii) the Second Lien Non-Convertible Notes Obligations, (iii) the Renesas Obligations and (iv) the Additional Equal Priority Obligations incurred pursuant to any Additional Equal Priority Debt Facility or any related Additional Equal Priority Documents, which pursuant to any Joinder Agreement are to be represented under this Agreement by a common Collateral Agent (in its capacity as such for such Additional Equal Priority Obligations).

"**Shared Collateral**" means, at any time, Collateral in which the holders of two or more Series of Equal Priority Obligations (or their respective Collateral Agents) hold a valid and perfected security interest at such time. If more than two Series of Equal Priority Obligations are outstanding at any time and the holders of less than all Series of Equal Priority Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of Equal Priority Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series that does not have a valid and perfected security interest in such Collateral at such time.

"**Title Insurance Requirement**" has the meaning assigned to such term in Section 5.18(c).

"**Uniform Commercial Code**" or "**UCC**" means the New York UCC, or the Uniform Commercial Code (or any similar or comparable legislation) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

SECTION 1.02.    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein," "hereof" and "hereunder" and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

SECTION 1.03.    Impairments.  It is the intention of the Equal Priority Secured Parties of each Series that the holders of Equal Priority Obligations of such Series (and not the Equal Priority Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the Equal Priority Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of Equal Priority Obligations), (y) any of the Equal Priority Obligations of such Series do not have an enforceable security interest in any of the Collateral securing any other Series of Equal Priority Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of Equal Priority Obligations) on a basis ranking prior to the security interest of such Series of Equal Priority Obligations but junior to the security interest of any other Series of Equal Priority Obligations or (ii) the existence of any Collateral for any other Series of Equal Priority Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of Equal Priority Obligations, an "**Impairment**" of such Series).  In the event of any Impairment with respect to any Series of Equal Priority Obligations, the results of such Impairment shall be borne solely by the holders of such Series of Equal Priority Obligations, and the rights of the holders of such Series of Equal Priority Obligations (including the right to receive distributions in respect of such Series of Equal Priority Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such Equal Priority Obligations subject to such Impairment. Additionally, in the event the Equal Priority Obligations of any Series are modified pursuant to applicable law (including pursuant to Section 1129 of the Bankruptcy Code), any reference to such Equal Priority Obligations or the Secured Notes Documents governing such Equal Priority Obligations shall refer to such obligations or such documents as so modified.

## ARTICLE II

### Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01.    Priority of Claims.

(a)        Anything contained herein or in any of the Secured Notes Documents to the contrary notwithstanding (but subject to Section 1.03) and, subject to the First Lien/Second Lien Intercreditor Agreement, if an Event of Default has occurred and is continuing and the Controlling Collateral Agent is taking action to enforce rights in respect of any Shared Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of Issuer  or any other Grantor or any Equal Priority Secured Party receives any payment pursuant to any intercreditor agreement (other than this Agreement) with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any such Shared Collateral by any Collateral Agent or any Equal Priority Secured Party and proceeds of any such distribution or payment (all proceeds of any sale, collection or other liquidation of any Shared Collateral and all proceeds of any such distribution or payment being collectively referred to as "**Proceeds**"), shall be applied (i) FIRST, to the payment of all amounts owing to each Collateral Agent (in its capacity as such) pursuant to the terms of any Secured Notes Document, (ii) SECOND, subject to Section 1.03, to the payment in full of the Equal Priority Obligations of each Series on a ratable basis, with such Proceeds to be applied to the Equal Priority Obligations of a given Series in accordance with the terms of the Secured Notes Documents applicable to such Series and (iii) THIRD, after the Discharge of Equal Priority Obligations, to Issuer  and the other Grantors or their successors or assigns, as their interests may appear, or to whomever may be lawfully entitled to receive the same pursuant to any Additional Intercreditor Agreement then in effect, or otherwise, or as a court of competent jurisdiction may direct. Notwithstanding the foregoing, with respect to any Shared Collateral for which a third party (other than an Equal Priority Secured Party) has a lien or security interest that is junior in priority to the security interest of any Series of Equal Priority Obligations, after giving effect to any Additional Intercreditor Agreement then in effect, but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of Equal Priority Obligations (such third party an "**Intervening Creditor**"), the value of any Shared Collateral or Proceeds that are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral or Proceeds to be distributed in respect of the Series of Equal Priority Obligations with respect to which such Impairment exists.  If, despite the provisions of this Section 2.01(a), any Equal Priority Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the Equal Priority Obligations to which it is then entitled in accordance with this Section 2.01(a), such Equal Priority Secured Party shall hold such payment or recovery in trust for the benefit of all Equal Priority Secured Parties for distribution in accordance with this Section 2.01(a).

(b)        Whenever a Collateral Agent shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any Series of Equal Priority Obligations, or the Shared Collateral subject to any Lien securing any Series of Equal Priority Obligations, it may request that such information be furnished to it in writing by each other applicable Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that (i) any information provided by any Collateral Agent as to the Shared Collateral subject to any Lien securing such Series of Equal Priority Obligations may be provided to the knowledge of such Collateral Agent and (ii) if a Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Collateral Agent shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Issuer. Each Collateral Agent may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any Equal Priority Secured Party or any other person as a result of such determination.

(c)        For the avoidance of doubt, any amounts to be distributed pursuant to this Section 2.01 shall be distributed by the Controlling Collateral Agent to each Non-Controlling Collateral Agent for further distribution to its Equal Priority Secured Parties.

(d)     Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of Equal Priority Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Notes Documents or any defect or deficiencies in the Liens securing the Equal Priority Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.03), each Equal Priority Secured Party hereby agrees that (i) the Liens securing each Series of Equal Priority Obligations on any Shared Collateral shall be of equal priority and (ii) the benefits and proceeds of the Shared Collateral shall be shared among the Equal Priority Secured Parties as provided herein.

SECTION 2.02.     Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)     With respect to any Shared Collateral, (i) only the Controlling Collateral Agent shall act or refrain from acting with respect to the Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral) and (ii) no Non-Controlling Collateral Agent or other Non-Controlling Secured Party shall, or shall have the right to, instruct the Controlling Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any Equal Priority Security Document, applicable law or otherwise, it being agreed that only the Controlling Collateral Agent  shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral; provided, that, notwithstanding the foregoing, (i) in any Bankruptcy Case, any Collateral Agent or any other Equal Priority Secured Party may file a proof of claim or statement of interest with respect to the Equal Priority Obligations owed to the Equal Priority Secured Parties; (ii) any Collateral Agent or any other Equal Priority Secured Party may take any action to preserve or protect the validity and enforceability of the Liens granted in favor of the Equal Priority Secured Parties; provided, that no such action is, or could reasonably be expected to be, (A) adverse to the Liens granted in favor of the Controlling Secured Parties or any other Equal Priority Secured Party or the rights of the Controlling Collateral Agent, or any other Controlling Secured Parties to exercise remedies in respect thereof or (B) otherwise inconsistent with the terms of this Agreement; and (iii) any Collateral Agent, or any other Equal Priority Secured Party may file any responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of such Equal Priority Secured Party, including any claims secured by the Shared Collateral, in each case, to the extent not inconsistent with the terms of this Agreement. Notwithstanding the equal priority of the Liens and subject to the terms of the First Lien/Second Lien Intercreditor Agreement, the Controlling Collateral Agent may deal with the Shared Collateral as if such Controlling Collateral Agent had a senior Lien on such Shared Collateral.  No Non-Controlling Collateral Agent or Non-Controlling Secured Party will, or will have the right to, contest, protest or object to any foreclosure proceeding or action brought by the Controlling Collateral Agent or any Controlling Secured Party or any other exercise by the Controlling Collateral Agent or any Controlling Secured Party of any rights and remedies relating to the Shared Collateral.  The foregoing shall not be construed to limit the rights and priorities of any Equal Priority Secured Party or Collateral Agent with respect to any Collateral not constituting Shared Collateral.

(b)     Each Collateral Agent and the Equal Priority Secured Parties for which it is acting hereunder agree to be bound by the provisions of this Agreement.

(c)     Each of the Equal Priority Secured Parties agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or

Liquidation Proceeding), the perfection, priority, validity, attachment or enforceability of a Lien held by or on behalf of any of the Equal Priority Secured Parties in all or any part of the Shared Collateral, or the provisions of this Agreement; provided, that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any other Equal Priority Secured Party to enforce this Agreement.

SECTION 2.03.   No Interference; Payment Over.

(a)   Each Equal Priority Secured Party agrees that (i) it will not challenge, or support any other Person in challenging, in any proceeding the validity or enforceability of any Equal Priority Obligations of any Series or any Equal Priority Security Document or the validity, attachment, perfection or priority of any Lien under any Equal Priority Security Document or the validity or enforceability of the priorities, rights or duties established by this Agreement, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by the Controlling Collateral Agent, (iii) it will not institute in any Bankruptcy Case or other proceeding any claim against the Controlling Collateral Agent  or any other Equal Priority Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Controlling Collateral Agent or any other Equal Priority Secured Party shall be liable for any action taken or omitted to be taken by the Controlling Collateral Agent, or any other Equal Priority Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (iv) it will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Shared Collateral and (v) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided, that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any other Equal Priority Secured Party to enforce this Agreement.

(b)   Each Equal Priority Secured Party hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral, pursuant to any Equal Priority Security Document or by the exercise of any rights available to it under applicable law or in any Bankruptcy Case or Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of Equal Priority Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other Equal Priority Secured Parties that have a security interest in such Shared Collateral and promptly transfer such Shared Collateral, Proceeds or payment, as the case may be, to the Controlling Collateral Agent to be distributed in accordance with the provisions of Section 2.01 hereof.

SECTION 2.04.   Automatic Release of Liens; Amendments to Equal Priority Security Documents.

(a)   If at any time the Controlling Collateral Agent forecloses upon or otherwise exercises remedies with respect to any Shared Collateral resulting in a sale or disposition thereof, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of each other Collateral Agent for the benefit of each Series of Equal Priority Secured Parties upon such Shared Collateral will automatically be released and discharged as and when, but only to the extent, such Liens in favor of the Controlling Collateral Agent on such Shared Collateral are released and discharged; provided, that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.01 hereof.

11

(b)     Each Collateral Agent agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Controlling Collateral Agent to evidence and confirm any release of Shared Collateral provided for in this Section.

(c)     Without the prior written consent of each other Collateral Agent, no Secured Notes Document may be otherwise amended, supplemented, modified or entered into, to the extent such amendment, supplement or modification would (i) contravene the provisions of this Agreement, (ii) other than in connection with an exercise of remedies under such Secured Notes Documents (to the extent permitted hereunder), change (to earlier dates) any dates upon which payment of principal are due thereon (including the scheduled maturity date) or shorten the weighted average life of the principal thereunder, or (iii) be materially more restrictive on the Issuer and the Grantors (as determined by the Issuer in good faith) than (when taken as a whole) those terms contained in the other Secured Notes Documents (unless the other Secured Notes Documents are amended to reflect such more restrictive terms).

SECTION 2.05.     Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against Issuer or any of its Subsidiaries.

(b)     Subject to the First Lien/Second Lien Intercreditor Agreement, if Issuer and/or any other Grantor shall become subject to a case (a "**Bankruptcy Case**") under the Bankruptcy Code and shall to the extent permitted under the First Lien/Second Lien Intercreditor Agreement, as debtor(s)-in-possession, move for approval of financing ("**DIP Financing**") to be provided by one or more lenders (the "**DIP Lenders**") under Section 364 of the Bankruptcy Code or any equivalent provision of any other applicable Bankruptcy Law or the use of cash collateral under Section 363 of the Bankruptcy Code or any equivalent provision of any other applicable Bankruptcy Law, each Equal Priority Secured Party agrees that it will raise no objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**"), or to any use of cash collateral that constitutes Shared Collateral, unless the Controlling Collateral Agent or any Controlling Secured Party with respect to such Shared Collateral shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any Equal Priority Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank equal in priority with the Liens on any such Shared Collateral granted to secure the Equal Priority Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the Equal Priority Secured Parties of each Series retain the benefit of their security interests on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority relative to each other series of Equal Priority Secured Parties (other than any Liens of the Equal Priority Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the Equal Priority Secured Parties of each Series are granted security interests on any additional collateral pledged to any Equal Priority Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority relative to each other series of Equal Priority Secured Parties as set forth in this Agreement and (C) if any Equal Priority Secured Parties are granted adequate protection with respect to Equal Priority Obligations subject hereto, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.01 of this

Agreement; provided, that the Equal Priority Secured Parties of each Series shall have a right to object to the grant of a security interest to secure the DIP Financing over any Collateral subject to security interests in favor of the Equal Priority Secured Parties of such Series or its Collateral Agent that do not constitute Shared Collateral; and provided, further, that the Equal Priority Secured Parties receiving adequate protection shall not object to any other Equal Priority Secured Party receiving adequate protection comparable to any adequate protection granted to such Equal Priority Secured Parties in connection with a DIP Financing or use of cash collateral.

(c)     For the avoidance of doubt, nothing in this Section 2.05 shall prevent an Equal Priority Secured Party from acting as a provider of DIP Financing to the Grantor(s) in an Insolvency or Liquidation Proceeding; provided, that if such DIP Financing includes a roll up or Refinancing of any Series of Equal Priority Obligations, then any of the other Equal Priority Secured Parties shall be entitled to an opportunity to participating in funding such DIP Financing on a pro rata basis.  If an Equal Priority Secured Party is also a DIP Lender, it shall be entitled to seek DIP Financing Liens in such capacity to secure such DIP Financing in accordance with the Bankruptcy Code.

SECTION 2.06.     Reinstatement.  In the event that any of the Equal Priority Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such Equal Priority Obligations shall again have been paid in full in cash.

SECTION 2.07.     Insurance.  As between the Equal Priority Secured Parties, the Controlling Collateral Agent shall have the right to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral.

SECTION 2.08.     Refinancings.  The Equal Priority Obligations of any Series may be Refinanced, in whole or in part, in each case, without notice to, or the consent of any Equal Priority Secured Party of any other Series (except to the extent a consent is otherwise required to permit the Refinancing transaction under any Secured Notes Document in respect of such Series), all without affecting the priorities provided for herein or the other provisions hereof; provided, that the Collateral Agent of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness; provided, further that in the event any such Refinancing transaction results in the aggregate principal amount of the applicable Series of Equal Priority Obligations then outstanding being increased and such increased principal amount is not permitted by any of the then extant Secured Notes Documents or Equal Priority Security Documents at the time of the incurrence thereof, then such increased principal amount (solely to the extent of such increase) shall not constitute "Equal Priority Obligations" for purposes of this Agreement.

SECTION 2.09.     Possessory Collateral Agent as Gratuitous Bailee for Perfection.

(a)     Subject to the terms of the First Lien/Second Lien Intercreditor Agreement, to the extent the Controlling Collateral Agent holds any Shared Collateral constituting Possessory Collateral in its possession or control (or in the possession or control of its agents or bailees), the Controlling Agent shall hold such Possessory Collateral as gratuitous bailee for the benefit of each other Equal Priority Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable Equal Priority Security Documents, in each case, subject to the terms and conditions of this Section 2.09; provided, that at any time after the Discharge of the Series of Equal Priority Obligations for which the Controlling Collateral Agent is acting, the Controlling

13

Collateral Agent shall, to the extent it is holding any Shared Collateral constituting Possessory Collateral in its possession or control (or in the possession or control of its agents or bailees) (at the sole cost and expense of the Grantors), promptly deliver all Possessory Collateral to the new Controlling Collateral Agent (after giving effect to the Discharge of such Series of Equal Priority Obligations) together with any necessary endorsements reasonably requested by such new Controlling Collateral Agent (or make such other arrangements as shall be reasonably requested by such new Controlling Collateral Agent to allow such new Controlling Collateral Agent to obtain control of such Possessory Collateral).  Pending delivery to the Controlling Collateral Agent, each other Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral, from time to time in its possession, as gratuitous bailee for the benefit of each other Equal Priority Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable Equal Priority Security Documents, in each case, subject to the terms and conditions of this Section 2.09.

(b)      The duties and responsibilities of the Controlling Collateral Agent and each other Collateral Agent under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Possessory Collateral as gratuitous bailee for the benefit of each other Equal Priority Secured Party for purposes of perfecting the Lien held by such Equal Priority Secured Parties therein.

(c)      The Controlling Collateral Agent, in its capacity as gratuitous bailee and/or gratuitous agent, shall have no obligation whatsoever to the other Collateral Agents to assure that the Possessory Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any person or any rights pertaining to the Shared Collateral except as expressly set forth in this Section 2.09. The duties or responsibilities of the Controlling Collateral Agent under this Section 2.09 upon the of Discharge of the applicable Equal Priority Obligations shall be limited solely to holding the Possessory Collateral as gratuitous bailee and/or gratuitous agent for the benefit of other Collateral Agents for purposes of perfecting the Lien held by the applicable Equal Priority Secured Parties.

(d)      The Controlling Collateral Agent shall not have by reason of any Secured Note Document, the Equal Priority Security Documents or this Agreement or any other document a fiduciary relationship in respect of the other Collateral Agents (or the Equal Priority Secured Parties for which such Collateral Agents are agent) and the other Collateral Agents hereby waive and release the Controlling Collateral Agent from all claims and liabilities arising pursuant to the Controlling Collateral Agent's role under this Section 2.09, as gratuitous bailee and/or gratuitous agent with respect to the Shared Collateral.

(e)      In the event that any Controlling Collateral Agent shall cease to be so designated the Controlling Collateral Agent pursuant to the definition of such term, then such Collateral Agent shall deliver to the successor Controlling Collateral Agent, to the extent that it is legally permitted to do so, the Possessory Collateral (if any) together with any necessary endorsements (or otherwise allow the successor Controlling Collateral Agent to obtain control of such Possessory Collateral) or as a court of competent jurisdiction may otherwise direct, and such successor Controlling Collateral Agent shall perform all duties of the Controlling Collateral Agent as set forth herein. The Company shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify the Controlling Collateral Agent for any loss or damage suffered by the Controlling Collateral Agent as a result of such transfer except for any loss or damage suffered by the Controlling Collateral Agent as a result of its own willful misconduct, gross negligence or bad faith. The Controlling Collateral Agent has no obligation to follow instructions from the successor Controlling Collateral Agent in contravention of this Agreement.

**ARTICLE III**

Existence and Amounts of Liens and Obligations

SECTION 3.01.    Determinations with Respect to Amounts of Liens and Obligations.
Whenever any Collateral Agent shall be required, in connection with the exercise of its rights or the
performance of its obligations hereunder, to determine the existence or amount of any Equal Priority
Obligations of any Series, or the Shared Collateral subject to any Lien securing the Equal Priority
Obligations of any Series, it may request that such information be furnished to it in writing by each other
Collateral Agent and shall be entitled to make such determination on the basis of the information so
furnished; provided, however, that if any Collateral Agent shall fail or refuse reasonably promptly to
provide the requested information, the requesting Collateral Agent shall be entitled to make any such
determination by such method as it may, in the exercise of its good faith judgment, determine, including
by reliance upon a certificate of Issuer.  Each Collateral Agent may rely conclusively, and shall be fully
protected in so relying, on any determination made by it in accordance with the provisions of the
preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no
liability to any Grantor, any Equal Priority Secured Party or any other Person as a result of such
determination.

**ARTICLE IV**

The Controlling Collateral Agent

SECTION 4.01.    Appointment and Authority.

(a)        Each of the Equal Priority Secured Parties hereby irrevocably appoints and authorizes the
Controlling Collateral Agent to take such actions on its behalf and to exercise such powers as are
delegated to the Controlling Collateral Agent by the terms hereof, together with such powers and
discretion as are reasonably incidental thereto.  Each of the Equal Priority Secured Parties also authorizes
the Controlling Collateral Agent to execute and deliver the First Lien/Second Lien Intercreditor
Agreement and to act as the "Controlling Second-Priority Collateral Agent" under the First Lien/Second
Lien Intercreditor Agreement. Each of the Equal Priority Secured Parties also authorizes the Controlling
Collateral Agent, at the request of Issuer, accompanied by a certificate of an Officer of the Issuer stating
that the execution of such Additional Intercreditor Agreement is authorized or permitted by the Secured
Note Documents, the Equal Priority Security Documents and this Agreement, and that all covenants and
conditions precedent set forth in such documents, to the execution and delivery of such Additional
Intercreditor Agreement have been complied with, to, if applicable, execute and deliver an Additional
Intercreditor Agreement in the capacity as "Designated Senior Representative" or "Designated Junior
Representative" or the equivalent agent however referred to for the Equal Priority Secured Parties under
such agreement and authorizes the Controlling Collateral Agent, in accordance with the provisions of this
Agreement, to take such actions on its behalf and to exercise such powers as are delegated to, or
otherwise given to, such "Designated Senior Representative" or "Designated Junior Representative" or
equivalent agent by the terms of any Additional Intercreditor Agreement together with such powers and
discretion as are reasonably incidental thereto and authorizes the Controlling Collateral Agent, in
accordance with the provisions of this Agreement, to take such actions on its behalf and to exercise such
powers as are delegated to it hereunder and thereunder.  In this connection, the Controlling Collateral
Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Controlling Collateral Agent
pursuant to the applicable Secured Notes Documents for purposes of holding or enforcing any Lien on the
Collateral (or any portion thereof) granted under any of the Equal Priority Security Documents, or for
exercising any rights and remedies thereunder or under any Additional Intercreditor Agreement at the
direction of the Controlling Collateral Agent, as the case may be, shall be entitled to the benefits of all the

15

rights, benefits, protections, immunities and indemnities granted to the Second Lien Convertible Notes Collateral Agent in the Second Lien Convertible Notes Indenture and any related documents, of all the rights, benefits, protections, immunities and indemnities granted to the Second Lien Non-Convertible Notes Collateral Agent in the Second Lien Non-Convertible Notes Indenture and any related documents, of all the rights, benefits, protections, immunities and indemnities granted to the Renesas Collateral Agent in the Renesas Indenture and the related documents, including, without limitation, rights, benefits, protections, immunities and indemnities granted the Second Lien Convertible Notes Security Agreement, the Second Lien Non-Convertible Notes Security Agreement, the Renesas Security Agreement and the equivalent provision of any Additional Equal Priority Document (as though such co-agents, sub-agents and attorneys-in-fact were the "Collateral Agent" named therein) as if set forth in full herein with respect thereto.  Without limiting the foregoing, each of the Equal Priority Secured Parties, and each Collateral Agent, hereby agrees to provide such cooperation and assistance as may be reasonably requested by the Controlling Collateral Agent to facilitate and effect actions taken or intended to be taken by the Controlling Collateral Agent pursuant to this Article IV, such cooperation to include execution and delivery of notices, instruments and other documents as are reasonably deemed necessary by the Controlling Collateral Agent to effect such actions, and joining in any action, motion or proceeding initiated by the Controlling Collateral Agent for such purposes.  It is understood and agreed that the Controlling Collateral Agent will only be acting in accordance with the instructions provided by the Controlling Secured Parties in accordance with the Secured Notes Documents to which it is a party.

(b)        Each Non-Controlling Secured Party acknowledges and agrees that the Controlling Collateral Agent shall be entitled, for the benefit of the Equal Priority Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the Equal Priority Security Documents pursuant to which the Controlling Collateral Agent is the collateral agent for such Shared Collateral, without regard to any rights to which the Non-Controlling Secured Parties would otherwise be entitled pursuant to the Equal Priority Security Documents (in their respective capacities as such).  Without limiting the foregoing, each Non-Controlling Secured Party agrees that none of the Controlling Collateral Agent or any other Equal Priority Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the Equal Priority Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any Equal Priority Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation.  Each of the Equal Priority Secured Parties waives any claim it may now or hereafter have against the Controlling Collateral Agent or the Collateral Agent for any other Series of Equal Priority Obligations or any other Equal Priority Secured Party of any other Series arising out of (i) any actions that do not violate this Agreement that any Collateral Agent or any Equal Priority Secured Party takes or omits to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the Equal Priority Obligations from any account debtor, guarantor or any other party) in accordance with the Equal Priority Security Documents or any other agreement related thereto or to the collection of the Equal Priority Obligations or the valuation, use, protection or release of any security for the Equal Priority Obligations, (ii) any election by any Collateral Agent or any holders of Equal Priority Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.05, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law by, any Grantor or any of its Subsidiaries, as debtor-in-possession.

SECTION 4.02.   <u>Rights as an Equal Priority Secured Party</u>.

(a)     The Person serving as the Controlling Collateral Agent hereunder shall have the same rights and powers in its capacity as an Equal Priority Secured Party under any Series of Equal Priority Obligations that it holds as any other Equal Priority Secured Party of such Series and may exercise the same as though it were not the Controlling Collateral Agent and the term "Equal Priority Secured Party" or "Equal Priority Secured Parties" or (as applicable) "Second Lien Convertible Notes Secured Party," "Second Lien Convertible Notes Secured Parties," "Second Lien Non-Convertible Notes Secured Party," "Second Lien Non-Convertible Notes Secured Parties," "Renesas Secured Party," "Renesas Secured Parties,"  "Additional Equal Priority Secured Party" or "Additional Equal Priority Secured Parties" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Controlling Collateral Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Grantors or any Subsidiary or other Affiliate thereof as if such Person were not the Controlling Collateral Agent hereunder and without any duty to account therefor to any other Equal Priority Secured Party.

SECTION 4.03.   <u>Exculpatory Provisions</u>.  The Controlling Collateral Agent shall not have any duties or obligations except those expressly set forth herein.  Without limiting the generality of the foregoing, the Controlling Collateral Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether an Event of Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby; <u>provided</u>, that the Controlling Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to this Agreement or applicable law;

(c)     shall not, except as expressly set forth herein, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to a Grantor or any of its Affiliates that is communicated to or obtained by it, in such capacity, or any of its Affiliates in any capacity;

(d)     shall not be liable for any action taken or not taken by it (i) in the absence of its own gross negligence or willful misconduct or (ii) in reliance on a certificate of an authorized officer of Issuer stating that such action is permitted by the terms of this Agreement.  The Controlling Collateral Agent shall not be deemed to have knowledge of any Event of Default under any Series of Equal Priority Obligations unless and until written notice describing such Event of Default and referencing the applicable agreement is given to the Controlling Collateral Agent;

(e)     shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Equal Priority Security Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Equal Priority Security Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien

purported to be created by the Equal Priority Security Documents, (v) the value or the sufficiency of any Collateral for any Series of Equal Priority Obligations, or (vi) the satisfaction of any condition set forth in any Secured Notes Document, other than to confirm receipt of items expressly required to be delivered to the Controlling Collateral Agent; and

(f)    need not segregate money held hereunder from other funds except to the extent required by law.  The Controlling Collateral Agent shall not be under any liability for interest on any money received by it hereunder except if and to the extent it may (at its option and in its discretion) otherwise agree in writing.

SECTION 4.04.    Collateral and Guaranty Matters.  Each of the Equal Priority Secured Parties irrevocably authorizes the applicable Collateral Agent, at its option and in its discretion, to release any Lien on any property granted to or held by it under any Equal Priority Security Document in accordance with Section 2.04 or upon receipt of a written request from Issuer stating that the releases of such Lien is permitted by the terms of each then extant Secured Notes Document.

**ARTICLE V**

Miscellaneous

SECTION 5.01.    Notices.  All notices and other communications provided for herein (including, but not limited to, all the directions and instructions to be provided to the Controlling Collateral Agent herein by the Equal Priority Secured Parties) shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to Issuer or any Grantor, to Issuer, at its address at: 4600 Silicon Drive, Durham, North Carolina 27703, Attention: [●], Email: [●];

(b)    if to the Second Lien Convertible Notes Collateral Agent, to it at: U.S. Bank Trust Company, National Association, 333 Commerce Street, Suite 900, Nashville, Tennessee 37201, Attention: Wally Jones, Email: wally.jones@usbank.com;

(c)    if to the Second Lien Non-Convertible Notes Collateral Agent, to it at: U.S. Bank Trust Company, National Association, 333 Commerce Street, Suite 900, Nashville, Tennessee 37201, Attention: Wally Jones, Email: wally.jones@usbank.com;

(d)    if to the Renesas Collateral Agent, to it at: U.S. Bank Trust Company, National Association, 333 Commerce Street, Suite 900, Nashville, Tennessee 37201, Attention: Wally Jones, Email: wally.jones@usbank.com; and

(e)    if to any other Collateral Agent, to it at the address set forth in the applicable Joinder Agreement.

Any party hereto may change its address or email address for notices and other communications hereunder by notice to the other parties hereto.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and, may be personally served, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth above or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.  As

18

agreed to in writing among the Controlling Collateral Agent and each other Collateral Agent from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 5.02.     Waivers; Amendment; Joinder Agreements.

(a)        No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)        Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement), except pursuant to an agreement or agreements in writing entered into by each Collateral Agent [and ●][1].

(c)        Notwithstanding the foregoing, without the consent of any Equal Priority Secured Party, any Additional Agent may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 5.13 of this Agreement and upon such execution and delivery, such Additional Agent and the Additional Equal Priority Secured Parties and Additional Equal Priority Obligations of the Series for which such Additional Agent is acting shall be subject to the terms hereof.

(d)        Notwithstanding the foregoing, without the consent of any other Collateral Agent or Equal Priority Secured Party, the Controlling Collateral Agent may effect amendments and modifications to this Agreement to the extent necessary to reflect any incurrence of any Additional Equal Priority Obligations that is permitted by the terms of each then extant Secured Notes Document.

SECTION 5.03.     Parties in Interest.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other Equal Priority Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 5.04.     Survival of Agreement.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05.     Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Any signature to this Agreement may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signatures and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest

---

[1] Amendment conditions subject to discussion among parties.

extent permitted by applicable law.  For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Agreement.

SECTION 5.06.    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07.    Authorization.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.  The Second Lien Convertible Notes Collateral Agent represents and warrants that this Agreement is binding upon the Second Lien Convertible Notes Secured Parties.  The Second Lien Non-Convertible Notes Collateral Agent represents and warrants that this Agreement is binding upon the Second Lien Non-Convertible Notes Secured Parties.  The Renesas Collateral Agent represents and warrants that this Agreement is binding upon the Renesas Secured Parties

SECTION 5.08.    Submission to Jurisdiction Waivers; Consent to Service of Process.  Each Collateral Agent, on behalf of itself and the Equal Priority Secured Parties of the Series for whom it is acting, irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the federal courts of the United States of America located in the City of New York or the courts of the State of New York, in each case located in the City of New York (collectively, the "**Specified Courts**"), and each party irrevocably submits to the non-exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of any process, summons, notice or document by mail (to the extent allowed under any applicable statute or rule of court) to such party's address will be effective service of process for any such suit, action or proceeding brought in any such court; and

(b)    waives any objection to the laying of venue of any suit, action or other proceeding in the Specified Courts and irrevocably and unconditionally waives and agrees not to plead or claim any such suit, action or other proceeding has been brought in an inconvenient forum.[2]

SECTION 5.09.    **GOVERNING LAW; WAIVER OF JURY TRIAL**.

**(A)    THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.**

**(B)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.**

---

[2] NTD: To be updated to track indentures.

SECTION 5.10.    Headings.  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.11.    Conflicts.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the other Equal Priority Security Documents or Additional Equal Priority Documents, the provisions of this Agreement shall control.  In the event of any conflict or inconsistency between the provisions of the First Lien/Second Lien Intercreditor Agreement, this Agreement and the provisions of any of the other Equal Priority Security Documents or Additional Equal Priority Documents, the provisions of the First Lien/Second Lien Intercreditor Agreement shall control.

SECTION 5.12.    Provisions Solely to Define Relative Rights.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Equal Priority Secured Parties in relation to one another.  No other creditor of Issuer or any Grantor shall have any rights or obligations hereunder, except as expressly provided in this Agreement (provided, that nothing in this Agreement (other than Section 2.04, 2.05, 2.09 and subject to Section 5.11 or Section 5.18(c)) is intended to or will amend, waive or otherwise modify the provisions of the Senior Notes Documents or any Additional Equal Priority Documents) [●][3].  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the Equal Priority Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 5.13.    Additional Equal Priority Obligations.  Issuer and its Subsidiaries may incur obligations that will constitute Additional Equal Priority Obligations hereunder only if such obligations are permitted to be so incurred and treated as such hereunder by the terms of each then extant Secured Notes Document and the other requirements of this Section 5.13 are satisfied.  Any such additional class or series of Additional Equal Priority Obligations (the "**Pari Passu Class Debt**") may be secured by a Lien and may be guaranteed by the Grantors on a *pari passu* basis with the Liens and guarantees in favor of the other Series of Equal Priority Obligations, if and subject to the condition that the Collateral Agent of any such Pari Passu Class Debt (each, a "**Pari Passu Class Debt Representative**"), acting on behalf of the holders of such Pari Passu Class Debt (such Collateral Agent and holders in respect of any Pari Passu Class Debt being referred to as the "**Pari Passu Class Debt Parties**"), becomes a party to this Agreement by satisfying the conditions set forth in clauses (i) through (iv) of the immediately succeeding paragraph.

In order for a Pari Passu Class Debt Representative to become a party to this Agreement,

(i)        such Pari Passu Class Debt Representative, each other Additional Agent, the Controlling Collateral Agent and each Grantor shall have executed and delivered to each Collateral Agent an instrument substantially in the form of Annex II (with such changes as may be reasonably approved by the Controlling Collateral Agent and such Pari Passu Class Debt Representative) pursuant to which such Pari Passu Class Debt Representative becomes a Collateral Agent and Additional Agent hereunder, and the Pari Passu Class Debt in respect of which such Pari Passu Class Debt Representative is the Collateral Agent and the related Pari Passu Class Debt Parties become subject hereto and bound hereby;

(ii)       Issuer and its Subsidiaries shall have delivered to the Controlling Collateral Agent true and complete copies of each of the Additional Equal Priority Documents relating to such Pari Passu Class Debt, certified as being true and correct by a Responsible Officer of Issuer;

---

[3] Reliance terms under discussion among parties.

(iii)    Issuer and its Subsidiaries shall have delivered to the Controlling Collateral Agent an Officer's Certificate stating that such Additional Equal Priority Obligations to be incurred are permitted by each then extant Secured Notes Document, or to the extent a consent is otherwise required to permit the incurrence of such Additional Equal Priority Obligations under any such Secured Notes Document, such requisite consent has been obtained; and

(iv)    the Additional Equal Priority Documents, as applicable, relating to such Pari Passu Class Debt shall provide that each Pari Passu Class Debt Party with respect to such Pari Passu Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Pari Passu Class Debt.

SECTION 5.14.    Integration.  This Agreement together with the other Secured Notes Documents and the Equal Priority Security Documents represents the entire agreement of each of the Grantors and the Equal Priority Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, any Collateral Agent or any other Equal Priority Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Secured Notes Documents or the Equal Priority Security Documents.

SECTION 5.15.    Information Concerning Financial Condition of Issuer and the other Grantors.  The Controlling Collateral Agent, the other Collateral Agents and the Equal Priority Secured Parties shall each, at its discretion, be responsible for keeping themselves informed of (a) the financial condition of Issuer and the other Grantors and all endorsers or guarantors of the Equal Priority Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Equal Priority Obligations.  The Controlling Collateral Agent, the other Collateral Agents and the Equal Priority Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event that the Controlling Collateral Agent, any other Collateral Agent or any Equal Priority Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it shall be under no obligation to (i) make, and Controlling Collateral Agent, the other Collateral Agents and the Equal Priority Secured Parties shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) provide any additional information or to provide any such information on any subsequent occasion, (iii) undertake any investigation or (iv) disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 5.16.    Additional Grantors.  Issuer agrees that, if any Subsidiary of Issuer shall become a Grantor after the date hereof, it will promptly cause such Subsidiary to become party hereto by executing and delivering to each Collateral Agent an instrument in the form of Annex III.  Upon such execution and delivery, such Subsidiary will become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein.  The execution and delivery of such instrument shall not require the consent of any other party hereunder, and will be acknowledged by the Controlling Collateral Agent.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

SECTION 5.17.    Further Assurances.  Each Collateral Agent, on behalf of itself and each Equal Priority Secured Party under the applicable Secured Notes Documents, Indenture or Additional Equal Priority Debt Facility, agrees that it will take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the other parties hereto may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement.

SECTION 5.18.     Second Lien Convertible Notes Collateral Agent, Second Lien Non-Convertible Notes Collateral Agent and Renesas Collateral Agent.

(a)     It is understood and agreed that (i) the Second Lien Convertible Notes Collateral Agent and the Second Lien Convertible Notes Trustee is entering into this Agreement in its capacity as Collateral Agent and Trustee under the Second Lien Convertible Notes Indenture and shall not be responsible for the terms or sufficiency of this Agreement and the other Indenture Documents (as defined in the Second Lien Convertible Notes Indenture), and the provisions of the Second Lien Convertible Notes Indenture and Second Lien Convertible Notes Security Agreement granting or extending any benefits, rights, protections, privileges, indemnities and immunities to the Second Lien Convertible Notes Collateral Agent and Second Lien Convertible Notes Trustee in such capacities shall also apply to it as Second Lien Convertible Notes Trustee, Second Lien Convertible Notes Collateral Agent and Controlling Collateral Agent hereunder, (ii) the Second Lien Non-Convertible Notes Collateral Agent and Second Lien Non-Convertible Notes Trustee is entering in this Agreement in its capacity as Collateral Agent and Trustee under the Second Lien Non-Convertible Notes Indenture and he Second Lien Non-Convertible Notes Security Agreement and shall not be responsible for the terms or sufficiency of this Agreement and the provisions of the Second Lien Non-Convertible Notes Indenture and the Second Lien Non-Convertible Notes Security Agreement granting or extending any benefits, rights, protections, privileges, indemnities and immunities to the Second Lien Non-Convertible Notes Collateral Agent and Second Lien Non-Convertible Notes Trustee thereunder shall also apply to the Second Lien Non-Convertible Notes Collateral Agent and Second Lien Non-Convertible Notes Trustee hereunder and (iii) the Renesas Collateral Agent and Renesas Trustee is entering in this Agreement in its capacity as Renesas Collateral Agent and Renesas Trustee under the Renesas [Indenture]  and shall not be responsible for the terms or sufficiency of this Agreement and the provisions of the Renesas [Indenture] and related documents granting or extending any benefits, rights, protections, privileges, indemnities and immunities to the Renesas Collateral Agent and Renesas Trustee thereunder shall also apply to Renesas Collateral Agent and Renesas Trustee hereunder.

(b)     For the avoidance of doubt, the parties hereto acknowledge that in no event shall the Second Lien Convertible Notes Collateral Agent, Second Lien Convertible Notes Trustee, Second Lien Non-Convertible Notes Collateral Agent, Second Lien Non-Convertible Notes Trustee, Renesas Collateral Agent or Renesas Trustee (or any similar trustee or collateral agent joining this Agreement) be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether any such party has been advised of the likelihood of such loss or damage and regardless of the form of action.

(c)     In addition, it is understood and agreed that, to the extent that the Controlling Collateral Agent is satisfied with or agrees to any deliveries or documents required to be provided in respect of any matters relating to any Shared Collateral or makes any determination in respect of any matters relating to any Shared Collateral (including extensions of time or waivers for the creation and perfection of security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets (including extensions beyond the date hereof or in connection with assets acquired, or Subsidiaries formed or acquired, after the date hereof) and any determination that the cost, burden, difficulty or consequence of obtaining or perfecting a security interest in a particular asset outweighs the benefit of a security interest to the relevant Equal Priority Secured Parties afforded thereby), the other Collateral Agents shall be deemed to be satisfied with such deliveries and/or documents and the judgment of the Controlling Collateral Agent in respect of any such matters under the Secured Notes Documents of the applicable Series shall be deemed to be the judgment of the each other Collateral Agent in respect of such matters under the applicable Secured Notes Documents.  Without limiting the effect of any of the foregoing and notwithstanding anything in this Agreement or any Secured Note Document to the contrary, to the extent any Secured Note Document requires the Issuer or any other Grantor to obtain,

execute and/or deliver (I) any lender's title insurance (or irrevocable commitment therefor) to insure in favor of any Secured Party any real property of any Grantor constituting Shared Collateral (the "Title Insurance Requirement"), (II) any mortgage, deed of trust or other similar instrument in favor of any Secured Party with respect to any fee-owned real property constituting Shared Collateral that is acquired by any Grantor after the Effective Date located in a jurisdiction that imposes a mortgage recording tax, documentary tax or similar tax in connection with the filing or recordation of mortgage, deed of trust or other instrument in favor of such Secured Party (the "Mortgage Requirement"), or (III) any deposit account control agreements or securities account control agreements with or to any Secured Party (the "Control Agreement Requirement"), the parties hereto agree that (x) prior to the Discharge of First-Priority Obligations (as defined in the First Lien/Second Lien Intercreditor Agreement), no Grantor shall be required to comply with any Title Insurance Requirement, Mortgage Requirement or Control Agreement Requirement under any Secured Note Document and (y) upon and after the Discharge of First-Priority Obligations (as defined in the First Lien/Second Lien Intercreditor Agreement), no Grantor shall be required to comply with any Title Insurance Requirement, Mortgage Requirement or Control Agreement Requirement under any Secured Note Document except in favor of, with or to the Controlling Collateral Agent for the benefit of the Controlling Secured Parties.

(d)     Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary duty, regardless of whether a default or event of default has occurred and is continuing, on any Collateral Agent.  Whenever reference is made in this Agreement to any action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by any Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by such Collateral Agent, it is understood that in all cases such Collateral Agent shall be acting, giving, withholding, suffering, omitting, taking or otherwise undertaking and exercising the same (or shall not be undertaking and exercising the same) in accordance with the applicable Notes Secured Document and the applicable Equal Priority Security Documents.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION**,
as Second Lien Convertible Notes Trustee, Second Lien Convertible Notes Collateral Agent and Controlling Collateral Agent

By: _____
     Name:
     Title:

[*Signature Page to Equal Priority Intercreditor Agreement*]

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION**,
as Second Lien Non-Convertible Notes Trustee and Second Lien Non-Convertible Notes Collateral Agent

By: _____
    Name:
    Title:

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,**
as Renesas Convertible Notes Trustee and Renesas Collateral Agent

By: _____
    Name:
    Title:

**WOLFSPEED, INC.**, as Issuer

By: _____
      Name:
      Title:

**WOLFSPEED TEXAS LLC**

By: _____
    Name:
    Title:

**ANNEX I**

GRANTORS

**WOLFSPEED, INC.**
**WOLFSPEED TEXAS LLC**

ANNEX II

[FORM OF] JOINDER NO. [    ] dated as of [                  ], 20[  ] to the EQUAL PRIORITY INTERCREDITOR AGREEMENT, dated as of [●], 2025 (the "**Equal Priority Intercreditor Agreement**"), by and among Wolfspeed, Inc., a Delaware corporation ("**Issuer**"), the other Grantors (as defined below) party thereto, U.S. Bank Trust Company, National Association, a national banking association ("**U.S. Bank**"), not in its individual capacity but solely as collateral agent and trustee for the Second Lien Convertible Notes Secured Parties (as defined therein) (in such capacities and together with its successors and permitted assigns in such capacities, the "**Second Lien Convertible Notes Collateral Agent**" and the "**Second Lien Convertible Notes Trustee**," as applicable) and as Controlling Collateral Agent, U.S. Bank, not in its individual capacity but solely as collateral agent and trustee for the Second Lien Non-Convertible Notes Secured Parties (as defined therein) (in such capacities and together with its successors and permitted assigns in such capacities, the "**Second Lien Non-Convertible Notes Collateral Agent**" and the "**Second Lien Non-Convertible Notes Trustee**," as applicable), U.S. Bank, not in its individual capacity but solely as collateral agent and trustee for the Renesas Secured Parties (in such capacities and together with its successors and permitted assigns in such capacities, the "**Renesas Collateral Agent**" and the "**Renesas Convertible Notes Trustee**," as applicable), and each Additional Agent from time to time party thereto.

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Equal Priority Intercreditor Agreement.

B.      As a condition to the ability of Issuer and certain of its Subsidiaries to incur Additional Equal Priority Obligations and to secure such Pari Passu Class Debt (and the guarantees in respect thereof) with the Pari Passu Liens, in each case under and pursuant to the Additional Equal Priority Documents, the Pari Passu Class Debt Representative in respect of such Pari Passu Class Debt is required to become a Collateral Agent under, and such Pari Passu Class Debt and the Pari Passu Class Debt Parties in respect thereof are required to become subject to and bound by, the Equal Priority Intercreditor Agreement.  Section 5.13 of the Equal Priority Intercreditor Agreement provides that such Pari Passu Class Debt Representative may become a Collateral Agent under, and such Pari Passu Class Debt and such Pari Passu Class Debt Parties may become subject to and bound by, the Equal Priority Intercreditor Agreement, upon the execution and delivery by the Pari Passu Class Debt Representative of an instrument in the form of this Joinder and the satisfaction of the other conditions set forth in Section 5.13 of the Equal Priority Intercreditor Agreement.  The undersigned Pari Passu Class Debt Representative, as collateral agent under the applicable Additional Equal Priority Documents (the "**New Collateral Agent**") and the undersigned Additional Agent, as [trustee under Additional Equal Priority Documents] (the "**New Trustee**") is executing this Joinder in accordance with the requirements of the Equal Priority Intercreditor Agreement.

Accordingly, the Controlling Collateral Agent, the New Trustee and the New Collateral Agent agree as follows:

SECTION 1.      In accordance with Section 5.13 of the Equal Priority Intercreditor Agreement, each of the New Trustee by its signature below becomes an Additional Agent and the New Collateral Agent by its signature below becomes a Collateral Agent and Additional Agent under, and the related Pari Passu Class Debt and Pari Passu Class Debt Parties become subject to and bound by, the Equal Priority Intercreditor Agreement with the same force and effect as if the New Collateral Agent had originally been named therein as a Collateral Agent, and the New Collateral Agent, on behalf of itself and such Pari Passu Class Debt Parties, hereby agrees to all the terms and provisions of the Equal Priority Intercreditor Agreement applicable to it as a Collateral Agent and to the Pari Passu Class Debt Parties that it represents as Additional Equal Priority Secured Parties.  Each reference to a "**Collateral Agent**" or an

"**Additional Agent**" in the Equal Priority Intercreditor Agreement shall be deemed to include the New Collateral Agent.  The Equal Priority Intercreditor Agreement is hereby incorporated herein by reference.  The New Collateral Agent is entering in this Agreement in its capacity as [ ] Collateral Agent under the [ ] Security Agreement at the direction of the requisite holders of the related Additional Equal Priority Obligations and as such shall not be responsible for the terms or sufficiency of this Agreement or the Equal Priority Intercreditor Agreement and the provisions of the Additional Equal Priority Documents granting or extending any benefits, rights, protections, privileges, indemnities and immunities to the New Collateral Agent thereunder shall also apply to New Collateral Agent hereunder.

SECTION 2.       The New Collateral Agent represents and warrants to the Controlling Collateral Agent and the other Equal Priority Secured Parties that (i) it has full power and authority to enter into this Joinder, in its capacity as [agent], (ii) this Joinder has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, arrangement, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity and the possible unavailability of specific performance, injunctive relief or other equitable remedies (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing and (iii) the Additional Equal Priority Documents relating to such Pari Passu Class Debt provide that, upon the New Collateral Agent's entry into this Agreement, the Pari Passu Class Debt Parties in respect of such Pari Passu Class Debt will be subject to and bound by the provisions of the Equal Priority Intercreditor Agreement as Additional Equal Priority Secured Parties.

SECTION 3.       This Joinder may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder shall become effective when the Controlling Collateral Agent shall have received a counterpart of this Joinder that bears the signature of the New Collateral Agent.  Any signature to this Joinder may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.  For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Joinder.

SECTION 4.       Except as expressly supplemented hereby, the Equal Priority Intercreditor Agreement shall remain in full force and effect.

SECTION 5.       **THIS JOINDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.       In case any one or more of the provisions contained in this Joinder should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Equal Priority Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.       All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Equal Priority Intercreditor Agreement.  All communications and notices

hereunder to the New Collateral Agent shall be given to it at the address set forth below its signature hereto.

SECTION 8.        Issuer agrees to reimburse the Controlling Collateral Agent for its reasonable out-of-pocket expenses in connection with this Joinder, including the reasonable fees, other charges and disbursements of counsel for the Controlling Collateral Agent.

IN WITNESS WHEREOF, the New Collateral Agent and the Controlling Collateral Agent have duly executed this Joinder to the Equal Priority Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW COLLATERAL AGENT], as
[●] for the holders of
[●],

By: _____
        Name:
        Title:

Address for notices:

_____

_____

Attention of:

_____

Telecopy:

_____

Acknowledged by:

[_____],
as Controlling Collateral Agent

By: _____
     Name:
     Title:

WOLFSPEED, INC.

By: _____
     Name:
     Title:

THE GRANTORS
LISTED ON SCHEDULE I HERETO

By: _____
     Name:
     Title:

Schedule I to the Joinder to the
Equal Priority Intercreditor Agreement

Grantors

[ ]

**ANNEX III**

[FORM OF] SUPPLEMENT NO. [    ] dated as of [                    ], 20[  ] to the EQUAL PRIORITY INTERCREDITOR AGREEMENT, dated as of [●], 2025 (the "**Equal Priority Intercreditor Agreement**"), by and among Wolfspeed, Inc., a Delaware corporation ("**Issuer**"), the other Grantors (as defined below) party thereto, U.S. Bank Trust Company, National Association, a national banking association ("**U.S. Bank**"), not in its individual capacity but solely as collateral agent and trustee for the Second Lien Convertible Notes Secured Parties (as defined therein) (in such capacities and together with its successors and permitted assigns in such capacities, the "**Second Lien Convertible Notes Collateral Agent**" and the "**Second Lien Convertible Notes Trustee**," as applicable) and as Controlling Collateral Agent, U.S. Bank, not in its individual capacity but solely as collateral agent and trustee for the Second Lien Non-Convertible Notes Secured Parties (as defined therein) (in such capacities and together with its successors and permitted assigns in such capacities, the "**Second Lien Non-Convertible Notes Collateral Agent**" and the "**Second Lien Non-Convertible Notes Trustee**," as applicable), U.S. Bank, not in its individual capacity but solely as collateral agent and trustee for the Renesas Secured Parties (in such capacities and together with its successors and permitted assigns in such capacities, the "**Renesas Collateral Agent**" and the "**Renesas Convertible Notes Trustee**," as applicable), and each Additional Agent from time to time party thereto.

A.      Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Equal Priority Intercreditor Agreement.

B.      The Grantors have entered into the Equal Priority Intercreditor Agreement.  Pursuant to the applicable Secured Notes Documents, certain newly acquired or organized Subsidiaries of the Issuer are required to enter into the Equal Priority Intercreditor Agreement.  Section 5.16 of the Equal Priority Intercreditor Agreement provides that such Subsidiaries may become party to the Equal Priority Intercreditor Agreement by execution and delivery of an instrument in the form of this Supplement.  The undersigned Subsidiary (the "**New Grantor**") is executing this Supplement in accordance with the requirements of the applicable Secured Notes Documents and any Additional Equal Priority Documents.

Accordingly, the Controlling Collateral Agent and the New Grantor agree as follows:

SECTION 1.      In accordance with Section 5.16 of the Equal Priority Intercreditor Agreement, the New Grantor by its signature below becomes a Grantor under the Equal Priority Intercreditor Agreement with the same force and effect as if originally named therein as a Grantor, and the New Grantor hereby agrees to all the terms and provisions of the Equal Priority Intercreditor Agreement applicable to it as a Grantor thereunder.  Each reference to a "Grantor" in the Equal Priority Intercreditor Agreement shall be deemed to include the New Grantor.  The Equal Priority Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.      The New Grantor represents and warrants to the Controlling Collateral Agent and the other Equal Priority Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, arrangement, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity and the possible unavailability of specific performance, injunctive relief or other equitable remedies (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

SECTION 3.      This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This

Supplement shall become effective when the Controlling Collateral Agent shall have received a counterpart of this Supplement that bears the signature of the New Grantor.  Any signature to this Supplement may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.  For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Supplement.

Delivery of an executed signature page to this Supplement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4.        Except as expressly supplemented hereby, the Equal Priority Intercreditor Agreement shall remain in full force and effect.

SECTION 5.        **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.        In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Equal Priority Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.        All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Equal Priority Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it in care of the Company as specified in the Equal Priority Intercreditor Agreement.

SECTION 8.        Issuer agrees to reimburse the Controlling Collateral Agent for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for the Controlling Collateral Agent.

IN WITNESS WHEREOF, the New Grantor, and the Controlling Collateral Agent have duly executed this Supplement to the Equal Priority Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW GRANTOR],

By: _____
       Name:
       Title:

Acknowledged by:

[_____],
as Controlling Collateral Agent

By: _____
     Name:
     Title:

# **EXHIBIT D**

**New Notes Documents**

## **EXHIBIT D-1**

**New Senior Secured Notes Indenture**

The draft form of indenture attached hereto is subject to the parties' ongoing review and comment in respects.  The terms in this form of indenture are subject to change.

*[Plan Supplement Filing Version 8/12/2025]*

***DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT***

---

**WOLFSPEED, INC.,**

as Issuer,

and the Subsidiary Guarantors party hereto from time to time,

Senior Secured Notes due 2030

———————————

INDENTURE

Dated as of [__], 2025

———————————

and

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Trustee and Collateral Agent

---

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND INCORPORATION BY REFERENCE ..................................1

    SECTION 1.01 Definitions.........................................................................................1

    SECTION 1.02 Terms Generally ............................................................................37

    SECTION 1.03 Effectuation of Transactions ........................................................38

    SECTION 1.04 Exchange Rates; Currency Equivalents ......................................38

    SECTION 1.05 Times of Day .................................................................................38

    SECTION 1.06 No Incorporation by Reference of Trust Indenture Act ..............38

    SECTION 1.07 Accounting Terms .........................................................................38

ARTICLE II. THE NOTES .................................................................................................39

    SECTION 2.01 Amount of Notes. ..........................................................................39

    SECTION 2.02 Form and Dating ...........................................................................39

    SECTION 2.03 Execution and Authentication ......................................................39

    SECTION 2.04 Registrar, Paying Agent and Custodian. ......................................40

    SECTION 2.05 Paying Agent to Hold Money in Trust .........................................42

    SECTION 2.06 Noteholder Lists ............................................................................42

    SECTION 2.07 Transfer and Exchange..................................................................42

    SECTION 2.08 Replacement Notes .......................................................................49

    SECTION 2.09 Outstanding Notes .........................................................................49

    SECTION 2.10 Cancellation ..................................................................................50

    SECTION 2.11 Defaulted Interest ..........................................................................50

    SECTION 2.12 CUSIP and ISIN Numbers ...........................................................50

    SECTION 2.13 Calculation of Principal Amount of Notes...................................50

    SECTION 2.14 [Reserved]. ....................................................................................50

    SECTION 2.15 Interest............................................................................................51

    SECTION 2.16 Payments Generally; Pro Rata Treatment ....................................53

ARTICLE III. REDEMPTION AND REPURCHASE ......................................................54

    SECTION 3.01 Redemption or Repurchase of Notes. ..........................................54

    SECTION 3.02 Voluntary and Mandatory Redemption or Repurchase of Notes.............55

    SECTION 3.03 Applicability of Article .................................................................60

    SECTION 3.04 Purchases by the Issuer or a Subsidiary ......................................60

    SECTION 3.05 Payment for Consent .....................................................................60

ARTICLE IV. REPRESENTATIONS AND WARRANTIES ............................................60

    SECTION 4.01 Organization; Powers....................................................................60

    SECTION 4.02 Authorization ................................................................................60

    SECTION 4.03 Enforceability................................................................................61

    SECTION 4.04 Governmental Approvals ..............................................................61

    SECTION 4.05 Financial Statements .....................................................................61

    SECTION 4.06 No Material Adverse Effect ..........................................................62

    SECTION 4.07 Title to Properties; Possession Under Leases. .............................62

    SECTION 4.08 Subsidiaries. ..................................................................................63

i

SECTION 4.09 Litigation; Compliance with Laws..........................................63
SECTION 4.10 Federal Reserve Regulations.................................................63
SECTION 4.11 Investment Company Act........................................................64
SECTION 4.12 [Reserved] ...........................................................................64
SECTION 4.13 Tax Returns .........................................................................64
SECTION 4.14 No Material Misstatements. ....................................................64
SECTION 4.15 Employee Benefit Plans .........................................................65
SECTION 4.16 Environmental Matters...........................................................65
SECTION 4.17 Security Documents. ..............................................................66
SECTION 4.18 Location of Real Property .......................................................67
SECTION 4.19 Solvency. ..............................................................................67
SECTION 4.20 Labor Matters .......................................................................68
SECTION 4.21 Insurance .............................................................................68
SECTION 4.22 No Default. ...........................................................................68
SECTION 4.23 Intellectual Property; Licenses, Etc ........................................68
SECTION 4.24 Senior Debt ..........................................................................68
SECTION 4.25 USA PATRIOT Act; Sanctions; Anti-Terrorism and Anti-
                Corruption Laws. ...................................................................68

ARTICLE V. [RESERVED] ....................................................................................70

ARTICLE VI. [RESERVED] ...................................................................................70

ARTICLE VII. AFFIRMATIVE COVENANTS ..........................................................70

SECTION 7.01 Existence; Business and Properties.........................................70
SECTION 7.02 Insurance. .............................................................................71
SECTION 7.03 Taxes ...................................................................................72
SECTION 7.04 Financial Statements, Reports, Etc. ........................................72
SECTION 7.05 Litigation and Other Notices ..................................................75
SECTION 7.06 Compliance with Laws............................................................75
SECTION 7.07 Maintaining Records; Access to Properties and Inspections ..................75
SECTION 7.08 [Reserved] ...........................................................................76
SECTION 7.09 Compliance with Environmental Laws .....................................76
SECTION 7.10 Further Assurances; Additional Security .................................76
SECTION 7.11 [Reserved] ...........................................................................80
SECTION 7.12 Post-Closing .........................................................................80
SECTION 7.13 Compliance with the USA PATRIOT Act, Anti-Terrorism
                Laws, Anti-Corruption Laws and Sanctions.............................80
SECTION 7.14 Cash Management Systems ....................................................80
SECTION 7.15 Employee Benefit Plans .........................................................81
SECTION 7.16 ERISA-Related Information .....................................................81
SECTION 7.17 [Reserved] ...........................................................................82
SECTION 7.18 [Reserved] ...........................................................................82
SECTION 7.19 [Reserved] ...........................................................................82
SECTION 7.20 [Reserved] ...........................................................................82

ARTICLE VIII. NEGATIVE COVENANTS ...............................................................83

SECTION 8.01 Indebtedness.........................................................................83

SECTION 8.02 Liens..............................................................................................87
SECTION 8.03 Sale and Lease-Back Transactions ..........................................92
SECTION 8.04 Investments, Loans and Advances ..........................................92
SECTION 8.05 Mergers, Consolidations, Sales of Assets and Acquisitions ...................95
SECTION 8.06 Dividends and Distributions....................................................98
SECTION 8.07 Transactions with Affiliates.....................................................99
SECTION 8.08 Business of the Issuer and the Subsidiaries .........................101
SECTION 8.09 Limitation on Payments and Modifications of Indebtedness;
　　　　　　　 Modifications of Certificate of Incorporation, By-Laws and
　　　　　　　 Certain Other Agreements; etc. ...........................................101
SECTION 8.10 Fiscal Year ...............................................................................105
SECTION 8.11 Liquidity Covenant .................................................................105
SECTION 8.12 Compliance with ERISA.........................................................105
SECTION 8.13 Compliance with Anti-Terrorism and Anti-Corruption Laws and
　　　　　　　 Sanctions...............................................................................106

ARTICLE IX. [RESERVED] ........................................................................................106

ARTICLE X. DEFAULTS AND REMEDIES...............................................................106

SECTION 10.01 Events of Default ...................................................................106
SECTION 10.02 Recission ................................................................................110
SECTION 10.03 Treatment of Certain Payments ...........................................111
SECTION 10.04 [Reserved] ..............................................................................111
SECTION 10.05 Control by Majority ...............................................................111

ARTICLE XI. TRUSTEE..............................................................................................112

SECTION 11.01 Duties of Trustee....................................................................112
SECTION 11.02 Rights of Trustee....................................................................113
SECTION 11.03 Individual Rights of Trustee .................................................115
SECTION 11.04 Trustee's Disclaimer ..............................................................115
SECTION 11.05 Notice of Defaults .................................................................115
SECTION 11.06 [Reserved]. .............................................................................115
SECTION 11.07 Expenses; Indemnity .............................................................115
SECTION 11.08 Replacement of Trustee. ........................................................118
SECTION 11.09 Successor Trustee by Merger .................................................118
SECTION 11.10 Eligibility; Disqualification..................................................119
SECTION 11.11 Limitation on Duty of Trustee and Collateral Agent in Respect
　　　　　　　 of Collateral; Indemnification.............................................119

ARTICLE XII. DISCHARGE OF INDENTURE; DEFEASANCE ............................120

SECTION 12.01 Discharge of Liability on Notes; Defeasance. .....................120
SECTION 12.02 Conditions to Defeasance......................................................122
SECTION 12.03 Application of Trust Money...................................................123
SECTION 12.04 Repayment to Issuer..............................................................123
SECTION 12.05 Reinstatement ........................................................................124

ARTICLE XIII. AMENDMENTS AND WAIVERS......................................................124

SECTION 13.01 Amendments and Waivers. ....................................................124

SECTION 13.02 Revocation and Effect of Consents and Waivers.................................127
SECTION 13.03 Notation on or Exchange of Notes..............................................127
SECTION 13.04 Trustee to Sign Amendments.....................................................128
SECTION 13.05 Calculation of Principal Amount ...............................................128

ARTICLE XIV. [Reserved] ...................................................................129

ARTICLE XV. COLLATERAL.....................................................................129

SECTION 15.01 Appointment...................................................................129
SECTION 15.02 Delegation of Duties .........................................................129
SECTION 15.03 Exculpatory Provisions .......................................................130
SECTION 15.04 Reliance by Agents ...........................................................131
SECTION 15.05 Notice of Default ............................................................131
SECTION 15.06 Non-Reliance on Agents and other Noteholder Parties ..........................131
SECTION 15.07 [Reserved] ...................................................................132
SECTION 15.08 Agent in Its Individual Capacity .............................................132
SECTION 15.09 Security Documents ...........................................................132
SECTION 15.10 [Reserved]....................................................................133
SECTION 15.11 Authorization of Actions to Be Taken .........................................133
SECTION 15.12 Release or Subordination of Liens ............................................134
SECTION 15.13 Powers Exercisable by Receiver or Trustee.....................................136
SECTION 15.14 Release Upon Termination of the Issuer's Obligations .........................136
SECTION 15.15 Right to Realize on Collateral and Enforce Guarantees ........................136
SECTION 15.16 Parallel Debt (Covenant to pay the Collateral Agent). ........................137

ARTICLE XVI. MISCELLANEOUS .................................................................138

SECTION 16.01 Notices; Communications ......................................................138
SECTION 16.02 Certificate and Opinion as to Conditions Precedent ...........................139
SECTION 16.03 Statements Required in Certificate or Opinion ................................139
SECTION 16.04 [Reserved] ...................................................................140
SECTION 16.05 Survival of Indenture ........................................................140
SECTION 16.06 Binding Effect ...............................................................140
SECTION 16.07 Successors and Assigns .......................................................140
SECTION 16.08 [Reserved] ...................................................................140
SECTION 16.09 [Reserved] ...................................................................141
SECTION 16.10 [Reserved] ...................................................................141
SECTION 16.11 Rules by Trustee, Paying Agent and Registrar .................................141
SECTION 16.12 Legal Holidays ...............................................................141
SECTION 16.13 GOVERNING LAW.................................................................141
SECTION 16.14 Entire Agreement .............................................................141
SECTION 16.15 WAIVER OF JURY TRIAL..........................................................141
SECTION 16.16 Severability .................................................................142
SECTION 16.17 No Recourse Against Others....................................................142
SECTION 16.18 Successors ...................................................................142
SECTION 16.19 Counterparts .................................................................142
SECTION 16.20 Headings......................................................................142
SECTION 16.21 Jurisdiction; Consent to Service of Process ..................................142

SECTION 16.22 Confidentiality ........................................................................................143
SECTION 16.23 Platform; Public Noteholder Party Information...................................144
SECTION 16.24 USA Patriot Act Notice........................................................................145
SECTION 16.25 Indenture Controls................................................................................145

**EXHIBIT, SCHEDULE & ANNEX INDEX**

| | |
|---|---|
| Exhibit A | Form of Global Note |
| Exhibit B-1 | Form of Restricted Note Legend |
| Exhibit B-2 | Form of Global Note Legend |
| Exhibit B-3 | Form of OID Legend |
| Exhibit C-1 | Form of Transfer Certificate from Transferor |
| Exhibit C-2 | Form of Transfer Certificate from Transferee |
| | |
| Schedule 1.01(A) | Certain Excluded Equity Interests |
| Schedule 1.01(B) | Immaterial Subsidiaries |
| Schedule 1.01(C) | Initial Subsidiary Guarantors |
| Schedule 1.01(D) | Agreed Security Principles |
| Schedule 4.04 | Governmental Approvals |
| Schedule 4.05 | Financial Statements |
| Schedule 4.07(d) | Obligations With Respect to Mortgaged Properties |
| Schedule 4.07(e) | Material Real Property |
| Schedule 4.08(a) | Subsidiaries |
| Schedule 4.08(b) | Subscriptions |
| Schedule 4.09 | Litigation |
| Schedule 4.13 | Taxes |
| Schedule 4.21 | Insurance |
| Schedule 4.23 | Intellectual Property |
| Schedule 7.12 | Post-Closing Items |
| Schedule 8.01 | Indebtedness |
| Schedule 8.02(a) | Liens |
| Schedule 8.04 | Investments |
| Schedule 8.05 | Dispositions |
| Schedule 8.07 | Transactions with Affiliates |
| Schedule 16.01 | Notice Information |

INDENTURE, dated as of [\_\_], 2025, by and among Wolfspeed, Inc., a [North Carolina] corporation (the "Issuer"), the Subsidiary Guarantors (as defined below) party hereto from time to time and U.S. Bank Trust Company, National Association, a national banking association, not in its individual capacity but solely as the trustee hereunder (the "Trustee") and as the collateral agent hereunder.

WHEREAS, the Issuer wishes to issue, subject to the terms and conditions hereof, Notes on the Closing Date in the aggregate principal amount of $[\_\_] (collectively, the "Notes").

WHEREAS, the Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of the Notes in the manner provided hereunder; and

WHEREAS, all things necessary to make this Indenture a legal, valid and binding agreement of the Issuer, in accordance with its terms, have been done, and the Issuer proposes to do all the things necessary to make the Notes, when executed by the Issuer and authenticated and delivered by the Trustee hereunder and duly issued by the Issuer, the legal, valid and binding obligations of the Issuer as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto covenant and agree as follows:

## ARTICLE I.

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01  Definitions.

"Acceptable Intercreditor Agreement" means, with respect to any Liens on the Collateral that are intended to be senior to any Liens on the Collateral securing the Note Obligations, an intercreditor agreement in form and substance reasonably satisfactory to the Issuer and the Required Noteholder Parties.

"Account Control Agreement" means (a) with respect to any Deposit Account or Securities Account held or located in the United States, a customary account control agreement which provides for the Collateral Agent to have "control" (as defined in Section 9-104 of the Uniform Commercial Code or Section 8-106 of the Uniform Commercial Code, as applicable) of Deposit Accounts or Securities Accounts, as applicable and (b) with respect to any other Deposit Account or Securities Account, such agreement as is necessary to obtain a perfected security interest under the laws of the applicable jurisdiction over such Deposit Account or Securities Account and which provides for the Collateral Agent to have the equivalent of "control" (as defined in Section 9-104 of the Uniform Commercial Code or Section 8-106 of the Uniform Commercial Code, as applicable) (to the extent such equivalent concept exists under the laws of the jurisdiction where such Deposit Account or Securities Account, as applicable, is held or located) of such Deposit Accounts or Securities Accounts, as applicable.

"Affiliate" means, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified.

"<u>Agents</u>" means the Trustee, the Collateral Agent and the Custodian.

"<u>Agreed Security Principles</u>" means the principles set forth in Schedule 1.01(D).

"<u>AHYDO Payments</u>" has the meaning assigned to such term in <u>Section 3.02(i).</u>

"<u>Anti-Corruption Laws</u>" means any Requirement of Law related to bribery or anti-corruption, including the United States Foreign Corrupt Practices Act of 1977, as now and hereafter in effect, or any successor statute.

"<u>Anti-Terrorism Law</u>" means any Requirement of Law related to money laundering or financing terrorism, including the Patriot Act, The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), Trading With the Enemy Act (50 U.S.C. §1 et seq., as amended), Executive Order 13224 (effective September 24, 2001) and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended), in each case, as now and hereafter in effect, or any successor statutes.

"<u>Applicable Redemption Price</u>"  means, with respect to any applicable Notes on any date of determination, (i) on or after June 23, 2026 and prior to the later of (x) June 23, 2027 and (y) the Extraordinary Receipts Trigger Date, 109.875% of the principal amount of such Notes plus accrued and unpaid interest on such Notes to, but excluding, the applicable redemption (or repurchase) date, (ii) on or after the later of (x) June 23, 2027 and (y) the Extraordinary Receipts Trigger Date and prior to June 23, 2028, 105.000% of the principal amount of such Notes plus accrued and unpaid interest on such Notes to, but excluding, the applicable redemption (or repurchase) date, (iii) on or after June 23, 2028 and prior to June 23, 2029, 103.000% of the principal amount of such Notes plus accrued and unpaid interest on such Notes to, but excluding, the applicable redemption (or repurchase) date and (iv) on or after June 23, 2029, 100% of the principal amount of such Notes plus accrued and unpaid interest on such Notes to, but excluding, the applicable redemption (or repurchase) date.

"<u>Asset Sale Offer</u>" has the meaning assigned to such term in <u>Section 3.02(b)</u>.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy," as codified as 11 U.S.C. Section 101 et seq., as amended, and any successor statute of similar import, in each case as in effect from time to time.

"<u>Bankruptcy Plan</u>" means that certain Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate, dated as of June 27, 2025, and including all appendices, exhibits, schedules and supplements thereto, as may be amended, supplemented, or modified from time to time.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F. R. § 1010.230.

2

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Board of Directors" means, as to any person, the board of directors or other governing body of such person, or if such person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Budget" has the meaning assigned to such term in Section 7.04(f).

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or the State of North Carolina are authorized or required by law to remain closed.

"Capital Expenditures" means, for any person in respect of any period, the aggregate of all expenditures incurred by such person during such period that, in accordance with GAAP, are or should be included in "additions to property, plant or equipment" or similar items reflected in the statement of cash flows of such person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease or finance lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; provided that obligations of the Issuer or its Subsidiaries, either existing on the Closing Date or created thereafter that (a) initially were not included on the consolidated balance sheet of the Issuer as capital lease or finance lease obligations and were subsequently recharacterized as capital lease or finance lease obligations or, in the case of a special purpose or other entity becoming consolidated with the Issuer and its Subsidiaries were required to be characterized as capital lease or finance obligations upon such consolidation, in either case, due to a change in accounting treatment or otherwise, or (b) did not exist on the Closing Date and were required to be characterized as capital lease or finance lease obligations but would not have been required to be treated as capital lease or finance lease obligations on the Closing Date had they existed at that time, shall for all purposes not be treated as Capitalized Lease Obligations or Indebtedness.

"Cash Interest" has the meaning assigned to such term in Section 2.15(h).

"Cash Management Agreement" means any agreement to provide to the Issuer or any Subsidiary cash management services for collections, treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), any demand deposit, payroll, trust or operating account relationships, commercial credit cards, merchant card, purchase or debit cards, non-card e-payables services, and other cash management services, including electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"Casualty Event" means any event that gives rise to the receipt by the Issuer or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, assets or property (including any improvements thereon) to replace or repair such equipment, assets or property or as compensation for such casualty or condemnation event.

3

A "Change of Control" shall be deemed to occur if:

(a)        a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Issuer, its Wholly Owned Subsidiaries and the employee benefit plans of the Issuer and its Wholly Owned Subsidiaries, files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the common Equity Interests of the Issuer representing more than 50% of the voting power of the common Equity Interests of the Issuer; or

(b)        a "Change of Control" (or similar event) or "Fundamental Event" (or similar event) shall occur under any Second Lien Indenture or any other indenture, credit agreement, or other relevant documentation in respect of any Indebtedness constituting Material Indebtedness of the Issuer or any Subsidiary;

*provided*, that the distribution of securities pursuant to the Bankruptcy Plan shall in no event be deemed to be a Change of Control.

"Change of Control Offer" has the meaning assigned to such term in Section 3.02(c).

"Charges" has the meaning assigned to such term in Section 2.15(e).

"Chapter 11 Cases" means the voluntary cases of the Issuer and certain of its subsidiaries filed in the United States Bankruptcy Court for the Southern District of Texas on July 1, 2025.

"CHIPS Act" means Title XCIX — Creating Helpful Incentives to Produce Semiconductors for America of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Pub.  L.  116-283), as amended by the CHIPS Act of 2022 (Division A of Pub.  L.  117-167).

"CHIPS Program Office" means United States Department of Commerce (the "Department"), CHIPS Program Office.

"Closing Date" means [    ], 2025.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated and rulings issued thereunder.

"Collateral" means all the "Collateral" (or similar term) as defined in any Security Document and shall also include the Mortgaged Properties, and all other property that is subject to any Lien in favor of the Trustee, the Collateral Agent or any Subagent for the benefit of the Noteholder Parties pursuant to any Security Document.

"Collateral Agent" means U.S. Bank Trust Company, National Association, together with its successors and permitted assigns in such capacity.

4

"Collateral Agreement" means the Collateral Agreement, dated as of the Closing Date, and as may be amended, restated, supplemented or otherwise modified from time to time, among the Issuer, each Domestic Subsidiary Guarantor and the Collateral Agent.

"Collateral and Guarantee Requirement" means the requirement that (in each case subject to the Agreed Security Principles, Sections 7.10(c), (d) and (g), Schedule 7.12, Section 7.14 and any applicable Intercreditor Agreement):

(a)        on the Closing Date, (x) the Collateral Agent shall have received from the Issuer and each Domestic Subsidiary Guarantor a counterpart to the Collateral Agreement and the documents required to be executed by the Issuer and each Domestic Subsidiary Guarantor pursuant to the Collateral Agreement in order to secure the Note Obligations thereunder and (y) the Trustee shall have received from each Subsidiary Guarantor, a counterpart of the Subsidiary Guarantee Agreement, in each case duly executed and delivered on behalf of such person;

(b)        on the Closing Date, (i)(x) all outstanding Equity Interests directly owned by the Issuer or any Domestic Subsidiary Guarantor, in each case, other than Excluded Securities, and (y) all Indebtedness owing to the Issuer or any Domestic Subsidiary Guarantor, other than Excluded Securities, shall have been pledged pursuant to the Collateral Agreement and (ii) the Collateral Agent shall have received certificates or other instruments (if any) representing such Equity Interests and such notes or other instruments required to be delivered pursuant to the applicable Security Documents, together with stock powers, note powers or other instruments of transfer with respect thereto endorsed in blank;

(c)        in the case of any person that becomes a Subsidiary Guarantor after the Closing Date, the Collateral Agent or the Trustee, as applicable, shall have received (i) a supplement to Subsidiary Guarantee Agreement duly executed and delivered by such Subsidiary Guarantor, (ii) in the case of a Domestic Subsidiary Guarantor, a supplement to the Collateral Agreement and supplements to the other Security Documents, if applicable, substantially in the form specified therefor or otherwise reasonably acceptable to the Collateral Agent (acting at the direction of the Required Noteholder Parties), in each case, duly executed and delivered on behalf of such Domestic Subsidiary Guarantor and (iii) in the case of a Foreign Subsidiary Guarantor, such other Security Documents governed by the law of any Foreign Collateral Jurisdiction as are necessary for the grant of a perfected security interest in the Equity Interests of, and assets of, such Subsidiary Guarantor, which shall include, among other things, security over substantially all assets in any jurisdiction where all-asset/floating security is customary, in each case, in form and substance reasonably acceptable to the Collateral Agent (acting at the direction of the Required Noteholder Parties) and duly executed and delivered on behalf of such Foreign Subsidiary Guarantor;

(d)        after the Closing Date, (i) (x) all outstanding Equity Interests of any person that becomes a Subsidiary Guarantor after the Closing Date and (y) subject to Section 7.10(g), all Equity Interests directly acquired by the Issuer or a Subsidiary Guarantor after the Closing Date, other than Excluded Securities, shall have been pledged

5

pursuant to the Collateral Agreement or other applicable Security Documents, and (ii) the Collateral Agent shall have received all certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(e)     except as otherwise contemplated by this Indenture or any Security Document, all documents and instruments, including Uniform Commercial Code financing statements, and filings with the United States Copyright Office and the United States Patent and Trademark Office, and all other actions reasonably requested by the Collateral Agent (acting at the direction of the Required Noteholder Parties) (including those required by applicable Requirements of Law) to be delivered, filed, registered or recorded to create the Liens intended to be created by the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Security Documents, shall have been delivered, filed, registered or recorded concurrently with, or promptly following, the execution and delivery of each such Security Document;

(f)     within the time periods set forth in Section 7.10 with respect to Mortgaged Properties encumbered pursuant to said Section 7.10, the Collateral Agent shall have received (i) counterparts of each Mortgage to be entered into with respect to each such Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property and suitable for recording or filing in all filing or recording offices that may be necessary or reasonably desirable to create a valid and enforceable Lien subject to no other Liens except Permitted Liens, at the time of recordation thereof, (ii) with respect to the Mortgage encumbering each such Mortgaged Property, opinions of counsel in favor of the Collateral Agent regarding the enforceability, due authorization, execution and delivery of the Mortgages and such other matters customarily covered in real estate counsel opinions and customarily given in similar financing transactions, (iii) with respect to each such Mortgaged Property, the Flood Documentation and (iv) such other customary certificates, affidavits and similar deliverables that are customarily given in similar financing transactions in connection with the delivery of a Mortgage or the other deliverables set forth in clause (g) below as the Collateral Agent may reasonably request (acting at the direction of the Required Noteholder Parties) that are available to the Issuer without material expense with respect to any such Mortgage or Mortgaged Property;

(g)     within the time periods set forth in Section 7.10 with respect to Mortgaged Properties encumbered pursuant to said Section 7.10, the Collateral Agent shall have received (i) with respect to each Mortgaged Property located in the United States of America, and to the extent customary in the jurisdiction in which the Mortgaged Property is located if located outside of the United States of America, a policy or policies or marked up unconditional binder of title insurance, or a date-down and modification endorsement, if available, paid for by the Issuer, issued by a nationally recognized title insurance company selected by the Issuer insuring the Lien of each Mortgage as a valid Lien on the Mortgaged Property described therein, free of any other Liens except Permitted Liens, with an insured amount not to exceed the fair market value of the insured Mortgaged Property (as determined in good faith by Issuer), together with such customary endorsements, coinsurance and reinsurance as may be necessary and as the

Collateral Agent may reasonably request (acting at the direction of the Required Noteholder Parties) and which are available at commercially reasonable rates in the jurisdiction where the applicable Mortgaged Property is located and (ii) with respect to each Mortgaged Property located in the United States of America, and to the extent customary in the jurisdiction in which the Mortgaged Property is located if located outside of the United States of America, a survey of each Mortgaged Property (including all improvements, easements and other customary matters thereon), as applicable, for which all necessary fees (where applicable) have been paid, which is (A) complying in all material respects with the minimum detail requirements of the American Land Title Association and American Congress of Surveying and Mapping as such requirements are in effect on the date of preparation of such survey and (B) sufficient for such title insurance company to remove all standard survey exceptions from the title insurance policy relating to such Mortgaged Property (*provided*, *however*, that a survey shall not be required to the extent that the issuer of the applicable title insurance policy provides reasonable and customary survey-related coverages (including, without limitation, survey-related endorsements) in the applicable title insurance policy based on an existing survey, zip map or express map and/or such other documentation as may be reasonably satisfactory to the title insurer);

(h)      evidence of the insurance required by the terms of <u>Section 7.02</u>; and

(i)      after the Closing Date, the Collateral Agent or the Trustee, as applicable, shall have received (i) such other Security Documents as may be required to be delivered pursuant to <u>Section 7.10</u> or the Collateral Agreement, and (ii) upon reasonable request by the Collateral Agent (acting at the direction of the Required Noteholder Parties), evidence of compliance with any other requirements of <u>Section 7.10</u>.

"<u>Competitor</u>" means a person or an Affiliate of a person engaged in the development, production, manufacture, marketing, distribution, promotion or sale of semiconductors (it being understood that no Noteholder or Affiliate of a Noteholder that owns such a person or an Affiliate of such a person and whose primary business is not the development, production, manufacture, marketing, distribution, promotion or sale of semiconductors shall be included in this definition).

"<u>Contribution Debt</u>" means Indebtedness of the Issuer or any Subsidiary in an aggregate outstanding principal amount not greater than 100% (or 50% in the case of Permitted Disqualified Stock) of the aggregate net amount of cash proceeds received by the Issuer after the Closing Date in excess of $300,000,000 in the aggregate from (x) the issuance or sale of the Issuer's Qualified Equity Interests and Permitted Disqualified Stock or (y) a contribution to the Issuer's common equity, in each case after the Closing Date (in each case of (x) and (y), other than proceeds (i) from the sale of Equity Interests by the Issuer to any Subsidiary or contributions to the common equity of the Issuer by any of its Subsidiaries or (ii) from the conversion of any Convertible Notes), in each case, to the extent such proceeds have not otherwise been applied to voluntarily redeem the Notes pursuant to <u>Section 3.02(a)(ii)</u> or make any Investments pursuant to <u>Section 8.04</u>, any Restricted Payments pursuant to <u>Section 8.06</u> or any prepayment of Indebtedness pursuant to <u>Section 8.09(b)</u>.  Notwithstanding anything to the

contrary set forth herein, Contribution Debt may only be allocated to Section 8.01(k) and may not be used to incur any other Indebtedness.

"Consolidated Interest Expense" means, with respect to any person for any period, all interest expense, including the amortization of debt discount and premium, the amortization or expensing of all fees and expenses payable in connection with the incurrence of indebtedness, the interest component under Capitalized Lease Obligations, capitalized interest, interest paid in kind and net payments and receipts (if any) pursuant to interest rate Hedging Agreements, in each case, of such person and its subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"Consolidated Net Income" means with respect to any person for any period, the aggregate of the Net Income of such person and its subsidiaries for such period, on a consolidated basis determined in accordance with GAAP, but excluding:

> (1)    extraordinary gains or losses;

> (2)    net earnings of any business entity (other than a Subsidiary) in which any Note Party or any Subsidiary thereof has an ownership interest unless such net earnings shall have actually been received by such Note Party or its Subsidiaries in the form of cash distributions;

> (3)    any gain or loss from Dispositions not in the ordinary course of business during such period; and

> (4)    any portion of the net earnings of any Subsidiary which for any reason is unavailable for payment of dividends to the Note Parties.

"Consolidated Total Assets" means, as of any date, the total assets of the Issuer and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, as set forth on the most recent consolidated balance sheet of the Issuer delivered pursuant to Section 7.04(a) or 7.04(b).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Control Triggering Event" shall mean any of the following: (i) the occurrence and continuance of any Event of Default or (ii) as of any date, the amount of Qualified Cash has been less than the Minimum Liquidity Threshold for a period of five (5) or more consecutive Business Days, in each case measured as of each such date during such period.

"Controlled Account" means any Deposit Account or Securities Account of the Issuer or any Subsidiary Guarantor that is required to be subject to an Account Control Agreement pursuant to Section 7.14(a).

"Controlled Entity" means any Note Party's Controlled Affiliates. As used in this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

"Convertible Notes" means, collectively, (i) the Second Lien Convertible Notes, (ii) the Second Lien Renesas Notes and (iii) any other debt securities issued by the Issuer from time to time permitted to be incurred under the terms of this Indenture that are convertible into common stock of the Issuer (and cash in lieu of fractional shares) and/or cash or any combination thereof (in an amount determined by reference to the price of such common stock).

"Core Assets" means any (i) MVF Assets, Siler City Assets or Durham Assets, in each case, excluding any immaterial ordinary course assets utilized in the applicable facility or campus or (ii) Equity Interests of any direct or indirect Subsidiary of the Issuer that directly or indirectly owns any of the foregoing.  Notwithstanding anything to the contrary set forth herein, it is understood and agreed that there is no limitation on any MVF Asset, Siler City Asset or Durham Asset moving to and from such locations.

"Corporate Trust Office" means the designated office of the Trustee in the United States of America at which at any time its corporate trust business shall be administered, or such other address as the Trustee may designate from time to time by notice to the Noteholder Parties and the Issuer, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Noteholder Parties and the Issuer).

"Custodian" has the meaning set forth in Section 2.04(a).

"Custodied Notes" has the meaning assigned to such term in Section 2.04(e).

"Default" means any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"Deposit Account" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"Depositary" means The Depository Trust Company or its successor.

"Depositary Participant" means any member of, or participant in, the Depositary.

"Depositary Procedures" means, with respect to any transfer, exchange or other transaction involving a Global Note or any beneficial interest therein, the rules and procedures of the Depositary applicable to such transfer, exchange or transaction.

"Discharged Indebtedness" means Indebtedness that has been defeased (pursuant to a contractual or legal defeasance) or discharged pursuant to the prepayment or deposit of amounts sufficient to satisfy such Indebtedness as it becomes due or irrevocably called for redemption (and regardless of whether such Indebtedness constitutes a liability on the balance

sheet of the obligor thereof); *provided*, *however*, that (i) such Indebtedness shall be deemed Discharged Indebtedness if the payment or deposit of all amounts required for defeasance or discharge or redemption thereof have been made even if certain conditions thereto have not been satisfied, so long as such conditions are reasonably expected to be satisfied within 95 days after such prepayment or deposit and (ii) such deposited funds shall be excluded from the calculation of Qualified Cash; *provided*, *further*, *however*, that if the conditions referred to in clause (i) of the immediately preceding proviso are not satisfied within 95 days after such prepayment or deposit, such Indebtedness shall cease to constitute Discharged Indebtedness after such 95-day period.

"Disinterested Director" means, with respect to any person and transaction, a member of the Board of Directors of such person who does not have any material direct or indirect financial interest in or with respect to such transaction.

"Dispose" or "Disposed of" means to convey, sell, lease, sub-lease, license, sub-license, sell and leaseback, assign, farm-out, transfer or otherwise dispose of any property, business or asset, in one transaction or a series of transactions, including any Sale and Lease-Back Transaction and any sale or issuance of Equity Interests of a Subsidiary, and including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.  The term "Disposition" shall have a correlative meaning to the foregoing.

"Disqualified Stock" means, with respect to any person, any Equity Interests of such person that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior redemption or repurchase in full of the Notes and payment in full of all other Note Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) at the option of the holder thereof, is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in each case of the preceding clauses (a) through (d), prior to the date that is ninety-one (91) days after the Maturity Date (provided, that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock).  Notwithstanding the foregoing: (i) any Equity Interests issued to any employee or to any plan for the benefit of employees of the Issuer or the Subsidiaries or by any such plan to such employees shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Issuer in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability and (ii) any class of Equity Interests of such person that by its terms authorizes such person to satisfy its obligations thereunder by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"DOE Borrower" means any borrower of any DOE Financing.

10

"DOE Financing" means any Indebtedness of any DOE Borrower owing to (x) the United States Department of Energy Loan Programs Office or (y) any financial institution acting as an administrator, facilitator, agent, trustee, servicer, conduit, instrumentality or similar capacity with respect to the United States Department of Energy Loans Programs Office.

"DOE Offer" has the meaning assigned to such term in Section 3.02(g).

"DOE Parent Entity" means the Issuer or any other Subsidiary which is a direct or indirect parent company of any DOE Borrower.

"Dollars" or "$" means lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary.

"Domestic Subsidiary Guarantor" means (a) each Domestic Subsidiary of the Issuer that is set forth on Schedule 1.01(C) and (b) each Domestic Subsidiary of the Issuer that is not an Excluded Subsidiary (unless Issuer has elected to cause such Domestic Subsidiary to become a Subsidiary Guarantor).

"DPA" means the Defense Production Act, as amended, including all implementing regulations.

"Durham Assets" means any assets of the Issuer or its Subsidiaries (i) located at, or used in, as of the Closing Date, Durham, North Carolina and (ii) located at, or used in, Durham, North Carolina from and after the Closing Date (it being understood and agreed that such assets in clauses (i) and (ii) shall at all times constitute "Durham Assets" even if subsequently removed from, or no longer used in, Durham, North Carolina), but in any event excluding the Project Sonic Assets (as defined in Schedule 8.05).

"EBITDA" means, for any period, in each case for the Issuer and its Subsidiaries on a consolidated basis, an amount equal to Consolidated Net Income for such period plus (a) the following to the extent deducted in calculating such Consolidated Net Income (other than amounts specifically excluded from Consolidated Net Income under clauses (a) through (c) of the definition of Consolidated Net Income): (i) Consolidated Interest Expense, (ii) taxes, (iii) depreciation and amortization, (iv) all non-recurring expenses and charges which do not represent a cash item in such period, (v) expenses in connection with the issuance of stock options or other equity as compensation to employees and/or management of the Issuer or any Subsidiary, (vi) costs and expenses, in an amount not to exceed $5,000,000 in the aggregate during any four (4) fiscal quarter period, incurred in connection with any investment, acquisition, asset disposition, equity issuance or incurrence, payment, prepayment, refinancing or redemption of Indebtedness (including fees and expenses related to this Indenture and any amendments, supplements and modifications thereof), including the amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses (in each case, whether or not consummated) and (vii) all adjustments used in the calculation of Non-GAAP net loss by the Issuer as reported in its filings with the SEC for the relevant period, minus (b) to the extent included in calculating Consolidated Net Income, (i) all non-recurring, non-cash items increasing net income for such period and (ii) any cash payments made during such period in respect of items described in clause (a)(iv) above subsequent to the fiscal quarter in which the relevant non-cash expenses or

11

losses were incurred <u>plus</u> (or <u>minus</u>) (c) non-cash losses (or gains) arising from the impact of mark-to-market valuation of the Note Parties Investment in Lextar Electronics Corporation; *provided*, that (x) in no event shall any fees, costs or expenses of the type referred to as "Start-up and Underutilization Costs" in the Issuer's filings with the SEC be added back in the calculation of EBITDA, (y) if any Disposition occurs during such period, any EBITDA attributable to the property, business or assets of such Disposition shall be excluded from the calculation of EBITDA and such Disposition shall be deemed to have occurred as of the first day of the relevant Test Period and (z) if any acquisition or Investment occurs during such period, any EBITDA attributable to the property, business or assets so acquired or Invested in shall be included in the calculation of EBITDA and such acquisition or Investment shall be deemed to have occurred as of the first day of the relevant Test Period.

"<u>Electing Noteholder</u>" has the meaning assigned to such term in <u>Section 2.02(b)</u>.

"<u>Environment</u>" means ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata or natural resources such as flora and fauna.

"<u>Environmental Laws</u>" means all applicable laws (including common law), rules, regulations, codes, ordinances, orders, decrees, judgments or other legally binding requirements, promulgated or entered into by or with any Governmental Authority, regulating or relating to pollution, the protection of the Environment, preservation or reclamation of natural resources (such as flora and fauna), including those regulating the generation, use, transport, management, Release or threatened Release of, or exposure to, any Hazardous Material or to public or employee health and safety matters (solely to the extent relating to human exposure to Hazardous Materials).

"<u>Environmental Permits</u>" has the meaning assigned to such term in <u>Section 4.16</u>.

"<u>Equity Interests</u>" of any person means any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any Preferred Stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing; *provided* that Equity Interests shall not include any Convertible Notes, Permitted Bond Hedge Transaction or Permitted Warrant Transaction.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time and any final regulations promulgated and the rulings issued thereunder.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) that, together with the Issuer or a Subsidiary, is treated as a single employer under Section 4001 of ERISA or Section 414(b), (c), (m) or (o) of the Code.

"<u>ERISA Event</u>" means (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Plan; (b) the failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of

12

security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance, there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title 1 of ERISA), whether or not waived, or, with respect to any Plan or Multiemployer Plan, the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived; (c) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (e) the filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan, the termination of any Plan under Section 4041(c) of ERISA, or the incurrence by the Issuer, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan; (f) the institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC, under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or the receipt by the Issuer, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by the Issuer, a Subsidiary or any ERISA Affiliate of any material liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (h) the receipt by the Issuer, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Issuer, a Subsidiary or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 432 of the Code or Section 305 of ERISA; (i) the withdrawal of any of the Issuer, a Subsidiary or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (j) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA; or (k) the Issuer, a Subsidiary or any ERISA Affiliate incurring any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA).

"Escrowed Indebtedness" means Indebtedness (i) issued to refinance in full any Indebtedness, (ii) in a principal amount no greater than the outstanding principal amount of such Indebtedness to be so refinanced (plus unpaid accrued interest thereon, underwriting discounts and fees, commissions and expenses related to such offering) and (iii) the proceeds of which are funded into an escrow account (pursuant to customary escrow arrangements) pending the release thereof for such refinancing; provided, for the avoidance of doubt, proceeds released from the escrow account and used to refinance the outstanding Indebtedness shall reduce dollar for dollar the amount of "Escrowed Indebtedness" permitted hereunder.

"Event of Default" has the meaning assigned to such term in Section 10.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Excluded Account" means (a) any Deposit Account specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the employees of any Note Party, (b) any tax account (including any sales tax account), (c) any fiduciary, pension, 401(k) or similar trust account holding employee funds, (d) any impound, escrow, trust, cash collateral or similar account and (e) any Deposit Account and Securities Account that has cash or Permitted Investments that do not have a balance at any time exceeding $20,000,000 individually and $50,000,000 in the aggregate for all such accounts constituting Excluded Accounts; provided that, no account that secures any obligations under any Second Lien Indenture, any Permitted Refinancing Indebtedness thereof or [●] shall be an Excluded Account.

"Excluded Property" has the meaning assigned to such term in Section 7.10(g).

"Excluded Securities" means any of the following:

(a)      any Equity Interests or Indebtedness with respect to which the Issuer and the Required Noteholder Parties reasonably agree that the cost or other consequences of pledging such Equity Interests or Indebtedness in favor of the Secured Parties under the Security Documents are likely to be excessive in relation to the value to be afforded thereby;

(b)      any Equity Interests or Indebtedness to the extent the pledge thereof would be prohibited by any Requirement of Law or would require governmental or other regulatory consent, approval, license or authorization to be pledged (unless such consent, approval, license or authorization has been received);

(c)      any Equity Interests of any person that is not a Wholly Owned Subsidiary to the extent (A) that a pledge thereof to secure the Note Obligations is prohibited by any organizational documents, joint venture agreement or shareholder agreement of such Subsidiary with an unaffiliated third party without the consent of such third party; provided, that this clause (A) shall not apply if (1) such other party is a Note Party or a Subsidiary of any Note Party or (2) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Issuer or any Subsidiary to obtain any such consent) and shall only apply for so long as such organizational documents, joint venture agreement or shareholder agreement or replacement or renewal thereof is in effect, or (B) a pledge thereof to secure the Note Obligations would give any other party (other than a Note Party or a Subsidiary of a Note Party) to any organizational document or shareholder agreement governing such Equity Interests the right to terminate its obligations thereunder (so long as, in each case of clause (A) and (B), such provision prohibits the granting of a security interest over such Equity Interests generally (and not solely a pledge to secure the Note Obligations));

14

(d)      any Equity Interests of any Subsidiary to the extent that the pledge of such Equity Interests could reasonably be expected to result in material adverse tax consequences to the Issuer or any Subsidiary as determined in good faith by the Issuer in consultation with the Required Noteholder Parties;

(e)      any Equity Interests or Indebtedness that are set forth on <u>Schedule 1.01(A)</u> to this Indenture or that have been identified on or prior to the Closing Date in writing to the Required Noteholder Parties by a Responsible Officer of the Issuer and agreed to by the Required Noteholder Parties; and

(f)      any Margin Stock;

*provided* that, no Equity Interest or Indebtedness that secures any obligations under any Second Lien Indenture, any Permitted Refinancing Indebtedness thereof or [●] shall be Excluded Securities.

"<u>Excluded Subsidiary</u>" means any of the following (except as otherwise provided in clause (b) of the definition of Subsidiary Guarantor):

(a)      each Immaterial Subsidiary,

(b)      each Subsidiary that is prohibited from Guaranteeing the Note Obligations by a contractual obligation (to the extent such prohibition exists as of the Closing Date or at the time of the acquisition of such Subsidiary (or is a renewal or replacement thereof); *provided* that such contractual obligation was not entered into or created in contemplation hereof and only for so long as such prohibition exists),

(c)      each Subsidiary that is prohibited from Guaranteeing the Note Obligations by any Requirement of Law or that would require consent, approval, license or authorization of a Governmental Authority to Guarantee the Note Obligations (unless such consent, approval, license or authorization has been received and is in effect),

(d)      [reserved],

(e)      [reserved],

(f)      each not-for-profit Subsidiary or political action committee,

(g)      each Subsidiary which is a foreign sales office, to the extent such Subsidiary does not own any material assets,

(h)      any other Subsidiary with respect to which, the providing of a Guarantee of the Note Obligations could reasonably be expected to result in material adverse tax consequences to the Issuer or any Subsidiary as determined in good faith by the Issuer in consultation with the Required Noteholder Parties, and

(i)      any other Subsidiary with respect to which, the Issuer and the Required Noteholder Parties reasonably determine that the cost or other consequences of providing a

15

Guarantee of the Note Obligations are to be excessive in relation to the value to be afforded thereby.

Notwithstanding anything to the contrary set forth herein or in any Note Document, in no event shall any Subsidiary that (x) is a borrower or guarantor of any DOE Financing, (y) owns any Material IP or (z) is a borrower, issuer or guarantor of any Second Lien Notes, any Permitted Refinancing Indebtedness thereof or [●], be an Excluded Subsidiary.

"<u>Extraordinary Receipts</u>" means 100% of the cash proceeds (other than cash proceeds constituting Net Proceeds) received by the Issuer and/or its Subsidiaries [●].[1]

"<u>Extraordinary Receipts Consummation Date</u>" means the date on which the Issuer has repurchased in the aggregate $175,000,000 principal amount of Notes pursuant to an Extraordinary Receipts Offer required to be made by the Issuer pursuant to <u>Section 3.02(j)(1)</u> (or such lesser principal amount of Notes tendered by Noteholders pursuant to an Extraordinary Receipts Offer required to be made by the Issuer pursuant to <u>Section 3.02(j)(1)</u>).

"<u>Extraordinary Receipts Offer</u>" has the meaning assigned to such term in <u>Section 3.02(j)</u>.

"<u>Extraordinary Receipts Trigger Date</u>" means the date on which the Issuer has repurchased all Notes required to be repurchased pursuant to an Extraordinary Receipts Offer required to be made by the Issuer pursuant to <u>Section 3.02(j)</u> (which, for the avoidance of doubt, shall be the amount required by the applicable subclause of <u>Section 3.02(j)</u> or such lesser principal amount of Notes tendered by the Noteholders pursuant to the Extraordinary Receipts Offer made pursuant to such subclause of <u>Section 3.02(j)</u>).

"<u>Fees</u>" means the fees payable by the Issuer (i) to any person pursuant to any Note Document, (ii) to the Collateral Agent for acting as collateral agent under the Note Documents and (iii) to the Trustee for acting as trustee hereunder.

"<u>Financial Officer</u>" of any person means the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer or Controller of such person.

"<u>First Lien/Second Lien Intercreditor Agreement</u>" means the First Lien/Second Intercreditor Agreement, dated as of [__], by and among [__], as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Indenture.

"<u>Fitch</u>" means Fitch Rating, part of the Fitch Group, a subsidiary of Fimalac, S.A., or any successor or assignee of the business of such company in the business of rating securities.

"<u>Flood Documentation</u>" means, with respect to each Mortgaged Property located in the United States of America or any territory thereof, (i) a completed "life-of-loan" Federal

---

[1] Scope of what constitutes Extraordinary Receipts is under discussion among the parties.

Emergency Management Agency standard flood hazard determination (to the extent a Mortgaged Property is located in a Special Flood Hazard Area, together with a notice about Special Flood Hazard Area status and flood disaster assistance duly executed by the Issuer and the applicable Note Party relating thereto) and (ii) a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 7.02(c) hereof and the applicable provisions of the Security Documents, each of which shall (A) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (B) name the Collateral Agent, on behalf of the Secured Parties, as additional insured and loss payee/mortgagee, (C) identify the address of each property located in a Special Flood Hazard Area, the applicable flood zone designation and the flood insurance coverage and deductible relating thereto and (D) be otherwise in customary form and substance (as reasonably determined by the Issuer).

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Collateral Jurisdiction" means, as of any date of determination, any jurisdiction in which a Foreign Subsidiary Guarantor is formed or incorporated.

"Foreign Subsidiary" means any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any state thereof or the District of Columbia.

"Foreign Subsidiary Guarantor" means each Foreign Subsidiary of the Issuer that is not an Excluded Subsidiary (unless the Issuer has elected to cause such Foreign Subsidiary to become a Subsidiary Guarantor).

"GAAP" means generally accepted accounting principles in effect in the United States of America on the Closing Date, applied on a consistent basis, subject to the provisions of Section 1.02.

"Global Note" means a Note that is represented by a certificate substantially in the form set forth in Exhibit A, registered in the name of the Depositary or its nominee, duly executed by the Issuer and authenticated by the Trustee, and deposited with the Trustee, as custodian for the Depositary.

"Global Note Legend" means a legend substantially in the form set forth in Exhibit B-2.

"Governmental Authority" means any federal, state, local or foreign government, court, governmental, regulatory or administrative agency, department, commission, board, bureau, tribunal agency, other authority, instrumentality or regulatory or legislative body.

"Gross Cash Proceeds" means the gross cash proceeds received by the Issuer from the applicable event; *provided* that, to constitute "Gross Cash Proceeds," the net cash proceeds received by the Issuer from such applicable event may not be less than 95.00% of the gross cash proceeds received by the Issuer from the applicable event.

"Guarantee" of or by any person (the "guarantor") means (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of the guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; *provided*, *however*, that the term "Guarantee" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted by this Indenture (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such person in good faith.

"guarantor" has the meaning assigned to such term in the definition of the term "Guarantee."

 "Hazardous Materials" means any material, substance or waste that is listed, regulated, or otherwise defined as hazardous, toxic, a pollutant or a contaminant (or words of similar regulatory intent or meaning) under applicable Environmental Law or the Release of which could give rise to liability under any applicable Environmental Law, including, without limitation, explosive or radioactive substances, petroleum byproducts or petroleum distillates, asbestos or asbestos-containing materials, per- and polyfluoroalkyl substances, polychlorinated biphenyls, radon gas or pesticides.

"Hedging Agreement" means any agreement entered into with respect to any swap, forward, future or derivative transaction, or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value, or credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed price physical delivery contracts, or any similar transaction or any combination of these transactions, in each

18

case of the foregoing, whether or not exchange traded; *provided*, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Issuer or any of the Subsidiaries shall be a Hedging Agreement.

"Historical Audited Financial Statements" has the meaning assigned to such term in Section 4.05.

"IAI" means an institutional "accredited investor" as described in Rule 501(a)(1), (2), (3) or (7) of Regulation D.

"IAI Global Note" means a Global Note that is an IAI Note.

"IAI Note" means (A) each Note that, on the original issue date thereof, was issued to one or more IAIs, other than in reliance upon Rule 144A or Regulation S, and each Note issued in exchange therefor or substitution thereof; and (B) each IAI Note issued pursuant to Section 2.07(e) in exchange for, or upon the transfer of, another Note, and each Note issued in exchange therefor or substitution thereof; *provided*, *however*, that a Note will cease to be an IAI Note when such Note is transferred to, or exchanged for, a Note that is a Rule 144A Note or a Regulation S Note.

"IAI Physical Note" means a Physical Note that is an IAI Note.

"Immaterial Subsidiary" means any Subsidiary of the Issuer that does not have (i) revenue, determined on a consolidated basis with its Subsidiaries, as of the last day of the most recently ended Test Period as of such date, in excess of 1% of the aggregate revenue of the Issuer and its Subsidiaries, on a consolidated basis, for such period or (ii) total assets, determined on a consolidated basis with its Subsidiaries, at any time, in excess of 1% of the Consolidated Total Assets; *provided*, that (x) the aggregate amount of revenue of Subsidiaries constituting Immaterial Subsidiaries, as of the last day of the most recently ended Test Period, shall not exceed 5% of the aggregate revenue of the Issuer and its Subsidiaries, on a consolidated basis, for such period and (y) the total assets of Subsidiaries constituting Immaterial Subsidiaries shall not at any time exceed 5% of the Consolidated Total Assets; *provided further*, that (A) the Issuer may elect in its sole discretion to exclude from classification as an Immaterial Subsidiary any Subsidiary that would otherwise meet the definition thereof and (B) for the avoidance of doubt, the Issuer may at any time designate any Subsidiary that complies with the terms of this definition as an "Immaterial Subsidiary". Each Immaterial Subsidiary as of the Closing Date shall be set forth in Schedule 1.01(B). Notwithstanding anything to the contrary set forth in this definition, no Subsidiary shall be an Immaterial Subsidiary if such Subsidiary, directly or indirectly, owns any Core Asset or is a borrower or guarantor under any Indebtedness for borrowed money [in excess of $50,000,000 (it being understood and agreed that any such Subsidiary, if applicable, may otherwise be deemed an Excluded Subsidiary in accordance with the definition thereof)].

"Indebtedness" of any person means, if and to the extent (other than with respect to clause (i)) the same would constitute indebtedness or a liability on a balance sheet prepared in accordance with GAAP, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar

instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (other than such obligations accrued in the ordinary course), (e) all Capitalized Lease Obligations of such person, (f) all net payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined in respect of outstanding Hedging Agreements, (g) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit, (h) the principal component of all obligations of such person in respect of bankers' acceptances, (i) all Guarantees by such person of Indebtedness described in clauses (a) to (h) above and (j) the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock); *provided*, that Indebtedness shall not include (A) trade and other ordinary-course payables, accrued expenses, and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase prices of an asset to satisfy unperformed obligations of the seller of such asset, (D) earn-out obligations (to the extent permitted hereunder) until such obligations become a liability on the balance sheet of such person in accordance with GAAP, (E) obligations in respect of Third Party Funds incurred in the ordinary course of business, (F) in the case of the Issuer and its Subsidiaries, intercompany liabilities in connection with the cash management, tax and accounting operations of the Issuer and the Subsidiaries, in each case, in the ordinary course of business and consistent with past practice, (G) completion guarantees or (H) any Permitted Warrant Transaction. The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness limits the liability of such person in respect thereof.

"Indemnitee" has the meaning assigned to such term in Section 11.07(b).

"Indenture" means this Indenture as amended, restated or supplemented from time to time.

"Ineligible Institution" means (i) a foreign person within the meaning of section 721 of the DPA or a person or Affiliate of a person controlled by a foreign person within the meaning of the DPA,  and (ii) a foreign government, foreign person, foreign entity (i.e., an entity not formed under the laws of the United States or any state within the United States or the District of Columbia), or a person representing or acting on behalf of a foreign government, foreign person, or foreign entity, or any entity with foreign ownership that (I) the Issuer reasonably determines, in consultation with the Required Noteholder Parties, would be a security risk to the Issuer's and its Subsidiaries' operations in consultation with the Defense Counterintelligence and Security Agency and (II) after such sale, transfer or conveyance, will own, directly or indirectly, more than twenty-five percent (25%) of the outstanding Notes; *provided* that, the foregoing restrictions shall not apply to any "foreign person" that is an "excepted investor" (in each case, within the meaning of the DPA).

"Information" has the meaning assigned to such term in Section 4.14(a).

"<u>Intellectual Property</u>" has the meaning assigned to such term in the Collateral Agreement.

["<u>Intercreditor Agreement</u>" means the Permitted Junior Intercreditor Agreement and, if any, an Acceptable Intercreditor Agreement.]

"<u>Interest Payment Date</u>" means, with respect to any Note, March 23, June 23, September 23 and December 23 of each year.

"<u>Interest Rate</u>" means, with respect to any Note, a fixed rate equal to (i) for the period commencing on the Closing Date through and including June 22, 2026, (x) 9.875% per annum, payable in cash, plus (y) 4.00% per annum, payable as PIK Interest, and (ii) commencing on June 23, 2026 and at all times thereafter, (A) in the event the Interest Rate Step-Down Condition is satisfied as of the most recent Test Date, 13.875% per annum, payable in cash, and (B) in the event the Interest Rate Step-Down Condition is not satisfied as of the most recent Test Date, 15.875% per annum, payable in cash.

"<u>Interest Rate Officer's Certificate</u>" has the meaning assigned to such term in <u>Section 2.15(g)</u>.

"<u>Interest Rate Step-Down Condition</u>" means (i)(a) the redemption or repurchase (other than any redemption or repurchase with the proceeds of any Disposition by the Issuer or any of its Subsidiaries) of Notes resulting in the aggregate principal amount of Notes outstanding being less than $1,000,000,000 and (b) the receipt by the Issuer of at least $450,000,000 of award disbursements pursuant to governmental grants under the CHIPS Act or (ii) as of the most recent Test Date, the ratio of the aggregate outstanding principal amount of the Notes to EBITDA for the most recently ended Test Period is less than or equal to 2.00:1.00.

"<u>Interest Rate Trigger Date</u>" has the meaning assigned to such term in <u>Section 2.15(g)</u>.

"<u>Investment</u>" has the meaning assigned to such term in <u>Section 8.04</u>.

"<u>Issuer</u>" has the meaning assigned to such term in the introductory paragraph of this Indenture.

"<u>Issuer's Order</u>" has the meaning assigned to such term in <u>Section 2.03</u>.

"<u>Junior Financing</u>" means (i) any Indebtedness for borrowed money that is subordinated in right of payment to the Note Obligations (other than intercompany Indebtedness) or (ii) any Indebtedness for borrowed money that is either unsecured or secured by Liens on the Collateral that are junior to the Liens on the Collateral securing the Note Obligations. Notwithstanding the foregoing, in no event shall any Indebtedness incurred pursuant to <u>Section 8.01(l)</u> constitute Junior Financing.  The Second Lien Notes shall constitute Junior Financing.

"<u>Leasehold Property</u>" means any leasehold or subleasehold interest of any Note Party as lessee or sublessee under any lease or sublease of Real Property.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar monetary encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; *provided*, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"Liquidity Covenant" means the covenant of the Issuer set forth in Section 8.11.

"Local Time" means New York City time (daylight or standard, as applicable).

"Make-Whole Amount" has the meaning assigned to such term in Section 3.02(e).

"Make-Whole Event" has the meaning assigned to such term in Section 3.02(e).

"Make-Whole Redemption Price" means, with respect to any Note on any applicable redemption (or repurchase) date, the greater of (I) the sum of (i) the principal amount of such Note, plus (ii) the accrued and unpaid interest on such Note to, but excluding, such redemption (or repurchase) date, plus (iii) the excess, if any, of (a) the present value at such redemption (or repurchase) date of (x) 109.875% of (A) the principal amount of such Note plus (B) all required PIK Interest due on such Note so redeemed or repurchased through June 23, 2026 plus (y) all required cash interest payments due on such Note so redeemed or repurchased through June 23, 2026, computed using a discount rate equal to the Treasury Rate as of such redemption (or repurchase) date plus 50 basis points, over (b) the principal amount of such Note, less (iv) 2.00% of the principal amount of such Note and (II) the sum of (i) 109.875% of the principal amount of such Note plus (ii) the accrued and unpaid interest on such Note to, but excluding, such redemption (or repurchase) date; *provided* that, if the Extraordinary Receipts Consummation Date has occurred, in connection with any redemption (or repurchase) on or after March 31, 2026 and solely to the extent that no Event of Default has occurred on or prior to such redemption (or repurchase) date, the "Make-Whole Redemption Price" shall be the sum of (i) 109.875% of the principal amount of such Note, plus (ii) the accrued and unpaid interest on such Note to, but excluding, such redemption (or repurchase) date (and, for the avoidance of doubt, if any Event of Default occurs or has occurred, this proviso shall be of no further effect).

If the redemption (or repurchase) is in connection with a satisfaction and discharge of the Indenture, the applicable Treasury Rate shall be computed as of the date that funds are irrevocably deposited with the Trustee to pay the amounts related thereto, as set forth in this Indenture.

"Margin Stock" has the meaning assigned to such term in Regulation U of the Board of Governors of the Federal Reserve System of the United States of America and all official rulings and interpretations thereunder or thereof.

"Material Adverse Effect" means (a) a material adverse effect on the business, property, operations, assets, liabilities (actual or contingent), operating results or financial condition of the Issuer and its Subsidiaries, taken as a whole, excluding in any event the effect of filing the Chapter 11 Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Chapter 11 Cases, the effects thereof and any

22

action required to be taken under the Chapter 11 Cases or the Bankruptcy Plan themselves, (b) a material adverse effect on the ability of the Issuer and the Subsidiary Guarantors (taken as a whole) to fully and timely perform any of their payment obligations under any Note Document to which the Issuer or any of the Subsidiary Guarantors is a party or (c) a material adverse effect on the validity or enforceability of any of the Note Documents or the rights and remedies of the Trustee and the Noteholder Parties thereunder.

"Material Indebtedness" means (i) Indebtedness (other than Notes) of any one or more of the Issuer or any Subsidiary in an aggregate principal amount exceeding $75,000,000 and (ii) Indebtedness under any Second Lien Indenture.

"Material IP" means any intellectual property (including any trade secrets) of the Issuer or any Subsidiary (and excluding commercial off the shelf products) that is material to any Product Family of the Issuer and its Subsidiaries[; provided that Material IP does not include [___]].[2]

"Material Real Property" means any parcel or parcels of Real Property now or hereafter owned in fee by the Issuer or any Subsidiary Guarantor and having a fair market value (on a per-property basis) of at least $5,000,000, as determined by the Issuer in good faith; *provided*, that "Material Real Property" shall not include (i) any Real Property in respect of which the Issuer or a Subsidiary Guarantor does not own the land in fee simple or (ii) any Real Property which the Issuer or a Subsidiary Guarantor leases to a third party.

"Maturity Date" means June 23, 2030.

"Maximum Rate" has the meaning assigned to such term in Section 2.15(e).

"Minimum Liquidity Threshold" has the meaning assigned to such term in Section 8.11.

"Moody's" means mean Moody's Investors Service, Inc.

"Mortgaged Properties" means each Material Real Property encumbered by a Mortgage pursuant to Section 7.10.

"Mortgages" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents (including amendments to any of the foregoing) delivered with respect to Mortgaged Properties, each, (i) in the case of Material Real Property located in the United States, in a form customary for financing transactions similar to this Indenture and reasonably satisfactory to the Collateral Agent (at the direction of the Required Noteholder Parties) and the Issuer or (ii) in the case of Material Real Property located outside of the United States in such form as is customary for the applicable jurisdiction and reasonably satisfactory to the Collateral Agent (at the direction of the Required Noteholder Parties) and the Issuer, in each case, as amended, supplemented or otherwise modified from time to time.

---

[2] Any exclusions from Material IP subject to discussion among the parties.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Issuer or any Subsidiary or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"MVF" means the Mohawk Valley Fab facility and campus in Marcy, New York.

"MVF Assets" means (i) any assets of the Issuer or its Subsidiaries located at, or used in, as of the Closing Date, MVF and (ii) any additional assets located at, or used in, MVF from and after the Closing Date (it being understood and agreed that such assets in clauses (i) and (ii) shall at all times constitute "MVF Assets" even if subsequently removed from, or no longer used in, MVF).

"Net Income" means, with respect to any person, the net income (loss) of such person, determined in accordance with GAAP.

"Net Proceeds" means [(A)] 100% of the cash proceeds actually received by the Issuer or any Subsidiary (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any Disposition of, or Casualty Event with respect to, (x) any Core Asset (other than any Disposition under Section 8.05(a)) or (y) any Non-Core Assets pursuant to Section 8.05(g), in each case, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations that are secured by the applicable asset or property (including without limitation principal amount, premium or penalty, if any, interest and other amounts) (other than pursuant to the Note Documents), other expenses and brokerage, consultant and other fees actually incurred in connection therewith, (ii) [reserved], (iii) Taxes paid or reasonably estimated to be payable as a result thereof (*provided*, that if the amount of any such estimated Taxes exceeds the amount of Taxes actually required to be paid in respect of such Disposition or Casualty Event, the aggregate amount of such excess shall constitute Net Proceeds at the time such Taxes are actually paid) and (iv) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (A) related to any of the applicable assets and (B) retained by the Issuer or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction); *provided*, that, with respect to any Net Proceeds arising from any Casualty Event with respect to any Core Assets, if no Default or Event of Default exists and the Issuer intends to use such proceeds within 12 months of such receipt to acquire assets that reasonably replace or remediate the property or assets subject to such Casualty Event to a similar level of such property or assets as prior to such Casualty Event, such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 12 months of such receipt, so used (it being understood that if any portion of

such proceeds are not so used within such 12 month period, such remaining portion shall constitute Net Proceeds as of the date of such expiry without giving effect to this proviso) [and (B) [●]].

"Non-Core Assets" means any assets owned by the Issuer or any Subsidiary that do not constitute Core Assets.

"Non-U.S. Person" means a person that is not a "U.S. person" within the meaning of Regulation S.

"Noteholder" means, as of any date, any Person that is a holder of a Note issued hereunder.

"Note Documents" means (i) this Indenture, (ii) the Subsidiary Guarantee Agreement, (iii) the Security Documents, (iv) any Intercreditor Agreement and (v) all other fee letters, documents, certificates, instruments or agreements executed and delivered by or on behalf of a Note Party for the benefit of any Agent, the Noteholders or any other person in connection herewith.

"Note Obligations" means (a) the due and punctual payment by the Issuer of (i) the unpaid principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Notes issued by the Issuer under this Indenture, when and as due, whether at maturity, by acceleration, upon one or more dates set for redemption or otherwise and (ii) all other monetary obligations of the Issuer owed under or pursuant to this Indenture and each other Note Document, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), and (b) the due and punctual payment of all obligations of each other Note Party under or pursuant to each of the Note Documents.

"Note Parties" means the Issuer and the Subsidiary Guarantors.

"Noteholder Party" means the Noteholders and holders of a beneficial interest in the Global Notes.

"Notes" shall have the meaning assigned to such term in the recitals of this Indenture.

"Notes Minimum" means $1.00.

"Notes Multiple" means $1.00.

"OFAC" shall have the meaning assigned to such term in the definition of "Sanctions."

"OFAC Listed Person" shall have the meaning assigned to such term in Section 4.25(a).

"Officer's Certificate" means a certificate signed on behalf of the Issuer by a Responsible Officer of the Issuer who is the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, which meets the requirements set forth in this Indenture.

"OID Legend" means a legend substantially in the form set forth in Exhibit B-3.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Trustee or the Collateral Agent, as applicable.  The counsel that delivers an Opinion of Counsel on behalf of the Issuer or other person may be an employee of, or counsel, to the Issuer or such other person.

"Paying Agent" has the meaning assigned to such term in Section 2.04(a).

"Parallel Debt" has the meaning ascribed thereto in Section 5.16.

"Parallel Debt Creditor" means the Collateral Agent in its capacity as creditor of the Parallel Debt.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Pension Plan" has the meaning ascribed thereto in Section 4.15(b).

"Perfection Certificate" means the Perfection Certificate with respect to the Issuer and the other Note Parties delivered to the Noteholders and the Trustee on or prior to the Closing Date, as the same may be supplemented from time to time to the extent required by Section 7.04(g).

"Permitted Bond Hedge Transaction" means any call or capped call option (or substantively equivalent derivative transaction) on the Issuer's common stock purchased by the Issuer in connection with the issuance of any Convertible Notes; *provided* that the purchase price for such Permitted Bond Hedge Transaction, less the proceeds received by the Issuer from the sale of any related Permitted Warrant Transaction, does not exceed the net proceeds received by the Issuer from the sale of such Convertible Notes issued in connection with the Permitted Bond Hedge Transaction.

"Permitted Disqualified Stock" means Preferred Stock of the Issuer that constitutes Disqualified Stock solely due to clause (c) of the definition thereof; *provided* that (i) such Preferred Stock has been broadly marketed to potential investors and (ii) such Preferred Stock does not provide for scheduled payments of dividends in cash in an amount in excess of 10.00% per annum (with variable interest rates converted to fixed rates based on implied forward interest rate curve for purposes of such determination).

26

"Permitted Investments" shall mean:

(a)    direct obligations of the United States of America, the United Kingdom or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America, the United Kingdom or any member of the European Union or any agency thereof, in each case with maturities not exceeding one year from the date of acquisition thereof;

(b)    time deposit accounts, certificates of deposit and money market deposits maturing within 180 days of the date of acquisition thereof issued by (i) a bank, trust company or other financial institution that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America, having capital, surplus and undivided profits in excess of $500 million and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act)), or (ii) other banks, trust companies or other financial institutions approved by the Trustee (acting at direction of the Required Noteholder Parties);

(c)    repurchase obligations with a term of not more than 185 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)    commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation (other than an Affiliate of the Issuer) organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P-1 (or higher) according to Moody's, or A-1 (or higher) according to S&P or F1 or higher by Fitch (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(e)    securities with maturities of six months or less from the date of acquisition, issued and fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's or A by Fitch (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(f)    shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (e) above;

(g)    money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P or Aaa by Moody's or AAA by Fitch and (iii) have portfolio assets of at least $500.0 million;

(h)    time deposit accounts, certificates of deposit and money market deposits in an aggregate face amount not in excess of 0.5% of Consolidated Total Assets;

27

(i)       any Investments permitted by the Issuer's investment policy (other than any Investment permitted by Section IX thereof), as in effect on the Closing Date, provided that such investment policy has been provided to the Required Noteholder Parties on or prior to the Closing Date; and

(j)       instruments equivalent to those referred to in clauses (a) through (i) above denominated in any foreign currency comparable in credit quality and tenor to those referred to above and commonly used by corporations for cash management purposes in any jurisdiction outside the United States of America to the extent reasonably required in connection with any business conducted by any Note Party or any Subsidiary, in each case, organized in such jurisdiction.

"Permitted Junior Intercreditor Agreement" means, with respect to any Liens on Collateral that are intended to be junior to any Liens on the Collateral securing the Note Obligations, the First Lien/Second Lien Intercreditor Agreement [or ●].

"Permitted Liens" has the meaning assigned to such term in Section 8.02.

"Permitted Refinancing Indebtedness" means any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); *provided*, that (a) the principal amount of such Permitted Refinancing Indebtedness does not exceed the principal amount of the Indebtedness so Refinanced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs and fees, commissions and expenses), (b) the final maturity date of such Permitted Refinancing Indebtedness is after the final maturity date of the Indebtedness being Refinanced and (ii) the Weighted Average Life to Maturity of such Permitted Refinancing Indebtedness (excluding customary amortization) is greater than or equal to the lesser of (i) the Weighted Average Life to Maturity of the Indebtedness being Refinanced and (ii) the Weighted Average Life to Maturity of the Notes then outstanding, (c) if the Indebtedness being Refinanced is subordinated in right of payment and/or in lien priority to the Note Obligations under this Indenture, such Permitted Refinancing Indebtedness shall be subordinated in right of payment and/or in lien priority, as applicable, to such Note Obligations on terms not materially less favorable to the Noteholder Parties as those contained in the documentation governing the Indebtedness being Refinanced (it being understood that secured Indebtedness may be Refinanced with unsecured Indebtedness), (d) no Permitted Refinancing Indebtedness shall have obligors that are not (or would not have been) obligated with respect to the Indebtedness being so Refinanced (*provided* that any Note Party may be an obligor for the Permitted Refinancing Indebtedness of any other Note Party), (e)(i) no Permitted Refinancing Indebtedness may be secured Indebtedness if the Indebtedness being Refinanced is unsecured Indebtedness as of the Closing Date and (ii) no Permitted Refinancing Indebtedness may be secured by any collateral that did not secure the Indebtedness being Refinanced as of the Closing Date, (f) the other terms of such Permitted Refinancing Indebtedness (other than interest rates, fees, floors, funding discounts and redemption or prepayment premiums and other pricing terms) are substantially similar to, or not more restrictive to the Issuer and its Subsidiaries than, the terms applicable to the Notes (except for (1) covenants or other provisions applicable only to periods after the Maturity Date or (2) those that

are otherwise reasonably acceptable to the Issuer and the Required Noteholder Parties (or, if more restrictive, the Note Documents are amended, prior to or concurrently with such Refinancing, to contain such more restrictive terms to the extent required to satisfy the foregoing standard), (g) at the time of such Refinancing, no Default or Event of Default shall have occurred or be continuing and (h) no Permitted Refinancing Indebtedness shall permit or require scheduled interest payments in cash in excess of 10.00% per annum (with variable interest rates converted to fixed rates based on implied forward interest rate curve for purposes of such determination).  Subject to the foregoing conditions, Permitted Refinancing Indebtedness may also be incurred in respect of any Indebtedness that constitutes Discharged Indebtedness.

"Permitted Warrant Transaction" means any call option, warrant or right to purchase (or substantively equivalent derivative transaction) on the Issuer's common stock sold by the Issuer substantially concurrently with any purchase by the Issuer of a related Permitted Bond Hedge Transaction.

"Person" or "person" means any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"Physical Note" means a Note (other than a Global Note) that is represented by a certificated Note in definitive, fully registered form (bearing the Restricted Notes Legend and not bearing the Global Notes Legend) and duly executed by the Issuer and authenticated by the Trustee.

"PIK Interest" has the meaning assigned to such term in Section 2.15(h).

"PIK Note" has the meaning assigned to such term in Section 2.15(h).

"Plan" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by the Issuer, any Subsidiary or any ERISA Affiliate or to which the Issuer, any Subsidiary or any ERISA Affiliate has or may have an obligation to contribute, and each such plan for the five-year period immediately following the latest date on which the Issuer, any Subsidiary or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"Platform" shall have the meaning assigned to such term in Section 7.04.

"Private Side Noteholder Party" shall have the meaning assigned to such term in Section 16.23.

"Preferred Stock" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"primary obligor" has the meaning assigned to such term in the definition of the term "Guarantee."

["Prior First Lien Indenture" means that certain Amended and Restated Indenture, dated as of October 11, 2024, by and among, the Issuer, the Subsidiary Guarantors party thereto from time to time and the Trustee, as amended, restated or supplemented from time to time.]

"Product Family" means (a) each product family (as referred to in the Issuer's most recent Form 10-K or Form 10-Q filings prior to the Closing Date or in any of the Issuer's Form 10-K or Form 10-Q filings after the Closing Date) and (b) shall also include (i) within the "materials" product family, each of (x) the bare wafers and (y) the epitaxial wafers, lines of business and (ii) within the "power devices" product family, each of (w) dies, (x) the Schottky diodes, (y) the metal oxide semiconductor field effect transistors (MOSFETs) and (z) the power modules, lines of business.

"Projections" means projections and any forward-looking statements (including statements with respect to booked business) of the Issuer and the Subsidiaries furnished to the Required Noteholder Parties by or on behalf of the Issuer or any of the Subsidiaries prior to the Closing Date.

"Public Noteholder Party" shall have the meaning assigned to such term in Section 16.23.

"Public Noteholder Party Information" shall have the meaning assigned to such term in Section 7.04.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Qualified Cash" has the meaning assigned to such term in Section 8.11.

"Qualified Equity Interests" means any Equity Interest other than Disqualified Stock.

"Real Property" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Note Party, whether by lease, license, or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"Record Date" has the meaning specified in Section 2.15(f).

"Refinance" has the meaning assigned to such term in the definition of the term "Permitted Refinancing Indebtedness," and "Refinanced" shall have a meaning correlative thereto.

"Register" has the meaning assigned to such term in Section 2.04(a).

"Registrar" has the meaning assigned to such term in Section 2.04(a).

"Regulation D" means Regulation D under the Securities Act, as such regulation may be amended, supplemented, replaced or otherwise modified from time to time.

"Regulation S" means Regulation S under the Securities Act, as such regulation may be amended, supplemented, replaced or otherwise modified from time to time.

"Regulation S Global Note" means a Global Note that is a Regulation S Note.

"Regulation S Note" means (A) each Note that, on the original issue date thereof, was issued and sold in reliance on Regulation S, and each Note issued in exchange therefor or substitution thereof; and (B) each Regulation S Note issued pursuant to Section 2.07(e) in exchange for, or upon the transfer of, another Note, and each Note issued in exchange therefor or substitution thereof; *provided*, *however*, that a Note will cease to be a Regulation S Note when such Note is transferred to, or exchanged for, a Note that is a Rule 144A Note or IAI Note.

"Regulation S Physical Note" means a Physical Note that is a Regulation S Note.

"Regulation T" means Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" means, with respect to any Noteholder, any other person that is engaged in making, purchasing, holding or otherwise investing in bank loans, debt securities or similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) such Noteholder, (b) an Affiliate of such Noteholder or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Noteholder.

"Related Parties" means, with respect to any specified person, such person's Controlled or Controlling Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such person and such person's Controlled or Controlling Affiliates.

"Release" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the Environment.

"Reportable Event" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder as to which the PBGC has not waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043 the requirement of Section 4043(a) of ERISA that it be notified of such event with respect to a Plan.

"Repurchase Offer" means an Asset Sale Offer, a Change of Control Offer, a Specified Transaction Offer, a DOE Offer or an Extraordinary Receipts Offer.

"Repurchase Offer Payment Date" has the meaning assigned to such term in Section 3.02(d).

"Required Noteholder Parties" means, at any time, Noteholder Parties (other than any Competitors and Ineligible Institutions) beneficially owning (including through beneficial interests) Notes that, taken together, represent more than 50% of the sum of all Notes (other than Notes held by any Competitors and Ineligible Institutions) outstanding at such time.

"Requirement of Law" means, as to any person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such person or any of its property or assets or to which such person or any of its property or assets is subject.

"Responsible Officer" means any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Indenture, or any other duly authorized employee or signatory of such person.

"Restricted Note Legend" means a legend substantially in the form set forth in Exhibit B-1.

"Restricted Payments" has the meaning assigned to such term in Section 8.06. The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the fair market value thereof (as determined by the Issuer in good faith).

"Rule 144A" means Rule 144A under the Securities Act, as such regulation may be amended, supplemented, replaced or otherwise modified from time to time.

"Rule 144A Global Note" means a Global Note that is a Rule 144A Note.

"Rule 144A Note" means (A) each Note that, on the original issue date thereof, was issued and sold in reliance upon Rule 144A and not Regulation S, and each Note issued in exchange therefor or substitution thereof; and (B) each Rule 144A Note issued pursuant to Section 2.07(e) in exchange for, or upon the transfer of, another Note, and each Note issued in exchange therefor or substitution thereof; *provided*, *however*, that a Note will cease to be a Rule 144A Note when such Note is transferred to, or exchanged for, a Note that is a Regulation S Note or an IAI Note.

"Rule 144A Physical Note" means a Physical Note that is a Rule 144A Note.

"Rule 501" means Rule 501 under the Securities Act.

"S&P" means S&P Global Ratings.

"Sale and Lease-Back Transaction" has the meaning assigned to such term in Section 8.03.

"Sanctioned Country" means at any time, a country, region or territory that is, or whose government is, the target of any comprehensive Sanctions, including, as of the Closing

Date, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria.

"Sanctioned Person" means at any time, any person with whom dealings are restricted or prohibited under Sanctions, including (i) any person listed in any Sanctions-related list of designated persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), or the U.S. Department of State), or equivalent lists maintained by the United Nations Security Council, the European Union or any EU member state, His Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (ii) any person located or organized in a Sanctioned Country or (iii) any person owned fifty (50) percent or more or controlled, directly or indirectly, by any such person described in clause (i) or (ii) of this definition.

"Sanctions" means sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by OFAC, the U.S. Department of State, or U.S. Department of Commerce, or (ii) the United Nations Security Council, the European Union or any of its member states, or His Majesty's Treasury of the United Kingdom.

"SEC" means the Securities and Exchange Commission or any successor thereto.

"Second Lien Convertible Notes" means the 2.5% Convertible Second Lien Senior Secured Notes due 2031 issued under the Second Lien Convertible Notes Indenture.

"Second Lien Convertible Notes Indenture" means the Indenture, dated as of the Closing Date, among the Issuer, as issuer, the guarantors party thereto from time to time and U.S. Bank Trust Company, National Association, as indenture trustee and as collateral agent, as such document may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Indenture

"Second Lien Renesas Notes" means the [*NOTES*] issued under the Second Lien Renesas Notes Indenture.

"Second Lien Renesas Notes Indenture" means the [*INDENTURE*], dated as of the Closing Date, among the Issuer, as issuer, the guarantors party thereto from time to time and U.S. Bank Trust Company, National Association, as indenture trustee and as collateral agent, as such document may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Indenture.

"Second Lien Takeback Notes" means the [*NOTES*] issued under the Second Lien Takeback Notes Indenture.

"Second Lien Takeback Notes Indenture" means the [*INDENTURE*], dated as of the Closing Date, among the Issuer, as issuer, the guarantors party thereto from time to time and U.S. Bank Trust Company, National Association, as indenture trustee and as collateral agent, as such document may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Indenture.

"Second Lien Notes" means, collectively, the Second Lien Takeback Notes, the Second Lien Renesas Notes and the Second Lien Convertible Notes.

"Second Lien Notes Indentures" means, collectively, the Second Lien Takeback Notes Indenture, the Second Lien Renesas Notes Indenture and the Second Lien Convertible Notes Indenture.

"Secured Parties" means, collectively, the Trustee, the Collateral Agent (including as the Parallel Debt Creditor), each Noteholder Party and each subagent appointed pursuant to Section 15.02 by the Trustee with respect to matters relating to the Note Documents or by the Collateral Agent (including as the Parallel Debt Creditor) with respect to matters relating to any Security Document.

"Securities Account" has the meaning assigned to such term in the Uniform Commercial Code.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Documents" means the Mortgages, the Collateral Agreement, each foreign collateral agreement, each Notice of Grant of Security Interest in Intellectual Property (as defined in the Collateral Agreement), each Account Control Agreement and each of the security agreements, pledge agreements and other instruments and documents executed and delivered at any time pursuant to any of the foregoing or pursuant to Section 7.10.

"Senior Indebtedness" has the meaning ascribed thereto in Section 13.01(b).

"Siler City Assets" means (i) any tangible personal or real property of the Issuer or its Subsidiaries located at, or used in, as of the Closing Date, the Siler City Facility and (ii) any tangible personal or real property purchased after the Closing Date and located at, or used in, the Siler City Facility from and after the Closing Date which did not fall into any other definition under this Indenture prior to such movement or use; *provided*, that, for the avoidance of doubt, Siler City Assets shall not include any intangible assets or property of the Issuer or its Subsidiaries.

"Siler City Facility" means the materials facility and campus in Siler City, North Carolina.

"Special Flood Hazard Area" has the meaning assigned to such term in Section 7.02(c).

"Specified Noteholder Parties" means, at any time, Noteholder Parties (other than any Competitors and Ineligible Institutions) beneficially owning (including through beneficial interests) Notes that, taken together, represent more than 50% of the aggregate principal amount of all Notes (other than Notes held by any Competitors and Ineligible Institutions) outstanding at such time; *provided* that the Specified Noteholder Parties shall include each Noteholder Party (other than any Competitors and Ineligible Institutions) that beneficially owns (together with its Affiliates) at least $100,000,000 of aggregate principal amount of outstanding Notes.

"Specified Transaction Offer" has the meaning assigned to such term in Section 3.02(h).

"Spot Rate" has the meaning assigned to such term in Section 1.04.

"Subagent" has the meaning assigned to such term in Section 15.02.

"subsidiary" means, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means, unless the context otherwise requires, a subsidiary of the Issuer.

"Subsidiary Guarantee Agreement" means the Subsidiary Guarantee Agreement dated as of the Closing Date as may be amended, restated, supplemented or otherwise modified from time to time, between each Subsidiary Guarantor and the Trustee.

"Subsidiary Guarantor" means (a) each Subsidiary of the Issuer that is not an Excluded Subsidiary and (b) any other Subsidiary of the Issuer that may be designated by the Issuer (by way of delivering to the Trustee of a supplement to the Subsidiary Guarantee Agreement duly executed by such Subsidiary) in its sole discretion from time to time to be a guarantor in respect of the Note Obligations, whereupon such Subsidiary shall be obligated to comply with the other requirements of Section 7.10(d) as if it were newly acquired.

"Successor Issuer" has the meaning assigned to such term in Section 8.05(o).

"Taxes" means any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority, whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Termination Date" means the date on which the principal of and interest on each Note, all Note Obligations, all Fees and all other expenses or amounts payable under any Note Document shall have been paid in full (other than in respect of contingent indemnification and expense reimbursement claims not then due).

"Test Date" means June 23 of each year commencing with [June 23, 2026].

"Test Period" means, on any date of determination, the period of four consecutive fiscal quarters of the Issuer then most recently ended (taken as one accounting period) for which financial statements have been (or were required to be) delivered pursuant to Section 7.04(a) or 7.04(b); *provided* that prior to the first date financial statements have been delivered pursuant to

Section 7.04(a) or 7.04(b), the Test Period in effect shall be the four fiscal quarter period ended [__], 2025[3].

"Third Party Funds" means any accounts or funds, or any portion thereof, received by the Issuer or any of its Subsidiaries as agent on behalf of third parties in accordance with a written agreement that imposes a duty upon the Issuer or one or more of its Subsidiaries to collect and remit those funds to such third parties.

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date of this Indenture.

"Transactions" means, collectively, the transactions to occur pursuant to the Note Documents, including (a) the execution, delivery and performance of the Note Documents, the creation of the Liens pursuant to the Security Documents, and the issuance of the Notes hereunder and (b) the payment of all fees and expenses to be paid and owing in connection with the foregoing.

"Transferee" means the transferee with respect to the sale, pledge, assignment, or other transfer of the Notes, in whole or in part, and of the rights of the Noteholder thereof with respect thereto and under this Indenture pursuant to Section 2.07.

"Transferee Letter" means a letter substantially in the form attached as Exhibit C-1 and accepted by the Trustee and the Issuer.

"Transferee Note" has the meaning assigned to such term in Section 2.07(e)(i)(3).

"Transferor Letter" means a letter substantially in the form attached as Exhibit C-2 and accepted by the Trustee and the Issuer.

"Treasury Rate" means, as of the applicable redemption (or repurchase) date, a rate per annum (computed on the basis of actual days elapsed over a year of 360 days) equal to the rate determined by the Issuer on the date three Business Days prior to the date of redemption (or repurchase), to be the yield expressed as a rate listed in The Wall Street Journal for United States Treasury securities having a term most nearly equal to the period from such redemption (or repurchase) date to June 23, 2026.  If the redemption (or repurchase) is in connection with a satisfaction and discharge or defeasance of the Indenture, the applicable Treasury Rate shall be computed as of the date that funds are irrevocably deposited with the Trustee to pay the amounts related thereto, as set forth in this Indenture.

"Trust Officer" means any officer:

(1)    within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust

---

[3] To be the fiscal quarter most recently ended prior to the Closing Date.

matter is referred because of such person's knowledge of and familiarity with the particular subject, and

(2)       who shall have direct responsibility for the administration of this Indenture.

"<u>Trustee</u>" means the party named as such in this Indenture, acting in its capacity as trustee hereunder, until a successor replaces it and, thereafter, means the successor.

"<u>Unfunded Pension Liability</u>" of any Plan means the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"<u>Uniform Commercial Code</u>" or "<u>UCC</u>" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"<u>USA PATRIOT Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107 56 (signed into law October 26, 2001)), as amended.

"<u>Weighted Average Life to Maturity</u>" means, when applied to any Indebtedness at any date, the number of years obtained by <u>dividing</u>:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; <u>by</u> (b) the then outstanding principal amount of such Indebtedness.

"<u>Wholly Owned Subsidiary</u>" of any person means a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person.  Unless the context otherwise requires, "Wholly Owned Subsidiary" means a Subsidiary of the Issuer that is a Wholly Owned Subsidiary of the Issuer.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02  <u>Terms Generally</u>.  The definitions set forth or referred to in <u>Section 1.01</u> shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  All references herein to Articles, Sections,

Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Indenture unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Indenture to any Note Document or other agreement or document shall mean such document as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof.  Except as otherwise expressly provided herein, any reference herein to any Requirement of Law means such Requirement of Law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time.  Except as otherwise expressly provided herein, references to any person shall mean and include such person's successors and assigns.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect on the Closing Date. If the Issuer or its Subsidiaries enters into any revolving, delayed draw or other committed debt facility, the Issuer may elect to determine compliance of such debt facility (including the incurrence of Indebtedness and Liens from time to time in connection therewith) with this Indenture and each other Note Document on the date definitive loan documents with respect thereto are executed by all parties thereto, assuming the full amount of such facility is incurred (and any applicable Liens are granted) on such date, in lieu of determining such compliance on any subsequent date (including any date on which Indebtedness is incurred pursuant to such facility).

SECTION 1.03  Effectuation of Transactions.  Each of the representations and warranties of the Issuer and its Subsidiaries contained in this Indenture and the other Note Documents (and all corresponding definitions) are made after giving effect to the Transactions, unless the context otherwise requires.

SECTION 1.04  Exchange Rates; Currency Equivalents.  Any amount specified in this Indenture or any of the other Note Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be reasonably determined by the Issuer  at such time on the basis of the Spot Rate for the purchase of such currency with Dollars.  The "Spot Rate" for a currency means the rate of exchange quoted by the Reuters Currencies Page (available at www.reuters.com/markets/currencies as of the Closing Date) for the applicable currency at 11:00 a.m. (New York time) on the date two Business Days prior to the date of such determination (or in the event such rate does not appear on any Reuters Currency Page, by reference to such other publicly available service for displaying exchange rates as the Issuer may determine to use in its reasonable discretion).  No Default or Event of Default shall arise as a result of any limitation or threshold set forth in Dollars in Article VIII or clause (f) or (j) of Section 10.01 being exceeded solely as a result of changes in currency exchange rates from those rates applicable on the first day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made and for the avoidance of doubt, no Default or Event of Default shall be deemed to have occurred solely as a result of a change in the rate of currency exchange occurring after the time of any relevant transaction so long as such relevant transaction was permitted at the time incurred, made, acquired, committed, entered or declared.

SECTION 1.05  Times of Day.  Unless otherwise specified herein, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

SECTION 1.06  <u>No Incorporation by Reference of Trust Indenture Act</u>.  This Indenture is not qualified under the TIA, and the TIA shall not apply to or in any way govern the terms of this Indenture.  As a result, no provisions of the TIA are incorporated into this Indenture unless expressly incorporated pursuant to this Indenture.

SECTION 1.07  <u>Accounting Terms</u>.  All accounting terms not specifically defined herein shall be construed in conformity with, and all financial data (including financial calculations) required to be submitted pursuant to this Indenture shall be prepared in conformity with, GAAP applied on a consistent basis, applied in a manner consistent with that used in preparing the Historical Audited Financial Statements, except as otherwise specifically prescribed herein.  Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Issuer and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 on financial liabilities shall be disregarded.

## ARTICLE II.

## THE NOTES

SECTION 2.01  <u>Amount of Notes</u>.

(a)  The aggregate principal amount of Notes which may be authenticated and delivered under this Indenture on the Closing Date is $[__] (which principal amount may exceed $[__] subsequently to the Closing Date as a result of the payment of PIK Interest).

SECTION 2.02  <u>Form and Dating</u>.

(a)  The Notes issued on the Closing Date will be initially issued and available for transfer and exchange in accordance with the terms of this Indenture to (1) IAIs in accordance with Rule 501(a)(1), (2), (3) or (7) of Regulation D, (2) QIBs in reliance on Regulation D or Rule 144A, as applicable, and (3) persons that are Non-U.S. Persons in offshore transactions (as defined in Rule 902(h) of Regulation S) in compliance with Rule 903 or Rule 904 under Regulation S.

(b)  The Notes and the Trustee's certificate of authentication shall be originally issued as one or more Global Notes in substantially the form of <u>Exhibit A</u> hereto, which is hereby incorporated in and expressly made a part of this Indenture.  The Notes may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Issuer or any Subsidiary Guarantor is subject, if any, or usage (*provided*, that any such notation, legend or endorsement is in a form acceptable to the Issuer).  Each Note shall be dated the date of its authentication, except that PIK Notes shall be dated as of the Interest Payment Date to which they relate.  The Notes shall be issued in registered form without interest coupons and in denominations of an integral multiple of the Notes Multiple and not less than the Notes Minimum, except as may be necessary to enable the registration of transfer by a Noteholder of its entire holding of Notes. At closing, the Issuer will deliver any Physical Notes to (x) the Custodian, on behalf of each Noteholder that requests the Custodian to hold such Noteholder's

Notes on its behalf (each such Noteholder, an "Electing Noteholder"), the Notes purchased by such Electing Noteholder, registered in the name of such Electing Noteholder or (y) such other person as directed by any Noteholder, on behalf of each Noteholder that requests such person to hold such Noteholder's Notes on its behalf, the Notes purchased by such Noteholder, registered in the name of such Noteholder.

SECTION 2.03  Execution and Authentication.  The Trustee shall authenticate and make available for delivery upon a written order of the Issuer signed by one Responsible Officer of the Issuer the Notes for original issue on the Closing Date in an aggregate original principal amount of $[__].

One Responsible Officer shall sign each of the Notes for the Issuer by manual, facsimile or electronic signature (including ".pdf" or DocuSign or other electronic signature platform).

If a Responsible Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid nor shall it be entitled to any benefit under this Indenture until an authorized signatory of the Trustee signs the certificate of authentication on the Note by manual signature.  The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee may appoint one or more authenticating agents reasonably acceptable to the Issuer to authenticate the Notes on behalf of the Trustee by manual signature.  Any such appointment shall be evidenced by an instrument signed by a Trust Officer, a copy of which shall be furnished to the Issuer.  Unless limited by the terms of such appointment, an authenticating agent may authenticate the Notes whenever the Trustee may do so by manual signature.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent or agent for service of notices and demands.

SECTION 2.04  Registrar, Paying Agent and Custodian.

(a)      The Issuer shall maintain (i) an office or agency where Notes may be presented for registration of transfer or for exchange (the "Registrar") and (ii) an office or agency where Notes may be presented for payment (the "Paying Agent").  The Registrar shall keep at its Corporate Trust Office books for (i) the recordation of the names and addresses of the Noteholders, (ii) the registration and transfer of the Notes and (iii) principal amounts (and stated interest) of the applicable Notes owing to, each Noteholder pursuant to the terms hereof from time to time (the "Register").  The Issuer shall appoint and maintain a person (other than the Issuer or its Affiliates) that will hold the Notes on behalf of the Depositary and each Electing Noteholder of a Physical Note (the "Custodian").  The Issuer hereby appoints the Trustee the Registrar, Custodian and Paying Agent to keep such books and make such assignments, registrations and transfers as are hereinafter set forth in this Section 2.04 and also authorizes and directs the Trustee to provide a copy of such assignment, registration or transfer record to any Paying Agent upon its request.  The entries in the Register shall be conclusive absent manifest error, and the Issuer, the Trustee and the

40

Noteholder Parties shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Noteholder hereunder for all purposes of this Indenture, notwithstanding notice to the contrary.   The Register shall be available for inspection by the Issuer or any Noteholder Party (but only, in the case of a Noteholder Party, at the Trustee's office and only with respect to any entry relating to such Noteholder Party's Notes), at any reasonable time and from time to time upon reasonable prior notice. The intention of this Section 2.04(a) is that the Notes be treated as registered for purposes of Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations and Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(b)      If a person other than the Trustee is appointed by the Issuer to maintain the Register, the Issuer will give the Trustee and any Paying Agent prompt written notice of such appointment and of the location, and any change in the location, of the successor Registrar and the Trustee and the Paying Agent shall have the right to inspect the Register at all reasonable times and to obtain copies thereof, and the Trustee shall have the right to conclusively rely upon a certificate executed on behalf of the Registrar by an officer thereof as to the names and addresses of the Noteholders and the principal amounts and number of such Notes.

(c)      The Issuer may enter into an appropriate agency agreement with any Registrar or Paying Agent not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such agent.  The Issuer shall notify the Trustee in writing of the name and address of any such agent.  If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 11.07.  The Issuer or any of its domestically organized Subsidiaries may act as Paying Agent or Registrar.

(d)      The Issuer may remove any Registrar or Paying Agent upon written notice to such Registrar or Paying Agent and to the Trustee; *provided*, *however*, that no such removal shall become effective until (i) if applicable, acceptance of an appointment by a successor Registrar or Paying Agent, as the case may be, as evidenced by an appropriate agreement entered into by the Issuer and such successor Registrar or Paying Agent, as the case may be, and delivered to the Trustee or (ii) notification to the Trustee that the Trustee shall serve as Registrar or Paying Agent until the appointment of a successor in accordance with clause (i) above.  The Registrar or Paying Agent may resign at any time upon written notice to the Issuer and the Trustee; *provided*, *however*, that the Trustee may resign as Paying Agent or Registrar only if the Trustee also resigns as Trustee in accordance with Section 11.08.

(e)      The Custodian's sole responsibility is to take and hold in safe-keeping the Notes for which it is acting as Custodian (the "Custodied Notes") on behalf of the Depositary and each Electing Noteholder. The Custodian shall transfer any Custodied Notes and surrender any Custodied Notes only in accordance with the written direction of the Electing Noteholder in whose name such Notes are registered; *provided* that the Custodian is hereby directed by each Electing Noteholder to (x) surrender such Custodied Note (or applicable portion thereof) called for redemption or repurchase pursuant to Section 3.01 or 3.02 and (y) to surrender such Custodied Note to the Issuer on the Maturity Date. The Custodian's duty with respect to a Custodied Note in its physical possession shall be limited to the exercise of reasonable care by the Custodian with respect to such Custodied Note in its physical possession. For the avoidance of doubt, notwithstanding that the Custodian may have physical possession of any Note with

41

respect to which it is acting in its capacity as Custodian, such Note shall nonetheless be the property solely of the Electing Noteholder of such Custodied Note.

(f)        The Custodian hereby agrees to act in its capacity as such with respect to, and hereby agrees to take and hold in accordance with <u>Section 2.04</u>, the Notes of the Depositary and each Electing Noteholder. If, following the Closing Date, any Electing Noteholder shall inform the Custodian in writing (including by e-mail) that such Electing Noteholder no longer wishes the Custodian to act in its capacity as such with respect to any Notes of such Electing Noteholder, the Custodian will promptly cause such Notes to be delivered to such Electing Noteholder by first-class mail (or by such other delivery method as such Electing Noteholder and the Custodian shall agree). Upon the written request of any Noteholder, the Custodian shall act in its capacity as such with respect to, and shall take and hold in accordance with this <u>Section 2.04</u>, the Notes of such Noteholder.

(g)        Each Noteholder of a Physical Note shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Issuer to such Noteholder in respect of the Notes, including the amounts of principal and interest paid and payable to such Noteholder from time to time hereunder. Failure to make any such recordation, or any error in such recordation, shall not affect the Issuer's obligations in respect of the Notes. Such accounts shall be prima facie evidence of the existence and the amount of the obligations recorded therein (absent manifest error); *provided* that, in the event of any inconsistency between such accounts and the Register, the Register shall govern.

SECTION 2.05  <u>Paying Agent to Hold Money in Trust</u>.  On or prior to each due date of the principal of and interest on any Note, the Issuer shall deposit with each Paying Agent (or if the Issuer or a Subsidiary is acting as Paying Agent, segregate and hold in trust for the benefit of the persons entitled thereto) a sum sufficient to pay such principal and interest when so becoming due.  The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that a Paying Agent shall hold in trust for the benefit of Noteholders or the Trustee all money held by a Paying Agent for the payment of principal of and interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment.  If the Issuer or a Subsidiary of the Issuer acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it in trust for the benefit of the persons entitled thereto.  The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent.  Upon complying with this <u>Section 2.05</u>, a Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06  <u>Noteholder Lists</u>.  The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Noteholders.  If the Trustee is not the Registrar, the Issuer shall furnish, or cause the Registrar to furnish, to the Trustee, in writing at least five Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Noteholders.

SECTION 2.07  <u>Transfer and Exchange</u>.

(a)    A Note (or any interest therein) may not be transferred in whole or in part except in accordance with this <u>Section 2.07</u>.  Upon written request by a Noteholder of the Notes and such Noteholder's compliance with the provisions of this <u>Section 2.07</u>, the Registrar shall register the transfer or exchange of a Physical Note or beneficial interest in a Global Note evidencing such Noteholder's interest in the Notes.  Prior to such registration of transfer or exchange of a Physical Note, the requesting Noteholder shall present or surrender to the Registrar the Physical Note duly endorsed and accompanied by a Transferor Letter and Transferee Letter duly executed by such Noteholder or Transferee, as applicable, and acknowledged by the Issuer, in each case duly authorized in writing.  In addition, the requesting Noteholder and its Transferee (if applicable) shall provide any additional certifications, documents and information, as applicable, required pursuant to <u>Section 2.07(b)</u>.  For the avoidance of doubt, any transfer or exchange of any Note will be effected using the assignment form attached to the form of note attached hereto as <u>Exhibit A</u>.

(b)    No transfer or exchange of any Note or interest therein shall be made unless such transfer or exchange is made pursuant to a transaction that is exempt from registration under the Securities Act.  None of the Issuer, the Trustee or the Registrar is obligated to register or qualify any Notes under the Securities Act or any other securities law or to take any action not otherwise required under this Indenture to permit the transfer or exchange of any Note or interest therein without registration or qualification.  Any Noteholder desiring to effect such a transfer or exchange shall, and does hereby agree to, indemnify the Issuer, the Trustee and the Registrar against any liability that may result if the transfer or exchange is not so exempt or is not made in accordance with the Securities Act and all other applicable federal and state laws.

(c)    <u>Transfers and Exchanges of Global Notes</u>

(i)    Subject to the immediately following sentence and this <u>Section 2.07</u>, no Global Note may be transferred or exchanged in whole except (x) by the Depositary to a nominee of the Depositary; (y) by a nominee of the Depositary to the Depositary or to another nominee of the Depositary; or (z) by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. No Global Note (or any portion thereof) may be transferred to, or exchanged for, a Physical Note; *provided*, *however*, that a Global Note will be exchanged, pursuant to customary procedures, for one or more Physical Notes if:

(1)    (x) the Depositary notifies the Issuer or the Trustee that the Depositary is unwilling or unable to continue as depositary for such Global Note or (y) the Depositary ceases to be a "clearing agency" registered under Section 17A of the Exchange Act and, in each case, the Issuer fails to appoint a successor Depositary within ninety (90) days of such notice or cessation;

(2)    an Event of Default has occurred and is continuing and the Issuer, the Trustee or the Registrar has received a written request from the Depositary, or from a holder of a beneficial interest in such Global Note, to exchange such Global Note or beneficial interest, as applicable, for one or more Physical Notes; or

(3)   the Issuer, in its sole discretion, permits the exchange of any beneficial interest in such Global Note for one or more Physical Notes at the request of the owner of such beneficial interest.

(ii)   Upon satisfaction of the requirements of this Indenture to effect a transfer or exchange of any Global Note (or any portion thereof):

(1)   the Trustee will reflect any resulting decrease of the principal amount of such Global Note by notation on the "Schedule of Exchanges of Interests in the Global Note" forming part of such Global Note (and, if such notation results in such Global Note having a principal amount of zero, then the Issuer may (but is not required to) instruct the Trustee to cancel such Global Note pursuant to Section 2.10);

(2)   if required to effect such transfer or exchange, then the Trustee will reflect any resulting increase of the principal amount of any other Global Note by notation on the "Schedule of Exchanges of Interests in the Global Note" forming part of such other Global Note;

(3)   if required to effect such transfer or exchange, then the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with Section 2.03, a new Global Note bearing each legend, if any, required by Section 2.07(f); and

(4)   if such Global Note (or such portion thereof), or any beneficial interest therein, is to be exchanged for one or more Physical Notes, then the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with Section 2.03, one or more Physical Notes that (x) are in a Notes Multiple and have an aggregate principal amount equal to the principal amount of such Global Note to be so exchanged; (y) are registered in such name(s) as the Depositary specifies (or as otherwise determined pursuant to customary procedures); and (z) bear each legend, if any, required by Section 2.07(f).

(iii)   Each transfer or exchange of a beneficial interest in any Global Note will be made in accordance with the Depositary Procedures.

(d)   Transfers and Exchanges of Physical Notes

(i)   Subject to this Section 2.07, a Noteholder of a Physical Note may (x) transfer such Physical Note (or any portion thereof in a Notes Multiple) to one or more other Person(s); (y) exchange such Physical Note (or any portion thereof in a Notes Multiple) for one or more other Physical Notes in a Notes Multiple having an aggregate principal amount equal to the aggregate principal amount of the Physical Note (or portion thereof) to be so exchanged; and (z) if then permitted by the Depositary Procedures, transfer such Physical Note (or any portion thereof in a Notes Multiple) in exchange for a beneficial interest in one or

44

more Global Notes; *provided*, *however*, that, to effect any such transfer or exchange, such Noteholder must:

(1) surrender such Physical Note to be transferred or exchanged to the office of the Registrar, together with any endorsements or transfer instruments reasonably required by the Issuer, the Trustee or the Registrar; and

(2) deliver such certificates, documentation or evidence as may be required by the Trustee or may be required to comply with the applicable procedures of the Depositary.

(ii) Upon the satisfaction of the requirements of this Indenture to effect a transfer or exchange of any Physical Note (such Physical Note being referred to as the "old Physical Note" for purposes of this Section 2.07(d)(ii)) of a Noteholder (or any portion of such old Physical Note in a Notes Multiple pursuant to clause (ii) of thereof):

(1) such old Physical Note will be promptly cancelled pursuant to Section 2.10;

(2) if such old Physical Note is to be so transferred or exchanged only in part, then the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with Section 2.03, one or more Physical Notes that (x) are in a Notes Multiple and have an aggregate principal amount equal to the principal amount of such old Physical Note not to be so transferred or exchanged; (y) are registered in the name of such Noteholder; and (z) bear each legend, if any, required by Section 2.07(f);

(3) in the case of a transfer:

(a) to the Depositary or a nominee thereof that will hold its interest in such old Physical Note (or such portion thereof) to be so transferred in the form of one or more Global Notes, the Trustee will reflect an increase of the principal amount of one or more existing Global Notes by notation on the "Schedule of Exchanges of Interests in the Global Note" forming part of such Global Note(s), which increase(s) are in a Notes Multiple and aggregate to the principal amount to be so transferred, and which Global Note(s) bear each legend, if any, required by Section 2.07(f); *provided*, *however*, that if such transfer cannot be so effected by notation on one or more existing Global Notes (whether because no Global Notes bearing each legend, if any, required by Section 2.07(f) then exist, because any such increase will result in any Global Note having an aggregate principal amount exceeding the maximum aggregate principal amount permitted by the Depositary or otherwise), then the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with Section 2.03, one or more Global Notes that (x) are in a Notes Multiple and have an aggregate principal amount equal to the principal amount that is to be so

45

transferred but that is not effected by notation as provided above; and (y) bear each legend, if any, required by Section 2.07(f); and

(b)      to a Transferee that will hold its interest in such old Physical Note (or such portion thereof) to be so transferred in the form of one or more Physical Notes, the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with Section 2.03, one or more Physical Notes that (x) are in a Notes Multiple and have an aggregate principal amount equal to the principal amount to be so transferred; (y) are registered in the name of such Transferee; and (z) bear each legend, if any, required by Section 2.07(f); and

(4)      in the case of an exchange, the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with Section 2.03, one or more Physical Notes that (x) are in a Notes Multiple and have an aggregate principal amount equal to the principal amount to be so exchanged; (y) are registered in the name of the Person to whom such old Physical Note was registered; and (z) bear each legend, if any, required by Section 2.07(f).

(e)      Restrictions Applicable to Transfers Between Rule 144A Notes, Regulation S Notes and IAI Notes.

(i)      None of the following transfers will be effected unless the requirements set forth in Section 2.07(e)(ii) are satisfied with respect to such transfer:

(1)      the transfer of a Rule 144A Physical Note, or a beneficial interest in a Rule 144A Global Note, to a Person who takes delivery thereof in the form of a Physical Note, or a beneficial interest in a Global Note, which, in each case, is a Regulation S Note or an IAI Note;

(2)      the transfer an IAI Physical Note, or a beneficial interest in an IAI Global Note, to a Person who takes delivery thereof in the form of a Physical Note, or a beneficial interest in a Global Note, which, in each case, is a Rule 144A Note or a Regulation S Note; and

(3)      a transfer of a Regulation S Physical Note, or a beneficial interest in a Regulation S Global Note, to a Person who takes delivery thereof in the form of a Physical Note, or a beneficial interest in a Global Note, which, in each case, is a Rule 144A Note or an IAI Note (such Note of which such Person referred to in preceding clause (1), (2) or (3), as applicable, is to take delivery being referred to as the "Transferee Note" for purposes of this Section 2.07(e)).

(ii)      A transfer described in Section 2.07(e)(i) will not be effected unless:

(1)      in the case the Transferee referred to in Section 2.07(e)(i) is to take delivery of the Transferee Note in the form of a beneficial interest in a

46

Global Note, the Noteholder delivers to the Registrar (1) a written order from a Depositary Participant or an indirect Depositary Participant given to the Depositary in accordance with the Depositary Procedures directing the Depositary to credit or cause to be credited a beneficial interest in such Global Note in an amount equal to the interest to be transferred; and (2) instructions given in accordance with the Depositary Procedures containing information regarding the Depositary Participant account to be so credited, or, in lieu of the foregoing, such other instructions or documentation as the Registrar may reasonably require in order to comply with the Depositary Procedures in connection with such transfer;

(2)    such Noteholder delivers to the Registrar a certificate substantially in the form set forth in Exhibit C-1 hereto, including the certification set forth in Item 1 thereof (if the Transferee Note is a Rule 144A Note), Item 3 thereof (if the Transferee Note is an IAI Note) or Item 2 thereof (if the Transferee Note is a Regulation S Note), or, in lieu thereof, such other certifications or documentation substantially to the same effect (or, with respect to any Global Note, such other electronic or other documentation or instructions as may be permitted or required by the Depositary Procedures) as may be reasonably acceptable to the Issuer; and

(3)    such Transferee delivers to the Registrar, if reasonably requested by the Company or the Registrar, a certificate substantially in the form set forth in Exhibit C-2 hereto, including the certification set forth in Item 1(a) thereof (if the Transferee Note is a Rule 144A Note), Item 1(b) thereof (if the Transferee Note is an IAI Note) or Item 1(c) thereof (if the Transferee Note is a Regulation S Note), or, in lieu thereof, such other certifications or documentation substantially to the same effect (or, with respect to any Global Note, such other electronic or other documentation or instructions as may be permitted or required by the Depositary Procedures) as may be reasonably acceptable to the Issuer.

(f)    <u>Legend</u>.

(i)    Each Global Note will bear the Global Note Legend (or any similar legend, not inconsistent with this Indenture, required by the Depositary for such Global Note).

(ii)    Each Note (and all Notes issued in exchange therefor or in substitution thereof) will bear the Restricted Note Legend and the OID Legend.

(iii)    A Noteholder's acceptance of any Note bearing any legend required by this <u>Section 2.07(f)</u> will constitute such Noteholder's acknowledgment of, and agreement to comply with, the restrictions set forth in such legend.

(g)    <u>Additional Obligations with Respect to Transfers and Exchanges of Notes</u>.

(i)    To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate, Notes in the manner provided in this Indenture at the Registrar's request.

(ii)     No service charge shall be made for any registration of transfer or exchange of Notes, but the Issuer may require payment of a sum sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith.

(iii)     Notwithstanding anything to the contrary in this Indenture or the Notes, a Note may not be transferred or exchanged in part unless the portion to be so transferred or exchanged is in a Notes Multiple.

(iv)     Prior to the due presentation for registration of transfer of any Note, the Issuer, the Subsidiary Guarantors, the Trustee, the Paying Agent and the Registrar may deem and treat the person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Issuer, the Subsidiary Guarantors, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

(v)     All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

(vi)     The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under applicable law with respect to any transfer of any interest in any Note other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine compliance as to form with the express requirements hereof.

(vii)     The Issuer shall not be required to make, and the Registrar need not register, transfers or exchanges of Notes selected for redemption (except, in the case of Notes to be redeemed in part, the portion thereof not to be redeemed) or of any Notes for a period of 15 days before a selection of Notes to be redeemed.

Neither the Trustee nor any agent thereof shall have any responsibility or liability for any actions taken or not taken by the Depositary. The Trustee may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and beneficial owners. None of the Issuer, the Trustee or any agent of the Issuer or the Trustee shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Note or maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

Neither the Issuer nor the Trustee shall have any responsibility or liability for any act or omission of the Depositary. All notices and communications to be given to the Noteholders and all payments to be made to Noteholders in respect of the Notes shall be given or made only to the registered Noteholder(s) (which shall be the Depositary or its nominee in the case of a Global Note).

Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Registrar shall be responsible for ascertaining whether any transfer complies with the registration provisions of, or the exemptions from, the Securities Act, applicable state securities laws, or other applicable law.  Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Registrar shall be required to obtain any certificate, approvals or other documents required by the terms of this Indenture if the Trustee has not been notified in writing of any transfer requiring such a certificate, approval or other documents to be presented by the proposed transferor or transferee.

Any holder of a beneficial interest in a Global Note shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in such Global Note may be effected only through a book-entry system maintained by (a) the Noteholder of such Global Note (or its agent) or (b) any holder of a beneficial interest in such Global Note, and that ownership of a beneficial interest in such Global Note shall be required to be reflected in a book entry.

SECTION 2.08  Replacement Notes.  If a mutilated Note is surrendered to the Registrar or if the Noteholder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note if the requirements of Section 8-405 of the Uniform Commercial Code are met, such that the Noteholder (a) satisfies the Issuer and the Trustee within a reasonable time after such Noteholder has notice of such loss, destruction or wrongful taking and the Registrar does not register a transfer prior to receiving such notification, (b) makes such request to the Issuer and the Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uniform Commercial Code (a "protected purchaser") and (c) satisfies any other reasonable requirements of the Issuer and the Trustee.  If required by the Trustee or the Issuer, such Noteholder shall furnish an indemnity bond sufficient in the judgment of the Trustee, with respect to the Trustee, and the Issuer, with respect to the Issuer, to protect the Issuer, the Trustee, the Paying Agent and the Registrar, as applicable, from any loss or liability that any of them may suffer if a Note is replaced and subsequently presented or claimed for payment.  The Issuer and the Trustee may charge the Noteholder for their expenses in replacing a Note (including without limitation, attorneys' fees and disbursements in replacing such Note).  In the event any such mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay such Note instead of issuing a new Note in replacement thereof.

Every replacement Note is an additional obligation of the Issuer.

The provisions of this Section 2.08 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Notes.

SECTION 2.09  Outstanding Notes.  Notes outstanding at any time are all Notes authenticated by the Trustee (giving effect to, and as increased by, any payment of PIK Interest made thereon by increasing the aggregate principal amount of Global Notes by an amount equal to the PIK Interest payable and with respect to Notes represented by Physical Securities, any PIK Notes issued after the Closing Date) except for those canceled by it, those delivered to it for cancellation and those described in this Section as not outstanding.

49

If a Note is replaced pursuant to Section 2.08 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If a Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal and interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and no Paying Agent is prohibited from paying such money to the Noteholders on that date pursuant to the terms of this Indenture, then on and after that date such Notes (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10   Cancellation.  Upon the redemption or repurchase of any Notes by the Issuer or any Subsidiary, such Notes shall be delivered to the Trustee for cancellation. The Registrar and each Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Notes in accordance with its customary procedures. The Issuer may not issue new Notes to replace Notes they have redeemed, paid or delivered to the Trustee for cancellation. The Trustee shall not authenticate Notes in place of canceled Notes other than pursuant to the terms of this Indenture.

SECTION 2.11   Defaulted Interest.  If the Issuer defaults in a payment of interest on the Notes, the Issuer shall pay the defaulted interest then borne by the Notes (plus interest on such defaulted interest to the extent lawful) pursuant to Section 2.15(b) in any lawful manner. The Issuer may pay the defaulted interest to the persons who are Noteholders on a subsequent special record date. The Issuer shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail or cause to be mailed to each affected Noteholder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.12   CUSIP and ISIN Numbers.  The Issuer may use one or more CUSIP or ISIN numbers to identify any of the Notes, and, if so, the Issuer and the Trustee will use such CUSIP or ISIN number(s) in notices to Noteholders; *provided*, *however*, that (i) the Trustee makes no representation as to the correctness or accuracy of any such CUSIP or ISIN number; and (ii) the effectiveness of any such notice will not be affected by any defect in, or omission of, any such CUSIP or ISIN number. The Issuer will promptly notify the Trustee of any change in the CUSIP or ISIN number(s) identifying any Notes.

SECTION 2.13   Calculation of Principal Amount of Notes.  The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes at such date of determination. With respect to any matter requiring consent, waiver, approval or other action of the Noteholders of a specified percentage of the principal amount of all the Notes, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes, the Noteholders of which have so consented, by (b) the aggregate principal amount, as of such date of

50

determination, of the Notes then outstanding, in each case, as determined in accordance with the preceding sentence, and Section 2.09 of this Indenture, and, if applicable, the definitions of "Required Noteholder Parties" and "Specified Noteholder Parties". Any calculation of the Make-Whole Redemption Price made pursuant to this Indenture or the Notes shall be made by the Issuer and delivered to the Trustee pursuant to an Officer's Certificate. The Trustee shall have no obligation to confirm or verify any such calculation. The Issuer and the Trustee agree that any action of the Noteholders may be evidenced by the Depositary's applicable procedures or by such other procedures as the Issuer and Trustee may agree.

SECTION 2.14  [Reserved].

SECTION 2.15  Interest.

(a)      The Notes shall bear interest at the Interest Rate.

(b)      Notwithstanding the foregoing, during the continuance of an Event of Default, at the option of the Required Noteholder Parties (and automatically upon an Event of Default under Sections 10.01(b), (c), (h) or (i)), the principal amount of all Notes outstanding and, to the extent permitted by applicable law, any interest payments on the Notes or any fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) payable on demand, at a rate per annum equal to 2.00% plus the rate otherwise applicable to such Note as provided in the preceding clauses of this Section 2.15; *provided*, that this clause (b) shall not apply to any Event of Default that has been waived by the Required Noteholder Parties pursuant to Section 13.01.

(c)      Accrued interest on each Note shall be payable in arrears (i) on each Interest Payment Date and (ii) on the applicable Maturity Date; *provided*, that (A) interest accrued pursuant to clause (b) of this Section 2.15 shall be payable on demand and (B) in the event of any redemption of any Note, accrued interest on the principal amount redeemed shall be payable on the date of such redemption to, but excluding, the date of such redemption.

(d)      All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)      Notwithstanding anything herein to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under applicable law (collectively, the "Charges"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Noteholder Party, shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by such Noteholder Party in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Noteholder Party, shall be limited to the Maximum Rate; *provided*, that such excess amount shall be paid to such Noteholder Party on subsequent payment dates to the extent not exceeding the legal limitation.

(f)     The Issuer shall pay interest on the Notes (except interest accrued pursuant to clause (b) of this <u>Section 2.15</u>) to the Paying Agent for the account of the persons who are registered Noteholders at the close of business, whether or not a Business Day, 15 days prior to an Interest Payment Date (each a "<u>Record Date</u>"). The Issuer shall pay interest accrued pursuant to clause (b) of this <u>Section 2.15</u> to the Paying Agent for the account of the registered Noteholders as of a subsequent special record date, which the Issuer shall fix or cause to be fixed and notice of which the Issuer shall promptly mail or cause to be mailed to each affected Noteholder, which notice shall state the special record date, the payment date and the amount of such interest to be paid.

(g)     In the event that the Interest Rate on the Notes is decreased as a result of the occurrence of the Interest Rate Step-Down Condition (the date of any such occurrence, an "<u>Interest Rate Trigger Date</u>"), the Issuer shall promptly (and in any event no later than ten (10) Business Days prior to the next Interest Payment Date) notify the Trustee and Noteholders in an Officer's Certificate of (i) the occurrence of such event, (ii) the applicable Interest Rate as a result of such decrease, (iii) the Interest Rate Trigger Date, and (iv) the calculation of interest due on the next succeeding Interest Payment Date (such notice, the "<u>Interest Rate Officer's Certificate</u>"). Unless and until the Trustee receives an Interest Rate Officer's Certificate, the Trustee may conclusively and without liability assume that the Interest Rate remains unchanged.

(h)     The amounts payable pursuant to clauses (i)(x) and (ii) of the definition of "Interest Rate" shall be payable in cash on each Interest Payment Date (and such payments are referred to herein as "<u>Cash Interest</u>"), and the amounts payable pursuant to clause (i)(y) of the definition of "Interest Rate" shall be payable in kind on each Interest Payment Date by increasing the outstanding principal amount of the Global Notes or by issuing Physical Notes under this Indenture having the same terms as the then-existing Notes, except that the issuance price, the issuance date and the initial Interest Payment Date may vary (the "<u>PIK Notes</u>"), in either case, in the amount of interest so paid in kind on such Note (and such payment is referred to herein as "<u>PIK Interest</u>").  To the extent the aggregate amount of interest paid on any Interest Payment Date is paid partially in the form of Cash Interest and partially in the form of  PIK Interest, each Note shall be entitled to the same percentage of Cash Interest and the same percentage of PIK Interest as each other Note. On each Interest Payment Date on which the Issuer pays interest in the form of PIK Interest as provided above, the Trustee shall increase the principal amount of each Global Note by an amount equal to the amount of interest payable in kind on such Global Note on such Interest Payment Date and an adjustment shall be made on the books and records of the Trustee with respect to each Note to reflect such increase as a result of the payment of such PIK Interest; <u>provided</u>, however, that if such amount of interest payable in kind is not a whole dollar, then such amount will be rounded to the nearest dollar (with 5/10ths rounded upwards).  On any Interest Payment Date on which the Issuer pays PIK Interest by issuing PIK Notes in the form of Physical Notes, the Issuer shall deliver to the Trustee PIK Notes duly executed by the Issuer together with an Issuer's Order requesting the authentication of such PIK Notes by the Trustee, with the principal amount of any such PIK Note (for the relevant interest as of the relevant Record Date for such Interest Payment Date).  All Notes issued representing PIK Interest will mature on their Stated Maturity and will be governed by, and subject to the terms, provisions and conditions of, this Indenture and shall have the same rights and benefits as the other Notes outstanding hereunder.  Any Physical Notes that are PIK Notes will be issued with the description "PIK Notes" on the face of such PIK Notes. For the avoidance

of doubt, for all purposes of this Indenture, all references to the "principal amount" of the Notes shall mean the outstanding principal amount as it has been increased as a result of all PIK Interest. Any payment of PIK Interest on a Note that would result in the principal balance of such Note not being in a Notes Multiple shall be increased to the next Notes Multiple. The Notes, including any PIK Notes, shall be treated as a single class for all purposes under this Indenture, including directions provided to the Trustee pursuant to Section 10.05, waivers, amendments, redemptions and offers to purchase, and shall rank on a parity basis in right of payment and security.

(i)     The amount of PIK Interest required to be paid on any Note for any Interest Payment Date shall be considered paid by the Issuer (i) with respect to Global Notes, on the applicable Interest Payment Date when the Trustee shall have increased the principal amount of such Global Notes by an amount equal to all interest payable in kind on such Global Notes on such Interest Payment Date; and (ii) with respect to Physical Notes, on the Interest Payment Date when the Issuer shall have delivered the PIK Notes duly executed by the Issuer together with an Issuer's Order requesting the authentication of such PIK Notes by the Trustee. Upon any increase in the principal amount of any Global Note or issuance of PIK Notes in respect of PIK Interest, such Note will bear interest on such increased principal amount. Notwithstanding the foregoing or anything to the contrary herein, on the Maturity Date, the Issuer shall pay all accrued and unpaid interest on the Notes entirely in cash and accrued and unpaid interest shall also be required to be paid entirely in cash in connection with any redemption, repurchase, exchange, offer to redeem or repurchase or any other principal payment to the extent accrued on the principal amount then being redeemed, repurchased, exchanged or paid and, upon any acceleration of the Notes, any accrued and unpaid interest on the aggregate principal amount of the Notes so accelerated shall be required to be entirely in cash.

SECTION 2.16  Payments Generally; Pro Rata Treatment.

(a)     Unless otherwise specified, the Issuer shall make each payment required to be made by it hereunder (whether of principal, interest or fees or otherwise) prior to 11:00 a.m., Local Time, on the date when due, in immediately available funds. Each such payment shall be made without condition or deduction for any defense, recoupment, set-off or counterclaim. Any amounts received after such time on any date shall be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Paying Agent for the account of the applicable Noteholders, except that payments pursuant to Section 11.07 shall be made directly to the persons entitled thereto. The Paying Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and no interest shall accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period. All payments made under the Note Documents shall be made in Dollars. Any payment required to be made by the Paying Agent hereunder shall be deemed to have been made by the time required if the Paying Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Paying Agent to make such payment.

(b)      Subject to Section 10.03, if at any time insufficient funds are received by and available to the Trustee from the Issuer to pay fully all amounts of principal, interest and fees then due from the Issuer hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due from the Issuer hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties and (ii) second, towards payment of principal then due from the Issuer hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

## ARTICLE III.

## REDEMPTION AND REPURCHASE

SECTION 3.01   Redemption or Repurchase of Notes.

(a)      Subject to the other clauses of this Section 3.01, to the extent not previously redeemed or repurchased, outstanding Notes shall be due and payable on the Maturity Date.

(b)      Redemptions or repurchases of the Notes from:

(i)      any mandatory redemption or offer to repurchase Notes pursuant to Section 3.02(b), Section 3.02(c), Section 3.02(g), Section 3.02(h) or Section 3.02(j) shall be allocated to the Notes pursuant to Section 3.01(c), and

(ii)      any optional redemption of the Notes pursuant to Section 3.02(a) shall be redeemed in accordance with Section 3.01(f).

(c)      Any mandatory redemption of Notes or offer to repurchase Notes pursuant to Section 3.02(b), Section 3.02(c), Section 3.02(g), Section 3.02(h) or Section 3.02(j) shall be made on a pro rata basis based on the aggregate principal amount of all Notes outstanding on the date of such mandatory redemption or offer to repurchase.

(d)      Prior to any optional redemption of the Notes pursuant to Section 3.02(a), a notice of redemption must be delivered electronically or mailed (by first-class mail) by the Issuer or, at the Issuer's request in an Officer's Certificate delivered at least five (5) Business Days prior to the requested date of delivery (or such shorter period as may be satisfactory to the Trustee), by the Trustee in the name and at the expense of the Issuer, at least ten days but not more than 60 days before the redemption date to each Noteholder of the Notes to be redeemed at such Noteholder's last address as the same appears on the registry books maintained by the Registrar pursuant to Section 2.04 or pursuant to the applicable procedures of the Depositary and such notice of redemption shall (A) specify the redemption date,  (B) that, on the redemption date, the redemption price will become due and payable upon each Note to be redeemed, and that interest thereof, if any, shall cease to accrue on the redemption date, (C) specify the outstanding principal amount of such Notes to be redeemed on such date, (D) specify the accrued interest and redemption price applicable to the redemption, (E) state the applicable provision of this Indenture pursuant to which such redemption is to be made, (F) the place or places where such Notes are to be surrendered for payment of the redemption price, (G) the CUSIP, ISIN or other similar numbers, if any, assigned to such Note, (H) in case any Physical Note is to be redeemed

in part only, the portion of the principal amount thereof to be redeemed and, upon surrender of each Physical Note, a new Physical Note in principal amount equal to the unredeemed portion thereof shall be issued; *provided*, that a notice of redemption may state that such notice is conditioned upon the effectiveness of other credit facilities, indentures or similar agreements or other transactions, in which case such notice may be revoked by the Issuer if such condition is not satisfied.

(e)     All redemptions of Notes shall be accompanied by accrued interest on the principal amount redeemed and the Issuer shall deliver to the Trustee an Officer's Certificate that such redemption shall comply with the conditions contained in this Indenture and the Note.

(f)     With respect to any optional redemption pursuant to Section 3.02(a) for less than the full aggregate principal amount of Notes then outstanding, such redemption shall be made on a pro rata basis among all Notes then outstanding. If any Note is to be redeemed in part only, the notice of redemption relating to such Note shall state the portion of the principal amount thereof to be redeemed in accordance with the preceding sentence and that, if such Note is a Physical Note, such Note shall be surrendered by the Noteholder thereof (or, if applicable, the Custodian on its behalf) to the Trustee.  Upon surrender of any Physical Note that is redeemed in part, the Issuer shall execute for the Noteholder a new Physical Note equal in principal amount to the unredeemed portion of the Physical Note surrendered which shall be authenticated by the Trustee.  The Issuer shall deliver a certificate of authentication to the Trustee. Upon receipt of a written order of the Issuer signed by one Responsible Officer of the Issuer, the Trustee will authenticate and make available for delivery to the Noteholder (or, if applicable, to the Custodian on its behalf), at the expense of the Issuer, the new Note equal in principal amount to the unredeemed portion of the Physical Note surrendered.

(g)     Without duplication of any amounts included in the calculation of the Make-Whole Redemption Price or the Applicable Redemption Price, if the redemption date is on or after an interest Record Date and on or before the related Interest Payment Date, any accrued and unpaid interest up to but excluding the redemption date will be paid to the person in whose name a Note is registered at the close of business on such interest Record Date, and no additional interest will be payable to Noteholders who redeem their Notes.

SECTION 3.02  Voluntary and Mandatory Redemption or Repurchase of Notes.

(a)     The Issuer shall have the right at any time and from time to time to redeem the Notes, in whole or in part in an aggregate principal amount that is an integral multiple of the Notes Multiple and not less than the Notes Minimum or, if less, the amount outstanding, subject to prior notice in accordance with Section 3.01(d); *provided* that:

(i)     in the event of any optional redemption of Notes made pursuant to this Section 3.02(a) prior to June 23, 2026, the Issuer shall redeem such Notes from the applicable Noteholders at the Make-Whole Redemption Price with respect to such Notes;

(ii)     notwithstanding clause (i) above or clause (iii) below, on any date that is prior to June 23, 2026, the Issuer may make an optional redemption of up to 35% of the original aggregate principal amount of the Notes issued prior to such redemption

55

(calculated in an aggregate amount with any other optional redemptions made pursuant to this clause (ii) of the Notes prior to such redemption) pursuant to this Section 3.02(a) with the cash proceeds (other than proceeds (A) from the sale of Equity Interests by the Issuer to any Subsidiary or (B) from the conversion of any Convertible Notes, and only to the extent such proceeds have not otherwise been applied to incur any Contribution Debt pursuant to Section 8.01(k) or make any Investments pursuant to Section 8.04, any Restricted Payments pursuant to Section 8.06 or any prepayment of Indebtedness pursuant to Section 8.09(b)) of any issuance of Qualified Equity Interests of the Issuer issued after the date the Issuer has received $300,000,000 of net cash proceeds from the issuance of Qualified Equity Interests of the Issuer since the Closing Date, at a redemption price equal to 111.875% of the principal amount of such Notes plus accrued and unpaid interest on such Notes to, but excluding, the applicable redemption date; and

(iii)    in the event of any optional redemption of Notes made pursuant to this Section 3.02(a) on or after June 23, 2026, the Issuer shall redeem such Notes from the applicable Noteholders at the Applicable Redemption Price with respect to such Notes.

(b)    The Issuer shall make an offer to repurchase the Notes for cash with all Net Proceeds (other than Net Proceeds from the sale or other disposition of "Building 21" (as described in item [__] of Schedule 8.05) [__])[4] at a price equal to the lesser of (i) 111.875% of the principal amount of such Notes plus accrued and unpaid interest on such Notes to, but excluding, the applicable repurchase date and (ii) the Applicable Redemption Price at the time of the Disposition or Casualty Event giving rise to such Net Proceeds (an "Asset Sale Offer") in accordance with clauses (b)(i) and (c) of Section 3.01 and the procedures set forth in Section 3.02(d); *provided*, that no Asset Sale Offer shall be required until the amount of Net Proceeds in the aggregate [●] exceeds $10,000,000 (and, once the amount of Net Proceeds [●] exceeds $10,000,000, all Net Proceeds [●] in excess of such $10,000,000 will be required to make an Asset Sale Offer under this Section 3.02(b)).

(c)    On or prior to the consummation of a Change of Control, the Issuer shall make an offer to repurchase all of the Notes for cash at a price equal to (x) if such Change of Control will occur prior to June 23, 2026, the greater of (i) the Make-Whole Redemption Price at the time such Change of Control occurs minus 1.00% of the principal amount of such Notes and (ii) the Applicable Redemption Price as of June 23, 2026 and (y) if such Change of Control will occur on or after June 23, 2026, the Applicable Redemption Price at the time such Change of Control occurs (a "Change of Control Offer") in accordance with clauses (b)(i) and (c) of Section 3.01 and the procedures set forth in Section 3.02(d).

(d)    If the Issuer is required to make a Repurchase Offer pursuant to Section 3.02(b), Section 3.02(c), Section 3.02(g), Section 3.02(h) or Section 3.02(j), as applicable, the Issuer will apply cash in the amount required to be applied pursuant to such Section to offer to repurchase the Notes at the applicable purchase price pursuant to such Section. (i) Within five Business Day following the realization or receipt of Net Proceeds, in the case of an Asset Sale Offer, (ii) on or prior to the consummation of a Change of Control, in the case of a Change of Control Offer, (iii) within five Business Days following the receipt of net cash proceeds, in the

---

[4] Any additional exceptions subject to discussions among parties.

case of a DOE Offer or a Specified Transaction Offer or (iv) within the time period set forth in Section 3.02(j), in the case of an Extraordinary Receipts Offer, the Issuer will deliver a notice to each Noteholder (with a copy to the Trustee) stating:

(1)     a Repurchase Offer is being made pursuant to Section 3.02(b), Section 3.02(c), Section 3.02(g), Section 3.02(h) or Section 3.02(j) of this Indenture, as applicable;

(2)     the purchase price and the purchase date, which shall be a date not less than 10 nor more than 20 Business Days from the date such notice is delivered to the Noteholders (including, with respect to Global Notes, electronically pursuant to the Depositary's applicable procedures); *provided*, that a notice of the Repurchase Offer may state that such notice is conditioned upon the effectiveness of such Change of Control or receipt of Net Proceeds or net cash proceeds or other applicable transactions, in which case such notice may be revoked by the Issuer if such condition is not satisfied;

(3)     that any Note not tendered will continue to accrue interest;

(4)     that, unless the Issuer defaults in the payment of the applicable purchase price, all Notes accepted for payment pursuant to the Repurchase Offer will cease to accrue interest after the date of purchase (the "Repurchase Offer Payment Date");

(5)     that Noteholders may rescind their tender at any time on or prior to the repurchase date; and

(6)     that Noteholders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (if the Notes are Global Notes held by the Depositary, then the applicable operational procedures of the Depositary for tendering and withdrawing securities will apply), which unpurchased portion must be equal to $1.00 in principal amount or an integral multiple of $1.00 in excess thereof.

On the Repurchase Offer Payment Date, the Issuer will, to the extent lawful, (i) accept for payment all Notes or portions of Notes properly tendered pursuant to the Repurchase Offer; (ii) deposit with the Paying Agent an amount equal to the applicable aggregate purchase price (including accrued and unpaid interest on the Notes to be repurchased) in respect of all Notes or portions of Notes properly tendered; and (iii) deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Issuer.  The Paying Agent will promptly deliver (but in any case, not later than five days after the Repurchase Date) to each Noteholder of Notes properly tendered the applicable purchase price (including accrued and unpaid interest to the date of repurchase) for such Notes.

If at the end of the Repurchase Offer pursuant to Section 3.02(b), Section 3.02(g), Section 3.02(h) or Section 3.02(j) more Notes are tendered than the Issuer is required to purchase, and if the Notes are Global Notes held by the Depositary, the Depositary will select the Notes to be redeemed in accordance with its operational arrangements. If the Notes are not Global Notes

held by the Depositary, selection of such Notes for purchase shall be made by the Issuer in compliance with the requirements of the principal national securities exchange, if any, on which such Notes are listed (and the Issuer shall notify the Trustee of any such listing), or if such Notes are not so listed, on a pro rata basis to the extent practicable, by lot or by such other method as the Issuer deems appropriate; *provided* that no Notes of a minimum $2,000 or less shall be purchased in part.

(e)     Without limiting the generality of the foregoing, in the event the Notes are accelerated or otherwise become due prior to their stated maturity for any reason following the occurrence of any Event of Default (including, without limitation, pursuant to Section 10.01(h) or (i)) or the acceleration of claims by operation of law (a "Make-Whole Event")), all fees, expenses and premiums (including any premium included in the Make-Whole Redemption Price or Applicable Redemption Price) as of the date such Notes are accelerated or become due will also be due and payable as if the Issuer had voluntarily redeemed such Notes (the "Make-Whole Amount"), and such Make-Whole Amount shall also be due and payable as of such date and shall constitute part of the Note Obligations. Any Make-Whole Amount payable above shall be presumed to be the liquidated damages sustained by the Noteholders as the result of the early termination and acceleration of the Note Obligations and the Issuer agrees that it is reasonable under the circumstances currently existing. The Make-Whole Amount shall also be payable in the event the Note Obligations (and/or this Indenture) are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure, in connection with any restructuring, reorganization or compromise of the Notes or the Note Obligations by the confirmation of a plan of reorganization or any other plan of compromise, restructuring or arrangement in any insolvency proceeding, or by any other means following the occurrence of a Make-Whole Event. THE ISSUER AND EACH SUBSIDIARY GUARANTOR EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING MAKE-WHOLE AMOUNT IN CONNECTION WITH ANY SUCH ACCELERATION. The Issuer and each Subsidiary Guarantor expressly agrees (to the fullest extent that it may lawfully do so) that: (A) the Make-Whole Amount is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Make-Whole Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Noteholders and the Issuer and each Subsidiary Guarantor giving specific consideration in this transaction for such agreement to pay the Make-Whole Amount; and (D) the Issuer and each Subsidiary Guarantor shall be estopped hereafter from claiming differently than as agreed to in this paragraph. Each of the Issuer and Subsidiary Guarantors expressly acknowledges that its agreement to pay the Make-Whole Amount to the Noteholders as herein described is a material inducement to the Noteholders to purchase the Notes.

(f)     In connection with any redemption or repurchase of Notes under this Indenture, the Noteholders must deliver to the Trustee their Notes.

(g)     The Issuer shall make an offer to repurchase the Notes for cash with all net cash proceeds of any DOE Financing received by the Issuer or any Subsidiary at a price equal to the lesser of (i) 105.00% of the principal amount of such Notes plus accrued and unpaid interest

on such Notes to, but excluding, the applicable repurchase date and (ii) the Applicable Redemption Price at the time of the receipt of such net cash proceeds (a "<u>DOE Offer</u>"), in each case in accordance with clauses (b)(i) and (c) of <u>Section 3.01</u> and the procedures set forth in <u>Section 3.02(d)</u>.

(h)      The Issuer shall make an offer to repurchase the Notes for cash with all net cash proceeds (which for the avoidance of doubt, shall be net of all legal fees, financial advisor fees and investment banking fees paid or payable by the Issuer and its Subsidiaries in connection therewith) received by the Issuer or any of its Subsidiaries as a result of any break-up or termination fee pursuant to any material agreement entered into by the Issuer or any Subsidiary that would have resulted in a Change of Control or an Asset Sale Offer had the transactions contemplated by such material agreement been consummated (a "<u>Specified Transaction Offer</u>") at a purchase price equal to (i) in the event such offer to repurchase the Notes is made prior to June 23, 2026, the Make-Whole Redemption Price with respect to such Notes and (ii) in the event such offer to repurchase the Notes is made on or after June 23, 2026, the Applicable Redemption Price with respect to such Notes, in each case in accordance with clause (b)(i) and (c) of <u>Section 3.01</u> and the procedures set forth in <u>Section 3.02(d)</u>.

(i)      On any Interest Payment Date on or after any accrual period that ends after the date that is five years after [October 11, 2024], the Issuer shall also pay a minimum amount of accrued and unpaid interest (including any PIK Interest and any original issue discount) on the Notes in cash at the Applicable Redemption Price as shall be necessary to ensure that none of the Notes shall be considered "applicable high yield discount obligations" within the meaning of Section 163(i) of the Code, or any successor provision ("<u>AHYDO Payments</u>"); *provided that*, any such AHYDO Payments shall be made with respect to all Notes outstanding on the date of such AHYDO Payments pro rata in accordance with the amount of the principal plus accrued and unpaid interest then outstanding with respect to such Notes. The Issuer shall notify the Trustee and the Noteholders no later than the Record Date preceding the Interest Payment Date on which any such AHYDO Payment will be made.

(j)      The Issuer shall make an offer to repurchase the Notes (an "<u>Extraordinary Receipts Offer</u>") in accordance with clauses (b)(i) and (c) of Section 3.01 and the procedures set forth in Section 3.02(d) as set forth in this Section 3.02(j):

(1)      in the event that the Issuer and/or its Subsidiaries have received in excess of $200,000,000 of aggregate Extraordinary Receipts during the period commencing on the Closing Date and ending on June 22, 2026, no later than the tenth (10th) Business Day after the date the Issuer and/or its Subsidiaries has received aggregate Extraordinary Receipts in excess of such amount, the Issuer shall make an offer to repurchase $175,000,000 aggregate principal amount of Notes for cash at a price equal to 109.875% of the principal amount of such Notes plus accrued and unpaid interest on such Notes to, but excluding, the applicable repurchase date;

(2)      in the event that the Issuer and/or its Subsidiaries have received in excess of $200,000,000 of aggregate Extraordinary Receipts during the period commencing on the Closing Date and ending on June 22, 2027 and the Issuer has not previously made an Extraordinary Receipts Offer under clause (1) above, no later than

the tenth (10th) Business Day after the date the Issuer and/or its Subsidiaries has received aggregate Extraordinary Receipts in excess of such amount, the Issuer shall make an offer to repurchase $225,000,000 aggregate principal amount of Notes for cash at a price equal to 109.875% of the principal amount of such Notes plus accrued and unpaid interest on such Notes to, but excluding, the applicable repurchase date; and

   (3) in the event that the Issuer and/or its Subsidiaries has not received in excess of $200,000,000 of aggregate Extraordinary Receipts during the period commencing on the Closing Date and ending on June 22, 2027, no later than the tenth (10th) Business Day after June 22, 2027, the Issuer shall make an offer to repurchase $150,000,000 aggregate principal amount of Notes for cash at a price equal to 109.875% of the principal amount of such Notes plus accrued and unpaid interest on such Notes to, but excluding, the applicable repurchase date.

   SECTION 3.03  <u>Applicability of Article</u>.  Redemption of Notes at the election of the Issuer or otherwise or repurchase of the Notes, as permitted or required by any provision of this Indenture, shall be made in accordance with such provision and this <u>Article III</u>.

   SECTION 3.04  <u>Purchases by the Issuer or a Subsidiary</u>.  The Issuer shall not, nor shall any Subsidiary, directly or indirectly, purchase, repurchase, repay or otherwise acquire (or offer to do any of the foregoing) any Notes on a non-pro rata basis other than pursuant to an offer made available on a pro rata basis to all Noteholders.

   SECTION 3.05  <u>Payment for Consent</u>.  Neither the Issuer nor any Subsidiary of the Issuer shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Noteholder for or as an inducement to any consent, waiver, amendment, modification or supplement of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid to all Noteholders that so consent, waive or agree to amend, modify or supplement in the applicable timeframe or timeframes set forth in solicitation documents relating to such consent, waiver, amendment, modification or supplement.

<div align="center">

**ARTICLE IV.**

**REPRESENTATIONS AND WARRANTIES**

</div>

   On the Closing Date, the Issuer and the Subsidiary Guarantors represent and warrant to each of the Noteholder Parties that:

   SECTION 4.01  <u>Organization; Powers</u>.  Each of the Issuer and each of its Subsidiaries (a) is a partnership, limited liability company, corporation, trust or other business association duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own or lease its property and assets and to carry on its business as now conducted, except where the failure to have such power or authority would not reasonably be expected to have a Material Adverse Effect, (c) is qualified to do business in each jurisdiction where such qualification is required, except where the failure so to qualify would not reasonably be expected to have a Material Adverse Effect, and (d) has the power and authority to execute, deliver and perform its

obligations under each of the Note Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Issuer, to issue the Notes hereunder.

SECTION 4.02  Authorization.  The execution, delivery and performance by the Issuer and each of the Subsidiary Guarantors of each of the Note Documents to which it is a party and the borrowings hereunder (a) have been duly authorized by all corporate, stockholder, partnership, limited liability company or other organizational action required to be obtained by the Issuer and such Subsidiary Guarantors and (b) will not (i) violate (A) any provision of law, statute, rule or regulation applicable to the Issuer or any such Subsidiary Guarantor, (B) the certificate or articles of incorporation or other constitutive documents (including any partnership, limited liability company or operating agreements) or by-laws of the Issuer, or any such Subsidiary Guarantor, (C) any applicable order of any court or any rule, regulation or order of any Governmental Authority applicable to the Issuer or any such Subsidiary Guarantor or (D) any provision of any indenture, certificate of designation for Preferred Stock, agreement or other instrument to which the Issuer or any such Subsidiary Guarantor is a party or by which any of them or any of their property is or may be bound, (ii) result in a breach of or constitute (alone or with due notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) under any such indenture, certificate of designation for Preferred Stock, agreement or other instrument, where any such conflict, violation, breach or default referred to in clause (i) or (ii) of this Section 4.02(b), would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Issuer or any such Subsidiary Guarantor, other than the Liens created by the Note Documents and Permitted Liens.

SECTION 4.03  Enforceability.  This Indenture has been duly executed and delivered by the Issuer and each Subsidiary Guarantor and constitutes, and each other Note Document in effect on the date hereof and each other Note Document when executed and delivered by the Issuer and each Subsidiary Guarantor that is party thereto will constitute, a legal, valid and binding obligation of such Note Party enforceable against the Issuer and each such Subsidiary Guarantor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, arrangement, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity and the possible unavailability of specific performance, injunctive relief or other equitable remedies (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

SECTION 4.04  Governmental Approvals.  No action, consent, exemption or other action or approval of, registration or filing with or any other action by any Governmental Authority is or will be required for the execution, delivery, enforcement against or performance by each Note Document to which the Issuer or any Subsidiary Guarantor is a party, except for (a) the filing of Uniform Commercial Code financing statements and equivalent filings in foreign jurisdictions, (b) filings with the United States Patent and Trademark Office and the United States Copyright Office and comparable offices in foreign jurisdictions and equivalent filings in foreign jurisdictions, (c) recordation of the Mortgages, (d) such as have been made or obtained and are in full force and effect, (e) such actions, consents and approvals the failure of which to be

obtained or made would not reasonably be expected to have a Material Adverse Effect and (f) filings or other actions listed on <u>Schedule 4.04</u> and any other filings or registrations required by the Security Documents.

SECTION 4.05  <u>Financial Statements</u>.  (a) The audited consolidated balance sheets and the consolidated statements of income, stockholders' equity, and cash flows as of and for the fiscal years ended [___][5] for the Issuer and its consolidated subsidiaries, including the notes thereto (the "<u>Historical Audited Financial Statements</u>"), present fairly in all material respects the consolidated financial position of the Issuer and its consolidated subsidiaries as of the dates and for the periods referred to therein and the results of operations and, if applicable, cash flows for the periods then ended, and, except as set forth on <u>Schedule 4.05</u>, were prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby; and (b) the unaudited consolidated balance sheet and the consolidated statements of income, stockholders' equity and cash flows as of and for the fiscal quarters ended [___][6] for the Issuer and its consolidated subsidiaries, including the notes thereto, if applicable, present fairly in all material respects the consolidated financial position of the Issuer and its consolidated subsidiaries as of the dates and for the periods referred to therein and the results of operations and, if applicable, cash flows for the periods then ended, and, except as set forth on <u>Schedule 4.05</u>, were prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby.

SECTION 4.06  <u>No Material Adverse Effect</u>.  Since the Closing Date, there has been no event or circumstance that, individually or in the aggregate with other events or circumstances, has had or would reasonably be expected to have a Material Adverse Effect.

SECTION 4.07  <u>Title to Properties; Possession Under Leases</u>.

(a)     Each of the Issuer and the Subsidiaries has valid title in fee simple or equivalent to, or valid leasehold interests in, or easements or other limited property interests in, all its Real Properties (including any Mortgaged Properties) and has valid title to its personal property and assets that are material to its business, in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All such properties and assets are free and clear of Liens, other than Permitted Liens or Liens arising by operation of law.

(b)     The Issuer and each of the Subsidiaries has complied with all obligations under all leases to which it is a party, except where the failure to comply would not reasonably be expected to have a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.

---

[5] To be the three most recently ended fiscal years of the Issuer.
[6] To be each fiscal quarter of the Issuer ended following the most recently ended fiscal year.

(c)     As of the Closing Date, none of the Issuer and the Subsidiaries has received any written notice of any pending or contemplated condemnation proceeding or Casualty Event affecting all or any portion of any Mortgaged Properties or any sale or disposition thereof in lieu of condemnation that remains unresolved as of the Closing Date.

(d)     Except as set forth on Schedule 4.07(d), as of the Closing Date, none of the Issuer and its Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein, except as permitted under Section 8.02 or 8.05 or as would not reasonably be expected to have a Material Adverse Effect.

(e)     Except as set forth on Schedule 4.07(e), there is no Material Real Property owned by any Note Party as of the Closing Date.

SECTION 4.08  Subsidiaries.

(a)     Schedule 4.08(a) sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each subsidiary of the Issuer and, as to each such subsidiary, the percentage of each class of Equity Interests owned by the Issuer or by any such subsidiary.

(b)     As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors (or entities controlled by directors) and shares held by directors (or entities controlled by directors)) relating to any Equity Interests of the Issuer or any of the Subsidiaries, except as set forth on Schedule 4.08(b).

SECTION 4.09  Litigation; Compliance with Laws.

(a)     Except as set forth on Schedule 4.09, there are no actions, suits, claims or disputes pending or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Issuer, threatened in writing against the Issuer or any of the Subsidiaries or any business, revenues, property or rights of any such person (A) that involve any Note Document or (B) that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, except (in the case of this clause (B) only) for any action, suit or proceeding at law or in equity or by or on behalf of any Governmental Authority or in arbitration which has been disclosed in any of the Issuer's public filings with the SEC, in each case, prior to the Closing Date or which arises out of the same facts and circumstances, and alleges substantially the same complaints and damages, as any action, suit or proceeding so disclosed and in which there has been no material adverse change since the date of such disclosure.

(b)     None of the Issuer, the Subsidiaries and their respective properties, revenues or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws, which are the subject of Section 4.16) or any restriction of record or agreement affecting any Mortgaged Property, or is in default with respect to any judgment, writ, injunction or decree

63

of any Governmental Authority, where such violation or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 4.10   Federal Reserve Regulations.  Neither the purchase of any Note hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, Regulation U or Regulation X of the Board.

SECTION 4.11   Investment Company Act.  None of the Issuer or the Subsidiaries is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 4.12   [Reserved].

SECTION 4.13   Tax Returns.  Except as set forth on Schedule 4.13:

(a)     Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, the Issuer and each of the Subsidiaries has filed or caused to be filed all federal, state, local and non-U.S. Tax returns required to have been filed by it (including in its capacity as withholding agent) and each such Tax return is true and correct;

(b)     Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, the Issuer and each of the Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due), except Taxes or assessments that are being contested in good faith by appropriate proceedings in accordance with Section 7.03 and for which the Issuer or any of the Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP; and

(c)     Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, as of the Closing Date, with respect to the Issuer and each of the Subsidiaries, there are no claims being asserted in writing with respect to any Taxes.

SECTION 4.14   No Material Misstatements.

(a)     Each representation, warranty and statement of fact of any Note Party contained in any Note Document or in any other documents, certificates or written statements (other than the Projections, forward looking information and information of a general economic nature or general industry nature) (the "Information") concerning the Issuer, the Subsidiaries, the Transactions and any other transactions contemplated hereby prepared by or on behalf of the foregoing or their representatives and made available to the Trustee or the Noteholders in connection with the Transactions or the other transactions contemplated hereby, when taken as a whole, was true and correct in all material respects, as of the date such Information was furnished to such Noteholder Parties and as of the Closing Date (in the case of such Information delivered prior to the Closing Date) and did not contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements

64

contained therein not materially misleading in light of the circumstances under which such statements were made (giving effect to all supplements and updates provided thereto).

(b)     The Projections that have been made available to any Noteholder Party in connection with the Transactions or the other transactions contemplated hereby have been prepared in good faith based upon assumptions believed by the Issuer to be reasonable as of the date thereof and as of the date such Projections and information were furnished to the Noteholder Parties (it being understood that such Projections are as to future events and are not to be viewed as facts, such Projections are subject to significant uncertainties and contingencies and that actual results during the period or periods covered by any such Projections may differ significantly from the projected results and such differences may be material, and that no assurance can be given that the projected results will be realized).

(c)     As of the Closing Date, to the knowledge of the Issuer, the information included in the Beneficial Ownership Certification (if any) is true and correct in all material respects.

SECTION 4.15   Employee Benefit Plans.

(a)     Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, (ii) each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes, or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and, to the knowledge of the Issuer, nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, to the knowledge of the Issuer, nothing has occurred that would adversely affect the issuance of a favorable determination letter or otherwise adversely affect such qualification), (iii) no ERISA Event has occurred, (iv) there exists no Unfunded Pension Liability with respect to any Pension Plan, (v) there are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Issuer, threatened, which would reasonably be expected to be asserted successfully against any Plan or (vi) the Issuer, any Subsidiary and each ERISA Affiliate have made all contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a Plan or Multiemployer Plan.

(b)     None of the Issuer, any Subsidiary or any ERISA Affiliate maintains or contributes to, or has any obligation to contribute to, or has ever maintained or contributed to, or has ever had any obligation to contribute to, any "employee pension benefit plan" as defined in Section 3(2) of ERISA subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA ("Pension Plan").

SECTION 4.16  <u>Environmental Matters</u>.  Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice, request for information, order, complaint or penalty has been received by the Issuer or any of its Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the Issuer's knowledge, threatened which allege a violation or potential violation of or liability under any Environmental Laws, in each case relating to the Issuer or any of its Subsidiaries, (ii) each of the Issuer and its Subsidiaries has all environmental permits, licenses and other approvals necessary for its operations to comply with all Environmental Laws ("<u>Environmental Permits</u>") and is in compliance with the terms of such Environmental Permits and with all Environmental Laws, (iii) (x) no Hazardous Material has been Released at, on or under any property currently or, to the Issuer's knowledge, formerly, owned, operated or leased by the Issuer or any of its Subsidiaries that would reasonably be expected to give rise to any cost, liability or obligation of the Issuer or any of its Subsidiaries under any Environmental Laws or Environmental Permits, and (y) no Hazardous Material has been generated, used, treated, stored, handled, disposed of or controlled, transported or Released by the Issuer or any of its Subsidiaries at any location in a manner that would reasonably be expected to require an environmental investigation or give rise to any cost, liability or obligation of the Issuer or any of its Subsidiaries under any Environmental Laws or Environmental Permits and (iv) there are no existing facts, circumstances or conditions arising out of or relating to the operations of the Issuer or its Subsidiaries or any Real Property or facilities currently or, to the Issuer's knowledge, previously owned or leased by the Issuer or any Subsidiary that would reasonably be expected to require environmental investigation, remedial activity or corrective action or cleanup or would reasonably be expected to result in the Issuer or any other Subsidiary incurring any liability pursuant to Environmental Law.

SECTION 4.17  <u>Security Documents.</u>

(a)    Each Security Document (when executed and delivered by the parties thereto) will be effective (subject, in the case of any foreign collateral agreement, to the Agreed Security Principles and any perfection requirements expressly set out in the applicable collateral agreement) to create in favor of (i) the Collateral Agent (for the benefit of the Secured Parties) and/or (ii) the Collateral Agent under a Parallel Debt structure for the benefit of the Secured Parties, in each case, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  As of the Closing Date, the Collateral Agent (for the benefit of the Secured Parties) and/or the Collateral Agent under a Parallel Debt structure for the benefit of the Secured Parties shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Note Parties in the Collateral (subject, in the case of any foreign collateral agreement, to the Agreed Security Principles and any perfection requirements expressly set out in the applicable collateral agreement) and, subject to Section 9-315 of the New York Uniform Commercial Code (or any comparable legislation in the applicable jurisdiction), the proceeds thereof, as security for the Note Obligations to the extent perfection can be obtained by filing Uniform Commercial Code financing statements (or similar financing statements or filings or other actions expressly described in the applicable foreign collateral document), in each case prior and superior in right to the Lien of any other person (except Permitted Liens).

(b)    Subject to the Agreed Security Principles in the case of any Intellectual Property held by any Foreign Subsidiary Guarantor, the Collateral Agent (for the benefit of the

66

Secured Parties) and/or the Collateral Agent under a Parallel Debt structure for the benefit of the Secured Parties shall have a fully perfected (subject to exceptions arising from defects in the chain of title, which defects in the aggregate do not constitute a Material Adverse Effect hereunder) Lien on, and security interest in, all right, title and interest of the Note Parties under the Security Documents or any ancillary document thereunder in the material Intellectual Property included in the Collateral (but, in the case of the registered copyrights included in the Collateral, only to the extent such registered copyrights are listed in such ancillary document filed with the United States Copyright Office or a similar office in the applicable jurisdiction) listed in such ancillary document, in each case prior and superior in right to the Lien of any other person, except for Permitted Liens (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office or a similar office in the relevant foreign jurisdiction, as applicable, may be necessary to perfect a Lien on material registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the Note Parties after the Closing Date).

(c)       Mortgages, if any, executed and delivered after the Closing Date pursuant to Section 7.10 shall be effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) and/ or the Collateral Agent under a Parallel Debt structure for the benefit of the Secured Parties legal, valid and enforceable Liens on all of the Note Parties' rights, titles and interests in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are filed or recorded in the proper real estate filing or recording offices, and all relevant mortgage taxes and recording charges are duly paid, the Collateral Agent (for the benefit of the Secured Parties) and/ or the Collateral Agent under a Parallel Debt structure for the benefit of the Secured Parties shall have valid Liens with record notice to third parties on, and security interests in, all rights, titles and interests of the Note Parties in such Mortgaged Property and, to the extent applicable, subject to Section 9-315 of the Uniform Commercial Code, the proceeds thereof, in each case prior and superior in right to the Lien of any other person, except for Permitted Liens.

SECTION 4.18  Location of Real Property.  Schedule 4.07(e) lists correctly, in all material respects, as of the Closing Date all Material Real Property owned by the Issuer and the Subsidiary Guarantors and the addresses thereof.

SECTION 4.19  Solvency.

(a)       As of the Closing Date, immediately after giving effect to the consummation of the Transactions on the Closing Date, (i) the fair value of the assets of the Issuer and its Subsidiaries on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of the Issuer and its Subsidiaries on a consolidated basis; (ii) the present fair saleable value of the property of the Issuer and its Subsidiaries on a consolidated basis will be greater than the amount that will be required to pay the probable liability of the Issuer and its Subsidiaries on a consolidated basis on their debts and other liabilities, direct, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) the Issuer and its Subsidiaries on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) the Issuer and its Subsidiaries on a consolidated basis will not have unreasonably small capital with which to conduct the businesses

67

in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date.

(b)     As of the Closing Date, immediately after giving effect to the consummation of the Transactions, the Issuer does not intend to, and the Issuer does not believe that it or any of its Subsidiaries will, incur debts beyond its ability to pay such debts as they mature.

SECTION 4.20  Labor Matters.  Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) the Issuer and its Subsidiaries are in compliance with all applicable laws, contracts, policies, plans and programs relating to employment and employment practices; (ii) neither the Issuer nor any of its Subsidiaries is a party to or bound by any collective bargaining agreement, contract or legally binding commitment to any labor union or employee organization or group in respect of or affecting employees; (iii) neither the Issuer nor any of its Subsidiaries is currently engaged in, or has any legal duty to engage in, any negotiation with any labor union or employee organization; (iv) there is no pending or, to the knowledge of the Issuer, threatened strike, labor dispute, complaint, grievance, or arbitration proceeding against the Issuer or any of its Subsidiaries regarding any alleged unfair labor practices within the meaning of the National Labor Relations Act; (v) the hours worked and payments made to employees of the Issuer and the Subsidiaries have not been in violation of the Fair Labor Standards Act (to the extent applicable) or any other applicable law dealing with such matters; and (vi) all payments due from the Issuer or any of the Subsidiaries or for which any claim may be made against the Issuer or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Issuer or such Subsidiary to the extent required by GAAP.

SECTION 4.21  Insurance.  Schedule 4.21 sets forth a true, complete and correct description, in all material respects, of all material insurance (excluding any title insurance) maintained by or on behalf of the Issuer or the Subsidiaries as of the Closing Date.  As of such date, such insurance is in full force and effect.

SECTION 4.22  No Default.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Indenture or any other Note Document.

SECTION 4.23  Intellectual Property; Licenses, Etc.  Except as would not reasonably be expected to have a Material Adverse Effect or as set forth in Schedule 4.23, (a) the Issuer and each of its Subsidiaries owns, or possesses the right to use, all Intellectual Property that are used or held for use in or are otherwise reasonably necessary for the present conduct of their respective businesses, (b) to the knowledge of the Issuer, the Issuer and its Subsidiaries are not interfering with, infringing upon, misappropriating or otherwise violating Intellectual Property of any person, and (c) (i) no claim or litigation regarding any of the Intellectual Property owned by the Issuer and its Subsidiaries is pending or, to the knowledge of the Issuer, threatened and (ii) to the knowledge of the Issuer, no claim or litigation regarding any other Intellectual Property described in the foregoing clauses (a) and (b) is pending or threatened.

SECTION 4.24  <u>Senior Debt</u>  The Note Obligations will constitute "Senior Debt" (or the equivalent thereof) under the documentation governing any Indebtedness of any Note Party permitted to be incurred hereunder constituting Indebtedness that is subordinated in right of payment to the Note Obligations.

SECTION 4.25  <u>USA PATRIOT Act; Sanctions; Anti-Terrorism and Anti-Corruption Laws</u>.

(a)      Neither the Issuer nor, to the knowledge of the Issuer, any of its officers, directors, brokers or agents (i) has violated any Anti-Terrorism Laws or Sanction, (ii) has engaged in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering or "specified unlawful activities" under 18 U.S.C. §1956, (iii) is a person whose name appears on the list of Specially Designated Nationals and Sanctioned Persons published by OFAC (an "<u>OFAC Listed Person</u>") or is otherwise a Sanctioned Person, (iv) is majority owned by or controlled by or acting on behalf of, directly or indirectly, (A) any OFAC Listed Person or (B) any other Sanctioned Person or Sanctioned Country, or (v) is otherwise blocked, the subject or target of Sanctions or engaged in any activity in violation of Sanctions or Anti-Terrorism Laws.  Neither Issuer nor any Controlled Entity has been notified that its name appears on a list of persons that engage in investment or other commercial activities in Iran or any other Sanctioned Country.  No part of the proceeds from the Notes made hereunder constitutes or will constitute funds obtained on behalf of any Sanctioned Person or in any Sanctioned Country or will otherwise be used by the Issuer, directly or knowingly indirectly, or lent, contributed or otherwise made available to any person (x) in connection with any investment in, or any transactions or dealings with, any Sanctioned Person or in any Sanctioned Country, (y) to fund any activities or business of or with any Sanctioned Person, or in any Sanctioned Country or (z) otherwise in any manner that would result in a material violation of Sanctions by any person (including any person participating in the Notes, whether as underwriter, advisor, investor or otherwise).

(b)      Neither the Issuer, nor to Issuer's knowledge, its officers, directors, brokers or agents acting or benefiting in any capacity in connection with the Notes (i) deals in or otherwise engages, or has dealt or otherwise engaged, in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or Sanction, (ii) engages in or conspires to, or has engaged or conspired to, engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law or Sanction, (iii) has been found in violation of, charged with, or convicted under any Anti-Terrorism Law, (iv) is under investigation by any Governmental Authority for possible violation of Anti-Terrorism Laws or any Sanctions, (v) has been assessed civil penalties under any Anti-Terrorism Laws or any Sanctions, or (vi) has had any of its funds seized or forfeited in an action under any Anti-Terrorism Law or Sanction.  The Issuer has established policies, procedures and controls which are reasonably designed (and otherwise comply with applicable law) to ensure that each of the Issuer and each Controlled Entity, and each of their respective directors, officers, employees and agents, is and will continue to be in compliance with all applicable current and future Anti-Terrorism Laws and Sanctions.

(c)      The Issuer (i) has not been charged with or convicted of bribery or any other anti-corruption related activity under any applicable Anti-Corruption Laws, (ii) to its knowledge is not under investigation by any Governmental Authority for possible violation of Anti-Corruption Laws, or (iii) has not been assessed civil or criminal penalties under any Anti-Corruption Laws.  No part of the proceeds of the Notes will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the Anti-Corruption Laws.  The Issuer and, to the knowledge of the Issuer, its directors, officers, employees and agents are in compliance with all Anti-Corruption Laws, and the Issuer has established policies, procedures and controls which are reasonably designed (and otherwise comply with applicable law) to ensure that Issuer and each Controlled Entity, and each of their respective directors, officers, employees and agents, is and will continue to be in compliance with all applicable current and future Anti-Corruption Laws.

(d)      The representations and warranties under this Section 4.25 will not be made by any Foreign Subsidiary if and to the extent that the expression of, or compliance with, these representations and warranties would result in a breach of, violate, conflict with or expose such entity or any director, officer or employee thereof to any liability under EU Regulation (EC) 2271/96 (or any associated implementing law or regulation in any member state of the European Union) or section 7 of the German Foreign Trade Regulation (*Verordnung zur Durchführung des Außenwirtschaftsgesetzes  Außenwirtschaftsverordnung – AWV*)) in connection with the German Foreign Trade Law (*Außenwirtschaftsgesetz*), or any similar law of any other jurisdiction, as applicable.

## ARTICLE V.

## [RESERVED]

## ARTICLE VI.

## [RESERVED]

## ARTICLE VII.

## AFFIRMATIVE COVENANTS

The Issuer covenants and agrees with each Noteholder Party that, until the Termination Date, unless the Required Noteholder Parties shall otherwise consent in writing, the Issuer will, and will cause each of the Subsidiaries to:

SECTION 7.01  Existence; Business and Properties.

(a)      Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except, in the case of a Subsidiary of the Issuer that is not a Note Party, where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and except as otherwise permitted under Section 8.05, and except for the liquidation or dissolution of Subsidiaries if the assets of such Subsidiaries to the extent they

exceed estimated liabilities are acquired by the Issuer or a Wholly Owned Subsidiary of the Issuer in such liquidation or dissolution; *provided*, that Subsidiary Guarantors may not be liquidated into Subsidiaries that are not Note Parties (except as permitted under <u>Section 8.05</u>).

(b)     Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, do or cause to be done all things necessary to (i) lawfully obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, Intellectual Property, licenses and rights with respect thereto necessary to the normal conduct of its business, (ii) at all times maintain, protect and preserve all property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted), and (iii) make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times (in each case except as permitted by this Indenture).

SECTION 7.02  <u>Insurance</u>.

(a)     Maintain, with financially sound and reputable insurance companies, insurance (subject to customary deductibles and retentions) in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations and consistent with past practice or industry practice, cause the Collateral Agent to be listed as a co-loss payee on property and casualty policies and as an additional insured on liability policies (other than workers' compensation, employer's liability, director and officer liability and other policies where such an endorsement would not customarily be provided to a secured creditor).  Notwithstanding the foregoing, the Issuer and the Subsidiaries may self-insure with respect to such risks with respect to which companies of established reputation engaged in the same general line of business in the same general area usually self-insure.

(b)     Except as the Required Noteholder Parties may agree in their discretion (with communication of such agreement, if any, to be delivered to the Issuer by the Trustee at the direction of the Required Noteholder Parties), where available, (i) cause all such property and casualty insurance policies to be endorsed or otherwise amended to include a "standard" lender's loss payable endorsement, in form and substance reasonably satisfactory to the Required Noteholder Parties; (ii) cause each such policy covered by this clause (b) to provide that it shall not be cancelled or not renewed upon less than 30 days' (or 10 days in the case of cancellation due to non-payment) prior written notice thereof by the insurer to the Collateral Agent; and (iii) deliver to the Collateral Agent, prior to or concurrently with the expiration, cancellation or nonrenewal of any such policy of insurance covered by this clause (b), evidence of renewal or replacement of any such policy and within ten (10) Business Days of such renewal, an insurance certificate with respect thereto, together with evidence satisfactory to the Required Noteholder Parties that the Issuer or the applicable Subsidiary is not past due on any payment of premium for such policy.

(c)     If any improved portion of any Mortgaged Property is at any time located in an area within the United States identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area (each a "<u>Special Flood Hazard Area</u>") with

71

respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Collateral Agent evidence of such compliance in form and substance reasonably acceptable to the Required Noteholder Parties.

(d)     In connection with the covenants set forth in this Section 7.02, it is understood and agreed that:

(i)     the Trustee, the Collateral Agent, the Noteholder Parties and their respective agents or employees shall not be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 7.02, it being understood that (A) the Note Parties shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against the Trustee, the Collateral Agent, the Noteholder Parties or their agents or employees.  If, however, the insurance policies, as a matter of the internal policy of such insurer, do not provide waiver of subrogation rights against such parties, as required above, then the Issuer, on behalf of itself and behalf of each of its Subsidiaries, hereby agrees, to the extent permitted by law, to waive, and further agrees to cause each of its Subsidiaries to waive, its right of recovery, if any, against the Trustee, the Collateral Agent, the Noteholder Parties and their agents and employees;

(ii)     the designation of any form, type or amount of insurance coverage by the Collateral Agent (including acting in the capacity as the Collateral Agent and as the Parallel Debt Creditor) under this Section 7.02 shall in no event be deemed a representation, warranty or advice by the Collateral Agent or the Noteholder Parties that such insurance is adequate for the purposes of the business of the Issuer and the Subsidiaries or the protection of their properties; and

(iii)     the amount and type of insurance that the Issuer and its Subsidiaries has in effect as of the Closing Date satisfies for all purposes the requirements of this Section 7.02 with respect to the properties and assets owned as of the Closing Date.

SECTION 7.03  Taxes.  Pay its obligations in respect of all Tax liabilities, assessments and governmental charges, before the same shall become delinquent or in default, except where (i) the amount or validity thereof is being contested in good faith by appropriate proceedings and the Issuer or a Subsidiary thereof has set aside on its books adequate reserves therefor in accordance with GAAP or (ii) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 7.04  Financial Statements, Reports, Etc..  Furnish to the Trustee:

(a)     within 105 days after the end of each fiscal year, a consolidated balance sheet and related statements of comprehensive income, cash flows and stockholders' equity

showing the financial position of the Issuer and its Subsidiaries as of the close of such fiscal year and the consolidated results of their operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of comprehensive income, cash flows and stockholders' equity shall be accompanied by customary management's discussion and analysis and audited by independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which opinion shall not be qualified as to scope of audit or as to the status of the Issuer or any Subsidiary as a going concern, other than solely with respect to, or resulting solely from, an upcoming maturity date under any series of Indebtedness occurring within one year from the time such opinion is delivered or any potential inability to satisfy the covenant set forth in Section 8.11 or any financial maintenance covenant in any series of Indebtedness, in each case, on a future date or in a future period) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Issuer and its Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that the delivery by the Issuer of annual reports on Form 10-K of the Issuer and its consolidated Subsidiaries shall satisfy the requirements of this Section 7.04(a) to the extent such annual reports include the information specified herein);

(b)      within 60 days after the end of each of the first three fiscal quarters of each fiscal year, a consolidated balance sheet and related statements of comprehensive income, cash flows and stockholders' equity showing the financial position of the Issuer and its Subsidiaries as of the close of such fiscal quarter and the consolidated results of their operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail, which consolidated balance sheet and related statements of operations, cash flows and stockholders' equity shall be accompanied by customary management's discussion and analysis and which consolidated balance sheet and related statements of comprehensive income, cash flows and stockholders' equity shall be certified by a Financial Officer of the Issuer on behalf of the Issuer as fairly presenting, in all material respects, the financial position and results of operations of the Issuer and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that the delivery by the Issuer of quarterly reports on Form 10-Q of the Issuer and its consolidated Subsidiaries shall satisfy the requirements of this Section 7.04(b) to the extent such quarterly reports include the information specified herein);

(c)      (i) concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Issuer (x) certifying that no Event of Default or Default has occurred since the date of the last certificate delivered pursuant to this Section 7.04(c) or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (y) identifying each Immaterial Subsidiary of the Issuer as of the date such certificate is delivered and (ii) no later than five (5) Business Days after the end of each calendar month, a certificate of a Financial Officer of the Issuer certifying compliance with the Liquidity Covenant;

(d)      [reserved];

(e)        promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Trustee or the Required Noteholder Parties, other materials filed by the Issuer or any of the Subsidiaries with the SEC or distributed to its stockholders generally, as applicable; *provided*, *however*, that such reports, proxy statements, filings and other materials required to be delivered pursuant to clauses (a) and (b) above or this clause (e) shall be deemed delivered for purposes of this Indenture when posted to the website of the Issuer or the website of the SEC;

(f)        within 60 days (or such later date as the Required Noteholder Parties (with communication of such extension, if any, to be delivered to the Trustee by the Trustee at the direction of the Required Noteholder Parties) may agree in their discretion) after the beginning of each fiscal year, a consolidated annual budget for such fiscal year consisting of a projected consolidated balance sheet of the Issuer and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected cash flow and projected income of the Issuer and its Subsidiaries for the following fiscal year (collectively, the "Budget"), which Budget shall in each case be accompanied by the statement of a Financial Officer of the Issuer to the effect that the Budget is based on assumptions believed by the Issuer to be reasonable as of the date of delivery thereof;

(g)        upon the reasonable request of the Trustee (acting at the direction of the Required Noteholder Parties) not more frequently than once a year, an updated Perfection Certificate (or, to the extent such request relates to specified information contained in the Perfection Certificate, such information) reflecting all changes since the date of the information most recently received pursuant to this clause (g) or Section 7.10(f) with a copy to the Trustee and the Collateral Agent;

(h)        promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Issuer or any of the Subsidiaries, or compliance with the terms of any Note Document as in each case the Required Noteholder Parties may reasonably request (for itself or on behalf of any Noteholder Party and with communication of such requests, if any, to be delivered to the Issuer by the Trustee at the direction of the Required Noteholder Parties), in each case, subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract, and excluding non-financial trade secrets and information subject to attorney-client or similar privileges; and

(i)        at a time determined by the Issuer after delivery of the financial statements required pursuant to Section 7.04(a) or 7.04(b) (but not later than 10 Business Days after such delivery), the Issuer shall cause appropriate Financial Officers or other officers with reasonably equivalent duties of the Issuer to participate in one conference call for the Noteholder Parties to discuss the financial condition and results of operations of the Issuer and its Subsidiaries for the most recently ended fiscal period and, prior to the date of each such conference call, will announce the time and date of such conference call and either include all information necessary to access the call or inform Noteholder Parties how they can obtain such information, including, without limitation, the applicable password or login information (if applicable); *provided*, that if the Issuer hosts a quarterly investor or financial results call to which the Noteholders have access, such conference call will satisfy the requirements of this Section 7.04(i).

74

In addition to providing such information and reports to the Trustee, the Issuer shall make available to the Noteholder Parties the information required to be provided pursuant to the foregoing clauses (a) through (h) of this Section 7.04, clauses (a) through (c) of Section 7.05, clauses (a) through (e) of Section 7.16, Section 8.05(o) and Section 8.07(b), by posting such information to its website or on IntraLinks or any comparable password protected online data system or website (the "Platform"). The Trustee shall have no duty to review or analyze reports delivered to it. Delivery of reports, information and documents to the Trustee pursuant to this Section 7.04, Section 7.05, Section 7.16, Section 8.05 and Section 8.07 is for informational purposes only, and the Trustee's receipt thereof shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely conclusively on an Officer's Certificate). The Trustee is under no duty to examine such reports, information or documents to ensure compliance with the provision of this Indenture or to ascertain the correctness or otherwise of the information or the statements contained therein. The Trustee shall not be obligated to monitor or confirm, on a continuing basis or otherwise, the Issuer's compliance with the covenants or with respect to any reports or other documents filed with or posted to any website under this Indenture, or participate in any conference calls.

All financial statements furnished pursuant to paragraphs (a), (b) and (e) above (the "Public Noteholder Party Information") shall be made available through a portion of the Platform designated "Public Noteholder Party" as contemplated by Section 16.23.

SECTION 7.05  Litigation and Other Notices. Furnish to the Trustee written notice of the following promptly after any Responsible Officer of the Issuer obtains actual knowledge thereof:

(a)     of any condition or event that constitutes any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)     the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against the Issuer or any of the Subsidiaries which if adversely determined would reasonably be expected to have a Material Adverse Effect;

(c)     any other event, development or change specific to the Issuer or any of the Subsidiaries that has had, or would reasonably be expected to have, a Material Adverse Effect; and

(d)     as of any date, the amount of Qualified Cash as of such date is less than the applicable Minimum Liquidity Threshold as of such date.

SECTION 7.06  Compliance with Laws. Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a

Material Adverse Effect; *provided*, that this <u>Section 7.06</u> shall not apply to Environmental Laws, which are the subject of <u>Section 7.09</u>, to laws related to Taxes, which are the subject of <u>Section 7.03</u>, or to Anti-Terrorism Laws, USA PATRIOT Act, Anti-Corruption Laws and Sanctions, which are the subject of <u>Section 7.13</u>.

      SECTION 7.07   <u>Maintaining Records; Access to Properties and Inspections</u>. Maintain all financial records in accordance with GAAP and permit any persons designated by the Trustee or the Required Noteholder Parties or, upon the occurrence and during the continuance of an Event of Default, any Noteholder Party to visit and inspect the financial records and the properties of the Issuer or any of the Subsidiaries at reasonable times, upon reasonable prior notice to the Issuer, and as often as reasonably requested (*provided*, *however*, that except during the continuance of an Event of Default, only one visit per calendar year for the Noteholder Parties, taken as a whole, shall be permitted) and to make extracts from and copies of such financial records, and permit any persons designated by the Trustee or the Required Noteholder Parties or, upon the occurrence and during the continuance of an Event of Default, any Noteholder Party upon reasonable prior notice to the Issuer to discuss the affairs, finances and condition of the Issuer or any of the Subsidiaries with the officers thereof and independent accountants therefor (so long as the Issuer has the opportunity to participate in any such discussions with such accountants), in each case, subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract, and excluding non-financial trade secrets and information subject to attorney-client or similar privileges.

      SECTION 7.08   [Reserved].

      SECTION 7.09   <u>Compliance with Environmental Laws</u>.  (i) Comply, and make commercially reasonable efforts to cause all lessees (if any) and other persons occupying its properties to comply, with all Environmental Laws applicable to its operations and properties; and obtain and renew all authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws, and (ii) in each case to the extent the Note Parties or their Subsidiaries are required by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws, except, in each case with respect to this <u>Section 7.09</u>, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

      SECTION 7.10   <u>Further Assurances; Additional Security</u>.  Subject to the Agreed Security Principles and the terms of any applicable Intercreditor Agreement:

      (a)   Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings  (*provided* that if a Mortgage is actually filed, only to the extent a filed Mortgage cannot act as a fixture filing in an applicable jurisdiction), Mortgages and other documents), that Trustee and/or Collateral Agent and/or Parallel Debt Creditor (in each case, acting at the direction of the Required Noteholder Parties) may reasonably request (including, without limitation, those required by applicable law), to satisfy the Collateral and Guarantee Requirement and to cause the Collateral and Guarantee Requirement to be and remain satisfied,

all at the expense of the Note Parties and provide to the Required Noteholder Parties and/or Parallel Debt Creditor, from time to time upon reasonable request, evidence reasonably satisfactory to the Required Noteholder Parties and/or Parallel Debt Creditor as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)     If any asset (other than Real Property) that has an individual fair market value (as determined in good faith by the Issuer) in an amount greater than $5,000,000 or is a semiconductor tool or equipment used in any Product Family of the Issuer and its Subsidiaries is acquired by the Issuer or any Subsidiary Guarantor after the Closing Date or owned by an entity at the time it becomes a Subsidiary Guarantor (in each case other than (x) assets constituting Collateral under a Security Document that become subject to the Lien of such Security Document upon acquisition thereof and (y) assets constituting Excluded Property), the Issuer or such Subsidiary Guarantor, as applicable, will (i) notify the Collateral Agent of such acquisition or ownership and (ii) cause such asset to be subjected to a Lien (subject to any Permitted Liens) securing the Note Obligations by, and take, and cause the Subsidiary Guarantors to take, such actions as shall be reasonably requested by the Collateral Agent (acting at the direction of the Required Noteholder Parties) to grant and perfect such Liens, including actions described in clause (a) of this Section 7.10, all at the expense of the Note Parties, subject to clause (g) below.

(c)     (i) Grant and cause each of the Subsidiary Guarantors to grant to the Collateral Agent security interests in, and mortgages on, any Material Real Property of the Issuer or such Subsidiary Guarantors, as applicable, (x) within 90 days after the Closing Date with respect to Material Real Property owned as of the Closing Date and (y) to the extent acquired after the Closing Date, within 90 days after such acquisition (or such later date as the Collateral Agent (acting at the direction of the Required Noteholder Parties) may agree) pursuant to a Mortgage, which security interest and mortgage shall constitute valid and enforceable Liens subject to no other Liens except Permitted Liens and (ii) to the extent applicable in the applicable jurisdiction, record or file, and cause each such Subsidiary Guarantor to record or file, the Mortgage or instruments related thereto in such manner and in such places as is required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) and/ or the Collateral Agent under a Parallel Debt structure for the benefit of the Secured Parties required to be granted pursuant to the Mortgages and pay, and cause each such Subsidiary Guarantor to pay, in full, all Taxes, fees and other charges required to be paid in connection with such recording or filing, in each case subject to clause (g) below. Unless otherwise waived by the Collateral Agent (acting at the direction of the Required Noteholder Parties), with respect to each such Mortgage, to the extent applicable in the applicable jurisdiction, the Issuer shall cause the requirements set forth in clauses (f) and (g) of the definition of "Collateral and Guarantee Requirement" to be satisfied with respect to such Material Real Property.

(d)     If any additional direct or indirect Subsidiary of the Issuer is formed or acquired after the Closing Date and if such Subsidiary is a Subsidiary Guarantor (with any Excluded Subsidiary ceasing to be an Excluded Subsidiary being deemed to constitute the acquisition of a Subsidiary), within 10 Business Days after the date such Subsidiary is formed or acquired (or such longer period as the Collateral Agent (acting at the direction of the Required Noteholder Parties) may agree), notify the Collateral Agent thereof and, within (x) in the case of a Domestic Subsidiary, 30 days or (y) in the case of a Foreign Subsidiary, 60 days, in each case,

77

after the date such Subsidiary is formed or acquired or such longer period as the Collateral Agent (acting at the direction of the Required Noteholder Parties) may agree (or, with respect to clauses (f), (g) and (h) of the definition of "Collateral and Guarantee Requirement", within 90 days after such formation or acquisition or such longer period as set forth therein or as the Collateral Agent (acting at the direction of the Required Noteholder Parties) may agree), cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Note Party, subject to clause (g) below.

(e)      [Reserved].

(f)      Furnish to the Collateral Agent prompt written notice of any change (A) in any Note Party's corporate or organization name, (B) in any Note Party's identity or organizational structure, (C) in any Note Party's organizational identification number, (D) in any Note Party's jurisdiction of organization or (E) in the location of the chief executive office of any Note Party that is not a registered organization; *provided*, that the Issuer shall not effect or permit any such change unless all filings have been made, or will have been made within 30 days following such change (or such longer period as the Trustee (acting at the direction of the Required Noteholder Parties) may agree), under the Uniform Commercial Code or other applicable law that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral in which a security interest may be perfected by such filing, for the benefit of the Secured Parties.

(g)      The Collateral and Guarantee Requirement and the other provisions of this Section 7.10 and the other Note Documents with respect to Collateral are (I) solely in the case of Foreign Subsidiaries (and the assets of and Equity Interests in such Foreign Subsidiaries), subject in all respects to the Agreed Security Principles and (II) solely in the case of Domestic Subsidiaries (and the assets of, and Equity Interests in, such Domestic Subsidiaries) need not be satisfied by any Excluded Subsidiary or by any Note Party with respect to any of the following (collectively, the "Excluded Property"):  (i) any Real Property other than Material Real Property, (ii) (x) motor vehicles and other assets subject to certificates of title and letter of credit rights (in each case, other than to the extent a Lien on such assets or such rights can be perfected by filing a UCC-1) and (y) commercial tort claims with a value of less than $10,000,000, (iii) pledges and security interests prohibited by applicable law, rule, regulation or contractual obligation (with respect to any such contractual obligation, only to the extent such restriction is permitted under Section 8.09(c) and such restriction is binding on such assets on the Closing Date or on the date of acquisition thereof and not entered into in contemplation thereof (and renewals and replacements thereof)) (in each case, except to the extent such prohibition is unenforceable after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code) or which would require governmental (including regulatory) consent, approval, license or authorization to be pledged (unless such consent, approval, license or authorization has been received), (iv) assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences as determined in good faith by the Issuer in consultation with the Required Noteholder Parties, (v) any lease, license or other agreement to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto (other than the Issuer or any Subsidiary thereof) after giving effect to the applicable anti-

assignment provisions of Article 9 of the Uniform Commercial Code, (vi) those assets as to which the Issuer and the Required Noteholder Parties reasonably agree that the cost or other consequence of obtaining such a security interest or perfection thereof are excessive in relation to the value afforded thereby, (vii) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in such licenses, franchises, charters or authorizations is prohibited or restricted thereby after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code, (viii) pending "intent to use" trademark applications for which an Amendment to Allege Use or a Statement of Use under Section 1(c) or 1(d) of the Lanham Act has not been filed with or accepted by the United States Trademark Office, (ix) any Excluded Account and any cash and Permitted Investments maintained in an Excluded Account, (x) any Excluded Securities, (xi) any Third Party Funds, (xii) any equipment or other real or personal property or asset that is subject to a Lien permitted by clause (i) of <u>Section 8.02</u>, if permitted by <u>Section 8.01</u>, if the agreement governing such Lien (or the Indebtedness secured thereby) prohibits or requires the consent of any person (other than the Issuer or any Subsidiary thereof) as a condition to the creation of any other security interest on such equipment or other real or personal property or asset and, in each case, such prohibition or requirement is permitted hereunder after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code, (xiii) [reserved] and (xiv) any other exceptions mutually agreed upon between the Issuer and the Required Noteholder Parties; *provided*, that the Issuer may in its sole discretion elect to exclude any property from the definition of Excluded Property; <u>provided</u>, further, that, no property or assets that secure any obligations under any Second Lien Indenture, any Permitted Refinancing Indebtedness thereof [or ●] shall be Excluded Property.  Notwithstanding anything herein to the contrary, (A) the Collateral Agent (acting at the direction of the Required Noteholder Parties) may grant extensions of time or waivers of requirements for the creation or perfection of security interests in or the obtaining of insurance (including title insurance), or the amount of insurance, or surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Note Parties on such date) where the Collateral Agent (acting at the direction of the Required Noteholder Parties) reasonably determines, in consultation with the Issuer, that perfection or obtaining of such items cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Indenture or the other Note Documents, (B)  no landlord, mortgagee or bailee waivers shall be required, (C) no notice shall be required to be sent to account debtors or other contractual third parties prior to the occurrence and continuance of an Event of Default, (D) Liens required to be granted from time to time pursuant to, or any other requirements of, the Collateral and Guarantee Requirement and the Security Documents shall be subject to exceptions and limitations set forth in the Security Documents and, to the extent appropriate in the applicable jurisdiction, as otherwise agreed between the Collateral Agent (acting at the direction of the Required Noteholder Parties) and the Issuer, (E) to the extent any Mortgaged Property is located in a jurisdiction with mortgage recording or similar tax, the amount secured by the Security Document with respect to such Mortgaged Property shall be limited to the fair market value of such Mortgaged Property as determined in good faith by the Issuer (subject to any applicable laws in the relevant jurisdiction or such lesser amount agreed to by the Collateral Agent (acting at the direction of the Required Noteholder Parties)), (F) the Collateral Agent (acting at the direction of the Required Noteholder Parties) and the Issuer may make such modifications to the Security Documents, and execute and/or consent to such easements, covenants, rights of way or

similar instruments as the Collateral Agent (acting at the direction of the Required Noteholder Parties) may agree to subordinate the lien of any Mortgage to any such easement, covenant, right of way or similar instrument or record or may agree to recognize any tenant pursuant to an agreement in form and substance reasonably acceptable to the Required Noteholder Parties, as are reasonable or necessary in connection with any project or transactions otherwise permitted hereunder, and (G) other than to the extent required by Section 7.14, no control agreement or control, lockbox or similar arrangement shall be required with respect to any deposit accounts, securities accounts or commodities accounts.

(h)     Neither the Collateral Agent (including as the Parallel Debt Creditor) nor the Trustee undertakes any responsibility whatsoever to determine whether any of the foregoing covenants have been satisfied, and neither shall have any liability whatsoever arising out of the failure of the Issuer or any of the Subsidiary Guarantors to satisfy such requirements.

SECTION 7.11  [Reserved].

SECTION 7.12  Post-Closing.  Take all necessary actions to satisfy the items described on Schedule 7.12 within the applicable period of time specified in such Schedule (or such longer period as the Required Noteholder Parties may agree in their reasonable discretion).

SECTION 7.13  Compliance with the USA PATRIOT Act, Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions.

(a)     Comply in all respects with the USA PATRIOT Act and all applicable Anti-Terrorism Laws, Anti-Corruption Laws and Sanctions.  The Note Parties shall, and shall cause each of their Subsidiaries to, maintain in effect policies, procedures and controls reasonably designed to ensure compliance by the Note Parties, the Controlled Entities and their respective directors, officers, employees and agents with applicable Sanctions, Anti-Corruption Laws and Anti-Terrorism Laws.  The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act, the Trustee and the Collateral Agent, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee or the Collateral Agent. The parties to this Indenture agree that they will provide the Trustee or the Collateral Agent, as applicable, with such information as it may reasonably request in order for the Trustee or the Collateral Agent to satisfy the requirements of the USA Patriot Act.

(b)     The covenants under this Section 7.13 will not apply to any Foreign Subsidiary if and to the extent that the compliance with these covenants result in a breach of, violate, conflict with  or expose such entity or any director, officer or employee thereof to any liability under EU Regulation (EC) 2271/96 (or any associated implementing law or regulation in any member state of the European Union) or section 7 of the German Foreign Trade Regulation (*Verordnung zur Durchführung des Außenwirtschaftsgesetzes  Außenwirtschaftsverordnung – AWV*)) in connection with the German Foreign Trade Law (*Außenwirtschaftsgesetz*), or any similar law of any other jurisdiction, as applicable.

SECTION 7.14  Cash Management Systems.

(a)      (x) Within 60 days after (i) the Closing Date or (ii) in the case of any person that becomes a Subsidiary Guarantor after the Closing Date, the date such person becomes a Subsidiary Guarantor (in each case, or such longer period as the Required Noteholder Parties may agree in their reasonable discretion), the Issuer and each applicable Subsidiary Guarantor shall have entered into Account Control Agreements (including, as applicable, customary notices to accounts banks (and acknowledgements thereof, if so required under applicable law) if required in order to perfect security interests over bank accounts of Foreign Subsidiary Guarantors) with respect to all cash and Permitted Investments maintained in Deposit Accounts and Securities Accounts of the Issuer and each Subsidiary Guarantor, in each case, other than cash and Permitted Investments maintained in Excluded Accounts and (y) within 5 Business Days (in each case, or such longer period as the Collateral Agent (acting at the direction of the Required Noteholder Parties) may agree) after any Deposit Account or Securities Account ceases to be an Excluded Account, the Issuer or the Subsidiary Guarantor, as applicable, shall enter into an Account Control Agreement with respect to such Deposit Account or Securities Account.

(b)      At any time after the occurrence and during the continuance of a Control Triggering Event, the Collateral Agent (acting at the written request of the Trustee or the Required Noteholder Parties) shall have the right to deliver an Activation Notice (or similar term, as defined in each Account Control Agreement) with respect to each Controlled Account.  After delivery of an Activation Notice (or similar term, as defined in each Account Control Agreement), the Collateral Agent shall comply with the written instructions of the Trustee (or the Required Noteholder Parties) with respect to credits and transfers from the applicable Controlled Accounts.

(c)      The Issuer and Subsidiary Guarantors may close and/or open any account (including any Controlled Account) maintained at any bank or other financial institution subject to the applicable requirements of Section 7.14(a).

(d)      So long as no Control Triggering Event has occurred and is continuing, the Issuer and Subsidiary Guarantors may direct the manner of disposition of funds in all Controlled Accounts.

(e)      The Collateral Agent (acting at the direction of the Required Noteholder Parties) shall promptly (a) furnish written notice to each person with whom a Controlled Account is maintained of any termination of a Control Triggering Event or (b) take such other action and execute such other documents as may be reasonably requested by the Issuer or the applicable Subsidiary Guarantor in connection with any termination of a Control Triggering Event.

SECTION 7.15  Employee Benefit Plans.  Maintain each material Plan in compliance with all applicable requirements of law and regulations, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 7.16  ERISA-Related Information.  The Issuer shall supply (or shall cause each of the Subsidiaries to supply) to the Trustee the following if such information relates to any event, development or change that has had, or would reasonably be expected to have, a Material Adverse Effect:

(a)        promptly and in any event within 15 days after the Issuer, any Subsidiary or any ERISA Affiliate files a Schedule B (or such other schedule as contains actuarial information) to IRS Form 5500 in respect of a Plan with Unfunded Pension Liabilities, a copy of such IRS Form 5500 (including the Schedule B);

(b)        promptly and in any event within 30 days after the Issuer, any Subsidiary or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred, a certificate of the chief financial officer of the Issuer describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by such Issuer, Subsidiary or ERISA Affiliate from the PBGC or any other governmental agency with respect thereto; *provided* that, in the case of ERISA Events under clause (b) of the definition thereof, the 30-day period set forth above shall be a 10-day period, and, in the case of ERISA Events under clause (e) of the definition thereof, in no event shall notice be given later than the occurrence of the ERISA Event;

(c)        promptly and in any event within 30 days after becoming aware that there has been (i) a material increase in Unfunded Pension Liabilities (taking into account only Plans with positive Unfunded Pension Liabilities) since the date the representations hereunder are deemed given, or from any prior notice, as applicable; (ii) the existence of any material Withdrawal Liability under Section 4201 of ERISA, if the Issuer, any Subsidiary or any ERISA Affiliate were to withdraw completely from any and all Multiemployer Plans, (iii) the adoption of, or the commencement of contributions to, any Plan subject to Section 412 of the Code by the Issuer, any Subsidiary or any ERISA Affiliate, or (iv) the adoption of any amendment to a Plan subject to Section 412 of the Code which results in a material increase in contribution obligations of the Issuer, any Subsidiary or any ERISA Affiliate, a detailed written description thereof from the chief financial officer of the Issuer;

(d)        if, at any time after the Closing Date, the Issuer, any Subsidiary or any ERISA Affiliate maintains, or contributes to (or incurs an obligation to contribute to), a Pension Plan or Multiemployer Plan, then the Issuer shall deliver (or shall cause each of the Subsidiaries to deliver) to the Trustee written notice as soon as practicable, and in any event within 10 days after the Issuer, any Subsidiary or any ERISA Affiliate first maintains, or contributes (or incurs an obligation to contribute to), thereto; and

(e)        promptly following receipt thereof, copies of (i) any documents described in Section 101(k) of ERISA that the Issuer, any Subsidiary or any ERISA Affiliate requests with respect to any Multiemployer Plan to which such Issuer, Subsidiary or ERISA Affiliate is obligated to contribute and (ii) any notices described in Section 101(l) of ERISA that the Issuer, any Subsidiary or any ERISA Affiliate requests with respect to any Multiemployer Plan to which such Issuer, Subsidiary or ERISA Affiliate is obligated to contribute; *provided* that if such Issuer, Subsidiary or ERISA Affiliate, as applicable, has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Trustee (acting at the direction of the Required Noteholder Parties), such Issuer, Subsidiary or ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor, and the Issuer shall (or shall cause each of the Subsidiaries to) provide copies of such documents and notices promptly after receipt thereof.

# ARTICLE VIII.

## NEGATIVE COVENANTS

The Issuer covenants and agrees with each Noteholder Party that, until the Termination Date, unless the Required Noteholder Parties shall otherwise consent in writing, the Issuer will not, and will not permit any of the Subsidiaries to:

SECTION 8.01  Indebtedness.  Incur, create, assume or permit to exist any Indebtedness on or after the Closing Date, except:[7]

(a)  Indebtedness existing or committed (including, for the avoidance of doubt, paid-in-kind interest payable on such Indebtedness to the extent specified in Schedule 8.01) on the Closing Date (*provided*, that any such Indebtedness that is not intercompany Indebtedness shall be set forth on Schedule 8.01) and any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness (other than intercompany indebtedness Refinanced with Indebtedness owed to a person not affiliated with the Issuer or any Subsidiary);

(b)  Indebtedness created hereunder and under the other Note Documents;

(c)  Indebtedness of the Issuer or any Subsidiary pursuant to Hedging Agreements entered into for non-speculative purposes;

(d)  Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Issuer or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case in the ordinary course of business and consistent with past practice or industry practices;

(e)  Indebtedness of the Issuer to any Subsidiary and of any Subsidiary to the Issuer or any other Subsidiary; *provided* that (i) any such Indebtedness of a Subsidiary that is not a Note Party owing to a Note Party is permitted by Section 8.04 and (ii) any such Indebtedness of a Note Party owing to a Subsidiary that is not a Note Party is permitted by Section 8.04 and is subordinated to the Note Obligations on terms reasonably satisfactory to the Trustee (acting at the direction of the Required Noteholder Parties);

(f)  Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case provided in the ordinary course of business and consistent with past practice or industry practices, including those incurred to secure health, safety and environmental obligations in the ordinary course of business and consistent with past practice or industry practices;

(g)  Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds or other cash

---

[7] Basket for an A/R facility under discussion between the Company and the noteholders and remains subject to the sole discretion of the noteholders as to whether it will be added and the size of any such basket.

management services, in each case incurred in the ordinary course of business and consistent with past practice or industry practices;

(h)     [reserved];

(i)     Capitalized Lease Obligations, mortgage financings and other Indebtedness incurred by the Issuer or any Subsidiary prior to or within 30 days after the acquisition, lease, construction, repair, replacement or improvement of the respective property (real or personal) permitted under this Indenture in order to finance such acquisition, lease, construction, repair, replacement or improvement, in an aggregate principal amount that immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 8.01(i), would not exceed $50,000,000 at any time;

(j)     solely to the extent the Issuer has received at least $500,000,000 of Gross Cash Proceeds from the issuance or sale of the Issuer's Qualified Equity Interests after the Closing Date, Indebtedness in respect of Permitted Disqualified Stock;

(k)     other unsecured Indebtedness of the Issuer or any Subsidiary Guarantor in an aggregate principal amount that, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 8.01(k), would not exceed the sum of (x) the aggregate principal amount of Convertible Notes that have been converted pursuant to their terms into Qualified Equity Interests plus (y) the amount of Contribution Debt; *provided* that (i) any Indebtedness incurred pursuant to this Section 8.01(k) shall have a maturity date no earlier than the Maturity Date and shall not permit or require scheduled cash interest payments in excess of 10.00% per annum (with variable interest rates converted to fixed rates based on implied forward interest rate curve for purposes of such determination) and (ii) the aggregate principal amount of Indebtedness outstanding under this Section 8.01(k) may not exceed $500,000,000 at any time;

(l)     Indebtedness and other obligations secured by the Siler City Assets in an outstanding amount not to exceed at any time (x) $750,000,000 of obligations in respect of any DOE Financing, plus (y) $750,000,000 of obligations to the United States Department of Commerce, the CHIPS Program Office or any other Governmental Authority of the United States, in each case under this clause (y), in respect of award disbursements received pursuant to governmental grants under the CHIPS Act;

(m)     Guarantees by the Issuer or any DOE Parent Entity of any DOE Financing; *provided* that Guarantees under this Section 8.01(m) shall only be permitted to the extent such Guarantees are senior unsecured or secured only by Liens on the Collateral that are junior to the Liens securing the Note Obligations and subject to the Permitted Junior Intercreditor Agreement;

(n)     [Reserved];

(o)     Indebtedness in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued to support performance obligations and trade letters of credit (other than obligations in respect of other Indebtedness) in the ordinary course of business;

(p)    Indebtedness in respect of cash collateralized letters of credit in an aggregate face amount not to exceed $50,000,000 at any one time;

(q)    Indebtedness arising from agreements of the Issuer or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations (including earn-outs), in each case, incurred or assumed in connection with any Investments or the disposition of any business, assets or a Subsidiary expressly permitted by this Indenture;

(r)    (i) Indebtedness under the Second Lien Convertible Notes Indenture in respect of the Second Lien Convertible Notes issued on the Closing Date (plus paid-in-kind interest applicable to such Indebtedness at the rate applicable thereto on the Closing Date), (ii) Indebtedness under the Second Lien Renesas Notes Indenture in respect of the Second Lien Renesas Notes issued on the Closing Date (plus paid-in-kind interest applicable to such Indebtedness at the rate applicable thereto on the Closing Date), (iii) Indebtedness under the Second Lien Takeback Notes Indenture in respect of the Second Lien Takeback Notes issued on the Closing Date (plus paid-in-kind interest applicable to such Indebtedness at the rate applicable thereto on the Closing Date) and (iv) any Permitted Refinancing Indebtedness (including, solely to the extent such Permitted Refinancing Indebtedness has an interest rate equal to or less than the Indebtedness it Refinances, any paid-in-kind interest on such Permitted Refinancing Indebtedness) incurred to Refinance any such Indebtedness; *provided* that, (x) the Liens securing any Indebtedness incurred in reliance on this clause (r) shall be junior to the Liens securing the Note Obligations, (y) Indebtedness incurred in reliance on this clause (r) shall have no borrower, issuer or obligor in respect thereof that is not the Issuer or a Subsidiary Guarantor and (z) Indebtedness incurred in reliance on this clause (r) shall not be secured by any assets or property that are not Collateral;

(s)    [Reserved];

(t)    [Reserved];

(u)    Indebtedness incurred in the ordinary course of business in respect of obligations of the Issuer or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; *provided*, that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and consistent with past practice or industry practices and not in connection with the borrowing of money or any Hedging Agreements;

(v)    Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Issuer or any Subsidiary incurred in the ordinary course of business and consistent with past practice, without duplication of any amounts payable under Section 8.06;

(w)    [Reserved];

(x)    obligations in respect of Cash Management Agreements;

(y)    Escrowed Indebtedness;

(z)      Indebtedness consisting of obligations of the Issuer or any Subsidiary under deferred compensation or other similar arrangements incurred by such person in connection with any Investment permitted hereunder;

(aa)      Guarantees of Indebtedness under customer financing lines of credit entered into in the ordinary course of business and consistent with past practice;

(bb)      Indebtedness consisting of (i) financing of insurance premiums or (ii) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business and consistent with past practice or industry practice; and

(cc)      other Indebtedness in an aggregate outstanding amount not in excess of $25,000,000 at any one time outstanding.

Notwithstanding anything to the contrary set forth herein, no Indebtedness that is incurred pursuant to any clause of Section 8.01 may be used to Refinance any Indebtedness that was incurred pursuant to, or outstanding under, any other clause of Section 8.01; *provided* that Indebtedness incurred pursuant to Section 8.01(k) or (j) may be used to Refinance Indebtedness incurred under any other clause of Section 8.01.

For purposes of determining compliance with this Section 8.01, if the use of proceeds from any incurrence or issuance of Indebtedness is to fund the repayment of any Indebtedness, then such repayment shall be deemed to have occurred substantially simultaneously with such incurrence or issuance so long as (1) such repayment occurs within one Business Day of such incurrence or issuance and (2) the proceeds thereof are deposited with a trustee, agent or other representative for such Indebtedness being repaid pending such repayment.

For purposes of determining compliance with this Section 8.01, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred or assumed (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date that such Indebtedness was incurred or assumed (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); *provided* that if such Indebtedness is incurred, assumed or committed to Refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being Refinanced), and such Refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such Refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the outstanding principal amount of such Indebtedness being Refinanced.

Further, for purposes of determining compliance with this Section 8.01, (A) Indebtedness need not be permitted solely by reference to one category of permitted Indebtedness (or any portion thereof) described in Sections 8.01(a) through (cc) but may be

permitted in part under any combination thereof, (B) in the event that an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Indebtedness (or any portion thereof) described in Sections 8.01(a) through (cc), the Issuer may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 8.01 and at the time of incurrence, assumption, classification or reclassification will be entitled to only include the amount and type of such item of Indebtedness (or any portion thereof) in any of the above clauses (or any portion thereof) and such item of Indebtedness (or any portion thereof) shall be treated as having been incurred, assumed or existing pursuant to only such clause or clauses (or any portion thereof).  Notwithstanding the foregoing, (x) all Indebtedness outstanding under the Second Lien Convertible Notes Indenture shall at all times be deemed to have been incurred in reliance on Section 6.01(r)(i), (y) all Indebtedness outstanding under the Second Lien Renesas Notes Indenture shall at all times be deemed to have been incurred in reliance on Section 6.01(r)(ii) and (iii) all Indebtedness outstanding under the Second Lien Takeback Notes Indenture shall at all times be deemed to have been incurred in reliance on Section 6.01(r)(iii) and, in each case, may not be so reclassified or divided.

SECTION 8.02  Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person) of the Issuer or any Subsidiary at the time owned by it or on any income or revenues or rights in respect of any thereof on or after the Closing Date, except the following (collectively, "Permitted Liens"):

(a)  Liens on property or assets of the Issuer and the Subsidiaries existing on the Closing Date and set forth on Schedule 8.02(a) and any modifications, replacements, renewals or extensions thereof; *provided*, that such Liens shall secure only those obligations that they secure on the Closing Date (and any Permitted Refinancing Indebtedness in respect of such obligations permitted by Section 8.01(a)) and shall not subsequently apply to any other property or assets of the Issuer or any Subsidiary other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien, and (B) proceeds and products thereof;

(b)  any Lien created under the Note Documents or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage;

(c)  [reserved];

(d)  Liens for Taxes, assessments or other governmental charges or levies not yet delinquent by more than 30 days or that are being contested in compliance with Section 7.03 or with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect;

(e)  Liens imposed by law, such as landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's, construction or other like Liens, securing obligations that are not overdue by more than 60 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Issuer or any Subsidiary shall have set aside on its books reserves in accordance with GAAP or with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect;

87

(f)    (i) pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations, (ii) Liens pursuant to Section 8a of the German Partial Retirement Act (*Altersteilzeitgesetz*) or  Section 7d of the German Social Law Act No. 4 (*Sozialgesetzbuch IV*) and (iii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Issuer or any Subsidiary;

(g)    deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capitalized Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, completion guarantees, bids, leases, subleases, licenses and sublicenses, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(h)    zoning and other land use restrictions, easements, survey exceptions, servitudes, trackage rights, leases (other than Capitalized Lease Obligations), subleases, licenses, special assessments, rights-of-way, reservations of rights, covenants, conditions, restrictions and declarations on or with respect to the use of Real Property or liens incidental to the conduct of the business of such Person or to the ownership of its Real Property, servicing agreements, development agreements, site plan agreements and other similar non-monetary encumbrances incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Issuer or any Subsidiary;

(i)    Liens securing Indebtedness incurred under Section 8.01(i); *provided*, that such Liens (i) only apply to assets permitted under Section 8.01(i) and (ii) do not apply to any property or assets of the Issuer or any Subsidiary other than (A) the property or assets acquired, leased, constructed, replaced, repaired or improved with such Indebtedness, (B) after-acquired property that is affixed or incorporated into the property covered by such Lien, and (C) proceeds and products thereof; *provided*, *further*, that individual financings provided by one lender (and its Affiliates) may be cross-collateralized to other financings provided by such lender (and its Affiliates);

(j)    (x) first-priority Liens on the Siler City Assets securing DOE Financing permitted under Section 8.01(l)(x) and (y) first-priority Liens on the Siler City Assets representing a federal interest and security interest in favor of the United States Department of Commerce, the CHIPS Program Office or any other Governmental Authority of the United States securing obligations permitted under Section 8.01(l)(y), so long as, in each case, the Note Obligations are secured on a second-priority basis on such assets and such Indebtedness or other obligations is subject to an Acceptable Intercreditor Agreement;

(k)     Liens securing judgments that do not constitute an Event of Default under Section 10.01(j);

(l)     Liens disclosed by the title insurance policies delivered on or subsequent to the Closing Date and pursuant to the Collateral and Guarantee Requirement, Section 7.10 or Schedule 7.12 and any replacement, extension or renewal of any such Lien; *provided*, that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien, and (B) proceeds and products thereof; *provided*, *further*, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Indenture;

(m)     any interest or title of a lessor or sublessor, licensor or sublicensor under any leases or subleases, licenses or sublicenses entered into by the Issuer or any Subsidiary in the ordinary course of business;

(n)     Liens in the ordinary course of business and consistent with past practice that are contractual rights of set-off and/or pledges of cash collateral (i) relating to the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposits, sweep accounts, reserve accounts or similar accounts of the Issuer or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business and consistent with past practice, including with respect to credit card charge-backs and similar obligations, (iii) relating to purchase orders and other agreements entered into with customers, suppliers or service providers of the Issuer or any Subsidiary or (iv) relating to any other Cash Management Agreement permitted by this Indenture;

(o)     Liens incurred in the ordinary course of business and consistent with past practice or industry practice (i) arising solely by virtue of any statutory or common law provision or customary standard terms relating to banker's liens, rights of set-off or similar rights, (ii) attaching to commodity trading accounts or other commodity brokerage accounts, (iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred and not for speculative purposes, (iv) in respect of Third Party Funds or (v) in favor of credit card companies pursuant to agreements therewith;

(p)     Liens securing obligations in respect of trade-related letters of credit, bankers' acceptances or similar obligations permitted under Section 8.01(f) or (o) and covering the property (or the documents of title in respect of such property) financed by such letters of credit, bankers' acceptances or similar obligations and the proceeds and products thereof;

(q)     leases or subleases, licenses or sublicenses (including with respect to Intellectual Property) granted to others in the ordinary course of business and consistent with past practice or industry practices;

(r)     Liens in favor of customs and revenue authorities arising as a matter of applicable law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and consistent with past practice or industry practice;

(s)     Liens solely on any cash earnest money deposits made by the Issuer or any of the Subsidiaries in connection with any letter of intent or purchase agreement in respect of any Investment permitted to be made hereunder;

(t)     Liens with respect to property or assets of any Subsidiary that is not a Note Party securing obligations of a Subsidiary that is not a Note Party permitted under Section 8.01;

(u)     Liens on any amounts held by a trustee or agent under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof, or under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions to the extent the relevant Indebtedness is permitted to be incurred and discharged, redeemed or defeased, as applicable, hereunder;

(v)     the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business;

(w)     Liens on Collateral securing Indebtedness incurred under Section 8.01(r); provided that, such Liens shall be junior to the Liens securing the Note Obligations and shall be subject to the Permitted Junior Intercreditor Agreement;

(x)     Liens arising from precautionary Uniform Commercial Code financing statements (and similar instruments under the laws of any other jurisdiction) regarding operating leases or other obligations not constituting Indebtedness;

(y)     [Reserved];

(z)     Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof;

(aa)     Liens on cash or Permitted Investments securing letters of credit permitted by Section 8.01(o) or (p); provided that such cash and Permitted Investments do not exceed 105% of the stated face amount of such letters of credit secured thereby;

(bb)     Liens securing insurance premiums financing arrangements; provided, that such Liens are limited to the applicable unearned insurance premiums;

(cc)     in the case of Real Property that constitutes a leasehold interest, any Lien to which the fee simple interest (or any superior leasehold interest) is subject;

(dd)     [Reserved];

(ee)     Liens on not more than $200,000,000 of deposits securing Hedging Agreements entered into for non-speculative purposes;

(ff)     Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit, bank guarantee or bankers' acceptance issued or created for the account of the Issuer or any Subsidiary in the ordinary course of business and consistent with past practice or industry practices; provided, that such Lien secures only the

obligations of the Issuer or such Subsidiaries in respect of such letter of credit, bank guarantee or banker's acceptance to the extent permitted under Section 8.01;

(gg)    [Reserved];

(hh)    Liens securing Guarantees permitted to be secured by Section 8.01(m); *provided* that such Liens shall be subject to the Permitted Junior Intercreditor Agreement;

(ii)    security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business;

(jj)    Liens arising out of conditional sale, title retention or similar arrangements for the sale or purchase of goods by the Issuer or any of the Subsidiaries in the ordinary course of business;

(kk)    customary payment in lieu of tax arrangements and other similar structures customary in the applicable jurisdiction in which assets or properties are located;

(ll)    other Liens with respect to property or assets of the Issuer or any Subsidiary securing obligations in an aggregate outstanding principal amount that, immediately after giving effect to the incurrence of the obligations secured by such Liens, would not exceed $25,000,000; *provided* that any such Liens on the Collateral shall be junior to the Liens securing the Note Obligations [and ●];

(mm)    Liens pursuant to Section 1136 (alone or in conjunction with 1192(1)) of the German Civil Code (*Bürgerliches Gesetzbuch*); and

(nn)    Liens required to be granted under mandatory law in favor of creditors as a consequence of a merger or conversion permitted under the Indenture due to §§ 22, 204 German Transformation Act (*Umwandlungsgesetz—UmwG*).

For purposes of determining compliance with this Section 8.02, (A) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of permitted Liens (or any portion thereof) described in Sections 8.02(a) through (nn) but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens (or any portion thereof) described in Sections 8.02(a) through (nn), the Issuer may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 8.02 and at the time of incurrence, classification or reclassification will be entitled to only include the amount and type of such Lien or such item of Indebtedness secured by such Lien (or any portion thereof) in any of the above clauses (or any portion thereof) and such Lien securing such item of Indebtedness (or any portion thereof) will be treated as being incurred or existing pursuant to only such clause or clauses (or any portion thereof) without giving pro forma effect to such item (or any portion thereof) when calculating the amount of Liens or Indebtedness that may be incurred, classified or reclassified pursuant to any other clause (or any portion thereof) at such time.  Notwithstanding the foregoing, Liens securing any

Indebtedness incurred under Section 8.01(r) shall only be permitted in reliance on the foregoing clause (w) of this Section 8.02.

SECTION 8.03  <u>Sale and Lease-Back Transactions</u>.  Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "<u>Sale and Lease-Back Transaction</u>").

SECTION 8.04  <u>Investments, Loans and Advances</u>.  (i) Purchase or acquire (including pursuant to any merger with a person that is not a Wholly Owned Subsidiary immediately prior to such merger) any Equity Interests, evidences of Indebtedness or other securities of any other person, (ii) make any loans or advances to or Guarantees of the Indebtedness of any other person (other than in respect of intercompany liabilities incurred in connection with the cash management, tax and accounting operations of the Issuer and the Subsidiaries) or (iii) purchase or otherwise acquire, in one transaction or a series of related transactions, (x) all or substantially all of the property and assets or business of another person or (y) assets constituting a business unit, line of business or division of such person (each of the foregoing, an "<u>Investment</u>"), in each case, on or after the Closing Date, except:

(a)      [Reserved];

(b)      (i) Investments by the Issuer or any Subsidiary in the Equity Interests of the Issuer or any Subsidiary; (ii) intercompany loans from the Issuer or any Subsidiary to the Issuer or any Subsidiary; and (iii) Guarantees by the Issuer or any Subsidiary of Indebtedness or other obligations permitted pursuant to <u>Section 8.01</u> (except to the extent such Guarantee is expressly subject to this <u>Section 8.04</u>); <u>provided</u> that (x) the aggregate amount of Investments made pursuant to this clause (b) by Note Parties in Subsidiaries that are not Note Parties and Guarantees made pursuant to this clause (b) by any Note Party of Indebtedness or other obligations of any Subsidiary that is not a Note Party shall not exceed $10,000,000 per fiscal year and (y) any Investment by any Note Party in any Subsidiary in the form of cash or Permitted Investments shall only be permitted to the extent such Investment was made in reliance on the foregoing clause (x) of this proviso;

(c)      Permitted Investments;

(d)      Investments arising out of the receipt by the Issuer or any Subsidiary of non-cash consideration for the Disposition of assets permitted under <u>Section 8.05</u> (other than clause (c) of <u>Section 8.05</u>);

(e)      loans and advances to officers, directors, employees or consultants of the Issuer or any Subsidiary (i) in the ordinary course of business in an aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) not to exceed $5,000,000, (ii) in respect of payroll payments and expenses in the ordinary course of business and consistent with past practice or industry practice and (iii) in connection with such person's purchase of Equity Interests of the Issuer solely to the extent

that the amount of such loans and advances shall be contributed to the Issuer in cash as common equity;

(f)       accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and consistent with past practice or industry practices and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(g)       Hedging Agreements entered into for non-speculative purposes in the ordinary course of business;

(h)       Investments existing on, or contractually committed as of, or contemplated as of, the Closing Date and set forth on Schedule 8.04 and any extensions, renewals, replacements or reinvestments thereof, so long as the aggregate amount of all Investments pursuant to this clause (h) is not increased at any time above the amount of such Investment existing, committed or contemplated on the Closing Date;

(i)       Investments resulting from pledges and deposits under Sections 8.02(f), (g), (n), (o), (r), (s), (u), (aa), (bb), (ee) and (ll);

(j)       Investments in the ordinary course of business and consistent with past practice by Note Parties into Subsidiaries that are not Note Parties on a transfer pricing basis to fund expenses of such Subsidiaries;

(k)       [Reserved];

(l)       any Permitted Bond Hedge Transaction or Permitted Warrant Transaction, to the extent constituting Investments;

(m)       Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business and consistent with past practice or industry practices or Investments acquired by the Issuer or a Subsidiary as a result of a foreclosure by the Issuer or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(n)       Investments of a Subsidiary acquired after the Closing Date or of a person merged into the Issuer or merged into or consolidated with a Subsidiary after the Closing Date, in each case, (i) to the extent such acquisition, merger or consolidation is permitted under this Section 8.04, (ii) in the case of any acquisition, merger or consolidation, in accordance with Section 8.05 and (iii) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(o)       other Investments in an aggregate amount not to exceed $50,000,000 at any one time outstanding; *provided* that no Investments may be made pursuant to this Section

93

8.04(o) in any Subsidiary, unless such Investment constitutes the acquisition of additional Equity Interests in a non-Wholly Owned Subsidiary;

(p)       Guarantees by the Issuer or any Subsidiary of operating leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into by the Issuer or any Subsidiary in the ordinary course of business and consistent with past practice or industry practices;

(q)       Investments to the extent that payment for such Investments is made with (or that are received in exchange for) Equity Interests of the Issuer or the cash proceeds of Equity Interests of the Issuer;

(r)       [Reserved];

(s)       Investments consisting of Restricted Payments permitted under Section 8.06 (and without duplication of any baskets thereunder);

(t)       Investments in the ordinary course of business and consistent with past practice or industry practice consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers;

(u)       [Reserved];

(v)       [Reserved];

(w)       advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Issuer or such Subsidiary;

(x)       [Reserved];

(y)       [Reserved];

(z)       [Reserved]; and

(aa)      to the extent constituting Investments, (i) purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or non-exclusive licenses or leases of Intellectual Property in each case in the ordinary course of business and consistent with past practice and not constituting all or substantially all of the assets of another person and (ii) development and expansion Capital Expenditures (which shall exclude, for the avoidance of doubt, any acquisition of Equity Interests of any person).

Any Investment in any person other than a Note Party that is otherwise permitted by this Section 8.04 may be made through intermediate Investments in Subsidiaries that are not Note Parties and such intermediate Investments shall be disregarded for purposes of determining the outstanding amount of Investments pursuant to any clause set forth above.  The amount of any Investment made other than in the form of cash or cash equivalents shall be the fair market

value thereof (as determined by the Issuer in good faith) valued at the time of the making thereof, and without giving effect to any subsequent write-downs or write-offs thereof.

For purposes of determining compliance with this covenant, an Investment need not be permitted solely by reference to one category of permitted Investments (or portion thereof) described in the above clauses but may be permitted in part under any combination thereof.

Notwithstanding anything to the contrary contained in Section 8.02, 8.04, 8.05 or 8.07, except as expressly set forth in item 1 of Schedule 8.05, neither the Issuer nor any Subsidiary shall be permitted to make any Investment of any Material IP into any person (including any Subsidiary) or Dispose of any Material IP (including to any Subsidiary) unless, (a) in the case of an Investment, at all times after giving effect to the consummation of such Investment, such Material IP is subject to a first-priority Lien securing the Note Obligations and (b) in the case of a Disposition of any Material IP, such Disposition consists of a non-exclusive license of such Material IP and such Material IP remains subject to a first-priority Lien securing the Note Obligations; *provided* that such non-exclusive license shall (X) if to a Subsidiary, be subject to recurring royalties, payment terms or other consideration negotiated consistent with an arm's length transaction, and (Y) otherwise (other than in subclause (X) immediately preceding), be entered into in the ordinary course of business.

SECTION 8.05  Mergers, Consolidations, Sales of Assets and Acquisitions. Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or Dispose of any Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of related transactions) all of the assets of any other person or division or line of business of a person, in each case, on or after the Closing Date, except that this Section 8.05 shall not prohibit:

(a)      (i) the purchase and Disposition of inventory in the ordinary course of business by the Issuer or any Subsidiary, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business by the Issuer or any Subsidiary or, with respect to operating leases, otherwise for fair market value on market terms (as determined in good faith by the Issuer), (iii) the Disposition of surplus, obsolete, damaged or worn out equipment or other property in the ordinary course of business by the Issuer or any Subsidiary, (iv) the Disposition of tools, equipment and similar property in exchange for, or the proceeds of the Disposition of which will be applied towards the purchase price of, new or replacement tools, equipment or similar property or (v) the Disposition of Permitted Investments in the ordinary course of business;

(b)      if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing or would result therefrom, (i) the merger, amalgamation or consolidation of any Subsidiary with or into the Issuer in a transaction in which the Issuer is the survivor, (ii) the merger, amalgamation or consolidation of any Subsidiary with or into any Subsidiary Guarantor in a transaction in which the surviving or resulting entity is or becomes a Subsidiary Guarantor and, in the case of each of clauses (i) and (ii), no person other than the Issuer or a Subsidiary Guarantor receives any consideration (unless otherwise permitted

by Section 8.04), (iii) the merger, amalgamation or consolidation of any Subsidiary that is not a Subsidiary Guarantor with or into any other Subsidiary that is not a Subsidiary Guarantor, (iv) the liquidation or dissolution or change in form of entity of any Subsidiary if the Issuer determines in good faith that such liquidation, dissolution or change in form is in the best interests of the Issuer and is not materially disadvantageous to the Noteholder Parties, (v) any Subsidiary may merge, amalgamate or consolidate with any other person (other than the Issuer) in order to effect an Investment permitted pursuant to Section 8.04 so long as the continuing or surviving person shall be a Subsidiary Guarantor (unless otherwise permitted by Section 8.04), which shall be a Note Party if the merging or consolidating Subsidiary was a Note Party (unless otherwise permitted by Section 8.04) and which together with each of its Subsidiaries shall have complied with any applicable requirements of Section 7.10 or (vi) any Subsidiary may merge, amalgamate or consolidate with any other person in order to effect an Asset Sale otherwise permitted pursuant to this Section 8.05;

(c)     Dispositions (i) to the Issuer or a Subsidiary Guarantor (upon voluntary liquidation or otherwise), (ii) [reserved] or (iii) by any Subsidiary that is not a Note Party to the Issuer or any Subsidiary;

(d)     [Reserved];

(e)     Investments permitted by Section 8.04 (including any merger, amalgamation or consolidation in order to effect such Investments) and Restricted Payments permitted by Section 8.06;

(f)     Dispositions of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(g)     other Dispositions of assets to a person that is not an Affiliate of any Note Party; *provided*, that (i) at the time of the execution of the definitive documentation for such Disposition, no Event of Default shall exist or would result from such Disposition, (ii) the requirements of the fourth to last paragraph of this Section 8.05 shall apply to such Disposition and (iii) the Net Proceeds thereof, if any, are applied in accordance with Section 3.02(b);

(h)     [Reserved];

(i)     leases or subleases or licenses or sublicenses of any real or personal property (including licenses of Intellectual Property) in the ordinary course of business and consistent with past practice or industry practices;

(j)     Dispositions of inventory or Dispositions or abandonment of Intellectual Property of the Issuer and its Subsidiaries determined in good faith by the management of the Issuer to be no longer useful or necessary in the operation of the business of the Issuer or any of the Subsidiaries;

(k)     other Dispositions for fair market value as determined in good faith by the Issuer (acting in its reasonable discretion) with an aggregate value not in excess of $10,000,000 per fiscal year;

(l)       dedications or dispositions of roads constituting Real Property, or the granting of easements, rights of way, rights of access and/or similar rights in Real Property, to any Governmental Authority, utility providers, cable or other communication providers and/or other parties providing services or benefits to any project that, would not reasonably be expected to interfere in any material respect with the operations of the Issuer and its Subsidiaries; *provided* that upon request by the Issuer accompanied by the documents required by Section 15.12, Collateral Agent shall (i) release its Mortgage on the portions of such Real Property dedicated or disposed of or (ii) subordinate its Mortgage on such Real Property to such easement, right of way, right of access or similar agreement, in each case, in such form as is reasonably satisfactory to Collateral Agent and the Issuer;

(m)      Dispositions contractually committed as of, or contemplated as of, the Closing Date and set forth on Schedule 8.05;

(n)      to the extent constituting an Asset Sale, any termination, settlement or extinguishment of Hedging Agreements or other contractual obligations; and

(o)      if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing or would result therefrom, any Subsidiary or any other person may be merged, amalgamated or consolidated with or into the Issuer, *provided* that (A) the Issuer shall be the surviving entity or (B) if the surviving entity is not the Issuer (such other person, the "Successor Issuer"), (1) the Successor Issuer shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Issuer shall expressly assume all the obligations of the Issuer under this Indenture and the other Note Documents pursuant to a supplement and/or amendment hereto or thereto in form reasonably satisfactory to the Trustee (acting at the direction of the Required Noteholder Parties), (3) each Subsidiary Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Subsidiary Guarantee Agreement confirmed that its guarantee thereunder shall apply to any Successor Issuer's obligations under this Indenture, (4) each Subsidiary Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to any applicable Security Document affirmed that its obligations thereunder shall apply to its guarantee as reaffirmed pursuant to clause (3), (5) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have affirmed that its obligations under the applicable Mortgage shall apply to its guarantee as reaffirmed pursuant to clause (3) and (6) the Successor Issuer shall have delivered to the Trustee an Officer's Certificate stating that such merger or consolidation does not violate this Indenture or any other Note Document (it being understood that if the foregoing are satisfied, the Successor Issuer will succeed to, and be substituted for, the Issuer under this Indenture).

Notwithstanding anything to the contrary contained in Section 8.05 above, (I) no Disposition of assets under Section 8.05(g) shall be permitted unless (i) such Disposition is for fair market value (as determined in good faith by the Issuer acting in its reasonable discretion) and such fair market value is no less than the net book value of the assets subject to such Disposition and (ii) at least 90% of the proceeds of such Disposition consists of cash and (II) neither the Issuer nor any Subsidiary shall be permitted to Dispose of any Material IP to any person that is not a Note Party, except for non-exclusive licenses.

Upon request by the Issuer, the Trustee (acting at the direction of the Required Noteholder Parties) shall direct the Collateral Agent on behalf of the Noteholder Parties to provide the tenant under any lease or sublease permitted hereunder with a subordination, non-disturbance and attornment agreement in such form as is reasonably satisfactory to the Trustee (acting at the direction of the Required Noteholder Parties).

To the extent any Collateral is sold, contributed, distributed, transferred or disposed of in a transaction expressly permitted by this Section 8.05 to any person other than a Note Party, such Collateral shall be sold, contributed, distributed, transferred or disposed of free and clear of the Liens created by the Note Documents, and the Trustee and the Collateral Agent shall take, and is hereby authorized by each Noteholder Party to take, any actions reasonably requested by the Issuer in order to evidence the foregoing.

For purposes of determining compliance with this covenant, a Disposition need not be permitted solely by reference to one category of permitted Dispositions (or portion thereof) described in the above clauses but may be permitted in part under any combination thereof.

SECTION 8.06  Dividends and Distributions.  Declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of the Issuer's Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the person redeeming, purchasing, retiring or acquiring such shares) (all of the foregoing, "Restricted Payments"), in each case, on or after the Closing Date; provided, however, that:

(a)      Restricted Payments may be made to the Issuer or to any Wholly-Owned Subsidiary of the Issuer (or, in the case of non-Wholly-Owned Subsidiaries, to the Issuer or any Subsidiary of the Issuer that is a direct or indirect parent of such Subsidiary and to each other owner of Equity Interests in such Subsidiary on a pro rata basis (or more favorable basis from the perspective of the Issuer or such Subsidiary) based on their relative ownership interests);

(b)      [Reserved];

(c)      Restricted Payments may be made to purchase or redeem the Equity Interests of the Issuer (including related stock appreciation rights or similar securities) held by then present or former directors, consultants, officers or employees of the Issuer or any of the Subsidiaries or by any Plan or any shareholders' agreement then in effect upon such person's death, disability, retirement or termination of employment or under the terms of any such Plan or any other agreement under which such shares of stock or related rights were issued; provided, that the aggregate amount of such purchases or redemptions under this clause (c) shall not exceed in any fiscal year $5,000,000 (plus (x) the amount of net proceeds contributed to the Issuer that were (x) received by the Issuer during such fiscal year from sales of Equity Interests of the Issuer to directors, consultants, officers or employees of the Issuer or any Subsidiary in

connection with permitted employee compensation and incentive arrangements, (y) the amount of net proceeds of any key-man life insurance policies received during such calendar year, and (z) the amount of any cash bonuses otherwise payable to present or former directors, consultants, officers or employees in such fiscal year that are foregone in return for the receipt of Equity Interests), which, if not used in any year, may be carried forward to any subsequent calendar year; and *provided*, *further*, that cancellation of Indebtedness owing to the Issuer or any Subsidiary from present or former directors, consultants, officers and employees of the Issuer or its Subsidiaries in connection with a repurchase of Equity Interests of the Issuer will not be deemed to constitute a Restricted Payment for purposes of this Section 8.06;

(d)     the Issuer may make non-cash repurchases of Equity Interests deemed to occur upon exercise of stock options if such Equity Interests represent a portion of the exercise price of such options;

(e)     if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would result therefrom, Restricted Payments may be made by the Issuer in the form of regularly scheduled dividends on Permitted Disqualified Stock;

(f)     Restricted Payments may be made by the Issuer in form of Equity Interests of the Issuer in connection with the redemption of any Convertible Notes; and

(g)     Restricted Payments may be made by the Issuer to pay in cash, in lieu of the issuance of fractional shares, upon the exercise of warrants or upon the conversion or exchange of Equity Interests of the Issuer or upon the conversion of any Convertible Notes; *provided*, that the aggregate amount of Restricted Payments made in reliance on this clause (g) shall not exceed $250,000.

SECTION 8.07  Transactions with Affiliates.

(a)     Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates on or after the Closing Date, unless such transaction is (i) upon terms that are no less favorable to the Issuer or such Subsidiary, as applicable, in any material respect than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate and (ii) if in connection with any transaction or series of transactions with a fair market value greater than $1,000,000, approved by a majority of the Disinterested Directors of the Issuer.

(b)     The foregoing clause (a) shall not prohibit, to the extent otherwise permitted under this Indenture,

(i)     any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, equity purchase agreements, stock options and stock ownership plans approved by the Board of Directors of the Issuer;

(ii)     loans and advances to officers, directors, employees or consultants of the Issuer or any Subsidiary permitted by Section 8.04(e);

99

(iii)    transactions among the Issuer or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction (including via merger, consolidation or amalgamation in which the Issuer or a Subsidiary is the surviving entity);

(iv)    the payment of fees, reasonable out-of-pocket costs and indemnities to directors, officers, consultants and employees the Issuer and the Subsidiaries in the ordinary course of business;

(v)    transactions, agreements and arrangements in existence on the Closing Date and set forth on Schedule 8.07 or any amendment thereto or replacement thereof or similar arrangement to the extent such amendment, replacement or arrangement is not adverse to the Noteholder Parties in any material respect;

(vi)    (A) any employment, independent contractor or consulting agreements entered into by the Issuer or any of the Subsidiaries in the ordinary course of business, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, consultants, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto;

(vii)    Restricted Payments permitted under Section 8.06 and Investments permitted under Section 8.04;

(viii)    [Reserved];

(ix)    [Reserved];

(x)    transactions for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business and consistent with past practice or industry practice;

(xi)    any transaction in respect of which the Issuer delivers to the Trustee a letter addressed to the Board of Directors of the Issuer from an accounting, appraisal or investment banking firm, in each case of nationally recognized standing that is in the good faith determination of the Issuer qualified to render such letter, which letter states that (i) such transaction is on terms that are substantially no less favorable to the Issuer or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate or (ii) such transaction is fair to the Issuer or such Subsidiary, as applicable, from a financial point of view;

(xii)    [Reserved];

(xiii)    transactions with joint ventures for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business and consistent with past practice;

(xiv)    [Reserved];

(xv)      [Reserved];

(xvi)     [Reserved];

(xvii)    [Reserved];

(xviii)   [Reserved];

(xix)     [Reserved];

(xx)      [Reserved];

(xxi)     transactions between the Issuer or any of the Subsidiaries and any person, a director of which is also a director of the Issuer; *provided*, *however*, that (A) such director abstains from voting as a director of the Issuer on any matter involving such other person and (B) such person is not an Affiliate of the Issuer for any reason other than such director's acting in such capacity;

(xxii)    transactions permitted by, and complying with, the provisions of Section 8.05; and

(xxiii)   intercompany transactions undertaken in good faith (as certified by a Responsible Officer of the Issuer) for the purpose of improving the consolidated tax efficiency of the Issuer and the Subsidiaries which do not circumvent any covenant set forth herein.

SECTION 8.08  Business of the Issuer and the Subsidiaries.  Notwithstanding any other provisions hereof, engage at any time in any material business or business activity materially different from any business or business activity (x) conducted by any of them on the Closing Date or (y) contemplated by any of them on the Closing Date and disclosed to the Noteholders on or prior to the Closing Date and, in each case, any business or activity reasonably related or incidental thereto and reasonable extensions thereof.

SECTION 8.09  Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.

(a)       Amend or modify in any manner materially adverse to the Noteholder Parties (as reasonably determined by the Issuer), or grant any waiver or release under or terminate in any manner (if such granting or termination shall be materially adverse to the Noteholder Parties (as reasonably determined by the Issuer)), the articles or certificate of incorporation, by-laws, limited liability company operating agreement, partnership agreement or other organizational documents of the Issuer or any Subsidiary.

(b)       (i) Make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of, or in respect of, principal of or interest on any Junior Financing, or any payment (whether at maturity or otherwise) or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination in respect of any Junior Financing, in each case, on or after the Closing Date, except for:

(A)    repayments, prepayments, redemptions or repurchases of any Junior Financing at a price not to exceed the principal amount thereof, plus accrued and unpaid interest and underwriting discounts, commissions and reasonable fees and expenses, with the proceeds of Permitted Refinancing Indebtedness expressly permitted under Section 8.01 solely to the extent such Permitted Refinancing Indebtedness has an interest rate and a cash component of any interest rate, in each case, equal to or less than the Junior Financing it Refinanced;

(B)    payments of regularly-scheduled interest due on any Junior Financing (i) that is issued and outstanding on the Closing Date, (ii) that is issued following the Closing Date in the principal amount and with the interest rate set forth in the Bankruptcy Plan or (iii) that constitutes Permitted Refinancing Indebtedness in respect of any Junior Financing referred to in clauses (i) or (ii) of this Section 8.09(b)(i)(B) solely to the extent such Permitted Refinancing Indebtedness has an interest rate and a cash component of any interest rate, in each case, equal to or less than the Junior Financing it Refinanced;

(C)    purchases of all or any portion of any Junior Financing at a price not to exceed the principal amount thereof, plus accrued and unpaid interest and reasonable fees and expenses thereon, with the proceeds of the substantially concurrent issuance or sale of common Equity Interests of the Issuer;

(D)    the conversion or exchange of any Junior Financing to common Equity Interests of the Issuer; *provided* that, such conversion or exchange is accompanied by permanent reductions of any commitments, if any, with respect to such Junior Financing to the extent of such conversion or exchange, to the extent applicable; and

(E)    the payment of cash in lieu of fractional shares; *provided* that, the aggregate amount of such cash paid in lieu of fractional shares shall not exceed $250,000.

(ii)    On or after the Closing Date, (x) amend or modify, or permit the amendment or modification of, any provision of any Junior Financing, or any agreement, document or instrument evidencing or relating thereto, other than amendments or modifications that are not adverse to Noteholder Parties (it being understood that any increase in the principal amount of, interest payable in respect of (including any cash component thereof) or fees payable in connection with, any Junior Financing or any change in the form of payment of any principal amount, interest or fees in respect of any Junior Financing is adverse to the Noteholder Parties) and that do not affect the lien subordination or payment subordination provisions thereof (if any) in a manner adverse to the Noteholder Parties or (y) amend or modify, or permit the amendment or modification of any agreement, document or instrument evidencing or relating thereto, if such amendment or modification affects the lien subordination or payment subordination provisions thereof (if any) in a manner adverse to the Noteholder Parties.

(c)     On or after the Closing Date, permit any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances to the Issuer or any Subsidiary that is a direct or indirect parent of such Subsidiary or (ii) the granting of Liens by the Issuer or such Subsidiary that is a Note Party pursuant to the Security Documents, in each case other than those arising under any Note Document, except, in each case, restrictions existing by reason of:

(A)     restrictions imposed by applicable law;

(B)     contractual encumbrances or restrictions in effect on the Closing Date, including under the Second Lien Indentures and any other Indebtedness existing on the Closing Date and set forth on Schedule 8.01;

(C)     any restriction on a Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Equity Interests or assets of a Subsidiary pending the closing of such sale or disposition;

(D)     any encumbrances or restrictions of the type referred to in Sections 8.09(c)(i) and 8.09(c)(ii) imposed by any agreement relating to Indebtedness incurred pursuant to Section 8.01(l);

(E)     any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Indenture to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(F)     any restrictions imposed by any agreement relating to Indebtedness or other obligations incurred pursuant to Section 8.01 to the extent such restrictions are not more restrictive in any material respect than the restrictions contained in this Indenture or are market terms at the time of issuance (as reasonably determined by the Issuer);

(G)     customary provisions contained in leases or licenses of Intellectual Property and other similar agreements entered into in the ordinary course of business and consistent with past practice or industry practice;

(H)     customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(I)     customary provisions restricting assignment of any agreement entered into in the ordinary course of business and consistent with past practice or industry practice;

(J)     customary restrictions and conditions contained in any agreement relating to the sale, transfer, lease or other disposition of any asset permitted under Section 8.05 pending the consummation of such sale, transfer, lease or other disposition;

(K)     customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is a Permitted Lien and such restrictions or

103

conditions relate only to the specific asset subject to such Lien, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 8.09;

(L)     customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as the Issuer has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Issuer and its Subsidiaries to meet their ongoing obligations;

(M)     any agreement in effect at the time such subsidiary becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary;

(N)     customary provisions in joint venture agreements and other similar agreements;

(O)     customary restrictions contained in leases, subleases, licenses or Equity Interests or asset sale agreements otherwise permitted hereby as long as such restrictions relate to the Equity Interests and assets subject thereto;

(P)     restrictions on cash or other deposits imposed by customers or counterparties under contracts entered into in the ordinary course of business (and including with respect to any cash collateral permitted to be provided to any counterparty under Section 8.02); and

(Q)     any encumbrances or restrictions of the type referred to in Sections 8.09(c)(i) and 8.09(c)(ii) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of or similar arrangements or the contracts, instruments or obligations referred to in clauses (A) through (P) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings or similar arrangements are, in the good faith judgment of the Issuer, not more restrictive in any material respect with respect to such dividend, other payment and Lien restrictions than those contained in the dividend, other payment and Lien restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing or similar arrangements or are otherwise in accordance with the terms of the applicable intercreditor agreement.

SECTION 8.10  Fiscal Year.  In the case of the Issuer or any Subsidiary, permit any change to its fiscal year without the prior written consent of the Required Noteholder Parties (with communication of such consent to be delivered to the Issuer by the Trustee at the direction of the Required Noteholder Parties), in which case, the Issuer and the Required Noteholder Parties will, and are hereby authorized by the Noteholder Parties to, make any adjustments to this Indenture that are necessary to reflect such change in fiscal year (with communication of such authorization to be delivered to the Issuer by the Trustee at the direction of the Required Noteholder Parties).

SECTION 8.11  Liquidity Covenant.  The Note Parties shall not, in the aggregate, as of the last day of any calendar month have less than $375,000,000 (the "Minimum Liquidity Threshold") of cash and Permitted Investments that are (a) not classified as "restricted" on the balance sheet of the Note Parties as of such date (other than in favor of the Note Obligations and the Second Lien Notes (and any Permitted Refinancing Indebtedness in respect thereof)), (b) not subject to any Lien other than any Lien permitted pursuant to Section 8.02(b) or 8.02(w) or Lien of the type referred to in Section 8.02(n) or (o) in favor of the related bank or financial institution and (c) subject to Section 7.14, maintained in Deposit Accounts and Securities Accounts in the name of a Note Party in the United States (or in any foreign jurisdiction where the Collateral Agent has been granted a perfected first lien security interest) as of such date, which cash or Permitted Investments are subject to an Account Control Agreement providing for springing control to the Collateral Agent upon the issuance of a notice of exclusive control or other similar notice (it being agreed that the Collateral Agent would have the right to issue such notice only upon and during the continuance of any Control Triggering Event) (such eligible cash and Permitted Investments, the "Qualified Cash").  The Note Parties shall not at any time knowingly allow, or knowingly take any action to cause, the amount of Qualified Cash held by the Note Parties to be below the amount which would be required by this Section 8.11 as of the last day of the current calendar month (including as a result of the cash and Permitted Investments held by the Note Parties not satisfying the requirements of this Section 8.11).  To the extent that the Note Parties have actual knowledge that the amount of Qualified Cash held by the Note Parties at any time is below the amount which would be required by this Section 8.11 as of the last day of the current calendar month (including as a result of any cash and Permitted Investments held by the Note Parties not satisfying the requirements of this Section 8.11), (x) except for the making of any payments or deposits required to operate the Issuer's business in the ordinary course and consistent with past practice, the Note Parties shall not allow, or take any action to cause, the amount of Qualified Cash held by the Note Parties to be reduced any further or any Qualified Cash held by the Note Parties to cease to satisfy the requirements of this Section 8.11 and (y) the Note Parties and their Subsidiaries shall use their reasonable best efforts to promptly increase the amount of Qualified Cash held by the Note Parties to an amount equal to (or greater than) the amount of Qualified Cash that would be required to be held by the Note Parties pursuant to this Section 8.11 as of the last day of the current calendar month and cause all cash and Permitted Investments held by the Note Parties to satisfy the requirements of this Section 8.11.

SECTION 8.12  Compliance with ERISA.  Cause or suffer to exist (a) any event that could result in the imposition of a Lien on any asset of the Issuer or any Subsidiary with respect to any Pension Plan or Multiemployer Plan or (b) any other ERISA Event, that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 8.13  Compliance with Anti-Terrorism and Anti-Corruption Laws and Sanctions.  No Note Party shall:

(a)  (i) violate any Anti-Terrorism Laws or Anti-Corruption Laws, (ii) engage in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering or "specified unlawful activities" under 18 U.S.C. §1956, (iii) become (including by virtue of being majority owned by or controlled by a Sanctioned Person), own or

control a Sanctioned Person or any other Sanctioned Person or (iv) knowingly permit any of their respective Affiliates to violate these laws or engage in these actions.

(b)     use, directly or knowingly indirectly, the proceeds of the Notes, or lend, contribute or otherwise make available such proceeds to any person, (x) to fund any activities or business of or with any Sanctioned Person or Sanctioned Country in violation of Sanctions, or (y) in any other manner that would result in a violation of Sanctions or any Anti-Terrorism Laws or Anti-Corruption Laws by any person (including any person participating in the Notes, whether as underwriter, advisor, investor, or otherwise).

(c)     (i) deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or Sanctions, or (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempt to violate, any of the prohibitions set forth in any Anti-Terrorism Law or Sanctions or (iii) knowingly permit any of their respective Affiliates to do any of the foregoing.

(d)     The covenants under this Section 8.13 will not apply to any Foreign Subsidiary if and to the extent that the compliance with, these covenants result in a breach of, violate, conflict with  or expose such entity or any director, officer or employee thereof to any liability under EU Regulation (EC) 2271/96 (or any associated implementing law or regulation in any member state of the European Union) or section 7 of the German Foreign Trade Regulation (*Verordnung zur Durchführung des Außenwirtschaftsgesetzes  Außenwirtschaftsverordnung – AWV*)) in connection with the German Foreign Trade Law (*Außenwirtschaftsgesetz*), or any similar law of any other jurisdiction, as applicable.

## ARTICLE IX.

## [RESERVED]

## ARTICLE X.

## DEFAULTS AND REMEDIES

SECTION 10.01  Events of Default.  In case of the happening of any of the following events (each, an "Event of Default"):

(a)     any representation or warranty made or deemed made by the Issuer or any Subsidiary herein or in any other Note Document or any certificate or document delivered pursuant hereto or thereto shall prove to have been false or misleading in any material respect (without duplication of any materiality qualifier therein) when so made or deemed made;

(b)     default shall be made in the payment of any principal of any Note when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for redemption or repurchase thereof or by acceleration thereof or otherwise;

(c)     default shall be made in the payment of any interest on any Note or in the payment of any Fee or any other amount (other than an amount referred to in clause (b) above)

due under any Note Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five Business Days;

(d)     default shall be made in the due observance or performance by the Issuer or any Subsidiary of any covenant, condition or agreement contained in <u>Section 7.01(a)</u>, <u>7.05(a)</u> or in <u>Article VIII</u>;

(e)     default shall be made in the due observance or performance by the Issuer or any Subsidiary of (i) any covenant, condition or agreement contained in <u>Section 7.04</u> (other than <u>Section 7.04(e)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> or <u>(i)</u>), <u>7.05(d)</u> or <u>7.14</u> and such default shall continue unremedied for a period of five (5) Business Days after the earlier of (x) any Responsible Officer of a Noteholder Party shall become aware of such default and (y) notice thereof from the Trustee or a Noteholder Party to the Issuer or (ii) any covenant, condition or agreement contained in any Note Document (other than those specified in clauses (b), (c), (d) and (e)(i) above) and such default shall continue unremedied for a period of 30 days after the earlier of (x) any Responsible Officer of a Noteholder Party shall become aware of such default and (y) notice thereof from the Trustee or a Noteholder Party to the Issuer;

(f)     (i) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity (other than (x) any event which triggers any conversion right of holders of Convertible Notes or (y) the actual conversion and settlement of such conversion of such Convertible Notes, in each case that is not a default or event of default under such Convertible Notes); or (ii) the Issuer or any Subsidiary fails to pay the principal of any Material Indebtedness at the stated final maturity thereof; *provided*, that this clause (f) shall not apply to any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness;

(g)     [reserved];

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of the Issuer or any of the Subsidiaries, or of a substantial part of the property or assets of the Issuer or any Subsidiary, under the Bankruptcy Code, as now constituted or hereafter amended, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Issuer or any of the Subsidiaries or for a substantial part of the property or assets of the Issuer or any of the Subsidiaries or (iii) the winding-up or liquidation of the Issuer or any Subsidiary (except in a transaction permitted hereunder); and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     the Issuer or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code, as now constituted or hereafter amended, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (h) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar

107

official for the Issuer or any of the Subsidiaries or for a substantial part of the property or assets of the Issuer or any Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) become unable or admit in writing its inability or fail generally to pay its debts as they become due;

(j)     the failure by the Issuer or any Subsidiary to pay one or more final judgments aggregating in excess of $75,000,000 (to the extent not covered by insurance), which judgments are not discharged or effectively waived or stayed for a period of 45 consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Issuer or any Subsidiary to enforce any such judgment;

(k)     (i) one or more ERISA Events shall have occurred, or (ii) there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability); or (iii) there is or arises any potential Withdrawal Liability if the Issuer, any Subsidiary or any ERISA Affiliate were to withdraw completely from one or more Multiemployer Plans; and the liability of the Issuer, any Subsidiary and any ERISA Affiliates contemplated by the foregoing clauses (i), (ii) and (iii), either individually or in the aggregate, has had, or would be reasonably expected to have, a Material Adverse Effect;

(l)     (i) any Note Document shall for any reason be asserted in writing by the Issuer or any Subsidiary not to be a legal, valid and binding obligation of any party thereto (other than in accordance with its terms), (ii) any security interest purported to be created by any Security Document and to extend to assets that constitute a material portion of the Collateral shall cease to be, or shall be asserted in writing by the Issuer or any other Note Party not to be (other than, in each case, in accordance with its terms), a valid and perfected security interest (perfected as or having the priority required by this Indenture or the relevant Security Document and subject to such limitations and restrictions as are set forth herein and therein) in the securities, assets or properties covered thereby, except from the failure of the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Agreement, (iii) (A) any of the Note Obligations of the Note Parties under the Note Documents for any reason shall cease to be, or shall be asserted in writing by the Issuer or any other Note Party not to be, "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in, any Junior Financing documentation or (B) the subordination provisions set forth in any Junior Financing documentation shall, in whole or in part, cease to be, or shall be asserted in writing by the Issuer or any other Note Party not to be, effective or legally valid, binding and enforceable against the holders of any Junior Financing, if applicable or (iv) a material portion of the Guarantees pursuant to the Security Documents by the Subsidiary Guarantors guaranteeing the Note Obligations shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by any Subsidiary Guarantor not to be in effect or not to be legal, valid and binding obligations (other than in accordance with the terms thereof); *provided*, that no Event of Default shall occur under this Section 10.01(l) if the Note Parties cooperate with the Collateral Agent to replace or perfect such security interest and Lien, such security interest and Lien is replaced and the rights, powers and privileges of the Secured Parties are not materially adversely affected by such replacement; or

(m)     any provisions of the First Lien/Second Lien Intercreditor Agreement or any other Intercreditor Agreement (following the effectiveness thereof) shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or the Note Obligations or the Liens securing the Note Obligations, for any reason, shall not have the priority contemplated by this Indenture.

then, and in every such event (other than an event with respect to the Issuer described in clause (h) or (i) above), and at any time thereafter during the continuance of such event, the Trustee, at the written request of the Required Noteholder Parties, shall, by notice to the Issuer, take any or all of the following actions, at the same or different times:  declare the Notes then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Notes so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Issuer accrued hereunder and under any other Note Document (including any amounts required under Section 3.02), shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained herein or in any other Note Document to the contrary notwithstanding; and in any event with respect to the Issuer described in clause (h) or (i) above, the principal of the Notes then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Issuer accrued hereunder and under any other Note Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained herein or in any other Note Document to the contrary notwithstanding.

Notwithstanding any other provision of this Indenture, the right of any Noteholder of a Note to receive payment of principal of, or premium, if any, and interest of the Note (including liquidated damages) on or after the respective due dates expressed in the Note, or to bring suit for the enforcement of any such payment on or after such respective dates, is absolute and unconditional and shall not be impaired or affected without the consent of the Noteholder.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorney's fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This paragraph does not apply to a suit by the Trustee, a suit by a Noteholder pursuant to the immediately preceding paragraph, or a suit by Noteholders of more than 10% in principal amount of the then outstanding Notes.

If an Event of Default in payment of principal, premium or interest specified in Section 10.01(b) or (c) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any Subsidiary Guarantor (or any other obligor on the Notes) for the whole amount of unpaid principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent that payment of such interest is lawful, interest on overdue installments of interest, in each case at the rate set forth in the Notes, and such further amounts as shall be sufficient to cover the costs and expenses

of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 11.07) and the Noteholders allowed in any judicial proceedings relative to the Issuer or any Subsidiary Guarantor (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same after deduction of its charges and expenses to the extent that any such charges and expenses are not paid out of the estate in any such proceedings and any custodian in any such judicial proceeding is hereby authorized by each Noteholder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Noteholders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under this Indenture. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Noteholder any plan or reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Noteholder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such proceedings.

SECTION 10.02  Recission.  At any time after any action is taken by the Trustee following the occurrence and continuation of an Event of Default pursuant to Section 10.01 and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter in this Article provided, the Required Noteholder Parties, by written notice to the Issuer and the Trustee, may rescind and annul such declaration and its consequences if:

(i)      the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)      all of the installments of interest and premium on and, if the Maturity Date with respect to the Notes has occurred, the then unpaid principal balance of all such Notes which were overdue prior to the date of such acceleration;

(B)      to the extent that payment of such interest is lawful, interest upon overdue installments of interest at the rate of interest applicable to the Notes;

(C)      all sums paid or advanced by the Trustee and the Collateral Agent pursuant to the terms of the Note Documents and the reasonable compensation, out-of-pocket expenses, disbursements and advances of the Trustee and the Collateral Agent and their agents and counsel incurred in connection with the enforcement of this Indenture;

(D)      all scheduled payments, early termination amounts, taxes, indemnities and interest on overdue interest; and

(ii)     all Events of Default, other than the nonpayment of the principal of or interest on Notes which have become due solely by such declaration of acceleration, have been cured or waived as provided herein.

No such rescission with respect to any Event of Default shall affect any subsequent Event of Default or impair any right consequent thereon.

SECTION 10.03   <u>Treatment of Certain Payments.</u>   Subject to the terms of any applicable Intercreditor Agreement, any amount received by the Trustee or the Collateral Agent from any Note Party (or from proceeds of any Collateral) following any Event of Default that is continuing or any acceleration of the Note Obligations under this Indenture or any Event of Default with respect to the Issuer under <u>Section 10.01(h)</u> or <u>(i)</u>, in each case that is continuing, shall be applied:  (i) first, ratably, to pay any fees, indemnities or expense reimbursements then due under any Note Document to the Trustee or the Collateral Agent from the Issuer or any Note Party, including those set forth in <u>Section 11.07</u> of this Indenture, (ii) second, towards payment of interest and fees then due from the Issuer hereunder with respect to Note Obligations, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, (iii) third, towards payment of other Note Obligations then due from the Issuer hereunder with respect to Note Obligations, ratably among the parties entitled thereto in accordance with the amounts of such Note Obligations then due to such parties, and (iv) last, the balance, if any, after all of the Note Obligations have been paid in full, to the Issuer or as otherwise required by Requirements of Law.

SECTION 10.04   [Reserved].

SECTION 10.05   <u>Control by Majority.</u>   The Required Noteholder Parties may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee.  However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or, if the Trustee, being advised by counsel, determines that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith shall determine that the action or proceeding so directed would involve the Trustee in personal liability or expense for which it is not adequately indemnified, or subject to <u>Section 11.01</u>, that the Trustee determines is unduly prejudicial to the rights of any other holder (*provided* that the Trustee shall not have an affirmative obligation to make such determination) or that would involve the Trustee in personal liability.  Prior to taking any action under this Indenture, the Trustee shall be entitled to indemnification, security and prefunding satisfactory to it against all losses and expenses caused by taking or not taking such action.

## ARTICLE XI.

## TRUSTEE

SECTION 11.01   <u>Duties of Trustee.</u>

(a)     The Trustee, prior to the occurrence of an Event of Default with respect to the Notes and after the curing or waiving of all Events of Default which may have occurred,

111

undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)        Except during the continuance of an Event of Default:

(i)        the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee (it being agreed that the permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty); and

(ii)        in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  The Trustee shall be under no duty to make any investigation as to any statement contained in any such instance, but may accept the same as conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions.  However, in the case of certificates or opinions required by any provision hereof to be provided to it, the Trustee shall examine the form of certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)        The Trustee may not be relieved from liability for its own grossly negligent action, its own grossly negligent failure to act or its own willful misconduct, except that:

(i)        this paragraph does not limit the effect of paragraph (b) of this Section;

(ii)        the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(iii)        the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 10.05; and

(iv)        no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(d)        Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section 11.01.

(e)     The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.

(f)     Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 11.01.

SECTION 11.02  Rights of Trustee.

(a)     The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee need not investigate any fact or matter stated in the document.

(b)     Other than in connection with actions specifically required under this Indenture, before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(c)     The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)     The Trustee shall not be responsible or liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; *provided, however*, that the Trustee's conduct does not constitute willful misconduct or gross negligence.

(e)     The Trustee may consult with counsel of its own selection and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture, note or other paper or document unless requested in writing to do so by the Required Noteholder Parties, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney, at the expense of the Issuer and shall incur no liability of any kind by reason of such inquiry or investigation.

(g)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture or the Security Documents at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the

Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(h)    The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder (including as Registrar, Custodian and Paying Agent), and each agent, custodian and other person employed to act hereunder, including the Collateral Agent; *provided, however* in and during an Event of Default, only the Trustee (in its capacity as such) and not any other agent (including, for the avoidance of doubt, the Collateral Agent) shall be subject to the prudent person standard.

(i)    The Trustee shall not be responsible or liable for any action taken or omitted by it in good faith at the direction of the Required Noteholder Parties as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(j)    Any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the Noteholder of any Note shall be conclusive and binding upon future Noteholders of Notes and upon Notes executed and delivered in exchange therefor or in place thereof.

(k)    The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Trust Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by a Trust Officer of the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(l)    The Trustee may request that the Issuer delivers an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(m)    The Trustee shall not be responsible or liable for punitive, special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of actions.

(n)    The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(o)    The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunction of utilities, computer (hardware or software) or

114

communication services; accidents; labor disputes; and acts of civil or military authorities and governmental action.

SECTION 11.03  Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent or Registrar may do the same with like rights.  However, the Trustee must comply with Sections 11.10 and 11.11.

SECTION 11.04  Trustee's Disclaimer.  The Trustee (including in its capacity as Custodian) shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, or the Notes or any other Note Document, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer or any Subsidiary Guarantor in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.  The Trustee shall not be charged with knowledge of any Default or Event of Default under Sections 10.01(a), (d), (e), (f), (g), (h), (i), (j), (k), (l), or (m) unless either (a) a Trust Officer shall have actual knowledge thereof or (b) the Trustee shall have received written notice thereof in accordance with Section 16.01 hereof from the Issuer, any Subsidiary Guarantor or any Noteholder.  In accepting the trust hereby created, the Trustee acts solely as Trustee under this Indenture and not in its individual capacity and all persons, including without limitation the Noteholders of Notes and the Issuer having any claim against the Trustee arising from this Indenture shall look only to the funds and accounts held by the Trustee hereunder for payment except as otherwise provided herein.  If the Trustee is directed by the Required Noteholder Parties to deliver any information, determination or any other matter to the Issuer, the Trustee will have no liability relating thereto nor will it be deemed to have any notice or knowledge of any information contained therein.  The Trustee will have no obligation to monitor or record any information contained therein.

SECTION 11.05  Notice of Defaults.  If a Default occurs and is continuing and is actually known to a Trust Officer of the Trustee or the Trustee has received written notice thereof pursuant to Section 11.02(k), the Trustee shall mail to each holder of the Notes notice of the Default within the later of 90 days after it occurs or 30 days after it is actually known to a Trust Officer or a Trust Officer of the Trustee has received written notice thereof pursuant to Section 11.02(k).  Except in the case of a Default in the payment of principal of, premium (if any) or interest on any Note, the Trustee may withhold notice if and so long as a committee of its Trust Officers in good faith determines that withholding notice is in the interests of the noteholders.

SECTION 11.06  [Reserved].

SECTION 11.07  Expenses; Indemnity.

(a)  The Issuer agrees to pay (i) all reasonable and documented out-of-pocket expenses incurred by the Trustee or the Collateral Agent in connection with the preparation of this Indenture and the other Note Documents, or by the Trustee or the Collateral Agent in connection with the administration of this Indenture, the other Note Documents and any

115

amendments, modifications or waivers of the provisions hereof or thereof, including the reasonable fees, charges and disbursements of Alston & Bird LLP, counsel for the Trustee and the Collateral Agent, and, if necessary, the reasonable and documented fees, charges and disbursements of one local counsel per jurisdiction, (ii) all reasonable and documented out-of-pocket costs, fees and expenses incurred by the Noteholders (limited in the case of legal fees and costs to the reasonable and documented fees and costs of (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) one local counsel in each relevant local jurisdiction (*provided* that any such local counsel shall not be in addition to any local counsel of the Trustee or Collateral Agent in such jurisdiction referred to in clause (i) above) and (c) any additional specialist counsel for diligence purposes that the Noteholders are required to engage pursuant to existing internal policies and procedures), accounting, consulting and other third party advisors retained by the Noteholders in connection with the examination, review, due diligence investigation, preparation and/or execution of this Indenture, the other Note Documents and any guarantees or collateral documents in connection therewith (whether prior to, on, or following the Closing Date), or by the Noteholders in connection with the administration of this Indenture, the other Note Documents and any amendments, modifications or waivers of the provisions hereof or thereof, and (iii) all reasonable and documented out-of-pocket expenses incurred by the Trustee, the Collateral Agent or any Noteholder Party in connection with the enforcement of their rights in connection with this Indenture and the other Note Documents, in connection with the Notes purchased hereunder, including the fees, charges and disbursements of a single counsel for the Trustee and Collateral Agent, and a single counsel for all Noteholder Parties, taken as a whole, and, if necessary, a single local counsel in each appropriate jurisdiction for all such persons, taken as a whole (and, in the case of an actual or perceived conflict of interest where such person affected by such conflict informs the Issuer of such conflict and thereafter retains its own counsel with the Issuer's prior written consent (not to be unreasonably withheld), of another firm of such for such affected person).

(b)     The Issuer agrees to indemnify the Trustee, the Collateral Agent, each Noteholder Party, each of their respective Affiliates, successors and assignors, and each of their respective directors, officers, employees, agents, trustees, advisors and members (each such person being called an "<u>Indemnitee</u>") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements (excluding the allocated costs of in house counsel and limited to not more than one counsel for all such Indemnitees related to the Trustee and Collateral Agent, taken as a whole, and limited to not more than one counsel for all such Indemnitees related to the Noteholder Parties, taken as a whole, and, if necessary, a single local counsel in each appropriate jurisdiction for all such Indemnitees, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict informs the Issuer of such conflict and thereafter retains its own counsel with the Issuer's prior written consent (not to be unreasonably withheld), of another firm of counsel for such affected Indemnitee)), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Indenture or any other Note Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated hereby and in the case of the Trustee and its related Indemnitees, the acceptance and administration of the trust or trusts hereunder, (ii) any violation of or liability under Environmental Laws by the Issuer or any Subsidiary, (iii) any actual or alleged presence,

Release or threatened Release of or exposure to Hazardous Materials at, under, on, from or to any property owned, leased or operated by the Issuer or any Subsidiary or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by the Issuer or any of its subsidiaries or Affiliates including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of its powers or duties hereunder or in connection with the enforcement of these provisions; *provided*, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are (x) determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the bad faith, gross negligence or willful misconduct of such Indemnitee or any of its Related Parties or (B) solely in the case of Noteholder Parties, a material breach of such Noteholder Party's obligations under the Note Documents or (y) arose from any claim, actions, suits, inquiries, litigation, investigation or proceeding that does not involve an act or omission of the Issuer or any of its Affiliates and is brought by an Indemnitee against another Indemnitee (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding against the Trustee or the Collateral Agent in its capacity as such); *provided further*, that such indemnity shall not, as to any Indemnitee, be available with respect to any settlement entered into by such Indemnitee or any of its Related Parties without the Issuer's written consent (such consent not to be unreasonably withheld, delayed or conditioned).  The provisions of this <u>Section 11.07</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Indenture, the consummation of the transactions contemplated hereby, the repayment of any of the Note Obligations, the invalidity or unenforceability of any term or provision of this Indenture or any other Note Document, or any investigation made by or on behalf of the Trustee, the Collateral Agent or any Noteholder Party.  All amounts due under this <u>Section 11.07</u> shall be payable within 15 days after written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(c)     To the fullest extent permitted by applicable law, neither the Issuer nor any Indemnitee shall assert, and each hereby waives, any claim against any Note Party or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Indenture, any other Note Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Notes or the use of the proceeds thereof; *provided*, that nothing contained in this sentence shall limit the Issuer's indemnification obligations to the extent set forth hereinabove to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnitee is entitled to indemnification hereunder.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Indenture or the other Note Documents or the transactions contemplated hereby or thereby.

(d)     The agreements in this <u>Section 11.07</u> shall survive the resignation of the Trustee, the Collateral Agent, the replacement of any Noteholder Party and the repayment, satisfaction or discharge of all the other Note Obligations and the termination of this Indenture.

SECTION 11.08  Replacement of Trustee.

(a)      The Trustee may resign at any time by so notifying the Issuer.  The Required Noteholder Parties may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee.  The Issuer shall remove the Trustee if:

(i)      the Trustee fails to comply with Section 11.10;

(ii)      the Trustee is adjudged bankrupt or insolvent;

(iii)      a receiver or other public officer takes charge of the Trustee or its property; or

(iv)      the Trustee otherwise becomes incapable of acting.

(b)      If the Trustee resigns, is removed by the Issuer or by the Required Noteholder Parties and such Noteholder Parties do not reasonably promptly appoint a successor Trustee, or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Issuer shall promptly appoint a successor Trustee.

(c)      A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall mail a notice of its succession to the Noteholder Parties.  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee.

(d)      If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Noteholders of 10% in principal amount of the Notes may petition at the expense of the Issuer any court of competent jurisdiction for the appointment of a successor Trustee.

(e)      If the Trustee fails to comply with Section 11.10, any Noteholder who has been a bona fide Noteholder of a Note for at least six months may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)      Notwithstanding the replacement of the Trustee pursuant to this Section, the Issuer's obligations under Section 11.07 shall continue for the benefit of the retiring Trustee.

SECTION 11.09  Successor Trustee by Merger.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation or banking association without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the

118

certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture that the certificate of the Trustee shall have.

SECTION 11.10  Eligibility; Disqualification.  There shall at all times be a Trustee hereunder which shall (i) be a bank or trust company organized and doing business under the laws of the United States of America or of any state thereof authorized under such laws to exercise corporate trustee power, (ii) be subject to supervision or examination by federal or state authority, (iii) have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition and (iv) have a long-term unsecured debt rating of at least "BBB+" by S&P.  If the Trustee shall cease to satisfy the eligibility requirements of this Section 11.10, the Trustee shall resign promptly after written request to do so by the Issuer; *provided*, that the resignation of the Trustee shall not be effective until the substitution and replacement of the Trustee by a successor Trustee meeting the eligibility requirements set forth in this Section 11.10.

SECTION 11.11  Limitation on Duty of Trustee and Collateral Agent in Respect of Collateral; Indemnification.

(a)     Beyond the exercise of reasonable care in the custody thereof, the Trustee shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Trustee shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.  The Trustee shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Trustee in good faith.

(b)     The Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuer to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  Subject to Section 11.01 of this Indenture, the Trustee shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Indenture, the Collateral Agreement or any other Security Document by the Issuer, the Subsidiary Guarantors or the Collateral Agent.  The Trustee may act and rely and shall be protected in acting and relying in good faith on the opinion or advice of or information obtained from any counsel, accountant, appraiser or other expert or adviser, whether retained or employed by the Issuer or by the Trustee, in relation to any matter

119

arising in the administration of this Indenture or the Security Documents.  The Trustee shall have no duty to verify or monitor the satisfaction of the Collateral and Guarantee Requirement.

(c)     The Trustee shall not be responsible or liable for the environmental condition or any contamination of any property secured by any mortgage or deed of trust or for any diminution in value of any such property as a result of any contamination of the property by any Hazardous Materials.  The Trustee shall not be liable for any claims by or on behalf of the Noteholders or any other person or entity arising from contamination of the property by any Hazardous Materials, and shall have no duty or obligation to assess the environmental condition of any such property or with respect to compliance of any such property under  any Environmental Laws or Environmental Permits.

(d)     Neither the Collateral Agent nor the Trustee shall be obligated to acquire possession of or take any action with respect to any property secured by a mortgage or deed of trust, if as a result of such action, the Collateral Agent or the Trustee would be considered to hold title to, to be a "mortgagee in possession of", or to be an "owner" or "operator" of such property within the meaning of the Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980 ("CERCLA"), as amended from time to time, or any equivalent designation in any analogous state or local laws or regulations promulgated pursuant to said laws.  Notwithstanding the foregoing, if at any time, Collateral Agent is entitled to take any action to preserve the Collateral or protect the security interest in the Collateral, prior to doing so, the Collateral Agent may require that a satisfactory indemnity bond or "Premises Pollution Liability Insurance" be furnished to it for the payment or reimbursement of all expenses to which it may be put and to protect it against all liability resulting from any claims, judgments, damages, losses, fees, penalties or expenses which may result from such action.

(e)     The Trustee shall be under no obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Issuer or any Guarantor, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require any such payment to be made.

(f)     The provisions of the Section for the benefit of the Trustee shall equally apply to the Collateral Agent, *mutatis mutandis*.

## ARTICLE XII.

## DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 12.01  Discharge of Liability on Notes; Defeasance.

(a)     This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights, protections and immunities of the Trustee and rights of registration or transfer or exchange of Notes, as expressly provided for in this Indenture) as to all outstanding Notes when:

(i)     either (A) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for

whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (B) all of the Notes (1) have become due and payable, (2) will become due and payable at their stated maturity within one year or (3) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be; *provided* that upon any redemption that requires the payment of the Make-Whole Redemption Price, the amount deposited shall be sufficient for purposes of this Indenture to the extent that an amount is deposited with the Trustee equal to the Make-Whole Redemption Price calculated as of the date of the notice of redemption, with any deficit as of the date of the redemption only required to be deposited with the Trustee on or prior to the date of the redemption and the Trustee shall have no liability for the Issuer's non-payment of such deficit;

(ii)     the Issuer and/or the Subsidiary Guarantors have paid all other sums payable under this Indenture; and

(iii)     the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

(b)     Subject to Sections 12.01(c) and 12.02, the Issuer may at any time terminate:

(i)     all of its obligations under the Notes and this Indenture with respect to the Noteholder Parties ("legal defeasance option"), and

(ii)     (ii) its obligations under Article VII, Article VIII, and Sections 10.01(a), 10.01(d), 10.01(e), 10.01(f), 10.01(g), 10.01(h), 10.01(i), 10.01(j), 10.01(k), 10.01(l) and 10.01(m) ("covenant defeasance option").

The Issuer may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option. In the event that the Issuer terminates all of its obligations under the Notes and this Indenture (with respect to such Notes) by exercising its legal defeasance option or its covenant defeasance option, the obligations of the Issuer and each Subsidiary Guarantor with respect to the Security Documents shall be terminated simultaneously with the termination of such obligation.

If the Issuer exercises its legal defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default. If the Issuer exercises its covenant defeasance option, payment of the Notes so defeased may not be accelerated because of

an Event of Default specified in Sections 10.01(a), 10.01(d), 10.01(e), 10.01(f), 10.01(g), 10.01(h), 10.01(i), 10.01(j), 10.01(k), 10.01(l) or 10.01(m).

Upon satisfaction of the conditions set forth herein (as evidenced by the Officer's Certificate and Opinion of Counsel delivered pursuant to Section 12.02(a)(viii)) and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of those obligations that the Issuer terminated.

(c)      Notwithstanding clauses (a) and (b) above, the Issuer's obligations in Sections 2.04, 2.05, 2.06, 2.07, 2.08 and 2.09 and Article XI, including, without limitation, Sections 11.07 and 11.08 and in this Article XII and the rights and immunities of the Trustee under this Indenture shall survive until the Notes have been paid in full.  Thereafter, the Issuer's obligations in Sections 11.07, 11.08 and 12.05 and the rights and immunities of the Trustee under this Indenture shall survive such satisfaction and discharge.

SECTION 12.02   Conditions to Defeasance.

(a)      The Issuer may exercise its legal defeasance option or its covenant defeasance option only if:

(i)      the Issuer irrevocably deposits in trust with the Trustee cash in Dollars sufficient to pay the principal of and premium (if any) and interest on the Notes when due at maturity or redemption, as the case may be; *provided* that upon any redemption that requires the payment of the Make-Whole Redemption price, the amount deposited shall be sufficient for purposes of this Indenture to the extent that an amount is deposited with the Trustee equal to the Make-Whole Redemption Price calculated as of the date of the notice of redemption, with any deficit as of the date of the redemption only required to be deposited with the Trustee on or prior to the date of the redemption;

(ii)      the Issuer delivers to the Trustee a certificate from a nationally recognized firm of independent accountants, investment bank or financial advisory firm expressing their opinion that the payments of principal and interest when due and without reinvestment on any deposited money without investment will provide cash at such times and in such amounts as will be sufficient to pay principal, premium, if any, and interest when due on all the Notes to maturity or redemption, as the case may be;

(iii)      no Default specified in Section 10.01(h) or (i) with respect to the Issuer shall have occurred or is continuing on the date of such deposit;

(iv)      the deposit does not constitute a default under any other material agreement or instrument binding on the Issuer;

(v)      in the case of the legal defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the beneficial owners of the Notes will not recognize income, gain or loss

for U.S. federal income tax purposes as a result of such deposit and defeasance and will be subject to U.S. federal income tax on the same amounts and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred. Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their Maturity Date within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer;

(vi)     such exercise does not impair the right of any Noteholder to receive payment of principal of, premium, if any, and interest on such Noteholder's Notes on or after the due dates therefore or to institute suit for the enforcement of any payment on or with respect to such Noteholder's Notes;

(vii)     in the case of the covenant defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that the Noteholders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; and

(viii)     the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes to be so defeased and discharged as contemplated by this Article XII have been complied with.

(b)     Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with Article III.

SECTION 12.03   Application of Trust Money.  The Trustee shall hold in trust money (including proceeds thereof) deposited with it pursuant to this Article XII.  The Trustee shall apply the deposited money through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased.

SECTION 12.04   Repayment to Issuer.  Each of the Trustee and each Paying Agent shall promptly turn over to the Issuer upon request any money held by it as provided in this Article XII that, in the written opinion of a nationally recognized firm of independent public accountants delivered to the Trustee, are in excess of the amount thereof that would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this Article XII.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer upon written request any money held by them for the payment of principal or interest that remains unclaimed for two years, and, thereafter, Noteholder Parties entitled to the money must look to the Issuer for payment as general creditors, and the Trustee and each Paying Agent shall have no further liability with respect to such monies.

SECTION 12.05  <u>Reinstatement</u>.  If the Trustee or any Paying Agent is unable to apply any money in accordance with this <u>Article XII</u> by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes so discharged or defeased shall be revived and reinstated as though no deposit had occurred pursuant to this <u>Article XII</u> until such time as the Trustee or any Paying Agent is permitted to apply all such money in accordance with this <u>Article XII</u>; *provided, however*, that, if the Issuer has made any payment of principal of, or interest on, any such Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Noteholders of such Notes to receive such payment from the money held by the Trustee or any Paying Agent.

<div align="center">

**ARTICLE XIII.**

**AMENDMENTS AND WAIVERS**

</div>

SECTION 13.01  <u>Amendments and Waivers.</u>

(a)      No failure or delay of the Trustee, the Collateral Agent or any Noteholder Party in exercising any right or power hereunder or under any Note Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Trustee, the Collateral Agent and the Noteholder Parties hereunder and under the other Note Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have under this Indenture at law, in equity, by statute or otherwise.  No waiver of any provision of this Indenture or any other Note Document or consent to any departure by the Issuer or any other Note Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Issuer or any other Note Party in any case shall entitle such person to any other or further notice or demand in similar or other circumstances.

(b)      Neither the Indenture nor any other Note Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by each Note Party party thereto and the Trustee or Collateral Agent, as applicable (in each case, with the consent of the Required Noteholder Parties); *provided*, *however*, that no such agreement shall:

(i)      reduce the principal amount of, or extend the Maturity Date of, or decrease the rate of interest on, any Note, without the prior written consent of each Noteholder of a Note directly adversely affected thereby (which, notwithstanding the foregoing, such consent of such Noteholder of a Note directly adversely affected thereby shall be the only consent required hereunder to make such modification),

(ii)      amend or modify the definitions of "Applicable Redemption Price" or "Make-Whole Redemption Price", or any provisions of <u>Section 3.01</u> or <u>3.02</u> relating to the price that is required to be paid in connection with a redemption or repurchase of the

<div align="center">124</div>

Notes, without the prior written consent of each Noteholder of a Note directly adversely affected thereby (which, notwithstanding the foregoing, such consent of such Noteholder of a Note directly adversely affected thereby shall be the only consent required hereunder to make such modification),

(iii)    extend any date on which payment of interest on any Note is due, without the prior written consent of each Noteholder of a Note directly adversely affected thereby (which, notwithstanding the foregoing, such consent of such Noteholder of a Note directly adversely affected thereby shall be the only consent required hereunder to make such modification),

(iv)    amend or modify the provisions of Section 3.01, 3.02, 3.04, 3.05, 2.16(b) or 10.03 with respect to the pro rata redemption, repurchase, offer, payment, application or sharing of payments required thereby, without the prior written consent of each Noteholder Party adversely affected thereby (which, notwithstanding the foregoing, such consent of such Noteholder of a Note adversely affected thereby shall be the only consent required hereunder to make such modification),

(v)    amend or modify the provisions of this Section 13.01 or the definition of the terms "Required Noteholder Parties" or "Specified Noteholder Parties" or any other provision hereof specifying the number or percentage of Noteholder Parties required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Noteholder Party adversely affected thereby, in each case except, for the avoidance of doubt, as otherwise provided in Section 13.01(d) and (e);

(vi)    release all or substantially all of the Collateral or all or substantially all of the Subsidiary Guarantors from their respective Guarantees under the Subsidiary Guarantee Agreement, except as expressly permitted by this Indenture or the Security Documents, without the prior written consent of each Noteholder Party;

(vii)    contractually subordinate any Note Obligations in right of payment to any other Indebtedness for borrowed money of the Note Parties or contractually subordinate the Liens securing the Note Obligations on the Collateral to Liens securing other Indebtedness for borrowed money (any such other Indebtedness for borrowed money, to which such Note Obligations or such Liens securing any of the Note Obligations, as applicable, are subordinated, "Senior Indebtedness"), without the consent of each Noteholder Party adversely affected thereby, in either case, unless such adversely affected Noteholder Party has been offered a bona fide opportunity to fund or otherwise provide its pro rata share of the Senior Indebtedness on the same terms as offered to all other providers (or their Affiliates) of the Senior Indebtedness (it being understood that this clause (vii) shall not apply to the incurrence of (A) debtor-in-possession financing or (B) Indebtedness that is expressly permitted by this Indenture as in effect on the Closing Date to be senior to the Note Obligations and/or secured by a Lien that is senior to the Liens securing the Note Obligations);

(viii)    amend or modify any provision of this Indenture or any other Note Document to make any payments in respect of any Note (including but not limited to principal, premium and interest) payable in a currency other than Dollars, without the prior written consent of each Noteholder Party;

(ix)    waive any Default or Event of Default arising pursuant to Section 10.01(b) or Section 10.01(c), without the prior written consent of each Noteholder Party;

(x)    amend or modify the last sentence of the definition of "Excluded Subsidiary" or the last paragraph of Section 8.04, subclause (II) of the first paragraph after Section 8.05(o) or any other provision hereof restricting the transfer or disposition of Material IP, without the prior written consent of each Specified Noteholder Party;

(xi)    amend or modify any provision that would allow for the incurrence of additional Indebtedness for borrowed money that is secured by a Lien that is pari passu with the Liens securing the Note Obligations (any such other Indebtedness for borrowed money, "Pari Passu Indebtedness"), without the consent of each Specified Noteholder Party that is adversely affected thereby, in either case, unless such adversely affected Noteholder Party has been offered a bona fide opportunity to fund or otherwise provide its pro rata share of the Pari Passu Indebtedness on the same terms as offered to all other providers (or their Affiliates) of the Pari Passu Indebtedness (it being understood that this clause (xi) shall not apply to the incurrence of (A) debtor-in-possession financing or (B) Indebtedness that is expressly permitted by this Indenture as in effect on the Closing Date to be secured by a Lien that is pari passu to the Liens securing the Note Obligations); or

(xii)    without the prior written consent of the Specified Noteholder Parties, amend or modify any provision of this Indenture or any other Note Document to permit the issuance of additional notes pursuant to this Indenture;

*provided*, *further*, that (x) no such agreement shall amend, modify or otherwise affect the rights or duties of the Trustee or the Collateral Agent without the prior written consent of the Trustee or the Collateral Agent acting as such at the effective date of such agreement, as applicable.  Each Noteholder Party shall be bound by any waiver, amendment or modification authorized by this Section 13.01 and (y) notwithstanding any other provision in the Note Documents, no amendment or modification of the Note Documents may be effected that would adversely change (x) the economic terms,  (y) the interests in the Collateral or (z) the legal remedies, in each case, of a particular Noteholder in a manner disproportionate to the rights or interests of any other Noteholder without the prior consent of each Noteholder so affected.

(c)    Without the consent of any Noteholder Party, the Issuer, the Subsidiary Guarantors, the Trustee and the Collateral Agent may (or shall, to the extent required by any Note Document) enter into any amendment, modification or waiver of any Note Document, or enter into any new agreement or instrument, (i) to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties or as required by local law or foreign law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law or this Indenture, (ii)

126

to effect the addition of any Subsidiary as a Subsidiary Guarantor (including as may be required or appropriate under foreign law for the addition of any Foreign Subsidiary Guarantor), (iii) to add more restrictive terms in respect of the Notes as contemplated by clause (f) of the definition of "Permitted Refinancing Indebtedness" or (iv) to otherwise enhance the rights or benefits of any Noteholder Party under any Note Document.

(d)     Notwithstanding anything to the contrary in this Indenture or the Notes, Notes (or beneficial interests therein) held by Competitors and Ineligible Institutions shall be disregarded for purposes of (i) the determination of "Required Noteholder Parties" and "Specified Noteholder Parties" and (ii) whether the consent or direction of each Noteholder Party or each affected Noteholder Party has been received for any amendment, waiver or other modification to this Indenture, the Notes or the other Note Documents.

(e)     Notwithstanding the foregoing, technical and conforming modifications to the Note Documents may be made with the consent of the Issuer and the Trustee (but without the consent of any Noteholder Party) to the extent necessary to cure any ambiguity, omission, defect or inconsistency.

SECTION 13.02  Revocation and Effect of Consents and Waivers.

(a)     A consent to an amendment or a waiver by a Noteholder Party shall bind the Noteholder Party and every subsequent Noteholder of that Note or portion of the Note that evidences the same debt as the consenting Noteholder Party's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Noteholder Party or subsequent Noteholder may revoke the consent or waiver as to such Noteholder Party's Note or portion of the Note if the Trustee receives the notice of revocation before the date on which the Trustee receives an Officer's Certificate from the Issuer certifying that the requisite amount of Noteholder Parties have consented.  After an amendment or waiver becomes effective, it shall bind every Noteholder Party.  An amendment or waiver becomes effective upon the (i) receipt by the Issuer or the Trustee of consents by the Required Noteholder Parties, (ii) satisfaction of conditions to effectiveness as set forth in this Indenture and any indenture supplemental hereto containing such amendment or waiver and (iii) execution of such amendment or waiver (or supplemental indenture) by the Issuer, the Subsidiary Guarantors and the Trustee.

(b)     The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Noteholders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding the immediately preceding paragraph, those persons who were Noteholders at such record date (or their duly designated proxies), and only those persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such persons continue to be Noteholders after such record date.  No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 13.03  Notation on or Exchange of Notes.  If an amendment, supplement or waiver changes the terms of a Note, the Issuer may require the Noteholder of the Note to deliver it to the Trustee.  The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Noteholder.  Alternatively, if the Issuer or the

Trustee so determine, the Issuer in exchange for the Note shall issue and, upon written order of the Issuer signed by a Responsible Officer, the Trustee shall authenticate a new Note that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supplement or waiver.

SECTION 13.04  <u>Trustee to Sign Amendments</u>.  The Trustee or the Collateral Agent, as applicable, shall sign any amendment, supplement or waiver authorized pursuant to this Article XIII if the amendment does not adversely affect the rights of the Trustee or the Collateral Agent.  If it does, the Trustee or the Collateral Agent may but need not sign it.  In signing such amendment, the Trustee or the Collateral Agent, as applicable, shall be entitled to receive indemnity, security and/or prefunding satisfactory to the Trustee or the Collateral Agent, as applicable, and shall be provided with, and (subject to <u>Section 11.01</u>) shall be fully protected in relying upon, in addition to the documents in <u>Section 16.02</u>, (i) an Officer's Certificate, (ii) an Opinion of Counsel stating that such amendment, supplement or waiver is authorized or permitted by this Indenture and the other applicable Note Documents and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and any Subsidiary Guarantors, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof, (iii) a copy of the resolution of the Board of Directors, certified by the Secretary or Assistant Secretary of the Issuer, authorizing the execution of such amendment, supplement or waiver and (iv) if such amendment, supplement or waiver is executed pursuant to <u>Section 13.01</u>, evidence reasonably satisfactory to the Trustee or the Collateral Agent, as applicable, of the consent of Noteholder Parties required to consent thereto.

SECTION 13.05  <u>Calculation of Principal Amount</u>.  Determinations as to whether the requisite Noteholder Parties have concurred in any direction, waiver or consent shall be made in accordance with this <u>Article XIII</u> and <u>Section 2.13</u>.  Additionally, the Required Noteholder Parties (or such other percentage of Noteholder Parties as may be required, including the Specified Noteholder Parties) may certify in writing to the Trustee or the Collateral Agent, as applicable, that such Required Noteholder Parties (or such other percentage of Noteholder Parties as may be required, including the Specified Noteholder Parties) beneficially own Notes that, taken together, represent more than 50% (or such other percentage, if applicable) of the sum of all Notes outstanding at such time (and, with respect to the Specified Noteholder Parties that included in such percentage is each Noteholder Party that beneficially owns (together with its Affiliates) at least $100,000,000 aggregate principal amount of outstanding Notes) and the Trustee or the Collateral Agent, as applicable, may rely on such certification as conclusive proof without any obligation to verify their holdings.

## ARTICLE XIV.

## [RESERVED]

## ARTICLE XV.

## COLLATERAL

SECTION 15.01  <u>Appointment</u>.

(a)     Each Noteholder Party (in its capacities as a Noteholder Party) hereby irrevocably designates and appoints the Trustee as the agent of such Noteholder Party under this Indenture and the other Note Documents, and the Collateral Agent as the agent for such Noteholder Party and the other Secured Parties under the Security Documents, and each such Noteholder Party irrevocably authorizes the Trustee and the Collateral Agent, in such capacities, to take such action on its behalf under the provisions of this Indenture and the other Note Documents and to exercise such powers and perform such duties as are expressly delegated to the Trustee and the Collateral Agent by the terms of this Indenture and the other Note Documents, together with such other powers as are reasonably incidental thereto.  In addition, to the extent required under the laws of any jurisdiction other than the United States of America, each of the Noteholder Parties hereby grants to the Trustee and Collateral Agent any required powers of attorney to execute any Security Document governed by the laws of such jurisdiction on such Noteholder Party's behalf.  Notwithstanding any provision to the contrary elsewhere in this Indenture, the Agents shall not have any duties or responsibilities, except those expressly set forth in any Note Document to which it is a party, or any fiduciary relationship with any Noteholder Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture or any other Note Document or otherwise exist against the Agents.

(b)     In furtherance of the foregoing, each Noteholder Party (in its capacities as a Noteholder Party) hereby appoints and authorizes the Collateral Agent to act as the agent of such Noteholder Party for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Note Parties to secure any of the Note Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Collateral Agent (and any Subagents appointed by the Collateral Agent pursuant to Section 15.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights or remedies thereunder at the direction of the Collateral Agent) shall be entitled to the benefits of this Article XV (including, without limitation, Section 15.07) and Article XI (including, without limitation, Section 11.07) as though the Collateral Agent (and any such Subagents) were an "Agent" under the Note Documents, as if set forth in full herein with respect thereto.

SECTION 15.02  Delegation of Duties.  The Trustee and the Collateral Agent may execute any of their respective duties under this Indenture and the other Note Documents (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.  Each Agent may also from time to time, when it deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "Subagent") with respect to all or any part of the Collateral; provided, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Trustee or the Collateral Agent.  Should any instrument in writing from the Issuer or any other Note Party be required by any Subagent so appointed by an Agent to more fully or certainly vest in and confirm to such Subagent such rights, powers, privileges and duties, the Issuer shall, or shall cause such Note Party to, execute, acknowledge and deliver any and all such instruments

129

promptly upon request by such Agent.  If any Subagent, or successor thereto, shall become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Trustee or the Collateral Agent until the appointment of a new Subagent.  No Agent shall be responsible for the negligence or misconduct of any agent, attorney-in-fact or Subagent that it selects with reasonable care.

SECTION 15.03  Exculpatory Provisions.  None of the Agents, or their respective Affiliates or any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Indenture or any other Note Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such person's own bad faith, gross negligence or willful misconduct) or (b) responsible in any manner to any of the Noteholder Parties for any recitals, statements, representations or warranties made by any Note Party or any officer thereof contained in this Indenture or any other Note Document or in any certificate, report, statement or other document referred to or provided for in, or received by any Agent under or in connection with, this Indenture or any other Note Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Indenture or any other Note Document or for any failure of any Note Party a party thereto to perform its obligations hereunder or thereunder. No Agent shall be under any obligation to any Noteholder Party to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Indenture or any other Note Document, or to inspect the properties, books or records of any Note Party.  No Agent shall have any duties or obligations except those expressly set forth in any Note Documents to which it is a party.  Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, and (b) no Agent shall, except as expressly set forth herein and in the other Note Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Issuer or any of its Affiliates that is communicated to or obtained by such Agent or any of its Affiliates in any capacity.  The Agents shall be deemed not to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default is given to the Trustee by the Issuer or a Noteholder Party.  No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Indenture or any other Note Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Indenture, any other Note Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Trustee.

SECTION 15.04  Reliance by Agents.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or

intranet website posting or other distribution) or conversation believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel (including counsel to the Issuer), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  Each Agent may deem and treat the Noteholder Party specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes and each Agent shall not be affected by any notice or knowledge to the contrary.  Each Agent shall be fully justified in failing or refusing to take any action under this Indenture or any other Note Document unless it shall first receive such advice or concurrence of the Required Noteholder Parties (or, if so specified by this Indenture, all or other Noteholder Parties) as it deems appropriate or it shall first be indemnified to its satisfaction by the Noteholder Parties against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture and the other Note Documents in accordance with a request of the Required Noteholder Parties (or, if so specified by this Indenture, all or other Noteholder Parties), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Noteholder Parties.

SECTION 15.05  Notice of Default.  Neither Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received written notice from a Noteholder Party or the Issuer referring to this Indenture, describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that the Trustee receives such a notice, the Trustee shall give notice thereof to the Noteholder Parties.  The Trustee shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Noteholder Parties (or, if so specified by this Indenture, all or other Noteholder Parties); provided, that unless and until the Trustee shall have received such directions, the Trustee may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Noteholder Parties.

SECTION 15.06  Non-Reliance on Agents and other Noteholder Parties.  Each Noteholder Party expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Note Party or any affiliate of a Note Party, shall be deemed to constitute any representation or warranty by any Agent to any Noteholder Party.  Each Noteholder Party represents to the Agents that it has, independently and without reliance upon any Agent or any other Noteholder Party, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into the business, operations, property, financial and other condition and creditworthiness of, the Note Parties and their affiliates and made its own decision to purchase or hold the Notes issued hereunder and enter into this Indenture.  Each Noteholder Party also represents that it will, independently and without reliance upon any Agent or any other Noteholder Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Indenture and the other Note Documents, and

to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Note Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Noteholder Parties by the Trustee hereunder, the Trustee shall not have any duty or responsibility to provide any Noteholder Party with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Note Party or any affiliate of a Note Party that may come into the possession of the Trustee or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

SECTION 15.07  [Reserved].

SECTION 15.08  Agent in Its Individual Capacity.  Each Agent and its affiliates may make loans to, accept deposits from, and generally engage in any kind of business with any Note Party as though such Agent were not an Agent.  With respect to its Notes purchased or held by it, each Agent shall have the same rights and powers under this Indenture and the other Note Documents as any Noteholder and may exercise the same as though it were not an Agent, and the terms "Noteholder" and "Noteholders" shall include each Agent in its individual capacity.

SECTION 15.09  Security Documents.  The Noteholder Parties and the other Secured Parties authorize the Collateral Agent and the Trustee to release any Collateral or Guarantors in accordance with Section 15.12 or if approved, authorized or ratified in accordance with Section 13.01.

[The Noteholder Parties and the other Secured Parties hereby authorize and instruct the Trustee and the Collateral Agent to, without any further consent of any Noteholder Party or any other Secured Party (other than the reasonable consent of the Required Noteholder Parties to the form of any such Acceptable Intercreditor Agreement), enter into (or acknowledge and consent to) any Acceptable Intercreditor Agreement that is contemplated by Section 8.02(j) with the collateral agent or other representatives of the holders of Indebtedness or other obligations that is to be secured by a Lien on the Collateral that is expressly permitted (including with respect to priority) under this Indenture and to subject the Liens on the Collateral securing the Note Obligations to the provisions thereof.] The Noteholder Parties and the other Secured Parties agree that (x) the Trustee and the Collateral Agent may rely exclusively on an Officer's Certificate of the Issuer as to whether any such other Liens are expressly permitted and that all covenants and conditions precedent to the execution of such Intercreditor Agreement have been complied with and (y) any Intercreditor Agreement entered into by the Trustee or the Collateral Agent in compliance with the terms of this Indenture shall be binding on the Secured Parties, and each Noteholder Party and the other Secured Parties hereby agrees that it will take no actions contrary to the provisions of, if entered into in compliance with the terms of this Agreement and if applicable, any Intercreditor Agreement. The foregoing provisions are intended as an inducement to any provider of any Indebtedness or other obligations expressly permitted by Section 8.01 hereof to extend credit to the Note Parties and such persons are intended third-party beneficiaries of such provisions.  For the avoidance of doubt, this Section 15.09 shall not limit in any manner the right of the Required Noteholder Parties to reasonably agree to the form and substance of any Intercreditor Agreement.

SECTION 15.10  [Reserved].

SECTION 15.11  Authorization of Actions to Be Taken.  (a) Each Noteholder Party, by its signature hereto or acceptance of Notes, consents and agrees to the terms of each Security Document and each Intercreditor Agreement as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Indenture, authorizes and directs the Trustee and/or the Collateral Agent to enter into each Intercreditor Agreement permitted by the terms of this Indenture and the Security Documents to which it is a party, authorizes and empowers the Trustee to direct the Collateral Agent to enter into, and the Collateral Agent to execute and deliver, the Security Documents and each Intercreditor Agreement permitted hereunder and authorizes and empowers the Trustee and the Collateral Agent to bind the holders of Notes and other holders of Note Obligations as set forth in the Security Documents to which it is a party and each Intercreditor Agreement permitted hereunder and to perform its obligations and exercise its rights and powers thereunder.

(b)     Subject to the provisions of each Intercreditor Agreement and the Security Documents, the Trustee and the Collateral Agent are authorized and empowered to receive for the benefit of the holders of Notes any funds collected or distributed under the Security Documents to which the Collateral Agent or Trustee is a party and to make further distributions of such funds to the holders of Notes according to the provisions of this Indenture.

(c)     Subject to the provisions of Article X, Section 11.01 and Section 11.02 hereof, each Intercreditor Agreement and the Security Documents, upon the occurrence and continuance of an Event of Default, the Trustee may, in its sole discretion and without the consent of the Noteholder Parties, direct, on behalf of the Noteholder Parties, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(1)     foreclose upon or otherwise enforce any or all of the Liens securing the Note Obligations;

(2)     enforce any of the terms of the Security Documents to which the Collateral Agent or Trustee is a party; or

(3)     collect and receive payment of any and all Note Obligations.

Subject to the terms of each Intercreditor Agreement, the Trustee is authorized and empowered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem expedient to protect or enforce the Liens securing Note Obligations or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Noteholder Parties in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment,

133

rule or order would impair the security interest hereunder or be prejudicial to the interests of Noteholder Parties, the Trustee or the Collateral Agent.

SECTION 15.12  Release or Subordination of Liens.

(a)     The Noteholder Parties and the other Secured Parties hereby irrevocably agree that the Liens granted to the Collateral Agent by the Note Parties on any Collateral shall be automatically released: (i) in full upon the occurrence of the Termination Date as set forth in Section 15.12(d) below; (ii) upon the Disposition of such Collateral by any Note Party to a person that is not (and is not required to become) a Note Party in a transaction not prohibited by this Indenture (and the Collateral Agent and the Trustee may rely conclusively on a certificate to that effect provided to it by any Note Party upon its reasonable request without further inquiry), (iii) to the extent that such Collateral comprises property leased to a Note Party, upon termination or expiration of such lease (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Note Party upon its reasonable request without further inquiry), (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Noteholder Parties (or such other percentage of the Noteholder Parties whose consent may be required in accordance with Section 13.01), (v) to the extent the property constituting such Collateral is owned by any Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from its obligations under the Guarantee in accordance with the Subsidiary Guaranty Agreement or clause (b) below (and the Collateral Agent and the Trustee may rely conclusively on a certificate to that effect provided to it by any Note Party upon its reasonable request without inquiry), (vi) as required by the Trustee to effect any Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent or the Trustee pursuant to the Security Documents and (vii) as required by the terms of any Intercreditor Agreement.  The Noteholder Parties and the other Secured Parties hereby irrevocably agree that the Liens granted to the Collateral Agent by the Note Parties on any Collateral shall be automatically subordinated to the Liens securing other Indebtedness or other obligations to the extent expressly contemplated by this Indenture and required by any Intercreditor Agreement permitted by this Indenture.  Any such release or subordination shall not in any manner discharge, affect, or impair the Note Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Note Parties in respect of) all interests retained by the Note Parties, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Note Documents.

(b)     In addition, the Noteholder Parties and the other Secured Parties hereby irrevocably agree that (i) any Subsidiary Guarantor that is an Excluded Subsidiary shall be released from the Guarantees upon written request of the Company and (ii) without limiting the foregoing, the Subsidiary Guarantors shall be automatically released from the Guarantees upon consummation of any transaction not prohibited hereunder resulting in such Subsidiary ceasing to exist or constitute a Subsidiary or otherwise becoming an Excluded Subsidiary (and the Trustee may rely conclusively on a certificate to that effect provided to it by any Note Party upon its reasonable request without inquiry).

(c)     The Noteholder Parties and the other Secured Parties hereby authorize the Trustee and the Collateral Agent, as applicable, to execute and deliver any instruments,

134

documents, and agreements necessary or desirable to evidence and confirm the release of any Subsidiary Guarantor or the release or subordination of any Collateral pursuant to Section 15.09 and the foregoing provisions of this Section 15.12) and to return to the Issuer all title documents (including share certificates (if any)) held by it in respect of any Collateral, all without the further consent or joinder of any Noteholder Party or any other Secured Party.  Any representation, warranty or covenant contained in any Note Document relating to any such Collateral or Subsidiary Guarantor shall no longer be deemed to be made.  In connection with any release or subordination hereunder, the Trustee and the Collateral Agent shall promptly (and the Secured Parties hereby authorize the Trustee and the Collateral Agent to) take such action and execute any such documents as may be reasonably requested by the Issuer and at the Issuer's expense in connection with the release or subordination of any Liens or release of Guarantees created by any Note Document in respect of such Subsidiary, property or asset; *provided*, that the Trustee and the Collateral Agent shall have received a certificate containing such certifications as the Trustee or the Collateral Agent, as applicable, shall reasonably request (and the Trustee and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Note Party upon its reasonable request without inquiry).  Notwithstanding anything to the contrary contained herein or any other Note Document, on the Termination Date, upon request of the Issuer, the Trustee and/or the Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral (including returning to the Issuer all share certificates (if any) held by it in respect of any Collateral and terminating any control agreements in respect of Controlled Accounts), and to release all obligations under any Note Document, whether or not on the date of such release there may be any contingent indemnification obligations or expense reimbursement claims not then due; *provided*, that the Trustee and the Collateral Agent shall have received an Officer's Certificate of the Issuer containing such certifications as the Trustee and the Collateral Agent shall reasonably request (and the Trustee and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Note Party upon its reasonable request without inquiry).

(d)     Any such release of obligations shall be deemed subject to the provision that such obligations shall be reinstated if after such release any portion of any payment in respect of the obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Issuer or any Subsidiary Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Issuer or any Subsidiary Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.  The Issuer agrees to pay all reasonable and documented out-of-pocket expenses incurred by the Trustee or the Collateral Agent (and their respective representatives) in connection with taking such actions to release security interest in all Collateral and all obligations under the Note Documents as contemplated by this Section 15.12(d).

SECTION 15.13  Powers Exercisable by Receiver or Trustee.  In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article XV upon the Issuer or the Subsidiary Guarantors with respect to the release, subordination, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or the Subsidiary Guarantors or of any officer

or officers thereof required by the provisions of this Article XV; and if the Trustee, the Collateral Agent or a nominee of the Trustee or Collateral Agent shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee, Collateral Agent or a nominee of the Trustee or Collateral Agent.

SECTION 15.14  Release Upon Termination of the Issuer's Obligations.  In the event (i) that the Issuer delivers to the Trustee an Officer's Certificate certifying that all the obligations under this Indenture, the Notes and the Security Documents (other than any contingent indemnification obligations or expense reimburse claims not then due) have been satisfied and discharged by the payment in full of the Issuer's obligations under the Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, or (ii) a discharge of this Indenture occurs under Article XII, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the Noteholder Parties, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done all acts reasonably necessary at the request and expense of the Issuer to release such Lien as soon as is reasonably practicable.

SECTION 15.15  Right to Realize on Collateral and Enforce Guarantees.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Note Party, (i) the Trustee (irrespective of whether the principal of any Note Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Issuer) shall be entitled and empowered, by intervention in such proceeding or otherwise (A) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of any or all of the Note Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Noteholder Parties and the Trustee and any Subagents allowed in such judicial proceeding, and (B) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and (ii) any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Noteholder Party to make such payments to the Trustee and, if the Trustee shall consent to the making of such payments directly to the Noteholder Parties, to pay to the Trustee any amount due for the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel, and any other amounts due the Trustee under the Note Documents.  Nothing contained herein shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Noteholder Party any plan of reorganization, arrangement, adjustment or composition affecting the Note Obligations or the rights of any Noteholder Party or to authorize the Trustee to vote in respect of the claim of any Noteholder Party in any such proceeding.

Anything contained in any of the Note Documents to the contrary notwithstanding, the Issuer, the Trustee, the Collateral Agent and each Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Trustee, on behalf of the Secured Parties in

136

accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent, and (b) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, to the extent permitted by applicable law, the Collateral Agent or any Noteholder Party may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Noteholder Party or Noteholder Parties in its or their respective individual capacities unless the Required Noteholder Parties shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Note Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other Disposition.

SECTION 15.16  Parallel Debt (Covenant to pay the Collateral Agent).

(a)      The Issuer and, subject to any limitations relating to any Guarantee of the Note Obligations given by a Subsidiary Guarantor (the "Guarantee Limitations"), each Subsidiary Guarantor hereby irrevocably and unconditionally undertakes to pay to the Collateral Agent amounts equal to any amounts owing from time to time by the Issuer or that Subsidiary Guarantor to any Secured Party under any Note Document as and when those amounts are due and payable.

(b)      The Issuer, each Subsidiary Guarantor and the Collateral Agent acknowledges that the obligations of the Issuer and each Subsidiary Guarantor under paragraph (a) above are several and are separate and independent from, and shall not in any way limit or affect, the corresponding obligations of the Issuer or that Subsidiary Guarantor to any Secured Party under any Note Document (its "Corresponding Debt"), nor shall it constitute the Collateral Agent and any Note Party as joint creditors of any Corresponding Debt, nor shall the amounts for which the Issuer or each Subsidiary Guarantor is liable under paragraph (a) above (its "Parallel Debt") be limited or affected in any way by its Corresponding Debt *provided* that:

(i)      The Parallel Debt of the Issuer and each Subsidiary Guarantor shall be decreased and the Collateral Agent shall not demand payment to the extent that its Corresponding Debt has been paid or (in the case of guarantee obligations) discharged; and

(ii)      The Corresponding Debt of the Issuer and each Guarantor shall be decreased and the Collateral Agent shall not demand payment to the extent that its Parallel Debt has been paid or (in the case of guarantee obligations) discharged.

(c)      For the purposes of this Section 15.16, the Collateral Agent acts in its own name and not as a trustee, and its claims in respect of the Parallel Debt shall not be held on trust and instead shall be owed to it in its individual capacity. The Collateral granted under the Security Documents to the Collateral Agent to secure the Parallel Debt is granted to the Collateral Agent in its capacity as Parallel Debt Creditor and shall not be held on trust.

All moneys received or recovered by the Collateral Agent pursuant to this <u>Section 15.16</u>, and all amounts received or recovered by the Collateral Agent from or by the enforcement of any Collateral granted to secure the Parallel Debt, shall be applied in accordance with this Indenture.

<div align="center">

**ARTICLE XVI.**

**MISCELLANEOUS**

</div>

SECTION 16.01  <u>Notices; Communications</u>.  (a) Except as provided in <u>Section 16.01(b)</u> and <u>Section 16.01(f)</u> below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or other electronic means as follows:

(i)       if to any Note Party or the Trustee, the Collateral Agent, the Required Noteholder Parties or the Noteholders as of the Closing Date to the address, telecopier number or electronic mail address specified for such person on <u>Schedule 16.01;</u> and

(ii)       if to any Noteholder that is not a Noteholder on the Closing Date, to the address, telecopier number or electronic mail address specified for such person in the applicable Transferee Letter.

(b)       Notices and other communications to the Noteholder Parties hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites).  The Issuer may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(c)       Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in <u>Section 16.01(b)</u> above shall be effective as provided in such <u>Section 16.01(b)</u>.

(d)       Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.

(e)       Documents required to be delivered pursuant to <u>Section 7.04</u> may be delivered electronically (including through the Platform) and if so delivered, shall be deemed to have been delivered on the date (i) on which the Issuer files such documents with the SEC or posts such documents, or provides a link thereto on the Issuer's website on the Internet at the website address listed on <u>Schedule 16.01</u>, or (ii) on which such documents are posted on the Issuer's behalf on an Internet or intranet website, if any, to which each Noteholder Party and the

<div align="center">138</div>

Trustee have access (whether a commercial, third-party website or whether sponsored by the Trustee).

(f)    Notwithstanding the foregoing, any notice or communication delivered or to be delivered to a Noteholder Party of Global Notes shall be delivered in accordance with the applicable procedures of the Depositary and shall be sufficiently given to it if so delivered to the Depositary within the time prescribed (and any such notice so given will be deemed to have been given in writing for purposes of this Indenture).

The Trustee may, in its sole discretion, agree to accept and act upon instructions or directions pursuant to this Indenture sent by e-mail, facsimile transmission or other similar electronic methods.  If the party elects to give the Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling.  The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction.  The party providing electronic instructions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk or interception and misuse by third parties.

SECTION 16.02  <u>Certificate and Opinion as to Conditions Precedent</u>.  Upon any request or application by the Issuer to the Trustee or Collateral Agent to take or refrain from taking any action under this Indenture or other Note Document, (a) the Issuer shall furnish to the Trustee at the request of the Trustee or Collateral Agent an Officer's Certificate in form reasonably satisfactory to the Trustee or the Collateral Agent stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture and any applicable Note Document relating to the proposed action have been complied with and (b), the Trustee or the Collateral Agent, as applicable, shall be entitled to request and receive an Opinion of Counsel in form reasonably satisfactory to the Trustee or the Collateral Agent, as applicable, stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 16.03  <u>Statements Required in Certificate or Opinion</u>.  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture or applicable Note Document shall include:

(a)    a statement that the individual making such certificate or opinion has read such covenant or condition;

(b)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)    a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)      a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with; *provided, however*, that with respect to matters of fact an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials.

SECTION 16.04  [Reserved]

SECTION 16.05  Survival of Indenture.  All covenants, agreements, representations and warranties made by the Note Parties herein, in the other Note Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Indenture or any other Note Document shall be considered to have been relied upon by the Noteholder Parties and shall survive the purchasing of the Notes and the execution and delivery of the Note Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect until the Termination Date.  Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Section 11.07) shall survive the Termination Date.

SECTION 16.06  Binding Effect.  This Indenture shall become effective when it shall have been executed by the Issuer and the Trustee and when the Trustee shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the Issuer, the Trustee and each Noteholder Party and their respective permitted successors and assigns.

SECTION 16.07  Successors and Assigns.  The provisions of this Indenture shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that except as permitted by Section 8.05, the Issuer may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Noteholder Party (and any attempted assignment or transfer by the Issuer without such consent shall be null and void).  Nothing in this Indenture, expressed or implied, shall be construed to confer upon any person (other than the parties hereto and the Noteholder Parties, their respective successors, assigns and transferees permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Trustee, the Collateral Agent and the Noteholder Parties) any legal or equitable right, remedy or claim under or by reason of this Indenture or the other Note Documents.  No transfer by a Noteholder shall be effective for purposes of this Indenture unless it has been recorded in the Register as provided in Section 2.04.

SECTION 16.08  [Reserved].

SECTION 16.09  [Reserved].

SECTION 16.10  [Reserved].

SECTION 16.11  Rules by Trustee, Paying Agent and Registrar.  The Trustee may make reasonable rules for action by or a meeting of the Noteholder Parties.  The Registrar and a Paying Agent may make reasonable rules for their functions.

SECTION 16.12  Legal Holidays.  If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall

accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period.  If a regular Record Date is not a Business Day, the Record Date shall not be affected.  If performance of any covenant, duty or obligation is required on a date which is not a Business Day, performance shall not be required until the next succeeding Business Day.

SECTION 16.13  <u>GOVERNING LAW</u>.  **THIS INDENTURE AND THE OTHER NOTE DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS INDENTURE OR ANY OTHER NOTE DOCUMENT (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER NOTE DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLE OF CONFLICTS OF LAW THAT COULD REQUIRE THE APPLICATION OF ANY OTHER LAW.**

SECTION 16.14  <u>Entire Agreement</u>.  This Indenture, the other Note Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Indenture and the other Note Documents.  Nothing in this Indenture or in the other Note Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Indenture or the other Note Documents.

SECTION 16.15  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES  (AND EACH NOTEHOLDER PARTY, BY ITS ACCEPTANCE OF A NOTE, HEREBY WAIVES), TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS INDENTURE OR ANY OF THE OTHER NOTE DOCUMENTS (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS INDENTURE AND THE OTHER NOTE DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 16.15</u>.

SECTION 16.16  <u>Severability</u>.  In the event any one or more of the provisions contained in this Indenture or in any other Note Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 16.17  <u>No Recourse Against Others</u>.  No director, officer, employee, manager, incorporator or holder of any Equity Interests in the Issuer or any direct or indirect parent companies, as such, shall have any liability for any obligations of the Issuer or any Subsidiary Guarantor under the Notes, the Subsidiary Guarantees or this Indenture, as applicable, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Noteholder Party, by its signature hereto or by accepting a Note, waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

SECTION 16.18  <u>Successors</u>.  All agreements of the Issuer and the Subsidiary Guarantors in this Indenture and the Notes shall bind such person's successors.  All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 16.19  <u>Counterparts</u>.  This Indenture may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in <u>Section 16.06</u>.  Delivery of an executed counterpart to this Indenture by facsimile transmission (or other electronic transmission) shall be as effective as delivery of a manually signed original.

SECTION 16.20  <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Indenture and are not to affect the construction of, or to be taken into consideration in interpreting, this Indenture.

SECTION 16.21  <u>Jurisdiction; Consent to Service of Process</u>.  (a) The Issuer and each other Note Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Trustee, the Collateral Agent, any Noteholder Party, or any Affiliate of the foregoing in any way relating to this Indenture or any other Note Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Indenture or in any other Note Document shall affect any right that the Trustee or any Noteholder Party may otherwise have to bring any action or proceeding relating to this Indenture or any other Note Document against the Issuer or any other Note Party or its properties in the courts of any jurisdiction.

(b)  Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Indenture or the other Note Documents in any New York State or federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party to this Indenture irrevocably consents to service of process in the manner provided for notices in <u>Section 16.01</u>.  Nothing in this Indenture will affect the right of any party to this Indenture or any other Note Document to serve process in any other manner permitted by law.  All Note Parties that are organized under the laws other than those of a state of the United States hereby consent to service of process for them being given to the Issuer and appoint the Issuer as their agent for such service.  Further, each Note Party that is organized under the laws other than those of a state of the United States waives any immunity it may have under any non-U.S. law or otherwise in relation to the jurisdiction or ruling of any aforementioned New York State or federal courts.

SECTION 16.22  <u>Confidentiality</u>.  Each of the Noteholder Parties and the Agents agree that it shall maintain in confidence any information relating to the Issuer and any Subsidiary furnished to it by or on behalf of the Issuer or any Subsidiary, but only to the extent such information is provided upon request pursuant to <u>Section 7.04(h)</u> or is only provided to the Private Side Noteholder Parties (other than information that (a) has become generally available to the public other than as a result of a disclosure by such party, (b) has been independently developed by such Noteholder Party or such Agent without violating this <u>Section 16.22</u> or (c) was available to such Noteholder Party or such Agent from a third party having, to such person's knowledge, no obligations of confidentiality to the Issuer or any other Note Party) and shall not reveal the same other than to its directors, partners, members, legal counsel, independent auditors, trustees, officers, employees and advisors with a need to know and any numbering, administration or settlement service providers or to any person that approves or administers the Notes on behalf of such Noteholder Party (so long as each such person shall have been instructed to keep the same confidential in accordance with this <u>Section 16.22</u>), except: (A) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded (*provided* that notice of such requirement or order shall be promptly furnished to the Issuer prior to such disclosure to the extent practicable and legally permitted), (B) as part of normal reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the Financial Industry Regulatory Authority, Inc., (C) to its parent companies, Affiliates or auditors and to their respective directors, partners, members, legal counsel, independent auditors, trustees, officers, employees and advisors (so long as each such person shall have been instructed to keep the same confidential in accordance with this <u>Section 16.22</u> and it being understood that the disclosing party shall be responsible for any breach of this <u>Section 16.22</u> by such recipient), (D) in order to enforce its rights under any Note Document in a legal proceeding, (E) disclosures made upon the request or demand of any regulatory or quasi-regulatory authority purporting to have jurisdiction over such person or any of its Affiliates, (F) to any prospective assignee or transferee of any of its rights under this Indenture (so long as such person shall have agreed with the Issuer to keep the same confidential in accordance with this <u>Section 16.22</u>, including pursuant to a "click through" agreement on the Platform), (G) disclosures with the consent of the relevant Note Party and (H) to any direct or indirect contractual counterparty in Hedging Agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees with the Issuer to be bound by the provisions of this <u>Section 16.22</u>, including pursuant to a "click through" agreement on the Platform); *provided*, that in the case of clauses

143

(F) and (H), no information may be provided to any Ineligible Institution or Competitor or person who is known to be acting for an Ineligible Institution or Competitor, in each case, to the extent that the list of Ineligible Institutions and Competitors has been made available to the disclosing Noteholder Party.  Notwithstanding anything to the contrary set forth herein, each party (and each of their respective employees, representatives or other agents) may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transactions contemplated by this Indenture and all materials of any kind (including opinions and other tax analyses) that are provided to any such party relating to such tax treatment and tax structure.  However, any information relating to the tax treatment or tax structure shall remain subject to the confidentiality provisions hereof (and the foregoing sentence shall apply) to the extent reasonably necessary to enable the parties hereto, their respective Affiliates, and all of their respective directors and employees to comply with applicable securities laws. For this purpose, "tax structure" means any facts relevant to the federal income tax treatment of the transactions contemplated by this Indenture but does not include information relating to the identity of any of the parties hereto or any of their respective Affiliates.

SECTION 16.23  Platform; Public Noteholder Party Information.  The Issuer and the Noteholder Parties hereby acknowledge that certain of the Noteholder Parties may be "public-side" Noteholder Parties (i.e., Noteholder Parties that do not wish to receive material non-public information with respect to the Issuer or its Subsidiaries or any of their respective securities) (each, a "Public Noteholder Party").  The Issuer hereby agrees that the Trustee and the Noteholder Parties are authorized to treat the Public Noteholder Party Information as solely containing information that is either (A) publicly available information or (B) not material (although it may be sensitive and proprietary) with respect to the Issuer or its Subsidiaries or any of their respective securities for purposes of United States Federal and state securities laws (*provided*, *however*, that such Public Noteholder Party Information shall be treated as set forth in Section 16.22, to the extent such Public Noteholder Party Information constitute information subject to the terms thereof).  The Noteholder Parties hereby acknowledge that any information required to be provided by the Issuer hereunder that is not Public Noteholder Party Information shall only be made available to "private side" Noteholder Parties (each, a "Private Side Noteholder Party") and that such information may contain information that is material non-public information with respect to the Issuer or its Subsidiaries or any of their respective securities for purposes of United States Federal and state securities laws and the Noteholder Parties agree to treat such information accordingly.

SECTION 16.24  USA Patriot Act Notice.  Each Noteholder Party that is subject to the USA PATRIOT Act and the Trustee (for itself and not on behalf of any Noteholder Party) hereby notifies the Issuer that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Note Party, which information includes the name and address of each Note Party and other information that will allow such Noteholder Party or the Trustee, as applicable, to identify each Note Party in accordance with the USA PATRIOT Act.

SECTION 16.25  Indenture Controls.  If and to the extent that any provision of the Notes limits, qualifies or conflicts with a provision of this Indenture, such provision of this Indenture shall control.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed by their respective authorized officers as of the date first written above.

WOLFSPEED, INC., as the Issuer

By: _____
    Name:
    Title:

WOLFSPEED TEXAS LLC, as a Subsidiary Guarantor

By: _____
    Name:
    Title:

**U.S BANK TRUST COMPANY, NATIONAL ASSOCIATION**, not in its individual capacity, but solely as the Trustee and the Collateral Agent

By:_____
  Name:  [_____]
  Title:  [_____]

**EXHIBIT A**

**[FORM OF NOTE]**

[*Insert Global Note Legend, if applicable*]

[*Insert Restricted Note Legend, if applicable*]

[*Inset OID Legend, if applicable*]

**<u>GLOBAL NOTE</u>**

[CUSIP No.: [     ]
ISIN No.: [    ]
Certificate No. [  ]
US$[    ]                                                            Date: [     ]

      FOR VALUE RECEIVED, Wolfspeed, Inc., a [North Carolina] corporation (the "<u>Issuer</u>"), hereby promises to pay [Cede & Co.] or its registered assigns (the "<u>Noteholder</u>") in lawful money of the United States of America and in immediately available funds, the principal amount of [    ] dollars ($[    ]) (as revised by the attached Schedule of Exchanges of Interests in the Global Note) in accordance with the terms of the Indenture (as defined below).

      This Note shall mature on June 23, 2030.

      The Issuer also promises to pay all accrued and unpaid interest at the rates provided in the Indenture on March 23, June 23, September 23 and December 23 of each year, commencing [    ], 202[  ]. Interest on this Note shall accrue from the most recent Interest Payment Date or, if no interest has been paid, [    ], 202[  ].

      All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The Issuer shall pay interest on the Notes (except interest accrued pursuant to clause (b) of <u>Section 2.15</u> of the Indenture) to the Paying Agent for the account of the persons who are registered Noteholders at the close of business, whether or not a Business Day, 15 days prior to an Interest Payment Date (each a "<u>Record Date</u>"). The Issuer shall pay interest accrued pursuant to clause (b) of <u>Section 2.15</u> of the Indenture to the Paying Agent for the account of the registered Noteholders as of a subsequent special record date, which the Issuer shall fix or cause to be fixed and notice of which the Issuer shall promptly mail or cause to be mailed to the registered Noteholder, which notice shall state the special record date, the payment date and the amount of such interest to be paid.

      This Note is one of the [Global Notes] referred to in, and is entitled to the benefits of, the Indenture, dated as of [  ], 2025 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Indenture</u>"), among the Issuer, the Subsidiary Guarantors party thereto from time to time and U.S. Bank Trust Company, National

A-1

Association, as trustee and collateral agent. Capitalized terms used herein without definition are used as defined in the Indenture.

The obligations under this Note are secured by a security interest in the Collateral pursuant to the Security Documents and are unconditionally guaranteed by the Subsidiary Guarantors.

This Note may be redeemed, in whole or in part, at the option of the Issuer at any time and from time to time at the redemption prices set forth in Section 3.02(a) of the Indenture.

This Note is subject to mandatory redemption and repurchase at the price set forth in the Indenture.

This Note is a Note Document, is entitled to the benefits of the Indenture and is subject to the requirements of the Indenture.  This Note is subject to all terms and provisions of the Indenture, including, without limitation, Sections 13.01 (Amendments and Waivers), 16.07 (Successors and Assigns) and 16.15 (WAIVER OF JURY TRIAL) thereof, and Noteholders are referred to the Indenture for a complete statement of such terms and provisions. The Indenture also contains certain covenants, events of default and other provisions applicable to this Note. If and to the extent that any provision of this Note limits, qualifies or conflicts with a provision of the Indenture, such provision of the Indenture shall control.  The Issuer will furnish to any Noteholder upon written request and without charge to such Noteholder a copy of the Indenture.

This Note is a registered obligation, transferable only upon notation in the Register.

This Note shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

<center>[SIGNATURE PAGE FOLLOWS]</center>

<center>A-2</center>

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

WOLFSPEED, INC.

By: _____
      Name:
      Title:

Dated:

TRUSTEE'S CERTIFICATE OF
    AUTHENTICATION

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
    as Trustee, certifies that this is
    one of the Notes
    referred to in the Indenture.

By: _____
    Authorized Signatory

Dated:

**SCHEDULE OF INCREASES AND DECREASES IN THE GLOBAL NOTE**

INITIAL PRINCIPAL AMOUNT OF THIS GLOBAL NOTE: $[___]

The following exchanges, transfers or cancellations of this Global Note have been made:

| Date | Amount of Increase (Decrease) in Principal Amount of this Global Note | Principal Amount of this Global Note After Such Increase (Decrease) | Signature of Authorized Signatory of Trustee |
| --- | --- | --- | --- |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

# ASSIGNMENT FORM

## WOLFSPEED, INC.

### Senior Secured Notes due 2030

Subject to the terms of the Indenture, the undersigned Noteholder of the Note identified below assigns (check one):

☐  the entire principal amount of

☐  $_____ [8] aggregate principal amount of

the Note identified by CUSIP No. _____ and Certificate No. _____, and all rights thereunder, to:

Name: _____

Address: _____

Social security or tax id. #: _____

and irrevocably appoints: _____

as agent to transfer the within Note on the books of the Issuer. The agent may substitute another to act for him/her.

Date:_____     _____
                                (Legal Name of Noteholder)


                                By: _____
                                    Name:
                                    Title:

                                Signature Guaranteed:


                                _____
                                     Participant in a Recognized Signature
                                     Guarantee Medallion Program


                                By: _____
                                         Authorized Signatory

_____

[8] Must be a Notes Multiple.

B-1-1

**EXHIBIT B-1**

FORM OF RESTRICTED NOTE LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW.  BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT IT IS (A) AN INSTITUTIONAL "ACCREDITED INVESTOR" AS DESCRIBED IN RULE 501(A)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT ACQUIRING THIS NOTE FOR ITS OWN ACCOUNT OR FOR THE ACCOUNTS OF ONE OR MORE OTHER INSTITUTIONAL "ACCREDITED INVESTORS" WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (B) A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) ACQUIRING THIS NOTE FOR ITS OWN ACCOUNT OR FOR THE ACCOUNTS OF ONE OR MORE OTHER "QUALIFIED INSTITUTIONAL BUYERS" WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, OR (C) IT IS NOT A "U.S. PERSON" WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT ("REGULATION S"), IS NOT ACQUIRING THIS NOTE FOR THE ACCOUNT OR FOR THE BENEFIT OF A "U.S. PERSON" AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S, (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" AS DESCRIBED IN RULE 501(A)(1), (2), (3) OR (7) OF REGULATION D  UNDER THE SECURITIES ACT ACQUIRING THIS NOTE FOR ITS OWN ACCOUNT OR FOR THE ACCOUNTS OF ONE OR MORE OTHER INSTITUTIONAL "ACCREDITED INVESTORS" WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION, (C) TO A QUALIFIED INSTITUTIONAL BUYER ACQUIRING THIS NOTE FOR ITS OWN ACCOUNT OR FOR THE ACCOUNTS OF ONE OR MORE OTHER QUALIFIED INSTITUTIONAL BUYERS WITH RESPECT TO WHICH IT EXERCISES SOLE INVESTMENT DISCRETION IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (D) OUTSIDE THE UNITED STATES TO A PERSON THAT IS NOT A "U.S. PERSON" WITHIN THE MEANING OF REGULATION S THAT IS NOT ACTING FOR THE ACCOUNT OR THE BENEFIT OF A "U.S. PERSON" IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S, (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR (F) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REQUESTS), AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.  AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

IN CONNECTION WITH ANY TRANSFER OR EXCHANGE, THE TRANSFEREE OR THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRUSTEE SUCH CERTIFICATES AND OTHER INFORMATION AS THE REGISTRAR OR TRUSTEE MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER OR EXCHANGE COMPLIES WITH THE FOREGOING RESTRICTIONS.

THE TERMS OF THIS NOTE ARE SUBJECT TO THE TERMS OF THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT AMONG [__] AND THE OTHER PARTIES FROM TIME TO TIME PARTY THERETO ENTERED INTO ON THE CLOSING DATE, AS IT MAY BE AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE INDENTURE.

**EXHIBIT B-2**

FORM OF GLOBAL NOTE LEGEND

THIS IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("DTC") OR A NOMINEE OF DTC, WHICH MAY BE TREATED BY THE ISSUER, THE TRUSTEE AND ANY AGENT THEREOF AS THE OWNER AND HOLDER OF THIS NOTE FOR ALL PURPOSES.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DTC TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE WILL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC, OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE, AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE WILL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN ARTICLE II OF THE INDENTURE HEREINAFTER REFERRED TO.

THE TERMS OF THIS NOTE ARE SUBJECT TO THE TERMS OF THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT AMONG [__] AND THE OTHER PARTIES FROM TIME TO TIME PARTY THERETO ENTERED INTO ON THE CLOSING DATE, AS IT MAY BE AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE INDENTURE.

**EXHIBIT B-3**

<u>FORM OF OID LEGEND</u>

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THIS NOTE WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT AND YIELD TO MATURITY FOR THIS NOTE BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE ISSUER AT THE FOLLOWING ADDRESS: 4600 SILICON DRIVE, DURHAM, NORTH CAROLINA, 27703, ATTENTION: [__].

**EXHIBIT C-1**

FORM OF TRANSFER CERTIFICATE FROM TRANSFEROR

WOLFSPEED, INC.,
  as the Issuer
4600 Silicon Drive
Durham, North Carolina 22703
Attention: [__]

U.S. Bank Trust Company, National Association,
  as the Trustee
333 Commerce Street, Suite 900
Nashville, Tennessee  37201
Attention: Wally Jones

Re.: Wolfspeed, Inc.

Re:      Senior Notes due 2030

Ladies and Gentlemen:

Reference is hereby made to the Indenture, dated as of [__], 2025, by and among Wolfspeed, Inc., a [North Carolina] corporation (the "Issuer"), the Subsidiary Guarantors (as defined therein) party thereto from time to time and U.S. Bank Trust Company, National Association, a national banking association, not in its individual capacity but solely as the trustee thereunder (the "Trustee") and the collateral agent thereunder. Capitalized terms used and not defined in this certificate have the meanings set forth or incorporated by reference in the Indenture.

The undersigned (the "Transferor") owns and proposes to transfer (the "Transfer") the following principal amount of the Transferor's [beneficial interests in the Global Note][Physical Note] identified in Annex A hereto:

$ _____ [9]

to:

_____ (the "Transferee"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor certifies that (check one):

1. ☐   Such Transfer is being made pursuant to, and in accordance with, Rule 144A, and, accordingly, the Transferor further certifies that such [beneficial interest][Physical Note] is being transferred to a Person that the Transferor reasonably believes is purchasing such [beneficial interest][Physical Note] for its own account, or for one or more accounts with

---

[9]      Must be a Notes Multiple.

respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A.

2. ☐   Such Transfer is being made pursuant to, and in accordance with, Rule 904 of Regulation S.

3. ☐   Such Transfer is being made pursuant to, and in accordance with, any other available exemption from the registration requirements of the Securities Act (including, if available, the exemption provided by Rule 144).

Dated: _____

_____
(Name of Transferor)

By:_____
    Name:
    Title:

Signature Guaranteed:

_____
(Participant in a Recognized Signature
Guarantee Medallion Program)

By:_____
    Authorized Signatory

Acknowledged by:

WOLFSPEED, INC., as Issuer

By: _____
    Name:
    Title:

ANNEX A TO CERTIFICATE OF TRANSFER

1.  The Transferor owns and proposes to transfer the following (check one):

    a. ☐   A beneficial interest in a Rule 144A Global Note identified by:
          CUSIP No. _____

    b. ☐   A beneficial interest in an IAI Global Note identified by:
          CUSIP No. _____

    c. ☐   A beneficial interest in a Regulation S Global Note identified by:
          CUSIP No. _____

2.  After the Transfer, the Transferee will hold the following (check one):

    a. ☐   A beneficial interest in a Rule 144A Global Note identified by:
          CUSIP No. _____

    b. ☐   A beneficial interest in an IAI Global Note identified by:
          CUSIP No. _____

    c. ☐   A beneficial interest in a Regulation S Global Note identified by:
          CUSIP No. _____

**EXHIBIT C-2**

FORM OF TRANSFER CERTIFICATE FROM TRANSFEREE

WOLFSPEED, INC.,
  as the Issuer
4600 Silicon Drive
Durham, North Carolina 22703
Attention: [___]

U.S. Bank Trust Company, National Association,
  as the Trustee
333 Commerce Street, Suite 900
Nashville, Tennessee  37201
Attention: Wally Jones

Re.: Wolfspeed, Inc.

      Re:     <u>Senior Notes due 2030</u>

Ladies and Gentlemen:

Reference is hereby made to the Indenture, dated as of [___], 2025, by and among Wolfspeed, Inc., a [North Carolina] corporation (the "Issuer"), the Subsidiary Guarantors (as defined therein) party thereto from time to time and U.S. Bank Trust Company, National Association, a national banking association, not in its individual capacity but solely as the trustee thereunder (the "Trustee") and the collateral agent thereunder.  Capitalized terms used and not defined in this certificate have the meanings set forth or incorporated by reference in the Indenture.

The undersigned (the "Transferee") certifies, in connection with its proposed acquisition (the "Acquisition") of:

$ _____ [10] aggregate principal amount of Notes certifies as follows:

1.  Either (check one):

    a.  ☐  <u>Rule 144A Transaction</u>. The Transferee is acquiring the Notes for the Transferee's own account or for an account with respect to which the Transferee exercises sole investment discretion, and the Transferee and such account are a "qualified institutional buyer" (as defined under Rule 144A) and the Transferee makes the representations set forth in Annex A hereto;

---

[10]      Must be a Notes Multiple.

b. ☐ <u>IAI Transaction</u>. The Transferee is acquiring the Notes for the Transferee's own account or for an account with respect to which the Transferee exercises sole investment discretion, and the Transferee and such account are an institutional "accredited investor" (as defined under Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) and the Transferee makes the representations set forth in Annex B hereto; or

c. ☐ <u>Regulation S Transaction</u>. The Transferee acknowledges that the Acquisition is being made pursuant to Regulation S and the Transferee makes the representations set forth in Annex C hereto.

Dated: _____

_____
(Name of Transferee)

_____
(Address of Transferee)

_____
(Taxpayer ID Number)

By:_____
    Name:
    Title:

Acknowledged by:

WOLFSPEED, INC., as Issuer

By: _____
    Name:
    Title:

ANNEX A TO CERTIFICATE OF TRANSFER

The Transferee represents and warrants to you that:

1. The Transferee is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), acquiring or holding the Notes for its own account or for the account of one or more such "qualified institutional buyers" with respect to which it exercises sole investment discretion, in a minimum denomination of $1.00 and integral multiples of $1.00 in excess thereof, and the Transferee is acquiring the Notes not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act. The Transferee has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in the Notes, and it invests in or purchases securities similar to the Notes in the normal course of its business. The Transferee, and any accounts for which it is acting, are each able to bear the economic risk of Transferee's or its investment.

2. The Transferee understands that the Notes have not been registered under the Securities Act or the securities laws of any state or other jurisdiction and, accordingly, may not be sold except as permitted in the following sentence. The Transferee agrees on its own behalf and on behalf of any investor account for which it is purchasing Notes to offer, sell or otherwise transfer such Notes only (a) in the United States to a person that is an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act), purchasing for its own account or for the account of one or more such institutional "accredited investors" with respect to which it exercises sole investment discretion and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act, (b) in the United States to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) acquiring such Notes for its own account or the accounts of one or more other "qualified institutional buyers" with respect to which it exercises sole investment discretion in a transaction meeting the requirements of Rule 144A, (c) outside the United States to a person that is not a "U.S. person" within the meaning of Regulation S under the Securities Act that is not acting for the account or the benefit of a "U.S. person" in an offshore transaction in accordance with Rule 904 of Regulation S under the Securities Act or (d) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder, in each of cases (a) through (d) in accordance with any applicable securities laws of any state of the United States. In addition, the Transferee will, and each subsequent holder is required to, notify any purchaser of the Note evidenced hereby of the resale restrictions set forth above.

ANNEX B TO CERTIFICATE OF TRANSFER

The Transferee represents and warrants to you that:

1.  The Transferee is an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act), acquiring or holding the Notes for its own account or for the account of one or more such institutional "accredited investors" with respect to which it exercises sole investment discretion, in a minimum denomination of $1.00 and integral multiples of $1.00 in excess thereof, and the Transferee is acquiring the Notes not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act.  The Transferee has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and it invests in or purchases securities similar to the Notes in the normal course of its business.  The Transferee, and any accounts for which it is acting, are each able to bear the economic risk of the Transferee's or its investment.

2.  The Transferee understands that the Notes have not been registered under the Securities Act or the securities laws of any state or other jurisdiction and, accordingly, may not be sold except as permitted in the following sentence.  The Transferee agrees on its own behalf and on behalf of any investor account for which it is purchasing Notes to offer, sell or otherwise transfer such Notes only (a) in the United States to a person that is an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act), purchasing for its own account or for the account of one or more such institutional "accredited investors" with respect to which it exercises sole investment discretion and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act, (b) in the United States to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) acquiring such Notes for its own account or the accounts of one or more other "qualified institutional buyers" with respect to which it exercises sole investment discretion in a transaction meeting the requirements of Rule 144A, (c) outside the United States to a person that is not a "U.S. person" within the meaning of Regulation S under the Securities Act that is not acting for the account or the benefit of a "U.S. person" in an offshore transaction in accordance with Rule 904 of Regulation S under the Securities Act or (d) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder, in each of cases (a) through (d) in accordance with any applicable securities laws of any state of the United States.  In addition, the Transferee will, and each subsequent holder is required to, notify any purchaser of the Note evidenced hereby of the resale restrictions set forth above.

ANNEX C TO CERTIFICATE OF TRANSFER

The Transferee represents and warrants to you that:

1.  The Transferee is (A) not a "U.S. person" within the meaning of Regulation S under the Securities Act and are not acting for the account or the benefit of a "U.S. person"; (B) acquiring the Notes outside the United States in an "offshore transaction" (as defined in Rule 902(h) of Regulation S under the Securities Act) in compliance with Regulation S under the Securities Act; and (C) not purchasing the Notes as a result of any "directed selling efforts" (within the meaning of Regulation S under the Securities Act). The Transferee is acquiring the Notes in a minimum denomination of $1.00 and integral multiples of $1.00 in excess thereof, and it is acquiring the Notes not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act.  The Transferee has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and it invests in or purchases securities similar to the Notes in the normal course of its business.  The Transferee, and any accounts for which it is acting, are each able to bear the economic risk of the Transferee's or its investment.

2.  The Transferee understands that the Notes have not been registered under the Securities Act or the securities laws of any state or other jurisdiction and, accordingly, may not be sold except as permitted in the following sentence.  The Transferee agrees on its own behalf and on behalf of any investor account for which it is purchasing Notes to offer, sell or otherwise transfer such Notes only (a) in the United States to a person that is an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act), purchasing for its own account or for the account of one or more such institutional "accredited investors" with respect to which it exercises sole investment discretion and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act, (b) in the United States to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) acquiring such Notes for its own account or the accounts of one or more other "qualified institutional buyers" with respect to which it exercises sole investment discretion in a transaction meeting the requirements of Rule 144A, (c) outside the United States to a person that is not a "U.S. person" within the meaning of Regulation S under the Securities Act that is not acting for the account or the benefit of a "U.S. person" in an offshore transaction in accordance with Rule 904 of Regulation S under the Securities Act or (d) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder, in each of cases (a) through (d) in accordance with any applicable securities laws of any state of the United States.  In addition, the Transferee will, and each subsequent holder is required to, notify any purchaser of the Note evidenced hereby of the resale restrictions set forth above.

## EXHIBIT D-2

### Form of New 2L Indenture

The draft form of indenture attached hereto is subject to the parties' ongoing review and comment in respects.  The terms in this form of indenture are subject to change.  This indenture represents a form of indenture, which will be appropriately modified for each of (i) the New 2L Takeback Notes Indenture, (ii) the New Renesas 2L Takeback Convertible Notes Indenture, and (iii) the New 2L Convertible Notes Indenture in accordance with the Restructuring Support Agreement.

*[Plan Supplement Filing Version 8/12/2025]*

*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

**WOLFSPEED, INC.[1]**

as Issuer

**THE SUBSIDIARY GUARANTORS PARTY HERETO FROM TIME TO TIME,**

as Subsidiary Guarantors

and

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,**

as Trustee and Collateral Agent

INDENTURE

Dated as of [●], 2025

2.5% Convertible Second Lien Senior Secured Notes due 2031

**THIS INDENTURE IS SUBJECT TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENTS (AS DEFINED HEREIN).**

---

[1]  <u>Note to Draft</u>: This draft form of indenture is subject to the parties' ongoing review and comment in respects. The terms in this form of indenture are subject to change. This indenture represents a form of indenture, which will be appropriately modified for each of Wolfspeed, Inc.'s (the "Issuer") (i) New 2L Takeback Notes, (ii) New Renesas 2L Takeback Convertible Notes and (iii) New 2L Convertible Notes, each as defined in that certain Restructuring Support Agreement, dated as of June 22, 2025 amongst the parties named therein, to be issued pursuant to the Issuer's Bankruptcy Plan and Confirmation Order, in each case as defined herein, in accordance with the terms of the Restructuring Support Agreement.

# WOLFSPEED, INC.

Reconciliation and tie between Trust Indenture Act of 1939 and
Indenture, dated as of [●], 2025

§ 310(a)(1) ..................................................................................................10.09
(a)(2) ..........................................................................................................10.09
(a)(3) ................................................................................................Not Applicable
(a)(4) ................................................................................................Not Applicable
(a)(5) ..........................................................................................................10.09
(b) ..............................................................................................................10.09
§ 311(a) ......................................................................................................10.10
(b) ..............................................................................................................10.10
(c) ....................................................................................................Not Applicable
§ 312(a) ........................................................................................................2.08
(b) ................................................................................................................2.08
(c) ................................................................................................................2.08
§ 313(a) ......................................................................................................10.10
(b)(1) ..........................................................................................................10.10
(b)(2) ..........................................................................................................10.10
(c) ..............................................................................................................10.10
(d) ..............................................................................................................10.10
§ 314(a) ......................................................................................3.03, 13.01, 13.03
(b) ....................................................................................................Not Applicable
(c)(1) ..........................................................................................................13.02
(c)(2) ..........................................................................................................13.02
(c)(3) ................................................................................................Not Applicable
(d) ....................................................................................................Not Applicable
(e) ..............................................................................................................13.03
(f) ....................................................................................................Not Applicable
§ 315(a) ......................................................................................................10.01
(b) ..............................................................................................................10.05
(c) ..............................................................................................................10.01
(d) ..............................................................................................................10.01
(e) ................................................................................................................7.04
§ 316(a)(last sentence) ..................................................................................2.16
(a)(1)(A) ......................................................................................................7.07
(a)(1)(B) ......................................................................................................7.05
(a)(2) ................................................................................................Not Applicable
(b) ................................................................................................................7.09
(c) ................................................................................................................2.05
§ 317(a)(1) ....................................................................................................7.09
(a)(2) ..........................................................................................................7.11
(b) ................................................................................................................2.07
§ 318(a) ......................................................................................................13.16

Note: This reconciliation and tie shall not, for any purpose, be deemed to be part of the Indenture.

## TABLE OF CONTENTS

**Page**

Article 1. DEFINITIONS; RULES OF CONSTRUCTION ........................................2
  SECTION 1.01. DEFINITIONS ....................................................................2
  SECTION 1.02. OTHER DEFINITIONS. ......................................................46
  SECTION 1.03. RULES OF CONSTRUCTION ...........................................47
  SECTION 1.04. CONFLICT WITH TRUST INDENTURE ACT .....................48
  SECTION 1.05. LIMITED CONDITION TRANSACTIONS ............................49

Article 2. THE NOTES ...................................................................................50
  SECTION 2.01. FORM, DATING AND DENOMINATIONS ...........................50
  SECTION 2.02. EXECUTION, AUTHENTICATION AND DELIVERY .............50
  SECTION 2.03. INITIAL NOTES AND ADDITIONAL NOTES ......................51
  SECTION 2.04. METHOD OF PAYMENT ...................................................52
  SECTION 2.05. ACCRUAL OF INTEREST; DEFAULTED AMOUNTS; WHEN PAYMENT
               DATE IS NOT A BUSINESS DAY .......................................52
  SECTION 2.06. REGISTRAR, PAYING AGENT AND CONVERSION AGENT ...53
  SECTION 2.07. PAYING AGENT AND CONVERSION AGENT TO HOLD PROPERTY IN
               TRUST ...........................................................................54
  SECTION 2.08. HOLDER LISTS ...............................................................54
  SECTION 2.09. LEGENDS .......................................................................55
  SECTION 2.10. TRANSFERS AND EXCHANGES[; CERTAIN TRANSFER RESTRICTIONS] .............56
  SECTION 2.11. EXCHANGE AND CANCELLATION OF NOTES TO BE CONVERTED OR TO
               BE REPURCHASED PURSUANT TO A REPURCHASE UPON FUNDAMENTAL
               CHANGE OR REDEMPTION ...............................................61
  SECTION 2.12. [RESERVED.][REMOVAL OF TRANSFER RESTRICTIONS ...................61
  SECTION 2.13. REPLACEMENT NOTES ....................................................61
  SECTION 2.14. REGISTERED HOLDERS; CERTAIN RIGHTS WITH RESPECT TO GLOBAL
               NOTES ...........................................................................62
  SECTION 2.15. CANCELLATION ..............................................................62
  SECTION 2.16. NOTES HELD BY THE ISSUER OR ITS AFFILIATES ............62
  SECTION 2.17. TEMPORARY NOTES ........................................................63
  SECTION 2.18. OUTSTANDING NOTES .....................................................63
  SECTION 2.19. REPURCHASES BY THE ISSUER ......................................64
  SECTION 2.20. CUSIP AND ISIN NUMBERS ...........................................64
  SECTION 2.21. TAX TREATMENT .............................................................64

Article 3. COVENANTS .................................................................................65
  SECTION 3.01. CONTINGENT CONSIDERATION ......................................65
  SECTION 3.02. PAYMENT ON NOTES ......................................................65
  SECTION 3.03. EXCHANGE ACT REPORTS. ............................................65
  SECTION 3.04. RULE 144A INFORMATION. .............................................66
  SECTION 3.05. [RESERVED] ..................................................................66

SECTION 3.06. [RESERVED] ................................................................................66
SECTION 3.07. COMPLIANCE AND DEFAULT CERTIFICATES ....................................66
SECTION 3.08. STAY, EXTENSION AND USURY LAWS ..............................................66
SECTION 3.09. CORPORATE EXISTENCE ................................................................67
SECTION 3.10. [RESERVED] ................................................................................67
SECTION 3.11. FURTHER INSTRUMENTS AND ACTS .................................................67
SECTION 3.12. INDEBTEDNESS ............................................................................67
SECTION 3.13. LIENS .........................................................................................72
SECTION 3.14. SALE AND LEASE-BACK TRANSACTIONS ...........................................73
SECTION 3.15. RESTRICTED PAYMENTS ................................................................73
SECTION 3.16. ASSET DISPOSITIONS .....................................................................76
SECTION 3.17. DISPOSITION OF MATERIAL IP ........................................................79
SECTION 3.18. TRANSACTIONS WITH AFFILIATES ...................................................79
SECTION 3.19. [RESERVED] ................................................................................81
SECTION 3.20. DIVIDENDS AND OTHER PAYMENT RESTRICTIONS AFFECTING
SUBSIDIARIES .............................................................................81
SECTION 3.21. FURTHER ASSURANCES; ADDITIONAL SECURITY ...........................83
SECTION 3.22. POST-CLOSING ............................................................................87
SECTION 3.23. [RESERVED] ................................................................................87

Article 4.        REPURCHASE AND REDEMPTION ..................................................88

SECTION 4.01. NO SINKING FUND ........................................................................88
SECTION 4.02. RIGHT OF HOLDERS TO REQUIRE THE ISSUER TO REPURCHASE NOTES
UPON A FUNDAMENTAL CHANGE ..................................................88
SECTION 4.03. RIGHT OF THE ISSUER TO REDEEM THE NOTES ................................93

Article 5.        CONVERSION ...........................................................................95

SECTION 5.01. RIGHT TO CONVERT .....................................................................95
SECTION 5.02. CONVERSION PROCEDURES ...........................................................96
SECTION 5.03. SETTLEMENT UPON CONVERSION ...................................................98
SECTION 5.04. RESERVE AND STATUS OF COMMON STOCK ISSUED UPON CONVERSION ......101
SECTION 5.05. ADJUSTMENTS TO THE CONVERSION RATE.....................................102
SECTION 5.06. VOLUNTARY ADJUSTMENTS ........................................................113
SECTION 5.07. ADJUSTMENTS TO THE CONVERSION RATE IN CONNECTION WITH A
MAKE-WHOLE EVENT ................................................................113
SECTION 5.08. EXCHANGE IN LIEU OF CONVERSION .............................................116
SECTION 5.09. EFFECT OF COMMON STOCK CHANGE EVENT ...............................116
SECTION 5.10. [RESERVED][BENEFICIAL OWNERSHIP LIMITATIONS]....................118
SECTION 5.11. RESPONSIBILITY OF TRUSTEE AND CONVERSION AGENT...............120
SECTION 5.12. [REGULATORY APPROVALS] ........................................................121

Article 6.        SUCCESSORS ..........................................................................121

SECTION 6.01. WHEN THE ISSUER AND SUBSIDIARY GUARANTORS MAY MERGE, ETC ........121
SECTION 6.02. SUCCESSOR ENTITY SUBSTITUTED ...............................................123

Article 7.        DEFAULTS AND REMEDIES ........................................................123

SECTION 7.01. EVENTS OF DEFAULT ........................................................................123
SECTION 7.02. ACCELERATION ..............................................................................126
SECTION 7.03. SOLE REMEDY FOR A FAILURE TO REPORT ............................................127
SECTION 7.04. OTHER REMEDIES ...........................................................................128
SECTION 7.05. WAIVER OF PAST DEFAULTS ..............................................................128
SECTION 7.06. [RESERVED] ..................................................................................128
SECTION 7.07. CONTROL BY MAJORITY ...................................................................128
SECTION 7.08. LIMITATION ON SUITS .....................................................................129
SECTION 7.09. ABSOLUTE RIGHT OF HOLDERS TO INSTITUTE SUIT FOR THE
              ENFORCEMENT OF THE RIGHT TO RECEIVE PAYMENT AND
              CONVERSION ...................................................................................129
SECTION 7.10. COLLECTION BY TRUSTEE .................................................................129
SECTION 7.11. PREFERENTIAL COLLECTION OF CLAIMS AGAINST ISSUER ........................130
SECTION 7.12. TRUSTEE MAY FILE PROOFS OF CLAIM ................................................130
SECTION 7.13. [RESERVED] ..................................................................................130
SECTION 7.14. SUMS RECEIVED BY DEBTORS AND THIRD-PARTY SECURITY
              PROVIDERS .....................................................................................130
SECTION 7.15. PRIORITIES ....................................................................................131
SECTION 7.16. UNDERTAKING FOR COSTS ................................................................132
SECTION 7.17. COLLATERAL AGENT EXPENSE REIMBURSEMENT .....................................132

Article 8.     AMENDMENTS, SUPPLEMENTS AND WAIVERS .................................132

SECTION 8.01. WITHOUT THE CONSENT OF HOLDERS .................................................132
SECTION 8.02. [WITH THE CONSENT OF HOLDERS .....................................................134
SECTION 8.03. [WITH THE CONSENT OF SUPERMAJORITY HOLDERS. ..............................136
SECTION 8.04. NOTICE OF AMENDMENTS, SUPPLEMENTS AND WAIVERS ..........................137
SECTION 8.05. REVOCATION, EFFECT AND SOLICITATION OF CONSENTS; SPECIAL
              RECORD DATES; ETC ........................................................................137
SECTION 8.06. NOTATIONS AND EXCHANGES ............................................................138
SECTION 8.07. TRUSTEE AND COLLATERAL AGENT TO EXECUTE SUPPLEMENTAL
              INDENTURES ...................................................................................138

Article 9.     SATISFACTION AND DISCHARGE; DEFEASANCE ..............................138

SECTION 9.01. TERMINATION OF ISSUER'S OBLIGATIONS ............................................138
SECTION 9.02. APPLICATION OF TRUST MONEY. .......................................................141
SECTION 9.03. REPAYMENT TO ISSUER ...................................................................141
SECTION 9.04. REINSTATEMENT .............................................................................141

Article 10.    TRUSTEE .......................................................................................142

SECTION 10.01. DUTIES OF THE TRUSTEE .................................................................142
SECTION 10.02. RIGHTS OF THE TRUSTEE .................................................................143
SECTION 10.03. INDIVIDUAL RIGHTS OF THE TRUSTEE ................................................144
SECTION 10.04. TRUSTEE'S DISCLAIMER ..................................................................145
SECTION 10.05. NOTICE OF DEFAULTS .....................................................................145
SECTION 10.06. COMPENSATION AND INDEMNITY ......................................................145
SECTION 10.07. REPLACEMENT OF THE TRUSTEE. .......................................................146

SECTION 10.08.   SUCCESSOR TRUSTEE BY MERGER, ETC. ..................................................147
SECTION 10.09.   ELIGIBILITY; DISQUALIFICATION..................................................................147
SECTION 10.10.   REPORTS BY THE TRUSTEE ........................................................................148

Article 11.      COLLATERAL AND SECURITY ....................................................148

SECTION 11.01.   COLLATERAL AGENT..................................................................................148
SECTION 11.02.   DELEGATION OF DUTIES ...........................................................................155
SECTION 11.03.   SECURITY DOCUMENTS .............................................................................156
SECTION 11.04.   AUTHORIZATION OF ACTIONS TO BE TAKEN .................................................157
SECTION 11.05.   RELEASE OR SUBORDINATION OF LIENS .......................................................158
SECTION 11.06.   POWERS EXERCISABLE BY RECEIVER OR TRUSTEE...........................................159
SECTION 11.07.   RELEASE UPON TERMINATION OF THE ISSUER'S OBLIGATIONS..........................160
SECTION 11.08.   RIGHT TO REALIZE ON COLLATERAL AND ENFORCE GUARANTEES ....................160
SECTION 11.09.   PARALLEL DEBT (COVENANT TO PAY THE COLLATERAL AGENT) ................161

Article 12.      GUARANTEES...............................................................................162

SECTION 12.01.   SUBSIDIARY GUARANTEES ........................................................................162
SECTION 12.02.   EXECUTION AND DELIVERY .......................................................................164
SECTION 12.03.   [RESERVED] ............................................................................................164
SECTION 12.04.   RELEASES OF SUBSIDIARY GUARANTEES ......................................................165
SECTION 12.05.   INSTRUMENT FOR THE PAYMENT OF MONEY .................................................166
SECTION 12.06.   LIMITATION ON SUBSIDIARY GUARANTOR LIABILITY ....................................166
SECTION 12.07.   "TRUSTEE" TO INCLUDE PAYING AGENT .....................................................166

Article 13.      MISCELLANEOUS ........................................................................166

SECTION 13.01.   NOTICES .................................................................................................166
SECTION 13.02.   DELIVERY OF OFFICER'S CERTIFICATE AND OPINION OF COUNSEL AS
                 TO CONDITIONS PRECEDENT .......................................................................169
SECTION 13.03.   STATEMENTS REQUIRED IN OFFICER'S CERTIFICATE AND OPINION OF
                 COUNSEL ................................................................................................169
SECTION 13.04.   RULES BY THE TRUSTEE, THE REGISTRAR AND THE PAYING AGENT ............170
SECTION 13.05.   NO PERSONAL LIABILITY OF DIRECTORS, OFFICERS, EMPLOYEES AND
                 STOCKHOLDERS .......................................................................................170
SECTION 13.06.   GOVERNING LAW; WAIVER OF JURY TRIAL .................................................170
SECTION 13.07.   SUBMISSION TO JURISDICTION ...................................................................170
SECTION 13.08.   NO ADVERSE INTERPRETATION OF OTHER AGREEMENTS .............................171
SECTION 13.09.   SUCCESSORS.............................................................................................171
SECTION 13.10.   FORCE MAJEURE ......................................................................................171
SECTION 13.11.   U.S.A .....................................................................................................171
SECTION 13.12.   CALCULATIONS ........................................................................................172
SECTION 13.13.   SEVERABILITY ..........................................................................................172
SECTION 13.14.   COUNTERPARTS ........................................................................................172
SECTION 13.15.   TABLE OF CONTENTS, HEADINGS, ETC. ......................................................172
SECTION 13.16.   PROVISION REQUIRED BY TRUST INDENTURE ACT TO CONTROL...................173
SECTION 13.17.   WITHHOLDING TAXES ...............................................................................173

Article 14.        INTERCREDITOR ARRANGEMENTS ............................................................173

    SECTION 14.01.   INTERCREDITOR AGREEMENTS ......................................................173
    SECTION 14.02.   ADDITIONAL INTERCREDITOR AGREEMENTS ..................................................173

<u>Exhibits</u>

Exhibit A: Form of Note ............................................................................................ A-1

Exhibit B-1: [Form of Restricted Note Legend ..................................................B1-1]²

Exhibit B-2: Form of Global Note Legend ......................................................[B2-1]

Exhibit C: Form of Supplemental Indenture........................................................C-1

Exhibit D: Agreed Security Principles.................................................................. D-1

---

² <u>Note to Draft</u>: Not applicable to the New Renesas 2L Takeback Convertible Notes.

**INDENTURE**, dated as of [●], 2025, among Wolfspeed, Inc., a [Delaware][3] corporation (the "**Issuer**"), the Subsidiary Guarantors (as defined below) party hereto from time to time and U.S. Bank Trust Company, National Association, a national banking association, not in its individual capacity but solely as the trustee hereunder (the "**Trustee**") and as the collateral agent (the "**Collateral Agent**") hereunder.

## RECITALS

WHEREAS, on June 30, 2025, the Issuer and its wholly owned subsidiary, Wolfspeed Texas LLC, commenced voluntary cases, jointly administered under the caption *In re Wolfspeed, Inc., et al.*, Case No. 25-90163 (CML) (the "**Chapter 11 Cases**"), under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (Houston Division) (the "**Bankruptcy Court**");

WHEREAS, pursuant to the terms and conditions of the Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate (Docket No. 8), dated [June 27, 2025] (as the same may be amended, modified or restated from time to time, and together with all appendices, exhibits and supplements thereto, the "**Bankruptcy Plan**") relating to the reorganization under Chapter 11 of Title 11 of the United States Code of the Issuer and its wholly owned subsidiary, Wolfspeed Texas LLC, which Bankruptcy Plan was confirmed by order, dated [●], 2025, of the Bankruptcy Court (the "**Confirmation Order**"), [certain holders of Convertible Notes Claims (as defined in the Bankruptcy Plan) are][Renesas (as defined herein) is][4] to be issued the Notes (as defined herein) in an initial aggregate principal amount equal to $[331,380,000][204,000,000] (the "**Initial Notes**");

WHEREAS, (a) all acts and things necessary to make (i) the Notes, when executed by the Issuer and authenticated and delivered by the Trustee or a duly authorized authenticating agent, as in this Indenture provided, the valid, binding and legal obligations of the Issuer; (ii) the Guarantees of the Subsidiary Guarantors hereunder the valid, binding and legal obligations of the Subsidiary Guarantors; and (iii) this Indenture a valid agreement of the Issuer and the Subsidiary Guarantors, according to its terms, have been done and performed, and (b) the execution of this Indenture and the issuance hereunder of the Notes have in all respects been duly authorized.

NOW, THEREFORE, in order to declare the terms and conditions upon which the Notes are, and are to be, authenticated, issued and delivered, and in consideration of the premises set forth herein, the Issuer and the Subsidiary Guarantors covenant and agree with the Trustee and Collateral Agent for the equal and proportionate benefit of the respective Holders from time to time of the Notes (except as otherwise provided below), as follows:

---

[3] <u>Note to Draft</u>: To be confirmed.

[4] <u>Note to Draft</u>: Certain bracketed text represents distinctions between the New Renesas 2L Takeback Convertible Notes and the New 2L Convertible Notes.

## Article 1.        DEFINITIONS; RULES OF CONSTRUCTION

**Section 1.01.  DEFINITIONS.**

"**Account Control Agreement**" means (a) with respect to any Deposit Account or Securities Account held or located in the United States, a customary account control agreement which provides for the Collateral Agent to have "control" (as defined in Section 9-104 of the Uniform Commercial Code or Section 8-106 of the Uniform Commercial Code, as applicable) of Deposit Accounts or Securities Accounts, as applicable and (b) with respect to any other Deposit Account or Securities Account, such agreement as is necessary to obtain a perfected security interest under the laws of the applicable jurisdiction over such Deposit Account or Securities Account and which provides for the Collateral Agent to have the equivalent of "control" (as defined in Section 9-104 of the Uniform Commercial Code or Section 8-106 of the Uniform Commercial Code, as applicable) (to the extent such equivalent concept exists under the laws of the jurisdiction where such Deposit Account or Securities Account, as applicable, is held or located) of such Deposit Accounts or Securities Accounts, as applicable.

"**Affiliate**" means, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified. [For the avoidance of doubt, the Note Parties and the Trustee hereby acknowledge that Renesas shall not be considered an Affiliate of any Note Party for purposes of this Indenture.]

"**Agreed Security Principles**" means the principles set forth in **Exhibit D**.

"**Acquired Indebtedness**" means, with respect to any specific Person: (i) Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Subsidiary of, such specified Person; and (ii) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person or any Subsidiary of such Person.

"**Asset Disposition**" means: (i) any sale, lease, conveyance or other Disposition by the Issuer or any Subsidiary of any assets (including by way of a Sale and Lease-Back Transaction, or by operation of law) (provided that the sale, lease, conveyance or other Disposition of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, shall not be an "Asset Disposition" but instead  shall be governed by **Section 6.01**) or (ii) the issuance or sale of Equity Interests of any Subsidiary of the Issuer, or the sale by the Issuer or any of its Subsidiaries of Equity Interests in any Subsidiary of the Issuer (in each case, other than directors' qualifying shares and shares to be held by third parties to meet applicable legal requirements); provided that the term "Asset Disposition" shall not include any of the following:

(A)        (i) the purchase and Disposition of inventory in the ordinary course of business by the Issuer or any Subsidiary, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business by the Issuer or any Subsidiary or, with respect to operating leases, otherwise for fair market value on market terms (as determined in good faith by the Issuer), (iii) the Disposition of surplus, obsolete, damaged or worn out equipment or other

property in the ordinary course of business by the Issuer or any Subsidiary, (iv) the Disposition of tools, equipment and similar property in exchange for, or the proceeds of the Disposition of which will be applied towards the purchase price of, new or replacement tools, equipment or similar property or (v) the Disposition of Permitted Investments in the ordinary course of business;

(B)     [Reserved];

(C)     Dispositions (i) to the Issuer or a Subsidiary Guarantor (upon voluntary liquidation or otherwise), (ii) by the Issuer or any Subsidiary Guarantor to any Subsidiary that is not a Note Party (other than of any Material IP) for fair market value as determined in good faith by the Issuer acting in its reasonable discretion or (iii) by any Subsidiary that is not a Note Party to the Issuer or any Subsidiary;

(D)     so long as no Event of Default exists or would result therefrom, Sale and Lease-Back Transactions permitted by **Section 3.14**; *provided* that if such Sale and Lease-Back Transaction results in a Capitalized Lease Obligation, such Capitalized Lease Obligation is permitted by **Section 3.12** and any Lien made the subject of such Capitalized Lease Obligation is permitted by **Section 3.13**;

(E)     any Restricted Payments permitted by **Section 3.15** and any Permitted Investments;

(F)     Dispositions of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(G)     other Dispositions of assets to a person that is not an Affiliate of any Note Party; provided, that (i) at the time of the execution of the definitive documentation for such Disposition, no Event of Default shall exist or would result from such Disposition, (ii) the requirements of **Section 3.16(A)** shall apply to such Disposition and (iii) the Net Proceeds thereof, if any, are applied in accordance with **Section 3.16(B)**;

(H)     [Reserved];

(I)     leases or subleases or licenses or sublicenses of any real or personal property (including licenses of Intellectual Property) in the ordinary course of business and consistent with past practice or industry practices;

(J)     Dispositions of inventory or Dispositions or abandonment of Intellectual Property of the Issuer and its Subsidiaries determined in good faith by the management of the Issuer to be no longer useful or necessary in the operation of the business of the Issuer or any of the Subsidiaries;

(K)     other Dispositions for fair market value as determined in good faith by the Issuer (acting in its reasonable discretion) with an aggregate value per fiscal year not in excess of the greater of (x) $20,000,000 and (y) [●]% of Consolidated Total Assets per fiscal year;

(L)     dedications or dispositions of roads constituting Real Property, or the granting of easements, rights of way, rights of access and/or similar rights in Real Property, to any Governmental Authority, utility providers, cable or other communication providers and/or other parties providing services or benefits to any project that, would not reasonably be expected to

interfere in any material respect with the operations of the Issuer and its Subsidiaries; provided that upon request by the Issuer accompanied by the documents required by **Section 11.05**, the Collateral Agent shall (i) release its Mortgage on the portions of such Real Property dedicated or disposed of or (ii) subordinate its Mortgage on such Real Property to such easement, right of way, right of access or similar agreement, in each case, in such form as is reasonably satisfactory to Collateral Agent and the Issuer;

(M)     Dispositions contractually committed as of, or contemplated as of, the Issue Date; and

(N)     to the extent constituting an Asset Disposition, any termination, settlement or extinguishment of Hedging Agreements or other contractual obligations.

"**Authorized Denomination**" means, with respect to a Note, a principal amount thereof equal to $1,000 or any integral multiple of $1,000.00 in excess thereof.

"**Bankruptcy Law**" means Title 11, United States Code or any similar U.S. federal or state or non-U.S. law for the relief of debtors.

"**Board of Directors**" means the board of directors of the Issuer or a committee of such board duly authorized to act on behalf of such board.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City (and in respect of payments, the place of payment) [or the State of North Carolina] are authorized or required by law to remain closed.

"**Capital Expenditures**" means, for any person in respect of any period, the aggregate of all expenditures incurred by such person during such period that, in accordance with GAAP, are or should be included in "additions to property, plant or equipment" or similar items reflected in the statement of cash flows of such person.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease or finance lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; *provided* that obligations of the Issuer or its Subsidiaries, either existing on the Issue Date or created thereafter that (a) initially were not included on the consolidated balance sheet of the Issuer as capital lease or finance lease obligations and were subsequently recharacterized as capital lease or finance lease obligations or, in the case of a special purpose or other entity becoming consolidated with the Issuer and its Subsidiaries were required to be characterized as capital lease or finance obligations upon such consolidation, in either case, due to a change in accounting treatment or otherwise, or (b) did not exist on the Issue Date and were required to be characterized as capital lease or finance lease obligations but would not have been required to be treated as capital lease or finance lease obligations on the Issue Date had they existed at that time, shall for all purposes not be treated as Capitalized Lease Obligations or Indebtedness.

"**Cash Equivalents**" shall mean:

(A)     direct obligations of the United States of America, the United Kingdom or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America, the United Kingdom or any member of the European Union or any agency thereof, in each case with maturities not exceeding one year from the date of acquisition thereof;

(B)     time deposit accounts, certificates of deposit and money market deposits maturing within 180 days of the date of acquisition thereof issued by a bank, trust company or other financial institution that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America, having capital, surplus and undivided profits in excess of $500 million and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(C)     repurchase obligations with a term of not more than 185 days for underlying securities of the types described in **clause (A)** above entered into with a bank meeting the qualifications described in **clause (B)** above;

(D)     commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation (other than an Affiliate of the Issuer) organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P-1 (or higher) according to Moody's, or A-1 (or higher) according to S&P or F1 or higher by Fitch (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(E)     securities with maturities of six months or less from the date of acquisition, issued and fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's or A by Fitch (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(F)     shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of **clauses (A)** through **(E)** above;

(G)     money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P or Aaa by Moody's or AAA by Fitch and (iii) have portfolio assets of at least $500.0 million;

(H)     time deposit accounts, certificates of deposit and money market deposits in an aggregate face amount not in excess of 0.5% of Consolidated Total Assets;

(I)     any Investments permitted by the Issuer's investment policy [(other than any Investment permitted by **Article 9** thereof)], as in effect on the Issue Date; and

(J)     instruments equivalent to those referred to in **clauses (A)** through **(I)** above denominated in any foreign currency comparable in credit quality and tenor to those referred to above and commonly used by corporations for cash management purposes in any jurisdiction

outside the United States of America to the extent reasonably required in connection with any business conducted by any Note Party or any Subsidiary, in each case, organized in such jurisdiction.

"**Cash Management Agreement**" means any agreement to provide to the Issuer or any Subsidiary cash management services for collections, treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), any demand deposit, payroll, trust or operating account relationships, commercial credit cards, merchant card, purchase or debit cards, non-card e-payables services, and other cash management services, including electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"**Casualty Event**" means any event that gives rise to the receipt by the Issuer or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, assets or property (including any improvements thereon) to replace or repair such equipment, assets or property or as compensation for such casualty or condemnation event.

"**Close of Business**" means 5:00 p.m., New York City time.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated and rulings issued thereunder.

"**Collateral**" means all the "Collateral" (or similar term) as defined in any Security Document and shall also include the Mortgaged Properties, and all other property that is subject to any Lien in favor of the Trustee, the Collateral Agent or any Subagent for the benefit of the Secured Parties pursuant to any Security Document.

"**Collateral Agent**" means U.S. Bank Trust Company, National Association, in its capacity as collateral agent, together with its successors and permitted assigns in such capacity.

"**Collateral Agreement**" means the Collateral Agreement, dated as of the Issue Date, and as may be amended, restated, supplemented or otherwise modified from time to time, among the Issuer, each Domestic Subsidiary Guarantor and the Collateral Agent.

"**Collateral and Guarantee Requirement**" means the requirement that (in each case subject to the Agreed Security Principles, **Sections 3.21(A)(iii)**, **(iv)** and **(vii)**, **Section 3.22**, and any applicable Intercreditor Agreement):

(A)     on the Issue Date, (x) the Collateral Agent shall have received from the Issuer and each Domestic Subsidiary Guarantor an executed counterpart to the Collateral Agreement and the documents required to be executed by the Issuer and each Domestic Subsidiary Guarantor pursuant to the Collateral Agreement in order to secure the Note Obligations thereunder, including, for the avoidance of doubt, each Notice of Grant of Security Interest in Intellectual Property and (y) the Trustee shall have received from each Subsidiary Guarantor, an executed counterpart to this Indenture, in each case duly executed and delivered on behalf of such person;

(B)     on the Issue Date, (i)(x) all outstanding Equity Interests directly owned by the Issuer or any Domestic Subsidiary Guarantor, in each case, other than Excluded Securities, and (y)

- 6 -

all Indebtedness owing to the Issuer or any Domestic Subsidiary Guarantor, other than Excluded Securities, shall have been pledged pursuant to the Collateral Agreement and (ii) the Collateral Agent shall have received certificates or other instruments (if any) representing such Equity Interests and such notes or other instruments required to be delivered pursuant to the applicable Security Documents, together with stock powers, note powers or other instruments of transfer with respect thereto endorsed in blank;

(C)     in the case of any person that becomes a Subsidiary Guarantor after the Issue Date, the Collateral Agent or the Trustee, as applicable, shall have received (i) a supplemental indenture to this Indenture substantially in the form of **Exhibit C**, duly executed and delivered by such Subsidiary Guarantor, (ii) in the case of a Domestic Subsidiary Guarantor, a supplement to the Collateral Agreement and supplements to the other Security Documents, if applicable, substantially in the form specified therefor, in each case, duly executed and delivered on behalf of such Domestic Subsidiary Guarantor and (iii) in the case of a Foreign Subsidiary Guarantor, such other Security Documents governed by the law of any Foreign Collateral Jurisdiction as are necessary for the grant of a perfected security interest in the Equity Interests of, and assets of, such Subsidiary Guarantor, which shall include, among other things, security over substantially all assets in any jurisdiction where all-asset/floating security is customary,  duly executed and delivered on behalf of such Foreign Subsidiary Guarantor;

(D)     after the Issue Date, (i) (x) all outstanding Equity Interests of any person that becomes a Subsidiary Guarantor after the Issue Date and (y) subject to **Section 3.21(A)(vii)**, all Equity Interests directly acquired by the Issuer or a Subsidiary Guarantor after the Issue Date, other than Excluded Securities, shall have been pledged pursuant to the Collateral Agreement or other applicable Security Documents, and (ii) the Collateral Agent shall have received all certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(E)     on the Issue Date, except as otherwise contemplated by this Indenture or any Security Document, all documents and instruments, including Uniform Commercial Code financing statements, and filings with the United States Copyright Office and the United States Patent and Trademark Office, and all other actions reasonably necessary (including those required by applicable Requirements of Law) to be delivered, filed, registered or recorded to create the Liens intended to be created by the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Security Documents, shall have been delivered, filed, registered or recorded concurrently with, or promptly following, the execution and delivery of each such Security Document;

(F)     subject to **Section 3.21(A)(vii)**, within the time periods set forth in **Section 3.21** with respect to Mortgaged Properties encumbered pursuant to said **Section 3.21**, the Collateral Agent shall have received (i) counterparts of each Mortgage to be entered into with respect to each such Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property and suitable for recording or filing in all filing or recording offices that may be necessary or reasonably desirable to create a valid and enforceable Lien subject to no other Liens except Permitted Liens, at the time of recordation thereof, (ii) with respect to the Mortgage encumbering each such Mortgaged Property, opinions of counsel in favor of the Collateral Agent regarding the enforceability, due authorization, execution and delivery of the Mortgages and such other matters

customarily covered in real estate counsel opinions and customarily given in similar financing transactions, (iii) with respect to each such Mortgaged Property, the Flood Documentation and (iv) such other customary certificates, affidavits and similar deliverables that are customarily given in similar financing transactions in connection with the delivery of a Mortgage reasonably necessary that are available to the Issuer without material expense with respect to any such Mortgage or Mortgaged Property;

(G)     [Reserved];

(H)     [Reserved]; and

(I)     after the Issue Date, the Collateral Agent or the Trustee, as applicable, shall have received (i) such other Security Documents as may be required to be delivered pursuant to **Section 3.21** or the Collateral Agreement, and (ii) evidence of compliance with any other requirements of **Section 3.21**.

"**Common Stock**" means the common stock of the Issuer, par value $[0.00125] per share, at the date of this Indenture, subject to **Section 5.09**.

"**Consolidated Interest Expense**" means, with respect to any person for any period, all interest expense, including the amortization of debt discount and premium, the amortization or expensing of all fees and expenses payable in connection with the incurrence of indebtedness, the interest component under Capitalized Lease Obligations, capitalized interest, interest paid in kind and net payments and receipts (if any) pursuant to interest rate Hedging Agreements, in each case, of such person and its subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated Net Income**" means with respect to any person for any period, the aggregate of the Net Income of such person and its subsidiaries for such period, on a consolidated basis determined in accordance with GAAP, but excluding:

(A)     extraordinary gains or losses;

(B)     net earnings of any business entity (other than a Subsidiary) in which any Note Party or any Subsidiary thereof has an ownership interest unless such net earnings shall have actually been received by such Note Party or its Subsidiaries in the form of cash distributions;

(C)     any gain or loss from Dispositions not in the ordinary course of business during such period; and

(D)     any portion of the net earnings of any Subsidiary which for any reason is unavailable for payment of dividends to the Note Parties.

"**Consolidated Total Assets**" means, as of any date, the total assets of the Issuer and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, as set forth on the most recent consolidated balance sheet of the Issuer delivered pursuant to **Section 3.03**.

["**Consolidated Total Debt**" means, as of any date of determination, the aggregate principal amount of indebtedness of the Issuer and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of indebtedness resulting from the application of purchase accounting in connection with any Asset Disposition), consisting of (a) indebtedness for borrowed money, Capital Lease Obligations and debt obligations evidenced by promissory notes or similar instruments and (b) all outstanding Permitted Disqualified Stock of the Issuer and all preferred stock of the Subsidiaries of the Issuer, with the amount of such Disqualified Stock and preferred stock equal to the greater of their respective voluntary or involuntary liquidation preferences and their Maximum Fixed Repurchase Prices. For purposes hereof, the "Maximum Fixed Repurchase Price" of any Disqualified Stock or preferred stock means the price at which such Disqualified Stock or preferred stock could be redeemed or repurchased by the issuer thereof in accordance with its terms or, if such Disqualified Stock or preferred stock cannot be so redeemed or repurchased, the fair market value of such Disqualified Stock or preferred stock, in each case, determined on any date on which Consolidated Total Debt shall be required to be determined.

"**Consolidated Total Net Leverage Ratio**" means, as of any date of determination, the ratio of (a) Consolidated Total Debt of the Issuer and its Subsidiaries on the date of determination less the aggregate amount of cash and Cash Equivalents of the Issuer and its Subsidiaries on a consolidated basis as of such date, to (b) EBITDA of the Issuer and its Subsidiaries for the most recent four-quarter period prior to such date for which the Issuer has internal financial statements available, in each case, calculated on a pro forma basis.][5]

"**Contribution Debt**" means Indebtedness of the Issuer or any Subsidiary in an aggregate outstanding principal amount not greater than 100% (or 50% in the case of Permitted Disqualified Stock) of the aggregate net amount of cash proceeds received by the Issuer after the Issue Date in excess of $300,000,000 in the aggregate from (x) the issuance or sale of the Issuer's Qualified Equity Interests and Permitted Disqualified Stock or (y) a contribution to the Issuer's common equity, in each case after the Issue Date (in each case of (x) and (y), other than proceeds (i) from the sale of Equity Interests by the Issuer to any Subsidiary or contributions to the common equity of the Issuer by any of its Subsidiaries or (ii) from the conversion of any Convertible Notes or the exercise of any Renesas Warrants), in each case, to the extent such proceeds have not otherwise been applied to make any Restricted Payments pursuant to **Section 3.15** or any Permitted Investments.  Notwithstanding anything to the contrary set forth herein, Contribution Debt may only be allocated to **Section 3.12(B)(xi)** and may not be used to incur any other Indebtedness.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

---

[5] <u>Note to Draft</u>: Definitions subject to ongoing review.

"**Controlled Account**" means any Deposit Account or Securities Account of the Issuer or any Subsidiary Guarantor that is required to be subject to an Account Control Agreement pursuant to the Collateral Agreement.

"**Conversion Date**" means, with respect to a Note, the first Business Day on which the requirements set forth in **Section 5.02(A)** to convert such Note are satisfied.

["**Conversion Expiration Date**" means [●], 2027.][6]

"**Conversion Price**" means, as of any time, an amount equal to (A) one thousand dollars ($1,000) *divided by* (B) the Conversion Rate in effect at such time.

"**Conversion Rate**" means, initially [●] shares of Common Stock per $1,000 principal amount of Notes, *provided*, *however*, that the Conversion Rate is subject to adjustment pursuant to **Article 5**; *provided*, *further*, that whenever this Indenture refers to the Conversion Rate as of a particular date without setting forth a particular time on such date, such reference will be deemed to be to the Conversion Rate immediately after the Close of Business on such date.

"**Conversion Share**" means any share of Common Stock issued or issuable upon conversion of any Note.

"**Convertible Notes**" means, collectively, (i) the Notes, (ii) the Second Lien [Non-]Renesas Notes and (iii) any other debt securities issued by the Issuer from time to time permitted to be incurred under the terms of this Indenture that are convertible into, or exchangeable for, equity interests of the Issuer (and cash in lieu of any fractional interests), cash or any combination thereof (in an amount determined by reference to the price of such equity interests).

"**Core Assets**" means any (i) MVF Assets, Siler City Assets or Durham Assets, in each case, excluding any immaterial ordinary course assets utilized in the applicable facility or campus or (ii) Equity Interests of any direct or indirect Subsidiary of the Issuer that directly or indirectly owns any of the foregoing.  Notwithstanding anything to the contrary set forth herein, it is understood and agreed that there is no limitation on any MVF Asset, Siler City Asset or Durham Asset moving to and from such locations.

"**Corporate Trust Office**" means the designated office of the Trustee at which at any time this Indenture shall be administered, which office at the date hereof is located at 333 Commerce Street, Suite 900, Nashville, Tennessee  37201, Attention: Global Corporate Trust – Wolfspeed, Inc., or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the designated corporate trust office of any successor trustee (or such other address as such successor trustee may designate from time to time by notice to the Holders and the Issuer).

---

[6] <u>Note to Draft</u>: New Renesas 2L Takeback Convertible Notes are non-convertible twenty-four (24) months after the Plan Effective Date.

"**Daily Cash Amount**" means, with respect to any VWAP Trading Day, the lesser of (A) the applicable Daily Maximum Cash Amount; and (B) the Daily Conversion Value for such VWAP Trading Day.

"**Daily Conversion Value**" means, with respect to any VWAP Trading Day, one-thirtieth (1/30th) of the product of (A) the Conversion Rate on such VWAP Trading Day; and (B) the Daily VWAP per share of Common Stock on such VWAP Trading Day.

"**Daily Maximum Cash Amount**" means, with respect to the conversion of any Note, the quotient obtained by dividing (A) the Specified Dollar Amount applicable to such conversion by (B) thirty (30).

"**Daily Share Amount**" means, with respect to any VWAP Trading Day, the quotient obtained by dividing (A) the excess, if any, of the Daily Conversion Value for such VWAP Trading Day over the applicable Daily Maximum Cash Amount by (B) the Daily VWAP for such VWAP Trading Day. For the avoidance of doubt, the Daily Share Amount will be zero for such VWAP Trading Day if such Daily Conversion Value does not exceed such Daily Maximum Cash Amount.

"**Daily VWAP**" means, for any VWAP Trading Day, the per share volume-weighted average price of the Common Stock as displayed under the heading "Bloomberg VWAP" on Bloomberg page identified by "WOLF" (or such other ticker symbol for such shares of Common Stock) appended by the suffix "<EQUITY> AQR" (or, if such page is not available, its equivalent successor page) in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on such VWAP Trading Day (or, if such volume-weighted average price is unavailable, the market value of one share of Common Stock on such VWAP Trading Day, reasonably determined, using a volume-weighted average price method, by a nationally recognized independent investment banking firm selected by the Issuer). The Daily VWAP will be determined without regard to after-hours trading or any other trading outside of the regular trading session.

"**Default**" means any event that is (or, after notice, passage of time or both, would be) an Event of Default.

"**Default Settlement Method**" means [Physical Settlement]; *provided*, *however*, that subject to **Section 5.03(A)(ii)**, the Issuer may, from time to time, change the Default Settlement Method by sending notice of the new Default Settlement Method to the Holders, the Trustee and the Conversion Agent.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Depositary**" means The Depository Trust Company or its successor.

"**Depositary Participant**" means any member of, or participant in, the Depositary.

"**Depositary Procedures**" means, with respect to any conversion, transfer, exchange or other transaction involving a Global Note or any beneficial interest therein, the rules and procedures of the Depositary applicable to such conversion, transfer, exchange or transaction.

["**ELOC/ATM**" means the equity line of credit or "at the market" program entered into to facilitate the sale of Common Stock as set forth in the Plan of Reorganization.][7]

"**Discharged Indebtedness**" means Indebtedness that has been defeased (pursuant to a contractual or legal defeasance) or discharged pursuant to the prepayment or deposit of amounts sufficient to satisfy such Indebtedness as it becomes due or irrevocably called for redemption (and regardless of whether such Indebtedness constitutes a liability on the balance sheet of the obligor thereof); *provided*, *however*, that such Indebtedness shall be deemed Discharged Indebtedness if the payment or deposit of all amounts required for defeasance or discharge or redemption thereof have been made even if certain conditions thereto have not been satisfied, so long as such conditions are reasonably expected to be satisfied within 95 days after such prepayment or deposit; *provided*, *further*, *however*, that if the conditions referred to in the immediately preceding proviso are not satisfied within 95 days after such prepayment or deposit, such Indebtedness shall cease to constitute Discharged Indebtedness after such 95-day period.

"**Disinterested Director**" means, with respect to any person and transaction, a member of the Board of Directors of such person who does not have any material direct or indirect financial interest in or with respect to such transaction.

"**Dispose**" or "**Disposed of**" means to convey, sell, lease, sub-lease, license, sub-license, sell and leaseback, assign, farm-out, transfer or otherwise dispose of any property, business or asset, in one transaction or a series of transactions, including any Sale and Lease-Back Transaction and any sale or issuance of Equity Interests of a Subsidiary, and including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.  The term "**Disposition**" shall have a correlative meaning to the foregoing.

"**Disqualified Stock**" means, with respect to any person, any Equity Interests of such person that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior redemption or repurchase in full of the Notes and payment in full of all other Note Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) at the option of the holder thereof, is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that

---

[7] <u>Note to Draft</u>: Certain of the aspects added for the New Renesas 2L Takeback Convertible Notes indenture are only applicable if regulatory approvals have not been received by emergence. To the extent received, such language will be removed.

would constitute Disqualified Stock, in each case of the preceding clauses (a) through (d), prior to the date that is ninety-one (91) days after the Maturity Date (provided, that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock).   Notwithstanding the foregoing: (i) any Equity Interests issued to any employee or to any plan for the benefit of employees of the Issuer or the Subsidiaries or by any such plan to such employees shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Issuer in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability and (ii) any class of Equity Interests of such person that by its terms authorizes such person to satisfy its obligations thereunder by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"**DOE Borrower**" means any borrower of any DOE Financing.

"**DOE Financing**" means any Indebtedness of any DOE Borrower owing to (x) the United States Department of Energy Loan Programs Office or (y) any financial institution acting as an administrator, facilitator, agent, trustee, servicer, conduit, instrumentality or similar capacity with respect to the United States Department of Energy Loans Programs Office.

"**DOE Parent Entity**" means the Issuer or any other Subsidiary which is a direct or indirect parent company of any DOE Borrower.

"**Domestic Subsidiary**" means any Subsidiary that is not a Foreign Subsidiary.

"**Domestic Subsidiary Guarantor**" means (a) Wolfspeed Texas LLC and (b) each Domestic Subsidiary of the Issuer that is not an Excluded Subsidiary (unless the Issuer has elected to cause such Domestic Subsidiary to become a Subsidiary Guarantor).

"**Durham Assets**" means any assets of the Issuer or its Subsidiaries (i) located at, or used in, as of the Issue Date, Durham, North Carolina and (ii) located at, or used in, Durham, North Carolina from and after the Issue Date (it being understood and agreed that such assets in clauses (i) and (ii) shall at all times constitute "Durham Assets" even if subsequently removed from, or no longer used in, Durham, North Carolina), but in any event excluding [                    ] (the "**Project Sonic Assets**")[8] and [                         ] (the "**Building 21 Assets**")[9].

"**EBITDA**" means, for any period, in each case for the Issuer and its Subsidiaries on a consolidated basis, an amount equal to Consolidated Net Income for such period plus (a) the following to the extent deducted in calculating such Consolidated Net Income (other than amounts specifically excluded from Consolidated Net Income under **clauses (A)** through **(C)** of the definition of Consolidated Net Income): (i) Consolidated Interest Expense, (ii) taxes, (iii) depreciation and amortization, (iv) all non-recurring expenses and charges which do not represent a cash item in such period, (v) expenses in connection with the issuance of stock options or other

---

[8] Note to Draft: To come from First Lien Indenture.

[9] Note to Draft: To come from Schedule 8.05 of the First Lien Indenture.

equity as compensation to employees and/or management of the Issuer or any Subsidiary, (vi) costs and expenses, in an amount not to exceed $6,500,000 in the aggregate during any four (4) fiscal quarter period, incurred in connection with any investment, acquisition, asset disposition, equity issuance or incurrence, payment, prepayment, refinancing or redemption of Indebtedness (including fees and expenses related to this Indenture and any amendments, supplements and modifications thereof), including the amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses (in each case, whether or not consummated) and (vii) all adjustments used in the calculation of non-GAAP net loss by the Issuer as reported in its filings with the SEC for the relevant period, minus (b) to the extent included in calculating Consolidated Net Income, (i) all non-recurring, non-cash items increasing net income for such period and (ii) any cash payments made during such period in respect of items described in clause (a)(iv) above subsequent to the fiscal quarter in which the relevant non-cash expenses or losses were incurred plus (or minus) (c) non-cash losses (or gains) arising from the impact of mark-to-market valuation of the Note Parties' Investment in Lextar Electronics Corporation; provided, that (x) in no event shall any fees, costs or expenses of the type referred to as "Start-up and Underutilization Costs" in the Issuer's filings with the SEC be added back in the calculation of EBITDA, (y) if any Disposition occurs during such period, any EBITDA attributable to the property, business or assets of such Disposition shall be excluded from the calculation of EBITDA and such Disposition shall be deemed to have occurred as of the first day of the relevant Test Period and (z) if any acquisition or Investment occurs during such period, any EBITDA attributable to the property, business or assets so acquired or invested in shall be included in the calculation of EBITDA and such acquisition or Investment shall be deemed to have occurred as of the first day of the relevant Test Period.

"**Equity Interests**" of any person means any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any Preferred Stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing; *provided* that Equity Interests shall not include any Convertible Notes, Permitted Bond Hedge Transaction or Permitted Warrant Transaction.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time and any final regulations promulgated and the rulings issued thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Issuer or a Subsidiary, is treated as a single employer under Section 4001 of ERISA or Section 414(b), (c), (m) or (o) of the Code.

"**Escrowed Indebtedness**" means Indebtedness (i) issued to refinance in full any Indebtedness, (ii) in a principal amount no greater than the outstanding principal amount of such Indebtedness to be so refinanced (plus unpaid accrued interest thereon, underwriting discounts and fees, commissions and expenses related to such offering) and (iii) the proceeds of which are funded into an escrow account (pursuant to customary escrow arrangements) pending the release thereof for such refinancing; *provided*, for the avoidance of doubt, proceeds released from the escrow

account and used to refinance the outstanding Indebtedness shall reduce dollar for dollar the amount of "Escrowed Indebtedness" permitted hereunder.

"**Excluded Account**" means (a) any Deposit Account specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the employees of any Note Party, (b) any tax account (including any sales tax account), (c) any fiduciary, pension, 401(k) or similar trust account holding employee funds, (d) any impound, escrow, trust, cash collateral (including any Deposit Account or Securities Account holding only cash collateral for letters of credit or Hedging Agreements secured by Liens permitted by **clauses (AA)** or **(EE)** of the definition of "Permitted Liens") or similar account and (e) any Deposit Account and Securities Account that has cash or Permitted Investments that do not have a balance at any time exceeding $20,000,000 individually and $50,000,000 in the aggregate for all such accounts constituting Excluded Accounts; [*provided* that, no account held by any Note Party over which a Lien has been granted to secure any obligations under the First Lien Notes Indenture, the Second Lien [Non-]Renesas Notes Indenture, the Second Lien Takeback Notes Indenture or any other Indebtedness for borrowed money[10] shall be an Excluded Account.]

"**Excluded Property**" has the meaning assigned to such term in **Section 3.21(A)(vii)**.

"**Excluded Securities**" means any of the following:

(A)    any Equity Interests or Indebtedness with respect to which the Issuer reasonably determines in good faith that the cost or other consequences of pledging such Equity Interests or Indebtedness in favor of the Secured Parties under the Security Documents are excessive to the Issuer in relation to the value to be afforded to the Holders thereby;

(B)    any Equity Interests or Indebtedness to the extent the pledge thereof would be prohibited by any Requirement of Law or would require governmental or other regulatory consent, approval, license or authorization to be pledged (unless such consent, approval, license or authorization has been received);

(C)    any Equity Interests of any person that is not a Wholly Owned Subsidiary to the extent (i) that a pledge thereof to secure the Note Obligations is prohibited by any organizational documents, joint venture agreement or stockholder agreement of such Subsidiary with an unaffiliated third party without the consent of such third party; provided, that this clause (i) shall not apply if (1) such other party is a Note Party or a Subsidiary of any Note Party, (2) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Issuer or any Subsidiary to obtain any such consent) and shall only apply for so long as such organizational documents, joint venture agreement or stockholder agreement or replacement or renewal thereof is in effect or (3) such contractual obligation was not entered into or created in contemplation of this Indenture and only for so long as such prohibition exists or (ii) a pledge thereof to secure the Note Obligations would give any other party (other than a Note Party or a Subsidiary of a Note Party) to any organizational document or stockholder agreement governing such Equity Interests the right to terminate its obligations thereunder (so long

---

[10] Note to Draft: To match language agreed in First Lien Indenture.

as, in each case of clause (i) and (ii), such provision prohibits the granting of a security interest over such Equity Interests generally (and not solely a pledge to secure the Note Obligations));

(D)     any Equity Interests of any Subsidiary to the extent that the pledge of such Equity Interests could reasonably be expected to result in material adverse tax consequences to the Issuer or any Subsidiary as reasonably determined in good faith by the Issuer;

(E)     [                    ][11]; and

(F)     any Margin Stock;

*provided* that, no Equity Interest or Indebtedness held by any Note Party over which a Lien has been granted to secure any obligations under the First Lien Notes Indenture, the Second Lien [Non-]Renesas Notes Indenture or the Second Lien Takeback Notes Indenture (or, in each case, any Permitted Refinancing Indebtedness in respect thereof) shall be Excluded Securities.

"**Excluded Subsidiary**" means any of the following (except as otherwise provided in clause (b) of the definition of Subsidiary Guarantor):

(A)     each Immaterial Subsidiary;

(B)     each Subsidiary that is prohibited from Guaranteeing the Note Obligations by a contractual obligation (to the extent such prohibition exists as of the Issue Date or at the time of the acquisition of such Subsidiary (or is a renewal or replacement thereof); provided that such contractual obligation was not entered into or created in contemplation of this Indenture and only for so long as such prohibition exists);

(C)     each Subsidiary that is prohibited from Guaranteeing the Note Obligations by any Requirement of Law or that would require consent, approval, license or authorization of a Governmental Authority to Guarantee the Note Obligations (unless such consent, approval, license or authorization has been received and is in effect);

(D)     [reserved];

(E)     [reserved];

(F)     each not-for-profit Subsidiary or political action committee;

(G)     each Subsidiary which is a foreign sales office, to the extent such Subsidiary does not own any material assets;

(H)     any other Subsidiary with respect to which, the providing of a Guarantee of the Note Obligations could reasonably be expected to result in material adverse tax consequences to the Issuer or any Subsidiary as reasonably determined in good faith by the Issuer; and

---

[11] Note to Draft: To replicate Schedule 1.01(A) of the First Lien Indenture.

(I)       any other Subsidiary with respect to which the Issuer reasonably determines in good faith that the cost or other consequences of providing a Guarantee of the Note Obligations are to be excessive to the Issuer in relation to the value to be afforded to the Holders thereby.

Notwithstanding anything to the contrary set forth herein or in any Note Document, in no event shall any Subsidiary that (x) is a borrower or guarantor of any DOE Financing, (y) owns any Material IP or (z) is a borrower, issuer or guarantor of any First Lien Notes, Second Lien [Non-]Renesas Notes or Second Lien Takeback Notes (or, in each case, any Permitted Refinancing Indebtedness in respect thereof) be an Excluded Subsidiary.

"**Ex-Dividend Date**" means, with respect to an issuance, dividend or distribution on the Common Stock, the first date on which shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such issuance, dividend or distribution (including pursuant to due bills or similar arrangements required by the relevant stock exchange). For the avoidance of doubt, any alternative trading convention on the applicable exchange or market in respect of the Common Stock under a separate ticker symbol or CUSIP number will not be considered "regular way" for this purpose.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Exempted Fundamental Change**" means any Fundamental Change with respect to which, in accordance with **Section 4.02(K)**, the Issuer does not offer to repurchase any Notes.

"**First Lien Notes**" means $[●] million First Lien Senior Secured Notes due 2030 issued by the Issuer pursuant to the First Lien Notes Indenture, and any additional notes which may be issued pursuant to and in accordance with the terms of the First Lien Notes Indenture, as may be further amended and supplemented from time to time.

"**First Lien Notes Collateral Agent**" means U.S. Bank Trust Company, National Association, as the collateral agent for the First Lien Notes, and/or any successor collateral agent, additional collateral agent and/or any other supplemental collateral agent appointed pursuant to the terms of First Lien Notes Indenture.

"**First Lien Notes Indenture**" means, an indenture, dated as of the Issue Date, among the Issuer, the Subsidiary Guarantors named therein, and U.S. Bank Trust Company, National Association, as the trustee and the collateral agent, in relation to the First Lien Notes, as such document may be amended, restated, supplemented or otherwise modified from time to time.

"**First Lien Notes Trustee**" means U.S. Bank Trust Company, National Association, as trustee for First Lien Notes, or its successors or assignees appointed pursuant to the terms of First Lien Notes Indenture.

"**First-Lien/Second-Lien Intercreditor Agreement**" means the intercreditor agreement, dated on or about the Issue Date, made between, among others, the Issuer, the Subsidiary Guarantors, the Trustee, the First Lien Notes Trustee, the Second Lien [Non-]Renesas Notes Trustee, the Second Lien Takeback Notes Trustee, the Collateral Agent, the First Lien Notes Collateral Agent, the Second Lien [Non-]Renesas Notes Collateral Agent, the Second Lien

Takeback Notes Collateral Agent and the other parties named therein, as such document may be amended, restated, supplemented or otherwise modified from time to time.

"**First-Priority Debt Documents**" shall have the meaning set forth in the First-Lien/Second-Lien Intercreditor Agreement.

"**First-Priority Obligations**" shall have the meaning set forth in the First-Lien/Second-Lien Intercreditor Agreement.

"**Fitch**" means Fitch Ratings, Inc. or any of its successors or assigns that is a "nationally recognized statistical rating organization" within the meaning of Section 3(a)(62) of the Exchange Act.

"**Flood Documentation**" means, with respect to each Mortgaged Property located in the United States of America or any territory thereof, (i) a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination (to the extent a Mortgaged Property is located in a Special Flood Hazard Area (as defined below), together with a notice about Special Flood Hazard Area status and flood disaster assistance duly executed by the Issuer and the applicable Note Party relating thereto) and [(ii) a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by the applicable provisions of the Security Documents, each of which shall (A) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable)], (B) name the Collateral Agent, on behalf of the Secured Parties, as additional insured and loss payee/mortgagee, (C) identify the address of each property located in an area within the United States identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area (each a "**Special Flood Hazard Area**"), the applicable flood zone designation and the flood insurance coverage and deductible relating thereto and (D) be otherwise in customary form and substance (as reasonably determined by the Issuer).

"**Foreign Collateral Jurisdiction**" means, as of any date of determination, any jurisdiction in which a Foreign Subsidiary Guarantor is formed or incorporated.

"**Foreign Subsidiary**" means any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any state thereof or the District of Columbia.

"**Foreign Subsidiary Guarantor**" means each Foreign Subsidiary of the Issuer that is not an Excluded Subsidiary (unless the Issuer has elected to cause such Foreign Subsidiary to become a Subsidiary Guarantor).

"**Fundamental Change**" means any of the following events:

(A)      a "person" or "group" (within the meaning of Section 13(d)(3) of the Exchange Act), other than the Issuer or its Wholly Owned Subsidiaries, or their respective employee benefit plans, or Renesas, files a Schedule TO (or any successor schedule, form or report) or any report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner" (as defined below) of Common Stock representing more than fifty percent (50%) of the voting power of all of the Common Stock; *provided*, *however*, that, for purposes of

this **clause (A)**, no person or group will be deemed to be a beneficial owner of any securities tendered pursuant to a tender offer or exchange offer made by or on behalf of such person or group until such tendered securities are accepted for purchase or exchange in such offer;

(B)     the consummation of (i) any sale, lease or other transfer, in one transaction or a series of transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, to any Person, other than solely to one or more of the Issuer's Wholly Owned Subsidiaries; or (ii) any transaction or series of related transactions in connection with which (whether by means of merger, consolidation, share exchange, combination, reclassification, recapitalization, acquisition, liquidation or otherwise) (other than changes solely resulting from a subdivision or combination of the Common Stock or solely a change in the par value or nominal value of the Common Stock) all of the shares of Common Stock are exchanged for, converted into, acquired for, or constitute solely the right to receive, other securities, cash or other property; *provided*, *however*, that any transaction described in **clause (B)(ii)** above pursuant to which the Persons that directly or indirectly "beneficially owned" (as defined below) all classes of the Issuer's common equity immediately before such transaction directly or indirectly "beneficially own," immediately after such transaction, more than fifty percent (50%) of all classes of common equity of the surviving, continuing or acquiring company or other transferee, as applicable, or the parent thereof, in substantially the same proportions vis-a-vis each other as immediately before such transaction will be deemed not to be a Fundamental Change pursuant to this **clause (B)**;

(C)     the Issuer's stockholders approve any plan or proposal for the liquidation or dissolution of the Issuer;

(D)     at any time after Issue Date, the Common Stock is not listed on any of The New York Stock Exchange, The NASDAQ Global Market or The NASDAQ Global Select Market (or any of their respective successors) (each, the "**Stock Exchange**"); or

(E)     any event or circumstance that constitutes, or results in any "fundamental change," "change of control" or any comparable term under, and as defined in, the First Lien Notes Indenture, the Second Lien [Non-]Renesas Convertible Notes Indenture or the Second Lien Takeback Notes Indenture;

*provided*, *however*, that a transaction or event described in **clause (A)** or **(B)** above will not constitute a Fundamental Change if at least ninety percent (90%) of the consideration received or to be received by the holders of Common Stock (excluding cash payments for fractional shares or pursuant to dissenters rights), in connection with such transaction or event, consists of ordinary shares or shares of common stock or other corporate common equity listed on any of the Stock Exchanges, or that will be so listed when issued or exchanged in connection with such transaction or event, and such transaction or event constitutes an Common Stock Change Event whose Reference Property consists of such consideration.

For the purposes of this definition, any transaction or event described in both **clause (A)** and in **clause (B)** above (without regard to the proviso in **clause (B)**) will be deemed to occur solely pursuant to **clause (B)** above (subject to such proviso).

- 19 -

For the purpose of this Indenture, whether a Person is a "**beneficial owner**" and whether shares are "**beneficially owned**" will be determined in accordance with Rule 13d-3 under the Exchange Act.

"**Fundamental Change Repurchase Date**" means the date fixed for the repurchase of any Notes by the Issuer pursuant to a Repurchase Upon Fundamental Change.

"**Fundamental Change Repurchase Notice**" means a notice (including a notice substantially in the form of the "Fundamental Change Repurchase Notice" set forth in **Exhibit A**) containing the information, or otherwise complying with the requirements, set forth in **Section 4.02(F)(i)** and **Section 4.02(F)(ii)**.

"**Fundamental Change Repurchase Price**" means the cash price payable by the Issuer to repurchase any Note upon its Repurchase Upon Fundamental Change, calculated pursuant to **Section 4.02(D)**.

"**GAAP**" means generally accepted accounting principles in effect in the United States of America on the Issue Date, applied on a consistent basis, subject to the provisions of **Section 1.03**.

"**Global Note**" means a Note that is represented by a certificate substantially in the form set forth in **Exhibit A**, registered in the name of the Depositary or its nominee, duly executed by the Issuer and authenticated by the Trustee, and deposited with the Trustee, as custodian for the Depositary.

"**Global Note Legend**" means a legend substantially in the form set forth in [**Exhibit B-2**].

"**Governmental Authority**" means any federal, state, local or foreign government, court, governmental, regulatory or administrative agency, department, commission, board, bureau, tribunal agency, other authority, instrumentality or regulatory or legislative body.

"**Gross Cash Proceeds**" means the gross cash proceeds received by the Issuer from the applicable event; *provided* that, to constitute "Gross Cash Proceeds," the net cash proceeds received by the Issuer from such applicable event may not be less than 95.00% of the gross cash proceeds received by the Issuer from the applicable event.

"**Guarantee**" of or by any person (the "guarantor") means (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of the

guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, that the term "Guarantee" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Issue Date or entered into in connection with any acquisition or Disposition of assets permitted by this Indenture (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as reasonably determined by such person in good faith.

"**Hedging Agreement**" means any agreement entered into with respect to any swap, forward, future or derivative transaction, or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value, or credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed price physical delivery contracts, or any similar transaction or any combination of these transactions, in each case of the foregoing, whether or not exchange traded; provided, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Issuer or any of the Subsidiaries shall be a Hedging Agreement.

"**Holder**" means a person in whose name a Note is registered on the Registrar's books.

"**Immaterial Subsidiary**" means any Subsidiary of the Issuer that does not have (i) revenue, determined on a consolidated basis with its Subsidiaries, as of the last day of the most recently ended Test Period as of such date, in excess of 1% of the aggregate revenue of the Issuer and its Subsidiaries, on a consolidated basis, for such period or (ii) total assets, determined on a consolidated basis with its Subsidiaries, at any time, in excess of 1% of the Consolidated Total Assets; *provided*, that (x) the aggregate amount of revenue of Subsidiaries constituting Immaterial Subsidiaries, as of the last day of the most recently ended Test Period, shall not exceed 5% of the aggregate revenue of the Issuer and its Subsidiaries, on a consolidated basis, for such period and (y) the total assets of Subsidiaries constituting Immaterial Subsidiaries shall not at any time exceed 5% of the Consolidated Total Assets; *provided further*, that (A) the Issuer may elect in its sole discretion to exclude from classification as an Immaterial Subsidiary any Subsidiary that would otherwise meet the definition thereof and (B) for the avoidance of doubt, the Issuer may at any time designate any Subsidiary that complies with the terms of this definition as an "Immaterial Subsidiary". Notwithstanding anything to the contrary set forth in this definition, no Subsidiary shall be an Immaterial Subsidiary if such Subsidiary, directly or indirectly, owns any Core Asset or is a borrower or guarantor under any Indebtedness for borrowed money in excess of $50,000,000 (it being understood and agreed that any such Subsidiary, if applicable, may otherwise be deemed an Excluded Subsidiary in accordance with the definition thereof). Each Immaterial Subsidiary as of the Issue Date shall be set forth in Schedule 1.01(B).

"**Indebtedness**" of any person means, if and to the extent (other than with respect to clause (i)) the same would constitute indebtedness or a liability on a balance sheet prepared in accordance with GAAP, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (other than such obligations accrued in the ordinary course), (e) all Capitalized Lease Obligations of such person, (f) all net payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined in respect of outstanding Hedging Agreements, (g) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit, (h) the principal component of all obligations of such person in respect of bankers' acceptances, (i) all Guarantees by such person of Indebtedness described in clauses (a) to (h) above and (j) the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock); provided, that Indebtedness shall not include (A) trade and other ordinary-course payables, accrued expenses, and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase prices of an asset to satisfy unperformed obligations of the seller of such asset, (D) earn-out obligations (to the extent permitted hereunder) until such obligations become a liability on the balance sheet of such person in accordance with GAAP, (E) obligations in respect of Third Party Funds incurred in the ordinary course of business, (F) in the case of the Issuer and its Subsidiaries, intercompany liabilities in connection with the cash management, tax and accounting operations of the Issuer and the Subsidiaries, in each case, in the ordinary course of business and consistent with past practice, (G) completion guarantees or (H) any Permitted Warrant Transaction. The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness limits the liability of such person in respect thereof.

"**Indenture**" means this Indenture, as amended or supplemented from time to time.

"**Intellectual Property**" has the meaning assigned to such term in the Collateral Agreement.

"**Intercreditor Agreements**" means the First-Lien/Second-Lien Intercreditor Agreement, the *Pari Passu* Intercreditor Agreement, and any Additional Intercreditor Agreement, collectively.

"**Interest Payment Date**" means, with respect to a Note, each June 15 and December 15 of each year, commencing on [June 15, 2026] (or commencing on such other date specified in the certificate representing such Note). For the avoidance of doubt, the Maturity Date is an Interest Payment Date.

"**Investment**" means (i) the purchase or acquisition (including pursuant to any merger with a person that is not a Wholly Owned Subsidiary immediately prior to such merger) of any Equity Interests, evidences of Indebtedness or other securities of any other person, (ii) the making of any loans or advances to or Guarantees of the Indebtedness of any other person (other than in respect

of intercompany liabilities incurred in connection with the cash management, tax and accounting operations of the Issuer and the Subsidiaries) or (iii) the purchase or acquisition, in one transaction or a series of related transactions, of (x) all or substantially all of the property and assets or business of another person or (y) assets constituting a business unit, line of business or division of such person.

If the Issuer or any Subsidiary sells or otherwise Disposes of any Equity Interests of any direct or indirect Subsidiary such that, after giving effect to any such sale or Disposition, such person is no longer a Subsidiary, the Issuer will be deemed to have made an Investment on the date of any such sale or Disposition equal to the fair market value of the Issuer's Investments in such Subsidiary that were not sold or Disposed of. The acquisition by the Issuer or any Subsidiary of a person that holds an Investment in a third person will be deemed to be an Investment by the Issuer or such Subsidiary in such third Person in an amount equal to the fair market value of the Investments held by the acquired Person in such third Person.  Except as otherwise provided in this Indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

["**Investor Rights Agreement**" means the Investor Rights [and Disposition] Agreement, dated as of the date hereof, between the Issuer and Renesas.]

"**Issue Date**" means [●], 2025.

"**Issuer**" means the Person named as such in the first paragraph of this Indenture and, subject to **Article 6**, its successors and assigns.

"**Issuer Order**" means a written request or order signed on behalf of the Issuer by one (1) of its Officers and delivered to the Trustee.

"**Last Reported Sale Price**" of the Common Stock for any Trading Day means the closing sale price per share of Common Stock (or, if no closing sale price is reported, the average of the last bid price and the last ask price per share of Common Stock or, if more than one in either case, the average of the average last bid prices and the average last ask prices per share of Common Stock) on such Trading Day as reported in composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is then listed. If the Common Stock is not listed on a U.S. national or regional securities exchange on such Trading Day, then the Last Reported Sale Price will be the last quoted bid price per share of Common Stock on such Trading Day in the over-the-counter market as reported by OTC Markets Group Inc. or a similar organization. If the Common Stock is not so quoted on such Trading Day, then the Last Reported Sale Price will be the average of the mid-point of the last bid price and the last ask price per share of Common Stock on such Trading Day from each of at least three (3) nationally recognized independent investment banking firms selected by the Issuer. Neither the Trustee nor the Conversion Agent will have any duty to determine the Last Reported Sale Price.

"**Leasehold Property**" means any leasehold or subleasehold interest of any Note Party as lessee or sublessee under any lease or sublease of Real Property.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar monetary encumbrance in or on such

- 23 -

asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; *provided*, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"**Limited Condition Transaction**" means any Investment or acquisition (whether by merger, amalgamation, consolidation or other business combination or the acquisition of Equity Interests, Indebtedness or otherwise) whose consummation is not conditioned on the availability of, or on obtaining, third party financing.

"**Majority Holders**" means, at any applicable time, Holders owning more than 50.0% of the aggregate principal amount of the Notes then outstanding.

"**Make-Whole Event**" means **(A)** a Fundamental Change (determined after giving effect to the proviso immediately after **clause (E)** of the definition thereof, but without regard to the proviso to **clause (B)(ii)** of such definition) (an event referred to in this **clause (A)**, a "**Make-Whole Fundamental Change**"); or **(B)** the sending of a Redemption Notice pursuant to **Section 4.03(G)** in respect of a Redemption; *provided, however*, that the sending of a Redemption Notice for a Redemption of less than all of the outstanding Notes will constitute a Make-Whole Event only with respect to the Notes called (or deemed to be called pursuant to **Section 4.03(K)**) for Redemption pursuant to such Redemption Notice and not with respect to any other Notes.

"**Make-Whole Event Conversion Period**" has the following meaning:

(A)      in the case of a Make-Whole Event pursuant to **clause (A)** of the definition thereof, the period from, and including, the Make-Whole Event Effective Date of such Make-Whole Event to, and including, the thirty fifth (35th) Trading Day after such Make-Whole Event Effective Date (or, if such Make-Whole Event also constitutes a Fundamental Change (other than an Exempted Fundamental Change), to, but excluding, the related Fundamental Change Repurchase Date); and

(B)      in the case of a Make-Whole Event pursuant to **clause (B)** of the definition thereof, the period from, and including, the Redemption Notice Date for the related Redemption to, and including, the second (2nd) Business Day immediately before the related Redemption Date;

*provided, however*, that if the Conversion Date for the conversion of a Note that has been called (or deemed, pursuant to **Section 4.03(K)**, to be called) for Redemption occurs during the Make-Whole Event Conversion Period for both a Make-Whole Fundamental Change occurring pursuant to **clause (A)** of the definition of "Make-Whole Event" and a Make-Whole Event resulting from such Redemption pursuant to **clause (B)** of such definition, then, notwithstanding anything to the contrary in **Section 5.07**, solely for purposes of such conversion, (x) such Conversion Date will be deemed to occur solely during the Make-Whole Event Conversion Period for the Make-Whole Event with the earlier Make-Whole Event Effective Date; and (y) the Make-Whole Event with the later Make-Whole Event Effective Date will be deemed not to have occurred.

"**Make-Whole Event Effective Date**" means (A) with respect to a Make-Whole Event pursuant to **clause (A)** of the definition thereof, the date on which such Make-Whole Event occurs or becomes effective; and (B) with respect to a Make-Whole Event pursuant to **clause (B)** of the definition thereof, the applicable Redemption Notice Date.

- 24 -

"**Make-Whole Fundamental Change**" has the meaning set forth in the definition of Make-Whole Event.

"**Margin Stock**" has the meaning assigned to such term in Regulation U of the Board of Governors of the Federal Reserve System of the United States of America from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Market Disruption Event**" means, with respect to any date, the occurrence or existence, during the one-half hour period ending at the scheduled close of trading on such date on the principal U.S. national or regional securities exchange or other market on which the Common Stock is listed for trading or trades, of any material suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the relevant exchange or otherwise) in the Common Stock or in any options contracts or futures contracts relating to the Common Stock.

"**Material Adverse Effect**" means (a) a material adverse effect on the business, property, operations, assets, liabilities (actual or contingent), operating results or financial condition of the Issuer and its Subsidiaries, taken as a whole, excluding in any event the effect of filing the Chapter 11 Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Chapter 11 Cases, the effects thereof and any action required to be taken under the Chapter 11 Cases or the Bankruptcy Plan themselves, (b) a material adverse effect on the ability of the Issuer and the Subsidiary Guarantors (taken as a whole) to fully and timely perform any of their payment obligations under any Note Document to which the Issuer or any of the Subsidiary Guarantors is a party or (c) a material adverse effect on the validity or enforceability of any of the Note Documents or the rights and remedies of the Trustee, the Collateral Agent and the Holders thereunder.

"**Material IP**" means any intellectual property (including any trade secrets) of the Issuer or any Subsidiary (and excluding commercial off the shelf products) that is material to any Product Family of the Issuer and its Subsidiaries; *provided* that Material IP does not include (i) [      ][12] or (ii) any intellectual property that is nearing expiration (as determined by the Issuer in good faith), has expired, lapsed, or been abandoned.]

"**Material Real Property**" means any parcel or parcels of Real Property now or hereafter owned in fee by the Issuer or any Subsidiary Guarantor and having a fair market value (on a per-property basis) of at least $5,000,000, as reasonably determined by the Issuer in good faith on the Issue Date (or, if acquired after the Issue Date, the date of acquisition); *provided*, that "Material Real Property" shall not include (i) any Real Property in respect of which the Issuer or a Subsidiary Guarantor does not own the land in fee simple or (ii) any Real Property which the Issuer or a Subsidiary Guarantor leases to a bona fide third party.

"**Maturity Date**" means June 15, 2031.

---

[12] <u>Note to Draft</u>: To replicate the Disposed Patent Portfolio in item [__] of Schedule 8.05 of the First Lien Indenture.

"**Moody's**" means Moody's Investors Service, Inc., and any successor to the ratings business thereof.

"**Mortgaged Properties**" means each Material Real Property encumbered by a Mortgage pursuant to **Section 3.21**.

"**Mortgages**" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents (including amendments to any of the foregoing) delivered with respect to Mortgaged Properties, each, (i) in the case of Material Real Property located in the United States, in a form customary for financing transactions similar to this Indenture and reasonably satisfactory to the Issuer or (ii) in the case of Material Real Property located outside of the United States in such form as is customary for the applicable jurisdiction and reasonably satisfactory to the Issuer, in each case, as amended, supplemented or otherwise modified from time to time.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Issuer or any Subsidiary or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"**MVF**" means the Mohawk Valley Fab facility and campus in Marcy, New York.

"**MVF Assets**" means (i) any assets of the Issuer or its Subsidiaries located at, or used in, as of the Issue Date, MVF and (ii) any additional assets located at, or used in, MVF from and after the Issue Date (it being understood and agreed that such assets in clauses (i) and (ii) shall at all times constitute "MVF Assets" even if subsequently removed from, or no longer used in, MVF).

"**Net Income**" means, with respect to any person, the net income (loss) of such person, determined in accordance with GAAP.

"**Net Proceeds**" means 100% of the cash proceeds actually received by the Issuer or any Subsidiary (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any Disposition of, or Casualty Event with respect to, (x) any Core Asset (other than any Disposition under **clause (A)** of the definition of "Asset Dispositions") or (y) any Non-Core Assets pursuant to **clause (G)** of the definition of "Asset Dispositions", in each case, net of (i) reasonable and documented out-of-pocket attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations that are secured by the applicable asset or property (including without limitation principal amount, premium or penalty, if any, interest and other amounts) (other than pursuant to the Note Documents), other expenses and brokerage, consultant and other fees actually incurred in connection therewith, (ii) [reserved], (iii) Taxes paid or reasonably estimated in good faith to be payable as a result thereof (*provided*, that if the amount of any such estimated Taxes exceeds the amount of Taxes actually required to be paid in respect of such Disposition or Casualty

Event, the aggregate amount of such excess shall constitute Net Proceeds at the time such Taxes are actually paid) and (iv) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (A) related to any of the applicable assets and (B) retained by the Issuer or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction); provided, that, with respect to any Net Proceeds arising from any Casualty Event with respect to any Core Assets, if no Default or Event of Default exists and the Issuer intends to use such proceeds within 12 months of such receipt to acquire assets that reasonably replace or remediate the property or assets subject to such Casualty Event to a similar level of such property or assets as prior to such Casualty Event, such portion of such proceeds shall not constitute Net Proceeds except to the extent not so used within 12 months of such receipt (it being understood that if any portion of such proceeds are not so used within such 12 month period, such remaining portion shall constitute Net Proceeds as of the date of such expiry without giving effect to this proviso).

"**Non-Core Assets**" means any assets owned by the Issuer or any Subsidiary that do not constitute Core Assets.

"**Note Agent**" means any Registrar, Paying Agent or Conversion Agent.

"**Note Documents**" means (i) this Indenture, (ii) the Notes, (iii) the Security Documents, (iv) any Intercreditor Agreement[, (v) the Investor Rights Agreement] and [(vi)] all other fee letters, documents, certificates, instruments or agreements executed and delivered by or on behalf of a Note Party for the benefit of the Collateral Agent, the Trustee, the Holders or any other person in connection herewith.

"**Note Obligations**" means (a) the due and punctual payment by the Issuer of (i) the unpaid principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Notes issued by the Issuer under this Indenture, when and as due, whether at maturity, by acceleration, upon one or more dates set for redemption or otherwise and (ii) all other monetary obligations of the Issuer owed under or pursuant to this Indenture and each other Note Document, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), and (b) the due and punctual payment of all obligations of each other Note Party under or pursuant to each of the Note Documents.

"**Note Parties**" means, collectively, the Issuer and each Subsidiary Guarantor and each of them is an "**Note Party**".

"**Notes**" means (i) the Initial Notes and (ii) following the issuance of any Additional Notes pursuant to the terms of this Indenture, such Additional Notes, treated as a single class. For the

avoidance of doubt, Initial Notes and Additional Notes shall vote together on all matters as one class, and except as where expressly provided otherwise, shall be deemed to constitute a single class or series for all purposes under this Indenture.

"**Observation Period**" means, with respect to any Note to be converted, (A) subject to **clause (B)** below, if the Conversion Date for such Note occurs on or before the thirty fifth (35th) Scheduled Trading Day immediately before the [Maturity Date][Conversion Expiration Date], the thirty (30) consecutive VWAP Trading Days beginning on, and including, the third (3rd) VWAP Trading Day immediately after such Conversion Date; (B) if such Conversion Date occurs on or after the date the Issuer has sent a Redemption Notice calling all or any Notes for Redemption pursuant to **Section 4.03(G)** and before the related Redemption Date, the thirty (30) consecutive VWAP Trading Days beginning on, and including, the thirty first (31st) Scheduled Trading Day immediately before such Redemption Date; and (C) subject to **clause (B)** above, if such Conversion Date occurs after the thirty fifth (35th) Scheduled Trading Day immediately before the [Maturity Date][Conversion Expiration Date], the thirty (30) consecutive VWAP Trading Days beginning on, and including, the thirty first (31st) Scheduled Trading Day immediately before the Maturity Date[Conversion Expiration Date].

"**Officer**" means the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Group Treasurer, any Treasury Director, the Controller, the Secretary or any Vice-President of the Issuer.

"**Officer's Certificate**" means a certificate that is signed on behalf of the Issuer by one (1) of its Officers and that meets the requirements of **Section 13.03**.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Opinion of Counsel**" means an opinion, from legal counsel (including an employee of, or counsel to, the Issuer or any of its Subsidiaries) reasonably acceptable to the Trustee, and, when applicable, the Collateral Agent, that meets the requirements of **Section 13.03**, subject to customary qualifications and exclusions.

"**Parallel Debt Creditor**" means the Collateral Agent in its capacity as creditor of the Parallel Debt.

"***Pari Passu* Intercreditor Agreement**" means the intercreditor agreement, dated on or about the Issue Date, made between, among others, the Issuer, the Subsidiary Guarantors, the Trustee, the Second Lien [Non-]Renesas Notes Trustee, the Second Lien Takeback Notes Trustee, the Collateral Agent, the Second Lien [Non-]Renesas Notes Collateral Agent, the Second Lien Takeback Notes Collateral Agent and the other parties named therein, as such document may be amended, restated, supplemented or otherwise modified from time to time.

"**Permitted Bond Hedge Transaction**" means any call or capped call option (or substantively equivalent derivative transaction) on the Issuer's common stock purchased by the Issuer in connection with the issuance of any Convertible Notes; provided that the purchase price for such Permitted Bond Hedge Transaction, less the proceeds received by the Issuer from the sale of any related Permitted Warrant Transaction, does not exceed the net proceeds received by the

Issuer from the sale of such Convertible Notes issued in connection with the Permitted Bond Hedge Transaction.

"**Permitted Disqualified Stock**" means Preferred Stock of the Issuer that constitutes Disqualified Stock solely due to clause (c) of the definition thereof; *provided* that (i) such Preferred Stock has been broadly marketed to potential investors and (ii) such Preferred Stock does not provide for scheduled payments of dividends in cash in an amount in excess of 10.00% per annum (with variable interest rates converted to fixed rates based on implied forward interest rate curve for purposes of such determination).

"**Permitted Investments**" shall mean:

(A)     any Investment in a Person if, as a result of such Investment, (a) such Person becomes a Note Party, or (b) such Person either (1) is merged, consolidated or amalgamated with or into a Note Party and a Note Party is the surviving Person, or (2) transfers or conveys substantially all of its assets to, or is liquidated into, a Note Party;

(B)     (i) Investments by the Issuer or any Subsidiary in the Equity Interests of the Issuer or any Subsidiary; (ii) intercompany loans from the Issuer or any Subsidiary to the Issuer or any Subsidiary; and (iii) Guarantees by the Issuer or any Subsidiary of Indebtedness or other obligations permitted pursuant to **Section 3.12** (except to the extent such Guarantee is expressly subject to **Section 3.15**); *provided* that (x) the aggregate amount of Investments made pursuant to this **clause (B)** by Note Parties in Subsidiaries that are not Note Parties and Guarantees made pursuant to this **clause (B)** by any Note Party of Indebtedness or other obligations of any Subsidiary that is not a Note Party in any fiscal year shall not exceed the greater of (x) $13,000,000 and (y) [●]% of Consolidated Total Assets and (y) any Investment by any Note Party in any Subsidiary in the form of cash or Cash Equivalents shall only be permitted to the extent such Investment was made in reliance on the foregoing clause (x) of this proviso;

(C)     any Investments in Cash Equivalents;

(D)     Investments arising out of the receipt by the Issuer or any Subsidiary of non-cash consideration for the Disposition of assets permitted under **Section 3.16**;

(E)     loans and advances to officers, directors, employees or consultants of the Issuer or any Subsidiary (i) in the ordinary course of business in an aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) not to exceed the greater of (x) $6,500,000 and (y) [●]% of Consolidated Total Assets, (ii) in respect of payroll payments and expenses in the ordinary course of business and consistent with past practice or industry practice and (iii) in connection with such person's purchase of Equity Interests of the Issuer solely to the extent that the amount of such loans and advances shall be contributed to the Issuer in cash as common equity;

(F)     accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and consistent with past practice or industry practices and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

- 29 -

(G)      Hedging Agreements entered into for non-speculative purposes in the ordinary course of business;

(H)      Investments existing on, or contractually committed as of, or contemplated as of, the Issue Date and any extensions, renewals, replacements or reinvestments thereof, so long as the aggregate amount of all Investments pursuant to this **clause (H)** is not increased at any time above the amount of such Investment existing, committed or contemplated on the Issue Date;

(I)      Investments resulting from pledges and deposits under **clauses (F)**, **(G)**, **(N)**, **(O)**, **(R)**, **(S)**, **(U)**, **(AA)**, **(BB)**, **(EE)** and **(LL)** of the definition of "Permitted Liens";

(J)      Investments in the ordinary course of business and consistent with past practice by Note Parties into Subsidiaries that are not Note Parties on a transfer pricing basis to fund expenses of such Subsidiaries;

(K)      any Investment in the Issuer or a Subsidiary;

(L)      any Permitted Bond Hedge Transaction or Permitted Warrant Transaction, to the extent constituting Investments;

(M)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business and consistent with past practice or industry practices or Investments acquired by the Issuer or a Subsidiary as a result of a foreclosure by the Issuer or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(N)      Investments of a Subsidiary acquired after the Issue Date or of a person merged into the Issuer or merged into or consolidated with a Subsidiary after the Issue Date, in each case, to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(O)      other Investments in an aggregate amount at any one time outstanding not to exceed the greater of (x) $100,000,000 and (y) [●]% of Consolidated Total Assets; *provided* that no Investments may be made pursuant to this **clause (O)** in any non-Wholly Owned Subsidiary, unless such Investment constitutes the acquisition of additional Equity Interests in such non-Wholly Owned Subsidiary;

(P)      Guarantees by the Issuer or any Subsidiary of operating leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into by the Issuer or any Subsidiary in the ordinary course of business and consistent with past practice or industry practices;

(Q)      Investments to the extent that payment for such Investments is made with (or that are received in exchange for) Equity Interests of the Issuer or the cash proceeds of Equity Interests of the Issuer;

(R)     [Reserved];

(S)     Investments consisting of Restricted Payments permitted under **Section 3.15** (and without duplication of any baskets thereunder);

(T)     Investments in the ordinary course of business and consistent with past practice or industry practice consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers;

(U)     [Reserved];

(V)     [Reserved];

(W)     advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Issuer or such Subsidiary; and

(X)     to the extent constituting Investments, (i) purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or non-exclusive licenses or leases of Intellectual Property in each case in the ordinary course of business and consistent with past practice and not constituting all or substantially all of the assets of another person and (ii) development and expansion Capital Expenditures (which shall exclude, for the avoidance of doubt, any acquisition of Equity Interests of any person).

"**Permitted Liens**" means:

(A)     Liens on property or assets of the Issuer and the Subsidiaries existing on the Issue Date and any modifications, replacements, renewals or extensions thereof; *provided* that such Liens shall secure only those obligations that they secure on the Issue Date (and any Permitted Refinancing Indebtedness in respect of such obligations permitted by **Section 3.12(B)(i)**) and shall not subsequently apply to any other property or assets of the Issuer or any Subsidiary other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien, and (B) proceeds and products thereof;

(B)     any Lien created under the Note Documents or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage;

(C)     [Reserved];

(D)     Liens for Taxes, assessments or other governmental charges or levies not yet delinquent by more than 30 days or that are being contested in good faith or with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect;

(E)     Liens imposed by law, such as landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's, construction or other like Liens, securing obligations that are not overdue by more than 60 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Issuer or any Subsidiary shall have set aside on its books reserves in accordance with GAAP or with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect;

(F)      (i) pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations, (ii) Liens pursuant to Section 8a of the German Partial Retirement Act (*Altersteilzeitgesetz*) or  Section 7d of the German Social Law Act No. 4 (*Sozialgesetzbuch IV*) and (iii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Issuer or any Subsidiary;

(G)      deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capitalized Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, completion guarantees, bids, leases, subleases, licenses and sublicenses, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(H)      zoning and other land use restrictions, easements, survey exceptions, servitudes, trackage rights, leases (other than Capitalized Lease Obligations), subleases, licenses, special assessments, rights-of-way, reservations of rights, covenants, conditions, restrictions and declarations on or with respect to the use of Real Property or liens incidental to the conduct of the business of such Person or to the ownership of its Real Property, servicing agreements, development agreements, site plan agreements and other similar non-monetary encumbrances incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Issuer or any Subsidiary;

(I)      Liens securing Indebtedness incurred under **Section 3.12(B)(ix)**; provided, that such Liens (i) only apply to assets permitted under **Section 3.12(B)(ix)** and (ii) do not apply to any property or assets of the Issuer or any Subsidiary other than (A) the property or assets acquired, leased, constructed, replaced, repaired or improved with such Indebtedness, (B) after-acquired property that is affixed or incorporated into the property covered by such Lien, and (C) proceeds and products thereof; *provided*, *further*, that individual financings provided by one lender (and its Affiliates) may be cross-collateralized to other financings provided by such lender (and its Affiliates);

(J)      (i) first-priority Liens on the Siler City Assets securing DOE Financing permitted under **Section 3.12(B)(xii)(x)** and (y) first-priority Liens on the Siler City Assets representing a federal interest and security interest in favor of the United States Department of Commerce, the CHIPS Program Office or any other Governmental Authority of the United States securing obligations permitted under **Section 3.12(B)(xii)(y)**, so long as, in each case, the Note Obligations are secured on a third-priority basis on such assets and such Indebtedness or other obligations is subject to an Intercreditor Agreement;

(K)      Liens securing judgments that do not constitute an Event of Default under **Section 7.01(A)(x)**;

(L)      Liens disclosed by the title insurance policies delivered on or subsequent to the Issue Date and pursuant to the Collateral and Guarantee Requirement or **Section 3.22** and any replacement, extension or renewal of any such Lien; *provided*, that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien, and (B) proceeds and products thereof; *provided*, *further*, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Indenture;

(M)      any interest or title of a lessor or sublessor, licensor or sublicensor under any leases or subleases, licenses or sublicenses entered into by the Issuer or any Subsidiary in the ordinary course of business;

(N)      Liens in the ordinary course of business and consistent with past practice that are contractual rights of set-off and/or pledges of cash collateral (i) relating to the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposits, sweep accounts, reserve accounts or similar accounts of the Issuer or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business and consistent with past practice, including with respect to credit card charge-backs and similar obligations, (iii) relating to purchase orders and other agreements entered into with customers, suppliers or service providers of the Issuer or any Subsidiary or (iv) relating to any other Cash Management Agreement permitted by this Indenture;

(O)      Liens incurred in the ordinary course of business and consistent with past practice or industry practice (i) arising solely by virtue of any statutory or common law provision or customary standard terms relating to banker's liens, rights of set-off or similar rights, (ii) attaching to commodity trading accounts or other commodity brokerage accounts, (iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred and not for speculative purposes, (iv) in respect of Third Party Funds or (v) in favor of credit card companies pursuant to agreements therewith;

(P)      Liens securing obligations in respect of trade-related letters of credit, bankers' acceptances or similar obligations permitted under **Section 3.12(B)(vi)** or **(xv)** and covering the property (or the documents of title in respect of such property) financed by such letters of credit, bankers' acceptances or similar obligations and the proceeds and products thereof;

(Q)      leases or subleases, licenses or sublicenses (including with respect to Intellectual Property) granted to others in the ordinary course of business and consistent with past practice or industry practices;

(R)      Liens in favor of customs and revenue authorities arising as a matter of applicable law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and consistent with past practice or industry practice;

(S)     Liens solely on any cash earnest money deposits made by the Issuer or any of the Subsidiaries in connection with any letter of intent or purchase agreement in respect of any Investment permitted to be made hereunder;

(T)     Liens with respect to property or assets of any Subsidiary that is not a Note Party securing obligations of a Subsidiary that is not a Note Party permitted under **Section 3.12**;

(U)     Liens on any amounts held by a trustee or agent under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof, or under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions to the extent the relevant Indebtedness is permitted to be incurred and discharged, redeemed or defeased, as applicable, hereunder;

(V)     the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business;

(W)     Liens on Collateral securing Indebtedness incurred under **Section 3.12(B)(xviii)**; *provided* that, such Liens shall be senior to the Liens securing the Note Obligations and shall be subject to the First-Lien/Second-Lien Intercreditor Agreement;

(X)     Liens on Collateral securing Indebtedness incurred under **Section 3.12(B)(xix)**; *provided* that, such Liens shall be *pari passu* to the Liens securing the Note Obligations and shall be subject to the Intercreditor Agreements;

(Y)     Liens arising from precautionary Uniform Commercial Code financing statements (and similar instruments under the laws of any other jurisdiction) regarding operating leases or other obligations not constituting Indebtedness;

(Z)     Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents under clause (C) of the definition thereof;

(AA)     Liens on cash or Cash Equivalents securing letters of credit permitted by **Section 3.12(B)(xv)** or **(xvi)**; *provided* that such cash and Cash Equivalents do not exceed 105% of the stated face amount of such letters of credit secured thereby;

(BB)     Liens securing insurance premiums financing arrangements; *provided*, that such Liens are limited to the applicable unearned insurance premiums;

(CC)     in the case of Real Property that constitutes a leasehold interest, any Lien to which the fee simple interest (or any superior leasehold interest) is subject;

(DD)     [Reserved];

(EE)     Liens on deposits securing Hedging Agreements entered into for non-speculative purposes in an aggregate outstanding principal amount not more than the greater of (x) $260,000,000 and (y) [●]% of Consolidated Total Assets;

- 34 -

(FF)    Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit, bank guarantee or bankers' acceptance issued or created for the account of the Issuer or any Subsidiary in the ordinary course of business and consistent with past practice or industry practices; *provided*, that such Lien secures only the obligations of the Issuer or such Subsidiaries in respect of such letter of credit, bank guarantee or banker's acceptance to the extent permitted under **Section 3.12**;

(GG)    [Reserved];

(HH)    Liens securing Guarantees permitted to be secured by **Section 3.12(B)(xiii)**; *provided* that such Liens shall be subject to the Intercreditor Agreements;

(II)    security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business;

(JJ)    Liens arising out of conditional sale, title retention or similar arrangements for the sale or purchase of goods by the Issuer or any of the Subsidiaries in the ordinary course of business;

(KK)    customary payment in lieu of tax arrangements and other similar structures customary in the applicable jurisdiction in which assets or properties are located;

(LL)    other Liens with respect to property or assets of the Issuer or any Subsidiary securing obligations in an aggregate outstanding principal amount that, immediately after giving effect to the incurrence of the obligations secured by such Liens, would not exceed the greater of (x) $32,500,000 and (y) [●]% of Consolidated Total Assets; *provided* that any such Liens on the Collateral shall be [*pari passu* with or] junior to the Liens securing the Note Obligations (but for the avoidance of doubt, shall not be required to be subject to any Intercreditor Agreement);

(MM)    Liens pursuant to Section 1136 (alone or in conjunction with 1192(1)) of the German Civil Code (*Bürgerliches Gesetzbuch*); and

(NN)    Liens required to be granted under mandatory law in favor of creditors as a consequence of a merger or conversion permitted under the Indenture due to §§ 22, 204 German Transformation Act (*Umwandlungsgesetz—UmwG*).

"**Permitted Refinancing Indebtedness**" means any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "**Refinance**"), the Indebtedness being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); *provided*, that (a) the principal amount of such Permitted Refinancing Indebtedness does not exceed the principal amount of the Indebtedness so Refinanced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs and fees, commissions and expenses), (b) the final maturity date of such Permitted Refinancing Indebtedness is after the final maturity date of the Indebtedness being Refinanced and (ii) the Weighted Average Life to Maturity of such Permitted Refinancing Indebtedness (excluding customary amortization) is greater than or equal to the lesser of (i) the Weighted Average Life to Maturity of the Indebtedness being Refinanced and (ii) the Weighted Average Life to Maturity of the Notes then outstanding, (c) if

the Indebtedness being Refinanced is subordinated in right of payment and/or in lien priority to the Note Obligations under this Indenture, such Permitted Refinancing Indebtedness shall be subordinated in right of payment and/or in lien priority, as applicable, to such Note Obligations on terms not materially less favorable to the Holders as those contained in the documentation governing the Indebtedness being Refinanced (it being understood that secured Indebtedness may be Refinanced with unsecured Indebtedness), (d) no Permitted Refinancing Indebtedness shall have obligors that are not (or would not have been) obligated with respect to the Indebtedness being so Refinanced as of the Issue Date (provided that any Note Party may be an obligor for the Permitted Refinancing Indebtedness of any other Note Party to the extent otherwise permitted under this Indenture), (e)(i) no Permitted Refinancing Indebtedness may be secured Indebtedness if the Indebtedness being Refinanced is unsecured Indebtedness as of the Issue Date and (ii) no Permitted Refinancing Indebtedness may be secured by any collateral that did not secure the Indebtedness being Refinanced as of the Issue Date, (f) the other terms of such Permitted Refinancing Indebtedness (other than interest rates, fees, floors, funding discounts and redemption or prepayment premiums and other pricing terms) are substantially similar to, or more restrictive to the Issuer and its Subsidiaries than, the terms applicable to the Notes (except for (1) covenants or other provisions applicable only to periods after the Maturity Date or (2) those that are otherwise reasonably acceptable to the Issuer (or, if more restrictive, the Note Documents are amended, prior to or concurrently with such Refinancing, to contain such more restrictive terms to the extent required to satisfy the foregoing standard)), (g) at the time of such Refinancing, no Default or Event of Default shall have occurred or be continuing and (h) no Permitted Refinancing Indebtedness shall permit or require scheduled interest payments in cash in excess of 10.00% per annum (with variable interest rates converted to fixed rates based on implied forward interest rate curve for purposes of such determination).   Subject to the foregoing conditions, Permitted Refinancing Indebtedness may also be incurred in respect of any Indebtedness that constitutes Discharged Indebtedness.

"**Permitted Warrant Transaction**" means any call option, warrant or right to purchase (or substantively equivalent derivative transaction) on the Issuer's common stock sold by the Issuer substantially concurrently with any purchase by the Issuer of a related Permitted Bond Hedge Transaction.

"**Person**" or "**person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or other agency or political subdivision thereof. Any division or series of a limited liability company, limited partnership or trust will constitute a separate "person" under this Indenture.

"**Physical Note**" means a Note (other than a Global Note) that is represented by a certificate substantially in the form set forth in **Exhibit A**, registered in the name of the Holder of such Note and duly executed by the Issuer and authenticated by the Trustee.

"**Plan**" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by the Issuer, any Subsidiary or any ERISA Affiliate or to which the Issuer, any Subsidiary or any ERISA Affiliate has or may have an obligation to contribute, and each such plan for the five-year period immediately following the latest date on which the Issuer, any Subsidiary or any ERISA Affiliate maintained, contributed to

or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"**Preferred Stock**" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"**Product Family**" means (a) each product family (as referred to in the Issuer's most recent Form 10-K or Form 10-Q filings prior to the Issue Date or in any of the Issuer's Form 10-K or Form 10-Q filings after the Issue Date) and (b) shall also include (i) within the "materials" product family, each of (x) the bare wafers and (y) the epitaxial wafers, lines of business and (ii) within the "power devices" product family, each of (w) dies, (x) the Schottky diodes, (y) the metal oxide semiconductor field effect transistors (MOSFETs) and (z) the power modules, lines of business.

"**Qualified Equity Interests**" means any Equity Interest other than Disqualified Stock.

"**Qualified Successor Entity**" means, with respect to a Business Combination Event, a corporation; provided, however, that a limited liability company, limited partnership or other similar entity shall also constitute a Qualified Successor Entity with respect to such Business Combination Event if either (a) such Business Combination Event is an Exempted Fundamental Change; or (b) both of the following conditions are satisfied: (i) either (x) such limited liability company, limited partnership or other similar entity, as applicable, is treated as a corporation or is a direct or indirect, wholly owned subsidiary of, and disregarded as an entity separate from, a corporation, in each case for U.S. federal income tax purposes; or (y) the Issuer has received an opinion of a nationally recognized tax counsel to the effect that such Business Combination Event will not be treated as an exchange under Section 1001 of the Code, for Holders or beneficial owners of the Notes; and (ii) such Business Combination Event constitutes a Common Stock Change Event whose Reference Property consists solely of any combination of cash in U.S. dollars and shares of common stock or other corporate common equity interests of an entity that is (x) treated as a corporation for U.S. federal income tax purposes, (y) organized under the laws of the United States, any State thereof or the District of Columbia, and (z) the direct or indirect parent of the limited liability company, limited partnership or similar entity.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Note Party, whether by lease, license, or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"**Redemption Date**" means the date fixed, pursuant to **Section 4.03(E)**, for the settlement of the redemption of any Notes by the Issuer pursuant to a Redemption.

"**Redemption Notice Date**" means the date on which the Issuer sends the Redemption Notice for a Redemption pursuant to **Section 4.03(G)**.

"**Redemption Price**" means the cash price determined and payable by the Issuer to redeem any Note upon its Redemption, calculated pursuant to **Section 4.03(F)**.

"**Refinance**" has the meaning assigned to such term in the definition of the term "Permitted Refinancing Indebtedness," and "Refinanced" shall have a meaning correlative thereto.

["**Registration Rights Agreement**" means the Registration Rights Agreement, dated as of the date hereof, among the Issuer, Renesas and the other parties thereto.]

"**Regular Record Date**" has the following meaning with respect to an Interest Payment Date: (A) if such Interest Payment Date occurs on June 15, the immediately preceding June 1; and (B) if such Interest Payment Date occurs on December 15, the immediately preceding December 1 and (C) if such Interest Payment Date occurs on the Maturity Date, the date falling 15 calendar days prior to the Maturity Date.

"**Renesas**" means Renesas Electronics America Inc., a California corporation (or any successor thereto), and any of its Affiliates.

"**Renesas Warrants**" means those certain warrants to purchase shares of Common Stock issued to Renesas by the Issuer, dated as of the Issue Date.

"**Repurchase Upon Fundamental Change**" means the repurchase of any Note by the Issuer pursuant to **Section 4.02**.

"**Requirement of Law**" means, as to any person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such person or any of its property or assets or to which such person or any of its property or assets is subject.

"**Responsible Officer**" means (A) any officer within the corporate trust department of the Trustee (or any successor group of the Trustee); and (B) with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his or her knowledge of, and familiarity with, the particular subject, in each case, who shall have direct responsibility for the administration of this Indenture.

"**Restricted Investment**" means an Investment other than a Permitted Investment.

["**Restricted Note Legend**" means a legend substantially in the form set forth in **Exhibit B-1**.

"**Restricted Share Legend**" means, with respect to any Conversion Share, a legend substantially to the effect that the offer and sale of such Conversion Share have not been registered under the Securities Act and that such Conversion Share cannot be sold or otherwise transferred except pursuant to a transaction that is registered under the Securities Act or that is exempt from, or not subject to, the registration requirements of the Securities Act.][13]

---

[13] <u>Note to Draft</u>: "Restricted Note Legend" and "Restricted Share Legend" concepts not applicable to New Renesas 2L Takeback Convertible Notes.

"**Rule 144**" means Rule 144 under the Securities Act (or any successor rule thereto), as the same may be amended from time to time.

"**Rule 144A**" means Rule 144A under the Securities Act (or any successor rule thereto), as the same may be amended from time to time.

"**S&P**" means S&P Global Ratings, and any successor to the ratings business thereof.

"**Scheduled Trading Day**" means any day that is scheduled to be a Trading Day on the principal U.S. national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Common Stock is then traded. If the Common Stock is not so listed or traded, then "**Scheduled Trading Day**" means a Business Day.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Second Lien [Non-]Renesas Notes**" means $[204.0][331.4] million 2.5% Convertible Second Lien Senior Secured Notes due 2031 issued by the Issuer pursuant to the Second Lien [Non-]Renesas Notes Indenture, and any additional notes which may be issued pursuant to and in accordance with the terms of the Second Lien [Non-]Renesas Notes Indenture, as may be further amended and supplemented from time to time.

"**Second Lien [Non-]Renesas Notes Collateral Agent**" means U.S. Bank Trust Company, National Association, as the collateral agent for the Second Lien [Non-]Renesas Notes, and/or any successor collateral agent, additional collateral agent and/or any other supplemental collateral agent appointed pursuant to the terms of Second Lien [Non-]Renesas Notes Indenture.

"**Second Lien [Non-]Renesas Notes Indenture**" means an indenture, dated as of the Issue Date, among the Issuer, the Subsidiary Guarantors named therein, and U.S. Bank Trust Company, National Association, as the trustee and the collateral agent, in relation to the Second Lien [Non-]Renesas Notes, as such document may be amended, restated, supplemented or otherwise modified from time to time.

"**Second Lien [Non-]Renesas Notes Trustee**" means U.S. Bank Trust Company, National Association, as trustee for Second Lien [Non-]Renesas Notes or its successors or assignees appointed pursuant to the terms of Second Lien [Non-]Renesas Notes Indenture.

"**Second Lien Takeback Notes**" means $[296.0][331.4] million 7.00%/12.00% Convertible Second Lien Senior Secured Notes due 2031 issued by the Issuer pursuant to the Second Lien Takeback Notes Indenture, and any additional notes which may be issued pursuant to and in accordance with the terms of the Second Lien Takeback Notes Indenture, as may be further amended and supplemented from time to time.

"**Second Lien Takeback Notes Collateral Agent**" means U.S. Bank Trust Company, National Association, as the collateral agent for the Second Lien Takeback Notes, and/or any successor collateral agent, additional collateral agent and/or any other supplemental collateral agent appointed pursuant to the terms of Second Lien Takeback Notes Indenture.

"**Second Lien Takeback Notes Indenture**" means an indenture, dated as of the Issue Date, among the Issuer, the Subsidiary Guarantors named therein, and U.S. Bank Trust Company, National Association, as the trustee and the collateral agent, in relation to the Second Lien Takeback Notes, as such document may be amended, restated, supplemented or otherwise modified from time to time.

"**Second Lien Takeback Notes Trustee**" means U.S. Bank Trust Company, National Association, as trustee for Second Lien Takeback Notes or its successors or assignees appointed pursuant to the terms of Second Lien Takeback Notes Indenture.

"**Second-Priority Obligations**" shall have the meaning set forth in the First-Lien/Second-Lien Intercreditor Agreement.

"**Secured Parties**" means, collectively, the Trustee, the Collateral Agent (including as the Parallel Debt Creditor), each Holder and each Subagent appointed pursuant to **Section 11.02** by the Trustee with respect to matters relating to the Note Documents or by the Collateral Agent (including as the Parallel Debt Creditor) with respect to matters relating to any Security Document.

"**Securities Account**" has the meaning assigned to such term in the Uniform Commercial Code.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Security**" means any Note or Conversion Share.

"**Security Documents**" means the Mortgages, the Collateral Agreement, each foreign collateral agreement, each Notice of Grant of Security Interest in Intellectual Property (as defined in the Collateral Agreement), each Account Control Agreement and each of the security agreements, pledge agreements and other instruments and documents executed and delivered at any time pursuant to any of the foregoing or pursuant to **Section 3.21**.

"**Settlement Method**" means Cash Settlement, Physical Settlement or Combination Settlement.

"**Significant Subsidiary**" means, with respect to any Person, any Subsidiary of such Person that constitutes a "significant subsidiary" (as defined in Rule 1-02(w) of Regulation S-X under the Exchange Act) of such Person; provided, however, that, if a Subsidiary meets the criteria of clause (1)(iii), but not clause (1)(i) or (1)(ii), of the definition of "significant subsidiary" in Rule 1-02(w) (or, if applicable, the respective successor clauses to the aforementioned clauses), then such Subsidiary will be deemed not to be a Significant Subsidiary unless such Subsidiary's income from continuing operations before income taxes, exclusive of amounts attributable to any non-controlling interests, for the last completed fiscal year before the date of determination exceeds [●] dollars ($[●],000,000).

"**Siler City Assets**" means (i) any tangible personal or real property of the Issuer or its Subsidiaries located at, or used in, as of the Issue Date, the Siler City Facility and (ii) any tangible personal or real property purchased after the Issue Date and located at, or used in, the Siler City Facility from and after the Issue Date which did not fall into any other definition under this

Indenture prior to such movement or use; *provided*, that, for the avoidance of doubt, Siler City Assets shall not include any intangible assets or property of the Issuer or its Subsidiaries.

"**Siler City Facility**" means the materials facility and campus in Siler City, North Carolina.

"**Special Interest**" means all amounts, if any, payable pursuant to **Section 7.03**, as applicable.

"**Specified Dollar Amount**" means, with respect to the conversion of a Note to which Combination Settlement applies, the maximum cash amount per $1,000 principal amount of such Note deliverable upon such conversion (excluding cash in lieu of any fractional share of Common Stock).

"**Stated Interest**" means 2.5% per annum, payable solely in cash.

"**Stated Maturity**" means, (1) with respect to any Indebtedness, the date specified in such debt security as the fixed date on which the final installment of principal of such Indebtedness is due and payable as set forth in the documentation governing such Indebtedness and (2) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"**Subsidiary**" means, with respect to any Person, (A) any corporation, association or other business entity (other than a partnership or limited liability company) of which more than fifty percent (50%) of the total voting power of the Equity Interests entitled (without regard to the occurrence of any contingency, but after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees, as applicable, of such corporation, association or other business entity is owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person; and (B) any partnership or limited liability company where (i) more than fifty percent (50%) of the capital accounts, distribution rights, equity and voting interests, or of the general and limited partnership interests, as applicable, of such partnership or limited liability company are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person, whether in the form of membership, general, special or limited partnership or limited liability company interests or otherwise; and (ii) such Person or any one or more of the other Subsidiaries of such Person is a controlling general partner of, or otherwise controls, such partnership or limited liability company.

"**Subsidiary Guarantee**" means the joint and several guarantee pursuant to **Article 12** hereof by a Subsidiary Guarantor of its Guaranteed Obligations.

"**Subsidiary Guarantor**" means (a) each Subsidiary of the Issuer that is not an Excluded Subsidiary and (b) any other Subsidiary of the Issuer that may be designated by the Issuer (by way of delivering to the Trustee a supplemental indenture to this Indenture substantially in the form of **Exhibit C**, duly executed by such Subsidiary) in its sole discretion from time to time to be a

guarantor in respect of the Guaranteed Obligations, whereupon such Subsidiary shall be obligated to comply with the other requirements of **Section 3.21(A)(iv)** as if it were newly acquired.

[“**Supermajority Holders**” means, at any applicable time, Holders owning more than 66 2/3% of the aggregate principal amount of the Notes then outstanding.]

“**Taxes**” means any and all present or future federal, state, local and non-U.S. taxes, duties, levies, imposts, charge assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority, whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

“**Termination Date**” means the date on which the principal of and interest on each Note, all Note Obligations, all fees and all other expenses or amounts payable under any Note Document shall have been paid in full (other than in respect of contingent indemnification and expense reimbursement claims not then due).

“**Test Period**” means, on any date of determination, the period of four consecutive fiscal quarters of the Issuer then most recently ended (taken as one accounting period) for which financial statements have been (or were required to be) delivered pursuant to **Section 3.03**; *provided* that prior to the first date financial statements have been delivered pursuant to **Section 3.03**, the Test Period in effect shall be the four fiscal quarter period ended [＿], 2025[14].

“**Third Party Funds**” means any accounts or funds, or any portion thereof, received by the Issuer or any of its Subsidiaries as agent on behalf of third parties in accordance with a written agreement that imposes a duty upon the Issuer or one or more of its Subsidiaries to collect and remit those funds to such third parties.

“**Trading Day**” means any day on which (A) trading in the Common Stock generally occurs on the principal U.S. national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Common Stock is then traded; and (B) there is no Market Disruption Event. If the Common Stock is not so listed or traded, then “Trading Day” means a Business Day.

“**Transactions**” means, collectively, the transactions to occur pursuant to the Note Documents, including (a) the execution, delivery and performance of the Note Documents, the creation of the Liens pursuant to the Security Documents, and the issuance of the Notes hereunder and (b) the payment of all fees and expenses to be paid and owing in connection with the foregoing.

[“**Transfer-Restricted Security**” means any Security that constitutes a “restricted security” (as defined in Rule 144); *provided*, *however*, that such Security will cease to be a Transfer- Restricted Security upon the earliest to occur of the following events:

---

[14]   Note to Draft: To be the fiscal quarter most recently ended prior to the Issue Date.

(A)      such Security is sold or otherwise transferred to a Person (other than the Issuer or an Affiliate of the Issuer) pursuant to a registration statement that was effective under the Securities Act at the time of such sale or transfer;

(B)      such Security is sold or otherwise transferred to a Person (other than the Issuer or an Affiliate of the Issuer) pursuant to an available exemption (including Rule 144) from the registration and prospectus-delivery requirements of, or in a transaction not subject to, the Securities Act and, immediately after such sale or transfer, such Security ceases to constitute a "restricted security" (as defined in Rule 144); and

(C)      such Security is eligible for resale, by a Person that is not an Affiliate of the Issuer and that has not been an Affiliate of the Issuer during the immediately preceding three (3) months, pursuant to Rule 144 without any limitations thereunder as to volume, manner of sale, availability of current public information or notice.

The Trustee is under no obligation to determine whether any Security is a Transfer- Restricted Security and may conclusively rely on an Officer's Certificate with respect thereto.]

"**Trust Indenture Act**" means the U.S. Trust Indenture Act of 1939, as amended.

"**Trustee**" means the Person named as such in the first paragraph of this Indenture until a successor replaces it in accordance with the provisions of this Indenture and, thereafter, means such successor.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**VWAP Market Disruption Event**" means, with respect to any date, (A) the failure by the principal U.S. national or regional securities exchange on which the Common Stock is then listed, or, if the Common Stock is not then listed on a U.S. national or regional securities exchange, the principal other market on which the Common Stock is then traded, to open for trading during its regular trading session on such date; or (B) the occurrence or existence, for more than one half hour period in the aggregate, of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the relevant exchange or otherwise) in the Common Stock or in any options contracts or futures contracts relating to the Common Stock, and such suspension or limitation occurs or exists at any time before 1:00 p.m., New York City time, on such date.

"**VWAP Trading Day**" means a day on which (A) there is no VWAP Market Disruption Event; and (B) trading in the Common Stock generally occurs on the principal U.S. national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Common Stock is then traded. If the Common Stock is not so listed or traded, then "VWAP Trading Day" means a Business Day.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"**Wholly Owned Subsidiary**" of any person means a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person.  Unless the context otherwise requires, "Wholly Owned Subsidiary" means a Subsidiary of the Issuer that is a Wholly Owned Subsidiary of the Issuer.

**Section 1.02.  OTHER DEFINITIONS.**[15]

| Term | Defined in Section |
|---|---|
| "**Additional Intercreditor Agreement**" | **14.02(A)** |
| "**Additional Notes**" | **2.03(B)** |
| [**"Beneficial Ownership Limitations"**  | **5.10(D)**] |
| "**Business Combination Event**" | **6.01(B)** |
| "**Cash Settlement**" | **5.03(A)** |
| "**Combination Settlement**" | **5.03(A)** |
| "**Common Stock Change Event**" | **5.09(A)** |
| "**Conversion Agent**" | **2.06(A)** |
| "**Conversion Consideration**" | **5.03(B)(i)** |
| "**Default Interest**" | **2.05(B)** |
| "**Defaulted Amount**" | **2.05(B)** |
| "**Event of Default**" | **7.01(A)** |
| "**Executed Documentation**" | **13.01** |
| "**Expiration Date**" | **5.05(A)(v)** |
| "**Expiration Time**" | **5.05(A)(v)** |
| "**Fundamental Change Notice**" | **4.02(E)** |
| "**Fundamental Change Repurchase Right**" | **4.02(A)** |
| [**"General Beneficial Ownership Limitation"** | **5.10(D)**] |
| "**Guaranteed Obligations**" | **12.01(A)(ii)** |
| "**Guarantor Business Combination Event**" | **6.01(B)** |
| [**"Holder Beneficial Ownership Limitation"** | **5.10(D)**] |
| "**Initial Notes**" | **2.03(A)** |

---

[15] <u>Note to Draft</u>: To be updated once draft settles.

| Term | Defined in Section |
|------|-------------------:|
| **"Issuer Business Combination Event"** | **6.01(A)** |
| **"Paying Agent"** | **2.06(A)** |
| **"Physical Settlement"** | **5.03(A)** |
| **"Redemption"** | **4.03(B)** |
| **"Redemption Notice"** | **4.03(G)** |
| **"Reference Property"** | **5.09(A)** |
| **"Reference Property Unit"** | **5.09(A)** |
| **"Register"** | **2.06(B)** |
| **"Registrar"** | **2.06(A)** |
| **"Specified Courts"** | **13.07** |
| **"Spin-Off Valuation Period"** | **5.05(A)(iii)(2)** |
| **"Successor Entity"** | **6.01(A)(i)** |
| **"Successor Guarantor"** | **6.01(B)(i)** |
| **"Successor Person"** | **5.09(A)** |
| **"Tender/Exchange Offer Valuation Period"** | **5.05(A)(v)** |
| **"Underlying Issuer"** | **5.09(A)** |

**Section 1.03. RULES OF CONSTRUCTION.**

For purposes of this Indenture:

(A)     "or" is not exclusive;

(B)     "including" means "including without limitation";

(C)     "will" expresses a command;

(D)     the "average" of a set of numerical values refers to the arithmetic average of such numerical values;

(E)     a merger involving, or a transfer of assets by, a limited liability company, limited partnership or trust will be deemed to include any division of or by, or an allocation of assets to a series of, such limited liability company, limited partnership or trust, or any unwinding of any such division or allocation;

(F)     words in the singular include the plural and in the plural include the singular, unless the context requires otherwise;

(G)     "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision of this Indenture, unless the context requires otherwise;

- 45 -

(H)     references to currency mean the lawful currency of the United States of America, unless the context requires otherwise;

(I)     the exhibits, schedules and other attachments to this Indenture are deemed to form part of this Indenture;

(J)     notwithstanding anything to the contrary in this Indenture, solely for purposes of determining whether any notice, direction, action to be taken or consent to be given under this Indenture or the other Note Documents is authorized, provided or given (as the case may be) by Holders of a sufficient aggregate principal amount of Notes, a beneficial owner of an interest in a Note shall be treated as a Holder, and the Trustee shall be permitted to rely in good faith on customary certificates of such beneficial ownership as evidence of holdings of Notes, which may be in the form of "screenshots" or other reasonable or customary electronic or other evidence of such beneficial owner's position (and shall not require the provision of DTC proxies, medallion-stamped guarantees or other similar evidence) in connection with any determination with respect to the Holders of Notes giving any notice, direction, action to be taken or consent;

(K)     the term "interest," when used with respect to a Note, includes any Default Interest and Special Interest, unless the context requires otherwise;

(L)     except as otherwise expressly provided herein, any reference herein to any Requirement of Law means such Requirement of Law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time; and

(M)     except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect on the Issue Date.

**Section 1.04.  CONFLICT WITH TRUST INDENTURE ACT.**

If any provision hereof limits, qualifies or conflicts with a provision of the Trust Indenture Act that is required under such Trust Indenture Act to be part of and govern this Indenture, the Trust Indenture Act provision shall control. If any provision of this Indenture modifies or excludes any provision of the Trust Indenture Act that may be so modified or excluded, the Trust Indenture Act provision shall be deemed to apply to this Indenture as so modified or to be excluded, as the case may be. The following Trust Indenture Act terms used in this Indenture have the following meanings:

(A)     "Commission" means the SEC;

(B)     "default" means Event of Default;

(C)     "indenture securities" means the Notes;

(D)     "indenture security holder" means a Holder;

(E)     "indenture to be qualified" means this Indenture;

(F)     "indenture trustee" or "institutional trustee" means the Trustee; and

(G)    "obligor" on the indenture securities means each Note Party and any successor obligor upon the Securities.

All other terms used in this Indenture that are defined by the Trust Indenture Act, defined by Trust Indenture Act reference to another statute or defined by SEC rule under the Trust Indenture Act and not otherwise defined herein are used herein as so defined.

**Section 1.05.  LIMITED CONDITION TRANSACTIONS.**

When calculating the availability under any basket or ratio under this Indenture or compliance with any provision of this Indenture in connection with any Limited Condition Transaction, any actions or transactions related thereto (including, without limitation, acquisitions, Investments, the incurrence of Indebtedness and issuance of Disqualified Stock and Preferred Stock and the use of proceeds therefrom, the incurrence of Liens and Restricted Payments), and determining compliance with Defaults and Events of Default, in each case, at the option of the Issuer (the Issuer's election to exercise such option, an "**LCT Election**"), the date of determination for availability under any such basket or ratio and whether any such action or transaction is permitted (or any requirement or condition therefor is complied with or satisfied (including, without limitation, as to the absence of any continuing Default or Event of Default) under this Indenture shall be deemed to be the date the definitive agreements for such Limited Condition Transaction are entered into (or, if applicable, the date of delivery of an irrevocable notice or similar event) (the "**LCT Test Date**"), and if, after giving effect to the Limited Condition Transaction and any actions or transactions related thereto (including, without limitation, acquisitions, Investments, the incurrence of Indebtedness and issuance of Disqualified Stock and Preferred Stock and the use of proceeds therefrom, the incurrence of Liens and Restricted Payments) on a pro forma basis, the Issuer or any of its Subsidiaries would have been permitted to take such actions or consummate such transactions on the relevant LCT Test Date in compliance with such ratio, test or basket (and any related requirements and conditions), such ratio, test or basket (and any related requirements and conditions) shall be deemed to have been complied with (or satisfied) for all purposes under the indenture (in the case of Indebtedness, for example, whether such Indebtedness is committed, issued or otherwise Incurred at the LCT Test Date or at any time thereafter); provided, that compliance with such ratios, tests or baskets (and any related requirements and conditions) shall not be determined or tested at any time after the applicable LCT Test Date for such Limited Condition Transaction or any actions or transactions related thereto (including, without limitation, acquisitions, Investments, the incurrence of Indebtedness and issuance of Disqualified Stock and Preferred Stock and the use of proceeds therefrom, the incurrence of Liens and Restricted Payments).

For the avoidance of doubt, if the Issuer has made an LCT Election, (1) if any of the ratios, tests or baskets for which compliance was determined or tested as of the LCT Test Date would at any time after the LCT Test Date have been exceeded or otherwise failed to have been complied with as a result of fluctuations in any such ratio, test or basket, including due to fluctuations in EBITDA or Consolidated Total Assets of the Issuer or the Person subject to such Limited Condition Transaction, such baskets, tests or ratios will not be deemed to have been exceeded or failed to have been complied with as a result of such fluctuations; (2) if any related requirements and conditions (including as to the absence of any continuing Default or Event of Default) for which compliance or satisfaction was determined or tested as of the LCT Test Date would at any

time after the LCT Test Date not have been complied with or satisfied (including due to the occurrence or continuation of a Default or Event of Default), such requirements and conditions will not be deemed to have been failed to be complied with or satisfied (and such Default or Event of Default shall be deemed not to have occurred or be continuing); and (3) in calculating the availability under any ratio, test or basket in connection with any action or transaction unrelated to such Limited Condition Transaction following the relevant LCT Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated or the date that the definitive agreement or date for redemption, purchase or repayment specified in an irrevocable notice for such Limited Condition Transaction is terminated, expires or passes, as applicable, without consummation of such Limited Condition Transaction, any such ratio, test or basket shall be determined or tested giving pro forma effect to such Limited Condition Transaction.

## Article 2.    THE NOTES

**Section 2.01.  FORM, DATING AND DENOMINATIONS.**

The Initial Notes and the Trustee's certificate of authentication will be substantially in the form set forth in **Exhibit A**. Any Additional Notes and the Trustee's certificate of authentication will be substantially in the form set forth in **Exhibit A**. The Notes will bear each legend, if any, required by **Section 2.09** and may bear notations, legends or endorsements required by law, stock exchange rule or usage or the Depositary. Each Note will be dated as of the date of its authentication.

Except to the extent otherwise provided in an Issuer Order delivered to the Trustee in connection with the issuance and authentication thereof, the Notes will be issued initially in the form of one or more Global Notes. Physical Notes may be exchanged for Global Notes, and Global Notes may be exchanged for Physical Notes, only as provided in **Section 2.10**.

The Notes will be issuable only in registered form without interest coupons and only in Authorized Denominations.

Each certificate representing a Note will bear a unique registration number that is not affixed to any other certificate representing another outstanding Note.

The terms contained in the Notes constitute part of this Indenture, and, to the extent applicable, the Issuer and the Trustee, by their execution and delivery of this Indenture, agree to such terms and to be bound thereby; *provided*, *however*, that, to the extent that any provision of any Note conflicts with the provisions of this Indenture, the provisions of this Indenture will control for purposes of this Indenture and such Note.

**Section 2.02.  EXECUTION, AUTHENTICATION AND DELIVERY.**

(A)    *Due Execution by the Issuer*.  At least one (1) duly authorized Officer will sign the Notes on behalf of the Issuer by manual, electronically (including ".pdf" or DocuSign or other electronic signature platform) or facsimile signature. A Note's validity will not be affected by the failure of any Officer whose signature is on any Note to hold, at the time such Note is authenticated, the same or any other office at the Issuer.

(B)     *Authentication by the Trustee and Delivery*.

(i)     No Note will be valid until it is authenticated by the Trustee. A Note will be deemed to be duly authenticated only when an authorized signatory of the Trustee (or a duly appointed authenticating agent) manually signs the certificate of authentication of such Note.

(ii)     The Trustee will cause an authorized signatory of the Trustee (or a duly appointed authenticating agent) to manually sign the certificate of authentication of a Note only if (1) the Issuer delivers such Note to the Trustee; (2) such Note is executed by the Issuer in accordance with **Section 2.02(A)**; and (3) the Issuer delivers a Issuer Order to the Trustee that (a) requests the Trustee to authenticate such Note; and (b) sets forth the name of the Holder of such Note and the date as of which such Note is to be authenticated. If such Issuer Order also requests the Trustee to deliver such Physical Note to any Holder, then the Trustee will promptly electronically deliver such Note in accordance with such Issuer Order.

(iii)     The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes. A duly appointed authenticating agent may authenticate Notes whenever the Trustee may do so under this Indenture, and a Note authenticated as provided in this Indenture by such an agent will be deemed, for purposes of this Indenture, to be authenticated by the Trustee. Each duly appointed authenticating agent will have the same rights to deal with the Issuer as the Trustee would have if it were performing the duties that the authentication agent was validly appointed to undertake.

## Section 2.03.   INITIAL NOTES AND ADDITIONAL NOTES

(A)     *Initial Notes*.   On the Issue Date, there will be originally issued (i) [●] ($[●]) aggregate principal amount of Notes, subject to the provisions of this Indenture (including **Section 2.02**). Notes issued pursuant to this **Section 2.03(A)**, and any Notes issued in exchange therefor or in substitution thereof, are referred to in this Indenture as the "**Initial Notes**."

(B)     At any time and from time to time after the execution and delivery of this Indenture and only so long as permitted by the terms of this Indenture, the Issuer may deliver additional notes (the "Additional Notes") executed by the Issuer to the Trustee for authentication, together with a written order of the Issuer in the form of an Officer's Certificate for the authentication and delivery of such Additional Notes, and the Trustee in accordance with such written order of the Issuer shall authenticate and deliver such Additional Notes. The Additional Notes shall have the same terms and conditions as the Initial Notes issued pursuant to **Section 2.03(A)** (including the benefit of the Subsidiary Guarantees and the Collateral) in all respects except for the issue date, the issue price, the date of the first payment of interest, and, if applicable, restrictions on transfer in respect of such Additional Notes, and upon issuance, the Additional Notes shall be consolidated with and form a single class with the previously outstanding Notes and vote together as one class on all matters with respect to the Notes; provided that, if the Additional Notes and any Notes that are resold after such Notes have been purchased or otherwise acquired by the Issuer or its Subsidiaries are not fungible with the Initial Notes for U.S. federal income tax purposes, the Additional Notes will be assigned a separate CUSIP and ISIN number or by no CUSIP number.

- 49 -

**Section 2.04.   METHOD OF PAYMENT.**

(A)     *Global Notes*.  The Issuer will pay, or cause the Paying Agent to pay, the principal (whether due upon maturity on the Maturity Date, Redemption on a Redemption Date or repurchase on a Fundamental Change Repurchase Date or otherwise) of, cash, interest on, and any cash Conversion Consideration for, any Global Note to the Depositary by wire transfer of immediately available funds no later than the time the same is due as provided in this Indenture.

(B)     *Physical Notes*.  The Issuer will pay, or cause the Paying Agent to pay, the principal (whether due upon maturity on the Maturity Date, Redemption on a Redemption Date or repurchase on a Fundamental Change Repurchase Date or otherwise) of, cash, interest on, and any cash Conversion Consideration for, any Physical Note no later than the time the same is due as provided in this Indenture by wire transfer of immediately available funds to an account of the Holder, as specified by the Holder.

**Section 2.05.   ACCRUAL OF INTEREST; DEFAULTED AMOUNTS; WHEN PAYMENT DATE IS NOT A BUSINESS DAY.**

(A)     *Accrual of Interest*.  Each Note will accrue interest at a rate per annum equal to the Stated Interest, plus any Special Interest that may accrue pursuant to **Section 7.03**. Stated Interest on each Note will (i) accrue from, and including, the most recent date to which Stated Interest has been paid or duly provided for (or, if no Stated Interest has theretofore been paid or duly provided for, the date set forth in the certificate representing such Note as the date from, and including, which Stated Interest will begin to accrue in such circumstance) to, but excluding, the date of payment of such Stated Interest; and (ii) be, subject to **Sections 4.02(D)**, **4.03(F)** and **5.02(D)** (but without duplication of any payment of interest), payable semi-annually in arrears on each Interest Payment Date, beginning on the first Interest Payment Date set forth in the certificate representing such Note, to the Holder of such Note as of the close of Business on the immediately preceding Regular Record Date. Stated Interest, and, if applicable, Special Interest, on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

(B)     *Defaulted Amounts*.  If the Issuer fails to pay any cash amount (a "**Defaulted Amount**") payable on a Note on or before the due date therefor as provided in this Indenture, then, regardless of whether such failure constitutes an Event of Default, (i) such Defaulted Amount will forthwith cease to be payable to the Holder of such Note otherwise entitled to such payment; (ii) to the extent lawful, interest ("**Default Interest**") will accrue on such Defaulted Amount at a rate per annum equal to the rate per annum at which Stated Interest accrues, from, and including, such due date to, but excluding, the date of payment of such Defaulted Amount and Default Interest; (iii) such Defaulted Amount and Default Interest will be paid as provided either in clause (i) or clause (ii) below, at the Issuer's election.

(i)     *Payment of Default Amounts on a Special Payment Date*. The Issuer will have the right to pay such Defaulted Amount and Default Interest on a payment date selected by the Issuer to the Holder of such Note as of the close of Business on a special record date selected by the Issuer, *provided* that such special record date must be no more than fifteen (15), nor less than ten (10), calendar days before such payment date; and at least fifteen (15) calendar days before such special record date, the Issuer will send notice

- 50 -

to the Trustee and the Holders that states such special record date, such payment date and the amount of such Defaulted Amount and Default Interest to be paid on such payment date.

(ii)     *Payment of Default Amount in Any Other Lawful Manner*. If not paid in accordance with Section 2.05(B)(i), such Defaulted Amount and Default Interest will be paid by the Issuer in any other lawful manner.

Notwithstanding anything to the contrary in this **Section 2.05(B)(i)**, a Default in the payment or delivery of any Conversion Consideration when due will be cured upon the payment or delivery of the same (together, if applicable in the case of any cash Conversion Consideration, with Default Interest thereon) to the Person to whom such Conversion Consideration is payable or deliverable (determined in accordance with **Article 5**).

(C)     *Delay of Payment when Payment Date is Not a Business Day*.  If the due date for a payment on a Note as provided in this Indenture is not a Business Day, then, notwithstanding anything to the contrary in this Indenture or the Notes, such payment may be made on the immediately following Business Day with the same force and effect as if such payment were made on such due date (and, for the avoidance of doubt,  no interest will accrue on such payment as a result of the related delay). Solely for purposes of the immediately preceding sentence, a day on which the applicable place of payment is authorized or required by law or executive order to close or be closed will be deemed not to be a "**Business Day**."

(D)     *Special Provision for Global Notes*. If the first date on which any Special Interest begins to accrue on a Global Note is on or after the fifth (5th) Business Day before a Regular Record Date and before the next Interest Payment Date, then, notwithstanding anything to the contrary in this Indenture or the Notes, the amount thereof accruing in respect of the period from, and including, such first date to, but excluding, such Interest Payment Date will not be payable on such Interest Payment Date but will instead be deemed to accrue (without duplication) entirely on such Interest Payment Date (and, for the avoidance of doubt, no interest will accrue as a result of the related delay).

**Section 2.06.   Registrar, Paying Agent and Conversion Agent.**

(A)     *Generally*.  The Issuer will maintain (i) an office or agency in the continental United States where Notes may be presented for registration of transfer or for exchange (the "**Registrar**"); (ii) an office or agency in the continental United States where Notes may be presented for payment (the "**Paying Agent**"); and (iii) an office or agency in the continental United States where Notes may be presented for conversion (the "**Conversion Agent**"). If the Issuer fails to maintain a Registrar, Paying Agent or Conversion Agent, then the Trustee will act as such. For the avoidance of doubt, the Issuer or any of its Subsidiaries may act as Registrar, Paying Agent or Conversion Agent.

(B)     *Duties of the Registrar*.  The Registrar will keep a record (the "**Register**") of the names and addresses of the Holders, the Notes held by each Holder and the transfer, exchange, repurchase, Redemption and conversion of Notes. Absent manifest error, the entries in the Register will be conclusive and the Issuer and the Trustee may treat each Person whose name is recorded

as a Holder in the Register as a Holder for all purposes. The Register will be in written form or in any form capable of being converted into written form reasonably promptly.

(C)     *Co-Agents; Issuer's Right to Appoint Successor Registrars, Paying Agents and Conversion Agents*.  The Issuer may appoint one or more co-Registrars, co-Paying Agents and co-Conversion Agents, each of whom will be deemed to be a Registrar, Paying Agent or Conversion Agent, as applicable, under this Indenture. Subject to **Section 2.06(A)**, the Issuer may change any Registrar, Paying Agent or Conversion Agent (including appointing itself or any of its Subsidiaries to act in such capacity) without notice to any Holder. The Issuer will notify the Trustee (and, upon request, any Holder) of the name and address of each Note Agent, if any, not a party to this Indenture and will enter into an appropriate agency agreement with each such Note Agent, which agreement will implement the provisions of this Indenture that relate to such Note Agent.

(D)     *Initial Appointments*.  The Issuer appoints the Trustee as the initial Paying Agent, the initial Registrar and the initial Conversion Agent.

## Section 2.07.  PAYING AGENT AND CONVERSION AGENT TO HOLD PROPERTY IN TRUST.

The Issuer will require each Paying Agent or Conversion Agent that is not the Trustee to agree in writing that such Note Agent will (A) hold in trust for the benefit of Holders or the Trustee all money and other property held by such Note Agent for payment or delivery due on the Notes; and (B) notify the Trustee of any default by the Issuer in making any such payment or delivery. The Issuer, at any time, may, and the Trustee, while any Default continues, may, require a Paying Agent or Conversion Agent to pay or deliver, as applicable, all money and other property held by it to the Trustee, after which payment or delivery, as applicable, such Note Agent (if not the Issuer or any of its Subsidiaries) will have no further liability for such money or property. If the Issuer or any of its Subsidiaries acts as Paying Agent or Conversion Agent, then (A) it will segregate and hold in a separate trust fund for the benefit of the Holders or the Trustee all money and other property held by it as Paying Agent or Conversion Agent; and (B) references in this Indenture or the Notes to the Paying Agent or Conversion Agent holding cash or other property, or to the delivery of cash or other property to the Paying Agent or Conversion Agent, in each case for payment or delivery to any Holders or the Trustee or with respect to the Notes, will be deemed to refer to cash or other property so segregated and held separately, or to the segregation and separate holding of such cash or other property, respectively. Upon the occurrence of any event pursuant to **Section 7.01(A)(x)** or **Section 7.01(A)(xi)** with respect to the Issuer (or with respect to any Subsidiary of the Issuer acting as Paying Agent or Conversion Agent), the Trustee will serve as the Paying Agent or Conversion Agent, as applicable, for the Notes.

## Section 2.08.  HOLDER LISTS.

(A)     If the Trustee is not the Registrar, the Issuer and any other obligor of the Notes will furnish to the Trustee, no later than seven (7) Business Days before each Interest Payment Date, and at such other times as the Trustee may request, a list, in such form and as of such date or time as the Trustee may reasonably require, of the names and addresses of the Holders, and shall otherwise comply with Section 312(a) of the Trust Indenture Act.

(B)     The Trustee shall preserve in as current a form as is reasonably practicable, all information as to the names and addresses of the Holders (1) contained in the most recent list furnished to it as provided in **Section 2.08(A)** and (2) received by it in the capacity of Paying Agent (if so acting), and shall otherwise comply with Section 312(a) of the Trust Indenture Act.

(C)     The Holders may communicate pursuant to Section 312(b) of the Trust Indenture Act with other Holders with respect to their rights under this Indenture or any or all series of the Notes.  The Issuer, the Trustee, the Registrar and anyone else shall have the protection of Section 312(c) of the Trust Indenture Act.

(D)     Each and every Holder, by receiving the Notes and holding the same, agrees with the Issuer and the Trustee that neither the Issuer nor the Trustee nor any agent of either of them shall be held accountable by reason of any disclosure of information as to the names and addresses of the Holders in accordance with the provisions of this **Section 2.08**.

**Section 2.09.** LEGENDS.

(A)     *Global Note Legend*.  Each Global Note will bear the Global Note Legend (or any similar legend, not inconsistent with this Indenture, required by the Depositary for such Global Note).

(B)     *[Reserved.]*

(C)     *[Reserved.][Restricted Note Legend*.  Subject to **Section 2.12**,

(i)     solely to the extent that any Note is issued in one or more transactions that result in such Note constituting a "restricted security" (as defined in Rule 144), each such Note that is a Transfer-Restricted Security will bear the Restricted Note Legend; and

(ii)     if a Note is issued in exchange for, in substitution of, or to effect a partial conversion of, another Note (such other Note being referred to as the "old Note" for purposes of this **Section 2.09(C)(ii)**), including pursuant to **Section 2.10(B)**, **2.10(C)**, **2.11** or **2.13**, then such Note will bear the Restricted Note Legend if such old Note bore the Restricted Note Legend at the time of such exchange or substitution, or on the related Conversion Date with respect to such conversion, as applicable; provided, however, that such Note need not bear the Restricted Note Legend if such Note does not constitute a Transfer-Restricted Security immediately after such exchange or substitution, or as of such Conversion Date, as applicable.]

(D)     *Other Legends*.  A Note may bear any other legend or text, not inconsistent with this Indenture, as may be required by applicable law or by any securities exchange or automated quotation system on which such Note is traded or quoted.

(E)     *Acknowledgment and Agreement by the Holders*.  A Holder's acceptance of any Note bearing any legend required by this **Section 2.09** will constitute such Holder's acknowledgment of, and agreement to comply with, the restrictions set forth in such legend.

(F)     *[Reserved.][Restricted Share Legend.*

(i)     Each Conversion Share will bear the Restricted Share Legend if the Note upon the conversion of which such Conversion Share was issued was (or would have been had it not been converted) a Transfer-Restricted Security at the time such Conversion Share was issued; *provided*, *however*, that such Conversion Share need not bear the Restricted Share Legend if the Issuer determines, in its reasonable discretion, that such Conversion Share need not bear the Restricted Share Legend.

(ii)     Notwithstanding anything to the contrary in this **Section 2.09(F)**, a Conversion Share need not bear a Restricted Share Legend if such Conversion Share is issued in an uncertificated form that does not permit affixing legends thereto, provided the Issuer takes measures (including the assignment thereto of a "restricted" CUSIP number) that it reasonably deems appropriate to enforce the transfer restrictions referred to in the Restricted Share Legend.]

**Section 2.10.   TRANSFERS AND EXCHANGES[; CERTAIN TRANSFER RESTRICTIONS].**

(A)     *Provisions Applicable to All Transfers and Exchanges*.

(i)     Subject to this **Section 2.10**, Physical Notes and beneficial interests in Global Notes may be transferred or exchanged from time to time and the Registrar will record each such transfer or exchange in the Register.

(ii)     Each Note issued upon transfer or exchange of any other Note (such other Note being referred to as the "old Note" for purposes of this **Section 2.10(A)(ii)**) or portion thereof in accordance with this Indenture will be the valid obligation of the Issuer, evidencing the same indebtedness, and entitled to the same benefits under this Indenture, as such old Note or portion thereof, as applicable.

(iii)     The Issuer, the Trustee and the Note Agents will not impose any service charge on any Holder for any transfer, exchange or conversion of Notes, but the Issuer, the Trustee, the Registrar and the Conversion Agent may require payment of a sum sufficient to cover any transfer tax or similar governmental charge that may be imposed in connection with any transfer, exchange or conversion of Notes, other than exchanges pursuant to **Section 2.11**, **2.17** or **8.05** not involving any transfer.

(iv)     Notwithstanding anything to the contrary in this Indenture or the Notes, a Note may not be transferred or exchanged in part unless the portion to be so transferred or exchanged is in an Authorized Denomination.

(v)     The Trustee will have no obligation or duty to monitor, determine or inquire as to compliance with any transfer restrictions imposed under [this Indenture or] applicable law with respect to any Security, other than to require the delivery of such certificates or other documentation or evidence as expressly required by this Indenture and to examine the same to determine substantial compliance as to form with the requirements of this Indenture.

- 54 -

(vi)     Each Note issued upon transfer of, or in exchange for, another Note will bear each legend, if any, required by **Section 2.09**.

(vii)     Upon satisfaction of the requirements of this Indenture to effect a transfer or exchange of any Note, the Issuer will cause such transfer or exchange to be effected as soon as reasonably practicable but in no event later than the second (2nd) Business Day after the date of such satisfaction.

(viii)     [Reserved.][For the avoidance of doubt, and subject to the terms of this Indenture, as used in this **Section 2.10**, an "exchange" of a Global Note or a Physical Note includes (x) an exchange effected for the sole purpose of removing any Restricted Note Legend affixed to such Global Note or Physical Note; and (y) if such Global Note or Physical Note is identified by a "restricted" CUSIP number, an exchange effected for the sole purpose of causing such Global Note or Physical Note to be identified by an "unrestricted" CUSIP number.]

(B)     *Transfers and Exchanges of Global Notes*.

(i)     Subject to the immediately following sentence, no Global Note may be transferred or exchanged in whole except (x) by the Depositary to a nominee of the Depositary; (y) by a nominee of the Depositary to the Depositary or to another nominee of the Depositary; or (z) by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. No Global Note (or any portion thereof) may be transferred to, or exchanged for, a Physical Note; *provided*, *however*, that a Global Note will be exchanged, pursuant to customary procedures, for one or more Physical Notes if:

(1)     (x) the Depositary notifies the Issuer or the Trustee that the Depositary is unwilling or unable to continue as depositary for such Global Note or (y) the Depositary ceases to be a "clearing agency" registered under Section 17A of the Exchange Act and, in each case, the Issuer fails to appoint a successor Depositary within ninety (90) days of such notice or cessation;

(2)     an Event of Default has occurred and is continuing and the Issuer, the Trustee or the Registrar has received a written request from the Depositary, or from a holder of a beneficial interest in such Global Note, to exchange such Global Note or beneficial interest, as applicable, for one or more Physical Notes; or

(3)     the Issuer, in its sole discretion, permits the exchange of any beneficial interest in such Global Note for one or more Physical Notes at the request of the owner of such beneficial interest.

(ii)     Upon satisfaction of the requirements of this Indenture to effect a transfer or exchange of any Global Note (or any portion thereof):

(1)     the Trustee will reflect any resulting decrease of the principal amount of such Global Note by notation on the "Schedule of Exchanges of Interests in the Global Note" forming part of such Global Note (and, if such notation results in such Global Note having a principal amount of zero, the Issuer may (but is not

required to) instruct the Trustee to cancel such Global Note pursuant to **Section 2.15**);

(2)     if required to effect such transfer or exchange, then the Trustee will reflect any resulting increase of the principal amount of any other Global Note by notation on the "Schedule of Exchanges of Interests in the Global Note" forming part of such other Global Note;

(3)     if required to effect such transfer or exchange, then the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02**, a new Global Note bearing each legend, if any, required by **Section 2.09**; and

(4)     if such Global Note (or such portion thereof), or any beneficial interest therein, is to be exchanged for one or more Physical Notes, then the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02**, one or more Physical Notes that (x) are in Authorized Denominations and have an aggregate principal amount equal to the principal amount of such Global Note to be so exchanged; (y) are registered in such name(s) as the Depositary specifies (or as otherwise determined pursuant to customary procedures); and (z) bear each legend, if any, required by **Section 2.09**.

(iii)     Each transfer or exchange of a beneficial interest in any Global Note will be made in accordance with the Depositary Procedures.

(C)     *Transfers and Exchanges of Physical Notes*.

(i)     Subject to this **Section 2.10**, a Holder of a Physical Note may (x) transfer such Physical Note (or any portion thereof in an Authorized Denomination) to one or more other Person(s); (y) exchange such Physical Note (or any portion thereof in an Authorized Denomination) for one or more other Physical Notes in Authorized Denominations having an aggregate principal amount equal to the aggregate principal amount of the Physical Note (or portion thereof) to be so exchanged; and (z) if then permitted by the Depositary Procedures, transfer such Physical Note (or any portion thereof in an Authorized Denomination) in exchange for a beneficial interest in one or more Global Notes; *provided*, *however*, that, to effect any such transfer or exchange, such Holder must:

(1)     surrender such Physical Note to be transferred or exchanged to the office of the Registrar, together with any endorsements or transfer instruments reasonably required by the Issuer, the Trustee or the Registrar[; and

(2)     deliver such certificates, documentation or evidence as may be required pursuant to **Section 2.10(D)**][Reserved].

(ii)     Upon the satisfaction of the requirements of this Indenture to effect a transfer or exchange of any Physical Note (such Physical Note being referred to as the "old Physical Note" for purposes of this **Section 2.10(C)(ii)**) of a Holder (or any portion of such old Physical Note in an Authorized Denomination):

(1)    such old Physical Note will be promptly cancelled pursuant to **Section 2.15**;

(2)    if such old Physical Note is to be so transferred or exchanged only in part, then the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02**, one or more Physical Notes that (x) are in Authorized Denominations and have an aggregate principal amount equal to the principal amount of such old Physical Note not to be so transferred or exchanged; (y) are registered in the name of such Holder; and (z) bear each legend, if any, required by **Section 2.09**;

(3)    in the case of a transfer:

(a)    to the Depositary or a nominee thereof that will hold its interest in such old Physical Note (or such portion thereof) to be so transferred in the form of one or more Global Notes, the Trustee will reflect an increase of the principal amount of one or more existing Global Notes by notation on the "Schedule of Exchanges of Interests in the Global Note" forming part of such Global Note(s), which increase(s) are in Authorized Denominations and aggregate to the principal amount to be so transferred, and which Global Note(s) bear each legend, if any, required by **Section 2.09**; *provided*, *however*, that if such transfer cannot be so effected by notation on one or more existing Global Notes (whether because no Global Notes bearing each legend, if any, required by **Section 2.09** then exist, because any such increase will result in any Global Note having an aggregate principal amount exceeding the maximum aggregate principal amount permitted by the Depositary or otherwise), then the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02**, one or more Global Notes that (x) are in Authorized Denominations and have an aggregate principal amount equal to the principal amount to be so transferred; and (y) bear each legend, if any, required by **Section 2.09**; and

(b)    to a transferee that will hold its interest in such old Physical Note (or such portion thereof) to be so transferred in the form of one or more Physical Notes, the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02** one or more Physical Notes that (x) are in Authorized Denominations and have an aggregate principal amount equal to the principal amount to be so transferred; (y) are registered in the name of such transferee; and (z) bear each legend, if any, required by **Section 2.09**; and

(4)    in the case of an exchange, the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02**, one or more Physical Notes that (x) are in Authorized Denominations and have an aggregate principal amount equal to the principal amount to be so exchanged; (y)

- 57 -

are registered in the name of the Person to whom such old Physical Note was registered; and (z) bear each legend, if any, required by **Section 2.09**.

(D)   *[Reserved.][Requirement to Deliver Documentation and Other Evidence.*   If a Holder of any Note that is identified by a "restricted" CUSIP number or that bears a Restricted Note Legend or is a Transfer-Restricted Security requests to:

(i)   cause such Note to be identified by an "unrestricted" CUSIP number;

(ii)   remove such Restricted Note Legend; or

(iii)   register the transfer of such Note to the name of another Person,

then the Issuer, the Trustee and the Registrar may refuse to effect such identification, removal or transfer, as applicable, unless there is delivered to the Issuer, the Trustee and the Registrar such certificates or other documentation or evidence as the Issuer, the Trustee and the Registrar may reasonably require to determine that such identification, removal or transfer, as applicable, complies with the Securities Act and other applicable securities laws.]

(E)   *Transfers of Notes Subject to Redemption, Repurchase or Conversion*.  Notwithstanding anything to the contrary in this Indenture or the Notes, the Issuer, the Trustee and the Registrar will not be required to register the transfer of or exchange any Note that (i) has been surrendered for conversion, except to the extent that any portion of such Note is not subject to conversion; (ii) is subject to a Fundamental Change Repurchase Notice validly delivered, and not withdrawn, pursuant to **Section 4.02(F)**, except to the extent that any portion of such Note is not subject to such notice or the Issuer fails to pay the applicable Fundamental Change Repurchase Price when due; or (iii) has been selected for Redemption pursuant to a Redemption Notice, except to the extent that any portion of such Note is not subject to Redemption or the Issuer fails to pay the applicable Redemption Price when due.

**Section 2.11.  EXCHANGE AND CANCELLATION OF NOTES TO BE CONVERTED OR TO BE REPURCHASED PURSUANT TO A REPURCHASE UPON FUNDAMENTAL CHANGE OR REDEMPTION.**

(A)   *Partial Conversions of Physical Notes and Partial Repurchases of Physical Notes Pursuant to a Repurchase Upon Fundamental Change or Redemption*.  If only a portion of a Physical Note of a Holder is to be converted pursuant to **Article 5** or repurchased pursuant to a Repurchase Upon Fundamental Change or Redemption, then, as soon as reasonably practicable after such Physical Note is surrendered for such conversion or repurchase, as applicable, the Issuer will cause such Physical Note to be exchanged, pursuant and subject to **Section 2.10(C)**, for  one or more Physical Notes that are in Authorized Denominations and have an aggregate principal amount equal to the principal amount of such Physical Note that is not to be so converted or repurchased, as applicable, and deliver such Physical Note(s) to such Holder; and  a Physical Note having a principal amount equal to the principal amount to be so converted or repurchased, as applicable, which Physical Note will be converted or repurchased, as applicable, pursuant to the terms of this Indenture; provided, however, that the Physical Note referred to in this **clause (ii)** need not be issued at any time after which such principal amount subject to such conversion or repurchase, as applicable, is deemed to cease to be outstanding pursuant to **Section 2.18**.

**Section 2.12.    [RESERVED.][REMOVAL OF TRANSFER RESTRICTIONS.**

Without limiting the generality of any other provision of this Indenture (including **Section 3.04**), the Restricted Note Legend affixed to any Note will be deemed, pursuant to this **Section 2.12** and the footnote to such Restricted Note Legend, to be removed therefrom upon the Issuer's delivery to the Trustee of notice, signed on behalf of the Issuer by one (1) of its Officers, to such effect (and, for the avoidance of doubt, such notice need not be accompanied by an Officer's Certificate or an Opinion of Counsel in order to be effective to cause such Restricted Note Legend to be deemed to be removed from such Note). If such Note bears a "restricted" CUSIP or ISIN number at the time of such delivery, then, upon such delivery, such Note will be deemed, pursuant to this **Section 2.12** and the footnotes to the CUSIP and ISIN numbers set forth on the face of the certificate representing such Note, to thereafter bear the "unrestricted" CUSIP and ISIN numbers identified in such footnotes; *provided*, *however*, that if such Note is a Global Note and the Depositary thereof requires a mandatory exchange or other procedure to cause such Global Note to be identified by "unrestricted" CUSIP and ISIN numbers in the facilities of such Depositary, then (i) the Issuer will effect such exchange or procedure as soon as reasonably practicable; and (ii) for purposes of **Section 3.04**, such Global Note will not be deemed to be identified by "unrestricted" CUSIP and ISIN numbers until such time as such exchange or procedure is effected.]

**Section 2.13.    REPLACEMENT NOTES.**

If a Holder of any Note claims that such Note has been mutilated, lost, destroyed or wrongfully taken, then the Issuer will issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02**, a replacement Note upon surrender to the Trustee of such mutilated Note, or upon delivery to the Trustee of evidence of such loss, destruction or wrongful taking reasonably satisfactory to the Trustee and the Issuer. In the case of a lost, destroyed or wrongfully taken Note, the Issuer and the Trustee may require the Holder thereof to provide such security or indemnity that is reasonably satisfactory to the Issuer and the Trustee to protect the Issuer and the Trustee from any loss that any of them may suffer if such Note is replaced.

Every replacement Note issued pursuant to this **Section 2.13** will be an additional obligation of the Issuer and will be entitled to all of the benefits of this Indenture equally and ratably with all other Notes issued under this Indenture.

**Section 2.14.    REGISTERED HOLDERS; CERTAIN RIGHTS WITH RESPECT TO GLOBAL NOTES.**

Only the Holder of a Note will have rights under this Indenture as the owner of such Note. Without limiting the generality of the foregoing, Depositary Participants will have no rights as such under this Indenture with respect to any Global Note held on their behalf by the Depositary or its nominee, or by the Trustee as its custodian, and the Issuer, the Trustee and the Note Agents, and their respective agents, may treat the Depositary as the absolute owner of such Global Note for all purposes whatsoever; *provided*, *however*, that (A) the Holder of any Global Note may grant proxies and otherwise authorize any Person, including Depositary Participants and Persons that hold interests in Notes through Depositary Participants, to take any action that such Holder is entitled to take with respect to such Global Note under this Indenture or the Notes; and (B) the

Issuer and the Trustee, and their respective agents, may give effect to any written certification, proxy or other authorization furnished by the Depositary.

**Section 2.15.   CANCELLATION.**

The Issuer may at any time deliver Notes to the Trustee for cancellation. The Registrar, the Paying Agent and the Conversion Agent will forward to the Trustee each Note duly surrendered to them for transfer, exchange, payment or conversion. The Trustee will promptly cancel all Notes so surrendered to it in accordance with its customary procedures. Without limiting the generality of **Section 2.03(B)**, the Issuer may not originally issue new Notes to replace Notes that it has paid or that have been cancelled upon transfer, exchange, payment or conversion.

**Section 2.16.   NOTES HELD BY THE ISSUER OR ITS AFFILIATES.**

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer and its Affiliates shall be disregarded and deemed not to be outstanding; *except* that for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which the Trustee actually knows are so owned shall be so disregarded. [Notwithstanding anything in this Indenture to the contrary, no Person shall be deemed to be an Affiliate, or to be under common control of any other Person with the Issuer or any Subsidiary Guarantor, solely as a result of such Person and/or such other Person being a Beneficial Owner of more than 10% of the voting power Issuer's outstanding Common Stock, unless such Person and/or such other Person (as determined in good faith by the Board of Directors of the Issuer) has the power, directly or indirectly, to direct or cause the direction of the management and policies of the Issuer, whether through the ownership of Common Stock of the Issuer, by contract, or otherwise.][16] Subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

**Section 2.17.   TEMPORARY NOTES.**

Until definitive Notes are ready for delivery, the Issuer may issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02**, temporary Notes. Temporary Notes will be substantially in the form of definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes. The Issuer will promptly prepare, issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02**, definitive Notes in exchange for temporary Notes. Until so exchanged, each temporary Note will in all respects be entitled to the same benefits under this Indenture as definitive Notes.

**Section 2.18.   OUTSTANDING NOTES.**

(A)     *Generally*.  The Notes that are outstanding at any time will be deemed to be those Notes that, at such time, have been duly executed and authenticated, excluding those Notes (or portions thereof) that have theretofore been (i) cancelled by the Trustee or delivered to the Trustee for cancellation in accordance with **Section 2.15**; (ii) assigned a principal amount of zero by

---

[16] <u>Note to Draft</u>: Subject to ongoing review.

notation on the "Schedule of Exchanges of Interests in the Global Note" forming part of any a Global Note representing such Note; (iii) paid in full (including upon conversion) in accordance with this Indenture; or (iv) deemed to cease to be outstanding to the extent provided in, and subject to, **clause (B)**, **(C)** or **(D)** of this **Section 2.18**. Subject to **Section 2.16**, the Notes do not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds such Notes.

(B)    *Replaced Notes*.  If a Note is replaced pursuant to **Section 2.13**, then such Note will cease to be outstanding at the time of its replacement, unless the Trustee and the Issuer receive proof reasonably satisfactory to them that such Note is held by a "protected purchaser" under applicable law.

(C)    *Maturing Notes and Notes Called for Redemption or Subject to Repurchase*.  If, on a Redemption Date, a Fundamental Change Repurchase Date or the Maturity Date, the Paying Agent holds money sufficient to pay the aggregate Redemption Price, Fundamental Change Repurchase Price or principal amount, respectively, together, in each case, with the aggregate interest, in each case due on such date, then (unless there occurs a Default in the payment of any such amount) (i) the Notes (or portions thereof) to be redeemed or repurchased, or that mature, on such date will be deemed, as of such date, to cease to be outstanding, except to the extent provided in **Section 4.02(D)**, **4.03(F)** or **5.02(D)**; and (ii) the rights of the Holders of such Notes (or such portions thereof), as such, will terminate with respect to such Notes (or such portions thereof), other than the right to receive the Redemption Price, Fundamental Change Repurchase Price or principal amount, as applicable, of, and accrued and unpaid interest on, such Notes (or such portions thereof), in each case as provided in this Indenture.

(D)    *Notes to Be Converted*.  At the Close of Business on the Conversion Date for any Note (or any portion thereof) to be converted, such Note (or such portion) will (unless there occurs a Default in the delivery of the Conversion Consideration or interest due, pursuant to **Section 5.03(B)** or **Section 5.02(D)**, upon such conversion) be deemed to cease to be outstanding, except to the extent provided in **Section 5.02(D)** or **Section 5.08**.

(E)    *Cessation of Accrual of Interest*.  Except as provided in **Section 4.02(D)**, **4.03(F)** or **5.02(D)**, interest will cease to accrue on each Note from, and including, the date that such Note is deemed, pursuant to this **Section 2.18**, to cease to be outstanding, unless there occurs a default in the payment or delivery of any cash or other property due on such Note.

**Section 2.19.    REPURCHASES BY THE ISSUER.**

Without limiting the generality of **Section 2.15**, the Issuer may, from time to time, repurchase Notes in open market purchases or in negotiated transactions without delivering prior notice to Holders. The Issuer may, to the extent permitted by applicable law, and directly or indirectly (regardless of whether such Notes are surrendered to the Issuer), repurchase Notes in the open market or otherwise, whether by the Issuer or the Issuer's Subsidiaries or through a private or public tender or exchange offer or through counterparties pursuant to private agreements, including cash-settled swaps or other derivatives, in each case, without prior notice to, or consent of, the Holders. The Issuer will promptly surrender to the Trustee for cancellation any Notes that the Issuer may repurchase. Any Notes that the Issuer may repurchase will be considered "outstanding" under this Indenture (except as provided in **Section 2.16**) unless and until such time

the Issuer causes them to be surrendered to the Trustee for cancellation, and, upon receipt of a written order from the Issuer, the Trustee will cancel all Notes so surrendered.

## Section 2.20.  CUSIP AND ISIN NUMBERS.

[Subject to **Section 2.12**], the][The] Issuer may use one or more CUSIP or ISIN numbers to identify any of the Notes, and, if so, the Issuer and the Trustee will use such CUSIP or ISIN number(s) in notices to Holders; *provided*, *however*, that (i) the Trustee makes no representation as to the correctness or accuracy of any such CUSIP or ISIN number; and (ii) the effectiveness of any such notice will not be affected by any defect in, or omission of, any such CUSIP or ISIN number. The Issuer will promptly notify the Trustee, in writing, of any change in the CUSIP or ISIN number(s) identifying any Notes.

## Section 2.21.  TAX TREATMENT.

The Issuer agrees, and each Holder of a Note agrees, and each beneficial owner of an interest in a Global Note by its acquisition of such interest is deemed to agree, for U.S. federal income tax purposes to treat the Notes as indebtedness that does not constitute a contingent payment debt instrument within the meaning of Treasury Regulation Section 1.1275-4. The Issuer and each Holder or beneficial owner of an interest in a Global Note shall file all tax returns consistent with, and take no position inconsistent with, the foregoing treatment (whether in audits, tax returns or otherwise) unless required to do so pursuant to a "determination" within the meaning of Section 1313(a) of the Code.

## Article 3.    COVENANTS[17]

## Section 3.01.  CONTINGENT CONSIDERATION.

Notwithstanding any other provisions hereof, the transactions set forth in the "Contingent Consideration Term Sheet" (as defined in the Bankruptcy Plan) and contemplated in the Bankruptcy Plan or "Definitive Documents" (as defined in the Bankruptcy Plan) shall be expressly permitted under this Indenture, and no Default or Event of Default shall occur in connection with the implementation of such transactions.

## Section 3.02.  PAYMENT ON NOTES.

(A)    *Generally*.  The Issuer will pay or cause to be paid in cash all the principal of, the Fundamental Change Repurchase Price and Redemption Price for, interest on, and other amounts due with respect to, the Notes on the dates and in the manner set forth in this Indenture and in the Notes.

(B)    *Deposit of Funds*.  Before 11:00 A.M., New York City time, on each Redemption Date, Fundamental Change Repurchase Date or Interest Payment Date, and on the Maturity Date or any other date on which any cash amount is due on the Notes, the Issuer will deposit, or will cause there to be deposited, with the Paying Agent cash, in funds immediately available on such

---

[17] Note to Draft: Section 3 remains subject to the ongoing review and comment of the parties in all respects.

date, sufficient to pay the cash amount due on the applicable Notes on such date. All the funds provided to the Paying Agent must be in U.S. dollars. The Paying Agent will return to the Issuer, as soon as practicable, any money not required for such purpose.

**Section 3.03.   EXCHANGE ACT REPORTS.**

(A)     *Generally*.   The Issuer shall file with the Trustee, within 15 days after the same are required to be filed with the SEC (giving effect to any grace period provided by Rule 12b-25 under the Exchange Act), copies of any documents or reports that the Issuer is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act (excluding any such information, documents or reports, or portions thereof, subject to, or with respect to which the Issuer is actively seeking, confidential treatment and any correspondence with the SEC). Any such document or report that the Issuer files with the SEC via the SEC's EDGAR system shall be deemed to be filed with the Trustee for purposes of this **Section 3.03(A)** at the time such documents are filed via the EDGAR system.

(B)     *Trustee's Disclaimer*.   The Trustee shall have no duty to review or analyze reports delivered to it. Delivery of the reports and documents described in **Section 3.03(A)** above to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to conclusively rely on an Officer's Certificate).

**Section 3.04.   RULE 144A INFORMATION.**

At any time the Issuer is not subject to Section 13 or 15(d) of the Exchange Act, the Issuer shall, so long as any of the Notes or any shares of Common Stock issuable upon conversion thereof shall, at such time, constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, promptly provide to the Trustee and, upon written request, any Holder, beneficial owner or prospective purchaser of such Notes or any shares of Common Stock issuable upon conversion of such Notes, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act to facilitate the resale of such Notes or shares of Common Stock pursuant to Rule 144A.

**Section 3.05.   [RESERVED].**

**Section 3.06.   [RESERVED].**

**Section 3.07.   COMPLIANCE AND DEFAULT CERTIFICATES.**

(A)     *Annual Compliance Certificate*.   Within one hundred twenty (120) days after the end of the fiscal year of 2025 and each fiscal year of the Issuer thereafter, the Issuer will deliver an Officer's Certificate to the Trustee stating (i) that the signatory thereto has supervised a review of the activities of the Note Parties during such fiscal year with a view towards determining whether any Default or Event of Default has occurred and (ii) whether, to such signatory's knowledge, a Default or Event of Default has occurred or is continuing (and, if so, describing all such Defaults or Events of Default and what action any Note Party is taking or proposes to take with respect thereto).

(B)     *Default Certificate.* If a Default or Event of Default occurs, then the Issuer will, within thirty (30) days after its occurrence, deliver an Officer's Certificate to the Trustee describing the same and what action the Issuer or any Note Party is taking or proposes to take with respect thereto; provided, however, that such notice will not be required if such Default or Event of Default has been cured or waived before the date the Issuer is required to deliver such notice.

**Section 3.08.   STAY, EXTENSION AND USURY LAWS.**

To the extent that it may lawfully do so, each of the Note Parties: (A) agrees that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law (wherever or whenever enacted or in force) that may affect the covenants or the performance of this Indenture; and (B) expressly waives all benefits or advantages of any such law and agrees that it will not, by resort to any such law, hinder, delay or impede the execution of any power granted to the Trustee by this Indenture, but will suffer and permit the execution of every such power as though no such law has been enacted.

**Section 3.09.   CORPORATE EXISTENCE.**

Subject to **Article 6**, each Note Party will cause to preserve and keep in full force and effect: (A) its corporate existence in accordance with the organizational or constitutional documents of such Note Party; and (B) the material rights (charter and statutory), licenses and franchises of each Note Party and their respective Subsidiaries; *provided*, *however*, that each Note Party need not preserve or keep in full force and effect any such existence, right, license or franchise if the Board of Directors determines that (x) the preservation thereof is no longer desirable in the conduct of the business of the Note Parties, taken as a whole; and (y) the loss thereof is not, individually or in the aggregate, materially adverse to the Holders.

**Section 3.10.   [RESERVED].**

**Section 3.11.   FURTHER INSTRUMENTS AND ACTS.**

At the Trustee's request, each Note Party will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to more effectively carry out the purposes of this Indenture.

**Section 3.12.   INDEBTEDNESS.**

(A)     The Issuer will not, and will not permit any of the Subsidiaries to, incur, create, assume or permit to exist any Indebtedness (including Acquired Indebtedness); *provided*, *however*, the Issuer and any Subsidiary may incur Indebtedness (including Acquired Indebtedness, if the Consolidated Net Leverage Ratio at the time such additional Indebtedness is incurred would have been no greater than [●]:1.00.

(B)     The provisions of **Section 3.12(A)** will not prohibit the Issuer or its Subsidiaries from incurring the following:

- 64 -

(i)      Indebtedness existing or committed (including, for the avoidance of doubt, paid-in-kind interest payable on such Indebtedness) on the Issue Date and described in Schedule 3.12(B)(i) and any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness (other than intercompany indebtedness Refinanced with Indebtedness owed to a person not affiliated with the Issuer or any Subsidiary);

(ii)     Indebtedness created hereunder and under the other Note Documents;

(iii)    Indebtedness of the Issuer or any Subsidiary pursuant to Hedging Agreements entered into for non-speculative purposes;

(iv)    Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Issuer or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case in the ordinary course of business and consistent with past practice or industry practices;

(v)     Indebtedness of the Issuer to any Subsidiary and of any Subsidiary to the Issuer or any other Subsidiary; provided that (a) any such Indebtedness of a Subsidiary that is not a Note Party owing to a Note Party is permitted by **Section 3.15** and (b) any such Indebtedness of a Note Party owing to a Subsidiary that is not a Note Party is permitted by **Section 3.15** and is subordinated to the Note Obligations as permitted by the Note Documents;

(vi)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case provided in the ordinary course of business and consistent with past practice or industry practices, including those incurred to secure health, safety and environmental obligations in the ordinary course of business and consistent with past practice or industry practices;

(vii)   Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds or other cash management services, in each case incurred in the ordinary course of business and consistent with past practice or industry practices;

(viii)  (1) Acquired Indebtedness or (2) Indebtedness of the Issuer or a Subsidiary incurred to finance an acquisition; provided in each case, that after giving effect to such acquisition, merger or consolidation, either (I) the Issuer would be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Net Leverage Ratio test set forth in **Section 3.12(A)** hereof or (II) the Consolidated Net Leverage Ratio is less than or equal to the Consolidated Net Leverage Ratio immediately prior to such acquisition, merger or consolidation;

(ix)    Capitalized Lease Obligations, mortgage financings and other Indebtedness incurred by the Issuer or any Subsidiary prior to or within 30 days after the acquisition, lease, construction, repair, replacement or improvement of the respective property (real or personal) permitted under this Indenture in order to finance such acquisition, lease,

- 65 -

construction, repair, replacement or improvement, in an aggregate principal amount that immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this **Section 3.12(B)(ix)**, would not exceed the greater of (x) $65,000,000 and (y) [●]% of Consolidated Total Assets  at any time;

(x)  solely to the extent the Issuer has received at least $500,000,000 of Gross Cash Proceeds from the issuance or sale of the Issuer's Qualified Equity Interests after the Issue Date, Indebtedness in respect of Permitted Disqualified Stock;

(xi)  other unsecured Indebtedness of the Issuer or any Subsidiary Guarantor in an aggregate principal amount that, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this **Section 3.12(B)(xi)**, would not exceed the sum of (x) the aggregate principal amount of Convertible Notes that have been converted pursuant to their terms into Qualified Equity Interests plus (y) the amount of Contribution Debt; provided that (I) any Indebtedness incurred pursuant to this **Section 3.12(B)(xi)** shall have a maturity date no earlier than the Maturity Date and shall not permit or require scheduled cash interest payments in excess of 10.00% per annum (with variable interest rates converted to fixed rates based on implied forward interest rate curve for purposes of such determination) and (II) the aggregate principal amount of Indebtedness outstanding under this **Section 3.12(B)(xi)** may not exceed the greater of (x) $750,000,000 and (y) [●]% of Consolidated Total Assets at any time;

(xii)  Indebtedness and other obligations secured by the Siler City Assets in an outstanding amount not to exceed at any time (1) the greater of (x) $975,000,000 and (y) [●]% of Consolidated Total Assets of obligations in respect of any DOE Financing, plus (2) the greater of (x) $975,000,000 and (y) [●]% of Consolidated Total Assets  of obligations to the United States Department of Commerce, the CHIPS Program Office or any other Governmental Authority of the United States, in each case under this **Section 3.12(B)(xii)(2)**, in respect of award disbursements received pursuant to governmental grants under the CHIPS Act;

(xiii)  Guarantees by the Issuer or any DOE Parent Entity of any DOE Financing; *provided* that Guarantees under this **Section 3.12(B)(xiii)** shall only be permitted to the extent such Guarantees are senior unsecured or secured only by Liens on the Collateral that are junior or *pari passu* to the Liens securing the Note Obligations and subject to the applicable Intercreditor Agreements;

(xiv)  [Reserved];

(xv)  Indebtedness in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued to support performance obligations and trade letters of credit (other than obligations in respect of other Indebtedness) in the ordinary course of business;

- 66 -

(xvi)   Indebtedness in respect of cash collateralized letters of credit in an aggregate face amount not to exceed the greater of (x) $65,000,000 and (y) [●]% of Consolidated Total Assets at any one time;

(xvii)   Indebtedness arising from agreements of the Issuer or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations (including earn-outs), in each case, incurred or assumed in connection with any Investments or the disposition of any business, assets or a Subsidiary expressly permitted by this Indenture;

(xviii)   Indebtedness under the First Lien Notes Indenture in respect of the First Lien Notes issued on the Issue Date (plus paid-in-kind interest applicable to such Indebtedness at the rate applicable thereto on the Issue Date) and any Permitted Refinancing Indebtedness (including any paid-in-kind interest on such Permitted Refinancing Indebtedness) incurred to Refinance any such Indebtedness; provided that, (x) the Liens securing any Indebtedness incurred in reliance on this clause (xviii) shall be senior to the Liens securing the Note Obligations, (y) Indebtedness incurred in reliance on this **Section 3.12(B)(xviii)** shall have no borrower, issuer or obligor in respect thereof that is not the Issuer or a Subsidiary Guarantor and (z) Indebtedness incurred in reliance on this **Section 3.12(B)(xviii)** shall not be secured by any assets or property that are not Collateral;

(xix)   (a) Indebtedness under the Second Lien [Non-]Renesas Notes Indenture in respect of the Second Lien [Non-]Renesas Notes issued on the Issue Date (plus paid-in-kind interest applicable to such Indebtedness at the rate applicable thereto on the Issue Date), (b) Indebtedness under the Second Lien Takeback Notes Indenture in respect of the Second Lien Takeback Notes issued on the Issue Date (plus paid-in-kind interest applicable to such Indebtedness at the rate applicable thereto on the Issue Date) and (c) any Permitted Refinancing Indebtedness (including any paid-in-kind interest on such Permitted Refinancing Indebtedness) incurred to Refinance any such Indebtedness; *provided* that, (x) the Liens securing any Indebtedness incurred in reliance on this **Section 3.12(B)(xix)** shall be *pari passu* to the Liens securing the Note Obligations, (y) Indebtedness incurred in reliance on this **Section 3.12(B)(xix)** shall have no borrower, issuer or obligor in respect thereof that is not the Issuer or a Subsidiary Guarantor and (z) Indebtedness incurred in reliance on this **Section 3.12(B)(xix)** shall not be secured by any assets or property that are not Collateral;

(xx)   [Reserved];

(xxi)   Indebtedness incurred in the ordinary course of business in respect of obligations of the Issuer or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; *provided*, that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and consistent with past practice or industry practices and not in connection with the borrowing of money or any Hedging Agreements;

(xxii)   Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Issuer or any Subsidiary incurred in the ordinary course of business and consistent with past practice, without duplication of any amounts payable under **Section 3.15**;

(xxiii)  [Reserved];

(xxiv)  obligations in respect of Cash Management Agreements;

(xxv)  Escrowed Indebtedness;

(xxvi)  Indebtedness consisting of obligations of the Issuer or any Subsidiary under deferred compensation or other similar arrangements incurred by such person in connection with any Investment permitted hereunder;

(xxvii) Guarantees of Indebtedness under customer financing lines of credit entered into in the ordinary course of business and consistent with past practice ;

(xxviii)Indebtedness consisting of (i) financing of insurance premiums or (ii) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business and consistent with past practice or industry practice; and

(xxix)  other Indebtedness in an aggregate outstanding amount not in excess of the greater of (x) $50,000,000 and (y) [●]% of Consolidated Total Assets at any one time outstanding.

(C)   Notwithstanding anything to the contrary set forth herein, no Indebtedness that is incurred pursuant to any clause of this **Section 3.12(B)** may be used to Refinance any Indebtedness that was incurred pursuant to, or outstanding under, any other clause of this **Section 3.12(B)**; *provided* that Indebtedness incurred pursuant to **Section 3.12(B)(x)** or **(xi)** may be used to Refinance Indebtedness incurred under any other clause of **Section 3.12(B)**.

(D)   For purposes of determining compliance with this **Section 3.12**, if the use of proceeds from any incurrence or issuance of Indebtedness is to fund the repayment of any Indebtedness, then such repayment shall be deemed to have occurred substantially simultaneously with such incurrence or issuance so long as (1) such repayment occurs within one Business Day of such incurrence or issuance and (2) the proceeds thereof are deposited with a trustee, agent or other representative for such Indebtedness being repaid pending such repayment.

(E)   For purposes of determining compliance with this **Section 3.12**, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Issue Date, on the Issue Date and, in the case of such Indebtedness incurred or assumed (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Issue Date, on the date that such Indebtedness was incurred or assumed (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided that if such Indebtedness is incurred, assumed or committed to Refinance other Indebtedness denominated in a currency other than

Dollars (or in a different currency from the Indebtedness being Refinanced), and such Refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such Refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the outstanding principal amount of such Indebtedness being Refinanced.

(F)     Further, for purposes of determining compliance with this **Section 3.12**, (i) Indebtedness need not be permitted solely by reference to one category of permitted Indebtedness (or any portion thereof) described in **Section 3.12(B)(i)** through **(xxix)** but may be permitted in part under any combination thereof, (B) in the event that an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Indebtedness (or any portion thereof) described in **Section 3.12(B)(i)** through **(xxix)**, the Issuer may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such item of Indebtedness (or any portion thereof) in any manner that complies with this **Section 3.12** and at the time of incurrence, assumption, classification or reclassification will be entitled to only include the amount and type of such item of Indebtedness (or any portion thereof) in any of the above clauses (or any portion thereof) and such item of Indebtedness (or any portion thereof) shall be treated as having been incurred, assumed or existing pursuant to only such clause or clauses (or any portion thereof).     Notwithstanding the foregoing, (x) all Indebtedness outstanding under the First Lien Notes Indenture shall at all times be deemed to have been incurred in reliance on **Section 3.12(B)(xviii)**, (y) all Indebtedness outstanding under the Second Lien [Non-]Renesas Notes Indenture shall at all times be deemed to have been incurred in reliance on **Section 3.12(B)(xix)(a)** and (iii) all Indebtedness outstanding under the Second Lien Takeback Notes Indenture shall at all times be deemed to have been incurred in reliance on **Section 3.12(B)(xix)(b)** and, in each case, may not be so reclassified or divided.

**Section 3.13.**  **LIENS**.

(A)     The Issuer will not, and will not permit any of the Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person) of the Issuer or any Subsidiary at the time owned by it or on any income or revenues or rights in respect of any thereof on or after the Issue Date, except Permitted Liens.

(B)     For purposes of determining compliance with this **Section 3.13**, (i) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of Permitted Liens (or any portion thereof) described in clauses (A) through (NN) of the definition of "Permitted Liens" but may be permitted in part under any combination thereof and (ii) in the event that a Lien securing an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of Permitted Liens (or any portion thereof) described in clauses (A) through (NN) of the definition of "Permitted Liens", the Issuer may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this **Section 3.13** and at the time of incurrence, classification or reclassification will be entitled to only include the amount and type of such Lien or such item of Indebtedness secured by such Lien (or any portion thereof) in any of the above clauses (or any portion thereof) and such Lien securing such item of Indebtedness (or any portion thereof) will be treated as being incurred or existing pursuant to only

such clause or clauses (or any portion thereof) without giving pro forma effect to such item (or any portion thereof) when calculating the amount of Liens or Indebtedness that may be incurred, classified or reclassified pursuant to any other clause (or any portion thereof) at such time. Notwithstanding the foregoing, (i) Liens securing any Indebtedness incurred under **Section 3.12(B)(xviii)** shall only be permitted in reliance on clause (W) of the definition of "Permitted Liens" and (ii) Liens securing any Indebtedness incurred under **Section 3.12(B)(xix)** shall only be permitted in reliance on clause (X) of the definition of "Permitted Liens".

**Section 3.14.   SALE AND LEASE-BACK TRANSACTIONS.**

The Issuer will not, and will not permit any of the Subsidiaries to enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Lease-Back Transaction**"), other than any such transaction with respect to equipment or other personal property to the extent that any Indebtedness arising from such Sale and Lease-Back Transaction is permitted under **Section 3.12(B)(ix)**.

**Section 3.15.   RESTRICTED PAYMENTS.**

(A)    The Issuer will not, and will not permit any of the Subsidiaries to, directly or indirectly:

(i)    declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of the Issuer's or any of its Subsidiaries' Equity Interests (including, without limitation, any such payment in connection with any merger or consolidation involving the Issuer or any of its Subsidiaries) or to the direct or indirect holders of the Issuer's or any of its Subsidiaries' Equity Interests in their capacity as holders (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the Issuer's or any of its Subsidiaries and other than dividends or distributions payable to the Issuer or a Subsidiary); or

(ii)    redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) (including, without limitation, in connection with any merger or consolidation involving the Issuer) any of the Issuer's Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the person redeeming, purchasing, retiring or acquiring such shares);

(iii)    make any principal payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Issuer or any Subsidiary Guarantor that is expressly contractually subordinated in right of payment to the Notes or to any Subsidiary Guarantee (excluding any intercompany Indebtedness between or among the Issuer and any of its Subsidiaries), except (a) a payment of principal at the Stated Maturity thereof or (b) the purchase, repurchase, redemption, defeasance or

- 70 -

other acquisition of Indebtedness purchased in anticipation of satisfying a sinking fund obligation, principal installment or scheduled maturity, in each case due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition[18]; or

(iv)     make any Restricted Investment,

(all such payments and other actions set forth in these **clauses (i)** through **(iv)** above being collectively referred to as "**Restricted Payments**").

(B)     The provisions of **Section 3.15(A)** will not prohibit:

(i)     Restricted Payments to the Issuer or to any Wholly-Owned Subsidiary of the Issuer (or, in the case of non-Wholly-Owned Subsidiaries, to the Issuer or any Subsidiary of the Issuer that is a direct or indirect parent of such Subsidiary and to each other owner of Equity Interests in such Subsidiary on a *pro rata* basis (or more favorable basis from the perspective of the Issuer or such Subsidiary) based on their relative ownership interests);

(ii)     [Reserved];

(iii)     Restricted Payments to purchase or redeem the Equity Interests of the Issuer (including related stock appreciation rights or similar securities) held by then present or former directors, consultants, officers or employees of the Issuer or any of the Subsidiaries or by any Plan or any stockholders' agreement then in effect upon such person's death, disability, retirement or termination of employment or under the terms of any such Plan or any other agreement under which such shares of stock or related rights were issued; provided, that the aggregate amount of such purchases or redemptions under this clause (iii) shall not exceed in any fiscal year the greater of (x) $6,500,000 and (y) [●]% of Consolidated Total Assets (plus (x) the amount of net proceeds contributed to the Issuer that were (x) received by the Issuer during such fiscal year from sales of Equity Interests of the Issuer to directors, consultants, officers or employees of the Issuer or any Subsidiary in connection with permitted employee compensation and incentive arrangements, (y) the amount of net proceeds of any key-man life insurance policies received during such calendar year, and (z) the amount of any cash bonuses otherwise payable to present or former directors, consultants, officers or employees in such fiscal year that are foregone in return for the receipt of Equity Interests), which, if not used in any year, may be carried forward to any subsequent calendar year; and *provided*, *further*, that cancellation of Indebtedness owing to the Issuer or any Subsidiary from present or former directors, consultants, officers and employees of the Issuer or its Subsidiaries in connection with a repurchase of Equity Interests of the Issuer will not be deemed to constitute a Restricted Payment for purposes of this **Section 3.15**;

---

[18] <u>Note to Draft</u>: To be aligned to 1L Indenture Section 8.09(b).

(iv)     non-cash repurchases of Equity Interests of the Issuer deemed to occur upon exercise of stock options if such Equity Interests represent a portion of the exercise price of such options;

(v)     if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would result therefrom, Restricted Payments by the Issuer in the form of regularly scheduled dividends on Permitted Disqualified Stock;

(vi)     Restricted Payments by the Issuer in the form of Equity Interests of the Issuer in connection with the redemption of any Convertible Notes or the exercise of any Renesas Warrants;

(vii)     Restricted Payments by the Issuer to pay in cash, in lieu of the issuance of fractional shares, upon the exercise of warrants (including the Renesas Warrants) or upon the conversion or exchange of Equity Interests of the Issuer or upon the conversion of any Convertible Notes; provided, that the aggregate amount of Restricted Payments made in reliance on this clause (vii) shall not exceed the greater of (x) $325,000 and (y) [●]% of Consolidated Total Assets.

(viii)     (x) any Restricted Payment made in connection with the entry into, or otherwise pursuant to the terms of, a Permitted Bond Hedge Transaction and (y) any cash payment made in connection with the exercise or early termination of any Permitted Warrant Transaction;

(ix)     any Restricted Payment so long as, on a pro forma basis after giving effect to such Restricted Payment, the Consolidated Net Leverage Ratio is less than [●]:1.00; and

(x)     so long as no Default or Event of Default has occurred and is continuing, any Restricted Payments in an aggregate amount not to exceed the greater of (x) $[●] and (y) [●]% of Consolidated Total Assets.

(C)     The amount of any Restricted Payment made other than in the form of cash or Cash Equivalents shall be the fair market value thereof (as reasonably determined by the Issuer in good faith), valued at the time of the making thereof, and without giving effect to any subsequent write-downs or write-offs thereof.

(D)     Any Investment in any person other than a Note Party that is otherwise permitted by this **Section 3.15** may be made through intermediate Investments in Subsidiaries that are not Note Parties and such intermediate Investments shall be disregarded for purposes of determining the outstanding amount of Investments pursuant to any clause set forth in this **Section 3.15** or one or more clauses in the definition of "Permitted Investments".

(E)     For purposes of determining compliance with this **Section 3.15**, (a) in the event that a proposed Restricted Payment (or a portion thereof) meets the criteria of **clauses (i)** through **(viii)** of **Section 3.15(B)** or is entitled to be made pursuant to one or more clauses in the definition of "Permitted Investments," the Issuer will be entitled to divide or classify or later divide or reclassify (based on circumstances existing on the date of such reclassification) such Restricted Payment (or

portion thereof) among such clauses (i) through (viii) and the definition of "Permitted Investments" in a manner that complies with this **Section 3.15** and (b) an Investment need not be permitted solely by reference to one category of Permitted Investments (or portion thereof) described in the definition thereof but may be permitted in part under any combination thereof.

**Section 3.16.  ASSET DISPOSITIONS.**

(A)    The Issuer will not, and will not permit any of its Subsidiaries to, consummate an Asset Disposition unless:

(i)    the Issuer or such Subsidiary, as the case may be, receives consideration at least equal to the fair market value (as reasonably determined in good faith by the Issuer) of the assets or Equity Interests issued or sold or otherwise Disposed of; and

(ii)    at least 75% of the proceeds of such Asset Disposition consists of cash or Cash Equivalents; provided, that for purposes of this **Section 3.16(A)(ii)** "cash" shall include:

(1)    any liabilities (as shown on the Issuer's or such Subsidiary's most recent balance sheet) of the Issuer or such Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Note Obligations) that are assumed by the transferee of any such assets pursuant to a customary novation or assumption agreement that releases the Issuer or such Subsidiary from further liability; and

(2)    any securities, notes or other obligations received by the Issuer or such Subsidiary from such transferee that are converted within 180 days after such Asset Disposition by the Issuer or such Subsidiary into cash (to the extent of the cash received in that conversion).

(B)    Within 365 days (or such shorter period as the Issuer in its sole election may determine) after the receipt of Net Proceeds from an Asset Disposition, the Issuer may elect to apply or cause to be applied an amount equal to the Net Proceeds from such Asset Disposition:

(i)    upon a Disposition of assets that constitutes Collateral, to (a) repay either (I) First-Priority Obligations or (II) Second-Priority Obligations (other than the Notes) (and if the Indebtedness repaid is revolving credit indebtedness, to correspondingly permanently reduce commitments with respect thereto); provided that in the case of any repayment pursuant to sub-clause (II), the Issuer shall make an offer (in accordance with the procedures set forth below for an Asset Disposition Offer) to all Holders to purchase a pro rata (together with any Second-Priority Obligations repaid pursuant to such clause (II)) principal amount of the Notes at 100% of the principal amount thereof, plus accrued and unpaid interest, if any, to but not including the date of repayment;

(ii)    to purchase the Notes pursuant to an offer to all holders of Notes at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to (but not including) the date of purchase;

(iii)    upon the Disposition of assets that do not constitute Collateral, to repurchase, prepay, redeem or repay Indebtedness of a Subsidiary that is not a Note Party, or Indebtedness of the Issuer or any Subsidiary Guarantor that is secured by a Lien on such assets; or

(iv)    upon a Disposition of assets that does not constitute Collateral, to either (a) make an investment in, or acquire assets related to or otherwise useful in the business of the Issuer and its Subsidiaries existing on the Issue Date; and/or (b) make Capital Expenditures in or that are used or useful in the business or to make Capital Expenditures for maintenance, repair or improvement of existing assets in accordance with the terms of this Indenture.

(C)    Any Net Proceeds from an Asset Disposition not applied or invested as provided in **Section 3.16(B)** within 365 days (or such shorter period as the Issuer in its sole election may determine) of such Asset Disposition will be deemed to constitute "**Excess Proceeds**" on the 366th day after such Asset Disposition (or for the avoidance of doubt on the day after such shorter application or investment period as the Issuer in its sole election may determine); provided that in the case of **Section 3.16(B)(iv)**, a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment so long as the Issuer or a Subsidiary enters into such commitment with the good faith expectation that such Net Proceeds will be applied to satisfy such commitment within 180 days of such commitment; *provided*, *further*, that if such commitment is later terminated or cancelled prior to the application of such Net Proceeds or such Net Proceeds are not so applied within such 180-day period, then such Net Proceeds shall constitute Excess Proceeds.

(D)    In no event later than 20 Business Days after any date (an "**Asset Disposition Offer Trigger Date**") that the aggregate amount of Excess Proceeds exceeds $[●] million (or such lesser amount as the Issuer shall determine), to the extent permitted by the First Lien Notes Indenture, the Issuer shall commence an offer to purchase to all Holders (an "**Asset Disposition Offer**") at a price in cash equal to 100% of the principal amount thereof, plus  accrued and unpaid interest to the date of purchase and to all holders of other Second-Priority Obligations containing provisions similar to those set forth in this Indenture with respect to asset dispositions, in each case, equal to the Excess Proceeds. If the aggregate principal amount of Notes and other Second-Priority Obligations tendered into such Asset Disposition Offer exceeds the amount of Excess Proceeds, the Trustee will select the Notes and the Issuer or its agent shall select the other Second-Priority Obligations to be purchased in accordance with the Depositary Procedures and, if no such Depositary Procedures apply, pro rata, by lot or by such other method the Issuer considers fair and appropriate. Upon completion of each Asset Disposition Offer, the amount of Excess Proceeds will be reset at zero. To the extent that any Excess Proceeds remain after completion of an Asset Disposition Offer, the Issuer may use the remaining amount for general corporate purposes and such amount shall no longer constitute Excess Proceeds.

(E)    In connection with an Asset Disposition Offer, the Issuer shall deliver to the Holders, in accordance with the Depositary Procedures (with a copy to the Trustee), a notice stating: (i) that an Asset Disposition Offer Trigger Date has occurred and that the Issuer is offering to purchase the maximum principal amount of Notes that may be purchased out of the Excess Proceeds (and identifying other Indebtedness, if any, that is entitled to participate pro rata in the

Asset Disposition Offer), at an offer price in cash equal to 100% of the principal amount thereof, plus accrued and unpaid interest to the date of purchase (the "**Asset Disposition Offer Purchase Date**"), which shall be a Business Day, specified in such notice, that is not earlier than 30 days or later than 60 days from the date such notice is delivered, (ii) the amount of accrued and unpaid interest as of the Asset Disposition Offer Purchase Date, (iii) that any Note not tendered will continue to accrue interest, (iv) that, unless the Issuer defaults in the payment of the purchase price for the Notes payable pursuant to the Asset Disposition Offer, any Notes accepted for payment pursuant to the Asset Disposition Offer shall cease to accrue interest after the Asset Disposition Offer Purchase Date, (v) the procedures to be followed by a Holders in order to accept an Asset Disposition Offer or to withdraw such acceptance, and (vi) such other information as may be required by the Indenture and applicable laws and regulations.

(F)     On the Asset Disposition Offer Purchase Date, the Issuer will (i) accept for payment the maximum principal amount of Notes or portions thereof tendered pursuant to the Asset Disposition Offer that can be purchased out of Excess Proceeds from such Asset Disposition, (ii) deposit with the paying agent the aggregate purchase price of all Notes or portions thereof accepted for payment and any accrued and unpaid interest on such Notes as of the Asset Disposition Offer Purchase Date, and (iii) deliver or cause to be delivered to the Trustee all Notes tendered pursuant to the Asset Disposition Offer. If less than all Notes tendered pursuant to the Asset Disposition Offer are accepted for payment by the Issuer for any reason consistent with the Indenture, selection of the Notes to be purchased by the Issuer shall be in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed or, if the Notes are not so listed, in accordance with the Depositary Procedures and, if no such Depositary Procedures apply, pro rata, by lot or by such other method the Issuer considers fair and appropriate; provided that Notes accepted for payment in part shall only be purchased in Authorized Denominations. The paying agent shall promptly deliver to each Holder of Notes or portions thereof accepted for payment an amount equal to the purchase price for such Notes plus any accrued and unpaid interest thereon, and the Trustee shall promptly authenticate and deliver to such Holder of Notes accepted for payment in part a new Note equal in principal amount to any unpurchased portion of the Notes, and any Note not accepted for payment in whole or in part shall be promptly returned to the Holder of such Note. On and after an Asset Disposition Offer Purchase Date, interest will cease to accrue on the Notes or portions thereof accepted for payment, unless the Issuer defaults in the payment of the purchase price therefor. The Issuer will announce the results of the Asset Disposition Offer to Holders of the Notes on or as soon as practicable after the Asset Disposition Offer Purchase Date.

(G)     To the extent applicable, the Issuer will comply, in all material respects, with all federal and state securities laws in connection with any Asset Disposition Offer (including complying with Rule 14e-1 under the Exchange Act, to the extent applicable) so as to permit effecting such Asset Disposition Offer in the manner set forth in this Indenture; *provided*, *however*, that, to the extent that any securities laws or regulations enacted after the Issue Date conflict with this **Section 3.16**, the Issuer will comply with such securities laws and regulations and will not be deemed to have breached its obligations under this **Section 3.16** (nor will such compliance be considered a Default or an Event of Default hereunder) by virtue of such conflict

**Section 3.17.   DISPOSITION OF MATERIAL IP.**

(A)      Notwithstanding anything to the contrary contained in **Section 3.13, 3.15, 3.16** or **3.18**, neither the Issuer nor any Subsidiary shall be permitted to make any Investment of any Material IP into any person (including any Subsidiary) or Dispose of any Material IP (including to any Subsidiary) unless, (i) in the case of an Investment, at all times after giving effect to the consummation of such Investment, such Material IP is subject to first priority Lien securing the Note Obligations and (ii) in the case of a Disposition of any Material IP, such Disposition consists of a non-exclusive license of such Material IP and such Material IP remains subject to at least a first priority Lien securing the Note Obligations; provided that such non-exclusive license shall (x) if to a Subsidiary, be subject to recurring royalties, payment terms or other consideration negotiated consistent with an arm's length transaction, and (y) otherwise (other than in subclause (x) immediately preceding), be entered into in the ordinary course of business.

(B)      The restrictions set forth in **Section 3.17(A)** shall not apply to [                    ].[19]

**Section 3.18.   TRANSACTIONS WITH AFFILIATES.**

(A)      The Issuer will not, and will not permit any of the Subsidiaries to sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates on or after the Issue Date, unless such transaction is (i) upon terms that are no less favorable to the Issuer or such Subsidiary, as applicable, in any material respect than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate and (ii) if in connection with any transaction or series of transactions with a fair market value greater than $1,300,000, approved by a majority of the Disinterested Directors of the Issuer.

(B)      The foregoing clause (A) shall not prohibit, to the extent otherwise permitted under this Indenture:

(i)      any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, equity purchase agreements, stock options and stock ownership plans approved by the Board of Directors of the Issuer;

(ii)      loans and advances to officers, directors, employees or consultants of the Issuer or any Subsidiary permitted by clause (E) of the definition of "Permitted Investments";

(iii)      transactions among the Issuer or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction (including via merger, consolidation or amalgamation in which the Issuer or a Subsidiary is the surviving entity);

---

[19] <u>Note to Draft</u>: To replicate item 1 of Schedule 8.05 in First Lien Indenture.

(iv)    the payment of fees, reasonable out-of-pocket costs and indemnities to directors, officers, consultants and employees the Issuer and the Subsidiaries in the ordinary course of business;

(v)    transactions, agreements and arrangements in existence on the Issue Date or any amendment thereto or replacement thereof or similar arrangement to the extent such amendment, replacement or arrangement is not adverse to the Holders in any material respect;

(vi)    (a) any employment, independent contractor or consulting agreements entered into by the Issuer or any of the Subsidiaries in the ordinary course of business, (b) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, consultants, officers or directors, and (c) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto;

(vii)    Restricted Payments permitted under **Section 3.15** and Permitted Investments;

(viii)    [Reserved];

(ix)    [Reserved];

(x)    transactions for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business and consistent with past practice or industry practice;

(xi)    any transaction in respect of which the Issuer delivers to the Trustee a letter addressed to the Board of Directors of the Issuer from an accounting, appraisal or investment banking firm, in each case of nationally recognized standing that is in the good faith determination of the Issuer qualified to render such letter, which letter states that (i) such transaction is on terms that are substantially no less favorable to the Issuer or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate or (ii) such transaction is fair to the Issuer or such Subsidiary, as applicable, from a financial point of view;

(xii)    [Reserved];

(xiii)    transactions with joint ventures for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business and consistent with past practice;

(xiv)    [Reserved];

(xv)    [Reserved];

(xvi)    [Reserved];

(xvii)   [Reserved];

(xviii)  [Reserved];

(xix)   [Reserved];

(xx)   [Reserved];

(xxi)   transactions between the Issuer or any of the Subsidiaries and any person, a director of which is also a director of the Issuer; *provided*, *however*, that (a) such director abstains from voting as a director of the Issuer on any matter involving such other person and (b) such person is not an Affiliate of the Issuer for any reason other than such director's acting in such capacity;

(xxii)   transactions permitted by, and complying with, the provisions of **Article 6**; and

(xxiii)  intercompany transactions undertaken in good faith for the purpose of improving the consolidated tax efficiency of the Issuer and the Subsidiaries which do not circumvent any provisions of this Indenture.

**Section 3.19.   [RESERVED]**.

**Section 3.20.   DIVIDENDS AND OTHER PAYMENT RESTRICTIONS AFFECTING SUBSIDIARIES**.

(A)   The Issuer will not, and will not cause or permit any of its Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary to:

(i)   pay dividends or make any other distributions on its Equity Interests to the Issuer or any Subsidiary, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to the Issuer or any Subsidiary Guarantor;

(ii)   make loans or advances to the Issuer or any Subsidiary; or

(iii)  sell, lease or transfer any of its properties or assets to the Issuer or any Subsidiary or

(iv)  grant any Liens by the Issuer or such Subsidiary that is a Note Party pursuant to the Security Documents,

*provided* that (x) the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill period to) loans or advances made to the Issuer or any Subsidiary to other Indebtedness incurred by the Issuer or any Subsidiary, shall not be deemed to constitute such an encumbrance or restriction.

(B)      The provisions of **Section 3.20(A)** shall not apply to the following:

(i)      restrictions imposed by applicable law;

(ii)      contractual encumbrances or restrictions in effect on the Issue Date, including under (a) the Note Documents, (b) the First Lien Notes Indenture, (c) the Second Lien [Non-]Renesas Notes Indenture, (d) the Second Lien Takeback Notes Indenture and (e) any other Indebtedness existing on the Issue Date;

(iii)      any restriction on a Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Equity Interests or assets of a Subsidiary pending the closing of such sale or disposition;

(iv)      any encumbrances or restrictions of the type referred to in **Section 3.20(A)(i)** through (iv) imposed by any agreement relating to Indebtedness incurred pursuant to **Section 3.20(B)(xii)**;

(v)      any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Indenture to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(vi)      any restrictions imposed by any agreement relating to Indebtedness or other obligations incurred pursuant to **Section 3.12** to the extent such restrictions are not more restrictive in any material respect than the restrictions contained in this Indenture or are market terms at the time of issuance (as reasonably determined by the Issuer);

(vii)      customary provisions contained in leases or licenses of Intellectual Property and other similar agreements entered into in the ordinary course of business and consistent with past practice or industry practice;

(viii)      customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(ix)      customary provisions restricting assignment of any agreement entered into in the ordinary course of business and consistent with past practice or industry practice;

(x)      customary restrictions and conditions contained in any agreement relating to the sale, transfer, lease or other disposition of any asset permitted under **Section 3.16** pending the consummation of such sale, transfer, lease or other disposition;

(xi)      customary restrictions and conditions contained in the document relating to any Lien, so long as (a) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien, and (b) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this **Section 3.20**;

(xii)      customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as the Issuer has determined in good faith that such net worth

- 79 -

provisions would not reasonably be expected to impair the ability of the Issuer and its Subsidiaries to meet their ongoing obligations;

(xiii)   any agreement in effect at the time such subsidiary becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary;

(xiv)   customary provisions in joint venture agreements and other similar agreements;

(xv)   customary restrictions contained in leases, subleases, licenses or Equity Interests or asset sale agreements otherwise permitted hereby as long as such restrictions relate to the Equity Interests and assets subject thereto;

(xvi)   restrictions on cash or other deposits imposed by customers or counterparties under contracts entered into in the ordinary course of business (and including with respect to any cash collateral permitted to be provided to any counterparty under **Section 3.13**); and

(xvii)   any encumbrances or restrictions of the type referred to in **Section 3.20(A)(i)** through (xvi) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of or similar arrangements or the contracts, instruments or obligations referred to in clauses (i) through (xiii) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings or similar arrangements are, in the good faith judgment of the Issuer, not more restrictive in any material respect with respect to such dividend, other payment, sale and Lien restrictions than those contained in the dividend, other payment and Lien restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing or similar arrangements or are otherwise in accordance with the terms of the applicable intercreditor agreement.

**Section 3.21.   FURTHER ASSURANCES; ADDITIONAL SECURITY.**

(A)   The Issuer will, and will cause each of the Subsidiaries to, subject to the Agreed Security Principles, the terms of any applicable Intercreditor Agreement and to the extent consist with the Collateral and Guarantee Requirement:

(i)   execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings (provided that if a Mortgage is actually filed, only to the extent a filed Mortgage cannot act as a fixture filing in an applicable jurisdiction), Mortgages and other documents), as are reasonably necessary (or that Trustee and/or Collateral Agent and/or Parallel Debt Creditor may reasonably request) (including, without limitation, those required by applicable law), to satisfy the Collateral and Guarantee Requirement and to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Note Parties and provide to the Collateral Agent and/or Parallel Debt Creditor, from time to time, evidence reasonably necessary to establish the

- 80 -

perfection and priority of the Liens created or intended to be created by the Security Documents.

(ii)      if any asset (other than Real Property) that has an individual fair market value (as determined in good faith by the Issuer at the time of acquisition) in an amount greater than $6,500,000 or is a semiconductor tool or equipment used in any Product Family of the Issuer and its Subsidiaries is acquired by the Issuer or any Subsidiary Guarantor after the Issue Date or owned by an entity at the time it becomes a Subsidiary Guarantor (in each case other than (x) assets constituting Collateral under a Security Document that become subject to the Lien of such Security Document upon acquisition thereof and (y) assets constituting Excluded Property), the Issuer or such Subsidiary Guarantor, as applicable, will (i) notify the Collateral Agent of such acquisition or ownership and (ii) cause such asset to be subjected to a Lien (subject to any Permitted Liens) securing the Note Obligations by, and take, and cause the Subsidiary Guarantors to take, such actions as shall be necessary (or reasonably requested by the Collateral Agent) to grant and perfect such Liens, including actions described in **Section 3.21(A)(i)**, all at the expense of the Note Parties, subject to **Section 3.21(A)(vii)**.

(iii)      (a) grant and cause each of the Subsidiary Guarantors to grant to the Collateral Agent security interests in, and mortgages on, any Material Real Property of the Issuer or such Subsidiary Guarantors, as applicable, (x) within 90 days after the Issue Date with respect to Material Real Property owned as of the Issue Date and (y) to the extent acquired after the Issue Date, within 90 days after such acquisition pursuant to a Mortgage, which security interest and mortgage shall constitute valid and enforceable Liens subject to no other Liens except Permitted Liens and (ii) to the extent applicable in the applicable jurisdiction, record or file, and cause each such Subsidiary Guarantor to record or file, the Mortgage or instruments related thereto in such manner and in such places as is required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) and/or the Collateral Agent under a Parallel Debt structure for the benefit of the Secured Parties required to be granted pursuant to the Mortgages and pay, and cause each such Subsidiary Guarantor to pay, in full, all Taxes, fees and other charges required to be paid in connection with such recording or filing, in each case subject to **Section 3.21(A)(vii)**. Subject to Section 3.21(A)(vii), with respect to each such Mortgage, to the extent applicable in the applicable jurisdiction, the Issuer shall cause the requirements set forth in clause (F) of the definition of "Collateral and Guarantee Requirement" to be satisfied with respect to such Material Real Property.

(iv)      if any additional direct or indirect Subsidiary of the Issuer is formed or acquired after the Issue Date and if such Subsidiary is a Subsidiary Guarantor (with any Excluded Subsidiary ceasing to be an Excluded Subsidiary being deemed to constitute the acquisition of a Subsidiary), within 10 Business Days after the date such Subsidiary is formed or acquired, notify the Collateral Agent thereof and, within (x) in the case of a Domestic Subsidiary, 30 days or (y) in the case of a Foreign Subsidiary, 60 days, in each case, after the date such Subsidiary is formed or acquired (or, with respect to clause (F) of the definition of "Collateral and Guarantee Requirement", within 90 days after such formation or acquisition or such longer period as set forth therein ), cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect

to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Note Party, subject to **Section 3.21(A)(vii)**.

(v)        [reserved].

(vi)        furnish to the Collateral Agent prompt written notice of any change (A) in any Note Party's corporate or organization name, (B) in any Note Party's identity or organizational structure, (C) in any Note Party's organizational identification number, (D) in any Note Party's jurisdiction of organization or (E) in the location of the chief executive office of any Note Party that is not a registered organization; provided, that the Issuer shall not effect or permit any such change unless all filings have been made, or will have been made within 30 days following such change, under the Uniform Commercial Code or other applicable law that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral in which a security interest may be perfected by such filing, for the benefit of the Secured Parties.

(vii)        the Collateral and Guarantee Requirement and the other provisions of this **Section 3.21(A)** and the other Note Documents with respect to Collateral are (a) solely in the case of Foreign Subsidiaries (and the assets of and Equity Interests in such Foreign Subsidiaries), subject in all respects to the Agreed Security Principles and (b) solely in the case of Domestic Subsidiaries (and the assets of, and Equity Interests in, such Domestic Subsidiaries) need not be satisfied by any Excluded Subsidiary or by any Note Party with respect to any of the following (collectively, the "**Excluded Property**"):  (I) any Real Property other than Material Real Property, (II) (x) motor vehicles and other assets subject to certificates of title and letter of credit rights (in each case, other than to the extent a Lien on such assets or such rights can be perfected by filing a UCC-1) and (y) commercial tort claims with a value of less than $10,000,000, (III) pledges and security interests prohibited by applicable law, rule, regulation or contractual obligation (with respect to any such contractual obligation, only to the extent such restriction is permitted [under **Section 3.20** ][20] and such restriction is binding on such assets on the Issue Date or on the date of acquisition thereof and not entered into in contemplation thereof (and renewals and replacements thereof)) (in each case, except to the extent such prohibition is unenforceable after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code) or which would require governmental (including regulatory) consent, approval, license or authorization to be pledged (unless such consent, approval, license or authorization has been received), (IV) assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences as determined in good faith by the Issuer, (V) any lease, license or other agreement to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto (other than the Issuer or any Subsidiary thereof) after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code, (VI) those assets as to which the Issuer in good faith determines that the cost or other consequence of obtaining such a

---

[20] Note to Draft: Section 3.20 subject to ongoing review.

security interest or perfection thereof are excessive in relation to the value afforded thereby, (VII) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in such licenses, franchises, charters or authorizations is prohibited or restricted thereby after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code, (VIII) pending "intent to use" trademark applications for which an Amendment to Allege Use or a Statement of Use under Section 1(c) or 1(d) of the Lanham Act has not been filed with or accepted by the United States Trademark Office, (IX) any Excluded Account and any cash and Cash Equivalents maintained in an Excluded Account, (X) any Excluded Securities, (XI) any Third Party Funds and (XII) any equipment or other real or personal property or asset that is subject to a Lien permitted by clause (I) of the definition of Permitted Liens, if permitted by **Section 3.12**, if the agreement governing such Lien (or the Indebtedness secured thereby) prohibits or requires the consent of any person (other than the Issuer or any Subsidiary thereof) as a condition to the creation of any other security interest on such equipment or other real or personal property or asset and, in each case, such prohibition or requirement is permitted hereunder after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code; provided, that the Issuer may in its sole discretion elect to exclude any property from the definition of Excluded Property; provided, further, that, no property or assets that secure any obligations under the First Lien Notes Indenture, the Second Lien [Non-]Renesas Notes Indenture or the Second Lien Takeback Notes Indenture shall be Excluded Property.  Notwithstanding anything herein to the contrary, (A) [reserved], (B)  no landlord, mortgagee or bailee waivers shall be required, (C) no notice shall be required to be sent to account debtors or other contractual third parties prior to the occurrence and continuance of an Event of Default, (D) Liens required to be granted from time to time pursuant to, or any other requirements of, the Collateral and Guarantee Requirement and the Security Documents shall be subject to exceptions and limitations set forth in the Security Documents and, to the extent appropriate in the applicable jurisdiction, as otherwise reasonably determined by the Issuer, (E) to the extent any Mortgaged Property is located in a jurisdiction with mortgage recording or similar tax, the amount secured by the Security Document with respect to such Mortgaged Property shall be limited to the fair market value of such Mortgaged Property as determined in good faith by the Issuer (subject to any applicable laws in the relevant jurisdiction or such lesser amount agreed to by the Collateral Agent), (F) the Issuer may make such modifications to the Security Documents, and execute and/or consent to such easements, covenants, rights of way or similar instruments to subordinate the lien of any Mortgage to any such easement, covenant, right of way or similar instrument or record as permitted by this Indenture or may agree to recognize any tenant pursuant to an agreement as are reasonable or necessary in connection with any project or transactions otherwise permitted hereunder, and (G) other than to the extent required by the Collateral Agreement, no control agreement or control, lockbox or similar arrangement shall be required with respect to any deposit accounts, securities accounts or commodities accounts, and (H) no Mortgage (or the filing of recordation thereof) on any Material Real Property acquired by the Issuer or any Subsidiary Guarantor after the Issue Date shall be required if such Material Real Property is located in a jurisdiction that imposes a mortgage recording tax, documentary tax or similar tax in connection with the filing or recordation thereof (x) at any time prior to the Discharge of First-Priority Obligations (as defined in the First Lien/Second Lien Intercreditor

Agreement) or (y) at any time after the Discharge of First-Priority Obligations, the Collateral Agent is not then the Controlling Collateral Agent (as defined in the *Pari Passu* Intercreditor Agreement) under the *Pari Passu* Intercreditor Agreement.

(viii)   Neither the Collateral Agent (including as the Parallel Debt Creditor) nor the Trustee undertakes any responsibility whatsoever to determine whether any of the foregoing covenants have been satisfied, and neither shall have any liability whatsoever arising out of the failure of the Issuer or any of the Subsidiary Guarantors to satisfy such requirements.

**Section 3.22.  POST-CLOSING.**

(A)   The Issuer will, and will cause each of the Subsidiaries to, take all necessary actions to satisfy the following items:

(i)   [          ].[21]

## Article 4.    REPURCHASE AND REDEMPTION

**Section 4.01.  NO SINKING FUND.**

No sinking fund is required to be provided for the Notes.

**Section 4.02.  RIGHT OF HOLDERS TO REQUIRE THE ISSUER TO REPURCHASE NOTES UPON A FUNDAMENTAL CHANGE.**

(A)   *Right of Holders to Require the Issuer to Repurchase Notes Upon a Fundamental Change*.  Subject to the other terms of this **Section 4.02**, if a Fundamental Change occurs, then each Holder will have the right (the "**Fundamental Change Repurchase Right**") to require the Issuer to repurchase such Holder's Notes (or any portion thereof in an Authorized Denomination) on the Fundamental Change Repurchase Date for such Fundamental Change for a cash purchase price equal to the Fundamental Change Repurchase Price.

(B)   *Repurchase Prohibited in Certain Circumstances*.  If the principal amount of the Notes has been accelerated and such acceleration has not been rescinded on or before the Fundamental Change Repurchase Date for a Repurchase Upon Fundamental Change (including as a result of the payment of the related Fundamental Change Repurchase Price, and any related interest pursuant to the proviso to **Section 4.02(D)**, on such Fundamental Change Repurchase Date), then (i) the Issuer may not repurchase any Notes pursuant to this **Section 4.02**; and (ii) the Issuer will cause any Notes theretofore surrendered for such Repurchase Upon Fundamental Change to be returned to the Holders thereof (or, if applicable with respect to Global Notes, cancel any instructions for book-entry transfer to the Issuer, the Trustee or the Paying Agent of the applicable beneficial interest in such Notes in accordance with the Depositary Procedures).

---

[21] <u>Note to Draft</u>: To replicate Schedule 7.12 in the First Lien Indenture.

(C)    *Fundamental Change Repurchase Date*.  The Fundamental Change Repurchase Date for any Fundamental Change will be a Business Day of the Issuer's choosing that is no more than thirty-five (35) and not less than twenty (20) Business Days after the date the Issuer delivers the related Fundamental Change Notice pursuant to **Section 4.02(E)**.

(D)    *Fundamental Change Repurchase Price*.  The Fundamental Change Repurchase Price for any Note to be repurchased upon a Repurchase Upon Fundamental Change following a Fundamental Change is an amount in cash equal to one hundred percent (100%) of the principal amount of such Note plus accrued and unpaid interest on such Note to, but excluding, the Fundamental Change Repurchase Date for such Fundamental Change; *provided*, *however*, that if such Fundamental Change Repurchase Date is after a Regular Record Date and on or before the next Interest Payment Date, then (i) the Holder of such Note at the Close of Business on such Regular Record Date will be entitled, notwithstanding such Repurchase Upon Fundamental Change, to receive, on or, at the Issuer's election, before such Interest Payment Date, the unpaid interest that would have accrued on such Note to, but excluding, such Interest Payment Date (assuming, solely for these purposes, that such Note remained outstanding through such Interest Payment Date, if such Fundamental Change Repurchase Date is before such Interest Payment Date); and (ii) the Fundamental Change Repurchase Price will not include accrued and unpaid interest on such Note to, but excluding, such Fundamental Change Repurchase Date. For the avoidance of doubt, if an Interest Payment Date is not a Business Day within the meaning of **Section 2.05(C)** and such Fundamental Change Repurchase Date occurs on the Business Day immediately after such Interest Payment Date, then (x) accrued and unpaid interest on Notes to, but excluding, such Interest Payment Date will be paid, in accordance with **Section 2.05(C)**, on the next Business Day to Holders as of the Close of Business on the immediately preceding Regular Record Date; and (y) the Fundamental Change Repurchase Price will include interest on Notes to be repurchased from, and including, such Interest Payment Date.

(E)    *Fundamental Change Notice*.  On or before the twentieth (20th) calendar day after the effective date of a Fundamental Change, the Issuer will deliver to each Holder, the Trustee, the Conversion Agent and the Paying Agent a notice of such Fundamental Change (a "**Fundamental Change Notice**"). Substantially contemporaneously, the Issuer will either (x) issue a press release through such national newswire service as the Issuer then uses; (y) publish the same through such other widely disseminated public medium as the Issuer then uses, including its website; or (z) file or furnish a Form 8-K (or any successor form) with the SEC, in each case of **clauses (x)**, **(y)** and **(z)**, containing the information set forth in the Fundamental Change Notice.

Such Fundamental Change Notice must state:

(i)    briefly, the events causing such Fundamental Change;

(ii)    the effective date of such Fundamental Change;

(iii)    the procedures that a Holder must follow to require the Issuer to repurchase its Notes pursuant to this **Section 4.02**, including the deadline for exercising the Fundamental Change Repurchase Right and the procedures for submitting and withdrawing a Fundamental Change Repurchase Notice;

- 85 -

(iv)     the Fundamental Change Repurchase Date for such Fundamental Change;

(v)     the Fundamental Change Repurchase Price per $1,000 principal amount of Notes for such Fundamental Change (and, if such Fundamental Change Repurchase Date is after a Regular Record Date and on or before the next Interest Payment Date, the amount, manner and timing of the interest payment payable pursuant to the proviso to **Section 4.02(D)**);

(vi)     the name and address of the Paying Agent and the Conversion Agent;

(vii)     the Conversion Rate in effect on the date of such Fundamental Change Notice and a description and quantification of any adjustments to the Conversion Rate that may result from such Fundamental Change (including pursuant to **Section 5.07**);

(viii)     the Settlement Method that will apply to all conversions of Notes with a Conversion Date that occurs on or after the date of such Fundamental Change Notice and on or before the second (2nd) Business Day before such Fundamental Change Repurchase Date;

(ix)     that Notes for which a Fundamental Change Repurchase Notice has been duly tendered and not duly withdrawn must be delivered to the Paying Agent for the Holder thereof to be entitled to receive the Fundamental Change Repurchase Price;

(x)     that Notes (or any portion thereof) that are subject to a Fundamental Change Repurchase Notice that has been duly tendered may be converted only if such Fundamental Change Repurchase Notice is withdrawn in accordance with this Indenture; and

(xi)     the CUSIP and ISIN numbers, if any, of the Notes.

Neither the failure to deliver a Fundamental Change Notice nor any defect in a Fundamental Change Notice will limit the Fundamental Change Repurchase Right of any Holder or otherwise affect the validity of any proceedings relating to any Repurchase Upon Fundamental Change.

(F)     *Procedures to Exercise the Fundamental Change Repurchase Right.*

(i)     *Delivery of Fundamental Change Repurchase Notice and Notes to Be Repurchased.* To exercise its Fundamental Change Repurchase Right for a Note following a Fundamental Change, the Holder thereof must deliver to the Paying Agent:

(1)     before the Close of Business on the Business Day immediately before the related Fundamental Change Repurchase Date (or such later time as may be required by law), a duly completed, written Fundamental Change Repurchase Notice with respect to such Note; and

(2)     such Note, duly endorsed for transfer (if such Note is a Physical Note) or by book-entry transfer (if such Note is a Global Note).

- 86 -

The Paying Agent will promptly deliver to the Issuer a copy of each Fundamental Change Repurchase Notice that it receives.

(ii)      *Contents of Fundamental Change Repurchase Notices*. Each Fundamental Change Repurchase Notice with respect to a Note must state:

(1)      if such Note is a Physical Note, the certificate number of such Note;

(2)      the principal amount of such Note to be repurchased, which must be an Authorized Denomination; and

(3)      that such Holder is exercising its Fundamental Change Repurchase Right with respect to such principal amount of such Note;

*provided*, *however*, that if such Note is a Global Note, then such Fundamental Change Repurchase Notice must comply with the Depositary Procedures (and any such Fundamental Change Repurchase Notice delivered in compliance with the Depositary Procedures will be deemed to satisfy the requirements of this **Section 4.02(F)**).

(iii)      *Withdrawal of Fundamental Change Repurchase Notice*. A Holder that has delivered a Fundamental Change Repurchase Notice with respect to a Note may withdraw such Fundamental Change Repurchase Notice by delivering a written notice of withdrawal to the Paying Agent at any time before the Close of Business on the Business Day immediately before the related Fundamental Change Repurchase Date. Such withdrawal notice must state:

(1)      if such Note is a Physical Note, the certificate number of such Note;

(2)      the principal amount of such Note to be withdrawn, which must be an Authorized Denomination; and

(3)      the principal amount of such Note, if any, that remains subject to such Fundamental Change Repurchase Notice, which must be an Authorized Denomination;

*provided*, *however*, that if such Note is a Global Note, then such withdrawal notice must comply with the Depositary Procedures (and any such withdrawal notice delivered in compliance with the Depositary Procedures will be deemed to satisfy the requirements of this **Section 4.02(F)**).

Upon receipt of any such withdrawal notice with respect to a Note (or any portion thereof), the Paying Agent will (x) promptly deliver a copy of such withdrawal notice to the Issuer; and (y) if such Note is surrendered to the Paying Agent, cause such Note (or such portion thereof in accordance with **Section 2.11**, treating such Note as having been then surrendered for partial repurchase in the amount set forth in such withdrawal notice as remaining subject to repurchase) to be returned to the Holder thereof (or, if applicable with respect to any Global Note, cancel any instructions for book-entry transfer to the Issuer,

the Trustee or the Paying Agent of the applicable beneficial interest in such Note in accordance with the Depositary Procedures).

(G) *Payment of the Fundamental Change Repurchase Price*.  Without limiting the Issuer's obligation to deposit the Fundamental Change Repurchase Price within the time proscribed by **Section 3.02(B)**, the Issuer will cause the Fundamental Change Repurchase Price for a Note (or portion thereof) to be repurchased pursuant to a Repurchase Upon Fundamental Change to be paid to the Holder thereof on or before the later of (i) the applicable Fundamental Change Repurchase Date; and (ii) the date (x) such Note is delivered to the Paying Agent (in the case of a Physical Note) or (y) the Depositary Procedures relating to the repurchase, and the delivery to the Paying Agent, of such Holder's beneficial interest in such Note to be repurchased are complied with (in the case of a Global Note). For the avoidance of doubt, interest payable pursuant to the proviso to **Section 4.02(D)** on any Note to be repurchased pursuant to a Repurchase Upon Fundamental Change must be paid pursuant to such proviso regardless of whether such Note is delivered or such Depositary Procedures are complied with pursuant to the first sentence of this **Section 4.02(G)**.

(H) *Repurchase by Third Party*.  Notwithstanding anything to the contrary in this **Section 4.02**, the Issuer will be deemed to satisfy its obligations under this **Section 4.02** if (i) one or more third parties conduct any Repurchase Upon Fundamental Change and related offer to repurchase Notes otherwise required by this **Section 4.02** in a manner that would have satisfied the requirements of this **Section 4.02** if conducted directly by the Issuer; and (ii) an owner of a beneficial interest in any Note repurchased by such third party or parties will not receive a lesser amount as a result of withholding or similar taxes than such owner would have received had the Issuer repurchased such Note.

(I) *Compliance with Applicable Securities Laws*.  To the extent applicable, the Issuer will comply with all federal and state securities laws in connection with a Repurchase Upon Fundamental Change (including complying with Rules 13e-4 and 14e-1 under the Exchange Act and filing any required Schedule TO, to the extent applicable) so as to permit effecting such Repurchase Upon Fundamental Change in the manner set forth in this Indenture; *provided*, *however*, that, to the extent that any securities laws or regulations enacted after the Issue Date conflict with the **Section 4.02**, the Issuer will comply with such securities laws and regulations and will not be deemed to have breached its obligations under this **Section 4.02** (nor will such compliance be considered a Default or an Event of Default hereunder) by virtue of such conflict.

(J) *Repurchase in Part*.  Subject to the terms of this **Section 4.02**, Notes may be repurchased pursuant to a Repurchase Upon Fundamental Change in part, but only in Authorized Denominations. Provisions of this **Section 4.02** applying to the repurchase of a Note in whole will equally apply to the repurchase of a permitted portion of a Note.

(K) *No Requirement to Conduct an Offer to Repurchase Notes if the Fundamental Change Results in the Notes Becoming Convertible into an Amount of Cash Exceeding the Fundamental Change Repurchase Price*. Notwithstanding anything to the contrary in this **Section 4.02**, the Issuer will not be required to send a Fundamental Change Notice pursuant to **Section 4.02(E)**, or offer to repurchase or repurchase any Notes pursuant to this **Section 4.02**, in connection with a Common Stock Change Event that constitutes a Fundamental Change pursuant to clause

(B)(ii) of the definition thereof (regardless of whether such Common Stock Change Event also constitutes a Fundamental Change to any other clause of such definition), if (i) the Reference Property of such Common Stock Change Event consists entirely of cash in U.S. dollars; (ii) immediately after such Fundamental Change, the Notes become convertible, pursuant to **Section 5.09(A)** and, if applicable, **Section 5.07**, into consideration that consists solely of U.S. dollars in an amount per $1,000 aggregate principal amount of Notes that equals or exceeds the Fundamental Change Repurchase Price per $1,000 aggregate principal amount of Notes (calculated (1) assuming that the same includes accrued and unpaid interest to, but excluding, the latest possible Fundamental Change Repurchase Date for such Fundamental Change); and (2) without regard to the proviso to the first sentence of **Section 4.02(D)**); and (iii) the Issuer timely sends the notice relating to such Fundamental Change and includes, in such notice, a statement that the Issuer is relying on this **Section 4.02(K)**.

**Section 4.03.   RIGHT OF THE ISSUER TO REDEEM THE NOTES**.

(A)   *No Right to Redeem Before [●], 202[7][8]*.  The Issuer may not redeem the Notes at any time before [●], 202[7][8].[22]

(B)   *Right to Redeem the Notes on or after [●], 202[7][8]*.  Subject to the terms of this **Section 4.03**, the Issuer has the right, at its election, to redeem (a "**Redemption**") all, or any portion in an Authorized Denomination, of the Notes, at any time, and from time to time, on a Redemption Date that falls on or after [●], 202[7][8] and on or before the sixtieth (60th) Scheduled Trading Day immediately before the Maturity Date, for a cash purchase price equal to the Redemption Price.

For the avoidance of doubt, the calling of any Notes for Redemption will constitute a Make-Whole Event with respect to such Notes pursuant to **clause (B)** of the definition thereof.

(C)   *[Reserved]*.

(D)   *Redemption Prohibited in Certain Circumstances*.  If the principal amount of the Notes has been accelerated and such acceleration has not been rescinded on or before the Redemption Date (including as a result of the payment of the related Redemption Price, and any related interest pursuant to the proviso to **Section 4.03(F)**, on such Redemption Date), then (i) the Issuer may not call for Redemption or otherwise redeem any Notes pursuant to this **Section 4.03**; and (ii) the Issuer will cause any Notes theretofore surrendered for such Redemption to be returned to the Holders thereof (or, if applicable with respect to Global Notes, cancel any instructions for book-entry transfer to the Issuer, the Trustee or the Paying Agent of the applicable beneficial interests in such Notes in accordance with the Depositary Procedures).

(E)   *Redemption Date*.  The Redemption Date for a Redemption will be a Business Day of the Issuer's choosing that is no more than sixty (60) Scheduled Trading Days and not less than

---

[22] <u>Note to Draft</u>: Two (2)-year call protection for New Renesas 2l Takeback Convertible Notes.

thirty-five (35) Scheduled Trading Days after the related Redemption Notice Date for such Redemption.

(F)     *Redemption Price*.  The Redemption Price for any Note called for Redemption is an amount in cash equal to one hundred percent (100%) of the principal amount of such Note plus accrued and unpaid interest on such Note to, but excluding, the Redemption Date for such Redemption; *provided*, *however*, that if such Redemption Date is after a Regular Record Date and on or before the next Interest Payment Date, then (i) the Holder of such Note at the Close of Business on such Regular Record Date will be entitled, notwithstanding such Redemption, to receive, on or, at the Issuer's election, before such Interest Payment Date, the unpaid interest that would have accrued on such Note to, but excluding, such Interest Payment Date (assuming, solely for these purposes, that such Note remained outstanding through such Interest Payment Date, if such Redemption Date is before such Interest Payment Date); and (ii) the Redemption Price will not include accrued and unpaid interest on such Note to, but excluding, such Redemption Date. For the avoidance of doubt, if an Interest Payment Date is not a Business Day within the meaning of **Section 2.05(C)** and such Redemption Date occurs on the Business Day immediately after such Interest Payment Date, then (x) accrued and unpaid interest on Notes to, but excluding, such Interest Payment Date will be paid, in accordance with **Section 2.05(C)**, on the next Business Day to Holders as of the Close of Business on the immediately preceding Regular Record Date; and (y) the Redemption Price will include interest on Notes to be redeemed from, and including, such Interest Payment Date.

(G)     *Redemption Notice*.  To call any Notes for Redemption, the Issuer must (i) deliver to each Holder of such Notes, the Trustee, the Conversion Agent and the Paying Agent a written notice of such Redemption (a "**Redemption Notice**"); and (ii) substantially contemporaneously therewith, either (x) issue a press release through such national newswire service as the Issuer then uses; (y) publish the same through such other widely disseminated public medium as the Issuer then uses, including its website; or (z) file or furnish a Form 8-K (or any successor form) with the SEC, in each case of **clauses (x)**, **(y)** and **(z)**, containing the information set forth in the Redemption Notice.

Such Redemption Notice must state:

(i)     that such Notes have been called for Redemption, briefly describing the Issuer's Redemption right under this Indenture;

(ii)     the Redemption Date for such Redemption;

(iii)     the Redemption Price per $1,000 principal amount of Notes for such Redemption (and, if the Redemption Date is after a Regular Record Date and on or before the next Interest Payment Date, the amount, manner and timing of the interest payment payable pursuant to the proviso to **Section 4.03(F)**);

(iv)     the name and address of the Paying Agent and the Conversion Agent;

(v)     that Notes called for Redemption may be converted at any time before the Close of Business on the Business Day immediately before the Redemption Date (or, if the

Issuer fails to pay the Redemption Price due on such Redemption Date in full, at any time until such time as the Issuer pays such Redemption Price in full);

(vi)     the Conversion Rate in effect on the Redemption Notice Date for such Redemption and a description and quantification of any adjustments to the Conversion Rate that may result from such Redemption (including pursuant to **Section 5.07**);

(vii)    the Settlement Method that will apply to all conversions of Notes with a Conversion Date that occurs on or after such Redemption Notice Date and on or before the second (2nd) Business Day before such Redemption Date; and

(viii)   the CUSIP and ISIN numbers, if any, of the Notes.

On or before the Redemption Notice Date, the Issuer will deliver a copy of such Redemption Notice to the Trustee and the Paying Agent. At the Issuer's request, given in an Officer's Certificate delivered to the Trustee at least five (5) days prior to the requested date of delivery (or such shorter period of time as may be acceptable to the Trustee), the Trustee shall give such notice in the Issuer's name; *provided, however* that in all cases, the text of such Redemption Notice shall be prepared by the Issuer.

(H)     *[Reserved]*.

(I)     *Selection and Conversion of Notes to Be Redeemed in Part*.  If less than all Notes then outstanding are called for Redemption, then:

(i)      the Notes to be redeemed will be selected by the Issuer as follows: (1) in the case of Global Notes, in accordance with the Depositary Procedures and, if no such Depositary Procedures apply, *pro rata*, by lot or by such other method the Issuer considers fair and appropriate; and (2) in the case of Physical Notes, *pro rata*, by lot or by such other method the Issuer considers fair and appropriate; and

(ii)     if only a portion of a Note is subject to Redemption and such Note is converted in part, then the converted portion of such Note will be deemed to be from the portion of such Note that was subject to Redemption.

(J)     *Payment of the Redemption Price*.  Without limiting the Issuer's obligation to deposit the Redemption Price by the time proscribed by **Section 3.02(B)**, the Issuer will cause the Redemption Price for a Note (or portion thereof) subject to Redemption to be paid to the Holder thereof on or before the applicable Redemption Date. For the avoidance of doubt, interest payable pursuant to the proviso to **Section 4.03(F)** on any Note (or portion thereof) subject to Redemption must be paid pursuant to such proviso.

(K)     *Right to Convert Not Affected*.  For the avoidance of doubt, a Redemption will not affect any Holder's right to convert any Notes on or after the Issue Date and prior to the Close of Business on the second (2nd) Business Day immediately before the applicable Redemption Date, except to the extent the Issuer fails to pay the Redemption Price for such Note in accordance with this Indenture.

## Article 5.    CONVERSION

**Section 5.01.  RIGHT TO CONVERT**.

(A)    *Generally*.  On and after the Issue Date until the fifth (5th) scheduled Trading Day immediately preceding the [Maturity Date][Conversion Expiration Date], subject to the provisions of this **Article 5**, each Holder may, at its option, convert such Holder's Notes into Conversion Consideration.

(B)    *Conversions in Part*.  Subject to the terms of this Indenture, Notes may be converted in part, but only in Authorized Denominations. Provisions of this **Article 5** applying to the conversion of a Note in whole will equally apply to conversions of a permitted portion of a Note.

(C)    *When Notes May Be Converted*.

(i)    [Reserved]

(ii)    *Limitations and Closed Periods*. Notwithstanding anything to the contrary in this Indenture or the Notes:

(1)    Notes may be surrendered for conversion only after the Open of Business and before the Close of Business on a day that is a Business Day;

(2)    in no event may any Note be converted after the Close of Business on the fifth (5th) Scheduled Trading Day immediately before the [Maturity Date][Conversion Expiration Date];

(3)    if the Issuer calls any Note for Redemption pursuant to **Section 4.03**, then the Holder of such Note may not convert such Note after the Close of Business on the second (2nd) Business Day immediately before the applicable Redemption Date, except to the extent the Issuer fails to pay the Redemption Price for such Note in accordance with this Indenture;

(4)    if a Fundamental Change Repurchase Notice is validly delivered pursuant to **Section 4.02(F)** with respect to any Note, then such Note may not be converted, except to the extent (a) such Note is not subject to such notice; (b) such notice is withdrawn in accordance with **Section 4.02(F)**; or (c) the Issuer fails to pay the Fundamental Change Repurchase Price for such Note in accordance with this Indenture; and

(5)    Physical Notes may not be converted within ten (10) Business Days prior to a mandatory exchange of Physical Notes for Global Notes.

**Section 5.02.  CONVERSION PROCEDURES**.

(A)    *Generally*.

(i)      *Global Notes*. To convert a beneficial interest in a Global Note that is convertible pursuant to **Section 5.01**, the owner of such beneficial interest must (1) comply with the Depositary Procedures for converting such beneficial interest (at which time such conversion will become irrevocable); and (2) pay any amounts due pursuant to **Section 5.02(D)** or **Section 5.02(E)**.

(ii)      *Physical Notes*. To convert all or a portion of a Physical Note that is convertible pursuant to **Section 5.01**, the Holder of such Note must (1) complete, manually sign and deliver to the Conversion Agent the conversion notice attached to such Physical Note or a facsimile/email of such conversion notice; (2) deliver such Physical Note to the Conversion Agent (at which time such conversion will become irrevocable); (3) furnish any endorsements and transfer documents that the Issuer or the Conversion Agent may require; and (4) pay any amounts due pursuant to **Section 5.02(D)** or **Section 5.02(E)**.

(B)      *Effect of Converting a Note*.  At the Close of Business on the Conversion Date for a Note (or any portion thereof) to be converted, such Note (or such portion) will (unless there occurs a Default in the delivery of the Conversion Consideration or interest due, pursuant to **Sections 5.03(B)** or **5.03(D)**, upon such conversion) be deemed to cease to be outstanding (and, for the avoidance of doubt, no Person will be deemed to be a Holder of such Note (or such portion thereof) as of the Close of Business on such Conversion Date), except to the extent provided in **Section 5.02(D)**.

(C)      *Holder of Record of Conversion Shares*.  The Person in whose name any Common Stock is issuable upon conversion of any Note will be deemed to become the holder of record of such Common Stock as of the Close of Business on (i) the Conversion Date for such conversion, in the case of Physical Settlement; or (ii) the last VWAP Trading Day of the Observation Period for such conversion, in the case of Combination Settlement.

(D)      *Interest Payable upon Conversion in Certain Circumstances*.  If the Conversion Date of a Note is after a Regular Record Date and before the next Interest Payment Date, then the Holder of such Note at the Close of Business on such Regular Record Date will be entitled, notwithstanding such conversion (and, for the avoidance of doubt, notwithstanding anything set forth in the proviso to this sentence), to receive, on or, at the Issuer's election, before such Interest Payment Date, the unpaid interest that would have accrued on such Note to, but excluding, such Interest Payment Date (assuming, solely for these purposes, that such Note remained outstanding through such Interest Payment Date); and  the Holder surrendering such Note for conversion must deliver to the Conversion Agent, at the time of such surrender, an amount of cash equal to the amount of such interest referred to in **clause (i)** above; *provided*, *however*, that the Holder surrendering such Note for conversion need not deliver such cash (w) if the Issuer has specified a Redemption Date for a Redemption that is after such Regular Record Date and on or before the second (2nd) Business Day immediately after such Interest Payment Date; [(x) if such Conversion Date occurs after the Regular Record Date immediately before the Maturity Date]; (y) if the Issuer has specified a Fundamental Change Repurchase Date that is after such Regular Record Date and on or before the Business Day immediately after such Interest Payment Date; or (z) to the extent of any overdue interest or interest that has accrued on any overdue interest. [For the avoidance of doubt, as a result of, and without limiting the generality of, the foregoing, if a Note is converted with a Conversion Date that is after the Regular Record Date immediately before the Maturity

Date, then the Issuer will pay, as provided above, the interest that would have accrued on such Note to, but excluding, the Maturity Date.] For the avoidance of doubt, if the Conversion Date of a Note to be converted is on an Interest Payment Date, then the Holder of such Note at the Close of Business on the Regular Record Date immediately before such Interest Payment Date will be entitled to receive, on such Interest Payment Date, the unpaid interest that has accrued on such Note to, but excluding, such Interest Payment Date, and such Note, when surrendered for conversion, need not be accompanied by any cash amount pursuant to the first sentence of this **Section 5.02(D)**.

(E)     *Taxes and Duties*.  If a Holder converts a Note, the Issuer will pay any documentary, stamp or similar issue or transfer tax or duty due on the issue or delivery (including, for the avoidance of doubt, pursuant to **Section 5.08**) of any Common Stock upon such conversion; *provided*, *however*, that if any tax or duty is due because such Holder requested such Common Stock to be registered in a name other than such Holder's name, then such Holder will pay such tax or duty.

(F)     *Conversion Agent to Notify Issuer of Conversions*.  If any Note is submitted for conversion to the Conversion Agent or the Conversion Agent receives any notice of conversion with respect to a Note, then the Conversion Agent will promptly notify the Issuer and the Trustee of such occurrence, together with any other information reasonably requested by the Issuer, and will cooperate with the Issuer to determine the Conversion Date for such Note.

**Section 5.03.  SETTLEMENT UPON CONVERSION**.

(A)     *Settlement Method*.  Upon the conversion of any Note, the Issuer will settle such conversion by paying or delivering, as applicable and as provided in this **Article 5**, either (x) Common Stock, together, if applicable, with cash in lieu of fractional shares as provided in **Section 5.03(B)(i)(1)** (a "**Physical Settlement**"); (y) solely cash as provided in **Section 5.03(B)(i)(2)** (a "**Cash Settlement**"); or (z) a combination of cash and Common Stock, together, if applicable, with cash in lieu of fractional shares as provided in **Section 5.03(B)(i)(3)** (a "**Combination Settlement**").

(i)     *The Issuer's Right to Elect Settlement Method*. The Issuer will have the right to elect the Settlement Method applicable to any conversion of a Note; *provided*, *however*, that:

(1)     if any Notes are called for Redemption, then the Issuer will specify, in the related Redemption Notice (and, in the case of a Redemption of less than all outstanding Notes, in a notice simultaneously sent to all Holders of Notes not called for Redemption) sent pursuant to **Section 4.03(G)**, the Settlement Method that will apply to all conversions of Notes with a Conversion Date that occurs on or after such Redemption Notice Date and on or before the second (2nd) Business Day before such Redemption Date;

(2)     if any Notes are called for Repurchase Upon Fundamental Change, then the Issuer will specify, in the related Fundamental Change Notice sent pursuant to **Section 4.02(E)**, the Settlement Method that will apply to all conversions of

- 94 -

Notes with a Conversion Date that occurs on or after the date of such Fundamental Change Notice and on or before the second (2nd) Business Day before such Fundamental Change Repurchase Date;

(3)     the Issuer will use the same Settlement Method for all conversions of Notes with the same Conversion Date (and, for the avoidance of doubt, the Issuer will not be obligated to use the same Settlement Method with respect to conversions of Notes with different Conversion Dates, except as provided in **clause (1)** and **clause (2)** above);

(4)     if, in respect of any Conversion Date (or one of the periods described in the third immediately succeeding set of parentheses, as the case may be), the Issuer elects to deliver a notice (the "**Settlement Notice**") of the relevant Settlement Method in respect of such Conversion Date (or such period, as the case may be), the Issuer shall deliver such Settlement Notice to converting Holders, the Trustee and the Conversion Agent no later than the close of business on the Trading Day immediately following the relevant Conversion Date (or, in the case of any conversions (x) of any Notes for which the relevant Conversion Date occurs on or after the date of issuance of a Redemption Notice and prior to the related Redemption Date, in such Redemption Notice, (y) for which the Issuer has irrevocably elected Physical Settlement pursuant to **Section 5.03(B)(i)(1)**, in the related notice described therein or (z) for which the Issuer has made an irrevocable election pursuant to **Section 5.03(A)(ii)**, in the Issuer's notice of such irrevocable election to the Holders) (in each case, the "**Settlement Method Election Deadline**"). If the Issuer does not timely elect a Settlement Method with respect to the conversion of a Note prior to the Settlement Method Election Deadline, then the Issuer shall no longer have the right to elect Cash Settlement or Physical Settlement for such conversion or during such period and will be deemed to have elected the Default Settlement Method (and, for the avoidance of doubt, the failure to timely make such election will not constitute a Default or Event of Default). Such Settlement Notice shall specify the relevant Settlement Method and in the case of an election of Combination Settlement, the relevant Settlement Notice shall indicate the Specified Dollar Amount per $1,000 principal amount of Notes;

(5)     if the Issuer timely elects Combination Settlement with respect to the conversion of a Note but does not timely notify the Holder of such Note of the applicable Specified Dollar Amount, then the Specified Dollar Amount for such conversion will be deemed to be $1,000 per $1,000 principal amount of Notes (and, for the avoidance of doubt, the failure to timely send such notification will not constitute a Default or Event of Default); and

(6)     the Settlement Method will be subject to **Section 5.09(A)(2)**.

(ii)     *The Issuer's Right to Irrevocably Fix the Settlement Method*. The Issuer will have the right, exercisable at its election by sending notice of such exercise to the Holders (with a copy to the Trustee and the Conversion Agent), to irrevocably fix the Settlement Method that will apply to all conversions of Notes with a Conversion Date that occurs on

- 95 -

or after the date such notice is sent to Holders, *provided* that (x) such Settlement Method must be a Settlement Method that the Issuer is then permitted to elect (for the avoidance of doubt, including pursuant to, and subject to, the other provisions of this **Section 5.03(A)**); (y) no such irrevocable election will affect any Settlement Method theretofore elected (or deemed to be elected) with respect to any Note pursuant to the other provisions of this **Section 5.03(A)**; and (z) upon any such irrevocable election, the Default Settlement Method will automatically be deemed to be set to the Settlement Method so fixed. Such notice, if sent, must set forth the applicable Settlement Method and expressly state that the election is irrevocable and applicable to all conversions of Notes with a Conversion Date that occurs on or after the date such notice is sent to Holders. For the avoidance of doubt, such an irrevocable election, if made, will be effective without the need to amend this Indenture or the Notes, including pursuant to **Section 8.01(G)** (it being understood, however, that the Issuer may nonetheless choose to execute such an amendment at its option).

(iii)    *Requirement to Publicly Disclose the Fixed or Default Settlement Method.* If the Issuer changes the Default Settlement Method pursuant to **clause (x)** of the proviso to the definition of such term or irrevocably fixes the Settlement Method pursuant to **Section 5.03(A)(i)**, then the Issuer will either post the Default Settlement Method or fixed Settlement Method, as applicable, on its website or disclose the same in a Current Report on Form 8-K (or any successor form) that is filed with the SEC.

(B)    *Conversion Consideration*.

(i)    *Generally*. Subject to **Section 5.03(B)(ii)** and **Section 5.03(B)(iii)**, the type and amount of consideration (the "**Conversion Consideration**") due in respect of each $1,000 principal amount of a Note to be converted will be as follows:

(1)    if Physical Settlement applies to such conversion, consideration consisting of a number of shares of Common Stock equal to the Conversion Rate in effect on the Conversion Date for such conversion;

(2)    if Cash Settlement applies to such conversion, consideration consisting of cash in an amount equal to the sum of the Daily Conversion Values for each VWAP Trading Day in the Observation Period for such conversion; or

(3)    if Combination Settlement applies to such conversion, consideration consisting of (x) a number of shares of Common Stock equal to the sum of the Daily Share Amounts for each VWAP Trading Day in the Observation Period for such conversion, and (y) an amount of cash equal to the sum of the Daily Cash Amounts for each VWAP Trading Day in such Observation Period.

(ii)    *Cash in Lieu of Fractional Shares*. If Physical Settlement or Combination Settlement applies to the conversion of any Note and the number of shares of Common Stock deliverable pursuant to **Section 5.03(B)(i)** upon such conversion is not a whole number, then such number will be rounded down to the nearest whole number and the Issuer will deliver, in addition to the other consideration due upon such conversion, cash

- 96 -

in lieu of the related fractional share in an amount equal to the product of (1) such fraction and (2) (x) the Daily VWAP on the Conversion Date for such conversion (or, if such Conversion Date is not a VWAP Trading Day, the immediately preceding VWAP Trading Day), in the case of Physical Settlement; or (y) the Daily VWAP on the last VWAP Trading Day of the Observation Period for such conversion, in the case of Combination Settlement.

(iii)    *Conversion of Multiple Notes by a Single Holder*. If a Holder converts more than one (1) Note on a single Conversion Date, then the Conversion Consideration due in respect of such conversion will (in the case of any Global Note, to the extent permitted by, and practicable under, the Depositary Procedures) be computed based on the total principal amount of Notes converted on such Conversion Date by such Holder.

(iv)    *Notice of Calculation of Conversion Consideration*. If Cash Settlement or Combination Settlement applies to the conversion of any Note, then the Issuer will determine the Conversion Consideration due thereupon promptly following the last VWAP Trading Day of the applicable Observation Period and will promptly thereafter send notice to the Trustee and the Conversion Agent of the same and the calculation thereof in reasonable detail. Neither the Trustee nor the Conversion Agent will have any duty to make any such determination.

(C)    *Delivery of the Conversion Consideration*.  Except as set forth in **Sections 5.05(D)** and **5.09**, the Issuer will pay or deliver, as applicable, the Conversion Consideration due upon the conversion of any Note to the Holder as follows: (i) if Cash Settlement or Combination Settlement applies to such conversion, on or before the second (2nd) Business Day immediately after the last VWAP Trading Day of the Observation Period for such conversion; and (ii) if Physical Settlement applies to such conversion, on or before the second (2nd) Business Day immediately after the Conversion Date for such conversion[; *provided*, *however*, that if a Note is converted with a Conversion Date that is after the Regular Record Date immediately before the Maturity Date, then, solely for purposes of such conversion, (x) the Issuer will deliver the Conversion Consideration due upon such conversion on the Maturity Date (or, if the Maturity Date is not a Business Day, the next Business Day); and (y) the Conversion Date will instead be deemed to be the second (2nd) Business Day immediately before the Maturity Date].

(D)    *Deemed Payment of Principal and Interest; Settlement of Accrued Interest Notwithstanding Conversion*.  If a Holder converts a Note, then the Issuer will not adjust the Conversion Rate to account for any accrued and unpaid interest on such Note, and, except as provided in **Section 5.02(D)**, the Issuer's delivery of the Conversion Consideration due in respect of such conversion will be deemed to fully satisfy and discharge the Issuer's obligation to pay the principal of such Note. As a result, except as provided in **Section 5.02(D)**, any accrued and unpaid interest on a converted Note will be cancelled, extinguished and forfeited.

**Section 5.04.    RESERVE AND STATUS OF COMMON STOCK ISSUED UPON CONVERSION**.

(A)    The Issuer shall at all times reserve for issuance and provide, free from preemptive rights, out of its authorized but unissued shares or shares held in treasury, sufficient shares of Common Stock to permit the conversion of all then-outstanding Notes, assuming (x) Physical Settlement will apply to such conversion; and (y) the Conversion Rate is increased by the

maximum amount pursuant to which the Conversion Rate may be increased pursuant to **Section 5.07**.

(B)     Each Conversion Share, if any, delivered upon conversion of any Note will be a newly issued share (except that any Conversion Share delivered by a designated financial institution pursuant to **Section 5.08** need not be a newly issued share), will be duly and validly issued, fully paid, non-assessable, free from preemptive rights and free of any lien or adverse claim (except to the extent of any lien or adverse claim created by the action or inaction of the Holder of such Note or the Person to whom such Conversion Share will be delivered) and will rank pari passu with the existing Common Stock. If the Common Stock is then listed on any securities exchange, or quoted on any inter-dealer quotation system, then the Issuer will use commercially reasonable efforts to cause each Conversion Share, when delivered upon conversion of any Note, to be admitted for listing on such exchange or quotation on such system.

**Section 5.05.  ADJUSTMENTS TO THE CONVERSION RATE.**

(A)     *Events Requiring an Adjustment to the Conversion Rate.*  The Conversion Rate will be adjusted from time to time as follows:

(i)     *Stock Dividends, Splits and Combinations.* If the Issuer issues solely the shares of Common Stock as a dividend or distribution on all or substantially all of the shares of Common Stock, or if the Issuer effects a split or a combination of the shares of Common Stock (in each case excluding an issuance solely pursuant to a Common Stock Change Event, as to which **Section 5.09** will apply), then the Conversion Rate will be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

where:

$CR_0$  =  the Conversion Rate in effect immediately before the Open of Business on the Ex-Dividend Date for such dividend or distribution, or immediately before the Open of Business on the effective date of such split or combination, as applicable;

$CR_1$  =  the Conversion Rate in effect immediately after the Open of Business on such Ex-Dividend Date or effective date, as applicable;

$OS_0$  =  the number of shares of Common Stock outstanding immediately before the Open of Business on such Ex-Dividend Date or effective date, as applicable, without giving effect to such dividend, distribution, split or combination; and

$OS_1$  =  the number of shares of Common Stock outstanding immediately after giving effect to such dividend, distribution, split or combination.

If any dividend, distribution, split or combination of the type described in this **Section 5.05(A)(i)** is declared or announced, but not so paid or made, then the Conversion Rate will be readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution or to effect such split or combination, to the Conversion Rate that would then be in effect had such dividend, distribution, split or combination not been declared or announced.

(ii)     *Rights, Options and Warrants*. If the Issuer distributes, to all or substantially all holders of the Common Stock, rights, options or warrants (other than rights issued or otherwise distributed pursuant to a stockholder rights plan, as to which **Sections 5.05(A)(iii)(1)** and **5.05(F)** will apply) entitling such holders, for a period of not more than sixty (60) calendar days after the record date of such distribution, to subscribe for or purchase shares of Common Stock at a price per share that is less than the average of the Last Reported Sale Prices per share of Common Stock for the ten (10) consecutive Trading Days ending on, and including, the Trading Day immediately before the date such distribution is announced, then the Conversion Rate will be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{OS + X}{OS + Y}$$

where:

$CR_0$    =    the Conversion Rate in effect immediately before the Open of Business on the Ex-Dividend Date for such distribution;

$CR_1$    =    the Conversion Rate in effect immediately after the Open of Business on such Ex-Dividend Date;

$OS$    =    the number of shares of Common Stock outstanding immediately before the Open of Business on such Ex-Dividend Date;

$X$    =    the total number of shares of Common Stock issuable pursuant to such rights, options or warrants; and

$Y$    =    a number of shares of Common Stock obtained by dividing (x) the aggregate price payable to exercise such rights, options or warrants by (y) the average of the Last Reported Sale Prices of the Common Stock for the ten (10) consecutive Trading Days ending on, and including, the Trading Day immediately before the date the distribution of such rights, options or warrants is announced.

To the extent such rights, options or warrants referred to in this **Section 5.05(A)(ii)** are not so distributed, the Conversion Rate will be readjusted to the Conversion Rate that would then be in effect had the increase to the Conversion Rate for such distribution been made on the basis of only the rights, options or warrants, if any, actually distributed. In addition, to the extent that shares of Common Stock are not delivered after the expiration of such

rights, options or warrants (including as a result of such rights, options or warrants not being exercised), the Conversion Rate will be readjusted to the Conversion Rate that would then be in effect had the increase to the Conversion Rate for such distribution been made on the basis of delivery of only the number of shares of Common Stock actually delivered upon exercise of such rights, option or warrants.

For purposes of this **Section 5.05(A)(ii)**, in determining whether any rights, options or warrants entitle holders of Common Stock to subscribe for or purchase shares of Common Stock at a price per share that is less than the average of the Last Reported Sale Prices of the Common Stock for the ten (10) consecutive Trading Days ending on, and including, the Trading Day immediately before the date the distribution of such rights, options or warrants is announced, and in determining the aggregate price payable to exercise such rights, options or warrants, there will be taken into account any consideration the Issuer receives for such rights, options or warrants and any amount payable on exercise thereof, with the value of such consideration, if not cash, to be determined by the Issuer in good faith.

    (iii)    *Spin-Offs and Other Distributed Property*.

        (1)    *Distributions Other than Spin-Offs*.  If the Issuer distributes shares of its Equity Interests, evidence of its indebtedness or other assets or property of the Issuer, or rights, options or warrants to acquire Equity Interests of the Issuer or other securities, to all or substantially all holders of the Common Stock, excluding:

            (a)    dividends, distributions, rights, options or warrants (including Common Stock splits) for which an adjustment to the Conversion Rate is required (or would be required without regard to **Section 5.05(C)**) pursuant to **Sections 5.05(A)(i)** or **5.05(A)(ii)**;

            (b)    dividends or distributions paid exclusively in cash for which an adjustment to the Conversion Rate is required (or would be required without regard to **Section 5.05(C)**) pursuant to **Section 5.05(A)(iv)**;

            (c)    rights issued or otherwise distributed pursuant to a stockholder rights plan, except to the extent provided in **Section 5.05(F)**;

            (d)    Spin-Offs for which an adjustment to the Conversion Rate is required (or would be required without regard to **Section 5.05(C)**) pursuant to **Section 5.05(A)(iii)(2)**;

            (e)    a distribution solely pursuant to a tender offer or exchange offer for Common Stock, as to which **Section 5.05(A)(v)** will apply; and

            (f)    a distribution solely pursuant to a Common Stock Change Event, as to which **Section 5.09** will apply,

then the Conversion Rate will be increased based on the following formula:

- 100 -

$$CR_1 = CR_0 \times \frac{SP}{SP - FMV}$$

where:

$CR_0$ =   the Conversion Rate in effect immediately before the Open of Business on the Ex-Dividend Date for such distribution;

$CR_1$ =   the Conversion Rate in effect immediately after the Open of Business on such Ex-Dividend Date;

$SP$ =   the average of the Last Reported Sale Prices of the Common Stock for the ten (10) consecutive Trading Days ending on, and including, the Trading Day immediately before such Ex-Dividend Date; and

$FMV$ =   the fair market value (as determined by the Issuer in good faith), as of such Ex-Dividend Date, of the shares of Equity Interests, evidences of indebtedness, assets, property, rights, options or warrants distributed per share of Common Stock pursuant to such distribution;

*provided*, *however*, that if *FMV* is equal to or greater than *SP*, then, in lieu of the foregoing adjustment to the Conversion Rate, each Holder will receive, for each $1,000 principal amount of Notes held by such Holder on the record date for such distribution, at the same time and on the same terms as holders of Common Stock, the amount and kind of shares of Equity Interests, evidences of indebtedness, assets, property, rights, options or warrants that such Holder would have received if such Holder had owned, on such record date, a number of shares of Common Stock equal to the Conversion Rate in effect on such record date.

To the extent such distribution is not so paid or made, the Conversion Rate will be readjusted to the Conversion Rate that would then be in effect had the adjustment been made on the basis of only the distribution, if any, actually made or paid.

(2)   *Spin-Offs*. If the Issuer distributes or dividends shares of Equity Interests of any class or series, or similar equity interests, of or relating to a Subsidiary or other business unit of the Issuer to all or substantially all holders of the Common Stock (other than solely pursuant to (x) a Common Stock Change Event, as to which **Section 5.09** will apply; or (y) a tender offer or exchange offer for Common Stock, as to which **Section 5.05(A)(v)** will apply), and such Equity Interests are listed or quoted (or will be listed or quoted upon the consummation of the transaction) on a U.S. national securities exchange (a "**Spin- Off**"), then the Conversion Rate will be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{FMV + SP}{SP}$$

where:

- 101 -

$CR_0$ =  the Conversion Rate in effect immediately before the Close of Business on the last Trading Day of the Spin-Off Valuation Period for such Spin-Off;

$CR_1$ =  the Conversion Rate in effect immediately after the Close of Business on the last Trading Day of the Spin-Off Valuation Period;

$FMV$ =  the product of (x) the average of the Last Reported Sale Prices per share or unit of the Equity Interests distributed in such Spin-Off over the ten (10) consecutive Trading Day period (the "**Spin-Off Valuation Period**") beginning on, and including, the Ex- Dividend Date for such Spin-Off (such average to be determined as if references to Common Stock in the definitions of Last Reported Sale Price, Trading Day and Market Disruption Event were instead references to such Equity Interests); and (y) the number of shares or units of such Equity Interests distributed per share of Common Stock in such Spin-Off; and

$SP$ =  the average of the Last Reported Sale Prices of the Common Stock for each Trading Day in the Spin-Off Valuation Period.

Notwithstanding anything to the contrary in this **Section 5.05(A)(iii)(2)**, (i) if any VWAP Trading Day of the Observation Period for a Note whose conversion will be settled pursuant to Cash Settlement or Combination Settlement occurs during the Spin-Off Valuation Period for such Spin-Off, then, solely for purposes of determining the Conversion Rate for such VWAP Trading Day for such conversion, such Spin-Off Valuation Period will be deemed to consist of the Trading Days occurring in the period from, and including, the Ex-Dividend Date for such Spin- Off to, and including, such VWAP Trading Day; and (ii) if the Conversion Date for a Note whose conversion will be settled pursuant to Physical Settlement occurs during the Spin-Off Valuation Period for such Spin-Off, then, solely for purposes of determining the Conversion Consideration for such conversion, such Spin-Off Valuation Period will be deemed to consist of the Trading Days occurring in the period from, and including, the Ex-Dividend Date for such Spin-Off to, and including, such Conversion Date.

To the extent any dividend or distribution of the type set forth in this **Section 5.05(A)(iii)(2)** is declared but not made or paid, the Conversion Rate will be readjusted to the Conversion Rate that would then be in effect had the adjustment been made on the basis of only the dividend or distribution, if any, actually made or paid.

(iv)  *Cash Dividends or Distributions*. If any cash dividend or distribution is made to all or substantially all holders of Common Stock, then the Conversion Rate will be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{SP}{SP - D}$$

where:

- 102 -

$CR_0$ = the Conversion Rate in effect immediately before the Open of Business on the Ex-Dividend Date for such dividend or distribution;

$CR_1$ = the Conversion Rate in effect immediately after the Open of Business on such Ex-Dividend Date;

$SP$ = the Last Reported Sale Price of the Common Stock on the Trading Day immediately before such Ex-Dividend Date; and

$D$ = the cash amount distributed per share of Common Stock in such dividend or distribution;

*provided*, *however*, that if $D$ is equal to or greater than $SP$, then, in lieu of the foregoing adjustment to the Conversion Rate, each Holder will receive, for each $1,000 principal amount of Notes held by such Holder on the record date for such dividend or distribution, at the same time and on the same terms as holders of Common Stock, the amount of cash that such Holder would have received if such Holder had owned, on such record date, a number of shares of Common Stock equal to the Conversion Rate in effect on such record date.

To the extent such dividend or distribution is declared but not made or paid, the Conversion Rate will be readjusted to the Conversion Rate that would then be in effect had the adjustment been made on the basis of only the dividend or distribution, if any, actually made or paid.

(v)     *Tender Offers or Exchange Offers*. If the Issuer or any of its Subsidiaries makes a payment in respect of a tender offer or exchange offer that is subject to the then-applicable tender offer rules under the Exchange Act (other than solely pursuant to an odd-lot tender offer pursuant to Rule 13e-4(h)(5) under the Exchange Act or any successor rule thereto), for Common Stock, and the value (determined as of the Expiration Time by the Board of Directors) of the cash and other consideration paid per share of Common Stock in such tender or exchange offer exceeds the Last Reported Sale Price of the Common Stock on the Trading Day immediately after the last date (the "**Expiration Date**") on which tenders or exchanges may be made pursuant to such tender or exchange offer (as it may be amended), then the Conversion Rate will be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{AC + (SP \times OS_1)}{SP \times OS_0}$$

where:

$CR_0$ = the Conversion Rate in effect immediately before the Close of Business on the last Trading Day of the ten (10) consecutive Trading Day period (the "**Tender/Exchange Offer Valuation Period**") beginning on, and including, the Trading Day immediately after the Expiration Date;

| | | |
|---|---|---|
| $CR_1$ | = | the Conversion Rate in effect immediately after the Close of Business on the last Trading Day of the Tender/Exchange Offer Valuation Period; |
| $AC$ | = | the aggregate value (determined as of the time (the "**Expiration Time**") such tender or exchange offer expires by the Board of Directors) of all cash and other consideration paid for Common Stock purchased or exchanged in such tender or exchange offer; |
| $OS_0$ | = | the number of shares of Common Stock outstanding immediately before the Expiration Time (including all shares of Common Stock accepted for purchase or exchange in such tender or exchange offer); |
| $OS_1$ | = | the number of shares of Common Stock outstanding immediately after the Expiration Time (excluding all shares of Common Stock accepted for purchase or exchange in such tender or exchange offer); and |
| $SP$ | = | the average of the Last Reported Sale Prices of the Common Stock over the Tender/Exchange Offer Valuation Period beginning on, and including, the Trading Day immediately after the Expiration Date; |

*provided*, *however*, that the Conversion Rate will in no event be adjusted down pursuant to this **Section 5.05(A)(v)**, except to the extent provided in the immediately following paragraph. Notwithstanding anything to the contrary in this **Section 5.05(A)(v)**, (i) if any VWAP Trading Day of the Observation Period for a Note whose conversion will be settled pursuant to Cash Settlement or Combination Settlement occurs during the Tender/Exchange Offer Valuation Period for such tender or exchange offer, then, solely for purposes of determining the Conversion Rate for such VWAP Trading Day for such conversion, such Tender/Exchange Offer Valuation Period will be deemed to consist of the Trading Days occurring in the period from, and including, the Trading Day immediately after the Expiration Date for such tender or exchange offer to, and including, such VWAP Trading Day; and (ii) if the Conversion Date for a Note whose conversion will be settled pursuant to Physical Settlement occurs during the Tender/Exchange Offer Valuation Period for such tender or exchange offer, then, solely for purposes of determining the Conversion Consideration for such conversion, such Tender/Exchange Offer Valuation Period will be deemed to consist of the Trading Days occurring in the period from, and including, the Trading Day immediately after the Expiration Date to, and including, such Conversion Date.

To the extent such tender or exchange offer is announced but not consummated (including as a result of the Issuer being precluded from consummating such tender or exchange offer under applicable law), or any purchases or exchanges of Common Stock in such tender or exchange offer are rescinded, the Conversion Rate will be readjusted to the Conversion Rate that would then be in effect had the adjustment been made on the basis of only the purchases or exchanges of Common Stock, if any, actually made, and not rescinded, in such tender or exchange offer.

- 104 -

(B)    *No Adjustments in Certain Cases*.

(i)    *Where Holders Participate in the Transaction or Event Without Conversion*. Notwithstanding anything to the contrary in **Section 5.05(A)**, the Issuer will not be obligated to adjust the Conversion Rate on account of a transaction or other event otherwise requiring an adjustment pursuant to **Section 5.05(A)** (other than a split or combination of the type set forth in **Section 5.05(A)(i)** or a tender or exchange offer of the type set forth in **Section 5.05(A)(v)**) if each Holder participates, at the same time and on the same terms as holders of Common Stock, and solely by virtue of being a Holder of Notes, in such transaction or event without having to convert such Holder's Notes and as if such Holder held a number of shares of Common Stock equal to the product of (i) the Conversion Rate in effect on the related record date; and (ii) the aggregate principal amount (expressed in thousands) of Notes held by such Holder on such date.

(ii)    *Certain Events*. The Issuer will not be required to adjust the Conversion Rate except as provided in **Section 5.05** or **Section 5.07**. Without limiting the foregoing, the Issuer will not be obligated to adjust the Conversion Rate on account of:

(1)    except as otherwise provided in **Section 5.05** or **Section 5.07**, the sale of shares of Common Stock for a purchase price that is less than the market price per share of Common Stock or less than the Conversion Price;

(2)    the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Issuer's securities and the investment of additional optional amounts in shares of Common Stock under any such plan;

(3)    the issuance of any shares of Common Stock or options or rights to purchase those shares of Common Stock pursuant to any present or future employee, director or consultant benefit or incentive plan (including pursuant to an evergreen provision) or program of, or assumed by, the Issuer or any of its Subsidiaries or in connection with any shares withheld for tax withholding purposes;

(4)    the issuance of any shares of Common Stock pursuant to any option, warrant, right or convertible or exchangeable security of the Issuer outstanding or announced as of the Issue Date;

(5)    for a tender offer or exchange offer by any party other than a tender offer or exchange offer by the Issuer or one or more of its Subsidiaries as described in **Section 5.05(A)(v)**;

(6)    an odd-lot tender offer pursuant to Rule 13e-4(h)(5) under the Exchange Act or any successor rule thereto;

(7)    upon the repurchase of any shares of Common Stock pursuant to an open-market repurchase program or other buyback transaction (including through any structured or derivative transactions, such as accelerated share repurchase

- 105 -

transactions, prepaid forward transactions or similar forward derivatives) that is not a tender offer or exchange offer of the nature described in **Section 5.05(A)(v)**;

(8)      solely a change in the par value (or lack of par value) of the Common Stock; or

(9)      accrued and unpaid interest on the Notes.

(iii)    Notwithstanding anything to the contrary in this Indenture or the Notes (but without limiting the operation of **Section 5.05(H)**), the Conversion Rate will not be adjusted pursuant to **Section 5.05(A)** on an account of any event described in any of **clauses (i)** through **(v)**, inclusive, of **Section 5.05(A)** where the Ex- Dividend Date, effective date or Expiration Date, as applicable, of such event occurs before the Issue Date.

(C)     If an adjustment to the Conversion Rate otherwise required by this **Article 5** would result in a change of less than one percent (1%) to the Conversion Rate, then, notwithstanding anything to the contrary in this **Article 5**, the Issuer may, at its election, defer such adjustment, except that all such deferred adjustments must be given effect immediately upon the earliest of the following: (i) when all such deferred adjustments not already given effect would result in a change of at least one percent (1%) to the Conversion Rate; (ii) the Conversion Date of, or any VWAP Trading Day of an Observation Period for, any Note; (iii) the date a Fundamental Change or Make-Whole Event occurs; (iv) the date the Issuer calls any Notes for Redemption; and (v) the thirty fifth (35th) VWAP Trading Day before the [Maturity Date][Conversion Expiration Date].

(D)     *Adjustments Not Yet Effective*.  Notwithstanding anything to the contrary in this Indenture or the Notes, if:

(i)    a Note is to be converted pursuant to Physical Settlement or Combination Settlement;

(ii)    the record date, effective date or Expiration Time for any event that requires an adjustment to the Conversion Rate pursuant to **Section 5.05(A)** has occurred on or before the Conversion Date for such conversion (in the case of Physical Settlement) or on or before any VWAP Trading Day in the Observation Period for such conversion (in the case of Combination Settlement), but an adjustment to the Conversion Rate for such event has not yet become effective as of such Conversion Date or VWAP Trading Day, as applicable;

(iii)    the Conversion Consideration due upon such conversion includes any whole shares of Common Stock (in the case of Physical Settlement) or due in respect of such VWAP Trading Day includes any whole or fractional shares of Common Stock (in the case of Combination Settlement); and

(iv)    such shares of Common Stock are not entitled to participate in such event (because they were not held on the related record date or otherwise),

then, solely for purposes of such conversion, the Issuer will, without duplication, give effect to such adjustment on such Conversion Date (in the case of Physical Settlement) or such VWAP

Trading Day (in the case of Combination Settlement). In such case, if the date on which the Issuer is otherwise required to deliver the consideration due upon such conversion is before the first date on which the amount of such adjustment can be determined, then the Issuer will delay the settlement of such conversion until the second (2nd) Business Day after such first date.

(E)  *Conversion Rate Adjustments where Converting Holders Participate in the Relevant Transaction or Event*.  Notwithstanding anything to the contrary in this Indenture or the Notes, if:

(i)  a Conversion Rate adjustment for any dividend or distribution becomes effective on any Ex-Dividend Date pursuant to **Section 5.05(A)**;

(ii)  a Note is to be converted pursuant to Physical Settlement or Combination Settlement;

(iii)  the Conversion Date for such conversion (in the case of Physical Settlement) or any VWAP Trading Day in the Observation Period for such conversion (in the case of Combination Settlement) occurs on or after such Ex-Dividend Date and on or before the related record date;

(iv)  the Conversion Consideration due upon such conversion includes any whole shares of Common Stock (in the case of Physical Settlement) or due in respect of such VWAP Trading Day includes any whole or fractional shares of Common Stock (in the case of Combination Settlement), in each case based on a Conversion Rate that is adjusted for such dividend or distribution; and

(v)  such shares would be entitled to participate in such dividend or distribution (including pursuant to **Section 5.02(C)**),

then (x) in the case of Physical Settlement, such Conversion Rate adjustment will not be given effect for such conversion and the Common Stock issuable upon such conversion based on such unadjusted Conversion Rate will not be entitled to participate in such dividend or distribution, but there will be added, to the Conversion Consideration otherwise due upon such conversion, the same kind and amount of consideration that would have been delivered in such dividend or distribution with respect to such shares of Common Stock had such shares been entitled to participate in such dividend or distribution; and (y) in the case of Combination Settlement, the Conversion Rate adjustment relating to such Ex-Dividend Date will be made for such conversion in respect of such VWAP Trading Day, but the shares of Common Stock issuable with respect to such VWAP Trading Day based on such adjusted Conversion Rate will not be entitled to participate in such dividend or distribution.

(F)  *Stockholder Rights Plans*.  If any shares of Common Stock are to be issued or delivered upon conversion of any Note and, at the time of such conversion, the Issuer has in effect any stockholder rights plan, then the Holder of such Note will be entitled to receive, in addition to, and concurrently with the delivery of, the Conversion Consideration otherwise payable under this Indenture upon such conversion, the rights set forth in such stockholder rights plan, unless such rights have separated from the Common Stock at such time, in which case, and only in such case, the Conversion Rate will be adjusted pursuant to **Section 5.05(A)(iii)(1)** on account of such

- 107 -

separation as if, at the time of such separation, the Issuer had made a distribution of the type referred to in such Section to all holders of the Common Stock, subject to readjustment in accordance with such Section if such rights expire, terminate or are redeemed.

(G)     *Limitation on Effecting Transactions Resulting in Certain Adjustments*.  The Issuer will not engage in or be a party to any transaction or event that would require the Conversion Rate to be adjusted pursuant to **Section 5.05(A)** or **Section 5.07** to an amount that would result in the Conversion Price per share of Common Stock being less than the par value of the Common Stock.

(H)     *Equitable Adjustments to Prices*.   Whenever any provision of this Indenture requires the Issuer to calculate the average of the Last Reported Sale Prices, or any function thereof, over a period of multiple days (including to calculate an adjustment to the Conversion Rate), or to calculate the Daily Conversion Values or Daily VWAPs over an Observation Period, the Issuer will make appropriate adjustments, if any, to such calculations to account for any adjustment to the Conversion Rate pursuant to **Section 5.05(A)**, would have resulted in an adjustment to the Conversion Rate that becomes effective, or any event that requires such an adjustment to the Conversion Rate where the Ex- Dividend Date, effective date or Expiration Date, as applicable, of such event occurs, at any time during such period, or Observation Period, as applicable.

(I)     *Calculation of Number of Outstanding Shares of Common Stock*.  For purposes of **Section 5.05(A)**, the number of shares of Common Stock outstanding at any time will (i) include shares issuable in respect of scrip certificates issued in lieu of fractions of Common Stock; and (ii) exclude Common Stock held in the Issuer's treasury (unless the Issuer pays any dividend or makes any distribution on Common Stock held in its treasury).

(J)     *Calculations*.  All calculations with respect to the Conversion Rate and adjustments thereto will be made, by the Issuer, to the nearest 1/10,000th of a share of Common Stock (with 5/100,000ths rounded upward).

(K)     *Notice of Conversion Rate Adjustments*.  Upon the effectiveness of any adjustment to the Conversion Rate pursuant to **Section 5.05(A)**, the Issuer will promptly deliver notice to the Holders, the Trustee and the Conversion Agent containing: (i) a brief description of the transaction or other event on account of which such adjustment was made; (ii) the Conversion Rate in effect immediately after such adjustment; and (iii) the effective time of such adjustment. Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

**Section 5.06.  VOLUNTARY ADJUSTMENTS**.

(A)     *Generally*.  To the extent permitted by law and applicable listing standards of The New York Stock Exchange (or any other securities exchange on which the Common Stock (or other applicable security) is then listed), the Issuer, from time to time, may (but is not required to) increase the Conversion Rate by any amount if (i) the Board of Directors determines that such increase is either (x) in the best interest of the Issuer; or (y) advisable to avoid or diminish any income tax imposed on holders of Common Stock or rights to purchase Common Stock as a result of any dividend or distribution of shares (or rights to acquire shares) of Common Stock or any similar event; (ii) such increase is in effect for a period of at least twenty (20) Business Days; and (iii) subject to applicable law, such increase is irrevocable during such period.

(B)     *Notice of Voluntary Increases*.  If the Board of Directors determines to increase the Conversion Rate pursuant to **Section 5.06(A)**, then, no later than the first Business Day of the related twenty (20) Business Day period referred to in **Section 5.06(A)**, the Issuer will deliver notice to each Holder, the Trustee and the Conversion Agent of such increase, the amount thereof and the period during which such increase will be in effect.

**Section 5.07.  ADJUSTMENTS TO THE CONVERSION RATE IN CONNECTION WITH A MAKE-WHOLE EVENT.**

(A)     *Generally*.  If a Make-Whole Event Effective Date occurs prior to the [Maturity Date][Conversion Expiration Date] and a Holder elects to convert its Notes in connection with such Make-Whole Event, the Issuer shall, under the circumstances described below, increase the Conversion Rate for the Notes so surrendered for conversion by a number of additional shares of Common Stock (the "**Additional Shares**"), as described below. A conversion of Notes shall be deemed for these purposes to be "in connection with" such Make-Whole Event if the relevant conversion notice is received by the Conversion Agent during the Make-Whole Event Conversion Period. For the avoidance of doubt, if the Issuer elects to redeem less than all of the outstanding Notes, then Holders of the Notes not called for redemption will not be entitled to an increased Conversion Rate for such Notes as provided in this **Section 5.07** on account of such redemption.

(B)     Upon surrender of Notes for conversion in connection with a Make-Whole Event, the Issuer shall, at its option, satisfy the related conversion obligation by Physical Settlement, Cash Settlement or Combination Settlement in accordance with **Section 5.03**; provided, however, that if, at the effective time of a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change that constitutes a Common Stock Change Event, the Reference Property following such Make-Whole Fundamental Change is composed entirely of cash, for any conversion of Notes following the effective date of such Make-Whole Fundamental Change, the Conversion Consideration shall be calculated based solely on the Stock Price for the transaction and shall be deemed to be an amount of cash per $1,000 principal amount of converted Notes equal to the Conversion Rate on such Conversion Date (including any adjustment for Additional Shares), multiplied by such Stock Price for such Make-Whole Fundamental Change. In such event, the Conversion Consideration shall be paid to Holders in cash on the second Business Day following the Conversion Date.

(C)     The number of Additional Shares, if any, by which the Conversion Rate shall be increased for conversions during the Make-Whole Event Conversion Period shall be determined by reference to the table below, based on the Make-Whole Event Effective Date and the price paid (or deemed to be paid) per share of the Common Stock in the Make-Whole Fundamental Change or on the Redemption Notice Date in the manner set forth in this **Section 5.07** (the "Stock Price"). If the holders of the Common Stock receive in exchange for their Common Stock only cash in a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the Stock Price shall be the cash amount paid per share. In all other cases, the Stock Price shall be the average of the Last Reported Sale Prices of the Common Stock over the five consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Make-Whole Event Effective Date. In the event that a conversion during a Redemption would also be deemed to be in connection with a Make-Whole Fundamental Change, a Holder of the Notes to be converted shall be entitled to a single increase to the Conversion Rate with respect to

- 109 -

the first to occur of the applicable Make-Whole Event Effective Date, and the later event will be deemed not to have occurred for purposes of this **Section 5.07**. The Issuer shall make appropriate adjustments to the Stock Price, in good faith and in a commercially reasonable manner, to account for any adjustment to the Conversion Rate that becomes effective, or any event requiring an adjustment to the Conversion Rate where the Ex-Dividend Date, effective date (as such term is used in **Section 5.05**) or expiration date of the event occurs during such five consecutive Trading Day period.

(D)    The Stock Prices set forth in the column headings of the table below shall be adjusted as of any date on which the Conversion Rate is otherwise adjusted. The adjusted Stock Prices shall equal the Stock Prices applicable immediately prior to such adjustment, multiplied by a fraction, the numerator of which is the Conversion Rate immediately prior to such adjustment giving rise to the Stock Price adjustment and the denominator of which is the Conversion Rate as so adjusted. The number of Additional Shares set forth in the table below shall be adjusted in the same manner and at the same time as the Conversion Rate as set forth in **Section 5.05**.

(E)    The following table sets forth the number of Additional Shares of Common Stock by which the Conversion Rate shall be increased per $1,000 principal amount of Notes pursuant to this **Section 5.07** for each Stock Price and Make-Whole Event Effective Date set forth below:[23]

| Make-Whole Event Effective Date | Stock Price | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

The exact Stock Price and Make-Whole Event Effective Date may not be set forth in the table above, in which case:

(i)    if the Stock Price is between two Stock Prices in the table above or the Make-Whole Event Effective Date is between two Make-Whole Event Effective Dates in the table, the number of Additional Shares by which the Conversion Rate will be increased shall be determined by a straight-line interpolation between the number of Additional Shares set forth for the higher and lower Stock Prices and the earlier and later Make-Whole Event Effective Dates, based on a 365- or 366-day year, as applicable;

(ii)    if the Stock Price is greater than $[●] per share (subject to adjustment in the same manner as the Stock Prices set forth in the column headings of the table above pursuant to **Section 5.07(E)** above), no Additional Shares shall be added to the Conversion Rate; and

---

[23] <u>Note to Draft</u>: To be updated.

(iii)     if the Stock Price is less than $[●] per share (subject to adjustment in the same manner as the Stock Prices set forth in the column headings of the table above pursuant to **Section 5.07(E)** above), no Additional Shares shall be added to the Conversion Rate.

(F)     Notwithstanding the foregoing, in no event shall the Conversion Rate per $1,000 principal amount of Notes exceed [●] shares of Common Stock, subject to adjustment in the same manner as the Conversion Rate pursuant to **Section 5.05**.

(G)     Nothing in this **Section 5.07** shall prevent an adjustment to the Conversion Rate pursuant to **Section 5.05** in respect of a Make-Whole Fundamental Change.

(H)     *Notice of the Occurrence of a Make-Whole Event*.  The Issuer will notify the Holders, the Trustee and the Conversion Agent of each Make-Whole Event (i) occurring pursuant to **clause (A)** of the definition thereof; and (ii) occurring pursuant to **clause (B)** of the definition thereof in accordance with **Section 4.03(G)**.

**Section 5.08.   EXCHANGE IN LIEU OF CONVERSION**.

Notwithstanding anything to the contrary in this **Article 5**, and subject to the terms of this **Section 5.08**, if a Note is submitted for conversion, the Issuer may elect, in lieu of conversion, to transfer such Note to a financial institution designated by the Issuer and arrange to have such financial institution deliver to the Holder of such Note the Conversion Consideration that would have been due upon conversion. To make such election, the Issuer must send notice of such election to the Holder of such Note, the Trustee and the Conversion Agent before the Close of Business on the Business Day immediately following the Conversion Date for such Note. If the Issuer has made such election, then:

(A)     no later than the Business Day immediately following such Conversion Date, the Issuer must deliver (or cause the delivery of) such Note, together with delivery instructions for the Conversion Consideration due upon such conversion (including wire instructions, if applicable), to a financial institution designated by the Issuer that has agreed to deliver such Conversion Consideration in the manner and at the time the Issuer would have had to deliver the same pursuant to this **Article 5**;

(B)     if such Note is a Global Note, then (i) such designated institution will send written confirmation to the Conversion Agent promptly after wiring the cash Conversion Consideration, if any, and delivering any other Conversion Consideration, due upon such conversion to the Holder of such Note; and (ii) the Conversion Agent will as soon as reasonably practicable thereafter contact such Holder's custodian with the Depositary to confirm receipt of the same; and

(C)     such Note will not cease to be outstanding by reason of such exchange in lieu of conversion, subject to the Depositary Procedures;

*provided*, *however*, that if such financial institution does not accept such Note or fails to timely deliver such Conversion Consideration, then the Issuer will be responsible for delivering such Conversion Consideration in the manner and at the time provided in this **Article 5** as if the Issuer had not elected to make an exchange in lieu of conversion. The Issuer, the Holder surrendering

- 111 -

Notes for conversion, the designated institution and the Conversion Agent shall cooperate to cause such Notes to be delivered to the designated institution and the Conversion Agent shall be entitled to conclusively rely upon the Issuer's instruction in connection with effecting any such exchange and shall have no liability for such election to exchange outside of its control.

**Section 5.09.** EFFECT OF COMMON STOCK CHANGE EVENT.

(A)      *Generally*.  If there occurs any:

(i)      recapitalization, reclassification or change of the Common Stock (other than (x) changes solely resulting from a subdivision or combination of the Common Stock, (y) a change only in par value or from par value to no par value or no par value to par value and (z) splits and combinations that do not involve the issuance of any other series or class of securities);

(ii)      consolidation, merger, combination or binding or statutory share exchange involving the Issuer;

(iii)      sale, lease or other transfer of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, to any Person; or

(iv)      other similar event,

and, as a result of which, the Common Stock is converted into, or exchanged for, or represents solely the right to receive, other securities, cash or other property, or any combination of the foregoing (such an event, a "**Common Stock Change Event**," and such other securities, cash or property, the "**Reference Property**," and the amount and kind of Reference Property that a holder of one (1) share of Common Stock would be entitled to receive on account of such Common Stock Change Event (without giving effect to any arrangement not to issue or deliver a fractional portion of any security or other property), a "**Reference Property Unit**"), then the Issuer and the resulting, surviving or transferee person (if not the Issuer) of such Common Stock Change Event (the "**Successor Person**"), and, if applicable as set forth below, the Underlying Issuer, will execute and deliver to the Trustee a supplemental indenture, without the consent of the Holders, providing, notwithstanding anything to the contrary in this Indenture or the Notes, as follows:

(1)      from and after the effective time of such Common Stock Change Event, (I) the Conversion Consideration due upon conversion of any Note, and the conditions to any such conversion, will be determined in the same manner as if each reference to any number of shares of Common Stock in this **Article 5** (or in any related definitions) were instead a reference to the same number of Reference Property Units; (II) for purposes of **Section 4.03**, each reference to any number of shares of Common Stock in such Section (or in any related definitions) will instead be deemed to be a reference to the same number of Reference Property Units; and (III) for purposes of the definition of "Fundamental Change" and "Make-Whole Event," references to Common Stock or to "Common Equity" will be deemed to refer to the common equity (including depositary receipts representing common equity), if any, forming part of such Reference Property;

(2)        if such Reference Property Unit consists entirely of cash, then the Issuer will be deemed to elect Physical Settlement in respect of all conversions whose Conversion Date occurs on or after the effective date of such Common Stock Change Event and will pay the cash due upon such conversions no later than the second (2nd) Business Day after the relevant Conversion Date;

(3)        for these purposes, (I) the Daily VWAP of any Reference Property Unit or portion thereof that consists of a class of common equity securities will be determined by reference to the definition of "Daily VWAP," substituting, if applicable, the Bloomberg page for such class of securities in such definition; and (II) the Daily VWAP of any Reference Property Unit or portion thereof that does not consist of a class of common equity securities, and the Last Reported Sale Price of any Reference Property Unit or portion thereof that does not consist of a class of securities, will be the fair value of such Reference Property Unit or portion thereof, as applicable, determined in good faith by the Issuer (or, in the case of cash denominated in U.S. dollars, the face amount thereof); and

(4)        if such Reference Property includes any shares of Equity Interests, then the Conversion Rate will be subject to subsequent adjustments in a manner consistent with **Section 5.05(A)**.

If the Reference Property consists of more than a single type of consideration to be determined based in part upon any form of stockholder election, then the composition of the Reference Property Unit will be deemed to be the weighted average of the types and amounts of consideration actually received, per share of Common Stock, by the holders of the Common Stock. The Issuer will notify Holders of such weighted average as soon as practicable after such determination is made.

At or before the effective time of such Common Stock Change Event, the Issuer and the Successor Person will execute and deliver to the Trustee a supplemental indenture pursuant to **Section 8.01(F)** as set forth above (which shall provide for anti-dilution and other adjustments that are as nearly equivalent as possible to the adjustments provided for in this **Article 5**). If the Reference Property includes shares of stock or other securities or assets (other than cash) of a Person other than the Issuer or a Successor Person (such person, the "**Underlying Issuer**"), then such Underlying Issuer will also execute such supplemental indenture, and such supplemental indenture shall contain such additional provisions to protect the interests of the Holders as the Issuer reasonably considers necessary by reason of the foregoing, including the provisions providing for the purchase rights set forth in **Section 4.02**.

(B)        *Notice of Common Stock Change Events*.  The Issuer will provide notice of each Common Stock Change Event to Holders, the Trustee and the Conversion Agent no later than the effective date of such Common Stock Change Event.

(C)        *Compliance Covenant*.  The Issuer will not become a party to any Common Stock Change Event unless its terms are consistent with this **Section 5.09**.

(D)     *The above provisions of this **Section 5.09** shall similarly apply to successive Common Stock Change Events*.

**Section 5.10.   [Reserved][Beneficial Ownership limitations].**[24]

(A)     [Notwithstanding anything to the contrary in this Indenture, no Holder will be entitled to receive shares of Common Stock upon conversion of Notes and no conversion of Notes shall take place to the extent (but only to the extent) that such receipt (or conversion) would cause such Holder and its Affiliates to beneficially own shares in excess of the Beneficial Ownership Limitations. For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its Affiliates shall include the number of shares of Common Stock issuable upon conversion of any Notes with respect to which such determination is being made, but shall exclude the number of shares of Common Stock which are issuable upon (i) conversion of the remaining, unconverted principal amount of Notes beneficially owned by the Holder and its Affiliates and (ii) exercise or conversion of the unexercised or unconverted portion of any other securities of the Issuer subject to a limitation on conversion or exercise analogous to the limitation contained herein (including, without limitation, any other Notes) beneficially owned by the Holder and its Affiliates. Except as set forth in the preceding sentence, for purposes of this provision, beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. Any purported delivery of shares of Common Stock upon conversion of the Notes shall be void and have no effect to the extent (but only to the extent) that such delivery would result in the converting Holder violating the Beneficial Ownership Limitations. Solely for the purpose of this **Section 5.10**, in the case of Global Notes, "Holder" shall mean a person that holds a beneficial interest in the Notes and not the Depositary or its nominee.

(B)     To the extent that the limitation contained in this **Section 5.10** applies, the determination of whether any Notes are convertible (in relation to other securities beneficially owned by the Holder) and of which principal amount of such Notes are convertible shall be in the sole discretion of the Holder, and the submission of a conversion notice shall be deemed to be the Holder's determination of whether any Notes may be converted (in relation to other securities beneficially owned by the Holder) and which principal amount such Notes are convertible, in each case subject to the Beneficial Ownership Limitations. To ensure compliance with this restriction, the Holder shall be deemed to represent to the Issuer, the Trustee and the Conversion Agent each time it delivers a conversion notice that such conversion notice has not violated the restrictions set forth in this **Section 5.10**, and none of the Issuer, the Trustee nor the Conversion Agent shall have any obligation to verify or confirm the accuracy of such determination. In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder.

(C)     For purposes of this **Section 5.10**, in determining the number of outstanding shares of Common Stock, the Holder may rely on the number of outstanding shares of Common Stock as stated in the most recent of the following: (i) the Issuer's most recent periodic or annual report filed with the SEC, as the case may be, (ii) a more recent public announcement by the Issuer, or

---

[24] Note to Draft: Not applicable to New Renesas 2L Takeback Convertible Notes

(iii) a more recent written notice by the Issuer or the Issuer's transfer agent to such Holder setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of a Holder, the Issuer shall within two (2) Trading Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Issuer, including the Notes, by the Holder since the date as of which such number of outstanding shares of Common Stock was reported.

(D)     The "General Beneficial Ownership Limitation" shall be [9.9]% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon conversion of any Notes held by the Holder. The Holder, upon not less than sixty-one (61) days' prior written notice to the Issuer, may elect a beneficial ownership limit as to such Holder (but not as to any other Holder) (such limit, a "Holder Beneficial Ownership Limitation" and together with the General Beneficial Ownership Limitation, the "Beneficial Ownership Limitations") that is less than or equal to the General Beneficial Ownership Limitation then applicable to the Holders. Any Holder Beneficial Ownership Limitation will be effective as of (i) the issue date for the Notes, for any notice delivered prior to the issuance of such Notes, and (ii) the sixty-first (61st) day after such notice is delivered to the Issuer in all other cases.

(E)     Any Notes surrendered for conversion for which shares of Common Stock are not delivered due to the Beneficial Ownership Limitations shall not be extinguished and, such Holder may either:

(F)     request return of the Notes surrendered by such Holder for conversion, after which the Issuer shall deliver such Notes to such Holder within two (2) Trading Days after receipt of such request; or

(G)     certify to the Issuer that the person (or persons) receiving shares of Common Stock upon conversion is not, and would not, as a result of such conversion, become the beneficial owner of shares of Common Stock outstanding at such time in excess of the applicable Beneficial Ownership Limitations, after which the Issuer shall deliver any such shares of Common Stock withheld on account of such applicable Beneficial Ownership Limitations by the later of (x) the date such shares were otherwise due to such person (or persons) and (y) two (2) Trading Days after receipt of such certification; provided, however, until such time as the affected Holder gives such notice, no person shall be deemed to be the stockholder of record with respect to the shares of Common Stock otherwise deliverable upon conversion in excess of any applicable Beneficial Ownership Limitations. Upon delivery of such notice, the provisions under **Section 5.03** shall apply to the shares of Common Stock to be delivered pursuant to such notice.

(H)     Under no circumstances shall the Trustee or the Conversion Agent have any obligation to identify any beneficial owner of Common Stock, or otherwise make any determination, monitor or otherwise take any action with respect to the limitations set forth in this **Section 5.10**.]

**Section 5.11.  RESPONSIBILITY OF TRUSTEE AND CONVERSION AGENT.**

The Trustee and the Conversion Agent shall not at any time be under any duty or responsibility to any Holder to determine the Conversion Rate (or any adjustment thereto) or whether any facts exist that may require any adjustment (including any increase) of the Conversion Rate, or with respect to the nature or extent or calculation of any such adjustment when made, or with respect to the method employed, or in the Indenture or in any supplemental indenture provided to be employed, in making the same. The Trustee and the Conversion Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock, monitoring the Issuer's stock trading price or of any securities, property or cash that may at any time be issued or delivered upon the conversion of any Note; and the Trustee and the Conversion Agent make no representations with respect thereto. Neither the Trustee nor the Conversion Agent shall be responsible for any failure of the Issuer to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or cash upon the surrender of any Note for the purpose of conversion or to comply with any of the duties, responsibilities or covenants of the Issuer contained in this **Article 5**. Without limiting the generality of the foregoing, neither the Trustee nor the Conversion Agent shall be under any responsibility to (a) determine whether a supplemental indenture needs to be entered into or (b) determine the correctness of any provisions contained in any supplemental indenture entered into pursuant to **Section 5.09** relating either to the kind or amount of shares of stock or securities or property (including cash) receivable by Holders upon the conversion of their Notes after any event referred to in such **Section 5.09** or to any adjustment to be made with respect thereto, but, subject to the provisions of **Section 13.02** of the Indenture, may accept (without any independent investigation) as conclusive evidence of the correctness of any such provisions, and shall be protected in conclusively relying upon, the Officer's Certificate (which the Issuer shall be obligated to deliver to the Trustee and the Conversion Agent prior to the execution of any such supplemental indenture) with respect thereto. Neither the Trustee nor the Conversion Agent shall be responsible for determining whether any event contemplated by this **Article 5** has occurred that makes the Notes eligible for conversion or no longer eligible therefor until the Issuer has delivered to the Trustee and the Conversion Agent the notices referred to in this **Article 5** with respect to the commencement or termination of such conversion rights, on which notices the Trustee and the Conversion Agent may conclusively rely.

**Section 5.12.  [REGULATORY APPROVALS].**

[Until the Renesas Base Distribution Date (as defined in the Bankruptcy Plan), Renesas will not be entitled to receive shares of Common Stock upon conversion of Notes and no conversion of Notes held by Renesas shall take place. Instead, for the avoidance of doubt and pursuant to the Registration Rights Agreement and the Investor Rights Agreement, upon the Issue Date and until the Renesas Base Distribution Date, the Issuer shall grant Renesas the right to receive the cash proceeds from a primary registered offering or sales under the ELOC/ATM of shares of Common Stock in lieu of shares of Common Stock issuable upon conversion of the Notes by Renesas under this Indenture and as a result thereof, the principal amount of Notes to be issued

hereunder to Renesas shall be reduced by the applicable amounts that are deemed to have been converted.][25]

## Article 6.    SUCCESSORS

**Section 6.01.  WHEN THE ISSUER AND SUBSIDIARY GUARANTORS MAY MERGE, ETC.**

(A)    *Generally*.  The Issuer will not consolidate with, merge with or into, dissolve or liquidate voluntarily into, or (directly, or indirectly through one or more of its Subsidiaries) sell, lease or otherwise Dispose, in one transaction or a series of transactions, all or substantially all of the consolidated assets of the Issuer and its Subsidiaries, taken as a whole, to another Person (a "**Issuer Business Combination Event**"), unless:

(i)    the resulting, surviving or transferee Person either (x) is the Issuer or (y) if not the Issuer, is a Qualified Successor Entity (such Qualified Successor Entity, the "**Successor Entity**") duly organized and existing under the laws of the United States of America, any State thereof or the District of Columbia that expressly assumes (by executing and delivering to the Trustee and the Collateral Agent, at or before the effective time of such Issuer Business Combination Event, a supplemental indenture pursuant to **Section 8.01(E)**) and any other amendments to the Security Documents all of the Issuer's obligations under this Indenture, the Security Documents to which the Issuer is a party, and the Notes;

(ii)    immediately after giving effect to such Issuer Business Combination Event, no Default or Event of Default will have occurred and be continuing; and

(iii)    before the effective time of any Issuer Business Combination Event, the Issuer will deliver to the Trustee an Officer's Certificate and Opinion of Counsel, each stating that (i) such Issuer Business Combination Event (and, if applicable, the related supplemental indenture) comply with **Section 6.01(A)**; and (ii) all conditions precedent to such Issuer Business Combination Event provided in this Indenture have been satisfied.

(B)    *Subsidiary Guarantors*.  Unless otherwise permitted pursuant to this Indenture (including **Section 12.04**), the Issuer shall not permit any Subsidiary Guarantor to consolidate with or merge with or into, dissolve or liquidate voluntarily into, or (directly, or indirectly through one or more of its Subsidiaries) sell, lease or otherwise Dispose, in one transaction or a series of transactions, all or substantially all of the consolidated assets (other than to the Issuer or another Subsidiary Guarantor) (a "**Guarantor Business Combination Event**" together with a Issuer Business Combination Event, a "**Business Combination Event**") unless:

(i)    the resulting, surviving or transferee Person (the "**Successor Guarantor**") either (x) is the Subsidiary Guarantor or (y) if not the Subsidiary Guarantor, is an entity that expressly assumes (by executing and delivering to the Trustee and the Collateral Agent, at or before the effective time of such Guarantor Business Combination Event, a

_____

[25] Note to Draft: Subject to update based on status of regulatory process.

- 117 -

supplemental indenture pursuant to **Section 8.01(B)**) and any other amendments to the Security Documents all of such Subsidiary Guarantor's obligations under this Indenture, the Security Documents to which it is a party, the Notes and its Guarantee;

(ii)     immediately after giving effect to such Guarantor Business Combination Event, no Default or Event of Default will have occurred and be continuing; and

(iii)     before the effective time of any Guarantor Business Combination Event, the Issuer and the Subsidiary Guarantor, as applicable, will deliver to the Trustee an Officer's Certificate and Opinion of Counsel, each stating that (i) such Guarantor Business Combination Event (and, if applicable, the related supplemental indenture) comply with **Section 6.01(B)**; and (ii) all conditions precedent to such Guarantor Business Combination Event provided in this Indenture have been satisfied.

(C)     For purposes of this **Section 6.01**, the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of one or more Subsidiaries of the Issuer to another Person, which properties and assets, if held by the Issuer instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Issuer on a consolidated basis, shall be deemed to be the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of the Issuer to another Person. Notwithstanding the foregoing, this **Article 6** shall not apply to any sale, conveyance, transfer or lease of assets between or among the Issuer and its Wholly Owned Subsidiaries and, in such an event, the Issuer shall not be discharged from its obligations under this Indenture, the Security Documents to which the Issuer is a party, and the Notes.

**Section 6.02.   SUCCESSOR ENTITY SUBSTITUTED**.

At the effective time of any Business Combination Event that complies with **Section 6.01**, the Successor Entity (if not the Issuer) or the Successor Guarantor (if not the applicable Subsidiary Guarantor), as the case may be, will succeed to, and may exercise every right and power of, the Issuer or the Subsidiary Guarantor, as the case may be, under this Indenture, the Security Documents, the Notes and/or Guarantee, as is applicable, with the same effect as if such Successor Entity or Successor Guarantor, as the case may be, had been named as the Issuer or Subsidiary Guarantor, as the case may be, in this Indenture, the Security Documents, the Notes and such Guarantee; *provided that* in the case of a lease, the predecessor Issuer will be discharged from its obligations under this Indenture and the Notes.

## Article 7.     DEFAULTS AND REMEDIES

**Section 7.01.   EVENTS OF DEFAULT**.

(A)     *Definition of Events of Default*.   "**Event of Default**" means the occurrence of any of the following:

(i)     a default in the payment when due (whether at maturity, upon Redemption or Repurchase Upon Fundamental Change or otherwise) of the principal of, or the Redemption Price or Fundamental Change Repurchase Price for, any Note;

(ii)     a default in the payment when due of interest on any Note, which default continues for thirty (30) consecutive days;

(iii)     the Issuer's failure to deliver, when required by this Indenture, a Fundamental Change Notice, and such failure is not cured within five (5) Business Days after its occurrence;

(iv)     [Reserved];

(v)     a default in the Issuer's obligation to convert a Note in accordance with **Article 5** upon the exercise of the conversion right with respect thereto, if such default is not cured within five (5) Business Days after its occurrence;

(vi)     a default in any Note Party's obligations under **Article 6**;

(vii)     [Reserved];

(viii)     a default in any of the Note Parties' obligations or agreements under the Note Documents (other than a default set forth in **clause (i), (ii), (iii), (iv), (v)** or **(vi)** of this **Section 7.01(A)**) where such default is not cured or waived within thirty (30) days after notice to the Issuer by the Trustee, or to the Issuer and the Trustee by Holders of at least twenty five percent (25%) of the aggregate principal amount of Notes then outstanding, which notice must specify such default, demand that it be remedied and state that such notice is a "Notice of Default," *provided* that any issuance of Common Stock as a result of which any Holder beneficially owns or would beneficially own a number of shares of Common Stock in excess of the [Beneficial Ownership Limitations][limitations set forth in the Investor Rights Agreement] shall not constitute a Default or an Event of Default;

(ix)     a default by an Note Party or any of its Significant Subsidiaries with respect to indebtedness for money borrowed (whether pursuant to one or more agreements or other instruments) of greater than [●] dollars ($[●],000,000) (or its foreign currency equivalent) in the aggregate of an Note Party or any of its Significant Subsidiaries, whether such indebtedness exists as of the Issue Date or is thereafter created, either: (x) resulting in such indebtedness becoming or being declared due and payable prior to its stated maturity, or (y) constituting a failure to pay the principal of any such indebtedness when due and payable (after the expiration of all applicable grace periods) at its stated maturity, upon required repurchase, upon declaration or otherwise, and, in the case of either **clause (x)** or **(y)**, such acceleration is not, after the expiration of any applicable grace period, rescinded or annulled or such indebtedness is not paid or discharged, as the case may be, within thirty (30) days after notice to the Issuer by the Trustee or to the Issuer and the Trustee by Holders of at least twenty five percent (25%) of the aggregate principal amount of Notes then outstanding in accordance with this Indenture;

(x)     one or more final judgments being rendered against an Note Party or any of its Subsidiaries for the payment of at least [●] dollars ($[●],000,000) (or its foreign currency equivalent) in the aggregate (excluding any amounts covered by insurance), where such judgment is not discharged or stayed within sixty (60) days after (i) the date on

which the right to appeal the same has expired, if no such appeal has commenced; or (ii) the date on which all rights to appeal have been extinguished;

(xi)   a Note Party or any of its Significant Subsidiaries, pursuant to or within the meaning of any Bankruptcy Law, either:

(1)   commences a voluntary case or proceeding;

(2)   consents to the entry of an order for relief against it in an involuntary case or proceeding;

(3)   consents to the appointment of a custodian of it or for any substantial part of its property (other than that arises from any solvent liquidation or restructuring of a Significant Subsidiary in the ordinary course of business that shall result in the net assets of such Significant Subsidiary being transferred to or otherwise vested in such Note Party or any of its other subsidiaries on a pro rata basis or on a basis more favorable to such Note Party);

(4)   makes a general assignment for the benefit of its creditors;

(5)   takes any comparable action under any foreign Bankruptcy Law; or

(6)   generally is not paying its debts as they become due;

(xii)   a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that either:

(1)   is for relief against a Note Party or any of its Significant Subsidiaries in an involuntary case or proceeding;

(2)   appoints a custodian of a Note Party or any of its Significant Subsidiaries, or for any substantial part of the property of a Note Party or any of its Significant Subsidiaries;

(3)   orders the winding up or liquidation of a Note Party or any of its Significant Subsidiaries; or

(4)   grants any similar relief under any foreign Bankruptcy Law,

(5)   and, in each case under this **Section 7.01(A)(xii)**, such order or decree remains unstayed and in effect for at least sixty (60) days;

(xiii)   if the obligation of any Subsidiary Guarantor under its Guarantee or any other Note Document to which any Subsidiary Guarantor is a party is limited or terminated by operation of law or by such Subsidiary Guarantor (other than, in each case, in accordance with the terms of this Indenture or such other Note Documents), or if any Subsidiary Guarantor fails to perform any obligation under its Guarantee or under any such Note Document, or repudiates or revokes or purports to repudiate or revoke in writing any

- 120 -

obligation under its Guarantee, or under any such Note Document, or any Subsidiary Guarantor ceases to exist for any reason (other than as permitted or not prohibited by this Indenture); or

(xiv)   any security interest and Liens purported to be created by any Security Document on any of the Collateral intended to be covered thereby having a fair market value in excess of $25,000,000 (unless perfection is not required by this Indenture or the Security Documents) shall cease to be in full force and effect or shall cease to give the Collateral Agent, for the benefit of the [Secured Parties], the Liens, rights, powers and privileges purported to be created and granted under such Security Documents (including a valid and perfected security interest in and Lien on all of the Collateral thereunder in favor of the Collateral Agent with the priority required by the Security Documents) with respect to any of the Collateral intended to be covered thereby having a fair market value in excess of $25,000,000 (unless perfection is not required by this Indenture or the Security Documents), or shall be asserted by or on behalf of any Note Party not to be a valid and perfected security interest in or Lien on the Collateral covered thereby (in each case, except (i) the failure of the Collateral Agent to maintain possession of possessory Collateral received by it, which failure is not a direct result of any act, omission, advice or direction of any Note Party, (ii) in connection with a transaction expressly permitted under the Note Documents, in each case solely to the extent such termination or release is permitted under the Note Documents or (iii) as a result of the satisfaction and discharge of this Indenture in accordance **Article 9**).

(B)     *Cause Irrelevant*.  Each of the events set forth in **Section 7.01(A)** will constitute an Event of Default regardless of the cause thereof or whether voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

## Section 7.02.  ACCELERATION.

(A)     *Automatic Acceleration in Certain Circumstances*.  If an Event of Default set forth in **Section 7.01(A)(xi)** or **7.01(A)(xii)** occurs with respect to the Issuer (and not solely with respect to a Significant Subsidiary of the Issuer), then the principal amount of, and all accrued and unpaid interest on, all of the Notes then outstanding will immediately become due and payable without any further action or notice by any Person.

(B)     *Optional Acceleration*.  Subject to **Section 7.03**, if an Event of Default (other than an Event of Default set forth in **Section 7.01(A)(xi)** or **7.01(A)(xii)** with respect to the Issuer and not solely with respect to a Significant Subsidiary of the Issuer) occurs and is continuing, then the Trustee, by notice to the Issuer, or Holders of at least twenty five percent (25%) of the aggregate principal amount of Notes then outstanding, by notice to the Issuer, the Trustee and the Collateral Agent, may declare the principal amount of, and all accrued and unpaid interest on, all of the Notes then outstanding (subject to the Trustee and the Collateral Agent being indemnified and/or secured and/or pre-funded to its satisfaction) to become due and payable immediately. For the avoidance of doubt, if such Event of Default is not continuing at the time such notice is provided (that is, such Event of Default has been cured or waived as of such time), then such notice will not be effective to cause such amounts to become due and payable immediately.

(C)     *Rescission of Acceleration*.   Notwithstanding anything to the contrary in this Indenture or the Notes, the Majority Holders, by notice to the Issuer and the Trustee, may, on behalf of all Holders, rescind any acceleration of the Notes and its consequences if (i) such rescission would not conflict with any judgment or decree of a court of competent jurisdiction; (ii) all existing Events of Default (except the non-payment of principal of, or interest on, the Notes that has become due solely because of such acceleration) have been cured or waived; and (iii) all sums paid or advanced by the Trustee under this Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee and the Collateral Agent and their agents and counsel have been paid. No such rescission will affect any subsequent Default or impair any right consequent thereto.

**Section 7.03.   SOLE REMEDY FOR A FAILURE TO REPORT.**

(A)     Notwithstanding anything in this Indenture or in the Notes to the contrary, to the extent the Issuer elects, the sole remedy for an Event of Default relating to the Issuer's failure to comply with its obligations as set forth in **Section 3.03(A)** shall, for the first 180 days after the occurrence of such an Event of Default, consist exclusively of the right to receive Special Interest on the Notes at a rate equal to 0.25% per annum of the principal amount of the Notes outstanding for the first 90 days during which such Event of Default is continuing, beginning on, and including, the date on which such an Event of Default first occurs and 0.50% per annum of the principal amount of the Notes outstanding for each day during the next 90 day period during which such Event of Default is continuing. In no event shall the rate of any such Special Interest payable under this **Section 7.03** exceed a total rate of 0.50% per annum on any Note, regardless of the number of events or circumstances giving rise to the requirement to pay such Special Interest. If the Issuer so elects, such Special Interest shall be payable in the same manner and on the same dates as the stated interest payable on the Notes. On the 181st day after such Event of Default (if the Event of Default relating to the Issuer's failure to file is not cured or waived prior to such 181st day), the Notes shall be immediately subject to acceleration as provided in **Section 7.02**. The provisions of this **Section 7.03** will not affect the rights of Holders of Notes in the event of the occurrence of any Event of Default other than the Issuer's failure to comply with its obligations as set forth in **Section 3.03(A)**. In the event the Issuer does not elect to pay Special Interest following an Event of Default in accordance with this **Section 7.03** or the Issuer elected to make such payment but does not pay the Special Interest when due, the Notes shall be immediately subject to acceleration as provided in **Section 7.02**.

(B)     In order to elect to pay Special Interest as the sole remedy during the first 180 days after the occurrence of any Event of Default described in the immediately preceding paragraph, the Issuer must notify all Holders of the Notes and the Trustee of such election prior to the beginning of such 180-day period. Upon the failure to timely give such notice, the Notes shall be immediately subject to acceleration as provided in **Section 7.02**.

(C)     If Special Interest accrues on any Note, then, no later than five (5) Business Days before each date on which such Special Interest is to be paid, the Issuer will deliver an Officer's Certificate to the Trustee and the Paying Agent stating (i) that the Issuer is obligated to pay Special Interest on such Note on such date of payment; and (ii) the amount of Special Interest that is payable on such date of payment. The Trustee and the Paying Agent shall have no duty to determine whether any Special Interest is payable or the amount thereof.

**Section 7.04.   OTHER REMEDIES.**

(A)     *Trustee May Pursue All Remedies*.  If an Event of Default occurs and is continuing, then the Trustee may pursue any available remedy to collect the payment of any amounts due with respect to the Notes or to enforce the performance of any provision of this Indenture or the Notes.

(B)     *Procedural Matters*.  The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in such proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy following an Event of Default will not impair the right or remedy or constitute a waiver of, or acquiescence in, such Event of Default. All powers and remedies given by this **Article 7** to the Trustee or to the Holders shall, to the extent permitted by law, be cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the Holders, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture.

**Section 7.05.   WAIVER OF PAST DEFAULTS.**

A Default that is (or, after notice, passage of time or both, would be) an Event of Default pursuant to **clause (i), (ii), (v)** or **(viii)** of **Section 7.01(A)** (that, in the case of **clause (viii)** only, results from a Default under any covenant that cannot be amended without the consent of each affected Holder), can be waived only with the consent of each affected Holder. Each other Default or Event of Default may be waived, on behalf of all Holders, by the Majority Holders. If an Event of Default is so waived, then it will cease to exist. If a Default is so waived, then it will be deemed to be cured and any Event of Default arising therefrom will be deemed not to occur. However, no such waiver will extend to any subsequent or other Default or Event of Default or impair any right arising therefrom.

**Section 7.06.   [RESERVED].**

**Section 7.07.   CONTROL BY MAJORITY.**

Majority Holders may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or the Collateral Agent or exercising any trust or power conferred on it under this Indenture. However, the Trustee or the Collateral Agent may refuse to follow any direction that conflicts with law, this Indenture or the Notes, or that, subject to **Section 10.01**, the Trustee or the Collateral Agent determines may be unduly prejudicial to the rights of other Holders (provided, however, that neither the Trustee nor the Collateral Agent shall have any affirmative duty to ascertain whether or not any such direction would prejudice any Holder) or may involve the Trustee or the Collateral Agent in liability, unless the Trustee or the Collateral Agent is offered security and indemnity satisfactory to the Trustee or the Collateral Agent against any loss, liability or expense to the Trustee or the Collateral Agent that may result from the Trustee's or the Collateral Agent's following such direction.

**Section 7.08.   LIMITATION ON SUITS.**

No Holder may pursue any remedy with respect to this Indenture or the Notes (except to enforce (x) its rights to receive the principal of, or the Redemption Price or Fundamental Change

Repurchase Price for, or interest on, any Notes; or (y) the Issuer's obligations to convert any Notes pursuant to **Article 5**), unless:

(A)      such Holder has previously delivered to the Trustee notice that an Event of Default is continuing;

(B)      Holders of at least twenty five percent (25%) in aggregate principal amount of the Notes then outstanding deliver a request to the Trustee to pursue such remedy;

(C)      such Holder or Holders offer and, if requested, provide to the Trustee security and indemnity satisfactory to the Trustee against any loss, liability or expense to the Trustee that may result from the Trustee's following such request;

(D)      the Trustee does not comply with such request within sixty (60) calendar days after its receipt of such request and such offer of security or indemnity; and

(E)      during such sixty (60) calendar day period, the Majority Holders do not deliver to the Trustee a direction that is inconsistent with such request.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder. The Trustee will have no duty to determine whether any Holder's use of this Indenture complies with the preceding sentence.

**Section 7.09.   ABSOLUTE RIGHT OF HOLDERS TO INSTITUTE SUIT FOR THE ENFORCEMENT OF THE RIGHT TO RECEIVE PAYMENT AND CONVERSION.**

Notwithstanding anything to the contrary in this Indenture or the Notes (but without limiting **Section 8.01**), the right of each Holder of a Note to bring suit for the enforcement of any payment or delivery, as applicable, of the principal of, or the Redemption Price or Fundamental Change Repurchase Price for, or any interest on, or the Conversion Consideration due pursuant to **Article 5** upon conversion of, such Note on or after the respective due dates therefor provided in this Indenture and the Notes, will not be impaired or affected without the consent of such Holder.

**Section 7.10.   COLLECTION BY TRUSTEE.**

The Trustee will have the right, upon the occurrence and continuance of an Event of Default pursuant to **clause (i), (ii)** or **(v)** of **Section 7.01(A)**, to recover judgment in its own name and as trustee of an express trust against the Issuer for the total unpaid or undelivered principal of, or Redemption Price or Fundamental Change Repurchase Price for, or interest on, or Conversion Consideration due pursuant to **Article 5** upon conversion of, the Notes, as applicable, and, to the extent lawful, any Default Interest on any Defaulted Amounts, and such further amounts sufficient to cover the costs and expenses of collection, including compensation provided for in **Section 10.06**.

**Section 7.11.   PREFERENTIAL COLLECTION OF CLAIMS AGAINST ISSUER.**

If and when the Trustee shall be or become a creditor of the Issuer (or any other obligor upon the Notes), the Trustee shall be subject to §311(a) of the Trust Indenture Act (excluding any

creditor relationship listed in §311(b) of the Trust Indenture Act) regarding the collection of claims against the Issuer (or any such other obligor).

**Section 7.12.   TRUSTEE MAY FILE PROOFS OF CLAIM**.

The Trustee has the right to (A) file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders allowed in any judicial proceedings relative to the Issuer (or any other obligor upon the Notes) or its creditors or property and (B) collect, receive and distribute any money or other property payable or deliverable on any such claims. Each Holder authorizes any custodian in such proceeding to make such payments to the Trustee, and, if the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to the Trustee for the reasonable compensation, expenses, disbursements and advances of the Trustee, and its agents and counsel, and any other amounts payable to the Trustee pursuant to **Section 10.06**. To the extent that the payment of any such compensation, expenses, disbursements, advances and other amounts out of the estate in such proceeding, is denied for any reason, payment of the same will be secured by a lien on, and will be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding (whether in liquidation or under any plan of reorganization or arrangement or otherwise). Nothing in this Indenture will be deemed to authorize the Trustee to authorize, consent to, accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

**Section 7.13.   [RESERVED]**.

**Section 7.14.   SUMS RECEIVED BY DEBTORS AND THIRD-PARTY SECURITY PROVIDERS**.

Without prejudice to **Section 7.11**, if the Issuer or any Subsidiary Guarantor receives or recovers any sum which, under the terms of any of the Note Documents, should have been paid to the Collateral Agent, the Issuer or that Subsidiary Guarantor will:

(a)   hold an amount of that receipt or recovery equal to the relevant Obligations (or, if less, the amount received or recovered) on trust for (or otherwise on behalf and for the account of) the Collateral Agent and promptly pay that amount to the Collateral Agent (or as the Collateral Agent may direct) for application in accordance with the terms of this Indenture; and

(b)   promptly pay an amount equal to the amount (if any) by which the receipt or recovery exceeds the relevant Obligations to the Collateral Agent (or as the Collateral Agent may direct) for application in accordance with the terms of this Indenture.

**Section 7.15.   PRIORITIES**.

Subject to the terms of the Intercreditor Agreements, the Collateral Agent and Trustee (acting in any capacity) will pay or deliver in the following order any money or other property that it collects pursuant to this **Article 7**:

*First*:    to the Collateral Agent and Trustee (acting in any capacity) and their respective agents and attorneys for amounts due under this Indenture or any other Note Documents, including payment of all fees and expenses (including any reasonably incurred and documented fees and expenses of legal counsel; *provided* that there shall not be more than one counsel in each relevant jurisdiction, and, to the extent necessary, special counsel), compensation, expenses and liabilities incurred, and all advances made, by the Trustee or the Collateral Agent and the costs and expenses of collection;

*Second*:    in case the principal of the outstanding Notes shall not have become due and be unpaid, to the payment of interest on, and any cash due upon conversion of, the Notes in default in the order of the date due of the payments of such interest and cash due upon conversion, as the case may be, with interest (to the extent that such interest has been collected by the Trustee) upon such overdue payments at the rate borne by the Notes at such time, such payments to be made ratably to the Persons entitled thereto;

*Third*:    in case the principal of the outstanding Notes shall have become due, by declaration or otherwise, and be unpaid to the payment of the whole amount (including, if applicable, the payment of Fundamental Change Repurchase Price and any cash due upon conversion) then owing and unpaid upon the Notes for principal and interest, if any, with interest on the overdue principal and, to the extent that such interest has been collected by the Trustee, upon overdue installments of interest at the rate borne by the Notes at such time, and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Notes, then to the payment of such principal (including, if applicable, the Fundamental Change Repurchase Price and any cash due upon conversion) and interest without preference or priority of principal over interest, or of interest over principal or of any installment of interest over any other installment of interest, or of any Note over any other Note, ratably to the aggregate of such principal (including, if applicable, the Fundamental Change Repurchase Price and any cash due upon conversion) and accrued and unpaid interest; and

*Fourth*:    the payment of the remainder, if any, to the Issuer (or to the extent the Trustee collects any amount for any Subsidiary Guarantor, to such Subsidiary Guarantor), or such other Person as a court of competent jurisdiction may direct.

The Trustee (acting in any capacity) may fix a record date and payment date for any payment or delivery to the Holders pursuant to this **Section 7.15**, in which case the Trustee will instruct the Issuer to, and the Issuer will, deliver, at least fifteen (15) calendar days before such record date, to each Holder and the Trustee a notice stating such record date, such payment date and the amount of such payment or nature of such delivery, as applicable.

- 126 -

**Section 7.16.   UNDERTAKING FOR COSTS**.

In any suit for the enforcement of any right or remedy under this Indenture or the Notes or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court, in its discretion, may (A) require the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and (B) assess reasonable costs (including reasonable attorneys' fees) against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided*, *however*, that this **Section 7.16** does not apply to any suit by the Trustee, any suit by a Holder pursuant to **Section 7.09**, any suit by one or more Holders of more than ten percent (10%) in aggregate principal amount of the Notes then outstanding, or any suit by any Holder for the enforcement of the payment of the principal of or interest on any Note, on or after the respective due dates expressed in such Note.

**Section 7.17.   COLLATERAL AGENT EXPENSE REIMBURSEMENT**.

The Note Parties, jointly and severally, agree to reimburse or pay the Trustee or Collateral Agent for its fees, expenses and indemnities incurred under this Indenture or the Note Documents (including all reasonably incurred and documented fees and disbursements of legal counsel; *provided* that there shall not be more than one counsel in each relevant jurisdiction and, to the extent necessary, special counsel) that may be paid or incurred by the Trustee or Collateral Agent in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations or Guaranteed Obligations and/or enforcing any rights with respect to, or collecting against, the Note Parties under this Indenture or the Security Documents.

## Article 8.      AMENDMENTS, SUPPLEMENTS AND WAIVERS

**Section 8.01.   WITHOUT THE CONSENT OF HOLDERS**.

Notwithstanding anything to the contrary in **Section 8.02**, the Issuer, the Trustee and, if required, the Collateral Agent may amend or supplement the Note Documents [(other than the Investor Rights Agreement)] without the consent of any Holder to:

(A)      cure any ambiguity or correct any omission, defect or inconsistency in any Note Document;

(B)      add guarantees or security with respect to the Issuer's obligations under this Indenture or the Notes, including for greater certainty, to allow any additional Subsidiary Guarantor to execute a supplemental indenture, a joinder to any Security Document and/or a Guarantee with respect to the Notes;

(C)      add to the Issuer's covenants or Events of Default for the benefit of the Holders or surrender any right or power conferred on the Issuer;

(D)      provide for the assumption of the Issuer's or any Subsidiary Guarantor's obligations under this Indenture, the Notes and the Security Document, as applicable, pursuant to, and in compliance with, **Article 6**;

- 127 -

(E)      enter into supplemental indentures pursuant to, and in accordance with, **Section 5.09** in connection with a Common Stock Change Event;

(F)      irrevocably elect or eliminate any Settlement Method or Specified Dollar Amount; provided, however, that no such election or elimination will affect any Settlement Method theretofore elected (or deemed to be elected) with respect to any Note pursuant to **Section 5.03(A)**;

(G)      adjust the Conversion Rate or the Conversion Price (including the establishment of the Conversion Rate or the Conversion Price ) in accordance with, and subject to the terms of, this Indenture;

(H)      evidence or provide for the acceptance of the appointment, under this Indenture, of a successor Trustee or Collateral Agent;

(I)      effect such amendment, restatement, supplement, modification, waiver or consent in respect of the First-Priority Debt Documents that shall apply automatically to the Note Documents without the consent of any Holder in accordance with the Intercreditor Agreements;

(J)      provide for the entry into an Additional Intercreditor Agreement pursuant to, and in compliance with, **Section 14.02**;

(K)      comply with the rules of any applicable Depositary in a manner that does not adversely affect the rights of the Holders;

(L)      comply with any requirement of the SEC in connection with any qualification of this Indenture or any supplemental indenture under the Trust Indenture Act, as then in effect;

(M)      make any other change to the Note Documents that does not, individually or in the aggregate with all other such changes, adversely affect the rights of the Holders, as such, in any material respect as determined by the Issuer in good faith;

(N)      effect, confirm and evidence the release, termination or discharge or any guarantee of or Lien securing the Notes when such release, termination or discharge is permitted by the Note Documents;

(O)      provide for or confirm the issuance of Additional Notes pursuant to the terms of **Section 2.03(B)**;

(P)      to make any amendment to the provisions of this Indenture relating to the transfer and legending of Notes as permitted by this Indenture, including to facilitate the issuance and administration of the Notes; provided, however, that compliance with this Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law;

(Q)      mortgage, pledge, hypothecate or grant any other Lien in favor of the Trustee or the Collateral Agent for the benefit of the Holders, as additional security for the payment and performance of all or any portion of the Obligations, in any property or assets (whether or not constituting Collateral), including any which are required to be mortgaged, pledged or

hypothecated, or in which a Lien is required to be granted to or for the benefit of the Trustee or the Collateral Agent pursuant to this Indenture, any of the Security Documents or otherwise;

(R)     to add additional junior priority Secured Parties to any Security Documents, to the extent permitted to be so secured by this Indenture;

(S)     to enter into any intercreditor agreement having substantially similar terms with respect to the Holders as those set forth in the First-Lien/Second-Lien Intercreditor Agreement, taken as a whole, or any joinder thereto in connection with the incurrence of any Obligations permitted to be incurred pursuant to the provisions of this Indenture;

(T)     in the case of any Security Document, to include therein any legend required to be set forth therein pursuant to the First-Lien/Second-Lien Intercreditor Agreement or to modify any such legend as required by the First-Lien/Second-Lien Intercreditor Agreement; or

(U)     to provide for the succession of any parties to the Security Documents (and other amendments that are administrative or ministerial in nature) in connection with an amendment, renewal, extension, substitution, refinancing, restructuring, replacement, supplementing or other modification from time to time of, the First Lien Notes, the Second Lien [Non-]Renesas Convertible Notes, the Second Lien Takeback Notes or any other agreement that is permitted by this Indenture.

**Section 8.02.   WITH THE CONSENT OF HOLDERS.**

(A)     *Generally*.   Subject to **Sections 8.01**, **7.05** and **7.09**, the immediately following sentence and the terms of the Intercreditor Agreements, the Issuer, the Trustee and, if required, the Collateral Agent may, with the consent of the Majority Holders, amend or supplement the Note Documents or waive compliance with any provision of the Note Documents [(other than the Investor Rights Agreement)]. Notwithstanding anything to the contrary in the foregoing sentence, but subject to **Section 8.01** and the terms of the Intercreditor Agreements, without the consent of each affected Holder, no amendment or supplement to the Note Documents, or waiver of any provision of the Note Documents, may:

(i)     reduce the principal, or extend the stated maturity, of any Note;

(ii)     reduce the Redemption Price or Fundamental Change Repurchase Price for any Note or change the times at which, or the circumstances under which, the Notes may or will be redeemed or repurchased by the Issuer;

(iii)     reduce the rate, or extend the time for the payment, of interest on any Note;

(iv)     make any change that adversely affects the conversion rights of any Note other than as permitted or required by this Indenture or the Notes;

(v)     impair the rights of any Holder set forth in **Section 7.09** (as such Section is in effect on the Issue Date);

- 129 -

(vi)     change the ranking of the Notes or any guarantee in any manner adverse to the Holders;

(vii)    make any Note payable in money, or at a place of payment, other than that stated in this Indenture or the Note;

(viii)   reduce the amount of Notes whose Holders must consent to any amendment, supplement, waiver or other modification; or

(ix)     make any change to any amendment, supplement, waiver or modification provision of this Indenture or the Notes that requires the consent of each affected Holder.

For the avoidance of doubt, pursuant to **clauses (i)**, **(ii)**, **(iii)** and **(iv)** of this **Section 8.02(A)**, no amendment or supplement to this Indenture or the Notes, or waiver of any provision of this Indenture or the Notes, may change the amount or type of consideration due on any Note (whether on an Interest Payment Date, Redemption Date, Fundamental Change Repurchase Date or the Maturity Date or upon conversion, or otherwise), or the date(s) or time(s) such consideration is payable or deliverable, as applicable, without the consent of each affected Holder.

(B)     *Holders Need Not Approve the Particular Form of any Amendment*.  A consent of any Holder pursuant to this **Section 8.02** need approve only the substance, and not necessarily the particular form, of the proposed amendment, supplement or waiver.

(C)     *Subsidiary Guarantors Bound*.  The Subsidiary Guarantors shall be bound by any supplemental indenture or amendment to the Note Documents entered into by the Issuer and the Trustee pursuant to the terms of this Indenture and may but shall not be required to execute any such supplemental indenture or amendment, other than in the case of a joinder of a new Subsidiary Guarantor the execution by such Subsidiary Guarantor.

**Section 8.03.  [WITH THE CONSENT OF SUPERMAJORITY HOLDERS.[26]**

(A)     Notwithstanding anything contained in **Section 8.01** or *Section 8*.**02**, without the consent of the Supermajority Holders, no amendment or supplement to the Note Documents, or waiver of any provision of the Note Documents [(other than the Investor Rights Agreement)], may:

(i)      subordinate, or change the priority with respect to the Liens securing the Obligations and then only to the extent not prohibited by the Intercreditor Agreements;

(ii)     release all or substantially all of the Collateral except as otherwise may be provided or permitted under this Indenture, the Intercreditor Agreements or the other Note Documents; or

---

[26] Note to Draft: Subject to further review.

(iii)     discharge any Note Party from its respective payment Obligations under the Note Documents, in each case, except as otherwise may be provided or permitted under this Indenture, the Intercreditor Agreements or the other Note Documents.

(B)     Notwithstanding anything contrary under this Indenture, the Holders are deemed to have consented to, and shall be deemed to have directed the Trustee and/or the Collateral Agent (as applicable), to execute and deliver any of the following amendments, waivers and other modifications to the Note Documents [(other than the Investor Rights Agreement)], in each case, as evidenced by an Officer's Certificate and Opinion of Counsel delivered to the Trustee and the Collateral Agent pursuant to **Section 8.07**, **Section 13.02** and **Section 13.03** hereof:

(i)     to establish that the Liens on any Collateral securing any Indebtedness replacing the applicable series of First Lien Notes permitted to be incurred under the First-Priority Debt Documents that represent First-Priority Obligations shall be senior to the Liens on such Collateral securing any Obligations under this Indenture, the Notes and the Subsidiary Guarantees, which obligations shall continue to be secured on a second-priority basis on the Collateral;

(ii)     to give effect to any amendment, waiver or consent to any of the First-Priority Debt Documents, to the extent applicable to the Collateral (including the release of any Liens on Collateral), that applies automatically to the comparable Security Documents with respect to the security interest of the Holders in such Collateral pursuant to the terms of the Intercreditor Agreements; and

(iii)     upon any cancellation, repayment, redemption or termination of the First Lien Notes and all other First-Priority Obligations without a replacement thereof, and to the extent the Obligations have not been discharged in full in accordance with the terms of this Indenture and the Intercreditor Agreements, to establish that the Liens on the Collateral securing any Obligations under this Indenture, the Notes and the Subsidiary Guarantees shall become first priority perfected Lien, except as set forth below under **Section 11.05**.

(C)     *Holders Need Not Approve the Particular Form of any Amendment*.  A consent of any Holder pursuant to this **Section 8.03** need approve only the substance, and not necessarily the particular form, of the proposed amendment, supplement or waiver.]

**Section 8.04.  NOTICE OF AMENDMENTS, SUPPLEMENTS AND WAIVERS.**

As soon as reasonably practicable after any amendment, supplement or waiver pursuant to **Section 8.01**, **8.02** or **8.03** becomes effective, the Issuer will send to the Holders and the Trustee notice that (A) describes the substance of such amendment, supplement or waiver in reasonable detail and (B) states the effective date thereof; *provided*, *however*, that the Issuer will not be required to provide such notice to the Holders if such amendment, supplement or waiver is included in a periodic or current report filed by the Issuer with the SEC within four (4) Business Days of its effectiveness. The failure to send, or the existence of any defect in, such notice will not impair or affect the validity of such amendment, supplement or waiver.

**Section 8.05.   REVOCATION, EFFECT AND SOLICITATION OF CONSENTS; SPECIAL RECORD DATES; ETC.**

(A)     *Revocation and Effect of Consents*.   The consent of a Holder of a Note to an amendment, supplement or waiver will bind (and constitute the consent of) each subsequent Holder of any Note to the extent the same evidences any portion of the same indebtedness as the consenting Holder's Note, subject to the right of any Holder of a Note to revoke (if not prohibited pursuant to **Section 8.05(B)**) any such consent with respect to such Note by delivering notice of revocation to the Trustee before the time such amendment, supplement or waiver becomes effective.

(B)     *Special Record Dates*.   The Issuer may, but is not required to, fix a record date for the purpose of determining the Holders entitled to consent or take any other action in connection with any amendment, supplement or waiver pursuant to this **Article 8**. If a record date is fixed, then, notwithstanding anything to the contrary in **Section 8.05(A)**, only Persons who are Holders as of such record date (or their duly designated proxies) will be entitled to give such consent, to revoke any consent previously given or to take any such action, regardless of whether such Persons continue to be Holders after such record date; *provided*, *however*, that no such consent will be valid or effective for more than one hundred and twenty (120) calendar days after such record date.

(C)     *Solicitation of Consents*.   For the avoidance of doubt, each reference in this Indenture or the Notes to the consent of a Holder will be deemed to include any such consent obtained in connection with a repurchase of, or tender or exchange offer for, any Notes.

(D)     *Effectiveness and Binding Effect*.   Each amendment or supplement to this Indenture, or waiver of any Default, Event of Default or compliance with any provision of this Indenture, will become effective in accordance with its terms and, when it becomes effective with respect to any Note (or any portion thereof), will thereafter bind every Holder of such Note (or such portion).

**Section 8.06.   NOTATIONS AND EXCHANGES.**

If any amendment, supplement or waiver changes the terms of a Note, then the Trustee or the Issuer may, in its discretion, require the Holder of such Note to deliver such Note to the Trustee so that the Trustee may place an appropriate notation prepared by the Issuer on such Note and return such Note to such Holder. Alternatively, at its discretion, the Issuer may, in exchange for such Note, issue, execute and deliver, and the Trustee will authenticate, in each case in accordance with **Section 2.02**, a new Note that reflects the changed terms. The failure to make any appropriate notation or issue a new Note pursuant to this **Section 8.06** will not impair or affect the validity of such amendment, supplement or waiver.

**Section 8.07.   TRUSTEE AND COLLATERAL AGENT TO EXECUTE SUPPLEMENTAL INDENTURES.**

The Trustee and/or the Collateral Agent, as the case may be, will execute and deliver any amendment or supplement to the Note Documents authorized pursuant to this **Article 8**, *provided*, *however*, that the Trustee and/or the Collateral Agent, as the case may be, need not (but may, in their respective sole and absolute discretion) execute or deliver any such amendment or supplement to the Note Documents that adversely affects the rights, duties, liabilities or immunities of the Trustee and/or the Collateral Agent, as the case may be. In executing any amendment or

supplement to the Note Documents, the Trustee and/or the Collateral Agent, as the case may be will be entitled to receive, and (subject to **Sections 10.01** and **10.02**) will be fully protected in relying on, an Officer's Certificate and an Opinion of Counsel, provided in accordance with **Section 13.02** and in addition to the documents delivered pursuant to **Section 13.03**, each stating that (A) the execution and delivery of such amendment or supplement to the Note Documents is authorized or permitted by this Indenture and the other applicable Note Documents; and (B) in the case of the Opinion of Counsel, such amendment or supplement to the Note Documents is valid, binding and enforceable against the Issuer in accordance with its terms. Every amendment or supplement to this Indenture or the Notes will be set forth in an amended or supplemental indenture.

<h2 style="text-align:center">Article 9.     SATISFACTION AND DISCHARGE; DEFEASANCE</h2>

**Section 9.01.** TERMINATION OF ISSUER'S OBLIGATIONS.

(A)     *Discharge.*  This Indenture will be discharged, and will cease to be of further effect as to all Notes issued under this Indenture, when:

    (i)     all Notes then outstanding (other than Notes replaced pursuant to **Section 2.13**) have (i) been delivered to the Trustee for cancellation; or (ii) become due and payable (whether on a Redemption Date, a Fundamental Change Repurchase Date, the Maturity Date, upon conversion or otherwise) for an amount of cash or Conversion Consideration, as applicable, that has been fixed;

    (ii)     the Issuer or any Subsidiary Guarantor has caused there to be irrevocably deposited with the Trustee, or with the Paying Agent (or, with respect to Conversion Consideration, the Conversion Agent), in each case for the benefit of the Holders, or has otherwise caused there to be delivered to the Holders, cash (or, with respect to Notes to be converted, Conversion Consideration) sufficient to satisfy all amounts or other property due on all Notes then outstanding (other than Notes replaced pursuant to **Section 2.13**);

    (iii)     the Issuer has performed all other Obligations by it under this Indenture; and

    (iv)     the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that the conditions precedent to the discharge of this Indenture have been satisfied;

*provided*, *however*, that **Article 10** and [**Section 11.01**] will survive such discharge and, until no Notes remain outstanding, **Section 2.15** and the obligations of the Trustee, the Paying Agent and the Conversion Agent with respect to money or other property deposited with them will survive such discharge.

At the Issuer's written request, the Trustee will acknowledge the satisfaction and discharge of this Indenture.

(B)     *Legal Defeasance and Covenant Defeasance.*

    (i)     The Issuer may at any time terminate:

(1)     all of the Note Parties' obligations under the Notes and this Indenture with respect to the Note Parties ("**Legal Defeasance Option**"), and

(2)     the Note Parties' obligations under **Sections 3.02**, **3.03**, **3.06**, **3.11**, **3.12**, **3.13**, **3.14**, **3.15**, **3.16**, **3.17**, **3.18** and **3.19**, **Article 6**, and Sections **7.01(A)(vi)**, **7.01(A)(viii)**, **7.01(A)(ix)**, **7.01(A)(x)** and **7.01(A)(xiii)** ("**Covenant Defeasance Option**").

(ii)     The Issuer may exercise its Legal Defeasance Option notwithstanding its prior exercise of its Covenant Defeasance Option. In the event that the Issuer terminates all of its obligations under the Notes and this Indenture (with respect to such Notes) by exercising its Legal Defeasance Option or its Covenant Defeasance Option, the obligations of the Issuer and each Subsidiary Guarantor with respect to the Security Documents shall be terminated simultaneously with the termination of such obligation.

(iii)     If the Issuer exercises its Legal Defeasance Option, payment of the Notes so defeased may not be accelerated because of an Event of Default. If the Issuer exercises its Covenant Defeasance Option, payment of the Notes so defeased may not be accelerated because of an Event of Default specified in Sections **7.01(A)(vi)**, **7.01(A)(viii)**, **7.01(A)(ix)**, **7.01(A)(x)** or **7.01(A)(xiii)**.

(iv)     The Issuer may exercise its Legal Defeasance Option or its Covenant Defeasance Option only if:

(1)     the Issuer irrevocably deposits in trust with the Trustee cash in U.S. Dollars sufficient to pay the principal of and interest on the Notes when due at maturity or redemption, as the case may be;

(2)     the Issuer delivers to the Trustee a certificate from a nationally recognized firm of independent accountants, investment bank or financial advisory firm expressing their opinion that the payments of principal and interest when due and without reinvestment on any deposited money without investment will provide cash at such times and in such amounts as will be sufficient to pay principal, and interest when due on all the Notes to maturity or redemption, as the case may be;

(3)     no Default specified in **Section 7.01(A)(xi)** or **7.01(A)(xii)** with respect to the Issuer shall have occurred or is continuing on the date of such deposit;

(4)     the deposit does not constitute a default under any other material agreement or instrument binding on the Issuer;

(5)     in the case of the Legal Defeasance Option, the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of

such deposit and defeasance and will be subject to U.S. federal income tax on the same amounts and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred. Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their maturity date within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer;

(6)     such exercise does not impair the right of any Holder to receive payment of principal of, premium, if any, and interest on such Holder's Notes on or after the due dates therefore or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(7)     in the case of the Covenant Defeasance Option, the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred;

(8)     the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance of the Notes to be so defeased as contemplated by this **Section 9.01(B)** have been complied with; and

(9)     before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with **Article 4**.

(v)     **Article 10** and **Section 11.01** will survive any defeasance and, until no Notes remain outstanding, **Section 2.15** and the obligations of the Trustee, the Paying Agent and the Conversion Agent with respect to money or other property deposited with them will survive such defeasance.

(vi)     At the Issuer's written request, the Trustee will acknowledge the defeasance of those obligations that the Issuer terminates.

**Section 9.02.  APPLICATION OF TRUST MONEY**.

The Trustee shall hold in trust money (including proceeds thereof) deposited with it pursuant to this **Article 9**. The Trustee shall apply the deposited money through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased.

**Section 9.03.  REPAYMENT TO ISSUER**.

Subject to applicable unclaimed property law, the Trustee, the Paying Agent and the Conversion Agent will promptly notify the Issuer if there exists (and, at the Issuer's request, promptly deliver to the Issuer) any cash, Conversion Consideration or other property held by any of them for payment or delivery on the Notes that remain unclaimed two (2) years after the date on which such payment or delivery was due. After such delivery to the Issuer, the Trustee, the Paying Agent and the Conversion Agent will have no further liability to any Holder with respect to such cash, Conversion Consideration or other property, and Holders entitled to the payment or delivery of such cash, Conversion Consideration or other property must look to the Issuer for payment as a general creditor of the Issuer.

**Section 9.04.  REINSTATEMENT**.

If the Trustee, the Paying Agent or the Conversion Agent is unable to apply any cash or other property deposited with it pursuant to **Section 9.01** because of any legal proceeding or any order or judgment of any court or other governmental authority that enjoins, restrains or otherwise prohibits such application, then the discharge of this Indenture pursuant to **Section 9.01** will be rescinded; *provided*, *however*, that if the Issuer thereafter pays or delivers any cash or other property due on the Notes to the Holders thereof, then the Issuer will be subrogated to the rights of such Holders to receive such cash or other property from the cash or other property, if any, held by the Trustee, the Paying Agent or the Conversion Agent, as applicable.

## Article 10.    TRUSTEE

**Section 10.01. DUTIES OF THE TRUSTEE**.

(A)    If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(B)    Except during the continuance of an Event of Default:

(i)    the duties of the Trustee will be determined solely by the express provisions of this Indenture, and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations will be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith or willful misconduct on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon Officer's Certificates or Opinions of Counsel that are provided to the Trustee and conform to the requirements of this Indenture. However, the Trustee will examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(C)    The Trustee may not be relieved from liabilities for its negligent action or negligent failure to act or willful misconduct, except that:

(i)        this paragraph will not limit the effect of **Section 10.01(B)**;

(ii)        the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii)        the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to **Section 7.06**.

(D)        Each provision of this Indenture that in any way relates to the Trustee is subject to paragraphs **(A)**, **(B)** and **(C)** of this **Section 10.01**, regardless of whether such provision so expressly provides.

(E)        No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any liability.

(F)        The Trustee will not be liable for interest on any money received by it, except as the Trustee may agree in writing with the Issuer. Money held in trust by the Trustee need not be segregated from other funds, except to the extent required by law.

**Section 10.02. Rights of the Trustee.**

(A)        The Trustee may conclusively rely on any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, judgment, bond, debenture, note, other evidence of indebtedness or other paper or document that it believes to be genuine and signed or presented by the proper Person, and the Trustee need not investigate any fact or matter stated in such document.

(B)        Before the Trustee acts or refrains from acting, it may require an Officer's Certificate, an Opinion of Counsel or both. The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officer's Certificate or Opinion of Counsel. The Trustee may consult with counsel; and the advice of such counsel, or any Opinion of Counsel, will constitute full and complete authorization of the Trustee to take or omit to take any action in good faith in reliance thereon without liability.

(C)        The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any such agent appointed with due care.

(D)        The Trustee will not be liable for any action it takes or omits to take in good faith and that it believes to be authorized or within the rights or powers vested in it by this Indenture.

(E)        Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer will be sufficient if signed by an Officer of the Issuer.

(F)        The Trustee need not exercise any rights or powers vested in it by this Indenture at the request or direction of any Holder unless such Holder has offered the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense that it may incur in complying with such request or direction.

(G)     The Trustee will not be responsible or liable for any punitive, special, indirect or consequential loss or damage (including lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(H)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and will be enforceable by, the Trustee in each of its capacities under this Indenture (including in its capacity as Conversion Agent), the Collateral Agent and each agent, custodian and other Person employed to act under this Indenture, including the Conversion Agent; *provided, however,* (i) that the Collateral Agent and each other agent, custodian, and other Person employed to act under this Indenture shall be liable only to the extent of its gross negligence or willful misconduct and (ii) in and during an Event of Default, only the Trustee (in its capacity as such) and not any other such agent (including for the avoidance of doubt, the Collateral Agent) shall be subject to the prudent person standard.

(I)     The permissive rights of the Trustee enumerated in this Indenture will not be construed as duties.

(J)     Neither the Trustee nor the Registrar will have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depositary Participants, members of the Depositary or owners of beneficial interests in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements of this Indenture.

(K)     Except with respect to receipt of payments of principal and interest on the Notes payable by the Issuer pursuant to **Section 3.02** and any Default or Event of Default information contained in the Officer's Certificate delivered to it pursuant to **Section 3.06(B)**, the Trustee will have no duty to monitor the Issuer's compliance with or the breach of any representation, warranty or covenant made in this Indenture.

(L)     The Trustee shall at no time have any responsibility or liability for or in respect to the legality, validity or enforceability of any Collateral or any arrangement or agreement between the Issuer and any other Person with respect thereto, or the legality, validity, enforceability, perfection or priority of any security interest created in any of the Collateral or maintenance of any perfection and priority, or for or with respect to the sufficiency of the Collateral following an Event of Default. The Trustee shall have no obligation to give, execute, deliver, file, record, authorize or obtain any financing statements, notices, instruments, documents, agreements, consents or other papers as shall be necessary to (i) create, preserve, perfect or validate the security interest granted to the Collateral Agent pursuant to the Security Documents or enable the Collateral Agent to exercise and enforce its rights under the Security Documents with respect to such pledge and security interest. In addition, the Trustee shall have no responsibility or liability (i) in connection with the acts or omissions of the Issuer in respect of the foregoing.

(M)     The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has received written notice at the Corporate Trust

- 138 -

Office of any event which is in fact such a default, and such notice references the Notes and this Indenture and states on its face that a Default or Event of Default has occurred.

(N)      Whether or not expressly incorporated therein, the Trustee shall have the benefit of all of the rights, privileges, protections, immunities and benefits given to the Trustee under this Indenture when acting under any other Note Document.

**Section 10.03. INDIVIDUAL RIGHTS OF THE TRUSTEE.**

(A)      The Trustee, in its individual or any other capacity, may become the owner or pledgee of any Note and may otherwise deal with the Issuer or any of its Affiliates with the same rights that it would have if it were not Trustee; provided, however, that if the Trustee acquires a "conflicting interest" (within the meaning of Section 310(b) of the Trust Indenture Act), then it must eliminate such conflict within ninety (90) days or resign as Trustee. Each Note Agent will have the same rights and duties as the Trustee under this **Section 10.03**.

**Section 10.04. TRUSTEE'S DISCLAIMER.**

The Trustee will not be (A) responsible for, and makes no representation as to, the validity or adequacy of this Indenture or the Notes or Note Documents; (B) accountable for the Issuer's use of the proceeds from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this Indenture; (C) responsible for the use or application of any money received by any Paying Agent other than the Trustee; and (D) responsible for any statement or recital in this Indenture, the Notes or Note Documents or any other document relating to the sale of the Notes or this Indenture, other than the Trustee's certificate of authentication.

**Section 10.05. NOTICE OF DEFAULTS.**

If a Default or Event of Default occurs, then the Trustee will send Holders a notice of such Default or Event of Default within ninety (90) days after it occurs or, if it is not actually known to a Responsible Officer of the Trustee at such time, promptly (and in any event within ten (10) Business Days) after it becomes known to a Responsible Officer; *provided*, *however*, that, except in the case of a Default or Event of Default in the payment of the principal of, or interest on, any Note, the Trustee shall be protected in withholding such notice if and for so long as it in good faith determines that withholding such notice is in the interests of the Holders. The Trustee will not to be charged with knowledge of any Default or Event of Default, or knowledge of any cure of any Default or Event of Default, unless written notice of such Default or Event of Default, or of such cure of any Default or Event of Default, has been given by the Issuer or any Holder to a Responsible Officer of the Trustee and such notice states on its face that a Default or Event of Default has occurred.

**Section 10.06. COMPENSATION AND INDEMNITY.**

(A)      The Issuer will, from time to time, pay the Trustee and the Collateral Agent reasonable compensation for its acceptance of this Indenture and the other Note Documents and services under this Indenture and the other Note Documents. The Trustee's and the Collateral Agent's compensation will not be limited by any law on compensation of a trustee of an express trust. In addition to the compensation for the Trustee's and Collateral Agent's services, the Issuer

- 139 -

will reimburse the Trustee and the Collateral Agent promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it under this Indenture, including the reasonable compensation, disbursements and expenses of the Trustee's and the Collateral Agent's agents and counsel.

(B)     The Issuer will indemnify the Trustee and the Collateral Agent and their respective directors, officers, employees and agents (collectively, the "**Indemnified Parties**") and hold the Indemnified Parties harmless against any and all losses, liabilities, suits, actions, proceedings at law or in equity, and any other costs, fees or expenses incurred by the Indemnified Parties arising out of or in connection with the acceptance and administration of its duties under this Indenture and the other Note Documents, including the costs and expenses of enforcing this Indenture and the Note Documents against the Issuer (including this **Section 10.06**) and defending itself against any claim (whether asserted by the Issuer, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties under this Indenture and the other Note Documents, except to the extent any such loss, liability, suit, action, proceeding at law or in equity or other cost, fee or expense may be attributable to such Indemnified Party's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. The Trustee or the Collateral Agent, as applicable, will promptly notify the Issuer of any third party claim for which it may seek indemnity, but the Trustee's or the Collateral Agent's failure to so notify the Issuer will not relieve the Issuer of its obligations under this **Section 10.06(B)**. The Issuer will defend such claim, and the Trustee and the Collateral Agent will cooperate in such defense. If the Trustee or the Collateral Agent is advised by counsel that it may have defenses available to it that are in conflict with the defenses available to the Issuer, or that there is an actual or potential conflict of interest, then the Trustee or the Collateral Agent may retain separate counsel, and the Issuer will pay the reasonable fees and expenses of such counsel (including the reasonable fees and expenses of counsel to the Trustee and the Collateral Agent incurred in evaluating whether such a conflict exists). The Issuer need not pay for any settlement of any such claim made without its consent, which consent will not be unreasonably withheld.

(C)     The obligations of the Issuer under this **Section 10.06** will survive the resignation or removal of the Trustee or the Collateral Agent, the repayment of the Notes and the satisfaction or discharge of this Indenture.

(D)     To secure the Issuer's payment obligations in this **Section 10.06**, the Trustee will have a lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal of, or interest on, particular Notes, which lien will survive the discharge of this Indenture.

(E)     If the Trustee or the Collateral Agent incurs expenses or renders services after an Event of Default pursuant to **Section 7.01(A)(xi)** or **7.01(A)(xii)** occurs, then such expenses and the compensation for such services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration for purposes of priority under any Bankruptcy Law.

**Section 10.07. REPLACEMENT OF THE TRUSTEE.**

(A)     Notwithstanding anything to the contrary in this **Section 10.07**, a resignation or removal of the Trustee, and the appointment of a successor Trustee, will become effective only upon such successor Trustee's acceptance of appointment as provided in this **Section 10.07**.

(B)     The Trustee may resign at any time and be discharged from the trust created by this Indenture by so notifying the Issuer. The Majority Holders may remove the Trustee by so notifying the Trustee and the Issuer in writing at least thirty (30) days prior to the requested date of removal. The Issuer may remove the Trustee if:

(i)     the Trustee fails to comply with the provisions of Section 310(b) of the Trust Indenture Act with respect to any series of Notes after written request therefor by the Issuer or by any Holder who has been a bona fide holder of a Note or Notes of such series for at least six (6) months;

(ii)     the Trustee fails to comply with **Section 10.09**;

(iii)     the Trustee is adjudged to be bankrupt or insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(iv)     a custodian or public officer takes charge of the Trustee or its property; or

(v)     the Trustee becomes incapable of acting.

(C)     If the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, then (i) the Issuer will promptly appoint a successor Trustee; and (ii) at any time within one (1) year after the successor Trustee takes office, the Majority Holders may appoint a successor Trustee to replace such successor Trustee appointed by the Issuer.

(D)     If a successor Trustee does not take office within sixty (60) days after the retiring Trustee resigns or is removed, then the retiring Trustee (at the expense of the Issuer), the Issuer or the Holders of at least ten percent (10%) in aggregate principal amount of the Notes then outstanding may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(E)     If the Trustee, after written request by a Holder of at least six (6) months, fails to comply with **Section 10.09**, then such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(F)     A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer, upon which notice the resignation or removal of the retiring Trustee will become effective and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee will send notice of its succession to Holders. The retiring Trustee will, upon payment of all amounts due to it under this Indenture, promptly transfer all property held by it as Trustee to the successor Trustee, which property will, for the avoidance of doubt, be subject to the lien provided for in **Section 10.06(D)**.

(G)     For as long as any First-Priority Obligations remain outstanding, the successor Trustee shall concurrently with its appointment as the successor Trustee accede as a party to the Intercreditor Agreements.

**Section 10.08. SUCCESSOR TRUSTEE BY MERGER, ETC.**

If the Trustee consolidates, merges or converts into, sells or transfers all or substantially all of its corporate trust business to, another corporation, then such corporation will become the successor Trustee without any further act.

**Section 10.09. ELIGIBILITY; DISQUALIFICATION.**

There will at all times be a Trustee under this Indenture that is a corporation organized and doing business under the laws of the United States of America or of any state or territory thereof or the District of Columbia, that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal, state, territorial or District of Columbia authorities and that has a combined capital and surplus of at least $50.0 million as set forth in its most recent published annual report of condition. Neither the Issuer nor any Subsidiary Guarantor nor any person directly or indirectly controlling, controlled by, or under common control with the Issuer or any Subsidiary Guarantor shall serve as Trustee under this Indenture.

**Section 10.10. REPORTS BY THE TRUSTEE.**

The Trustee shall transmit to Holders such reports concerning the Trustee and its actions under this Indenture as may be required pursuant to the Trust Indenture Act (including, without limitation, Sections 313(a), (b) and (c)) at the times and in the manner provided pursuant thereto. If required by Section 313(a) of the Trust Indenture Act, the Trustee shall, within sixty (60) days after each [●] following the date of this Indenture, deliver to Holders a brief report, dated as of such [●], which complies with the provisions of such Section 313(a) (but if no event described in Section 313(a) has occurred within the twelve (12) months preceding the reporting date, no report need be transmitted).

A copy of each such report shall, at the time of such transmission to Holders, be filed by the Trustee with the SEC and with the Issuer.

## Article 11.     COLLATERAL AND SECURITY

**Section 11.01. COLLATERAL AGENT.**

(A)     The Issuer and the Subsidiary Guarantors hereby appoint U.S. Bank Trust Company, National Association to act as Collateral Agent, and each Holder, by its acceptance of any Notes and the Subsidiary Guarantees thereof, irrevocably consents and agrees to such appointment on its behalf. The Collateral Agent shall have the privileges, powers and immunities as set forth in this Indenture and the Security Documents. Notwithstanding any provision to the contrary contained elsewhere in this Indenture, the Security Documents or the Intercreditor Agreements, the duties of the Collateral Agent shall be ministerial and administrative in nature, and the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the Security Documents and the Intercreditor Agreements to which the

Collateral Agent is a party, nor shall the Collateral Agent have or be deemed to have any trust or other fiduciary relationship with the Trustee, any Holder, the Issuer or any Subsidiary Guarantor, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture,  the Security Documents or the Intercreditor Agreements or otherwise exist against the Collateral Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Indenture with reference to the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(B)     The Issuer and the Subsidiary Guarantors hereby agrees that the Collateral Agent shall hold the Collateral on behalf of and for the benefit of all of the Holders, the Trustee and the Collateral Agent, in each case pursuant to, and in accordance with, the terms of the Security Documents and the Intercreditor Agreements and that the Collateral as now or hereafter constituted shall be held for the benefit of all the Holders, the Collateral Agent and the Trustee, and that the Lien of this Indenture and the Security Documents in respect of the Trustee, the Collateral Agent and the Holders is subject to and qualified and limited in all respects by the Security Documents and the Intercreditor Agreements and actions that may be taken thereunder. The Collateral Agent is each Holder's agent for the purpose of perfecting the Holders' security interest in the Collateral which, in accordance with Article 9 of the Uniform Commercial Code can be perfected only by possession. Should the Trustee obtain possession of any such Collateral, the Trustee shall notify the Collateral Agent thereof and promptly shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(C)     Each Holder, by its acceptance of any Notes and the Subsidiary Guarantees thereof, irrevocably consents and agrees to the terms of the Security Documents and the Intercreditor Agreements (including, without limitation, the provisions providing for foreclosure, exercises of remedies and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms, agrees to the appointment of the Collateral Agent and authorizes and directs the Collateral Agent (i) to enter into the Security Documents and the Intercreditor Agreements, whether executed on or after the Issue Date, and perform its obligations and exercise its rights, powers and discretions under the Security Documents and the Intercreditor Agreements in accordance therewith, (ii) make the representations of the Holders set forth in the Security Documents and the Intercreditor Agreements, and (iii) bind the Holders on the terms as set forth in the Security Documents and the Intercreditor Agreements.

(D)     The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Collateral Agent nor any of its officers, directors, employees or agents shall be responsible for any act or failure to act hereunder or under any Security Documents or Intercreditor Agreements to which it is a party, except for its own gross negligence or willful misconduct. The Collateral Agent shall have no liability for any action taken, or errors in judgment made, in good faith by it or any of its officers, employees or agents, unless it shall have been grossly negligent in ascertaining the pertinent facts.

(E)     The Collateral Agent shall be entitled to seek and shall be fully justified in failing or refusing to take any action under this Indenture, the Security Documents or the Intercreditor Agreements unless it shall first receive such advice or concurrence of the Trustee or the Majority

- 143 -

Holders as it determines and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Except as otherwise provided in the Security Documents or the Intercreditor Agreements, the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture, the Security Documents or the Intercreditor Agreements in accordance with a request, direction, instruction or consent of the Trustee or the Majority Holders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders. If the Collateral Agent shall request direction from the Majority Holders with respect to any action, the Collateral Agent shall be entitled to refrain from taking such action unless and until the Collateral Agent shall have received direction from the Majority Holders, and the Collateral Agent shall not incur liability to any Person by reason of so refraining.

(F)     The Collateral Agent shall take such action with respect to such Default or Event of Default as may be requested by the Trustee or the Majority Holders (subject to this **Section 11.01(F)**), subject to the terms of the Security Documents.

(G)     Except as otherwise explicitly provided herein or in the Security Documents or the Intercreditor Agreements, neither the Collateral Agent nor any of its respective officers, directors, employees or agents or other Affiliates shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.

(H)     If at any time or times the Trustee shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the Obligations arising under, or relating to, this Indenture, except for any such proceeds or payments received by the Trustee from the Collateral Agent pursuant to the terms of this Indenture and to the extent such proceeds or payments are permitted to be paid to the Trustee or the Holders under the terms of the Intercreditor Agreements, or (ii) payments from the Collateral Agent in excess of the amount required to be paid to the Trustee pursuant to Article 7, the Trustee shall promptly turn the same over to the Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Collateral Agent such proceeds to be applied by the Collateral Agent pursuant to the terms of this Indenture, the Security Documents and the Intercreditor Agreements.

(I)     Neither the Trustee nor the Collateral Agent shall have any obligation whatsoever to any of the Holders or to the Trustee, in the case of the Collateral Agent, to assure that the Collateral exists or is owned by the Issuer or any Subsidiary Guarantor or is cared for, protected, or insured or has been encumbered, or that the Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all of the Issuer's or any Subsidiary Guarantor's property constituting Collateral intended to be subject to the Lien and security interest of the Security Documents has been properly and completely listed or delivered, as the case may be, or the value, genuineness, validity, ownership, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Collateral Agent pursuant to this Indenture, any Security Document or the Intercreditor Agreements other than to exercise such rights, authorities and powers pursuant to the instructions

of the Trustee or the Majority Holders or as otherwise provided in the Security Documents. Further to the foregoing and notwithstanding anything to the contrary in this Indenture or in any Security Document or any Intercreditor Agreement, in no event shall the Collateral Agent or the Trustee be responsible for, or have any duty or obligation with respect to, the recording, filing, registering, perfection, protection or maintenance of the security interests or Liens intended to be created by this Indenture, the Security Documents or the Intercreditor Agreements (including without limitation the filing or continuation of any Uniform Commercial Code financing or continuation statements or similar documents or instruments), nor shall the Collateral Agent be responsible for, or makes any representation regarding, the validity, effectiveness or priority of any of the Security Documents or the security interests or Liens intended to be created thereby.

(J)      The Collateral Agent shall exercise reasonable care in the custody of any Collateral in its possession or control or any income thereon. The Collateral Agent shall be deemed to have exercised reasonable care in the custody of Collateral in its possession if the Collateral is accorded treatment substantially equal to that which they accord similar property held for its own benefit and shall not be liable or responsible for any loss or diminution in value of any of the Collateral, including, without limitation, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith. The Collateral Agent shall be permitted to use overnight carriers to transmit possessory collateral and shall be not liable for any items lost or damages in transmit.

(K)      Upon the receipt by the Collateral Agent of a written request of the Issuer signed by an Officer (a "**Security Document Order**"), the Collateral Agent is hereby authorized to execute and enter into, and shall execute and enter into, without the further consent of any Holder or the Trustee, any Security Document to be executed after the Issue Date.   Such Security Document Order shall (i) state that it is being delivered to the Collateral Agent pursuant to, and is a Security Document referred to in, this Section 11.01(K), (ii) instruct the Collateral Agent to execute and enter into such Security Document and (iii) certify that all covenants and conditions precedent, if any to the execution and delivery of the Security Document have been compiled with; provided that in no event shall the Collateral Agent be required to enter into a Security Document that it reasonably determines adversely affects the Collateral Agent. The Holders, through their acceptance of the Notes, hereby authorize and direct the Collateral Agent to execute such Security Documents.

(L)      Upon receipt by the Collateral Agent of a Security Document Order, the Collateral Agent is hereby authorized to execute and enter into, and shall execute and enter into, without the further consent of any Holder or the Trustee, any Intercreditor Agreement to be entered into after the Issue Date. Such Security Document Order shall (i) state that it is being delivered to the Collateral Agent pursuant to, and is an Intercreditor Agreement referred to in this Section 11.01(L), (ii) certify that such Intercreditor Agreement complies with the terms of this Indenture and the Note Documents and that all covenants and conditions precedent, if any, under this Indenture and the Note Documents to such execution and delivery have been complied with and (iii) instruct the Collateral Agent to execute and enter into such Intercreditor Agreement; provided that in no event shall the Collateral Agent be required to enter into any intercreditor agreement if it reasonably determines that such document adversely affects the Collateral Agent. The Holders, by their acceptance of the Notes, authorize and direct the Collateral Agent to execute such intercreditor

agreements and the Collateral Agent shall be entitled to conclusively rely on such Security Document Order.

(M)     The Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Security Documents or the Intercreditor Agreements and to the extent not prohibited under the Intercreditor Agreements, for turnover to the Trustee to make further distributions of such funds to itself, the Trustee and the Holders in accordance with the provisions of **Section 7.15** and the other provisions of this Indenture.

(N)     In acting under this Indenture or any other Note Document, the Collateral Agent shall have all the rights and protections provided hereunder and in the Note Documents as well as the rights and protections afforded to the Trustee (including its rights to be compensated, reimbursed and indemnified under Section 10.06). For the avoidance of doubt, the rights, privileges, protections, immunities and benefits given to the Collateral Agent hereunder, including, without limitation, its right to be indemnified prior to taking action, shall survive the satisfaction, discharge or termination of this Indenture or its earlier termination, resignation or removal of the Collateral Agent, in such capacity.

(O)     Notwithstanding anything to the contrary contained in this Indenture, the Intercreditor Agreements or the Security Documents, in the event the Collateral Agent is entitled or required to commence an action to foreclose or otherwise exercise its remedies to acquire control or possession of the Collateral, the Collateral Agent shall not be required to commence any such action or exercise any remedy or to inspect or conduct any studies of any property under the Mortgages or take any such other action if the Collateral Agent has reasonably determined that the Collateral Agent may incur personal liability as a result of the presence at, or release on or from, the Collateral or such property, of any hazardous substances.  The Collateral Agent shall at any time be entitled to cease taking any action described in this clause if it no longer reasonably deems any indemnity, security or undertaking from the Issuer or the Holders to be sufficient.

(P)     The parties hereto and the Holders hereby agree and acknowledge that neither the Collateral Agent nor the Trustee shall assume, be responsible for or otherwise be obligated for any liabilities, claims, causes of action, suits, losses, allegations, requests, demands, penalties, fines, settlements, damages (including foreseeable and unforeseeable), judgments, expenses and costs (including but not limited to, any remediation, corrective action, response, removal or remedial action, or investigation, operations and maintenance or monitoring costs, for personal injury or property damages, real or personal) of any kind whatsoever, pursuant to any environmental law as a result of this Indenture, the Intercreditor Agreements, the Security Documents or any actions taken pursuant hereto or thereto.  Further, the parties hereto and the Holders hereby agree and acknowledge that in the exercise of its rights under this Indenture, the Intercreditor Agreements and the Security Documents, the Collateral Agent or the Trustee may hold or obtain indicia of ownership primarily to protect the security interest of the Collateral Agent or the Trustee in the Collateral and that any such actions taken by the Collateral Agent or the Trustee shall not be construed as or otherwise constitute any participation in the management of such Collateral.  In the event that the Collateral Agent or the Trustee is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Collateral Agent's or the Trustee's sole discretion may cause the Collateral Agent or the Trustee to be considered an "owner

or operator" under the provisions of the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), 42 U.S.C. §9601, et seq., or otherwise cause the Collateral Agent or the Trustee to incur liability under CERCLA or any other federal, state or local law, the Collateral Agent and the Trustee reserves the right, instead of taking such action, to either resign as the Collateral Agent or the Trustee or arrange for the transfer of the title or control of the asset to a court-appointed receiver.  Neither the Collateral Agent nor the Trustee shall be liable to the Issuer, the Subsidiary Guarantors or any other Person for any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Collateral Agent's or the Trustee's actions and conduct as authorized, empowered and directed hereunder or relating to the discharge, release or threatened release of hazardous materials into the environment. If at any time it is necessary or advisable for property to be possessed, owned, operated or managed by any Person (including the Collateral Agent or the Trustee) other than the Issuer or the Subsidiary Guarantors, subject to the terms of the Security Documents, a majority in interest of Holders shall direct the Collateral Agent or the Trustee to appoint an appropriately qualified Person (excluding the Collateral Agent or the Trustee) who they shall designate to possess, own, operate or manage, as the case may be, the property.

(Q)     Neither the Trustee nor the Collateral Agent shall be under any obligation to effect or maintain insurance or to renew any policies of insurance or to make any determination or inquire as to the sufficiency of any policies of insurance carried by the Issuer or any Subsidiary Guarantor, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require any such payment to be made.

(R)     Without limiting the foregoing, with respect to any Collateral located outside of the United States ("Foreign Collateral"), the Collateral Agent shall have no obligation to directly enforce, or exercise rights and remedies in respect of, or otherwise exercise any judicial action or appear before any court in any jurisdiction outside of the United States.  To the extent the Majority Holders determine that it is necessary or advisable in connection with any enforcement or exercise of rights with respect to Foreign Collateral to exercise any judicial action or appear before any such court, the Majority Holders shall be entitled to direct the Collateral Agent to appoint a local agent for such purpose (subject to the receipt of such protections, security and indemnities as the Collateral Agent shall determine in its sole discretion to protect the Collateral Agent from liability).

(S)     Neither the Collateral Agent nor the Trustee shall have any responsibility or liability for the actions or omissions of the any other agent under the Intercreditor Agreements, nor shall the Trustee or Collateral Agent be obligated at any time to indemnify any person in connection with the exercise of any remedy under the Security Documents.

(T)     The Collateral Agent may resign at any time by notice to the Trustee and the Issuer, such resignation to be effective upon the acceptance of a successor agent to its appointment as Collateral Agent. The Collateral Agent may be removed by the Issuer at any time, upon thirty days written notice to the Collateral Agent. If the Collateral Agent resigns or is removed under this Indenture, the Issuer shall appoint a successor collateral agent. If no successor collateral agent is appointed and has accepted such appointment within 30 days after the Collateral Agent gave notice of resignation or was removed, the retiring Collateral Agent may (at the expense of the Issuer), at its option, appoint a successor Collateral Agent or petition a court of competent jurisdiction for the

- 147 -

appointment of a successor.  Upon the acceptance of its appointment as successor collateral agent hereunder, such successor collateral agent shall succeed to all the rights, powers and duties of the retiring Collateral Agent, and the term "Collateral Agent" shall mean such successor collateral agent, and the retiring or removed Collateral Agent's appointment, powers and duties as the Collateral Agent shall be terminated. After the retiring Collateral Agent's resignation or removal hereunder, the provisions of this Section 11.01 (and Section 10.06) shall continue to inure to its benefit and the retiring or removed Collateral Agent shall not by reason of such resignation or removal be deemed to be released from liability as to any actions taken or omitted to be taken by it while it was the Collateral Agent under this Indenture.

(U)     If the Collateral Agent consolidates, mergers, converts into or transfers all or substantially all of its corporate trust business to another corporation, such successor corporation without any further act shall be the successor Collateral Agent.

(V)     Permissive rights of the Collateral Agent to do things enumerated in this Indenture, the Security Documents or the Intercreditor Agreements shall not be construed as a duty.

(W)     Nothing in this Indenture shall require the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder.

(X)     The Collateral Agent shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of the Holders, unless the Holders have offered to the Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against the costs, expenses and liabilities which may be incurred by it in compliance with such direction or request.

(Y)     In no event shall the Collateral Agent be responsible or liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(Z)     Before the Collateral Agent acts or refrains from acting in each case at the request or direction of the Issuer or the Subsidiary Guarantors, it may require an Officer's Certificate and an Opinion of Counsel, which shall conform to the provisions of **Section 13.03**. The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion. The Collateral Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Collateral Agent in accordance with the advice of counsel or other professionals retained or consulted by the Collateral Agent.

(AA)     The Collateral Agent may act through attorneys or agents and shall not be responsible for the acts or omissions of any such attorney or agent appointed with due care.

(BB)     The Collateral Agent shall not be charged with knowledge of (i) any events or other information, or (ii) any default under this Indenture or any other agreement unless a Responsible Officer of the Collateral Agent shall have actual knowledge thereof.

- 148 -

(CC)   The Collateral Agent may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties, not only as to due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein.

(DD)   The Collateral Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(EE)   The Collateral Agent shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to **Section 7.07**. The Majority Holders may direct the time, method and place of conducting any proceeding for any remedy available to the Collateral Agent or of exercising any trust or power conferred on the Collateral Agent. However, the Collateral Agent may refuse to follow any direction that conflicts with law or this Indenture or the Notes, the Security Documents or the Intercreditor Agreements or that the Collateral Agent  determines is unduly prejudicial to the rights of other Holders (provided that the Collateral Agent shall not have an affirmative duty to determine whether any such action is unduly prejudicial) or would involve the Collateral Agent in personal liability; provided, however, that the Collateral Agent may take any other action deemed proper by the Collateral Agent that is not inconsistent with such direction. Prior to taking any such action hereunder, the Collateral Agent shall be entitled to indemnification reasonably satisfactory to it against all fees, losses, liabilities and expenses (including attorney's fees and expenses) that may be caused by taking or not taking such action.

(FF)   The Collateral Agent shall not be liable for interest on any money received by it except as the Collateral Agent may agree in writing with the Issuer (and money held in trust by the Collateral Agent need not be segregated from other funds except to the extent required by law).

(GG)   Notwithstanding anything else to the contrary set forth herein, whenever reference is made herein or in any other Note Document to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken (or not to be) suffered or omitted by the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Collateral Agent, (i) such provision shall refer to the Collateral Agent exercising each of the foregoing at the instruction of the Majority Holders (or such other number or percentage of Holders as is required by the Note Documents) and (ii) it is understood that in all cases, the Collateral Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from the Majority Holders (or such other number or percentage of Holders as shall be expressly provided for in any Note Document) in respect of such action.

- 149 -

**Section 11.02. DELEGATION OF DUTIES.**

(A)     The Trustee and the Collateral Agent (each an "**Agent**") may execute any of their respective duties under this Indenture and the other Note Documents (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof)) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants and experts concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents, attorneys-in-fact or Subagent selected by it with reasonable care.  Each Agent may also from time to time, when it deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "**Subagent**") with respect to all or any part of the Collateral; *provided*, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the applicable Agent.  Should any instrument in writing from the Issuer or any other Note Party be required by any Subagent so appointed by an Agent to more fully or certainly vest in and confirm to such Subagent such rights, powers, privileges and duties, the Issuer shall, or shall cause such Note Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by such Agent.  If any Subagent, or successor thereto, shall become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Trustee or the Collateral Agent until the appointment of a new Subagent.

**Section 11.03. SECURITY DOCUMENTS.**

(A)     The Holders and the other Secured Parties authorize the Collateral Agent and the Trustee to release any Collateral or Subsidiary Guarantors in accordance with **Section 11.05** or Section 12.04 or if approved, authorized or ratified in accordance with **Article 8**.

(B)     The Holders and the other Secured Parties hereby authorize and instruct the Trustee and the Collateral Agent to, without any further consent of any Holders or any other Secured Party (other than any consent of the Holders to the form of any Additional Intercreditor Agreement, to the extent required by **Article 8** or **Article 14**), enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify (i) the First Lien/Second Lien Intercreditor Agreement, (ii) the Pari Passu Intercreditor Agreement or (iii) any Additional Intercreditor Agreement, in each case of clauses (i), (ii) and (iii), with the collateral agent or other representatives of the holders of Indebtedness or other obligations that is to be secured by a Lien on the Collateral that is expressly permitted (including with respect to priority) under this Indenture and to subject the Liens on the Collateral securing the Note Obligations to the provisions thereof. The Holders and the other Secured Parties agree that (x) the Trustee and the Collateral Agent may rely exclusively on an Officer's Certificate of the Issuer as to whether any such other Liens are expressly permitted and that all covenants and conditions precedent to the execution of such Intercreditor Agreement have been complied with and (y) any Intercreditor Agreement entered into by the Trustee or the Collateral Agent in compliance with the terms of this Indenture shall be binding on the Secured Parties, and each Holder and the other Secured Parties hereby agrees that it will take no actions contrary to the provisions of, if entered into in compliance with the terms of this Indenture and if applicable, any Intercreditor Agreement. The foregoing provisions are intended as an inducement to any provider of any Indebtedness or other obligations

- 150 -

expressly permitted by **Section 3.12** to extend credit to the Note Parties and such persons are intended third-party beneficiaries of such provisions.

**Section 11.04. AUTHORIZATION OF ACTIONS TO BE TAKEN**.

(A)     Each Holder, by its acceptance of Notes, consents and agrees to the terms of each Security Document and each Intercreditor Agreement as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Indenture, authorizes and directs the Trustee and/or the Collateral Agent to enter into each Intercreditor Agreement permitted by the terms of this Indenture and the Security Documents to which it is a party, authorizes and empowers the Trustee to direct the Collateral Agent to enter into, and the Collateral Agent to execute and deliver, the Security Documents and each Intercreditor Agreement permitted hereunder and authorizes and empowers the Trustee and the Collateral Agent to bind the holders of Notes and other holders of Note Obligations as set forth in the Security Documents to which it is a party and each Intercreditor Agreement permitted hereunder and to perform its obligations and exercise its rights and powers thereunder.

(B)     Subject to the provisions of each Intercreditor Agreement and the Security Documents, the Trustee and the Collateral Agent are authorized and empowered to receive for the benefit of the holders of Notes any funds collected or distributed under the Security Documents to which the Collateral Agent or Trustee is a party and to make further distributions of such funds to the holders of Notes according to the provisions of this Indenture.

(C)     Subject to the provisions of **Article 7**, **Section 10.01** and **Section 10.02**, each Intercreditor Agreement and the Security Documents, upon the occurrence and during the continuance of an Event of Default, the Trustee may, in its sole discretion and without the consent of the Holders, direct, on behalf of the Holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

>     (i)     foreclose upon or otherwise enforce any or all of the Liens securing the Note Obligations;

>     (ii)     enforce any of the terms of the Security Documents to which the Collateral Agent or Trustee is a party; or

>     (iii)     collect and receive payment of any and all Note Obligations.

(D)     Subject to the terms of each Intercreditor Agreement, the Trustee is authorized and empowered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem expedient to protect or enforce the Liens securing the Note Obligations or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Holders in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid

if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of Holders, the Trustee or the Collateral Agent.

**Section 11.05. RELEASE OR SUBORDINATION OF LIENS.**

(A)     The Holders and the other Secured Parties hereby irrevocably agree that the Liens granted to the Collateral Agent by the Note Parties on any Collateral shall be automatically released: (i) in full upon the occurrence of the Termination Date subject to **Section 11.05(D)**; (ii) upon the Disposition of such Collateral by any Note Party to a person that is not (and is not required to become) a Note Party in a transaction not prohibited by this Indenture (and the Collateral Agent and the Trustee may rely conclusively on an Officer's Certificate to that effect provided to it by any Note Party upon its reasonable request without further inquiry), (iii) to the extent that such Collateral comprises property leased to a Note Party, upon termination or expiration of such lease (and the Collateral Agent may rely conclusively on an Officer's Certificate to that effect provided to it by any Note Party upon its reasonable request without further inquiry), (iv) if the release of such Lien is approved, authorized or ratified in writing by the Majority Holders (or such other percentage of the Holders whose consent may be required in accordance with **Article 8**), (v) to the extent that the property constituting such Collateral is owned by any Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from its obligations under its Subsidiary Guarantee in accordance with this Indenture (and the Collateral Agent and the Trustee may rely conclusively on an Officer's Certificate to that effect provided to it by any Note Party upon its reasonable request without inquiry), (vi) as required by the Trustee to effect any Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent or the Trustee pursuant to the Security Documents and (vii) as required by the terms of any Intercreditor Agreement.  The Holders and the other Secured Parties hereby irrevocably agree that the Liens granted to the Collateral Agent by the Note Parties on any Collateral shall be automatically subordinated to the Liens securing other Indebtedness or other obligations to the extent expressly contemplated by this Indenture and required by any Intercreditor Agreement permitted by this Indenture.  Any such release or subordination shall not in any manner discharge, affect, or impair the Note Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Note Parties in respect of) all interests retained by the Note Parties, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Note Documents.

(B)     [Reserved.]

(C)     The Holders and the other Secured Parties hereby authorize the Trustee and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Subsidiary Guarantor or the release or subordination of any Collateral pursuant to **Section 11.03** and the foregoing provisions of this **Section 11.05** and to return to the Issuer all title documents (including share certificates (if any)) held by it in respect of any Collateral, all without the further consent or joinder of any Holder or any other Secured Party.  Any representation, warranty or covenant contained in any Note Document relating to any such Collateral or Subsidiary Guarantor shall no longer be deemed to be made.  In connection with any release or subordination hereunder, the Trustee and the Collateral Agent shall promptly (and the Secured Parties hereby authorize the Trustee and the Collateral Agent to) take such action and execute any such documents as may be reasonably

- 152 -

requested by the Issuer and at the Issuer's expense in connection with the release or subordination of any Liens or release of Guarantees created by any Note Document in respect of such Subsidiary, property or asset; provided, that the Trustee and the Collateral Agent shall have received an Officer's Certificate containing such certifications as the Trustee or the Collateral Agent, as applicable, shall reasonably request (and the Trustee and the Collateral Agent may rely conclusively on an Officer's Certificate to that effect provided to it by any Note Party upon its reasonable request without inquiry). Notwithstanding anything to the contrary contained herein or any other Note Document, on the Termination Date, upon request of the Issuer, the Trustee and/or the Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral (including returning to the Issuer all share certificates (if any) held by it in respect of any Collateral ), and to release all obligations under any Note Document [(other than the Investor Rights Agreement)], whether or not on the date of such release there may be any contingent indemnification obligations or expense reimbursement claims not then due; *provided*, that the Trustee and the Collateral Agent shall have received an Officer's Certificate of the Issuer containing such certifications as the Trustee and the Collateral Agent shall reasonably request (and the Trustee and the Collateral Agent may rely conclusively on an Officer's Certificate to that effect provided to it by any Note Party upon its reasonable request without inquiry).

(D)     Any such release of obligations shall be deemed subject to the provision that such obligations shall be reinstated if after such release any portion of any payment in respect of the obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Issuer or any Subsidiary Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Issuer or any Subsidiary Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made. The Issuer agrees to pay all reasonable and documented out-of-pocket expenses incurred by the Trustee or the Collateral Agent (and their respective representatives) in connection with taking such actions to release security interest in all Collateral and all obligations under the Note Documents as contemplated by this **Section 11.05(D)**.

**Section 11.06. POWERS EXERCISABLE BY RECEIVER OR TRUSTEE**.

(A)     In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this **Article 11** upon the Issuer or the Subsidiary Guarantors with respect to the release, subordination, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or the Subsidiary Guarantors or of any officer or officers thereof required by the provisions of this **Article 11**; and if the Trustee, the Collateral Agent or a nominee of the Trustee or Collateral Agent shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee, Collateral Agent or a nominee of the Trustee or Collateral Agent.

**Section 11.07. RELEASE UPON TERMINATION OF THE ISSUER'S OBLIGATIONS**.

(A)     In the event (i) that the Issuer delivers to the Trustee an Officer's Certificate certifying that all the obligations under this Indenture, the Notes and the Security Documents (other

than any contingent indemnification obligations or expense reimburse claims not then due) have been satisfied and discharged by the payment in full of the Issuer's obligations under the Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, or (ii) a discharge of this Indenture occurs under **Article 9**, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the Holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done all acts reasonably necessary at the request and expense of the Issuer to release such Lien as soon as is reasonably practicable.

**Section 11.08. RIGHT TO REALIZE ON COLLATERAL AND ENFORCE GUARANTEES.**

(A)     Subject to the Intercreditor Agreement, in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Note Party, (i) the Trustee (irrespective of whether the principal of any Note Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Issuer) shall be entitled and empowered, by intervention in such proceeding or otherwise (A) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of any or all of the Note Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Holders and the Trustee and any Subagents allowed in such judicial proceeding, and (B) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and (ii) any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, if the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due for the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel, and any other amounts due the Trustee under the Note Documents.  Nothing contained herein shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Note Obligations or the rights of any Holder or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

(B)     Anything contained in any of the Note Documents to the contrary notwithstanding, the Issuer, the Trustee, the Collateral Agent and each Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Subsidiary Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Trustee, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent, and (b) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, to the extent permitted by applicable law, the Collateral Agent or any Holder may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Note Party or Note Parties in its or their respective individual capacities unless the [Supermajority Holders] shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the

- 154 -

purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Note Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other Disposition.

**Section 11.09. PARALLEL DEBT (COVENANT TO PAY THE COLLATERAL AGENT)**.

(A)     The Issuer and, subject to **Section 12.06**, each Subsidiary Guarantor hereby irrevocably and unconditionally undertakes to pay to the Collateral Agent amounts equal to any amounts owing from time to time by the Issuer or that Subsidiary Guarantor to any Secured Party under any Note Document as and when those amounts are due and payable.

(B)     The Issuer, each Subsidiary Guarantor and the Collateral Agent acknowledges that the obligations of the Issuer and each Subsidiary Guarantor under paragraph (A) above are several and are separate and independent from, and shall not in any way limit or affect, the corresponding obligations of the Issuer or that Subsidiary Guarantor to any Secured Party under any Note Document (its "**Corresponding Debt**"), nor shall it constitute the Collateral Agent and any Note Party as joint creditors of any Corresponding Debt, nor shall the amounts for which the Issuer or each Subsidiary Guarantor is liable under paragraph (A) above (its "**Parallel Debt**") be limited or affected in any way by its Corresponding Debt provided that:

(i)     The Parallel Debt of the Issuer and each Subsidiary Guarantor shall be decreased and the Collateral Agent shall not demand payment to the extent that its Corresponding Debt has been paid or (in the case of guarantee obligations) discharged; and

(ii)     The Corresponding Debt of the Issuer and each Subsidiary Guarantor shall be decreased and the Collateral Agent shall not demand payment to the extent that its Parallel Debt has been paid or (in the case of guarantee obligations) discharged.

(C)     For the purposes of this **Section 11.09**, the Collateral Agent acts in its own name and not as a trustee, and its claims in respect of the Parallel Debt shall not be held on trust and instead shall be owed to it in its individual capacity. The Collateral granted under the Security Documents to the Collateral Agent to secure the Parallel Debt is granted to the Collateral Agent in its capacity as Parallel Debt Creditor and shall not be held on trust.

(D)     All moneys received or recovered by the Collateral Agent pursuant to this **Section 11.09**, and all amounts received or recovered by the Collateral Agent from or by the enforcement of any Collateral granted to secure the Parallel Debt, shall be applied in accordance with this Indenture.

## Article 12.     GUARANTEES

**Section 12.01. SUBSIDIARY GUARANTEES**.

(A)     Subject to this **Article 12**, each of the Subsidiary Guarantors hereby, jointly and severally, unconditionally guarantees, on a senior basis, as primary obligors and not as a surety, to each the Collateral Agent for the benefit of each Holder (and its successors and assigns) of a Note authenticated and delivered by the Trustee and each of the Collateral Agent and the Trustee to the

Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes, the Note Documents and/or the Obligations of the Issuer:

> (i)      that the principal of, interest on, or any other amount payable to the Holders, under the Notes shall be promptly paid in full or performed when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest (including but not limited to any interest, fees, costs or charges that would accrue but for the provisions of applicable Bankruptcy Law after any insolvency proceeding), on the Notes, if any, if lawful; and

> (ii)     that in the case of any extension of time of payment or renewal of any Notes or the payment of any other amount payable to the Holders, the same shall be promptly paid in full when due (such obligations in **clauses (i)** and **(ii)** being herein collectively called the "**Guaranteed Obligations**").

(B)     Failing payment when so due of any amount so guaranteed for whatever reason, the Subsidiary Guarantors will be jointly and severally obligated to pay the same immediately. An Event of Default under this Indenture or the Notes shall constitute an event of default under the Subsidiary Guarantees, and shall entitle the Holders to accelerate the obligations of the Subsidiary Guarantors hereunder in the same manner and to the same extent as the obligations of the Issuer.

(C)     The Subsidiary Guarantors hereby agree that their obligations hereunder shall be absolute, irrevocable and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the Notes, this Indenture, the Note Documents or any other agreement or instrument referred to herein or therein, the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance (other than complete performance) which might otherwise constitute a legal or equitable discharge or defense of a surety of Subsidiary Guarantor, all to the fullest extent permitted by law. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Subsidiary Guarantors hereunder which remain absolute, irrevocable and unconditional under any and all circumstances as described above, to the fullest extent permitted by law:

> (i)     at any time or from time to time, without notice to the Subsidiary Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

> (ii)     any of the acts mentioned in any of the provisions of this Indenture or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

> (iii)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Indenture, Notes, or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed

Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)     any Lien or security interest granted to, or in favor of any Holder, the Collateral Agent or the Trustee as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)     the release of any other Subsidiary Guarantor.

(D)     Each Subsidiary Guarantor further, to the fullest extent permitted by law, hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenants that its Subsidiary Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

(E)     Until terminated in accordance with **Section 12.05**, each Subsidiary Guarantee shall, to the fullest extent permitted by law, remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation, reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee or other similar officer be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment of the Notes are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or Subsidiary Guarantees, whether as a "voidable preference," "fraudulent transfer" or otherwise, all as though such payment had not been made. In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(F)     Each Subsidiary Guarantor further agrees that, as between the Subsidiary Guarantors, on the one hand, and the Holders, the Collateral Agent and the Trustee, on the other hand, (a) the maturity of the obligations guaranteed hereby may be accelerated as provided in **Section 7.02** hereof (and shall be deemed to have become automatically due and payable in the circumstances in said **Section 7.02**) for the purposes of its Subsidiary Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed thereby, and (b) in the event of any declaration of acceleration of such obligations as provided in **Section 7.02** hereof, such obligations (whether or not due and payable) shall forthwith become due and payable by the Subsidiary Guarantor for the purpose of its Subsidiary Guarantee. The Subsidiary Guarantors shall have the right to seek contribution from any non-paying Subsidiary Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Subsidiary Guarantees.

(G)     Each Subsidiary Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees) incurred by the Trustee or the Collateral Agent in enforcing any rights under the Note Documents.

(H)     Each Subsidiary Guarantor shall be subrogated to all rights of Holders against the Issuer in respect of any amounts paid by such Subsidiary Guarantor pursuant to the provisions of this **Section 12.01**; provided that, no Subsidiary Guarantor shall be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under this Indenture, the Notes or the Note Documents shall have been paid in full in cash.

(I)     Each payment to be made by a Subsidiary Guarantor in respect of its Subsidiary Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

(J)     Each Subsidiary Guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held in connection with the Note Documents or any of them.

**Section 12.02. EXECUTION AND DELIVERY**.

(A)     To evidence its Subsidiary Guarantee set forth in **Section 12.01** hereof, each Subsidiary Guarantor hereby agrees that this Indenture (or a supplemental indenture) shall be executed on behalf of such Subsidiary Guarantor by one of its authorized officers.

(B)     Each Subsidiary Guarantor hereby agrees that its Subsidiary Guarantee set forth in **Section 12.01** hereof shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Subsidiary Guarantee on the Notes. If an officer whose signature is on this Indenture (or a supplemental indenture) no longer holds that office at the time the Trustee authenticates a Note, the Subsidiary Guarantee of such Subsidiary Guarantor shall be valid nevertheless.

(C)     The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Subsidiary Guarantee set forth in this Indenture on behalf of the Subsidiary Guarantors.

**Section 12.03. [RESERVED]**.

**Section 12.04. RELEASES OF SUBSIDIARY GUARANTEES**.

(A)     The Subsidiary Guarantee of a Subsidiary Guarantor shall be automatically and unconditionally released:

(i)     in connection with (x) any disposition (including by way of merger or consolidation) of the Equity Interests of such Subsidiary Guarantor (or the Equity Interests of the direct parent of such Subsidiary Guarantor) to a Person that is not (either before or after giving effect to such transaction) a Note Party, to the extent such sale is permitted under any First-Priority Debt Documents and is not in violation of Section 3.16 or (y) any sale or other disposition of all or substantially all of the properties or assets of that Subsidiary Guarantor, by way of merger, consolidation or otherwise solely to the extent that such sale or other disposition is permitted pursuant to **Section 6.01**, in each case, only provided that the applicable guarantee of such Subsidiary Guarantor under First-Priority

- 158 -

Debt Documents is also released under any First-Priority Debt Documents substantially at the same time;

(ii)     the liquidation or dissolution of such Subsidiary Guarantor; *provided* that no Event of Default occurs as a result thereof or has occurred or is continuing;

(iii)     upon exercise of the Legal Defeasance Option or Covenant Defeasance Option, or the satisfaction and discharge of this Indenture and the other Note Documents [(other than the Investor Rights Agreement)], in each case in accordance with **Article 9**;

(iv)     if such Subsidiary Guarantor is not a Significant Subsidiary (or would be deemed an Immaterial Subsidiary (as defined in the First Lien Notes Indenture)) under the First Lien Notes Indenture; *provided* that no Event of Default occurs as a result thereof or has occurred or is continuing;

(v)     upon the occurrence of the Termination Date subject to **Section 11.05(D)**;

(vi)     if such Subsidiary Guarantor is an Excluded Subsidiary or upon consummation of any transaction not prohibited hereunder resulting in such Subsidiary Guarantor ceasing to constitute a Subsidiary or otherwise becoming an Excluded Subsidiary; or

(vii)     in accordance with the terms of any Intercreditor Agreement.

(B)     Upon delivery by the Issuer to the Trustee of an Officer's Certificate or an Opinion of Counsel to the effect that any of the conditions described in the foregoing clauses **(i), (ii), (iii), (iv), (v) and (vi)** of **Section 12.04(A)** has occurred and the conditions precedent to such transactions provided for in this Indenture have been complied with, the Trustee shall promptly execute any documents reasonably requested by the Issuer in order to evidence the release of any Subsidiary Guarantor from its obligations under its Subsidiary Guarantee. Any Subsidiary Guarantor not released from its obligations under its Subsidiary Guarantee shall remain liable for the full amount of principal of and interest, premium, if any, on, the Notes and for the other obligations of such Subsidiary Guarantor under this Indenture as provided in this **Article 12**.

(C)     Further, the Subsidiary Guarantees are not convertible and will automatically terminate when the Notes are all converted in full in accordance with **Article 5**.

**Section 12.05.** **INSTRUMENT FOR THE PAYMENT OF MONEY**.

(A)     Each Subsidiary Guarantor hereby acknowledges that the guarantee in this **Article 12** constitutes an instrument for the payment of money, and consents and agrees that any Holder (to the extent that the Holder is otherwise entitled to exercise rights and remedies hereunder) or the Trustee, at its sole option, in the event of a dispute by such Subsidiary Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213 to the extent permitted thereunder.

**Section 12.06. LIMITATION ON SUBSIDIARY GUARANTOR LIABILITY**.

(A)     Each Subsidiary Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Subsidiary Guarantee of such Subsidiary Guarantor not constitute a fraudulent transfer or conveyance for purposes of any bankruptcy law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law or any comparable laws in any other jurisdiction to the extent applicable to any Subsidiary Guarantee. The obligations of each Subsidiary Guarantor under its Subsidiary Guarantee will be limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Subsidiary Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Subsidiary Guarantor in respect of the obligations of such other Subsidiary Guarantor under its Subsidiary Guarantee or pursuant to its contribution obligations under this Indenture, result in the obligations of such Subsidiary Guarantor under its Subsidiary Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or state law or any comparable laws in any other jurisdiction and not otherwise being void or voidable under any similar laws affecting the rights of creditors generally.

**Section 12.07. "TRUSTEE" TO INCLUDE PAYING AGENT**.

(A)     In case at any time any Paying Agent other than the Trustee shall have been appointed and be then acting hereunder, the term "Trustee" as used in this **Article 12** shall in each case (unless the context shall otherwise require) be construed as extending to and including such Paying Agent within its meaning as fully and for all intents and purposes as if such Paying Agent were named in this **Article 12** in place of the Trustee.

## Article 13.     MISCELLANEOUS

**Section 13.01. NOTICES**.

Any notice or communication by any Note Party or the Trustee, Collateral Agent and Note Agent to the other must be provided in writing and will be deemed to have been duly given in writing if delivered in person or by first class mail (registered or certified, return receipt requested), facsimile transmission, electronic transmission or other similar means of unsecured electronic communication or overnight air courier guaranteeing next day delivery, or to the other's address, which initially is as follows:

If to any Note Party:

> Wolfspeed, Inc.
> 4600 Silicon Drive
> Durham, North Carolina 27703
> Attention: General Counsel
> Facsimile No.: [●]

If to the Trustee or Collateral Agent:

> U.S. Bank Trust Company, National Association

333 Commerce Street, Suite 900
Nashville, Tennessee  37201
Attention: Global Corporate Trust – Wolfspeed, Inc.
Facsimile No.: 615-251-0737

Any Note Party, the Trustee or the Collateral Agent, by notice to the other, may designate additional or different addresses (including facsimile numbers and electronic addresses) for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: (A) at the time delivered by hand, if personally delivered; (B) five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; (C) when receipt acknowledged, if transmitted by facsimile, electronic transmission or other similar means of unsecured electronic communication; and (D) the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

All notices or communications required to be made to a Holder pursuant to this Indenture must be made in writing and will be deemed to be duly sent or given in writing if mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery, to its address shown on the Register; *provided*, *however*, that a notice or communication to a Holder of a Global Note may, but need not, instead be sent pursuant to the Depositary Procedures (in which case, such notice will be deemed to be duly sent or given in writing). The failure to send a notice or communication to a Holder, or any defect in such notice or communication, will not affect its sufficiency with respect to any other Holder.

If the Trustee is then acting as the Depositary's custodian for the Notes, then, at the reasonable request of the Issuer to the Trustee, the Trustee will cause any notice prepared by the Issuer to be sent to any Holder(s) pursuant to the Depositary Procedures, *provided* such request is evidenced in a Issuer Order delivered, together with the text of such notice, to the Trustee at least two (2) Business Days before the date such notice is to be so sent. For the avoidance of doubt, such Issuer Order need not be accompanied by an Officer's Certificate or Opinion of Counsel. The Trustee will not have any liability relating to the contents of any notice that it sends to any Holder pursuant to any such Issuer Order.

If a notice or communication is mailed or sent in the manner provided above within the time prescribed, it will be deemed to have been duly given, whether or not the addressee receives it.

Notwithstanding anything to the contrary in this Indenture or the Notes, (A) whenever any provision of this Indenture requires a party to send notice to another party, no such notice need be sent if the sending party and the recipient are the same Person acting in different capacities; and (B) whenever any provision of this Indenture requires a party to send notice to more than one receiving party, and each receiving party is the same Person acting in different capacities, then only one such notice need be sent to such Person.

Facsimile, documents executed, scanned and transmitted electronically and electronic signatures, including those created or transmitted through a software platform or application, will

- 161 -

be deemed original signatures for purposes of this Indenture and all matters and agreements related thereto, with such facsimile, scanned and electronic signatures having the same legal effect as original signatures. The parties agree that this Indenture or any instrument, agreement or document necessary for the consummation of the transactions contemplated by this Indenture or related hereto or thereto (including addendums, amendments, notices, instructions, communications with respect to the delivery of securities or the wire transfer of funds or other communications) ("**Executed Documentation**") may be accepted, executed or agreed to through the use of an electronic signature in accordance with applicable laws, rules and regulations in effect from time to time applicable to the effectiveness and enforceability of electronic signatures. Any Executed Documentation accepted, executed or agreed to in conformity with such laws, rules and regulations will be binding on all parties to this Indenture to the same extent as if it were physically executed and each party hereby consents to the use of any third- party electronic signature capture service providers as may be reasonably chosen by a signatory hereto or thereto. When the Trustee, Collateral Agent or a Note Agent acts on any Executed Documentation sent by electronic transmission, the Trustee, Collateral Agent or Note Agent will not be responsible or liable for any losses, costs or expenses arising directly or indirectly from its reliance upon and compliance with such Executed Documentation, notwithstanding that such Executed Documentation (A) may not be an authorized or authentic communication of the party involved or in the form such party sent or intended to send (whether due to fraud, distortion or otherwise); or (B) may conflict with, or be inconsistent with, a subsequent written instruction or communication; it is understood and agreed that the Trustee, Collateral Agent and each Note Agent will conclusively presume that Executed Documentation that purports to have been sent by an authorized officer of a Person has been sent by an authorized officer of such Person. The party providing Executed Documentation through electronic transmission or otherwise with electronic signatures agrees to assume all risks arising out of such electronic methods, including the risk of the Trustee, Collateral Agent or a Note Agent acting on unauthorized instructions and the risk of interception and misuse by third parties.

**Section 13.02. DELIVERY OF OFFICER'S CERTIFICATE AND OPINION OF COUNSEL AS TO CONDITIONS PRECEDENT.**

Upon any request or application by the Issuer to the Trustee or to the Collateral Agent to take any action under this Indenture or the other Note Documents (other than with respect to clause (B) below, the initial authentication of Notes under this Indenture), the Issuer will furnish to the Trustee and the Collateral Agent:

(A)    an Officer's Certificate in form and substance reasonably satisfactory to the Trustee and the Collateral Agent that complies with **Section 13.03** and states that, in the opinion of the signatory thereto, all conditions precedent and covenants, if any, provided for in this Indenture and, as applicable, the other Note Documents, relating to such action have been satisfied; and

(B)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee that complies with **Section 13.03** and states that, in the opinion of such counsel, all such conditions precedent and covenants, if any, have been satisfied.

**Section 13.03. STATEMENTS REQUIRED IN OFFICER'S CERTIFICATE AND OPINION OF COUNSEL.**

Upon any application or request by the Issuer to the Trustee or the Collateral Agent to take or refrain from taking any action under any provision of this Indenture or the other Note Documents, the Issuer shall furnish to the Trustee or the Collateral Agent such certificates and opinions as may be required under the provisions of the Trust Indenture Act made a part of this Indenture and hereunder. Each such certificate or opinion shall be given in the form of an Officer's Certificate, if to be given by an Officer of the Issuer, or an Opinion of Counsel, if to be given by counsel, and shall comply with the requirements of the Trust Indenture Act and any other requirements set forth in this Indenture.

Each Officer's Certificate (other than an Officer's Certificate pursuant to **Section 3.06**) or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture or the other Note Documents will include:

(A)     a statement that the signatory making such certificate or opinion thereto has read such covenant or condition;

(B)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion therein are based;

(C)     a statement that, in the opinion of such signatory, he, she or it has made such examination or investigation as is necessary to enable him, her or it to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(D)     a statement as to whether, in the opinion of such signatory, such covenant or condition has been complied with.

Any certificate, statement or opinion of an Officer of the Issuer or of counsel may be based, insofar as it relates to accounting matters, upon a certificate or opinion of or representations by an accountant or firm of accountants in the employ of the Issuer, unless such officer or counsel, as the case may be, knows that the certificate or opinion or representations with respect to the accounting matters upon which his certificate, statement or opinion may be based as aforesaid are erroneous.

Any certificate or opinion of any independent firm of public accountants filed with the Trustee shall contain a statement that such firm is independent.

**Section 13.04. RULES BY THE TRUSTEE, THE REGISTRAR AND THE PAYING AGENT.**

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.05. NO PERSONAL LIABILITY OF DIRECTORS, OFFICERS, EMPLOYEES AND STOCKHOLDERS.

No past, present or future director, officer, employee, incorporator or stockholder of any Note Party, as such, will have any liability for any obligations of such Note Party under this Indenture, the Intercreditor Agreements or the Notes or for any claim based on, in respect of, or by reason of, such obligations or their creation. By accepting any Note, each Holder waives and releases all such liability. Such waiver and release are part of the consideration for the issuance of the Notes.

Section 13.06. GOVERNING LAW; WAIVER OF JURY TRIAL.

THIS INDENTURE AND THE NOTES, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS INDENTURE OR THE NOTES, WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. EACH OF THE NOTE PARTIES, THE TRUSTEE AND THE COLLATERAL AGENT AND THE HOLDERS BY THEIR ACCEPTANCE OF THE NOTES, IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED BY THIS INDENTURE OR THE NOTES.

Section 13.07. SUBMISSION TO JURISDICTION.

Any legal suit, action or proceeding arising out of or based upon this Indenture or the transactions contemplated by this Indenture may be instituted in the federal courts of the United States of America or the courts of the State of New York, in each case located in the Borough of Manhattan in the City of New York (collectively, the "**Specified Courts**"), and each party irrevocably submits to the non-exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of any process, summons, notice or document by mail (to the extent allowed under any applicable statute or rule of court) to such party's address set forth in **Section 13.01** will be effective service of process for any such suit, action or proceeding brought in any such court. Each of the Note Parties, the Trustee, the Collateral Agent and Holders (by its acceptance of any Note) irrevocably and unconditionally waives any objection to the laying of venue of any suit, action or other proceeding in the Specified Courts and irrevocably and unconditionally waives and agrees not to plead or claim any such suit, action or other proceeding has been brought in an inconvenient forum.

Section 13.08. NO ADVERSE INTERPRETATION OF OTHER AGREEMENTS.

Neither this Indenture nor the Notes may be used to interpret any other indenture, note, loan or debt agreement of the Issuer or its Subsidiaries or of any other Person, and no such indenture, note, loan or debt agreement may be used to interpret this Indenture or the Notes.

**Section 13.09. SUCCESSORS.**

All agreements of each Note Parties in this Indenture and the Notes will bind its successors. All agreements of the Trustee and the Collateral Agent in this Indenture will bind their respective successors.

**Section 13.10. FORCE MAJEURE.**

The Trustee, Collateral Agent and each Note Agent will not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility under this Indenture, the Notes or any other Note Document by reason of any occurrence beyond its control (including any act or provision of any present or future law or regulation or governmental authority, act of God or war, civil unrest,  local or national disturbance or disaster, act of terrorism or unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

**Section 13.11. U.S.A. PATRIOT ACT.**

In order to comply with the laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering, including Section 326 of the USA PATRIOT Act of the United States ("**Applicable Terrorism Law**"), the Trustee, Collateral Agent and the Note Agents are required to obtain, verify, record and update certain information relating to individuals and entities which maintain a business relationship with the Trustee, Collateral Agent and/or the Note Agents. Accordingly, each of the Note Parties (including any Person that executes an agreement to become a Subsidiary Guarantor) agrees to provide to the Trustee, Collateral Agent or any of the Note Agents (or any additional party that executes an agreement to become party to this Indenture as a trustee, a collateral trustee or a note agent) upon its request from time to time such documentation as may be available for such party in order to enable the Trustee, the Collateral Agent or any of the Note Agents (or any such additional party) to comply with Applicable Terrorism Law.

**Section 13.12. CALCULATIONS.**

The Issuer will be responsible for making all calculations called for under this Indenture or the Notes, including, but not limited to, determinations of the Last Reported Sale Price, the Daily Conversion Value, the Daily Cash Amount, the Daily Share Amount, accrued interest on the Notes, the Conversion Rate and the Conversion Price.

The Issuer will make all calculations in good faith, and, absent manifest error, its calculations will be final and binding on all Holders. The Issuer will provide a schedule of its calculations to the Trustee and the Conversion Agent, and each of the Trustee and the Conversion Agent may rely conclusively on the accuracy of the Issuer's calculations without independent verification. The Issuer will promptly forward a copy of each such schedule to a Holder upon its written request therefor.

**Section 13.13. SEVERABILITY.**

If any provision of this Indenture or the Notes is invalid, illegal or unenforceable, then the validity, legality and enforceability of the remaining provisions of this Indenture or the Notes will not in any way be affected or impaired thereby.

**Section 13.14. COUNTERPARTS.**

This Indenture and the Notes may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument. The exchange of copies of this Indenture or the Notes and of signature pages by facsimile, PDF transmission or similar imaged document transmitted by electronic transmission (including .jpeg file or any electronic signature complying with the U.S. federal ESIGN Act of 2000, including Orbit, Adobe Sign, DocuSign, or any other similar platform identified by the Issuer and reasonably available at no undue burden or expense to the Trustee or the Collateral Agent) shall be deemed original signatures for all purposes hereunder and shall constitute effective execution and delivery of this Indenture or the Notes as to the parties hereto and may be used in lieu of the original Indenture or Notes for all purposes. Any electronically signed document delivered via email from a person purporting to be an authorized officer shall be considered signed or executed by such authorized officer on behalf of the applicable Person. The Trustee and the Collateral Agent shall have no duty to inquire into or investigate the authenticity or authorization of any such electronic signature and shall be entitled to conclusively rely on any such electronic signature without any liability with respect thereto.

**Section 13.15. TABLE OF CONTENTS, HEADINGS, ETC.**

The table of contents and the headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions of this Indenture.

**Section 13.16. PROVISION REQUIRED BY TRUST INDENTURE ACT TO CONTROL.**

If and to the extent that any provision of this Indenture limits, qualifies or conflicts with duties imposed by, or with another provision (an "incorporated provision") included in this Indenture by operation of Sections 310 to 3178, inclusive, of the Trust Indenture Act, such imposed duties or incorporated provision shall control.

**Section 13.17. WITHHOLDING TAXES.**

Each Holder of a Note agrees, and each beneficial owner of an interest in a Global Note by its acquisition of such interest is deemed to agree, that if the Issuer or other applicable withholding agent (including the Trustee) is required by applicable law to pay withholding taxes or backup withholding on behalf of a Holder or beneficial owner as a result of an adjustment or the non-occurrence of an adjustment to the Conversion Rate, and the Issuer or such other withholding agent pays such taxes to the applicable taxing authority, then the Issuer or such other withholding agent, as applicable, may, at its option, withhold such amounts paid on behalf of the Holder or beneficial owner from or set off such payments against, payments of cash or the delivery of other Conversion

Consideration on such Note, or any payments on the Issuer's Common Stock or sales proceeds received by, or other funds or assets of, the Holder or beneficial owner of such Note.

## Article 14.    INTERCREDITOR ARRANGEMENTS

### Section 14.01. INTERCREDITOR AGREEMENTS.

(A)    The Indenture is entered into with the benefit of, and subject to the terms of, the Intercreditor Agreements and each Holder, by accepting a Note, shall be deemed to have agreed to, and accepted the terms and conditions of, the Intercreditor Agreements, to have authorized the Trustee and the Collateral Agent, as applicable, to enter into the Intercreditor Agreements on its behalf, and to have agreed that the Trustee and the Collateral Agent shall be bound by the Intercreditor Agreements, as well as this Indenture. The rights, duties and benefits of the Trustee and the Collateral Agent are governed by this Indenture and the Intercreditor Agreements. For the avoidance of doubt, to the extent any provision of any of the Intercreditor Agreements conflicts with the express provisions of this Indenture, the provisions of such Intercreditor Agreement shall govern and be controlling.

### Section 14.02. ADDITIONAL INTERCREDITOR AGREEMENTS.

(A)    At the request of the Issuer, at the time of the incurrence of any Indebtedness that is expressly permitted under this Indenture to share the Collateral or that is otherwise permitted to be incurred under this Indenture, the Issuer, the relevant Subsidiary Guarantors, the Trustee and the Collateral Agent will (without the consent of Holders), to the extent authorized and permitted under the then-existing applicable Intercreditor Agreement(s), enter into such amendments, supplements or agreements as necessary to add the obligees of such Indebtedness and/or any representative(s) thereof as party to the applicable Intercreditor Agreement(s), or an additional Intercreditor Agreement (each such agreement, an "**Additional Intercreditor Agreement**"); provided that such amendments, supplements, agreements or such Additional Intercreditor Agreement will not impose any personal obligations on the Trustee or the Collateral Agent or adversely affect the rights, duties, liabilities or immunities of the Trustee or the Collateral Agent under the Indenture or any Intercreditor Agreement.

(B)    At the written direction of the Issuer and without the consent of the Holders, the Trustee and the Collateral Agent, to the extent authorized and permitted under the applicable Intercreditor Agreement, shall upon the written direction of the Issuer from time to time enter into one or more Additional Intercreditor Agreements or amendments or supplements of the Intercreditor Agreement(s) to: (1) cure any ambiguity, omission, defect or inconsistency therein; (2) increase the amount of Indebtedness permitted to be incurred or issued under this Indenture of the types covered thereby that may be incurred by the Issuer or any other Note Party that is subject thereto (including the addition of provisions relating to new Indebtedness); (3) add Subsidiary Guarantors thereto; (4) further secure the Notes (including any Additional Notes); (5) allow any successor Trustee and/or Collateral Agent to accede as a party thereto; or (6) make any other such change thereto that does not adversely affect the rights of holders of the Notes in any material respect; provided that such Additional Intercreditor Agreement will not impose any personal obligations on the Trustee or the Collateral Agent or adversely affect the rights, duties, liabilities

or immunities of the Trustee or the Collateral Agent under the Indenture or the Intercreditor Agreements.

(C)     In executing any execution of the Additional Intercreditor Agreement or the amendments or supplements of an Intercreditor Agreement in accordance with this **Section 14.02**, the Trustee and the Collateral Agent, as the case may be, will be entitled to receive, and (subject to Sections **10.01** and **10.02**) will be fully protected in relying on, an Officer's Certificate , provided in accordance with **Section 13.02**, stating that the execution and delivery of such Additional Intercreditor Agreement or such amendments or supplements of the Intercreditor Agreement is authorized or permitted by this Indenture and the other Note Documents;

(D)     Each Holder, by accepting a Note, will be deemed to have agreed to and accepted the terms and conditions of the Intercreditor Agreements and each Additional Intercreditor Agreement (in each case as may be amended or supplemented from time to time in accordance with the terms of this Indenture, the Intercreditor Agreements or other Note Documents), to have authorized the Trustee and the Collateral Agent to become a party to any such Intercreditor Agreements, and Additional Intercreditor Agreement(s), and any amendment referred to in **Article 8** and the Trustee or the Collateral Agent will not be required to seek the consent of any Holders to perform their respective obligations under and in accordance with this **Article 14**.

[***The Remainder of This Page Intentionally Left Blank; Signature Page Follows***]

**IN WITNESS WHEREOF**, the parties to this Indenture have caused this Indenture to be duly executed as of the date first written above.

<u>**Issuer:**</u>

WOLFSPEED, INC.

By:   _____
     Name:
     Title:

<u>**Subsidiary Guarantor:**</u>

WOLFSPEED TEXAS LLC

By:   _____
     Name:
     Title:

[Signature Page to Second Lien Indenture]

**Trustee:**

U.S. BANK TRUST COMPANY, NATIONAL
ASSOCIATION,
as Trustee, Registrar, Paying Agent, Conversion
Agent

By: _____
      Name:
      Title:

[Signature Page to Second Lien Indenture]

**<u>Collateral Agent</u>:**

U.S. BANK TRUST COMPANY, NATIONAL
ASSOCIATION,
as Collateral Agent

By: _____
     Name:
     Title:

[Signature Page to Second Lien Indenture]

**EXHIBIT A**

<u>FORM OF NOTE</u>

*[Insert Global Note Legend, if applicable]*

*[Insert Restricted Note Legend, if applicable]*

[THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE NOTES WERE ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("OID") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. NOTEHOLDERS MAY OBTAIN INFORMATION REGARDING THE AMOUNT OF ANY OID, THE ISSUE PRICE, THE ISSUE DATE, AND THE YIELD TO MATURITY RELATING TO THE NOTES BY CONTACTING THE ISSUER.]

**Wolfspeed, Inc.**

**2.5% Convertible Second Lien Senior Secured Notes due 2031**

CUSIP No.: [__][*[Insert for a "unrestricted" / "restricted" CUSIP number:*]*]

Certificate No. [__]

ISIN No.: [__][[*[Insert for a "unrestricted" / "restricted" ISIN number:*]*]

Wolfspeed, Inc., a [Delaware] corporation, for value received, promises to pay to Cede & Co., or its registered assigns, the principal sum of [  ] dollars ($[__]) [(as revised by the attached Schedule of Exchanges of Interests in the Global Note)]§§§§§§§ on June 15, 2031 and to pay interest thereon, as provided in the Indenture referred to below, until the principal and all accrued and unpaid interest are paid or duly provided for.

Interest Payment Dates: June 15 and December 15 of each year, commencing on [June 15, 2026], unless otherwise provided in the definition of "Interest Payment Date."

Regular Record Dates: June 1 and December 1, unless otherwise provided in the definition of "Regular Record Date."

Additional provisions of this Note are set forth on the other side of this Note.

---

*       [This Note will be deemed to be identified by CUSIP No. [____] and ISIN No. [____] from and after such time when the Issuer delivers, pursuant to **Section 2.12** of the within-mentioned Indenture, written notice to the Trustee of the deemed removal of the Restricted Note Legend affixed to this Note.]

§§§§§§§       Insert bracketed language for Global Notes Only.

**IN WITNESS WHEREOF**, Wolfspeed, Inc. has caused this instrument to be duly executed as of the date set forth below.

WOLFSPEED, INC.

Date: _____          By: _____

                                         Name:
                                         Title:

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

U.S. Bank Trust Company, National Association, as Trustee, certifies that this is one of the Notes referred to in the within-mentioned Indenture.

Date: _____          By: _____

                                              Authorized Signatory

<div align="center">

**Wolfspeed, Inc.**

**2.5% Convertible Second Lien Senior Secured Notes due 2031**

</div>

This Note is one of a duly authorized issue of notes of Wolfspeed, Inc., a [Delaware] corporation (the "**Issuer**"), designated as its 2.5% Convertible Second Lien Senior Secured Notes due 2031 (the "**Notes**"), all issued or to be issued pursuant to an indenture, dated as of [●], 2025 (as the same may be amended from time to time, the "**Indenture**"), between the Issuer, the Subsidiary Guarantors from time to time party thereto and U.S. Bank Trust Company, National Association, as Trustee and as Collateral Agent. Capitalized terms used in this Note without definition have the respective meanings ascribed to them in the Indenture.

The Indenture sets forth the rights and obligations of the Issuer, the Trustee and the Holders and the terms of the Notes. The Notes are secured pursuant to the terms of the Indenture, the Intercreditor Agreements (as defined in the Indenture) and the Security Documents referred to in the Indenture and subject to the Liens securing First-Priority Obligations as defined in the Indenture. Notwithstanding anything to the contrary in this Note, to the extent that any provision of this Note conflicts with the provisions of the Indenture, the provisions of the Indenture will control.

1.     **Interest**. This Note will accrue interest at a rate and in the manner set forth in **Section 2.05** of the Indenture. Stated Interest on this Note will begin to accrue from, and including, [●], 202[●].

2.     **Maturity**. This Note will mature on June 15, 2031, unless earlier repurchased, redeemed or converted.

3.     **Guarantees**. The Issuer's obligations under the Indenture and the Notes are fully and unconditionally guaranteed by the Subsidiary Guarantors as provided in **Article 12** of the Indenture.

4.     **Method of Payment**. Cash amounts due on this Note will be paid in the manner set forth in **Section 2.04** of the Indenture.

5.     **Persons Deemed Owners**. The Holder of this Note will be treated as the owner of this Note for all purposes.

6.     **Denominations; Transfers and Exchanges**. All Notes will be in registered form, without coupons, in principal amounts equal to any Authorized Denominations. Subject to the terms of the Indenture, the Holder of this Note may transfer or exchange this Note by presenting it to the Registrar and delivering any required documentation or other materials.

7.     **Right of Holders to Require the Issuer to Repurchase Notes upon a Fundamental Change**. If a Fundamental Change occurs, then each Holder will have the right to require the Issuer to repurchase such Holder's Notes (or any portion thereof in an Authorized Denomination) for cash in the manner, and subject to the terms, set forth in **Section 4.02** of the Indenture.

<div align="center">A-5</div>

8.      **Redemption of the Notes**. The Notes will be subject to Redemption for cash in the manner, and subject to the terms, set forth in **Section 4.03** of the Indenture.

9.      **Limitation on Conversion**. Any conversion of any Note is subject to [**Section 5.10** of the Indenture][the Investor Rights Agreement].

10.     **Conversion**. The Holder of this Note may convert this Note into Conversion Consideration in the manner, and subject to the terms, set forth in **Article 5** of the Indenture.

11.     **When the Issuer and Subsidiary Guarantors May Merge, Etc**. **Article 6** of the Indenture places certain restrictions on the Issuer and the Subsidiary Guarantors' ability to be a party to a Business Combination Event.

12.     **Defaults and Remedies**. If an Event of Default occurs, then the principal amount of, and all accrued and unpaid interest on, all of the Notes then outstanding may (and, in certain circumstances, will automatically) become due and payable in the manner, and subject to the terms, set forth in **Article 7** of the Indenture.

13.     **Amendments, Supplements and Waivers**. The Issuer, the Trustee and, if required, the Collateral Agent, may amend or supplement the Note Documents or waive compliance with any provision of the Note Documents [(other than the Investor Rights Agreement)] in the manner, and subject to the terms, set forth in **Section 7.05** and **Article 8** of the Indenture.

14.     **No Personal Liability of Directors, Officers, Employees and Stockholders**. No past, present or future director, officer, employee, incorporator or stockholder of the Issuer, as such, will have any liability for any obligations of the Issuer under the Indenture or the Notes or for any claim based on, in respect of, or by reason of, such obligations or their creation. By accepting any Note, each Holder waives and releases all such liability. Such waiver and release are part of the consideration for the issuance of the Notes.

15.     **Authentication**. No Note will be valid until it is authenticated by the Trustee. A Note will be deemed to be duly authenticated only when an authorized signatory of the Trustee (or a duly appointed authenticating agent) manually signs the certificate of authentication of such Note.

16.     **Abbreviations**. Customary abbreviations may be used in the name of a Holder or its assignee, such as TEN COM (tenants in common), TEN ENT (tenants by the entireties), JT TEN (joint tenants with right of survivorship and not as tenants in common), CUST (custodian), and U/G/M/A (Uniform Gift to Minors Act).

17.     **Governing Law**. THIS NOTE, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS NOTE, WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

* * *

To request a copy of the Indenture, which the Issuer will provide to any Holder at no charge, please send a written request to the following address:

Wolfspeed, Inc.

4600 Silicon Drive
Durham, North Carolina 27703
Attention: General Counsel
Facsimile No.: [●]

**SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE**[*]

INITIAL PRINCIPAL AMOUNT OF THIS GLOBAL NOTE: $[ ]

The following exchanges, transfers or cancellations of this Global Note have been made:

| Date | Amount of Increase (Decrease) in Principal Amount of this Global Note | Principal Amount of this Global Note After Such Increase (Decrease) | Signature of Authorized Signatory of Trustee |
|------|------|------|------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

---

[*]    Insert for Global Notes only.

A-8

**CONVERSION NOTICE**

Wolfspeed, Inc.

2.5% Convertible Second Lien Senior Secured Notes due 2031

Subject to the terms of the Indenture, by executing and delivering this Conversion Notice, the undersigned Holder of the Note identified below directs the Issuer to convert (check one):

☐ the entire principal amount of

☐ $ _____ * aggregate principal amount of

the Note identified by CUSIP No. _____ and Certificate No. _____.

The undersigned acknowledges that if the Conversion Date of a Note to be converted is after a Regular Record Date and before the next Interest Payment Date, then such Note, when surrendered for conversion, must, in certain circumstances, be accompanied with an amount of cash equal to the interest that would have accrued on such Note to, but excluding, such Interest Payment Date.

Date: _____     _____

                                                      (Legal Name of Holder)

By: _____

        Name:
        Title:

Signature Guaranteed:

_____

Participant in a Recognized Signature Guarantee Medallion Program

By: _____

                    Authorized Signatory

---

\* Must be an Authorized Denomination.

A-9

**FUNDAMENTAL CHANGE REPURCHASE NOTICE**

Wolfspeed, Inc.

2.5% Convertible Second Lien Senior Secured Notes due 2031

Subject to the terms of the Indenture, by executing and delivering this Fundamental Change Repurchase Notice, the undersigned Holder of the Note identified below is exercising its Fundamental Change Repurchase Right with respect to (check one):

☐     the entire principal amount of

☐     $ _____* aggregate principal amount of

the Note identified by CUSIP No. and Certificate No.

The undersigned acknowledges that this Note, duly endorsed for transfer, must be delivered to the Paying Agent before the Fundamental Change Repurchase Price will be paid.

Date: _____    _____

                                           (Legal Name of Holder)

                       By: _____

                             Name:

                             Title:

             Signature Guaranteed:

                   _____

                   Participant in a Recognized Signature
                      Guarantee Medallion Program

                   By: _____

                         Authorized Signatory

---

\*    Must be an Authorized Denomination.

A-10

## ASSIGNMENT FORM

Wolfspeed, Inc.

2.5% Convertible Second Lien Senior Secured Notes due 2031

Subject to the terms of the Indenture, the undersigned Holder of the within Note assigns to:

Name: _____

Address: _____

Social security or
tax identification
number: _____

the within Note and all rights thereunder irrevocably appoints:

as agent to transfer the within Note on the books of the Issuer. The agent may substitute another to act for him/her.

Date: _____     _____
                                                            (Legal Name of Holder)


                                   By: _____
                                                Name:
                                                Title:

                                   Signature Guaranteed:


                                   _____
                                   Participant in a Recognized Signature
                                        Guarantee Medallion Program


                                   By: _____
                                                Authorized Signatory

## TRANSFEROR ACKNOWLEDGMENT[*][§§§§§§§]

If the within Note bears a Restricted Note Legend, the undersigned further certifies that (check one):

1. ☐ Such Transfer is being made to the Issuer or a Subsidiary of the Issuer.

2. ☐ Such Transfer is being made pursuant to, and in accordance with, a registration statement that is effective under the Securities Act at the time of the Transfer.

3. ☐ Such Transfer is being made pursuant to, and in accordance with, Rule 144A under the Securities Act, and, accordingly, the undersigned further certifies that the within Note is being transferred to a Person that the undersigned reasonably believes is purchasing the within Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act in a transaction meeting the requirements of Rule 144A. **If this item is checked, then the transferee must complete and execute the acknowledgment contained on the next page**.

4. ☐ Such Transfer is being made pursuant to, and in accordance with, any other available exemption from the registration requirements of the Securities Act (including, if available, the exemption provided by Rule 144 under the Securities Act).


Dated: _____

_____
(Legal Name of Holder)


By: _____
Name:
Title:


By: _____
Authorized Signatory

---

[*]   To be included only if the Note constitutes a "restricted security" (as defined in Rule 144).

[§§§§§§§] <u>Note to Draft</u>: Not applicable for New Renesas 2L Takeback Convertible Notes.

## TRANSFEREE ACKNOWLEDGMENT*********

The undersigned represents that it is purchasing the within Note for its own account, or for one or more accounts with respect to which the undersigned exercises sole investment discretion, and that and the undersigned and each such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act. The undersigned acknowledges that the transferor is relying, in transferring the within Note on the exemption from the registration and prospectus- delivery requirements of the Securities Act of 1933, as amended, provided by Rule 144A and that the undersigned has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A.

Dated: _____

_____
(Name of Transferee)

By: _____
Name:
Title:

---

\*    This paragraph and the immediately preceding paragraph will be deemed to be removed from the face of this Note at such time when the Issuer delivers written notice to the Trustee of such deemed removal pursuant to **Section 2.12** of the within-mentioned Indenture.

******** <u>Note to Draft</u>: Not applicable for New Renesas 2L Takeback Convertible Notes.

A-13

**EXHIBIT B-1**

FORM OF RESTRICTED NOTE LEGEND[††††††††]

THE OFFER AND SALE OF THIS NOTE AND THE SHARES OF COMMON STOCK, IF ANY, ISSUABLE UPON CONVERSION OF THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND THIS NOTE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER AGREES FOR THE BENEFIT OF THE ISSUER THAT IT WILL NOT OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT ONLY:

(1)     REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT; AND

(2)     AGREES FOR THE BENEFIT OF THE ISSUER THAT IT WILL NOT OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE OR ANY

BENEFICIAL INTEREST HEREIN, EXCEPT ONLY:

(A)     TO THE ISSUER OR ANY SUBSIDIARY THEREOF;

(B)     PURSUANT TO A REGISTRATION STATEMENT THAT IS EFFECTIVE UNDER THE SECURITIES ACT;

(C)     TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT;

(D)     PURSUANT TO RULE 144 UNDER THE SECURITIES ACT;

(E)     PURSUANT TO REGULATION S UNDER THE SECURITIES ACT; OR

(F)     PURSUANT TO ANY OTHER EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

BEFORE THE REGISTRATION OF ANY SALE OR TRANSFER IN ACCORDANCE WITH (C), (D), (E) OR (F) ABOVE, THE ISSUER, THE TRUSTEE AND THE REGISTRAR RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH CERTIFICATES OR OTHER DOCUMENTATION OR EVIDENCE AS THEY MAY REASONABLY REQUIRE IN ORDER TO DETERMINE THAT THE PROPOSED

---

[††††††††] <u>Note to Draft</u>: Not applicable for New Renesas 2L Takeback Convertible Notes.

SALE OR TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

[EXHIBIT B-2]

FORM OF GLOBAL NOTE LEGEND

THIS IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITARY OR A NOMINEE OF THE DEPOSITARY, WHICH MAY BE TREATED BY THE ISSUER, THE TRUSTEE AND ANY AGENT THEREOF AS THE OWNER AND HOLDER OF THIS NOTE FOR ALL PURPOSES.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE WILL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC, OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE, AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE WILL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN **ARTICLE 2** OF THE INDENTURE HEREINAFTER REFERRED TO.

**EXHIBIT C**

FORM OF SUPPLEMENTAL INDENTURE

SUPPLEMENTAL INDENTURE (this "**Supplemental Indenture**") dated as of [●], 20[●] among Wolfspeed, Inc. (or its successor) (the "**Issuer**"), U.S. Bank Trust Company, National Association, as trustee (the "**Trustee**"), and as collateral agent (the "**Collateral Agent**"), under the indenture referred to below.

WHEREAS the Issuer (or its successor) has heretofore executed and delivered to the Trustee and the Collateral Agent an indenture (as amended, supplemented or otherwise modified, the "**Indenture**") dated as of [●], 2025, providing for the issuance of the Issuer's 2.5% Convertible Second Lien Senior Secured Notes due 2031 (the "**Notes**"); and

WHEREAS pursuant to [**Section 8.01**] / [**Section 8.02**] / [**Section 8.03**] of the Indenture, the Trustee, the Collateral Agent and the Issuer are authorized to execute and deliver this Supplemental Indenture [without]/[with] the consent of [any Holder]/[Majority Holder]/[Supermajority Holder]/[each Holder] of the Notes;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Issuer, the Trustee and the Collateral Agent mutually covenant and agree for the equal and ratable benefit of the Holders (as defined in the Indenture) as follows:

1.      **Defined Terms.** As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular Section hereof.

2.      **Amendments. [ ]**

3.      **Ratification of Indenture; Supplemental Indentures Part of Indenture.** Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder shall be bound hereby.

4.      **Governing Law.** THIS SUPPLEMENTAL INDENTURE AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS SUPPLEMENTAL INDENTURE, WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

5.      **Trustee and Collateral Agent Make No Representation.** The Trustee and the Collateral Agent make no representation as to the validity or sufficiency of this Supplemental Indenture or with respect to the recitals contained herein, all of which recitals are made solely by the other parties hereto.

6.    **Counterparts.** The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

7.    **Effect of Headings.** The Section headings herein are for convenience only and shall not affect the construction thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

WOLFSPEED, INC.

By: _____
Name:
Title:

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Trustee, Registrar, Paying Agent, Conversion Agent

By: _____
Name:
Title:

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Collateral Agent

By: _____
Name:
Title:

**EXHIBIT D**

<u>AGREED SECURITY PRINCIPLES</u>

[To come]

# EXHIBIT E

**Investor Rights and Disposition Agreement**

*[Plan Supplement Filing Version 8/12/2025]*

*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

**INVESTOR RIGHTS [AND DISPOSITION] AGREEMENT**

This INVESTOR RIGHTS [AND DISPOSITION] AGREEMENT (this "**Agreement**") is entered into as of [●], 2025, by and among Wolfspeed, Inc., a Delaware corporation (including its successors and permitted assigns, the "**Company**"), and Renesas Electronics America Inc., a California corporation (the "**Investor**").

The Company and Wolfspeed Texas LLC filed [the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, consistent with the terms thereof, the "**Plan**") on June 30, 2025], which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2025.

As a condition to each of the parties' obligations under the Plan, the Company and the Investor are entering into this Agreement for the purpose of granting certain rights to the Investor.

In consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1      Definitions.

"**Affiliate**" means with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

["**ATM Program**" means the "at-the-market" offering program to facilitate the sale of shares of Common Stock (or securities convertible or exercisable for Common Stock) as set forth in the Plan.]

"**Board of Directors**" means the Company's board of directors.

"**business day**" means any day other than a Saturday or Sunday or a legal holiday on which commercial banks in New York City or the State of California in the United States, or Japan, are authorized or required by law to be closed.

"**Bylaws**" means the Bylaws of the Company, as the same may be amended or amended and restated from time to time.

"**Certificate of Incorporation**" means the Certificate of Incorporation of the Company, as the same has been and may be amended or restated from time to time.

"**Change of Control**" means (i) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Wholly Owned Subsidiaries and the employee benefit plans of the Company and its Wholly Owned Subsidiaries, who files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the common equity interests of the Company representing more than 50% of the voting power of the common equity interests of the Company; (ii) the Company shall have sold all or substantially all of the assets of its entire business or all or substantially all of the assets of its business producing silicon carbide bare wafers and epitaxial wafers; or (iii) the stockholders of the Company have adopted a plan or proposal of dissolution.

"**Commission**" means the United States Securities and Exchange Commission.

"**Common Stock**" means the shares of common stock, [par value $0.00125 per share], of the Company, and any capital stock into which all of the Common Stock shall have been converted, exchanged, or reclassified following the date hereof.

"**DCSA**" means the Defense Counterintelligence and Security Agency of the United States Department of Defense.

["**ELOC Program**" means the equity line of credit to facilitate the sale of shares of Common Stock (or securities convertible or exercisable for Common Stock) as set forth in the Plan.]

"**Exchange**" means the New York Stock Exchange or any national securities exchange on which the Company's Common Stock is listed or admitted to trading.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended, or any similar successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect from time to time.

"**Holder**" means any Renesas entity holding Securities.

"**Initial Issue Date**" means [the date hereof] [the Renesas Base Distribution Date (as defined in the Plan)].

"**Necessary Action**" means, with respect to a specified result, all actions (to the extent such actions are permitted by applicable law, rule or regulation and, in the case of any action by the Company that requires a vote or other action on the part of the Board of Directors (or a committee of such board duly authorized to act with the authority of such board), to the extent such action is consistent with the fiduciary duties that the Company's directors may have in such capacity) necessary to cause such result, including, to the extent applicable, (i) including the Renesas Director and the Outside Director in the Board of Directors' slate of nominees to the stockholders at every meeting of the stockholders called with respect to the election of directors to the Board of Directors, (ii) including the Renesas Director and the Outside Director in the proxy statement prepared by management of the Company in connection with soliciting proxies for every meeting of the stockholders of the Company called with respect to the election of directors to the Board of Directors, and at every adjournment or postponement thereof, and on every action or approval by written consent of the Board of Directors (or a committee of such board duly authorized to act with

2

the authority of such board) with respect to the election of directors to the Board of Directors (and unanimously recommending the stockholders of the Company vote in favor of the election of the Renesas Director and the Outside Director at all times), (iii) not nominating any candidate for the slate of nominees for each election of directors to the Board of Directors in opposition to the election of the Renesas Director and the Outside Director, (iv) seeking the adoption of stockholders' resolutions and amendments to the Organizational Documents of the Company if necessary, (v) executing necessary agreements and instruments, and (vi) making or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations or similar actions that are required to achieve such result.

"**Organizational Documents**" means, collectively, the Certificate of Incorporation and Bylaws.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, other legal entity or organization, including a government or political subdivision or an agency or authority.

"**Second Lien Convertible Notes**" means the convertible notes to be issued pursuant to the Second Lien Convertible Notes Indenture.

"**Second Lien Convertible Notes Indenture**" means that certain Indenture, dated as of [●], 2025, between the Company and U.S. Bank Trust Company, National Association, as trustee.

"**Securities**" means (a) any shares of Common Stock held by a Holder and any shares of Common Stock hereafter acquired by any Holder (including, without limitation, pursuant to the conversion of the Second Lien Convertible Notes in accordance with the Second Lien Convertible Notes Indenture), (b) Common Stock acquired pursuant to the exercise of the Warrant and (c) any other securities issued or issuable with respect to any such shares of Common Stock, including shares of Common Stock underlying any warrants or the Second Lien Convertible Notes by way of share split, share dividend (including dividends paid in kind), distribution, recapitalization, merger, exchange, replacement or similar event or otherwise.

"**Securities Act**" means the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder or any similar federal statute and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"**Subsidiary**" means, with respect to any Person: (a) any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of the capital stock entitled (without regard to the occurrence of any contingency, but after giving effect to any voting agreement or stockholders' agreement that effectively Transfers voting power) to vote in the election of directors, managers or trustees, as applicable, of such corporation, association or other business entity is owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person; and (b) any partnership or limited liability company where (x) more than 50% of the capital accounts, distribution rights, equity and voting interests, or of the general and limited partnership interests, as applicable, of such partnership or limited liability corporation are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person, whether in the form of membership, general, special or limited partnership or limited liability company interests or

3

otherwise, and (y) such Person or any one or more of the other Subsidiaries of such Person is a controlling general partner of, or otherwise controls, such partnership or limited liability company.

"**Transfer**" means, when used as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition by the Transferor (whether by operation of law or otherwise) and, when used as a verb, the Transferor voluntarily or involuntarily, transfers, sells, pledges or hypothecates or otherwise disposes of (whether by operation of law or otherwise), including, in each case, (a) the establishment or increase of a put equivalent position or liquidation with respect to, or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act with respect to, any security or (b) entry into any swap or other arrangement that transfers to another Person, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise. The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"**Warrant**" means that certain warrant, dated as of [●], 2025, issued by the Company to the Investor.

"**Wholly Owned Subsidiary**" of any Person means a Subsidiary of such Person, all of the equity interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such Person or another Wholly Owned Subsidiary of such Person. Unless the context otherwise requires, "Wholly Owned Subsidiary" means a Subsidiary of the Company that is a Wholly Owned Subsidiary of the Company.

The following terms are defined in the Sections of the Agreement indicated:

## INDEX OF TERMS

| Term | Section |
|---|---|
| Aggregate Company Voting Power | Section 2.2(a) |
| Agreement | Preamble |
| Beneficial Ownership Limitation | Section 2.2(a) |
| Company | Preamble |
| [ELOC/ATM Program | Section 3.2] |
| [ELOC/ATM Program Termination Date | Section 3.5] |
| FOCI Mitigation Plan | Section 3.1 |
| Initial Limitation Period | Section 2.2(a) |
| Investor | Preamble |
| Limitation Periods | Section 2.2(a) |
| Limitations | Section 2.2(a) |
| Minimum Threshold | Section 2.1(a) |
| Outside Director | Section 2.1(a) |
| Plan | Preamble |

| | |
|---|---|
| [Register | Section 3.2] |
| Renesas | Section 2.1(a) |
| Renesas Director | Section 2.1(a) |
| Renesas Observer | Section 2.1(g) |
| Repurchase Event | Section 2.2(b) |
| Subsequent Limitation Period | Section 2.2(a) |
| Voting Rights Limitation | Section 2.2(a) |

Section 1.2    <u>Rules of Construction</u>. Unless the context otherwise requires:

(a)    References in the singular or to "him," "her," "it," "itself" or other like references, and references in the plural or the feminine or masculine reference, as the case may be, shall also, when the context so requires, be deemed to include the plural or singular, or the masculine or feminine reference, as the case may be;

(b)    References to Articles and Sections shall refer to articles and sections of this Agreement, unless otherwise specified;

(c)    The headings in this Agreement are for convenience and identification only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision thereof;

(d)    This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party that drafted and caused this Agreement to be drafted; and

(e)    References to "including" in this Agreement shall mean "including, without limitation," whether or not so specified.

<div align="center">

ARTICLE II
<u>GOVERNANCE RIGHTS</u>

</div>

Section 2.1    <u>Election of Directors</u>. From and after the Initial Issue Date:

(a)    <u>Generally</u>. At any annual or special meeting (or action by written consent) for the election of directors to the Board of Directors, the Company shall, upon written request by the Investor or its designated Affiliate (which shall initially be Renesas Electronics Corporation as of the date hereof) (the Investor, Renesas Electronics Corporation and their Affiliates, collectively, "**Renesas**"), take all Necessary Action, subject to the following provisos, to cause the election or reelection to the Board of Directors, (A) for so long as Renesas beneficially owns (as defined under Section 13 of the Exchange Act) in the aggregate in excess of 10.0% of the shares of Common Stock (the "**Minimum Threshold**"), one (1) director selected by Renesas to the Board of Directors (the "**Renesas Director**") and (B) for so long as the Renesas Director maintains his or her position on the Board of Directors and the Company maintains a facility security clearance with DCSA, one (1) director selected by the Company to the Board of Directors meeting the qualifications set forth in 32 C.F.R. § 117.11(f) and subject to the approval of DCSA who is mutually acceptable to

<div align="center">5</div>

the Company and Renesas (the "**Outside Director**"); <u>provided</u>, that all of Renesas' rights under <u>Article II</u> are non-transferable and such rights and the Company's obligations hereunder related thereto shall (except for Renesas' rights under <u>Section 2.1(d)</u>, and the parties' rights and obligations under <u>Section 2.2</u>) automatically be terminated without any further action required in the event that Renesas beneficially owns (as defined under Section 13 of the Exchange Act) shares of Common Stock in the aggregate less than the Minimum Threshold. The Renesas Director and the Outside Director may not be removed as a director on the Board of Directors by the Company under any circumstances, except as provided under <u>Section 2.1(c)</u>. In the event that a vacancy is created on the Board of Directors at any time due to the death, disability, retirement, resignation, or removal of the Renesas Director, then Renesas shall have the right to designate an individual, who meets the requirements of this <u>Section 2.1(a)</u> and subject to <u>Section 2.1(c)</u>, to fill such vacancy to be appointed by the Board of Directors as promptly as practicable. In the event that Renesas shall fail to designate in writing a representative to fill the vacant Renesas Director seat on the Board of Directors, such Board of Directors seat shall remain vacant until such time as Renesas selects an individual to fill such seat in accordance with this <u>Section 2.1(a)</u>, and during any period where such seat remains vacant, the Board of Directors nonetheless shall be deemed duly constituted. The Company's obligations with respect to <u>Section 2.1(a)</u> shall be subject to the Renesas Director's satisfaction of all requirements regarding service as a director of the Company under applicable law and applicable rules of any Exchange. Renesas will direct the Renesas Director (A) to consent to such reference and background checks or other investigations as the Board of Directors may reasonably request in order to determine the Renesas Director's eligibility and qualification to serve as contemplated hereunder and (B) to provide to the Company a completed copy of the directors and officers questionnaire submitted by the Company to its other directors in the ordinary course of business.

(b)     <u>Renesas Director Initial Appointment</u>. The Renesas Director and the Outside Director shall be appointed by the Board of Directors as promptly as practicable following the Initial Issue Date to serve until the next annual meeting of stockholders of the Company after the Initial Issue Date, and the Company and the Board of Directors shall include the Renesas Director and the Outside Director in the slate of nominees recommended to the stockholders of the Company for election as a director at any annual or special meeting (or action by written consent) of the stockholders of the Company at or by which directors of the Company are to be elected, in each case, so long as the Minimum Threshold is met.

(c)     <u>Removal; Nomination Withdrawal</u>. Subject to the last sentence of this <u>Section 2.1(c)</u>, the Board of Directors shall not remove the Renesas Director or decline or withdraw any nomination or, subject to the Board of Directors' duties under Delaware law, recommendation regarding the Renesas Director required under <u>Section 2.1(b)</u>, unless Renesas delivers to the Board of Directors a written request for such withdrawal or, as applicable, (A) the [Governance and Nominations Committee] of the Board of Directors determines reasonably and in good faith, applying criteria consistent with those applied to other members of or nominees to the Board of Directors, after consultation with outside legal counsel, that such Renesas Director is prohibited or disqualified from serving as a director of the Company under any rule or regulation of the Commission or any Exchange or is a "bad actor" as such term is defined in Rule 506(d) under the Securities Act, or (B) such Renesas Director has admitted or been judicially determined, pursuant to a final, non-appealable decision, to have engaged in (x) acts or omissions constituting a breach of such Renesas Director's duties to the Company, (y) acts or omissions that involve intentional

6

misconduct or an intentional violation of law and that are felonies, violations of law involving moral turpitude or are materially adverse to the Company or (z) any transaction involving the Company from which such Renesas Director derived an improper personal benefit that was not disclosed to the Board of Directors prior to the authorization of such transaction where such disclosure is required pursuant to the Organizational Documents; provided, however, that, in each case, Renesas shall have the right to designate, in lieu of such Renesas Director, a new Renesas Director. The Board of Directors shall not remove the Outside Director or decline or withdraw any nomination or recommendation required under Section 2.1(b) regarding the Outside Director, unless in accordance with the FOCI Mitigation Plan. The Renesas Director shall promptly resign from the Board of Directors if Renesas loses its right to nominate the Renesas Director pursuant to Section 2.1(a); and the Board of Directors shall have the ability to remove the Renesas Director if the Renesas Director fails to so promptly resign.

(d)     Indemnification; Compensation. The Renesas Director shall be entitled to (i) advancement of expenses and indemnification in the same manner and to the same extent as the other non-executive members of the Board of Directors under the Organizational Documents, the Delaware General Corporation Law and any related indemnification agreements to the extent that the Company is a party thereto and such agreements are in full force and effect, and (ii) unless waived by the Renesas Director, cash and equity compensation in the same manner and to the same extent as other non-executive members of the Board of Directors. Any director minimum ownership requirements shall be deemed satisfied in respect of the Renesas Director, by any Securities held by Renesas. The Company shall be the indemnitor of first resort in connection with the aforementioned indemnity obligations (i.e., its obligations to the Renesas Director are primary and any obligation of Renesas to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Renesas Director are secondary).

(e)     D&O Insurance. The Renesas Director shall be covered as an insured by the Company's directors and officers indemnity insurance coverage on customary terms consistent with the coverage for other non-executive directors, and the Company shall maintain in full force and effect directors' and officers' liability insurance in reasonable amounts from established and reputable insurers to the same extent it indemnifies and provides insurance for the non-executive members of the Board of Directors.

(f)     Board Policies. The Renesas Director shall be subject to all policies of the Board of Directors and the Company applicable to other non-executive members of Board of Directors.

(g)     Board Observer. If, for whatever reason, (i) the Renesas Director (or any replacement for the Renesas Director) is not elected by the Company's stockholders as a director to the Board of Directors in accordance with this Section 2.1 or (ii) Renesas determines not to appoint or nominate a director to the Board of Directors, in each case at any time it is entitled to nominate the Renesas Director pursuant to Section 2.1(a), Renesas shall be entitled to appoint one (1) non-voting observer (the "**Renesas Observer**") to the Board of Directors in lieu of the Renesas Director that is not elected or otherwise nominated or appointed by Renesas to the Board of Directors, as applicable, subject to a customary confidentiality commitment of the Renesas Observer. The Renesas Observer shall be entitled to attend and participate in any meeting of the Board of Directors that the Renesas Observer would have been entitled to attend had he or she

7

been elected as a director, but shall, for the avoidance of doubt, not have any voting rights at such meetings, subject to a customary confidentiality commitment of the Renesas Observer. The Company shall give the Renesas Observer copies of all notices, minutes, consents and other materials that it provides to directors at the same time and in the same manner as provided to such directors. The Renesas Observer shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided. The Company reserves the right to withhold any information or to exclude the Renesas Observer from any meeting, or portion thereof, as is reasonably determined by a majority of the members of the Board of Directors to be necessary for the purposes of confidentiality, competitive factors, attorney client privilege or other reasonable purposes. For the avoidance of doubt, the Renesas Observer's appointment shall terminate immediately upon the appointment or election of a Renesas Director.

(h)     Board Size. For so long as Renesas is entitled to designate a director for nomination to the Board of Directors under this Agreement, the Company shall maintain the total number of directors on its Board of Directors at eight (8) or more (including the Renesas Director and the Outside Director). For the avoidance of doubt, the Company's failure to comply with this Section 2.1(i) shall not affect in any way Renesas' rights under this Agreement, including Renesas' right to designate the Renesas Director.

Section 2.2     Voting Rights and Beneficial Ownership.

(a)     Until January 1 of the year following the Initial Issue Date (the "**Initial Limitation Period**"), (i) Renesas shall not exercise voting rights attached to any shares of Common Stock owned by Renesas representing more than 9.9% of the Aggregate Company Voting Power (as defined below) (the "**Voting Rights Limitation**") and (ii) any conversion or exercise of Securities by Renesas shall be null and void and treated as if never made to the extent that, after giving effect to such conversion or exercise, Renesas would own Common Stock representing more than 39.9% of the Aggregate Company Voting Power immediately after giving effect to such conversion or exercise (the "**Beneficial Ownership Limitation**" and, together with the Voting Rights Limitation, the "**Limitations**"). Such Initial Limitation Period shall be automatically renewed for subsequent one (1) year periods (any such one (1) year period, a "**Subsequent Limitation Period**" and, together with the Initial Limitation Period, the "**Limitation Periods**") unless Renesas provides signed written notice to the Company (email being sufficient) at least three (3) months prior to the expiration of any Limitation Period terminating the Limitations; provided, that the parties' rights and obligations under this Section 2.2 shall automatically be terminated without any further action required in the event that Renesas beneficially owns (as defined under Section 13 of the Exchange Act) shares of Common Stock in the aggregate less than 9.9% of the Aggregate Company Voting Power. Notwithstanding the foregoing, Renesas may terminate the Limitations at any time and without regard to any Limitation Period by signed written notice to the Company (email being sufficient) if the Company has submitted to its stockholders' meeting a proposal of (w) any transaction that would lead to a Change of Control of the Company, (x) the issuance of any Common Stock (or instruments convertible or exercisable into Common Stock), (y) any amendment to the Organizational Documents that would adversely affect any rights of Renesas and (z) any other matters that could adversely affect any rights of Renesas. The "**Aggregate Company Voting Power**" means the aggregate voting power of the outstanding shares of the Company's equity securities entitled to

vote as a single class on general matters submitted to a vote at a meeting of the Company's stockholders.

(b)     If the Company proposes any share buyback, open market purchase or other transaction that would reduce the outstanding shares of the Company's equity securities such that Renesas would exceed the Beneficial Ownership Limitation (a "**Repurchase Event**"), the Company shall promptly notify Renesas of such Repurchase Event, and the Company and Renesas shall work together in good faith to restructure Renesas' holdings such that Renesas shall not exceed the Beneficial Ownership Limitation.

<div align="center">

ARTICLE III
MISCELLANEOUS
</div>

Section 3.1     FOCI Mitigation Plan Compliance. For so long as the Company maintains a facility security clearance with DCSA and until such time as its foreign ownership control and influence mitigation plan ("**FOCI Mitigation Plan**") pursuant to 32 C.F.R. § 117.11(d) is terminated by DCSA, the FOCI Mitigation Plan shall remain in full force and effect (subject to applicable law) and any conflict between the FOCI Mitigation Plan and this Agreement shall be resolved in favor of the FOCI Mitigation Plan.

Section 3.2     [Sale Proceeds Remittance; Entitlements Register. Prior to the Renesas Base Distribution Date, the Company shall keep and properly maintain at its principal executive office a register (the "**Register**") of the entitlements to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the [*Order Confirming the [Amended] Joint Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate*] [Docket No. [●]]. To the extent that the Company, prior to the Renesas Base Distribution Date, conducts a primary registered offering of shares of Common Stock of the Company pursuant to the Registration Rights Agreement (as defined in the Plan) or Reserve Shares (as defined in the Plan) under the ELOC Program or ATM Program (collectively, the "**ELOC/ATM Program**"), the Company shall cause the cash proceeds from such sale transaction to be promptly remitted directly to Renesas (by delivery to Renesas of a certified or official bank check payable to the order of Renesas or by wire transfer of immediately available funds to an account designated in writing by Renesas) without any reduction, set-off, or any other deductions other than the commission or discount for the sales agent administering the ELOC/ATM Program or underwriter(s) for the primary registered offering. All determinations as to whether to complete any sale transaction pursuant to the ELOC/ATM Program and as to the timing, manner, price and other terms of any such sale transaction (including the level of commission or discount for the sales agent administering the ELOC/ATM Program) shall be at the discretion of Renesas; provided, that, such sales transactions shall be subject to any contractual limitations the Company is then subject to (including pursuant to the Registration Rights Agreement), market conditions, applicable laws, and customary quarterly blackout rights, and shall only take place during open trading window periods under the Company's insider trading policy. The Company reserves the right to impose up to two (2) blackout periods for an aggregate of up to ninety (90) days in any twelve (12) month period when it is in possession of material non-public information during which sales under the ELOC/ATM Program shall not be permitted, if sales under the ELOC/ATM Program would have a detrimental impact on alternate transactions (including, but not limited to, merger, acquisition or offering transactions) being contemplated by the Company or if the Company reasonably believes it would

<div align="center">9</div>

require disclosure that would meaningfully interfere with an alternate company transaction or otherwise cause meaningful harm to the Company. For the avoidance of doubt, Renesas shall have the right to demand the filing of a draft registration statement related to the ELOC/ATM Program during any blackout period; provided that the Company shall not be required to publicly file such registration statement until the day following the expiration of such blackout period. In addition, Renesas agrees not to use the ELOC/ATM Program, and to be locked up (for a customary period not longer than the lock-up period imposed on, and on the same terms as, to the extent applicable to Renesas' right to use the ELOC/ATM Program, the Company) in connection with any underwritten offering being conducted by the Company for its own account or for the account of any other person, in each case even if it does not participate in such underwritten offering, subject to the following: (i) Renesas' ability to have customary piggyback rights on any underwritten offering conducted by the Company (either primary or secondary) and (ii) that such lock-up requirement shall no longer apply when Renesas owns less than 10% of the Common Stock on a fully diluted basis and Renesas no longer has a person on the board of directors of the Company. Upon remittance of such cash proceeds to Renesas, the Company shall update the Register accordingly for the sale of such shares of Common Stock. The Company shall provide Renesas with reasonable access to the Register upon request and shall use reasonable best efforts to cooperate with Renesas in furtherance of this Section 3.2.]

Section 3.3     [Common Stock Reserve. Prior to the Renesas Base Distribution Date, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock the maximum number of shares of Common Stock issuable in connection with a Registered Primary Offering (as defined in the Registration Rights Agreement) pursuant to the Registration Rights Agreement. The Company shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock in connection with any Registered Primary Offering.]

Section 3.4     [Primary Registered Offerings; ELOC/ATM Sales. To the extent that the Company conducts sales of shares of Common Stock (or securities convertible or exercisable for Common Stock) of the Company through a Registered Primary Offering or under the ELOC/ATM Program, and Renesas receives the cash proceeds from such sales, then the number of shares of Common Stock issuable in connection with a Registered Primary Offering pursuant to the Registration Rights Agreement shall be decreased proportionally for the sale of such shares of Common Stock (or securities convertible or exercisable for Common Stock).]

Section 3.5     [ATM Program; Sales Program Termination. Once the Company is eligible to use Form S-3, the Company agrees to create the ATM Program, and the Company shall (a) make all necessary registration and regulatory filings to establish and maintain the ATM Program, and (b) enter into all documentation reasonably necessary to establish and maintain such ATM Program, including, without limitation, to (i) cause the Company's legal and accounting advisors to provide the necessary legal opinions and comfort letters as is necessary or customary to enter into and execute trades under the ATM Program and (ii) provide materials responsive to customary due diligence requests. For so long as the Company (x) is eligible to use Form S-3, (y) is maintaining the ATM Program, and (z) is otherwise in compliance with this Section 3.5, the Company shall not be required to maintain the ELOC Program. The termination date (the "**ELOC/ATM Program Termination Date**") for the ATM Program (or the ELOC Program if the Company is not eligible to use Form S-3) shall be five (5) business days after the earlier of (i) the

Renesas Base Distribution Date, (ii) the disposition of all properties related to the Base Consideration (as defined in the Plan) and, if applicable, the Contingent Additional Consideration (as defined in the Plan) subject to the Renesas Contingent Documentation (as defined in the Plan), and (iii) ten (10) years from the date hereof; provided, that the documentation related to the ELOC/ATM Program shall provide for a reasonable period of winddown upon each such event (if necessary). Upon the ELOC/ATM Program Termination Date, the Company shall deliver to Renesas the remaining Base Consideration and, if applicable, Contingent Additional Consideration, not previously distributed to Renesas, less any portions of the Base Consideration and, if applicable, the Contingent Additional Consideration, in respect of which Renesas has received sale proceeds pursuant to primary registered offerings or the ELOC/ATM Program.]

Section 3.6    [Withholding. Notwithstanding anything in this Agreement to the contrary, Renesas shall hold its right or entitlement to receive the Base Consideration or, if applicable, Contingent Additional Consideration through a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended, that provides the Company a valid IRS Form W-9 (a "**U.S. W-9 Provider**"); provided, if Renesas determines that it is not commercially reasonable to hold such right or entitlement through a U.S. W-9 Provider, then Renesas may Transfer such right or entitlement to an Affiliate that is not a U.S. W-9 Provider as long as (a) Renesas provides the Company written notice of such Transfer no later than the earlier of (i) ten (10) days after the Transfer and (ii) five (5) days prior to any Transfer or release of the Base Consideration, the Contingent Additional Consideration or any consideration pursuant to sales under the ELOC/ATM Program or any registered offering on a primary basis, (b) Renesas and such transferee agree in writing that the Company shall be entitled to deduct and withhold, or cause to be deducted or withheld, from any distribution, payment or Transfer made pursuant thereto or any transactions or documentation entered into in connection therewith, such amounts as are required to be deducted and withheld with respect to the making of such payment under applicable tax law; provided that, notwithstanding the foregoing, in any case where Renesas or such transferee is subject to withholding, the Company's sole remedy shall be to withhold or deduct the required amounts under applicable tax law and (c) such transferee shall provide the Company a valid IRS Form W-8BEN-E (or any amended or comparable substitute form). The Company and Renesas agree to cooperate in good faith to eliminate or minimize any applicable withholding tax imposed on the transactions or any transfer of consideration pursuant to sales under the ELOC/ATM Program or any registered offering on a primary basis contemplated in Section 3.2 and Section 3.5, in each case, to the extent permitted by applicable tax law.]

Section 3.7    Severability. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 3.8    Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware irrespective of the choice of laws principles thereof. The parties agree that any legal action or

proceeding regarding this Agreement shall be brought and determined exclusively in a state or federal court located within the State of Delaware. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 3.9    <u>Successors and Assigns</u>. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party hereto without the prior written consent of the other parties hereto. Any purported assignment or delegation in violation of this Agreement shall be null and void *ab initio*.

Section 3.10    <u>Notices</u>. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or facsimile or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

(a)    if to the Company, to:

Wolfspeed, Inc.
4600 Silicon Drive
Durham, NC 27703
Attention: Melissa Garrett
E-mail: Melissa.Garrett@wolfspeed.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:    Tad J. Freese
              Richard Kim
E-mail:       Tad. Freese@lw.com
              Richard.Kim2@lw.com

(b)    if to a Holder, to:

Renesas Electronics America Inc.
c/o Renesas Electronics Corporation
Toyosu Foresia, 3 2 24 Toyosu, Koto ku
Tokyo 135-0061 Japan
Attention:    Shuhei Shinkai
              Sho Ozaki
              Takahiro Homma

E-mail:     shuhei.shinkai.nx@renesas.com
                  sho.ozaki.pv@renesas.com
                  takahiro.homma.jz@renesas.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Steven N. Serajeddini, P.C.
                Yusuf Salloum
                Claire Stephens
E-mail:     steven.serajeddini@kirkland.com
                yusuf.salloum@kirkland.com
                claire.stephens@kirkland.com

and

Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
Attention:    Rachel W. Sheridan, P.C.
                Shagufa R. Hossain, P.C.
                Anthony L. Sanderson
E-mail:     rachel.sheridan@kirkland.com
                shagufa.hossain@kirkland.com
                anthony.sanderson@kirkland.com

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next business day following such dispatch and (iii) in the case of mailing, on the fifth (5th) business day after the posting thereof.

Section 3.11   <u>Headings</u>. The headings contained in this Agreement are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

Section 3.12   <u>Entire Agreement</u>. This Agreement, the FOCI Mitigation Plan and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such subject matter.

Section 3.13   <u>Specific Performance</u>. Damages in the event of breach of this Agreement by a party hereto may be difficult, if not impossible, to ascertain, and it is therefore agreed that the other parties hereto, in addition to and without limiting any other remedy or right it may have, will have the right to an injunction or other equitable relief in any court of competent jurisdiction,

13

enjoining any such breach, and enforcing specifically the terms and provisions hereof, and each of the parties hereto hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief. The existence of this right will not preclude any party hereto from pursuing any other rights and remedies at law or in equity which such party may have.

Section 3.14   Counterparts; Facsimile or .pdf Signature. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document. This Agreement may be executed by facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, and a facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, shall constitute an original for all purposes.

Section 3.15   Amendment. This Agreement may not be amended, modified or supplemented without the written consent of the Company and Renesas.

Section 3.16   Extensions; Waivers. Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement and (b) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any extension or waiver pursuant to this [Section 3.16] will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

Section 3.17   Further Assurances. Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party may reasonably require in order to effectuate the terms and purposes of this Agreement.

Section 3.18   No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

Section 3.19   Interpretation; Construction. This Agreement has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement. Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, as the same may from

14

time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited. References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections mean the sections of this Agreement, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

Section 3.20    Termination. This Agreement shall automatically terminate, without any further action by any Person, upon the earlier of (i) the written agreement of each party hereto to terminate this Agreement, (ii) the dissolution, liquidation or winding up of the Company. Nothing herein shall relieve any party from any liability for the breach of any of the agreements set forth in this Agreement or (iii) such time when the parties hereto have no further rights or obligations hereunder. The provisions of Section 2.1(d) and Article III shall survive any termination of this Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties have executed this Investor Rights [and Disposition] Agreement as of the date first above written.

**WOLFSPEED INC.**


By: _____
    Name: [●]
    Title:  [●]


**RENESAS ELECTRONICS AMERICA INC.**


By: _____
    Name: [●]
    Title:  [●]

*[Signature Page to Investor Rights [and Disposition] Agreement]*

# **EXHIBIT F**

**Registration Rights Agreement**

*[Plan Supplement Filing Version 8/12/2025]*

*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

**REGISTRATION RIGHTS AGREEMENT**

**AMONG**

**WOLFSPEED, INC.**

**AND**

**THE HOLDERS PARTY HERETO**

**DATED [●], 2025**

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** .................................................................1
    Section 1.1   Definitions.......................................................1

**ARTICLE II SHELF [AND PRIMARY DEMAND] REGISTRATION** ..................7
    Section 2.1   Shelf Registration.............................................7
    Section 2.2   [Primary Registered Offerings]...............................11
    Section 2.3   Deferral or Suspension of Registration; Grace Periods ...........12
    Section 2.4   Effective Registration Statement .............................13
    Section 2.5   Selection of Underwriters; Cutback............................14
    Section 2.6   Lock-up.......................................................15
    Section 2.7   Participation in Underwritten Offering; Information by Holder.....15
    Section 2.8   Registration Expenses ........................................16

**ARTICLE III PIGGYBACK REGISTRATION** ....................................17
    Section 3.1   Notices ......................................................17
    Section 3.2   Underwriter's Cutback........................................18
    Section 3.3   Company Control..............................................19
    Section 3.4   Selection of Underwriters ....................................19
    Section 3.5   Withdrawal of Registration ...................................19

**ARTICLE IV REGISTRATION PROCEDURES** ..................................19
    Section 4.1   Registration Procedures .....................................19
    Section 4.2   Notice Opt-In and Opt-Out ...................................24

**ARTICLE V INDEMNIFICATION** .............................................25
    Section 5.1   Indemnification by the Company...............................25
    Section 5.2   Indemnification by Selling Holders ..........................26
    Section 5.3   Conduct of Indemnification Proceedings.......................26
    Section 5.4   Other Indemnification .......................................27
    Section 5.5   Contribution ................................................27

**ARTICLE VI COMPLIANCE WITH EXEMPTION REQUIREMENTS** .............28
    Section 6.1   Compliance with Exemption Requirements .......................28

**ARTICLE VII MISCELLANEOUS** ............................................28
    Section 7.1   Severability ................................................28
    Section 7.2   Governing Law; Jurisdiction; Waiver of Jury Trial.............29
    Section 7.3   Other Registration Rights ...................................29
    Section 7.4   Additional Rights...........................................29
    Section 7.5   Successors and Assigns.......................................29
    Section 7.6   Notices .....................................................30
    Section 7.7   Headings ....................................................31
    Section 7.8   Additional Parties..........................................31
    Section 7.9   Adjustments .................................................31

i

# TABLE OF CONTENTS
(cont'd)

**Page**

| | | |
|---|---|---|
| Section 7.10 | Entire Agreement | 31 |
| Section 7.11 | Specific Performance | 31 |
| Section 7.12 | Counterparts; Facsimile or .pdf Signature | 32 |
| Section 7.13 | Amendment | 32 |
| Section 7.14 | Extensions; Waivers | 32 |
| Section 7.15 | Further Assurances | 33 |
| Section 7.16 | No Third-Party Beneficiaries | 33 |
| Section 7.17 | Interpretation; Construction | 33 |
| Section 7.18 | Term | 33 |

Exhibit A     -     Adoption Agreement
Schedule I     -     List of Holders

THIS **REGISTRATION RIGHTS AGREEMENT**, dated as of [●], 2025 (this "Agreement"), is entered into by and among Wolfspeed, Inc., a Delaware corporation (together with any successor entity thereto, the "Company"), and each of the Holders (as defined below) that are parties hereto from time to time.

## RECITALS

A.      Wolfspeed, Inc. and Wolfspeed Texas LLC filed [the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, consistent with the terms thereof, the "Plan") on June 30, 2025], which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2025.

B.      The Company proposes to issue Common Stock, Warrants and Convertible Notes (each as defined below) [and to remit to Renesas (as defined below) the Base Consideration Proceeds (as defined below) and, if applicable, the Contingent Additional Consideration Proceeds (as defined below) from the sale of Common Stock, in each case] pursuant to, and upon the terms set forth in, the Plan, the [*Order Confirming the [Amended] Joint Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate*] [Docket No. [●]] (the "Confirmation Order"), and the Definitive Documentation (as defined below).

C.      The Company and the Holders have agreed to enter into this Agreement pursuant to which the Company shall grant the Holders certain registration rights under the Securities Act (as defined below) with respect to the Registrable Securities (as defined below) in furtherance of the foregoing.

D.      The Holders on Schedule I are deemed to have executed this Agreement pursuant to the Confirmation Order (as defined below).

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Holders hereby agree as follows:

## AGREEMENT

## ARTICLE I

## DEFINITIONS

Section 1.1      Definitions. As used herein, the following terms shall have the following respective meanings:

["Additional Approvals" has the meaning assigned to such term in the Plan.]

"Adoption Agreement" means an Adoption Agreement in the form attached hereto as Exhibit A.

1

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Assignee</u>" has the meaning set forth in <u>Section 7.5</u>.

"<u>Automatic Shelf Registration Statement</u>" means an "automatic shelf registration statement" as defined in Rule 405 (or any successor rule then in effect) promulgated under the Securities Act.

["<u>Base Consideration Proceeds</u>" has the meaning assigned to such term in the Plan.]

"<u>beneficially owned</u>," "<u>beneficial ownership</u>" and similar phrases have the same meanings as such terms have under Rule 13d-3 and 13d-5 (or any successor rule then in effect) under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable upon the occurrence of a subsequent event [(including, for the avoidance of doubt, the Renesas Base Distribution Date)] or with the passage of time.

"<u>Board</u>" means the Board of Directors of the Company from time to time.

"<u>Bought Deal</u>" has the meaning ascribed to it in <u>Section 3.1(a)</u>.

"<u>Business Day</u>" means any day other than a Saturday or Sunday or a legal holiday on which commercial banks in New York City or the State of California in the United States, or Japan, are authorized or required by law to be closed.

["<u>CFIUS Approval</u>" has the meaning assigned to such term in the Plan.]

"<u>Commission</u>" means the U.S. Securities and Exchange Commission or any other U.S. Federal agency at the time administering the Securities Act.

"<u>Common Stock</u>" means, collectively, the Company's shares of [common stock, par value $0.00125 per share], any additional security paid, issued or distributed in respect of any such shares by way of a dividend, split or distribution, or in connection with a combination of shares, and any security into which such Common Stock or additional securities shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, amalgamation, consolidation, exchange, distribution or otherwise.

"<u>Company</u>" has the meaning set forth in the Preamble.

"<u>Confirmation Order</u>" has the meaning set forth in the recitals.

["<u>Contingent Additional Consideration Proceeds</u>" has the meaning assigned to such term in the Plan.]

"control," including the correlative terms "controlling," "controlled by" and "under common control with," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.

"Convertible Notes" means the Renesas Convertible Notes and the Non-Renesas Convertible Notes.

"Definitive Documentation" has the meaning assigned to such term in the Plan.

["Disposition Agreement" means, together with any necessary ancillary related documentation, the Investor Rights and Disposition Agreement entered into on the date hereof between the Company and Renesas, as may be amended or supplemented from time to time.

"Effective Date" has the meaning assigned to such term in the Plan.

"ELOC/ATM" means the equity line of credit or "at the market" program entered into to facilitate the sale of Common Stock as set forth in the Plan.]

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FINRA" means the Financial Industry Regulatory Authority or any successor regulatory authority.

"Form S-1 Shelf" has the meaning ascribed to it in Section 2.1(a).

"Form S-3 Shelf" has the meaning ascribed to it in Section 2.1(a).

"Free Writing Prospectus" means any "free writing prospectus" as defined in Rule 405 promulgated under the Securities Act.

"Holders" means any holder of Registrable Securities that is set forth on Schedule I hereto and Transferees of such Holders that acquire Registrable Securities in accordance with Section 7.5 and execute an Adoption Agreement in accordance with Section 7.5 (in each case, so long as such Persons holds any Registrable Securities).

"Information" has the meaning ascribed to it in Section 4.1(h).

"Initial Notice" has the meaning ascribed to it in Section 3.1(a).

"Inspectors" has the meaning ascribed to it in Section 4.1(h).

"Lock-up Period" has the meaning ascribed to it in Section 2.6(a).

"MNPI" has the meaning ascribed to it in Section 4.2.

"New 2L Convertible Notes" has the meaning assigned to such term in the Plan.

"New Renesas 2L Takeback Convertible Notes" has the meaning assigned to such term in the Plan.

"Non-Renesas Convertible Notes" means any New 2L Convertible Notes issued or issuable to Non-Renesas Holders pursuant to the Plan that are (i) issued to a Non-Renesas Holder who reasonably determines (on the advice of counsel) that it may be deemed an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company; provided, that, such Non-Renesas Holder provides notice to the Company and Renesas of such determination on or prior to the date hereof and the Company reasonably agrees (on advice of counsel) with such determination; or (ii) issued other than pursuant to Section 1145 of the Bankruptcy Code.

"Non-Renesas Holders" means Holders party hereto from time to time, in each case other than Renesas.

"Non-Renesas Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.1(b).

"Non-Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.1(d).

"Opt-In Election" has the meaning ascribed to it in Section 4.2.

"Opt-Out Election" has the meaning ascribed to it in Section 4.2.

"Person" means any individual, partnership, limited liability company, corporation, company, association, joint stock company, trust, joint venture, unincorporated organization or any governmental entity or any department, agency or political subdivision thereof.

"Piggyback Notice" has the meaning ascribed to it in Section 3.1(a).

"Piggyback Registration" means any registration pursuant to Section 3.1(a).

"Plan" has the meaning set forth in the recitals.

"Policies" has the meaning ascribed to it in Section 4.2.

["Primary Demand Notice" has the meaning ascribed to it in Section 2.2(b).

"Primary Demand Registration" means a registration of Primary Shares pursuant to Section 2.2.

"Primary Demand Right" has the meaning ascribed to it in Section 2.2(a).

"Primary Shares" has the meaning ascribed to it in Section 2.2(a).]

"Prospectus" means the prospectus included in any Registration Statement, as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the securities covered by such Registration Statement and, in each case, by all other amendments and supplements to such prospectus, including post-effective amendments and, in each case, all material incorporated by reference in such prospectus.

["Registered Primary Offering" means a primary registered offering of Primary Shares pursuant to Section 2.2.]

"Registrable Securities" means, with respect to any Holder, at any time, the Shares held or beneficially owned by such Holder at such time; provided, however, that as to any Registrable Securities, such securities shall cease to be Registrable Securities (i) upon the sale thereof pursuant to an effective registration statement, (ii) upon the sale thereof pursuant to Rule 144, (iii) when such securities cease to be outstanding, (iv) when (A) such Registrable Securities are held by a Holder that together with its Affiliates beneficially owns Shares representing less than 3% of the issued and outstanding Common Stock of the Company and (B) on advice of counsel to the Company, which counsel shall be reasonably acceptable to the relevant Holder, such securities may be sold or disposed of by such Holder without the volume, manner of sale and public information limitations under Rule 144 (or any similar provisions then in force), or (v) if such securities shall have been otherwise transferred and new certificates or book-entries for them not bearing a legend restricting transfer shall have been delivered by the Company and such securities may be publicly resold without registration under the Securities Act[; provided, further, that, prior to the Renesas Base Distribution Date, clauses (ii), (iii), (iv) and (v) of this definition shall not apply to Registrable Securities held or beneficially owned by Renesas].

"Registration Statement" means any registration statement of the Company filed with the Commission under the Securities Act that covers the Registrable Securities [or the Primary Shares], including any preliminary Prospectus and the Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits thereto and all material incorporated by reference in such registration statement.

["Regulatory Approvals" has the meaning assigned to such term in the Plan.]

"Related Fund" means any investment manager or advisor that controls, manages, advises or subadvises a Holder.

"Renesas" means Renesas Electronics America Inc., a California corporation (or any successor thereto), and any of its controlled Affiliates.

["Renesas Base Distribution Date" has the meaning assigned to such term in the Plan.]

"Renesas Convertible Notes" means the New Renesas 2L Takeback Convertible Notes issued or issuable to Renesas pursuant to the Plan[, including, prior to the Renesas Base Distribution Date, the associated entitlement to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the Confirmation Order].

"Renesas Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.1(b).

"Renesas Warrants" means the Warrants issued or issuable to Renesas pursuant to the Plan[, including, prior to the Renesas Base Distribution Date, the associated entitlement to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the Confirmation Order].

"Representatives" has the meaning ascribed to it in Section 4.2.

5

"<u>Required Holders</u>" means each of (i) Renesas for so long as Renesas beneficially owns Registrable Securities and (ii) Holders of a majority of the Registrable Securities beneficially owned by Non-Renesas Holders.

"<u>Rule 144</u>" means Rule 144 under the Securities Act (or successor rule).

"<u>Rule 144A</u>" means Rule 144A under the Securities Act (or successor rule).

"<u>Seasoned Issuer</u>" means an issuer eligible to use a registration statement on Form S-3 under the Securities Act and who is not an "ineligible issuer" as defined in Rule 405.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Selling Holders</u>" means the Holders selling Registrable Securities pursuant to a Registration Statement under this Agreement.

"<u>Selling Holders' Counsel</u>" has the meaning set forth in <u>Section 4.1(b)</u>.

"<u>Shares</u>" means Common Stock (i) issued or issuable to Renesas pursuant to the Plan[, including, prior to the Renesas Base Distribution Date, the associated entitlement to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the Confirmation Order]; (ii) issued or issuable upon exercise of the Renesas Warrants; (iii) issued or issuable upon conversion of the Renesas Convertible Notes; (iv) issued or issuable to any Non-Renesas Holder pursuant to the Plan other than pursuant to Section 1145 of the Bankruptcy Code which Non-Renesas Holder reasonably determines (on the advice of counsel) that it may be deemed an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company; <u>provided</u>, that, such Non-Renesas Holder provides notice to the Company and Renesas of such determination on or prior to the date hereof and the Company reasonably agrees (on advice of counsel) with such determination; and (v) issued or issuable upon conversion of the Non-Renesas Convertible Notes and shall also include any security of the Company issued in respect of or in exchange for such securities of the Company described in the foregoing clause (i) through (v), whether by way of dividend or other distribution, split, recapitalization, merger, amalgamation, rollup transaction, consolidation or reorganization.

"<u>Shelf Holder</u>" has the meaning ascribed to it in <u>Section 2.1(b)</u>.

"<u>Shelf Registration</u>" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

"<u>Shelf Registration Statement</u>" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

"<u>Shelf Take-Down</u>" has the meaning ascribed to it in <u>Section 2.1(b)</u>.

"<u>Subsequent Shelf Registration Statement</u>" has the meaning ascribed to it in <u>Section 2.1(f)</u>.

"<u>Subsidiary</u>" means each Person in which another Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% in voting power of the outstanding capital stock or other equity interests.

6

"Transfer" means any direct or indirect sale, assignment, transfer, conveyance, gift, bequest by will or under intestacy laws, pledge, mortgage, charge, hypothecation or other encumbrance, or any other disposition, of the stated security (or any interest therein or right thereto, including the issuance of any total return swap or other derivative whose economic value is primarily based upon the value of the stated security) or of all or part of the voting power (other than the granting of a revocable proxy) associated with the stated security (or any interest therein) whatsoever, or any other transfer of beneficial ownership of the stated security, with or without consideration and whether voluntarily or involuntarily (including by operation of law).

"Transferee" means a Person acquiring Shares pursuant to a Transfer.

"Underwritten Offering" means a sale, on the Company's or any Holder's behalf, of Shares [or Primary Shares] by the Company or a Holder to an underwriter for reoffering to the public.

"Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.1(c)(i).

"Underwritten Shelf Take-Down Notice" has the meaning ascribed to it in Section 2.1(c)(i).

"Warrants" means, collectively, those certain warrants to purchase shares of Common Stock issued to Renesas by the Company, dated as of date hereof.

"Well-Known Seasoned Issuer" means a "well-known seasoned issuer" as defined in Rule 405 promulgated under the Securities Act (or any successor rule then in effect) and which (i) is a "well-known seasoned issuer" under paragraph (1)(i)(A) of such definition or (ii) is a "well-known seasoned issuer" under paragraph (1)(i)(B) of such definition and is also eligible to register a primary offering of its securities relying on General Instruction I.B.1 of Form S-3 under the Securities Act.

## ARTICLE II

## SHELF [AND PRIMARY DEMAND] REGISTRATION

Section 2.1    Shelf Registration.

(a)    Filing. As promptly as practicable, and in any event not later than thirty (30) days of [each of (i) ]the date hereof [and (ii) solely with respect to Registrable Securities held by Renesas, the occurrence of the Renesas Base Distribution Date], the Company shall, pursuant to the requirements of this Section 2.1(a), file (or confidentially submit) on Form S-1 (the "Form S-1 Shelf") or, if available, on Form S-3 (a "Form S-3 Shelf" and, together with the Form S-1 Shelf and any Automatic Shelf Registration Statement, if available, a "Shelf Registration Statement") a Shelf Registration Statement to register under the Securities Act the Registrable Securities owned by the Holders (as applicable) at such time in accordance with Rule 415 under the Securities Act or any successor rule thereto (a "Shelf Registration"). [For purposes of this Section 2.1 only, the Registrable Securities owned by Renesas on any date shall only include those Registrable Securities (including Registrable Securities underlying securities convertible for or exercisable into Shares) actually distributed to Renesas on or prior to such date pursuant to the Plan.] With respect to each Shelf Registration, (i) the Company shall use commercially reasonable efforts to

cause to be declared effective the Shelf Registration Statement as promptly as practicable after the filing (or confidential submission) thereof and, in any event, within five (5) Business Days of resolving all Commission comments or receiving notice that the Shelf Registration Statement will not be reviewed and (ii) the Shelf Registration Statement shall include a Plan of Distribution disclosure in customary form for similar resale registration statements as reasonably requested by the Holders holding a majority of the Registrable Securities included in such Shelf Registration Statement (which shall include, if Registrable Securities held by Renesas are included in such Shelf Registration Statement, the Non-Renesas Holders holding a majority of the Registrable Securities included in such Shelf Registration Statement that are held by Non-Renesas Holders).

(b)    Shelf Take-Downs. Any Holder whose Registrable Securities are included in an effective Shelf Registration Statement (a "Shelf Holder") may initiate an offering or sale of all or part of such Registrable Securities (a "Shelf Take-Down"), in which case the provisions of this Section 2.1 shall apply. Notwithstanding the foregoing: (i) any such Shelf Holder may initiate an unlimited number of Non-Underwritten Shelf Take-Downs pursuant to Section 2.1(d) below; (ii) Renesas may initiate no more than three (3) Underwritten Shelf Take-Downs (including any block trade) pursuant to Section 2.1(c) below during any 12-month period (any such Underwritten Shelf Take-Down, a "Renesas Underwritten Shelf Take-Down"); and (iii) Non-Renesas Holders may initiate no more than two (2) Underwritten Shelf Take-Downs (including any block trade) pursuant to Section 2.1(c) below during any 12-month period (any such Underwritten Shelf Take-Down, a "Non-Renesas Underwritten Shelf Take-Down"); provided, that, the Registrable Securities requested to be sold by the initiating Shelf Holder(s) of any single Underwritten Shelf Take-Down shall have an anticipated aggregate offering price (before deducting underwriting discounts and commissions) of at least $75.0 million.

(c)    Underwritten Shelf Take-Downs.

(i)    Subject to Section 2.1(b), at any time that a Shelf Registration Statement is effective, if a Shelf Holder so elects in a written request delivered to the Company (an "Underwritten Shelf Take-Down Notice"), a Shelf Take-Down may be in the form of an Underwritten Offering (an "Underwritten Shelf Take-Down") and, if necessary, the Company shall use reasonable best efforts to file any necessary Prospectus supplement or post-effective amendment to its Shelf Registration Statement as soon as practicable and, in any event, within twenty (20) Business Days after the receipt of an Underwritten Shelf Take-Down Notice, unless a longer period is agreed to by the Shelf Holder(s) initiating the Underwritten Shelf Take-Down, and in all events subject to compliance with the notice requirements described in Section 2.1(c)(ii) and Section 3.1(a). Such initiating Shelf Holder(s) shall indicate in such Underwritten Shelf Take-Down Notice (A) the aggregate number of Registrable Securities expected to be offered and sold in such Underwritten Shelf Take-Down, (B) the expected plan of distribution of such Underwritten Shelf Take-Down, and (C) whether it intends for such Underwritten Shelf Take-Down to involve a customary "roadshow" (including an "electronic roadshow") or other marketing effort by the underwriters.

(ii)    Upon delivery of an Underwritten Shelf Take-Down Notice, the Company shall promptly deliver an Initial Notice of such Underwritten Shelf Take-Down to all Shelf Holders pursuant to Section 3.1(a).

(iii)     Upon delivery of an Initial Notice, the other Shelf Holders may elect to sell Registrable Securities in such Underwritten Shelf Take-Down, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as agreed to by the initiating Shelf Holder(s), by following the procedure set forth in Section 3.1(a) (but, in all cases, subject to Section 2.5(b) and Section 2.7).

(iv)     Notwithstanding the delivery of any Underwritten Shelf Take-Down Notice, all determinations as to whether to complete any Underwritten Shelf Take-Down and as to the timing, manner, price and other terms of any Underwritten Shelf Take-Down shall be at the discretion of the Shelf Holders holding a majority of the Registrable Securities contemplated to be sold under such Underwritten Shelf Take-Down Notice. The Shelf Holder(s) initiating the Underwritten Shelf Take-Down may withdraw an Underwritten Shelf Take-Down Notice by providing written notice to the Company at any time prior to the execution of an underwriting agreement, unless the Company is informed by the remaining Holders of Registrable Securities included in such Underwritten Shelf Take-Down to continue with such offering and the anticipated aggregate offering price (before deducting underwriting discounts and commissions) of the remaining Registrable Securities covered thereby (excluding the Registrable Securities of the withdrawing Holders) are at least $75.0 million. To the extent an Underwritten Shelf Take-Down Notice is so withdrawn, such Underwritten Shelf Take-Down shall not be counted towards the limitations set forth in Section 2.1(b). To the extent an Underwritten Shelf Take-Down Notice was delivered by Renesas and is not so withdrawn, due to the remaining Holders of Registrable Securities included in such Underwritten Shelf Take-Down informing the Company to proceed with such Underwritten Shelf Take-Down, and to the extent that Renesas does not participate in such Underwritten Shelf Take-Down, such Underwritten Shelf Take-Down shall be counted as a Non-Renesas Underwritten Shelf Take-Down under Section 2.1(b)(iii) and shall not be counted as a Renesas Underwritten Shelf Take-Down under Section 2.1(b)(ii). To the extent an Underwritten Shelf Take-Down Notice was delivered by Non-Renesas Holder(s) and the related Underlying Shelf Registration is not so withdrawn due to Renesas informing the Company to proceed with such Underwritten Shelf Take-Down, and to the extent that no Non-Renesas Holders participate in such Underwritten Shelf Take-Down, such Underwritten Shelf Take-Down shall be counted as a Renesas Underwritten Shelf Take-Down under Section 2.1(b)(ii) and shall not be counted as a Non-Renesas Underwritten Shelf Take-Down under Section 2.1(b)(iii).

(v)     Notwithstanding any provision of this Agreement to the contrary, no Holder may provide an Underwritten Shelf Take-Down Notice during the period beginning upon the receipt by the Holder of an Initial Notice and ending upon the consummation or withdrawal of the related Piggyback Registration so long as the Company is actively and in good faith pursuing such Piggyback Registration and provided that this clause shall not apply for longer than sixty (60) consecutive days.

(d)     Non-Underwritten Shelf Take-Downs. If a Shelf Holder desires to effect a Shelf Take-Down that does not constitute an Underwritten Shelf Take-Down (a "Non-Underwritten Shelf Take-Down"), provided that the Company receives written notice of the Underwritten Shelf Take-Down at least  two (2) Business Days prior to the consummation thereof, the Company shall use commercially reasonable efforts to ensure that upon the sale of Shares pursuant to an effective Shelf Registration Statement a customary legal opinion is promptly, and, in any event not later than one (1) Business Days following the date of such sale, issued to the

Company's transfer agent permitting the removal of legends from such Shares subject to the delivery of customary representation letters of selling Holders and/or brokers to the Company, the continuing effectiveness of the Shelf Registration Statement and satisfaction of customary procedures necessary to allow such transfer agent to remove such legends in connection with a sale pursuant to the Shelf Registration Statement.

(e)     Continued Effectiveness. The Company shall use commercially reasonable efforts to keep the Shelf Registration Statement filed pursuant to Section 2.1(a) hereof continuously effective under the Securities Act, including by filing a new Shelf Registration Statement if necessary, in order to permit the Prospectus (or any Prospectus supplement) forming a part thereof to be usable by a Shelf Holder until the earlier to occur of the date as of which (i) all Registrable Securities registered by such Shelf Registration Statement have been sold and (ii) all securities registered pursuant to the terms of this Agreement cease to constitute Registrable Securities as defined hereunder.

(f)     Subsequent Shelf Registrations. If the Shelf Registration Statement filed under Section 2.1(a) or any Subsequent Shelf Registration Statement ceases to be effective for any reason at any time during the period described in Section 2.1(e), the Company shall use commercially reasonable efforts to obtain the prompt withdrawal of any order suspending the effectiveness thereof, and in any event shall within thirty (30) days of such cessation of effectiveness amend such Shelf Registration Statement in a manner designed to obtain the withdrawal of the order suspending the effectiveness thereof, or file an additional shelf registration statement pursuant to Rule 415 under the Securities Act (or any similar provision then in force) covering all of the Registrable Securities covered by and not sold under the Shelf Registration Statement (a "Subsequent Shelf Registration Statement"). If a Subsequent Shelf Registration Statement is filed, the Company shall use commercially reasonable efforts to cause the Subsequent Shelf Registration Statement to be declared effective as soon as practicable after such filing and to keep such Subsequent Shelf Registration Statement continuously effective during the period described in Section 2.1(e). As used herein the term "Shelf Registration Statement" means the Shelf Registration Statement referenced in Section 2.1(a) and any Subsequent Shelf Registration Statements.

(g)     Conversion to Form S-3. In the event the Company files a Form S-1 Shelf, the Company shall use commercially reasonable efforts to convert the Shelf Registration Statement to a Form S-3 Shelf as soon as reasonably practicable after the Company becomes a Seasoned Issuer or a Well-Known Seasoned Issuer.

Section 2.2     [Primary Registered Offerings].

(a)     [Renesas Demand for Primary Registration. Prior to receipt of certification of all Regulatory Approvals or written confirmation by Renesas's authorized representative of the granting of such Regulatory Approvals from the applicable regulatory authorities (where such certifications are not issued by the applicable regulatory authorities) for Renesas, subject to the provisions of this Article II and the provisions of the Disposition Agreement, at any time and from time to time, Renesas shall have the right to request in writing that the Company register the sale on Form S-1 (or any successor form thereto) or, if available, on Form S-3 (or any successor form thereto) under the Securities Act of Common Stock or other equity securities of the Company on

10

a primary basis ("Primary Shares") for purposes of a Registered Primary Offering (a "Primary Demand Right") to execute sales to receive Base Consideration Proceeds and Contingent Additional Consideration Proceeds, as applicable. Renesas may initiate no more than one (1) Registered Primary Offering pursuant to this Section 2.2 during any 12-month period; provided, that, after the Company becomes a Seasoned Issuer or a Well-Known Seasoned Issuer, Renesas may initiate no more than two (2) Registered Primary Offerings pursuant to this Section 2.2 during any 12-month period. Notwithstanding the foregoing, if all Regulatory Approvals, other than CFIUS Approval or the Additional Approvals, have been obtained, Renesas shall not have the ability to exercise the Primary Demand Right until nineteen (19) weeks after the Effective Date.

(b)     Primary Demand Notices. All requests made pursuant to this Section 2.2 shall be made by providing written notice to the Company (each such written notice, a "Primary Demand Notice"), which notice shall specify the aggregate number and class or classes of Primary Shares proposed to be registered by the Company and the minimum price at which any sale of Primary Shares may be executed. The Company shall effect any requested Primary Demand Registration using a Form S-3 whenever the Company is a Seasoned Issuer or a Well-Known Seasoned Issuer and shall use an Automatic Shelf Registration Statement if it is a Well-Known Seasoned Issuer.

(c)     Primary Demand Filing. Subject to Section 2.3, promptly after receipt of any Primary Demand Notice, the Company shall give an Initial Notice of the Primary Demand Notice to all Holders of Registrable Securities and otherwise comply with Section 3.1(a). Upon delivery of a Primary Demand Notice, the Holders may elect to sell Registrable Securities in such Registered Primary Offering, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as applicable to the Primary Shares, by following the procedure set forth in Section 3.1(a) (but, in all cases, subject to Section 2.7 and Section 3.2(d)). Subject to Section 2.3, the Company shall use reasonable best efforts to file (or confidentially submit) the Registration Statement in respect of a Primary Demand Notice as soon as practicable and, in any event, within thirty (30) days after receiving a Primary Demand Notice and shall use commercially reasonable efforts to cause the same to be declared effective by the Commission as promptly as practicable after such filing (or confidential submission) and, in any event, within five (5) Business Days of resolving all Commission comments or receiving notice that such Registration Statement will not be reviewed. The Company shall use reasonable best efforts to file any necessary Prospectus supplement or post-effective amendments to such Registration Statement as and when necessary in order to facilitate the Registered Primary Offering. All determinations as to whether to complete any Registered Primary Offering and as to the timing, manner, price and other terms of any Registered Primary Offering shall be at the discretion of Renesas.

(d)     Selection of Underwriters. If Renesas delivers a Primary Demand Notice, Renesas shall select the managing underwriter or underwriters to administer such Registered Primary Offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed.

(e)     Primary Demand Withdrawal. Renesas may withdraw a Primary Demand Notice by providing written notice to the Company at any time prior to the execution of an

11

underwriting agreement, and such Primary Demand Notice shall not be counted towards the limitations set forth in Section 2.2(a).

(f)     Termination of Primary Demand Right. The Primary Demand Right will terminate on the Renesas Base Distribution Date.

(g)     Notwithstanding any provision of this Agreement to the contrary, Renesas may not provide a Primary Demand Notice during the period beginning upon the receipt by Renesas of an Initial Notice and ending upon the consummation or withdrawal of the related Piggyback Registration.]

Section 2.3     Deferral or Suspension of Registration; Grace Periods. If (a) the Company receives [a Primary Demand Notice or] an Underwritten Shelf Take-Down Notice and the Board, in its good faith judgment after consultation with outside legal counsel of the Company, determines that it would be materially adverse to the Company for such Registration Statement to be filed or declared effective on or before the date such filing or effectiveness would otherwise be required hereunder, or for such Registration Statement or Prospectus included therein to be used to sell Shares [or Primary Shares] or for such Underwritten Shelf Take-Down to be effected, because such action would: (i) have a detrimental impact on alternate transactions (including, but not limited to, merger, acquisition or offering transactions) being contemplated by the Company, including, but not limited to, requiring the Company (in the reasonable judgment of the Company) to disclose such alternate transaction in a manner that would meaningfully interfere with such transaction; (ii) based on the advice of the Company's outside counsel, require disclosure of material non-public information that the Company has a bona fide business purpose for preserving as confidential, provided, that, the exception in clause (ii) shall continue to apply only during the time in which such business purpose is continuing and such material non-public information has not been disclosed and remains material; or (iii) render the Company unable to comply with requirements under the Securities Act or the Exchange Act or (b) the Company is subject to a Commission stop order suspending the effectiveness of any Registration Statement or the initiation of proceedings with respect to such Registration Statement under Section 8(d) or 8(e) of the Securities Act, then the Company shall have the right to defer such filing (but not the preparation), initial effectiveness or continued use of a Registration Statement and the Prospectus included therein, provided that, unless consented to in writing by the Holders holding a majority of the Registrable Securities proposed to be included [(in the case of an Underwritten Shelf Take-Down)] (including, if Renesas participates in such Underwritten Shelf-Take-Down, the Non-Renesas Holders holding a majority of the Registrable Securities proposed to be included in such Underwritten Shelf Take-Down held by Non-Renesas Holders) [or Renesas (in the case of a Registered Primary Offering)], the Company shall not use the deferral or suspension rights provided under Section 2.3(a) to [(x) defer or suspend an Underwritten Shelf Take-Down] more than twice in any 12-month period or for more than ninety (90) calendar days in the aggregate in any 12-month period [or (y) defer or suspend a Primary Offering more than twice in any 12-month period or for more than ninety (90) calendar days] in the aggregate in any 12-month period]. [For the avoidance of doubt, Renesas shall have the right to demand the filing of a draft registration statement during such period in furtherance of Section 2.2; provided that the Company shall not be required to publicly file a Registration Statement until the day following the expiration of such period.] If the Company shall so postpone the filing, initial effectiveness or continued use of a Registration Statement with respect to [a Primary Demand Notice or] an Underwritten Shelf Take-

Down Notice and if [Renesas or] the applicable Shelf Holder[, respectively,] within thirty (30) days after receipt of the notice of postponement advises the Company in writing that it has determined to withdraw such [Primary Demand Notice or] Underwritten Shelf Take-Down Notice, then such [Primary Demand Notice or] Underwritten Shelf Take-Down Notice shall be deemed to be withdrawn and shall not be counted towards the limitations set forth in Section 2.1(b) [or Section 2.2(a)]. In the event of any deferral or suspension pursuant to this Section 2.3, the Company shall (i) use commercially reasonable efforts to keep the Shelf Holders [or Renesas], as applicable, apprised of the estimated length of the anticipated delay; and (ii) notify the Shelf Holders [or Renesas], as applicable, promptly upon termination of the deferral or suspension. After the expiration of the deferral or suspension period and without any further request from the applicable Shelf Holder [or Renesas], as applicable, to the extent such Shelf Holder [or Renesas] has not withdrawn the [Primary Demand Notice or] Underwritten Shelf Take-Down Notice, if applicable, the Company shall as promptly as reasonably practicable prepare and file (or confidentially submit) a Registration Statement or post-effective amendment or supplement to the applicable Registration Statement or document, or file any other required document, as applicable, and cause any such amendment to be declared effective as promptly as practicable so that, as thereafter delivered to purchasers of the Registrable Securities [or Primary Shares] included therein, the Prospectus will not include a material misstatement or omission and will be effective and useable for the sale of Registrable Securities [or Primary Shares]. [Notwithstanding any provision of this Agreement to the contrary, sales of [Shares] or [Primary Shares]  through any Underwritten Offering [or Registered Primary Offering] shall be subject to market conditions, applicable laws, and customary quarterly blackout rights, and shall only take place during open trading window periods under the Company's insider trading policy.]

Section 2.4    Effective Registration Statement. A registration required or requested pursuant to this Article II shall not be deemed to have been effected, nor shall such registration be counted towards the limitations set forth in Section 2.1(b) [or Section 2.2(a)]:

(a)    unless a Registration Statement with respect thereto has been declared effective by the Commission and remains effective in compliance with the provisions of the Securities Act and the laws of any U.S. state or other jurisdiction applicable to the disposition of Registrable Securities [or Primary Shares] covered by such Registration Statement for (x) not less than 180 days (or such shorter period as will terminate when all of such Registrable Securities [or Primary Shares] shall have been disposed of in accordance with such Registration Statement) or, if such Registration Statement relates to an Underwritten Offering, such longer period as, in the opinion of external counsel for the Company, a Prospectus is required by law to be delivered in connection with sales of Registrable Securities [or Primary Shares] by an underwriter or dealer or (y) in respect of a Shelf Registration Statement filed pursuant to Section 2.1(a) hereof, for such period as is provided in Section 2.1(e) hereof;

(b)    if, after it becomes effective, such Registration Statement is interfered with by any stop order, injunction or other order or requirement of the Commission or other governmental authority or court for any reason other than a violation of applicable law solely by any Selling Holder and has not thereafter become effective;

(c)    unless the offering, in the case of an Underwritten Shelf Take-Down, has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities

requested in good faith for disposition (inclusive of any Registrable Securities reduced from such Underwritten Shelf Take-Down pursuant to the terms of Section 2.5 or Section 3.2, as applicable);

(d)     with respect to any request for a Registration Statement or an offering, to the extent the applicable Holders shall have reimbursed the Company for all reasonable and documented expenses of the Company related to such Registration Statement or offering; or

(e)     if, in the case of an Underwritten Offering, the conditions to closing specified in an underwriting agreement applicable to the Company are not satisfied or waived other than by reason of any breach or failure by any Selling Holder.

Section 2.5     Selection of Underwriters; Cutback.

(a)     Selection of Underwriters. If a Shelf Holder intends to offer and sell the Registrable Securities covered by its request under this Article II by means of an Underwritten Shelf Take-Down, the participating Shelf Holders shall mutually select, in the final determination of the Holders of a majority of the Registrable Securities under such Underwritten Shelf Take-Down, the managing underwriter or underwriters to administer such offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed.

(b)     Underwriter's Cutback. Notwithstanding any other provision of this Article II or Section 3.1, if the managing underwriter or underwriters of an Underwritten Shelf Take-Down advise the Company in their good faith opinion that the inclusion of all such Registrable Securities proposed to be included in such Underwritten Shelf Take-Down would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities in such Underwritten Shelf Take-Down, then the number of securities proposed to be included in such Underwritten Shelf Take-Down shall be allocated among the Company, the Selling Holders and all other Persons selling securities in such Underwritten Shelf Take-Down in the following order:

(i)     first, the Registrable Securities of the class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) proposed to be included in such Underwritten Shelf Take-Down, pro rata among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such Underwritten Shelf Take-Down by each such Holder at the time of such Underwritten Shelf Take-Down;

(ii)     second, all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Underwritten Shelf Take-Down other than securities to be sold by the Company; and

(iii)     third, the securities of the same class or classes to be sold by the Company.

14

No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such offering. If the underwriter has not limited the number of Registrable Securities to be underwritten, the Company may include securities for its own account (or for the account of any other Persons) in such offering if the underwriter so agrees and if the number of Registrable Securities would not thereby be limited.

Section 2.6    Lock-up.

(a)    If requested by the managing underwriters in connection with any Underwritten Offering, each Holder (i) who together with its Affiliates owns 10% or more of the Common Stock on a fully-diluted basis at the time of such Underwritten Offering, (ii) who possesses the right to select one or more members of the Board or (iii) who is a natural person and serving as a director or executive officer of the Company shall agree to be bound by customary lock-up agreements providing that such Holder shall not, directly or indirectly, effect any Transfer (including sales pursuant to Rule 144) of any such Shares without prior written consent from the underwriters managing such Underwritten Offering during a period beginning on the date of launch of such Underwritten Offering and ending up to ninety (90) days from and including the date of pricing or such shorter period as reasonably requested by the underwriters managing such Underwritten Offering (the "Lock-Up Period"); provided, that, (A) the foregoing shall not apply to any Shares that are offered for sale as part of such Underwritten Offering, (B) such Lock-Up Period shall be no longer than and on substantially the same terms as the lock-up period applicable to the Company and the executive officers and directors of the Company, (C) such Lock-Up Period shall include customary carve-outs as negotiated in good faith between the Holder and the underwriter and (D) the Holders shall have been offered the opportunity to participate in such Underwritten Offering pursuant to the terms of Article III hereof (subject to the terms of Section 2.5 or Section 3.2, as applicable). Each such Holder agrees to execute a customary lock-up agreement in favor of the underwriters to such effect.

(b)    The terms of this Section 2.6 will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

Section 2.7    Participation in Underwritten Offering; Information by Holder. No Holder may participate in an Underwritten Offering hereunder unless such Holder (a) agrees to sell such Holder's Shares on the basis provided in any underwriting arrangements, and in accordance with the terms and provisions of this Agreement, including any lock-up arrangements, and (b) completes and executes all questionnaires, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements. In addition, the Holders shall furnish to the Company such information regarding such Holder or Holders and the distribution proposed by such Holders, as applicable, as the Company may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Article II. Nothing in this Section 2.7 shall be construed to create any additional rights regarding the registration of Shares in any Person otherwise than as set forth herein or require any Holder to make any representations, warranties or agreements in respect of or relating to the Company. The Company will use commercially reasonable efforts to ensure that (i) underwriting arrangements shall be in customary form, (ii) no underwriter shall require any Holder to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such Holder and such Holder's intended

15

method of distribution, and (iii) any representation required to be made by such Holder by law and any other representations, warranties and agreements customarily made by selling securityholders registering securities in similar circumstances to the extent the same do not relate to the Company. If, despite the Company's commercially reasonable efforts, an underwriter requires any Holder to make additional representations or warranties to or agreements with such underwriter, such Holder may elect not to participate in such Underwritten Offering and shall not be bound by Section 2.7 hereof.

Section 2.8    Registration Expenses. All expenses incident to the Company's performance of or compliance with this Agreement, including without limitation (i) all registration and filing fees, and any other fees and expenses associated with filings required to be made with any stock exchange, the Commission and FINRA (including, if applicable, the fees and expenses of any "qualified independent underwriter" and its counsel as may be required by the rules and regulations of FINRA), (ii) all fees and expenses of compliance with state securities or blue sky laws (including fees and disbursements of counsel for the underwriters and one counsel for the Selling Holders in connection with blue sky qualifications of the Shares [or Primary Shares] and determination of their eligibility for investment under the laws of such jurisdictions as the managing underwriters may designate), (iii) all printing and related messenger and delivery expenses (including expenses of printing certificates for the Shares [and the Primary Shares] in a form eligible for deposit with The Depository Trust Company and of printing prospectuses), (iv) all fees and disbursements of counsel for the Company and of all independent certified public accountants of the Company and its Subsidiaries (including the expenses related to any "comfort" letters), (v) all fees and expenses incurred in connection with the listing of the Shares [or the Primary Shares] on any securities exchange and all rating agency fees, (vi) all fees and documented out-of-pocket disbursements of underwriters customarily paid by the issuer or sellers of securities and subject to reimbursement by the issuer pursuant to the applicable underwriting agreement, including expenses of any special experts retained in connection with the registration (excluding underwriting discounts and commissions and transfer taxes, if any, and fees and disbursements of counsel to underwriters to the extent agreed to be paid by such underwriters (other than such fees and disbursements incurred in connection with any registration or qualification of Shares [or Primary Shares] under the securities or blue sky laws of any state)), (vii) all reasonable fees and documented out-of-pocket expenses of Selling Holders' Counsel for Holders of Registrable Securities included in a Piggyback Registration or Shelf Take-Down, as applicable, not to exceed $50,000 per Piggyback Registration or Shelf Take-Down (as applicable), and (viii) fees and expenses of other Persons retained by the Company, and any other reasonable expenses customarily paid by the issuers of securities, will be borne by the Company, regardless of whether the Registration Statement becomes effective (or such offering is completed) and whether or not all or any portion of the Registrable Securities originally requested to be included in such registration or offering are ultimately included in such registration or offering; provided, however, that (A) any underwriting discounts, commissions or fees in connection with the sale of the Registrable Securities will be borne by the Holders pro rata on the basis of the number of Shares so offered and sold, [(B) any underwriting discounts, commissions or fees in connection with the sale of the Primary Shares will be borne by Renesas,] (C) transfer taxes with respect to the sale of Registrable Securities will be borne by the Holder of such Registrable Securities and (D) the fees and expenses of any accountants or other persons retained or employed by any Holder will be borne by such Holder.

16

# ARTICLE III

# PIGGYBACK REGISTRATION

Section 3.1        Notices.

(a)        If the Company at any time proposes for any reason to register the sale of Common Stock or other equity securities of the Company under the Securities Act (other than a Non-Underwritten Shelf Take-Down, [sales under the ELOC/ATM,] sales under any [other] "at-the-market" offering, a dividend reinvestment plan or rights offering, a registration on Form S-4 or Form S-8, or any successor of either such form, or a registration relating solely to the offer and sale to the Company's directors or employees pursuant to any employee share plan or other employee benefit plan or arrangement) whether or not Common Stock or other equity securities of the Company are to be sold by the Company or otherwise[, and whether or not in connection with any Primary Demand Registration pursuant to Section 2.2, or any other agreement] (such registration, a "Piggyback Registration"), the Company shall give to each Holder holding Registrable Securities of the same class or classes proposed to be registered (or convertible or exercisable at the Holder's option into or for such class or classes) written notice of its intention to so register the Shares[, Primary Shares] or other equity securities of the Company at least ten (10) Business Days prior to the expected date of filing of such Registration Statement or amendment or supplement thereto in which the Company first intends to identify any selling stockholders and the number of Registrable Securities [and Primary Shares] to be sold (each such notice, an "Initial Notice"). The Company shall, subject to the provisions of Section 3.2 and Section 3.3 below, include in such Piggyback Registration on the same terms and conditions as the securities otherwise being sold, all Registrable Securities of the same class or classes as the Common Stock or other equity securities of the Company proposed to be registered (or convertible or exercisable at the Holder's option into or for such class or classes) with respect to which the Company has received written requests from Holders for inclusion therein within the time period specified by the Company in the applicable Initial Notice, which time period shall be not less than five (5) Business Days, in each case after sending the applicable Initial Notice (each such written request, a "Piggyback Notice"), which Piggyback Notice shall specify the number of Shares proposed to be included in the Piggyback Registration.

(b)        If a Holder does not deliver a Piggyback Notice within the period specified in Section 3.1(a), such Holder shall be deemed to have irrevocably waived any and all rights under this Article III with respect to such registration (but not with respect to future registrations in accordance with this Article III).

(c)        No registration effected under this Section 3.1 shall relieve the Company of its obligation to effect any registration or Shelf Take-Down under Section 2.1 [or Section 2.2] hereof, and no registration effected pursuant to this Section 3.1 shall be deemed to have been effected pursuant to Section 2.1 [or Section 2.2] hereof, and no Piggyback Registration shall count towards the number of Underwritten Shelf Take-Downs that a Shelf Holder is entitled to make pursuant to Section 2.1 hereof [or Registered Primary Offerings that Renesas is entitled to initiate pursuant to Section 2.2 hereof]. The Initial Notice, the Piggyback Notice and the contents thereof shall be kept confidential until the public filing of the applicable Registration Statement, post-effective amendment or Prospectus supplement.

17

Section 3.2    Underwriter's Cutback. If the managing underwriter of an Underwritten Offering [(including an offering pursuant to Section 2.2)] that includes a Piggyback Registration advises the Company that it is the managing underwriter's good faith opinion that the inclusion of all such Registrable Securities proposed to be included in such Underwritten Offering would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities [or the Primary Shares] to be offered thereby, then the number of securities proposed to be included in such Underwritten Offering shall be allocated among the Company, the Selling Holders and all other Persons selling securities in such Underwritten Offering in the following order:

(a)    If the Piggyback Registration referred to in Section 3.1 is initiated as an underwritten primary registration on behalf of the Company [(other than a Registered Primary Offering pursuant to Section 2.2)], then, with respect to each class proposed to be registered:

(i)    *first*, Common Stock or other equity securities of the Company of the class or classes proposed to be registered that the Company proposes to sell, as applicable;

(ii)    *second*, all Registrable Securities of the same class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) held by Holders requested to be included in such Piggyback Registration (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such offering by each such Holder at the time of such Piggyback Registration); and

(iii)    *third*, all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Piggyback Registration.

(b)    if the Piggyback Registration referred to in Section 3.1 is an Underwritten Shelf Take-Down, then the provisions of Section 2.5(b) shall apply.

(c)    if the Piggyback Registration referred to in Section 3.1 is an underwritten secondary registration on behalf of any holder of securities other than a Holder, then, with respect to each class proposed to be registered:

(i)    *first*, the securities of the class or classes proposed to be registered held by such holder;

(ii)    *second*, the Registrable Securities of the same class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) held by Holders requested to be included in such Piggyback Registration (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Piggyback Registration);

(iii)    *third,* all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Piggyback Registration other than securities to be sold by the Company; and

(iv)    *fourth*, the Common Stock or other equity securities of the Company of the same class or classes to be sold by the Company.

(d)    [if the Piggyback Registration referred to in <u>Section 3.1</u> is a Registered Primary Offering, then, with respect to each class proposed to be registered:

(i)    *first*, the Primary Shares and all Registrable Securities of the same class or classes (or convertible or exercisable at Renesas' option into or for such class or classes) held by Renesas requested to be included in such Registered Primary Offering;

(ii)    *second*, all Registrable Securities of the same class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) held by Holders other than Renesas requested to be included in such Registered Primary Offering (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Registered Primary Offering);

(iii)    *third,* all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Registered Primary Offering other than securities to be sold by the Company; and

(iv)    *fourth*, any additional securities of the same class or classes to be sold by the Company.]

Section 3.3    <u>Company Control</u>. Except for a Registration Statement being filed in connection with a Shelf Registration [or the exercise of a Primary Demand Right], the Company may decline to file a Registration Statement after an Initial Notice has been given or after receipt by the Company of a Piggyback Notice, and the Company may withdraw a Registration Statement after filing and after such Initial Notice or Piggyback Notice, but prior to the effectiveness of the Registration Statement, <u>provided</u>, that, the Company shall promptly notify the Selling Holders in writing of any such action.

Section 3.4    <u>Selection of Underwriters</u>. If the Company intends to offer and sell Common Stock or other equity securities of the Company by means of an Underwritten Offering (other than an offering pursuant to <u>Section 2.1</u> [or <u>Section 2.2</u>]), the Company shall select the managing underwriter or underwriters to administer such Underwritten Offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing.

Section 3.5    <u>Withdrawal of Registration</u>. Any Holder shall have the right to withdraw all or a part of its Piggyback Notice by giving written notice to the Company of such withdrawal at any time prior to the execution of an underwriting agreement.

## ARTICLE IV

## REGISTRATION PROCEDURES

Section 4.1    <u>Registration Procedures</u>. If and whenever the Company is under an obligation pursuant to the provisions of this Agreement to use commercially reasonable efforts to

19

effect the registration of any Registrable Securities [or Primary Shares] or the offering thereof, the Company shall, as expeditiously as reasonably practicable:

(a)      in the case of Registrable Securities, use commercially reasonable efforts to cause a Registration Statement that registers such Registrable Securities to become and remain effective for a period of 180 days or, if earlier, until the earlier to occur of the date as of which (i) all of such Registrable Securities covered thereby have been disposed of and (ii) all securities registered pursuant to the terms of this Agreement cease to constitute Registrable Securities as defined hereunder; provided, that, in the case of any registration of Registrable Securities on a Shelf Registration Statement which are intended to be offered on a continuous or delayed basis, such 180-day period shall be extended, if necessary or contemplated by Section 2.1(e), to keep the registration statement continuously effective, supplemented and amended to the extent necessary to ensure that it is available for sales of such Registrable Securities, and to ensure that it conforms with the requirements of this Agreement, the Securities Act and the policies, rules and regulations of the Commission as announced from time to time, until the Company is no longer required to keep the registration statement continuously effective pursuant to Section 2.1(e) of this Agreement;

(b)      [(x) with respect to a Shelf Registration or Piggyback Registration, furnish] to each Selling Holder, [and (y) with respect to a Registered Primary Offering, furnish to Renesas, in each case] at least ten (10) Business Days before filing the related Registration Statement, or such shorter period as reasonably practical or necessary due to the timing requirements of Section 2.1(c)(i), as applicable, copies of such Registration Statement or any amendments or supplements thereto, which documents shall be subject to the review, comment and reasonable approval by (x) counsel to Renesas (including any reasonably necessary local counsel), to the extent any Registrable Securities beneficially owned by Renesas are included on such Registration Statement, and (y) [solely in the case of a Shelf Registration or Piggyback Registration,] one (1) lead counsel (and any reasonably necessary local counsel) selected by the Non-Renesas Holders who beneficially own a majority of any Registrable Securities owned by Non-Renesas Holders included on such Registration Statement, and who shall represent all Selling Holders that are Non-Renesas Holders as a group (such counsel in (x) and (y), collectively, the "Selling Holders' Counsel") (it being understood that such ten (10) Business Day period need not apply to successive drafts of the same document proposed to be filed so long as such successive drafts are supplied to the Selling Holders' Counsel in advance of the proposed filing by a period of time that is customary and reasonable under the circumstances);

(c)      furnish to [Renesas (in the case of a Registered Primary Offering) and] each Selling Holder [(in the case of a Shelf Registration or Piggyback Registration)] and each underwriter, if any, such number of copies of final conformed versions of the applicable Registration Statement and of each amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference) reasonably requested by [Renesas or] such Selling Holder [(as applicable)] or underwriter in writing;

(d)      in the case of Registrable Securities and [Primary Shares], prepare and file with the Commission such amendments, including post-effective amendments, and supplements to such Registration Statement and the applicable Prospectus or Prospectus supplement, including any Free Writing Prospectus as defined in Rule 405 under the Securities Act, used in connection therewith as may be (i) reasonably requested by any Selling Holder ([in the case of a Shelf

20

Registration or Piggyback Registration and] to the extent such request relates to information relating to such Selling Holder) or any Holder requesting the inclusion of its Registrable Securities therein, or (ii) necessary to keep such Registration Statement effective for at least the period specified in Section 4.1(a) or elsewhere in this Agreement and to comply with the provisions of this Agreement and the Securities Act with respect to the sale or other disposition of such Registrable Securities [and Primary Shares], and furnish to each Selling Holder [(in the case of a Shelf Registration or Piggyback Registration) and Renesas (in the case of a Registered Primary Offering)] and to the managing underwriter(s), if any, within a reasonable period of time prior to the filing thereof a copy of any amendment or supplement to such Registration Statement or Prospectus; provided, however, that, with respect to each Free Writing Prospectus or other materials to be delivered to purchasers at the time of sale of the Registrable Securities, the Company shall (i) ensure that no Registrable Securities are sold "by means of" (as defined in Rule 159A(b) under the Securities Act) such Free Writing Prospectus or other materials without the prior written consent of the sellers of the Registrable Securities, which Free Writing Prospectus or other materials shall be subject to the review of counsel to such sellers and (ii) make all required filings of all Free Writing Prospectuses or other materials with the Commission as are required;

(e)       notify in writing each Selling Holder [(in the case of a Shelf Registration or Piggyback Registration) and Renesas (in the case of a Registered Primary Offering)] promptly (i) of the receipt by the Company of any notification with respect to any comments by the Commission with respect to such Registration Statement or any amendment or supplement thereto or any request by the Commission for the amending or supplementing thereof or for additional information with respect thereto, (ii) of the receipt by the Company of any notification with respect to the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement or any amendment or supplement thereto or the initiation or threatening of any proceeding for that purpose and (iii) of the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Securities [or Primary Shares (as the case may be)] for sale in any jurisdiction or the initiation or threatening of any proceeding for such purposes and, in any such case as promptly as reasonably practicable thereafter, prepare and file an amendment or supplement to such Registration Statement or Prospectus which will correct such statement or omission or effect such compliance;

(f)       use commercially reasonable efforts to register or qualify such Registrable Securities [and Primary Shares] under such other securities or blue sky laws of such jurisdictions as the Selling Holders [(in the case of a Shelf Registration or Piggyback Registration)] reasonably request [(or reasonably necessary, in the case of Primary Shares)] and do any and all other acts and things which may be reasonably necessary or advisable to enable such Selling Holders to consummate their disposition in such jurisdictions; provided, however, that the Company will not be required to qualify generally to do business, subject itself to general taxation or consent to general service of process in any jurisdiction where it would not otherwise be required to do so but for this Section 4.1(f);

(g)       [in the case of a Shelf Registration or Piggyback Registration,] furnish to each Selling Holder such number of copies of a summary Prospectus or other prospectus, including a preliminary prospectus and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents as such Selling Holders or any underwriter may reasonably request in writing;

21

(h)    notify on a timely basis each Selling Holder of such Registrable Securities (in the case of a Shelf Registration or Piggyback Registration) at any time when a prospectus relating to such Registrable Securities is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading and, at the request of such Selling Holder, as soon as practicable prepare and furnish to such Selling Holder a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the offeree of such securities, such Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(i)    make available to the Selling Holders, the Selling Holders' Counsel, any underwriter participating in any disposition pursuant to such Registration Statement and counsel to the underwriter(s) (collectively, the "Inspectors") any pertinent corporate records and documents reasonably requested to conduct customary due diligence in connection the related disposition (collectively, the "Information") and, to the extent customary and requested by the underwriter(s) participating in any such disposition, request that the independent public accountants who have certified the Company's financial statements make themselves available, at reasonable times and for reasonable periods, to discuss the business of the Company. Any of the Information which the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, shall not be disclosed by the Inspectors unless otherwise agreed between the Inspector and the Company;

(j)    in the case of an Underwritten Offering, cause to be delivered to the underwriters of such Underwritten Offering a "comfort" letter in customary form and at customary times and covering matters of the type customarily covered by such comfort letters from its independent certified public accountants;

(k)    in the case of an Underwritten Offering, cause to be delivered to the underwriters of such Underwritten Offering a written and signed legal opinion or opinions in customary form from its outside or in-house legal counsel dated the closing date of the Underwritten Offering;

(l)    provide a transfer agent and registrar (which may be the same entity) for such Registrable Securities [or Primary Shares] and deliver to such transfer agent and registrar such customary forms, legal opinions from its outside or in-house legal counsel, agreements and other documentation as such transfer agent and/or registrar so request;

(m)    issue to any underwriter to which any Selling Holders may sell Registrable Securities [or the Company may sell Primary Shares] in such offering certificates evidencing such Registrable Securities [or Primary Shares];

(n)    use commercially reasonable efforts to cause such Registrable Securities [(in the case of a Shelf Registration or Piggyback Registration) and Primary Shares (in the case of

a Registered Primary Offering)] to be listed on any national securities exchange on which any Common Stock is listed or, if the Common Stock is not listed on a national securities exchange, upon the request of any Selling Holder of the Registrable Securities included in such registration [(in the case of a Shelf Registration or Piggyback Registration) or Renesa (in the case of a Registered Primary Offering)], use commercially reasonable efforts to qualify such Registrable Securities [(in the case of a Shelf Registration or Piggyback Registration) and Primary Shares (in the case of a Registered Primary Offering)] for inclusion on such national securities exchange as the Company shall designate;

(o)      otherwise use commercially reasonable efforts to comply with all applicable rules and regulations of the Commission and make available to its security holders, no later than sixty (60) days after the end of the 12-month period beginning with the first day of the Company's first full fiscal quarter after the effective date of such Registration Statement, earnings statements (which need not be audited) covering a period of twelve (12) months beginning within three (3) months after the effective date of the Registration Statement, which earnings statements shall satisfy the provisions of Section 11(a) of the Securities Act or any successor rule thereto, provided that such requirement shall be deemed satisfied if the Company timely files complete and accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act;

(p)      notify the Selling Holders [(in the case of a Shelf Registration or Piggyback Registration) and Renesa (in the case of a Registered Primary Offering)] and the lead underwriter or underwriters, if any, and (if requested) confirm such advice in writing, as promptly as reasonably practicable after notice thereof is received by the Company when the applicable Registration Statement or any amendment thereto has been filed or becomes effective and when the applicable Prospectus or any amendment or supplement thereto has been filed;

(q)      use commercially reasonable efforts to prevent the entry of, and use commercially reasonable efforts to obtain as promptly as reasonably practicable the withdrawal of, any stop order with respect to the applicable Registration Statement or other order suspending the use of any preliminary or final Prospectus;

(r)      promptly incorporate in a Prospectus supplement or post-effective amendment to the applicable Registration Statement such information as the lead underwriter or underwriters, if any, and[, in the case of a Shelf Registration or Piggyback Registration], each Selling Holder agree should be included therein relating to the plan of distribution with respect to such class of Registrable Securities [or Primary Shares], which may include disposition of Registrable Securities [or Primary Shares] by all lawful means, including firm-commitment underwritten public offerings, block trades, agented transactions, sales directly into the market, purchases or sales by brokers, derivative transactions, short sales, stock loan or stock pledge transactions and sales not involving a public offering; and make all required filings of such Prospectus supplement or post-effective amendment as promptly as reasonably practicable after being notified of the matters to be incorporated in such Prospectus supplement or post-effective amendment;

(s)      if a Prospectus supplement will be used in connection with the marketing of an Underwritten Shelf Take-Down [or Registered Primary Offering] and the managing underwriter(s) at any time shall notify the Company in writing that, in the sole judgment of such

managing underwriter(s), inclusion of detailed information to be used in such Prospectus supplement is of material importance to the success of such Underwritten Shelf Take-Down [or Registered Primary Offering], the Company shall use commercially reasonable efforts to include such information in such Prospectus supplement;

(t)      cooperate with each Selling Holder [in the case of a Shelf Registration or Piggyback Registration] and each underwriter or agent, if any, participating in the disposition of such Registrable Securities [or Primary Shares] and their respective counsel in connection with any filings required to be made with FINRA;

(u)      provide a CUSIP number or numbers for all such shares, in each case not later than the effective date of the applicable registration statement;

(v)      to the extent reasonably requested by the lead or managing underwriters in connection with an Underwritten Offering, send appropriate officers of the Company to attend any "roadshows" scheduled in connection with any such Underwritten Offering, with all out of pocket costs and expenses incurred by the Company or such officers in connection with such attendance to be paid by the Company;

(w)      enter into such agreements (including an underwriting agreement in customary form) and take such other actions as [(i) in the case of a Shelf Registration or Piggyback Registration,] the Selling Holder or Selling Holders, as the case may be, owning at least a majority of the Registrable Securities covered by any applicable Registration Statement shall reasonably request [and (ii) in the case of a Registered Primary Offering, Renesas shall reasonably request, in each case] in order to expedite or facilitate the disposition of such Registrable Securities [and Primary Shares (as applicable)], including customary indemnification and contribution to the effect and to the extent provided in <u>Article V</u> hereof, <u>provided</u>, <u>however</u>, that [in the case of a Shelf Registration or a Piggyback Registration], if a Selling Holder becomes a party to any underwriting agreement or related documents, the Selling Holder shall not be required in any such underwriting agreement or related documents to make any representations or warranties to or agreements with the Company or the underwriters other than customary representations, warranties or agreements regarding such Selling Holder's title to Registrable Securities and any written information provided by the Selling Holder to the Company expressly for inclusion in the related Registration Statement, and the liability of any Selling Holder under the underwriting agreement shall be several and not joint and in no event shall the liability of any Selling Holder under the underwriting agreement be greater in amount than the dollar amount of the proceeds received by such Selling Holder under the sale of the Registrable Securities pursuant to such underwriting agreement (net of underwriting discounts and commissions); and

(x)      subject to all the other provisions of this Agreement, use commercially reasonable efforts to take all other steps necessary to effect the registration, marketing and sale of such Registrable Securities [or Primary Shares] contemplated hereby.

Section 4.2    <u>Notice Opt-In and Opt-Out</u>. Notwithstanding anything to the contrary in this Agreement, until a Holder makes an affirmative written election, the Company shall not deliver any notice or any information to such Holder that would reasonably be expected to constitute material non-public information ("<u>MNPI</u>"), including any applicable registration notices, or any

other information under this Agreement. Upon receipt of a written election to receive such notices or information (an "Opt-In Election") the Company shall provide to the Holder all applicable notices or information pursuant to this Agreement from the date of such Opt-In Election. At any time following a Holder making an Opt-In Election, such Holder may also make a written election to no longer receive any such notices or information (an "Opt-Out Election"), which election shall cancel any previous Opt-In Election, and, following receipt of such Opt-Out Election, the Company shall not deliver any such notice or information to such Holder from the date of such Opt-Out Election. An Opt-Out Election may state a date on which it expires or, if no such date is specified, shall remain in effect indefinitely. A Holder who previously has given the Company an Opt-In Election or Opt-Out Election may revoke such election at any time, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-In Elections and Opt-Out Elections. Should any Holder have made an Opt-In Election and have received a notice or any information that would reasonably be expected to constitute MNPI, such Holder agrees that it shall treat such MNPI as confidential in accordance with procedures adopted by it in good faith to protect confidential information of third parties delivered to such Holder (the "Policies") and shall not disclose such MNPI, in each case, without the prior written consent of the Company until such time as such MNPI is or becomes available to the public generally, other than as a result of disclosure by the Holder in breach of the terms of this Agreement; provided, that, a Holder may deliver or disclose MNPI (A) to its Affiliates and its and its Affiliates' directors, officers, employees, agents, external advisors or legal counsel (collectively, "Representatives"), but solely to the extent such disclosure reasonably relates to its evaluation of exercise of its rights under this Agreement and the sale of any Registrable Securities in connection therewith, and such Representatives are subject to the Policies or agree to hold the MNPI confidential on terms substantially consistent with this Section 4.2; (B) when disclosure of such information is required by court or administrative order or is necessary to respond to inquiries of regulatory authorities; (C) when disclosure of such information is required, in the reasonable opinion of such Holder's counsel, by law (including any disclosure requirements pursuant to federal securities laws in connection with the filing of any Registration Statement or the use of any Prospectus referred to in this Agreement); or (D) when such information becomes available to any such Person from a source other than the Company and such source is not bound by a confidentiality agreement.

## ARTICLE V

## INDEMNIFICATION

Section 5.1    Indemnification by the Company. In connection with any Registration Statement in which a Holder is participating, the Company agrees to indemnify and hold harmless, to the full extent permitted by law, such Holder, its Affiliates and their respective officers, directors, managers, partners, members and representatives, and each of their respective successors and assigns, against any losses, claims, damages, liabilities and expenses, including amounts paid in settlement, caused by any violation by the Company of the Securities Act or the Exchange Act applicable to the Company and relating to action or inaction required of the Company in connection with the registration contemplated by such Registration Statement or any untrue or alleged untrue statement of a material fact contained in such Registration Statement or related Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto, or any other disclosure document (including reports and other documents filed under the Exchange Act and any document incorporated by reference therein) or any omission or alleged omission to state

therein a material fact required to be stated therein or necessary to make the statements therein not misleading; provided, however, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such Registration Statement or related Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto in reliance upon and in conformity with information furnished to the Company in writing by the Person asserting such loss, claim, damage, liability or expense specifically for use therein. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any such Person and shall survive the transfer of such securities. The Company shall also provide customary indemnification to any underwriters participating in any Underwritten Offering.

Section 5.2    Indemnification by Selling Holders. Each Selling Holder agrees to indemnify and hold harmless, to the full extent permitted by law, the Company, the Company's controlled Affiliates and its and their respective directors, managers, partners, members and representatives, and each of their respective successors and assigns, and each Person who controls the Company (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) against any losses, claims, damages or liabilities and expenses caused by any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that such untrue statement or omission was made in reliance on and in conformity with any information furnished in writing by such Selling Holder to the Company expressly for inclusion in such Registration Statement and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting such loss, claim, damage, liability or expense; provided, that the obligation to indemnify shall be several, not joint and several, for each Selling Holder and in no event shall the liability of any Selling Holder hereunder be greater in amount than the dollar amount of the net proceeds (after deducting underwriting discounts and commissions) received by such Selling Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

Section 5.3    Conduct of Indemnification Proceedings. Any Person entitled to indemnification hereunder will (i) give prompt (but in any event within thirty (30) days after such Person has actual knowledge of the facts constituting the basis for indemnification) written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided, however, that any delay or failure to so notify the indemnifying party shall relieve the indemnifying party of its obligations hereunder only to the extent that it is materially prejudiced by reason of such delay or failure, but shall not relieve the indemnifying party from any other liability that it may have otherwise. Any Person entitled to indemnification hereunder shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Person unless (a) the indemnifying party has agreed in writing to pay such fees or expenses, (b) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after receipt of notice of such claim from the Person entitled to indemnification hereunder and employ counsel reasonably satisfactory to such Person, (c) the indemnified party

26

has reasonably concluded, based on the advice of counsel, that there may be legal defenses available to it or other indemnified parties that are different from or in addition to those available to the indemnifying party or (d) in the reasonable judgment of any such Person, based upon advice of counsel, a conflict of interest may exist between such Person and the indemnifying party with respect to such claims (in which case, if such Person notifies the indemnifying party in writing that such Person elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such Person). If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its consent (but such consent will not be unreasonably withheld, conditioned or delayed). No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened action or claim in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement includes (i) an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action, (ii) does not include a statement as to or an admission of fault, culpability or failure to act by or on behalf of any indemnified party and (iii) does not commit any indemnified party to take, or hold back from taking, any action. No indemnified party shall, without the written consent of the indemnifying party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder, and no indemnifying party shall be liable for any settlement or compromise of, or consent to the entry of judgment with respect to, any such action or claim effected without its consent, in each case which consent shall not be unreasonably withheld, conditioned or delayed.

Section 5.4    Other Indemnification. Indemnification similar to that specified in this Article V (with appropriate modifications) shall be given by the Company and each Selling Holder with respect to any required registration or other qualification of Registrable Securities under Federal or state law or regulation of governmental authority other than the Securities Act.

Section 5.5    Contribution. If for any reason the indemnification provided for in Section 5.1 or Section 5.2 is unavailable to an indemnified party or insufficient to hold it harmless as contemplated by Section 5.1 and Section 5.2, then (i) the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnified party and the indemnifying party or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective sellers, on the other hand, from their sale of the Registrable Securities. The relative fault of such indemnifying party and indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such indemnifying party or indemnified party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5.5 were determined by pro rata allocation (even if the Holders or any underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 5.5. Notwithstanding the provisions of this Section 5.5, no Holder shall be required to contribute an

amount greater than the dollar amount by which the net proceeds received by such Holder with respect to the sale of any Registrable Securities giving rise to such indemnification and contribution obligation exceeds the amount of damages which such Holder has otherwise been required to pay by reason of any and all untrue or alleged untrue statements of material fact or omissions or alleged omissions of material fact made in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto related to such sale of Registrable Securities. The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or expenses (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or, except as provided in <u>Section 5.3</u>, defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The Holders' obligations in this <u>Section 5.5</u> to contribute shall be several in proportion to the dollar amount of the net proceeds (after deducting underwriting discounts and commissions) received by such Selling Holders with respect to the sale of the Registrable Securities giving rise to such contribution obligation and not joint.

## ARTICLE VI

## COMPLIANCE WITH EXEMPTION REQUIREMENTS

Section 6.1    <u>Compliance with Exemption Requirements</u>. So long as any Registrable Securities remain outstanding, the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Section 4(a)(7), Rule 144 and Rule 144A under the Securities Act, as such rules may be amended from time to time or any similar rules or regulations adopted by the Commission, including, without limiting the generality of the foregoing, (i) making and keeping current public information available, as those terms are understood and defined in Rule 144 promulgated under the Securities Act, (ii) filing with the Commission in a timely manner all reports and other documents required of the Company under the Exchange Act, to the extent so required, and (iii) at the request of any Holder if such Holder proposes to sell securities in compliance with Section 4(a)(7), Rule 144 or Rule 144A, forthwith furnish to such Holder, as applicable, a written statement of compliance with the reporting requirements of the Commission as set forth in such rules and make available to such Holder such information as will enable the Holder to make sales pursuant to Section 4(a)(7), Rule 144 or Rule 144A.

## ARTICLE VII

## MISCELLANEOUS

Section 7.1    <u>Severability</u>. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so

28

narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 7.2     Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of [New York] irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Agreement shall be brought and determined exclusively in a state or federal court located within the [Borough of Manhattan in The City of New York]. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 7.3     Other Registration Rights. The Company shall not grant any demand, piggyback or shelf registration rights, the terms of which are senior to or conflict with the rights granted to the Holders hereunder to any other Person, without the prior written consent of the Required Holders.

Section 7.4     Additional Rights. If the Company at any time after the date hereof grants to any other holders of Common Stock or securities of the Company convertible or exercisable into or for Common Stock any rights to request the Company to effect the registration under the Securities Act of any shares of Common Stock on terms more favorable to such holders than the terms set forth in this Agreement, the terms of this Agreement shall be deemed amended or supplemented to the extent necessary to provide the Holders such more favorable rights and benefits.

Section 7.5     Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto, each of which, in the case of the Holders and any Transferees thereof, shall agree to become subject to the terms of this Agreement by executing an Adoption Agreement and be bound to the same extent as the parties hereto. The Company may not assign any of its rights or delegate any of its duties hereunder [(a) with respect to Section 2.2 and any associated rights and duties herein, without the prior written consent of Renesas for so long as Renesas holds or beneficially owns any Registrable Securities, and (b) with respect to any other rights or duties hereunder,] without the prior written consent of the Required Holders. Any Holder may, at its election and at any time or from time to time, assign its rights and delegate its duties hereunder, in whole or in part, to any Transferee of such Holder (each, an "Assignee"); provided, that no such assignment shall be binding upon or obligate the Company to any such Assignee unless and until such Assignee delivers the Company an Adoption Agreement; provided, that (i) any rights assigned hereunder shall apply only in respect of Registrable Securities that are Transferred and not in respect of any other securities that the Transferee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement. If a Holder assigns its rights under this Agreement in connection with the Transfer of less than all of its Registrable Securities, the Holder shall retain its rights under this Agreement with respect to its remaining Registrable Securities. If a Holder assigns its rights under this Agreement in connection with the Transfer of all of its Registrable Securities, the Holder shall have no further rights or obligations under this Agreement, except under Article V hereof in respect

29

of offerings in which such Holder participated or registrations in which Registrable Securities held by such Holder were included. Any purported assignment in violation of this provision shall be null and *void ab initio*.

Section 7.6     Notices.  All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

    (a)     if to the Company, to:

            Wolfspeed, Inc.
            4600 Silicon Drive
            Durham, NC 27703
            Attention: Melissa Garrett
            Email: Melissa.Garrett@wolfspeed.com

            with a copy, in each case, (which shall not constitute notice), to:

            Latham & Watkins LLP
            140 Scott Drive
            Menlo Park, CA 94025
            Attention:    Tad J. Freese
                          Richard Kim
            E-mail:       Tad. Freese@lw.com
                          Richard.Kim2@lw.com

    (b)     if to Renesas, to the address or e-mail address set forth under Renesas' name in Schedule I attached hereto,

            with a copy, in each case, (which shall not constitute notice), to:

            Kirkland & Ellis LLP
            1301 Pennsylvania Avenue, N.W.
            Washington, D.C. 20004
            Attention: Rachel W. Sheridan, P.C.
                       Shagufa R. Hossain, P.C.
                       Anthony L. Sanderson
            Email: rachel.sheridan@kirkland.com
                   shagufa.hossain@kirkland.com
                   anthony.sanderson@kirkland.com

       (c)     if to any Non-Renesas Holder, to the address or e-mail address set forth under such other Holder's name in <u>Schedule I</u> attached hereto,

                      with a copy, in each case, (which shall not constitute notice) to:

                      Ropes & Gray LLP
                      1211 Avenue of the Americas
                      New York, NY 10036
                      Attn:   Ryan P. Dahl
                                Matthew M. Roose
                                Sam Badawi

                      Email:  ryan.dahl@ropesgray.com
                               matthew.roose@ropesgray.com
                             sam.badawi@ropesgray.com

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth (5th) Business Day after the posting thereof.

       Section 7.7    <u>Headings</u>. The headings contained in this Agreement are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

       Section 7.8    <u>Additional Parties</u>. Additional parties to this Agreement shall only include each Holder (a) who has executed an Adoption Agreement, in the form attached hereto as <u>Exhibit A</u>, or (b) who (i) is bound by and subject to the terms of this Agreement, and (ii) has adopted this Agreement with the same force and effect as if it were originally a party hereto.

       Section 7.9    <u>Adjustments</u>. If, and as often as, there are any changes in the Shares or securities convertible into or exchangeable into or exercisable for Shares as a result of any reclassification, recapitalization, split (including a reverse split), or subdivision or combination, exchange or readjustment of shares, or any share dividend or share distribution, merger, amalgamation or other similar transaction affecting such Shares or such securities, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to such Shares or such securities as so changed.

       Section 7.10   <u>Entire Agreement</u>. This Agreement and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such subject matter.

       Section 7.11   <u>Specific Performance</u>. Damages in the event of breach of this Agreement by a party hereto may be difficult, if not impossible, to ascertain, and it is therefore agreed that the

other parties hereto, in addition to and without limiting any other remedy or right it may have, will have the right to seek an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach, and enforcing specifically the terms and provisions hereof, and each of the parties hereto hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief. The existence of this right will not preclude any party hereto from pursuing any other rights and remedies at law or in equity which such party may have.

Section 7.12    Counterparts; Facsimile or .pdf Signature. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document. This Agreement may be executed by facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, and a facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, shall constitute an original for all purposes.

Section 7.13    Amendment. Other than with respect to amendments to Schedule I attached hereto, which may be amended by the Company from time to time to reflect the Holders at such time, this Agreement may not be amended, modified or supplemented without the written consent of the Required Holders; provided, however, that, with respect to a particular Holder or group of Holders, any such amendment, supplement, modification or waiver that (a) would materially and adversely disproportionately affect such Holder or group of Holders in any respect as compared to any other Holder or group of Holders or (b) would disproportionately benefit any other Holder or group of Holders or confer any benefit on any other Holder or group of Holders to which such Holder of group of Holders would not be entitled, shall not be effective against such Holder or group of Holders unless approved in writing by such Holder or the Holders of a majority of the Registrable Securities held by such group of Holders, as the case may be. [For the avoidance of doubt, the Company and Renesas (for so long as Renesas holds or beneficially owns any Registrable Securities) can amend Section 2.2 and any associated rights, duties and definitions without the written consent of any other Holder so long as such amendment is not materially adverse any such Holders.]

Section 7.14    Extensions; Waivers. Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any extension or waiver pursuant to this Section 7.14 will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

Section 7.15    Further Assurances. Each of the parties hereto shall execute all such further instruments and documents and take all such further action as the Company may reasonably require in order to effectuate the terms and purposes of this Agreement.

Section 7.16    No Third-Party Beneficiaries. Except pursuant to Article V, this Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

Section 7.17    Interpretation; Construction. This Agreement has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement. Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the schedules, exhibits and annexes, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited. References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections, schedules, annexes and exhibits mean the sections of this Agreement and the schedules, annexes and exhibits attached to this Agreement, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

Section 7.18    Term. This Agreement shall terminate (i) with respect to any Holder, at such time as such Holder has no Registrable Securities and (ii) in full and be of no further effect at such time as there are no Registrable Securities held by any Holders. Notwithstanding the foregoing, Article V, Section 7.2, Section 7.6, and Section 7.17 shall survive any termination.

* * * *

33

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or been deemed to execute this Agreement, on the date first above written.

**THE COMPANY**:

**WOLFSPEED, INC.**

By: _____
       Name:
       Title:

[*Signature Page to Registration Rights Agreement*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or been deemed to execute this Agreement, on the date first above written.

**HOLDER:**

**RENESAS ELECTRONICS AMERICA INC.**

By: _____
      Name: [●]
      Title:  [●]

[*Signature Page to Registration Rights Agreement*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or been deemed to execute this Agreement, on the date first above written.

**HOLDER:**

**[●]**

By: _____
    Name: [●]
    Title:  [●]

**EXHIBIT A**

**ADOPTION AGREEMENT**

This Adoption Agreement ("Adoption") is executed pursuant to the terms of the Registration Rights Agreement, dated as of [●], 2025, a copy of which is attached hereto (as amended, the "Registration Rights Agreement"), by the undersigned (the "Undersigned") executing this Adoption. Capitalized terms used herein without definition are defined in the Registration Rights Agreement and are used herein with the same meanings set forth therein. By the execution of this Adoption, the Undersigned agrees as follows:

1.      Acknowledgment. The Undersigned acknowledges that the Undersigned is acquiring certain Shares (or securities convertible into or exercisable for Shares), subject to the terms and conditions of the Registration Rights Agreement.

2.      Agreement. The Undersigned (i) agrees that the Shares (or securities convertible into or exercisable for Shares) acquired by the Undersigned, and certain other Shares and other securities of the Company convertible into or exercisable for Shares that may be acquired by the Undersigned in the future, shall be bound by and subject to the terms of the Registration Rights Agreement, pursuant to the terms thereof, and (ii) hereby adopts the Registration Rights Agreement with the same force and effect as if the undersigned were originally a party thereto.

3.      Notice. Any notice required as permitted by the Registration Rights Agreement shall be given to the Undersigned at the address listed beside the Undersigned's signature below.

4.      Opt-In Election. The undersigned Holder hereby notifies the Company of its decision to either exercise or decline its Opt-In Election by marking the appropriate box below.

[_] The undersigned Holder hereby exercises its Opt-In Election.

[_] The undersigned Holder hereby declines its Opt-In Election.

[NAME OF HOLDER]                          Address for Notices:


By:  _____          [●]
Name                                 [●]
Title:                               Telephone: [●]
Date:                                Email: [●]

**SCHEDULE I**

**List of Holders**

[*On file with the Company*]

# **EXHIBIT G**

**Renesas Warrants Agreement**

*[Plan Supplement Filing Version 8/12/2025]*

*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

**THIS WARRANT WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE. THE WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS AND THE ISSUER, IF IT SO REASONABLY DETERMINES IS NECESSARY, IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO ITS BOARD OF DIRECTORS THAT SUCH TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.**

**IN ADDITION, THE WARRANT MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE TRANSFER PROVISIONS OF THE WARRANT.**

**THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE ISSUER (NOT TO BE UNREASONABLY WITHHELD, CONDITIONED OR DELAYED).**

<div align="center">

**WARRANT**

</div>

Warrant Certificate No.: [●]

Original Issue Date: [●], 2025.

FOR VALUE RECEIVED, Wolfspeed, Inc., a Delaware corporation (the "**Company**"), hereby certifies that Renesas Electronics America Inc., a California corporation, or its registered assigns (the "**Holder**"), is entitled to purchase from the Company a number of shares of duly authorized, validly issued, fully paid, and nonassessable Common Stock equal to the Issuance Amount less the aggregate number of Common Stock previously issued from time to time as a result of any partial exercise of this Warrant in accordance with <u>Section 3</u>, at a purchase price per share of $[●][1] (the "**Exercise Price**"), all subject to the terms, conditions, and adjustments set forth below in this Warrant.  Certain capitalized terms used herein are defined in <u>Section 1</u> hereof.

---

[1] **Note**: To be set at an assumed $2.25 billion As Converted Equity Value (as defined in the Restructuring Term Sheet).

1.     <u>Definitions</u>.   As used in this Warrant, the following terms have the respective meanings set forth below:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"**Aggregate Exercise Price**" means, with respect to any exercise of this Warrant for Warrant Shares pursuant to Section 3 hereof, an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to <u>Section 3</u> hereof, multiplied by (b) the Exercise Price.

"**Board**" means the board of directors of the Company.

"**Business Day**" means any day other than a Saturday or Sunday or a legal holiday on which commercial banks in New York City or the State of California in the United States are authorized or required by law to be closed.

"**Common Stock**" means the shares of common stock, [par value $0.00125 per share], of the Company, and any capital stock into which such Common Stock shall have been converted, exchanged, or reclassified following the date hereof.

"**Company**" has the meaning set forth in the preamble.

"**ELOC/ATM**" means the equity line of credit or "at the market" program entered into to facilitate the sale of Common Stock as set forth in the Plan.

"**Exercise Date**" means, for any given exercise of this Warrant, the date on which the conditions to such exercise as set forth in <u>Section 3</u> shall have been satisfied at or prior to 5:00 p.m., Eastern Time, on a Business Day, including, without limitation, the receipt by the Company of the Exercise Notice, this Warrant, and the Aggregate Exercise Price.

"**Exercise Notice**" has the meaning set forth in <u>Section 3(a)(i)</u>.

"**Exercise Period**" has the meaning set forth in <u>Section 2</u>.

"**Exercise Price**" has the meaning set forth in the preamble.

"**Extraordinary Dividend**" has the meaning set forth in <u>Section 4(e)</u>.

"**Fair Market Value**" means, (i) with respect to the Common Stock, as of any particular date: (a) the closing price of the Common Stock for such day on the primary U.S. securities exchange on which the Common Stock may at the time be listed; (b) if there have been no sales of the Common Stock on any such exchange on any such day, the average of the closing bid and asked prices for the Common Stock on such exchange at the

end of such day; or (c) if at any time the Common Stock is not listed on any Trading Market, the fair market value per share as determined in good faith by the Board and (ii) with respect to any other property, the fair market value thereof as determined in good faith by the Board.

"**Holder**" has the meaning set forth in the preamble.

"**Investor Rights Agreement**" means the Investor Rights Agreement, dated as of the date hereof by and between the Company and the Holder.

"**Issuance Amount**" means [●]² (as subject to adjustment pursuant to Section 3(k) hereof) of duly authorized, validly issued, fully paid, and nonassessable shares of Common Stock of the Company.

"**Original Issue Date**" means [●], 2025.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, other legal entity or organization, including a government or political subdivision or an agency or authority.

"**Plan**" means [the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, consistent with the terms thereof) on June 30, 2025, which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2025].

"**Registration Rights Agreement**" means the Registration Rights Agreement, dated as of the date hereof by and between the Company, the Holder and the other parties thereto.

"**Regulatory Trigger Deadline**" means the earlier of (i) the date on which the Company, Wolfspeed Texas LLC and the Holder agree in good faith that it is more likely than not that the Regulatory Approvals (as defined in the Investor Rights Agreement) will not be obtained, and (ii) two (2) years from the Original Issue Date; provided, if upon two (2) years from the Original Issue Date the Company, Wolfspeed Texas LLC and the Holder agree, in good faith, that Regulatory Approvals are more likely than not to be obtained prior to three (3) years from the Original Issue Date, then upon three (3) years from the Original Issue Date. For the avoidance of doubt, to the extent the Holder obtains all Regulatory Approvals prior to the date of the Regulatory Trigger Deadline, the Regulatory Trigger Deadline shall be deemed not to have occurred.

"**Sale of the Company**" means an event or transaction or series of related events or transactions pursuant to which, directly or indirectly, either (x) any Person or group of

---

² **Note**: To be equal to 5.0% of all Common Stock as of the Original Issue Date assuming all New 2L Convertible Notes and New Renesas 2L Takeback Convertible Notes (each as defined in the Restructuring Term Sheet) are treated as having converted into Common Stock on such date, and not subject to dilution from MIP or LTIP (each as defined in the Restructuring Term Sheet).

Persons acting jointly or otherwise in concert acquires ownership, directly or indirectly, beneficially or of record, of equity interests of the Company having more than fifty percent (50%) of the aggregate ordinary voting power, determined on a fully-diluted, as-if-converted or exercised basis, whether such right is exercisable immediately or only after the passage of time, or (y) all or substantially all of the assets or businesses of the Company and its Subsidiaries, taken as a whole, are transferred or sold, including by way of lease, transfer, conveyance or other disposition (including, without limitation, by way of irrevocable, exclusive license arrangements).

"**Securities Act**" has the meaning set forth in <u>Section 8(a)</u>.

"**Subsidiary**" means, with respect to any Person: (a) any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of the capital stock entitled (without regard to the occurrence of any contingency, but after giving effect to any voting agreement or shareholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees, as applicable, of such corporation, association or other business entity is owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person; and (b) any partnership or limited liability company where (x) more than 50% of the capital accounts, distribution rights, equity and voting interests, or of the general and limited partnership interests, as applicable, of such partnership or limited liability corporation are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person, whether in the form of membership, general, special or limited partnership or limited liability company interests or otherwise, and (y) such Person or any one or more of the other Subsidiaries of such Person is a controlling general partner of, or otherwise controls, such partnership or limited liability company.

"**Trading Market**" means any market or exchange of the New York Stock Exchange or The Nasdaq Stock Market, LLC.

"**VWAP**" means the 20-day volume-weighted average price (using the "VWAP" function on Bloomberg Financial Markets and the "Bloomberg Definition" methodology).

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Documents**" means this Warrant, the Registration Rights Agreement and the Investor Rights Agreement.

"**Warrant Shares**" means the Common Stock or other capital stock of the Company then purchasable upon exercise of any portion of this Warrant in accordance with the terms of this Warrant.

4

2.      Term of Warrant.  Subject to the terms and conditions hereof, at any time or from time to time after the date hereof and prior to 5:00 p.m., Eastern Time, on [●], 2028[3] or, if such day is not a Business Day, on the immediately following Business Day (the "**Exercise Period**"), the Holder of this Warrant may exercise this Warrant for all or any part of the Warrant Shares purchasable hereunder (subject to adjustment as provided herein); provided, however, that if the Regulatory Trigger Deadline occurs, then such Exercise Period shall be extended to 5:00 p.m., Eastern Time, on [●], 2029[4].

3.      Exercise of Warrant.

(a)      *Exercise Procedure*.  This Warrant may be exercised from time to time on any Business Day during the Exercise Period, for all or any part of the unexercised Warrant Shares, upon:

(i)      surrender of this Warrant to the Company at its then principal executive office (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft, or destruction in accordance with Section 7(a) hereof), together with an Exercise Notice in the form attached hereto as **Exhibit A** (each, an "**Exercise Notice**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

(ii)      payment to the Company of the Aggregate Exercise Price in accordance with Section 3(b).

(b)      *Payment of the Aggregate Exercise Price*.  Payment of the Aggregate Exercise Price shall be made at the option of the Holder by the following methods:

(i)      by delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account designated in writing by the Company, in the amount of such Aggregate Exercise Price (a "**Cash Exercise**");

(ii)      by having the Company withhold Warrant Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the Holder shall surrender this Warrant in exchange for the number of Warrant Shares as is computed using the following formula (a "**Cashless Exercise**"):

$$X = Y*(A - B) \div A$$

Where:

$X$ = the number of Warrant Shares to be issued to the Holder.

---

[3] **Note**: To be three years from the Original Issue Date.
[4] **Note**: To be four years from the Original Issue Date.

Y = the total number of Warrant Shares for which the Holder has elected to exercise this Warrant pursuant to Section 3(a), if such exercise were by means of a Cash Exercise.

A = the Fair Market Value of one Warrant Share as of the applicable Exercise Date.

B = the Exercise Price in effect under this Warrant as of the applicable Exercise Date.

or

(iii)    any combination of the foregoing.

If the foregoing calculation results in a negative number, then no Warrant Shares shall be issuable via a Cashless Exercise.  In the event of any withholding of Warrant Shares pursuant to Section 3(b)(ii) or Section 3(b)(iii) above where the number of shares whose value is equal to the Aggregate Exercise Price is not a whole number, the number of shares withheld by the Company shall be rounded up to the nearest whole share and the Company shall make a cash payment to the Holder (by delivery of a certified or official bank check or by wire transfer of immediately available funds) based on the incremental fraction of a share being so withheld by the Company in an amount equal to the product of (x) such incremental fraction of a share being so withheld multiplied by (y) the Fair Market Value per Warrant Share as of the Exercise Date.

(c)    *Delivery of Shares*.  Upon receipt by the Company of the Exercise Notice, surrender of this Warrant, and payment of the Aggregate Exercise Price (in accordance with Section 3(a) and Section 3(b) hereof), the Company shall, as promptly as reasonably practicable, and in any event within five (5) Business Days after the completion of the last of those conditions to be completed, deliver (or cause to be delivered) to the Holder (x) (1) a book-entry statement representing the Warrant Shares issuable upon such exercise or (2) if the Warrant Shares are issued in certificated form, a certificate or certificates for the number of Warrant Shares issuable upon such exercise, together with (y) cash in lieu of any fraction of a Warrant Share, as provided in Section 3(d) hereof.  The book-entry position shall be registered in the name of the Holder or, subject to compliance with Section 6 below, such other Person's name as shall be designated in the Exercise Notice.  This Warrant shall be deemed to have been exercised and such Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(d)    *Fractional Shares*.  The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant.  As to any fraction of a Warrant Share that the Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay to such Holder an amount in cash (by delivery of a certified or official bank check or by wire transfer of immediately available funds) equal to the product of (i) such fraction multiplied by (ii) the Fair Market Value of one Warrant Share on the Exercise Date.

(e)     *Delivery of New Warrant*.  Unless the purchase rights represented by this Warrant shall have expired or shall have been fully exercised, the Company shall, at the time of delivery of the book-entry statement or certificate representing the Warrant Shares being issued in accordance with <u>Section 3(c)</u> hereof, deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unexpired and unexercised Warrant Shares called for by this Warrant.  Such new Warrant shall in all other respects be identical to this Warrant.

(f)     *Representations of the Company*.  The Company hereby represents, covenants, and agrees:

(i)     The Company (A) is a corporation duly organized,  validly existing and in good standing under the laws of the State of Delaware, (B) has all requisite corporate power and authority to own and operate its properties, to carry on its business as now conducted and as currently proposed to be conducted, to issue and enter into this Warrant and to carry out the transactions contemplated thereby, and (C) except where the failure to do so, individually or in the aggregate, has not had, and would not be reasonably expected to have, a material adverse effect on the business, assets, financial condition or operations of the Company, is qualified to do business and, where applicable is in good standing, in every jurisdiction where such qualification is required.

(ii)     This Warrant is, and any Warrant issued in substitution for or replacement of this Warrant shall be, upon issuance, duly authorized and validly issued.

(iii)     All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be reasonably necessary in order that such Warrant Shares are, validly issued, fully paid, and nonassessable, issued without violation of any preemptive or similar rights of any stockholder of the Company and free and clear of all taxes, liens, and charges.

(iv)     The Company shall pay all expenses in connection with, and all taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of this Warrant; <u>provided</u>, that the Company shall not be required to pay (x) any tax or governmental charge imposed in respect of net income (howsoever denominated) of any Holder, (y) any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid and (z) any legal fees or expenses of the Holder in connection with such exercise. The Holder agrees to promptly provide any forms or other documentation reasonably requested by the Company to reduce or eliminate any such taxes or other

7

governmental charges, in each case to the extent the Holder is legally eligible to do so.

(v)     Other than the Registration Rights Agreement, as of the Original Issue Date there are no contracts, agreements or understandings between the Company and any Person granting such Person demand, piggyback or shelf registration rights.

(g)     *Conditional Exercise*.  Notwithstanding any other provision hereof, if an exercise of any portion of this Warrant is to be made in connection with an offering by the Company, a Sale of the Company or other transaction, such exercise may at the election of the Holder be conditioned upon the consummation of such transaction, in which case such exercise shall not be deemed to be effective until immediately prior to the consummation of such transaction.

(h)     *Reservation of Shares*.  During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock or other securities constituting Warrant Shares, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the applicable Exercise Price.  The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect, and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares upon the exercise of this Warrant.

(i)     *No Material Changes*.  Except and to the extent as waived or consented to by the Holder, the Company shall not by any action, including, without limitation, amending its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of the Holder as set forth in this Warrant against impairment.  Without limiting the generality of the foregoing, the Company shall (A) not increase the par value of any Warrant Shares above the amount payable therefor upon such exercise immediately prior to such increase in par value, (B) use commercially reasonable efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof, as may be required to be obtained by the Company to perform its obligations under this Warrant, and (C) use commercially reasonable efforts to ensure that the Warrant Shares may be issued without violation of any applicable law or regulation or of any requirement of any securities exchange on which the Warrant Shares are listed or traded. Notwithstanding the foregoing, nothing in this paragraph shall prevent the Company from repurchasing or otherwise buying back shares of its Common Stock.

(j)     *Listing.*  The Company shall use commercially reasonable efforts to cause the Warrant Shares to be approved for listing on the primary U.S. securities exchange on

which the Common Stock may at the time be listed on or about the Original Issue Date, subject to notice of issuance of the Warrant Shares.

(k)     [*Regulatory Approvals*. Until all the Regulatory Approvals have been received, the Warrant shall not be issued (other than for U.S. federal and applicable state and local income tax purposes). Instead, for the avoidance of doubt and pursuant to the Warrant Documents, upon the Original Issue Date and until all the Regulatory Approvals have been received, (i) the Company shall grant the Holder the right to receive the cash proceeds from a primary registered offering or sales under the ELOC/ATM of shares of Common Stock in lieu of Warrant Shares receivable under this Warrant and (ii) the transfer of the Warrant, including the transfer of the right to receive the cash proceeds from a primary registered offering or sales under the ELOC/ATM of shares of Common Stock in lieu of Warrant Shares receivable under this Warrant, shall be subject to the restrictions in Section 3.6 of the Investor Rights Agreement.]

4.     <u>Effect of Certain Events</u>.

(a)     *Fundamental Transaction*.  If, at any time after the Original Issue Date but prior to the exercise hereof, (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person (other than for the purpose of changing the Company's name and/or the jurisdiction of incorporation of the Company or a holding company for the Company), (ii) the Company (and all of its Subsidiaries, taken as a whole), directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any, direct or indirect, purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to sell, tender or exchange their shares for other securities, cash or property and has been accepted by the holders of more than 50% of the voting power of the capital stock of the Company, (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off, merger or scheme of arrangement) with another Person or group of Persons whereby such other Person or group acquires more than 50% of the voting power of the capital stock of the Company (each a "**Fundamental Transaction**"), unless a Successor Entity (as defined below) otherwise assumes this Warrant, then this warrant shall be automatically exercised in full immediately prior to the completion of such Fundamental Transaction via cashless exercise (or, at the Holder's option, via cash exercise to the extent the Holder pays the applicable Exercise Price in cash prior to the completion of such Fundamental Transaction) and the Holder shall receive consideration in the amount owed to the Holder as a shareholder of the Company and in proportion to the Holder's entitlement to consideration in connection with the closing of such Fundamental Transaction. For the avoidance of doubt, unless a Successor Entity (as defined below) elects to assume this Warrant, this Warrant shall not remain outstanding following the

closing of a Fundamental Transaction. Notwithstanding anything to the contrary, in the event of a Fundamental Transaction (other than one involving the Holder or any of its Affiliates) that is consummated within two (2) years of the Original Issue Date, the Company or any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "**Successor Entity**") shall, at the Holder's option, exercisable at any time concurrently with, or within 30 days prior to, the consummation of the Fundamental Transaction, purchase this Warrant from the Holder by paying to the Holder an amount in cash equal to the Black-Scholes Value of the remaining unexercised portion of this Warrant on the date of the consummation of such Fundamental Transaction; provided, however, if the Fundamental Transaction is not within the Company's control, including not approved by the Company's Board of Directors, the Holder shall only be entitled to receive from the Company or any Successor Entity the same type or form of consideration (and in the same proportion), at the Black Scholes Value of the unexercised portion of this Warrant, that is being offered and paid to the holders of Common Stock of the Company in connection with the Fundamental Transaction, whether that consideration be in the form of cash, stock or any combination thereof, or whether the holders of Common Stock are given the choice to receive from among alternative forms of consideration in connection with the Fundamental Transaction; provided, further, that if holders of Common Stock of the Company are not offered or paid any consideration in such Fundamental Transaction, such holders of Common Stock will be deemed to have received common stock of the Successor Entity (which Successor Entity may be the Company following such Fundamental Transaction) in such Fundamental Transaction. "**Black-Scholes Value**" means the value of this Warrant based on the Black-Scholes Option Pricing Model obtained from the "OVME" function on Bloomberg Financial Markets determined as of the day of consummation of the applicable Fundamental Transaction for pricing purposes and reflecting (A) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the time between the date of the public announcement of the applicable Fundamental Transaction and the termination of the Exercise Period, (B) an implied volatility equal to thirty-five percent (35%), (C) an underlying price per share of Common Stock calculation equal to the VWAP of the Common Stock measured as of the date of the Holder's election pursuant to this Section 4(a), (D) a remaining option time equal to the remaining Exercise Period measured as of the date of the Holder's election pursuant to this Section 4(a) and (E) a zero cost of borrow. The payment of the Black-Scholes Value will be made to the Holder by wire transfer of immediately available funds (or such other consideration) within the later of (i) three (3) Business Days of the Holder's election and (ii) the date of consummation of the Fundamental Transaction. If the Successor Entity in a Fundamental Transaction purchases or otherwise assumes the Warrant pursuant to this Section 4(a), such Successor Entity will be deemed to assume in writing all of the obligations of the Company under this Warrant in accordance with the provisions of this Section 4(a) pursuant to written agreements in form and substance reasonably satisfactory to the Holder and approved in writing by the Holder (without unreasonable delay) prior to such Fundamental Transaction and shall, at the option of the Holder, deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant which is exercisable for a corresponding number of shares of capital stock of such Successor Entity (or its parent entity) equivalent to the shares of Common Stock acquirable and receivable upon exercise of this Warrant prior to such

Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction), and which is reasonably satisfactory in form and substance to the Holder. Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall be added to the term "Company" under this Warrant (so that from and after the occurrence or consummation of such Fundamental Transaction, each and every provision of this Warrant referring to the "Company" shall refer instead to each of the Company and the Successor Entity or Successor Entities, jointly and severally), and the Successor Entity or Successor Entities, jointly and severally with the Company, may exercise every right and power of the Company prior thereto and the Successor Entity or Successor Entities shall assume all of the obligations of the Company prior thereto under this Warrant with the same effect as if the Company and such Successor Entity or Successor Entities, jointly and severally, had been named as the Company herein. For the avoidance of doubt, the Holder shall be entitled to the benefits of the provisions of this Section 4(a) regardless of whether the Company has sufficient authorized shares of Common Stock for the issuance of Warrant Shares.

(b)     *Adjustment of Warrant Upon Spin-off.*  If, at any time after the Original Issue Date but prior to the exercise hereof, the Company shall distribute equity of one or more of its divisions or Subsidiaries to its stockholders (or consummate any other transactions commonly known as a "spin off") (such transaction, a "**Spin-Off**" and such newly created entity, the "**Spin-off Entity**"), then the Company (i) shall issue to the Holder a new warrant to purchase the number of shares of common stock or other proprietary interest in the Spin-off Entity (and any other consideration) that the Holder would have owned had the Holder exercised this Warrant immediately prior to the consummation of such spin-off and (ii) shall make provision therefor in the agreement, if any, relating to such Spin-Off.  This Warrant and such new warrant shall provide for rights and obligations which shall be as nearly equivalent as may be practicable to the rights and obligations provided for in this Warrant, including, for the avoidance of doubt, through adjusting the Exercise Price and any other terms hereof.  The provisions of this Section 4(b) (and any equivalent thereof in any such new warrant) shall apply to successive transactions.

(c)     *Stock Dividends and Distributions*. Subject to the provisions of Section 4(a), as applicable, if the Company shall, at any time or from time to time after the Original Issue Date, (A) make or declare, or fix a record date for the determination of holders of Common Stock entitled to receive a dividend or any other distribution payable in Common Stock of the Company or securities convertible, exercisable or exchangeable into Common Stock, (B) subdivide the outstanding Common Stock, whether by way of stock dividend, stock split or otherwise, or (C) combine the outstanding Common Stock into a smaller number of shares, whether by way of stock combination, reverse stock split or otherwise, then, and in each such event, provision shall be made so that the Holder shall receive upon exercise of the Warrant, the kind and amount of securities of the Company which the Holder would have been entitled to receive had the Warrant been exercised in full into Warrant Shares on the date of such event (or, in the case of a dividend, immediately

11

prior to the record date therefore) and had the Holder thereafter, during the period from the date of such event to and including the Exercise Date, retained such securities receivable by them as aforesaid during such period, giving application to all adjustments called for during such period under this Section 4(c) with respect to the rights of the Holder; provided, that no such provision shall be made if the Holder receives, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such securities in an amount equal to the amount of such securities as the Holder would have received if the Warrant had been exercised in full into Warrant Shares on the date of such event.

(d)     *Adjustment in Exercise Price*.  Whenever the number of Warrant Shares acquirable upon exercise of the Warrants is adjusted as provided in Section 4(c), the Exercise Price shall be adjusted to equal the Exercise Price immediately prior to such adjustment multiplied by a fraction (A) the numerator of which shall be the number of Warrant Shares for which a Warrant is exercisable immediately prior to such adjustment and (B) the denominator of which shall be the number of Warrant Shares for which a Warrant is exercisable immediately after such adjustment.

(e)     *Extraordinary Dividends and Distributions*.  If the Company, at any time after the Original Issue Date but prior to the exercise hereof, shall pay a dividend or make a distribution in cash, securities or other assets to all of the holders of Common Stock on account of such Common Stock (or other capital stock or securities at the time issuable upon exercise of the Warrant), other than as described in Section 4(b) or Section 4(c) (any such non-excluded event being referred to herein as an "**Extraordinary Dividend**"), then the Exercise Price shall be decreased, effective immediately after the effective date of such Extraordinary Dividend, by the amount of cash and/or the Fair Market Value of any securities or other assets paid on each share of Common Stock in respect of such Extraordinary Dividend; provided, that no such provision shall be made if the Holder receives, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such cash, securities or other assets in an amount equal to the amount of such cash, securities or other assets as the Holder would have received if the Warrant had been exercised in full into Warrant Shares immediately prior to the effective date of such Extraordinary Dividend.

(f)     *Primary Registered Offering; ELOC/ATM Sales*. To the extent that the Company, prior to the receipt of the Regulatory Approvals, conducts a primary registered offering of shares of Common Stock (including any Warrant Shares) pursuant to the Registration Rights Agreement or sales of shares of Common Stock (including any Warrant Shares) under the ELOC/ATM, and the Holder receives the cash proceeds from such offering or sales in lieu of Warrant Shares receivable under this Warrant, then the number of Warrant Shares receivable upon exercise of this Warrant shall be decreased proportionally for the sale of such Warrant Shares.

(g)     *Certificate as to Adjustment*.

(i)     As promptly as reasonably practicable following any adjustment pursuant to the provisions of this Section 3(k), but in any event not later than three

(3) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer setting forth in reasonable detail such adjustment and the facts upon which it is based and certifying the calculation thereof.

(ii)     As promptly as reasonably practicable following the receipt by the Company of a written request by the Holder, but in any event not later than three (3) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer certifying the amount of other shares of stock, securities, or assets then issuable upon exercise of the Warrant and the applicable Exercise Price.

(h)     *Notices.*  In the event:

(i)     that the Company shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon exercise of this Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution described in Section 4(c) or Section 4(e), to vote at a meeting (other than an annual meeting for which a definitive proxy statement has been filed) (or act by written consent), to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security;

(ii)     of any Spin-Off;

(iii)     of any Fundamental Transaction; or

(iv)     of the voluntary or involuntary dissolution, liquidation, or winding-up of the Company;

then, and in each such case, the Company shall send or cause to be sent to the Holder at least ten (10) Business Days prior to the applicable record date or the applicable expected effective date, as the case may be, for the event, a written notice specifying, as the case may be, (A) the record date for such dividend, distribution, meeting, or consent or other right or action, and a description of such dividend, distribution, or other right or action to be taken at such meeting or by written consent, or (B) the effective date on which such Fundamental Transaction, Spin-Off, dissolution, liquidation, or winding-up is proposed to take place, and the date, if any is to be fixed, as of which the books of the Company shall close or a record shall be taken with respect to which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon exercise of this Warrant) shall be entitled to exchange their Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such Fundamental Transaction, Spin-Off, dissolution, liquidation, or winding-up, and the amount per share and character of such exchange applicable to this Warrant and the Warrant Shares.

5.     Transfer of Warrant.  Subject to compliance with applicable federal and state securities laws, this Warrant, and all rights hereunder are transferable to any Affiliate of the Holder (or, with the Company's prior written consent (not to be unreasonably withheld, conditioned or delayed), to a non-Affiliate of the Holder), in whole or in part, by the Holder without charge to the Holder, provided, however, that this Warrant and all rights hereunder shall not be transferred

13

unless and until the Holder has given the Company a written notice of the portion of this Warrant being transferred, such notice to set forth the name, address and taxpayer identification number of the transferee, the anticipated date of such transfer, and surrendering this Warrant to the Company for reissuance to the transferee(s).  Upon surrender of this Warrant to the Company at its then principal executive office with a properly completed and duly executed assignment in the form attached hereto as **Exhibit B**, together with funds sufficient to pay any taxes or other governmental charges that may be imposed in connection with the making of such transfer, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees and in the denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant, if any, not so assigned and this Warrant shall promptly be cancelled.  Such new warrant shall be identical in all other respects to this Warrant.

6.     Holder Not Deemed a Stockholder; Limitations on Liability.  Except as otherwise specifically provided herein (including Section 4(c) and Section 4(e)), prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose with respect to the Warrant Shares, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give, or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance, or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise.  In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

7.     Replacement on Loss; Division and Combination.

(a)     *Replacement of Warrant on Loss*.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be a sufficient indemnity) and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company, at its own expense, shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for an equivalent number of Warrant Shares as the Warrant so lost, stolen, mutilated, or destroyed; provided, that, in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

(b)     *Division and Combination of Warrant*.  Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive office, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys. Subject to compliance with the applicable provisions of this Warrant as to any transfer or

14

assignment which may be involved in such division or combination, the Company shall at its own expense execute and deliver a new Warrant or Warrants in exchange for this Warrant or Warrants so surrendered in accordance with such notice. Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for an equivalent number of Warrant Shares as this Warrant or Warrants so surrendered in accordance with such notice.

8.     Compliance with the Securities Act.

(a)     *Agreement to Comply with the Securities Act; Legend*.  The Holder, by acceptance of this Warrant, agrees to comply in all respects with the provisions of this Section 8(a) and the restrictive legend requirements set forth on the face of this Warrant and further agrees that such Holder shall not offer, sell, transfer, or otherwise dispose of this Warrant except under circumstances that will not result in a violation of the Securities Act of 1933, as amended (the "**Securities Act**"). This Warrant (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

> "THIS WARRANT WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE. THE WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS AND THE ISSUER, IF IT SO REASONABLY DETERMINES IS NECESSARY, IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO ITS BOARD OF DIRECTORS THAT SUCH TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

IN ADDITION, THE WARRANT MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE TRANSFER PROVISIONS OF THE WARRANT.

THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE ISSUER (NOT TO BE UNREASONABLY WITHHELD, CONDITIONED OR DELAYED)."

(b)     *Representations of the Holder*.  In connection with the issuance of this Warrant, the Holder specifically represents, as of the date hereof, to the Company by acceptance of this Warrant as follows (and any transferee or assignee of the Holder is deemed to represent as of the date of such transfer or assignment as if it were the Holder):

(i)     The Holder is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act.  The Holder is acquiring this Warrant and the Warrant Shares to be issued upon exercise hereof for investment for its own account and not with a view towards, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the Securities Act.

(ii)     The Holder acknowledges that it can bear the economic and financial risk of its investment for an indefinite period, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant and the Warrant Shares.  The Holder has received such information about the Company and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of this Warrant and the business, properties, prospects, and financial condition of the Company.

9.     Warrant Register.  The Company shall keep and properly maintain at its principal executive office books for the registration of this Warrant and any transfers thereof. The Company may deem and treat the Person in whose name this Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination, or other transfer of this Warrant effected in accordance with the provisions of this Warrant.

10.     Tax Matters.

(a)     To the extent not already provided to the Company, Holder shall deliver to the Company an IRS Form W-9 (or if a transferee Holder is a foreign entity, an appropriate IRS Form W-8) and any other forms or documents reasonably requested by the Company to reduce or eliminate any withholding required by applicable tax law. The Company shall reasonably cooperate with the Holder to minimize or eliminate any such withholding to the extent permitted by applicable tax law.

(b)     Subject to Section 10(a), if the Company is required by law to withhold and pay taxes on behalf of the Holder as a result of any payments, transfers, distributions (including deemed distributions) or other deliveries pursuant to the Warrant (including the exercise of the Warrant), then the Company shall be entitled to set off such withholding taxes against payments or other deliveries on the Warrant (including by liquidating a portion of any non-cash deliveries on the Warrant to generate sufficient funds to pay applicable withholding taxes). Any amounts or property withheld pursuant to the preceding sentence shall be deemed to have been paid, transferred, distributed or otherwise delivered to, and received by, the Holder for all purposes of this Warrant to the extent the Company has paid such amounts to the applicable tax authority.

(c)     The Company and Holder intend that, for U.S. federal income tax purposes, the Warrant shall be treated as part of the consideration issued in exchange for the Allowed Renesas Claim (as such terms are defined in the Plan) in a transaction treated as a "recapitalization" under Section 368(a)(1)(E) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and shall report such transaction in a manner consistent with the foregoing, unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of Code.

11.     Cumulative Remedies. The rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity, or otherwise.

12.     Severability. If any provision of this Warrant is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Warrant or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Warrant or affecting the validity or enforceability of such provision in any other jurisdiction.

14.     Governing Law; Jurisdiction; Waiver of Jury Trial. This Warrant shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Warrant shall be brought and determined exclusively in a state or federal court located within the Borough of Manhattan in The City of New York. EACH PARTY TO THIS WARRANT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS WARRANT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.     Successors and Assigns. This Warrant shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto. Subject to the terms of this Warrant, the Company may not assign any of its rights or delegate any of its duties hereunder without the prior written consent of the Holder. Any Holder may, at its election and at any time or from time to time, assign its rights and delegate its duties hereunder, in whole or in part, to any

Affiliate of the Holder (or, with the Company's prior written consent, to a non-Affiliate of the Holder) (each, an "**Assignee**"); provided, that no such assignment shall be binding upon or obligate the Company to any such Assignee unless and until the Holder delivers the Company the executed assignment and funds described in Section 5. If a Holder assigns its rights under this Warrant in connection with the transfer of all of its Warrants or Warrant Shares, the Holder shall have no further rights or obligations under this Warrant. Any purported assignment in violation of this provision shall be null and *void ab initio*.

16.    Notices. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or facsimile or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

if to the Company, to:

> Wolfspeed, Inc.
> 4600 Silicon Drive
> Durham, NC 27703
> Attention: Melissa Garrett
> E-mail: Melissa.Garrett@wolfspeed.com

with a copy, in each case, (which shall not constitute notice) to:

> Latham & Watkins LLP
> 505 Montgomery Street, Suite 2000
> San Francisco, CA 94111
> Attention: Tad J. Freese
>           Richard Kim
> Email: Tad.Freese@lw.com
>           Richard.Kim2@lw.com

if to a Holder, to:

> Renesas Electronics America Inc.
> c/o Renesas Electronics Corporation
> Toyosu Foresia, 3 2 24 Toyosu, Koto ku
> Tokyo 135-0061 Japan
> Attention: Shuhei Shinkai
>           Sho Ozaki
>           Takahiro Homma
> E-mail: shuhei.shinkai.nx@renesas.com
>           sho.ozaki.pv@renesas.com
>           takahiro.homma.jz@renesas.com

with a copy, in each case, (which shall not constitute notice) to:

Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Attention: Rachel W. Sheridan, P.C.
            Shagufa R. Hossain, P.C.
            Anthony L. Sanderson
Email: rachel.sheridan@kirkland.com
       shagufa.hossain@kirkland.com
       anthony.sanderson@kirkland.com

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth (5th) Business Day after the posting thereof.

17.     Headings. The headings contained in this Warrant are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Warrant.

18.     Entire Agreement. The Warrant Documents and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such subject matter.

19.     Specific Performance. Damages in the event of breach of this Warrant by a party hereto may be difficult, if not impossible, to ascertain, and it is therefore agreed that the other parties hereto, in addition to and without limiting any other remedy or right it may have, will have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach, and enforcing specifically the terms and provisions hereof, and each of the parties hereto hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief. The existence of this right will not preclude any party hereto from pursuing any other rights and remedies at law or in equity which such party may have.

20.     Counterparts; Facsimile or .pdf Signature. This Warrant may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document. This Warrant may be executed by facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, and a facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, shall constitute an original for all purposes.

21.     Amendment. This Warrant may not be amended, modified or supplemented unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought.

22.   <u>Extensions; Waivers</u>. Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Warrant, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any extension or waiver pursuant to this <u>Section 22</u> will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Warrant shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

23.   <u>No Third-Party Beneficiaries</u>. This Warrant shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

24.   <u>Interpretation; Construction</u>. This Warrant has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Warrant will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Warrant. Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Warrant," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Warrant as a whole, including the schedules, exhibits and annexes, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited. References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections, schedules, annexes and exhibits mean the sections of this Warrant and the schedules, annexes and exhibits attached to this Warrant, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

*[Signature pages follow]*

20

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original Issue Date.

WOLFSPEED, INC.

By: _____
Name:
Title:

[*Signature Page to Warrant*]

Accepted and agreed:

RENESAS ELECTRONICS AMERICA INC.

By: _____

Name: _____

Title: _____

[*Signature Page to Warrant*]

**Exhibit A**

**Form of Exercise Notice**

(To be executed upon exercise of the Warrant(s))

The undersigned hereby irrevocably elects to exercise the right, represented by the Warrant Certificate(s), to purchase Common Stock of Wolfspeed, Inc. and (check one or both):

____ herewith tenders in payment for _____ shares of Common Stock an amount of $_____ by certified or official bank check made payable to the order of Wolfspeed, Inc. or by wire transfer in immediately available funds to an account arranged with Wolfspeed, Inc.; and/or

____ herewith tenders the Warrant(s) for _____ Common Stock pursuant to the cashless exercise provision of Section 3(b)(ii) of the Warrant.

The undersigned requests that a statement representing the Common Stock issued upon exercise of the Warrant(s) be delivered in accordance with the instructions set forth below.

Dated: _____, 20____

THIS EXERCISE NOTICE MUST BE DELIVERED TO WOLFSPEED, INC. PRIOR TO 5:00 P.M., EASTERN TIME, ON THE EXERCISE DATE. ALL CAPITALIZED TERMS USED HEREIN BUT NOT DEFINED HEREIN SHALL HAVE THE MEANINGS ASSIGNED TO THEM IN THE WARRANT.

**THE UNDERSIGNED REQUESTS THAT A STATEMENT REPRESENTING THE COMMON STOCK BE DELIVERED AS FOLLOWS:**

Name: _____

(Please Print)

Address: _____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable): _____

**IF SAID NUMBER OF COMMON STOCK SHALL NOT BE ALL THE COMMON STOCK ACQUIRABLE UNDER THE WARRANT(S), THE UNDERSIGNED REQUESTS THAT A NEW WARRANT CERTIFICATE(S) REPRESENTING THE BALANCE OF SUCH WARRANT(S) SHALL BE REGISTERED AND DELIVERED AS FOLLOWS:**

Name: _____

(Please Print)

Address: _____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable): _____

Signature: _____

Name: _____

Capacity in which Signing: _____

The signature must correspond with the name as written upon the face of the within Warrant Certificate in every particular, without alteration or enlargement or any change whatever.

A-2

**Exhibit B**

**Form of Assignment**

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers to each assignee set forth below all of the rights of the undersigned in and to the number of Warrants (as defined in and evidenced by the Warrant Certificate) set forth opposite the name of such assignee below, and in and to the Warrant Certificate with respect to the Warrants and the Common Stock issuable upon the exercise of said Warrants:

| <u>Name of Assignee</u> | <u>Address</u> | <u>Number of Warrants</u> | <u>Warrant Certificate No.</u> |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

If the total number of Warrants shall not be all of the Warrants evidenced by the foregoing Warrant Certificate, the undersigned requests that a new Warrant Certificate evidencing the Warrants not so assigned be issued in the name of and delivered to the undersigned.

Name of holder of Warrant: _____

By: _____
Name: _____
Title: _____
Dated: _____

B-1

## EXHIBIT H

### Restructuring Transactions Exhibit

This restructuring transactions exhibit (this "***Restructuring Transactions Exhibit***") sets forth a description of certain of the Restructuring Transactions the Debtors currently anticipate will be effectuated on or after the Effective Date in connection with the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as may be amended, modified or supplemented from time to time, the "***Plan***").[8]  The Debtors reserve the right to amend, supplement, or modify the following steps prior to the Effective Date in accordance with the terms of the Plan and the Restructuring Support Agreement.  To the extent there is any inconsistency between this Restructuring Transactions Exhibit and the Plan (without reference to this Restructuring Transactions Exhibit), the Plan shall govern.

Unless otherwise specified, the following transactions shall occur in the order set forth below:

On the Effective Date and, for the avoidance of doubt, prior to the effectiveness of the Plan:

1. The Reorganized Debtors shall distribute the allocable Pro Rata Share of New 2L Convertible Notes Rights (subject to the Initial Backstop Parties' Premium and the Backstop Holdback Allocation), New 2L Takeback Notes, and 56.3% of New Common Stock (subject to dilution from, as applicable, the conversion of the New 2L Convertible Notes (including those issued on account of the Backstop Premium), the conversion of the New Renesas 2L Takeback Convertible Notes, the Incentive Plans, and the exercise of the Renesas Warrants) to each Holder of an Allowed Convertible Notes Claim in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Convertible Notes Claim.

2. Immediately following Step 1, the Reorganized Debtors shall consummate the New 2L Convertible Notes Rights Offering (including the transactions contemplated by the Backstop Agreement) and issue the New 2L Convertible Notes in exchange for Purchase Price thereon, including the New 2L Convertible Notes on account of the Backstop Premium.

3. Immediately following Step 2, the Reorganized Debtors shall distribute the allocable Pro Rata Share of New Senior Secured Notes and Effective Date Cash Payment to each Holder of an Allowed Senior Secured Notes Claim in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Senior Secured Notes Claim.

4. Immediately following Step 3:

---

[8]     Capitalized terms used but not defined herein have the meanings given to them in the Plan.

a. If a Distribution Event has not occurred, the Reorganized Debtors shall distribute the Base Consideration to Renesas in full and final satisfaction, settlement, release, and discharge and in exchange for all Renesas Claims.

b. If a Distribution Event has occurred, the Reorganized Debtors shall:

i. distribute the right to (X) the Base Consideration, (Y) if applicable, and without duplication with clause (X), the Base Consideration Proceeds, and (Z) if the Regulatory Trigger Deadline occurs, the Contingent Additional Consideration (in each case, subject to the terms of the Plan, the Restructuring Support Agreement, and the Renesas Contingent Documentation) to Renesas in full and final satisfaction, settlement, release, and discharge and in exchange for all Renesas Claims;

ii. reserve on their books and records New Common Stock for issuance in an amount equal to the Reserve Shares;

iii. enter into the Renesas Contingent Documentation with Renesas; and

iv. enter into the Contingent Cash Escrow Agreement and contribute the Contingent Cash to the escrow account in accordance with the Contingent Cash Escrow Agreement.

5. Immediately following Step 4, the Reorganized Debtors shall distribute the allocable Pro Rata Share of the Commitment Fee Amount to each Holder of an Allowed Commitment Fee Claim in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Commitment Fee Claim; *provided*, that, if a Distribution Event has occurred, then $5,000,000 of such Commitment Fee Amount shall be contributed to the escrow account pursuant to Step 4(b)(iv) above.

6. Immediately following Step 5, the Reorganized Debtors shall distribute the allocable Pro Rata Share of the Equity Recovery to each Holder of an Allowed Existing Equity Interest and all Existing Equity Interests and other Interests shall be cancelled, released, extinguished, and of no further force and effect.

7. Immediately following Step 6, the Reorganized Parent shall convert into a corporation organized under the laws of Delaware.

After the Effective Date (solely if a Distribution Event occurs):

8. If, prior to the Regulatory Trigger Deadline, Renesas obtains all Regulatory Approvals, then:

a. the Reorganized Debtors shall (i) issue to Renesas all Base Consideration not previously distributed to Renesas (including any interest paid on or repayment of the New Renesas 2L Takeback Convertible Notes since the Effective Date), less any portions or equivalent proceeds of the Base Consideration in respect of which

2

Renesas has received Sale Proceeds pursuant to the Investor Rights and Disposition Agreement and (ii) distribute the Contingent Shares to the Holders of Existing Equity Interests in accordance with the Plan;

b. $10,000,000 of the Contingent Cash shall be remitted from the escrow account governed by the Contingent Cash Escrow Agreement to the Reorganized Debtors; and

c. $5,000,000 of the Contingent Cash shall be distributed to the Holders of Allowed Commitment Fee Claims, which shall be released no later than five (5) Business Days after the Regulatory Approvals have been obtained.

9. If Step 8 does not occur but the Regulatory Trigger Deadline occurs, then the Contingent Cash shall be released from escrow and distributed to Renesas and the Incremental New 2L Takeback Notes shall be issued to Renesas pursuant to Article 6.22(a) of the Plan, the Renesas Warrants Term Extension shall become effective, and the Contingent Shares shall be subject to and distributed through the ELOC/ATM Programs and Registered Primary Offerings.

10. Finally, if the Renesas Base Distribution Date occurs after Step 9, then the Reorganized Debtors shall immediately issue to Renesas (a) all Base Consideration not previously distributed to Renesas, less any portions or equivalent proceeds of the Base Consideration in respect of which Renesas has received Sale Proceeds pursuant to the Investor Rights and Disposition Agreement and (b) the Contingent Additional Consideration, less any portions of the Contingent Additional Consideration received in Step 9 or in respect of which Renesas has received Sale Proceeds pursuant to the Investor Rights and Disposition Agreement.

## <u>EXHIBIT I</u>

### Amended Rights Offering Procedures

Attached hereto are amended Rights Offering Procedures, along with a redline against the Rights Offering Procedures that were attached to the Rights Offering Procedures Order [Docket No. 63].

**Rights Offering Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

------------------------------------------------------------ x

In re:                                                : Chapter 11

                                                      :

WOLFSPEED, INC., *et al.*,                            : Case No.  25-90163 (CML)

                                                      :

                    Debtors.[1]                       : (Jointly Administered)

                                                      :

------------------------------------------------------------ x

**RIGHTS OFFERING PROCEDURES FOR
CONVERTIBLE NOTES CLAIMS (CLASS 4)**

Wolfspeed, Inc. and its debtor affiliate in the above-captioned Chapter 11 Cases (as defined herein), as debtors and debtors in possession (collectively, the "***Debtors***"), are seeking to implement a proposed restructuring pursuant to the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate*, filed contemporaneously herewith (as may be further amended, supplemented, or otherwise modified in accordance with its terms, the "***Plan***").[2]

The Plan provides for the Debtors to conduct the rights offering (the "***Rights Offering***") pursuant to which each holder of an Allowed Convertible Notes Claim (each, an "***Eligible Offeree***") is being issued a right (the "***Subscription Rights***") to subscribe for and acquire its pro rata share (calculated based on the aggregate amount of Allowed Convertible Notes Claims held by such Eligible Offeree relative to the aggregate amount of all Allowed Convertible Notes Claims ("***Pro Rata Share***")) of principal amount of the New 2L Convertible Notes for an aggregate Rights Offering principal amount equal to 60% of the Rights Offering Amount (the "***Non-Holdback Rights Offering Amount")***, at a purchase price equal to 91.3242% of the principal amount thereof (the "***Purchase Price***").

The Subscription Rights will be issued in reliance on the exemption from registration under the Securities Act of 1933, as amended (the "***Securities Act***"), provided by section 1145 of the Bankruptcy Code ("***Section 1145***"). The issuance of New 2L Convertible Notes pursuant to the exercise of the Subscription Rights, and the issuance of the New Common Stock issuable upon the

---

[1]   The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: Wolfspeed, Inc.  (2719) and Wolfspeed Texas LLC (0339).  The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, and if not defined in the Plan, shall have the meanings ascribed to such terms in the Disclosure Statement (as defined in the Plan) or the Backstop Agreement (as defined in the Plan), as applicable.

2

conversion thereof, will be similarly exempted from the registration requirements of the Securities Act in accordance with the foregoing.

These rights offering procedures (the "***Rights Offering Procedures***") are being provided to Holders of Convertible Notes Claims (Class 4).  You should read these Rights Offering Procedures in their entirety.  Additional information is also included in the attached Subscription Form (the "***Subscription Form***") and any attachments thereto (together, the "***Election Documents***").

*Key provisions are summarized below*:

- To exercise your Subscription Rights, you must instruct the bank, broker, or other financial institution (each, a "***Nominee***") holding your Convertible Notes in "street name" through The Depository Trust Company ("***DTC***") to electronically deliver such Convertible Notes into the Rights Offering event established through DTC's Automated Tender Offer Program ("***ATOP***")[3], so that such delivery occurs on or before the Subscription Tender Deadline and, subject to the following paragraph, pay your aggregate Purchase Price in connection with such exercise in accordance with the procedures described below by the Subscription Payment Deadline, which is one business day following the Subscription Tender Deadline.  There will be no over-subscription privilege in connection with the Rights Offering.

- Pursuant to and in accordance with the Backstop Agreement, the Commitment Parties (each in their capacities as Eligible Offerees) <u>must</u> exercise all of their Subscription Rights in full at or prior to the Subscription Tender Deadline and will pay their respective aggregate Purchase Price in accordance with the Backstop Agreement.

- Eligible Offerees are not required to exercise any of their Subscription Rights (unless they are party to, and in accordance with, the Backstop Agreement), but they may if they wish to do so and follow the required procedures.

- Additional information regarding the Rights Offering is provided in this document and in the Election Documents, which will be delivered by Epiq Corporate Restructuring, LLC (the "***Subscription Agent***") through the various Nominees holding Convertible Notes. Eligible Offerees should carefully review these Rights Offering Procedures and Election Documents in their entirety.

**The Subscription Rights distributed and issued pursuant to the Plan and these Rights Offering Procedures, and the New 2L Convertible Notes distributed and issued in connection with the exercise of such rights, are being issued and distributed by Reorganized Parent pursuant to the Rights Offering without registration under the Securities Act**.

**Neither the distribution of the Subscription Rights nor the offer and sale of any of the New 2L Convertible Notes issued and distributed following the Rights Offering pursuant to**

---

[3] Use of DTC's ATOP system is subject to review of the draft Rights Offering Documents by DTC.  In the event DTC does not permit use of ATOP, the Nominees processing the instructions of beneficial owners would be advised of an alternative submission protocol for the tender of the Convertible Notes.

the Plan and these Rights Offering Procedures, have been or will be registered under the Securities Act, or any state or local law requiring registration for offer and sale of a security.

The Subscription Rights corresponding to Allowed Convertible Notes Claims will trade together with, and be evidenced by, the underlying Allowed Convertible Notes Claims until the Subscription Tender Deadline, subject to such limitations, if any, that would be applicable to the transferability of the underlying existing Convertible Notes.  Eligible Offerees that are Commitment Parties are permitted to designate affiliates to receive the New 2L Convertible Notes, without the need to transfer any Allowed Convertible Notes Claims to such affiliate (including any controlled investment affiliates), subject to compliance with these Rights Offering Procedures and applicable securities law. Once an Eligible Offeree has properly exercised its Subscription Rights, subject to the terms and conditions contained in the Rights Offering Procedures (and the Backstop Agreement in the case of any Commitment Party), such exercise will be irrevocable following the Subscription Tender Deadline unless the Rights Offering is terminated.

The exercise of the Subscription Rights, once made, cannot be revoked after the Subscription Tender Deadline, unless the Rights Offering is terminated.

The Disclosure Statement was distributed in connection with the Debtors' solicitation of votes to accept or reject the Plan and included important information, including risk factors, that should be carefully read and considered by each Eligible Offeree prior to making a decision to exercise their Subscription Rights.  Electronic copies of the Disclosure Statement are available on the Debtors' restructuring website at https://dm.epiq11.com/Wolfspeed.

**IMPORTANT NOTE TO NOMINEES**:  As further described in the Subscription Form, the DTC participant/Nominee shall be required to provide a spreadsheet (the "***Nominee Spreadsheet***," as detailed in Exhibit 2 to the Subscription Form) on behalf of any Commitment Parties who participates in the Rights Offering through ATOP to the Subscription Agent by 5:00 p.m. prevailing Central Time on September 12, 2025 (one Business Day following the Subscription Tender Deadline).  Such Nominee Spreadsheet must include a valid Commitment Party Code for any Commitment Party that tendered into Option B–Commitment Party or Option C–Commitment Party Designation.  [Any tender into Option B–Commitment Party or Option C–Commitment Party Designation that does not have a valid Commitment Party Code shall be considered an ineligible election.]

Eligible Offerees that are not Commitment Parties who participate in the Rights Offering by tendering their Convertible Notes into the "Option A–Standard Subscription" ATOP election (as described in greater detail below) shall (i) have the related Purchase Price *automatically* paid on its behalf to the Subscription Agent, and (ii) receive their Plan consideration and the related Rights Offering New 2L Convertible Notes on account of such tender as part of the ATOP process.

Eligible Offerees that are Commitment Parties who participate in the Rights Offering by tendering their Convertible Notes into the "Option B–Commitment Party" ATOP election (as described in greater detail below) shall receive their Plan consideration and the related Rights Offering New 2L Convertible Notes on account of such tender as part of the ATOP process.

Eligible Offerees that are Commitment Parties who participate in the Rights Offering by tendering their Convertible Notes into the "Option C–Commitment Party Designation" ATOP election (as described in greater detail below), shall receive their Plan consideration and the related Rights Offering New 2L Convertible Notes on account of such tender through a manual delivery process, as outlined in the Subscription Form and the Designation Form.

---

**The Rights Offering is being conducted by the Debtors in good faith and in compliance with the Bankruptcy Code. In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the Plan, or an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the Plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale, or purchase of securities.**

**The New 2L Convertible Notes offered hereby have not been approved or disapproved by the U.S. Securities and Exchange Commission or any other state securities commission or any other regulatory or governmental authority, nor have any of the foregoing passed upon the accuracy or adequacy of the information presented, and any representation to the contrary is a criminal offense.**

---

Eligible Offerees should note the following times relating to the Rights Offering Procedures:

| Date | Calendar Date | Event |
|---|---|---|
| "Election Commencement Date" | August 14, 2025 | The date of commencement of the Rights Offering, on which Eligible Offerees will be served copies of the Rights Offering Procedures and Subscription Form. |
| "Subscription Tender Deadline" | 4:00 p.m. prevailing Central Time on September 11, 2025 | The deadline for Eligible Offerees to exercise Subscription Rights through ATOP. *For All Eligible Offerees Participating in the Rights Offering* Eligible Offerees must instruct the Nominee holding their Convertible Notes in "street name" through DTC to electronically deliver such Convertible Notes into the Rights Offering event established through ATOP, so that such delivery occurs |

| Date | Calendar Date | Event |
|------|---------------|-------|
| | | on or before the Subscription Tender Deadline. |
| "Subscription Payment Deadline" | On or about September 12, 2025 | *For All Eligible Offerees who are not Commitment Parties* <br><br> Payment of the applicable aggregate Purchase Price with respect to Option A–Standard Subscription will be automatically charged by DTC on the Subscription Payment Deadline to the DTC Participant that tendered such Eligible Offeree's Convertible Notes. **After Subscription Rights are exercised, the underlying Convertible Notes will not be transferable.** |

The Commitment Parties have already been designated and are known to the Debtors (subject to transfers permitted pursuant to Section 1.4 of the Backstop Agreement).

Special Note for Commitment Parties. Commitment Parties are not required to pay the applicable aggregate Purchase Price for any exercised Subscription Rights on the Subscription Payment Deadline; and instead must provide their payment by the Backstop Funding Date, which is expected to occur after the Subscription Payment Deadline, in accordance with Sections 1.1 and 1.2 of the Backstop Agreement.

**The rights and obligations of the Commitment Parties in the Rights Offering shall be governed by the Backstop Agreement. To the extent the rights and obligations set forth therein differ from the rights and obligations summarized in these Rights Offering Procedures or any Election Documents, the Backstop Agreement shall control**.

**No interest is payable on any advance funding of the applicable aggregate Purchase Price. If the Rights Offering is terminated for any reason, the applicable aggregate Purchase Price previously received on account of the Rights Offering by the Subscription Agent will be returned to Eligible Offerees as provided herein. No interest will be paid on any returned Purchase Price.**

**To participate in the Rights Offering, an Eligible Offeree must complete all of the steps outlined in these Rights Offering Procedures at or prior to the Subscription Tender Deadline and, for any party that is not a Commitment Party, make the applicable payment by the Subscription Payment Deadline. If an Eligible Offeree does not complete all of the steps outlined herein by the applicable deadlines, such Eligible Offeree shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights**

Offering; *provided*, that the Commitment Parties (in their capacities as Eligible Offerees) shall not be required to pay their respective applicable aggregate Purchase Price until the Backstop Funding Date in accordance with Sections 1.1 and 1.2 of the Backstop Agreement.

**SUBJECT TO THE TERMS AND CONDITIONS OF THESE RIGHTS OFFERING PROCEDURES (AND THE BACKSTOP AGREEMENT IN THE CASE OF ANY COMMITMENT PARTY), ALL SUBSCRIPTION ELECTIONS ARE IRREVOCABLE, AFTER THE SUBSCRIPTION TENDER DEADLINE UNLESS THE RIGHTS OFFERING IS TERMINATED.**

1.      Subscription Period

The Rights Offering will commence on the Election Commencement Date and will expire at the Subscription Tender Deadline. Each Eligible Offeree intending to exercise its Subscription Rights must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Election Documents at or prior to the Subscription Tender Deadline and must pay for any exercised Subscription Rights at or prior to the applicable deadline.

Subject to the terms and conditions set forth herein, and except with respect to the Commitment Parties (as otherwise described herein), any exercise of the Subscription Rights after the Subscription Tender Deadline and/or payment after Subscription Payment Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Tender Deadline and/or payment after Subscription Payment Deadline will not be honored, regardless of when the documents relating to such exercise were sent.

The Subscription Tender Deadline may be extended by the mutual agreement of the Debtors and the Requisite Commitment Parties (as defined in the Backstop Agreement), or as required by law.

As more fully described below, in order for an Eligible Offeree to exercise its Subscription Rights, any tender into the Rights Offering ATOP event must be received at or prior to the Subscription Tender Deadline and, with respect to any Option A–Standard Subscription, payment of the applicable aggregate Purchase Price will be automatically charged by DTC on the Subscription Payment Deadline to the DTC participant, and the aggregate amount shall be wired to the Subscription Agent by DTC on the following business day. The Commitment Parties are not required to pay their applicable aggregate Purchase Price on the Subscription Funding Deadline, and instead must make any payment in accordance with the Backstop Agreement.

Each Eligible Offeree may exercise all or any portion of such Eligible Offeree's Subscription Rights, subject to the terms and conditions contained herein.  In order to facilitate the exercise of the Subscription Rights, beginning on the Election Commencement Date, the Subscription Form and these Rights Offering Procedures will be sent to holders of Convertible Notes.

Notwithstanding anything to the contrary in these Rights Offering Procedures, pursuant to the Backstop Agreement, Eligible Offerees that are Commitment Parties must exercise their Subscription Rights in full, and may select either Option B–Commitment Party or Option C–Commitment Party Designation.

2.      Exercise of Subscription Rights

An Eligible Offeree electing to participate in the Rights Offering must:

- instruct the Nominee holding their Convertible Notes in "street name" through DTC to electronically deliver such Convertible Notes into the Rights Offering event established through ATOP, so that such delivery occurs on or before the Subscription Tender Deadline.

- Eligible Offerees that are not a Commitment Party may only select Option A–Standard Subscription to participate in the Rights Offering, and the applicable Purchase Price will be *automatically* charged by DTC to the DTC participant tendering such Eligible Offeree's Convertible Notes.

- Eligible Offerees that are a Commitment Party and have a valid Commitment Party Code, may either select Option B–Commitment Party (with no designation) **or**, to designate one or more affiliate to receive their New 2L Convertible Notes, may (a) select Option C–Commitment Party Designation (with designation) and (b) provide all required details outlined in the Designation Form provided separately to each Commitment Party (the "***Designation Form***").

- If the Eligible Offeree is not a Commitment Party, payment of the applicable aggregate Purchase Price will be automatically charged by DTC on the Subscription Payment Deadline to the DTC participant, and on the business day following the Subscription Payment Deadline, DTC will automatically wire the Aggregate Purchase Price relating to any Convertible Notes tendered into Option A–Standard Subscription in accordance with the wire instructions to be provided by the Subscription Agent to DTC.

- if the Eligible Offeree is a Commitment Party, make payment of its applicable aggregate Purchase Price to the account specified in the Funding Notice by the Backstop Funding Date in accordance with Sections 1.1 and 1.2 of the Backstop Agreement, which account shall be an escrow account maintained at a financial institution of national standing reasonably acceptable to the Requisite Commitment Parties (the "***Escrow Account***") pursuant to an escrow agreement and related documentation in form and substance acceptable to the Requisite Commitment Parties.

The Debtors reserve the right to request reasonable additional information and diligence from Eligible Offerees electing to participate in the Rights Offering in their reasonable discretion to ensure that such Eligible Offerees satisfy the foregoing requirements.  Any dispute about whether an Eligible Offeree satisfies such requirements shall be finally resolved by the Bankruptcy Court unless otherwise consensually resolved by such Eligible Offeree and the Debtors prior to such hearing.

ALL COMMITMENT PARTIES MUST MAKE ALL PAYMENTS TO THE ESCROW ACCOUNT SPECIFIED IN THE FUNDING NOTICE IN ACCORDANCE WITH THE

BACKSTOP AGREEMENT (OR AS OTHERWISE PERMITTED UNDER SECTIONS 1.1 AND 1.2 OF THE BACKSTOP AGREEMENT).

**DELIVERY OF THE ELIGIBLE OFFEREE'S CONVERTIBLE NOTES VIA THE ATOP RIGHTS OFFERING EVENT IS THE ONLY VALID METHOD OF SUBMISSION AND NO OTHER METHODS WILL BE ACCEPTED.**

*Payment of the Aggregate Purchase Price*.  Payment of the applicable aggregate Purchase Price with respect to Option A–Standard Subscription will be automatically charged by DTC on the Subscription Payment Deadline to the DTC Participant that tendered such Eligible Offeree's Convertible Notes.

The cash deposited with the Subscription Agent in accordance with these Rights Offering Procedures will be deposited and held by the Subscription Agent in a segregated account.  The Subscription Agent may not use such cash for any other purpose and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance.  The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' chapter 11 estates.

3.      Revocation; Transfers of Subscription Rights

The Subscription Rights corresponding to Allowed Convertible Notes Claims will trade together with, and be evidenced by, the underlying Allowed Convertible Notes Claims until the Subscription Tender Deadline, subject to such limitations, if any, that would be applicable to the transferability of the underlying existing Convertible Notes.

Pursuant to the terms of the Rights Offering Procedures, Commitment Parties are permitted to designate affiliates to receive the New 2L Convertible Notes and Plan consideration, without the need to transfer any Allowed Convertible Notes Claims to such affiliate (including any controlled investment affiliates), subject to compliance with applicable securities law; provided, however, that in order to designate an affiliate, a Commitment Party must (i) arrange for the tender of its existing Convertible Notes into the correct Option C–Commitment Party Designation "Designation Option" in ATOP, and (ii) provide the Designation Form, including all attachments thereto, in accordance with the instructions on the Designation Form by the due date specified therein.

Once an Eligible Offeree has properly exercised its Subscription Rights, subject to the terms and conditions contained in the Rights Offering Procedures (and the Backstop Agreement in the case of any Commitment Party), such exercise will be irrevocable after the Subscription Tender Deadline unless the Rights Offering is terminated.

4.      Termination/Return of Payment

Unless the Plan Effective Date has occurred (and other than as set forth in the Backstop Agreement), the Rights Offering (a) will be deemed automatically terminated without any action of any party upon the earliest of (i) the withdrawal of the Plan by the Debtors pursuant to its terms or, subject to the terms of the Restructuring Support Agreement and the Backstop Agreement, the entry of an order by the Court denying confirmation of the Plan, (ii) termination of the Backstop Agreement or the Restructuring Support Agreement in accordance with its terms

(other than any automatic termination event arising out of the second sentence of Section 5.01(g) of the Restructuring Support Agreement or Section 6.3(b) of the Backstop Agreement, and other than a termination upon the consummation of the transactions contemplated thereunder in connection with the occurrence of the Plan Effective Date) and (iii) the Outside Date (as defined in the Backstop Agreement, as may be extended pursuant to the terms thereof), or (b) may be terminated by mutual agreement of the Debtors and the Requisite Commitment Parties. Upon the termination of the Backstop Agreement in accordance with Article VI of the Backstop Agreement, or to the extent the Plan Effective Date does not occur when required pursuant to Section 1.1 of the Backstop Agreement, any payments received by the Debtors pursuant to Funding Notices shall be returned, without interest, to the bank account identified by the applicable Commitment Party as soon as reasonably practicable, subject to the Backstop Agreement. Any payment made by DTC shall be returned to the applicable DTC Participant that was charged the Aggregate Purchase Price by DTC, and the Subscription Agent shall request wire instructions from each such DTC Participant.

5.      Minimum Denominations; No Bulk Tenders

Tenders of Convertible Notes may only be made in minimum denominations of $1,000 and incremental denominations of $1,000 thereafter.  Nominees must submit instructions separately on account of each Eligible Offeree.  "Bulk tenders" into ATOP will not be permitted.

The total Rights on account of the New 2L Convertible Notes will be calculated and rounded down to the nearest $1,000.  No compensation shall be paid, whether in cash or otherwise, in respect of any rounded amounts.  The New 2L Convertible Notes are expected to be issued in minimum denominations of $1,000 and in increments of $1,000 in excess thereof.

6.      Validity of Exercise of Subscription Rights

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors in consultation with the Requisite Commitment Parties and, if necessary, subject to a final and binding determination by the Bankruptcy Court.  Subject to the foregoing, the Debtors may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights, in consultation with the Requisite Commitment Parties.  Subscriptions will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith, in consultation with the Requisite Commitment Parties.  In addition, the Subscription Agent shall have no obligation to notify parties of or cure any defects to the forms returned in exercising the Subscription Rights.

**As noted above, before exercising any Subscription Rights, Eligible Offerees should carefully read the Disclosure Statement and the Plan in their entirety for information relating to the Debtors and the risk factors to be considered in deciding whether to participate in the Rights Offering**.

All calculations, including, to the extent applicable, the calculation of (a) the value of any Eligible Offeree's Allowed Convertible Notes Claim for the purposes of the Rights Offering and

(b) any Eligible Offeree's New 2L Convertible Notes shall be made in good faith by the Debtors and in accordance with any claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

7.      Modification of Procedures

The Debtors reserve the right to modify the Rights Offering Procedures, or adopt additional procedures consistent with the Rights Offering Procedures, to effectuate the Rights Offering and to issue the New 2L Convertible Notes, as applicable, with the consent of the Requisite Commitment Parties; *provided*, *however*, that the Debtors shall provide prompt written notice (the "***Modification Notice***") to the Eligible Offerees of any material modification to the Rights Offering Procedures made after the Election Commencement Date by: (i) posting the Modification Notice on the Subscription Agent's website at https://dm.epiq11.com/Wolfspeed; (ii) filing a copy of the Modification Notice on the docket of the Debtors' Chapter 11 Cases; and (iii) providing a copy of the Modification Notice to counsel to the Ad Hoc 26s/28s/29s Noteholder Group, with email notice being sufficient. In so doing, and subject to the foregoing consent rights of the Requisite Commitment Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith is necessary and appropriate to effectuate and implement the Rights Offering and the issuance of the New 2L Convertible Notes.

The Debtors reserve the right to request reasonable additional documentation and diligence from any participant in the Rights Offering to confirm that such participant is an Eligible Offeree.

8.      Inquiries and Transmittal of Documents; Subscription Agent

Questions relating to the Rights Offering should be directed to the Subscription Agent via email to Registration@epiqglobal.com (please reference "Wolfspeed" in the subject line). Please note that the Subscription Agent is only able to respond to procedural questions regarding the Rights Offering, and cannot provide any information beyond that included in these Rights Offering Procedures and the Election Documents.

9.      Failure to Exercise Subscription Rights

Unexercised Subscription Rights will be cancelled and forever and irrevocably relinquished at the Subscription Tender Deadline. If the Subscription Agent for any reason does not receive from an Eligible Offeree (i) the submission of the existing Convertible Notes by the Subscription Tender Deadline and (ii) payment of the subscription price by the Subscription Payment Deadline (other than in the case of a Commitment Party, whose payment of the subscription price shall be made in accordance with the Backstop Agreement), in each case in accordance with these Rights Offering Procedures, such Eligible Offeree shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering, unless otherwise approved by the Requisite Commitment Parties and the Debtors.

Subject to the terms and conditions set forth herein and in the Backstop Agreement, any attempt to exercise Subscription Rights after the Subscription Tender Deadline shall be null and void and the Debtors shall not be obligated to honor any such purported exercise received by the Subscription Agent after the Subscription Tender Deadline.

10.     Backstop Agreement

In the event of any conflict between these Rights Offering Procedures and the terms of the Backstop Agreement, the terms of the Backstop Agreement will control.

**WOLFSPEED, INC.**

**INSTRUCTIONS FOR SUBMITTING A RIGHTS OFFERING ELECTION**

Capitalized terms used and not defined herein shall have the meaning assigned to them in the Rights Offering Procedures.

1. The Subscription Form contains participation and election options with respect to the Subscription Rights.

2. Eligible Offerees must instruct their Nominee holding their Convertible Notes in "street name" through DTC to electronically deliver such Convertible Notes into the applicable option in the Rights Offering event established through DTC's ATOP, so that such delivery occurs on or before the Subscription Tender Deadline, **September 11, 2025 at 4:00 p.m. prevailing Central Time**.

3. No Subscription Election will be accepted after the Subscription Tender Deadline. No Subscription Election may be withdrawn or modified after the Subscription Tender Deadline.

4. Delivery of a Subscription Election will be deemed to have occurred only when the Subscription Agent actually receives the submission of the underlying Convertible Notes into the Rights Offering ATOP event in accordance with these Rights Offering Procedures.

5. You should not rely on any information, representations, or inducements made to obtain a participation in Rights Offering that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

**IF YOU HAVE ANY QUESTIONS REGARDING THE SUBSCRIPTION FORM, THESE INSTRUCTIONS, OR THE RIGHTS OFFERING PROCEDURES, PLEASE CONTACT THE SUBSCRIPTION AGENT VIA EMAIL TO REGISTRATION@EPIQGLOBAL.COM (PLEASE REFERENCE "WOLFSPEED" IN THE SUBJECT LINE).**

**Subscription Form**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
-------------------------------------------------- x
                                                   :
In re:                                             :   Chapter 11
                                                   :
WOLFSPEED, INC., et al.,                           :   Case No.  25-90163 (CML)
                                                   :
         Debtors.¹                                 :   (Jointly Administered)
                                                   :
-------------------------------------------------- x
```

**RIGHTS OFFERING SUBSCRIPTION FORM
FOR USE BY ELIGIBLE OFFEREES OF
ALLOWED CONVERTIBLE NOTES CLAIM
IN CONNECTION WITH THE DEBTORS' PLAN**

---

**The "Subscription Tender Deadline" is 4:00 p.m. prevailing Central Time on September 11, 2025.**

**The "Subscription Payment Deadline" is 5:00 p.m. prevailing Central Time on September 12, 2025, except for Commitment Parties who must fund in accordance with the Backstop Agreement.**

**ALL ELIGIBLE OFFEREES[2] ELECTING TO PARTICIPATE IN THE RIGHTS OFFERING MUST INSTRUCT THE BANK, BROKER, OR OTHER FINANCIAL INSTITUTION (EACH A "*NOMINEE*") HOLDING THEIR CONVERTIBLE NOTES TO ELECTRONICALLY DELIVER SUCH CONVERTIBLE NOTES INTO THE APPLICABLE RIGHTS OFFERING EVENT OPTION ESTABLISHED THROUGH THE AUTOMATED TENDER OFFER PROGRAM ("*ATOP*") OF THE DEPOSITORY TRUST COMPANY ("*DTC*") , SO THAT SUCH DELIVERY OCCURS ON OR BEFORE THE SUBSCRIPTION TENDER DEADLINE.**

---

**To exercise the Subscription Rights with respect to its Allowed Convertible Notes Claims, each Eligible Offeree of an Allowed Convertible Notes Claims must cause the Nominee**

---

[1]    The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: Wolfspeed, Inc.  (2719) and Wolfspeed Texas LLC (0339).  The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Rights Offering Procedures for Convertible Notes Claims (Class 4) (the "***Rights Offering Procedures***"), and if not defined in the Rights Offering Procedures, shall have the meanings ascribed to such terms in the Plan (as defined in the Rights Offering Procedures), the Disclosure Statement (as defined in the Rights Offering Procedures) or the Backstop Agreement (as defined in the Plan), as applicable.

B-1

**holding their Convertible Notes to electronically deliver such Convertible Notes into the Rights Offering event option established on ATOP on or before the Subscription Tender Deadline**.

If you wish to participate in the Rights Offering, you must relay your instructions to your Nominee(s).  If you wish to participate in the Rights Offering, please complete this Subscription Form in order to determine the principal amount of New 2L Convertible Notes you are entitled to purchase and the Aggregate Purchase Price therefor.  Please return this Subscription Form to your Nominee or otherwise follow your Nominee's instructions with respect to relaying the necessary instructions to permit your Nominee(s) to tender your Convertible Notes prior to the Subscription Tender Deadline, and follow all other directions in this Subscription Form by the relevant deadlines.

The election options are outlined in Item 4 below.

<u>**Payment of Rights Offering Purchase Price**</u>:  **Payment of the applicable aggregate Purchase Price with respect to Option A–Standard Subscription will be automatically charged by DTC on the Subscription Payment Deadline to the DTC Participant that tendered such Eligible Offeree's Convertible Notes. (Commitment Parties in Option B–Commitment Party and Option C–Commitment Party Designation must deliver funding at a later date, in accordance with the Backstop Agreement.)**

**The Subscription Rights corresponding to the Allowed Convertible Notes Claims will trade together with, and be evidenced by, the underlying Allowed Convertible Notes Claims, until the Subscription Tender Deadline, subject to such limitations, if any, that would be applicable to the transferability of the underlying Allowed Convertible Notes Claims and compliance with applicable securities law.**

**Please consult the Plan, the Disclosure Statement and the Rights Offering Procedures for additional information with respect to this Subscription Form.**

**If you have any questions, please contact the Subscription Agent by emailing <u>Registration@epiqglobal.com</u> (please reference "Wolfspeed" in the subject line).**

**SUBJECT TO THE TERMS AND CONDITIONS OF THE RIGHTS OFFERING PROCEDURES (AND THE BACKSTOP AGREEMENT IN THE CASE OF ANY COMMITMENT PARTY), ALL ELECTION INSTRUCTIONS ARE IRREVOCABLE AFTER THE RIGHTS OFFERING DEADLINE.**

**Item 1. Amount of Convertible Notes Held.**

The undersigned, or the beneficial owner on whose behalf the undersigned is executing this form, is a beneficial owner of Convertible Notes in the following aggregate principal amount(s) or that the person executing this form is an authorized signatory of that beneficial Holder. (If you do not know the principal amount, please contact your Nominee immediately).

**IMPORTANT NOTE: IF YOU HOLD YOUR NOTES THROUGH MORE THAN ONE NOMINEE, YOU <u>MUST</u> PROVIDE SEPARATE INSTRUCTIONS TO EACH APPLICABLE NOMINEE.  YOU MAY NOT AGGREGATE POSITIONS HELD BY DIFFERENT NOMINEES. PROVIDE YOUR INSTRUCTIONS TO YOUR NOMINEE AS REQUIRED BY THE NOMINEE.**

*Aggregate principal amount of 2026 Convertible Notes:*

$_____

*Aggregate principal amount of 2028 Convertible Notes:*

$_____

*Aggregate principal amount of 2029 Convertible Notes:*

$_____

**Item 2. Subscription Rights.  *Calculation of New 2L Convertible Notes and Aggregate Purchase Price*.  Only instruct your Nominee to tender the Principal Amount of Convertible Notes that you wish to exercise; *provided, however*, that Commitment Parties are required by the terms of the Backstop Agreement to tender all of their Convertible Notes into the ATOP event.**

[*Remainder of page intentionally left blank*]

B-3

| Principal Amount of Convertible Notes to be Tendered into the Rights Offering; you must select an option in Item 4 below. | | Factor | | Calculation of New 2L Convertible Notes |
|---|---|---|---|---|
| (Insert Principal Amount of 2026 Convertible Notes CUSIP 225447AD3 Tendered) | X | 0.05851812 | = | (New 2L Convertible Notes Subscribed) (***Round DOWN to nearest whole number***) |
| (Insert Principal Amount of 2028 Convertible Notes CUSIP 977852AB8 Tendered) | X | 0.05840183 | = | (New 2L Convertible Notes Subscribed) (***Round DOWN to nearest whole number***) |
| (Insert Principal Amount of 2029 Convertible Notes CUSIP 977852AD4 Tendered) | X | 0.05898612 | = | (New 2L Convertible Notes Subscribed) (***Round DOWN to nearest whole number***) |
| | | TOTAL New 2L Convertible Notes Subscribed: | = | (TOTAL New 2L Convertible Notes Subscribed above) (***Round DOWN to nearest $1,000***). |
| | | Aggregate Purchase Price: | = | (Aggregate Purchase Price of 91.3242%, reflecting the total principal amount of New 2L Convertible Notes subscribed, as shown immediately above, multiplied by 0.913242, rounded down to the nearest penny) |

**IMPORTANT NOTE:  For the avoidance of doubt, the principal amount of Rights Offering New 2L Convertible Notes will be based solely upon the Principal Amount of the Convertible Notes tendered through ATOP, and _not_ on the amounts shown in Item 2.**

**Item 3. Payment of the Purchase Price**.

The Aggregate Purchase Price is shown in the final row of Item 2.

Payment of the applicable aggregate Purchase Price with respect to Option A–Standard Subscription will be automatically charged by DTC on the Subscription Payment Deadline to the DTC Participant that tendered such Eligible Offeree's Convertible Notes.

Commitment Parties in Option B–Commitment Party and Option C–Commitment Party Designation must deliver funding at a later date, in accordance with the Backstop Agreement.

**Item 4.  <u>Selection of Rights Offering Option</u>**

*If you instruct your Nominee to tender your Convertible Notes into the Rights Offering ATOP event but no specific selection is made, you will be deemed to have selected Option A–Standard Subscription.  Option A–Standard Subscription is the only option available to Eligible Offerees that are not Commitment Parties.*

☐ **<u>Option A–Standard Subscription</u>**. *Only Option for Eligible Offerees that are not Commitment Parties*: **Participate in the Rights Offering**.  To make this election, arrange for the tender of the applicable Convertible Notes by the Subscription Tender Deadline into <u>Option A–Standard Subscription</u> of the ATOP event, thereby acknowledging that the payment of the applicable aggregate Purchase Price will be automatically charged by DTC on the Subscription Payment Deadline to the DTC participant tendering Convertible Notes on your behalf, and receive all Plan consideration and Rights Offering entitlements through the ATOP event, to the extent such securities are eligible on the DTC platform.  Payment by Eligible Offerees who are not Commitment Parties must be made by the Subscription Payment Deadline.

☐ **<u>Option B–Commitment Party</u>**. *One of Two Options for Commitment Parties*: **Participate in the Rights Offering with NO DESIGNATION of Plan consideration and Rights Offering New 2L Convertible Notes**.  To make this election, arrange for the tender of the applicable Convertible Notes by the Subscription Tender Deadline into <u>Option B–Commitment Party</u> of the ATOP event, and receive all Plan consideration and Rights Offering entitlements through the ATOP event, to the extent such securities are eligible on the DTC platform.

☐ **<u>Option C–Commitment Party Designation</u>**. *Second of Two Options for Commitment Parties*. **Participate in the Rights Offering and DESIGNATE some or all of your Plan consideration and Rights Offering New 2L Notes to an affiliate(s)**.  To make this election, arrange for the tender notes of the applicable Convertible Notes by the Subscription Tender Deadline into <u>Option C–Commitment Party Designation</u> of the ATOP event and receive Plan consideration and Rights Offering entitlements through a private arrangement to be agreed with the applicable Commitment Party, which will permit such Commitment Party to designate all or a portion of its Plan consideration and Rights Offering entitlements to affiliate(s), in accordance with the Designation Form provided separately to each Commitment Party (the "***Designation Form***") – with all such Plan consideration and Rights Offering New 2L Convertible Notes to be distributed via Deposit or Withdrawal at Custodian ("***DWAC***")

deposit, to the extent such securities are eligible on the DTC platform, and not through the ATOP event. The tendering Commitment Party must also arrange for (i) the Designation Form in accordance with the directions in the Designation Form provided separately to each Commitment Party, and (ii) the Designation Spreadsheet (as described in the Designation Form) to be provided to the Subscription Agent in accordance with the return instructions therein. This is a "Deliver-Only" option and no entitlements will be distributed through the ATOP event.

**Item 5. <u>Commitment Parties.</u>**

☐ Check this box if you are a "Commitment Party" and insert your Commitment Party Code below or otherwise convey it to your Nominee. This is REQUIRED for Option B–Commitment Party or Option C–Commitment Party Designation.

| |
|---|
| Insert Commitment Party Code: |
| |

***<u>If you do not have a Commitment Party Code, you are not a Commitment Party and may only select Option A–Standard Subscription to the extent you wish to exercise your Rights</u>***.

**(THE DEFINITION OF "COMMITMENT PARTY" IS SET FORTH IN THE BACKSTOP COMMITMENT AGREEMENT, DATED AS OF JUNE 22, 2025, AMONG WOLFSPEED, INC., WOLFSPEED TEXAS LLC AND THE COMMITMENT PARTIES.)**

If you are a Commitment Party, you must deliver your Aggregate Purchase Price in accordance with the terms of the Backstop Agreement and can disregard Item 6 below.

**Item 6. <u>Payment and Delivery Instructions – for all Participating Holders that are not Commitment Parties.</u>**

Payment of the Aggregate Purchase Price calculated pursuant to Item 2 above will be automatically charged by DTC on the Subscription Payment Deadline to the DTC participant tendering Convertible Note.

**Item 8. Certification and Signature.**

The undersigned hereby certifies that (a) the undersigned was the beneficial holder of an Allowed Convertible Notes Claim above as of the date hereof, or the authorized signatory (the "***Authorized Signatory***") of such beneficial holder acting on behalf of such Holder, (b) the Eligible Offeree has reviewed a copy of the Plan, the Disclosure Statement and the Rights Offering Procedures, (c) the Eligible Offeree understands that the exercise of any Subscription Rights is subject to all of the terms and conditions set forth in the Plan, the Rights Offering Procedures, and, if applicable, the Backstop Agreement and (d) if the Designation Option has been selected, all details with respect to any affiliated designees has been provided in accordance with the Designation Form and all such information is true and accurate.

**The Eligible Offeree (or the Authorized Signatory on behalf of such Eligible Offeree) acknowledges that (i) the Eligible Offeree has made all of the elections set forth in the Election Spreadsheet, (ii) if Option C–Commitment Party Designation has been selected, the Eligible Offeree will provide the Designation Form in accordance with the instructions in the Designation Form, and (iii) the Eligible Offeree will be bound to pay the aggregate Purchase Price to which it has subscribed and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Offeree: _____

Signature: _____

Name of Signatory: _____

Title: _____

Telephone Number: _____

Email: _____

---

**The Subscription Tender Deadline is 4:00 p.m. prevailing Central Time on September 11, 2025.**

---

**Exhibit 1 to Subscription Form**

**INSTRUCTIONS TO THE NOMINEE/DTC PARTICIPANT REGARDING OPTION B–COMMITMENT PARTY AND OPTION C–COMMITMENT PARTY DESIGNATION FOR COMMITMENT PARTIES ONLY**

The Nominee Spreadsheet is available from the Subscription Agent by emailing Registration@epiqglobal.com (with reference to "Wolfspeed Nominee Spreadsheet" in the subject line).

The Nominee Spreadsheet is applicable *only* to instructions in Option B–Commitment Party and Option C–Commitment Party Designation and sets forth the required information to be provided for those options, including (i) VOI Number; and (ii) the Commitment Party Code.

**RETURN OF THE NOMINEE SPREADSHEET FOR ALL INSTRUCTIONS INTO OPTION B–COMMITMENT PARTY AND OPTION C–COMMITMENT PARTY DESIGNATION.**

Deadline:  5:00 p.m. prevailing Central Time on September 12, 2025, which is one business day following the Subscription Tender Deadline.

Return Instructions:
The completed Nominee Spreadsheet should be transmitted to the Subscription Agent via email to Registration@epiqglobal.com (with reference to "Wolfspeed Nominee Spreadsheet" in the subject line) by the deadline shown above.

**Redline – Amended Rights Offering Procedures vs Original Rights Offering Procedures**

**Rights Offering Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
----------------------------------------------------------- x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
WOLFSPEED, INC., et al.,                                    :    Case No.  25-90163 (CML)
                                                            :
                          Debtors.¹                         :    (Jointly Administered)
                                                            :
----------------------------------------------------------- x
```

**RIGHTS OFFERING PROCEDURES FOR
CONVERTIBLE NOTES CLAIMS (CLASS 4)**

Wolfspeed, Inc. and its debtor affiliate in the above-captioned Chapter 11 Cases (as defined herein), as debtors and debtors in possession (collectively, the "***Debtors***"), are seeking to implement a proposed restructuring pursuant to the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate*, filed contemporaneously herewith (as may be further amended, supplemented, or otherwise modified in accordance with its terms, the "***Plan***").²

The Plan provides for the Debtors to conduct the rights offering (the "***Rights Offering***") pursuant to which each holder of an Allowed Convertible Notes Claim (each, an "***Eligible Offeree***") is being issued a right (the "***Subscription Rights***") to subscribe for and acquire its pro rata share (calculated based on the aggregate amount of Allowed Convertible Notes Claims held by such Eligible Offeree relative to the aggregate amount of all Allowed Convertible Notes Claims ("***Pro Rata Share***")) of principal amount of the New 2L Convertible Notes for an aggregate Rights Offering principal amount equal to 60% of the Rights Offering Amount (the "***Non-Holdback Rights Offering Amount")***, at a purchase price equal to 91.3242% of the principal amount thereof (the "***Purchase Price***").

The Subscription Rights will be issued in reliance on the exemption from registration under the Securities Act of 1933, as amended (the "***Securities Act***"), provided by section 1145 of the Bankruptcy Code ("***Section 1145***"). The issuance of New 2L Convertible Notes pursuant to the exercise of the Subscription Rights, and the issuance of the New Common Stock issuable upon

---

[1]   The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are:  Wolfspeed, Inc.  (2719) and Wolfspeed Texas LLC (0339).  The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, and if not defined in the Plan, shall have the meanings ascribed to such terms in the Disclosure Statement (as defined in the Plan) or the Backstop Agreement (as defined in the Plan), as applicable.

the conversion thereof, will be similarly exempted from the registration requirements of the Securities Act in accordance with the foregoing.

These rights offering procedures (the "***Rights Offering Procedures***") are being provided to Holders of Convertible Notes Claims (Class 4).  You should read these Rights Offering Procedures in their entirety.  Additional information is also included in the attached Subscription Form (the "***Subscription Form***") and any attachments thereto (together, the "***Election Documents***").

*Key provisions are summarized below*:

- To exercise your Subscription Rights, you must instruct the bank, broker, or other financial institution (each, a "***Nominee***") holding your Convertible Notes in "street name" through The Depository Trust Company ("***DTC***") to electronically deliver such Convertible Notes into the Rights Offering event established through DTC's Automated Tender Offer Program ("***ATOP***")[3], so that such delivery occurs on or before the Subscription Tender Deadline and, subject to the following paragraph, pay your aggregate Purchase Price in connection with such exercise in accordance with the procedures described below by the Subscription Payment Deadline, which is one business day following the Subscription Tender Deadline.  There will be no over-subscription privilege in connection with the Rights Offering.

- Pursuant to and in accordance with the Backstop Agreement, the Commitment Parties (each in their capacities as Eligible Offerees) <u>must</u> exercise all of their Subscription Rights in full at or prior to the Subscription Tender Deadline and will pay their respective aggregate Purchase Price in accordance with the Backstop Agreement.

- Eligible Offerees are not required to exercise any of their Subscription Rights (unless they are party to, and in accordance with, the Backstop Agreement), but they may if they wish to do so and follow the required procedures.

- Additional information regarding the Rights Offering is provided in this document and in the Election Documents, which will be delivered by Epiq Corporate Restructuring, LLC (the "***Subscription Agent***") through the various Nominees holding Convertible Notes. Eligible Offerees should carefully review these Rights Offering Procedures and Election Documents in their entirety.

**The Subscription Rights distributed and issued pursuant to the Plan and these Rights Offering Procedures, and the New 2L Convertible Notes distributed and issued in connection with the exercise of such rights, are being issued and distributed by Reorganized Parent pursuant to the Rights Offering without registration under the Securities Act**.

---

[3]   Use of DTC's ATOP system is subject to review of the draft Rights Offering Documents by DTC.  In the event DTC does not permit use of ATOP, the Nominees processing the instructions of beneficial owners would be advised of an alternative submission protocol for the tender of the Convertible Notes.

**Neither the distribution of the Subscription Rights nor the offer and sale of any of the New 2L Convertible Notes issued and distributed following the Rights Offering pursuant to the Plan and these Rights Offering Procedures, have been or will be registered under the Securities Act, or any state or local law requiring registration for offer and sale of a security**.

The Subscription Rights corresponding to Allowed Convertible Notes Claims will trade together with, and be evidenced by, the underlying Allowed Convertible Notes Claims until the Subscription Tender Deadline, subject to such limitations, if any, that would be applicable to the transferability of the underlying existing Convertible Notes. Eligible Offerees **that are Commitment Parties** are permitted to designate affiliates to receive the New 2L Convertible Notes, without the need to transfer any Allowed Convertible Notes Claims to such affiliate (including any controlled investment affiliates), subject to compliance with these Rights Offering Procedures and applicable securities law. Once an Eligible Offeree has properly exercised its Subscription Rights, subject to the terms and conditions contained in the Rights Offering Procedures (and the Backstop Agreement in the case of any Commitment Party), such exercise will be irrevocable following the Subscription Tender Deadline unless the Rights Offering is terminated.

~~Any Eligible Offeree who wishes to designate an affiliate(s) to receive its New 2L Convertible Notes must select the "Designation" option in the ATOP Rights Offering event and provide the required information outlined in the Designation Form (attached as an exhibit to the Subscription Form) with each such affiliate designee's information, in accordance with these Rights Offering Procedures.~~

The exercise of the Subscription Rights, once made, cannot be revoked after the Subscription Tender Deadline, unless the Rights Offering is terminated.

The Disclosure Statement was distributed in connection with the Debtors' solicitation of votes to accept or reject the Plan and included important information, including risk factors, that should be carefully read and considered by each Eligible Offeree prior to making a decision to exercise their Subscription Rights. Electronic copies of the Disclosure Statement are available on the Debtors' restructuring website at https://dm.epiq11.com/Wolfspeed.

**IMPORTANT NOTE TO NOMINEES**: As further described in the Subscription Form, the DTC participant/Nominee shall be required to provide a spreadsheet (the "***Nominee Spreadsheet***," as detailed in Exhibit 2 to the Subscription Form) on behalf of any ~~Eligible Offeree~~**Commitment Parties** who participates in the Rights Offering through ATOP to the Subscription Agent by 5:00 p.m. prevailing Central Time on September 12, 2025 (one Business Day following the Subscription Tender Deadline). Such Nominee Spreadsheet ~~shall~~**must** include~~, for each tendered position, (i) the~~ **a valid** Commitment Party Code for any Commitment Party ~~and (ii) wire details for any payments on behalf of a non-Commitment Party. The Nominee Spreadsheet for any Commitment Party shall, among other things, provide such Commitment Party's~~**that tendered into Option B–Commitment Party or Option C–Commitment Party Designation. [Any tender into Option B–Commitment Party or Option C–Commitment Party Designation that does not have a valid** Commitment Party Code~~, so that no payment will be due for such Commitment Party on the Subscription~~

4

Payment Deadline.  The Nominee Spreadsheet must be provided for both ATOP options, which are described below. shall be considered an ineligible election.]

Eligible Offerees that are not Commitment Parties who participate in the Rights Offering by tendering their Convertible Notes into the "Option A–Standard Subscription" ATOP election (as described in greater detail below) shall (i) have the related Purchase Price *automatically* paid on its behalf to the Subscription Agent, and (ii) receive their Plan consideration and the related Rights Offering New 2L Convertible Notes on account of such tender as part of the ATOP process.

Eligible Offerees **that are Commitment Parties** who participate in the Rights Offering by tendering their Convertible Notes into the "Option 1B–Commitment Party" ATOP election (as described in greater detail below) and making the required payment by the applicable deadline, shall receive their Plan consideration and the related Rights Offering New 2L Convertible Notes on account of such tender as part of the ATOP process.

Eligible Holders**Offerees that are Commitment Parties** who participate in the Rights Offering by tendering their Convertible Notes into the "Option 2C–Commitment Party Designation" ATOP election (as described in greater detail below) and making the required payment by the applicable deadline, shall receive their Plan consideration and the related Rights Offering New 2L Convertible Notes on account of such tender through a manual delivery process, as outlined in the Subscription Form and the Designation Form.

**The Rights Offering is being conducted by the Debtors in good faith and in compliance with the Bankruptcy Code.  In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the Plan, or an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the Plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale, or purchase of securities.**

**The New 2L Convertible Notes offered hereby have not been approved or disapproved by the U.S. Securities and Exchange Commission or any other state securities commission or any other regulatory or governmental authority, nor have any of the foregoing passed upon the accuracy or adequacy of the information presented, and any representation to the contrary is a criminal offense.**

Eligible Offerees should note the following times relating to the Rights Offering Procedures:

| Date | Calendar Date | Event |
|---|---|---|
| "Election Commencement Date" | August 14, 2025 | The date of commencement of the Rights Offering, on which Eligible Offerees will be served copies of the Rights Offering Procedures and |

5

| Date | Calendar Date | Event |
|------|---------------|-------|
| | | Subscription Form. |
| "Subscription Tender Deadline" | 4:00 p.m. prevailing Central Time on September 11, 2025 | The deadline for Eligible Offerees to exercise Subscription Rights through ATOP. |
| | | *For All Eligible Offerees Participating in the Rights Offering* |
| | | Eligible Offerees must instruct the Nominee holding their Convertible Notes in "street name" through DTC to electronically deliver such Convertible Notes into the Rights Offering event established through ATOP, so that such delivery occurs on or before the Subscription Tender Deadline. |
| "Subscription Payment Deadline" | ~~5:00 p.m. prevailing Central Time on~~**On or about** September 12, 2025 | *For All Eligible Offerees who are not Commitment Parties* |
| | | ~~Each Eligible Offeree who is not a Commitment Party and who elects to participate in the Rights Offering must deliver (or arrange for its affiliate designee, if any, to deliver) a wire transfer of its~~**Payment of the** applicable aggregate Purchase Price ~~no later than~~**with respect to Option A—Standard Subscription will be automatically charged by DTC on** the Subscription Payment Deadline **to the DTC Participant that tendered such Eligible Offeree's Convertible Notes**. **After Subscription Rights are exercised, the underlying Convertible Notes will not be transferable.** |

The Commitment Parties have already been designated and are known to the Debtors (subject to transfers permitted pursuant to Section 1.4 of the Backstop Agreement).

Special Note for Commitment Parties.  Commitment Parties are not required to pay the applicable aggregate Purchase Price for any exercised Subscription Rights on the Subscription Payment Deadline; and instead must provide their payment by the Backstop Funding Date, which is expected to occur after the Subscription Payment Deadline, in accordance with Sections 1.1 and 1.2 of the Backstop Agreement.

**The rights and obligations of the Commitment Parties in the Rights Offering shall be governed by the Backstop Agreement.  To the extent the rights and obligations set forth therein differ from the rights and obligations summarized in these Rights Offering Procedures or any Election Documents, the Backstop Agreement shall control**.

**No interest is payable on any advance funding of the applicable aggregate Purchase Price.  If the Rights Offering is terminated for any reason, the applicable aggregate Purchase Price previously received on account of the Rights Offering by the Subscription Agent will be returned to Eligible Offerees as provided herein.  No interest will be paid on any returned Purchase Price.**

**To participate in the Rights Offering, an Eligible Offeree must complete all of the steps outlined in these Rights Offering Procedures at or prior to the Subscription Tender Deadline and, for any party that is not a Commitment Party, make the applicable payment by the Subscription Payment Deadline.  If an Eligible Offeree does not complete all of the steps outlined herein by the applicable deadlines, such Eligible Offeree shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering; *provided*, that the Commitment Parties (in their capacities as Eligible Offerees) shall not be required to pay their respective applicable aggregate Purchase Price until the Backstop Funding Date in accordance with Sections 1.1 and 1.2 of the Backstop Agreement.**

**SUBJECT TO THE TERMS AND CONDITIONS OF THESE RIGHTS OFFERING PROCEDURES (AND THE BACKSTOP AGREEMENT IN THE CASE OF ANY COMMITMENT PARTY), ALL SUBSCRIPTION ELECTIONS ARE IRREVOCABLE, AFTER THE SUBSCRIPTION TENDER DEADLINE UNLESS THE RIGHTS OFFERING IS TERMINATED.**

1.      Subscription Period

The Rights Offering will commence on the Election Commencement Date and will expire at the Subscription Tender Deadline. Each Eligible Offeree intending to exercise its Subscription Rights must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Election Documents at or prior to the Subscription Tender Deadline and must pay for any exercised Subscription Rights at or prior to the applicable deadline.

Subject to the terms and conditions set forth herein, and except with respect to the Commitment Parties (as otherwise described herein), any exercise of the Subscription Rights after the Subscription Tender Deadline and/or payment after Subscription Payment Deadline will

not be allowed and any purported exercise received by the Subscription Agent after the Subscription Tender Deadline and/or payment after Subscription Payment Deadline will not be honored, regardless of when the documents relating to such exercise were sent.

The Subscription Tender Deadline may be extended by the mutual agreement of the Debtors and the Requisite Commitment Parties (as defined in the Backstop Agreement), or as required by law.

As more fully described below, in order for an Eligible Offeree to exercise its Subscription Rights, any tender into the Rights Offering ATOP event must be received at or prior to the Subscription Tender Deadline and, ~~if it is not a Commitment Party, such Eligible Offeree's~~**with respect to any Option A–Standard Subscription, payment of the** applicable aggregate Purchase Price ~~must be received (by wire transfer of immediately available funds) by~~**will be automatically charged by DTC on** the Subscription Payment Deadline ~~by~~**to the DTC participant, and the aggregate amount shall be wired to** the Subscription Agent **by DTC on the following business day**. The Commitment Parties are not required to pay their applicable aggregate Purchase Price ~~by~~**on** the Subscription Funding Deadline, and instead must make any payment in accordance with the Backstop Agreement.

Each Eligible Offeree may exercise all or any portion of such Eligible Offeree's Subscription Rights, subject to the terms and conditions contained herein.  In order to facilitate the exercise of the Subscription Rights, beginning on the Election Commencement Date, the Subscription Form and these Rights Offering Procedures will be sent to holders of Convertible Notes.

Notwithstanding anything to the contrary in these Rights Offering Procedures, pursuant to the Backstop Agreement, Eligible Offerees that are Commitment Parties must exercise their Subscription Rights in full**, and may select either Option B–Commitment Party or Option C–Commitment Party Designation**.

2.      Exercise of Subscription Rights

An Eligible Offeree ~~(or its affiliate designee, if any)~~ electing to participate in the Rights Offering must:

- instruct the Nominee holding their Convertible Notes in "street name" through DTC to electronically deliver such Convertible Notes into the Rights Offering event established through ATOP, so that such delivery occurs on or before the Subscription Tender Deadline.

- **Eligible Offerees that are not a Commitment Party may only select Option A–Standard Subscription to participate in the Rights Offering, and the applicable Purchase Price will be *automatically* charged by DTC to the DTC participant tendering such Eligible Offeree's Convertible Notes.**

- Eligible Offerees ~~who wish~~**that are a Commitment Party and have a valid Commitment Party Code, may either select Option B–Commitment Party**

8

(with no designation) or, to designate anone or more affiliate to receive their New 2L Convertible Notes must, may (a) select the appropriateOption C–Commitment Party Designation (with designation ATOP option in the Rights Offering event) and (b) provide all required details outlined in the Designation Form attached as Exhibit 1 to the Subscriptionprovided separately to each Commitment Party (the "*Designation* Form;").

- ifIf the Eligible Offeree is not a Commitment Party, coordinate payment of itsthe applicable aggregate Purchase Price will be automatically charged by DTC on the Subscription Payment Deadline to the DTC participant, and on the business day following the Subscription Payment Deadline, DTC will automatically wire the Aggregate Purchase Price relating to any Convertible Notes tendered into Option A–Standard Subscription in accordance with the wire instructions to be provided by the Subscription Funding Deadline by wire transfer ONLY of immediately available funds to the Subscription Agent as indicated in the Election Documents;Agent to DTC.

- if the Eligible Offeree is a Commitment Party, make payment of its applicable aggregate Purchase Price to the account specified in the Funding Notice by the Backstop Funding Date in accordance with Sections 1.1 and 1.2 of the Backstop Agreement, which account shall be an escrow account maintained at a financial institution of national standing reasonably acceptable to the Requisite Commitment Parties (the "*Escrow Account*") pursuant to an escrow agreement and related documentation in form and substance acceptable to the Requisite Commitment Parties.

The Debtors reserve the right to request reasonable additional information and diligence from Eligible Offerees electing to participate in the Rights Offering in their reasonable discretion to ensure that such Eligible Offerees satisfy the foregoing requirements.  Any dispute about whether an Eligible Offeree satisfies such requirements shall be finally resolved by the Bankruptcy Court unless otherwise consensually resolved by such Eligible Offeree and the Debtors prior to such hearing.

ALL COMMITMENT PARTIES MUST MAKE ALL PAYMENTS TO THE ESCROW ACCOUNT SPECIFIED IN THE FUNDING NOTICE IN ACCORDANCE WITH THE BACKSTOP AGREEMENT (OR AS OTHERWISE PERMITTED UNDER SECTIONS 1.1 AND 1.2 OF THE BACKSTOP AGREEMENT).

**DELIVERY OF THE ELIGIBLE OFFEREE'S CONVERTIBLE NOTES VIA THE ATOP RIGHTS OFFERING EVENT IS THE ONLY VALID METHOD OF SUBMISSION AND NO OTHER METHODS WILL BE ACCEPTED.**

*Payment of the Aggregate Purchase Price.*  Other than in the case of Commitment Parties, paymentPayment of the applicable aggregate Purchase Price must be made by wire transfer of immediately available funds to the account ofwith respect to Option A–Standard Subscription will be automatically charged by DTC on the Subscription Agent shown in the Subscription Form, and the funds must be received in the account of the

~~Subscription Agent by the Subscription Funding Deadline.~~**Payment Deadline to the DTC Participant that tendered such Eligible Offeree's Convertible Notes.**

~~In the event that the funds received by the Subscription Agent from any Eligible Offeree (other than a Commitment Party) do not correspond to the applicable aggregate Purchase Price payable from such Eligible Offeree, the submission will be deemed invalid until such irregularities are resolved pursuant to the procedures described in Section 7 hereof.~~

The cash deposited with the Subscription Agent in accordance with these Rights Offering Procedures will be deposited and held by the Subscription Agent in a segregated account. The Subscription Agent may not use such cash for any other purpose and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' chapter 11 estates.

3.     Revocation; Transfers of Subscription Rights

The Subscription Rights corresponding to Allowed Convertible Notes Claims will trade together with, and be evidenced by, the underlying Allowed Convertible Notes Claims until the Subscription Tender Deadline, subject to such limitations, if any, that would be applicable to the transferability of the underlying existing Convertible Notes.

Pursuant to the terms of the Rights Offering Procedures, ~~Eligible Offerees~~**Commitment Parties** are permitted to designate affiliates to receive the New 2L Convertible Notes and Plan consideration, without the need to transfer any Allowed Convertible Notes Claims to such affiliate (including any controlled investment affiliates), subject to compliance with applicable securities law; provided, however, that in order to designate an affiliate, ~~the Eligible Holder~~**a Commitment Party** must (i) arrange for the tender of its existing Convertible Notes into the correct **Option C–Commitment Party Designation** "Designation Option" in ATOP, and (ii) provide the Designation Form, including all attachments thereto, in accordance with the instructions on the Designation Form by the due date specified therein.

Once an Eligible Offeree has properly exercised its Subscription Rights, subject to the terms and conditions contained in the Rights Offering Procedures (and the Backstop Agreement in the case of any Commitment Party), such exercise will be irrevocable after the Subscription Tender Deadline unless the Rights Offering is terminated.

4.     Termination/Return of Payment

Unless the Plan Effective Date has occurred (and other than as set forth in the Backstop Agreement), the Rights Offering (a) will be deemed automatically terminated without any action of any party upon the earliest of (i) the withdrawal of the Plan by the Debtors pursuant to its terms or, subject to the terms of the Restructuring Support Agreement and the Backstop Agreement, the entry of an order by the Court denying confirmation of the Plan, (ii) termination of the Backstop Agreement or the Restructuring Support Agreement in accordance with its terms (other than any automatic termination event arising out of the second sentence of Section 5.01(g) of the Restructuring Support Agreement or Section 6.3(b) of the Backstop Agreement, and other than a termination upon the consummation of the transactions

contemplated thereunder in connection with the occurrence of the Plan Effective Date) and (iii) the Outside Date (as defined in the Backstop Agreement, as may be extended pursuant to the terms thereof), or (b) may be terminated by mutual agreement of the Debtors and the Requisite Commitment Parties. Upon the termination of the Backstop Agreement in accordance with Article VI of the Backstop Agreement, or to the extent the Plan Effective Date does not occur when required pursuant to Section 1.1 of the Backstop Agreement, any payments received by the Debtors pursuant to Funding Notices shall be returned, without interest, to the bank account identified by the applicable Commitment Party as soon as reasonably practicable, subject to the Backstop Agreement. **Any payment made by DTC shall be returned to the applicable DTC Participant that was charged the Aggregate Purchase Price by DTC, and the Subscription Agent shall request wire instructions from each such DTC Participant.**

5.      Minimum Denominations; No Bulk Tenders

Tenders of Convertible Notes may only be made in minimum denominations of $1,000 and incremental denominations of $1,000 thereafter.   Nominees must submit instructions separately on account of each Eligible Offeree.  "Bulk tenders" into ATOP will not be permitted.

The total Rights on account of the New 2L Convertible Notes will be calculated and rounded down to the nearest $1,000.  No compensation shall be paid, whether in cash or otherwise, in respect of any rounded amounts.  The New 2L Convertible Notes are expected to be issued in minimum denominations of $1,000 and in increments of $1,000 in excess thereof.

6.      Validity of Exercise of Subscription Rights

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors in consultation with the Requisite Commitment Parties and, if necessary, subject to a final and binding determination by the Bankruptcy Court.  Subject to the foregoing, the Debtors may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights, in consultation with the Requisite Commitment Parties.  Subscriptions will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith, in consultation with the Requisite Commitment Parties.  In addition, the Subscription Agent shall have no obligation to notify parties of or cure any defects to the forms returned in exercising the Subscription Rights.

**As noted above, before exercising any Subscription Rights, Eligible Offerees should carefully read the Disclosure Statement and the Plan in their entirety for information relating to the Debtors and the risk factors to be considered in deciding whether to participate in the Rights Offering**.

All calculations, including, to the extent applicable, the calculation of (a) the value of any Eligible Offeree's Allowed Convertible Notes Claim for the purposes of the Rights Offering and (b) any Eligible Offeree's New 2L Convertible Notes shall be made in good faith by the Debtors and in accordance with any claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

7. Modification of Procedures

The Debtors reserve the right to modify the Rights Offering Procedures, or adopt additional procedures consistent with the Rights Offering Procedures, to effectuate the Rights Offering and to issue the New 2L Convertible Notes, as applicable, with the consent of the Requisite Commitment Parties; *provided*, *however*, that the Debtors shall provide prompt written notice (the "***Modification Notice***") to the Eligible Offerees of any material modification to the Rights Offering Procedures made after the Election Commencement Date by: (i) posting the Modification Notice on the Subscription Agent's website at https://dm.epiq11.com/Wolfspeed; (ii) filing a copy of the Modification Notice on the docket of the Debtors' Chapter 11 Cases; and (iii) providing a copy of the Modification Notice to counsel to the Ad Hoc 26s/28s/29s Noteholder Group, with email notice being sufficient. In so doing, and subject to the foregoing consent rights of the Requisite Commitment Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith is necessary and appropriate to effectuate and implement the Rights Offering and the issuance of the New 2L Convertible Notes.

The Debtors reserve the right to request reasonable additional documentation and diligence from any participant in the Rights Offering to confirm that such participant is an Eligible Offeree ~~(or such Eligible Offerees' affiliate designee)~~.

8. Inquiries and Transmittal of Documents; Subscription Agent

Questions relating to the Rights Offering should be directed to the Subscription Agent via email to Registration@epiqglobal.com (please reference "Wolfspeed" in the subject line). Please note that the Subscription Agent is only able to respond to procedural questions regarding the Rights Offering, and cannot provide any information beyond that included in these Rights Offering Procedures and the Election Documents.

9. Failure to Exercise Subscription Rights

Unexercised Subscription Rights will be cancelled and forever and irrevocably relinquished at the Subscription Tender Deadline. If the Subscription Agent for any reason does not receive from an Eligible Offeree (i) the submission of the existing Convertible Notes by the Subscription Tender Deadline and (ii) payment of the subscription price by the Subscription Payment Deadline (other than in the case of a Commitment Party, whose payment of the subscription price shall be made in accordance with the Backstop Agreement), in each case in accordance with these Rights Offering Procedures, such Eligible Offeree shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering, unless otherwise approved by the Requisite Commitment Parties and the Debtors.

Subject to the terms and conditions set forth herein and in the Backstop Agreement, any attempt to exercise Subscription Rights after the Subscription Tender Deadline shall be null and void and the Debtors shall not be obligated to honor any such purported exercise received by the Subscription Agent after the Subscription Tender Deadline.

10. Backstop Agreement

In the event of any conflict between these Rights Offering Procedures and the terms of the Backstop Agreement, the terms of the Backstop Agreement will control.

**WOLFSPEED, INC.**

**INSTRUCTIONS FOR SUBMITTING A RIGHTS OFFERING ELECTION**

Capitalized terms used and not defined herein shall have the meaning assigned to them in the Rights Offering Procedures.

1.      The Subscription Form contains participation and election options with respect to the Subscription Rights.

2.      Eligible Offerees must instruct their Nominee holding their Convertible Notes in "street name" through DTC to electronically deliver such Convertible Notes into the applicable option in the Rights Offering event established through DTC's ATOP, so that such delivery occurs on or before the Subscription Tender Deadline, **September 11, 2025 at 4:00 p.m. prevailing Central Time**.

3.      No Subscription Election will be accepted after the Subscription Tender Deadline. No Subscription Election may be withdrawn or modified after the Subscription Tender Deadline.

4.      Delivery of a Subscription Election will be deemed to have occurred only when the Subscription Agent actually receives ~~(i)~~ the submission of the underlying Convertible Notes into the Rights Offering ATOP event in accordance with these Rights Offering Procedures~~, and (ii) payment of the purchase price by the applicable deadline~~.

5.      You should not rely on any information, representations, or inducements made to obtain a participation in Rights Offering that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

**IF YOU HAVE ANY QUESTIONS REGARDING THE SUBSCRIPTION FORM, THESE INSTRUCTIONS, OR THE RIGHTS OFFERING PROCEDURES, PLEASE CONTACT THE SUBSCRIPTION AGENT VIA EMAIL TO REGISTRATION@EPIQGLOBAL.COM (PLEASE REFERENCE "WOLFSPEED" IN THE SUBJECT LINE).**

**Subscription Form**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------- x
                                :

In re:                                :      Chapter 11
                                  :

WOLFSPEED, INC., *et al.*,                   :      Case No.  25-90163 (CML)
                                  :

          Debtors.[1]                   :      (Jointly Administered)
                                  :
---------------------------------------------------------- x

**RIGHTS OFFERING SUBSCRIPTION FORM
FOR USE BY ELIGIBLE OFFEREES OF
ALLOWED CONVERTIBLE NOTES CLAIM
IN CONNECTION WITH THE DEBTORS' PLAN**

---

> **The "Subscription Tender Deadline" is 4:00 p.m. prevailing Central Time on September 11, 2025.**
>
> **The "Subscription Payment Deadline" is 5:00 p.m. prevailing Central Time on September 12, 2025, except for Commitment Parties who must fund in accordance with the Backstop Agreement.**
>
> **ALL ELIGIBLE OFFEREES[2] ELECTING TO PARTICIPATE IN THE RIGHTS OFFERING MUST INSTRUCT THE BANK, BROKER, OR OTHER FINANCIAL INSTITUTION (EACH A "*NOMINEE*") HOLDING THEIR CONVERTIBLE NOTES TO ELECTRONICALLY DELIVER SUCH CONVERTIBLE NOTES INTO THE APPLICABLE RIGHTS OFFERING EVENT OPTION ESTABLISHED THROUGH THE AUTOMATED TENDER OFFER PROGRAM ("*ATOP*") OF THE DEPOSITORY TRUST COMPANY ("*DTC*") , SO THAT SUCH DELIVERY OCCURS ON OR BEFORE THE SUBSCRIPTION TENDER DEADLINE.**

**To exercise the Subscription Rights with respect to its Allowed Convertible Notes Claims,**

---

[1] The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are:  Wolfspeed, Inc.  (2719) and Wolfspeed Texas LLC (0339).  The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Rights Offering Procedures for Convertible Notes Claims (Class 4) (the "***Rights Offering Procedures***"), and if not defined in the Rights Offering Procedures, shall have the meanings ascribed to such terms in the Plan (as defined in the Rights Offering Procedures), the Disclosure Statement (as defined in the Rights Offering Procedures) or the Backstop Agreement (as defined in the Plan), as applicable.

each Eligible Offeree of an Allowed Convertible Notes Claims must cause the Nominee holding their Convertible Notes to electronically deliver such Convertible Notes into the Rights Offering event option established on ATOP on or before the Subscription Tender Deadline.

If you wish to participate in the Rights Offering, you must relay your instructions to your Nominee(s).  If you wish to participate in the Rights Offering, please complete this Subscription Form in order to determine the principal amount of New 2L Convertible Notes you are entitled to purchase and the Aggregate Purchase Price therefor.  Please return this Subscription Form to your Nominee or otherwise follow your Nominee's instructions with respect to relaying the necessary instructions to permit your Nominee(s) to tender your Convertible Notes prior to the Subscription Tender Deadline, and follow all other directions in this Subscription Form by the relevant deadlines.

The election options are outlined in Item 4 below.  ~~Any Eligible Offeree who wishes to designate an affiliate(s) to receive their New 2L Convertible Notes and other Plan consideration must (i) elect the designation option via ATOP and (ii) provide the requested details on behalf of each such designee in accordance with Designation Form, which is attached as Exhibit 1 to this Subscription Form.~~

**Payment of Rights Offering Purchase Price**:  ~~Eligible Offerees who are electing to participate in the Rights Offering and are not Commitment Parties must coordinate payment of the~~**Payment of the applicable** aggregate Purchase Price ~~for receipt in accordance with Item 6 herein by~~**with respect to Option A–Standard Subscription will be automatically charged by DTC on** the Subscription ~~Funding Deadline, which is 5:00 p.m. prevailing Central Time, one business day following the Subscription Tender Deadline~~**Payment Deadline to the DTC Participant that tendered such Eligible Offeree's Convertible Notes**. (Commitment Parties **in Option B–Commitment Party and Option C–Commitment Party Designation** must deliver funding at a later date, in accordance with the Backstop Agreement.)

The Subscription Rights corresponding to the Allowed Convertible Notes Claims will trade together with, and be evidenced by, the underlying Allowed Convertible Notes Claims, until the Subscription Tender Deadline, subject to such limitations, if any, that would be applicable to the transferability of the underlying Allowed Convertible Notes Claims and compliance with applicable securities law.

Please consult the Plan, the Disclosure Statement and the Rights Offering Procedures for additional information with respect to this Subscription Form.

If you have any questions, please contact the Subscription Agent by emailing Registration@epiqglobal.com (please reference "Wolfspeed" in the subject line).

SUBJECT TO THE TERMS AND CONDITIONS OF THE RIGHTS OFFERING PROCEDURES (AND THE BACKSTOP AGREEMENT IN THE CASE OF ANY COMMITMENT PARTY), ALL ELECTION INSTRUCTIONS ARE IRREVOCABLE AFTER THE RIGHTS OFFERING DEADLINE.

**Item 1. Amount of Convertible Notes Held.**

The undersigned, or the beneficial owner on whose behalf the undersigned is executing this form, is a beneficial owner of Convertible Notes in the following aggregate principal amount(s) or that the person executing this form is an authorized signatory of that beneficial Holder. (If you do not know the principal amount, please contact your Nominee immediately).

**IMPORTANT NOTE: IF YOU HOLD YOUR NOTES THROUGH MORE THAN ONE NOMINEE, YOU <u>MUST</u> PROVIDE SEPARATE INSTRUCTIONS TO EACH APPLICABLE NOMINEE.  YOU MAY NOT AGGREGATE POSITIONS HELD BY DIFFERENT NOMINEES.  PROVIDE YOUR INSTRUCTIONS TO YOUR NOMINEE AS REQUIRED BY THE NOMINEE.**

*Aggregate principal amount of 2026 Convertible Notes:*

$_____

*Aggregate principal amount of 2028 Convertible Notes:*

$_____

*Aggregate principal amount of 2029 Convertible Notes:*

$_____

**Item 2. Subscription Rights.  *Calculation of New 2L Convertible Notes and Aggregate Purchase Price*.  Only instruct your Nominee to tender the Principal Amount of Convertible Notes that you wish to exercise; *provided, however*, that Commitment Parties are required by the terms of the Backstop Agreement to tender all of their Convertible Notes into the ATOP event.**

*[Remainder of page intentionally left blank]*

| Principal Amount of Convertible Notes to be Tendered into the Rights Offering; you must select an option in Item 4 below. | | Factor | | Calculation of New 2L Convertible Notes |
|---|---|---|---|---|
| (Insert Principal Amount of 2026 Convertible Notes CUSIP 225447AD3 Tendered) | X | ~~0.XXXXXXXX0~~ **.05851812** | = | (New 2L Convertible Notes Subscribed) (*Round DOWN to nearest whole number*) |
| (Insert Principal Amount of 2028 Convertible Notes CUSIP 977852AB8 Tendered) | X | ~~0.XXXXXXXX0~~ **.05840183** | = | (New 2L Convertible Notes Subscribed) (*Round DOWN to nearest whole number*) |
| (Insert Principal Amount of 2029 Convertible Notes CUSIP 977852AD4 Tendered) | X | ~~0.XXXXXXXX0~~ **.05898612** | = | (New 2L Convertible Notes Subscribed) (*Round DOWN to nearest whole number*) |
| | | ~~Total~~**TOTAL** New 2L Convertible Notes **Subscribed**: | = | (TOTAL New 2L Convertible Notes Subscribed~~, rounded down~~ **above) (*Round DOWN** to nearest **$1,000***). |
| | | Aggregate Purchase Price: | = | (Aggregate Purchase Price of 91.3242%, reflecting the total principal amount of New 2L Convertible Notes subscribed, as shown immediately above, multiplied by 0.913242, rounded down to the nearest penny) |

**IMPORTANT NOTE:   For the avoidance of doubt, the principal amount of Rights Offering New 2L Convertible Notes will be based solely upon the Principal Amount of the Convertible Notes tendered through ATOP, and _not_ on the amounts shown in Item 2.**

B-4

**Item 3. Payment of the Purchase Price**.

~~Eligible Offerees who are electing to participate in the Rights Offering and are not Commitment Parties must coordinate payment of the~~The Aggregate Purchase Price **is** shown in the final row of Item 2 ~~for receipt in accordance with Item 6 herein by the Subscription Payment Deadline. (~~.

**Payment of the applicable aggregate Purchase Price with respect to Option A–Standard Subscription will be automatically charged by DTC on the Subscription Payment Deadline to the DTC Participant that tendered such Eligible Offeree's Convertible Notes.**

Commitment Parties **in Option B–Commitment Party and Option C–Commitment Party Designation** must deliver funding **at a later date,** in accordance with the Backstop Agreement.~~)~~

~~Each Eligible Offeree that is not a Commitment Party must calculate the aggregate Purchase Price, in connection with any Rights Offering election and arrange for payment as detailed in Item 6.~~

~~PLEASE NOTE: NO EXERCISE OF SUBSCRIPTION RIGHTS BY AN ELIGIBLE OFFEREE THAT IS NOT A COMMITMENT PARTY WILL BE VALID UNLESS THE AGGREGATE PURCHASE PRICE IS PAID BY THE SUBSCRIPTION PAYMENT DEADLINE. ELIGIBLE OFFEREES THAT ARE COMMITMENT PARTIES MUST DELIVER THE APPROPRIATE FUNDING AT A LATER DATE, IN ACCORDANCE WITH THE BACKSTOP AGREEMENT.~~

**Item 4.  Selection of Rights Offering Option**

*If you instruct your Nominee to tender your Convertible Notes into the Rights Offering ATOP event but no specific selection is made, you will be deemed to have selected Option ~~1~~A–Standard Subscription.  Option A–Standard Subscription is the only option available to Eligible Offerees that are not Commitment Parties.*

☐  **Option ~~1.~~A–Standard Subscription. *Only Option for Eligible Offerees that are not Commitment Parties*:** Participate in the Rights Offering ~~*with NO DESIGNATION of Plan consideration and Rights Offering New 2L Convertible Notes*~~.  To make this election, arrange for the tender of the applicable Convertible Notes by the Subscription Tender Deadline into Option ~~1~~A–Standard Subscription of the ATOP event, ~~pay in accordance with the payment instructions~~**thereby acknowledging that the payment of the applicable aggregate Purchase Price will be automatically charged by DTC on the Subscription Payment Deadline to the DTC participant tendering Convertible Notes on your behalf**, and receive all Plan consideration and Rights Offering entitlements through the ATOP event, to the extent such securities are eligible on the DTC platform.  Payment by Eligible Offerees who are not Commitment Parties must be made by the Subscription Payment Deadline.

☐  **Option B–Commitment Party. *One of Two Options for Commitment Parties*:  Participate**

B-5

*in the Rights Offering with NO DESIGNATION of Plan consideration and Rights Offering New 2L Convertible Notes.* **To make this election, arrange for the tender of the applicable Convertible Notes by the Subscription Tender Deadline into Option B–Commitment Party of the ATOP event, and receive all Plan consideration and Rights Offering entitlements through the ATOP event, to the extent such securities are eligible on the DTC platform.**

☐ Option ~~2.~~ *~~Available only to institutional investors and not individuals~~***C–Commitment Party Designation.** *Second of Two Options for Commitment Parties.* **Participate in the Rights Offering and DESIGNATE some or all of your Plan consideration and Rights Offering New 2L Notes to an affiliate(s)**.  To make this election, arrange for the tender notes of the applicable Convertible Notes by the Subscription Tender Deadline into ~~Option 2~~**C–Commitment Party Designation** of the ATOP event~~, pay in accordance with the payment instructions,~~ and receive Plan consideration and Rights Offering entitlements through a private arrangement to be agreed with the applicable ~~Eligible Offeree~~**Commitment Party**, which will permit such ~~Eligible Offeree~~**Commitment Party** to designate all or a portion of its Plan consideration and Rights Offering entitlements to affiliate(s), in accordance with the Designation Form ~~attached as Exhibit 1 hereto~~**provided separately to each Commitment Party** (the "***Designation Form***") – with all such Plan consideration and Rights Offering New 2L Convertible Notes to be distributed via Deposit or Withdrawal at Custodian ("***DWAC***") deposit, to the extent such securities are eligible on the DTC platform, and not through the ATOP event.  ~~Payment by Eligible Offerees who are not Commitment Parties must be made by the Subscription Payment Deadline and payment by the Commitment Parties must be made in accordance with the Backstop Agreement.~~  The tendering ~~Eligible Offeree~~**Commitment Party** must also arrange for (i) the Designation Form in accordance with the directions in the Designation Form ~~(attached hereto as Exhibit 1)~~**provided separately to each Commitment Party**, and (ii) the Designation Spreadsheet (as described in the Designation Form) to be provided to the Subscription Agent in accordance with the return instructions therein.  This is a "Deliver-Only" option and no entitlements will be distributed through the ATOP event.

**Item 5.  Commitment Parties.**

☐  Check this box if you are a "Commitment Party" and insert your Commitment Party Code below or otherwise convey it to your Nominee.   **This is REQUIRED for Option B–Commitment Party or Option C–Commitment Party Designation.**

┌─────────────────────────────────────────────┐
│ Insert Commitment Party Code:                │
│                                              │
└─────────────────────────────────────────────┘

***If you do not have a Commitment Party Code, you are not a Commitment Party and may only select Option A–Standard Subscription to the extent you wish to exercise your Rights***.

**(THE DEFINITION OF "COMMITMENT PARTY" IS SET FORTH IN THE BACKSTOP COMMITMENT AGREEMENT, DATED AS OF JUNE 22, 2025, AMONG**

**WOLFSPEED, INC., WOLFSPEED TEXAS LLC AND THE COMMITMENT PARTIES.)**

If you are a Commitment Party, you must deliver your Aggregate Purchase Price in accordance with the terms of the Backstop Agreement and can disregard Item 6 below.

**Item 6.   Payment and Delivery Instructions – for all Participating Holders that are not Commitment Parties.**

*Payment of the Aggregate Purchase Price calculated pursuant to Item 2 above* shall be made by wire transfer ONLY of immediately available funds.  Eligible Offerees who are not Commitment Parties must deliver full payment of the applicable aggregate Purchase Price so as to be received by the Subscription Agent by the Subscription Payment Deadline or the subscription represented by such Eligible Offeree's tender into the ATOP event will not be recognized, and the associated Subscription Rights will be deemed forever relinquished and waived.   Any Eligible Offeree that is submitting payment via its Nominee(s) must coordinate such payment with its Nominee(s) in sufficient time to ensure such payment is provided to the Subscription Agent by the Subscription Payment Deadline.

Upon tendering its Convertible Notes, each Eligible Offeree who is not a Commitment Party will receive its Plan consideration and Rights Offering entitlements in accordance with the election option selected by such Eligible Offeree.

Each Eligible Offeree who participates in the Rights Offering by tendering its Convertible Notes into the "Option 2" ATOP election (as described in the Rights Offering Procedures) and makes the required payment by the applicable deadline, shall receive its Plan consideration and Rights Offering Shares on account of such tender as outlined in the Designation Form attached as Exhibit 1 hereto.  Each Eligible Offeree tendering into the "Option 2" ATOP election must provide the Designation Form in accordance with the directions contained in the Designation Form.

Please note that the below instructions pertain to all Eligible Offerees who are NOT Commitment Parties.   (Commitment Parties will receive separate funding instructions at the appropriate time.)

*Wire Instructions:*

| Bank Name: | Citizens Bank, NA |
|---|---|
| Bank Address: | 1 Citizens Drive, Riverside, RI 02915 |
| ABA/Routing No.: | 036076150 |
| SWIFT (for international wires): | CTZIUS33 |
| Account Name: | Epiq Corporate Restructuring LLC as Subscription Agt for Wolfspeed |

| ~~Account No.:~~ | ~~[Account Number]~~ |
| --- | --- |
| ~~Reference:~~ | ~~Insert VOI Number of ATOP Tender (or Euroclear or Clearstream reference number, if applicable) in memo field OR a Nominee acting on behalf of multiple parties may provide a spreadsheet to the Subscription Agent~~ |

*Payment of the Aggregate Purchase Price calculated pursuant to Item 2 above* **will be automatically charged by DTC on the Subscription Payment Deadline to the DTC participant tendering Convertible Note.**

~~**Item 7.  Wire information in the event a refund is needed; ONLY if the holder is providing the wire in lieu of the Nominee:**[1]~~

| ~~Account Name:~~ | |
| --- | --- |
| ~~Bank Account No.:~~ | |
| ~~ABA/Routing No.:~~ | |
| ~~Bank Name:~~ | |
| ~~Bank Address:~~ | |
| ~~Reference:~~ | |

**Item 8. Certification and Signature.**

The undersigned hereby certifies that (a) the undersigned was the beneficial holder of an Allowed Convertible Notes Claim above as of the date hereof, or the authorized signatory (the "*Authorized Signatory*") of such beneficial holder acting on behalf of such Holder, (b) the Eligible Offeree has reviewed a copy of the Plan, the Disclosure Statement and the Rights Offering Procedures, (c) the Eligible Offeree understands that the exercise of any Subscription Rights is subject to all of the terms and conditions set forth in the Plan, the Rights Offering Procedures, and, if applicable, the Backstop Agreement and (d) if the Designation Option has been selected, all details with respect to any affiliated designees has been provided in accordance with the Designation Form and all such information is true and accurate.

**The Eligible Offeree (or the Authorized Signatory on behalf of such Eligible Offeree) acknowledges that (i) the Eligible Offeree has made all of the elections set forth in the Election Spreadsheet, (ii) if Option ~~2~~C–Commitment Party Designation has been selected, the Eligible Offeree will provide the Designation Form in accordance with the instructions in the Designation Form, and (iii) the Eligible Offeree will be bound to pay the aggregate**

---

[1] ~~If payment of the Aggregate Purchase Price will be made by your Nominee on your behalf, the wire information in this Item 7 should be your Nominee's information, and any refund will be issued to your Nominee.~~

**Purchase Price to which it has subscribed and that it may be liable to the Debtors to the extent of any nonpayment.**

Date:_____

Name of Eligible Offeree:_____

Signature:_____

Name of Signatory: _____

Title:_____

Telephone Number: _____

Email:_____

> **The Subscription Tender Deadline is 4:00 p.m. prevailing Central Time on September 11, 2025.**

## Exhibit 1 to Subscription Form

### ~~DESIGNATION FORM TO ACCOMPANY DESIGNATION SPREADSHEET~~

~~One Designation Form may be used by a fund manager or similar entity to cover the Designations of multiple affiliated holders of Convertible Notes that are managed by or affiliated with such entity.  The Designation Spreadsheet is available from the Subscription Agent's website at https://dm.epiq11.com/Wolfspeed~~

~~1. Certification by the Institutional Investor.~~

~~The undersigned certifies that the information set forth below and in the accompanying Designation Spreadsheet is correct to the best of the undersigned's information and belief.~~

| | |
|---|---|
| ~~Name of Eligible Offeree(s) that selected Option 2:~~ | |
| ~~Name of contact person at the Eligible Offeree(s):~~ | |
| ~~Contact person's telephone number:~~ | |
| ~~Contact person's email address:~~ | |
| ~~Date:~~ | |
| ~~Signature:~~ | |
| ~~Name of Signatory:~~ | |
| ~~Title of Signatory:~~ | |

~~2. Return of the Designation Form and Designation Spreadsheet:~~

~~Deadline: 5:00 p.m. prevailing Central time on September 12, 2025, which is one business day following the Subscription Tender Deadline.~~

~~Return Instructions:~~

~~The completed Designation Form and Designation Spreadsheet must be returned to the Subscription Agent via email to Registration@epiqglobal.com (with reference to "Wolfspeed Rights Offering Designation" in the subject line) by the deadline shown above.~~

~~Exhibit 2~~

**INSTRUCTIONS TO THE NOMINEE/DTC PARTICIPANT REGARDING OPTION B–COMMITMENT PARTY AND OPTION C–COMMITMENT PARTY DESIGNATION FOR COMMITMENT PARTIES ONLY**

The Nominee Spreadsheet is available from the Subscription Agent by emailing Registration@epiqglobal.com (with reference to "Wolfspeed Nominee Spreadsheet" in the subject line).

The Nominee Spreadsheet is applicable ~~to *both*~~*only* to instructions in Option ~~1~~B–Commitment Party and Option ~~2~~C–Commitment Party Designation and sets forth the required information to be provided for those options, including (i) VOI Number; and (ii) ~~*either* (a) the Aggregate Purchase Price for any Eligible Offerees who are not Commitment Parties, *or* (b)~~ the Commitment Party Code~~, for any Commitment Parties~~.

**RETURN OF THE NOMINEE SPREADSHEET~~:~~ FOR ALL INSTRUCTIONS INTO OPTION B–COMMITMENT PARTY AND OPTION C–COMMITMENT PARTY DESIGNATION.**

Deadline:  5:00 p.m. prevailing Central Time on September 12, 2025, which is one business day following the Subscription Tender Deadline.

Return Instructions:
The completed Nominee Spreadsheet should be transmitted to the Subscription Agent via email to Registration@epiqglobal.com (with reference to "Wolfspeed Nominee Spreadsheet" in the subject line) by the deadline shown above.