IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| WOLFSPEED, INC., *et al.*, | : | Case No. 25-90163 (CML) |
| Debtors.[1] | : | (Jointly Administered) |

## MOTION OF DEBTORS FOR ORDER (A) AUTHORIZING THE DEBTORS' ENTRY INTO THE BACKSTOP AGREEMENT AND PERFORMANCE OF RELATED OBLIGATIONS; AND (B) GRANTING RELATED RELIEF

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Wolfspeed, Inc. and its debtor affiliate in the above-captioned Chapter 11 Cases (as defined herein), as debtors and debtors in possession (collectively, the "***Debtors***"), respectfully state as follows in support of this motion (this "***Motion***"). In support hereof, the Debtors rely on the *Declaration of Alex Tracy in Support of Motion of Debtors for Order (A) Authorizing the Debtors' (I) Entry into the Backstop Agreement and (II) Performance of Related Obligations; and (B) Granting Related Relief* (the "***Tracy Declaration***") filed concurrently herewith and further represent as follows:

---

[1]  The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: Wolfspeed, Inc. (2719) and Wolfspeed Texas LLC (0339).  The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

US-DOCS\161733600.1

**RELIEF REQUESTED**

1. By this Motion, the Debtors seek entry of an order (which may be included as part of the Confirmation Order) containing the relief attached hereto as **Exhibit A** (a) authorizing the Debtors' entry into the Backstop Agreement (as defined below) and their performance of related obligations under the Backstop Agreement, including payment of the Backstop Premium (as defined below), the Expense Reimbursement (as defined below), and performance and compliance with the Indemnification Obligations (as defined below); and (b) granting related relief.

**JURISDICTION AND VENUE**

2. The United States Bankruptcy Court for the Southern District of Texas (the "*Court*") has jurisdiction to consider this Motion under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

3. The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 503(b) and 507(a) of title 11 of the United States Code (the "*Bankruptcy Code*"), rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), rule 2002-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "*Bankruptcy Local Rules*"), and the Procedures for Complex Cases in the Southern District of Texas.

**BACKGROUND**

4. On June 30, 2025 (the "*Petition Date*"), the Debtors each commenced with the Court a voluntary case (the "*Chapter 11 Cases*") under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

5. The Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules.

6. The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Daniel Hugo in Support of Chapter 11 Petitions and First Day Relief* [Docket No. 5] (the "***First Day Declaration***"), filed on the Petition Date and incorporated herein by reference.[2]

7. The Debtors, together with their non-debtor affiliates (collectively, the "***Company***"), are a leading producer of wide bandgap semiconductors, silicon carbide ("***SiC***") materials, and gallium nitride ("***GaN***") materials. The Company's products are used in a broad range of applications, including electric vehicles, motor drives, power supplies, military communications, radar, satellite, and telecommunications. Established in 1987, the Company's headquarters are located in Durham, North Carolina and the majority of the Company's products are manufactured at the Company's production facilities in North Carolina, New York, and Arkansas.

8. On June 22, 2025, the Debtors entered into that certain Restructuring Support Agreement (as may be amended from time to time and including all exhibits thereto, the "***Restructuring Support Agreement***") with (i) an ad hoc group of secured noteholders (the "***Ad Hoc Senior Secured Noteholder Group***") that collectively hold, own, or control more than 97% of the aggregate outstanding principal amount of the Senior Secured Notes, (ii) an ad hoc group of unsecured noteholders (the "***Ad Hoc 26s/28s/29s Noteholder Group***") that collectively hold, own,

---

[2] Capitalized terms used but not otherwise defined herein have the meaning assigned to them in the First Day Declaration.

3

or control more than 67% of the aggregate outstanding principal amount of the Convertible Notes, and (iii) Renesas Electronics America Inc. ("**Renesas**" and, together with the Ad Hoc Senior Secured Noteholder Group and the Ad Hoc 26s/28s/29s Noteholder Group, the "**Consenting Creditors**") which holds, owns, or controls 100% of the outstanding principal amount of loans under the Customer Refundable Deposit Agreement. Under the Restructuring Support Agreement, each of the Consenting Creditors has agreed to support the Company's restructuring pursuant to the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate* [Docket No. 8] (as may be modified, amended, or supplemented and including all exhibits, schedules, or supplements thereto, the "**Plan**") filed on the Petition Date.

## RIGHTS OFFERING

9. The Plan contemplates, among other things, a rights offering (the "**Rights Offering**") whereby all holders of existing Convertible Notes Claims shall be eligible to participate to subscribe for their Pro Rata Share of up to $301.125 million (the "**New 2L Convertible Notes Rights Offering Amount**") of New 2L Convertible Notes, at a purchase price of 91.3242% of the principal amount thereof (the "**New 2L Convertible Notes Rights**"); *provided, however*, (i) 20.0% of the New 2L Convertible Notes to be issued by Wolfspeed pursuant to the Rights Offering shall be reserved exclusively for the Initial Backstop Parties (the "**Initial Backstop Parties' Premium**"), and (ii) 20.0% of the New 2L Convertible Notes to be issued by Wolfspeed pursuant to the Rights Offering shall be reserved exclusively for the Backstop Parties (including, for the avoidance of doubt, the Initial Backstop Parties) (the "**Backstop Holdback Allocation**"). The Rights Offering, including the Backstop Premium, shall benefit to the fullest extent permitted by law from the exemption from registration provided by section 1145 of the Bankruptcy Code, except with respect to the portion thereof constituting the Initial Backstop Parties' Premium, the Backstop Holdback

Allocation, and any New 2L Convertible Notes issued to the Commitment Parties (as defined in the Backstop Agreement) on account of their Rights Offering Backstop Commitment (as defined below), and except with respect to any recipient thereof that is an "underwriter" under section 1145(b) of the Bankruptcy Code, which securities are not eligible for section 1145 treatment and shall be offered pursuant to Section 4(a)(2) of the Securities Act or another applicable exemption. The basic New 2L Convertible Notes Rights allocable to holders of Convertible Notes Claims are expected to be exempt from registration pursuant to section 1145 of the Bankruptcy Code.

10. On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Order (I) Approving Rights Offering Procedures and Related Forms, (II) Authorizing Debtors to Conduct Rights Offering in Connection with Debtors' Plan of Reorganization, and (III) Granting Related Relief* [Docket No. 10] (the "**Rights Offering Motion**"). On July 1, 2025, the Court entered an order approving the Rights Offering in connection with the Rights Offering Motion [Docket No. 63].

11. To ensure the funding anticipated through the Rights Offering, the Debtors entered into that certain *Rights Offering Backstop Commitment Agreement*, dated as of June 22, 2025, attached hereto as **Exhibit B** (the "**Backstop Agreement**") with the Commitment Parties. Pursuant to the Backstop Agreement, the Commitment Parties have committed, subject to the terms and conditions thereof, to fully backstop the Rights Offering.

12. The funds generated from the Rights Offering are critical to the successful implementation of the Plan and ensure the Reorganized Debtors can satisfy their obligations thereunder. Specifically, the proceeds thereof are intended to fund the Effective Date Cash Payment[3] to the Senior Secured Noteholders. Accordingly, such funds will allow the Debtors to

---

[3] "***Effective Date Cash Payment***" means approximately $275,361,979, which is the amount of cash necessary to effectuate the redemption of $250,000,000 in principal amount of outstanding Senior Secured Notes at a

consummate the restructuring transactions and emerge with adequate capital to operate the reorganized businesses and position the Reorganized Debtors for growth and success. The commitments made by the Commitment Parties provide assurances that the Rights Offering will deliver funds necessary and sufficient to accomplish these goals.

## BACKSTOP AGREEMENT

13. Pursuant to the terms of the Backstop Agreement, the Commitment Parties have collectively committed, subject to the terms and conditions thereof, to fully backstop the Rights Offering (the "***Rights Offering Backstop Commitment***"). The Rights Offering Backstop Commitment is a several liability (as opposed to a joint and several liability) and is subject to the satisfaction of all conditions under the Backstop Agreement. In exchange for the Rights Offering Backstop Commitment, the Debtors have agreed to compensate these parties with a non-refundable premium equal to $30.25 million (the "***Backstop Premium***"), which premium shall be payable on the Plan Effective Date in the form of New 2L Convertible Notes, to be issued at par, free and clear of all Liens (other than under the New Organizational Documents or applicable securities Laws); *provided*, *that*, if the Backstop Agreement is terminated prior to the Effective Date for any reason other than breach by the Commitment Parties, then the Backstop Premium shall be payable in cash to the Commitment Parties by the earlier of (x) the Outside Date[4] and (y) the effective date of an Alternative Transaction.[5]

---

redemption price of 109.875% of the principal amount thereof inclusive of accrued and unpaid interest thereon and based on an assumed Effective Date of September 30, 2025.

[4] As defined in the Backstop Agreement, "***Outside Date***" means four (4) months after the Petition Date; *provided*, solely to obtain some or all Regulatory Approvals, the Debtors, in their sole discretion, may extend the Outside Date by thirty (30) days; *provided*, *further*, that the Outside Date may be extended by up to sixty (60) days with the consent of the Requisite Commitment Parties and each of the Company Parties, and any subsequent extension shall require the consent of each Commitment Party and each Company Party.

[5] As defined in the Backstop Agreement, "***Alternative Transaction***" means any dissolution, winding up, liquidation, receivership, assignment for the benefit of creditors, restructuring, reorganization, workout, exchange, extension, sale of all or any material portion of assets, disposition, merger, amalgamation, acquisition,

14. Other than as set forth in paragraph 13, the Backstop Premium will be earned upon the Court's entry of the Confirmation Order and is payable on the Effective Date.

15. In addition, the Debtors have agreed to indemnify the Commitment Parties against certain losses, on the terms and conditions set forth in the Backstop Agreement (the "*Indemnification Obligations*"). The Debtors have also agreed to reimburse each Commitment Party for all reasonable and documented fees and expenses of their advisors, including, for the avoidance of doubt, all Restructuring Expenses (as defined in the Restructuring Support Agreement) (the "*Expense Reimbursement*" and collectively with the Indemnification Obligations and Backstop Premium, the "*Backstop Agreement Obligations*").

16. The Backstop Agreement Obligations are integral components of the Backstop Agreement, the Restructuring Support Agreement, and the Debtors' restructuring efforts at large. In the absence of providing the Commitment Parties with the Backstop Agreement Obligations, such parties would not have entered into the Backstop Agreement or the Restructuring Support Agreement.

## BASIS FOR RELIEF

17. The Court should approve the Debtors' entry into the Backstop Agreement. Entry into the Backstop Agreement is permitted under section 363(b)(1) of the Bankruptcy Code which allows a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the

---

consolidation, partnership, plan of arrangement, plan of reorganization, plan of liquidation, investment, debt investment, equity investment, tender offer, refinancing, recapitalization, share exchange, business combination, joint venture or similar transaction involving all or a material portion of the assets, debt or equity of the Company Parties and their respective subsidiaries (taken as a whole), in each case that is a bona fide alternative to the Restructuring Transactions; *provided*, that any Transaction that is implemented pursuant to a valid amendment of the Restructuring Support Agreement shall not be an Alternative Transaction so long as such amendment does not materially affect the rights and/or obligations of the Commitment Parties thereunder (it being understood and agreed that any amendments or modifications that affect or impact the Rights Offering Backstop Premium, the Purchase Price, the economic terms, including the Backstop Percentages or Direct Investment Percentages, under the Backstop Agreement, or materially affects the *pro forma* capital structure of reorganized Wolfspeed, in each case shall be deemed to be material and shall require the consent of the Requisite Commitment Parties).

7

estate." 11 U.S.C. § 363(b)(1). In the Fifth Circuit, bankruptcy courts have authorized the use or sale of property of the estate outside the ordinary course of business when such use or sale is grounded upon a "sound business purpose" and is proposed in good faith. *See*, *e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity Holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

18. Once a debtor articulates a valid business justification under section 363, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. *See In re Pisces Energy, LLC*, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) (explaining that the "'business judgment test' . . . requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.'") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008). Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not

entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

19. Entry into the Backstop Agreement is also authorized under section 105(a) of the Bankruptcy Code, which provides the Court with expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of a debtor's assets. *See In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1333 (5th Cir. 1993) ("Section 105(a) authorizes a bankruptcy court to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code"); *In re Cooper Props. Liquidation Tr., Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

### A. The Court Should Authorize the Debtors' Entry Into the Backstop Agreement

20. The Debtors submit that sound business reasons exist to authorize entry into the Backstop Agreement. The Backstop Agreement is the product of extensive good faith, arm's-length negotiations among the Debtors and their key economic stakeholders. The Debtors and their advisors spent months exploring the terms of a restructuring with numerous parties in the Debtors' capital structure. Ultimately, the Debtors determined it was in their best interests to enter into definitive agreements that provide for the significant capital infusion and deleveraging contemplated in the Restructuring Support Agreement and fully backstopped by the Commitment Parties pursuant to the Backstop Agreement.

21. The Backstop Agreement is the product, and a critical element, of the Debtors' prepackaged Chapter 11 Cases, providing the Debtors with the ability to maximize the value of their estates. It also provides the Debtors with certainty as it ensures that necessary funds will be available to make payments required under their Chapter 11 Plan.

### 1. The Backstop Premium Should be Approved

22. The Backstop Premium is a necessary inducement and provides reasonable compensation for the Commitment Parties to enter into the Backstop Agreement, which will provide significant benefits to the Debtors' estates by, among other things, securing a $275 million new money investment. Agreeing to the Backstop Premium and other obligations contemplated under the Backstop Agreement is a reasonable exercise of the Debtors' business judgment given (a) the significant benefit to the estates of having a definitive agreement for a value-maximizing transaction and fully committed capital that will facilitate a deleveraging of the Debtors' balance sheet and emergence from these Chapter 11 Cases, (b) the costs incurred by the Commitment Parties in committing and reserving capital and in connection with engaging with the Debtors and negotiating the terms of the Backstop Agreement and other transaction documents, and (c) the continuing opportunity costs between the time of execution of Backstop Agreement and consummation of the Plan. Under these circumstances, the Backstop Agreement Obligations contemplated under the Backstop Agreement are reasonable in amount and necessary to maximize the value of the Debtors' estates. Undoubtedly, the Rights Offering Backstop Commitment confers a material benefit to the Debtors' estates as it injects the needed capital to make payments required under their Chapter 11 Plan and thereby lead the Debtors successfully out of bankruptcy with the ability to continue to operate as a healthy and profitable going concern enterprise.

23. The Backstop Premium is an integral part of the Backstop Agreement. The Commitment Parties would not have agreed to the binding Rights Offering Backstop Commitment

without appropriate compensation for undertaking the risks associated with these commitments and the opportunity costs related to constraining the underlying committed capital. In recognition of these risks and burdens, the Debtors agreed to the reasonable fees and protections under the Backstop Agreement in the sound exercise of their business judgment.

24. Here, the Backstop Premium likely imposes no cash costs on the Debtors, as the Backstop Premium will be paid in the form of New 2L Convertible Notes on the Effective Date. But even if the Backstop Agreement is terminated prior to the Effective Date, requiring payment of the Backstop Premium in cash is reasonable in light of the benefits that the Debtors and their estates have and will receive from the Backstop Agreement and Commitment Parties—including the substantial support for the Plan.

25. The Debtors have evaluated the risks and the costs associated with entry into the Backstop Agreement, including the Backstop Agreement Obligations, and considered those factors in comparison with the uncertainty and expense that would accompany the lack of a clear, supported exit path and source of committed exit capital in a reorganized transaction in the absence of the Rights Offering and the Backstop Agreement, and the Debtors have soundly determined that the Backstop Agreement minimizes their risk and maximizes value for all of their stakeholders. Finally, the size of the Backstop Premium is comparable to other backstop premiums approved in this district.[6]

26. In light of the benefits that will inure to the Debtors and their estates as a result of the commitment of capital necessary to backstop the Rights Offering, the Debtors submit

---

[6] *See, e.g., In re Cineworld Group Plc*, Case No. 22-90186 (MI) (Bankr. S.D. Tex. Apr. 11, 2023) [Docket No. 1625] (approving rights offering, backstop agreement, and backstop commitment premium equal to 20.0% of the rights offering in accordance with the backstop agreement); *In re Invacare Corp.*, Case No. 23-90068 (CML) (Bankr. S.D. Tex. Mar. 30, 2023) [Docket No. 372] (same); *In re Talen Energy Corporation*, Case No. 22-90330 (MI) (Bankr. S.D. Tex. Aug. 29, 2022) [Docket No. 1133] (approving backstop premium equal to 20% of each backstop party's portion of the backstop commitment).

11

that entry into the Backstop Agreement and effectuating the transactions contemplated thereby, including the Indemnification Obligations and the payment of the Backstop Premium and the Expense Reimbursement, is justified and in the best interest of the Debtors' estates, and should be approved by this Court.

      **2.      The Backstop Agreement Obligations, Including the Backstop Premium, Should Be Allowed as Administrative Expenses Pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code**

27.      Section 503(b)(1)(A) of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including . . . the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A). Further, section 507(a)(2) of the Bankruptcy Code provides that "administrative expenses allowed under section 503(b)" are entitled to priority. 11 U.S.C. § 507(a)(2).

28.      As detailed above, the Backstop Agreement Obligations undertaken by the Debtors represent a material inducement for the Commitment Parties to enter into the Backstop Agreement and the Restructuring Support Agreement and were vital to the Backstop Parties agreeing to (i) reserve capital for a period of time at great opportunity cost and (ii) consummate the transaction contemplated thereby, which will provide a material benefit to the Debtors' estates. Compared to the substantial value provided by the Commitment Parties, the Backstop Agreement Obligations are reasonable uses of estate resources and should be accorded administrative expense priority on the off chance that the Backstop Agreement is terminated prior to the Effective Date. These payments constitute "actual, necessary costs and expenses of preserving the estate." 11 U.S.C § 503(b)(1)(A). Accordingly, in the event that the Backstop Agreement Obligations become payable under the terms of the Backstop Agreement, such claims should be allowed as administrative expenses of the Debtors' estates.

**REQUEST FOR RELIEF PURSUANT TO BANKRUPTCY RULES 6004(H)**

29. To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day stay under Bankruptcy Rule 6004(h).

**NOTICE**

30. Notice of the Motion will be served on: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Ad Hoc Senior Secured Noteholder Group; (c) counsel to the Ad Hoc 26s/28s/29s Noteholder Group; (d) counsel to Renesas; (e) the creditors listed on the Debtors' consolidated list of 30 creditors holding the largest unsecured claims; (f) the United States Attorney for the Southern District of Texas; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) the state attorneys general for states in which the Debtors conduct business; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

31. A copy of the Motion is available on (a) the Court's website, at www.txs.uscourts.gov and (b) the website maintained by the Debtors' claims and noticing agent, Epiq Corporate Restructuring LLC, at https://dm.epiq11.com/Wolfspeed.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the proposed Confirmation Order granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: August 15, 2025  
Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*
**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email:  taddavidson@hunton.com
  ashleyharper@hunton.com
  pguffy@hunton.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Keith A. Simon (NY Bar No. 4636007)
Eric L. Einhorn (NY Bar No. 5568845)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:  ray.schrock@lw.com
  alex.welch@lw.com
  keith.simon@lw.com
  eric.einhorn@lw.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

**CERTIFICATE OF SERVICE**

    I certify that on August 15, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II