IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

------------------------------------------------------------ x
                                                                     :

In re:                                                           :    Chapter 11

WOLFSPEED, INC., *et al.*,                    :    Case No. 25-90163 (CML)

                   Debtors.[1]                            :    (Jointly Administered)

------------------------------------------------------------ x

**DECLARATION OF ALEXANDER TRACY IN SUPPORT OF
MOTION OF DEBTORS FOR ORDER (A) AUTHORIZING THE DEBTORS'
ENTRY INTO BACKSTOP AGREEMENT AND PERFORMANCE
OF RELATED OBLIGATIONS; AND (B) GRANTING RELATED RELIEF**

I, Alexander Tracy, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1.    I submit this declaration (the "**Declaration**") in support of the *Motion of Debtors for Order (A) Authorizing Debtors' Entry Into Backstop Agreement and Performance of Related Obligations; and (B) Granting Related Relief* (the "**Motion**"), filed contemporaneously herewith.[2]

2.    Except as otherwise indicated herein, the statements in this Declaration are based on (i) my personal knowledge or opinion, (ii) information I obtained from the Debtors' advisors, the Debtors' management, and employees of Perella (as defined below) working directly with me or under my supervision, (iii) my active involvement in participating in the negotiations with the relevant counterparties (and their respective advisors) on behalf of the Debtors, and/or (iv) my review of the documents relevant to their issues. If called to testify under oath, I am able to and

---

[1]    The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: Wolfspeed, Inc. (2719) and Wolfspeed Texas LLC (0339). The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed in the Motion.

US-DOCS\160558032.1

would testify to each of the facts set forth herein on the foregoing bases. I am not being compensated specifically for this testimony other than through non-contingent payments received by Perella as a professional proposed to be retained by the Debtors in accordance with Perella's engagement agreement (and this Court's order, once entered, approving same).

3. I am a Partner at Perella Weinberg Partners LP (together with its corporate advisory affiliates, "*Perella*") residing in Perella's New York office, located at 767 5th Avenue, New York, New York 10153. As set forth in Perella's retention application, Perella is serving as the proposed investment banker to Debtor Wolfspeed, Inc. ("*Wolfspeed*"), together with its affiliated debtors and debtors in possession (collectively, the "*Debtors*") in the above-captioned chapter 11 cases (the "*Chapter 11 Cases*").

4. Perella is an investment banking firm that provides strategic and financial advisory services, as well as capital markets knowledge, financing skills, and restructuring capabilities that are valuable for and used in large-scale corporate restructuring transactions. Perella's professionals have extensive experience providing investment banking services to financially distressed companies, debtors in chapter 11 cases, and creditors, equity holders, purchasers, and other parties-in-interest constituencies in reorganization proceedings and complex financial restructurings, both in-court and out-of-court.

5. For instance, Perella is providing or has recently provided investment banking and other services in connection with the chapter 11 restructurings involving, by way of example, the following companies: *In re Accelerate Diagnostics, Inc.*, Case No. 25-10837 (KBO) (Bankr. D. Del.); *In re Accuride Corporation*, Case No. 24-12289 (JKS) (Bankr. D. Del.); *In re Cal. Res. Corp.*, Case No. 20-33568 (DRJ) (Bankr. S.D. Tex.); *In re CARBO Ceramics Inc.*, Case No. 20-31973 (MI) (Bankr. S.D. Tex.); *In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr.

S.D.N.Y.); *In re Chesapeake Exploration, L.L.C.*, et al., Case No. 20-33239 (CML) (Bankr. S.D. Tex., Houston Div.); *In re Cineworld Grp. Plc*, Case No. 22-90168 (MI) (Bankr. S.D. Tex.); *In re Clovis Oncology, Inc.*, Case No. 22-11292 (JKS) (Bankr. D. Del.); *In re CorEnergy Infrastructure Trust, Inc.*, Case No. 24-40236-can11 (Bankr. W.D. Mis.); *In re Ector County Energy Ctr. LLC*, Case No. 22-10320 (JTD) (Bankr. D. Del.); *In re Endo Int'l plc*, Case No. 22-22549 (JLG) (Bankr. S.D.N.Y.); *In re Enviva Pellets Epes Holdings, LLC*, Case No. 24-10454 (BFK) (Bankr. E.D. Va., Richmond Div.); *In re Franchise Group, Inc., et al.*, Case No. 24-12480 (LSS) (D. Del.); *In re FTX Trading LTD*, Case No. 22-11068 (JTD) (Bankr. D. Del.); *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y.); *In re Global Clean Energy Holdings, Inc.*, et al., Case No. 25-90113 (ARP) (Bankr. S.D. Tex., Houston Div.); *In re Hartshorne Holdings, LLC*, Case No. 20-40133 (THF) (Bankr. W.D. Ky.); *In re Hearthside Food Solutions, LLC, et at.*, Case No. 24-90586 (ARP) (Bankr. S.D. Tex., Houston Div.); *In re HighPoint Res. Corp.*, No. 21-10565 (CSS) (Bankr. D. Del.); *In re Hornblower Holdings LLC, et al.*, Case No. 24-90061 (MI) (Bankr. S.D. Tex, Houston Div.); *In re Invitae Corporation, et al.*, Case No. 24-11362 (MBK) (Bankr. D. NJ); *In re Ion Geophysical Corp.*, Case No. 22-30987 (MI) (Bankr. S.D. Tex.); *In re Ligado Networks LLC*, Case No. 25-10006 (TMH) (Bankr. D. Del); *In re Limetree Bay Servs., LLC*, Case No. 21-32351 (DRJ) (Bankr. S.D. Tex.);  *In re MLN US Holdco LLC, et al.*, Case No. 25-90090 (CML) (Bankr. S.D. Tex., Houston Div.); *In re NanoString Techs. Inc.*, Case No. 24-10160 (CTG) (Bankr. D. Del.); *In re Nine Point Energy Holdings, Inc.*, Case No. 21-10570 (MFW) (Bankr. D. Del.); *In re Oldco Tire Distributors, Inc., et al.*, Case No. 24-12391 (CTG) (Bankr. D. Del.); *In re OSG Group Holdings, Inc.*, Case No. 23-90799 (CML) (Bankr. S.D. Tex.); *In re Quotient Ltd.*, Case No. 23-90003 (DRJ) (Bankr. S.D. Tex.); *In re Spirit Airlines, Inc.*, et al., Case No. 24-11988 (SHL) (Bankr. S.D. NY); *In re Talen Energy Supply, LLC*, Case No. 22- 90054 (MI) (Bankr. S.D.

Tex.); *In re TPC Group Inc.*, Case No. 22-10493 (Bankr. D. Del.); and *In re Vertex Energy, Inc.*, Case No. 24-90507 (CML) (Bankr. S.D. Tex.).

6.      I have approximately 25 years of investment banking and capital structure advisory experience assisting companies on a wide range of strategic matters and transactions.  I have advised senior management and boards of directors of companies (including conflicts committees of boards of directors), as well as investors and creditors, across a broad range of industries in connection with restructurings, mergers and acquisitions and financing transactions.  In particular, I have been involved in numerous restructurings, including, by way of example only, the following: American Tire Distributors Corporation; Blackhawk Mining; Caesars Entertainment Operating Company; Carbo Ceramics; Chesapeake Energy Corporation; Cineworld Group Plc; Dana Corporation; Diamond Offshore Drilling, Inc.;  Dura Automotive Systems; Excel Maritime Carriers; Extended Stay Hotels; Foresight Energy; Global Brokerage, Inc.; Hearthside Food Solutions; Hermitage Offshore Services Ltd.; Hexion, Inc.; Hornblower Holdings LLC; Ion Media Networks; iPayment, Inc.; MagnaChip Semiconductor; Memorial Production Partners LP; MLN US Holdco LLC; Molycorp, Inc.; Oasis Petroleum, Inc.; Ocean Rig; Pacific Drilling S.A.; PG&E Corporation; Pyxus; Rex Energy; Seadrill Limited; Synagro Technologies; Talen Energy Supply, LLC; TPC Group, Inc.; and Valaris PLC.

7.      Prior to joining Perella's investment banking team in July 2016, I held various positions at other institutions, including the position of Managing Director, at the investment banking firm Miller Buckfire & Co. LLC.  Prior to that time, I was a Vice President at Chanin Capital Partners, which I joined in 2002.  Prior to 2002, I worked within the mergers and acquisitions department of the investment banking division at Prudential Securities.  I received a

Bachelor of Arts Degree in Economics and a Bachelor of Arts Degree in English from Amherst College.

8. In virtually all of those prior-listed restructuring cases, I actively advised clients with respect to issues relating to chapter 11 plan negotiations, processing DIP financing, cash collateral usage, section 363 sale processes, negotiation of restructuring agreements, negotiation of plans of reorganization, and developing and implementing new money recapitalizations, in each case analyzing and evaluating business plans, cash flow forecasts, and liquidity needs, as well as evaluating, negotiating, and structuring DIP financings. It is in these capacities, in working together with bankruptcy counsel, that I am familiar with the chapter 11 process.

9. As a result of my experience and training, I am familiar with the standard methodologies and analyses necessary to determine a company's liquidity needs and financing requirements and forecasting the same. I am also able to analyze and determine whether interest rates and fees proposed to be paid to postpetition lenders are in line with the market, taking into account a company's financing needs, projected revenues and the terms of the proposed financing.

10. Since February, 2025, Perella has worked closely with the Debtors' management team and other professionals retained by the Debtors in the Chapter 11 Cases to analyze the Debtors' business, operations, and financial projections. In my representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives and restructuring options. Members of my team and I have also assisted the Debtors in reviewing and negotiating certain key terms and conditions of the *Rights Offering Backstop Commitment Agreement*, dated as of June 22, 2025 (the "**Backstop Agreement**"), annexed to the Motion as **Exhibit B**.

## I. The Debtors' Restructuring Goals and Need for Capital

11. The Debtors have filed these prepackaged Chapter 11 Cases in furtherance of a consensual effort to restructure and significantly deleverage the Company's balance sheet (the "**Restructuring**"). Specifically, the Restructuring is supported by certain holders of approximately (i) more than 97% of the aggregate outstanding principal amount under the Senior Secured Notes, (ii) more than 67% of the aggregate outstanding principal amount under the Convertible Notes, and (iii) 100% of the aggregate outstanding principal amount under the Renesas Customer Refundable Deposit Agreement (collectively, the "**Consenting Creditors**"), that are each party to that certain *Restructuring Support Agreement* dated as of June 22, 2025 (as amended from time to time and including all exhibits and schedules thereto, the "**Restructuring Support Agreement**"). Subject to the terms and conditions of the Restructuring Support Agreement, the Restructuring will be implemented pursuant to the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate* [Docket No. 8] (the "**Plan**") filed on the Petition Date.

12. The commencement of the Chapter 11 Cases was a crucial step in the Company's journey to right-size its capital structure and maintain customer confidence in the Company and its innovative suite of products. With the support of their key stakeholders, the Debtors expect to emerge from chapter 11 on an expeditious timeframe, with a healthier balance sheet, and the ability to continue to provide innovative solutions to their customers.

13. The Restructuring contemplated by the Restructuring Support Agreement and further detailed in the Plan will substantially reduce the Company's balance sheet liabilities from approximately $6,749 million to approximately $2,118 million in total debt upon emergence from chapter 11. Likewise, the Plan will materially reduce the Company's annual cash interest expenses from approximately $400 million to $160 million.

14. To consummate the transactions contemplated by the Plan, the Debtors will require significant capital to both fund the distributions thereunder and provide the Reorganized Debtors with sufficient go-forward operating liquidity to satisfy those requirements related thereto under the Bankruptcy Code. Notably, the Plan provides for payment of the Effective Date Cash Payment to the Senior Secured Noteholders and payment in full in cash of all Administrative Claims and all Allowed General Unsecured Claims and certain other cash distributions.

15. Without the new capital contemplated by the Plan (including through the Rights Offering as discussed below) and committed through the Backstop Agreement, the Debtors may not be able to restructure and exit the Chapter 11 Cases on the currently contemplated timeline, if at all. If the Debtors' stay in chapter 11 is prolonged as a result of having to revamp their restructuring plan to secure new sources of capital outside of those contemplated by the Plan/Backstop Agreement as described in the Motion, the Debtors may not have sufficient liquidity to fund the Debtors' projected financing needs for operations and additional chapter 11 expenses and such longer duration will reduce estate value.

## II.   The Rights Offering

16. To obtain this necessary additional capital, the Plan contemplates, among other things, a rights offering (the "***Rights Offering***") whereby all holders of Convertible Notes Claims shall be eligible to participate to subscribe for their Pro Rata Share of up to $301.125 million of New 2L Convertible Notes, at a purchase price of 91.3242% of the principal amount thereof (the "***New 2L Convertible Notes Rights***"); *provided, however*, (i) 20.0% of the New 2L Convertible Notes to be issued by Wolfspeed pursuant to the New 2L Convertible Notes Rights Offering shall be reserved exclusively for the Initial Backstop Parties (the "***Initial Backstop Parties' Premium***"), and (ii) 20.0% of the New 2L Convertible Notes to be issued by Wolfspeed pursuant to the New

7

2L Convertible Notes Rights Offering shall be reserved exclusively for the Backstop Parties (including, for the avoidance of doubt, the Initial Backstop Parties) (the "**Backstop Holdback Allocation**"). The New 2L Convertible Notes Rights Offering shall benefit to the fullest extent permitted by law from the exemption from registration provided by section 1145 of the Bankruptcy Code, except with respect to the portion thereof constituting the Initial Backstop Parties' Premium, the Backstop Holdback Allocation, and any New 2L Convertible Notes issued to the Commitment Parties (as defined in the Backstop Agreement) on account of their Rights Offering Backstop Commitment (as defined in the Backstop Agreement), and except with respect to any recipient thereof that is an "underwriter" under section 1145(b) of the Bankruptcy Code, which securities are not eligible for section 1145 treatment and shall be offered pursuant to Section 4(a)(2) of the Securities Act or another applicable exemption. The basic New 2L Convertible Notes Rights allocable to holders of Convertible Notes Claims are expected to be exempt from registration pursuant to section 1145 of the Bankruptcy Code.

17. The Rights Offering is, in my view, a critical component to the Plan. Specifically, the Rights Offering provides the Debtors with $275 million of cash to provide the Debtors what management believes is sufficient liquidity to fund the Effective Date Cash Payment to the Senior Secured Noteholders while preserving enough cash to emerge from chapter 11 as a viable, going concern enterprise. The Rights Offering will help ensure this liquidity need is satisfied, in addition to ensuring the Debtors can perform the transactions and fund the distributions contemplated by the Plan. Notably, the Rights Offering is a product of the Restructuring Support Agreement which was a product of months-long negotiation among sophisticated parties surrounding the Restructuring Support Agreement and the Plan.

### III.  The Backstop Agreement

18.  To ensure the funding anticipated by the Rights Offering, the Debtors negotiated the Backstop Agreement with the Commitment Parties (as defined in the Backstop Agreement) in good faith and at arm's length.  I participated in these negotiations.  Pursuant to the Backstop Agreement, the Commitment Parties have agreed to backstop the Rights Offering.

19.  The Commitment Parties' funding commitments under the Backstop Agreement provide the Debtors and their stakeholders with reasonable comfort that the Debtors will have funds sufficient to satisfy the projected obligations under the Plan and emerge from the Chapter 11 Cases with a financially stronger balance sheet.

20.  In exchange for the Commitment Parties' undertaking the obligations pursuant to the Backstop Agreement, the Debtors agreed to provide certain consideration to the Commitment Parties, in the form of the Backstop Premium, the Backstop Holdback Allocation, the Expense Reimbursement, and the Indemnification Obligations (collectively the "**Backstop Agreement Obligations**").  I am aware the Debtors' management and Board of Directors have concluded that, in the exercise of their reasonable business judgment, this is a fair and equitable exchange of consideration.

21.  Specifically, the Backstop Agreement Obligations are structured to compensate the Commitment Parties for the substantial time, cost and risk they are incurring to aid the Debtors in their restructuring efforts, including (i) the time and expense in conducting diligence, submitting restructuring proposals, and negotiating and drafting the terms of the Backstop Agreement and other documents key to the Debtors' reorganization, (ii) the opportunity costs associated with committing and reserving substantial capital for a significant period of time, and (iii) the risk that

economic, market, or commercial developments negatively impact the Debtors during the period that the backstop commitments are in place.

**A.     The Backstop Agreement Obligations**

    **i.     The Backstop Premium and the Backstop Holdback Allocation**

22.     In exchange for the commitment to backstop the Rights Offering, the Debtors have agreed to (a) pay to the Commitment Parties a nonrefundable aggregate premium of $30.25 million in the form of additional New 2L Convertible Notes (the "***Backstop Premium***") and (b) reserve exclusively for the Commitment Parties 40.0% of the New 2L Convertible Notes to be issued by Wolfspeed pursuant to the Rights Offering, consisting of the Backstop Holdback Allocation and the Initial Backstop Parties' Premium.

    **ii.     The Expense Reimbursement**

23.     The Backstop Agreement also requires the Debtors to reimburse certain fees and expenses incurred by the Commitment Parties and their advisors in connection with the transactions under both the Backstop Agreement and the Restructuring Support Agreement, such as reasonable advisor fees, travel costs, filing fees, and other expenses (the "***Expense Reimbursement***").

    **iii.     The Indemnification Obligations**

24.     Under the Backstop Agreement, the Debtors have also agreed to indemnify the Commitment Parties for certain losses, claims, damages, liabilities, and reasonable costs and expenses arising out of or in connection with the Backstop Agreement, the Plan, and the transactions contemplated thereby (the "***Indemnification Obligations***").

### IV. The Backstop Agreement Provides Significant Benefit to the Debtors

25. In my view, the Backstop Agreement provides substantial benefits to the Debtors and their estates.

26. First, together with the Restructuring Support Agreement, the commitments under the Backstop Agreement were important to building creditor consensus for the Plan and confidence in the Debtors' overall Restructuring. Such agreements served to reduce expenses which a more prolonged Chapter 11 bankruptcy would otherwise experience.

27. Second, the Backstop Agreement provides key financial support for the Plan, by ensuring the Debtors have sufficient commitment through the Rights Offering to generate the funds necessary to finance the transactions contemplated by the Plan. The funds generated from the Rights Offering should provide the Debtors sufficient liquidity to fund the Effective Date Cash Payment to the Senior Secured Noteholders, and is expected to provide confidence to customers, vendors, employees, and other interested parties that the Debtors are able to meet their obligations.

28. Third, the Backstop Agreement provides confidence to the estate that the Debtors will be able consummate the Rights Offering in order to emerge from the Chapter 11 Cases on the contemplated timeline, avoiding liquidity issues that may arise from an extended stay in chapter 11. During the period of time between entry into the Backstop Agreement and consummation of the Plan, the Debtors will be exposed to various economic, market, commercial, or regulatory risks that could negatively impact their ability to raise capital. The Commitment Parties' commitment of $275 million in funding during this time provides protection from these risks and increases the likelihood the Debtors can successfully implement the Plan in a timely manner to maximize value for all stakeholders. Without these commitments, there is no assurance that the Debtors would be able to emerge from the Chapter 11 Cases on the agreed upon timeline, if at all.

### V. Negotiation of the Backstop Agreement

29. I believe the Backstop Agreement is the product of extensive good-faith, arm's-length negotiations among the Debtors and their key economic stakeholders. These negotiations touched on (among other things) the size, structure, and terms of the Rights Offering and the Backstop Agreement. The Backstop Agreement Obligations were important key terms that were heavily negotiated. Indeed, during negotiations, I am aware the Commitment Parties insisted on the Backstop Agreement Obligations and, accordingly, the Backstop Agreement Obligations, in my view, were necessary inducements for the Commitment Parties to agree to provide the backstop and funding commitments in the Backstop Agreement that are so valuable to the Debtors.

30. Throughout the course of these negotiations, the Debtors were successful at improving the terms that were initially offered by the Commitment Parties. During the negotiating process, the Commitment Parties conveyed to the Debtors that the protections afforded by the Commitment Obligations were necessary conditions to fully backstopping the Rights Offering under the Backstop Agreement.

31. The Debtors and their advisors evaluated the risks and costs associated with entry into the Backstop Agreement, including their provisions of the Backstop Agreement Obligations, relative to the benefits to be derived from such agreement. Based on their evaluations, the Debtors determined that, in their sound business judgment, the benefits of having a source of committed capital to provide sufficient funds to implement the transactions contemplated by the Plan outweighed the risks and costs associated with entry into the Backstop Agreement.

### VI. Perella's Analysis of Backstop Agreements in Precedent Chapter 11 Cases

32. In connection with the negotiation of the Backstop Agreement, Perella reviewed and analyzed backstop arrangements for comparable rights offerings in other similarly large and/or complex chapter 11 cases. Specifically, Perella reviewed the backstop fees and other main economic terms (such as discount, direct allocation amount ("holdback"), length of commitment, and termination fees) of those comparable backstop arrangements, in order to assess market terms for similar rights offerings. In total, Perella reviewed and analyzed more than 25 other precedent rights offerings during the negotiation of the Backstop Agreement.

33. In my experience, costs of backstopped capital in rights offerings can take various forms, including (i) a discount at which the new money is being invested, (ii) a commitment premium or backstop fee (typically based on a percentage of the full size of the commitment provided by the backstop parties and paid in cash, debt and/or equity consideration that can be priced at a discount to plan value), (iii) a direct allocation or "holdback" (which allows the backstop parties to invest no less than a certain amount), and (iv) reimbursement of professional fees and expenses and indemnification obligations. Termination payments are also common in backstop arrangements in chapter 11 cases. When included, termination payments are typically based on a percentage of the full size of the commitment provided by the backstop parties and are triggered as compensation in certain scenarios where the backstop arrangement is terminated.

34. Concurrently with the Debtors' extensive good-faith, arm's-length negotiations with its stakeholders, the Debtors, with Perella's assistance, conducted a third-party financing process to seek potential competitive new money financing alternatives (the "**Third-Party Financing Process**"). In connection with the Third-Party Financing Process, eight (8) potential financing parties executed confidentiality agreements with the Debtors and accessed a virtual data

room, and three (3) of these potential financing parties attended presentations with members of the Debtors' management team. One potential financing party submitted a preliminary, non-binding indication of interest, but following further negotiations regarding the economic terms of a potential financing transaction, this party decided not to move forward. At conclusion of the Third-Party Financing Process, none of the potential financing parties that executed confidentiality agreements were willing to provide the Debtors with an executable new money financing alternative to the Backstop Agreement.

35. Based on the analysis Perella performed in connection with the negotiation of the Backstop Agreement, the good-faith and arm's-length nature of the negotiations, as well as the lack of executable third-party new money financing alternatives available to the Debtors, I believe the Backstop Premium, and the Backstop Agreement Obligations generally, are within the range of what I believe to be reasonable and fall within the range of backstop fees generally paid in comparable transactions. Notably, the Backstop Premium will be paid in the form of additional New 2L Convertible Notes and will not impose incremental cash fees on the Debtors. With respect to the other Backstop Agreement Obligations that appear in the Backstop Agreement, I believe they are customary and generally in line with market practice for such transactions.

### VII.   Conclusion

36. From my perspective, the decision to enter into the Backstop Agreement, and pay any amounts required thereunder, is substantially likely to minimize the Debtors' risk and maximize value for the Debtors' stakeholders while generating creditor consensus for the Plan. The Backstop Agreement and the funds guaranteed thereunder is, in my view, a critical component to the Restructuring Support Agreement and the Plan. The relief requested in the Motion, if granted, would allow the Debtors to meet their restructuring goals to ensure sufficient liquidity,

create a sustainable capital structure by deleveraging the Debtors' balance sheets, and maximize value for the Debtors and their stakeholders.

37. I believe that the Backstop Agreement was negotiated in good faith and at arm's length. The Debtors entered into the Backstop Agreement after careful consideration of its terms—including the Backstop Agreement Obligations—by the Debtors' management in consultation with their experienced financial and legal advisors, including the Perella team. In evaluating the Backstop Agreement, the Debtors and their advisors concluded that (i) its terms, taken as a whole, are reasonable under the circumstances, and (ii) it should provide the Debtors sufficient funds to implement the transactions contemplated by the Restructuring Support Agreement and the Plan.

38. The Backstop Agreement Obligations I understand are essential components to the Commitment Parties under the Backstop Agreement. As discussed above, during negotiations, the Commitment Parties insisted on the Backstop Agreement Obligations, which were necessary inducements for the Commitment Parties to agree to provide what I believe are valuable backstop and funding commitments in the Backstop Agreement. Based on my professional experience and Perella's assessment and comparison of the Backstop Agreement Obligations to similar commitments in comparable cases, I believe the Backstop Agreement Obligations, taken as a whole, are reasonable under the circumstances in consideration of the cost of capital and the certainty the Backstop Agreement provides the Debtors with respect to their Chapter 11 Cases.

39. Finally, the Backstop Agreement (including the Backstop Agreement Obligations) is supported by the Debtors' supporting stakeholders who are not signatories to the Backstop Agreement or participants in the Rights Offering, including (i) the Ad Hoc Senior Secured Noteholder Group, which controls more than 97% of the aggregate outstanding principal amount of the Senior Secured Notes, and (ii) Renesas Electronics America Inc., which holds, owns, or

controls 100% of the outstanding principal amount of loans under the Debtors' Customer Refundable Deposit Agreement.

40. In light of the foregoing, I believe approval of the Backstop Agreement and the Backstop Agreement Obligations is appropriate and in the best interest of the Debtors and their estates, as it will help ensure the success of the Debtors' restructuring efforts by securing the capital required for the Debtors to timely emerge from chapter 11 and position the Debtors for their success and growth in the future.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   August 15, 2025
         New York, New York

                                             */s/ Alexander Tracy*
                                             Alexander Tracy
                                             Partner
                                             Perella Weinberg Partners LP

**CERTIFICATE OF SERVICE**

      I certify that on August 15, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

                                              */s/ Timothy A. ("Tad") Davidson II*
                                              Timothy A. ("Tad") Davidson II