**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------- x
                                    :
In re:                              :   Chapter 11
                                    :
WOLFSPEED, INC., et al.,            :   Case No. 25-90163 (CML)
                                    :
            Debtors.[1]             :   (Jointly Administered)
                                    :
------------------------------------------------------- x
```

**NOTICE OF FILING OF SECOND PLAN SUPPLEMENT
FOR THE JOINT PREPACKAGED CHAPTER 11 PLAN
OF REORGANIZATION OF WOLFSPEED, INC. AND ITS DEBTOR AFFILIATE**

As contemplated by the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as may be amended, modified, or supplemented from time to time, and including all exhibits and supplements thereto, the "***Plan***"),[2] the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") hereby file certain of the documents comprising the Plan Supplement as the exhibits attached to this Notice with the United States Bankruptcy Court for the Southern District of Texas (the "***Court***"). Capitalized terms used but not defined herein have the meanings set forth in the Plan.

On August 12, 2025, the Debtors filed the initial Plan Supplement [Docket No. 168] (the "***Initial Plan Supplement***").

The Debtors hereby file the second Plan Supplement (the "***Second Plan Supplement***").

The Second Plan Supplement includes the following exhibits (in each case, as may be amended, modified, or supplemented from time to time):

| EXHIBIT | DOCUMENT |
|---------|----------|
| E | Investor Rights and Disposition Agreement |
| E-1 | Redline of Investor Rights and Disposition Agreement |
| F | Registration Rights Agreement |
| F-1 | Redline of Registration Rights Agreement |

---

[1]  The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: Wolfspeed, Inc. (2719) and Wolfspeed Texas LLC (0339).  The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

[2]  Capitalized terms used but not defined herein have the meanings given to them in the Plan.

| EXHIBIT | DOCUMENT |
|---------|----------|
| G | Renesas Warrants Agreement |
| G-1 | Redline of Renesas Warrants Agreement |
| H | Restructuring Transactions Exhibit |
| H-1 | Redline of Restructuring Transactions Exhibit |
| J | Required Disclosures under Section 1129(a)(5) |
| K | New Corporate Governance Documents |
| K-1 | Wolfspeed, Inc. Amended and Restated Bylaws |
| K-2 | Wolfspeed, Inc. Amended and Restated Certificate of Incorporation |

The remaining exhibits to the Plan Supplement will be filed with separate notices.

These documents remain subject to continuing negotiations in accordance with the terms of the Plan and the Restructuring Support Agreement and the final versions may contain material differences from the versions filed herewith. For the avoidance of doubt, the parties thereto have not consented to such document as being in final form and reserve all rights in that regard. Such parties reserve all of their respective rights with respect to such documents and to amend, modify, or supplement the Plan Supplement and any of the documents contained therein through the Effective Date in accordance with the terms of the Plan and the Restructuring Support Agreement. To the extent material amendments or modifications are made to any of these documents, the Debtors will file a revised version with the Court prior to the hearing to consider confirmation of the Plan and the adequacy of the Disclosure Statement (the "***Confirmation Hearing***").

The Plan Supplement is integral to, part of, and incorporated by reference into the Plan. Please note, however, these documents have not yet been approved by the Court. If the Plan is confirmed, the documents contained in the Plan Supplement (including any amendments, modifications, or supplements thereto) will be approved by the Court pursuant to the order confirming the Plan.

The deadline for filing objections to the adequacy of the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 7] (the "***Disclosure Statement***") and/or confirmation of the Plan is **5:00 p.m. (Central Time)** on **August 22, 2025** (the "***Objection Deadline***"). Any objections to the adequacy of the Disclosure Statement and/or confirmation of the Plan shall: (a) be in writing; (b) conform to the applicable Bankruptcy Rules and the Bankruptcy Local Rules; (c) set forth the name of the objecting party, the basis for the objection, and the specific grounds thereof; and (d) be filed with the Clerk of the Court no later than the Objection Deadline.

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

The Confirmation Hearing is scheduled to commence **on September 8, 2025 at 1:00 p.m. (Prevailing Central Time)** before Judge Christopher M. Lopez of the United States Bankruptcy Court, Southern District of Texas, 4th Floor, Courtroom 401, 515 Rusk Street, Houston, Texas 77002. **The Confirmation Hearing may be continued by the Court or by the Debtors without further notice other than by announcement of the same in open court and/or by filing and serving a notice of adjournment.**

In the event of a timely filed objection that is not settled by the parties, the Court shall hear such objection at the Confirmation Hearing or on a later date as may be fixed by the Court.

Copies of the documents included in the Plan Supplement or the Plan, or any other document filed in the Chapter 11 Cases, may be obtained free of charge by visiting the website maintained by the Debtors' claims and noticing agent, Epiq Corporate Restructuring LLC, at https://dm.epiq11.com/Wolfspeed. You may also obtain copies of any pleadings filed in the Chapter 11 Cases through the Court's electronic case filing system at https://www.txs.uscourts.gov/page/bankruptcy-court using a PACER password (to obtain a PACER password, go to the PACER website at http://pacer.psc.uscourts.gov).

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT BY (A) CALLING (888) 818-4267 OR NON U.S./CANADA AT +1 (971) 606-5246, OR (B) EMAILING WOLFSPEED@EPIQGLOBAL.COM. <u>PLEASE NOTE THAT THE NOTICE AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.</u>**

Dated:  August 19, 2025
        Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
        ashleyharper@hunton.com
        pguffy@hunton.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Keith A. Simon (NY Bar No. 4636007)
Eric L. Einhorn (NY Bar No. 5568845)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:   ray.schrock@lw.com
         alex.welch@lw.com
         keith.simon@lw.com
         eric.einhorn@lw.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 19, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II

## EXHIBIT E

**Investor Rights and Disposition Agreement**

*[Plan Supplement Filing Version 8/19/2025]*
*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

**INVESTOR RIGHTS [AND DISPOSITION] AGREEMENT**

This INVESTOR RIGHTS [AND DISPOSITION] AGREEMENT (this "**Agreement**") is entered into as of [●], 2025, by and among Wolfspeed, Inc., a Delaware corporation (including its successors and permitted assigns, the "**Company**"), and Renesas Electronics America Inc., a California corporation (the "**Investor**").

The Company and Wolfspeed Texas LLC filed [the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, consistent with the terms thereof, the "**Plan**") on June 30, 2025], which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2025.

As a condition to each of the parties' obligations under the Plan, the Company and the Investor are entering into this Agreement for the purpose of granting certain rights to the Investor.

In consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1    Definitions.

"**Affiliate**" means with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

["**ATM Program**" means the "at-the-market" offering program to facilitate the sale of shares of Common Stock (or securities convertible or exercisable for Common Stock) as set forth in the Plan.]

"**Board of Directors**" means the Company's board of directors.

"**business day**" means any day other than a Saturday or Sunday or a legal holiday on which commercial banks in New York City or the State of California in the United States, or Japan, are authorized or required by law to be closed.

"**Bylaws**" means the Bylaws of the Company, as the same may be amended or amended and restated from time to time.

"**Certificate of Incorporation**" means the Certificate of Incorporation of the Company, as the same has been and may be amended or restated from time to time.

"**Change of Control**" means (i) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Wholly Owned Subsidiaries and the employee benefit plans of the Company and its Wholly Owned Subsidiaries, who files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the common equity interests of the Company representing more than 50% of the voting power of the common equity interests of the Company; (ii) the Company shall have sold all or substantially all of the assets of its entire business or all or substantially all of the assets of its business producing silicon carbide bare wafers and epitaxial wafers; or (iii) the stockholders of the Company have adopted a plan or proposal of dissolution.

"**Commission**" means the United States Securities and Exchange Commission.

"**Common Stock**" means the shares of common stock, par value $0.00125 per share, of the Company, and any capital stock into which all of the Common Stock shall have been converted, exchanged, or reclassified following the date hereof.

"**DCSA**" means the Defense Counterintelligence and Security Agency of the United States Department of Defense.

["**ELOC Program**" means the equity line of credit to facilitate the sale of shares of Common Stock (or securities convertible or exercisable for Common Stock) as set forth in the Plan.]

"**Exchange**" means the New York Stock Exchange or any national securities exchange on which the Company's Common Stock is listed or admitted to trading.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended, or any similar successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect from time to time.

"**Holder**" means any Renesas entity holding Securities.

"**Initial Issue Date**" means [the date hereof] [the Renesas Base Distribution Date (as defined in the Plan)].

"**Necessary Action**" means, with respect to a specified result, all actions (to the extent such actions are permitted by applicable law, rule or regulation and, in the case of any action by the Company that requires a vote or other action on the part of the Board of Directors (or a committee of such board duly authorized to act with the authority of such board), to the extent such action is consistent with the fiduciary duties that the Company's directors may have in such capacity) necessary to cause such result, including, to the extent applicable, (i) including the Renesas Director and the Outside Director in the Board of Directors' slate of nominees to the stockholders at every meeting of the stockholders called with respect to the election of directors to the Board of Directors, (ii) including the Renesas Director and the Outside Director in the proxy statement prepared by management of the Company in connection with soliciting proxies for every meeting of the stockholders of the Company called with respect to the election of directors to the Board of Directors, and at every adjournment or postponement thereof, and on every action or approval by written consent of the Board of Directors (or a committee of such board duly authorized to act with

the authority of such board) with respect to the election of directors to the Board of Directors (and unanimously recommending the stockholders of the Company vote in favor of the election of the Renesas Director and the Outside Director at all times), (iii) not nominating any candidate for the slate of nominees for each election of directors to the Board of Directors in opposition to the election of the Renesas Director and the Outside Director, (iv) seeking the adoption of stockholders' resolutions and amendments to the Organizational Documents of the Company if necessary, (v) executing necessary agreements and instruments, and (vi) making or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations or similar actions that are required to achieve such result.

"**Organizational Documents**" means, collectively, the Certificate of Incorporation and Bylaws.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, other legal entity or organization, including a government or political subdivision or an agency or authority.

"**Second Lien Convertible Notes**" means the convertible notes to be issued pursuant to the Second Lien Convertible Notes Indenture.

"**Second Lien Convertible Notes Indenture**" means that certain Indenture, dated as of [●], 2025, between the Company and U.S. Bank Trust Company, National Association, as trustee.

"**Securities**" means (a) any shares of Common Stock held by a Holder and any shares of Common Stock hereafter acquired by any Holder (including, without limitation, pursuant to the conversion of the Second Lien Convertible Notes in accordance with the Second Lien Convertible Notes Indenture), (b) Common Stock acquired pursuant to the exercise of the Warrant and (c) any other securities issued or issuable with respect to any such shares of Common Stock, including shares of Common Stock underlying any warrants or the Second Lien Convertible Notes by way of share split, share dividend (including dividends paid in kind), distribution, recapitalization, merger, exchange, replacement or similar event or otherwise.

"**Securities Act**" means the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder or any similar federal statute and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"**Subsidiary**" means, with respect to any Person: (a) any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of the capital stock entitled (without regard to the occurrence of any contingency, but after giving effect to any voting agreement or stockholders' agreement that effectively Transfers voting power) to vote in the election of directors, managers or trustees, as applicable, of such corporation, association or other business entity is owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person; and (b) any partnership or limited liability company where (x) more than 50% of the capital accounts, distribution rights, equity and voting interests, or of the general and limited partnership interests, as applicable, of such partnership or limited liability corporation are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person, whether in the form of membership, general, special or limited partnership or limited liability company interests or

otherwise, and (y) such Person or any one or more of the other Subsidiaries of such Person is a controlling general partner of, or otherwise controls, such partnership or limited liability company.

"**Transfer**" means, when used as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition by the Transferor (whether by operation of law or otherwise) and, when used as a verb, the Transferor voluntarily or involuntarily, transfers, sells, pledges or hypothecates or otherwise disposes of (whether by operation of law or otherwise), including, in each case, (a) the establishment or increase of a put equivalent position or liquidation with respect to, or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act with respect to, any security or (b) entry into any swap or other arrangement that transfers to another Person, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise. The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"**Warrant**" means that certain warrant, dated as of [●], 2025, issued by the Company to the Investor.

"**Wholly Owned Subsidiary**" of any Person means a Subsidiary of such Person, all of the equity interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such Person or another Wholly Owned Subsidiary of such Person. Unless the context otherwise requires, "Wholly Owned Subsidiary" means a Subsidiary of the Company that is a Wholly Owned Subsidiary of the Company.

The following terms are defined in the Sections of the Agreement indicated:

## INDEX OF TERMS

| **Term** | **Section** |
|---|---|
| Aggregate Company Voting Power | Section 2.2(a) |
| Agreement | Preamble |
| Beneficial Ownership Limitation | Section 2.2(a) |
| Company | Preamble |
| Direction Letter | Section 3.2] |
| [ELOC/ATM Program | Section 3.2] |
| [ELOC/ATM Program Termination Date | Section 3.5] |
| FOCI Mitigation Plan | Section 3.1 |
| Initial Limitation Period | Section 2.2(a) |
| Investor | Preamble |
| Limitation Periods | Section 2.2(a) |
| Limitations | Section 2.2(a) |
| Minimum Threshold | Section 2.1(a) |
| Outside Director | Section 2.1(a) |

| | |
|---|---|
| Plan | Preamble |
| [Register | Section 3.2] |
| Renesas | Section 2.1(a) |
| Renesas Director | Section 2.1(a) |
| Renesas Observer | Section 2.1(g) |
| Repurchase Event | Section 2.2(b) |
| Subsequent Limitation Period | Section 2.2(a) |
| Valuation | [Section 3.6(d)] |
| Voting Rights Limitation | Section 2.2(a) |

Section 1.2    <u>Rules of Construction</u>. Unless the context otherwise requires:

(a)    References in the singular or to "him," "her," "it," "itself" or other like references, and references in the plural or the feminine or masculine reference, as the case may be, shall also, when the context so requires, be deemed to include the plural or singular, or the masculine or feminine reference, as the case may be;

(b)    References to Articles and Sections shall refer to articles and sections of this Agreement, unless otherwise specified;

(c)    The headings in this Agreement are for convenience and identification only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision thereof;

(d)    This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party that drafted and caused this Agreement to be drafted; and

(e)    References to "including" in this Agreement shall mean "including, without limitation," whether or not so specified.

ARTICLE II
<u>GOVERNANCE RIGHTS</u>

<u>Election of Directors</u>. From and after the Initial Issue Date:

(a)    <u>Generally</u>. At any annual or special meeting (or action by written consent) for the election of directors to the Board of Directors, the Company shall, upon written request by the Investor or its designated Affiliate (which shall initially be Renesas Electronics Corporation as of the date hereof) (the Investor, Renesas Electronics Corporation and their Affiliates, collectively, "**Renesas**"), take all Necessary Action, subject to the following provisos, to cause the election or reelection to the Board of Directors, (A) for so long as Renesas beneficially owns (as defined under Section 13 of the Exchange Act) in the aggregate in excess of 10.0% of the shares of Common Stock (the "**Minimum Threshold**"), one (1) director selected by Renesas to the Board of Directors (the "**Renesas Director**") and (B) for so long as the Renesas Director maintains his or her position

5

on the Board of Directors and the Company maintains a facility security clearance with DCSA, one (1) director selected by the Company to the Board of Directors meeting the qualifications set forth in 32 C.F.R. § 117.11(f) and subject to the approval of DCSA who is mutually acceptable to the Company and Renesas (the "**Outside Director**"); provided, that all of Renesas' rights under Article II are non-transferable and such rights and the Company's obligations hereunder related thereto shall (except for Renesas' rights under Section 2.1(d), and the parties' rights and obligations under Section 2.2) automatically be terminated without any further action required in the event that Renesas beneficially owns (as defined under Section 13 of the Exchange Act) shares of Common Stock in the aggregate less than the Minimum Threshold. The Renesas Director and the Outside Director may not be removed as a director on the Board of Directors by the Company under any circumstances, except as provided under Section 2.1(c). In the event that a vacancy is created on the Board of Directors at any time due to the death, disability, retirement, resignation, or removal of the Renesas Director, then Renesas shall have the right to designate an individual, who meets the requirements of this Section 2.1(a) and subject to Section 2.1(c), to fill such vacancy to be appointed by the Board of Directors as promptly as practicable. In the event that Renesas shall fail to designate in writing a representative to fill the vacant Renesas Director seat on the Board of Directors, such Board of Directors seat shall remain vacant until such time as Renesas selects an individual to fill such seat in accordance with this Section 2.1(a), and during any period where such seat remains vacant, the Board of Directors nonetheless shall be deemed duly constituted. The Company's obligations with respect to Section 2.1(a) shall be subject to the Renesas Director's satisfaction of all requirements regarding service as a director of the Company under applicable law and applicable rules of any Exchange. Renesas will direct the Renesas Director (A) to consent to such reference and background checks or other investigations as the Board of Directors may reasonably request in order to determine the Renesas Director's eligibility and qualification to serve as contemplated hereunder and (B) to provide to the Company a completed copy of the directors and officers questionnaire submitted by the Company to its other directors in the ordinary course of business.

(b)     Renesas Director Initial Appointment. The Renesas Director and the Outside Director shall be appointed by the Board of Directors as promptly as practicable following the Initial Issue Date to serve until the next annual meeting of stockholders of the Company after the Initial Issue Date, and the Company and the Board of Directors shall include the Renesas Director and the Outside Director in the slate of nominees recommended to the stockholders of the Company for election as a director at any annual or special meeting (or action by written consent) of the stockholders of the Company at or by which directors of the Company are to be elected, in each case, so long as the Minimum Threshold is met.

(c)     Removal; Nomination Withdrawal. Subject to the last sentence of this Section 2.1(c), the Board of Directors shall not remove the Renesas Director or decline or withdraw any nomination or, subject to the Board of Directors' duties under Delaware law, recommendation regarding the Renesas Director required under Section 2.1(b), unless Renesas delivers to the Board of Directors a written request for such withdrawal or, as applicable, (A) the [Governance and Nominations Committee] of the Board of Directors determines reasonably and in good faith, applying criteria consistent with those applied to other members of or nominees to the Board of Directors, after consultation with outside legal counsel, that such Renesas Director is prohibited or disqualified from serving as a director of the Company under any rule or regulation of the Commission or any Exchange or is a "bad actor" as such term is defined in Rule 506(d) under the

Securities Act, or (B) such Renesas Director has admitted or been judicially determined, pursuant to a final, non-appealable decision, to have engaged in (x) acts or omissions constituting a breach of such Renesas Director's duties to the Company, (y) acts or omissions that involve intentional misconduct or an intentional violation of law and that are felonies, violations of law involving moral turpitude or are materially adverse to the Company or (z) any transaction involving the Company from which such Renesas Director derived an improper personal benefit that was not disclosed to the Board of Directors prior to the authorization of such transaction where such disclosure is required pursuant to the Organizational Documents; provided, however, that, in each case, Renesas shall have the right to designate, in lieu of such Renesas Director, a new Renesas Director. The Board of Directors shall not remove the Outside Director or decline or withdraw any nomination or recommendation required under Section 2.1(b) regarding the Outside Director, unless in accordance with the FOCI Mitigation Plan. The Renesas Director shall promptly resign from the Board of Directors if Renesas loses its right to nominate the Renesas Director pursuant to Section 2.1(a); and the Board of Directors shall have the ability to remove the Renesas Director if the Renesas Director fails to so promptly resign.

(d)    Indemnification; Compensation. The Renesas Director shall be entitled to (i) advancement of expenses and indemnification in the same manner and to the same extent as the other non-executive members of the Board of Directors under the Organizational Documents, the Delaware General Corporation Law and any related indemnification agreements to the extent that the Company is a party thereto and such agreements are in full force and effect, and (ii) unless waived by the Renesas Director, cash and equity compensation in the same manner and to the same extent as other non-executive members of the Board of Directors. Any director minimum ownership requirements shall be deemed satisfied in respect of the Renesas Director, by any Securities held by Renesas. The Company shall be the indemnitor of first resort in connection with the aforementioned indemnity obligations (i.e., its obligations to the Renesas Director are primary and any obligation of Renesas to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Renesas Director are secondary).

(e)    D&O Insurance. The Renesas Director shall be covered as an insured by the Company's directors and officers indemnity insurance coverage on customary terms consistent with the coverage for other non-executive directors, and the Company shall maintain in full force and effect directors' and officers' liability insurance in reasonable amounts from established and reputable insurers to the same extent it indemnifies and provides insurance for the non-executive members of the Board of Directors.

(f)    Board Policies. The Renesas Director shall be subject to all policies of the Board of Directors and the Company applicable to other non-executive members of Board of Directors.

(g)    Board Observer. If, for whatever reason, (i) the Renesas Director (or any replacement for the Renesas Director) is not elected by the Company's stockholders as a director to the Board of Directors in accordance with this Section 2.1 or (ii) Renesas determines not to appoint or nominate a director to the Board of Directors, in each case at any time it is entitled to nominate the Renesas Director pursuant to Section 2.1(a), Renesas shall be entitled to appoint one (1) non-voting observer (the "**Renesas Observer**") to the Board of Directors in lieu of the Renesas Director that is not elected or otherwise nominated or appointed by Renesas to the Board of

7

Directors, as applicable, subject to a customary confidentiality commitment of the Renesas Observer. The Renesas Observer shall be entitled to attend and participate in any meeting of the Board of Directors that the Renesas Observer would have been entitled to attend had he or she been elected as a director, but shall, for the avoidance of doubt, not have any voting rights at such meetings, subject to a customary confidentiality commitment of the Renesas Observer. The Company shall give the Renesas Observer copies of all notices, minutes, consents and other materials that it provides to directors at the same time and in the same manner as provided to such directors. The Renesas Observer shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided. The Company reserves the right to withhold any information or to exclude the Renesas Observer from any meeting, or portion thereof, as is reasonably determined by a majority of the members of the Board of Directors in good faith, upon written advice of counsel, to be necessary to protect competitively sensitive information of the Company, or preserve attorney client privilege. For the avoidance of doubt, the Renesas Observer's appointment shall terminate immediately upon the appointment or election of a Renesas Director.

(h)     Board Committees. Each committee or subcommittee of the Board of Directors (collectively, the "**Committees**") will regularly report to the Board of Directors concerning the Committee's activities at Committee meetings with respect to such matters as are relevant to the discharge of the responsibilities of the Committee.

(i)     Board Size. For so long as Renesas is entitled to designate a director for nomination to the Board of Directors under this Agreement, the Company shall maintain the total number of directors on its Board of Directors at eight (8) or more (including the Renesas Director and the Outside Director). For the avoidance of doubt, the Company's failure to comply with this Section 2.1(i) shall not affect in any way Renesas' rights under this Agreement, including Renesas' right to designate the Renesas Director.

Section 2.2     Voting Rights and Beneficial Ownership.

(a)     Until January 1 of the year following the Initial Issue Date (the "**Initial Limitation Period**"), (i) Renesas shall not exercise voting rights attached to any shares of Common Stock owned by Renesas representing more than 9.9% of the Aggregate Company Voting Power (as defined below) (the "**Voting Rights Limitation**") and (ii) any conversion or exercise of Securities by Renesas shall be null and void and treated as if never made to the extent that, after giving effect to such conversion or exercise, Renesas would own Common Stock representing more than 39.9% of the Aggregate Company Voting Power immediately after giving effect to such conversion or exercise (the "**Beneficial Ownership Limitation**" and, together with the Voting Rights Limitation, the "**Limitations**"). Such Initial Limitation Period shall be automatically renewed for subsequent one (1) year periods (any such one (1) year period, a "**Subsequent Limitation Period**" and, together with the Initial Limitation Period, the "**Limitation Periods**") unless Renesas provides signed written notice to the Company (email being sufficient) at least three (3) months prior to the expiration of any Limitation Period terminating the Limitations; provided, that the parties' rights and obligations under this Section 2.2 shall automatically be terminated without any further action required in the event that Renesas beneficially owns (as defined under Section 13 of the Exchange Act) shares of Common Stock in the aggregate less than 9.9% of the Aggregate Company Voting Power. Notwithstanding the

foregoing, Renesas may terminate the Limitations at any time and without regard to any Limitation Period by signed written notice to the Company (email being sufficient) if the Company has submitted to its stockholders' meeting a proposal of (w) any transaction that would lead to a Change of Control of the Company, (x) the issuance of any Common Stock (or instruments convertible or exercisable into Common Stock), (y) any amendment to the Organizational Documents that would adversely affect any rights of Renesas and (z) any other matters that could adversely affect any rights of Renesas. The "**Aggregate Company Voting Power**" means the aggregate voting power of the outstanding shares of the Company's equity securities entitled to vote as a single class on general matters submitted to a vote at a meeting of the Company's stockholders.

(b)     If the Company proposes any share buyback, open market purchase or other transaction that would reduce the outstanding shares of the Company's equity securities such that Renesas would exceed the Beneficial Ownership Limitation (a "**Repurchase Event**"), the Company shall promptly notify Renesas of such Repurchase Event, and the Company and Renesas shall work together in good faith to restructure Renesas' holdings such that Renesas shall not exceed the Beneficial Ownership Limitation.

ARTICLE III
MISCELLANEOUS

FOCI Mitigation Plan Compliance. For so long as the Company maintains a facility security clearance with DCSA and until such time as its foreign ownership control and influence mitigation plan ("**FOCI Mitigation Plan**") pursuant to 32 C.F.R. § 117.11(d) is terminated by DCSA, the FOCI Mitigation Plan shall remain in full force and effect (subject to applicable law) and any conflict between the FOCI Mitigation Plan and this Agreement shall be resolved in favor of the FOCI Mitigation Plan.

[Sale Proceeds Remittance; Entitlements Register. Prior to the Renesas Base Distribution Date, the Company shall keep and properly maintain at its principal executive office a register (the "**Register**") of the entitlements to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the [*Order Confirming the [Amended] Joint Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate*] [Docket No. [●]]. To the extent that the Company, prior to the Renesas Base Distribution Date, conducts a primary registered offering of shares of Common Stock of the Company pursuant to the Registration Rights Agreement (as defined in the Plan) or Reserve Shares (as defined in the Plan) under the ELOC Program or ATM Program (collectively, the "**ELOC/ATM Program**"), the Company shall cause the cash proceeds from such sale transaction to be promptly remitted directly to Renesas (by delivery to Renesas of a certified or official bank check payable to the order of Renesas or by wire transfer of immediately available funds to an account designated in writing by Renesas) without any reduction, set-off, or any other deductions other than the commission or discount for the sales agent administering the ELOC/ATM Program or underwriter(s) for the primary registered offering. The Register shall provide for anti-dilution protections in respect of dividends, the subdivision or combination of outstanding Common Stock, Common Stock splits, the issuance of rights or warrants to all or substantially all holders of Common Stock, spinoffs, recapitalizations, and change of control transactions (excluding, for the avoidance of doubt, any price-based or "ratchet" protections). Renesas may issue direction letters (each a "**Direction Letter**") to the Company exercising its

9

right (i) to designate Reserve Shares for issuance and sale and to receive cash proceeds from the sale of the Reserve Shares and (ii) to direct the Company to instruct the sales agent administering the ELOC/ATM Programs, or subject to the terms of the Registration Rights Agreement, underwriter(s) for any Registered Primary Offerings (as defined in the Registration Rights Agreement), to sell part or all of the Reserve Shares. The Direction Letter shall specify, among other things, (i) the number of the Reserve Shares to be issued and the portion of the Consideration Shares, the Warrant Consideration Shares or the Notes Consideration Shares (each, as defined in the Plan) to which such Direction Letter relates and whether such sales are conducted through the ELOC/ATM Program or a Registered Primary Offering, and may specify the minimum price at which any sale of such Reserve Shares may be executed. Upon delivery of a Direction Letter to the Company in connection with the ELOC/ATM Program, the Company shall (i) promptly notify and direct the sales agent administering the ELOC/ATM Program to sell part or all of the Reserve Shares, including by providing such sales agent with the applicable Direction Letter and other customary documentation needed by the such sales agent to effectuate the sale transaction, and (ii) issue the required Reserve Shares to the sales agent in accordance with the procedures set forth in the Renesas Contingent Documentation (as defined in the Plan) in connection with the sales agent consummating such sale transaction. All determinations as to whether to complete any sale transaction pursuant to the ELOC/ATM Program and as to the timing, manner, price and other terms of any such sale transaction (including the level of commission or discount for the sales agent administering the ELOC/ATM Program) shall be at the discretion of Renesas; provided, that, such sales transactions shall be subject to any contractual limitations the Company is then subject to (including pursuant to the Registration Rights Agreement), market conditions, applicable laws, and customary quarterly blackout rights, and shall only take place during open trading window periods under the Company's insider trading policy. The Company reserves the right to impose up to two (2) blackout periods for an aggregate of up to ninety (90) days in any twelve (12) month period when it is in possession of material non-public information during which sales under the ELOC/ATM Program shall not be permitted, if sales under the ELOC/ATM Program would have a detrimental impact on alternate transactions (including, but not limited to, merger, acquisition or offering transactions) being contemplated by the Company or if the Company reasonably believes it would require disclosure that would meaningfully interfere with an alternate company transaction or otherwise cause meaningful harm to the Company. For the avoidance of doubt, Renesas shall have the right to demand the filing of a draft registration statement related to the ELOC/ATM Program during any blackout period; provided that the Company shall not be required to publicly file such registration statement until the day following the expiration of such blackout period. In addition, Renesas agrees not to use the ELOC/ATM Program, and to be locked up (for a customary period not longer than the lock-up period imposed on, and on the same terms as, to the extent applicable to Renesas' right to use the ELOC/ATM Program, the Company) in connection with any underwritten offering being conducted by the Company for its own account or for the account of any other person, in each case even if it does not participate in such underwritten offering, subject to the following: (i) Renesas' ability to have customary piggyback rights on any underwritten offering conducted by the Company (either primary or secondary) and (ii) that such lock-up requirement shall no longer apply when Renesas owns less than 10% of the Common Stock on a fully diluted basis and Renesas no longer has a director on the board of directors of the Company. The Company shall bear all administrative and registration costs, including the Company's legal and accounting fees, in connection with the ELOC/ATM Program. Renesas shall bear any and all agents', banks', or underwriters' underwriting, private placement,

structuring or other fees (including discounts and commissions, but excluding, for the avoidance of doubt, any legal fees of the sales agent administering the ELOC/ATM Program), as well as Renesas's financial, legal, and other Renesas advisor fees. Upon remittance of such cash proceeds to Renesas, the Company shall update the Register accordingly for the sale of such shares of Common Stock. The Company shall provide Renesas with reasonable access to the Register upon request and shall use reasonable best efforts to cooperate with Renesas in furtherance of this <u>Section 3.2</u>.]

Section 3.3     [<u>Common Stock Reserve</u>. Prior to the Renesas Base Distribution Date, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock the maximum number of shares of Common Stock issuable in connection with a Registered Primary Offering pursuant to the Registration Rights Agreement. The Company shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock in connection with any Registered Primary Offering.]

Section 3.4     [<u>Primary Registered Offerings; ELOC/ATM Sales</u>. To the extent that the Company conducts sales of shares of Common Stock (or securities convertible or exercisable for Common Stock) of the Company through a Registered Primary Offering or under the ELOC/ATM Program, and Renesas receives the cash proceeds from such sales, then the number of shares of Common Stock issuable in connection with a Registered Primary Offering pursuant to the Registration Rights Agreement shall be decreased proportionally for the sale of such shares of Common Stock (or securities convertible or exercisable for Common Stock).]

[<u>ATM Program; Sales Program Termination</u>. Once the Company is eligible to use Form S-3, the Company agrees to create the ATM Program, and the Company shall (a) make all necessary registration and regulatory filings to establish and maintain the ATM Program, and (b) enter into all documentation reasonably necessary to establish and maintain such ATM Program, including, without limitation, to (i) cause the Company's legal and accounting advisors to provide the necessary legal opinions and comfort letters as is necessary or customary to enter into and execute trades under the ATM Program and (ii) provide materials responsive to customary due diligence requests. For so long as the Company (x) is eligible to use Form S-3, (y) is maintaining the ATM Program, and (z) is otherwise in compliance with this <u>Section 3.5</u>, the Company shall not be required to maintain the ELOC Program. The termination date (the "**ELOC/ATM Program Termination Date**") for the ATM Program (or the ELOC Program if the Company is not eligible to use Form S-3) shall be five (5) business days after the earlier of (i) the Renesas Base Distribution Date, (ii) the disposition of all properties related to the Base Consideration (as defined in the Plan) and, if applicable, the Contingent Additional Consideration (as defined in the Plan) subject to the Renesas Contingent Documentation, and (iii) ten (10) years from the date hereof; <u>provided</u>, that the documentation related to the ELOC/ATM Program shall provide for a reasonable period of winddown upon each such event (if necessary). Upon the ELOC/ATM Program Termination Date, the Company shall deliver to Renesas the remaining Base Consideration and, if applicable, Contingent Additional Consideration, not previously distributed to Renesas, less any portions of the Base Consideration and, if applicable, the Contingent Additional Consideration, in respect of which Renesas has received sale proceeds pursuant to primary registered offerings or the ELOC/ATM Program.]

Section 3.6    Tax Matters.

(a)    [Notwithstanding anything in this Agreement to the contrary, Renesas shall hold its right or entitlement to receive the Base Consideration or, if applicable, Contingent Additional Consideration through a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended, that provides the Company a valid IRS Form W-9 (a "**U.S. W-9 Provider**"); provided, if Renesas determines that it is not commercially reasonable to hold such right or entitlement through a U.S. W-9 Provider, then Renesas may Transfer such right or entitlement to an Affiliate that is not a U.S. W-9 Provider as long as (a) Renesas provides the Company written notice of such Transfer no later than the earlier of (i) ten (10) days after the Transfer and (ii) five (5) days prior to any Transfer or release of the Base Consideration, the Contingent Additional Consideration or any consideration pursuant to sales under the ELOC/ATM Program or any registered offering on a primary basis, (b) Renesas and such transferee agree in writing that the Company shall be entitled to deduct and withhold, or cause to be deducted or withheld, from any distribution, payment or Transfer made pursuant thereto or any transactions or documentation entered into in connection therewith, such amounts as are required to be deducted and withheld with respect to the making of such payment under applicable tax law; provided that, notwithstanding the foregoing, in any case where Renesas or such transferee is subject to withholding, the Company's sole remedy shall be to withhold or deduct the required amounts under applicable tax law and (c) such transferee shall provide the Company a valid IRS Form W-8BEN-E (or any amended or comparable substitute form). The Company and Renesas agree to cooperate in good faith to eliminate or minimize any applicable withholding tax imposed on the transactions or any transfer of consideration pursuant to sales under the ELOC/ATM Program or any registered offering on a primary basis contemplated in Section 3.2 and Section 3.5, in each case, to the extent permitted by applicable tax law.

(b)    Without limiting the foregoing, if a Distribution Event (as defined in the Plan) occurs and Renesas receives less consideration on an after-tax basis than it would have received had it received the Base Consideration and, if applicable, the Contingent Additional Consideration at the Effective Date (as defined in the Plan) solely as a result of a change in applicable U.S. federal income tax law after the Effective Date or a failure of a Distribution Event to qualify for the intended tax treatment provided for in the Plan, then the Company and Renesas shall use commercially reasonable efforts (taking into account outstanding Regulatory Approvals (as defined in the Plan)) to mitigate any tax incurred in excess of the amount of tax that would have been incurred by Renesas had the Regulatory Approvals been secured by the Effective Date. For the avoidance of doubt, Renesas will not bear any tax obligations of Wolfspeed Texas LLC or the Company or any respective agents thereof based on Wolfspeed Texas LLC's, the Company's, or any such agents' income, gain or profits (howsoever denominated).]

(c)    The Company and Renesas agree to cooperate in good faith, to the extent permitted by applicable tax law, to eliminate or minimize any withholding taxes or backup withholding, including requesting from Renesas a complete and correct executed IRS Form W-9 or applicable IRS Form W-8, as applicable, prior to paying, withholding or setting off any withholding taxes or backup withholding under the Warrant or the Second Lien Convertible Notes Indenture.

(d)     The Company shall obtain a valuation of the "Warrant" (as defined in the Warrant) for U.S. federal and applicable state and local income tax purposes from Ernst & Young LLP (or if Ernst & Young LLP is unable to provide the valuation, such other nationally recognized accounting or valuation firm selected by the Company that is reasonably acceptable to Renesas) (the "**Valuation**"). The Company shall provide Renesas with a copy of the Valuation along with reasonable supporting documentation within forty-five (45) days of the Effective Date (as defined in the Plan).

Severability. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Agreement shall be brought and determined exclusively in a state or federal court located within the State of Delaware. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Successors and Assigns. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party hereto without the prior written consent of the other parties hereto. Any purported assignment or delegation in violation of this Agreement shall be null and void *ab initio*.

Notices. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or facsimile or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

(a)     if to the Company, to:

Wolfspeed, Inc.
4600 Silicon Drive
Durham, NC 27703
Attention: Melissa Garrett
E-mail: Melissa.Garrett@wolfspeed.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:    Tad J. Freese
                Richard Kim
E-mail:       Tad. Freese@lw.com
                Richard.Kim2@lw.com

(b)       if to a Holder, to:

Renesas Electronics America Inc.
c/o Renesas Electronics Corporation
Toyosu Foresia, 3 2 24 Toyosu, Koto ku
Tokyo 135-0061 Japan
Attention:    Shuhei Shinkai
                Sho Ozaki
                Takahiro Homma
E-mail:       shuhei.shinkai.nx@renesas.com
                sho.ozaki.pv@renesas.com
                takahiro.homma.jz@renesas.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Steven N. Serajeddini, P.C.
                Yusuf Salloum
                Claire Stephens
E-mail:       steven.serajeddini@kirkland.com
                yusuf.salloum@kirkland.com
                claire.stephens@kirkland.com

and

Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
Attention:    Rachel W. Sheridan, P.C.
                Shagufa R. Hossain, P.C.
                Anthony L. Sanderson
E-mail:       rachel.sheridan@kirkland.com
                shagufa.hossain@kirkland.com
                anthony.sanderson@kirkland.com

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next business day following such dispatch and (iii) in the case of mailing, on the fifth (5th) business day after the posting thereof.

Headings. The headings contained in this Agreement are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

Entire Agreement. This Agreement, the FOCI Mitigation Plan and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such subject matter.

Specific Performance. Damages in the event of breach of this Agreement by a party hereto may be difficult, if not impossible, to ascertain, and it is therefore agreed that the other parties hereto, in addition to and without limiting any other remedy or right it may have, will have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach, and enforcing specifically the terms and provisions hereof, and each of the parties hereto hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief. The existence of this right will not preclude any party hereto from pursuing any other rights and remedies at law or in equity which such party may have.

Counterparts; Facsimile or .pdf Signature. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document. This Agreement may be executed by facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, and a facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, shall constitute an original for all purposes.

Amendment. This Agreement may not be amended, modified or supplemented without the written consent of the Company and Renesas.

Extensions; Waivers. Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement and (b) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any extension or waiver pursuant to this [Section 3.16] will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

Further Assurances. Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party may reasonably require in order to effectuate the terms and purposes of this Agreement.

No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

Interpretation; Construction. This Agreement has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement. Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited. References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections mean the sections of this Agreement, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

Termination. This Agreement shall automatically terminate, without any further action by any Person, upon the earlier of (i) the written agreement of each party hereto to terminate this Agreement, (ii) the dissolution, liquidation or winding up of the Company. Nothing herein shall relieve any party from any liability for the breach of any of the agreements set forth in this Agreement or (iii) such time when the parties hereto have no further rights or obligations hereunder. The provisions of Section 2.1(d) and Article III shall survive any termination of this Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties have executed this Investor Rights [and Disposition] Agreement as of the date first above written.

**WOLFSPEED INC.**


By: _____
    Name: [●]
    Title:  [●]


**RENESAS ELECTRONICS AMERICA INC.**


By: _____
    Name: [●]
    Title:  [●]

## **EXHIBIT E-1**

**Redline of Investor Rights and Disposition Agreement**

Attached hereto is a redline of the Investor Rights and Disposition Agreement marked against the version filed as Exhibit E to the Initial Plan Supplement [Docket No. 168].

## INVESTOR RIGHTS [AND DISPOSITION] AGREEMENT

This INVESTOR RIGHTS [AND DISPOSITION] AGREEMENT (this "**Agreement**") is entered into as of [●], 2025, by and among Wolfspeed, Inc., a Delaware corporation (including its successors and permitted assigns, the "**Company**"), and Renesas Electronics America Inc., a California corporation (the "**Investor**").

The Company and Wolfspeed Texas LLC filed [the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, consistent with the terms thereof, the "**Plan**") on June 30, 2025], which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2025.

As a condition to each of the parties' obligations under the Plan, the Company and the Investor are entering into this Agreement for the purpose of granting certain rights to the Investor.

In consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1     Definitions.

"**Affiliate**" means with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

["**ATM Program**" means the "at-the-market" offering program to facilitate the sale of shares of Common Stock (or securities convertible or exercisable for Common Stock) as set forth in the Plan.]

"**Board of Directors**" means the Company's board of directors.

"**business day**" means any day other than a Saturday or Sunday or a legal holiday on which commercial banks in New York City or the State of California in the United States, or Japan, are authorized or required by law to be closed.

"**Bylaws**" means the Bylaws of the Company, as the same may be amended or amended and restated from time to time.

"**Certificate of Incorporation**" means the Certificate of Incorporation of the Company, as the same has been and may be amended or restated from time to time.

"**Change of Control**" means (i) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Wholly Owned Subsidiaries and the employee benefit plans of the Company and its Wholly Owned Subsidiaries, who files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the common equity interests of the Company representing more than 50% of the voting power of the common equity interests of the Company; (ii) the Company shall have sold all or substantially all of the assets of its entire business or all or substantially all of the assets of its business producing silicon carbide bare wafers and epitaxial wafers; or (iii) the stockholders of the Company have adopted a plan or proposal of dissolution.

"**Commission**" means the United States Securities and Exchange Commission.

"**Common Stock**" means the shares of common stock, ~~par value $0.00125 per share~~, of the Company, and any capital stock into which all of the Common Stock shall have been converted, exchanged, or reclassified following the date hereof.

"**DCSA**" means the Defense Counterintelligence and Security Agency of the United States Department of Defense.

["**ELOC Program**" means the equity line of credit to facilitate the sale of shares of Common Stock (or securities convertible or exercisable for Common Stock) as set forth in the Plan.]

"**Exchange**" means the New York Stock Exchange or any national securities exchange on which the Company's Common Stock is listed or admitted to trading.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended, or any similar successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect from time to time.

"**Holder**" means any Renesas entity holding Securities.

"**Initial Issue Date**" means [the date hereof] [the Renesas Base Distribution Date (as defined in the Plan)].

"**Necessary Action**" means, with respect to a specified result, all actions (to the extent such actions are permitted by applicable law, rule or regulation and, in the case of any action by the Company that requires a vote or other action on the part of the Board of Directors (or a committee of such board duly authorized to act with the authority of such board), to the extent such action is consistent with the fiduciary duties that the Company's directors may have in such capacity) necessary to cause such result, including, to the extent applicable, (i) including the Renesas Director and the Outside Director in the Board of Directors' slate of nominees to the stockholders at every meeting of the stockholders called with respect to the election of directors to the Board of Directors, (ii) including the Renesas Director and the Outside Director in the proxy statement prepared by management of the Company in connection with soliciting proxies for every meeting of the stockholders of the Company called with respect to the election of directors to the Board of Directors, and at every adjournment or postponement thereof, and on every action or approval by written consent of the Board of Directors (or a committee of such

board duly authorized to act with the authority of such board) with respect to the election of directors to the Board of Directors (and unanimously recommending the stockholders of the Company vote in favor of the election of the Renesas Director and the Outside Director at all times), (iii) not nominating any candidate for the slate of nominees for each election of directors to the Board of Directors in opposition to the election of the Renesas Director and the Outside Director, (iv) seeking the adoption of stockholders' resolutions and amendments to the Organizational Documents of the Company if necessary, (v) executing necessary agreements and instruments, and (vi) making or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations or similar actions that are required to achieve such result.

"**Organizational Documents**" means, collectively, the Certificate of Incorporation and Bylaws.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, other legal entity or organization, including a government or political subdivision or an agency or authority.

"**Second Lien Convertible Notes**" means the convertible notes to be issued pursuant to the Second Lien Convertible Notes Indenture.

"**Second Lien Convertible Notes Indenture**" means that certain Indenture, dated as of [●], 2025, between the Company and U.S. Bank Trust Company, National Association, as trustee.

"**Securities**" means (a) any shares of Common Stock held by a Holder and any shares of Common Stock hereafter acquired by any Holder (including, without limitation, pursuant to the conversion of the Second Lien Convertible Notes in accordance with the Second Lien Convertible Notes Indenture), (b) Common Stock acquired pursuant to the exercise of the Warrant and (c) any other securities issued or issuable with respect to any such shares of Common Stock, including shares of Common Stock underlying any warrants or the Second Lien Convertible Notes by way of share split, share dividend (including dividends paid in kind), distribution, recapitalization, merger, exchange, replacement or similar event or otherwise.

"**Securities Act**" means the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder or any similar federal statute and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"**Subsidiary**" means, with respect to any Person: (a) any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of the capital stock entitled (without regard to the occurrence of any contingency, but after giving effect to any voting agreement or stockholders' agreement that effectively Transfers voting power) to vote in the election of directors, managers or trustees, as applicable, of such corporation, association or other business entity is owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person; and (b) any partnership or limited liability company where (x) more than 50% of the capital accounts, distribution rights, equity and voting interests, or of the general and limited partnership interests, as applicable, of such partnership or limited liability corporation are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person,

3

whether in the form of membership, general, special or limited partnership or limited liability company interests or otherwise, and (y) such Person or any one or more of the other Subsidiaries of such Person is a controlling general partner of, or otherwise controls, such partnership or limited liability company.

"**Transfer**" means, when used as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition by the Transferor (whether by operation of law or otherwise) and, when used as a verb, the Transferor voluntarily or involuntarily, transfers, sells, pledges or hypothecates or otherwise disposes of (whether by operation of law or otherwise), including, in each case, (a) the establishment or increase of a put equivalent position or liquidation with respect to, or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act with respect to, any security or (b) entry into any swap or other arrangement that transfers to another Person, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise. The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"**Warrant**" means that certain warrant, dated as of [●], 2025, issued by the Company to the Investor.

"**Wholly Owned Subsidiary**" of any Person means a Subsidiary of such Person, all of the equity interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such Person or another Wholly Owned Subsidiary of such Person. Unless the context otherwise requires, "Wholly Owned Subsidiary" means a Subsidiary of the Company that is a Wholly Owned Subsidiary of the Company.

The following terms are defined in the Sections of the Agreement indicated:

## INDEX OF TERMS

| **Term** | **Section** |
|---|---|
| Aggregate Company Voting Power | Section 2.2(a) |
| Agreement | Preamble |
| Beneficial Ownership Limitation | Section 2.2(a) |
| Company | Preamble |
| **Direction Letter** | **Section 3.2]** |
| [ELOC/ATM Program | Section 3.2] |
| [ELOC/ATM Program Termination Date | Section 3.5] |
| FOCI Mitigation Plan | Section 3.1 |
| Initial Limitation Period | Section 2.2(a) |
| Investor | Preamble |
| Limitation Periods | Section 2.2(a) |
| Limitations | Section 2.2(a) |
| Minimum Threshold | Section 2.1(a) |

4

| | |
|---|---|
| Outside Director | Section 2.1(a) |
| Plan | Preamble |
| [Register | Section 3.2] |
| Renesas | Section 2.1(a) |
| Renesas Director | Section 2.1(a) |
| Renesas Observer | Section 2.1(g) |
| Repurchase Event | Section 2.2(b) |
| Subsequent Limitation Period | Section 2.2(a) |
| **Valuation** | **[Section 3.6(d)]** |
| Voting Rights Limitation | Section 2.2(a) |

Section 1.2    <u>Rules of Construction</u>. Unless the context otherwise requires:

(a)    References in the singular or to "him," "her," "it," "itself" or other like references, and references in the plural or the feminine or masculine reference, as the case may be, shall also, when the context so requires, be deemed to include the plural or singular, or the masculine or feminine reference, as the case may be;

(b)    References to Articles and Sections shall refer to articles and sections of this Agreement, unless otherwise specified;

(c)    The headings in this Agreement are for convenience and identification only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision thereof;

(d)    This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party that drafted and caused this Agreement to be drafted; and

(e)    References to "including" in this Agreement shall mean "including, without limitation," whether or not so specified.

ARTICLE II<br>GOVERNANCE RIGHTS

Section 2.1    <u>Election of Directors</u>. From and after the Initial Issue Date:

(a)    <u>Generally</u>. At any annual or special meeting (or action by written consent) for the election of directors to the Board of Directors, the Company shall, upon written request by the Investor or its designated Affiliate (which shall initially be Renesas Electronics Corporation as of the date hereof) (the Investor, Renesas Electronics Corporation and their Affiliates, collectively, "**Renesas**"), take all Necessary Action, subject to the following provisos, to cause the election or reelection to the Board of Directors, (A) for so long as Renesas beneficially owns (as defined under Section 13 of the Exchange Act) in the aggregate in excess of 10.0% of the shares of Common Stock (the "**Minimum Threshold**"), one (1) director selected

by Renesas to the Board of Directors (the "**Renesas Director**") and (B) for so long as the Renesas Director maintains his or her position on the Board of Directors and the Company maintains a facility security clearance with DCSA, one (1) director selected by the Company to the Board of Directors meeting the qualifications set forth in 32 C.F.R. § 117.11(f) and subject to the approval of DCSA who is mutually acceptable to the Company and Renesas (the "**Outside Director**"); <u>provided</u>, that all of Renesas' rights under <u>Article II</u> are non-transferable and such rights and the Company's obligations hereunder related thereto shall (except for Renesas' rights under <u>Section 2.1(d)</u>, and the parties' rights and obligations under <u>Section 2.2</u>) automatically be terminated without any further action required in the event that Renesas beneficially owns (as defined under Section 13 of the Exchange Act) shares of Common Stock in the aggregate less than the Minimum Threshold. The Renesas Director and the Outside Director may not be removed as a director on the Board of Directors by the Company under any circumstances, except as provided under <u>Section 2.1(c)</u>. In the event that a vacancy is created on the Board of Directors at any time due to the death, disability, retirement, resignation, or removal of the Renesas Director, then Renesas shall have the right to designate an individual, who meets the requirements of this <u>Section 2.1(a)</u> and subject to <u>Section 2.1(c)</u>, to fill such vacancy to be appointed by the Board of Directors as promptly as practicable. In the event that Renesas shall fail to designate in writing a representative to fill the vacant Renesas Director seat on the Board of Directors, such Board of Directors seat shall remain vacant until such time as Renesas selects an individual to fill such seat in accordance with this <u>Section 2.1(a)</u>, and during any period where such seat remains vacant, the Board of Directors nonetheless shall be deemed duly constituted. The Company's obligations with respect to <u>Section 2.1(a)</u> shall be subject to the Renesas Director's satisfaction of all requirements regarding service as a director of the Company under applicable law and applicable rules of any Exchange. Renesas will direct the Renesas Director (A) to consent to such reference and background checks or other investigations as the Board of Directors may reasonably request in order to determine the Renesas Director's eligibility and qualification to serve as contemplated hereunder and (B) to provide to the Company a completed copy of the directors and officers questionnaire submitted by the Company to its other directors in the ordinary course of business.

(b)      <u>Renesas Director Initial Appointment</u>. The Renesas Director and the Outside Director shall be appointed by the Board of Directors as promptly as practicable following the Initial Issue Date to serve until the next annual meeting of stockholders of the Company after the Initial Issue Date, and the Company and the Board of Directors shall include the Renesas Director and the Outside Director in the slate of nominees recommended to the stockholders of the Company for election as a director at any annual or special meeting (or action by written consent) of the stockholders of the Company at or by which directors of the Company are to be elected, in each case, so long as the Minimum Threshold is met.

(c)      <u>Removal; Nomination Withdrawal</u>. Subject to the last sentence of this <u>Section 2.1(c)</u>, the Board of Directors shall not remove the Renesas Director or decline or withdraw any nomination or, subject to the Board of Directors' duties under Delaware law, recommendation regarding the Renesas Director required under <u>Section 2.1(b)</u>, unless Renesas delivers to the Board of Directors a written request for such withdrawal or, as applicable, (A) the [Governance and Nominations Committee] of the Board of Directors determines reasonably and in good faith, applying criteria consistent with those applied to other members of or nominees to the Board of Directors, after consultation with outside legal counsel, that such Renesas Director

6

is prohibited or disqualified from serving as a director of the Company under any rule or regulation of the Commission or any Exchange or is a "bad actor" as such term is defined in Rule 506(d) under the Securities Act, or (B) such Renesas Director has admitted or been judicially determined, pursuant to a final, non-appealable decision, to have engaged in (x) acts or omissions constituting a breach of such Renesas Director's duties to the Company, (y) acts or omissions that involve intentional misconduct or an intentional violation of law and that are felonies, violations of law involving moral turpitude or are materially adverse to the Company or (z) any transaction involving the Company from which such Renesas Director derived an improper personal benefit that was not disclosed to the Board of Directors prior to the authorization of such transaction where such disclosure is required pursuant to the Organizational Documents; provided, however, that, in each case, Renesas shall have the right to designate, in lieu of such Renesas Director, a new Renesas Director. The Board of Directors shall not remove the Outside Director or decline or withdraw any nomination or recommendation required under Section 2.1(b) regarding the Outside Director, unless in accordance with the FOCI Mitigation Plan. The Renesas Director shall promptly resign from the Board of Directors if Renesas loses its right to nominate the Renesas Director pursuant to Section 2.1(a); and the Board of Directors shall have the ability to remove the Renesas Director if the Renesas Director fails to so promptly resign.

(d)     Indemnification; Compensation. The Renesas Director shall be entitled to (i) advancement of expenses and indemnification in the same manner and to the same extent as the other non-executive members of the Board of Directors under the Organizational Documents, the Delaware General Corporation Law and any related indemnification agreements to the extent that the Company is a party thereto and such agreements are in full force and effect, and (ii) unless waived by the Renesas Director, cash and equity compensation in the same manner and to the same extent as other non-executive members of the Board of Directors. Any director minimum ownership requirements shall be deemed satisfied in respect of the Renesas Director, by any Securities held by Renesas. The Company shall be the indemnitor of first resort in connection with the aforementioned indemnity obligations (i.e., its obligations to the Renesas Director are primary and any obligation of Renesas to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Renesas Director are secondary).

(e)     D&O Insurance. The Renesas Director shall be covered as an insured by the Company's directors and officers indemnity insurance coverage on customary terms consistent with the coverage for other non-executive directors, and the Company shall maintain in full force and effect directors' and officers' liability insurance in reasonable amounts from established and reputable insurers to the same extent it indemnifies and provides insurance for the non-executive members of the Board of Directors.

(f)     Board Policies. The Renesas Director shall be subject to all policies of the Board of Directors and the Company applicable to other non-executive members of Board of Directors.

(g)     Board Observer. If, for whatever reason, (i) the Renesas Director (or any replacement for the Renesas Director) is not elected by the Company's stockholders as a director to the Board of Directors in accordance with this Section 2.1 or (ii) Renesas determines not to

7

appoint or nominate a director to the Board of Directors, in each case at any time it is entitled to nominate the Renesas Director pursuant to Section 2.1(a), Renesas shall be entitled to appoint one (1) non-voting observer (the "**Renesas Observer**") to the Board of Directors in lieu of the Renesas Director that is not elected or otherwise nominated or appointed by Renesas to the Board of Directors, as applicable, subject to a customary confidentiality commitment of the Renesas Observer. The Renesas Observer shall be entitled to attend and participate in any meeting of the Board of Directors that the Renesas Observer would have been entitled to attend had he or she been elected as a director, but shall, for the avoidance of doubt, not have any voting rights at such meetings, subject to a customary confidentiality commitment of the Renesas Observer. The Company shall give the Renesas Observer copies of all notices, minutes, consents and other materials that it provides to directors at the same time and in the same manner as provided to such directors. The Renesas Observer shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided. The Company reserves the right to withhold any information or to exclude the Renesas Observer from any meeting, or portion thereof, as is reasonably determined by a majority of the members of the Board of Directors **in good faith, upon written advice of counsel,** to be necessary ~~for the purposes of confidentiality, competitive factors,~~**to protect competitively sensitive information of the Company, or preserve** attorney client privilege ~~or other reasonable purposes~~. For the avoidance of doubt, the Renesas Observer's appointment shall terminate immediately upon the appointment or election of a Renesas Director.

**(h)** **Board Committees. Each committee or subcommittee of the Board of Directors (collectively, the "Committees") will regularly report to the Board of Directors concerning the Committee's activities at Committee meetings with respect to such matters as are relevant to the discharge of the responsibilities of the Committee.**

**(i)** ~~(h)~~ Board Size. For so long as Renesas is entitled to designate a director for nomination to the Board of Directors under this Agreement, the Company shall maintain the total number of directors on its Board of Directors at eight (8) or more (including the Renesas Director and the Outside Director). For the avoidance of doubt, the Company's failure to comply with this Section 2.1(i) shall not affect in any way Renesas' rights under this Agreement, including Renesas' right to designate the Renesas Director.

Section 2.2    Voting Rights and Beneficial Ownership.

(a)    Until January 1 of the year following the Initial Issue Date (the "**Initial Limitation Period**"), (i) Renesas shall not exercise voting rights attached to any shares of Common Stock owned by Renesas representing more than 9.9% of the Aggregate Company Voting Power (as defined below) (the "**Voting Rights Limitation**") and (ii) any conversion or exercise of Securities by Renesas shall be null and void and treated as if never made to the extent that, after giving effect to such conversion or exercise, Renesas would own Common Stock representing more than 39.9% of the Aggregate Company Voting Power immediately after giving effect to such conversion or exercise (the "**Beneficial Ownership Limitation**" and, together with the Voting Rights Limitation, the "**Limitations**"). Such Initial Limitation Period shall be automatically renewed for subsequent one (1) year periods (any such one (1) year period, a "**Subsequent Limitation Period**" and, together with the Initial Limitation Period, the "**Limitation Periods**") unless Renesas provides signed written notice to the Company (email

8

being sufficient) at least three (3) months prior to the expiration of any Limitation Period terminating the Limitations; provided, that the parties' rights and obligations under this Section 2.2 shall automatically be terminated without any further action required in the event that Renesas beneficially owns (as defined under Section 13 of the Exchange Act) shares of Common Stock in the aggregate less than 9.9% of the Aggregate Company Voting Power. Notwithstanding the foregoing, Renesas may terminate the Limitations at any time and without regard to any Limitation Period by signed written notice to the Company (email being sufficient) if the Company has submitted to its stockholders' meeting a proposal of (w) any transaction that would lead to a Change of Control of the Company, (x) the issuance of any Common Stock (or instruments convertible or exercisable into Common Stock), (y) any amendment to the Organizational Documents that would adversely affect any rights of Renesas and (z) any other matters that could adversely affect any rights of Renesas. The "**Aggregate Company Voting Power**" means the aggregate voting power of the outstanding shares of the Company's equity securities entitled to vote as a single class on general matters submitted to a vote at a meeting of the Company's stockholders.

(b) If the Company proposes any share buyback, open market purchase or other transaction that would reduce the outstanding shares of the Company's equity securities such that Renesas would exceed the Beneficial Ownership Limitation (a "**Repurchase Event**"), the Company shall promptly notify Renesas of such Repurchase Event, and the Company and Renesas shall work together in good faith to restructure Renesas' holdings such that Renesas shall not exceed the Beneficial Ownership Limitation.

ARTICLE III
MISCELLANEOUS

Section 3.1    FOCI Mitigation Plan Compliance. For so long as the Company maintains a facility security clearance with DCSA and until such time as its foreign ownership control and influence mitigation plan ("**FOCI Mitigation Plan**") pursuant to 32 C.F.R. § 117.11(d) is terminated by DCSA, the FOCI Mitigation Plan shall remain in full force and effect (subject to applicable law) and any conflict between the FOCI Mitigation Plan and this Agreement shall be resolved in favor of the FOCI Mitigation Plan.

Section 3.2    [Sale Proceeds Remittance; Entitlements Register. Prior to the Renesas Base Distribution Date, the Company shall keep and properly maintain at its principal executive office a register (the "**Register**") of the entitlements to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the [*Order Confirming the [Amended] Joint Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate*] [Docket No. [●]]. To the extent that the Company, prior to the Renesas Base Distribution Date, conducts a primary registered offering of shares of Common Stock of the Company pursuant to the Registration Rights Agreement (as defined in the Plan) or Reserve Shares (as defined in the Plan) under the ELOC Program or ATM Program (collectively, the "**ELOC/ATM Program**"), the Company shall cause the cash proceeds from such sale transaction to be promptly remitted directly to Renesas (by delivery to Renesas of a certified or official bank check payable to the order of Renesas or by wire transfer of immediately available funds to an account designated in writing by Renesas) without any reduction, set-off, or any other deductions other than the commission or discount for the sales agent administering the ELOC/ATM Program or underwriter(s) for the

9

primary registered offering. **The Register shall provide for anti-dilution protections in respect of dividends, the subdivision or combination of outstanding Common Stock, Common Stock splits, the issuance of rights or warrants to all or substantially all holders of Common Stock, spinoffs, recapitalizations, and change of control transactions (excluding, for the avoidance of doubt, any price-based or "ratchet" protections). Renesas may issue direction letters (each a "Direction Letter") to the Company exercising its right (i) to designate Reserve Shares for issuance and sale and to receive cash proceeds from the sale of the Reserve Shares and (ii) to direct the Company to instruct the sales agent administering the ELOC/ATM Programs, or subject to the terms of the Registration Rights Agreement, underwriter(s) for any Registered Primary Offerings (as defined in the Registration Rights Agreement), to sell part or all of the Reserve Shares. The Direction Letter shall specify, among other things, (i) the number of the Reserve Shares to be issued and the portion of the Consideration Shares, the Warrant Consideration Shares or the Notes Consideration Shares (each, as defined in the Plan) to which such Direction Letter relates and whether such sales are conducted through the ELOC/ATM Program or a Registered Primary Offering, and may specify the minimum price at which any sale of such Reserve Shares may be executed. Upon delivery of a Direction Letter to the Company in connection with the ELOC/ATM Program, the Company shall (i) promptly notify and direct the sales agent administering the ELOC/ATM Program to sell part or all of the Reserve Shares, including by providing such sales agent with the applicable Direction Letter and other customary documentation needed by the such sales agent to effectuate the sale transaction, and (ii) issue the required Reserve Shares to the sales agent in accordance with the procedures set forth in the Renesas Contingent Documentation (as defined in the Plan) in connection with the sales agent consummating such sale transaction.** All determinations as to whether to complete any sale transaction pursuant to the ELOC/ATM Program and as to the timing, manner, price and other terms of any such sale transaction (including the level of commission or discount for the sales agent administering the ELOC/ATM Program) shall be at the discretion of Renesas; provided, that, such sales transactions shall be subject to any contractual limitations the Company is then subject to (including pursuant to the Registration Rights Agreement), market conditions, applicable laws, and customary quarterly blackout rights, and shall only take place during open trading window periods under the Company's insider trading policy. The Company reserves the right to impose up to two (2) blackout periods for an aggregate of up to ninety (90) days in any twelve (12) month period when it is in possession of material non-public information during which sales under the ELOC/ATM Program shall not be permitted, if sales under the ELOC/ATM Program would have a detrimental impact on alternate transactions (including, but not limited to, merger, acquisition or offering transactions) being contemplated by the Company or if the Company reasonably believes it would require disclosure that would meaningfully interfere with an alternate company transaction or otherwise cause meaningful harm to the Company. For the avoidance of doubt, Renesas shall have the right to demand the filing of a draft registration statement related to the ELOC/ATM Program during any blackout period; provided that the Company shall not be required to publicly file such registration statement until the day following the expiration of such blackout period. In addition, Renesas agrees not to use the ELOC/ATM Program, and to be locked up (for a customary period not longer than the lock-up period imposed on, and on the same terms as, to the extent applicable to Renesas' right to use the ELOC/ATM Program, the Company) in connection with any underwritten offering being conducted by the Company for its

10

own account or for the account of any other person, in each case even if it does not participate in such underwritten offering, subject to the following: (i) Renesas' ability to have customary piggyback rights on any underwritten offering conducted by the Company (either primary or secondary) and (ii) that such lock-up requirement shall no longer apply when Renesas owns less than 10% of the Common Stock on a fully diluted basis and Renesas no longer has a director on the board of directors of the Company. **The Company shall bear all administrative and registration costs, including the Company's legal and accounting fees, in connection with the ELOC/ATM Program. Renesas shall bear any and all agents', banks', or underwriters' underwriting, private placement, structuring or other fees (including discounts and commissions, but excluding, for the avoidance of doubt, any legal fees of the sales agent administering the ELOC/ATM Program), as well as Renesas's financial, legal, and other Renesas advisor fees.** Upon remittance of such cash proceeds to Renesas, the Company shall update the Register accordingly for the sale of such shares of Common Stock. The Company shall provide Renesas with reasonable access to the Register upon request and shall use reasonable best efforts to cooperate with Renesas in furtherance of this <u>Section 3.2</u>.]

Section 3.3     [<u>Common Stock Reserve</u>. Prior to the Renesas Base Distribution Date, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock the maximum number of shares of Common Stock issuable in connection with a Registered Primary Offering ~~(as defined in the Registration Rights Agreement)~~ pursuant to the Registration Rights Agreement. The Company shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock in connection with any Registered Primary Offering.]

Section 3.4     [<u>Primary Registered Offerings; ELOC/ATM Sales</u>. To the extent that the Company conducts sales of shares of Common Stock (or securities convertible or exercisable for Common Stock) of the Company through a Registered Primary Offering or under the ELOC/ATM Program, and Renesas receives the cash proceeds from such sales, then the number of shares of Common Stock issuable in connection with a Registered Primary Offering pursuant to the Registration Rights Agreement shall be decreased proportionally for the sale of such shares of Common Stock (or securities convertible or exercisable for Common Stock).]

Section 3.5     [<u>ATM Program; Sales Program Termination</u>. Once the Company is eligible to use Form S-3, the Company agrees to create the ATM Program, and the Company shall (a) make all necessary registration and regulatory filings to establish and maintain the ATM Program, and (b) enter into all documentation reasonably necessary to establish and maintain such ATM Program, including, without limitation, to (i) cause the Company's legal and accounting advisors to provide the necessary legal opinions and comfort letters as is necessary or customary to enter into and execute trades under the ATM Program and (ii) provide materials responsive to customary due diligence requests. For so long as the Company (x) is eligible to use Form S-3, (y) is maintaining the ATM Program, and (z) is otherwise in compliance with this <u>Section 3.5</u>, the Company shall not be required to maintain the ELOC Program. The termination date (the "**ELOC/ATM Program Termination Date**") for the ATM Program (or the ELOC Program if the Company is not eligible to use Form S-3) shall be five (5) business days after the earlier of (i) the Renesas Base Distribution Date, (ii) the disposition of all properties related to the Base Consideration (as defined in the Plan) and, if applicable, the Contingent Additional Consideration (as defined in the Plan) subject to the Renesas Contingent Documentation ~~(as~~

11

~~defined in the Plan)~~, and (iii) ten (10) years from the date hereof; <u>provided</u>, that the documentation related to the ELOC/ATM Program shall provide for a reasonable period of winddown upon each such event (if necessary). Upon the ELOC/ATM Program Termination Date, the Company shall deliver to Renesas the remaining Base Consideration and, if applicable, Contingent Additional Consideration, not previously distributed to Renesas, less any portions of the Base Consideration and, if applicable, the Contingent Additional Consideration, in respect of which Renesas has received sale proceeds pursuant to primary registered offerings or the ELOC/ATM Program.]

### Section 3.6    Tax Matters.

(a)    ~~Section 3.6 [Withholding.~~ [Notwithstanding anything in this Agreement to the contrary, Renesas shall hold its right or entitlement to receive the Base Consideration or, if applicable, Contingent Additional Consideration through a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended, that provides the Company a valid IRS Form W-9 (a "**U.S. W-9 Provider**"); provided, if Renesas determines that it is not commercially reasonable to hold such right or entitlement through a U.S. W-9 Provider, then Renesas may Transfer such right or entitlement to an Affiliate that is not a U.S. W-9 Provider as long as (a) Renesas provides the Company written notice of such Transfer no later than the earlier of (i) ten (10) days after the Transfer and (ii) five (5) days prior to any Transfer or release of the Base Consideration, the Contingent Additional Consideration or any consideration pursuant to sales under the ELOC/ATM Program or any registered offering on a primary basis, (b) Renesas and such transferee agree in writing that the Company shall be entitled to deduct and withhold, or cause to be deducted or withheld, from any distribution, payment or Transfer made pursuant thereto or any transactions or documentation entered into in connection therewith, such amounts as are required to be deducted and withheld with respect to the making of such payment under applicable tax law; provided that, notwithstanding the foregoing, in any case where Renesas or such transferee is subject to withholding, the Company's sole remedy shall be to withhold or deduct the required amounts under applicable tax law and (c) such transferee shall provide the Company a valid IRS Form W-8BEN-E (or any amended or comparable substitute form). The Company and Renesas agree to cooperate in good faith to eliminate or minimize any applicable withholding tax imposed on the transactions or any transfer of consideration pursuant to sales under the ELOC/ATM Program or any registered offering on a primary basis contemplated in Section 3.2 and Section 3.5, in each case, to the extent permitted by applicable tax law.~~]~~

(b)    Without limiting the foregoing, if a Distribution Event (as defined in the Plan) occurs and Renesas receives less consideration on an after-tax basis than it would have received had it received the Base Consideration and, if applicable, the Contingent Additional Consideration at the Effective Date (as defined in the Plan) solely as a result of a change in applicable U.S. federal income tax law after the Effective Date or a failure of a Distribution Event to qualify for the intended tax treatment provided for in the Plan, then the Company and Renesas shall use commercially reasonable efforts (taking into account outstanding Regulatory Approvals (as defined in the Plan)) to mitigate any tax incurred in excess of the amount of tax that would have been incurred by Renesas had the Regulatory Approvals been secured by the Effective Date. For the avoidance of doubt, Renesas will not bear any tax obligations of Wolfspeed Texas LLC or the Company or any respective agents

12

**thereof based on Wolfspeed Texas LLC's, the Company's, or any such agents' income, gain or profits (howsoever denominated).]**

> **(c)** **The Company and Renesas agree to cooperate in good faith, to the extent permitted by applicable tax law, to eliminate or minimize any withholding taxes or backup withholding, including requesting from Renesas a complete and correct executed IRS Form W-9 or applicable IRS Form W-8, as applicable, prior to paying, withholding or setting off any withholding taxes or backup withholding under the Warrant or the Second Lien Convertible Notes Indenture.**

> **(d)** **The Company shall obtain a valuation of the "Warrant" (as defined in the Warrant) for U.S. federal and applicable state and local income tax purposes from Ernst & Young LLP (or if Ernst & Young LLP is unable to provide the valuation, such other nationally recognized accounting or valuation firm selected by the Company that is reasonably acceptable to Renesas) (the "Valuation"). The Company shall provide Renesas with a copy of the Valuation along with reasonable supporting documentation within forty-five (45) days of the Effective Date (as defined in the Plan).**

Section 3.7    <u>Severability</u>. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 3.8    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Agreement shall be brought and determined exclusively in a state or federal court located within the State of Delaware. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 3.9    <u>Successors and Assigns</u>. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party hereto without the prior written consent of the other parties hereto. Any purported assignment or delegation in violation of this Agreement shall be null and void *ab initio*.

Section 3.10   <u>Notices</u>. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or facsimile or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

(a)     if to the Company, to:

Wolfspeed, Inc.
4600 Silicon Drive
Durham, NC 27703
Attention: Melissa Garrett
E-mail: Melissa.Garrett@wolfspeed.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:     Tad J. Freese
               Richard Kim
E-mail:        Tad. Freese@lw.com
               Richard.Kim2@lw.com

(b)     if to a Holder, to:

Renesas Electronics America Inc.
c/o Renesas Electronics Corporation
Toyosu Foresia, 3 2 24 Toyosu, Koto ku
Tokyo 135-0061 Japan
Attention:     Shuhei Shinkai
               Sho Ozaki
               Takahiro Homma
E-mail:        shuhei.shinkai.nx@renesas.com
               sho.ozaki.pv@renesas.com
               takahiro.homma.jz@renesas.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:     Steven N. Serajeddini, P.C.
               Yusuf Salloum
               Claire Stephens

14

E-mail:        steven.serajeddini@kirkland.com
yusuf.salloum@kirkland.com
claire.stephens@kirkland.com

and

Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
Attention:    Rachel W. Sheridan, P.C.
Shagufa R. Hossain, P.C.
Anthony L. Sanderson
E-mail:        rachel.sheridan@kirkland.com
shagufa.hossain@kirkland.com
anthony.sanderson@kirkland.com

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next business day following such dispatch and (iii) in the case of mailing, on the fifth (5th) business day after the posting thereof.

Section 3.11   <u>Headings</u>. The headings contained in this Agreement are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

Section 3.12   <u>Entire Agreement</u>. This Agreement, the FOCI Mitigation Plan and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such subject matter.

Section 3.13   <u>Specific Performance</u>. Damages in the event of breach of this Agreement by a party hereto may be difficult, if not impossible, to ascertain, and it is therefore agreed that the other parties hereto, in addition to and without limiting any other remedy or right it may have, will have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach, and enforcing specifically the terms and provisions hereof, and each of the parties hereto hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief. The existence of this right will not preclude any party hereto from pursuing any other rights and remedies at law or in equity which such party may have.

Section 3.14   <u>Counterparts; Facsimile or .pdf Signature</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document. This Agreement may be executed by facsimile or .pdf signature, which for the avoidance of doubt shall include

15

DocuSign, and a facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, shall constitute an original for all purposes.

Section 3.15   Amendment. This Agreement may not be amended, modified or supplemented without the written consent of the Company and Renesas.

Section 3.16   Extensions; Waivers. Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement and (b) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any extension or waiver pursuant to this [Section 3.16] will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

Section 3.17   Further Assurances. Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party may reasonably require in order to effectuate the terms and purposes of this Agreement.

Section 3.18   No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

Section 3.19   Interpretation; Construction. This Agreement has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement. Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited. References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections mean the sections of this Agreement, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant

16

relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

Section 3.20   <u>Termination</u>. This Agreement shall automatically terminate, without any further action by any Person, upon the earlier of (i) the written agreement of each party hereto to terminate this Agreement, (ii) the dissolution, liquidation or winding up of the Company. Nothing herein shall relieve any party from any liability for the breach of any of the agreements set forth in this Agreement or (iii) such time when the parties hereto have no further rights or obligations hereunder. The provisions of <u>Section 2.1(d)</u> and <u>Article III</u> shall survive any termination of this Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties have executed this Investor Rights [and Disposition] Agreement as of the date first above written.

**WOLFSPEED INC.**


By:_____
    Name: [●]
    Title:  [●]


**RENESAS ELECTRONICS AMERICA INC.**


By:_____
    Name: [●]
    Title:  [●]


*[Signature Page to Investor Rights [and Disposition] Agreement]*

# EXHIBIT F

**Registration Rights Agreement**

*[Plan Supplement Filing Version 8/19/2025]*
*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

**REGISTRATION RIGHTS AGREEMENT**

**AMONG**

**WOLFSPEED, INC.**

**AND**

**THE HOLDERS PARTY HERETO**

**DATED [●], 2025**

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ............................................................................1
    Section 1.1    Definitions.....................................................................1

**ARTICLE II SHELF [AND PRIMARY DEMAND] REGISTRATION** ..................................7
    Section 2.1    Shelf Registration............................................................7
    Section 2.2    [Primary Registered Offerings].........................................10
    Section 2.3    Deferral or Suspension of Registration; Grace Periods ..........12
    Section 2.4    Effective Registration Statement ......................................13
    Section 2.5    Selection of Underwriters; Cutback....................................14
    Section 2.6    Lock-up.......................................................................15
    Section 2.7    Participation in Underwritten Offering; Information by Holder...............15
    Section 2.8    Registration Expenses ....................................................16

**ARTICLE III PIGGYBACK REGISTRATION** ..................................................17
    Section 3.1    Notices .......................................................................17
    Section 3.2    Underwriter's Cutback....................................................18
    Section 3.3    Company Control...........................................................19
    Section 3.4    Selection of Underwriters ................................................19
    Section 3.5    Withdrawal of Registration ..............................................19

**ARTICLE IV REGISTRATION PROCEDURES** ................................................19
    Section 4.1    Registration Procedures ..................................................19
    Section 4.2    Notice Opt-In and Opt-Out .............................................24

**ARTICLE V INDEMNIFICATION** ...............................................................25
    Section 5.1    Indemnification by the Company.......................................25
    Section 5.2    Indemnification by Selling Holders ....................................26
    Section 5.3    Conduct of Indemnification Proceedings.............................26
    Section 5.4    Other Indemnification ....................................................27
    Section 5.5    Contribution ................................................................27

**ARTICLE VI COMPLIANCE WITH EXEMPTION REQUIREMENTS** ..........................28
    Section 6.1    Compliance with Exemption Requirements ..........................28

**ARTICLE VII MISCELLANEOUS** ..............................................................28
    Section 7.1    Severability ................................................................28
    Section 7.2    Governing Law; Jurisdiction; Waiver of Jury Trial..................29
    Section 7.3    Other Registration Rights ................................................29
    Section 7.4    Additional Rights..........................................................29
    Section 7.5    Successors and Assigns...................................................29
    Section 7.6    Notices .......................................................................30
    Section 7.7    Headings ....................................................................31
    Section 7.8    Additional Parties.........................................................31
    Section 7.9    Adjustments ................................................................31

## TABLE OF CONTENTS
(cont'd)

**Page**

| | | |
|---|---|---|
| Section 7.10 | Entire Agreement | 31 |
| Section 7.11 | Specific Performance | 31 |
| Section 7.12 | Counterparts; Facsimile or .pdf Signature | 32 |
| Section 7.13 | Amendment | 32 |
| Section 7.14 | Extensions; Waivers | 32 |
| Section 7.15 | Further Assurances | 33 |
| Section 7.16 | No Third-Party Beneficiaries | 33 |
| Section 7.17 | Interpretation; Construction | 33 |
| Section 7.18 | Term | 33 |

| | | |
|---|---|---|
| Exhibit A | - | Adoption Agreement |
| Schedule I | - | List of Holders |

THIS **REGISTRATION RIGHTS AGREEMENT**, dated as of [●], 2025 (this "Agreement"), is entered into by and among Wolfspeed, Inc., a Delaware corporation (together with any successor entity thereto, the "Company"), and each of the Holders (as defined below) that are parties hereto from time to time.

## RECITALS

A.       Wolfspeed, Inc. and Wolfspeed Texas LLC filed [the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, consistent with the terms thereof, the "Plan") on June 30, 2025], which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2025.

B.       The Company proposes to issue Common Stock, Warrants and Convertible Notes (each as defined below) [and to remit to Renesas (as defined below) the Base Consideration Proceeds (as defined below) and, if applicable, the Contingent Additional Consideration Proceeds (as defined below) from the sale of Common Stock, in each case] pursuant to, and upon the terms set forth in, the Plan, the [*Order Confirming the [Amended] Joint Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate*] [Docket No. [●]] (the "Confirmation Order"), and the Definitive Documentation (as defined below).

C.       The Company and the Holders have agreed to enter into this Agreement pursuant to which the Company shall grant the Holders certain registration rights under the Securities Act (as defined below) with respect to the Registrable Securities (as defined below) in furtherance of the foregoing.

D.       The Holders on Schedule I are deemed to have executed this Agreement pursuant to the Confirmation Order (as defined below).

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Holders hereby agree as follows:

## AGREEMENT

## ARTICLE I

## DEFINITIONS

Definitions. As used herein, the following terms shall have the following respective meanings:

["Additional Approvals" has the meaning assigned to such term in the Plan.]

"Adoption Agreement" means an Adoption Agreement in the form attached hereto as Exhibit A.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Assignee</u>" has the meaning set forth in <u>Section 7.5</u>.

"<u>Automatic Shelf Registration Statement</u>" means an "automatic shelf registration statement" as defined in Rule 405 (or any successor rule then in effect) promulgated under the Securities Act.

["<u>Base Consideration Proceeds</u>" has the meaning assigned to such term in the Plan.]

"<u>beneficially owned</u>," "<u>beneficial ownership</u>" and similar phrases have the same meanings as such terms have under Rule 13d-3 and 13d-5 (or any successor rule then in effect) under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable upon the occurrence of a subsequent event [(including, for the avoidance of doubt, the Renesas Base Distribution Date)] or with the passage of time.

"<u>Board</u>" means the Board of Directors of the Company from time to time.

"<u>Business Day</u>" means any day other than a Saturday or Sunday or a legal holiday on which commercial banks in New York City or the State of California in the United States, or Japan, are authorized or required by law to be closed.

["<u>CFIUS Approval</u>" has the meaning assigned to such term in the Plan.]

"<u>Commission</u>" means the U.S. Securities and Exchange Commission or any other U.S. Federal agency at the time administering the Securities Act.

"<u>Common Stock</u>" means, collectively, the Company's shares of common stock, par value $[0.00125] per share, any additional security paid, issued or distributed in respect of any such shares by way of a dividend, split or distribution, or in connection with a combination of shares, and any security into which such Common Stock or additional securities shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, amalgamation, consolidation, exchange, distribution or otherwise.

"<u>Company</u>" has the meaning set forth in the Preamble.

"<u>Confirmation Order</u>" has the meaning set forth in the recitals.

["<u>Contingent Additional Consideration Proceeds</u>" has the meaning assigned to such term in the Plan.]

"<u>control</u>," including the correlative terms "<u>controlling</u>," "<u>controlled by</u>" and "<u>under common control with</u>," means possession, directly or indirectly, of the power to direct or cause the

direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.

"Convertible Notes" means the Renesas Convertible Notes and the Non-Renesas Convertible Notes.

"Definitive Documentation" has the meaning assigned to such term in the Plan.

["Disposition Agreement" means, together with any necessary ancillary related documentation, the Investor Rights and Disposition Agreement entered into on the date hereof between the Company and Renesas, as may be amended or supplemented from time to time.

"Effective Date" has the meaning assigned to such term in the Plan.

"ELOC/ATM" means the equity line of credit or "at the market" program entered into to facilitate the sale of Common Stock as set forth in the Plan.]

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FINRA" means the Financial Industry Regulatory Authority or any successor regulatory authority.

"Form S-1 Shelf" has the meaning ascribed to it in Section 2.1(a).

"Form S-3 Shelf" has the meaning ascribed to it in Section 2.1(a).

"Free Writing Prospectus" means any "free writing prospectus" as defined in Rule 405 promulgated under the Securities Act.

"Holders" means any holder of Registrable Securities that is set forth on Schedule I hereto and Transferees of such Holders that acquire Registrable Securities in accordance with Section 7.5 and execute an Adoption Agreement in accordance with Section 7.5 (in each case, so long as such Persons holds any Registrable Securities).

"Information" has the meaning ascribed to it in Section 4.1(i).

"Initial Notice" has the meaning ascribed to it in Section 3.1(a).

"Inspectors" has the meaning ascribed to it in Section 4.1(i).

"Lock-up Period" has the meaning ascribed to it in Section 2.6(a).

"MNPI" has the meaning ascribed to it in Section 4.2.

"New 2L Convertible Notes" has the meaning assigned to such term in the Plan.

"New Renesas 2L Takeback Convertible Notes" has the meaning assigned to such term in the Plan.

"<u>Non-Renesas Convertible Notes</u>" means any New 2L Convertible Notes issued or issuable to Non-Renesas Holders pursuant to the Plan that are (i) issued to a Non-Renesas Holder who reasonably determines (on the advice of counsel) that it may be deemed an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company; <u>provided</u>, that, such Non-Renesas Holder provides notice to the Company and Renesas of such determination on or prior to the date hereof and the Company reasonably agrees (on advice of counsel) with such determination; or (ii) issued other than pursuant to Section 1145 of the Bankruptcy Code.

"<u>Non-Renesas Holders</u>" means Holders party hereto from time to time, in each case other than Renesas.

"<u>Non-Renesas Underwritten Shelf Take-Down</u>" has the meaning ascribed to it in <u>Section 2.1(b)</u>.

"<u>Non-Underwritten Shelf Take-Down</u>" has the meaning ascribed to it in <u>Section 2.1(d)</u>.

"<u>Opt-In Election</u>" has the meaning ascribed to it in <u>Section 4.2</u>.

"<u>Opt-Out Election</u>" has the meaning ascribed to it in <u>Section 4.2</u>.

"<u>Person</u>" means any individual, partnership, limited liability company, corporation, company, association, joint stock company, trust, joint venture, unincorporated organization or any governmental entity or any department, agency or political subdivision thereof.

"<u>Piggyback Notice</u>" has the meaning ascribed to it in <u>Section 3.1(a)</u>.

"<u>Piggyback Registration</u>" means any registration pursuant to <u>Section 3.1(a)</u>.

"<u>Plan</u>" has the meaning set forth in the recitals.

"<u>Policies</u>" has the meaning ascribed to it in <u>Section 4.2</u>.

["<u>Primary Demand Notice</u>" has the meaning ascribed to it in <u>Section 2.2(b)</u>.

"<u>Primary Demand Registration</u>" means a registration of Primary Shares pursuant to <u>Section 2.2</u>.

"<u>Primary Demand Right</u>" has the meaning ascribed to it in <u>Section 2.2(a)</u>.

"<u>Primary Shares</u>" has the meaning ascribed to it in <u>Section 2.2(a)</u>.]

"<u>Prospectus</u>" means the prospectus included in any Registration Statement, as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the securities covered by such Registration Statement and, in each case, by all other amendments and supplements to such prospectus, including post-effective amendments and, in each case, all material incorporated by reference in such prospectus.

["<u>Registered Primary Offering</u>" means a primary registered offering of Primary Shares pursuant to <u>Section 2.2</u>.]

"Registrable Securities" means, with respect to any Holder, at any time, the Shares held or beneficially owned by such Holder at such time; provided, however, that as to any Registrable Securities, such securities shall cease to be Registrable Securities (i) upon the sale thereof pursuant to an effective registration statement, (ii) upon the sale thereof pursuant to Rule 144, (iii) when such securities cease to be outstanding, (iv) when (A) such Registrable Securities are held by a Holder that together with its Affiliates beneficially owns Shares representing less than 3% of the issued and outstanding Common Stock of the Company and (B) on advice of counsel to the Company, which counsel shall be reasonably acceptable to the relevant Holder, such securities may be sold or disposed of by such Holder without the volume, manner of sale and public information limitations under Rule 144 (or any similar provisions then in force), or (v) if such securities shall have been otherwise transferred and new certificates or book-entries for them not bearing a legend restricting transfer shall have been delivered by the Company and such securities may be publicly resold without registration under the Securities Act[; provided, further, that, prior to the Renesas Base Distribution Date, clauses (ii), (iii), (iv) and (v) of this definition shall not apply to Registrable Securities held or beneficially owned by Renesas].

"Registration Statement" means any registration statement of the Company filed with the Commission under the Securities Act that covers the Registrable Securities [or the Primary Shares], including any preliminary Prospectus and the Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits thereto and all material incorporated by reference in such registration statement.

["Regulatory Approvals" has the meaning assigned to such term in the Plan.]

"Related Fund" means any investment manager or advisor that controls, manages, advises or subadvises a Holder.

"Renesas" means Renesas Electronics America Inc., a California corporation (or any successor thereto), and any of its controlled Affiliates.

["Renesas Base Distribution Date" has the meaning assigned to such term in the Plan.]

"Renesas Convertible Notes" means the New Renesas 2L Takeback Convertible Notes issued or issuable to Renesas pursuant to the Plan[, including, prior to the Renesas Base Distribution Date, the associated entitlement to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the Confirmation Order].

"Renesas Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.1(b).

"Renesas Warrants" means the Warrants issued or issuable to Renesas pursuant to the Plan[, including, prior to the Renesas Base Distribution Date, the associated entitlement to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the Confirmation Order].

"Representatives" has the meaning ascribed to it in Section 4.2.

"<u>Required Holders</u>" means each of (i) Renesas for so long as Renesas beneficially owns Registrable Securities and (ii) Holders of a majority of the Registrable Securities beneficially owned by Non-Renesas Holders.

"<u>Rule 144</u>" means Rule 144 under the Securities Act (or successor rule).

"<u>Rule 144A</u>" means Rule 144A under the Securities Act (or successor rule).

"<u>Seasoned Issuer</u>" means an issuer eligible to use a registration statement on Form S-3 under the Securities Act and who is not an "ineligible issuer" as defined in Rule 405.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Selling Holders</u>" means the Holders selling Registrable Securities pursuant to a Registration Statement under this Agreement.

"<u>Selling Holders' Counsel</u>" has the meaning set forth in <u>Section 4.1(b)</u>.

"<u>Shares</u>" means Common Stock (i) issued or issuable to Renesas pursuant to the Plan[, including, prior to the Renesas Base Distribution Date, the associated entitlement to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the Confirmation Order]; (ii) issued or issuable upon exercise of the Renesas Warrants; (iii) issued or issuable upon conversion of the Renesas Convertible Notes; (iv) issued or issuable to any Non-Renesas Holder pursuant to the Plan which Non-Renesas Holder reasonably determines (on the advice of counsel) that it may be deemed an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company; <u>provided</u>, that, such Non-Renesas Holder provides notice to the Company and Renesas of such determination on or prior to the date hereof and the Company reasonably agrees (on advice of counsel) with such determination; and (v) issued or issuable upon conversion of the Non-Renesas Convertible Notes and shall also include any security of the Company issued in respect of or in exchange for such securities of the Company described in the foregoing clause (i) through (v), whether by way of dividend or other distribution, split, recapitalization, merger, amalgamation, rollup transaction, consolidation or reorganization.

"<u>Shelf Holder</u>" has the meaning ascribed to it in <u>Section 2.1(b)</u>.

"<u>Shelf Registration</u>" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

"<u>Shelf Registration Statement</u>" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

"<u>Shelf Take-Down</u>" has the meaning ascribed to it in <u>Section 2.1(b)</u>.

"<u>Subsequent Shelf Registration Statement</u>" has the meaning ascribed to it in <u>Section 2.1(f)</u>.

"<u>Subsidiary</u>" means each Person in which another Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% in voting power of the outstanding capital stock or other equity interests.

6

"Transfer" means any direct or indirect sale, assignment, transfer, conveyance, gift, bequest by will or under intestacy laws, pledge, mortgage, charge, hypothecation or other encumbrance, or any other disposition, of the stated security (or any interest therein or right thereto, including the issuance of any total return swap or other derivative whose economic value is primarily based upon the value of the stated security) or of all or part of the voting power (other than the granting of a revocable proxy) associated with the stated security (or any interest therein) whatsoever, or any other transfer of beneficial ownership of the stated security, with or without consideration and whether voluntarily or involuntarily (including by operation of law).

"Transferee" means a Person acquiring Shares pursuant to a Transfer.

"Underwritten Offering" means a sale, on the Company's or any Holder's behalf, of Shares [or Primary Shares] by the Company or a Holder to an underwriter for reoffering to the public.

"Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.1(c)(i).

"Underwritten Shelf Take-Down Notice" has the meaning ascribed to it in Section 2.1(c)(i).

"Warrants" means, collectively, those certain warrants to purchase shares of Common Stock issued to Renesas by the Company, dated as of date hereof.

"Well-Known Seasoned Issuer" means a "well-known seasoned issuer" as defined in Rule 405 promulgated under the Securities Act (or any successor rule then in effect) and which (i) is a "well-known seasoned issuer" under paragraph (1)(i)(A) of such definition or (ii) is a "well-known seasoned issuer" under paragraph (1)(i)(B) of such definition and is also eligible to register a primary offering of its securities relying on General Instruction I.B.1 of Form S-3 under the Securities Act.

## ARTICLE II

## SHELF [AND PRIMARY DEMAND] REGISTRATION

Shelf Registration.

(a)    Filing. As promptly as practicable, and in any event not later than thirty (30) days of [each of (i) ]the date hereof [and (ii) solely with respect to Registrable Securities held by Renesas, the occurrence of the Renesas Base Distribution Date], the Company shall, pursuant to the requirements of this Section 2.1(a), file (or confidentially submit) on Form S-1 (the "Form S-1 Shelf") or, if available, on Form S-3 (a "Form S-3 Shelf" and, together with the Form S-1 Shelf and any Automatic Shelf Registration Statement, if available, a "Shelf Registration Statement") a Shelf Registration Statement to register under the Securities Act the Registrable Securities owned by the Holders (as applicable) at such time in accordance with Rule 415 under the Securities Act or any successor rule thereto (a "Shelf Registration"). [For purposes of this Section 2.1 only, the Registrable Securities owned by Renesas on any date shall only include those Registrable Securities (including Registrable Securities underlying securities convertible for or exercisable into Shares) actually distributed to Renesas on or prior to such date pursuant to the Plan.] With respect to each Shelf Registration, (i) the Company shall use commercially reasonable efforts to

cause to be declared effective the Shelf Registration Statement as promptly as practicable after the filing (or confidential submission) thereof and, in any event, within five (5) Business Days of resolving all Commission comments or receiving notice that the Shelf Registration Statement will not be reviewed and (ii) the Shelf Registration Statement shall include a Plan of Distribution disclosure in customary form for similar resale registration statements as reasonably requested by the Holders holding a majority of the Registrable Securities included in such Shelf Registration Statement (which shall include, if Registrable Securities held by Renesas are included in such Shelf Registration Statement, the Non-Renesas Holders holding a majority of the Registrable Securities included in such Shelf Registration Statement that are held by Non-Renesas Holders).

(b)     Shelf Take-Downs. Any Holder whose Registrable Securities are included in an effective Shelf Registration Statement (a "Shelf Holder") may initiate an offering or sale of all or part of such Registrable Securities (a "Shelf Take-Down"), in which case the provisions of this Section 2.1 shall apply. Notwithstanding the foregoing: (i) any such Shelf Holder may initiate an unlimited number of Non-Underwritten Shelf Take-Downs pursuant to Section 2.1(d) below; (ii) Renesas may initiate no more than three (3) Underwritten Shelf Take-Downs (including any block trade) pursuant to Section 2.1(c) below during any 12-month period (any such Underwritten Shelf Take-Down, a "Renesas Underwritten Shelf Take-Down"); and (iii) Non-Renesas Holders may initiate no more than two (2) Underwritten Shelf Take-Downs (including any block trade) pursuant to Section 2.1(c) below during any 12-month period (any such Underwritten Shelf Take-Down, a "Non-Renesas Underwritten Shelf Take-Down"); provided, that, the Registrable Securities requested to be sold by the initiating Shelf Holder(s) of any single Underwritten Shelf Take-Down shall have an anticipated aggregate offering price (before deducting underwriting discounts and commissions) of at least $75.0 million.

(c)     Underwritten Shelf Take-Downs.

(i)     Subject to Section 2.1(b), at any time that a Shelf Registration Statement is effective, if a Shelf Holder so elects in a written request delivered to the Company (an "Underwritten Shelf Take-Down Notice"), a Shelf Take-Down may be in the form of an Underwritten Offering (an "Underwritten Shelf Take-Down") and, if necessary, the Company shall use reasonable best efforts to file any necessary Prospectus supplement or post-effective amendment to its Shelf Registration Statement as soon as practicable and, in any event, within fifteen (15) Business Days after the receipt of an Underwritten Shelf Take-Down Notice, unless a longer period is agreed to by the Shelf Holder(s) initiating the Underwritten Shelf Take-Down, and in all events subject to compliance with the notice requirements described in Section 2.1(c)(ii) and Section 3.1(a). Such initiating Shelf Holder(s) shall indicate in such Underwritten Shelf Take-Down Notice (A) the aggregate number of Registrable Securities expected to be offered and sold in such Underwritten Shelf Take-Down, (B) the expected plan of distribution of such Underwritten Shelf Take-Down, and (C) whether it intends for such Underwritten Shelf Take-Down to involve a customary "roadshow" (including an "electronic roadshow") or other marketing effort by the underwriters.

(ii)     Upon delivery of an Underwritten Shelf Take-Down Notice, the Company shall promptly deliver an Initial Notice of such Underwritten Shelf Take-Down to all Shelf Holders pursuant to Section 3.1(a).

8

(iii)     Upon delivery of an Initial Notice, the other Shelf Holders may elect to sell Registrable Securities in such Underwritten Shelf Take-Down, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as agreed to by the initiating Shelf Holder(s), by following the procedure set forth in <u>Section 3.1(a)</u> (but, in all cases, subject to <u>Section 2.5(b)</u> and <u>Section 2.7</u>).

(iv)     Notwithstanding the delivery of any Underwritten Shelf Take-Down Notice, all determinations as to whether to complete any Underwritten Shelf Take-Down and as to the timing, manner, price and other terms of any Underwritten Shelf Take-Down shall be at the discretion of the Shelf Holders holding a majority of the Registrable Securities contemplated to be sold under such Underwritten Shelf Take-Down Notice. The Shelf Holder(s) initiating the Underwritten Shelf Take-Down may withdraw an Underwritten Shelf Take-Down Notice by providing written notice to the Company at any time prior to the execution of an underwriting agreement, unless the Company is informed by the remaining Holders of Registrable Securities included in such Underwritten Shelf Take-Down to continue with such offering and the anticipated aggregate offering price (before deducting underwriting discounts and commissions) of the remaining Registrable Securities covered thereby (excluding the Registrable Securities of the withdrawing Holders) are at least $75.0 million. To the extent an Underwritten Shelf Take-Down Notice is so withdrawn, such Underwritten Shelf Take-Down shall not be counted towards the limitations set forth in <u>Section 2.1(b)</u>. To the extent an Underwritten Shelf Take-Down Notice was delivered by Renesas and is not so withdrawn, due to the remaining Holders of Registrable Securities included in such Underwritten Shelf Take-Down informing the Company to proceed with such Underwritten Shelf Take-Down, and to the extent that Renesas does not participate in such Underwritten Shelf Take-Down, such Underwritten Shelf Take-Down shall be counted as a Non-Renesas Underwritten Shelf Take-Down under <u>Section 2.1(b)(iii)</u> and shall not be counted as a Renesas Underwritten Shelf Take-Down under <u>Section 2.1(b)(ii)</u>. To the extent an Underwritten Shelf Take-Down Notice was delivered by Non-Renesas Holder(s) and is not so withdrawn, due to Renesas informing the Company to proceed with such Underwritten Shelf Take-Down, and to the extent that no Non-Renesas Holders participate in such Underwritten Shelf Take-Down, such Underwritten Shelf Take-Down shall be counted as a Renesas Underwritten Shelf Take-Down under <u>Section 2.1(b)(ii)</u> and shall not be counted as a Non-Renesas Underwritten Shelf Take-Down under <u>Section 2.1(b)(iii)</u>.

(v)     Notwithstanding any provision of this Agreement to the contrary, no Holder may provide an Underwritten Shelf Take-Down Notice during the period beginning upon the receipt by the Holder of an Initial Notice and ending upon the consummation or withdrawal of the related Piggyback Registration so long as the Company is actively and in good faith pursuing such Piggyback Registration and provided that this clause shall not apply for longer than forty-five (45) consecutive days.

(d)     <u>Non-Underwritten Shelf Take-Downs</u>. If a Shelf Holder desires to effect a Shelf Take-Down that does not constitute an Underwritten Shelf Take-Down (a "<u>Non-Underwritten Shelf Take-Down</u>"), provided that the Company receives written notice of the Non-Underwritten Shelf Take-Down at least two (2) Business Days prior to the consummation thereof, the Company shall use commercially reasonable efforts to ensure that upon the sale of Shares pursuant to an effective Shelf Registration Statement a customary legal opinion is promptly, and, in any event not later than one (1) Business Days following the date of such sale, issued to the

9

Company's transfer agent permitting the removal of legends from such Shares subject to the delivery of customary representation letters of selling Holders and/or brokers to the Company, the continuing effectiveness of the Shelf Registration Statement and satisfaction of customary procedures necessary to allow such transfer agent to remove such legends in connection with a sale pursuant to the Shelf Registration Statement.

(e)    Continued Effectiveness. The Company shall use commercially reasonable efforts to keep the Shelf Registration Statement filed pursuant to Section 2.1(a) hereof continuously effective under the Securities Act, including by filing a new Shelf Registration Statement if necessary, in order to permit the Prospectus (or any Prospectus supplement) forming a part thereof to be usable by a Shelf Holder until the earlier to occur of the date as of which (i) all Registrable Securities registered by such Shelf Registration Statement have been sold and (ii) all securities registered pursuant to the terms of this Agreement cease to constitute Registrable Securities as defined hereunder.

(f)    Subsequent Shelf Registrations. If the Shelf Registration Statement filed under Section 2.1(a) or any Subsequent Shelf Registration Statement ceases to be effective for any reason at any time during the period described in Section 2.1(e), the Company shall use commercially reasonable efforts to obtain the prompt withdrawal of any order suspending the effectiveness thereof, and in any event shall within thirty (30) days of such cessation of effectiveness amend such Shelf Registration Statement in a manner designed to obtain the withdrawal of the order suspending the effectiveness thereof, or file an additional shelf registration statement pursuant to Rule 415 under the Securities Act (or any similar provision then in force) covering all of the Registrable Securities covered by and not sold under the Shelf Registration Statement (a "Subsequent Shelf Registration Statement"). If a Subsequent Shelf Registration Statement is filed, the Company shall use commercially reasonable efforts to cause the Subsequent Shelf Registration Statement to be declared effective as soon as practicable after such filing and to keep such Subsequent Shelf Registration Statement continuously effective during the period described in Section 2.1(e). As used herein the term "Shelf Registration Statement" means the Shelf Registration Statement referenced in Section 2.1(a) and any Subsequent Shelf Registration Statements.

(g)    Conversion to Form S-3. In the event the Company files a Form S-1 Shelf, the Company shall use commercially reasonable efforts to convert the Shelf Registration Statement to a Form S-3 Shelf as soon as reasonably practicable after the Company becomes a Seasoned Issuer or a Well-Known Seasoned Issuer.

[Primary Registered Offerings].

(a)    [Renesas Demand for Primary Registration. Prior to receipt of certification of all Regulatory Approvals or written confirmation by Renesas's authorized representative of the granting of such Regulatory Approvals from the applicable regulatory authorities (where such certifications are not issued by the applicable regulatory authorities) for Renesas, subject to the provisions of this Article II and the provisions of the Disposition Agreement, at any time and from time to time, Renesas shall have the right to request in writing that the Company register the sale on Form S-1 (or any successor form thereto) or, if available, on Form S-3 (or any successor form thereto) under the Securities Act of Common Stock or other equity securities of the Company on

10

a primary basis ("<u>Primary Shares</u>") for purposes of a Registered Primary Offering (a "<u>Primary Demand Right</u>") to execute sales to receive Base Consideration Proceeds and Contingent Additional Consideration Proceeds, as applicable. Renesas may initiate no more than one (1) Registered Primary Offering pursuant to this <u>Section 2.2</u> during any 12-month period; provided, that, after the Company becomes a Seasoned Issuer or a Well-Known Seasoned Issuer, Renesas may initiate no more than two (2) Registered Primary Offerings pursuant to this <u>Section 2.2</u> during any 12-month period. Notwithstanding the foregoing, if all Regulatory Approvals, other than CFIUS Approval or the Additional Approvals, have been obtained, Renesas shall not have the ability to exercise the Primary Demand Right until nineteen (19) weeks after the Effective Date.

(b)      <u>Primary Demand Notices</u>. All requests made pursuant to this <u>Section 2.2</u> shall be made by providing written notice to the Company (each such written notice, a "<u>Primary Demand Notice</u>"), which notice shall specify the aggregate number and class or classes of Primary Shares proposed to be registered by the Company and the minimum price at which any sale of Primary Shares may be executed. The Company shall effect any requested Primary Demand Registration using a Form S-3 whenever the Company is a Seasoned Issuer or a Well-Known Seasoned Issuer and shall use an Automatic Shelf Registration Statement if it is a Well-Known Seasoned Issuer.

(c)      <u>Primary Demand Filing</u>. Subject to <u>Section 2.3</u>, promptly after receipt of any Primary Demand Notice, the Company shall give an Initial Notice of the Primary Demand Notice to all Holders of Registrable Securities and otherwise comply with <u>Section 3.1(a)</u>. Upon delivery of a Primary Demand Notice, the Holders may elect to sell Registrable Securities in such Registered Primary Offering, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as applicable to the Primary Shares, by following the procedure set forth in <u>Section 3.1(a)</u> (but, in all cases, subject to <u>Section 2.7</u> and <u>Section 3.2(d)</u>). Subject to <u>Section 2.3</u>, the Company shall use reasonable best efforts to file (or confidentially submit) the Registration Statement in respect of a Primary Demand Notice as soon as practicable and, in any event, within thirty (30) days after receiving a Primary Demand Notice and shall use commercially reasonable efforts to cause the same to be declared effective by the Commission as promptly as practicable after such filing (or confidential submission) and, in any event, within five (5) Business Days of resolving all Commission comments or receiving notice that such Registration Statement will not be reviewed. The Company shall use reasonable best efforts to file any necessary Prospectus supplement or post-effective amendments to such Registration Statement as and when necessary in order to facilitate the Registered Primary Offering. All determinations as to whether to complete any Registered Primary Offering and as to the timing, manner, price and other terms of any Registered Primary Offering shall be at the discretion of Renesas.

(d)      <u>Selection of Underwriters</u>. If Renesas delivers a Primary Demand Notice, Renesas shall select the managing underwriter or underwriters to administer such Registered Primary Offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed.

(e)      <u>Primary Demand Withdrawal</u>. Renesas may withdraw a Primary Demand Notice by providing written notice to the Company at any time prior to the execution of an

underwriting agreement, and such Primary Demand Notice shall not be counted towards the limitations set forth in Section 2.2(a).

        (f)    <u>Termination of Primary Demand Right</u>. The Primary Demand Right will terminate on the Renesas Base Distribution Date.

        (g)    Notwithstanding any provision of this Agreement to the contrary, Renesas may not provide a Primary Demand Notice during the period beginning upon the receipt by Renesas of an Initial Notice and ending upon the consummation or withdrawal of the related Piggyback Registration.]

        <u>Deferral or Suspension of Registration; Grace Periods</u>. If (a) the Company receives [a Primary Demand Notice or] an Underwritten Shelf Take-Down Notice and the Board, in its good faith judgment after consultation with outside legal counsel of the Company, determines that it would be materially adverse to the Company for such Registration Statement to be filed or declared effective on or before the date such filing or effectiveness would otherwise be required hereunder, or for such Registration Statement or Prospectus included therein to be used to sell Shares [or Primary Shares] or for such Underwritten Shelf Take-Down to be effected, because such action would: (i) have a detrimental impact on alternate transactions (including, but not limited to, merger, acquisition or offering transactions) being contemplated by the Company, including, but not limited to, requiring the Company (in the reasonable judgment of the Company) to disclose such alternate transaction in a manner that would meaningfully interfere with such transaction; (ii) based on the advice of the Company's outside counsel, require disclosure of material non-public information that the Company has a bona fide business purpose for preserving as confidential, provided, that, the exception in clause (ii) shall continue to apply only during the time in which such business purpose is continuing and such material non-public information has not been disclosed and remains material; or (iii) render the Company unable to comply with requirements under the Securities Act or the Exchange Act or (b) the Company is subject to a Commission stop order suspending the effectiveness of any Registration Statement or the initiation of proceedings with respect to such Registration Statement under Section 8(d) or 8(e) of the Securities Act, then the Company shall have the right to defer such filing (but not the preparation), initial effectiveness or continued use of a Registration Statement and the Prospectus included therein, provided that, unless consented to in writing by the Holders holding a majority of the Registrable Securities proposed to be included [(in the case of an Underwritten Shelf Take-Down)] (including, if Renesas participates in such Underwritten Shelf-Take-Down, the Non-Renesas Holders holding a majority of the Registrable Securities proposed to be included in such Underwritten Shelf Take-Down held by Non-Renesas Holders) [or Renesas (in the case of a Registered Primary Offering)], the Company shall not use the deferral or suspension rights provided under Section 2.3(a) more than twice in any 12-month period or for more than ninety (90) calendar days in the aggregate in any 12-month period. [For the avoidance of doubt, Renesas shall have the right to demand the filing of a draft registration statement during such period in furtherance of Section 2.2; provided that the Company shall not be required to publicly file a Registration Statement until the day following the expiration of such period.] If the Company shall so postpone the filing, initial effectiveness or continued use of a Registration Statement with respect to [a Primary Demand Notice or] an Underwritten Shelf Take-Down Notice and if [Renesas or] the applicable Shelf Holder[, respectively,] within thirty (30) days after receipt of the notice of postponement advises the Company in writing that it has determined to withdraw such [Primary

Demand Notice or] Underwritten Shelf Take-Down Notice, then such [Primary Demand Notice or] Underwritten Shelf Take-Down Notice shall be deemed to be withdrawn and shall not be counted towards the limitations set forth in Section 2.1(b) [or Section 2.2(a)]. In the event of any deferral or suspension pursuant to this Section 2.3, the Company shall (i) use commercially reasonable efforts to keep the Shelf Holders [or Renesas], as applicable, apprised of the estimated length of the anticipated delay; and (ii) notify the Shelf Holders [or Renesas], as applicable, promptly upon termination of the deferral or suspension. After the expiration of the deferral or suspension period and without any further request from the applicable Shelf Holder [or Renesas], as applicable, to the extent such Shelf Holder [or Renesas] has not withdrawn the [Primary Demand Notice or] Underwritten Shelf Take-Down Notice, if applicable, the Company shall as promptly as reasonably practicable prepare and file (or confidentially submit) a Registration Statement or post-effective amendment or supplement to the applicable Registration Statement or document, or file any other required document, as applicable, and cause any such amendment to be declared effective as promptly as practicable so that, as thereafter delivered to purchasers of the Registrable Securities [or Primary Shares] included therein, the Prospectus will not include a material misstatement or omission and will be effective and useable for the sale of Registrable Securities [or Primary Shares]. [Notwithstanding any provision of this Agreement to the contrary, sales of Primary Shares through any Registered Primary Offering shall be subject to market conditions, applicable laws, and customary quarterly blackout rights, and shall only take place during open trading window periods under the Company's insider trading policy.]

Effective Registration Statement. A registration required or requested pursuant to this Article II shall not be deemed to have been effected, nor shall such registration be counted towards the limitations set forth in Section 2.1(b) [or Section 2.2(a)]:

(a)     unless a Registration Statement with respect thereto has been declared effective by the Commission and remains effective in compliance with the provisions of the Securities Act and the laws of any U.S. state or other jurisdiction applicable to the disposition of Registrable Securities [or Primary Shares] covered by such Registration Statement for (x) not less than 180 days (or such shorter period as will terminate when all of such Registrable Securities [or Primary Shares] shall have been disposed of in accordance with such Registration Statement) or, if such Registration Statement relates to an Underwritten Offering, such longer period as, in the opinion of external counsel for the Company, a Prospectus is required by law to be delivered in connection with sales of Registrable Securities [or Primary Shares] by an underwriter or dealer or (y) in respect of a Shelf Registration Statement filed pursuant to Section 2.1(a) hereof, for such period as is provided in Section 2.1(e) hereof;

(b)     if, after it becomes effective, such Registration Statement is interfered with by any stop order, injunction or other order or requirement of the Commission or other governmental authority or court for any reason other than a violation of applicable law solely by any Selling Holder and has not thereafter become effective;

(c)     unless the offering, in the case of an Underwritten Shelf Take-Down, has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities requested in good faith for disposition (inclusive of any Registrable Securities reduced from such Underwritten Shelf Take-Down pursuant to the terms of Section 2.5 or Section 3.2, as applicable);

13

(d)  with respect to any request for a Registration Statement or an offering, to the extent the applicable Holders shall have reimbursed the Company for all reasonable and documented expenses of the Company related to such Registration Statement or offering; or

(e)  if, in the case of an Underwritten Offering, the conditions to closing specified in an underwriting agreement applicable to the Company are not satisfied or waived other than by reason of any breach or failure by any Selling Holder.

Selection of Underwriters; Cutback.

(a)  Selection of Underwriters. If a Shelf Holder intends to offer and sell the Registrable Securities covered by its request under this Article II by means of an Underwritten Shelf Take-Down, the participating Shelf Holders shall mutually select, in the final determination of the Holders of a majority of the Registrable Securities under such Underwritten Shelf Take-Down, the managing underwriter or underwriters to administer such offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed.

(b)  Underwriter's Cutback. Notwithstanding any other provision of this Article II or Section 3.1, if the managing underwriter or underwriters of an Underwritten Shelf Take-Down advise the Company in their good faith opinion that the inclusion of all such Registrable Securities proposed to be included in such Underwritten Shelf Take-Down would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities in such Underwritten Shelf Take-Down, then the number of securities proposed to be included in such Underwritten Shelf Take-Down shall be allocated among the Company, the Selling Holders and all other Persons selling securities in such Underwritten Shelf Take-Down in the following order:

(i)  *first*, the Registrable Securities of the class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) proposed to be included in such Underwritten Shelf Take-Down, *pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such Underwritten Shelf Take-Down by each such Holder at the time of such Underwritten Shelf Take-Down;

(ii)  *second,* all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Underwritten Shelf Take-Down other than securities to be sold by the Company; and

(iii)  *third*, the securities of the same class or classes to be sold by the Company.

No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such offering. If the underwriter has not limited the number of Registrable Securities to be underwritten, the Company may include securities for its

14

own account (or for the account of any other Persons) in such offering if the underwriter so agrees and if the number of Registrable Securities would not thereby be limited.

Lock-up.

(a) If requested by the managing underwriters in connection with any Underwritten Offering, each Holder (i) who together with its Affiliates owns 10% or more of the Common Stock on a fully-diluted basis at the time of such Underwritten Offering, (ii) who possesses the right to select one or more members of the Board or (iii) who is a natural person and serving as a director or executive officer of the Company shall agree to be bound by customary lock-up agreements providing that such Holder shall not, directly or indirectly, effect any Transfer (including sales pursuant to Rule 144) of any such Shares without prior written consent from the underwriters managing such Underwritten Offering during a period beginning on the date of launch of such Underwritten Offering and ending up to ninety (90) days from and including the date of pricing or such shorter period as reasonably requested by the underwriters managing such Underwritten Offering (the "Lock-Up Period"); provided, that, (A) the foregoing shall not apply to any Shares that are offered for sale as part of such Underwritten Offering, (B) such Lock-Up Period shall be no longer than and on substantially the same terms as the lock-up period applicable to the Company and the executive officers and directors of the Company, (C) such Lock-Up Period shall include customary carve-outs as negotiated in good faith between the Holder and the underwriter and (D) the Holders shall have been offered the opportunity to participate in such Underwritten Offering pursuant to the terms of Article III hereof (subject to the terms of Section 2.5 or Section 3.2, as applicable). Each such Holder agrees to execute a customary lock-up agreement in favor of the underwriters to such effect.

(b) The terms of this Section 2.6 will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

Participation in Underwritten Offering; Information by Holder. No Holder may participate in an Underwritten Offering hereunder unless such Holder (a) agrees to sell such Holder's Shares on the basis provided in any underwriting arrangements, and in accordance with the terms and provisions of this Agreement, including any lock-up arrangements, and (b) completes and executes all questionnaires, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements. In addition, the Holders shall furnish to the Company such information regarding such Holder or Holders and the distribution proposed by such Holders, as applicable, as the Company may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Article II. Nothing in this Section 2.7 shall be construed to create any additional rights regarding the registration of Shares in any Person otherwise than as set forth herein or require any Holder to make any representations, warranties or agreements in respect of or relating to the Company. The Company will use commercially reasonable efforts to ensure that (i) underwriting arrangements shall be in customary form, (ii) no underwriter shall require any Holder to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such Holder and such Holder's intended method of distribution, and (iii) any representation required to be made by such Holder by law and any other representations, warranties and agreements customarily made by selling securityholders registering securities in similar circumstances to the extent the same do not relate to the Company.

15

If, despite the Company's commercially reasonable efforts, an underwriter requires any Holder to make additional representations or warranties to or agreements with such underwriter, such Holder may elect not to participate in such Underwritten Offering and shall not be bound by Section 2.7 hereof.

Registration Expenses. All expenses incident to the Company's performance of or compliance with this Agreement, including without limitation (i) all registration and filing fees, and any other fees and expenses associated with filings required to be made with any stock exchange, the Commission and FINRA (including, if applicable, the fees and expenses of any "qualified independent underwriter" and its counsel as may be required by the rules and regulations of FINRA), (ii) all fees and expenses of compliance with state securities or blue sky laws (including fees and disbursements of counsel for the underwriters and one counsel for the Selling Holders that are Non-Renesas Holders in connection with blue sky qualifications of the Shares [or Primary Shares] and determination of their eligibility for investment under the laws of such jurisdictions as the managing underwriters may designate), (iii) all printing and related messenger and delivery expenses (including expenses of printing certificates for the Shares [and the Primary Shares] in a form eligible for deposit with The Depository Trust Company and of printing prospectuses), (iv) all fees and disbursements of counsel for the Company and of all independent certified public accountants of the Company and its Subsidiaries (including the expenses related to any "comfort" letters), (v) all fees and expenses incurred in connection with the listing of the Shares [or the Primary Shares] on any securities exchange and all rating agency fees, (vi) all fees and documented out-of-pocket disbursements of underwriters customarily paid by the issuer or sellers of securities and subject to reimbursement by the issuer pursuant to the applicable underwriting agreement, including expenses of any special experts retained in connection with the registration (excluding underwriting discounts and commissions and transfer taxes, if any, and fees and disbursements of counsel to underwriters to the extent agreed to be paid by such underwriters (other than such fees and disbursements incurred in connection with any registration or qualification of Shares [or Primary Shares] under the securities or blue sky laws of any state)), (vii) all reasonable fees and documented out-of-pocket expenses of Selling Holders' Counsel for the Non-Renesas Holders of Registrable Securities included in a Piggyback Registration or Shelf Take-Down, as applicable, not to exceed $50,000 per Piggyback Registration or Shelf Take-Down (as applicable), and (viii) fees and expenses of other Persons retained by the Company, and any other reasonable expenses customarily paid by the issuers of securities, will be borne by the Company, regardless of whether the Registration Statement becomes effective (or such offering is completed) and whether or not all or any portion of the Registrable Securities originally requested to be included in such registration or offering are ultimately included in such registration or offering; provided, however, that (A) any underwriting discounts, commissions or fees in connection with the sale of the Registrable Securities will be borne by the Holders pro rata on the basis of the number of Shares so offered and sold, (B) [any underwriting discounts, commissions or fees in connection with the sale of the Primary Shares will be borne by Renesas, (C) ]transfer taxes with respect to the sale of Registrable Securities will be borne by the Holder of such Registrable Securities, ([D]) the fees and expenses of any accountants or other persons retained or employed by any Holder will be borne by such Holder and ([E]) for the avoidance of doubt, Renesas will bear all of Renesas' financial, legal and other advisor fees in connection with any [(i)] registration of Registrable Securities hereunder or any offering thereof in which Renesas is a Selling Holder [or (ii) Primary Registration].

16

# ARTICLE III

## PIGGYBACK REGISTRATION

Notices.

(a)     If the Company at any time proposes for any reason to register the sale of Common Stock or other equity securities of the Company under the Securities Act (other than a Non-Underwritten Shelf Take-Down, [sales under the ELOC/ATM,] sales under any [other] "at-the-market" offering, a dividend reinvestment plan or rights offering, a registration on Form S-4 or Form S-8, or any successor of either such form, or a registration relating solely to the offer and sale to the Company's directors or employees pursuant to any employee share plan or other employee benefit plan or arrangement) whether or not Common Stock or other equity securities of the Company are to be sold by the Company or otherwise[, and whether or not in connection with any Primary Demand Registration pursuant to Section 2.2, or any other agreement] (such registration, a "Piggyback Registration"), the Company shall give to each Holder holding Registrable Securities of the same class or classes proposed to be registered (or convertible or exercisable at the Holder's option into or for such class or classes) written notice of its intention to so register the Shares[, Primary Shares] or other equity securities of the Company at least eight (8) Business Days prior to the expected date of filing of such Registration Statement or amendment or supplement thereto in which the Company first intends to identify any selling stockholders and the number of Registrable Securities [and Primary Shares] to be sold (each such notice, an "Initial Notice"). The Company shall, subject to the provisions of Section 3.2 and Section 3.3 below, include in such Piggyback Registration on the same terms and conditions as the securities otherwise being sold, all Registrable Securities of the same class or classes as the Common Stock or other equity securities of the Company proposed to be registered (or convertible or exercisable at the Holder's option into or for such class or classes) with respect to which the Company has received written requests from Holders for inclusion therein within the time period specified by the Company in the applicable Initial Notice, which time period shall be not less than five (5) Business Days after sending the applicable Initial Notice (each such written request, a "Piggyback Notice"), which Piggyback Notice shall specify the number of Shares proposed to be included in the Piggyback Registration.

(b)     If a Holder does not deliver a Piggyback Notice within the period specified in Section 3.1(a), such Holder shall be deemed to have irrevocably waived any and all rights under this Article III with respect to such registration (but not with respect to future registrations in accordance with this Article III).

(c)     No registration effected under this Section 3.1 shall relieve the Company of its obligation to effect any registration or Shelf Take-Down under Section 2.1 [or Section 2.2] hereof, and no registration effected pursuant to this Section 3.1 shall be deemed to have been effected pursuant to Section 2.1 [or Section 2.2] hereof, and no Piggyback Registration shall count towards the number of Underwritten Shelf Take-Downs that a Shelf Holder is entitled to make pursuant to Section 2.1 hereof [or Registered Primary Offerings that Renesas is entitled to initiate pursuant to Section 2.2 hereof]. The Initial Notice, the Piggyback Notice and the contents thereof shall be kept confidential until the public filing of the applicable Registration Statement, post-effective amendment or Prospectus supplement.

Underwriter's Cutback. If the managing underwriter of an Underwritten Offering [(including an offering pursuant to Section 2.2)] that includes a Piggyback Registration advises the Company that it is the managing underwriter's good faith opinion that the inclusion of all such Registrable Securities proposed to be included in such Underwritten Offering would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities [or the Primary Shares] to be offered thereby, then the number of securities proposed to be included in such Underwritten Offering shall be allocated among the Company, the Selling Holders and all other Persons selling securities in such Underwritten Offering in the following order:

(a)     If the Piggyback Registration referred to in Section 3.1 is initiated as an underwritten primary registration on behalf of the Company [(other than a Registered Primary Offering pursuant to Section 2.2)], then, with respect to each class proposed to be registered:

(i)     *first*, Common Stock or other equity securities of the Company of the class or classes proposed to be registered that the Company proposes to sell, as applicable;

(ii)     *second*, all Registrable Securities of the same class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) held by Holders requested to be included in such Piggyback Registration (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such offering by each such Holder at the time of such Piggyback Registration); and

(iii)     *third*, all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Piggyback Registration.

(b)     if the Piggyback Registration referred to in Section 3.1 is an Underwritten Shelf Take-Down, then the provisions of Section 2.5(b) shall apply.

(c)     if the Piggyback Registration referred to in Section 3.1 is an underwritten secondary registration on behalf of any holder of securities other than a Holder, then, with respect to each class proposed to be registered:

(i)     *first*, the securities of the class or classes proposed to be registered held by such holder;

(ii)     *second*, the Registrable Securities of the same class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) held by Holders requested to be included in such Piggyback Registration (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Piggyback Registration);

(iii)     *third,* all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Piggyback Registration other than securities to be sold by the Company; and

18

(iv)  *fourth*, the Common Stock or other equity securities of the Company of the same class or classes to be sold by the Company.

(d)  [if the Piggyback Registration referred to in <u>Section 3.1</u> is a Registered Primary Offering, then, with respect to each class proposed to be registered:

(i)  *first*, the Primary Shares and all Registrable Securities of the same class or classes (or convertible or exercisable at Renesas' option into or for such class or classes) held by Renesas requested to be included in such Registered Primary Offering;

(ii)  *second*, all Registrable Securities of the same class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) held by Holders other than Renesas requested to be included in such Registered Primary Offering (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Registered Primary Offering);

(iii)  *third,* all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Registered Primary Offering other than securities to be sold by the Company; and

(iv)  *fourth*, any additional securities of the same class or classes to be sold by the Company.]

<u>Company Control</u>. Except for a Registration Statement being filed in connection with a Shelf Registration [or the exercise of a Primary Demand Right], the Company may decline to file a Registration Statement after an Initial Notice has been given or after receipt by the Company of a Piggyback Notice, and the Company may withdraw a Registration Statement after filing and after such Initial Notice or Piggyback Notice, but prior to the effectiveness of the Registration Statement, <u>provided</u>, that, the Company shall promptly notify the Selling Holders in writing of any such action.

<u>Selection of Underwriters</u>. If the Company intends to offer and sell Common Stock or other equity securities of the Company by means of an Underwritten Offering (other than an offering pursuant to <u>Section 2.1</u> [or <u>Section 2.2</u>]), the Company shall select the managing underwriter or underwriters to administer such Underwritten Offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing.

<u>Withdrawal of Registration</u>. Any Holder shall have the right to withdraw all or a part of its Piggyback Notice by giving written notice to the Company of such withdrawal at any time prior to the execution of an underwriting agreement.

## ARTICLE IV

## REGISTRATION PROCEDURES

<u>Registration Procedures</u>. If and whenever the Company is under an obligation pursuant to the provisions of this Agreement to use commercially reasonable efforts to effect the registration

19

of any Registrable Securities [or Primary Shares] or the offering thereof, the Company shall, as expeditiously as reasonably practicable:

(a)      in the case of Registrable Securities, use commercially reasonable efforts to cause a Registration Statement that registers such Registrable Securities to become and remain effective for a period of 180 days or, if earlier, until the earlier to occur of the date as of which (i) all of such Registrable Securities covered thereby have been disposed of and (ii) all securities registered pursuant to the terms of this Agreement cease to constitute Registrable Securities as defined hereunder; provided, that, in the case of any registration of Registrable Securities on a Shelf Registration Statement which are intended to be offered on a continuous or delayed basis, such 180-day period shall be extended, if necessary or contemplated by Section 2.1(e), to keep the registration statement continuously effective, supplemented and amended to the extent necessary to ensure that it is available for sales of such Registrable Securities, and to ensure that it conforms with the requirements of this Agreement, the Securities Act and the policies, rules and regulations of the Commission as announced from time to time, until the Company is no longer required to keep the registration statement continuously effective pursuant to Section 2.1(e) of this Agreement;

(b)      [(x) with respect to a Shelf Registration or Piggyback Registration, furnish] to each Selling Holder, [and (y) with respect to a Registered Primary Offering, furnish to Renesas, in each case] at least ten (10) Business Days before filing the related Registration Statement, or such shorter period as reasonably practical or necessary due to the timing requirements of Section 2.1(c)(i), as applicable, copies of such Registration Statement or any amendments or supplements thereto, which documents shall be subject to the review, comment and reasonable approval by (x) counsel to Renesas (including any reasonably necessary local counsel), to the extent any Registrable Securities beneficially owned by Renesas are included on such Registration Statement, and (y) [solely in the case of a Shelf Registration or Piggyback Registration,] one (1) lead counsel (and any reasonably necessary local counsel) selected by the Non-Renesas Holders who beneficially own a majority of any Registrable Securities owned by Non-Renesas Holders included on such Registration Statement, and who shall represent all Selling Holders that are Non-Renesas Holders as a group (such counsel in (x) and (y), collectively, the "Selling Holders' Counsel") (it being understood that such ten (10) Business Day period need not apply to successive drafts of the same document proposed to be filed so long as such successive drafts are supplied to the Selling Holders' Counsel in advance of the proposed filing by a period of time that is customary and reasonable under the circumstances);

(c)      furnish to [Renesas (in the case of a Registered Primary Offering) and] each Selling Holder [(in the case of a Shelf Registration or Piggyback Registration)] and each underwriter, if any, such number of copies of final conformed versions of the applicable Registration Statement and of each amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference) reasonably requested by [Renesas or] such Selling Holder [(as applicable)] or underwriter in writing;

(d)      in the case of Registrable Securities and [Primary Shares], prepare and file with the Commission such amendments, including post-effective amendments, and supplements to such Registration Statement and the applicable Prospectus or Prospectus supplement, including any Free Writing Prospectus as defined in Rule 405 under the Securities Act, used in connection therewith as may be (i) reasonably requested by any Selling Holder ([in the case of a Shelf

20

Registration or Piggyback Registration and] to the extent such request relates to information relating to such Selling Holder) or any Holder requesting the inclusion of its Registrable Securities therein, or (ii) necessary to keep such Registration Statement effective for at least the period specified in <u>Section 4.1(a)</u> or elsewhere in this Agreement and to comply with the provisions of this Agreement and the Securities Act with respect to the sale or other disposition of such Registrable Securities [and Primary Shares], and furnish to each Selling Holder [(in the case of a Shelf Registration or Piggyback Registration) and Renesas (in the case of a Registered Primary Offering)] and to the managing underwriter(s), if any, within a reasonable period of time prior to the filing thereof a copy of any amendment or supplement to such Registration Statement or Prospectus; <u>provided</u>, <u>however</u>, that, with respect to each Free Writing Prospectus or other materials to be delivered to purchasers at the time of sale of the Registrable Securities, the Company shall (i) ensure that no Registrable Securities are sold "by means of" (as defined in Rule 159A(b) under the Securities Act) such Free Writing Prospectus or other materials without the prior written consent of the sellers of the Registrable Securities, which Free Writing Prospectus or other materials shall be subject to the review of counsel to such sellers and (ii) make all required filings of all Free Writing Prospectuses or other materials with the Commission as are required;

(e)     notify in writing each Selling Holder [(in the case of a Shelf Registration or Piggyback Registration) and Renesas (in the case of a Registered Primary Offering)] promptly (i) of the receipt by the Company of any notification with respect to any comments by the Commission with respect to such Registration Statement or any amendment or supplement thereto or any request by the Commission for the amending or supplementing thereof or for additional information with respect thereto, (ii) of the receipt by the Company of any notification with respect to the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement or any amendment or supplement thereto or the initiation or threatening of any proceeding for that purpose and (iii) of the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Securities [or Primary Shares (as the case may be)] for sale in any jurisdiction or the initiation or threatening of any proceeding for such purposes and, in any such case as promptly as reasonably practicable thereafter, prepare and file an amendment or supplement to such Registration Statement or Prospectus which will correct such statement or omission or effect such compliance;

(f)     use commercially reasonable efforts to register or qualify such Registrable Securities [and Primary Shares] under such other securities or blue sky laws of such jurisdictions as the Selling Holders [(in the case of a Shelf Registration or Piggyback Registration)] reasonably request [(or reasonably necessary, in the case of Primary Shares)] and do any and all other acts and things which may be reasonably necessary or advisable to enable such Selling Holders to consummate their disposition in such jurisdictions; <u>provided</u>, <u>however</u>, that the Company will not be required to qualify generally to do business, subject itself to general taxation or consent to general service of process in any jurisdiction where it would not otherwise be required to do so but for this <u>Section 4.1(f)</u>;

(g)     [in the case of a Shelf Registration or Piggyback Registration,] furnish to each Selling Holder such number of copies of a summary Prospectus or other prospectus, including a preliminary prospectus and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents as such Selling Holders or any underwriter may reasonably request in writing;

(h)     notify on a timely basis each Selling Holder of such Registrable Securities (in the case of a Shelf Registration or Piggyback Registration) at any time when a prospectus relating to such Registrable Securities is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading and, at the request of such Selling Holder, as soon as practicable prepare and furnish to such Selling Holder a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the offeree of such securities, such Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(i)     make available to the Selling Holders, the Selling Holders' Counsel, any underwriter participating in any disposition pursuant to such Registration Statement and counsel to the underwriter(s) (collectively, the "**Inspectors**") any pertinent corporate records and documents reasonably requested to conduct customary due diligence in connection with the related disposition (collectively, the "**Information**") and, to the extent customary and requested by the underwriter(s) participating in any such disposition, request that the independent public accountants who have certified the Company's financial statements make themselves available, at reasonable times and for reasonable periods, to discuss the business of the Company. Any of the Information which the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, shall not be disclosed by the Inspectors unless otherwise agreed between the Inspector and the Company;

(j)     in the case of an Underwritten Offering, cause to be delivered to the underwriters of such Underwritten Offering a "comfort" letter in customary form and at customary times and covering matters of the type customarily covered by such comfort letters from its independent certified public accountants;

(k)     in the case of an Underwritten Offering, cause to be delivered to the underwriters of such Underwritten Offering a written and signed legal opinion or opinions in customary form from its outside or in-house legal counsel dated the closing date of the Underwritten Offering;

(l)     provide a transfer agent and registrar (which may be the same entity) for such Registrable Securities [or Primary Shares] and deliver to such transfer agent and registrar such customary forms, legal opinions from its outside or in-house legal counsel, agreements and other documentation as such transfer agent and/or registrar so request;

(m)     issue to any underwriter to which any Selling Holders may sell Registrable Securities [or the Company may sell Primary Shares] in such offering certificates evidencing such Registrable Securities [or Primary Shares];

(n)     use commercially reasonable efforts to cause such Registrable Securities [(in the case of a Shelf Registration or Piggyback Registration) and Primary Shares (in the case of

22

a Registered Primary Offering)] to be listed on any national securities exchange on which any Common Stock is listed or, if the Common Stock is not listed on a national securities exchange, upon the request of any Selling Holder of the Registrable Securities included in such registration [(in the case of a Shelf Registration or Piggyback Registration) or Renesas (in the case of a Registered Primary Offering)], use commercially reasonable efforts to qualify such Registrable Securities [(in the case of a Shelf Registration or Piggyback Registration) and Primary Shares (in the case of a Registered Primary Offering)] for inclusion on such national securities exchange as the Company shall designate;

      (o)    otherwise use commercially reasonable efforts to comply with all applicable rules and regulations of the Commission and make available to its security holders, no later than sixty (60) days after the end of the 12-month period beginning with the first day of the Company's first full fiscal quarter after the effective date of such Registration Statement, earnings statements (which need not be audited) covering a period of twelve (12) months beginning within three (3) months after the effective date of the Registration Statement, which earnings statements shall satisfy the provisions of Section 11(a) of the Securities Act or any successor rule thereto, provided that such requirement shall be deemed satisfied if the Company timely files complete and accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act;

      (p)    notify the Selling Holders [(in the case of a Shelf Registration or Piggyback Registration) and Renesas (in the case of a Registered Primary Offering)] and the lead underwriter or underwriters, if any, and (if requested) confirm such advice in writing, as promptly as reasonably practicable after notice thereof is received by the Company when the applicable Registration Statement or any amendment thereto has been filed or becomes effective and when the applicable Prospectus or any amendment or supplement thereto has been filed;

      (q)    use commercially reasonable efforts to prevent the entry of, and use commercially reasonable efforts to obtain as promptly as reasonably practicable the withdrawal of, any stop order with respect to the applicable Registration Statement or other order suspending the use of any preliminary or final Prospectus;

      (r)    promptly incorporate in a Prospectus supplement or post-effective amendment to the applicable Registration Statement such information as the lead underwriter or underwriters, if any, and[, in the case of a Shelf Registration or Piggyback Registration], each Selling Holder agree should be included therein relating to the plan of distribution with respect to such class of Registrable Securities [or Primary Shares], which may include disposition of Registrable Securities [or Primary Shares] by all lawful means, including firm-commitment underwritten public offerings, block trades, agented transactions, sales directly into the market, purchases or sales by brokers, derivative transactions, short sales, stock loan or stock pledge transactions and sales not involving a public offering; and make all required filings of such Prospectus supplement or post-effective amendment as promptly as reasonably practicable after being notified of the matters to be incorporated in such Prospectus supplement or post-effective amendment;

      (s)    if a Prospectus supplement will be used in connection with the marketing of an Underwritten Shelf Take-Down [or Registered Primary Offering] and the managing underwriter(s) at any time shall notify the Company in writing that, in the sole judgment of such

managing underwriter(s), inclusion of detailed information to be used in such Prospectus supplement is of material importance to the success of such Underwritten Shelf Take-Down [or Registered Primary Offering], the Company shall use commercially reasonable efforts to include such information in such Prospectus supplement;

(t)     cooperate with each Selling Holder [in the case of a Shelf Registration or Piggyback Registration] and each underwriter or agent, if any, participating in the disposition of such Registrable Securities [or Primary Shares] and their respective counsel in connection with any filings required to be made with FINRA;

(u)     provide a CUSIP number or numbers for all such shares, in each case not later than the effective date of the applicable registration statement;

(v)     to the extent reasonably requested by the lead or managing underwriters in connection with an Underwritten Offering, send appropriate officers of the Company to attend any "roadshows" scheduled in connection with any such Underwritten Offering, with all out of pocket costs and expenses incurred by the Company or such officers in connection with such attendance to be paid by the Company;

(w)     enter into such agreements (including an underwriting agreement in customary form) and take such other actions as [(i) in the case of a Shelf Registration or Piggyback Registration,] the Selling Holder or Selling Holders, as the case may be, owning at least a majority of the Registrable Securities covered by any applicable Registration Statement shall reasonably request [and (ii) in the case of a Registered Primary Offering, Renesas shall reasonably request, in each case] in order to expedite or facilitate the disposition of such Registrable Securities [and Primary Shares (as applicable)], including customary indemnification and contribution to the effect and to the extent provided in <u>Article V</u> hereof, <u>provided</u>, <u>however</u>, that [in the case of a Shelf Registration or a Piggyback Registration], if a Selling Holder becomes a party to any underwriting agreement or related documents, the Selling Holder shall not be required in any such underwriting agreement or related documents to make any representations or warranties to or agreements with the Company or the underwriters other than customary representations, warranties or agreements regarding such Selling Holder's title to Registrable Securities and any written information provided by the Selling Holder to the Company expressly for inclusion in the related Registration Statement, and the liability of any Selling Holder under the underwriting agreement shall be several and not joint and in no event shall the liability of any Selling Holder under the underwriting agreement be greater in amount than the dollar amount of the proceeds received by such Selling Holder under the sale of the Registrable Securities pursuant to such underwriting agreement (net of underwriting discounts and commissions); and

(x)     subject to all the other provisions of this Agreement, use commercially reasonable efforts to take all other steps necessary to effect the registration, marketing and sale of such Registrable Securities [or Primary Shares] contemplated hereby.

<u>Notice Opt-In and Opt-Out</u>. Notwithstanding anything to the contrary in this Agreement, until a Holder makes an affirmative written election, the Company shall not deliver any notice or any information to such Holder that would reasonably be expected to constitute material non-public information ("<u>MNPI</u>"), including any applicable registration notices, or any other

information under this Agreement. Upon receipt of a written election to receive such notices or information (an "Opt-In Election") the Company shall provide to the Holder all applicable notices or information pursuant to this Agreement from the date of such Opt-In Election. At any time following a Holder making an Opt-In Election, such Holder may also make a written election to no longer receive any such notices or information (an "Opt-Out Election"), which election shall cancel any previous Opt-In Election, and, following receipt of such Opt-Out Election, the Company shall not deliver any such notice or information to such Holder from the date of such Opt-Out Election. An Opt-Out Election may state a date on which it expires or, if no such date is specified, shall remain in effect indefinitely. A Holder who previously has given the Company an Opt-In Election or Opt-Out Election may revoke such election at any time, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-In Elections and Opt-Out Elections. Should any Holder have made an Opt-In Election and have received a notice or any information that would reasonably be expected to constitute MNPI, such Holder agrees that it shall treat such MNPI as confidential in accordance with procedures adopted by it in good faith to protect confidential information of third parties delivered to such Holder (the "Policies") and shall not disclose such MNPI, in each case, without the prior written consent of the Company until such time as such MNPI is or becomes available to the public generally, other than as a result of disclosure by the Holder in breach of the terms of this Agreement; provided, that, a Holder may deliver or disclose MNPI (A) to its Affiliates and its and its Affiliates' directors, officers, employees, agents, external advisors or legal counsel (collectively, "Representatives"), but solely to the extent such disclosure reasonably relates to its evaluation of exercise of its rights under this Agreement and the sale of any Registrable Securities in connection therewith, and such Representatives are subject to the Policies or agree to hold the MNPI confidential on terms substantially consistent with this Section 4.2; (B) when disclosure of such information is required by court or administrative order or is necessary to respond to inquiries of regulatory authorities; (C) when disclosure of such information is required, in the reasonable opinion of such Holder's counsel, by law (including any disclosure requirements pursuant to federal securities laws in connection with the filing of any Registration Statement or the use of any Prospectus referred to in this Agreement); or (D) when such information becomes available to any such Person from a source other than the Company and such source is not bound by a confidentiality agreement.

**ARTICLE V**

**INDEMNIFICATION**

Indemnification by the Company. In connection with any Registration Statement in which a Holder is participating, the Company agrees to indemnify and hold harmless, to the full extent permitted by law, such Holder, its Affiliates and their respective officers, directors, managers, partners, members and representatives, and each of their respective successors and assigns, against any losses, claims, damages, liabilities and expenses, including amounts paid in settlement, caused by any violation by the Company of the Securities Act or the Exchange Act applicable to the Company and relating to action or inaction required of the Company in connection with the registration contemplated by such Registration Statement or any untrue or alleged untrue statement of a material fact contained in such Registration Statement or related Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto, or any other disclosure document (including reports and other documents filed under the Exchange Act and any document incorporated by reference therein) or any omission or alleged omission to state therein a material

25

fact required to be stated therein or necessary to make the statements therein not misleading; provided, however, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such Registration Statement or related Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto in reliance upon and in conformity with information furnished to the Company in writing by the Person asserting such loss, claim, damage, liability or expense specifically for use therein. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any such Person and shall survive the transfer of such securities. The Company shall also provide customary indemnification to any underwriters participating in any Underwritten Offering.

Indemnification by Selling Holders. Each Selling Holder agrees to indemnify and hold harmless, to the full extent permitted by law, the Company, the Company's controlled Affiliates and its and their respective directors, managers, partners, members and representatives, and each of their respective successors and assigns, and each Person who controls the Company (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) against any losses, claims, damages or liabilities and expenses caused by any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that such untrue statement or omission was made in reliance on and in conformity with any information furnished in writing by such Selling Holder to the Company expressly for inclusion in such Registration Statement and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting such loss, claim, damage, liability or expense; provided, that, the obligation to indemnify shall be several, not joint and several, for each Selling Holder and in no event shall the liability of any Selling Holder hereunder be greater in amount than the dollar amount of the net proceeds (after deducting underwriting discounts and commissions) received by such Selling Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

Conduct of Indemnification Proceedings. Any Person entitled to indemnification hereunder will (i) give prompt (but in any event within thirty (30) days after such Person has actual knowledge of the facts constituting the basis for indemnification) written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided, however, that any delay or failure to so notify the indemnifying party shall relieve the indemnifying party of its obligations hereunder only to the extent that it is materially prejudiced by reason of such delay or failure, but shall not relieve the indemnifying party from any other liability that it may have otherwise. Any Person entitled to indemnification hereunder shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Person unless (a) the indemnifying party has agreed in writing to pay such fees or expenses, (b) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after receipt of notice of such claim from the Person entitled to indemnification hereunder and employ counsel reasonably satisfactory to such Person, (c) the indemnified party has reasonably concluded, based on the advice of counsel, that there may be legal defenses available to it or other

indemnified parties that are different from or in addition to those available to the indemnifying party or (d) in the reasonable judgment of any such Person, based upon advice of counsel, a conflict of interest may exist between such Person and the indemnifying party with respect to such claims (in which case, if such Person notifies the indemnifying party in writing that such Person elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such Person). If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its consent (but such consent will not be unreasonably withheld, conditioned or delayed). No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened action or claim in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement includes (i) an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action, (ii) does not include a statement as to or an admission of fault, culpability or failure to act by or on behalf of any indemnified party and (iii) does not commit any indemnified party to take, or hold back from taking, any action. No indemnified party shall, without the written consent of the indemnifying party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder, and no indemnifying party shall be liable for any settlement or compromise of, or consent to the entry of judgment with respect to, any such action or claim effected without its consent, in each case which consent shall not be unreasonably withheld, conditioned or delayed.

Other Indemnification. Indemnification similar to that specified in this Article V (with appropriate modifications) shall be given by the Company and each Selling Holder with respect to any required registration or other qualification of Registrable Securities under Federal or state law or regulation of governmental authority other than the Securities Act.

Contribution. If for any reason the indemnification provided for in Section 5.1 or Section 5.2 is unavailable to an indemnified party or insufficient to hold it harmless as contemplated by Section 5.1 and Section 5.2, then (i) the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnified party and the indemnifying party or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective sellers, on the other hand, from their sale of the Registrable Securities. The relative fault of such indemnifying party and indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such indemnifying party or indemnified party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5.5 were determined by pro rata allocation (even if the Holders or any underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 5.5. Notwithstanding the provisions of this Section 5.5, no Holder shall be required to contribute an amount greater than the dollar amount by which the net proceeds received by such Holder with

27

respect to the sale of any Registrable Securities giving rise to such indemnification and contribution obligation exceeds the amount of damages which such Holder has otherwise been required to pay by reason of any and all untrue or alleged untrue statements of material fact or omissions or alleged omissions of material fact made in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto related to such sale of Registrable Securities. The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or expenses (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or, except as provided in <u>Section 5.3</u>, defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The Holders' obligations in this <u>Section 5.5</u> to contribute shall be several in proportion to the dollar amount of the net proceeds (after deducting underwriting discounts and commissions) received by such Selling Holders with respect to the sale of the Registrable Securities giving rise to such contribution obligation and not joint.

## ARTICLE VI

## COMPLIANCE WITH EXEMPTION REQUIREMENTS

<u>Compliance with Exemption Requirements</u>. So long as any Registrable Securities remain outstanding, the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Section 4(a)(7), Rule 144 and Rule 144A under the Securities Act, as such rules may be amended from time to time or any similar rules or regulations adopted by the Commission, including, without limiting the generality of the foregoing, (i) making and keeping current public information available, as those terms are understood and defined in Rule 144 promulgated under the Securities Act, (ii) filing with the Commission in a timely manner all reports and other documents required of the Company under the Exchange Act, to the extent so required, and (iii) at the request of any Holder if such Holder proposes to sell securities in compliance with Section 4(a)(7), Rule 144 or Rule 144A, forthwith furnish to such Holder, as applicable, a written statement of compliance with the reporting requirements of the Commission as set forth in such rules and make available to such Holder such information as will enable the Holder to make sales pursuant to Section 4(a)(7), Rule 144 or Rule 144A.

## ARTICLE VII

## MISCELLANEOUS

<u>Severability</u>. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Agreement shall be brought and determined exclusively in a state or federal court located within the State of Delaware. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Other Registration Rights. The Company shall not grant any demand, piggyback or shelf registration rights, the terms of which are senior to or conflict with the rights granted to the Holders hereunder to any other Person, without the prior written consent of the Required Holders.

Additional Rights. If the Company at any time after the date hereof grants to any other holders of Common Stock or securities of the Company convertible or exercisable into or for Common Stock any rights to request the Company to effect the registration under the Securities Act of any shares of Common Stock on terms more favorable to such holders than the terms set forth in this Agreement, the terms of this Agreement shall be deemed amended or supplemented to the extent necessary to provide the Holders such more favorable rights and benefits.

Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto, each of which, in the case of the Holders and any Transferees thereof, shall agree to become subject to the terms of this Agreement by executing an Adoption Agreement and be bound to the same extent as the parties hereto. The Company may not assign any of its rights or delegate any of its duties hereunder [(a) with respect to Section 2.2 and any associated rights and duties herein, without the prior written consent of Renesas for so long as Renesas holds or beneficially owns any Registrable Securities, and (b) with respect to any other rights or duties hereunder,] without the prior written consent of the Required Holders. Any Holder may, at its election and at any time or from time to time, assign its rights and delegate its duties hereunder, in whole or in part, to any Transferee of such Holder (each, an "Assignee"); provided, that no such assignment shall be binding upon or obligate the Company to any such Assignee unless and until such Assignee delivers the Company an Adoption Agreement; provided, that (i) any rights assigned hereunder shall apply only in respect of Registrable Securities that are Transferred and not in respect of any other securities that the Transferee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement. If a Holder assigns its rights under this Agreement in connection with the Transfer of less than all of its Registrable Securities, the Holder shall retain its rights under this Agreement with respect to its remaining Registrable Securities. If a Holder assigns its rights under this Agreement in connection with the Transfer of all of its Registrable Securities, the Holder shall have no further rights or obligations under this Agreement, except under Article V hereof in respect of offerings in which such Holder participated or registrations in which Registrable Securities held by such Holder were included. Any purported assignment in violation of this provision shall be null and *void ab initio*.

Notices. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or sent by

nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

      (a)    if to the Company, to:

          Wolfspeed, Inc.
          4600 Silicon Drive
          Durham, NC 27703
          Attention: Melissa Garrett
          Email: Melissa.Garrett@wolfspeed.com

          with a copy, in each case, (which shall not constitute notice), to:

          Latham & Watkins LLP
          140 Scott Drive
          Menlo Park, CA 94025
          Attention:    Tad J. Freese
                        Richard Kim
          E-mail:      Tad. Freese@lw.com
                        Richard.Kim2@lw.com

      (b)    if to Renesas, to the address or e-mail address set forth under Renesas' name in <u>Schedule I</u> attached hereto,

          with a copy, in each case, (which shall not constitute notice), to:

          Kirkland & Ellis LLP
          1301 Pennsylvania Avenue, N.W.
          Washington, D.C. 20004
          Attention: Rachel W. Sheridan, P.C.
                     Shagufa R. Hossain, P.C.
                     Anthony L. Sanderson
          Email: rachel.sheridan@kirkland.com
                 shagufa.hossain@kirkland.com
                 anthony.sanderson@kirkland.com

      (c)    if to any Non-Renesas Holder, to the address or e-mail address set forth under such other Holder's name in <u>Schedule I</u> attached hereto,

          with a copy, in each case, (which shall not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attn:   Ryan P. Dahl
        Matthew M. Roose
        Sam Badawi

Email: ryan.dahl@ropesgray.com
       matthew.roose@ropesgray.com
       sam.badawi@ropesgray.com

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth (5th) Business Day after the posting thereof.

Headings. The headings contained in this Agreement are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

Additional Parties. Additional parties to this Agreement shall only include each Holder (a) who has executed an Adoption Agreement, in the form attached hereto as Exhibit A, or (b) who (i) is bound by and subject to the terms of this Agreement, and (ii) has adopted this Agreement with the same force and effect as if it were originally a party hereto.

Adjustments. If, and as often as, there are any changes in the Shares or securities convertible into or exchangeable into or exercisable for Shares as a result of any reclassification, recapitalization, split (including a reverse split), or subdivision or combination, exchange or readjustment of shares, or any share dividend or share distribution, merger, amalgamation or other similar transaction affecting such Shares or such securities, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to such Shares or such securities as so changed.

Entire Agreement. This Agreement and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such subject matter.

Specific Performance. Damages in the event of breach of this Agreement by a party hereto may be difficult, if not impossible, to ascertain, and it is therefore agreed that the other parties hereto, in addition to and without limiting any other remedy or right it may have, will have the right to seek an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach, and enforcing specifically the terms and provisions hereof, and each of the parties hereto hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief. The existence of this

right will not preclude any party hereto from pursuing any other rights and remedies at law or in equity which such party may have.

Counterparts; Facsimile or .pdf Signature. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document. This Agreement may be executed by facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, and a facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, shall constitute an original for all purposes.

Amendment. Other than with respect to amendments to Schedule I attached hereto, which may be amended by the Company from time to time to reflect the Holders at such time, this Agreement may not be amended, modified or supplemented without the written consent of the Required Holders; provided, however, that, with respect to a particular Holder or group of Holders, any such amendment, supplement, modification or waiver that (a) would materially and adversely disproportionately affect such Holder or group of Holders in any respect as compared to any other Holder or group of Holders or (b) would disproportionately benefit any other Holder or group of Holders or confer any benefit on any other Holder or group of Holders to which such Holder or group of Holders would not be entitled, shall not be effective against such Holder or group of Holders unless approved in writing by such Holder or the Holders of a majority of the Registrable Securities held by such group of Holders, as the case may be. [For the avoidance of doubt, the Company and Renesas (for so long as Renesas holds or beneficially owns any Registrable Securities) can amend Section 2.2 and any associated rights, duties and definitions without the written consent of any other Holder so long as such amendment is not materially adverse any such Holders.]

Extensions; Waivers. Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any extension or waiver pursuant to this Section 7.14 will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

Further Assurances. Each of the parties hereto shall execute all such further instruments and documents and take all such further action as the Company may reasonably require in order to effectuate the terms and purposes of this Agreement.

No Third-Party Beneficiaries. Except pursuant to Article V, this Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

Interpretation; Construction. This Agreement has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement. Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the schedules, exhibits and annexes, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited. References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections, schedules, annexes and exhibits mean the sections of this Agreement and the schedules, annexes and exhibits attached to this Agreement, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

Term. This Agreement shall terminate (i) with respect to any Holder, at such time as such Holder has no Registrable Securities and (ii) in full and be of no further effect at such time as there are no Registrable Securities held by any Holders. Notwithstanding the foregoing, Article V, Section 7.2, Section 7.6, and Section 7.17 shall survive any termination.

* * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or been deemed to execute this Agreement, on the date first above written.

**THE COMPANY**:

**WOLFSPEED, INC.**

By: _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or been deemed to execute this Agreement, on the date first above written.

**HOLDER:**

**RENESAS ELECTRONICS AMERICA INC.**


By: _____
    Name: [●]
    Title:  [●]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or been deemed to execute this Agreement, on the date first above written.

**HOLDER:**

**[●]**


By:_____
     Name: [●]
     Title:  [●]

**EXHIBIT A**

**ADOPTION AGREEMENT**

This Adoption Agreement ("Adoption") is executed pursuant to the terms of the Registration Rights Agreement, dated as of [●], 2025, a copy of which is attached hereto (as amended, the "Registration Rights Agreement"), by the undersigned (the "Undersigned") executing this Adoption. Capitalized terms used herein without definition are defined in the Registration Rights Agreement and are used herein with the same meanings set forth therein. By the execution of this Adoption, the Undersigned agrees as follows:

1.      Acknowledgment. The Undersigned acknowledges that the Undersigned is acquiring certain Shares (or securities convertible into or exercisable for Shares), subject to the terms and conditions of the Registration Rights Agreement.

2.      Agreement. The Undersigned (i) agrees that the Shares (or securities convertible into or exercisable for Shares) acquired by the Undersigned, and certain other Shares and other securities of the Company convertible into or exercisable for Shares that may be acquired by the Undersigned in the future, shall be bound by and subject to the terms of the Registration Rights Agreement, pursuant to the terms thereof, and (ii) hereby adopts the Registration Rights Agreement with the same force and effect as if the undersigned were originally a party thereto.

3.      Notice. Any notice required as permitted by the Registration Rights Agreement shall be given to the Undersigned at the address listed beside the Undersigned's signature below.

4.      Opt-In Election. The undersigned Holder hereby notifies the Company of its decision to either exercise or decline its Opt-In Election by marking the appropriate box below.

[ _ ] The undersigned Holder hereby exercises its Opt-In Election.

[ _ ] The undersigned Holder hereby declines its Opt-In Election.

[NAME OF HOLDER]                        Address for Notices:


By:      _____      [●]
Name                                      [●]
Title:                                    Telephone: [●]
Date:                                     Email: [●]

**SCHEDULE I**

**List of Holders**

[*On file with the Company*]

**<u>EXHIBIT F-1</u>**

**Redline of Registration Rights Agreement**

Attached hereto is a redline of the Registration Rights Agreement marked against the version filed as Exhibit F to the Initial Plan Supplement [Docket No. 168].

**REGISTRATION RIGHTS AGREEMENT**

**AMONG**

**WOLFSPEED, INC.**

**AND**

**THE HOLDERS PARTY HERETO**

**DATED [●], 2025**

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ................................................................................ **1**
    Section 1.1    Definitions ................................................................................ 1

**ARTICLE II SHELF [AND PRIMARY DEMAND] REGISTRATION** ............ **7**
    Section 2.1    Shelf Registration ................................................................ 7
    Section 2.2    [Primary Registered Offerings] ........................................ ~~11~~10
    Section 2.3    Deferral or Suspension of Registration; Grace Periods ....... 12
    Section 2.4    Effective Registration Statement .......................................... 13
    Section 2.5    Selection of Underwriters; Cutback ..................................... 14
    Section 2.6    Lock-up .................................................................................. 15
    Section 2.7    Participation in Underwritten Offering; Information by Holder ... 15
    Section 2.8    Registration Expenses ........................................................... 16

**ARTICLE III PIGGYBACK REGISTRATION** ............................................... **17**
    Section 3.1    Notices .................................................................................... 17
    Section 3.2    Underwriter's Cutback .......................................................... 18
    Section 3.3    Company Control .................................................................... 19
    Section 3.4    Selection of Underwriters ..................................................... 19
    Section 3.5    Withdrawal of Registration ................................................... 19

**ARTICLE IV REGISTRATION PROCEDURES** ........................................... **19**
    Section 4.1    Registration Procedures ........................................................ 19
    Section 4.2    Notice Opt-In and Opt-Out ................................................... 24

**ARTICLE V INDEMNIFICATION** ................................................................ **25**
    Section 5.1    Indemnification by the Company .......................................... 25
    Section 5.2    Indemnification by Selling Holders ..................................... 26
    Section 5.3    Conduct of Indemnification Proceedings ............................. 26
    Section 5.4    Other Indemnification ........................................................... 27
    Section 5.5    Contribution ........................................................................... 27

**ARTICLE VI COMPLIANCE WITH EXEMPTION REQUIREMENTS** ....... **28**
    Section 6.1    Compliance with Exemption Requirements .......................... 28

**ARTICLE VII MISCELLANEOUS** ................................................................ **28**
    Section 7.1    Severability ............................................................................ 28
    Section 7.2    Governing Law; Jurisdiction; Waiver of Jury Trial ............. 29
    Section 7.3    Other Registration Rights ...................................................... 29
    Section 7.4    Additional Rights .................................................................. 29
    Section 7.5    Successors and Assigns ......................................................... 29
    Section 7.6    Notices .................................................................................... 30
    Section 7.7    Headings ................................................................................. 31
    Section 7.8    Additional Parties ................................................................. 31
    Section 7.9    Adjustments ........................................................................... 31

# TABLE OF CONTENTS
(cont'd)

| | | Page |
|---|---|---|
| Section 7.10 | Entire Agreement | 31 |
| Section 7.11 | Specific Performance | 31 |
| Section 7.12 | Counterparts; Facsimile or .pdf Signature | 32 |
| Section 7.13 | Amendment | 32 |
| Section 7.14 | Extensions; Waivers | 32 |
| Section 7.15 | Further Assurances | 33 |
| Section 7.16 | No Third-Party Beneficiaries | 33 |
| Section 7.17 | Interpretation; Construction | 33 |
| Section 7.18 | Term | 33 |

| | | |
|---|---|---|
| Exhibit A | - | Adoption Agreement |
| Schedule I | - | List of Holders |

THIS **REGISTRATION RIGHTS AGREEMENT**, dated as of [●], 2025 (this "Agreement"), is entered into by and among Wolfspeed, Inc., a Delaware corporation (together with any successor entity thereto, the "Company"), and each of the Holders (as defined below) that are parties hereto from time to time.

## RECITALS

A.     Wolfspeed, Inc. and Wolfspeed Texas LLC filed [the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, consistent with the terms thereof, the "Plan") on June 30, 2025], which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2025.

B.     The Company proposes to issue Common Stock, Warrants and Convertible Notes (each as defined below) [and to remit to Renesas (as defined below) the Base Consideration Proceeds (as defined below) and, if applicable, the Contingent Additional Consideration Proceeds (as defined below) from the sale of Common Stock, in each case] pursuant to, and upon the terms set forth in, the Plan, the [*Order Confirming the [Amended] Joint Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate*] [Docket No. [●]] (the "Confirmation Order"), and the Definitive Documentation (as defined below).

C.     The Company and the Holders have agreed to enter into this Agreement pursuant to which the Company shall grant the Holders certain registration rights under the Securities Act (as defined below) with respect to the Registrable Securities (as defined below) in furtherance of the foregoing.

D.     The Holders on Schedule I are deemed to have executed this Agreement pursuant to the Confirmation Order (as defined below).

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Holders hereby agree as follows:

## AGREEMENT

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions. As used herein, the following terms shall have the following respective meanings:

["Additional Approvals" has the meaning assigned to such term in the Plan.]

"Adoption Agreement" means an Adoption Agreement in the form attached hereto as Exhibit A.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person.

"Agreement" has the meaning set forth in the Preamble.

"Assignee" has the meaning set forth in Section 7.5.

"Automatic Shelf Registration Statement" means an "automatic shelf registration statement" as defined in Rule 405 (or any successor rule then in effect) promulgated under the Securities Act.

["Base Consideration Proceeds" has the meaning assigned to such term in the Plan.]

"beneficially owned," "beneficial ownership" and similar phrases have the same meanings as such terms have under Rule 13d-3 and 13d-5 (or any successor rule then in effect) under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable upon the occurrence of a subsequent event [(including, for the avoidance of doubt, the Renesas Base Distribution Date)] or with the passage of time.

"Board" means the Board of Directors of the Company from time to time.

~~"Bought Deal" has the meaning ascribed to it in Section 3.1(a).~~

"Business Day" means any day other than a Saturday or Sunday or a legal holiday on which commercial banks in New York City or the State of California in the United States, or Japan, are authorized or required by law to be closed.

["CFIUS Approval" has the meaning assigned to such term in the Plan.]

"Commission" means the U.S. Securities and Exchange Commission or any other U.S. Federal agency at the time administering the Securities Act.

"Common Stock" means, collectively, the Company's shares of ~~[~~common stock, par value $[0.00125] per share~~]~~, any additional security paid, issued or distributed in respect of any such shares by way of a dividend, split or distribution, or in connection with a combination of shares, and any security into which such Common Stock or additional securities shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, amalgamation, consolidation, exchange, distribution or otherwise.

"Company" has the meaning set forth in the Preamble.

"Confirmation Order" has the meaning set forth in the recitals.

["Contingent Additional Consideration Proceeds" has the meaning assigned to such term in the Plan.]

"<u>control</u>," including the correlative terms "<u>controlling</u>," "<u>controlled by</u>" and "<u>under common control with</u>," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.

"<u>Convertible Notes</u>" means the Renesas Convertible Notes and the Non-Renesas Convertible Notes.

"<u>Definitive Documentation</u>" has the meaning assigned to such term in the Plan.

["<u>Disposition Agreement</u>" means, together with any necessary ancillary related documentation, the Investor Rights and Disposition Agreement entered into on the date hereof between the Company and Renesas, as may be amended or supplemented from time to time.

"<u>Effective Date</u>" has the meaning assigned to such term in the Plan.

"<u>ELOC/ATM</u>" means the equity line of credit or "at the market" program entered into to facilitate the sale of Common Stock as set forth in the Plan.]

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"<u>FINRA</u>" means the Financial Industry Regulatory Authority or any successor regulatory authority.

"<u>Form S-1 Shelf</u>" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

"<u>Form S-3 Shelf</u>" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

"<u>Free Writing Prospectus</u>" means any "free writing prospectus" as defined in Rule 405 promulgated under the Securities Act.

"<u>Holders</u>" means any holder of Registrable Securities that is set forth on <u>Schedule I</u> hereto and Transferees of such Holders that acquire Registrable Securities in accordance with <u>Section 7.5</u> and execute an Adoption Agreement in accordance with <u>Section 7.5</u> (in each case, so long as such Persons holds any Registrable Securities).

"<u>Information</u>" has the meaning ascribed to it in <u>Section 4.1(~~h~~i)</u>.

"<u>Initial Notice</u>" has the meaning ascribed to it in <u>Section 3.1(a)</u>.

"<u>Inspectors</u>" has the meaning ascribed to it in <u>Section 4.1(~~h~~i)</u>.

"<u>Lock-up Period</u>" has the meaning ascribed to it in <u>Section 2.6(a)</u>.

"<u>MNPI</u>" has the meaning ascribed to it in <u>Section 4.2</u>.

"<u>New 2L Convertible Notes</u>" has the meaning assigned to such term in the Plan.

3

"New Renesas 2L Takeback Convertible Notes" has the meaning assigned to such term in the Plan.

"Non-Renesas Convertible Notes" means any New 2L Convertible Notes issued or issuable to Non-Renesas Holders pursuant to the Plan that are (i) issued to a Non-Renesas Holder who reasonably determines (on the advice of counsel) that it may be deemed an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company; provided, that, such Non-Renesas Holder provides notice to the Company and Renesas of such determination on or prior to the date hereof and the Company reasonably agrees (on advice of counsel) with such determination; or (ii) issued other than pursuant to Section 1145 of the Bankruptcy Code.

"Non-Renesas Holders" means Holders party hereto from time to time, in each case other than Renesas.

"Non-Renesas Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.1(b).

"Non-Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.1(d).

"Opt-In Election" has the meaning ascribed to it in Section 4.2.

"Opt-Out Election" has the meaning ascribed to it in Section 4.2.

"Person" means any individual, partnership, limited liability company, corporation, company, association, joint stock company, trust, joint venture, unincorporated organization or any governmental entity or any department, agency or political subdivision thereof.

"Piggyback Notice" has the meaning ascribed to it in Section 3.1(a).

"Piggyback Registration" means any registration pursuant to Section 3.1(a).

"Plan" has the meaning set forth in the recitals.

"Policies" has the meaning ascribed to it in Section 4.2.

["Primary Demand Notice" has the meaning ascribed to it in Section 2.2(b).

"Primary Demand Registration" means a registration of Primary Shares pursuant to Section 2.2.

"Primary Demand Right" has the meaning ascribed to it in Section 2.2(a).

"Primary Shares" has the meaning ascribed to it in Section 2.2(a).]

"Prospectus" means the prospectus included in any Registration Statement, as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the securities covered by such Registration Statement and, in each case, by all other

4

amendments and supplements to such prospectus, including post-effective amendments and, in each case, all material incorporated by reference in such prospectus.

["Registered Primary Offering" means a primary registered offering of Primary Shares pursuant to Section 2.2.]

"Registrable Securities" means, with respect to any Holder, at any time, the Shares held or beneficially owned by such Holder at such time; provided, however, that as to any Registrable Securities, such securities shall cease to be Registrable Securities (i) upon the sale thereof pursuant to an effective registration statement, (ii) upon the sale thereof pursuant to Rule 144, (iii) when such securities cease to be outstanding, (iv) when (A) such Registrable Securities are held by a Holder that together with its Affiliates beneficially owns Shares representing less than 3% of the issued and outstanding Common Stock of the Company and (B) on advice of counsel to the Company, which counsel shall be reasonably acceptable to the relevant Holder, such securities may be sold or disposed of by such Holder without the volume, manner of sale and public information limitations under Rule 144 (or any similar provisions then in force), or (v) if such securities shall have been otherwise transferred and new certificates or book-entries for them not bearing a legend restricting transfer shall have been delivered by the Company and such securities may be publicly resold without registration under the Securities Act[; provided, further, that, prior to the Renesas Base Distribution Date, clauses (ii), (iii), (iv) and (v) of this definition shall not apply to Registrable Securities held or beneficially owned by Renesas].

"Registration Statement" means any registration statement of the Company filed with the Commission under the Securities Act that covers the Registrable Securities [or the Primary Shares], including any preliminary Prospectus and the Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits thereto and all material incorporated by reference in such registration statement.

["Regulatory Approvals" has the meaning assigned to such term in the Plan.]

"Related Fund" means any investment manager or advisor that controls, manages, advises or subadvises a Holder.

"Renesas" means Renesas Electronics America Inc., a California corporation (or any successor thereto), and any of its controlled Affiliates.

["Renesas Base Distribution Date" has the meaning assigned to such term in the Plan.]

"Renesas Convertible Notes" means the New Renesas 2L Takeback Convertible Notes issued or issuable to Renesas pursuant to the Plan[, including, prior to the Renesas Base Distribution Date, the associated entitlement to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the Confirmation Order].

"Renesas Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.1(b).

"Renesas Warrants" means the Warrants issued or issuable to Renesas pursuant to the Plan[, including, prior to the Renesas Base Distribution Date, the associated entitlement to

5

recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the Confirmation Order].

"<u>Representatives</u>" has the meaning ascribed to it in <u>Section 4.2</u>.

"<u>Required Holders</u>" means each of (i) Renesas for so long as Renesas beneficially owns Registrable Securities and (ii) Holders of a majority of the Registrable Securities beneficially owned by Non-Renesas Holders.

"<u>Rule 144</u>" means Rule 144 under the Securities Act (or successor rule).

"<u>Rule 144A</u>" means Rule 144A under the Securities Act (or successor rule).

"<u>Seasoned Issuer</u>" means an issuer eligible to use a registration statement on Form S-3 under the Securities Act and who is not an "ineligible issuer" as defined in Rule 405.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Selling Holders</u>" means the Holders selling Registrable Securities pursuant to a Registration Statement under this Agreement.

"<u>Selling Holders' Counsel</u>" has the meaning set forth in <u>Section 4.1(b)</u>.

"<u>Shares</u>" means Common Stock (i) issued or issuable to Renesas pursuant to the Plan[, including, prior to the Renesas Base Distribution Date, the associated entitlement to recovery on account of Renesas' allowed Class 5 claim pursuant to the Plan and the Confirmation Order]; (ii) issued or issuable upon exercise of the Renesas Warrants; (iii) issued or issuable upon conversion of the Renesas Convertible Notes; (iv) issued or issuable to any Non-Renesas Holder pursuant to the Plan ~~other than pursuant to Section 1145 of the Bankruptcy Code~~ which Non-Renesas Holder reasonably determines (on the advice of counsel) that it may be deemed an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company; <u>provided</u>, that, such Non-Renesas Holder provides notice to the Company and Renesas of such determination on or prior to the date hereof and the Company reasonably agrees (on advice of counsel) with such determination; and (v) issued or issuable upon conversion of the Non-Renesas Convertible Notes and shall also include any security of the Company issued in respect of or in exchange for such securities of the Company described in the foregoing clause (i) through (v), whether by way of dividend or other distribution, split, recapitalization, merger, amalgamation, rollup transaction, consolidation or reorganization.

"<u>Shelf Holder</u>" has the meaning ascribed to it in <u>Section 2.1(b)</u>.

"<u>Shelf Registration</u>" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

"<u>Shelf Registration Statement</u>" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

"<u>Shelf Take-Down</u>" has the meaning ascribed to it in <u>Section 2.1(b)</u>.

"<u>Subsequent Shelf Registration Statement</u>" has the meaning ascribed to it in <u>Section 2.1(f)</u>.

"<u>Subsidiary</u>" means each Person in which another Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% in voting power of the outstanding capital stock or other equity interests.

"<u>Transfer</u>" means any direct or indirect sale, assignment, transfer, conveyance, gift, bequest by will or under intestacy laws, pledge, mortgage, charge, hypothecation or other encumbrance, or any other disposition, of the stated security (or any interest therein or right thereto, including the issuance of any total return swap or other derivative whose economic value is primarily based upon the value of the stated security) or of all or part of the voting power (other than the granting of a revocable proxy) associated with the stated security (or any interest therein) whatsoever, or any other transfer of beneficial ownership of the stated security, with or without consideration and whether voluntarily or involuntarily (including by operation of law).

"<u>Transferee</u>" means a Person acquiring Shares pursuant to a Transfer.

"<u>Underwritten Offering</u>" means a sale, on the Company's or any Holder's behalf, of Shares [or Primary Shares] by the Company or a Holder to an underwriter for reoffering to the public.

"<u>Underwritten Shelf Take-Down</u>" has the meaning ascribed to it in <u>Section 2.1(c)(i)</u>.

"<u>Underwritten Shelf Take-Down Notice</u>" has the meaning ascribed to it in <u>Section 2.1(c)(i)</u>.

"<u>Warrants</u>" means, collectively, those certain warrants to purchase shares of Common Stock issued to Renesas by the Company, dated as of date hereof.

"<u>Well-Known Seasoned Issuer</u>" means a "well-known seasoned issuer" as defined in Rule 405 promulgated under the Securities Act (or any successor rule then in effect) and which (i) is a "well-known seasoned issuer" under paragraph (1)(i)(A) of such definition or (ii) is a "well-known seasoned issuer" under paragraph (1)(i)(B) of such definition and is also eligible to register a primary offering of its securities relying on General Instruction I.B.1 of Form S-3 under the Securities Act.

## ARTICLE II

## SHELF [AND PRIMARY DEMAND] REGISTRATION

Section 2.1    <u>Shelf Registration</u>.

(a)    <u>Filing</u>. As promptly as practicable, and in any event not later than thirty (30) days of [each of (i) ]the date hereof [and (ii) solely with respect to Registrable Securities held by Renesas, the occurrence of the Renesas Base Distribution Date], the Company shall, pursuant to the requirements of this <u>Section 2.1(a)</u>, file (or confidentially submit) on Form S-1 (the "<u>Form S-1 Shelf</u>") or, if available, on Form S-3 (a "<u>Form S-3 Shelf</u>" and, together with the

7

Form S-1 Shelf and any Automatic Shelf Registration Statement, if available, a "Shelf Registration Statement") a Shelf Registration Statement to register under the Securities Act the Registrable Securities owned by the Holders (as applicable) at such time in accordance with Rule 415 under the Securities Act or any successor rule thereto (a "Shelf Registration"). [For purposes of this Section 2.1 only, the Registrable Securities owned by Renesas on any date shall only include those Registrable Securities (including Registrable Securities underlying securities convertible for or exercisable into Shares) actually distributed to Renesas on or prior to such date pursuant to the Plan.] With respect to each Shelf Registration, (i) the Company shall use commercially reasonable efforts to cause to be declared effective the Shelf Registration Statement as promptly as practicable after the filing (or confidential submission) thereof and, in any event, within five (5) Business Days of resolving all Commission comments or receiving notice that the Shelf Registration Statement will not be reviewed and (ii) the Shelf Registration Statement shall include a Plan of Distribution disclosure in customary form for similar resale registration statements as reasonably requested by the Holders holding a majority of the Registrable Securities included in such Shelf Registration Statement (which shall include, if Registrable Securities held by Renesas are included in such Shelf Registration Statement, the Non-Renesas Holders holding a majority of the Registrable Securities included in such Shelf Registration Statement that are held by Non-Renesas Holders).

(b)     Shelf Take-Downs. Any Holder whose Registrable Securities are included in an effective Shelf Registration Statement (a "Shelf Holder") may initiate an offering or sale of all or part of such Registrable Securities (a "Shelf Take-Down"), in which case the provisions of this Section 2.1 shall apply. Notwithstanding the foregoing: (i) any such Shelf Holder may initiate an unlimited number of Non-Underwritten Shelf Take-Downs pursuant to Section 2.1(d) below; (ii) Renesas may initiate no more than three (3) Underwritten Shelf Take-Downs (including any block trade) pursuant to Section 2.1(c) below during any 12-month period (any such Underwritten Shelf Take-Down, a "Renesas Underwritten Shelf Take-Down"); and (iii) Non-Renesas Holders may initiate no more than two (2) Underwritten Shelf Take-Downs (including any block trade) pursuant to Section 2.1(c) below during any 12-month period (any such Underwritten Shelf Take-Down, a "Non-Renesas Underwritten Shelf Take-Down"); provided, that, the Registrable Securities requested to be sold by the initiating Shelf Holder(s) of any single Underwritten Shelf Take-Down shall have an anticipated aggregate offering price (before deducting underwriting discounts and commissions) of at least $75.0 million.

(c)     Underwritten Shelf Take-Downs.

(i)     Subject to Section 2.1(b), at any time that a Shelf Registration Statement is effective, if a Shelf Holder so elects in a written request delivered to the Company (an "Underwritten Shelf Take-Down Notice"), a Shelf Take-Down may be in the form of an Underwritten Offering (an "Underwritten Shelf Take-Down") and, if necessary, the Company shall use reasonable best efforts to file any necessary Prospectus supplement or post-effective amendment to its Shelf Registration Statement as soon as practicable and, in any event, within ~~twenty~~fifteen (~~20~~15) Business Days after the receipt of an Underwritten Shelf Take-Down Notice, unless a longer period is agreed to by the Shelf Holder(s) initiating the Underwritten Shelf Take-Down, and in all events subject to compliance with the notice requirements described in Section 2.1(c)(ii) and Section 3.1(a). Such initiating Shelf Holder(s) shall indicate in such Underwritten Shelf Take-Down Notice (A) the aggregate number of Registrable Securities

8

expected to be offered and sold in such Underwritten Shelf Take-Down, (B) the expected plan of distribution of such Underwritten Shelf Take-Down, and (C) whether it intends for such Underwritten Shelf Take-Down to involve a customary "roadshow" (including an "electronic roadshow") or other marketing effort by the underwriters.

(ii)     Upon delivery of an Underwritten Shelf Take-Down Notice, the Company shall promptly deliver an Initial Notice of such Underwritten Shelf Take-Down to all Shelf Holders pursuant to Section 3.1(a).

(iii)     Upon delivery of an Initial Notice, the other Shelf Holders may elect to sell Registrable Securities in such Underwritten Shelf Take-Down, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as agreed to by the initiating Shelf Holder(s), by following the procedure set forth in Section 3.1(a) (but, in all cases, subject to Section 2.5(b) and Section 2.7).

(iv)     Notwithstanding the delivery of any Underwritten Shelf Take-Down Notice, all determinations as to whether to complete any Underwritten Shelf Take-Down and as to the timing, manner, price and other terms of any Underwritten Shelf Take-Down shall be at the discretion of the Shelf Holders holding a majority of the Registrable Securities contemplated to be sold under such Underwritten Shelf Take-Down Notice. The Shelf Holder(s) initiating the Underwritten Shelf Take-Down may withdraw an Underwritten Shelf Take-Down Notice by providing written notice to the Company at any time prior to the execution of an underwriting agreement, unless the Company is informed by the remaining Holders of Registrable Securities included in such Underwritten Shelf Take-Down to continue with such offering and the anticipated aggregate offering price (before deducting underwriting discounts and commissions) of the remaining Registrable Securities covered thereby (excluding the Registrable Securities of the withdrawing Holders) are at least $75.0 million. To the extent an Underwritten Shelf Take-Down Notice is so withdrawn, such Underwritten Shelf Take-Down shall not be counted towards the limitations set forth in Section 2.1(b). To the extent an Underwritten Shelf Take-Down Notice was delivered by Renesas and is not so withdrawn, due to the remaining Holders of Registrable Securities included in such Underwritten Shelf Take-Down informing the Company to proceed with such Underwritten Shelf Take-Down, and to the extent that Renesas does not participate in such Underwritten Shelf Take-Down, such Underwritten Shelf Take-Down shall be counted as a Non-Renesas Underwritten Shelf Take-Down under Section 2.1(b)(iii) and shall not be counted as a Renesas Underwritten Shelf Take-Down under Section 2.1(b)(ii). To the extent an Underwritten Shelf Take-Down Notice was delivered by Non-Renesas Holder(s) and ~~the related Underlying Shelf Registration~~ is not so withdrawn**,** due to Renesas informing the Company to proceed with such Underwritten Shelf Take-Down, and to the extent that no Non-Renesas Holders participate in such Underwritten Shelf Take-Down, such Underwritten Shelf Take-Down shall be counted as a Renesas Underwritten Shelf Take-Down under Section 2.1(b)(ii) and shall not be counted as a Non-Renesas Underwritten Shelf Take-Down under Section 2.1(b)(iii).

(v)     Notwithstanding any provision of this Agreement to the contrary, no Holder may provide an Underwritten Shelf Take-Down Notice during the period beginning upon the receipt by the Holder of an Initial Notice and ending upon the consummation or withdrawal of the related Piggyback Registration so long as the Company is actively and in good

9

faith pursuing such Piggyback Registration and provided that this clause shall not apply for longer than ~~sixty~~forty-five (~~60~~45) consecutive days.

(d)    <u>Non-Underwritten Shelf Take-Downs</u>. If a Shelf Holder desires to effect a Shelf Take-Down that does not constitute an Underwritten Shelf Take-Down (a "<u>Non-Underwritten Shelf Take-Down</u>"), provided that the Company receives written notice of the ~~Underwritten~~<u>Non-Underwritten</u> Shelf Take-Down at least two (2) Business Days prior to the consummation thereof, the Company shall use commercially reasonable efforts to ensure that upon the sale of Shares pursuant to an effective Shelf Registration Statement a customary legal opinion is promptly, and, in any event not later than one (1) Business Day following the date of such sale, issued to the Company's transfer agent permitting the removal of legends from such Shares subject to the delivery of customary representation letters of selling Holders and/or brokers to the Company, the continuing effectiveness of the Shelf Registration Statement and satisfaction of customary procedures necessary to allow such transfer agent to remove such legends in connection with a sale pursuant to the Shelf Registration Statement.

(e)    <u>Continued Effectiveness</u>. The Company shall use commercially reasonable efforts to keep the Shelf Registration Statement filed pursuant to <u>Section 2.1(a)</u> hereof continuously effective under the Securities Act, including by filing a new Shelf Registration Statement if necessary, in order to permit the Prospectus (or any Prospectus supplement) forming a part thereof to be usable by a Shelf Holder until the earlier to occur of the date as of which (i) all Registrable Securities registered by such Shelf Registration Statement have been sold and (ii) all securities registered pursuant to the terms of this Agreement cease to constitute Registrable Securities as defined hereunder.

(f)    <u>Subsequent Shelf Registrations</u>. If the Shelf Registration Statement filed under <u>Section 2.1(a)</u> or any Subsequent Shelf Registration Statement ceases to be effective for any reason at any time during the period described in <u>Section 2.1(e)</u>, the Company shall use commercially reasonable efforts to obtain the prompt withdrawal of any order suspending the effectiveness thereof, and in any event shall within thirty (30) days of such cessation of effectiveness amend such Shelf Registration Statement in a manner designed to obtain the withdrawal of the order suspending the effectiveness thereof, or file an additional shelf registration statement pursuant to Rule 415 under the Securities Act (or any similar provision then in force) covering all of the Registrable Securities covered by and not sold under the Shelf Registration Statement (a "<u>Subsequent Shelf Registration Statement</u>"). If a Subsequent Shelf Registration Statement is filed, the Company shall use commercially reasonable efforts to cause the Subsequent Shelf Registration Statement to be declared effective as soon as practicable after such filing and to keep such Subsequent Shelf Registration Statement continuously effective during the period described in <u>Section 2.1(e)</u>. As used herein the term "Shelf Registration Statement" means the Shelf Registration Statement referenced in <u>Section 2.1(a)</u> and any Subsequent Shelf Registration Statements.

(g)    <u>Conversion to Form S-3</u>. In the event the Company files a Form S-1 Shelf, the Company shall use commercially reasonable efforts to convert the Shelf Registration Statement to a Form S-3 Shelf as soon as reasonably practicable after the Company becomes a Seasoned Issuer or a Well-Known Seasoned Issuer.

Section 2.2      [Primary Registered Offerings].

(a)      [Renesas Demand for Primary Registration. Prior to receipt of certification of all Regulatory Approvals or written confirmation by Renesas's authorized representative of the granting of such Regulatory Approvals from the applicable regulatory authorities (where such certifications are not issued by the applicable regulatory authorities) for Renesas, subject to the provisions of this Article II and the provisions of the Disposition Agreement, at any time and from time to time, Renesas shall have the right to request in writing that the Company register the sale on Form S-1 (or any successor form thereto) or, if available, on Form S-3 (or any successor form thereto) under the Securities Act of Common Stock or other equity securities of the Company on a primary basis ("Primary Shares") for purposes of a Registered Primary Offering (a "Primary Demand Right") to execute sales to receive Base Consideration Proceeds and Contingent Additional Consideration Proceeds, as applicable. Renesas may initiate no more than one (1) Registered Primary Offering pursuant to this Section 2.2 during any 12-month period; provided, that, after the Company becomes a Seasoned Issuer or a Well-Known Seasoned Issuer, Renesas may initiate no more than two (2) Registered Primary Offerings pursuant to this Section 2.2 during any 12-month period. Notwithstanding the foregoing, if all Regulatory Approvals, other than CFIUS Approval or the Additional Approvals, have been obtained, Renesas shall not have the ability to exercise the Primary Demand Right until nineteen (19) weeks after the Effective Date.

(b)      Primary Demand Notices. All requests made pursuant to this Section 2.2 shall be made by providing written notice to the Company (each such written notice, a "Primary Demand Notice"), which notice shall specify the aggregate number and class or classes of Primary Shares proposed to be registered by the Company and the minimum price at which any sale of Primary Shares may be executed. The Company shall effect any requested Primary Demand Registration using a Form S-3 whenever the Company is a Seasoned Issuer or a Well-Known Seasoned Issuer and shall use an Automatic Shelf Registration Statement if it is a Well-Known Seasoned Issuer.

(c)      Primary Demand Filing. Subject to Section 2.3, promptly after receipt of any Primary Demand Notice, the Company shall give an Initial Notice of the Primary Demand Notice to all Holders of Registrable Securities and otherwise comply with Section 3.1(a). Upon delivery of a Primary Demand Notice, the Holders may elect to sell Registrable Securities in such Registered Primary Offering, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as applicable to the Primary Shares, by following the procedure set forth in Section 3.1(a) (but, in all cases, subject to Section 2.7 and Section 3.2(d)). Subject to Section 2.3, the Company shall use reasonable best efforts to file (or confidentially submit) the Registration Statement in respect of a Primary Demand Notice as soon as practicable and, in any event, within thirty (30) days after receiving a Primary Demand Notice and shall use commercially reasonable efforts to cause the same to be declared effective by the Commission as promptly as practicable after such filing (or confidential submission) and, in any event, within five (5) Business Days of resolving all Commission comments or receiving notice that such Registration Statement will not be reviewed. The Company shall use reasonable best efforts to file any necessary Prospectus supplement or post-effective amendments to such Registration Statement as and when necessary in order to facilitate the Registered Primary Offering. All determinations as to whether to

11

complete any Registered Primary Offering and as to the timing, manner, price and other terms of any Registered Primary Offering shall be at the discretion of Renesas.

(d)     Selection of Underwriters. If Renesas delivers a Primary Demand Notice, Renesas shall select the managing underwriter or underwriters to administer such Registered Primary Offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed.

(e)     Primary Demand Withdrawal. Renesas may withdraw a Primary Demand Notice by providing written notice to the Company at any time prior to the execution of an underwriting agreement, and such Primary Demand Notice shall not be counted towards the limitations set forth in Section 2.2(a).

(f)     Termination of Primary Demand Right. The Primary Demand Right will terminate on the Renesas Base Distribution Date.

(g)     Notwithstanding any provision of this Agreement to the contrary, Renesas may not provide a Primary Demand Notice during the period beginning upon the receipt by Renesas of an Initial Notice and ending upon the consummation or withdrawal of the related Piggyback Registration.]

Section 2.3     Deferral or Suspension of Registration; Grace Periods. If (a) the Company receives [a Primary Demand Notice or] an Underwritten Shelf Take-Down Notice and the Board, in its good faith judgment after consultation with outside legal counsel of the Company, determines that it would be materially adverse to the Company for such Registration Statement to be filed or declared effective on or before the date such filing or effectiveness would otherwise be required hereunder, or for such Registration Statement or Prospectus included therein to be used to sell Shares [or Primary Shares] or for such Underwritten Shelf Take-Down to be effected, because such action would: (i) have a detrimental impact on alternate transactions (including, but not limited to, merger, acquisition or offering transactions) being contemplated by the Company, including, but not limited to, requiring the Company (in the reasonable judgment of the Company) to disclose such alternate transaction in a manner that would meaningfully interfere with such transaction; (ii) based on the advice of the Company's outside counsel, require disclosure of material non-public information that the Company has a bona fide business purpose for preserving as confidential, provided, that, the exception in clause (ii) shall continue to apply only during the time in which such business purpose is continuing and such material non-public information has not been disclosed and remains material; or (iii) render the Company unable to comply with requirements under the Securities Act or the Exchange Act or (b) the Company is subject to a Commission stop order suspending the effectiveness of any Registration Statement or the initiation of proceedings with respect to such Registration Statement under Section 8(d) or 8(e) of the Securities Act, then the Company shall have the right to defer such filing (but not the preparation), initial effectiveness or continued use of a Registration Statement and the Prospectus included therein, provided that, unless consented to in writing by the Holders holding a majority of the Registrable Securities proposed to be included [(in the case of an Underwritten Shelf Take-Down)] (including, if Renesas participates in such Underwritten Shelf-Take-Down, the Non-Renesas Holders holding a majority of the Registrable

Securities proposed to be included in such Underwritten Shelf Take-Down held by Non-Renesas Holders) [or Renesas (in the case of a Registered Primary Offering)], the Company shall not use the deferral or suspension rights provided under Section 2.3(a) ~~to [(x) defer or suspend an Underwritten Shelf Take-Down]~~ more than twice in any 12-month period or for more than ninety (90) calendar days in the aggregate in any 12-month period ~~[or (y) defer or suspend a Primary Offering more than twice in any 12-month period or for more than ninety (90) calendar days] in the aggregate in any 12-month period]~~. [For the avoidance of doubt, Renesas shall have the right to demand the filing of a draft registration statement during such period in furtherance of Section 2.2; provided that the Company shall not be required to publicly file a Registration Statement until the day following the expiration of such period.] If the Company shall so postpone the filing, initial effectiveness or continued use of a Registration Statement with respect to [a Primary Demand Notice or] an Underwritten Shelf Take-Down Notice and if [Renesas or] the applicable Shelf Holder[, respectively,] within thirty (30) days after receipt of the notice of postponement advises the Company in writing that it has determined to withdraw such [Primary Demand Notice or] Underwritten Shelf Take-Down Notice, then such [Primary Demand Notice or] Underwritten Shelf Take-Down Notice shall be deemed to be withdrawn and shall not be counted towards the limitations set forth in Section 2.1(b) [or Section 2.2(a)]. In the event of any deferral or suspension pursuant to this Section 2.3, the Company shall (i) use commercially reasonable efforts to keep the Shelf Holders [or Renesas], as applicable, apprised of the estimated length of the anticipated delay; and (ii) notify the Shelf Holders [or Renesas], as applicable, promptly upon termination of the deferral or suspension. After the expiration of the deferral or suspension period and without any further request from the applicable Shelf Holder [or Renesas], as applicable, to the extent such Shelf Holder [or Renesas] has not withdrawn the [Primary Demand Notice or] Underwritten Shelf Take-Down Notice, if applicable, the Company shall as promptly as reasonably practicable prepare and file (or confidentially submit) a Registration Statement or post-effective amendment or supplement to the applicable Registration Statement or document, or file any other required document, as applicable, and cause any such amendment to be declared effective as promptly as practicable so that, as thereafter delivered to purchasers of the Registrable Securities [or Primary Shares] included therein, the Prospectus will not include a material misstatement or omission and will be effective and useable for the sale of Registrable Securities [or Primary Shares]. [Notwithstanding any provision of this Agreement to the contrary, sales of ~~[Shares] or [~~Primary Shares]~~]~~ through any ~~Underwritten Offering  [or~~ Registered Primary Offering~~]~~ shall be subject to market conditions, applicable laws, and customary quarterly blackout rights, and shall only take place during open trading window periods under the Company's insider trading policy.]

Section 2.4    Effective Registration Statement. A registration required or requested pursuant to this Article II shall not be deemed to have been effected, nor shall such registration be counted towards the limitations set forth in Section 2.1(b) [or Section 2.2(a)]:

(a)    unless a Registration Statement with respect thereto has been declared effective by the Commission and remains effective in compliance with the provisions of the Securities Act and the laws of any U.S. state or other jurisdiction applicable to the disposition of Registrable Securities [or Primary Shares] covered by such Registration Statement for (x) not less than 180 days (or such shorter period as will terminate when all of such Registrable Securities [or Primary Shares] shall have been disposed of in accordance with such Registration Statement) or, if such Registration Statement relates to an Underwritten Offering, such longer

13

period as, in the opinion of external counsel for the Company, a Prospectus is required by law to be delivered in connection with sales of Registrable Securities [or Primary Shares] by an underwriter or dealer or (y) in respect of a Shelf Registration Statement filed pursuant to Section 2.1(a) hereof, for such period as is provided in Section 2.1(e) hereof;

(b)     if, after it becomes effective, such Registration Statement is interfered with by any stop order, injunction or other order or requirement of the Commission or other governmental authority or court for any reason other than a violation of applicable law solely by any Selling Holder and has not thereafter become effective;

(c)     unless the offering, in the case of an Underwritten Shelf Take-Down, has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities requested in good faith for disposition (inclusive of any Registrable Securities reduced from such Underwritten Shelf Take-Down pursuant to the terms of Section 2.5 or Section 3.2, as applicable);

(d)     with respect to any request for a Registration Statement or an offering, to the extent the applicable Holders shall have reimbursed the Company for all reasonable and documented expenses of the Company related to such Registration Statement or offering; or

(e)     if, in the case of an Underwritten Offering, the conditions to closing specified in an underwriting agreement applicable to the Company are not satisfied or waived other than by reason of any breach or failure by any Selling Holder.

Section 2.5     Selection of Underwriters; Cutback.

(a)     Selection of Underwriters. If a Shelf Holder intends to offer and sell the Registrable Securities covered by its request under this Article II by means of an Underwritten Shelf Take-Down, the participating Shelf Holders shall mutually select, in the final determination of the Holders of a majority of the Registrable Securities under such Underwritten Shelf Take-Down, the managing underwriter or underwriters to administer such offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed.

(b)     Underwriter's Cutback. Notwithstanding any other provision of this Article II or Section 3.1, if the managing underwriter or underwriters of an Underwritten Shelf Take-Down advise the Company in their good faith opinion that the inclusion of all such Registrable Securities proposed to be included in such Underwritten Shelf Take-Down would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities in such Underwritten Shelf Take-Down, then the number of securities proposed to be included in such Underwritten Shelf Take-Down shall be allocated among the Company, the Selling Holders and all other Persons selling securities in such Underwritten Shelf Take-Down in the following order:

(i)     first, the Registrable Securities of the class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) proposed to be included in such Underwritten Shelf Take-Down, pro rata among the respective Holders of such

14

Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such Underwritten Shelf Take-Down by each such Holder at the time of such Underwritten Shelf Take-Down;

(ii)    *second,* all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Underwritten Shelf Take-Down other than securities to be sold by the Company; and

(iii)    *third*, the securities of the same class or classes to be sold by the Company.

No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such offering. If the underwriter has not limited the number of Registrable Securities to be underwritten, the Company may include securities for its own account (or for the account of any other Persons) in such offering if the underwriter so agrees and if the number of Registrable Securities would not thereby be limited.

Section 2.6    Lock-up.

(a)    If requested by the managing underwriters in connection with any Underwritten Offering, each Holder (i) who together with its Affiliates owns 10% or more of the Common Stock on a fully-diluted basis at the time of such Underwritten Offering, (ii) who possesses the right to select one or more members of the Board or (iii) who is a natural person and serving as a director or executive officer of the Company shall agree to be bound by customary lock-up agreements providing that such Holder shall not, directly or indirectly, effect any Transfer (including sales pursuant to Rule 144) of any such Shares without prior written consent from the underwriters managing such Underwritten Offering during a period beginning on the date of launch of such Underwritten Offering and ending up to ninety (90) days from and including the date of pricing or such shorter period as reasonably requested by the underwriters managing such Underwritten Offering (the "Lock-Up Period"); provided, that, (A) the foregoing shall not apply to any Shares that are offered for sale as part of such Underwritten Offering, (B) such Lock-Up Period shall be no longer than and on substantially the same terms as the lock-up period applicable to the Company and the executive officers and directors of the Company, (C) such Lock-Up Period shall include customary carve-outs as negotiated in good faith between the Holder and the underwriter and (D) the Holders shall have been offered the opportunity to participate in such Underwritten Offering pursuant to the terms of Article III hereof (subject to the terms of Section 2.5 or Section 3.2, as applicable). Each such Holder agrees to execute a customary lock-up agreement in favor of the underwriters to such effect.

(b)    The terms of this Section 2.6 will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

Section 2.7    Participation in Underwritten Offering; Information by Holder. No Holder may participate in an Underwritten Offering hereunder unless such Holder (a) agrees to sell such Holder's Shares on the basis provided in any underwriting arrangements, and in accordance with the terms and provisions of this Agreement, including any lock-up arrangements, and

(b) completes and executes all questionnaires, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements. In addition, the Holders shall furnish to the Company such information regarding such Holder or Holders and the distribution proposed by such Holders, as applicable, as the Company may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Article II. Nothing in this Section 2.7 shall be construed to create any additional rights regarding the registration of Shares in any Person otherwise than as set forth herein or require any Holder to make any representations, warranties or agreements in respect of or relating to the Company. The Company will use commercially reasonable efforts to ensure that (i) underwriting arrangements shall be in customary form, (ii) no underwriter shall require any Holder to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such Holder and such Holder's intended method of distribution, and (iii) any representation required to be made by such Holder by law and any other representations, warranties and agreements customarily made by selling securityholders registering securities in similar circumstances to the extent the same do not relate to the Company. If, despite the Company's commercially reasonable efforts, an underwriter requires any Holder to make additional representations or warranties to or agreements with such underwriter, such Holder may elect not to participate in such Underwritten Offering and shall not be bound by Section 2.7 hereof.

Section 2.8    Registration Expenses. All expenses incident to the Company's performance of or compliance with this Agreement, including without limitation (i) all registration and filing fees, and any other fees and expenses associated with filings required to be made with any stock exchange, the Commission and FINRA (including, if applicable, the fees and expenses of any "qualified independent underwriter" and its counsel as may be required by the rules and regulations of FINRA), (ii) all fees and expenses of compliance with state securities or blue sky laws (including fees and disbursements of counsel for the underwriters and one counsel for the Selling Holders **that are Non-Renesas Holders** in connection with blue sky qualifications of the Shares [or Primary Shares] and determination of their eligibility for investment under the laws of such jurisdictions as the managing underwriters may designate), (iii) all printing and related messenger and delivery expenses (including expenses of printing certificates for the Shares [and the Primary Shares] in a form eligible for deposit with The Depository Trust Company and of printing prospectuses), (iv) all fees and disbursements of counsel for the Company and of all independent certified public accountants of the Company and its Subsidiaries (including the expenses related to any "comfort" letters), (v) all fees and expenses incurred in connection with the listing of the Shares [or the Primary Shares] on any securities exchange and all rating agency fees, (vi) all fees and documented out-of-pocket disbursements of underwriters customarily paid by the issuer or sellers of securities and subject to reimbursement by the issuer pursuant to the applicable underwriting agreement, including expenses of any special experts retained in connection with the registration (excluding underwriting discounts and commissions and transfer taxes, if any, and fees and disbursements of counsel to underwriters to the extent agreed to be paid by such underwriters (other than such fees and disbursements incurred in connection with any registration or qualification of Shares [or Primary Shares] under the securities or blue sky laws of any state)), (vii) all reasonable fees and documented out-of-pocket expenses of Selling Holders' Counsel for **the Non-Renesas** Holders of Registrable Securities included in a Piggyback Registration or Shelf Take-Down, as applicable, not to exceed $50,000 per Piggyback Registration or Shelf Take-Down (as

16

applicable), and (viii) fees and expenses of other Persons retained by the Company, and any other reasonable expenses customarily paid by the issuers of securities, will be borne by the Company, regardless of whether the Registration Statement becomes effective (or such offering is completed) and whether or not all or any portion of the Registrable Securities originally requested to be included in such registration or offering are ultimately included in such registration or offering; provided, however, that (A) any underwriting discounts, commissions or fees in connection with the sale of the Registrable Securities will be borne by the Holders pro rata on the basis of the number of Shares so offered and sold, [(B) [any underwriting discounts, commissions or fees in connection with the sale of the Primary Shares will be borne by Renesas,] (C) ]transfer taxes with respect to the sale of Registrable Securities will be borne by the Holder of such Registrable Securities and, ([D]) the fees and expenses of any accountants or other persons retained or employed by any Holder will be borne by such Holder. **and ([E]) for the avoidance of doubt, Renesas will bear all of Renesas' financial, legal and other advisor fees in connection with any [(i)] registration of Registrable Securities hereunder or any offering thereof in which Renesas is a Selling Holder [or (ii) Primary Registration].**

**ARTICLE III**

**PIGGYBACK REGISTRATION**

Section 3.1     Notices.

(a)     If the Company at any time proposes for any reason to register the sale of Common Stock or other equity securities of the Company under the Securities Act (other than a Non-Underwritten Shelf Take-Down, [sales under the ELOC/ATM,] sales under any [other] "at-the-market" offering, a dividend reinvestment plan or rights offering, a registration on Form S-4 or Form S-8, or any successor of either such form, or a registration relating solely to the offer and sale to the Company's directors or employees pursuant to any employee share plan or other employee benefit plan or arrangement) whether or not Common Stock or other equity securities of the Company are to be sold by the Company or otherwise[, and whether or not in connection with any Primary Demand Registration pursuant to Section 2.2, or any other agreement] (such registration, a "Piggyback Registration"), the Company shall give to each Holder holding Registrable Securities of the same class or classes proposed to be registered (or convertible or exercisable at the Holder's option into or for such class or classes) written notice of its intention to so register the Shares[, Primary Shares] or other equity securities of the Company at least ~~ten~~eight (~~10~~8) Business Days prior to the expected date of filing of such Registration Statement or amendment or supplement thereto in which the Company first intends to identify any selling stockholders and the number of Registrable Securities [and Primary Shares] to be sold (each such notice, an "Initial Notice"). The Company shall, subject to the provisions of Section 3.2 and Section 3.3 below, include in such Piggyback Registration on the same terms and conditions as the securities otherwise being sold, all Registrable Securities of the same class or classes as the Common Stock or other equity securities of the Company proposed to be registered (or convertible or exercisable at the Holder's option into or for such class or classes) with respect to which the Company has received written requests from Holders for inclusion therein within the time period specified by the Company in the applicable Initial Notice, which time period shall be not less than five (5) Business Days~~, in each case~~ after sending the applicable Initial Notice

(each such written request, a "Piggyback Notice"), which Piggyback Notice shall specify the number of Shares proposed to be included in the Piggyback Registration.

(b)     If a Holder does not deliver a Piggyback Notice within the period specified in Section 3.1(a), such Holder shall be deemed to have irrevocably waived any and all rights under this Article III with respect to such registration (but not with respect to future registrations in accordance with this Article III).

(c)     No registration effected under this Section 3.1 shall relieve the Company of its obligation to effect any registration or Shelf Take-Down under Section 2.1 [or Section 2.2] hereof, and no registration effected pursuant to this Section 3.1 shall be deemed to have been effected pursuant to Section 2.1 [or Section 2.2] hereof, and no Piggyback Registration shall count towards the number of Underwritten Shelf Take-Downs that a Shelf Holder is entitled to make pursuant to Section 2.1 hereof [or Registered Primary Offerings that Renesas is entitled to initiate pursuant to Section 2.2 hereof]. The Initial Notice, the Piggyback Notice and the contents thereof shall be kept confidential until the public filing of the applicable Registration Statement, post-effective amendment or Prospectus supplement.

Section 3.2     Underwriter's Cutback. If the managing underwriter of an Underwritten Offering [(including an offering pursuant to Section 2.2)] that includes a Piggyback Registration advises the Company that it is the managing underwriter's good faith opinion that the inclusion of all such Registrable Securities proposed to be included in such Underwritten Offering would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities [or the Primary Shares] to be offered thereby, then the number of securities proposed to be included in such Underwritten Offering shall be allocated among the Company, the Selling Holders and all other Persons selling securities in such Underwritten Offering in the following order:

(a)     If the Piggyback Registration referred to in Section 3.1 is initiated as an underwritten primary registration on behalf of the Company [(other than a Registered Primary Offering pursuant to Section 2.2)], then, with respect to each class proposed to be registered:

(i)     *first*, Common Stock or other equity securities of the Company of the class or classes proposed to be registered that the Company proposes to sell, as applicable;

(ii)     *second*, all Registrable Securities of the same class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) held by Holders requested to be included in such Piggyback Registration (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such offering by each such Holder at the time of such Piggyback Registration); and

(iii)     *third*, all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Piggyback Registration.

18

(b)     if the Piggyback Registration referred to in <u>Section 3.1</u> is an Underwritten Shelf Take-Down, then the provisions of <u>Section 2.5(b)</u> shall apply.

(c)     if the Piggyback Registration referred to in <u>Section 3.1</u> is an underwritten secondary registration on behalf of any holder of securities other than a Holder, then, with respect to each class proposed to be registered:

(i)     *first*, the securities of the class or classes proposed to be registered held by such holder;

(ii)     *second*, the Registrable Securities of the same class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) held by Holders requested to be included in such Piggyback Registration (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Piggyback Registration);

(iii)     *third,* all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Piggyback Registration other than securities to be sold by the Company; and

(iv)     *fourth*, the Common Stock or other equity securities of the Company of the same class or classes to be sold by the Company.

(d)     [if the Piggyback Registration referred to in <u>Section 3.1</u> is a Registered Primary Offering, then, with respect to each class proposed to be registered:

(i)     *first*, the Primary Shares and all Registrable Securities of the same class or classes (or convertible or exercisable at Renesas' option into or for such class or classes) held by Renesas requested to be included in such Registered Primary Offering;

(ii)     *second*, all Registrable Securities of the same class or classes (or convertible or exercisable at the Holder's option into or for such class or classes) held by Holders other than Renesas requested to be included in such Registered Primary Offering (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Registered Primary Offering);

(iii)     *third,* all other securities of the same class or classes (or convertible or exercisable at the holder's option into or for such class or classes) requested to be included in such Registered Primary Offering other than securities to be sold by the Company; and

(iv)     *fourth*, any additional securities of the same class or classes to be sold by the Company.]

Section 3.3     <u>Company Control</u>. Except for a Registration Statement being filed in connection with a Shelf Registration [or the exercise of a Primary Demand Right], the Company

may decline to file a Registration Statement after an Initial Notice has been given or after receipt by the Company of a Piggyback Notice, and the Company may withdraw a Registration Statement after filing and after such Initial Notice or Piggyback Notice, but prior to the effectiveness of the Registration Statement, provided, that, the Company shall promptly notify the Selling Holders in writing of any such action.

Section 3.4    Selection of Underwriters. If the Company intends to offer and sell Common Stock or other equity securities of the Company by means of an Underwritten Offering (other than an offering pursuant to Section 2.1 [or Section 2.2]), the Company shall select the managing underwriter or underwriters to administer such Underwritten Offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing.

Section 3.5    Withdrawal of Registration. Any Holder shall have the right to withdraw all or a part of its Piggyback Notice by giving written notice to the Company of such withdrawal at any time prior to the execution of an underwriting agreement.

## ARTICLE IV

## REGISTRATION PROCEDURES

Section 4.1    Registration Procedures. If and whenever the Company is under an obligation pursuant to the provisions of this Agreement to use commercially reasonable efforts to effect the registration of any Registrable Securities [or Primary Shares] or the offering thereof, the Company shall, as expeditiously as reasonably practicable:

(a)    in the case of Registrable Securities, use commercially reasonable efforts to cause a Registration Statement that registers such Registrable Securities to become and remain effective for a period of 180 days or, if earlier, until the earlier to occur of the date as of which (i) all of such Registrable Securities covered thereby have been disposed of and (ii) all securities registered pursuant to the terms of this Agreement cease to constitute Registrable Securities as defined hereunder; provided, that, in the case of any registration of Registrable Securities on a Shelf Registration Statement which are intended to be offered on a continuous or delayed basis, such 180-day period shall be extended, if necessary or contemplated by Section 2.1(e), to keep the registration statement continuously effective, supplemented and amended to the extent necessary to ensure that it is available for sales of such Registrable Securities, and to ensure that it conforms with the requirements of this Agreement, the Securities Act and the policies, rules and regulations of the Commission as announced from time to time, until the Company is no longer required to keep the registration statement continuously effective pursuant to Section 2.1(e) of this Agreement;

(b)    [(x) with respect to a Shelf Registration or Piggyback Registration, furnish] to each Selling Holder, [and (y) with respect to a Registered Primary Offering, furnish to Renesas, in each case] at least ten (10) Business Days before filing the related Registration Statement, or such shorter period as reasonably practical or necessary due to the timing requirements of Section 2.1(c)(i), as applicable, copies of such Registration Statement or any amendments or supplements thereto, which documents shall be subject to the review, comment

and reasonable approval by (x) counsel to Renesas (including any reasonably necessary local counsel), to the extent any Registrable Securities beneficially owned by Renesas are included on such Registration Statement, and (y) [solely in the case of a Shelf Registration or Piggyback Registration,] one (1) lead counsel (and any reasonably necessary local counsel) selected by the Non-Renesas Holders who beneficially own a majority of any Registrable Securities owned by Non-Renesas Holders included on such Registration Statement, and who shall represent all Selling Holders that are Non-Renesas Holders as a group (such counsel in (x) and (y), collectively, the "Selling Holders' Counsel") (it being understood that such ten (10) Business Day period need not apply to successive drafts of the same document proposed to be filed so long as such successive drafts are supplied to the Selling Holders' Counsel in advance of the proposed filing by a period of time that is customary and reasonable under the circumstances);

(c)     furnish to [Renesas (in the case of a Registered Primary Offering) and] each Selling Holder [(in the case of a Shelf Registration or Piggyback Registration)] and each underwriter, if any, such number of copies of final conformed versions of the applicable Registration Statement and of each amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference) reasonably requested by [Renesas or] such Selling Holder [(as applicable)] or underwriter in writing;

(d)     in the case of Registrable Securities and [Primary Shares], prepare and file with the Commission such amendments, including post-effective amendments, and supplements to such Registration Statement and the applicable Prospectus or Prospectus supplement, including any Free Writing Prospectus as defined in Rule 405 under the Securities Act, used in connection therewith as may be (i) reasonably requested by any Selling Holder ([in the case of a Shelf Registration or Piggyback Registration and] to the extent such request relates to information relating to such Selling Holder) or any Holder requesting the inclusion of its Registrable Securities therein, or (ii) necessary to keep such Registration Statement effective for at least the period specified in Section 4.1(a) or elsewhere in this Agreement and to comply with the provisions of this Agreement and the Securities Act with respect to the sale or other disposition of such Registrable Securities [and Primary Shares], and furnish to each Selling Holder [(in the case of a Shelf Registration or Piggyback Registration)] and Renesas (in the case of a Registered Primary Offering)] and to the managing underwriter(s), if any, within a reasonable period of time prior to the filing thereof a copy of any amendment or supplement to such Registration Statement or Prospectus; provided, however, that, with respect to each Free Writing Prospectus or other materials to be delivered to purchasers at the time of sale of the Registrable Securities, the Company shall (i) ensure that no Registrable Securities are sold "by means of" (as defined in Rule 159A(b) under the Securities Act) such Free Writing Prospectus or other materials without the prior written consent of the sellers of the Registrable Securities, which Free Writing Prospectus or other materials shall be subject to the review of counsel to such sellers and (ii) make all required filings of all Free Writing Prospectuses or other materials with the Commission as are required;

(e)     notify in writing each Selling Holder [(in the case of a Shelf Registration or Piggyback Registration) and Renesas (in the case of a Registered Primary Offering)] promptly (i) of the receipt by the Company of any notification with respect to any comments by the Commission with respect to such Registration Statement or any amendment or supplement thereto or any request by the Commission for the amending or supplementing thereof or for

21

additional information with respect thereto, (ii) of the receipt by the Company of any notification with respect to the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement or any amendment or supplement thereto or the initiation or threatening of any proceeding for that purpose and (iii) of the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Securities [or Primary Shares (as the case may be)] for sale in any jurisdiction or the initiation or threatening of any proceeding for such purposes and, in any such case as promptly as reasonably practicable thereafter, prepare and file an amendment or supplement to such Registration Statement or Prospectus which will correct such statement or omission or effect such compliance;

(f)       use commercially reasonable efforts to register or qualify such Registrable Securities [and Primary Shares] under such other securities or blue sky laws of such jurisdictions as the Selling Holders [(in the case of a Shelf Registration or Piggyback Registration)] reasonably request [(or reasonably necessary, in the case of Primary Shares)] and do any and all other acts and things which may be reasonably necessary or advisable to enable such Selling Holders to consummate their disposition in such jurisdictions; provided, however, that the Company will not be required to qualify generally to do business, subject itself to general taxation or consent to general service of process in any jurisdiction where it would not otherwise be required to do so but for this Section 4.1(f);

(g)       [in the case of a Shelf Registration or Piggyback Registration,] furnish to each Selling Holder such number of copies of a summary Prospectus or other prospectus, including a preliminary prospectus and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents as such Selling Holders or any underwriter may reasonably request in writing;

(h)       notify on a timely basis each Selling Holder of such Registrable Securities (in the case of a Shelf Registration or Piggyback Registration) at any time when a prospectus relating to such Registrable Securities is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading and, at the request of such Selling Holder, as soon as practicable prepare and furnish to such Selling Holder a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the offeree of such securities, such Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(i)       make available to the Selling Holders, the Selling Holders' Counsel, any underwriter participating in any disposition pursuant to such Registration Statement and counsel to the underwriter(s) (collectively, the "**Inspectors**") any pertinent corporate records and documents reasonably requested to conduct customary due diligence in connection **with** the related disposition (collectively, the "**Information**") and, to the extent customary and requested by the underwriter(s) participating in any such disposition, request that the independent public accountants who have certified the Company's financial statements make themselves available,

22

at reasonable times and for reasonable periods, to discuss the business of the Company. Any of the Information which the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, shall not be disclosed by the Inspectors unless otherwise agreed between the Inspector and the Company;

(j)   in the case of an Underwritten Offering, cause to be delivered to the underwriters of such Underwritten Offering a "comfort" letter in customary form and at customary times and covering matters of the type customarily covered by such comfort letters from its independent certified public accountants;

(k)   in the case of an Underwritten Offering, cause to be delivered to the underwriters of such Underwritten Offering a written and signed legal opinion or opinions in customary form from its outside or in-house legal counsel dated the closing date of the Underwritten Offering;

(l)   provide a transfer agent and registrar (which may be the same entity) for such Registrable Securities [or Primary Shares] and deliver to such transfer agent and registrar such customary forms, legal opinions from its outside or in-house legal counsel, agreements and other documentation as such transfer agent and/or registrar so request;

(m)   issue to any underwriter to which any Selling Holders may sell Registrable Securities [or the Company may sell Primary Shares] in such offering certificates evidencing such Registrable Securities [or Primary Shares];

(n)   use commercially reasonable efforts to cause such Registrable Securities [(in the case of a Shelf Registration or Piggyback Registration) and Primary Shares (in the case of a Registered Primary Offering)] to be listed on any national securities exchange on which any Common Stock is listed or, if the Common Stock is not listed on a national securities exchange, upon the request of any Selling Holder of the Registrable Securities included in such registration [(in the case of a Shelf Registration or Piggyback Registration) or Renesas (in the case of a Registered Primary Offering)], use commercially reasonable efforts to qualify such Registrable Securities [(in the case of a Shelf Registration or Piggyback Registration) and Primary Shares (in the case of a Registered Primary Offering)] for inclusion on such national securities exchange as the Company shall designate;

(o)   otherwise use commercially reasonable efforts to comply with all applicable rules and regulations of the Commission and make available to its security holders, no later than sixty (60) days after the end of the 12-month period beginning with the first day of the Company's first full fiscal quarter after the effective date of such Registration Statement, earnings statements (which need not be audited) covering a period of twelve (12) months beginning within three (3) months after the effective date of the Registration Statement, which earnings statements shall satisfy the provisions of Section 11(a) of the Securities Act or any successor rule thereto, provided that such requirement shall be deemed satisfied if the Company timely files complete and accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act;

(p)     notify the Selling Holders [(in the case of a Shelf Registration or Piggyback Registration) and Renesas (in the case of a Registered Primary Offering)] and the lead underwriter or underwriters, if any, and (if requested) confirm such advice in writing, as promptly as reasonably practicable after notice thereof is received by the Company when the applicable Registration Statement or any amendment thereto has been filed or becomes effective and when the applicable Prospectus or any amendment or supplement thereto has been filed;

(q)     use commercially reasonable efforts to prevent the entry of, and use commercially reasonable efforts to obtain as promptly as reasonably practicable the withdrawal of, any stop order with respect to the applicable Registration Statement or other order suspending the use of any preliminary or final Prospectus;

(r)     promptly incorporate in a Prospectus supplement or post-effective amendment to the applicable Registration Statement such information as the lead underwriter or underwriters, if any, and[, in the case of a Shelf Registration or Piggyback Registration], each Selling Holder agree should be included therein relating to the plan of distribution with respect to such class of Registrable Securities [or Primary Shares], which may include disposition of Registrable Securities [or Primary Shares] by all lawful means, including firm-commitment underwritten public offerings, block trades, agented transactions, sales directly into the market, purchases or sales by brokers, derivative transactions, short sales, stock loan or stock pledge transactions and sales not involving a public offering; and make all required filings of such Prospectus supplement or post-effective amendment as promptly as reasonably practicable after being notified of the matters to be incorporated in such Prospectus supplement or post-effective amendment;

(s)     if a Prospectus supplement will be used in connection with the marketing of an Underwritten Shelf Take-Down [or Registered Primary Offering] and the managing underwriter(s) at any time shall notify the Company in writing that, in the sole judgment of such managing underwriter(s), inclusion of detailed information to be used in such Prospectus supplement is of material importance to the success of such Underwritten Shelf Take-Down [or Registered Primary Offering], the Company shall use commercially reasonable efforts to include such information in such Prospectus supplement;

(t)     cooperate with each Selling Holder [in the case of a Shelf Registration or Piggyback Registration] and each underwriter or agent, if any, participating in the disposition of such Registrable Securities [or Primary Shares] and their respective counsel in connection with any filings required to be made with FINRA;

(u)     provide a CUSIP number or numbers for all such shares, in each case not later than the effective date of the applicable registration statement;

(v)     to the extent reasonably requested by the lead or managing underwriters in connection with an Underwritten Offering, send appropriate officers of the Company to attend any "roadshows" scheduled in connection with any such Underwritten Offering, with all out of pocket costs and expenses incurred by the Company or such officers in connection with such attendance to be paid by the Company;

(w)     enter into such agreements (including an underwriting agreement in customary form) and take such other actions as [(i) in the case of a Shelf Registration or Piggyback Registration,] the Selling Holder or Selling Holders, as the case may be, owning at least a majority of the Registrable Securities covered by any applicable Registration Statement shall reasonably request [and (ii) in the case of a Registered Primary Offering, Renesas shall reasonably request, in each case] in order to expedite or facilitate the disposition of such Registrable Securities [and Primary Shares (as applicable)], including customary indemnification and contribution to the effect and to the extent provided in Article V hereof, provided, however, that [in the case of a Shelf Registration or a Piggyback Registration], if a Selling Holder becomes a party to any underwriting agreement or related documents, the Selling Holder shall not be required in any such underwriting agreement or related documents to make any representations or warranties to or agreements with the Company or the underwriters other than customary representations, warranties or agreements regarding such Selling Holder's title to Registrable Securities and any written information provided by the Selling Holder to the Company expressly for inclusion in the related Registration Statement, and the liability of any Selling Holder under the underwriting agreement shall be several and not joint and in no event shall the liability of any Selling Holder under the underwriting agreement be greater in amount than the dollar amount of the proceeds received by such Selling Holder under the sale of the Registrable Securities pursuant to such underwriting agreement (net of underwriting discounts and commissions); and

(x)     subject to all the other provisions of this Agreement, use commercially reasonable efforts to take all other steps necessary to effect the registration, marketing and sale of such Registrable Securities [or Primary Shares] contemplated hereby.

Section 4.2     Notice Opt-In and Opt-Out. Notwithstanding anything to the contrary in this Agreement, until a Holder makes an affirmative written election, the Company shall not deliver any notice or any information to such Holder that would reasonably be expected to constitute material non-public information ("MNPI"), including any applicable registration notices, or any other information under this Agreement. Upon receipt of a written election to receive such notices or information (an "Opt-In Election") the Company shall provide to the Holder all applicable notices or information pursuant to this Agreement from the date of such Opt-In Election. At any time following a Holder making an Opt-In Election, such Holder may also make a written election to no longer receive any such notices or information (an "Opt-Out Election"), which election shall cancel any previous Opt-In Election, and, following receipt of such Opt-Out Election, the Company shall not deliver any such notice or information to such Holder from the date of such Opt-Out Election. An Opt-Out Election may state a date on which it expires or, if no such date is specified, shall remain in effect indefinitely. A Holder who previously has given the Company an Opt-In Election or Opt-Out Election may revoke such election at any time, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-In Elections and Opt-Out Elections. Should any Holder have made an Opt-In Election and have received a notice or any information that would reasonably be expected to constitute MNPI, such Holder agrees that it shall treat such MNPI as confidential in accordance with procedures adopted by it in good faith to protect confidential information of third parties delivered to such Holder (the "Policies") and shall not disclose such MNPI, in each case, without the prior written consent of the Company until such time as such MNPI is or becomes available to the public generally, other than as a result of disclosure by the Holder in breach of the terms of this Agreement; provided, that, a Holder may deliver or disclose MNPI (A) to its Affiliates and

25

its and its Affiliates' directors, officers, employees, agents, external advisors or legal counsel (collectively, "Representatives"), but solely to the extent such disclosure reasonably relates to its evaluation of exercise of its rights under this Agreement and the sale of any Registrable Securities in connection therewith, and such Representatives are subject to the Policies or agree to hold the MNPI confidential on terms substantially consistent with this Section 4.2; (B) when disclosure of such information is required by court or administrative order or is necessary to respond to inquiries of regulatory authorities; (C) when disclosure of such information is required, in the reasonable opinion of such Holder's counsel, by law (including any disclosure requirements pursuant to federal securities laws in connection with the filing of any Registration Statement or the use of any Prospectus referred to in this Agreement); or (D) when such information becomes available to any such Person from a source other than the Company and such source is not bound by a confidentiality agreement.

## ARTICLE V

## INDEMNIFICATION

Section 5.1    Indemnification by the Company. In connection with any Registration Statement in which a Holder is participating, the Company agrees to indemnify and hold harmless, to the full extent permitted by law, such Holder, its Affiliates and their respective officers, directors, managers, partners, members and representatives, and each of their respective successors and assigns, against any losses, claims, damages, liabilities and expenses, including amounts paid in settlement, caused by any violation by the Company of the Securities Act or the Exchange Act applicable to the Company and relating to action or inaction required of the Company in connection with the registration contemplated by such Registration Statement or any untrue or alleged untrue statement of a material fact contained in such Registration Statement or related Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto, or any other disclosure document (including reports and other documents filed under the Exchange Act and any document incorporated by reference therein) or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading; provided, however, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such Registration Statement or related Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto in reliance upon and in conformity with information furnished to the Company in writing by the Person asserting such loss, claim, damage, liability or expense specifically for use therein. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any such Person and shall survive the transfer of such securities. The Company shall also provide customary indemnification to any underwriters participating in any Underwritten Offering.

Section 5.2    Indemnification by Selling Holders. Each Selling Holder agrees to indemnify and hold harmless, to the full extent permitted by law, the Company, the Company's controlled Affiliates and its and their respective directors, managers, partners, members and representatives, and each of their respective successors and assigns, and each Person who controls the Company (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) against any losses, claims, damages or liabilities and expenses caused by any

untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that such untrue statement or omission was made in reliance on and in conformity with any information furnished in writing by such Selling Holder to the Company expressly for inclusion in such Registration Statement and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting such loss, claim, damage, liability or expense; provided, that, the obligation to indemnify shall be several, not joint and several, for each Selling Holder and in no event shall the liability of any Selling Holder hereunder be greater in amount than the dollar amount of the net proceeds (after deducting underwriting discounts and commissions) received by such Selling Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

Section 5.3    Conduct of Indemnification Proceedings. Any Person entitled to indemnification hereunder will (i) give prompt (but in any event within thirty (30) days after such Person has actual knowledge of the facts constituting the basis for indemnification) written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided, however, that any delay or failure to so notify the indemnifying party shall relieve the indemnifying party of its obligations hereunder only to the extent that it is materially prejudiced by reason of such delay or failure, but shall not relieve the indemnifying party from any other liability that it may have otherwise. Any Person entitled to indemnification hereunder shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Person unless (a) the indemnifying party has agreed in writing to pay such fees or expenses, (b) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after receipt of notice of such claim from the Person entitled to indemnification hereunder and employ counsel reasonably satisfactory to such Person, (c) the indemnified party has reasonably concluded, based on the advice of counsel, that there may be legal defenses available to it or other indemnified parties that are different from or in addition to those available to the indemnifying party or (d) in the reasonable judgment of any such Person, based upon advice of counsel, a conflict of interest may exist between such Person and the indemnifying party with respect to such claims (in which case, if such Person notifies the indemnifying party in writing that such Person elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such Person). If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its consent (but such consent will not be unreasonably withheld, conditioned or delayed). No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened action or claim in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement includes (i) an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action, (ii) does not include a statement as to or an admission of fault, culpability or failure to act by or on behalf of any indemnified party and (iii) does not commit any indemnified party to take, or hold back from taking, any action. No indemnified party shall, without the written consent of the

27

indemnifying party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder, and no indemnifying party shall be liable for any settlement or compromise of, or consent to the entry of judgment with respect to, any such action or claim effected without its consent, in each case which consent shall not be unreasonably withheld, conditioned or delayed.

Section 5.4    Other Indemnification. Indemnification similar to that specified in this Article V (with appropriate modifications) shall be given by the Company and each Selling Holder with respect to any required registration or other qualification of Registrable Securities under Federal or state law or regulation of governmental authority other than the Securities Act.

Section 5.5    Contribution. If for any reason the indemnification provided for in Section 5.1 or Section 5.2 is unavailable to an indemnified party or insufficient to hold it harmless as contemplated by Section 5.1 and Section 5.2, then (i) the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnified party and the indemnifying party or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective sellers, on the other hand, from their sale of the Registrable Securities. The relative fault of such indemnifying party and indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such indemnifying party or indemnified party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5.5 were determined by pro rata allocation (even if the Holders or any underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 5.5. Notwithstanding the provisions of this Section 5.5, no Holder shall be required to contribute an amount greater than the dollar amount by which the net proceeds received by such Holder with respect to the sale of any Registrable Securities giving rise to such indemnification and contribution obligation exceeds the amount of damages which such Holder has otherwise been required to pay by reason of any and all untrue or alleged untrue statements of material fact or omissions or alleged omissions of material fact made in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto related to such sale of Registrable Securities. The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or expenses (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or, except as provided in Section 5.3, defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The Holders' obligations in this Section 5.5 to contribute shall be several in proportion to the dollar amount of the net proceeds (after deducting underwriting discounts and commissions) received

28

by such Selling Holders with respect to the sale of the Registrable Securities giving rise to such contribution obligation and not joint.

## ARTICLE VI

## COMPLIANCE WITH EXEMPTION REQUIREMENTS

Section 6.1     Compliance with Exemption Requirements. So long as any Registrable Securities remain outstanding, the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Section 4(a)(7), Rule 144 and Rule 144A under the Securities Act, as such rules may be amended from time to time or any similar rules or regulations adopted by the Commission, including, without limiting the generality of the foregoing, (i) making and keeping current public information available, as those terms are understood and defined in Rule 144 promulgated under the Securities Act, (ii) filing with the Commission in a timely manner all reports and other documents required of the Company under the Exchange Act, to the extent so required, and (iii) at the request of any Holder if such Holder proposes to sell securities in compliance with Section 4(a)(7), Rule 144 or Rule 144A, forthwith furnish to such Holder, as applicable, a written statement of compliance with the reporting requirements of the Commission as set forth in such rules and make available to such Holder such information as will enable the Holder to make sales pursuant to Section 4(a)(7), Rule 144 or Rule 144A.

## ARTICLE VII

## MISCELLANEOUS

Section 7.1     Severability. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 7.2     Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of [New York]Delaware irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Agreement shall be brought and determined exclusively in a state or federal court located within the [Borough of Manhattan in The City of New York]State of Delaware. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 7.3    Other Registration Rights. The Company shall not grant any demand, piggyback or shelf registration rights, the terms of which are senior to or conflict with the rights granted to the Holders hereunder to any other Person, without the prior written consent of the Required Holders.

Section 7.4    Additional Rights. If the Company at any time after the date hereof grants to any other holders of Common Stock or securities of the Company convertible or exercisable into or for Common Stock any rights to request the Company to effect the registration under the Securities Act of any shares of Common Stock on terms more favorable to such holders than the terms set forth in this Agreement, the terms of this Agreement shall be deemed amended or supplemented to the extent necessary to provide the Holders such more favorable rights and benefits.

Section 7.5    Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto, each of which, in the case of the Holders and any Transferees thereof, shall agree to become subject to the terms of this Agreement by executing an Adoption Agreement and be bound to the same extent as the parties hereto. The Company may not assign any of its rights or delegate any of its duties hereunder [(a) with respect to Section 2.2 and any associated rights and duties herein, without the prior written consent of Renesas for so long as Renesas holds or beneficially owns any Registrable Securities, and (b) with respect to any other rights or duties hereunder,] without the prior written consent of the Required Holders. Any Holder may, at its election and at any time or from time to time, assign its rights and delegate its duties hereunder, in whole or in part, to any Transferee of such Holder (each, an "Assignee"); provided, that no such assignment shall be binding upon or obligate the Company to any such Assignee unless and until such Assignee delivers the Company an Adoption Agreement; provided, that (i) any rights assigned hereunder shall apply only in respect of Registrable Securities that are Transferred and not in respect of any other securities that the Transferee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement. If a Holder assigns its rights under this Agreement in connection with the Transfer of less than all of its Registrable Securities, the Holder shall retain its rights under this Agreement with respect to its remaining Registrable Securities. If a Holder assigns its rights under this Agreement in connection with the Transfer of all of its Registrable Securities, the Holder shall have no further rights or obligations under this Agreement, except under Article V hereof in respect of offerings in which such Holder participated or registrations in which Registrable Securities held by such Holder were included. Any purported assignment in violation of this provision shall be null and void ab initio.

Section 7.6    Notices. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

30

(a)      if to the Company, to:

> Wolfspeed, Inc.
> 4600 Silicon Drive
> Durham, NC 27703
> Attention: Melissa Garrett
> Email: Melissa.Garrett@wolfspeed.com
>
> with a copy, in each case, (which shall not constitute notice), to:
>
> Latham & Watkins LLP
> 140 Scott Drive
> Menlo Park, CA 94025
> Attention:     Tad J. Freese
>                Richard Kim
> E-mail:        Tad. Freese@lw.com
>                Richard.Kim2@lw.com

(b)      if to Renesas, to the address or e-mail address set forth under Renesas' name in Schedule I attached hereto,

> with a copy, in each case, (which shall not constitute notice), to:
>
> Kirkland & Ellis LLP
> 1301 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004
> Attention: Rachel W. Sheridan, P.C.
>                Shagufa R. Hossain, P.C.
>                Anthony L. Sanderson
> Email: rachel.sheridan@kirkland.com
>                shagufa.hossain@kirkland.com
>                anthony.sanderson@kirkland.com

(c)      if to any Non-Renesas Holder, to the address or e-mail address set forth under such other Holder's name in Schedule I attached hereto,

> with a copy, in each case, (which shall not constitute notice) to:
>
> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036
> Attn:   Ryan P. Dahl
>                Matthew M. Roose
>                Sam Badawi
>
> Email: ryan.dahl@ropesgray.com
>                matthew.roose@ropesgray.com
>                sam.badawi@ropesgray.com

31

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth (5th) Business Day after the posting thereof.

Section 7.7    Headings. The headings contained in this Agreement are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

Section 7.8    Additional Parties. Additional parties to this Agreement shall only include each Holder (a) who has executed an Adoption Agreement, in the form attached hereto as Exhibit A, or (b) who (i) is bound by and subject to the terms of this Agreement, and (ii) has adopted this Agreement with the same force and effect as if it were originally a party hereto.

Section 7.9    Adjustments. If, and as often as, there are any changes in the Shares or securities convertible into or exchangeable into or exercisable for Shares as a result of any reclassification, recapitalization, split (including a reverse split), or subdivision or combination, exchange or readjustment of shares, or any share dividend or share distribution, merger, amalgamation or other similar transaction affecting such Shares or such securities, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to such Shares or such securities as so changed.

Section 7.10    Entire Agreement. This Agreement and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such subject matter.

Section 7.11    Specific Performance. Damages in the event of breach of this Agreement by a party hereto may be difficult, if not impossible, to ascertain, and it is therefore agreed that the other parties hereto, in addition to and without limiting any other remedy or right it may have, will have the right to seek an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach, and enforcing specifically the terms and provisions hereof, and each of the parties hereto hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief. The existence of this right will not preclude any party hereto from pursuing any other rights and remedies at law or in equity which such party may have.

Section 7.12    Counterparts; Facsimile or .pdf Signature. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document. This Agreement may be executed by facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, and a facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, shall constitute an original for all purposes.

32

Section 7.13   Amendment. Other than with respect to amendments to Schedule I attached hereto, which may be amended by the Company from time to time to reflect the Holders at such time, this Agreement may not be amended, modified or supplemented without the written consent of the Required Holders; provided, however, that, with respect to a particular Holder or group of Holders, any such amendment, supplement, modification or waiver that (a) would materially and adversely disproportionately affect such Holder or group of Holders in any respect as compared to any other Holder or group of Holders or (b) would disproportionately benefit any other Holder or group of Holders or confer any benefit on any other Holder or group of Holders to which such Holder of group of Holders would not be entitled, shall not be effective against such Holder or group of Holders unless approved in writing by such Holder or the Holders of a majority of the Registrable Securities held by such group of Holders, as the case may be. [For the avoidance of doubt, the Company and Renesas (for so long as Renesas holds or beneficially owns any Registrable Securities) can amend Section 2.2 and any associated rights, duties and definitions without the written consent of any other Holder so long as such amendment is not materially adverse any such Holders.]

Section 7.14   Extensions; Waivers. Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any extension or waiver pursuant to this Section 7.14 will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

Section 7.15   Further Assurances. Each of the parties hereto shall execute all such further instruments and documents and take all such further action as the Company may reasonably require in order to effectuate the terms and purposes of this Agreement.

Section 7.16   No Third-Party Beneficiaries. Except pursuant to Article V, this Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

Section 7.17   Interpretation; Construction. This Agreement has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement. Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa,

unless the context otherwise requires. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the schedules, exhibits and annexes, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited. References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections, schedules, annexes and exhibits mean the sections of this Agreement and the schedules, annexes and exhibits attached to this Agreement, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

Section 7.18   Term. This Agreement shall terminate (i) with respect to any Holder, at such time as such Holder has no Registrable Securities and (ii) in full and be of no further effect at such time as there are no Registrable Securities held by any Holders. Notwithstanding the foregoing, Article V, Section 7.2, Section 7.6, and Section 7.17 shall survive any termination.

* * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or been deemed to execute this Agreement, on the date first above written.

**THE COMPANY**:

**WOLFSPEED, INC.**

By: _____
     Name:
     Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or been deemed to execute this Agreement, on the date first above written.

**HOLDER:**

**RENESAS ELECTRONICS AMERICA INC.**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
    Name: [●]
    Title:  [●]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or been deemed to execute this Agreement, on the date first above written.

**HOLDER:**

**[●]**

By:_____
    Name: [●]
    Title:  [●]

*[Signature Page to Registration Rights Agreement]*

**EXHIBIT A**

**ADOPTION AGREEMENT**

This Adoption Agreement ("Adoption") is executed pursuant to the terms of the Registration Rights Agreement, dated as of [●], 2025, a copy of which is attached hereto (as amended, the "Registration Rights Agreement"), by the undersigned (the "Undersigned") executing this Adoption. Capitalized terms used herein without definition are defined in the Registration Rights Agreement and are used herein with the same meanings set forth therein. By the execution of this Adoption, the Undersigned agrees as follows:

1.      Acknowledgment. The Undersigned acknowledges that the Undersigned is acquiring certain Shares (or securities convertible into or exercisable for Shares), subject to the terms and conditions of the Registration Rights Agreement.

2.      Agreement. The Undersigned (i) agrees that the Shares (or securities convertible into or exercisable for Shares) acquired by the Undersigned, and certain other Shares and other securities of the Company convertible into or exercisable for Shares that may be acquired by the Undersigned in the future, shall be bound by and subject to the terms of the Registration Rights Agreement, pursuant to the terms thereof, and (ii) hereby adopts the Registration Rights Agreement with the same force and effect as if the undersigned were originally a party thereto.

3.      Notice. Any notice required as permitted by the Registration Rights Agreement shall be given to the Undersigned at the address listed beside the Undersigned's signature below.

4.      Opt-In Election. The undersigned Holder hereby notifies the Company of its decision to either exercise or decline its Opt-In Election by marking the appropriate box below.

[_] The undersigned Holder hereby exercises its Opt-In Election.

[_] The undersigned Holder hereby declines its Opt-In Election.

[NAME OF HOLDER]                              Address for Notices:


By: _____            [●]
Name                                                      [●]
Title:                                                       Telephone: [●]
Date:                                                      Email: [●]

**SCHEDULE I**

**List of Holders**

[*On file with the Company*]

## **EXHIBIT G**

**Renesas Warrants Agreement**

*[Plan Supplement Filing Version 8/19/2025]*

*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

**THIS WARRANT WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE. THE WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS AND THE ISSUER, IF IT SO REASONABLY DETERMINES IS NECESSARY, IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO ITS BOARD OF DIRECTORS THAT SUCH TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.**

**IN ADDITION, THE WARRANT MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE TRANSFER PROVISIONS OF THE WARRANT.**

**THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE ISSUER (NOT TO BE UNREASONABLY WITHHELD, CONDITIONED OR DELAYED).**

**WARRANT**

Warrant Certificate No.: [●]

Original Issue Date: [●], 2025.

FOR VALUE RECEIVED, Wolfspeed, Inc., a Delaware corporation (the "**Company**"), hereby certifies that Renesas Electronics America Inc., a California corporation, or its registered assigns (the "**Holder**"), is entitled to purchase from the Company a number of shares of duly authorized, validly issued, fully paid, and nonassessable Common Stock equal to the Issuance Amount less the aggregate number of Common Stock previously issued from time to time as a result of any partial exercise of this Warrant in accordance with <u>Section 3</u>, at a purchase price per share of $[●][1] (the "**Exercise Price**"), all subject to the terms, conditions, and adjustments set forth below in this Warrant.  Certain capitalized terms used herein are defined in <u>Section 1</u> hereof.

---

[1] **Note**: To be set at an assumed $2.25 billion As Converted Equity Value (as defined in the Restructuring Term Sheet).

1.    <u>Definitions</u>.   As used in this Warrant, the following terms have the respective meanings set forth below:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"**Aggregate Exercise Price**" means, with respect to any exercise of this Warrant for Warrant Shares pursuant to Section 3 hereof, an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to <u>Section 3</u> hereof, multiplied by (b) the Exercise Price.

"**Black-Scholes Value**" means the value of this Warrant based on the Black-Scholes Option Pricing Model obtained from the "OVME" function on Bloomberg Financial Markets determined as of the day of consummation of the applicable Fundamental Transaction for pricing purposes and reflecting (A) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the time between the date of the public announcement of the applicable Fundamental Transaction and the termination of the Exercise Period, (B) an implied volatility equal to thirty-five percent (35%), (C) an underlying price per share of Common Stock calculation equal to the VWAP of the Common Stock measured as of the date of the Holder's election pursuant to Section 4(a), (D) a remaining option time equal to the remaining Exercise Period measured as of the date of the Holder's election pursuant to Section 4(a), (E) a zero cost of borrow, and (F) assuming zero discrete dividend payments.

"**Board**" means the board of directors of the Company.

"**Business Day**" means any day other than a Saturday or Sunday or a legal holiday on which commercial banks in New York City or the State of California in the United States are authorized or required by law to be closed.

"**Common Stock**" means the shares of common stock, par value $0.00125 per share, of the Company, and any capital stock into which such Common Stock shall have been converted, exchanged, or reclassified following the date hereof.

"**Company**" has the meaning set forth in the preamble.

"**ELOC/ATM**" means the equity line of credit or "at the market" program entered into to facilitate the sale of Common Stock as set forth in the Plan.

"**Exercise Date**" means, for any given exercise of this Warrant, the date on which the conditions to such exercise as set forth in <u>Section 3</u> shall have been satisfied at or prior to 5:00 p.m., Eastern Time, on a Business Day, including, without limitation, the receipt by the Company of the Exercise Notice, this Warrant, and the Aggregate Exercise Price.

"**Exercise Notice**" has the meaning set forth in Section 3(a)(i).

"**Exercise Period**" has the meaning set forth in Section 2.

"**Exercise Price**" has the meaning set forth in the preamble.

"**Extraordinary Dividend**" has the meaning set forth in Section 4(e).

"**Fair Market Value**" means, (i) with respect to the Common Stock, as of any particular date: (a) the closing price of the Common Stock for such day on the primary U.S. securities exchange on which the Common Stock may at the time be listed; (b) if there have been no sales of the Common Stock on any such exchange on any such day, the average of the closing bid and asked prices for the Common Stock on such exchange at the end of such day; or (c) if at any time the Common Stock is not listed on any Trading Market, the fair market value per share as determined in good faith by the Board and (ii) with respect to any other property, the fair market value thereof as determined in good faith by the Board; provided that if the Holder objects in writing to the Board's calculation of Fair Market Value within three (3) Business Days of receipt of written notice thereof, the valuation dispute resolution procedure set forth in Section 12 hereof shall be invoked to determine Fair Market Value.

"**Fundamental Transaction**" means (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person (other than for the purpose of changing the Company's name and/or the jurisdiction of incorporation of the Company or a holding company for the Company), (ii) the Company (and all of its Subsidiaries, taken as a whole), directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any, direct or indirect, purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to sell, tender or exchange their shares for other securities, cash or property and has been accepted by the holders of more than 50% of the voting power of the capital stock of the Company, (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off, merger or scheme of arrangement) with another Person or group of Persons whereby such other Person or group acquires more than 50% of the voting power of the capital stock of the Company.

"**Holder**" has the meaning set forth in the preamble.

"**Investor Rights Agreement**" means the Investor Rights Agreement, dated as of the date hereof by and between the Company and the Holder.

"**Issuance Amount**" means [●]² (as subject to adjustment pursuant to Section 4 hereof) of duly authorized, validly issued, fully paid, and nonassessable shares of Common Stock of the Company.

"**Original Issue Date**" means [●], 2025.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, other legal entity or organization, including a government or political subdivision or an agency or authority.

"**Plan**" means [the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, consistent with the terms thereof) on June 30, 2025, which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2025].

"**Registration Rights Agreement**" means the Registration Rights Agreement, dated as of the date hereof by and between the Company, the Holder and the other parties thereto.

"**Regulatory Trigger Deadline**" means the earlier of (i) the date on which the Company, Wolfspeed Texas LLC and the Holder agree in good faith that it is more likely than not that the Regulatory Approvals (as defined in the Plan) will not be obtained, and (ii) two (2) years from the Original Issue Date; provided, if upon two (2) years from the Original Issue Date the Company, Wolfspeed Texas LLC and the Holder agree, in good faith, that Regulatory Approvals are more likely than not to be obtained prior to three (3) years from the Original Issue Date, then upon three (3) years from the Original Issue Date. For the avoidance of doubt, to the extent the Holder obtains all Regulatory Approvals prior to the date of the Regulatory Trigger Deadline, the Regulatory Trigger Deadline shall be deemed not to have occurred.

"**Sale of the Company**" means an event or transaction or series of related events or transactions pursuant to which, directly or indirectly, either (x) any Person or group of Persons acting jointly or otherwise in concert acquires ownership, directly or indirectly, beneficially or of record, of equity interests of the Company having more than fifty percent (50%) of the aggregate ordinary voting power, determined on a fully-diluted, as-if-converted or exercised basis, whether such right is exercisable immediately or only after the passage of time, or (y) all or substantially all of the assets or businesses of the Company and its Subsidiaries, taken as a whole, are transferred or sold, including by way of lease, transfer, conveyance or other disposition (including, without limitation, by way of irrevocable, exclusive license arrangements).

"**Securities Act**" has the meaning set forth in Section 8(a).

---

² **Note**: To be equal to 5.0% of all Common Stock as of the Original Issue Date assuming all New 2L Convertible Notes and New Renesas 2L Takeback Convertible Notes (each as defined in the Restructuring Term Sheet) are treated as having converted into Common Stock on such date, and not subject to dilution from MIP or LTIP (each as defined in the Restructuring Term Sheet).

"**Subsidiary**" means, with respect to any Person: (a) any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of the capital stock entitled (without regard to the occurrence of any contingency, but after giving effect to any voting agreement or shareholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees, as applicable, of such corporation, association or other business entity is owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person; and (b) any partnership or limited liability company where (x) more than 50% of the capital accounts, distribution rights, equity and voting interests, or of the general and limited partnership interests, as applicable, of such partnership or limited liability corporation are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person, whether in the form of membership, general, special or limited partnership or limited liability company interests or otherwise, and (y) such Person or any one or more of the other Subsidiaries of such Person is a controlling general partner of, or otherwise controls, such partnership or limited liability company.

"**Trading Market**" means any market or exchange of the New York Stock Exchange or The Nasdaq Stock Market, LLC.

"**VWAP**" means the 20-day volume-weighted average price (using the "VWAP" function on Bloomberg Financial Markets and the "Bloomberg Definition" methodology).

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Documents**" means this Warrant, the Registration Rights Agreement and the Investor Rights Agreement.

"**Warrant Shares**" means the Common Stock or other capital stock of the Company then purchasable upon exercise of any portion of this Warrant in accordance with the terms of this Warrant.

2.    <u>Term of Warrant</u>.  Subject to the terms and conditions hereof, at any time or from time to time after the date hereof and prior to 5:00 p.m., Eastern Time, on [●], 2028[3] or, if such day is not a Business Day, on the immediately following Business Day (the "**Exercise Period**"), the Holder of this Warrant may exercise this Warrant for all or any part of the Warrant Shares purchasable hereunder (subject to adjustment as provided herein); provided, however, that if the Regulatory Trigger Deadline occurs, then such Exercise Period shall be extended to 5:00 p.m., Eastern Time, on [●], 2029[4].

---

[3] **Note**: To be three years from the Original Issue Date.
[4] **Note**: To be four years from the Original Issue Date.

3.      Exercise of Warrant.

(a)      *Exercise Procedure*.  This Warrant may be exercised from time to time on any Business Day during the Exercise Period, for all or any part of the unexercised Warrant Shares, upon:

(i)      surrender of this Warrant to the Company at its then principal executive office (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft, or destruction in accordance with Section 7(a) hereof), together with an Exercise Notice in the form attached hereto as **Exhibit A** (each, an "**Exercise Notice**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

(ii)      payment to the Company of the Aggregate Exercise Price in accordance with Section 3(b).

(b)      *Payment of the Aggregate Exercise Price*.  Payment of the Aggregate Exercise Price shall be made at the option of the Holder by the following methods:

(i)      by delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account designated in writing by the Company, in the amount of such Aggregate Exercise Price (a "**Cash Exercise**");

(ii)      by having the Company withhold Warrant Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the Holder shall surrender this Warrant in exchange for the number of Warrant Shares as is computed using the following formula (a "**Cashless Exercise**"):

$$X = Y*(A - B) \div A$$

Where:

$X$ = the number of Warrant Shares to be issued to the Holder.

$Y$ = the total number of Warrant Shares for which the Holder has elected to exercise this Warrant pursuant to Section 3(a), if such exercise were by means of a Cash Exercise.

$A$ = the Fair Market Value of one Warrant Share as of the applicable Exercise Date.

$B$ = the Exercise Price in effect under this Warrant as of the applicable Exercise Date.

or

(iii)     any combination of the foregoing.

If the foregoing calculation results in a negative number, then no Warrant Shares shall be issuable via a Cashless Exercise.  In the event of any withholding of Warrant Shares pursuant to Section 3(b)(ii) or Section 3(b)(iii) above where the number of shares whose value is equal to the Aggregate Exercise Price is not a whole number, the number of shares withheld by the Company shall be rounded up to the nearest whole share and the Company shall make a cash payment to the Holder (by delivery of a certified or official bank check or by wire transfer of immediately available funds) based on the incremental fraction of a share being so withheld by the Company in an amount equal to the product of (x) such incremental fraction of a share being so withheld multiplied by (y) the Fair Market Value per Warrant Share as of the Exercise Date.

(c)     *Delivery of Shares*.  Upon receipt by the Company of the Exercise Notice, surrender of this Warrant, and payment of the Aggregate Exercise Price (in accordance with Section 3(a) and Section 3(b) hereof), the Company shall, as promptly as reasonably practicable, and in any event within three (3) Business Days after the completion of the last of those conditions to be completed, deliver (or cause to be delivered) to the Holder (x) (1) a book-entry statement representing the Warrant Shares issuable upon such exercise or (2) if the Warrant Shares are issued in certificated form, a certificate or certificates for the number of Warrant Shares issuable upon such exercise, together with (y) cash in lieu of any fraction of a Warrant Share, as provided in Section 3(d) hereof.  The book-entry position shall be registered in the name of the Holder or, subject to compliance with Section 6 below, such other Person's name as shall be designated in the Exercise Notice.  This Warrant shall be deemed to have been exercised and such Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(d)     *Fractional Shares*.  The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant.  As to any fraction of a Warrant Share that the Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay to such Holder an amount in cash (by delivery of a certified or official bank check or by wire transfer of immediately available funds) equal to the product of (i) such fraction multiplied by (ii) the Fair Market Value of one Warrant Share on the Exercise Date.

(e)     *Delivery of New Warrant*.  Unless the purchase rights represented by this Warrant shall have expired or shall have been fully exercised, the Company shall, at the time of delivery of the book-entry statement or certificate representing the Warrant Shares being issued in accordance with Section 3(c) hereof, deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unexpired and unexercised Warrant Shares called for by this Warrant.  Such new Warrant shall in all other respects be identical to this Warrant.

(f)     *Representations of the Company*.  The Company hereby represents, covenants, and agrees:

(i)      The Company (A) is a corporation duly organized,  validly existing and in good standing under the laws of the State of Delaware, (B) has all requisite corporate power and authority to own and operate its properties, to carry on its business as now conducted and as currently proposed to be conducted, to issue and enter into this Warrant and to carry out the transactions contemplated thereby, and (C) except where the failure to do so, individually or in the aggregate, has not had, and would not be reasonably expected to have, a material adverse effect on the business, assets, financial condition or operations of the Company, is qualified to do business and, where applicable is in good standing, in every jurisdiction where such qualification is required.

(ii)     This Warrant is, and any Warrant issued in substitution for or replacement of this Warrant shall be, upon issuance, duly authorized and validly issued.

(iii)    All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be reasonably necessary in order that such Warrant Shares are, validly issued, fully paid, and nonassessable, issued without violation of any preemptive or similar rights of any stockholder of the Company and free and clear of all taxes, liens, and charges.

(iv)     The Company shall pay all expenses in connection with, and all taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of this Warrant; provided, that the Company shall not be required to pay (x) any tax or governmental charge imposed in respect of net income (howsoever denominated) of any Holder, (y) any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid and (z) any legal fees or expenses of the Holder in connection with such exercise. The Holder agrees to promptly provide any forms or other documentation reasonably requested by the Company to reduce or eliminate any such taxes or other governmental charges, in each case to the extent the Holder is legally eligible to do so.

(v)      Other than the Registration Rights Agreement, as of the Original Issue Date there are no contracts, agreements or understandings between the Company and any Person granting such Person demand, piggyback or shelf registration rights.

(g)      *Conditional Exercise*.  Notwithstanding any other provision hereof, if an exercise of any portion of this Warrant is to be made in connection with an offering by the Company, a Sale of the Company or other transaction, such exercise may at the election of the Holder be conditioned upon the consummation of such transaction, in which case such

exercise shall not be deemed to be effective until immediately prior to the consummation of such transaction.

(h)     *Reservation of Shares*.  During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock or other securities constituting Warrant Shares, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the applicable Exercise Price.  The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect, and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares upon the exercise of this Warrant.

(i)     *No Material Changes*.  Except and to the extent as waived or consented to by the Holder, the Company shall not by any action, including, without limitation, amending its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of the Holder as set forth in this Warrant against impairment.  Without limiting the generality of the foregoing, the Company shall (A) not increase the par value of any Warrant Shares above the amount payable therefor upon such exercise immediately prior to such increase in par value, (B) use commercially reasonable efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof, as may be required to be obtained by the Company to perform its obligations under this Warrant, and (C) use commercially reasonable efforts to ensure that the Warrant Shares may be issued without violation of any applicable law or regulation or of any requirement of any securities exchange on which the Warrant Shares are listed or traded. Notwithstanding the foregoing, nothing in this paragraph shall prevent the Company from repurchasing or otherwise buying back shares of its Common Stock.

(j)     *Listing.*  The Company shall use commercially reasonable efforts to cause the Warrant Shares to be approved for listing on the primary U.S. securities exchange on which the Common Stock may at the time be listed on or about the Original Issue Date, subject to notice of issuance of the Warrant Shares.

(k)     [*Regulatory Approvals*. Until all the Regulatory Approvals have been received, the Warrant shall not be issued (other than for U.S. federal and applicable state and local income tax purposes). Instead, for the avoidance of doubt and pursuant to the Warrant Documents, upon the Original Issue Date and until all the Regulatory Approvals have been received, (i) the Company shall grant the Holder the right to receive the cash proceeds from a primary registered offering or sales under the ELOC/ATM of shares of Common Stock in lieu of Warrant Shares receivable under this Warrant and (ii) the transfer of the Warrant, including the transfer of the right to receive the cash proceeds from a primary registered offering or sales under the ELOC/ATM of shares of Common Stock in

lieu of Warrant Shares receivable under this Warrant, shall be subject to the restrictions in Section 3.6 of the Investor Rights Agreement.]

4.    <u>Effect of Certain Events</u>.

(a)    *Fundamental Transaction*.  The Holder shall be entitled to the benefits of the provisions of this <u>Section 4(a)</u> regardless of whether the Company has sufficient authorized shares of Common Stock for the issuance of Warrant Shares. If, at any time after the Original Issue Date but prior to the exercise hereof and prior to the expiration of the Exercise Period, there occurs a Fundamental Transaction, then:

(i)    If such Fundamental Transaction is consummated within two (2) years of the Original Issue Date, except with respect to a Fundamental Transaction involving the Holder or any of its Affiliates, the Company or any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "**Successor Entity**") shall, at the Holder's option, exercisable at any time concurrently with, or within 30 days after, the consummation of the Fundamental Transaction (or, if later, the date of the public announcement of the applicable Fundamental Transaction), purchase this Warrant from the Holder by paying to the Holder an amount in cash equal to the Black-Scholes Value of the remaining unexercised portion of this Warrant on the date of the consummation of such Fundamental Transaction. The payment of the Black-Scholes Value will be made to the Holder by wire transfer of immediately available funds (or such other consideration) within the later of (i) three (3) Business Days of the Holder's election and (ii) the date of consummation of the Fundamental Transaction.

(ii)    If such Fundamental Transaction is consummated following the two (2) year anniversary of the Original Issue Date and the consideration to be received in such Fundamental Transaction for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction exceeds the Exercise Price then in effect at the time of the consummation of such Fundamental Transaction such that the Warrant has positive intrinsic value (i.e., the Warrant is "in the money" at the time of such Fundamental Transaction), this Warrant shall be automatically exercised in full immediately prior to the completion of such Fundamental Transaction via cashless exercise (or, at the Holder's option, via cash exercise to the extent the Holder pays the applicable Exercise Price in cash prior to the completion of such Fundamental Transaction) and the Holder shall receive consideration in the amount owed to the Holder as a shareholder of the Company and in proportion to the Holder's entitlement to consideration in connection with the closing of such Fundamental Transaction.

(iii)    If such Fundamental Transaction is consummated following the two (2) year anniversary of the Original Issue Date and the consideration to be received in such Fundamental Transaction for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction is less than the Exercise Price then in effect at the

10

time of the consummation of such Fundamental Transaction such that the Warrant has zero or negative intrinsic value (i.e., the Warrant is "at the money" or "out of the money" at the time of such Fundamental Transaction), the Company shall cause any Successor Entity (or its parent entity) to issue to the Holder a new warrant to purchase the number of shares of common stock or other proprietary interest in the Successor Entity (or its parent entity) (and to receive any other consideration) equivalent to the shares of Common Stock acquirable and receivable upon exercise of this Warrant prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock and such other consideration (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock and such other consideration, such number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction), in form and substance reasonably satisfactory to the Holder and approved in writing by the Holder (without unreasonable delay) prior to such Fundamental Transaction and shall deliver to the Holder such new warrant in exchange for this Warrant. Such new warrant shall provide for rights and obligations which shall be as nearly equivalent as may be practicable to the rights and obligations provided for in this Warrant, including, for the avoidance of doubt, the remaining Exercise Period and any other terms hereof. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the consideration it receives upon any exercise of the new warrant following such Fundamental Transaction. The provisions of this Section 4(a) (and any equivalent thereof in any such new warrant) shall apply to successive transactions.

(b)      *Adjustment of Warrant Upon Spin-off*.  If, at any time after the Original Issue Date but prior to the exercise hereof, the Company shall distribute equity of one or more of its divisions or Subsidiaries to its stockholders (or consummate any other transactions commonly known as a "spin off") (such transaction, a "**Spin-Off**" and such newly created entity, the "**Spin-off Entity**"), then the Company (i) shall issue to the Holder a new warrant to purchase the number of shares of common stock or other proprietary interest in the Spin-off Entity (and any other consideration) that the Holder would have owned had the Holder exercised this Warrant immediately prior to the consummation of such spin-off and (ii) shall make provision therefor in the agreement, if any, relating to such Spin-Off.  This Warrant and such new warrant shall provide for rights and obligations which shall be as nearly equivalent as may be practicable to the rights and obligations provided for in this Warrant, including, for the avoidance of doubt, through adjusting the Exercise Price and any other terms hereof.  The provisions of this Section 4(b) (and any equivalent thereof in any such new warrant) shall apply to successive transactions.

(c)      *Stock Dividends and Distributions*. Subject to the provisions of Section 4(a), as applicable, if the Company shall, at any time or from time to time after the Original Issue Date, (A) make or declare, or fix a record date for the determination of holders of Common Stock entitled to receive a dividend or any other distribution payable

11

in Common Stock of the Company or securities convertible, exercisable or exchangeable into Common Stock, (B) subdivide the outstanding Common Stock, whether by way of stock dividend, stock split or otherwise, or (C) combine the outstanding Common Stock into a smaller number of shares, whether by way of stock combination, reverse stock split or otherwise, then, and in each such event, provision shall be made so that the Holder shall receive upon exercise of the Warrant, the kind and amount of securities of the Company which the Holder would have been entitled to receive had the Warrant been exercised in full into Warrant Shares on the date of such event (or, in the case of a dividend, immediately prior to the record date therefore) and had the Holder thereafter, during the period from the date of such event to and including the Exercise Date, retained such securities receivable by them as aforesaid during such period, giving application to all adjustments called for during such period under this <u>Section 4(c)</u> with respect to the rights of the Holder; <u>provided</u>, that no such provision shall be made if the Holder receives, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such securities in an amount equal to the amount of such securities as the Holder would have received if the Warrant had been exercised in full into Warrant Shares on the date of such event.

(d)     *Adjustment in Exercise Price*.  Whenever the number of Warrant Shares acquirable upon exercise of the Warrants is adjusted as provided in <u>Section 4(c)</u>, the Exercise Price shall be adjusted to equal the Exercise Price immediately prior to such adjustment multiplied by a fraction (A) the numerator of which shall be the number of Warrant Shares for which a Warrant is exercisable immediately prior to such adjustment and (B) the denominator of which shall be the number of Warrant Shares for which a Warrant is exercisable immediately after such adjustment.

(e)     *Extraordinary Dividends and Distributions*.  If the Company, at any time after the Original Issue Date but prior to the exercise hereof, shall pay a dividend or make a distribution in cash, securities or other assets to all of the holders of Common Stock on account of such Common Stock (or other capital stock or securities at the time issuable upon exercise of the Warrant), other than as described in <u>Section 4(b)</u> or <u>Section 4(c)</u> (any such non-excluded event being referred to herein as an "**Extraordinary Dividend**"), then the Exercise Price shall be decreased, effective immediately after the effective date of such Extraordinary Dividend, by the amount of cash and/or the Fair Market Value of any securities or other assets paid on each share of Common Stock in respect of such Extraordinary Dividend; <u>provided</u>, that no such provision shall be made if the Holder receives, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such cash, securities or other assets in an amount equal to the amount of such cash, securities or other assets as the Holder would have received if the Warrant had been exercised in full into Warrant Shares immediately prior to the effective date of such Extraordinary Dividend.

(f)     *Primary Registered Offering; ELOC/ATM Sales*. To the extent that the Company, prior to the receipt of the Regulatory Approvals, conducts a primary registered offering of shares of Common Stock (including any Warrant Shares) pursuant to the Registration Rights Agreement or sales of shares of Common Stock (including any Warrant Shares) under the ELOC/ATM, and the Holder receives the cash proceeds from such

12

offering or sales in lieu of Warrant Shares receivable under this Warrant, then the number of Warrant Shares receivable upon exercise of this Warrant shall be decreased proportionally for the sale of such Warrant Shares.

(g)    *Certificate as to Adjustment*.

(i)    As promptly as reasonably practicable following any adjustment pursuant to the provisions of this <u>Section 4</u>, but in any event not later than three (3) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer setting forth in reasonable detail such adjustment and the facts upon which it is based and certifying the calculation thereof.

(ii)    As promptly as reasonably practicable following the receipt by the Company of a written request by the Holder, but in any event not later than three (3) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer certifying the amount of other shares of stock, securities, or assets then issuable upon exercise of the Warrant and the applicable Exercise Price.

(h)    *Notices*.  In the event:

(i)    that the Company shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon exercise of this Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution described in <u>Section 4(c)</u> or <u>Section 4(e)</u>, to vote at a meeting (other than an annual meeting for which a definitive proxy statement has been filed) (or act by written consent), to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security;

(ii)    of any Spin-Off;

(iii)    of any Fundamental Transaction; or

(iv)    of the voluntary or involuntary dissolution, liquidation, or winding-up of the Company;

then, and in each such case, the Company shall send or cause to be sent to the Holder at least ten (10) Business Days prior to the applicable record date or the applicable expected effective date, as the case may be, for the event, a written notice specifying, as the case may be, (A) the record date for such dividend, distribution, meeting, or consent or other right or action, and a description of such dividend, distribution, or other right or action to be taken at such meeting or by written consent, or (B) the effective date on which such Fundamental Transaction, Spin-Off, dissolution, liquidation, or winding-up is proposed to take place, and the date, if any is to be fixed, as of which the books of the Company shall close or a record shall be taken with respect to which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon exercise of this Warrant) shall be entitled to exchange their Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such Fundamental Transaction,

13

Spin-Off, dissolution, liquidation, or winding-up, and the amount per share and character of such exchange applicable to this Warrant and the Warrant Shares.

5.    <u>Transfer of Warrant</u>.  Subject to compliance with applicable federal and state securities laws, this Warrant, and all rights hereunder are transferable to any Affiliate of the Holder (or, with the Company's prior written consent (not to be unreasonably withheld, conditioned or delayed), to a non-Affiliate of the Holder), in whole or in part, by the Holder without charge to the Holder, <u>provided</u>, <u>however</u>, that this Warrant and all rights hereunder shall not be transferred unless and until the Holder has given the Company a written notice of the portion of this Warrant being transferred, such notice to set forth the name, address and taxpayer identification number of the transferee, the anticipated date of such transfer, and surrendering this Warrant to the Company for reissuance to the transferee(s).  Upon surrender of this Warrant to the Company at its then principal executive office with a properly completed and duly executed assignment in the form attached hereto as **Exhibit B**, together with funds sufficient to pay any taxes or other governmental charges that may be imposed in connection with the making of such transfer, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees and in the denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant, if any, not so assigned and this Warrant shall promptly be cancelled.  Such new warrant shall be identical in all other respects to this Warrant.

6.    <u>Holder Not Deemed a Stockholder; Limitations on Liability</u>.  Except as otherwise specifically provided herein (including <u>Section 4(c)</u> and <u>Section 4(e)</u>), prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose with respect to the Warrant Shares, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give, or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance, or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise.  In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

7.    <u>Replacement on Loss; Division and Combination</u>.

(a)    *Replacement of Warrant on Loss*.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be a sufficient indemnity) and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company, at its own expense, shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for an equivalent number of Warrant Shares as the Warrant so lost, stolen, mutilated, or destroyed; <u>provided</u>, that, in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

(b)    *Division and Combination of Warrant*.  Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive office, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys. Subject to compliance with the applicable provisions of this Warrant as to any transfer or assignment which may be involved in such division or combination, the Company shall at its own expense execute and deliver a new Warrant or Warrants in exchange for this Warrant or Warrants so surrendered in accordance with such notice.  Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for an equivalent number of Warrant Shares as this Warrant or Warrants so surrendered in accordance with such notice.

8.    Compliance with the Securities Act.

(a)    *Agreement to Comply with the Securities Act; Legend*.  The Holder, by acceptance of this Warrant, agrees to comply in all respects with the provisions of this Section 8(a) and the restrictive legend requirements set forth on the face of this Warrant and further agrees that such Holder shall not offer, sell, transfer, or otherwise dispose of this Warrant except under circumstances that will not result in a violation of the Securities Act of 1933, as amended (the "**Securities Act**"). This Warrant (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

> "THIS WARRANT WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE. THE WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW AND (2) SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS AND THE ISSUER,

IF IT SO REASONABLY DETERMINES IS NECESSARY, IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO ITS BOARD OF DIRECTORS THAT SUCH TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

IN ADDITION, THE WARRANT MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE TRANSFER PROVISIONS OF THE WARRANT.

THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE ISSUER (NOT TO BE UNREASONABLY WITHHELD, CONDITIONED OR DELAYED).”

(b)     *Representations of the Holder*.  In connection with the issuance of this Warrant, the Holder specifically represents, as of the date hereof, to the Company by acceptance of this Warrant as follows (and any transferee or assignee of the Holder is deemed to represent as of the date of such transfer or assignment as if it were the Holder):

(i)     The Holder is an “accredited investor” as defined in Rule 501 of Regulation D promulgated under the Securities Act.  The Holder is acquiring this Warrant and the Warrant Shares to be issued upon exercise hereof for investment for its own account and not with a view towards, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the Securities Act.

(ii)     The Holder acknowledges that it can bear the economic and financial risk of its investment for an indefinite period, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant and the Warrant Shares.  The Holder has received such information about the Company and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of this Warrant and the business, properties, prospects, and financial condition of the Company.

9.     <u>Warrant Register</u>.  The Company shall keep and properly maintain at its principal executive office books for the registration of this Warrant and any transfers thereof.  The Company may deem and treat the Person in whose name this Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination, or other transfer of this Warrant effected in accordance with the provisions of this Warrant.

10. <u>Tax Matters</u>.

(a)   To the extent not already provided to the Company, Holder shall deliver to the Company an IRS Form W-9 (or if a transferee Holder is a foreign entity, an appropriate IRS Form W-8) and any other forms or documents reasonably requested by the Company to reduce or eliminate any withholding required by applicable tax law. The Company shall reasonably cooperate with the Holder to minimize or eliminate any such withholding to the extent permitted by applicable tax law.

(b)   Subject to <u>Section 10(a)</u>, if the Company is required by law to withhold and pay taxes on behalf of the Holder as a result of any payments, transfers, distributions (including deemed distributions) or other deliveries pursuant to the Warrant (including the exercise of the Warrant), then the Company shall be entitled to set off such withholding taxes against payments or other deliveries on the Warrant (including by liquidating a portion of any non-cash deliveries on the Warrant to generate sufficient funds to pay applicable withholding taxes). Any amounts or property withheld pursuant to the preceding sentence shall be deemed to have been paid, transferred, distributed or otherwise delivered to, and received by, the Holder for all purposes of this Warrant to the extent the Company has paid such amounts to the applicable tax authority.

(c)   The Company and Holder intend that, for U.S. federal income tax purposes, the Warrant shall be treated as part of the consideration issued in exchange for the Allowed Renesas Claim (as such terms are defined in the Plan) in a transaction treated as a "recapitalization" under Section 368(a)(1)(E) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and shall report such transaction in a manner consistent with the foregoing, unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of Code.

11.   <u>Cumulative Remedies</u>. The rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity, or otherwise.

12.   <u>Valuation Dispute Resolution</u>.  In the case of any dispute as to the determination of the Black-Scholes Value, the Fair Market Value of any Common Stock, Warrant Shares or Extraordinary Dividends to be issued, withheld or otherwise determined, the calculation of the Aggregate Exercise Price or any other computation or valuation of Fair Market Value or any computation pursuant to <u>Section 4</u> required to be made hereunder or in connection herewith, in the event the Holder, on the one hand, and the Company, on the other hand, are unable to settle such dispute within ten (10) Business Days, then either party may elect to submit the disputed matter(s) for resolution by an accounting firm of nationally recognized standing as may be mutually agreed upon by the Holder and the Company.  Such firm's determination of such disputed matter(s) shall be binding upon all parties absent demonstrable error.  The fees and expenses of the accounting firm pursuant to this <u>Section 12</u> shall be borne by the Company, on the one hand, and the Holder, on the other hand, based upon the percentage which the aggregate portion of the contested amount not awarded to each party bears to the aggregate amount actually contested by such party.  For example, if the Company claims the Fair Market Value is $1,000 for a given property and the Holder contests that the Fair Market Value of such property is only $500 (i.e., $500 is being

contested) and if the accounting firm ultimately resolves the dispute by determining a Fair Market Value of $800 for such property, then the costs and expenses of the accounting firm will be allocated 60% (i.e., 300 ÷ 500) to the Holder and 40% (i.e., 200 ÷ 500) to the Company.

13. <u>Severability</u>. If any provision of this Warrant is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Warrant or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Warrant or affecting the validity or enforceability of such provision in any other jurisdiction.

14. <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. This Warrant shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Warrant shall be brought and determined exclusively in a state or federal court located within the Borough of Manhattan in The City of New York. EACH PARTY TO THIS WARRANT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS WARRANT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15. <u>Successors and Assigns</u>. This Warrant shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto. Subject to the terms of this Warrant, the Company may not assign any of its rights or delegate any of its duties hereunder without the prior written consent of the Holder. Any Holder may, at its election and at any time or from time to time, assign its rights and delegate its duties hereunder, in whole or in part, to any Affiliate of the Holder (or, with the Company's prior written consent, to a non-Affiliate of the Holder) (each, an "**Assignee**"); <u>provided</u>, that no such assignment shall be binding upon or obligate the Company to any such Assignee unless and until the Holder delivers the Company the executed assignment and funds described in <u>Section 5</u>. If a Holder assigns its rights under this Warrant in connection with the transfer of all of its Warrants or Warrant Shares, the Holder shall have no further rights or obligations under this Warrant. Any purported assignment in violation of this provision shall be null and *void ab initio*.

16. <u>Notices</u>. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or facsimile or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

if to the Company, to:

> Wolfspeed, Inc.
> 4600 Silicon Drive
> Durham, NC 27703
> Attention: Melissa Garrett
> E-mail: Melissa.Garrett@wolfspeed.com

with a copy, in each case, (which shall not constitute notice) to:

> Latham & Watkins LLP
> 505 Montgomery Street, Suite 2000
> San Francisco, CA 94111
> Attention: Tad J. Freese
>      Richard Kim
> Email: Tad.Freese@lw.com
>      Richard.Kim2@lw.com

if to a Holder, to:

> Renesas Electronics America Inc.
> c/o Renesas Electronics Corporation
> Toyosu Foresia, 3 2 24 Toyosu, Koto ku
> Tokyo 135-0061 Japan
> Attention: Shuhei Shinkai
>      Sho Ozaki
>      Takahiro Homma
> E-mail: shuhei.shinkai.nx@renesas.com
>      sho.ozaki.pv@renesas.com
>      takahiro.homma.jz@renesas.com

with a copy, in each case, (which shall not constitute notice) to:

> Kirkland & Ellis LLP
> 1301 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004
> Attention: Rachel W. Sheridan, P.C.
>      Shagufa R. Hossain, P.C.
>      Anthony L. Sanderson
> Email: rachel.sheridan@kirkland.com
>      shagufa.hossain@kirkland.com
>      anthony.sanderson@kirkland.com

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth (5th) Business Day after the posting thereof.

19

17.     <u>Headings</u>. The headings contained in this Warrant are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Warrant.

18.     <u>Entire Agreement</u>. The Warrant Documents and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such subject matter.

19.     <u>Specific Performance</u>. Damages in the event of breach of this Warrant by a party hereto may be difficult, if not impossible, to ascertain, and it is therefore agreed that the other parties hereto, in addition to and without limiting any other remedy or right it may have, will have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach, and enforcing specifically the terms and provisions hereof, and each of the parties hereto hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief. The existence of this right will not preclude any party hereto from pursuing any other rights and remedies at law or in equity which such party may have.

20.     <u>Counterparts; Facsimile or .pdf Signature</u>. This Warrant may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document. This Warrant may be executed by facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, and a facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, shall constitute an original for all purposes.

21.     <u>Amendment</u>. This Warrant may not be amended, modified or supplemented unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought.

22.     <u>Extensions; Waivers</u>. Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Warrant, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any extension or waiver pursuant to this <u>Section 22</u> will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Warrant shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

23.     <u>No Third-Party Beneficiaries</u>. This Warrant shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

24.    <u>Interpretation; Construction</u>. This Warrant has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Warrant will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Warrant. Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Warrant," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Warrant as a whole, including the schedules, exhibits and annexes, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited. References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections, schedules, annexes and exhibits mean the sections of this Warrant and the schedules, annexes and exhibits attached to this Warrant, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original Issue Date.

WOLFSPEED, INC.

By: _____
Name:
Title:

Accepted and agreed:

RENESAS ELECTRONICS AMERICA INC.


By: _____

Name: _____

Title: _____

**Exhibit A**

**Form of Exercise Notice**

(To be executed upon exercise of the Warrant(s))

The undersigned hereby irrevocably elects to exercise the right, represented by the Warrant Certificate(s), to purchase Common Stock of Wolfspeed, Inc. and (check one or both):

_____ herewith tenders in payment for _____ shares of Common Stock an amount of $_____ by certified or official bank check made payable to the order of Wolfspeed, Inc. or by wire transfer in immediately available funds to an account arranged with Wolfspeed, Inc.; and/or

_____ herewith tenders the Warrant(s) for _____ Common Stock pursuant to the cashless exercise provision of <u>Section 3(b)(ii)</u> of the Warrant.

The undersigned requests that a statement representing the Common Stock issued upon exercise of the Warrant(s) be delivered in accordance with the instructions set forth below.

Dated: _____, 20_____

THIS EXERCISE NOTICE MUST BE DELIVERED TO WOLFSPEED, INC. PRIOR TO 5:00 P.M., EASTERN TIME, ON THE EXERCISE DATE. ALL CAPITALIZED TERMS USED HEREIN BUT NOT DEFINED HEREIN SHALL HAVE THE MEANINGS ASSIGNED TO THEM IN THE WARRANT.

**THE UNDERSIGNED REQUESTS THAT A STATEMENT REPRESENTING THE COMMON STOCK BE DELIVERED AS FOLLOWS:**

Name: _____

(Please Print)

Address: _____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable): _____

**IF SAID NUMBER OF COMMON STOCK SHALL NOT BE ALL THE COMMON STOCK ACQUIRABLE UNDER THE WARRANT(S), THE UNDERSIGNED REQUESTS THAT A NEW WARRANT CERTIFICATE(S) REPRESENTING THE BALANCE OF SUCH WARRANT(S) SHALL BE REGISTERED AND DELIVERED AS FOLLOWS:**

Name: _____

(Please Print)

Address: _____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable): _____

Signature: _____

Name: _____

Capacity in which Signing: _____

The signature must correspond with the name as written upon the face of the within Warrant Certificate in every particular, without alteration or enlargement or any change whatever.

A-2

**Exhibit B**

**Form of Assignment**

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers to each assignee set forth below all of the rights of the undersigned in and to the number of Warrants (as defined in and evidenced by the Warrant Certificate) set forth opposite the name of such assignee below, and in and to the Warrant Certificate with respect to the Warrants and the Common Stock issuable upon the exercise of said Warrants:

| <u>Name of Assignee</u> | <u>Address</u> | <u>Number of Warrants</u> | <u>Warrant Certificate No.</u> |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

If the total number of Warrants shall not be all of the Warrants evidenced by the foregoing Warrant Certificate, the undersigned requests that a new Warrant Certificate evidencing the Warrants not so assigned be issued in the name of and delivered to the undersigned.

Name of holder of Warrant: _____

By: _____
Name: _____
Title: _____
Dated: _____

## **EXHIBIT G-1**

### **Redline of Renesas Warrants Agreement**

Attached hereto is a redline of the Renesas Warrants Agreement marked against the version filed as Exhibit G to the Initial Plan Supplement [Docket No. 168].

**THIS WARRANT WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE. THE WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS AND THE ISSUER, IF IT SO REASONABLY DETERMINES IS NECESSARY, IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO ITS BOARD OF DIRECTORS THAT SUCH TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.**

**IN ADDITION, THE WARRANT MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE TRANSFER PROVISIONS OF THE WARRANT.**

**THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE ISSUER (NOT TO BE UNREASONABLY WITHHELD, CONDITIONED OR DELAYED).**

**WARRANT**

Warrant Certificate No.: [●]

Original Issue Date: [●], 2025.

FOR VALUE RECEIVED, Wolfspeed, Inc., a Delaware corporation (the "**Company**"), hereby certifies that Renesas Electronics America Inc., a California corporation, or its registered assigns (the "**Holder**"), is entitled to purchase from the Company a number of shares of duly authorized, validly issued, fully paid, and nonassessable Common Stock equal to the Issuance Amount less the aggregate number of Common Stock previously issued from time to time as a result of any partial exercise of this Warrant in accordance with <u>Section 3</u>, at a purchase price per share of $[●][1] (the "**Exercise Price**"), all subject to the terms, conditions, and adjustments set forth below in this Warrant.  Certain capitalized terms used herein are defined in <u>Section 1</u> hereof.

---

[1] **Note**: To be set at an assumed $2.25 billion As Converted Equity Value (as defined in the Restructuring Term Sheet).

1.     <u>Definitions</u>.  As used in this Warrant, the following terms have the respective meanings set forth below:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"**Aggregate Exercise Price**" means, with respect to any exercise of this Warrant for Warrant Shares pursuant to Section 3 hereof, an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to <u>Section 3</u> hereof, multiplied by (b) the Exercise Price.

"**Black-Scholes Value**" means the value of this Warrant based on the Black-Scholes Option Pricing Model obtained from the "OVME" function on Bloomberg Financial Markets determined as of the day of consummation of the applicable Fundamental Transaction for pricing purposes and reflecting (A) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the time between the date of the public announcement of the applicable Fundamental Transaction and the termination of the Exercise Period, (B) an implied volatility equal to thirty-five percent (35%), (C) an underlying price per share of Common Stock calculation equal to the VWAP of the Common Stock measured as of the date of the Holder's election pursuant to Section 4(a), (D) a remaining option time equal to the remaining Exercise Period measured as of the date of the Holder's election pursuant to Section 4(a), (E) a zero cost of borrow, and (F) assuming zero discrete dividend payments.

"**Board**" means the board of directors of the Company.

"**Business Day**" means any day other than a Saturday or Sunday or a legal holiday on which commercial banks in New York City or the State of California in the United States are authorized or required by law to be closed.

"**Common Stock**" means the shares of common stock, [par value $0.00125 per share], of the Company, and any capital stock into which such Common Stock shall have been converted, exchanged, or reclassified following the date hereof.

"**Company**" has the meaning set forth in the preamble.

"**ELOC/ATM**" means the equity line of credit or "at the market" program entered into to facilitate the sale of Common Stock as set forth in the Plan.

"**Exercise Date**" means, for any given exercise of this Warrant, the date on which the conditions to such exercise as set forth in <u>Section 3</u> shall have been satisfied at or prior to 5:00 p.m., Eastern Time, on a Business Day, including, without limitation,

the receipt by the Company of the Exercise Notice, this Warrant, and the Aggregate Exercise Price.

"**Exercise Notice**" has the meaning set forth in <u>Section 3(a)(i)</u>.

"**Exercise Period**" has the meaning set forth in <u>Section 2</u>.

"**Exercise Price**" has the meaning set forth in the preamble.

"**Extraordinary Dividend**" has the meaning set forth in <u>Section 4(e)</u>.

"**Fair Market Value**" means, (i) with respect to the Common Stock, as of any particular date: (a) the closing price of the Common Stock for such day on the primary U.S. securities exchange on which the Common Stock may at the time be listed; (b) if there have been no sales of the Common Stock on any such exchange on any such day, the average of the closing bid and asked prices for the Common Stock on such exchange at the end of such day; or (c) if at any time the Common Stock is not listed on any Trading Market, the fair market value per share as determined in good faith by the Board and (ii) with respect to any other property, the fair market value thereof as determined in good faith by the Board~~.~~**; provided that if the Holder objects in writing to the Board's calculation of Fair Market Value within three (3) Business Days of receipt of written notice thereof, the valuation dispute resolution procedure set forth in Section 12 hereof shall be invoked to determine Fair Market Value.**

**"Fundamental Transaction" means (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person (other than for the purpose of changing the Company's name and/or the jurisdiction of incorporation of the Company or a holding company for the Company), (ii) the Company (and all of its Subsidiaries, taken as a whole), directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any, direct or indirect, purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to sell, tender or exchange their shares for other securities, cash or property and has been accepted by the holders of more than 50% of the voting power of the capital stock of the Company, (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off, merger or scheme of arrangement) with another Person or group of Persons whereby such other Person or group acquires more than 50% of the voting power of the capital stock of the Company.**

"**Holder**" has the meaning set forth in the preamble.

"**Investor Rights Agreement**" means the Investor Rights Agreement, dated as of the date hereof by and between the Company and the Holder.

"**Issuance Amount**" means [●]² (as subject to adjustment pursuant to Section ~~3(k)~~4 hereof) of duly authorized, validly issued, fully paid, and nonassessable shares of Common Stock of the Company.

"**Original Issue Date**" means [●], 2025.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, other legal entity or organization, including a government or political subdivision or an agency or authority.

"**Plan**" means [the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, consistent with the terms thereof) on June 30, 2025, which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2025].

"**Registration Rights Agreement**" means the Registration Rights Agreement, dated as of the date hereof by and between the Company, the Holder and the other parties thereto.

"**Regulatory Trigger Deadline**" means the earlier of (i) the date on which the Company, Wolfspeed Texas LLC and the Holder agree in good faith that it is more likely than not that the Regulatory Approvals (as defined in the ~~Investor Rights Agreement~~**Plan**) will not be obtained, and (ii) two (2) years from the Original Issue Date; provided, if upon two (2) years from the Original Issue Date the Company, Wolfspeed Texas LLC and the Holder agree, in good faith, that Regulatory Approvals are more likely than not to be obtained prior to three (3) years from the Original Issue Date, then upon three (3) years from the Original Issue Date. For the avoidance of doubt, to the extent the Holder obtains all Regulatory Approvals prior to the date of the Regulatory Trigger Deadline, the Regulatory Trigger Deadline shall be deemed not to have occurred.

"**Sale of the Company**" means an event or transaction or series of related events or transactions pursuant to which, directly or indirectly, either (x) any Person or group of Persons acting jointly or otherwise in concert acquires ownership, directly or indirectly, beneficially or of record, of equity interests of the Company having more than fifty percent (50%) of the aggregate ordinary voting power, determined on a fully-diluted, as-if-converted or

---

² **Note**: To be equal to 5.0% of all Common Stock as of the Original Issue Date assuming all New 2L Convertible Notes and New Renesas 2L Takeback Convertible Notes (each as defined in the Restructuring Term Sheet) are treated as having converted into Common Stock on such date, and not subject to dilution from MIP or LTIP (each as defined in the Restructuring Term Sheet).

exercised basis, whether such right is exercisable immediately or only after the passage of time, or (y) all or substantially all of the assets or businesses of the Company and its Subsidiaries, taken as a whole, are transferred or sold, including by way of lease, transfer, conveyance or other disposition (including, without limitation, by way of irrevocable, exclusive license arrangements).

"**Securities Act**" has the meaning set forth in <u>Section 8(a)</u>.

"**Subsidiary**" means, with respect to any Person: (a) any corporation, association or other business entity (other than a partnership or limited liability company) of which more than 50% of the total voting power of the capital stock entitled (without regard to the occurrence of any contingency, but after giving effect to any voting agreement or shareholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees, as applicable, of such corporation, association or other business entity is owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person; and (b) any partnership or limited liability company where (x) more than 50% of the capital accounts, distribution rights, equity and voting interests, or of the general and limited partnership interests, as applicable, of such partnership or limited liability corporation are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person, whether in the form of membership, general, special or limited partnership or limited liability company interests or otherwise, and (y) such Person or any one or more of the other Subsidiaries of such Person is a controlling general partner of, or otherwise controls, such partnership or limited liability company.

"**Trading Market**" means any market or exchange of the New York Stock Exchange or The Nasdaq Stock Market, LLC.

"**VWAP**" means the 20-day volume-weighted average price (using the "VWAP" function on Bloomberg Financial Markets and the "Bloomberg Definition" methodology).

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Documents**" means this Warrant, the Registration Rights Agreement and the Investor Rights Agreement.

"**Warrant Shares**" means the Common Stock or other capital stock of the Company then purchasable upon exercise of any portion of this Warrant in accordance with the terms of this Warrant.

2.      <u>Term of Warrant</u>.  Subject to the terms and conditions hereof, at any time or from time to time after the date hereof and prior to 5:00 p.m., Eastern Time, on [●], 2028[3] or, if such

---

[3] **Note**: To be three years from the Original Issue Date.

day is not a Business Day, on the immediately following Business Day (the "**Exercise Period**"), the Holder of this Warrant may exercise this Warrant for all or any part of the Warrant Shares purchasable hereunder (subject to adjustment as provided herein); provided, however, that if the Regulatory Trigger Deadline occurs, then such Exercise Period shall be extended to 5:00 p.m., Eastern Time, on [●], 2029[4].

3.      Exercise of Warrant.

(a)      *Exercise Procedure*.  This Warrant may be exercised from time to time on any Business Day during the Exercise Period, for all or any part of the unexercised Warrant Shares, upon:

(i)      surrender of this Warrant to the Company at its then principal executive office (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft, or destruction in accordance with Section 7(a) hereof), together with an Exercise Notice in the form attached hereto as **Exhibit A** (each, an "**Exercise Notice**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

(ii)      payment to the Company of the Aggregate Exercise Price in accordance with Section 3(b).

(b)      *Payment of the Aggregate Exercise Price*.  Payment of the Aggregate Exercise Price shall be made at the option of the Holder by the following methods:

(i)      by delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account designated in writing by the Company, in the amount of such Aggregate Exercise Price (a "**Cash Exercise**");

(ii)      by having the Company withhold Warrant Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the Holder shall surrender this Warrant in exchange for the number of Warrant Shares as is computed using the following formula (a "**Cashless Exercise**"):

$$X = Y*(A - B) \div A$$

Where:

$X$ = the number of Warrant Shares to be issued to the Holder.

---

[4] **Note**: To be four years from the Original Issue Date.

Y = the total number of Warrant Shares for which the Holder has elected to exercise this Warrant pursuant to <u>Section 3(a)</u>, if such exercise were by means of a Cash Exercise.

A = the Fair Market Value of one Warrant Share as of the applicable Exercise Date.

B = the Exercise Price in effect under this Warrant as of the applicable Exercise Date.

or

(iii)   any combination of the foregoing.

If the foregoing calculation results in a negative number, then no Warrant Shares shall be issuable via a Cashless Exercise.  In the event of any withholding of Warrant Shares pursuant to Section 3(b)(ii) or Section 3(b)(iii) above where the number of shares whose value is equal to the Aggregate Exercise Price is not a whole number, the number of shares withheld by the Company shall be rounded up to the nearest whole share and the Company shall make a cash payment to the Holder (by delivery of a certified or official bank check or by wire transfer of immediately available funds) based on the incremental fraction of a share being so withheld by the Company in an amount equal to the product of (x) such incremental fraction of a share being so withheld multiplied by (y) the Fair Market Value per Warrant Share as of the Exercise Date.

(c)   *Delivery of Shares*.  Upon receipt by the Company of the Exercise Notice, surrender of this Warrant, and payment of the Aggregate Exercise Price (in accordance with <u>Section 3(a)</u> and <u>Section 3(b)</u> hereof), the Company shall, as promptly as reasonably practicable, and in any event within ~~five~~three (~~5~~3) Business Days after the completion of the last of those conditions to be completed, deliver (or cause to be delivered) to the Holder (x) (1) a book-entry statement representing the Warrant Shares issuable upon such exercise or (2) if the Warrant Shares are issued in certificated form, a certificate or certificates for the number of Warrant Shares issuable upon such exercise, together with (y) cash in lieu of any fraction of a Warrant Share, as provided in <u>Section 3(d)</u> hereof.  The book-entry position shall be registered in the name of the Holder or, subject to compliance with <u>Section 6</u> below, such other Person's name as shall be designated in the Exercise Notice.  This Warrant shall be deemed to have been exercised and such Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(d)   *Fractional Shares*.  The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant.  As to any fraction of a Warrant Share that the Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay to such Holder an amount in cash (by delivery of a certified or official bank check or by wire transfer of immediately available funds) equal to the product of

(i) such fraction multiplied by (ii) the Fair Market Value of one Warrant Share on the Exercise Date.

(e)     *Delivery of New Warrant.*  Unless the purchase rights represented by this Warrant shall have expired or shall have been fully exercised, the Company shall, at the time of delivery of the book-entry statement or certificate representing the Warrant Shares being issued in accordance with Section 3(c) hereof, deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unexpired and unexercised Warrant Shares called for by this Warrant.  Such new Warrant shall in all other respects be identical to this Warrant.

(f)     *Representations of the Company.*  The Company hereby represents, covenants, and agrees:

(i)     The Company (A) is a corporation duly organized,  validly existing and in good standing under the laws of the State of Delaware, (B) has all requisite corporate power and authority to own and operate its properties, to carry on its business as now conducted and as currently proposed to be conducted, to issue and enter into this Warrant and to carry out the transactions contemplated thereby, and (C) except where the failure to do so, individually or in the aggregate, has not had, and would not be reasonably expected to have, a material adverse effect on the business, assets, financial condition or operations of the Company, is qualified to do business and, where applicable is in good standing, in every jurisdiction where such qualification is required.

(ii)     This Warrant is, and any Warrant issued in substitution for or replacement of this Warrant shall be, upon issuance, duly authorized and validly issued.

(iii)     All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be reasonably necessary in order that such Warrant Shares are, validly issued, fully paid, and nonassessable, issued without violation of any preemptive or similar rights of any stockholder of the Company and free and clear of all taxes, liens, and charges.

(iv)     The Company shall pay all expenses in connection with, and all taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of this Warrant; provided, that the Company shall not be required to pay (x) any tax or governmental charge imposed in respect of net income (howsoever denominated) of any Holder, (y) any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid and (z) any legal fees or expenses of the Holder in connection with such

exercise. The Holder agrees to promptly provide any forms or other documentation reasonably requested by the Company to reduce or eliminate any such taxes or other governmental charges, in each case to the extent the Holder is legally eligible to do so.

(v)     Other than the Registration Rights Agreement, as of the Original Issue Date there are no contracts, agreements or understandings between the Company and any Person granting such Person demand, piggyback or shelf registration rights.

(g)     *Conditional Exercise*.  Notwithstanding any other provision hereof, if an exercise of any portion of this Warrant is to be made in connection with an offering by the Company, a Sale of the Company or other transaction, such exercise may at the election of the Holder be conditioned upon the consummation of such transaction, in which case such exercise shall not be deemed to be effective until immediately prior to the consummation of such transaction.

(h)     *Reservation of Shares*.  During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock or other securities constituting Warrant Shares, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the applicable Exercise Price.  The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect, and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares upon the exercise of this Warrant.

(i)     *No Material Changes*.  Except and to the extent as waived or consented to by the Holder, the Company shall not by any action, including, without limitation, amending its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of the Holder as set forth in this Warrant against impairment.  Without limiting the generality of the foregoing, the Company shall (A) not increase the par value of any Warrant Shares above the amount payable therefor upon such exercise immediately prior to such increase in par value, (B) use commercially reasonable efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof, as may be required to be obtained by the Company to perform its obligations under this Warrant, and (C) use commercially reasonable efforts to ensure that the Warrant Shares may be issued without violation of any applicable law or regulation or of any requirement of any securities exchange on which the Warrant Shares are listed or traded. Notwithstanding the foregoing, nothing in this paragraph shall prevent the Company from repurchasing or otherwise buying back shares of its Common Stock.

(j)     *Listing.*  The Company shall use commercially reasonable efforts to cause the Warrant Shares to be approved for listing on the primary U.S. securities exchange on which the Common Stock may at the time be listed on or about the Original Issue Date, subject to notice of issuance of the Warrant Shares.

(k)     [*Regulatory Approvals.* Until all the Regulatory Approvals have been received, the Warrant shall not be issued (other than for U.S. federal and applicable state and local income tax purposes). Instead, for the avoidance of doubt and pursuant to the Warrant Documents, upon the Original Issue Date and until all the Regulatory Approvals have been received, (i) the Company shall grant the Holder the right to receive the cash proceeds from a primary registered offering or sales under the ELOC/ATM of shares of Common Stock in lieu of Warrant Shares receivable under this Warrant and (ii) the transfer of the Warrant, including the transfer of the right to receive the cash proceeds from a primary registered offering or sales under the ELOC/ATM of shares of Common Stock in lieu of Warrant Shares receivable under this Warrant, shall be subject to the restrictions in Section 3.6 of the Investor Rights Agreement.]

4.     <u>Effect of Certain Events</u>.

(a)     *Fundamental Transaction*.  **The Holder shall be entitled to the benefits of the provisions of this Section 4(a) regardless of whether the Company has sufficient authorized shares of Common Stock for the issuance of Warrant Shares. If, at any time after the Original Issue Date but prior to the exercise hereof and prior to the expiration of the Exercise Period, there occurs a Fundamental Transaction, then:**

(i)     (a) *Fundamental Transaction*.  If, at any time after the Original Issue Date but prior to the exercise hereof, (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person (other than for the purpose of changing the Company's name and/or the jurisdiction of incorporation of the Company or a holding company for the Company), (ii) the Company (and all of its Subsidiaries, taken as a whole), directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any, direct or indirect, purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to sell, tender or exchange their shares for other securities, cash or property and has been accepted by the holders of more than 50% of the voting power of the capital stock of the Company, (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including,

without limitation, a reorganization, recapitalization, spin-off, merger or scheme of arrangement) with another Person or group of Persons whereby such other Person or group acquires more than 50% of the voting power of the capital stock of the Company (each a "Fundamental Transaction"), unless a Successor Entity (as defined below) otherwise assumes this Warrant, then this warrant shall be automatically exercised in full immediately prior to the completion of such Fundamental Transaction via cashless exercise (or, at the Holder's option, via cash exercise to the extent the Holder pays the applicable Exercise Price in cash prior to the completion of such Fundamental Transaction) and the Holder shall receive consideration in the amount owed to the Holder as a shareholder of the Company and in proportion to the Holder's entitlement to consideration in connection with the closing of such Fundamental Transaction. For the avoidance of doubt, unless a Successor Entity (as defined below) elects to assume this Warrant, this Warrant shall not remain outstanding following the closing of a Fundamental Transaction. Notwithstanding anything to the contrary, in the event of a Fundamental Transaction (other than one involving the Holder or any of its Affiliates) that**If such Fundamental Transaction** is consummated within two (2) years of the Original Issue Date, **except with respect to a Fundamental Transaction involving the Holder or any of its Affiliates,** the Company or any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "**Successor Entity**") shall, at the Holder's option, exercisable at any time concurrently with, or within 30 days ~~prior to~~**after**, the consummation of the Fundamental Transaction **(or, if later, the date of the public announcement of the applicable Fundamental Transaction)**, purchase this Warrant from the Holder by paying to the Holder an amount in cash equal to the Black-Scholes Value of the remaining unexercised portion of this Warrant on the date of the consummation of such Fundamental Transaction~~; provided, however, if the Fundamental Transaction is not within the Company's control, including not approved by the Company's Board of Directors, the Holder shall only be entitled to receive from the Company or any Successor Entity the same type or form of consideration (and in the same proportion), at the Black Scholes Value of the unexercised portion of this Warrant, that is being offered and paid to the holders of Common Stock of the Company in connection with the Fundamental Transaction, whether that consideration be in the form of cash, stock or any consideration thereof, or whether the holders of Common Stock are given the choice to receive from among alternative forms of consideration in connection with the Fundamental Transaction; provided, further, that if holders of Common Stock of the Company are not offered or paid any consideration in such Fundamental Transaction, such holders of Common Stock will be deemed to have received common stock of the Successor Entity (which Successor Entity may be the Company following such Fundamental Transaction) in such Fundamental Transaction. "Black-Scholes Value" means the value of this Warrant based on the Black-Scholes Option Pricing Model obtained from the "OVME" function on Bloomberg Financial Markets determined as of the~~

~~day of consummation of the applicable Fundamental Transaction for pricing purposes and reflecting (A) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the time between the date of the public announcement of the applicable Fundamental Transaction and the termination of the Exercise Period, (B) an implied volatility equal to thirty-five percent (35%), (C) an underlying price per share of Common Stock calculation equal to the VWAP of the Common Stock measured as of the date of the Holder's election pursuant to this Section 4(a), (D) a remaining option time equal to the remaining Exercise Period measured as of the date of the Holder's election pursuant to this Section 4(a) and (E) a zero cost of borrow~~. The payment of the Black-Scholes Value will be made to the Holder by wire transfer of immediately available funds (or such other consideration) within the later of (i) three (3) Business Days of the Holder's election and (ii) the date of consummation of the Fundamental Transaction.

(ii)    **If such Fundamental Transaction is consummated following the two (2) year anniversary of the Original Issue Date and the consideration to be received in such Fundamental Transaction for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction exceeds the Exercise Price then in effect at the time of the consummation of such Fundamental Transaction such that the Warrant has positive intrinsic value (i.e., the Warrant is "in the money" at the time of such Fundamental Transaction), this Warrant shall be automatically exercised in full immediately prior to the completion of such Fundamental Transaction via cashless exercise (or, at the Holder's option, via cash exercise to the extent the Holder pays the applicable Exercise Price in cash prior to the completion of such Fundamental Transaction) and the Holder shall receive consideration in the amount owed to the Holder as a shareholder of the Company and in proportion to the Holder's entitlement to consideration in connection with the closing of such Fundamental Transaction.**

(iii)    If ~~the Successor Entity in a Fundamental Transaction purchases or otherwise assumes the Warrant pursuant to this Section 4(a), such Successor Entity will be deemed to assume in writing all of the obligations of the Company under this Warrant in accordance with the provisions of this Section 4(a) pursuant to written agreements in form and substance reasonably satisfactory to the Holder and approved in writing by the Holder (without unreasonable delay) prior to such Fundamental Transaction and shall, at the option of the Holder, deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant which is exercisable for a corresponding number of shares of capital stock of such~~ **such Fundamental Transaction is consummated following the two (2) year anniversary of the Original Issue Date and the consideration to be received in such Fundamental Transaction for each Warrant Share that would have been issuable upon such exercise**

**immediately prior to the occurrence of such Fundamental Transaction is less than the Exercise Price then in effect at the time of the consummation of such Fundamental Transaction such that the Warrant has zero or negative intrinsic value (i.e., the Warrant is "at the money" or "out of the money" at the time of such Fundamental Transaction), the Company shall cause any** Successor Entity (or its parent entity) **to issue to the Holder a new warrant to purchase the number of shares of common stock or other proprietary interest in the Successor Entity (or its parent entity) (and to receive any other consideration**) equivalent to the shares of Common Stock acquirable and receivable upon exercise of this Warrant prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock **and such other consideration** (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock **and such other consideration**, such number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction), ~~and which is reasonably satisfactory~~ in form and substance **reasonably satisfactory** to the Holder. ~~Upon the occurrence of any~~ **and approved in writing by the Holder (without unreasonable delay) prior to** such Fundamental Transaction~~, the Successor Entity shall be added to the term "Company" under this Warrant (so that from and after the occurrence or consummation of such Fundamental Transaction, each and every provision of this Warrant referring to the "Company" shall refer instead to each of the Company and the Successor Entity or Successor Entities, jointly and severally), and the Successor Entity or Successor Entities, jointly and severally with the Company, may exercise every right and power of the Company prior thereto and the Successor Entity or Successor Entities shall assume all of the obligations of the Company prior thereto under this Warrant with the same effect as if the Company and such Successor Entity or Successor Entities, jointly and severally, had been named as the Company herein. For the avoidance of doubt, the Holder shall be entitled to the benefits of the provisions of this Section 4(a) regardless of whether the Company has sufficient authorized shares of Common Stock for the issuance of Warrant Shares.~~ **and shall deliver to the Holder such new warrant in exchange for this Warrant. Such new warrant shall provide for rights and obligations which shall be as nearly equivalent as may be practicable to the rights and obligations provided for in this Warrant, including, for the avoidance of doubt, the remaining Exercise Period and any other terms hereof. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the consideration it receives upon any exercise of the new warrant following such Fundamental Transaction. The provisions of this Section 4(a) (and any equivalent thereof in any such new warrant) shall apply to successive transactions.**

(b)   *Adjustment of Warrant Upon Spin-off.*  If, at any time after the Original Issue Date but prior to the exercise hereof, the Company shall distribute equity of one or more of its divisions or Subsidiaries to its stockholders (or consummate any other transactions commonly known as a "spin off") (such transaction, a "**Spin-Off**" and such newly created entity, the "**Spin-off Entity**"), then the Company (i) shall issue to the Holder a new warrant to purchase the number of shares of common stock or other proprietary interest in the Spin-off Entity (and any other consideration) that the Holder would have owned had the Holder exercised this Warrant immediately prior to the consummation of such spin-off and (ii) shall make provision therefor in the agreement, if any, relating to such Spin-Off.  This Warrant and such new warrant shall provide for rights and obligations which shall be as nearly equivalent as may be practicable to the rights and obligations provided for in this Warrant, including, for the avoidance of doubt, through adjusting the Exercise Price and any other terms hereof.  The provisions of this Section 4(b) (and any equivalent thereof in any such new warrant) shall apply to successive transactions.

(c)   *Stock Dividends and Distributions*.  Subject to the provisions of Section 4(a), as applicable, if the Company shall, at any time or from time to time after the Original Issue Date, (A) make or declare, or fix a record date for the determination of holders of Common Stock entitled to receive a dividend or any other distribution payable in Common Stock of the Company or securities convertible, exercisable or exchangeable into Common Stock, (B) subdivide the outstanding Common Stock, whether by way of stock dividend, stock split or otherwise, or (C) combine the outstanding Common Stock into a smaller number of shares, whether by way of stock combination, reverse stock split or otherwise, then, and in each such event, provision shall be made so that the Holder shall receive upon exercise of the Warrant, the kind and amount of securities of the Company which the Holder would have been entitled to receive had the Warrant been exercised in full into Warrant Shares on the date of such event (or, in the case of a dividend, immediately prior to the record date therefore) and had the Holder thereafter, during the period from the date of such event to and including the Exercise Date, retained such securities receivable by them as aforesaid during such period, giving application to all adjustments called for during such period under this Section 4(c) with respect to the rights of the Holder; provided, that no such provision shall be made if the Holder receives, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such securities in an amount equal to the amount of such securities as the Holder would have received if the Warrant had been exercised in full into Warrant Shares on the date of such event.

(d)   *Adjustment in Exercise Price*.  Whenever the number of Warrant Shares acquirable upon exercise of the Warrants is adjusted as provided in Section 4(c), the Exercise Price shall be adjusted to equal the Exercise Price immediately prior to such adjustment multiplied by a fraction (A) the numerator of which shall be the number of Warrant Shares for which a Warrant is exercisable immediately prior to such adjustment and (B) the denominator of which shall be the number of Warrant Shares for which a Warrant is exercisable immediately after such adjustment.

(e)     *Extraordinary Dividends and Distributions*.  If the Company, at any time after the Original Issue Date but prior to the exercise hereof, shall pay a dividend or make a distribution in cash, securities or other assets to all of the holders of Common Stock on account of such Common Stock (or other capital stock or securities at the time issuable upon exercise of the Warrant), other than as described in Section 4(b) or Section 4(c) (any such non-excluded event being referred to herein as an "**Extraordinary Dividend**"), then the Exercise Price shall be decreased, effective immediately after the effective date of such Extraordinary Dividend, by the amount of cash and/or the Fair Market Value of any securities or other assets paid on each share of Common Stock in respect of such Extraordinary Dividend; provided, that no such provision shall be made if the Holder receives, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such cash, securities or other assets in an amount equal to the amount of such cash, securities or other assets as the Holder would have received if the Warrant had been exercised in full into Warrant Shares immediately prior to the effective date of such Extraordinary Dividend.

(f)     *Primary Registered Offering; ELOC/ATM Sales*. To the extent that the Company, prior to the receipt of the Regulatory Approvals, conducts a primary registered offering of shares of Common Stock (including any Warrant Shares) pursuant to the Registration Rights Agreement or sales of shares of Common Stock (including any Warrant Shares) under the ELOC/ATM, and the Holder receives the cash proceeds from such offering or sales in lieu of Warrant Shares receivable under this Warrant, then the number of Warrant Shares receivable upon exercise of this Warrant shall be decreased proportionally for the sale of such Warrant Shares.

(g)     *Certificate as to Adjustment*.

(i)     As promptly as reasonably practicable following any adjustment pursuant to the provisions of this Section ~~3(k)~~4, but in any event not later than three (3) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer setting forth in reasonable detail such adjustment and the facts upon which it is based and certifying the calculation thereof.

(ii)     As promptly as reasonably practicable following the receipt by the Company of a written request by the Holder, but in any event not later than three (3) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer certifying the amount of other shares of stock, securities, or assets then issuable upon exercise of the Warrant and the applicable Exercise Price.

(h)     *Notices*.  In the event:

(i)     that the Company shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon exercise of this Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution described in Section 4(c) or Section 4(e), to vote at a meeting

(other than an annual meeting for which a definitive proxy statement has been filed) (or act by written consent), to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security;

(ii)     of any Spin-Off;

(iii)    of any Fundamental Transaction; or

(iv)    of the voluntary or involuntary dissolution, liquidation, or winding-up of the Company;

then, and in each such case, the Company shall send or cause to be sent to the Holder at least ten (10) Business Days prior to the applicable record date or the applicable expected effective date, as the case may be, for the event, a written notice specifying, as the case may be, (A) the record date for such dividend, distribution, meeting, or consent or other right or action, and a description of such dividend, distribution, or other right or action to be taken at such meeting or by written consent, or (B) the effective date on which such Fundamental Transaction, Spin-Off, dissolution, liquidation, or winding-up is proposed to take place, and the date, if any is to be fixed, as of which the books of the Company shall close or a record shall be taken with respect to which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon exercise of this Warrant) shall be entitled to exchange their Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such Fundamental Transaction, Spin-Off, dissolution, liquidation, or winding-up, and the amount per share and character of such exchange applicable to this Warrant and the Warrant Shares.

5.     <u>Transfer of Warrant</u>.  Subject to compliance with applicable federal and state securities laws, this Warrant, and all rights hereunder are transferable to any Affiliate of the Holder (or, with the Company's prior written consent (not to be unreasonably withheld, conditioned or delayed), to a non-Affiliate of the Holder), in whole or in part, by the Holder without charge to the Holder, <u>provided</u>, <u>however</u>, that this Warrant and all rights hereunder shall not be transferred unless and until the Holder has given the Company a written notice of the portion of this Warrant being transferred, such notice to set forth the name, address and taxpayer identification number of the transferee, the anticipated date of such transfer, and surrendering this Warrant to the Company for reissuance to the transferee(s).  Upon surrender of this Warrant to the Company at its then principal executive office with a properly completed and duly executed assignment in the form attached hereto as **Exhibit B**, together with funds sufficient to pay any taxes or other governmental charges that may be imposed in connection with the making of such transfer, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees and in the denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant, if any, not so assigned and this Warrant shall promptly be cancelled.  Such new warrant shall be identical in all other respects to this Warrant.

6.     Holder Not Deemed a Stockholder; Limitations on Liability.  Except as otherwise specifically provided herein (including Section 4(c) and Section 4(e)), prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose with respect to the Warrant Shares, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give, or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance, or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise.  In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

7.     Replacement on Loss; Division and Combination.

(a)     *Replacement of Warrant on Loss*.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be a sufficient indemnity) and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company, at its own expense, shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for an equivalent number of Warrant Shares as the Warrant so lost, stolen, mutilated, or destroyed; provided, that, in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

(b)     *Division and Combination of Warrant*.  Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive office, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys.  Subject to compliance with the applicable provisions of this Warrant as to any transfer or assignment which may be involved in such division or combination, the Company shall at its own expense execute and deliver a new Warrant or Warrants in exchange for this Warrant or Warrants so surrendered in accordance with such notice.  Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for an equivalent number of Warrant Shares as this Warrant or Warrants so surrendered in accordance with such notice.

8.     Compliance with the Securities Act.

(a)     *Agreement to Comply with the Securities Act; Legend*.  The Holder, by acceptance of this Warrant, agrees to comply in all respects with the provisions of this

Section 8(a) and the restrictive legend requirements set forth on the face of this Warrant and further agrees that such Holder shall not offer, sell, transfer, or otherwise dispose of this Warrant except under circumstances that will not result in a violation of the Securities Act of 1933, as amended (the "**Securities Act**"). This Warrant (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

> "THIS WARRANT WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE. THE WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS AND THE ISSUER, IF IT SO REASONABLY DETERMINES IS NECESSARY, IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO ITS BOARD OF DIRECTORS THAT SUCH TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.
>
> IN ADDITION, THE WARRANT MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE TRANSFER PROVISIONS OF THE WARRANT.
>
> THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE ISSUER (NOT TO BE UNREASONABLY WITHHELD, CONDITIONED OR DELAYED)."

(b)     *Representations of the Holder*.  In connection with the issuance of this Warrant, the Holder specifically represents, as of the date hereof, to the Company by acceptance of this Warrant as follows (and any transferee or assignee of the Holder is deemed to represent as of the date of such transfer or assignment as if it were the Holder):

(i)     The Holder is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act.  The Holder is acquiring this Warrant and the Warrant Shares to be issued upon exercise hereof for investment for its own account and not with a view towards, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the Securities Act.

(ii)     The Holder acknowledges that it can bear the economic and financial risk of its investment for an indefinite period, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant and the Warrant Shares.  The Holder has received such information about the Company and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of this Warrant and the business, properties, prospects, and financial condition of the Company.

9.     Warrant Register.  The Company shall keep and properly maintain at its principal executive office books for the registration of this Warrant and any transfers thereof.  The Company may deem and treat the Person in whose name this Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination, or other transfer of this Warrant effected in accordance with the provisions of this Warrant.

10.     Tax Matters.

(a)     To the extent not already provided to the Company, Holder shall deliver to the Company an IRS Form W-9 (or if a transferee Holder is a foreign entity, an appropriate IRS Form W-8) and any other forms or documents reasonably requested by the Company to reduce or eliminate any withholding required by applicable tax law. The Company shall reasonably cooperate with the Holder to minimize or eliminate any such withholding to the extent permitted by applicable tax law.

(b)     Subject to Section 10(a), if the Company is required by law to withhold and pay taxes on behalf of the Holder as a result of any payments, transfers, distributions (including deemed distributions) or other deliveries pursuant to the Warrant (including the exercise of the Warrant), then the Company shall be entitled to set off such withholding taxes against payments or other deliveries on the Warrant (including by liquidating a portion of any non-cash deliveries on the Warrant to generate sufficient funds to pay applicable withholding taxes). Any amounts or property withheld pursuant to the preceding sentence shall be deemed to have been paid, transferred, distributed or

otherwise delivered to, and received by, the Holder for all purposes of this Warrant to the extent the Company has paid such amounts to the applicable tax authority.

(c)     The Company and Holder intend that, for U.S. federal income tax purposes, the Warrant shall be treated as part of the consideration issued in exchange for the Allowed Renesas Claim (as such terms are defined in the Plan) in a transaction treated as a "recapitalization" under Section 368(a)(1)(E) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and shall report such transaction in a manner consistent with the foregoing, unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of Code.

11.     <u>Cumulative Remedies</u>. The rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity, or otherwise.

12.     ~~Severability~~<u>Valuation Dispute Resolution</u>.  In the case of any dispute as to the determination of the Black-Scholes Value, the Fair Market Value of any Common Stock, Warrant Shares or Extraordinary Dividends to be issued, withheld or otherwise determined, the calculation of the Aggregate Exercise Price or any other computation or valuation of Fair Market Value or any computation pursuant to Section 4 required to be made hereunder or in connection herewith, in the event the Holder, on the one hand, and the Company, on the other hand, are unable to settle such dispute within ten (10) Business Days, then either party may elect to submit the disputed matter(s) for resolution by an accounting firm of nationally recognized standing as may be mutually agreed upon by the Holder and the Company.  Such firm's determination of such disputed matter(s) shall be binding upon all parties absent demonstrable error.  The fees and expenses of the accounting firm pursuant to this Section 12 shall be borne by the Company, on the one hand, and the Holder, on the other hand, based upon the percentage which the aggregate portion of the contested amount not awarded to each party bears to the aggregate amount actually contested by such party.  For example, if the Company claims the Fair Market Value is $1,000 for a given property and the Holder contests that the Fair Market Value of such property is only $500 (i.e., $500 is being contested) and if the accounting firm ultimately resolves the dispute by determining a Fair Market Value of $800 for such property, then the costs and expenses of the accounting firm will be allocated 60% (i.e., 300 ÷ 500) to the Holder and 40% (i.e., 200 ÷ 500) to the Company.

**13.**     <u>Severability</u>. If any provision of this Warrant is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Warrant or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Warrant or affecting the validity or enforceability of such provision in any other jurisdiction.

14.     <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. This Warrant shall be governed by and construed and interpreted in accordance with the laws of the State of New York

irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Warrant shall be brought and determined exclusively in a state or federal court located within the Borough of Manhattan in The City of New York. EACH PARTY TO THIS WARRANT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS WARRANT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15. <u>Successors and Assigns</u>. This Warrant shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto. Subject to the terms of this Warrant, the Company may not assign any of its rights or delegate any of its duties hereunder without the prior written consent of the Holder. Any Holder may, at its election and at any time or from time to time, assign its rights and delegate its duties hereunder, in whole or in part, to any Affiliate of the Holder (or, with the Company's prior written consent, to a non-Affiliate of the Holder) (each, an "**Assignee**"); <u>provided</u>, that no such assignment shall be binding upon or obligate the Company to any such Assignee unless and until the Holder delivers the Company the executed assignment and funds described in <u>Section 5</u>. If a Holder assigns its rights under this Warrant in connection with the transfer of all of its Warrants or Warrant Shares, the Holder shall have no further rights or obligations under this Warrant. Any purported assignment in violation of this provision shall be null and *void ab initio*.

~~16. Notices~~**Notices**. All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or facsimile or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

if to the Company, to:

Wolfspeed, Inc.
4600 Silicon Drive
Durham, NC 27703
Attention: Melissa Garrett
E-mail: Melissa.Garrett@wolfspeed.com

with a copy, in each case, (which shall not constitute notice) to:

Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Attention: Tad J. Freese
            Richard Kim
Email: Tad.Freese@lw.com
            Richard.Kim2@lw.com

if to a Holder, to:

> Renesas Electronics America Inc.
> c/o Renesas Electronics Corporation
> Toyosu Foresia, 3 2 24 Toyosu, Koto ku
> Tokyo 135-0061 Japan
> Attention: Shuhei Shinkai
>         Sho Ozaki
>         Takahiro Homma
> E-mail: shuhei.shinkai.nx@renesas.com
>         sho.ozaki.pv@renesas.com
>         takahiro.homma.jz@renesas.com

with a copy, in each case, (which shall not constitute notice) to:

> Kirkland & Ellis LLP
> 1301 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004
> Attention: Rachel W. Sheridan, P.C.
>         Shagufa R. Hossain, P.C.
>         Anthony L. Sanderson
> Email: rachel.sheridan@kirkland.com
>         shagufa.hossain@kirkland.com
>         anthony.sanderson@kirkland.com

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth (5th) Business Day after the posting thereof.

17.     <u>Headings</u>. The headings contained in this Warrant are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Warrant.

18.     <u>Entire Agreement</u>. The Warrant Documents and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such subject matter.

19.     <u>Specific Performance</u>. Damages in the event of breach of this Warrant by a party hereto may be difficult, if not impossible, to ascertain, and it is therefore agreed that the other parties hereto, in addition to and without limiting any other remedy or right it may have, will have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach, and enforcing specifically the terms and provisions hereof, and each of the parties hereto hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief. The

existence of this right will not preclude any party hereto from pursuing any other rights and remedies at law or in equity which such party may have.

20.    Counterparts; Facsimile or .pdf Signature. This Warrant may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document. This Warrant may be executed by facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, and a facsimile or .pdf signature, which for the avoidance of doubt shall include DocuSign, shall constitute an original for all purposes.

21.    Amendment. This Warrant may not be amended, modified or supplemented unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought.

22.    Extensions; Waivers. Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Warrant, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any extension or waiver pursuant to this Section 22 will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Warrant shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

23.    No Third-Party Beneficiaries. This Warrant shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

24.    Interpretation; Construction. This Warrant has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises, this Warrant will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Warrant. Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Warrant," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Warrant as a whole, including the schedules, exhibits and annexes, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited. References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections,

schedules, annexes and exhibits mean the sections of this Warrant and the schedules, annexes and exhibits attached to this Warrant, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original Issue Date.

WOLFSPEED, INC.

By: _____

Name:

Title:

Accepted and agreed:

RENESAS ELECTRONICS AMERICA INC.


By: _____
Name: _____
Title: _____

**Exhibit A**

**Form of Exercise Notice**

(To be executed upon exercise of the Warrant(s))

The undersigned hereby irrevocably elects to exercise the right, represented by the Warrant Certificate(s), to purchase Common Stock of Wolfspeed, Inc. and (check one or both):

_____     herewith tenders in payment for _____ shares of Common Stock an amount of $_____ by certified or official bank check made payable to the order of Wolfspeed, Inc. or by wire transfer in immediately available funds to an account arranged with Wolfspeed, Inc.; and/or

_____     herewith tenders the Warrant(s) for _____ Common Stock pursuant to the cashless exercise provision of <u>Section 3(b)(ii)</u> of the Warrant.

The undersigned requests that a statement representing the Common Stock issued upon exercise of the Warrant(s) be delivered in accordance with the instructions set forth below.

Dated: _____, 20_____

THIS EXERCISE NOTICE MUST BE DELIVERED TO WOLFSPEED, INC. PRIOR TO 5:00 P.M., EASTERN TIME, ON THE EXERCISE DATE. ALL CAPITALIZED TERMS USED HEREIN BUT NOT DEFINED HEREIN SHALL HAVE THE MEANINGS ASSIGNED TO THEM IN THE WARRANT.

**THE  UNDERSIGNED  REQUESTS  THAT  A  STATEMENT  REPRESENTING THE COMMON STOCK BE DELIVERED AS FOLLOWS:**

Name: _____

(Please Print)

Address: _____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable): _____

**IF  SAID  NUMBER  OF  COMMON  STOCK  SHALL  NOT  BE  ALL  THE COMMON STOCK ACQUIRABLE UNDER THE WARRANT(S), THE UNDERSIGNED REQUESTS  THAT  A  NEW  WARRANT  CERTIFICATE(S)  REPRESENTING  THE BALANCE OF SUCH WARRANT(S) SHALL BE REGISTERED AND DELIVERED AS FOLLOWS:**

Name: _____

(Please Print)

Address: _____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable): _____

Signature: _____

Name: _____

Capacity in which Signing: _____

The  signature  must  correspond  with  the  name  as  written  upon  the  face  of  the  within Warrant  Certificate  in  every  particular,  without  alteration  or  enlargement  or  any  change whatever.

A-2

**Exhibit B**

**Form of Assignment**

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers to each assignee set forth below all of the rights of the undersigned in and to the number of Warrants (as defined in and evidenced by the Warrant Certificate) set forth opposite the name of such assignee below, and in and to the Warrant Certificate with respect to the Warrants and the Common Stock issuable upon the exercise of said Warrants:

| Name of Assignee | Address | Number of Warrants | Warrant Certificate No. |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

If the total number of Warrants shall not be all of the Warrants evidenced by the foregoing Warrant Certificate, the undersigned requests that a new Warrant Certificate evidencing the Warrants not so assigned be issued in the name of and delivered to the undersigned.

Name of holder of Warrant: _____

By: _____
Name: _____
Title: _____
Dated: _____

B-1

## EXHIBIT H

### Restructuring Transactions Exhibit

This restructuring transactions exhibit (this "***Restructuring Transactions Exhibit***") sets forth a description of certain of the Restructuring Transactions the Debtors currently anticipate will be effectuated on or after the Effective Date in connection with the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as may be amended, modified or supplemented from time to time, the "***Plan***").[3]  The Debtors reserve the right to amend, supplement, or modify the following steps prior to the Effective Date in accordance with the terms of the Plan and the Restructuring Support Agreement.  To the extent there is any inconsistency between this Restructuring Transactions Exhibit and the Plan (without reference to this Restructuring Transactions Exhibit), the Plan shall govern.

Unless otherwise specified, the following transactions shall occur in the order set forth below:

On the Effective Date and, for the avoidance of doubt, prior to the effectiveness of the Plan:

1.  The Reorganized Parent shall convert into a corporation organized under the laws of Delaware.

2.  The Reorganized Debtors shall distribute the allocable Pro Rata Share of New 2L Convertible Notes Rights (subject to the Initial Backstop Parties' Premium and the Backstop Holdback Allocation), New 2L Takeback Notes, and 56.3% of New Common Stock (subject to dilution from, as applicable, the conversion of the New 2L Convertible Notes (including those issued on account of the Backstop Premium), the conversion of the New Renesas 2L Takeback Convertible Notes, the Incentive Plans, and the exercise of the Renesas Warrants) to each Holder of an Allowed Convertible Notes Claim in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Convertible Notes Claim.

3.  Immediately following Step 2, the Reorganized Debtors shall consummate the New 2L Convertible Notes Rights Offering (including the transactions contemplated by the Backstop Agreement) and issue the New 2L Convertible Notes in exchange for Purchase Price thereon, including the New 2L Convertible Notes on account of the Backstop Premium.

4.  Immediately following Step 3, the Reorganized Debtors shall distribute the allocable Pro Rata Share of New Senior Secured Notes and Effective Date Cash Payment to each Holder of an Allowed Senior Secured Notes Claim in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Senior Secured Notes Claim.

---

[3]    Capitalized terms used but not defined herein have the meanings given to them in the Plan.

5. Immediately following Step 4:

    a. If a Distribution Event has not occurred, the Reorganized Debtors shall distribute the Base Consideration to Renesas in full and final satisfaction, settlement, release, and discharge and in exchange for all Renesas Claims.

    b. If a Distribution Event has occurred, the Reorganized Debtors shall:

        i. distribute the right to (X) the Base Consideration, (Y) if applicable, and without duplication with clause (X), the Base Consideration Proceeds, and (Z) if the Regulatory Trigger Deadline occurs, the Contingent Additional Consideration (in each case, subject to the terms of the Plan, the Restructuring Support Agreement, and the Renesas Contingent Documentation) to Renesas in full and final satisfaction, settlement, release, and discharge and in exchange for all Renesas Claims;

        ii. reserve on their books and records New Common Stock for issuance in an amount equal to the Reserve Shares;

        iii. enter into the Renesas Contingent Documentation with Renesas; and

        iv. enter into the Contingent Cash Escrow Agreement and contribute the Contingent Cash to the escrow account in accordance with the Contingent Cash Escrow Agreement.

6. Immediately following Step 5, the Reorganized Debtors shall distribute the allocable Pro Rata Share of the Commitment Fee Amount to each Holder of an Allowed Commitment Fee Claim in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Commitment Fee Claim; *provided*, that, if a Distribution Event has occurred, then $5,000,000 of such Commitment Fee Amount shall be contributed to the escrow account pursuant to Step 5(b)(iv) above.

7. Immediately following Step 6, the Reorganized Debtors shall distribute the allocable Pro Rata Share of the Equity Recovery to each Holder of an Allowed Existing Equity Interest and all Existing Equity Interests and other Interests shall be cancelled, released, extinguished, and of no further force and effect.

<u>After the Effective Date (solely if a Distribution Event occurs)</u>:

8. If, prior to the Regulatory Trigger Deadline, Renesas obtains all Regulatory Approvals, then:

    a. the Reorganized Debtors shall (i) issue to Renesas all Base Consideration not previously distributed to Renesas (including any interest paid on or repayment of the New Renesas 2L Takeback Convertible Notes since the Effective Date), less any portions or equivalent proceeds of the Base Consideration in respect of which Renesas has received Sale Proceeds pursuant to the Investor Rights and Disposition

Agreement and (ii) distribute the Contingent Shares to the Holders of Existing Equity Interests in accordance with the Plan;

b. $10,000,000 of the Contingent Cash shall be remitted from the escrow account governed by the Contingent Cash Escrow Agreement to the Reorganized Debtors; and

c. $5,000,000 of the Contingent Cash shall be distributed to the Holders of Allowed Commitment Fee Claims, which shall be released no later than five (5) Business Days after the Regulatory Approvals have been obtained.

9. If Step 8 does not occur but the Regulatory Trigger Deadline occurs, then the Contingent Cash shall be released from escrow and distributed to Renesas and the Incremental New 2L Takeback Notes shall be issued to Renesas pursuant to Article 6.22(a) of the Plan, the Renesas Warrants Term Extension shall become effective, and the Contingent Shares shall be subject to and distributed through the ELOC/ATM Programs and Registered Primary Offerings.

10. Finally, if the Renesas Base Distribution Date occurs after Step 9, then the Reorganized Debtors shall immediately issue to Renesas (a) all Base Consideration not previously distributed to Renesas, less any portions or equivalent proceeds of the Base Consideration in respect of which Renesas has received Sale Proceeds pursuant to the Investor Rights and Disposition Agreement and (b) the Contingent Additional Consideration, less any portions of the Contingent Additional Consideration received in Step 9 or in respect of which Renesas has received Sale Proceeds pursuant to the Investor Rights and Disposition Agreement.

## **EXHIBIT H-1**

### **Redline of Restructuring Transactions Exhibit**

Attached hereto is a redline of the Restructuring Transactions Exhibit marked against the version filed as Exhibit H to the Initial Plan Supplement [Docket No. 168].

## EXHIBIT H

### Restructuring Transactions Exhibit

This restructuring transactions exhibit (this "***Restructuring Transactions Exhibit***") sets forth a description of certain of the Restructuring Transactions the Debtors currently anticipate will be effectuated on or after the Effective Date in connection with the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as may be amended, modified or supplemented from time to time, the "***Plan***").[1]   The Debtors reserve the right to amend, supplement, or modify the following steps prior to the Effective Date in accordance with the terms of the Plan and the Restructuring Support Agreement.   To the extent there is any inconsistency between this Restructuring Transactions Exhibit and the Plan (without reference to this Restructuring Transactions Exhibit), the Plan shall govern.

Unless otherwise specified, the following transactions shall occur in the order set forth below:

On the Effective Date and, for the avoidance of doubt, prior to the effectiveness of the Plan:

1.  **The Reorganized Parent shall convert into a corporation organized under the laws of Delaware.**

2.  ~~1.~~ The Reorganized Debtors shall distribute the allocable Pro Rata Share of New 2L Convertible Notes Rights (subject to the Initial Backstop Parties' Premium and the Backstop Holdback Allocation), New 2L Takeback Notes, and 56.3% of New Common Stock (subject to dilution from, as applicable, the conversion of the New 2L Convertible Notes (including those issued on account of the Backstop Premium), the conversion of the New Renesas 2L Takeback Convertible Notes, the Incentive Plans, and the exercise of the Renesas Warrants) to each Holder of an Allowed Convertible Notes Claim in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Convertible Notes Claim.

3.  ~~2.~~ Immediately following Step ~~1~~2, the Reorganized Debtors shall consummate the New 2L Convertible Notes Rights Offering (including the transactions contemplated by the Backstop Agreement) and issue the New 2L Convertible Notes in exchange for Purchase Price thereon, including the New 2L Convertible Notes on account of the Backstop Premium.

4.  ~~3.~~ Immediately following Step ~~2~~3, the Reorganized Debtors shall distribute the allocable Pro Rata Share of New Senior Secured Notes and Effective Date Cash Payment to each Holder of an Allowed Senior Secured Notes Claim in full and final satisfaction,

---

[1]   Capitalized terms used but not defined herein have the meanings given to them in the Plan.

settlement, release, and discharge and in exchange for each Allowed Senior Secured Notes Claim.

**5.** ~~4.~~ Immediately following Step ~~3~~4:

    a. If a Distribution Event has not occurred, the Reorganized Debtors shall distribute the Base Consideration to Renesas in full and final satisfaction, settlement, release, and discharge and in exchange for all Renesas Claims.

    b. If a Distribution Event has occurred, the Reorganized Debtors shall:

        i. distribute the right to (X) the Base Consideration, (Y) if applicable, and without duplication with clause (X), the Base Consideration Proceeds, and (Z) if the Regulatory Trigger Deadline occurs, the Contingent Additional Consideration (in each case, subject to the terms of the Plan, the Restructuring Support Agreement, and the Renesas Contingent Documentation) to Renesas in full and final satisfaction, settlement, release, and discharge and in exchange for all Renesas Claims;

        ii. reserve on their books and records New Common Stock for issuance in an amount equal to the Reserve Shares;

        iii. enter into the Renesas Contingent Documentation with Renesas; and

        iv. enter into the Contingent Cash Escrow Agreement and contribute the Contingent Cash to the escrow account in accordance with the Contingent Cash Escrow Agreement.

**6.** ~~5.~~ Immediately following Step ~~4~~5, the Reorganized Debtors shall distribute the allocable Pro Rata Share of the Commitment Fee Amount to each Holder of an Allowed Commitment Fee Claim in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Commitment Fee Claim; *provided*, that, if a Distribution Event has occurred, then $5,000,000 of such Commitment Fee Amount shall be contributed to the escrow account pursuant to Step ~~4~~5(b)(iv) above.

**7.** ~~6.~~ Immediately following Step ~~5~~6, the Reorganized Debtors shall distribute the allocable Pro Rata Share of the Equity Recovery to each Holder of an Allowed Existing Equity Interest and all Existing Equity Interests and other Interests shall be cancelled, released, extinguished, and of no further force and effect.

~~7. Immediately following Step 6, the Reorganized Parent shall convert into a corporation organized under the laws of Delaware.~~
<u>After the Effective Date (solely if a Distribution Event occurs)</u>:

8. If, prior to the Regulatory Trigger Deadline, Renesas obtains all Regulatory Approvals, then:

a.   the Reorganized Debtors shall (i) issue to Renesas all Base Consideration not previously distributed to Renesas (including any interest paid on or repayment of the New Renesas 2L Takeback Convertible Notes since the Effective Date), less any portions or equivalent proceeds of the Base Consideration in respect of which Renesas has received Sale Proceeds pursuant to the Investor Rights and Disposition Agreement and (ii) distribute the Contingent Shares to the Holders of Existing Equity Interests in accordance with the Plan;

b.   $10,000,000 of the Contingent Cash shall be remitted from the escrow account governed by the Contingent Cash Escrow Agreement to the Reorganized Debtors; and

c.   $5,000,000 of the Contingent Cash shall be distributed to the Holders of Allowed Commitment Fee Claims, which shall be released no later than five (5) Business Days after the Regulatory Approvals have been obtained.

9.   If Step 8 does not occur but the Regulatory Trigger Deadline occurs, then the Contingent Cash shall be released from escrow and distributed to Renesas and the Incremental New 2L Takeback Notes shall be issued to Renesas pursuant to Article 6.22(a) of the Plan, the Renesas Warrants Term Extension shall become effective, and the Contingent Shares shall be subject to and distributed through the ELOC/ATM Programs and Registered Primary Offerings.

10.   Finally, if the Renesas Base Distribution Date occurs after Step 9, then the Reorganized Debtors shall immediately issue to Renesas (a) all Base Consideration not previously distributed to Renesas, less any portions or equivalent proceeds of the Base Consideration in respect of which Renesas has received Sale Proceeds pursuant to the Investor Rights and Disposition Agreement and (b) the Contingent Additional Consideration, less any portions of the Contingent Additional Consideration received in Step 9 or in respect of which Renesas has received Sale Proceeds pursuant to the Investor Rights and Disposition Agreement.

## EXHIBIT J

### Required Disclosures Under Section 1129(a)(5)

As of the Effective Date, the term of the current members of the board of directors of Wolfspeed, Inc. shall expire and the New Board will be instituted at Reorganized Parent. The initial New Board will have eight (8) members, *provided*, that the Chief Executive Officer of Reorganized Parent shall be a member of the New Board and Renesas shall be entitled to select one (1) member of the board of the New Board pending requisite Regulatory Approval in accordance with the Investor Rights Agreement; *provided further*, that upon the occurrence of the Renesas Base Distribution Date, the board seat reserved for the individual Renesas designates to sit on the New Board shall be immediately filled by such individual in accordance with Reorganized Parent's New Corporate Governance Documents, and in accordance with the Restructuring Support Agreement.

The officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law.

Set out below are the biographies and affiliations of the initial New Board members known as of the date hereof, which disclosure may be amended and/or supplemented at any time prior to the Confirmation Hearing in accordance with the Plan and the Restructuring Support Agreement and subject to the consent rights thereunder.

### Biographies/Affiliations of the Members of the New Board

- **Robert Feurle**. Mr. Feurle currently serves as the Chief Executive Officer of Wolfspeed, Inc. Prior to joining Wolfspeed, Mr. Feurle served as Executive Vice President and General Manager of the Business Unit Opto Semiconductors at ams-OSRAM AG (SIX: AMS), a light and sensor developer and producer / semiconductor manufacturer, and a member of the company's Executive Committee since March 2022. He also served as Executive Vice President and General Manager of the Business Unit Image Sensor Solutions at ams-OSRAM AG from July 2020 to March 2022. Mr. Feurle previously served as Vice President and General Manager of Integrated Solutions and Discretes at Infineon Technologies AG from November 2015 to June 2020. Prior to Infineon Technologies, he served as Vice President of Marketing and Program Management for the Compute and Networking Business at Micron Technology, Inc. (Nasdaq: MU) from April 2009 to November 2015. Earlier, he served as Senior Vice President and General Manager of the DRAM Business Unit and then the Graphics DRAM Business Unit at Qimonda AG from December 2005 to March 2009. He also held various roles at Infineon Technologies from August 1999 to May 2005, including Director of Embedded DRAM Development and later Senior Director of the Specialty DRAM Product Line. He began his career at Siemens AG in 1996. Mr. Feurle holds a degree in Electrical Engineering from the University of Applied Sciences in Konstanz, Germany.

- **_Paul V. Walsh, Jr_**.  Mr. Walsh has been a member of the Board of Directors of Wolfspeed, Inc. since May 2025.  He served as Chief Financial Officer, Senior Vice President and Treasurer at Allegro MicroSystems, Inc.  (Nasdaq: ALGM), a global semiconductor company focused on sensor and power ICs for automotive and industrial applications, from 2014 until his retirement in 2022.  Prior to Allegro, Mr. Walsh was Chief Financial Officer and Senior Vice President at Rocket Software, Inc., a global software development firm, from 2013 to 2014.  From 2004 to 2013, he held several financial leadership roles at Silicon Laboratories Inc. (Nasdaq: SLAB), including Chief Financial Officer and Senior Vice President from 2011 to 2013 and Chief Accounting Officer and Vice President of Finance from 2006 to 2011.  Mr. Walsh currently serves on the boards of Semtech Corporation (Nasdaq: SMTC) and Kopin Corporation (Nasdaq: KOPN) and previously served on the boards of Nitero, Inc. and Grande Communications Networks, LLC.  He brings more than 30 years of operational and financial leadership in the semiconductor industry.

- **_Mark Jensen_**.  Mr. Jensen has been a member of the Board of Directors of Wolfspeed, Inc. since May 2025.  He served as an executive at Deloitte & Touche LLP until his retirement in 2012, holding a variety of leadership roles including U.S. Managing Partner–Audit and Enterprise Risk Services, Technology Industry, and U.S. Managing Partner–Venture Capital Services Group.  Prior to joining Deloitte, Mr. Jensen was Chief Financial Officer of Redleaf Group and served as Managing Partner of Arthur Andersen LLP's Silicon Valley Office, where he also led the firm's Global Technology Industry Practice.  Mr. Jensen currently serves on the boards of Lattice Semiconductor Corporation and 23andMe Holding Co., and previously served on the boards of Exabeam, Inc., Unwired Planet, Inc., Control4 Corporation, and ForeScout Technologies, Inc.  He brings extensive experience in finance, accounting, and corporate governance, particularly within the technology and semiconductor sectors.

# **EXHIBIT K**

## **New Corporate Governance Documents**

**EXHIBIT K-1**

**Wolfspeed, Inc. Amended and Restated Bylaws**

*[Plan Supplement Filing Version 8/19/2025]*
*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

**Bylaws of**

**Wolfspeed, Inc.**

**(a Delaware corporation)**

**as of [●], 2025**

## Table of Contents

**Page**

Article I - Corporate Offices ......................................................................................................... 3

    1.1    Registered Office ................................................................................................... 3
    1.2    Other Offices ........................................................................................................ 3

Article II - Meetings of Stockholders ......................................................................................... 3

    2.1    Place of Meetings ................................................................................................. 3
    2.2    Annual Meeting .................................................................................................... 3
    2.3    Special Meeting .................................................................................................... 3
    2.4    Notice of Business to be Brought Before a Meeting. ........................................... 4
    2.5    Notice of Nominations for Election to the Board of Directors. ............................ 8
    2.6    Additional Requirements for Valid Nomination of Candidates to Serve as Director
           and, if Elected, to be Seated as Directors ........................................................... 11
    2.7    Notice of Stockholders' Meetings ....................................................................... 13
    2.8    Quorum ................................................................................................................ 13
    2.9    Adjourned Meeting; Notice .................................................................................. 13
    2.10   Conduct of Business ........................................................................................... 14
    2.11   Voting ................................................................................................................. 14
    2.12   Record Date for Stockholder Meetings and Other Purposes .............................. 15
    2.13   Proxies ............................................................................................................... 15
    2.14   List of Stockholders Entitled to Vote ................................................................ 15
    2.15   Inspectors of Election ........................................................................................ 16
    2.16   Delivery to the Corporation. .............................................................................. 16

Article III - Directors ................................................................................................................ 17

    3.1    Powers ................................................................................................................. 17
    3.2    Number of Directors ............................................................................................ 17
    3.3    Election, Qualification and Term of Office of Directors ..................................... 17
    3.4    Resignation and Vacancies .................................................................................. 17
    3.5    Place of Meetings; Meetings by Telephone ........................................................ 17
    3.6    Regular Meetings ................................................................................................. 18
    3.7    Special Meetings; Notice ..................................................................................... 18
    3.8    Quorum ................................................................................................................ 18
    3.9    Board Action without a Meeting .......................................................................... 19
    3.10   Fees and Compensation of Directors .................................................................. 19

Article IV - Committees ............................................................................................................ 19

    4.1    Committees of Directors ...................................................................................... 19
    4.2    Committee Minutes .............................................................................................. 19
    4.3    Meetings and Actions of Committees .................................................................. 19
    4.4    Subcommittees. ................................................................................................... 20

Article V - Officers ................................................................................................................... 20

    5.1    Officers ............................................................................................................... 20
    5.2    Appointment of Officers ..................................................................................... 20

**TABLE OF CONTENTS**
**(continued)**

Page

| | | |
|---|---|---|
| 5.3 | Subordinate Officers | 20 |
| 5.4 | Removal and Resignation of Officers | 21 |
| 5.5 | Vacancies in Offices | 21 |
| 5.6 | Representation of Shares of Other Corporations | 21 |
| 5.7 | Authority and Duties of Officers | 21 |
| 5.8 | Compensation. | 21 |

Article VI - Records ........................................................................................................ 21

Article VII - General Matters ......................................................................................... 22

| | | |
|---|---|---|
| 7.1 | Execution of Corporate Contracts and Instruments | 22 |
| 7.2 | Stock Certificates | 22 |
| 7.3 | Special Designation of Certificates | 22 |
| 7.4 | Lost Certificates | 23 |
| 7.5 | Shares Without Certificates | 23 |
| 7.6 | Construction; Definitions | 23 |
| 7.7 | Dividends | 23 |
| 7.8 | Fiscal Year | 23 |
| 7.9 | Seal | 24 |
| 7.10 | Transfer of Stock | 24 |
| 7.11 | Stock Transfer Agreements | 24 |
| 7.12 | Registered Stockholders | 24 |
| 7.13 | Waiver of Notice | 24 |
| 7.14 | FOCI Mitigation Plan Compliance. | 25 |

Article VIII - Notice ....................................................................................................... 25

| | | |
|---|---|---|
| 8.1 | Delivery of Notice; Notice by Electronic Transmission | 25 |

Article IX - Indemnification ........................................................................................... 26

| | | |
|---|---|---|
| 9.1 | Indemnification of Directors and Officers | 26 |
| 9.2 | Indemnification of Others | 26 |
| 9.3 | Prepayment of Expenses | 26 |
| 9.4 | Determination; Claim | 27 |
| 9.5 | Non-Exclusivity of Rights | 27 |
| 9.6 | Insurance | 27 |
| 9.7 | Other Indemnification | 27 |
| 9.8 | Continuation of Indemnification | 27 |
| 9.9 | Amendment or Repeal; Interpretation | 27 |

Article X - Amendments .................................................................................................. 28

Article XI - Definitions ................................................................................................... 28

ii

**Bylaws of**
**Wolfspeed, Inc.**

---

## Article I - Corporate Offices

Registered Office.

The address of the registered office of Wolfspeed, Inc. (the "Corporation") in the State of Delaware, and the name of its registered agent at such address, shall be as set forth in the Corporation's certificate of incorporation, as the same may be amended and/or restated from time to time (the "Certificate of Incorporation").

Other Offices.

The Corporation may have additional offices at any place or places, within or outside the State of Delaware, as the Corporation's board of directors (the "Board") may from time to time establish or as the business of the Corporation may require.

## Article II - Meetings of Stockholders

Place of Meetings.

Meetings of stockholders shall be held at any place within or outside the State of Delaware, designated by the Board.  The Board may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the General Corporation Law of the State of Delaware (the "DGCL"). In the absence of any such designation or determination, stockholders' meetings shall be held at the Corporation's principal executive office.

Annual Meeting.

The Board shall designate the date and time of the annual meeting of stockholders.  At the annual meeting of stockholders, directors shall be elected and other proper business properly brought before the meeting in accordance with Section 2.4 of these bylaws of the Corporation (the "Bylaws") may be transacted. The Board may postpone, reschedule or cancel any previously scheduled annual meeting of stockholders.

Special Meeting.

Special meetings of stockholders may be called only by such persons and only in such manner as set forth in the Certificate of Incorporation.

No business may be transacted at any special meeting of stockholders other than the business specified in the notice of such meeting. The Board may postpone, reschedule or cancel any previously scheduled special meeting of stockholders.

<u>Notice of Business to be Brought Before a Meeting</u>.

**(a)**      At an annual meeting of the stockholders, only such business (other than the nomination of persons for the election to the Board) shall be conducted as shall have been properly brought before the meeting.  To be properly brought before an annual meeting, business must be (i) specified in a notice of meeting given by or at the direction of the Board or a duly authorized committee thereof, (ii) if not specified in a notice of meeting, otherwise brought before the meeting by or at the direction of the Board, a duly authorized committee thereof or the chairperson of the Board or (iii) otherwise properly brought before the meeting by a stockholder present in person who (A) (1) was a record owner of shares of capital stock of the Corporation both at the time of giving the notice provided for in this Section 2.4 and at the time of the meeting, (2) is entitled to vote at the meeting, and (3) has complied with this Section 2.4 in all applicable respects or (B) properly made such proposal in accordance with Rule 14a-8 under the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the "<u>Exchange Act</u>").  The foregoing clause (iii) shall be the exclusive means for a stockholder to propose business (other than the nomination of persons for election to the Board) to be brought before an annual meeting of the stockholders.  The only matters that may be brought before a special meeting are the matters specified in the notice of meeting given by or at the direction of the person calling the meeting pursuant to Section 2.3, and stockholders shall not be permitted to propose business to be brought before a special meeting of the stockholders. For purposes of this Section 2.4, "present in person" shall mean that the stockholder proposing that the business be brought before the annual meeting of the Corporation, or a qualified representative of such proposing stockholder, appear at such annual meeting, either in person or by means of remote communication.  A "qualified representative" of such proposing stockholder shall be a duly authorized officer, manager or partner of such stockholder or any other person authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at or before the meeting of stockholders in writing or by electronic transmission.  Stockholders seeking to nominate persons for election to the Board must comply with Section 2.5 and Section 2.6 and this Section 2.4 shall not be applicable to nominations except as expressly provided in Section 2.5 and Section 2.6.

**(b)**      Without qualification, for business to be properly brought before an annual meeting by a stockholder, the business must constitute a proper matter for stockholder action and the stockholder must (i) provide Timely Notice (as defined below) thereof in writing and in proper form to the Secretary of the Corporation and (ii) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.4.  To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred twenty (120) days prior to the one-year anniversary of the preceding year's annual meeting, which, in the case of the first annual meeting of stockholders following the date hereof, the date of the preceding year's annual meeting shall be deemed to be [●]; *provided, however*, that if the date of the annual meeting is more than thirty (30) days before or more than sixty (60) days after such anniversary date, notice by the stockholder to be timely must be so delivered, or mailed and received, not more than the hundred twentieth (120th) day prior to such annual meeting and not later than (i) the ninetieth (90th) day prior to such annual meeting or, (ii) if later, the tenth (10th) day following the day on which public disclosure of the date of such annual meeting was first made by the Corporation (such notice within such time periods, "<u>Timely Notice</u>").  In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of Timely Notice as described above.

**(c)**      To be in proper form for purposes of this Section 2.4, a stockholder's notice to the Secretary shall set forth:

(i)        As to each Proposing Person (as defined below), (A) the name and address of such Proposing Person (including, if applicable, the name and address that appear on the Corporation's books and records), (B) the class or series and number of shares of capital stock of the Corporation that are, directly or indirectly, owned of record or beneficially owned (within the meaning of Rule 13d-3 under the Exchange Act) by such Proposing Person, except that such Proposing Person shall in all events be deemed to beneficially own any shares of any class or series of capital stock of the Corporation as to which such Proposing Person has a right to acquire beneficial ownership at any time in the future, (C) the date or dates such shares were acquired, (D) the investment intent of such acquisition and (E) any pledge by such Proposing Person with respect to any of such shares (the disclosures to be made pursuant to the foregoing clauses (A) through (E) are referred to as "Stockholder Information");

(ii)        As to each Proposing Person,

(A) the material terms and conditions of any "derivative security" (as such term is defined in Rule 16a-1(c) under the Exchange Act) that constitutes a "call equivalent position" (as such term is defined in Rule 16a-1(b) under the Exchange Act) or a "put equivalent position" (as such term is defined in Rule 16a-1(h) under the Exchange Act) or other derivative or synthetic arrangement in respect of any class or series of shares of capital stock of the Corporation ("Synthetic Equity Position") that is, directly or indirectly, held or maintained by, held for the benefit of, or involving such Proposing Person, including, without limitation,

(1) any option, warrant, convertible security, stock appreciation right, future or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of capital stock of the Corporation or with a value derived in whole or in part from the value of any shares of any class or series of shares of capital stock of the Corporation,

(2) any derivative or synthetic arrangement having the characteristics of a long position or a short position in any class or series of shares of capital stock of the Corporation, including, without limitation, a stock loan transaction, a stock borrow transaction, or a share repurchase transaction or

(3) any contract, derivative, swap or other transaction or series of transactions designed to

(x) produce economic benefits and risks that correspond substantially to the ownership of any class or series of shares of capital stock of the Corporation,

(y) mitigate any loss relating to, reduce the economic risk (of ownership or otherwise) of, or manage the risk of share price decrease in, any class or series of shares of capital stock of the Corporation, or

(z) increase or decrease the voting power in respect of any class or series of shares of capital stock of the Corporation held or maintained by, held for the benefit of, or involving such Proposing Person,

including, without limitation, due to the fact that the value of such contract, derivative, swap or other transaction or series of transactions is determined by reference to the price, value or volatility of any class or series of shares of capital stock of the Corporation, whether or not such instrument, contract or right shall be subject to settlement in the underlying class or series of shares of capital stock of the Corporation, through the delivery of cash or other property, or otherwise, and without regard to whether the holder thereof may have entered into transactions that hedge or mitigate the economic effect of such instrument, contract or right, or any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the price or value of any shares of any class or series of shares of capital stock of the Corporation;

*provided that*, for the purposes of the definition of "Synthetic Equity Position," the term "derivative security" shall also include any security or instrument that would not otherwise constitute a "derivative security" as a result of any feature that would make any conversion, exercise or similar right or privilege of such security or instrument becoming determinable only at some future date or upon the happening of a future occurrence, in which case the determination of the amount of securities into which such security or instrument would be convertible or exercisable shall be made assuming that such security or instrument is immediately convertible or exercisable at the time of such determination; *and, provided, further, that* any Proposing Person satisfying the requirements of Rule 13d-1(b)(1) under the Exchange Act (other than a Proposing Person that so satisfies Rule 13d-1(b)(1) under the Exchange Act solely by reason of Rule 13d-1(b)(1)(ii)(E)) shall not be deemed to hold or maintain the notional amount of any securities that underlie any Synthetic Equity Position that is, directly or indirectly, held or maintained by, held for the benefit of, or involving such Proposing Person as a hedge with respect to a bona fide derivatives trade or position of such Proposing Person arising in the ordinary course of such Proposing Person's business as a derivatives dealer,

(B) a description of any agreement, arrangement or understanding with respect to any rights to dividends on the shares of any class or series of shares of capital stock of the Corporation owned beneficially by such Proposing Person that are separated or separable pursuant to such agreement, arrangement or understanding from the underlying shares of capital stock of the Corporation,

(C) any material pending or threatened legal proceeding in which such Proposing Person is a party or material participant involving the Corporation or any of its officers or directors, or any affiliate of the Corporation,

(D) any other material relationship between such Proposing Person, on the one hand, and the Corporation or any affiliate of the Corporation, on the other hand,

(E) any direct or indirect material interest in any material contract or agreement of such Proposing Person with the Corporation or any affiliate of the Corporation (including, in any such case, any employment agreement, collective bargaining agreement or consulting agreement),

(F) any proportionate interest in shares of capital stock of the Corporation or a Synthetic Equity Position held, directly or indirectly, by a general or limited partnership, limited liability company or similar entity in which any such Proposing Person (1) is a general partner or, directly or indirectly, beneficially owns an interest in a general partner

4

of such general or limited partnership or (2) is the manager, managing member or, directly or indirectly, beneficially owns an interest in the manager or managing member of such limited liability company or similar entity,

(G) a representation that such Proposing Person intends or is part of a group that intends to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal or otherwise solicit proxies or votes from stockholders in support of such proposal and

(H) any other information relating to such Proposing Person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies or consents by such Proposing Person in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act,

(the disclosures to be made pursuant to the foregoing clauses (A) through (H) are referred to as "Disclosable Interests"); *provided*, *however*, that Disclosable Interests shall not include any such disclosures with respect to the ordinary course business activities of any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the stockholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner; and

(iii)     As to each item of business that the stockholder proposes to bring before the annual meeting, (A) a brief description of the business desired to be brought before the annual meeting, the reasons for conducting such business at the annual meeting and any material interest in such business of each Proposing Person, (B) the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend the Bylaws, the language of the proposed amendment), (C) a reasonably detailed description of all agreements, arrangements and understandings (x) between or among any of the Proposing Persons or (y) between or among any Proposing Person and any other person or entity (including their names) in connection with the proposal of such business by such stockholder, and (D) any other information relating to such item of business that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act; *provided*, *however*, that the disclosures required by this paragraph (iii) shall not include any disclosures with respect to any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the stockholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner.

For purposes of this Section 2.4, the term "*Proposing Person"* shall mean (i) the stockholder providing the notice of business proposed to be brought before an annual meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the business proposed to be brought before the annual meeting is made, and (iii) any participant (as defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) with such stockholder in such solicitation.

(d)     The Board may request that any Proposing Person furnish such additional information as may be reasonably required by the Board.  Such Proposing Person shall provide such additional information within ten (10) days after it has been requested by the Board.

**(e)**        A Proposing Person shall update and supplement its notice to the Corporation of its intent to propose business at an annual meeting, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 2.4 shall be true and correct as of the record date for stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof).  For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other Section of these Bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding matters, business or resolutions proposed to be brought before a meeting of the stockholders.

**(f)**        Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at an annual meeting that is not properly brought before the meeting in accordance with this Section 2.4.  The presiding officer of the meeting (or, in advance of any meeting of stockholders, the Board or an authorized committee thereof) shall, if the facts warrant, determine that the business was not properly brought before the meeting in accordance with this Section 2.4, and if he or she should so determine, he or she shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

**(g)**        This Section 2.4 is expressly intended to apply to any business proposed to be brought before an annual meeting of stockholders other than any proposal made in accordance with Rule 14a-8 under the Exchange Act and included in the Corporation's proxy statement.  In addition to the requirements of this Section 2.4 with respect to any business proposed to be brought before an annual meeting, each Proposing Person shall comply with all applicable requirements of the Exchange Act with respect to any such business.  Nothing in this Section 2.4 shall be deemed to affect the rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

**(h)**        For purposes of these Bylaws, "<u>public disclosure</u>" shall mean disclosure in a press release reported by a national news service or in a document publicly filed by the Corporation with the U.S. Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

<u>Notice of Nominations for Election to the Board of Directors</u>.

**(a)**        Nominations of any person for election to the Board at an annual meeting or at a special meeting (but only if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting) may be made at such meeting only (i) by or at the direction of the Board, including by any committee or persons authorized to do so by the Board or these Bylaws, or (ii) by a stockholder present in person who (A) was a record owner of shares of capital stock of the Corporation both at the time of giving the notice provided for in this Section 2.5 and at the time of the meeting, (B) is entitled to vote at the meeting, and (C) has complied with this Section 2.5 and Section 2.6 as to such notice and nomination. For purposes of this Section 2.5, "present in person" shall mean that the stockholder nominating any person for election to the Board at the meeting of the Corporation, or a

6

qualified representative of such stockholder, appear at such meeting, either in person or by means of remote communication. A "qualified representative" of such proposing stockholder shall be a duly authorized officer, manager or partner of such stockholder or any other person authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at or before the meeting of stockholders in writing or by electronic transmission. The foregoing clause (ii) shall be the exclusive means for a stockholder to make any nomination of a person or persons for election to the Board at an annual meeting or special meeting.

**(b)**      (i) Without qualification, for a stockholder to make any nomination of a person or persons for election to the Board at an annual meeting, the stockholder must (1) provide Timely Notice (as defined in Section 2.4) thereof in writing and in proper form to the Secretary of the Corporation, (2) provide the information, agreements and questionnaires with respect to each Nominating Person (as defined below) and its candidate for nomination as required to be set forth by this Section 2.5 and Section 2.6 and (3) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.5 and Section 2.6.

(ii)  Without qualification, if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling a special meeting, then for a stockholder to make any nomination of a person or persons for election to the Board at a special meeting, the stockholder must (A) provide timely notice thereof in writing and in proper form to the Secretary of the Corporation at the principal executive offices of the Corporation, (B) provide the information with respect to each Nominating Person and its candidate for nomination as required by this Section 2.5 and Section 2.6 and (C) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.5. To be timely, a stockholder's notice for nominations to be made at a special meeting must be delivered to, or mailed and received at, the principal executive offices of the Corporation not earlier than the one hundred twentieth (120th) day prior to such special meeting and not later than the ninetieth (90th) day prior to such special meeting or, if later, the tenth (10th) day following the day on which public disclosure (as defined in Section 2.4) of the date of such special meeting at which directors are to be elected was first made (such notice within such time periods, "Special Meeting Timely Notice").

(iii)  In no event shall any adjournment or postponement of an annual meeting or special meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

(iv)  In no event may a Nominating Person deliver a notice of nomination, as applicable, with respect to a greater number of director candidates than are subject to election by stockholders at the applicable meeting. If the Corporation shall, subsequent to such notice, increase the number of directors subject to election at the meeting, such notice as to any additional nominees shall be due on the later of (i) the conclusion of the time period for Timely Notice or Special Meeting Timely Notice, as applicable, or (ii) the tenth day following the date of public disclosure (as defined in Section 2.4) of such increase.

**(c)**      To be in proper form for purposes of this Section 2.5, a stockholder's notice to the Secretary shall set forth:

**(i)**      As to each Nominating Person, the Stockholder Information (as defined in Section 2.4(c)(i), except that for purposes of this Section 2.5 the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 2.4(c)(i));

       **(ii)**    As to each Nominating Person, any Disclosable Interests (as defined in Section 2.4(c)(ii), except that for purposes of this Section 2.5 the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 2.4(c)(ii) and the disclosure with respect to the business to be brought before the meeting in Section 2.4(c)(ii) shall be made with respect to the nomination proposed to be made at the meeting); and provided that, in lieu of including the information set forth in Section 2.4(c)(ii)(G), the Nominating Person's notice for purposes of this Section 2.5 shall include a representation as to whether the Nominating Person intends or is part of a group that intends to deliver a proxy statement and solicit the holders of shares representing at least 67% of the voting power of shares entitled to vote on the election of directors in support of director nominees other than the Corporation's nominees in accordance with Rule 14a-19 promulgated under the Exchange Act; and

       **(iii)**    As to each candidate whom a Nominating Person proposes to nominate for election as a director, (A) all information relating to such candidate for nomination that is required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14(a) under the Exchange Act (including such candidate's written consent to being named in a proxy statement and accompanying proxy card relating to the Corporation's next meeting of stockholders at which directors are to be elected and to serving as a director for a full term if elected), (B) a description of any direct or indirect material interest in any material contract or agreement between or among any Nominating Person, on the one hand, and each candidate for nomination or his or her respective associates (as defined in Rule 14a-1(a) promulgated under the Exchange Act) or any other participants (as defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) in such solicitation, on the other hand, including, without limitation, all information that would be required to be disclosed pursuant to Item 404 under Regulation S-K if such Nominating Person were the "registrant" for purposes of such rule and the candidate for nomination were a director or executive officer of such registrant and (C) a completed and signed questionnaire, representation and agreement as provided in Section 2.6(a).

For purposes of this Section 2.5, the term "*Nominating Person*" shall mean (i) the stockholder providing the notice of the nomination proposed to be made at the meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the nomination proposed to be made at the meeting is made, and (iii) any participant (as defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) with such stockholder in such solicitation.

       **(d)**    The Corporation may request that any Nominating Person furnish such additional information as may be reasonably required by the Corporation to determine whether such proposed nominee is qualified under the Certificate of Incorporation, these Bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or any law rule or regulation applicable to the Corporation to serve as a director and/or independent director of the Corporation.  Such Nominating Person shall provide such additional information within ten (10) days after it has been requested by the Board.

       **(e)**    A stockholder providing notice of any nomination proposed to be made at a meeting shall further update and supplement such notice or the materials delivered pursuant to this Section 2.5, as applicable, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 2.5 shall be true and correct as of the record date for stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business

days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof).  For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other Section of these Bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any nomination, including by changing or adding nominees, or to submit any new nomination, or submit any new proposal, matters, business or resolutions proposed to be brought before a meeting of the stockholders.

(f)    In addition to the requirements of this Section 2.5 with respect to any nomination proposed to be made at a meeting, each Nominating Person shall comply with all applicable requirements of the Exchange Act with respect to any such nominations.  Notwithstanding the foregoing provisions of this Section 2.5, unless otherwise required by law, (i) no Nominating Person shall solicit proxies in support of director nominees other than the Corporation's nominees unless such Nominating Person has, or is part of a group that has, complied with Rule 14a-19 promulgated under the Exchange Act in connection with the solicitation of such proxies, including the provision to the Corporation of notices required thereunder, in accordance with the time frames required in this Section 2.5 or by Rule 14a-19 promulgated under the Exchange Act, as applicable, and (ii) if (1) any Nominating Person provides notice in accordance with Rule 14a-19(b) promulgated under the Exchange Act and (2) (x) such notice in accordance with Rule 14a-19(b) is not provided within the time period for Timely Notice or Special Meeting Timely Notice, as applicable, (y) such Nominating Person subsequently fails to comply with the requirements of Rule 14a-19(a)(2) or Rule 14a-19(a)(3) promulgated under the Exchange Act or (z) such Nominating Person fails to timely provide reasonable evidence sufficient to satisfy the Corporation that such Nominating Person has met the requirements of Rule 14a-19(a)(3) promulgated under the Exchange Act in accordance with the following sentence, then the nomination of such Nominating Person's proposed nominees shall be disregarded, notwithstanding that each such nominee is included as a nominee in the Corporation's proxy statement, notice of meeting or other proxy materials for any meeting of stockholders (or any supplement thereto) and notwithstanding that proxies or votes in respect of the election of such proposed nominees may have been received by the Corporation (which proxies and votes shall be disregarded). If any Nominating Person provides notice in accordance with Rule 14a-19(b) promulgated under the Exchange Act, such Nominating Person shall deliver to the Corporation, no later than seven (7) business days prior to the applicable meeting, reasonable evidence that it has met the requirements of Rule 14a-19(a)(3) promulgated under the Exchange Act.

<u>Additional Requirements for Valid Nomination of Candidates to Serve as Director and, if Elected, to be Seated as Directors.</u>

(a)    To be eligible to be a candidate for election as a director of the Corporation at an annual or special meeting, a candidate must be nominated in the manner prescribed in Section 2.5 and the candidate for nomination, whether nominated by the Board or by a stockholder of record, must have previously delivered , to the Secretary at the principal executive offices of the Corporation, (i) a completed written questionnaire (in the form provided by the Corporation within ten (10) days upon written request of any stockholder of record therefor) with respect to the background, qualifications, stock ownership and independence of such proposed nominee and (ii) a written representation and agreement (in the form provided by the Corporation within ten (10) days upon written request of any stockholder of record therefor) that such candidate for nomination (A) is not and, if elected as a director during his or her term of office, will not become a party to (1) any agreement, arrangement or understanding with, and has not given and will not give any commitment or assurance to, any person or entity as to how such proposed nominee, if elected as a director of the Corporation, will act or vote on any issue or question (a

9

"Voting Commitment") or (2) any Voting Commitment that could limit or interfere with such proposed nominee's ability to comply, if elected as a director of the Corporation, with such proposed nominee's fiduciary duties under applicable law, (B) is not, and will not become a party to, any agreement, arrangement or understanding with any person or entity other than the Corporation with respect to any direct or indirect compensation or reimbursement for service as a director that has not been disclosed therein, (C) if elected as a director of the Corporation, will comply, consistent with such person's fiduciary duties as a director, with all applicable corporate governance, conflict of interest, confidentiality, stock ownership and trading and other policies and guidelines of the Corporation applicable to directors and in effect during such person's term in office as a director (and, if requested by any candidate for nomination, the Secretary of the Corporation shall provide to such candidate for nomination all such policies and guidelines then in effect), and (D) if elected as a director of the Corporation, intends to serve the entire term until the next meeting at which such candidate would face re-election.

(b)     The Board may also require any proposed candidate for nomination as a director to furnish such other information related to such candidate's eligibility or qualification to serve as a director as may reasonably be requested by the Board in writing prior to the meeting of stockholders at which such candidate's nomination is to be acted upon. Without limiting the generality of the foregoing, the Board may request such other information in order for the Board to determine the eligibility of such candidate for nomination to be an independent director of the Corporation or to comply with the director qualification standards and additional selection criteria in accordance with the Corporation's Corporate Governance Guidelines. Such other information shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the request by the Board has been delivered to, or mailed and received by, the Nominating Person.

(c)     A candidate for nomination as a director shall further update and supplement the materials delivered pursuant to this Section 2.6, if necessary, so that the information provided or required to be provided pursuant to this Section 2.6 shall be true and correct as of the record date for stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other Section of these Bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any nomination or to submit any new proposal, including by changing or adding nominees, matters, business or resolutions proposed to be brought before a meeting of the stockholders.

(d)     No candidate nominated pursuant to Section 2.5(a)(ii) shall be eligible for nomination as a director of the Corporation unless such candidate for nomination and the Nominating Person seeking to place such candidate's name in nomination has complied with Section 2.5 and this Section 2.6, as applicable. The presiding officer at the meeting shall, if the facts warrant, determine that a nomination was not properly made in accordance with Section 2.5 and this Section 2.6, and if he or she should so determine, he or she shall so declare such determination to the meeting, the defective nomination shall be disregarded and any ballots cast for the candidate in question (but in the case of any form of ballot listing

10

other qualified nominees, only the ballots cast for the nominee in question) shall be void and of no force or effect.

**(e)** Notwithstanding anything in these Bylaws to the contrary, no candidate for nomination shall be eligible to be seated as a director of the Corporation unless nominated in accordance with Section 2.5 and this Section 2.6 and elected as a director.

Notice of Stockholders' Meetings.

Unless otherwise provided by law, the Certificate of Incorporation or these Bylaws, the notice of any meeting of stockholders shall be sent or otherwise given in accordance with Section 8.1 of these Bylaws not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting. The notice shall specify the place, if any, date and time of the meeting, the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting of stockholders, the purpose or purposes for which such meeting is called.

Quorum.

Unless otherwise provided by law, the Certificate of Incorporation or these Bylaws, the holders of a majority in voting power of the stock issued and outstanding and entitled to vote, present in person, or by remote communication, if applicable, or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of stockholders. A quorum, once established at a meeting, shall not be broken by the withdrawal of enough votes to leave less than a quorum. If, however, a quorum is not present or represented at any meeting of stockholders, then either (i) the person presiding over the meeting or (ii) a majority in voting power of the stockholders entitled to vote at the meeting, present in person, or by remote communication, if applicable, or represented by proxy, shall have power to adjourn the meeting from time to time in the manner provided in Section 2.9 of these Bylaws until a quorum is present or represented. At any recessed or adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.

Adjourned Meeting; Notice.

When a meeting is adjourned to another time or place, unless these Bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken or are provided in any other manner permitted by the DGCL. At any adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for determination of stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix as the record date for determining stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such meeting as of the record date so fixed for notice of such adjourned meeting.

Conduct of Business.

The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the person presiding over the

meeting. The Board may adopt by resolution such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board, the person presiding over any meeting of stockholders shall have the right and authority to convene and (for any or no reason) to recess and/or adjourn the meeting, to prescribe such rules, regulations and procedures (which need not be in writing) and to do all such acts as, in the judgment of such presiding person, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the person presiding over the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present (including, without limitation, rules and procedures for removal of disruptive persons from the meeting); (iii) limitations on attendance at or participation in the meeting to stockholders entitled to vote at the meeting, their duly authorized and constituted proxies or such other persons as the person presiding over the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. The presiding person at any meeting of stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting (including, without limitation, determinations with respect to the administration and/or interpretation of any of the rules, regulations or procedures of the meeting, whether adopted by the Board or prescribed by the person presiding over the meeting), shall, if the facts warrant, determine and declare to the meeting that a matter of business was not properly brought before the meeting and if such presiding person should so determine, such presiding person shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board or the person presiding over the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

Voting.

Except as may be otherwise provided in the Certificate of Incorporation, these Bylaws or the DGCL, each stockholder shall be entitled to one (1) vote for each share of capital stock held by such stockholder.

Except as otherwise provided by the Certificate of Incorporation, at all duly called or convened meetings of stockholders at which a quorum is present, for the election of directors, a plurality of the votes cast shall be sufficient to elect a director. Except as otherwise provided by the Certificate of Incorporation, these Bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or applicable law or pursuant to any regulation applicable to the Corporation or its securities, each other matter presented to the stockholders at a duly called or convened meeting at which a quorum is present shall be decided by the affirmative vote of the holders of a majority in voting power of the votes cast (excluding abstentions and broker non-votes) on such matter.

Record Date for Stockholder Meetings and Other Purposes.

In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall, unless otherwise required by law, not be more than sixty (60) days nor less than ten (10) days before the date of such meeting. If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on

the next day preceding the day on which notice is first given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting; and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of capital stock, or for the purposes of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

Proxies.

Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy authorized by an instrument in writing or by a transmission permitted by law, including Rule 14a-19 promulgated under the Exchange Act, filed in accordance with the procedure established for the meeting, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.  The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212 of the DGCL.  A proxy may be in the form of an electronic transmission which sets forth or is submitted with information from which it can be determined that the transmission was authorized by the stockholder.

Any stockholder directly or indirectly soliciting proxies from other stockholders must use a proxy card color other than white, which shall be reserved for the exclusive use by the Board.

List of Stockholders Entitled to Vote.

The Corporation shall prepare, no later than the tenth day before each meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting (provided, however, that if the record date for determining the stockholders entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of ten (10) days ending on the day before the meeting date: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the Corporation's principal executive office.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  Such list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.  Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this Section 2.14 or to vote in person or by proxy at any meeting of stockholders.

<u>Inspectors of Election</u>.

Before any meeting of stockholders, the Corporation shall appoint an inspector or inspectors of election to act at the meeting or its adjournment and make a written report thereof.  The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If any person appointed as inspector or any alternate fails to appear or fails or refuses to act, then the person presiding over the meeting shall appoint a person to fill that vacancy.

Such inspectors shall:

    (i)    determine the number of shares outstanding and the voting power of each, the number of shares represented at the meeting and the validity of any proxies and ballots;

    (ii)    count all votes or ballots;

    (iii)    count and tabulate all votes;

    (iv)    determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspector(s); and

    (v)    certify its or their determination of the number of shares represented at the meeting and its or their count of all votes and ballots.

Each inspector, before entering upon the discharge of the duties of inspector, shall take and sign an oath faithfully to execute the duties of inspection with strict impartiality and according to the best of such inspector's ability.  Any report or certificate made by the inspectors of election is prima facie evidence of the facts stated therein.  The inspectors of election may appoint such persons to assist them in performing their duties as they determine.

    2.16    <u>Delivery to the Corporation.</u>

Whenever this Article II requires one or more persons (including a record or beneficial owner of stock) to deliver a document or information to the Corporation or any officer, employee or agent thereof (including any notice, request, questionnaire, revocation, representation or other document or agreement), unless the Corporation otherwise consents, such document or information shall be in writing exclusively (and not in an electronic transmission) and shall be delivered exclusively by hand (including, without limitation, overnight courier service) or by certified or registered mail, return receipt requested, and the Corporation shall not be required to accept delivery of any document not in such written form or so delivered. For the avoidance of doubt, unless the Corporation otherwise consents, the Corporation expressly opts out of Section 116 of the DGCL with respect to the delivery of information and documents to the Corporation required by this Article II.

### Article III - Directors

<u>Powers</u>.

Except as otherwise provided by the Certificate of Incorporation or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board.

Number of Directors.

Subject to the Certificate of Incorporation, and subject to any contractual obligation of the Corporation to have a greater minimum number of directors, the total number of directors constituting the Board shall be determined from time to time by resolution of the Board. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

Election, Qualification and Term of Office of Directors.

Except as provided in Section 3.4 of these Bylaws, and subject to the Certificate of Incorporation, each director, including a director elected to fill a vacancy or newly created directorship, shall hold office until the expiration of the term of the class, if any, for which elected and until such director's successor is elected and qualified or until such director's earlier death, resignation, disqualification or removal. Directors need not be stockholders. The Certificate of Incorporation or these Bylaws may prescribe qualifications for directors.

Resignation and Vacancies.

Any director may resign at any time upon notice given in writing or by electronic transmission to the Corporation. The resignation shall take effect at the time specified therein or upon the happening of an event specified therein, and if no time or event is specified, at the time of its receipt. When one or more directors so resigns and the resignation is effective at a future date or upon the happening of an event to occur on a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in Section 3.3.

Unless otherwise provided in the Certificate of Incorporation or these Bylaws, vacancies resulting from the death, resignation, disqualification or removal of any director, and newly created directorships resulting from any increase in the authorized number of directors shall be filled only by a majority of the directors then in office, although less than a quorum, or by a sole remaining director.

Place of Meetings; Meetings by Telephone.

The Board may hold meetings, both regular and special, either within or outside the State of Delaware.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting pursuant to these Bylaws shall constitute presence in person at the meeting.

Regular Meetings.

Regular meetings of the Board may be held within or outside the State of Delaware and at such time and at such place as which has been designated by the Board and publicized among all directors, either orally or in writing, by telephone, including a voice-messaging system or other system designed to record and communicate messages, facsimile, or by electronic mail or other means of electronic transmission. No further notice shall be required for regular meetings of the Board.

Special Meetings; Notice.

Special meetings of the Board for any purpose or purposes may be called at any time by the chairperson of the Board, the Chief Executive Officer, the President, the Secretary or a majority of the total number of directors constituting the Board.

Notice of the time and place of special meetings shall be:

      (i)      delivered personally by hand, by courier or by telephone;

      (ii)     sent by United States first-class mail, postage prepaid;

      (iii)    sent by facsimile or electronic mail; or

      (iv)    sent by other means of electronic transmission,

directed to each director at that director's address, telephone number, facsimile number or electronic mail address, or other address for electronic transmission, as the case may be, as shown on the Corporation's records.

If the notice is (i) delivered personally by hand, by courier or by telephone, (ii) sent by facsimile or electronic mail, or (iii) sent by other means of electronic transmission, it shall be delivered or sent at least twenty-four (24) hours before the time of the holding of the meeting.  If the notice is sent by U.S. mail, it shall be deposited in the U.S. mail at least four (4) days before the time of the holding of the meeting. The notice need not specify the place of the meeting (if the meeting is to be held at the Corporation's principal executive office) nor the purpose of the meeting.

Quorum.

At all meetings of the Board, unless otherwise provided by the Certificate of Incorporation, a majority of the total number of directors shall constitute a quorum for the transaction of business.  The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the Certificate of Incorporation or these Bylaws.  If a quorum is not present at any meeting of the Board, then a majority of the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

Board Action without a Meeting.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission. After an action is taken, the consent or consents relating thereto shall be filed with the minutes of the proceedings of the Board, or the committee thereof, in the same paper or electronic form as the minutes are maintained. Such action by written consent or consent by electronic transmission shall have the same force and effect as a unanimous vote of the Board.

16

Fees and Compensation of Directors.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board shall have the authority to fix the compensation, including fees and reimbursement of expenses, of directors for services to the Corporation in any capacity.

## Article IV - Committees

Committees of Directors.

The Board may designate one (1) or more committees, each committee to consist, of one (1) or more of the directors of the Corporation.  The Board may designate one (1) or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.  Any such committee, to the extent provided in the resolution of the Board or in these Bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the Corporation.

Committee Minutes.

Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

Meetings and Actions of Committees.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of:

(i)     Section 3.5 (place of meetings; meetings by telephone);

(ii)    Section 3.6 (regular meetings);

(iii)   Section 3.7 (special meetings; notice);

(iv)    Section 3.8 (quorum);

(v)     Section 3.9 (board action without a meeting); and

(vi)    Section 7.13 (waiver of notice),

with such changes in the context of those Bylaws as are necessary to substitute the committee and its members for the Board and its members.  *However*:

(i)        the time of regular meetings of committees may be determined either by resolution of the Board or by resolution of the committee;

(ii)        special meetings of committees may also be called by resolution of the Board or the chairperson of the applicable committee; and

(iii)        the Board may adopt rules for the governance of any committee to override the provisions that would otherwise apply to the committee pursuant to this Section 4.3, provided that such rules do not violate the provisions of the Certificate of Incorporation or applicable law.

4.4    <u>Subcommittees.</u>

Unless otherwise provided in the Certificate of Incorporation, these Bylaws or the resolutions of the Board designating the committee, a committee may create one (1) or more subcommittees, each subcommittee to consist of one (1) or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee.

## Article V - Officers

<u>Officers.</u>

The officers of the Corporation shall include a Chief Executive Officer and a Secretary.  The Corporation may also have, at the discretion of the Board, a Chairperson of the Board, a Vice Chairperson of the Board, a President, a Chief Financial Officer, a Treasurer, one (1) or more Vice Presidents, one (1) or more Assistant Vice Presidents, one (1) or more Assistant Treasurers, one (1) or more Assistant Secretaries, and any such other officers as may be appointed in accordance with the provisions of these Bylaws.  Any number of offices may be held by the same person. No officer need be a stockholder or director of the Corporation.

<u>Appointment of Officers.</u>

The Board shall appoint the officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 of these Bylaws.

<u>Subordinate Officers.</u>

The Board may appoint, or empower the Chief Executive Officer or, in the absence of a Chief Executive Officer, the President, to appoint, such other officers and agents as the business of the Corporation may require.  Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board may from time to time determine.

<u>Removal and Resignation of Officers.</u>

Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board.

Any officer may resign at any time by giving written notice to the Corporation.  Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice.  Unless

otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective.  Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

> Vacancies in Offices.

Any vacancy occurring in any office of the Corporation shall be filled by the Board or as provided in Section 5.2.

> Representation of Shares of Other Corporations.

The Chairperson of the Board, the Chief Executive Officer, or the President of this Corporation, or any other person authorized by the Board, the Chief Executive Officer or the President, is authorized to vote, represent and exercise on behalf of this Corporation all rights incident to any and all shares or voting securities of any other corporation or other person standing in the name of this Corporation.  The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

> Authority and Duties of Officers.

All officers of the Corporation shall respectively have such authority and perform such duties in the management of the business of the Corporation as may be provided herein or designated from time to time by the Board and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.

5.8   Compensation.

The compensation of the officers of the Corporation for their services as such shall be fixed from time to time by or at the direction of the Board. An officer of the Corporation shall not be prevented from receiving compensation by reason of the fact that he or she is also a director of the Corporation.

## Article VI - Records

A stock ledger consisting of one or more records in which the names of all of the Corporation's stockholders of record, the address and number of shares registered in the name of each such stockholder, and all issuances and transfers of stock of the corporation are recorded in accordance with Section 224 of the DGCL shall be administered by or on behalf of the Corporation.  Any records administered by or on behalf of the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or by means of, or be in the form of, any information storage device, or method, or one or more electronic networks or databases (including one or more distributed electronic networks or databases), provided that the records so kept can be converted into clearly legible paper form within a reasonable time and, with respect to the stock ledger, that the records so kept (i) can be used to prepare the list of stockholders specified in Sections 219 and 220 of the DGCL, (ii) record the information specified in Sections 156, 159, 217(a) and 218 of the DGCL, and (iii) record transfers of stock as governed by Article 8 of the Uniform Commercial Code as adopted in the State of Delaware.

## Article VII - General Matters

Execution of Corporate Contracts and Instruments.

The Board, except as otherwise provided in these Bylaws, may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances.

Stock Certificates.

The shares of the Corporation shall be represented by certificates, provided that the Board by resolution may provide that some or all of the shares of any class or series of stock of the Corporation shall be uncertificated. Certificates for the shares of stock, if any, shall be in such form as is consistent with the Certificate of Incorporation and applicable law. Every holder of stock represented by a certificate shall be entitled to have a certificate signed by, or in the name of the Corporation by, any two officers authorized to sign stock certificates representing the number of shares registered in certificate form. The Chairperson or Vice Chairperson of the Board, Chief Executive Officer, the President, Vice President, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Corporation shall be specifically authorized to sign stock certificates. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

The Corporation may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. Upon the face or back of each stock certificate issued to represent any such partly paid shares, or upon the books and records of the Corporation in the case of uncertificated partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on fully paid shares, the Corporation shall declare a dividend upon partly paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

7.3     Special Designation of Certificates.

If the Corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or on the back of the certificate that the Corporation shall issue to represent such class or series of stock (or, in the case of uncertificated shares, set forth in a notice provided pursuant to Section 151 of the DGCL); provided, however, that except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock (or, in the case of any uncertificated shares, included in the aforementioned notice) a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights. Except as otherwise expressly provided by law, the rights and obligations of the holders of uncertificated stock and the rights and obligations of the holders of certificates representing stock of the same class and series shall be identical.

Lost Certificates.

Except as provided in this Section 7.4, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the Corporation and cancelled at the same time. The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

Shares Without Certificates.

The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.

Construction; Definitions.

Unless the context requires otherwise, the general provisions, rules of construction and definitions in the DGCL shall govern the construction of these Bylaws.  Without limiting the generality of this provision, the singular number includes the plural and the plural number includes the singular.

Dividends.

The Board, subject to any restrictions contained in either (i) the DGCL or (ii) the Certificate of Incorporation, may declare and pay dividends upon the shares of its capital stock.  Dividends may be paid in cash, in property or in shares of the Corporation's capital stock.

The Board may set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the Corporation, and meeting contingencies.

Fiscal Year.

The fiscal year of the Corporation shall be fixed by resolution of the Board and may be changed by the Board.

Seal.

The Corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board.  The Corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

Transfer of Stock.

Shares of the Corporation shall be transferable in the manner prescribed by law and in these Bylaws. Shares of stock of the Corporation shall be transferred on the books of the Corporation only by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Corporation of the certificate or certificates representing such shares endorsed by the appropriate person or persons (or

by delivery of duly executed instructions with respect to uncertificated shares), with such evidence of the authenticity of such endorsement or execution, transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps.  No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing the names of the persons from and to whom it was transferred.

Stock Transfer Agreements.

The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes or series of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes or series owned by such stockholders in any manner not prohibited by the DGCL.

Registered Stockholders.

The Corporation:

(i)       shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and notices and to vote as such owner; and

(ii)       shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

Waiver of Notice.

Whenever notice is required to be given under any provision of the DGCL, the Certificate of Incorporation or these Bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, the Board or any committee of the Board, as the case may be, need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate of Incorporation or these Bylaws.

7.14    FOCI Mitigation Plan Compliance.

For so long as the Company maintains a facility security clearance with the Defense Counterintelligence and Security Agency of the United States Department of Defense ("DCSA") and, following the adoption of a foreign ownership control and influence mitigation plan ("FOCI Mitigation Plan") pursuant to 32 C.F.R. § 117.11(d) and until such time as such FOCI Mitigation Plan is terminated by DCSA or otherwise not required to be maintained by the Company, the FOCI Mitigation Plan shall remain in full force and effect (subject to applicable law) and any conflict between the FOCI Mitigation Plan and these Bylaws shall be resolved in favor of the FOCI Mitigation Plan.

## Article VIII - Notice

<u>Delivery of Notice; Notice by Electronic Transmission</u>.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under any provisions of the DGCL, the Certificate of Incorporation, or these Bylaws may be given in writing directed to the stockholder's mailing address (or by electronic transmission directed to the stockholder's electronic mail address, as applicable) as it appears on the records of the Corporation and shall be given (1) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (2) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's address or (3) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given.  Any such consent shall be revocable by the stockholder by written notice or electronic transmission to the Corporation. Notwithstanding the provisions of this paragraph, the Corporation may give a notice by electronic mail in accordance with the first paragraph of this section without obtaining the consent required by this paragraph.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(i)      if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(ii)      if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

(iii)      if by any other form of electronic transmission, when directed to the stockholder.

Notwithstanding the foregoing, a notice may not be given by an electronic transmission from and after the time that (1) the Corporation is unable to deliver by such electronic transmission two (2) consecutive notices given by the Corporation and (2) such inability becomes known to the Secretary or an Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice, provided, however, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

An affidavit of the Secretary or an Assistant Secretary or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

### Article IX - Indemnification

Indemnification of Directors and Officers.

The Corporation shall indemnify and hold harmless, to the fullest extent permitted by the DGCL as it presently exists or may hereafter be amended, any director or officer of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding") by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while serving as a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans (a "covered person"), against all liability and loss suffered and expenses (including attorneys' fees, judgments, fines ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred by such person in connection with any such Proceeding.   Notwithstanding the preceding sentence, except as otherwise provided in Section 9.4, the Corporation shall be required to indemnify a person in connection with a Proceeding initiated by such person only if the Proceeding was authorized in the specific case by the Board.

Indemnification of Others.

The Corporation shall have the power to indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any employee or agent of the Corporation or any other person serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, who is not a covered person, who was or is made or is threatened to be made a party or is otherwise involved in any Proceeding by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was an employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding.

Prepayment of Expenses.

The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by any covered person, and may pay the expenses incurred by any employee or agent of the Corporation, in defending any Proceeding in advance of its final disposition; provided, however, that such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the person to repay all amounts advanced if it should be ultimately determined that the person is not entitled to be indemnified under this Article IX or otherwise.

Determination; Claim.

If a claim for indemnification (following the final disposition of such Proceeding) under this Article IX is not paid in full within sixty (60) days, or a claim for advancement of expenses under this Article IX is not paid in full within thirty (30) days, after a written claim therefor has been received by the Corporation the claimant may thereafter (but not before) file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by law.  In any such action the Corporation shall have the burden of proving that the claimant was not entitled to the requested indemnification or payment of expenses under applicable law.

Non-Exclusivity of Rights.

The rights conferred on any person by this Article IX shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

Insurance.

The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust enterprise or non-profit entity against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of the DGCL.

Other Indemnification.

The Corporation's obligation, if any, to indemnify or advance expenses to any person who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or non-profit entity shall be reduced by any amount such person may collect as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or non-profit enterprise.

Continuation of Indemnification.

The rights to indemnification and to prepayment of expenses provided by, or granted pursuant to, this Article IX shall continue notwithstanding that the person has ceased to be a director or officer of the Corporation and shall inure to the benefit of the estate, heirs, executors, administrators, legatees and distributees of such person.

Amendment or Repeal; Interpretation.

The provisions of this Article IX shall constitute a contract between the Corporation, on the one hand, and, on the other hand, each individual who serves or has served as a director or officer of the Corporation (whether before or after the adoption of these Bylaws), in consideration of such person's performance of such services, and pursuant to this Article IX the Corporation intends to be legally bound to each such current or former director or officer of the Corporation. With respect to current and former directors and officers of the Corporation, the rights conferred under this Article IX are present contractual rights and such rights are fully vested, and shall be deemed to have vested fully, immediately upon adoption of these Bylaws. With respect to any directors or officers of the Corporation who commence service following adoption of these Bylaws, the rights conferred under this provision shall be present contractual rights and such rights shall fully vest, and be deemed to have vested fully, immediately upon such director or officer commencing service as a director or officer of the Corporation. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection (i) hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification or (ii) under any agreement providing for indemnification or advancement of expenses to an officer or director of the Corporation in effect prior to the time of such repeal or modification.

Any reference to an officer of the Corporation in this Article IX shall be deemed to refer exclusively to the Chief Executive Officer, President, and Secretary, or other officer of the Corporation appointed by (x) the Board pursuant to Article V of these Bylaws or (y) an officer to whom the Board has delegated the

power to appoint officers pursuant to Article V of these Bylaws, and any reference to an officer of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be deemed to refer exclusively to an officer appointed by the board of directors (or equivalent governing body) of such other entity pursuant to the certificate of incorporation and bylaws (or equivalent organizational documents) of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise. The fact that any person who is or was an employee of the Corporation or an employee of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise has been given or has used the title of "Vice President" or any other title that could be construed to suggest or imply that such person is or may be an officer of the Corporation or of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall not result in such person being constituted as, or being deemed to be, an officer of the Corporation or of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise for purposes of this Article IX.

## Article X - Amendments

The Board is expressly empowered to adopt, amend or repeal the Bylaws of the Corporation. The stockholders also shall have power to adopt, amend or repeal the Bylaws of the Corporation; provided, however, that such action by stockholders shall require, in addition to any other vote required by the Certificate of Incorporation or applicable law, the affirmative vote of the holders of at least two-thirds of the voting power of all the then-outstanding shares of voting stock of the Corporation with the power to vote generally in an election of directors, voting together as a single class.

## Article XI - Definitions

As used in these Bylaws, unless the context otherwise requires, the following terms shall have the following meanings:

An "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

An "electronic mail" means an electronic transmission directed to a unique electronic mail address (which electronic mail shall be deemed to include any files attached thereto and any information hyperlinked to a website if such electronic mail includes the contact information of an officer or agent of the Corporation who is available to assist with accessing such files and information).

An "electronic mail address" means a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox (commonly referred to as the "local part" of the address) and a reference to an internet domain (commonly referred to as the "domain part" of the address), whether or not displayed, to which electronic mail can be sent or delivered.

The term "person" means any individual, general partnership, limited partnership, limited liability company, corporation, trust, business trust, joint stock company, joint venture, unincorporated association, cooperative or association or any other legal entity or organization of whatever nature, and shall include any successor (by merger or otherwise) of such entity.

**EXHIBIT K-2**

**Wolfspeed, Inc. Amended and Restated Certificate of Incorporation**

*[Plan Supplement Filing Version 8/19/2025]*
*DRAFT – SUBJECT TO PARTIES' ONGOING REVIEW AND COMMENT*

## CERTIFICATE OF INCORPORATION
## OF
## WOLFSPEED, INC.

I, the undersigned, for the purposes of incorporating and organizing a corporation under the General Corporation Law of the State of Delaware, do execute this Certificate of Incorporation and do hereby certify as follows:

### ARTICLE I

The name of the corporation is Wolfspeed, Inc. (the "Corporation").

### ARTICLE II

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801, and the name of its registered agent at such address is The Corporation Trust Company.

### ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "DGCL") as it now exists or may hereafter be amended and supplemented.

### ARTICLE IV

The Corporation is authorized to issue two classes of stock to be designated, respectively, "Common Stock" and "Preferred Stock."  The total number of shares of capital stock which the Corporation shall have authority to issue is [ ● ].  The total number of shares of Common Stock that the Corporation is authorized to issue is [ ● ], having a par value of $0.00125 per share, and the total number of shares of Preferred Stock that the Corporation is authorized to issue is [ ● ], having a par value of $0.00125 per share.

### ARTICLE V

The designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation are as follows:

A.  COMMON STOCK.

1.  General.    The voting, dividend, liquidation and other rights and powers of the Common Stock are subject to and qualified by the rights, powers and preferences of any series of Preferred Stock as may be designated by the Board of Directors of the Corporation (the "Board of Directors") and outstanding from time to time.

2.  Voting.    Except as otherwise provided herein or expressly required by law, each holder of Common Stock, as such, shall be entitled to vote on each matter submitted to a vote

of stockholders and shall be entitled to one (1) vote for each share of Common Stock held of record by such holder as of the record date for determining stockholders entitled to vote on such matter. Except as otherwise required by law, holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate of Incorporation (as the same may be amended and/or restated from time to time, including by any Certificate of Designation (as defined below), the "Certificate of Incorporation") that relates solely to the rights, powers, preferences (or the qualifications, limitations or restrictions thereof) or other terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation (including any Certificate of Designation) or pursuant to the DGCL.

Subject to the rights of any holders of any outstanding series of Preferred Stock, the number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the requisite vote of the stockholders entitled to vote thereon, without a separate vote of the holders of the Preferred Stock or the Common Stock voting as a separate class, irrespective of the provisions of Section 242(b)(2) of the DGCL.

3. <u>Dividends</u>. Subject to applicable law and the rights and preferences of any holders of any outstanding series of Preferred Stock, the holders of Common Stock, as such, shall have equal rights of participation in the dividends on the Common Stock when, as and if declared by the Board of Directors in accordance with applicable law.

4. <u>Liquidation</u>. Subject to the rights and preferences of any holders of any shares of any outstanding series of Preferred Stock, in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the funds and assets of the Corporation that may be legally distributed to the Corporation's stockholders shall be distributed among the holders of the then outstanding Common Stock <u>pro rata</u> in accordance with the number of shares of Common Stock held by each such holder.

B. <u>PREFERRED STOCK</u>

Shares of Preferred Stock may be issued from time to time in one or more series, each of such series to have such terms as stated or expressed herein and in the resolution or resolutions providing for the creation and issuance of such series adopted by the Board of Directors as hereinafter provided.

Authority is hereby expressly granted to the Board of Directors from time to time to issue the Preferred Stock in one or more series, and in connection with the creation of any such series, by adopting a resolution or resolutions providing for the issuance of the shares thereof and by filing a certificate of designation relating thereto in accordance with the DGCL (each certificate, as the same may be amended and/or restated from time to time, a "Certificate of Designation"), to determine and fix the number of shares of such series and such voting powers, full or limited, or no voting powers, and such designations, preferences and relative participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including without limitation thereof, dividend rights, conversion rights, redemption privileges and liquidation preferences, and to increase or decrease (but not below the number of shares of such series then outstanding) the

2

number of shares of any series as shall be stated and expressed in such resolutions, all to the fullest extent now or hereafter permitted by the DGCL. Without limiting the generality of the foregoing, the resolution or resolutions providing for the creation and issuance of any series of Preferred Stock may provide that such series shall be superior or rank equally or be junior to any other series of Preferred Stock to the extent permitted by law and this Certificate of Incorporation (including any Certificate of Designation). Except as otherwise required by law, holders of any series of Preferred Stock shall be entitled only to such voting rights, if any, as shall expressly be granted thereto by this Certificate of Incorporation (including any Certificate of Designation).

The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the requisite vote of the stockholders entitled to vote thereon, without a separate vote of the holders of the Preferred Stock or the Common Stock voting as a separate class, irrespective of the provisions of Section 242(b)(2) of the DGCL.

## ARTICLE VI

For the management of the business and for the conduct of the affairs of the Corporation it is further provided that:

A. Except as otherwise expressly provided by the DGCL or this Certificate of Incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The number of directors which shall constitute the whole Board of Directors shall be the number of directors fixed from time to time in accordance with the bylaws of the Corporation (the "Bylaws").

B. Subject to the special rights of the holders of one or more outstanding series of Preferred Stock to elect directors, the Board of Directors or any individual director may be removed from office at any time, with or without cause and only by the affirmative vote of the holders of at least two-thirds of the voting power of all of the then outstanding shares of voting stock of the Corporation entitled to vote at an election of directors.

C. Subject to the special rights of the holders of one or more outstanding series of Preferred Stock to elect directors, except as otherwise provided by law, any vacancies on the Board of Directors resulting from death, resignation, disqualification, retirement, removal or other causes and any newly created directorships resulting from any increase in the number of directors shall be filled exclusively by the affirmative vote of a majority of the directors then in office, even though less than a quorum, or by a sole remaining director (other than any directors elected by the separate vote of one or more outstanding series of Preferred Stock), and shall not be filled by the stockholders. Any director appointed in accordance with the preceding sentence shall hold office until the expiration of the term of the class to which such director shall have been appointed or until his or her earlier death, resignation, retirement, disqualification or removal.

D. Whenever the holders of any one or more series of Preferred Stock issued by the Corporation shall have the right, voting separately as a series or separately as a class with one or more such other series, to elect directors at an annual or special meeting of stockholders, the election, term of office, removal and other features of such directorships shall be governed by the

3

terms of this Certificate of Incorporation (including any Certificate of Designation). Notwithstanding anything to the contrary in this Article VI, the number of directors that may be elected by the holders of any such series of Preferred Stock shall be in addition to the number fixed pursuant to paragraph A of this Article VI, and the total number of directors constituting the whole Board of Directors shall be automatically adjusted accordingly. Except as otherwise provided in the Certificate of Designation(s) in respect of one or more series of Preferred Stock, whenever the holders of any series of Preferred Stock having such right to elect additional directors are divested of such right pursuant to the provisions of such Certificate of Designation(s), the terms of office of all such additional directors elected by the holders of such series of Preferred Stock, or elected to fill any vacancies resulting from the death, resignation, disqualification or removal of such additional directors, shall forthwith terminate (in which case each such director thereupon shall cease to be qualified as, and shall cease to be, a director) and the total authorized number of directors of the Corporation shall automatically be reduced accordingly.

E.   In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to adopt, amend or repeal Bylaws. In addition to any vote of the holders of any class or series of stock of the Corporation required by applicable law or by this Certificate of Incorporation (including any Certificate of Designation in respect of one or more series of Preferred Stock) or the Bylaws, the adoption, amendment or repeal of the Bylaws by the stockholders of the Corporation shall require the affirmative vote of the holders of at least two-thirds of the voting power of all of the then outstanding shares of voting stock of the Corporation entitled to vote generally in an election of directors.

F. The directors of the Corporation need not be elected by written ballot unless the Bylaws so provide.

## ARTICLE VII

A.      Any action required or permitted to be taken by the stockholders of the Corporation must be effected at an annual or special meeting of stockholders of the Corporation and shall not be taken by consent in lieu of a meeting.  Notwithstanding the foregoing, any action required or permitted to be taken by the holders of any outstanding series of Preferred Stock, voting separately as a series or separately as a class with one or more other such series, may be taken without a meeting, without prior notice and without a vote, to the extent expressly so provided by the applicable Certificate of Designation(s) relating to such series of Preferred Stock, if a consent or consents, setting forth the action so taken, shall be signed by the holders of outstanding shares of the relevant series of Preferred Stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation in accordance with the applicable provisions of the DGCL.

B.      Subject to the special rights of the holders of one or more outstanding series of Preferred Stock, special meetings of stockholders of the Corporation may be called, for any purpose or purposes, at any time only by or at the direction of the Board of Directors, the Chairperson of the Board of Directors, the Chief Executive Officer or President, and shall not be called by any other person or persons.

C.      Advance notice of stockholder nominations for the election of directors and of other business proposed to be brought by stockholders before any meeting of stockholders of the Corporation shall be given in the manner provided in the Bylaws.

## ARTICLE VIII

No director or officer of the Corporation shall have any personal liability to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty as a director or officer, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL as the same exists or hereafter may be amended.  Any amendment, repeal or modification of this Article VIII, or the adoption of any provision of the Certificate of Incorporation inconsistent with this Article VIII, shall not adversely affect any right or protection of a director or officer of the Corporation with respect to any act or omission occurring prior to such amendment, repeal, modification or adoption.  If the DGCL is amended after approval by the stockholders of this Article VIII to authorize corporate action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL as so amended.

## ARTICLE IX

The Corporation shall have the power to provide rights to indemnification and advancement of expenses to its current and former officers, directors, employees and agents and to any person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise.

## ARTICLE X

Unless the Corporation consents in writing to the selection of an alternative forum, (a) the Court of Chancery (the "Chancery Court") of the State of Delaware (or, in the event that the Chancery Court does not have jurisdiction, the federal district court for the District of Delaware or other state courts of the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action, suit or proceeding brought on behalf of the Corporation, (ii) any action, suit or proceeding asserting a claim of breach of a fiduciary duty owed by any director, officer or stockholder of the Corporation to the Corporation or to the Corporation's stockholders, (iii) any action, suit or proceeding arising pursuant to any provision of the DGCL or the Bylaws or this Certificate of Incorporation (as either may be amended from time to time) or (iv) any action, suit or proceeding asserting a claim against the Corporation governed by the internal affairs doctrine; and (b) subject to the preceding provisions of this Article X, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause or causes of action arising under the Securities Act of 1933, as amended, including all causes of action asserted against any defendant to such complaint. If any action the subject matter of which is within the scope of clause (a) of the immediately preceding sentence is filed in a court other than the courts in the State of Delaware (a "Foreign Action") in the name of any stockholder, such stockholder shall be deemed, to the fullest extent permitted by law, to have consented to (x) the personal jurisdiction of the state and federal courts in the State of Delaware in connection with any action brought in any such court to enforce the provisions of clause (a) of the immediately preceding sentence and (y) having service of process made upon

such stockholder in any such action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder.

Any person or entity purchasing or otherwise acquiring any interest in any security of the Corporation shall be deemed to have notice of and consented to this Article X.  This Article X is intended to benefit and may be enforced by the Corporation, its officers and directors, the underwriters to any offering giving rise to such complaint, and any other professional or entity whose profession gives authority to a statement made by that person or entity and who has prepared or certified any part of the documents underlying the offering.  Notwithstanding the foregoing, the provisions of this Article X shall not apply to suits brought to enforce any liability or duty created by the Securities Exchange Act of 1934, as amended, or any other claim for which the federal courts of the United States have exclusive jurisdiction.

If any provision or provisions of this Article X shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever, (a) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article X (including, without limitation, each portion of any paragraph of this Article X containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (b) the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

## ARTICLE XI

A.  Notwithstanding anything contained in this Certificate of Incorporation to the contrary, in addition to any vote required by applicable law, the following provisions in this Certificate of Incorporation may be amended, altered, repealed or rescinded, in whole or in part, or any provision inconsistent therewith or herewith may be adopted, only by the affirmative vote of the holders of at least 66 2/3% of the total voting power of all the then outstanding shares of stock of the Corporation entitled to vote thereon, voting together as a single class: Part B of Article V, Article VI, Article VII, Article VIII, Article IX, Article X, and this Article XI.

B.  If any provision or provisions of this Certificate of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (i) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Certificate of Incorporation (including, without limitation, each portion of any paragraph of this Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not, to the fullest extent permitted by applicable law, in any way be affected or impaired thereby and (ii) to the fullest extent permitted by applicable law, the provisions of this Certificate of Incorporation (including, without limitation, each such portion of any paragraph of this Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service to or for the benefit of the Corporation to the fullest extent permitted by law.

## ARTICLE XII

A.      The Corporation hereby renounces any interest or expectancy in, or in any rights to be offered an opportunity to participate in, any business opportunity which may be a corporate opportunity that is presented to or acquired, created, or developed by, or otherwise comes into the possession of any member of the Board of Directors who is not an employee of the Corporation or his or her Affiliates (such Persons (as defined below) collectively referred to as "Identified Persons" and, individually, as an "Identified Person"), except as provided in Article XII(B). Subject to Article XII(B), in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself, herself or himself and the Corporation or any of its Affiliates, to the fullest extent permitted by law, such Identified Person (a) shall have no obligation to (i) communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates, (ii) refrain from engaging in such corporate opportunity, (iii) make or refrain from making investments in such corporate opportunity or (iv) otherwise refrain from competing with the Corporation or any of its Affiliates with respect to such corporate opportunity, and (b) shall not (I) be deemed to have acted in bad faith or in a manner inconsistent with the best interests of the Corporation or its stockholders or to have acted in a manner inconsistent with or opposed to any fiduciary duty to the Corporation or its stockholders or (II) be liable to the Corporation or its stockholders for breach of any fiduciary duty as a stockholder, director or officer of the Corporation, in each case, solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person, except to the extent such actions are in breach of this Article XII.

B.      The Corporation does not renounce its interest in any corporate opportunity offered to any Identified Person if such opportunity is offered to such person in his or her capacity as a director or officer of the Corporation and the provisions of Article XII(A) shall not apply to any such corporate opportunity.

C.      In addition to and notwithstanding the foregoing provisions of this Article XII, a corporate opportunity shall not be deemed to be a potential corporate opportunity for the Corporation if it is a business opportunity that the Corporation is not legally permitted to undertake.

D.      For purposes of this Article XII, (i) "Affiliate" shall mean a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another Person; and (ii) "Person" shall mean any individual, corporation, general or limited partnership, limited liability company, joint venture, trust, association or any other entity.

E.      To the fullest extent permitted by law, any Person purchasing or otherwise acquiring any interest in any shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this Article XII.

## ARTICLE XIII

The incorporator of the Corporation is [●], whose mailing address is [●].

7

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Incorporation as of this ___ day of _____, 2025.

_____
Name:
Incorporator