**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------- x
                                                        :
In re:                                                  :    Chapter 11
                                                        :
WOLFSPEED, INC., et al.,                                :    Case No. 25-90163 (CML)
                                                        :
                  Debtors.¹                             :    (Jointly Administered)
                                                        :
------------------------------------------------------- x
```

**DECLARATION OF DANIEL HUGO IN SUPPORT
OF (I) APPROVAL OF DISCLOSURE STATEMENT
AND (II) CONFIRMATION OF JOINT PREPACKAGED
CHAPTER 11 PLAN OF WOLFSPEED, INC. AND ITS DEBTOR AFFILIATE**

I, Daniel Hugo, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

1.      I am the Deputy Chief Restructuring Officer ("***Deputy CRO***") of Wolfspeed, Inc. ("***Wolfspeed***", together with its debtor affiliate in the above-captioned Chapter 11 Cases, the "***Debtors***").

2.      The Debtors, together with their non-debtor affiliates (collectively, the "***Company***"), are a leading producer of wide bandgap semiconductors, silicon carbide materials, and gallium nitride materials.  The Company's products are used in a broad range of applications, including electric vehicles, motor drives, power supplies, military communications, radar, satellite, and telecommunications.  Established in 1987, the Company's headquarters are located in Durham,

---

[1]   The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: Wolfspeed, Inc. (2719) and Wolfspeed Texas LLC (0339).  The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

North Carolina and the majority of the Company's products are manufactured at the Company's production facilities in North Carolina, New York, and Arkansas.

3.      I was appointed as Deputy CRO in June 2025.  Prior to my appointment as Deputy CRO, I provided financial advisory services to the Debtors in connection with my role as a Senior Managing Director at FTI Consulting, Inc. ("**FTI**"), financial advisor to the Debtors.  Since commencing work for the Debtors in April 2025, together with the FTI team, I have been personally involved with the Debtors' business and operations and their restructuring process. Accordingly, I have acquired significant knowledge of the Debtors, their business, and the circumstances that led to the commencement of the Chapter 11 Cases, as well as the Debtors' financial affairs, capital structure, operations, and related matters.

4.      I have held the position of Senior Managing Director at FTI since January 2018. Prior to that time, I held positions within FTI's Turnaround and Restructuring Services practice as Managing Director (April 2015–January 2018), Senior Director (April 2014–April 2015), Director (April 2011–April 2014), and Senior Consultant (January 2009–April 2011).  During the more than sixteen (16) years that I have spent with FTI, I have led or otherwise been actively involved in the restructuring or reorganization of companies with annual revenues between $400 million and as much as $17 billion, including Frontier Communications Corporation; Petmate Holding Co; Claire's Stores, Inc.; DACCO Transmission Parts (NY), Inc.; RG Steel, LLC; Archbrook Laguna LLC; Hines Horticulture, Inc.; Canwest Global Communications Corp.; BHM Technologies Holdings, Inc.; Transportation Management Services, Inc.; Bally Total Fitness Corporation; Terra Construction Inc; and 24 Hour Fitness Worldwide, Inc.  In addition, I have served in numerous interim management roles for various companies.  I received a Bachelor of Business of Administration from Western Illinois University and a Master of Business Administration from

DePaul University.  Additionally, I am a Certified Turnaround Professional, a designation issued by the Turnaround Management Association.

5.      I submit this declaration (the "***Declaration***") in support of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate* [Docket No. 8] (as may be amended, modified, supplemented, or restated, the "***Plan***")[2], including the agreements and other documents set forth in those certain Plan Supplements, dated August 12, 2025 [Docket No. 168], August 19, 2025 [Docket No. 213], August 21, 2025 [Docket No. 236], September 4, 2025 [Docket No. 267], and September 5, 2025 [Docket No. 268] (the documents contained therein, as they have been or may be amended, modified, restated, or supplemented, collectively, the "***Plan Supplement***").  I am generally knowledgeable about and familiar with the terms and provisions of the Plan and the Plan Supplement.

6.      Except as otherwise indicated herein, the facts set forth in this Declaration (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, my experience with the Debtors' operations and finances, and my discussions with the Debtors' advisors, including Latham & Watkins LLP, Hunton Andrews Kurth LLP, Epiq Corporate Restructuring, LLC, FTI, and Perella Weinberg Partners LP (collectively, the "***Advisors***").  If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

7.      I am knowledgeable and familiar with the Debtors' business and financial affairs, the circumstances leading to the commencement of the Chapter 11 Cases, and the terms of the Plan.  Based on my personal involvement in the negotiation and implementation of the transactions embodied in the Plan and the Chapter 11 Cases, as well as my discussions with the board of

---

[2]    Capitalized terms used but not defined herein have the meaning ascribed to them in the Plan.

directors of Wolfspeed, Inc. (the "***Board***"), the finance committee comprised of three independent directors established by the Board (the "***Finance Committee***"), the Advisors, and other members of the Debtors' management team, I believe that (i) the Plan was proposed in good faith and (ii) the Debtors, acting through their officers, directors, managers, and Advisors, have conducted themselves in good faith and fairly in relation to the formulation, negotiation, and solicitation of votes on the Plan.

## Debtors' Objectives

8.      The Debtors commenced the Chapter 11 Cases with a prepackaged chapter 11 plan and a clear strategy to achieve their financial and strategic objectives, including to:

- implement the consensual Restructuring Transactions set forth in the Plan to substantially reduce the Company's balance sheet liabilities upon emergence and reduce the Company's annual cash interest expenses;

- right-size the Debtors' capital structure and maintain customer confidence in the Company and its innovative suite of products;

- preserve the assets of the Debtors' Estates while ensuring the claims of the Debtors' general unsecured creditors, such as vendors, suppliers, and landlords are unimpaired under the Plan and undisputed general unsecured claims will be satisfied in full in the ordinary course of business;

- secure the support of the Debtors' major stakeholders, including the substantial majority of holders of Senior Secured Notes and Convertible Notes, as well as Renesas; and

- minimize the impact of the Chapter 11 Cases by maintaining vendor and supplier contracts, assuming leases, preserving customer relationships, and ensuring employees' wages will be paid as usual.

9.      As previously described in the First Day Declaration,[3] the Debtors faced the upcoming maturity date of the 2026 Convertible Notes and the uncertainty of whether they would receive CHIPS Act (as defined in the First Day Declaration) funding and arrived at the Plan after

---

[3]    "***First Day Declaration***" means *Declaration of Daniel Hugo in Support of Debtors' Chapter 11 Petitions and First Day Relief*, as filed on June 30, 2025 [Docket No. 5].

substantial, good-faith efforts by the Debtors and their Advisors to develop viable strategic alternatives, including attempts to reorganize the Debtors' capital structure out-of-court.

10.     With the support of (i) an ad hoc group of secured noteholders (the "***Ad Hoc Senior Secured Noteholder Group***") that collectively hold, own, or control more than 97% of the aggregate outstanding principal amount of the Senior Secured Notes, (ii) an ad hoc group of unsecured noteholders (the "***Ad Hoc 26s/28s/29s Noteholder Group***") that collectively hold, own, or control more than 67% of the aggregate outstanding principal amount of the Convertible Notes, and (iii) Renesas Electronics America Inc. ("***Renesas***" and, together with the Ad Hoc Senior Secured Noteholder Group and the Ad Hoc 26s/28s/29s Noteholder Group, the "***Consenting Creditors***") which holds, owns, or controls 100% of the outstanding principal amount of loans under the Customer Refundable Deposit Agreement (the "***CRD***"), the reorganization embodied in the Plan will reduce the Company's funded indebtedness and interest expense, increase its liquidity, allow the Company to continue operating in the ordinary course of business with minimal disruption, and finance the Company's go-forward business through the exit financing.

11.     Specifically, the Plan will, among other things: (i) reduce the Company's total funded debt (including accrued but unpaid interest) by approximately $4.6 billion, (ii) settle all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest, including pursuant to the transactions set forth in the Restructuring Support Agreement (as defined below) and Plan, and (iii) pay holders of General Unsecured Claims in full.

12.     I believe that the reorganization embodied in the Plan will significantly enhance the Debtors' long-term viability and competitive position, as it will reduce the Debtors' debt burden

and enable the Company's senior management team to dedicate their efforts toward operational performance and value creation. Once approved, the Plan will allow the Reorganized Debtors to emerge as a stronger enterprise for their customers and stakeholders by de-leveraging its balance sheet. Accordingly, I believe the Plan should be confirmed.

### Development of Plan

13.     As noted above, the fully consensual Plan is the result of months of extensive good faith, arm's-length negotiations among the Debtors and key parties in interest, which agreed to support the Plan pursuant to the *Restructuring Support Agreement*, dated as of June 22, 2025, by and among the Debtors and the Consenting Creditors (including all exhibits, annexes, and schedules attached thereto, as the same may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "***Restructuring Support Agreement***"). The proposed restructuring will be effectuated pursuant to the Plan and contemplates, in relevant part, the following:

- Each Holder of Convertible Notes Claims was provided the opportunity to participate in a rights offering in an aggregate principal amount equal to $301.125 million (the "***Rights Offering***");

- The following treatment of Claims and Interests:

    o   Holders of an Allowed Other Secured Claim and an Allowed Other Priority Claim will be unimpaired under the Plan. For the avoidance of doubt, each Holder of a Commitment Fee Claim has agreed to receive, and shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Commitment Fee Claim, its Pro Rata Share of the Commitment Fee Amount; *provided*, subject to the Plan Supplement Documents, that $5,000,000 of such Commitment Fee Amount shall be held in escrow as part of the Contingent Additional Consideration, and released to such Holders of Allowed Commitment Fee Claims entitled thereto no later than five (5) Business Days after the Debtors and Renesas, as applicable, obtain Regulatory Approvals prior to a Regulatory Trigger Deadline; provided, however, to the extent the Regulatory Trigger Deadline occurs before Regulatory Approvals are obtained, each Holder of a Commitment Fee Claim agrees that

the Commitment Fee Amount shall be reduced by such $5,000,000, and distribution of such reduced Commitment Fee Amount shall be in full and final satisfaction, release, and discharge of its Allowed Commitment Fee Claim.

o      Holders of an Allowed Senior Secured Notes Claim shall receive, in full and final satisfaction of such Claim in accordance with the Restructuring Transactions, their Pro Rata Share of (i) the New Senior Secured Notes; and (ii) the Effective Date Cash Payment.

o      Holders of an Allowed Convertible Notes Claim shall receive, in full and final satisfaction of such Claim in accordance with the Restructuring Transactions, their Pro Rata Share of (i) the New 2L Convertible Notes Rights (subject to the Initial Backstop Parties' Premium and the Backstop Holdback Allocation); (ii) the New 2L Takeback Notes; and (iii) 56.3% of the New Common Stock (subject to dilution from, where applicable, the conversion of the New 2L Convertible Notes (including those issued on account of the Backstop Premium), the conversion of the New Renesas 2L Takeback Convertible Notes, the Incentive Plans, and the exercise of the Renesas Warrants).

o      Renesas shall receive, in full and final satisfaction of Allowed Renesas Claims in accordance with the Restructuring Transactions, (i) the Base Consideration; (ii) if applicable, and without duplication with clause (i) above, the Base Consideration Proceeds; and (iii) if the Regulatory Trigger Deadline occurs prior to the receipt of the Regulatory Approvals, the Contingent Additional Consideration.

o      Holders of an Allowed General Unsecured Claim will be unimpaired under the Plan and their Claims will be adjudicated in the ordinary course of business pursuant to the Plan procedures.

o      Holders of an Allowed Intercompany Claim and Allowed Intercompany Interest will be unimpaired and presumed to accept / impaired and deemed to reject the Plan.

o      Holders of an Allowed 510(b) Claim will be unimpaired under the Plan.

o      Holders of Existing Equity Interests shall receive, in full and final satisfaction of such Claim in accordance with the Restructuring Transactions, their Pro Rata Share of the Equity Recovery (subject to dilution from the conversion of the New 2L Convertible Notes (including those issued on account of the Backstop Premium), the conversion of the New Renesas 2L Takeback Convertible Notes, Incentive Plans, and the exercise of the Renesas Warrants);

provided, that, if the Distribution Event occurs, the Equity Recovery shall be reduced from 5.0% to 3.0% of New Common Stock.

- Releases (i) of claims and Causes of Action of the Debtors, the Estates, and the Reorganized Debtors against the Released Parties (the "***Debtor Release***")[4] and (ii) claims and Causes of Action held by certain non-Debtor third parties, the Releasing Parties, against the Released Parties (the "***Third-Party Release***"), as well as a related injunction provision (the "***Injunction Provision***"); and

- Collectively, 15% of New Common Stock of the Reorganized Parent will be reserved for a Management Incentive Plan and Long Term Incentive Plan, subject to dilution from the conversion of the New Renesas 2L Takeback Convertible Notes and exercise of the Renesas Warrants.

14.     The Restructuring contemplated by the Plan provides the Debtors with a viable path forward and a framework to exit chapter 11 successfully and in a timely fashion with the support of the Consenting Creditors.

**Requirements for Confirmation under Section 1129 of the Bankruptcy Code**

15.     I am aware that, for the Bankruptcy Court to confirm the Plan, the Debtors must demonstrate that the Plan satisfies the requirements of section 1129 of the title 11 of the United States Code (the "***Bankruptcy Code***").  Below, I set out facts with respect to certain of those requirements as I understand them, based on the events that have occurred throughout the Chapter 11 Cases, my experience as the Debtors' Deputy CRO, and discussions I have had with the Advisors and other members of the Debtors' management team.  Other facts supporting these requirements are set forth in the Plan and Plan Supplement, as well as other declarations filed in support of confirmation of the Plan.

---

[4]     The Debtor release is supported by the Special Committee (as defined below) following the results of the Investigation (as defined below), as more fully discussed in the contemporaneously filed *Declaration of Mark E. Jensen in Support of Confirmation of the Joint Prepackaged Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate*.

I.      **Section 1129(a)(1): Plan Compliance with Bankruptcy Code Provisions**

16.     I believe the Plan complies with all provisions of the Bankruptcy Code. The Plan provides for the following ten Classes of Claims and Interests: (i) Class 1 (Other Secured Claims); (ii) Class 2 (Other Priority Claims); (iii) Class 3 (Senior Secured Notes Claims); (iv) Class 4 (Convertible Notes Claims); (v) Class 5 (Renesas Claims); (vi) Class 6 (General Unsecured Claims); (vii) Class 7 (Intercompany Claims); (viii) Class 8 (Intercompany Interests); (ix) Class 9 (510(b) Claims); and (x) Class 10 (Existing Equity Interests).

17.     ***Classification & Compliance with Section 1122 of the Bankruptcy Code***.  The classification structure of the Plan listed above is rational and appropriate.  The Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests, which classification generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests.

18.     Moreover, within a given Class, all Claims and Interests have the same or similar rights against the Debtors.  Accordingly, based on the above and my discussions with the Advisors, I believe the Plan complies with section 1122 of the Bankruptcy Code.

19.     ***Release, Exculpation, and Injunction Provisions Comply with Section 1123(b)(6) of Bankruptcy Code***.  It is my understanding that section 1123(b)(6) of the Bankruptcy Code provides that a plan may include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.  I understand that the Plan provides for the following: (i) releases of claims and Causes of Action of the Debtors, the Estates, and the Reorganized Debtors against the Released Parties pursuant to the Debtor Release; (ii) releases of claims and Causes of Action held by certain non-Debtor third parties (*i.e.*, the Releasing Parties) against the Released Parties pursuant to the Third-Party Release; (iii) an exculpation provision (the

"**Exculpation Provision**"); and (iv) the related Injunction Provision.  I understand that the Debtor Release, Third-Party Release, Exculpation Provision, and Injunction Provision are integral components of the Plan, and are appropriate and necessary under the circumstances.

20.    **Debtor Release**.  The Debtor Release set forth in Section 10.6(a) of the Plan was heavily negotiated by sophisticated parties, each of which was represented by competent counsel and financial advisors.  The result is a comprehensive, integrated compromise that reflects arm's-length negotiations, and which was approved by the special committee of independent and disinterested directors of the Board comprised of Mark E. Jensen and Paul V. Walsh, Jr. (the "**Special Committee**").  Further, the Debtor Release is supported by the Debtors' creditors.  The Plan is supported by the Consenting Creditors, and the holders of Claims in Class 3 (Senior Secured Notes Claims), Class 4 (Convertible Notes Claims), and Class 5 (Renesas Claims) voted overwhelmingly in favor of the Plan, including the release provisions set forth therein, as set forth in the Voting Declaration (as defined below).  *See* Voting Decl., Ex.  A.  Notwithstanding the Debtor Releases, I understand that Section 10.8 of the Plan preserves the Reorganized Debtors' rights with respect to the Retained Causes of Action identified in the Plan Supplement.  The Debtor Release is fair, reasonable, and in the best interests of the Debtors' estates, maximizing recoveries for all stakeholders.

21.    In consideration of the Debtor Release, the Released Parties provided, and continue to provide, integral support to the Debtors during the Chapter 11 Cases and have contributed meaningfully to the Debtors' proposed reorganization.

22.    Additionally, certain of the Released Parties provided pre- and post-petition services to the Debtors in their capacity as directors, managers, and officers and guided the Debtors through their restructuring, including the Chapter 11 Cases.  Specifically, the Debtors' officers,

managers, directors, and executive management team (i) were instrumental throughout the Chapter 11 Cases and in negotiating the Restructuring Support Agreement and the Plan, which provide for agreed-upon recoveries to a number of the Debtors' stakeholders (including payment in full of all General Unsecured Claims in the ordinary course), (ii) managed intense demands associated with the Chapter 11 Cases while maintaining their regular operational duties, (iii) stabilized the Debtors' operations leading up to and during the Chapter 11 Cases in addition to ensuring the preservation of the Debtors' business in the ordinary course through the negotiation of the Plan and, by extension, the value of the Estates, and (iv) preserved more than 3,300 jobs, while continuing to deliver the highest level of service to the Company's customers.

23.     Furthermore, I understand that the Debtor Releases are supported by the Special Committee following the results of the independent, privileged investigation (the "*Investigation*") overseen by outside counsel and conducted by the Special Committee.   The results of the Investigation are discussed in greater detail in the *Declaration of Mark E. Jensen in Support of Confirmation of the Joint Prepackaged Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate* filed contemporaneously herewith.

24.     It is my view that the Debtor Release appropriately offers protection to parties that directly or constructively participated in the Debtors' restructuring efforts.   Indeed, many of the Released Parties made or will make a substantial contribution to the Chapter 11 Cases, including a number of officers and directors who have worked tirelessly to maximize value for the benefit of all stakeholders.   Without these contributions, I believe that the Plan (and the transactions contemplated therein) would not have been possible.

25.     Finally, it is my understanding that the Debtor Release does not operate to waive or release any Causes of Action arising from actual fraud, gross negligence, or willful misconduct,

in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

26.     For each of these reasons, I believe that the Debtors have satisfied the business judgment standard, as it has been explained to me, in granting the Debtor Release as part of the Plan. The Debtor Release and related injunction are, in my opinion, (i) fair and reasonable to parties in interest; (ii) an essential means of implementing the Plan; (iii) an integral and bargained for element of the Plan; (iv) beneficial to, and in the best interests of, the Debtors, the Estates, and the Debtors' creditors; (v) critical to the overall objectives of the Plan; and (vi) supported by the creditors generally (as evidenced by overwhelming votes in favor of the Plan).

27.     ***Third-Party Release***.   In addition to the Debtor Release, I understand that Section 10.6(b) of the Plan sets forth a certain voluntary, consensual Third-Party Release.  Parties in interest were provided extensive notice of the Chapter 11 Cases, the Plan, the proposed Third-Party Release, and the Objection Deadline, each of which contained conspicuous and bold language explaining the Third-Party Releases and the process for opting out of the Third-Party Releases.

28.     The Releasing Parties include: (a) each Debtor; (b) each Reorganized Debtor; (c) Consenting Senior Secured Noteholders; (d) Consenting Convertible Noteholders; (e) Renesas; (f) the Backstop Parties and Initial Backstop Parties; (g) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (h) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; and (i) each Related Party of each Entity in clauses (a) through (h), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it

were so directed by the Entity in the foregoing clauses (a) through (h) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (h); provided, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, will not be a "Releasing Party."

29.     It is my understanding that the Third-Party Release does not operate to waive or release any Causes of Action arising from actual fraud, gross negligence, or willful misconduct, in each case as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

30.     The Third-Party Release is an integral part of the Plan and a condition of the settlements set forth therein.  The Debtors spent months engaging in good faith, arm's-length negotiations with the Consenting Creditors regarding the terms of the Plan and Restructuring Support Agreement, including the releases in the Plan.  Thus, the Third-Party Release was heavily negotiated by sophisticated parties, each of which is represented by competent counsel, and were a material inducement for parties to enter into a comprehensive settlement and provide their support for the Restructuring Support Agreement, the Plan, and the Restructuring Transactions and settlements embodied therein.  Furthermore, the Released Parties made significant concessions in the Chapter 11 Cases in exchange for the Third-Party Release and the Debtor Release.  The Third-Party Release was also fully consensual.  To that end, 210 parties who held Claims and Interests that voted on the Plan or received an Opt-Out Election Form opted-out of the Third-Party Release, which speaks to the consensual nature of the Third-Party Release.  *See* Voting Decl. ¶ 14.

By facilitating participation by the Released Parties in both the negotiation of the Plan and the chapter 11 process, the Third-Party Release was critical to gaining support for the Plan.

31.       The Third-Party Release is also being given for consideration.  The Released Parties played an extensive and integral role in the Debtors' restructuring.  Each of the Released Parties has provided and continues to provide integral support to the Debtors throughout the Chapter 11 Cases and has contributed meaningfully to the Debtors' proposed reorganization.  Accordingly, the Third-Party Release was a core negotiation point and appropriately offers certain protections to parties that constructively and actively participated in the Chapter 11 Cases.  All parties in interest benefit from the Restructuring Transactions contemplated by the Plan and the significant contributions of the Released Parties in furtherance thereof, as such contributions have resulted in a restructuring that will allow the Debtors to emerge successfully from chapter 11 with a greatly deleveraged balance sheet, positioning the Debtors for future success.

32.       ***Exculpation Provision***.  I have been advised that the Exculpation Provision is limited to the Debtors and their Estates and does not exculpate acts or omissions that are judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.  The Exculpation Provision is important because the Exculpated Parties have participated in the Chapter 11 Cases in good faith, and such provision is necessary to protect them from collateral attacks related to any good faith acts or omissions in connection with, or related to, among other things, the Chapter 11 Cases and the Plan.

33.       ***Injunction Provision***.  I have been advised that the Injunction Provision is necessary to, among other reasons, enforce the Debtor Release, the Third-Party Release, and the Exculpation Provision by permanently enjoining all Persons and Entities from commencing or maintaining any action against the Debtors or the Reorganized Debtors on account of or in

connection with or with respect to any Claims or Interests discharged, released, exculpated, or settled under the Plan.

34.     The Plan also provides for a "gatekeeping" provision to implement the Plan's Exculpation, Debtor Release, and Third-Party Release provisions.  Specifically, <u>Section 10.5</u> of the Plan provides that, for any Person or Entity to commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of Claims or Causes of Action subject to the Debtor Release, the Third-Party Release, or Exculpation Provision, the Court must (i) first determine, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (ii) specifically authorize a Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party (the "***Gatekeeping Provision***").  It is my understanding that the Gatekeeping Provision only applies to Claims or Causes of Action brought against a Released Party if the Person or Entity bringing such Claim or Cause of Action is a Releasing Party.

35.     I believe that the Injunction Provision and the Gatekeeping Provision are necessary to implement the Debtor Release, the Third Party Release, and the Exculpation Provision, and that they are appropriate, narrowly tailored to achieve their purpose, represents key provisions that are centrally important to the Plan, and should be approved.  I further believe the Debtors and the Consenting Creditors would not have agreed to the Plan without the inclusion of the Injunction Provision and Gatekeeping Provisions because they are integral components of the Plan.  I, therefore, believe that the Injunction Provision complies with the provisions of the Bankruptcy Code and should be approved.

## II.     <u>Section 1129(a)(2): Debtors Compliance with the Bankruptcy Code</u>

36.     I believe that the Debtors as Plan proponents have complied with the Bankruptcy Code.

37.     On July 1, 2025, the Bankruptcy Court entered an order that, among other things, scheduled the Confirmation Hearing and approved the Debtors' proposed Ballots, forms, notices, and manner of Solicitation (as defined therein) [Docket No. 60] (the "***Solicitation Order***"). As detailed in the *Declaration of Emily Young of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast in Connection with the Joint Chapter 11 Plan of Wolfspeed, Inc. and its Debtor Affiliate*, filed contemporaneously herewith (the "***Voting Declaration***"), I understand that, in accordance with the solicitation and voting procedures, the Debtors solicited votes from holders of Claims in Class 3 (Senior Secured Notes Claims), Class 4 (Convertible Notes Claims), and Class 5 (Renesas Claims). *See* Voting Decl. ¶¶ 8-9. I believe that the Debtors have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order governing the notice, disclosure, and solicitation in connection with the Plan and the Disclosure Statement. In addition, I believe the Debtors and their professionals acted in good faith in all respects in connection with the tabulation of such votes. Accordingly, I believe the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

## III.     <u>Section 1129(a)(3): Good Faith</u>

38.     The Plan has been proposed by the Debtors in good faith and for the legitimate purposes of reorganizing the Debtors' ongoing business and enhancing the Debtors' long-term financial viability while providing recoveries to certain of the Debtors' stakeholders. The Plan is the culmination of extensive, good-faith negotiations between the Debtors and the majority of their key economic stakeholders, including the Consenting Creditors.

39.     The Finance Committee met regularly with the Advisors and management, oversaw the chapter 11 process, and made decisions approving, among other things, the Plan and certain related settlements contemplated therein.   The Finance Committee members were deemed independent and disinterested, and they voted affirmatively to authorize the Debtors to enter into the Plan, the Restructuring Support Agreement, and the transactions and settlements contemplated therein.

40.     The Debtors' senior management, along with the Advisors, negotiated the transactions memorialized in the Restructuring Support Agreement and Plan, which transactions and documents were approved by the Board.   Following such determination and approvals, the Board authorized the commencement of the Chapter 11 Cases to effectuate the transactions contemplated in the Restructuring Support Agreement and the Plan.   To the best of my knowledge, the Debtors followed appropriate governance practices throughout the entire Plan negotiation and approval process and, as such, the Debtors have proposed the Plan in good faith.   As a result, I believe the Debtors have satisfied the good faith requirement of Section 1129(a)(3) of the Bankruptcy Code.

## IV.     Section 1129(a)(4): Professional Fees Subject to Bankruptcy Court Approval

41.     All payments by the Debtors for services provided to the Debtors during the Chapter 11 Cases will be subject to approval by the Bankruptcy Court as reasonable.   Specifically, Section 2.4 of the Plan provides that Professionals seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred after the Petition Date through and including the Confirmation Date must file final applications no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, thereby giving interested parties adequate time to review the Professional Fee Claims.   Further, Article XI of the Plan provides that the Bankruptcy Court "shall retain exclusive jurisdiction over all matters

arising in, arising under, and related to the Chapter 11 Cases for, among other things . . . to hear and determine all Professional Fee Claims." Plan § 11.1.  Any other professional fee payments to be made by the Debtors will be made in accordance with the Plan.

**V.      Section 1129(a)(5): Information Regarding Proposed Officers and Managers**

42.     I believe that the Debtors have satisfied or will satisfy the requirements under section 1129(a)(5) of the Bankruptcy Code through disclosures in Section 5.11 of the Plan and Exhibit J of the Plan Supplement.  The Plan Supplement provides that the constitution of the New Board will be in accordance with the terms set forth in the applicable New Corporate Governance Documents, which are included as Exhibit K to the Plan Supplement.  *See* Plan Suppl., Ex. K; Plan, § 5.11.  The Debtors filed an amended Plan Supplement that provided, among other things, the identity and affiliations of the persons proposed to serve on the New Board, in accordance with section 1129(a)(5) of the Bankruptcy Code.  *See* Plan Suppl., Ex. J.

**VI.      Section 1129(a)(6): No Rate Changes**

43.     The Plan does not provide for any rate changes by the Debtors.

**VII.      Section 1129(a)(7): Best Interests Test**

44.     It is my understanding, based on discussions with the Advisors, that to satisfy the "best interests" test under Section 1129(a)(7) of the Bankruptcy Code, a debtor must demonstrate that each holder of a claim or interest in such impaired class either (i) has accepted or is deemed to have accepted the plan or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of such plan, that is not less than the amount such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry and analysis, the Plan satisfies the "best interests" test under Section 1129(a)(7) of the Bankruptcy Code.

45.     To demonstrate the Plan's compliance with Section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of FTI and other professionals, prepared the Liquidation Analysis, which is attached to the Disclosure Statement as <u>Exhibit D</u>.  The Liquidation Analysis contains various estimates, assumptions, and qualifications, all of which are incorporated herein by reference.  I believe that the information used by the Debtors in the Liquidation Analysis is information that debtors typically rely upon in conducting analyses of this type.

46.     The Liquidation Analysis shows that each class of Claim and Interest Holders will not receive less under the Plan than what they would receive in a liquidation.  Therefore, I believe that the Plan complies with Section 1129(a)(7) of the Bankruptcy Code.

**VIII.   <u>Section 1129(a)(11): Feasibility</u>**

47.     It is my understanding, based on discussions with the Advisors, that section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed only if it is feasible (*i.e.*, if the Debtors' reorganization is not likely to be followed by liquidation or the need for further financial reorganization).  As set forth in <u>Exhibit E</u> to the Disclosure Statement, the Debtors have prepared and filed with the Bankruptcy Court financial projections for the Reorganized Debtors (the "***Financial Projections***") for fiscal years 2026 through 2029.  *See* Disclosure Statement, Ex. E.  Based upon the Financial Projections, the Debtors will have sufficient resources to make all known payments required pursuant to the Plan and to service their debts as they become due.

48.     The Financial Projections assume a reorganization of the Debtors' capital structure consisting of the pro forma capital structure to be implemented on the Effective Date, including a refinancing of the Senior Secured Notes.  The Financial Projections and the updated capital structure contemplate a reduction of the Debtors' funded indebtedness by approximately $4.6 billion.

49.     Since filing the Financial Projections and their conditional approval on July 1, 2025 [Docket No. 60],[5] nothing has occurred to my knowledge that alters my view that the Financial Projections demonstrate that the Reorganized Debtors will be able to fund their business plan and satisfy obligations as they become due with operating cash flow, available working capital facilities, and cash on hand or that the Reorganized Debtors will be able to perform in accordance with the terms of the Plan.  Specifically, as referenced in the Debtors' MACOM Sale Motion[6], the Debtors are seeking authority to sell the MACOM Shares and realize proceeds of approximately $87 million.  Pursuant to the Financial Projections, this sale was originally forecasted to occur in October 2025 with $88 million of proceeds retained by the Reorganized Debtors.  Pursuant to agreements reached with the Consenting Creditors, the Debtors will retain the first $60.8 million of proceeds arising from the MACOM Shares Sale (as defined therein) and utilize the remainder for a partial paydown of the Senior Secured Notes Claims on an agreed lower repayment premium. Having regard to the Debtors' current cash position, including lower than expected costs incurred by the Debtors during the course of the Chapter 11 Cases, this pay down does not materially affect the Reorganized Debtors' forecast.

50.     Ultimately, based upon my understanding of the Plan, the advice of the Advisors, the work in preparing the Financial Projections, and my experience with the Debtors' business and

---

[5]    The Financial Projections note that "[a]lthough the Financial Projections represent the Debtors' best estimates and good faith judgment (for which the Debtors believe they have a reasonable basis) of the results of future operations, financial position, and cash flows of the Debtors, they are only estimates and actual results may vary considerably from such Financial Projections."  *See* Financial Projections at 1.

[6]    *Debtors'* Emergency *Motion for an Order (I) Authorizing the Private Sale of MACOM Shares Free and Clear of Liens, Claims, Encumbrances, and Other Interests and (II) Granting Related Relief* [Docket No. 242] and corresponding *Declaration of Daniel Hugo in Support of Debtors'* Emergency *Motion for an Order (I) Authorizing the Private Sale of MACOM Shares Free and Clear of Liens, Claims, Encumbrances, and Other Interests and (II) Granting Related Relief* [Docket No. 243].

industry, I believe that the Plan is feasible.  The Plan embodies a carefully tailored restructuring that will provide for the continued viability of the Debtors' business.

## IX.      Section 1129(a)(14)–(16): Inapplicable Provisions

51.      The Debtors do not have any domestic support obligations, no Debtor is an "individual" as I understand that term to be used in the Bankruptcy Code, and the Debtors are each a moneyed business or commercial corporation.

## X.      Section 1129(b): Cramdown of Non-Accepting Classes

52.      I understand that, pursuant to section 1129(b) of the Bankruptcy Code, a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or interests (*i.e.*, "crammed down") so long as the plan is "fair and equitable" and it does not discriminate unfairly as to the non-accepting class.  Based upon my discussions with the Advisors, I understand that the only Class to which cramdown is relevant is Class 10 (Existing Equity Interests), which is deemed to have rejected the Plan in accordance with the terms thereof.

### A.      Plan Does Not Discriminate Unfairly

53.      Based upon my discussions with the Advisors, I understand that section 1129(b)(1) of the Bankruptcy Code prohibits unfair discrimination, which occurs when similarly situated classes are treated differently without a reasonable basis for the disparate treatment.  The Debtors have a reasonable and permissible basis for the differing classification of the two Classes of Interests—Class 8 (Intercompany Interests) and Class 10 (Existing Equity Interests)—because each of these Classes are at different Debtor entities and comprised of dissimilar Interests given that Class 8 contains Interests held by another Debtor or an affiliate of a Debtor while Class 10 contains Interests held by third parties.

### B. *Plan Is Fair and Equitable*

54. Based upon my discussions with the Advisors, I understand that section 1129(b)(2) of the Bankruptcy Code requires that a plan be fair and equitable with respect to rejecting classes of claims or interests and that this is assessed by whether any holder of a claim or interest junior to the rejecting class will receive or retain property under the plan on account of such junior claim or interest.

55. Here, the "fair and equitable" rule is satisfied because distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code.

56. With respect to the only class that is deemed to reject the Plan—Class 10 (Existing Equity Interests)—no holder of a junior Interest at that Debtor will receive or retain property under the Plan (and indeed, there is no such junior Interest).

57. Moreover, no holder of a Claim is receiving more than 100% of what it is owed. As set forth in the contemporaneously filed *Declaration of Alex Tracy in Support of Confirmation of Joint Prepackaged Chapter 11 Plan of Wolfspeed, Inc. and its Debtor Affiliate* and the Valuation Analysis (as defined therein) attached to the Disclosure Statement as Exhibit F, the estimated potential range of the Reorganized Debtors' Enterprise Value (as defined in the Disclosure Statement) is approximately $2.35 billion to $2.85 billion, with a midpoint value of $2.60 billion.

58. As a result, and as set forth below and in the Disclosure Statement, Article I.B., no holder of a Claim is receiving more than 100% of what it is owed:

| Class | Approx. Percentage Recovery[7] |
|---|---|
| **Class 1: Other Secured Claims** | 100% |
| **Class 2: Other Priority Claims** | 100% |

---

[7] Approximate percentage recovery is illustrated prior to dilution from the Incentive Plans.

| Class | Approx. Percentage Recovery[7] |
|---|---|
| **Class 3: Senior Secured Notes Claims** | 86% |
| **Class 4: Convertible Notes Claims** | 25 to 30% |
| **Class 5: Renesas Claims** | 27 to 29% |
| **Class 6: General Unsecured Claims** | 100% |
| **Class 7: Intercompany Claims** | 0% / 100% |
| **Class 8: Intercompany Interests** | 0% / 100% |
| **Class 9: 510(b) Claims** | 100% |
| **Class 10: Existing Equity Interests** | N/A |

59.     For these reasons, I believe that the Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

## XI.     Section 1129(c): Plan Is Only Plan Currently on File

60.     The Plan is the only operative chapter 11 plan currently on file in the Chapter 11 Cases.

## XII.     Section 1129(d): Principal Purpose of Plan Is Not Avoidance of Taxes

61.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds.

## XIII.     Section 1129(e): Inapplicable Provision

62.     Based on my understanding of the Plan and discussions with the Advisors, the Chapter 11 Cases are not "small business cases" as I understand that term to be defined in the Bankruptcy Code.

**XIV.  Other Provisions of the Bankruptcy Code**

63.    I understand that the Plan includes other provisions that, as explained to me by counsel, are consistent with the applicable provisions of the Bankruptcy Code, including Article 8 of the Plan, which provides that each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed assumed and amended (as necessary to implement the terms of the Restructuring Transaction), as of the Effective Date, unless such contract or lease: (i) has been assumed, assumed and assigned, or rejected by the Debtors by prior order of the Bankruptcy Court; (ii) is the subject of a motion to reject filed by the Debtors pending on the Effective Date; (iii) is identified as a rejected Executory Contract or Unexpired Lease by the Debtors on the Schedule of Rejected Executory Contracts and Unexpired Leases, (iv) is rejected or terminated pursuant to the terms of the Plan; or (v) is the subject of a pending Cure Dispute.  I believe that the assumption or rejection by the Debtors of their Executory Contracts and Unexpired Leases in accordance with and subject to the terms and conditions of the Plan is both beneficial and necessary to the Debtors' and Reorganized Debtors' business operations upon and subsequent to emergence from chapter 11.

64.    I believe that the assumption by the Debtors of (i) the Indemnification Obligations pursuant to Article 8.4 of the Plan and (ii) all the D&O Policies pursuant to Article 8.6 of the Plan, is of fundamental importance to the Debtors' reorganization process, a sound exercise of the Debtors' business judgment, and in the best interest of the Debtors and their Estates.

**Request for Waiver of Bankruptcy Rule 3020(e)**

65.    Any significant delay may have an impact on the Debtors' financial performance and ability to achieve the Financial Projections.  The Plan represents a fair and equitable compromise by and among the major parties in interest in the Chapter 11 Cases and should be consummated as expeditiously as possible and without delay.  In addition, the Debtors' prompt

emergence from chapter 11 is required under the Restructuring Support Agreement and will assist in assuaging the concerns of the Debtors' customers, suppliers, vendors, and employees regarding the sustainability and viability of the Reorganized Debtors and will result in significant savings of fees and expenses related to the administration of the Chapter 11 Cases.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  September 5, 2025
        New York, New York

                              */s/ Daniel Hugo*
                              By:    Daniel Hugo
                              Title:  Deputy Chief Restructuring Officer