**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
---------------------------------------------------------- x
                                            :
In re:                                      :    Chapter 11
                                            :
WOLFSPEED, INC., et al.,                    :    Case No. 25-90163 (CML)
                                            :
            Debtors.¹                       :    (Jointly Administered)
                                            :
---------------------------------------------------------- x
```

**DECLARATION OF MARK E. JENSEN IN SUPPORT OF CONFIRMATION
OF THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF
<u>WOLFSPEED, INC. AND ITS DEBTOR AFFILIATE</u>**

I, Mark E. Jensen, hereby declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information, and belief.

<u>**Summary of Declaration**</u>

1. As a member of the board of directors (the "***Board***") of Wolfspeed, Inc. ("***Wolfspeed***" and, together with its affiliated debtor and debtor-in-possession, collectively, the "***Company***" or the "***Debtors***") and the Board's Special Investigation Committee, I submit this declaration ("***Declaration***") in support of confirmation of the *Joint Prepackaged Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 8] (as modified, amended, or supplemented from time to time, the "***Plan***"), including the Debtor Release contained therein.[2]

2. In particular, I offer this Declaration to (a) advise the Court that, following an exhaustive investigation and due deliberation, the Special Investigation Committee has

---

[1]    The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: Wolfspeed, Inc. (2719) and Wolfspeed Texas LLC (0339).  The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

unanimously concluded that the Plan's release of all Claims and Causes of Action owned by or belonging to the Debtors is reasonable under the circumstances, appropriate, and in the best interests of the Debtors, their Estates, and all of the Debtors' stakeholders, (b) describe the process the Special Investigation Committee followed in reaching its conclusion, and (c) explain the reasoning behind the Special Investigation Committee's conclusion.

### Professional Background and Qualifications

3.       Since May 8, 2025, I have served as an independent and disinterested director (a "**Disinterested Director**" and together with Paul V. Walsh, Jr., the "**Disinterested Directors**") on the Board of Wolfspeed.

4.       I am a certified public accountant and member at The American Institute of Certified Public Accountants, with over 45 years in the financial services and accounting industries.  I currently serve as chairman of the Board of Directors and a member of the Special Committee of 23andMe Holding Co. (now Chrome Holding Co.), and as an independent director on the Board of Directors of Lattice Semiconductor Corporation where I also chair the Audit Committee.  I previously served as an independent director and Audit Committee Chair of, among others, Control4 Corp., Forescout Technologies, Inc., and Unwired Planet, Inc. (now Great Elm Capital Group, Inc.).  I also served as a managing partner at Deloitte & Touche LLP and at Arthur Andersen LLP, and as Chief Financial Officer of Redleaf Group, Inc.  I received my undergraduate degree from Colorado State University and an undergraduate degree from Metropolitan State University of Denver.

5.       Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' management team, the Debtors' legal counsel, other advisors, and Katten Muchin Rosenman LLP ("**Katten**"), serving as

counsel to Wolfspeed on behalf of and at the sole discretion of the Disinterested Directors, and my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives. For the avoidance of doubt, I do not, and do not intend to, waive the attorney-client privilege or any other applicable privilege or protection by submitting this Declaration.

### Appointment to the Board and Special Investigation Committee

6.      On May 6, 2025, the Board established the Special Investigation Committee. On May 8, 2025, the Board elected Paul V. Walsh Jr. and me as (i) members of the Board; (ii) members of the Audit Committee; and (iii) sole members of the Special Investigation Committee.

7.      Prior to the commencement of the Chapter 11 Cases, the Special Investigation Committee initiated a privileged and confidential independent investigation (the "***Independent Investigation***") to determine whether the Debtors' Estates hold any potentially viable Claims or Causes of Action that are worthy of pursuit or maintenance in the context of the Chapter 11 Cases, whether the nature of such Claims or Causes of Action is direct or derivative, whether such Claims or Causes of Action have been asserted or unasserted, and whether the target of such Claims or Causes of Action are the Debtors' current or former directors, officers, shareholders, insiders, affiliates, lenders, and any other parties (including third parties).

8.      On June 2, 2025, Wolfspeed retained Katten to render independent legal services on behalf of and at the sole discretion of the Disinterested Directors, to conduct the Independent Investigation and to provide advice and legal services in connection with the exercise of the Disinterested Directors' fiduciary duties. Each in our capacity as Disinterested Directors and members of the Special Investigation Committee, Paul Walsh and I reviewed the credentials of Katten, met with the attorneys leading the matter, and agreed to the retention of Katten as special

counsel to Wolfspeed at the sole discretion of the Disinterested Directors.   The Special Investigation Committee selected Katten as independent special counsel based on the firm's prior engagements and expertise representing disinterested directors in complex chapter 11 cases, and in particular, the lead attorneys from Katten working on this matter, including Steven J. Reisman and Cindi M. Giglio.   In hiring Katten, we relied on the fact that the lead attorneys from Katten working on this matter are widely regarded as market leaders in the representation of independent directors and advisors and, in recent years, have represented independent directors and advisors in some of the largest and most complex chapter 11 cases throughout the United States and in confidential out-of-court restructuring matters.

**Consideration of the Restructuring Support Agreement and Plan**

9.     I understand that, beginning in early 2025, the Debtors and their advisors began negotiations regarding potential restructuring transactions with the principals and advisors of three lender constituencies: (a) an ad hoc group of the Senior Secured Noteholders; (b) an ad hoc group of holders of 2026 Convertible Notes, 2028 Convertible Notes, and 2029 Convertible Notes; and (c) Renesas, in its capacity as a holder of the CRD Loans.   I have been advised that, prior to my time on the Board, the Board and the Finance Committee of the Board met regularly to discuss the status of negotiations and the Company's restructuring options.

10.     After extensive arm's-length negotiations, the Company presented the Board with the proposal memorialized in the restructuring support agreement, dated June 22, 2025 (the "***Restructuring Support Agreement***"), which enjoyed the broad support of holders whose Claims at the time represented approximately (i) more than 97% of the aggregate outstanding principal amount under the Senior Secured Notes, (ii) more than 67% of the aggregate outstanding principal amount under the Convertible Notes, and (iii) 100% of the aggregate outstanding principal

amount under the CRD Loans. After deliberating with the Company and its advisors, the Board determined that the Restructuring Support Agreement would result in a material deleveraging and a value-maximizing plan of reorganization that would pave the way for an expeditious exit from chapter 11. Among other things, the Restructuring Support Agreement is designed to reduce the Debtors' prepetition funded debt obligations by more than fifty percent, and to add a post-emergence capital infusion of approximately $301 million from the New 2L Convertible Notes Rights Offering. Moreover, the Restructuring Support Agreement includes a robust "fiduciary out" in the event that the Company, the Board, or a governing body of the Company determines that proceeding with the transactions contemplated by the Restructuring Support Agreement would be inconsistent with the exercise of fiduciary duties. Although the Debtors and the Board retained full fiduciary flexibility to consider other alternatives, no superior offer has been provided to the Company. The Board has concluded that the transactions described in the Restructuring Support Agreement and the Plan constitute the best available transaction for the Debtors and their stakeholders.

### Independent Investigation

11.     Beginning in June 2025, the Disinterested Directors, with the assistance of Katten, have conducted the Independent Investigation. The scope of the Independent Investigation was broad. It included the course of conduct and material dealings involving the Company and the Released Parties, as well as the acts and omissions of Wolfspeed's directors and officers. The Special Investigation Committee also analyzed the derivative claims asserted in *Lamon v. Wolfspeed, Inc. et al.*, Case No. 25 Civ. 298 (M.D.N.C.) and other allegations raised by shareholders in various letters to the Board.

12.     At the Special Investigation Committee's direction, Katten submitted 55 categories of diligence requests to the Company, seeking documents and information relevant to the Independent Investigation.  These requests covered a broad range of materials, including board materials and minutes, corporate formation and governance documents, corporate structure charts, material agreements, and financial information.  In response, Katten received and reviewed more than 2,000 documents from the Debtors.  Katten reviewed the Company's pertinent filings with the U.S. Securities and Exchange Commission.  Katten also was granted access to more than 43,000 custodial emails from certain Company personnel, conducted targeted searches based on its legal and factual analysis, and reviewed emails and attachments relevant to the Independent Investigation.  Katten interviewed fourteen current and former directors, officers, personnel, and advisors, and held several meetings with Company personnel and advisors regarding diligence production, scheduling interviews, and other administrative matters.  It is my understanding that the Company, its management team, and its advisors fully cooperated with all of Katten's requests and inquiries.

13.     The Disinterested Directors maintained regular, weekly communication with Katten to provide direction for the Independent Investigation and to receive updates on its workstreams, progress, and findings.  During meetings of the Special Investigation Committee, the Disinterested Directors were actively engaged, drawing on their experience to ask questions about the facts being developed and potentially applicable legal theories.  These meetings were held in addition to the Disinterested Directors' participation in Board meetings concerning the Debtors' general business operations and the overall trajectory of the Chapter 11 Cases.

14.     The Special Investigation Committee, with the assistance of Katten, conducted a thorough analysis to determine whether the Debtors possess any colorable and potentially viable

Claims and Causes of Action—whether direct or derivative, asserted or unasserted—including, but not limited to, any such Claims or Causes of Action against the Debtors' current or former directors, officers, shareholders, insiders, affiliates, lenders, as well as any other parties (including third parties) that are worthy of pursuit or maintenance in the context of the Chapter 11 Cases.

15.     After exhaustive diligence and due deliberation, the Special Investigation Committee has concluded that the Debtors' Estates do not have any viable and valuable Claims and Causes of Action against Released Parties that would warrant the time, expense, and uncertainty associated with the prosecution or maintenance of such Claims or Causes of Action. This is particularly so given that the Debtors' major stakeholders have agreed on a prepackaged Plan, which is designed to maximize value for all stakeholders and to provide the Company with a fresh start post-emergence through a consensual balance sheet restructuring.

### Evaluation of the Debtor Release

16.     In my role as a Disinterested Director and member of the Special Investigation Committee, I have reviewed the reasonableness and appropriateness of the release provisions in the Plan.  As set forth more fully below, I believe that the Plan's release provisions are reasonable under the circumstances, appropriate, and in the best interests of the Debtors, their Estates, and all of the Debtors' stakeholders.

17.     Article 10.6 of the Plan provides for releases by, among others, the Debtors and their Estates (the "***Debtor Release***") of any and all Claims and Causes of Action, including any derivative claims the Debtors could assert, against the "***Released Parties***," which include, among others, the Debtors, the Reorganized Debtors, Consenting Senior Secured Noteholders, Consenting Convertible Noteholders, the Senior Secured Notes Trustee, Renesas, the Backstop Parties and

Initial Backstop Parties (including each of the foregoing parties' Related Parties).[3]  I have reviewed the Debtor Release and concluded it is appropriate, justified, in the best interests of the Debtors and their stakeholders, and an integral part of the Plan for the reasons set forth below.

18.     ***First***, the Released Parties have provided valuable consideration.  The Restructuring Transactions embodied in the Plan (including the Debtor Release) were negotiated by sophisticated parties and counsel, including months of prepetition negotiations among the Debtors and the Consenting Creditors that resulted in the Restructuring Support Agreement.  The Debtors' key stakeholders and current directors and officers were critical participants in the Plan process, in terms of negotiating a consensual transaction for the benefit of all stakeholders, voting in favor of the Plan, and cooperating with the Independent Investigation.  In particular, each of the Released Parties has worked collaboratively and constructively with the Debtors and has provided (whether by their execution of the Restructuring Support Agreement, voting to accept the Plan, or otherwise) value to the Estates in the form of, among other things, reciprocal releases for the Debtors, impairment of their debt-related claims and/or cancellation of existing equity interests, negotiation and formulation of the Plan, and/or providing necessary consents under the Company's governing documents, in each case as may be applicable to the specific Released Party.  They have done so with the understanding that they would receive releases from the Debtors, subject to the Independent Investigation.  The Debtor Release is an essential *quid pro quo* for the Released Parties' contributions to and support of the Debtors' restructuring.  In the absence of the Released Parties' support, the Debtors would not be in a position to confirm the Plan, consummate the Restructuring Transactions, effectuate the transactions contemplated under the Plan, and maximize

---

[3]     The foregoing description is meant as a summary of the operative Plan provisions only.  Certain of the Released Parties are defined as such in multiple capacities.  To the extent there is any conflict between the foregoing summary and the definition of "***Released Parties***" contained in Article I of the Plan, the Plan shall control.

value for the benefit of the Debtors' stakeholders.  The Debtor Release, therefore, is a critical component of the Plan.

19.     **Second**, the Debtors' largest economic stakeholders, including the Consenting Creditors—the stakeholders that would benefit from any valuable Estate Claims and Causes of Action—support the restructuring and the Releases that are an essential component of the Plan, after representatives of those stakeholders engaged in months of negotiations and careful consideration of the alternatives.  This reasoned support thus confirms the reasonableness of the Releases.

20.     **Third**, the Special Investigation Committee has concluded that the Debtors' Estates do not have viable and valuable Claims or Causes of Action against Released Parties that would warrant the time, expense, and uncertainty associated with the pursuit or maintenance of such Claims or Causes of Action.  This conclusion is based on several factors, including, among others: the absence of evidence in the record to support any such Claims or Causes of Action; the existence of legal authorities and record evidence supporting affirmative defenses to any such Claims or Causes of Action; significant questions regarding the Debtors' likelihood of success if such Claims or Causes of Action were pursued; and significant questions regarding the resources that would be available and required to prosecute these matters.

21.     Additionally, the Special Investigation Committee has considered whether the costs and efforts involved would serve the best interests of the Debtors at this time, particularly in light of, among other things, the objectives and intended benefits of the prepackaged Plan, the amount of effort, focus and resources that will be required post-emergence to achieve those objectives and to realize those benefits, and the uncertainties associated with both the merits of, and likely remedies for, any such Claims or Causes of Action.

22.    The Special Investigation Committee also found that the Debtor Release was an integral part of the Plan, played an essential role in garnering widespread support for the Plan among the Debtors' key stakeholders, and provides needed certainty and finality for the Released Parties regarding the parties' respective obligations under the Plan.

23.    After considering all relevant factors, the Special Investigation Committee, myself included, unanimously concluded that (a) it is reasonable under the circumstances for the Debtors to grant the releases of Released Parties contained in the Debtor Release, (b) the Debtor Release has been provided in exchange for good and valuable consideration from the Released Parties, (c) the Debtor Release is in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and (d) the Debtor Release is fair, equitable, and reasonable, and is given and made after due notice and opportunity to be heard.

24.    For these reasons, as a Disinterested Director of the Board and member of the Special Investigation Committee, I respectfully request that the Debtor Release be approved as part of confirmation of the Plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 5, 2025

/s/ Mark E. Jensen
Mark E. Jensen
Disinterested Director of the Board of
Wolfspeed, Inc.