**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------------- x
                  :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WOLFSPEED, INC., *et al.*, | : | Case No. 25-90163 (CML) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------- x

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF**
**(I) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND**
**(II) CONFIRMATION OF JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**<u>REORGANIZATION OF WOLFSPEED, INC. AND ITS DEBTOR AFFILIATE</u>**

---

[1]    The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: Wolfspeed, Inc. (2719) and Wolfspeed Texas LLC (0339). The Debtors' mailing address is 4600 Silicon Drive, Durham, NC 27703.

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ..................................................................................1

I.   Background .....................................................................................................3

     A.   The Restructuring Support Agreement ..................................................3

     B.   The Solicitation Process and Voting Results. .......................................4

     C.   Non-Voting Classes ...............................................................................7

     D.   Service of Combined Notice and Publication ........................................8

     E.   Plan Supplement and Proposed Confirmation Order ............................8

II.  OVERVIEW OF THE PLAN ........................................................................10

III. LIMITED OBJECTIONS RECEIVED ........................................................14

ARGUMENT .........................................................................................................15

I.   Approval of the Disclosure Statement is Warranted....................................16

     A.   Creditors Received Sufficient Notice of the Hearing and Objection
          Deadline for Approval of the Disclosure Statement. ..........................16

     B.   The Disclosure Statement Satisfies the Requirements of the Bankruptcy
          Code and Should Be Approved............................................................18

     C.   The Debtors' Prepetition Solicitation of Votes Complied with the
          Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures
          Order. ...................................................................................................20

          1.   The Disclosure Statement Demonstrates That the Debtors Complied
               with Applicable Non-bankruptcy Law with Respect to Their
               Prepetition Solicitation..............................................................21

          2.   The Ballots Used to Solicit Holders of Claims Entitled to Vote on
               the Plan Complied with the Bankruptcy Rules. ........................22

          3.   The Voting Record Date Complied with the Bankruptcy Rules and
               the Solicitation Procedures Order. ............................................23

          4.   The Debtors' Solicitation Period Complied with Bankruptcy Rule
               3018 and the Solicitation Procedures Order. .............................24

i

<u>Page</u>

5. The Debtors' Vote Tabulation Was Appropriate and Complied with the Solicitation Procedures Order. ..............................................24

6. Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Solicitation Procedures Order. .........25

7. Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith. ......................................................25

II. The Plan Meets the Requirements For Confirmation Under Section 1129 of the Bankruptcy Code. ....................................................26

A. The Plan Complies with All Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(1). ..........................................27

1. The Classification of Claims and Interests in the Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ...........................................................27

2. The Plan Satisfies the Requirements of Section 1123(a). ..........................29

3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.............................................34

4. The Assumption or Rejection of Executory Contracts and Unexpired Leases Under the Plan Is Appropriate Pursuant to Section 365 and Section 1123(b)(2) of the Bankruptcy Code.............................................35

5. The Plan Complies with Section 1123(d) of the Bankruptcy Code...........38

6. The Plan's Release, Exculpation, and Injunction Provisions Comply with the Bankruptcy Code. .......................................................38

a. The Debtor Release Complies with the Bankruptcy Code and Is Appropriate. ..............................................39

(i) The Debtor Release is Fair and Equitable.............39

(ii) The Debtor Release is in the Debtors' Best Interests ................................................41

b. The Consensual Third-Party Release Complies with the Bankruptcy Code and Is Appropriate. ...........................................44

c. The Exculpation Provision Complies with the Bankruptcy Code and is Appropriate. ................................................52

d. The Injunction Provision and Gatekeeping Provision Comply with the Bankruptcy Code and is Appropriate.................53

**Page**

B.  The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2)............................................................55

C.  The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3). ........................................56

D.  The Plan Provides That Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Approval – 11 U.S.C. § 1129(a)(4)............58

E.  The Debtors Have Disclosed All Necessary Information Regarding the Reorganized Debtors' Directors and Officers and Insiders – 11 U.S.C. § 1129(a)(5)............................................................................59

F.  The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6)............61

G.  The Plan is in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7)...............61

H.  Acceptance of Impaired Voting Class –11 U.S.C. § 1129(a)(8). ..........................62

I.  The Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9)............................................................................63

J.  At Least One Impaired Class Has Accepted the Plan – 11 U.S.C. § 1129(a)(10)............................................................................64

K.  The Plan is Feasible – 11 U.S.C. § 1129(a)(11). ..................................................64

L.  All Statutory Fees Have Been or Will Be Paid – 11 U.S.C. § 1129(a)(12)...........67

M.  The Plan Provides for the Assumption of Any Retiree Benefit Obligations – 11 U.S.C. § 1129(a)(13)......................................................................67

N.  Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code Are Inapplicable. .............68

O.  Section 1129(b):  The Plan Satisfies the "Cramdown" Requirements .................68

    1.  The Plan Does Not Discriminate Unfairly.................................................69

    2.  The Plan Is Fair and Equitable..................................................................72

P.  The Plan Is Not an Attempt to Avoid Tax Obligations – 11 U.S.C. § 1129(d).............................................................................73

Q.  The Waiver of a Stay of the Confirmation Order Is Appropriate. .........................73

**Page**

III.    The U.S. Trustee Objection Should Be Overruled ............................................................74

    A.    Purdue Does Not Support the U.S. Trustee's Objection.......................................74

    B.    The U.S. Trustee's Reliance on State Contract Law is Without Support .............78

    C.    The Injunction Provision and Gatekeeping Provision Are Each Consistent
        with Fifth Circuit Law and Plans Confirmed in this District................................81

CONCLUSION..................................................................................................................84

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*In re 203 N. LaSalle St. Ltd. P'ship.*,
190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds sub nom. Bank
of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434
(1999) ..................................................................................................................69

*In re 11,111, Inc.*,
117 B.R. 471 (Bankr. D. Minn. 1990) .................................................................69

*In re AIO US, Inc.*,
No. 24-11836 (CTG), 2025 WL 2426380 (Bankr. D. Del. Aug. 21, 2025) ..........82

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997) ...............................................................................69

*In re Apex Oil Co.*,
118 B.R. 683 (Bankr. E.D. Mo. 1990) ..................................................................60

*In re Applegate Prop., Ltd.*,
133 B.R. 827 (Bankr. W.D. Tex. 1991) ................................................................18

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood
Chair Co.)*,
203 F.3d 914 (5th Cir. 2000) ...............................................................................47

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ..............................................................69

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) .......................................................................................61, 72

*In re Beyond.com Corp.*,
289 B.R. 138 (Bankr. N.D. Cal. 2003) .................................................................60

*In re Bigler LP*,
442 B.R. 537 (Bankr. S.D. Tex. 2010) .................................................................39

*In re Bowles*,
48 B.R. 502 (Bankr. E.D. Va. 1985) ....................................................................69

*Brite v. Sun Country Dev. (In re Sun Country Dev.)*,
764 F.2d 406 (5th Cir. 1985) ...............................................................................56

*In re Buttonwood Partners, Ltd.*,
  111 B.R. 57 (Bankr. S.D.N.Y. 1990) ..................................................................70

*In re Camp Arrowhead*, *Ltd.*,
  451 B.R. 678 (Bankr. W.D. Tex. 2011) ................................................44, 54, 81

*In re CJ Holding Co.*,
  597 B.R. 597 (S.D. Tex. 2019) .............................................................44, 75, 81

*In re Cutera, Inc.*,
  No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) .....................................77

*In re Diamond Sports Grp., LLC*,
  No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) ....................................77

*In re DocuData Solutions, L.C.*,
  No. 25-90023 (CML) (Bankr. S.D. Tex. Jun. 23, 2025) ......................................77

*In re Drexel Burnham Lambert Grp. Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ............................................................56, 61

*In re Eagle Bus Mfg., Inc.*,
  134 B.R. 584 (Bankr. S.D. Tex. 1991), *aff'd, NLRB v. Greyhound Lines (In re
  Eagle Bus Mfg.)*, 158 B.R. 421 (S.D. Tex. 1993) .............................................27, 36

*In re Energy & Expl. Partners, Inc.*,
  No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) .....................................45

*Evercore Cap. Partners II, L.L.C. v. Nancy Sue Davis Tr. (In re Davis Offshore,
  L.P.)*,
  644 F.3d 259 (5th Cir. 2011) ..............................................................................26

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
  Ltd. P'ship)*,
  116 F.3d 790 (5th Cir. 1997) ....................................................................56, 57, 65

*Floyd v. Hefner*,
  No. H-03-5693 (MH), 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006),
  *on reconsideration in part,* 556 F.Supp. 2d 617 (S.D. Tex. 2008) .........................18

*FOMPuerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*,
  255 Fed. App'x 909 (5th Cir. 2007) ..............................................................47, 48

*In re Food City, Inc.*,
  110 B.R. 808 (Bankr. W.D. Tex. 1990) ...............................................................57

*In re Foster Mortg. Corp.*,
  68 F.3d 914 (5th Cir. 1995) ...............................................................................43

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ..............................................................69

*In re Gen. Homes Corp.*,
    134 B.R. 853 (Bankr. S.D. Tex. 1991) ..........................................................39, 40

*In re GOL Linhas Aéreas Inteligentes S.A.*,
    Case No. 24-10118 (MG), 2025 WL 1466055 (Bankr. S.D.N.Y. May 22,
    2025), *appeal docketed,* No. 25-04610 (S.D.N.Y. June 3, 2025)..........................79

*In re Granite Broad. Corp.*,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007)...............................................................72

*In re Great Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ..................................................................65

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024)..................................................................3, 44, 75, 76

*Heartland Fed. Savings & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe
    Enters., Ltd., II)*,
    994 F.2d 1160 (5th Cir. 1993) ................................................................26, 28, 65

*In re Heritage Org., L.L.C.*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007)...............................................................39

*Hernandez v. Larry Miller Roofing, Inc.*,
    628 Fed. App'x 281 (5th Cir. 2016) ..................................................................47

*Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In
    re Highland Capital Mgmt., L.P.)*,
    132 F.4th 353 (5th Cir. 2025) ................................................................55, 82, 83

*In re Idearc, Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub nom. In re
    Idearc, Inc.,* 662 F.3d 315 (5th Cir. 2011) ........................................................27, 36

*In Cutera, Inc.*,
    No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025)........................................82

*In re Indep. Contract Drilling, Inc.*,
    No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025)................................76, 77, 81

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ..................................................................78

*In re Intrum AB*,
    No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024)........................................77

*In re Invitae Corp.*,
    No. 24-11362 (MBK) (Bankr. D.N.J. July 23, 2024) ...........................................78

*In re J.D. Mfg., Inc.*,
    No. 07-36751 (WWS), 2008 WL 4533690 (Bankr. S.D. Tex. Oct. 2, 2008) .........................18

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...............................................................69, 70

*Kellogg v. United States (In re West Tex. Mktg. Corp.)*,
    54 F.3d 1194 (5th Cir. 1995) ...........................................................................79

*In re Lakeside Glob. II Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) .........................................................15, 65

*In re Landmark at Plaza Park, Ltd.*,
    7 B.R. 653 (Bankr. D.N.J. 1980) ......................................................................65

*In re LaVie Care Ctrs., LLC*,
    No. 24-55507, 2024 WL 4988600, slip op. (Bankr. N.D. Ga. Dec. 5, 2024) .........................80

*In re Lone Star Utils. LLC*,
    2014 WL 4629129 (Bankr. N.D. Tex. Sept. 15, 2014) ...........................................15

*Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*,
    756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986).......................36

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
    150 F.3d 503 (5th Cir. 1998) ...............................................................18, 56, 58

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022), *abrogated in part on other grounds by Purdue*, 603 U.S. 204.......................................................................................80

*In re Mayer Pollock Steel Corp.*,
    174 B.R. 414 (Bankr. E.D. Pa. 1994) ...............................................................65

*In re McCommas LFG Processing Partners, LP*,
    2007 Bankr. LEXIS 4053 (Bankr. N.D. Tex. 2007)..............................................58

*In re Metrocraft Publ'g Servs., Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) .................................................................19

*In re Mirant Corp.*,
    348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities,* No. 06-cv-744-A, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006) ...............................................................39, 40, 41

*In re Mirant Corp.*,
No. 03-46590 (DML), 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) .......................28

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
57 U.S. 370 (2019) ................................................................................................................36

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ..............................................................................................................16

*N.L.R.B. v. Bildisco & Bildisco*,
465 U.S. 513 (1984) ..........................................................................................................36, 57

*NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P. (In re Highland
Capital Mgmt., L.P.)*,
48 F.4th 419 (5th Cir. 2022) .......................................................................................54, 81, 82

*Norwest Bank Worthington v. Ahlers*,
485 U.S. 197 (1988) ..............................................................................................................41

*Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun
Elec. Power Coop., Inc.)*,
119 F.3d 349 (5th Cir. 1997) .................................................................................................40

*Otto v. Tex. Tamale Co., Inc. (In re Tex. Tamale Co., Inc.)*,
219 B.R. 732 (Bankr. S.D. Tex. 1998) ..................................................................................16

*In re Pacific Lumber Co.*,
584 F.3d at 253 ......................................................................................................................54

*Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint
Venture)*,
995 F.2d 1274 (5th Cir. 1991) ...............................................................................................27

*In re Phx. Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ....................................................................................19

*In re Pilgrim's Pride Corp.*,
2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010).............................................................54

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ....................................................................................65

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000).............................................................................................52, 53

*Republic Supply Co. v. Shoaf*,
815 F.2d 1046 (5th Cir. 1987) ..........................................................................................47, 48

*Richmond Leasing Co. v. Cap. Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985) .........................................................37

*In re Rivera Echevarria*,
129 B.R. 11 (Bankr. D.P.R. 1991) ....................................................70

*In re Robertshaw US Holding Corp.*,
662 B.R. 300 (Bankr. S.D. Tex. 2024) ....................................... *passim*

*In re Robertshaw US Holding Corp.*,
No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) ......................77

*In re Rusty Jones, Inc.*,
110 B.R. 362 (Bankr. N.D. Ill. 1990) ................................................59

*Sequa Corp. v. Christopher (In re Christopher)*,
28 F.3d 512 (5th Cir. 1994) .............................................................16

*In re Sherwood Square Assoc.*,
107 B.R. 872 (Bankr. D. Md. 1989) ..................................................59

*In re Spirit Airlines, Inc.*,
668 B.R. 689 (Bankr. S.D.N.Y. 2025) ..........................................78, 80

*In re Star Ambulance Serv. LLC*,
540 B.R. 251 (Bankr. S.D. Tex. 2015) .........................................15, 61

*In re Stratford Assocs. Ltd. P'ship*,
145 B.R. 689 (Bankr. D. Kan. 1992) .................................................59

*In re Temple Zion*,
125 B.R. 910 (Bankr. E.D. Pa. 1991) ...............................................65

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
844 F.2d 1142 (5th Cir. 1988) .........................................................18

*The Cadle Co. v. Mims (In re Moore)*,
608 F.3d 253 (5th Cir. 2010) ...........................................................40

*In re The Container Store Group, Inc.*,
No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025)...................77, 83

*In re The Landing Assocs.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993).........................................60, 65

*Toibb v. Radloff*,
501 U.S. 157 (1991)........................................................................57

x

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ...............................................................59, 65

*In re Transcon. Energy Corp.*,
    764 F.2d 1296 (9th Cir. 1985) ...............................................................................43

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
    549 U.S. 444 (2007).............................................................................................78, 79

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ...............................................................18, 19

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983)...................................................................................................57

*In re Vroom, Inc.*,
    No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025)...........................................77

*Walters v. Hunt (In re Hunt)*,
    146 B.R. 178 (Bankr. N.D. Tex. 1992) ...................................................................16

*In re Wesco Aircraft Holdings, Inc.*,
    No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025).............................................77

*Williams v. Placid Oil Co. (In re Placid Oil Co.)*,
    753 F.3d 151 (5th Cir. 2014) ...................................................................................16

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007).................................................................45, 48

*In re WorldCom, Inc.*,
    2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...........................................71

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .........................................................................56

## STATUTES

11 U.S.C.
    § 101(31)...............................................................................................................33, 59
    § 157(b)(2)(L)...........................................................................................................52
    § 301.........................................................................................................................64
    § 302.........................................................................................................................64
    § 303.........................................................................................................................64
    § 365.......................................................................................................35, 36, 37, 67
    § 365(a)....................................................................................................................36
    § 365(b)(1)...............................................................................................................38
    § 501(a)....................................................................................................................22

§ 507(a)(1) ........................................................................................................64
§ 507(a)(2) ..............................................................................................29, 63
§ 507(a)(3) ..............................................................................................29, 63
§ 507(a)(4) ........................................................................................................64
§ 507(a)(5) ........................................................................................................64
§ 507(a)(6) ........................................................................................................64
§ 507(a)(7) ........................................................................................................64
§ 507(a)(8) ..............................................................................................29, 64
§ 510(b) ............................................................................................................41
§ 524(g) ............................................................................................................75
§ 701 ................................................................................................................67
§ 1122 ......................................................................................................27, 28
§ 1122(a) ....................................................................................27, 28, 29
§ 1122(b) ................................................................................................27, 64
§ 1123 ..........................................................................................27, 36, 67
§ 1123(a) ................................................................................................29, 30
§ 1123(a)(1) ..........................................................................................28, 29
§ 1123(a)(2) ..........................................................................................29, 30
§ 1123(a)(3) ....................................................................................................30
§ 1123(a)(4) ....................................................................................................30
§ 1123(a)(5) ..........................................................................................31, 32
§ 1123(a)(6) ..........................................................................................32, 33
§ 1123(a)(7) ..........................................................................................33, 34
§ 1123(a)(8) ....................................................................................................29
§ 1123(b) ......................................................................................34, 35, 39
§ 1123(b)(1) ..........................................................................................34, 35
§ 1123(b)(2) ..........................................................................................35, 38
§ 1123(b)(3) ....................................................................................................39
§ 1123(b)(3)(A) ..........................................................................................39
§ 1123(d) ........................................................................................................38
§ 1124 ..............................................................................................................14
§ 1124(2) ........................................................................................................34
§ 1125 ............................................................................18, 20, 26, 55
§ 1125(a) ....................................................................................18, 20, 21
§ 1125(a)(1) ....................................................................................................18
§ 1125(b) ........................................................................................................20
§ 1125(e) ................................................................................................25, 26
§ 1125(g) ........................................................................................................21
§ 1126 ..............................................................................................................55
§ 1126(b) ................................................................................................20, 21
§ 1126(b)(1) ................................................................................................22
§ 1126(b)(2) ................................................................................................20
§ 1126(c) ........................................................................................................63
§ 1126(f) ................................................................................25, 62, 63
§ 1126(g) ..........................................................................................................7
§ 1129 ....................................................................................................passim

§ 1129(a) .................................................................................................. 15, 26, 55, 68
§ 1129(a)(1) ....................................................................................................... 27, 55
§ 1129(a)(2) ....................................................................................................... 55, 56
§ 1129(a)(3) ....................................................................................... 52, 56, 57, 58
§ 1129(a)(4) ............................................................................................................ 58, 59
§ 1129(a)(5) ......................................................................................................... 9, 59, 60
§ 1129(a)(5)(A)(i) .................................................................................................... 59
§ 1129(a)(5)(A)(ii) ............................................................................................... 59, 60
§ 1129(a)(5)(B) ......................................................................................................... 59
§ 1129(a)(6) ............................................................................................................... 61
§ 1129(a)(7) ............................................................................................................... 61
§ 1129(a)(8) ......................................................................................................... 62, 63
§ 1129(a)(9) ......................................................................................................... 14, 63
§ 1129(a)(10) ............................................................................................................ 64
§ 1129(a)(11) ..................................................................................................... 64, 66
§ 1129(a)(12) ............................................................................................................ 67
§ 1129(a)(13) ............................................................................................................ 67
§ 1129(a)(14) ............................................................................................................ 68
§ 1129(a)(15) ............................................................................................................ 68
§ 1129(a)(16) ............................................................................................................ 68
§ 1129(b) ............................................................................................................ *passim*
§ 1129(b)(1) ................................................................................................... 26, 68, 69
§ 1129(b)(2)(B)(ii) .................................................................................................... 72
§ 1129(b)(2)(C)(ii) .................................................................................................... 72
§ 1129(d) ................................................................................................................... 73

15 U.S.C.
§ 77d(a)(2) .......................................................................................................... 21, 22
§ 77e ........................................................................................................................ 22, 73

28 U.S.C. § 1930(a) ......................................................................................................... 67

**RULES**

Fᴇᴅ. R. Bᴀɴᴋʀ. P.
2002(b) ...................................................................................................................... 16, 17
3017(a) ...................................................................................................................... 16, 17
3017(d) ................................................................................................................ 20, 22, 23
3017(e) ............................................................................................................................ 20
3018 ................................................................................................................................. 24
3018(b) ................................................................................................................ 20, 23, 24
3018(c) ....................................................................................................................... 20, 23
3020 ................................................................................................................................. 74
3020(e) ............................................................................................................................ 73
6004 ................................................................................................................................. 74
6004(h) ............................................................................................................................ 74

6006 .................................................................................................................. 74

6006(d) ............................................................................................................. 74

## TREATISES

7 Collier on Bankruptcy (16th ed.) ...................................................................... 55, 60, 72

## REGULATIONS

17 C.F.R.

§ 230.144A .......................................................................................................... 22

§ 230.501 *et seq.* ................................................................................................ 21

§ 230.506 ............................................................................................................. 22

§ 230.901 *et seq.* ................................................................................................ 21

§ 230.902 ............................................................................................................. 22

§ 230.903 ............................................................................................................. 22

## OTHER AUTHORITIES

H.R. REP. No. 95-595 (1977) .............................................................................. 27, 55

S. REP. No. 95-989 (1978) .................................................................................. 27, 55

Wolfspeed, Inc. and Wolfspeed Texas LLC (collectively, the "***Debtors***") hereby submit this memorandum of law in support of (i) final approval of the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 7] (the "***Disclosure Statement***") and (ii) confirmation of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate*, dated June 27, 2025 [Docket No. 8] (as may be amended, modified, or supplemented from time to time, the "***Plan***"), pursuant to Section 1129 of title 11 of the United States Code (the "***Bankruptcy Code***").[2]

## PRELIMINARY STATEMENT

1.      The Debtors seek approval of a disclosure statement and confirmation of a plan of reorganization that implements a comprehensive restructuring of the Debtors' prepetition funded debt obligations.   The Plan is the result of the Debtors' extensive negotiations with an overwhelming majority of their key stakeholders, including the Ad Hoc Senior Secured Group, the Ad Hoc 26s/28s/29s Group, and Renesas.  Critically, as set forth in the *Declaration of Emily Young, on Behalf of Epiq Corporate Restructuring, LLC, Regarding Solicitation and Tabulation of Ballots Cast in Connection with the Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and its Debtor Affiliate* [Docket No. 272] (the "***Vote Certification***"), all voting classes of claims have voted to accept the Plan: (a) 100% in amount and number of the Class 3 Senior Secured Notes Claims that voted; (b) 91.33% in amount of the Class 4 Convertible Notes Claims that voted and 93.91% in number of Holders of Class 4 Convertible Notes Claims that voted; and (c) 100% in amount and number of the Class 5 Renesas Claims that voted.

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan, the Disclosure Statement, or the Solicitation Procedures Motion, as applicable.

2.      Approval of the Disclosure Statement and confirmation of the Plan will allow the Debtors to emerge from the Chapter 11 Cases as reorganized entities better positioned to succeed in the critical and competitive semiconductor industry.  Specifically, the Plan will (a) allow the Debtors to continue to operate in the ordinary course as a leading American semiconductor manufacturer; (b) substantially de-lever the Debtors' balance sheet by permanently reducing over $4.6 billion of their prepetition funded debt obligations; (c) provide the Debtors with a liquidity infusion upon emergence pursuant to the New 2L Convertible Notes Rights Offering; (d) leave general unsecured creditors unimpaired; and (e) provide recoveries to existing shareholders.  The Plan represents a highly successful outcome for the Chapter 11 Cases and should be confirmed.

3.      The Debtors received two formal objections to the Plan.  One objection, filed by Oracle America, Inc., ("***Oracle***") addresses issues particular to Oracle's asserted claims.  The Debtors consensually resolved this objection prior to the Confirmation Hearing with the inclusion of agreed-upon language in the Proposed Confirmation Order (as defined below).

4.      The other objection (the "***U.S. Trustee Objection***") was filed by the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***").  The Debtors do not expect to resolve the U.S. Trustee's objection which—in keeping with a post-*Purdue* shift in policy by the Office of the United States Trustee nationwide—primarily takes issue with the opt-out mechanism employed by the Debtors with respect to the Plan's Third-Party Release (as defined below).  As explained in greater detail below, the U.S. Trustee's objection is meritless because (i) the opt-out mechanism employed by the Plan is consistent with longstanding practice in this district for more than a decade; and (ii) it is premised on a misplaced reliance on the Supreme Court's decision in *Purdue*, which did *not* change the law in the Fifth Circuit.  As the Court is well aware, the Fifth Circuit has long prohibited non-consensual releases, and the U.S. Trustee offers

no valid legal or factual basis, much less a persuasive one, for the Court to break with a longstanding practice under which hundreds of complex chapter 11 cases employing such an opt-out mechanism have been confirmed.[3]  Indeed, this Court has uniformly rejected substantively identical objections raised by the U.S. Trustee's office on this issue in several complex chapter 11 cases post-*Purdue*, and the U.S. Trustee cannot offer a factual or legal basis that the Court should reach a different result in this case—because there isn't one.  Apart from the objection of the U.S. Trustee, the Debtors expect to have no unresolved objections at the time of the Confirmation Hearing.

## I.    BACKGROUND

### A.    The Restructuring Support Agreement

5.    On June 22, 2025, the Debtors entered into that certain Restructuring Support Agreement (as may be amended from time to time and including all exhibits, annexes, and schedules attached thereto, the "***Restructuring Support Agreement***") with (i) an ad hoc group of secured noteholders (the "***Ad Hoc Senior Secured Group***") that collectively hold, own, or control more than 97% of the aggregate outstanding principal amount of the Senior Secured Notes, (ii) an ad hoc group of unsecured noteholders (the "***Ad Hoc 26s/28s/29s Noteholder Group***") that collectively hold, own, or control more than 67% of the aggregate outstanding principal amount of the Convertible Notes, and (iii) Renesas Electronics America Inc. ("***Renesas***" and, together with the Ad Hoc Senior Secured Noteholder Group and the Ad Hoc 26s/28s/29s Noteholder Group, the "***Consenting Creditors***") which holds, owns, or controls 100% of the outstanding principal amount of loans under the CRD.  The Plan incorporates the terms of the Restructuring Support Agreement,

---

[3]    *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) ("*Hundreds of chapter 11 cases* have been confirmed in this District with consensual third-party releases with an opt-out.") (emphasis added).

which has provided a roadmap for the Debtors' restructuring process. As noted above, upon the occurrence of the Effective Date, the Debtors will significantly de-lever their balance sheet while keeping their operations intact and paying all general unsecured creditors in full or otherwise leaving them Unimpaired.

      **B.**      **The Solicitation Process and Voting Results.**

      6.      On June 27, 2025, prior to commencing the Chapter 11 Cases, and as more fully described in the Solicitation Procedures Motion,[4] the Debtors commenced the solicitation of votes on the Plan from eligible Holders of Class 3 Senior Secured Notes Claims, Holders of Class 4 Convertible Notes Claims, and Holders of Class 5 Renesas Claims. Specifically, the Debtors, through their claims, balloting, and noticing agent, Epiq Corporate Restructuring, LLC (the "***Notice and Claims Agent***"), transmitted copies of a solicitation package (the "***Solicitation Package***")[5] to Holders of Claims in the Voting Classes or their nominees via electronic mail and, as applicable, via next business day delivery or first class mail. The Solicitation Package contained the Disclosure Statement, including the Plan and other exhibits thereto, and the applicable Ballots.[6]

      7.      On July 1, 2025, the Court entered an order granting the Solicitation Procedures Motion [Docket No. 60] (the "***Solicitation Procedures Order***") which, among other things,

---

[4]   *See Emergency Motion of Debtors for an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement, (B) Confirmation of Plan, and (C) Approval of Backstop Agreement; (II) Approving (A) Solicitation Procedures and (B) Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline (III) Fixing Deadline to Object to Disclosure Statement and Plan; (IV) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement to File Statements of Financial Affairs and Schedules of Assets and Liabilities; (V) Conditionally Approving the Disclosure Statement and (VI) Granting Related Relief* [Docket No. 9] (the "**Solicitation Procedures Motion**"). The facts and the legal arguments set forth in the Solicitation Procedures Motion are incorporated herein by reference in their entirety.*

[5]   *See Certificate of Service* filed on July 1, 2025 [Docket No. 32] (the "***Prepetition Solicitation Affidavit***").

[6]   The forms of ballots are annexed as Exhibits 3-5 to the Solicitation Procedures Order (as defined below) (collectively, the "***Ballots***").

(a) conditionally approved the Disclosure Statement as containing adequate information; (b) scheduled the Confirmation Hearing for September 8, 2025, to consider (i) final approval of the Disclosure Statement and any objections thereto, (ii) confirmation of the Plan and any objections thereto, and (iii) approval of the Debtors' entry into the Backstop Agreement and objections thereto; (c) established August 22, 2025 at 5:00 p.m. (prevailing Central Time), as the deadline to file objections to the adequacy of the Disclosure Statement or confirmation of the Plan (the "***Objection Deadline***"); (d) provided that any party in interest who has not (i) notified the Debtors of its intention to object to the Disclosure Statement on the basis that it does not include adequate information prior to the Voting Deadline (as defined below), (ii) provided the Debtors with a written request for additional information that would cure such objection, and (iii) provided sufficient opportunity for the Debtors to cure such objection or provide such information, shall be deemed to have waived such objection to the Disclosure Statement; (e) approved the Solicitation Procedures (as defined in the Solicitation Procedures Motion) with respect to the Plan, including the forms of Ballots, the Notice of Non-Voting Status, Release Opt-Out Form and related instructions; (f) approved the form and manner of the notice of the commencement of the Chapter 11 Cases, the Confirmation Hearing, and the Objection Deadline; and (g) granted related relief.

8.     The Disclosure Statement and Plan, among other case-related pleadings and information, were also made publicly available free of charge on the Notice and Claims Agent's website, https://dm.epiq11.com/Wolfspeed.

9.     The Solicitation Package advised recipients that (a) the date for determining which Holders of Class 3 Senior Secured Notes Claims, Holders of Class 4 Convertible Notes Claims, and Holders of Class 5 Renesas Claims were entitled to vote to accept or reject the Plan was June 25, 2025 (the "***Voting Record Date***") and (b) the deadline for submitting a Ballot containing a vote

to accept or reject the Plan was August 22, 2025 at 5:00 p.m. (prevailing Central Time) (the "***Voting Deadline***"). The instructions set forth on the Ballots further advised recipients that the Ballots must be returned to the Notice and Claims Agent by the Voting Deadline and specified the applicable methods by which Ballots could be transmitted to the Notice and Claims Agent. Each Ballot also contained detailed instructions regarding how to complete it and how to make any applicable elections (*e.g.*, opting out of the Third-Party Release) contained therein. The Voting Record Date and the Voting Deadline were clearly identified in the Solicitation Package.

10.     The materials in the Solicitation Package also established and communicated how the Notice and Claims Agent would tabulate the votes and elections contained in the Ballots. Those tabulation rules provided, among other things, that: (i) the last properly completed Ballot submitted by a Holder of a Claim in a Voting Class, that is actually received by the Notice and Claims Agent on or before the Voting Deadline, supersedes and revokes any prior Ballot(s) submitted by that Holder on account of the same Claim; (ii) Ballots that attempt to partially accept and partially reject the Plan will not be counted; (iii) illegible Ballots will not be counted; (iv) Ballots containing insufficient information to identify the Holder will not be counted; (v) any form of ballot other than the official form of Ballot sent by the Notice and Claims Agent will not be counted; (vi) Ballots received after the Voting Deadline (provided that such Voting Deadline has not been extended) will not be counted; and (vii) Ballots received prior to the entry of the Solicitation Procedures Order from Non-Eligible Holders will not be counted.

11.     The Debtors, through their Notice and Claims Agent, completed the solicitation and tabulation of votes following the Voting Deadline. As noted above and in the Vote Certification, the Debtors received votes in favor of the Plan from Holders of Class 3 Senior Secured Notes Claims, Holders of Class 4 Convertible Notes Claims, and Holders of Class 5 Renesas Claims.

### C.    Non-Voting Classes

12.    The Plan provides that the Holders of Claims and Interests in specific Classes are presumed to accept or deemed to reject the Plan (collectively, the "***Non-Voting Classes***"). Specifically, Holders of Claims in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 6 (General Unsecured Claims), and Class 9 (510(b) Claims) are unimpaired and are presumed to accept the Plan (collectively, the "***Unimpaired Non-Voting Classes***").  Accordingly, Holders in the Unimpaired Non-Voting Classes are conclusively presumed to accept the Plan and, therefore, are not entitled to vote.  In addition, Holders of Interests in Class 10 (Existing Equity Interests) are not receiving or retaining any property under the Plan on account of the value of their Existing Equity Interests; *provided*, that such Holders of Existing Equity Interests are receiving a recovery as a gift from applicable creditors as set forth in the Plan.  Accordingly, because their recovery is funded solely as a gift from applicable creditors, the Holders of Existing Equity Interests in Class 10 are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Similarly, Holders of Claims and Interests in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) are either unimpaired or not expected to receive any recovery on account of their Claims or Interests and thus are either presumed to accept or deemed to reject the Plan (as applicable).  Accordingly, Holders of Claims and Interests in each of the Non-Voting Classes are conclusively presumed to either accept or reject the Plan and were not solicited.

13.    The Solicitation Procedures Order approved service of the Notice of Non-Voting Status to Holders in Classes 1, 2, 6, 9, and 10.  This notice was not sent to Classes 7 and 8, as these Claims and Interests are held by the Debtors' affiliates. The Notice of Non-Voting Status, attached as Exhibit 2 to the Solicitation Procedures Order, includes the full text of the injunction, release, and exculpation provisions from the Plan and informs Holders in Non-Voting Classes that they will consent to the third-party release unless they opt out using the provided Release Opt-Out

Forms. The Notice of Non-Voting Status and the Release Opt-Out Forms were served on non-Affiliate Holders in the Non-Voting Classes (*i.e.*, the Debtors' creditor matrix and Holders of Existing Equity Interests) by the Notice and Claims Agent on or before July 3, 2025.[7]

### D.   Service of Combined Notice and Publication

14.    Following the entry of the Solicitation Procedures Order, on July 2 and July 3, 2025, the Debtors caused the Notice and Claims Agent to serve the Combined Notice on the Debtors' creditor matrix, Holders of Existing Equity Interests, and Holders of Claims in the Voting Classes in accordance with the terms of the Solicitation Procedures Order.[8]  In addition, the Debtors caused a form of the Combined Notice to be published in the national edition of *The Wall Street Journal* on August 28, 2025 (the "**Publication Notice**") in accordance with the terms of the Solicitation Procedures Order.[9]

### E.   Plan Supplement and Proposed Confirmation Order

15.    On August 12, 2025, the Debtors filed with the Court the *Notice of Filing of Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 168] (as amended, modified, and supplemented, the "**Plan Supplement**"), which included, among other things, the Schedule of Retained Causes of Action, the Schedule of Rejected Executory Contracts and Unexpired Leases, the Intercreditor

---

[7]    *See Certificate of Service,* filed July 9, 2025 [Docket No. 92], *and Certificate of Servic*e, filed July 15, 2025 [Docket No. 105] (collectively, the "**Postpetition Solicitation Affidavit**" and, together with the Prepetition Solicitation Affidavit, the "**Solicitation Affidavits**"). On August 12, the Debtors served the Combined Notice and the Notice of Non-Voting Status on certain employees that were part of the Debtors' existing employee share purchase plan who are Holders of Existing Equity Interests and did not receive service on July 3, 2025. *See Certificate of Service,* filed August 15, 2025 [Docket No. 209].

[8]    *See* Postpetition Solicitation Affidavit.

[9]    *See Affidavit of Publication of Notice of Combined Hearing on Disclosure Statement, Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and is Debtor Affiliate, and Related Matters in the Wall Street Journal* [Docket No. 253] (the "**Affidavit of Publication**").

Agreements, the New Notes Documents, the Investor Rights and Disposition Agreement, the Registration Rights Agreement, the Renesas Warrants Agreement, and the amended Rights Offering Procedures. Thereafter, on August 19, 2025, the Debtors filed with the Court the *Notice of Filing of Second Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 213], which included, among other things, the Investor Rights and Disposition Agreement, the Registration Rights Agreement, the Renesas Warrants Agreement, the Restructuring Transactions Exhibit, required disclosures under section 1129(a)(5) of the Bankruptcy Code, and the New Corporate Governance Documents, on August 21, 2025, the Debtors filed with the Court the *Notice of Filing of Third Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 236], which included, among other things, the New Notes Documents and required disclosures under section 1129(a)(5) of the Bankruptcy Code, on September 4, 2025, the Debtors filed with the Court the *Notice of Filing of Fourth Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 267], which included, among other things, the New Notes Documents, the Investor Rights and Disposition Agreement, the Registration Rights Agreement, further supplemented 1129(a)(5) Disclosures, New Corporate Governance Documents, Renesas Contingent Documentation, and the Incentive Plans, and on September 5, 2025, the Debtors filed with the Court the *Notice of Filing of Fifth Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 268], which included, among things, the Contingent Cash Escrow Agreement and the Intercreditor Agreements.

16.     On August 15, 2025, the Debtors also filed a proposed form of *Order (I) Approving Disclosure Statement, (II) Confirming Joint Prepackaged Chapter 11 Plan of Reorganization of*

*Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 208], and on September 5, 2025, the Debtors filed a revised proposed form of such order [Docket No. 273] (as amended or modified, the "***Proposed Confirmation Order***").  The Debtors expect to satisfy all conditions precedent to the Effective Date shortly after the Court's entry of the Proposed Confirmation Order and expect for the plan to become effective shortly thereafter.

## II.    OVERVIEW OF THE PLAN

17.    As noted above, the restructuring contemplated in the Plan will allow the Debtors to emerge from the Chapter 11 Cases with a capital structure better aligned with the Debtors' long-term growth and business strategy.  Specifically, the Plan will accomplish a material deleveraging of the Debtors' balance sheet by reducing funded debt by over $4.6 billion, without impairing business operations and, notably, satisfying Allowed General Unsecured Claims in full.

18.    The following table summarizes the treatment of Claims and Interests under the Plan and designates which Classes are Impaired by the Plan and which Classes of Claims and Interests are entitled to vote on the Plan:[10]

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| 1 | Other Secured Claims | The legal, equitable, and contractual rights of Holders of Allowed Other Secured Claims are unaltered by the Plan.  On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Other Secured Claim, on the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' or | Unimpaired | Not Entitled to Vote<br><br>(Presumed to Accept) |

---

[10]    The table is qualified in its entirety by reference to the full text of the Plan.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| | | Reorganized Debtors' option (as applicable), either (i) payment in full in Cash, (ii) delivery of the Collateral securing its Allowed Other Secured Claim, (iii) Reinstatement of its Allowed Other Secured Claim, or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.  For the avoidance of doubt, each Holder of a Commitment Fee Claim has agreed to receive, and shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Commitment Fee Claim, its Pro Rata Share of the Commitment Fee Amount; *provided*, subject to the Plan Supplement Documents, that $5,000,000 of such Commitment Fee Amount shall be held in escrow as part of the Contingent Additional Consideration, and released to such Holders of Allowed Commitment Fee Claims entitled thereto no later than five (5) Business Days after the Debtors and Renesas, as applicable, obtain Regulatory Approvals prior to a Regulatory Trigger Deadline; *provided*, *however*, to the extent the Regulatory Trigger Deadline occurs before Regulatory Approvals are obtained, each Holder of a Commitment Fee Claim agrees that the Commitment Fee Amount shall be reduced by such $5,000,000, and distribution of such reduced Commitment Fee Amount shall be in full and final satisfaction, release, and discharge of its Allowed Commitment Fee Claim. | | |
| 2 | Other Priority Claims | The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims are unaltered by the Plan.  On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Other Priority Claim, on the Effective Date, | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| | | each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | | |
| 3 | Senior Secured Notes Claims | On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Senior Secured Notes Claim agrees to less favorable treatment of its Allowed Senior Secured Notes Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Senior Secured Notes Claim, on the Effective Date, each Holder of an Allowed Senior Secured Notes Claim shall receive its Pro Rata Share of (i) the New Senior Secured Notes; and (ii) the Effective Date Cash Payment. | *Impaired* | *Entitled to Vote* |
| 4 | Convertible Notes Claims | On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Convertible Notes Claim agrees to less favorable treatment of its Allowed Convertible Notes Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Convertible Notes Claim, on the Effective Date, each Holder of an Allowed Convertible Notes Claim shall receive its Pro Rata Share of: (i) the New 2L Convertible Notes Rights (subject to the Initial Backstop Parties' Premium and the Backstop Holdback Allocation); (ii) the New 2L Takeback Notes; and (iii) 56.3% of the New Common Stock (subject to dilution from, where applicable, the conversion of the New 2L Convertible Notes (including those issued on account of the Backstop Premium), the conversion of the New Renesas 2L Takeback Convertible Notes, the Incentive Plans, and the exercise of the Renesas Warrants). | *Impaired* | *Entitled to Vote* |
| 5 | Renesas Claims | On or as soon as reasonably practicable after the Effective Date, except to the extent that Renesas agrees to a less favorable treatment, in full and final satisfaction, settlement, | *Impaired* | *Entitled to Vote* |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| | | release, and discharge of all Renesas Claims, Renesas shall receive, subject in all respects to the terms of the Plan and applicable Plan Supplement Documents: (i) the Base Consideration; (ii) if applicable, and without duplication with clause (i) above, the Base Consideration Proceeds; and (iii) if the Regulatory Trigger Deadline occurs, the Contingent Additional Consideration. | | |
| 6 | General Unsecured Claims | The legal, equitable, and contractual rights of the Holders of Allowed General Unsecured Claims are unaltered by the Plan. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in full in Cash on the Effective Date or in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim. | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Intercompany Claims | On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims shall be either: (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors or Reorganized Debtors, as applicable, and with the consent of the Required Consenting Creditors. | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests shall be either: (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors or Reorganized Debtors, as applicable, and with the consent of the Required Consenting Creditors. | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan |
|---|---|---|---|---|
| 9 | 510(b) Claims | 510(b) Claims shall be Unimpaired and shall, unless otherwise set forth in the Plan, continue in the ordinary course. | Unimpaired | Not Entitled to Vote<br><br>(Presumed to Accept) |
| 10 | Existing Equity Interests | On the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Existing Equity Interest shall receive its Pro Rata Share of the Equity Recovery (subject to dilution from the conversion of the New 2L Convertible Notes (including those issued on account of the Backstop Premium), the conversion of the New Renesas 2L Takeback Convertible Notes, Incentive Plans, and the exercise of the Renesas Warrants); *provided*, that, if the Distribution Event occurs, the Equity Recovery shall be reduced from 5.0% to 3.0% of the New Common Stock. On the Effective Date, all Existing Equity Interests and other Interests shall be cancelled, released, extinguished, and of no further force and effect. | Impaired | Not Entitled to Vote<br><br>(Deemed to Reject) |

## III.    LIMITED OBJECTIONS RECEIVED

19.    As noted above, the Debtors have received only two formal, yet limited, objections to confirmation of the Plan.

20.    In addition, the Debtors received informal comments to the Plan and Proposed Confirmation Order from certain governmental authorities, creditors, and parties in interest, including the Consenting Creditors. The Debtors have addressed and resolved all such comments through the addition of clarifying language in a revised version of the Proposed Confirmation Order.

## ARGUMENT

21.     This memorandum is divided into three parts.  First, the Debtors request final approval of the Disclosure Statement and a finding that the Debtors complied with the Solicitation Procedures Order.  Second, the Debtors demonstrate that the Plan satisfies Section 1129 of the Bankruptcy Code and, accordingly, request that the Court confirm the Plan and approve the Restructuring Transactions provided for therein.[11]  Finally, the Debtors address the arguments raised in the U.S. Trustee Objection and state why the U.S. Trustee Objection should be overruled. In support of the Plan, the Debtors have filed contemporaneously herewith (a) the *Declaration of Alexander Tracy in Support of Confirmation of Joint Prepackaged Chapter 11 Plan of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 270] (the "***Tracy Declaration***"); (b) the *Declaration of Daniel Hugo in Support of Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 269] (the "***Hugo Declaration***"); and (c) the *Declaration of Mark. E. Jensen in Support of Confirmation of the Joint Prepackaged Plan of Reorganization of Wolfspeed, Inc. and Its Debtor Affiliate* [Docket No. 271] (the "***Jensen Declaration***" and, together with the Tracy Declaration and the Hugo Declaration, the "***Confirmation Declarations***").  The Debtors also rely upon the First Day Declaration,[12] the Solicitation Affidavits, and the Vote Certification.

---

[11]   *See In re Lakeside Glob. II Ltd.*, 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989) ("In order to confirm a reorganization plan, the bankruptcy court must be satisfied that the plan complies with all of the requirements of § 1129(a) of the Bankruptcy Code.") (internal citations omitted); *In re Star Ambulance Serv. LLC*, 540 B.R. 251, 259 (Bankr. S.D. Tex. 2015) ("As the proponents of the Plan, the Debtor must establish by a preponderance of the evidence that each of the confirmation requirements set forth in Bankruptcy Code [Section] 1129 has been met.") (internal citation omitted); *In re Lone Star Utils. LLC*, 2014 WL 4629129, at *2 (Bankr. N.D. Tex. Sept. 15, 2014) ("The Debtor has the burden of proving the elements of Bankruptcy Code section 1129(a) by a preponderance of the evidence.").

[12]   *Declaration of Daniel Hugo in Support of Chapter 11 Petitions and First Day Relief* [Docket No. 4] (the "***First Day Declaration***").

## I.     APPROVAL OF THE DISCLOSURE STATEMENT IS WARRANTED.

### A.     Creditors Received Sufficient Notice of the Hearing and Objection Deadline for Approval of the Disclosure Statement.

22.     Under Bankruptcy Rule 3017(a), a hearing on the adequacy of a disclosure statement generally requires twenty-eight (28) days' notice.[13]  Similarly, Bankruptcy Rule 2002(b) provides that parties in interest should receive twenty-eight (28) days' notice of the objection deadline and the hearing to consider approval of the disclosure statement.[14]  Courts in the Fifth Circuit and elsewhere have adopted the general rule that due process requires "notice be 'reasonably calculated, under all the circumstances, to inform interested parties of the pendency' of a proceeding."[15]  When evaluating the notice and the sufficiency thereof, courts will consider "[f]irst, whether the notice apprised the claimant of the pendency of the action, and second, whether it was sufficiently timely to permit the claimant to act."[16]  Whether a particular method of notice is reasonably calculated to inform interested parties is determined on a case-by-case basis.[17]

23.     As noted above, on July 1, 2025, the Court entered the Solicitation Procedures Order which, among other things, scheduled the Confirmation Hearing, approved certain objection and reply deadlines, and approved the form of Combined Notice and manner of service thereof.[18]

---

[13]   *See* Fed. R. Bankr. P. 3017(a) ("the court must hold a hearing on . . . at least 28 days' notice to the debtor, creditors, equity security holders and other parties in interest . . . to consider the disclosure statement and any objections or modifications thereto.").

[14]   *See* Fed. R. Bankr. P. 2002(b).

[15]   *Willaims v. Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151, 154 (5th Cir. 2014) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

[16]   *Otto v. Tex. Tamale Co., Inc. (In re Tex. Tamale Co., Inc.)*, 219 B.R. 732, 739-40 (Bankr. S.D. Tex. 1998) (applying two-part test) (internal citation omitted); *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994) (same).

[17]   *See Walters v. Hunt (In re Hunt)*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992) ("Whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case.").

[18]   *See* Solicitation Procedures Order.

The Combined Notice informed recipients of, among other things: (a) the commencement of the Chapter 11 Cases, (b) the date and time set for the Confirmation Hearing, (c) the Objection Deadline, (d) the procedures for filing objection to final approval of the Disclosure Statement and/or the confirmation of the Plan, (e) how to view or obtain copies of the Plan and the Disclosure Statement, and (f) the proposed treatment of Claims and Interests of each Class under the Plan.[19] On July 2 and 3, 2025, the Combined Notice was served upon the Debtors' full creditor matrix, Holders of Existing Equity Interests, Holders of Claims in the Voting Classes, and the Debtors' master service list.  Accordingly, the Debtors submit that all parties in interest had notice at least twenty-eight (28) days prior to each of the Objection Deadline and the Confirmation Hearing, in compliance with both Bankruptcy Rule 3017(a) and Bankruptcy Rule 2002(b).[20]

24.    Further, the Debtors caused the Publication Notice to be published in the national edition of *The Wall Street Journal* on August 28, 2025, which publication, among other things, disclosed the date of the Confirmation Hearing and the Objection Deadline.[21]  Both the Combined Notice and the Publication Notice also included instructions regarding how parties in interest could obtain copies of the Plan and the Disclosure Statement free of charge through the Notice and Claims Agent's website, https://dm.epiq11.com/Wolfspeed.

25.    For the reasons set forth above, the Debtors submit that they have satisfied Bankruptcy Rules 2002(b) and 3017(a).

---

[19]    *See id.*, Ex. 1.

[20]    *See* Postpetition Certificate of Service.

[21]    *See* Affidavit of Publication.

**B.      The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and Should Be Approved**.

26.      The Disclosure Statement complies with Section 1125(a) of the Bankruptcy Code, which requires that a disclosure statement provide material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[22]  "Adequate information" is a flexible standard based on the facts and circumstances of each case.[23]  Courts within the Fifth Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying Section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[24]

27.      Courts may consider various factors when evaluating the adequacy of the disclosures in a proposed disclosure statement, including: (a) the events that led to the filing of a

---

[22]   11 U.S.C. § 1125(a)(1); *see, e.g.*, *In re J.D. Mfg., Inc.*, No. 07-36751 (WWS), 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) ("Adequacy of information is a determination that is relative both to the entity (e.g. assets/business being reorganized or liquidated) and to the sophistication of the creditors to whom the disclosure statement is addressed.") (internal quotations omitted); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statement is . . . to provide enough information to interested persons so they may make an informed choice. . . .") (internal citation omitted); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) ("A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims and on the outcome of the case. . . .") (emphasis in original) (internal citation omitted).

[23]   *See, e.g.*, 11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of § 1125 indicates that, in determining what constitutes 'adequate information' with respect to a particular disclosure statement . . . the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of each case.") (internal citations omitted); *Floyd v. Hefner*, No. H-03-5693 (MH), 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006), *on reconsideration in part,* 556 F.Supp. 2d 617 (S.D. Tex. 2008), (noting that what constitutes "adequate information" is a flexible standard); *In re Applegate Prop.*, 133 B.R. at 829 ("The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court.") (internal citations omitted).

[24]   *See, e.g., In re Cajun Elec. Power Coop., Inc.*, 150 F.3d at 518 (holding that courts are vested with wide discretion to determine whether disclosure statement contains "adequate information" within meaning of Section 1125(a) of the Bankruptcy Code); *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.").

bankruptcy petition, (b) the relationship of the debtor with its affiliates, (c) a description of the available assets and their value, (d) the anticipated future of the company, (e) claims asserted against the debtor, (f) the estimated return to creditors under a chapter 7 liquidation, (g) the chapter 11 plan or a summary thereof, (h) financial information relevant to a creditor's decision to accept or reject the chapter 11 plan, (i) information relevant to the risks posed to creditors under the plan, (j) the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers, and (k) the source of information stated in the disclosure statement.[25]

28.     The Disclosure Statement is extensive and comprehensive.  It contains descriptions of, among other things: (a) the Plan, (b) an overview of the Debtors' businesses, (c) key events leading to the commencement of the Chapter 11 Cases, (d) anticipated events during the Chapter 11 Cases, (e) financial information and financial projections that would be relevant to creditors' determinations of whether to accept or reject the Plan, (f) the Liquidation Analysis (as defined below) setting forth the estimated return that Holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation, (g) a valuation analysis, (h) risk factors affecting the Plan, and (i) federal tax law consequences of the Plan.  In addition, the Disclosure Statement and the Plan were subject to review and comment by the signatories to the Restructuring Support Agreement, as well as the consent rights set forth therein.[26]

29.     The Solicitation Procedures Order provides that any party in interest who has not (i) notified the Debtors of its intention to object to the Disclosure Statement on the basis that it does not include adequate information prior to the Voting Deadline, (ii) provided the Debtors with

---

[25]   *See In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  Disclosure regarding all topics is not necessary in every case.  *See, e.g.*, *In re U.S. Brass Corp.*, 194 B.R. at 424-25; *In re Phx. Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

[26]   *See* Restructuring Support Agreement.

a written request for additional information that would cure such objection, and (iii) provided sufficient opportunity for the Debtors to cure such objection or provide such information, shall be deemed to have waived such objection to the Disclosure Statement.  No party has (a) objected to the adequacy of the Disclosure Statement; (b) notified the Debtors of its intention to object to the Disclosure Statement on the basis that it does not include adequate information; or (c) provided the Debtors with a request for additional information that would cure an objection with respect to the adequate information of the Disclosure Statement.

30.     Accordingly, for these reasons, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of Section 1125(a) of the Bankruptcy Code, in satisfaction of Sections 1125(b) and 1126(b)(2) of the Bankruptcy Code, and should therefore be approved.

       **C.**      **The Debtors' Prepetition Solicitation of Votes Complied with the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order.**

31.     The Debtors commenced the prepetition solicitation of votes on the Plan from Holders of Claims in the Voting Classes.[27]  To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with Sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 3017(d), 3017(e), 3018(b), and 3018(c).  Similarly, section 1125(b) of the Bankruptcy Code prohibits solicitation of a plan unless the plan (or summary thereof) and "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" are transmitted to those persons whose votes are being solicited.  For the reasons set forth herein, the Debtors satisfied the requirements of the Bankruptcy Code and the Bankruptcy Rules in connection

---

[27]  *See* Prepetition Certificate of Service.

with the solicitation, and the Debtors complied with the procedures approved by the Solicitation Procedures Order.

<blockquote>

1.     **The Disclosure Statement Demonstrates That the Debtors Complied with Applicable Non-bankruptcy Law with Respect to Their Prepetition Solicitation.**
</blockquote>

32.     Section 1126(b) of the Bankruptcy Code expressly permits a debtor to solicit votes from holders of claims and interests prepetition without a court-approved disclosure statement if the solicitation complies with applicable non-bankruptcy law—including generally applicable federal and state securities laws or regulations—or, if no such laws exist, the solicited holders receive "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code.[28]

33.     To the extent that the Debtors' prepetition solicitation was deemed to constitute an offer of new securities, such solicitation procedures are exempt from securities law registration requirements pursuant to Section 4(a)(2), Regulation D, and/or Regulation S of the Securities Act,[29] or any similar rules, regulations, or statutes, as applicable to any recipient deemed an offeree.  Specifically, Section 4(a)(2) and Regulation D of the Securities Act create an exemption from the registration requirements under the Securities Act for certain transactions not involving a "public offering," and Regulation S creates an exemption from the registration requirements under the Securities Act for offerings deemed to be executed outside of the United States.[30]

---

[28]   *See* 11 U.S.C. § 1126(b) ("[A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title."); *see also* 11 U.S.C. § 1125(g) ("[A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.").

[29]   The Securities Act of 1933 (the "***Securities Act***").

[30]   *See* Securities Act, 15 U.S.C. § 77d(a)(2); 17 C.F.R. § 230.501 *et seq.*; 17 C.F.R. § 230.901 *et seq*.

34.     The Debtors have complied with the requirements of Section 4(a)(2) of the Securities Act, Regulation D, and Regulation S thereunder, as applicable, with respect to the requirements for transactions exempt from the registration requirements under the Securities Act in order to address the scenario where the prepetition solicitation of votes would be deemed a private placement of securities.  The prepetition solicitation materials made clear that it was only applicable to Holders that were one of the following: (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act); (ii) an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act) (or their authorized signatories); or (iii) for holders located outside the United States, a person other than a "U.S. person" (as defined in Rule 902 under the Securities Act) and not participating on behalf of or on account of a U.S. person.[31] Therefore, the prepetition solicitation meets the requirements of applicable non-bankruptcy law and, thus, complies with Section 1126(b)(1) of the Bankruptcy Code.

35.     In addition, Bankruptcy Rule 3017(d) enumerates those materials that must be provided to holders of claims and interests for the purpose of soliciting votes to accept or reject a plan of reorganization and, as set forth below, the solicitation complied with such rules.[32]

> **2.     The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Bankruptcy Rules.**

36.     Bankruptcy Rule 3017(d) requires the Debtors to transmit a form of ballot, which substantially conforms to Official Form No. 314, only to "creditors and equity security holders

---

[31]   *See, e.g.*, Regulation D, 17 C.F.R. § 230.506 (deeming a transaction a non-public offering under Section 4(a)(2) of the Securities Act if the transaction only involves accredited investors, provided certain other conditions are satisfied); Regulation S, 17 C.F.R. § 230.903 (deeming a transaction occurring outside the United States, and, therefore, not subject to Section 5 of the Securities Act, if the transaction only involves purchasers who are not a U.S. person, provided certain conditions are satisfied).

[32]   Fed. R. Bankr. P. 3017(d).

entitled to vote on the plan."[33]   Bankruptcy Rule 3018(c) provides that, "[a]n acceptance or rejection of a plan [shall] be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."[34]   As set forth in the Solicitation Affidavits, the Ballots were transmitted to all Holders of Claims in the Voting Classes.[35]   The forms of Ballots complied with the Bankruptcy Rules and are consistent with Official Form No. 314.   Moreover, the forms of Ballots were approved by the Bankruptcy Court in the Solicitation Procedures Order.[36]   Further, there have been no objections to the sufficiency of the Ballots.   Based on the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rules 3017(d) and 3018(c).

### 3. The Voting Record Date Complied with the Bankruptcy Rules and the Solicitation Procedures Order.

37.   In a solicitation, the identity of holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials is to be determined "on the date specified in the solicitation. . . ."[37]   The Solicitation Procedures Order, the Disclosure Statement, and the Ballot clearly identify June 25, 2025 as the Voting Record Date. No party in interest has objected to the Voting Record Date.   Therefore, the Debtors respectfully request that the Court approve June 25, 2025 as the Voting Record Date on a final basis, to the extent not previously approved on a final basis in the Solicitation Procedures Order.

---

[33]   *Id.* at (2)

[34]   Fed. R. Bankr. P. 3018(c).

[35]   *See* Prepetition Certificate of Service.

[36]   *See* Solicitation Procedures Order, ¶ 13.

[37]   Fed. R. Bankr. P. 3018(b).

4. **The Debtors' Solicitation Period Complied with Bankruptcy Rule 3018 and the Solicitation Procedures Order.**

38.     The Debtors' solicitation period for all Holders of Claims in Voting Classes complied with Bankruptcy Rule 3018.  First, as set forth above, the Plan and Disclosure Statement were transmitted to all Holders of Claims in Voting Classes in accordance with Bankruptcy Rule 3018(b).[38]  Second, the solicitation period—which lasted from June 27, 2025 through August 22, 2025 (approximately 57 days)—complied with the deadlines set forth in the Solicitation Procedures Order and was adequate under the particular facts and circumstances of the Chapter 11 Cases and applicable bankruptcy law.  Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 3018.

5. **The Debtors' Vote Tabulation Was Appropriate and Complied with the Solicitation Procedures Order.**

39.     The Debtors further submit that the tabulation of votes was completed in a manner consistent with the Solicitation Procedures approved in the Solicitation Procedures Order and in accordance with applicable bankruptcy law.  As described in the Solicitation Procedures Motion and the Vote Certification, the Notice and Claims Agent used standard and customary procedures in tabulating votes from Holders of Claims in Voting Classes.  Specifically, the Notice and Claims Agent reviewed and tabulated all valid Ballots received through August 22, 2025, each in accordance with the court-approved Solicitation Procedures and the Disclosure Statement.[39]

---

[38]     *See* Prepetition Certificate of Service, ¶¶ 2, 3.

[39]     *See* Vote Certification.

6.      **Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Solicitation Procedures Order.**

40.      As further described in the Solicitation Procedures Motion, certain Holders of Claims and Interests were not provided a Solicitation Package because such Holders were either Unimpaired under, and conclusively presumed to accept, the Plan pursuant to Section 1126(f) of the Bankruptcy Code and/or are receiving no recovery under the Plan and are deemed to reject the Plan.  In the Solicitation Procedures Order, the Court approved the Debtors' Solicitation Procedures, which provided that the Debtors would not mail a copy of the Solicitation Package to Holders of Claims and Interests presumed to accept and/or deemed to reject the Plan.[40]  As set forth above, the Court-approved Combined Notice was sent to the Debtors' full creditor matrix and provided instructions for obtaining copies of the Disclosure Statement and Plan, which are available at no cost on the Notice and Claims Agent's website.  In addition, the Court-approved Notice of Non-Voting Status and Release Opt-Out Forms were sent to all non-Affiliate Holders of Claims and Interests in Non-Voting Classes (*i.e.*, the Debtors' creditor matrix and Holders of Existing Equity Interests) in accordance with the Solicitation Procedures Order.[41]

7.      **Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

41.      Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable on account of such solicitation . . . for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan. . . ."[42]  Section

---

[40]    *See* Solicitation Procedures Order, ¶ 7.

[41]    *See id.*

[42]    11 U.S.C. § 1125(e).

25

1125(e) of the Bankruptcy Code is understood to "provide[] a safe harbor for the disclosure and solicitation process of a bankruptcy."[43]

42.     As set forth in the First Day Declaration, the Hugo Declaration, and the Disclosure Statement, the parties to the Restructuring Support Agreement engaged in arm's-length, good-faith negotiations,[44] and all parties, including the Debtors, the Released Parties, and the Exculpated Parties took appropriate actions in connection with the solicitation of votes on the Plan in compliance with Section 1125 of the Bankruptcy Code.   Therefore, the Debtors respectfully request that the Court grant these parties the protections provided under Section 1125(e) of the Bankruptcy Code.

## II.     THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE.

43.     To confirm a plan, a court must find that both the plan and the debtor are in compliance with each of the requirements of Section 1129 of the Bankruptcy Code.   Further, the proponent of a plan must demonstrate compliance with Section 1129 by a preponderance of the evidence.[45]   For the reasons set forth below, the Plan and the Debtors meet the requirements of Section 1129 of the Bankruptcy Code.[46]

---

[43]   *Evercore Cap. Partners II, L.L.C. v. Nancy Sue Davis Tr. (In re Davis Offshore, L.P.)*, 644 F.3d 259, 266 (5th Cir. 2011) (internal citations and quotations omitted).

[44]   *See* First Day Declaration ¶¶ 60-66; *see also* Hugo Declaration, ¶ 13.

[45]   *Heartland Fed. Savings & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (recognizing that "preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.") (internal citation omitted).

[46]   In the event all requirements of Section 1129(a) are met other than every impaired class having accepted the Plan, the Court may confirm the Plan if the "cramdown" requirements under Section 1129(b) of the Bankruptcy Code are satisfied.   11 U.S.C. § 1129(b)(1).   Here, each Voting Class has voted to accept the Plan.

A. **The Plan Complies with All Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(1).**

44.     Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]."[47]   As set forth herein, the Plan complies with the requirements of the Bankruptcy Code in terms of both (a) the classification of Claims and Interests and (b) the content of the Plan.

1. **The Classification of Claims and Interests in the Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.** [48]

45.     Section 1122(a) of the Bankruptcy Code states: "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[49]   The plan proponent has broad discretion in classifying claims under Section 1122 and, as implied by the statute, a plan may place substantially similar claims in different classes when a reasonable nondiscriminatory basis exists for such classification.[50]   In evaluating whether a plan complies with Section 1122, courts look to the kind, species, or character of each category of claims.   If a plan classifies substantially similar claims in different classes, there must exist a reasonable, non-

---

[47]   11 U.S.C. § 1129(a)(1).   The legislative history of Section 1129(a)(1) explains that this provision encompasses the requirements of Sections 1122 and 1123 governing classification of claims and contents of the plan, respectively.   *See* H.R. REP. No. 95-595, at 412 (1977); S. REP. No. 95-989, at 126 (1978).

[48]   The Plan does not include a class for administrative convenience so Section 1122(b) of the Bankruptcy Code does not apply in the Chapter 11 Cases.

[49]   11 U.S.C. § 1122(a).

[50]   *In re Idearc, Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009), *subsequently aff'd sub nom. In re Idearc, Inc.,* 662 F.3d 315 (5th Cir. 2011); *see also In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991), *aff'd, NLRB v. Greyhound Lines (In re Eagle Bus Mfg.)*, 158 B.R. 421 (S.D. Tex. 1993); *Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278-79 (5th Cir. 1991) ("A fair reading of both subsections [of Section 1122] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class.").

discriminatory basis for such treatment, such as a business or economic justification for the separate classification or a legal distinction between the claims.[51]  Here, the Plan classifies substantially similar Claims and Interests in the same Class, satisfying Section 1122(a) of the Bankruptcy Code.

46.     Article 3 of the Plan classifies eight Classes of Claims against the Debtors and two Classes of Interests in the Debtors, which are described in the Plan and Disclosure Statement. Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Other Priority Claims are not classified and are separately treated.  The Classes under the Plan are designated as follows:  Other Secured Claims (Class 1), Other Priority Claims (Class 2), Senior Secured Notes Claims (Class 3), Convertible Notes Claims (Class 4), Renesas Claims (Class 5), General Unsecured Claims (Class 6), Intercompany Claims (Class 7), Intercompany Interests (Class 8), 510(b) Claims (Class 9), and Existing Equity Interests (Class 10).

47.     The classification scheme set forth in the Plan complies with Section 1122(a) of the Bankruptcy Code because each Class contains only Claims or Interests that are substantially similar to each other.  Furthermore, the classification scheme created by the Plan is based on the similar nature of the Claims or Interests contained in each Class and not upon an impermissible classification factor.  Similar Claims have not been placed into different Classes in order to affect the outcome of the vote on the Plan.  Rather, Other Secured Claims, Other Priority Claims, Senior Secured Notes Claims, Convertible Notes Claims, Renesas Claims, General Unsecured Claims,

[51]   *See In re Briscoe Enters.*, 994 F.2d at 1167 (Claims may be classified separately for good business reasons and a plan proponent cannot "classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); *In re Mirant Corp.,* No. 03-46590 (DML), 2007 WL 1258932 at *7 (Bankr. N.D. Tex. Apr. 27, 2007) ("Section 1122 of the Bankruptcy Code does not require that all substantially similar claims be placed in the same class.  Decisions interpreting section 1122(a) generally uphold separate classification of different groups of unsecured claims when a reasonable basis exists for that classification.") (internal citations omitted).

Intercompany Claims, and 510(b) Claims respectively, have been classified separately because of the nature of such Claims and/or their unique proposed treatment under the Plan, as negotiated in connection with the Restructuring Support Agreement.[52]  Intercompany Interests and Existing Equity Interests have been classified separately due to their distinct nature and their separate proposed treatment under the Plan.[53]  Because each Class consists of only similar Claims or Interests, the Court should approve the classification scheme of the Plan as consistent with Section 1122(a) of the Bankruptcy Code.

### 2.    The Plan Satisfies the Requirements of Section 1123(a).

48.    The Plan complies with all subsections of Section 1123(a) of the Bankruptcy Code, which sets forth seven requirements that every chapter 11 plan must satisfy.[54]

49.    <u>Designation of Classes of Claims and Interests – 11 U.S.C. § 1123(a)(1)</u>.  Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate classes of interests and claims, other than the types of claims specified in Section 507(a)(2) (administrative expense claims), Section 507(a)(3) (claims arising in the "gap" period in an involuntary case),[55] and Section 507(a)(8) (priority tax claims).[56]  As described above, Article 3 of the Plan designates Classes of Claims and Interests in compliance with Section 1123(a)(1).

50.    <u>Specification of Unimpaired Classes – 11 U.S.C. § 1123(a)(2)</u>.  Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not

---

[52]    *See* Hugo Declaration, ¶¶ 17-18.

[53]    *See id.*

[54]    11 U.S.C. § 1123(a).  Section 1123(a)(8) does not apply in the Chapter 11 Cases because the Debtors are not individuals.

[55]    The Debtors commenced a voluntary chapter 11 case; therefore, there are no "gap" period claims of the kind specified in Section 507(a)(3) of the Bankruptcy Code.

[56]    11 U.S.C. § 1123(a)(1).

impaired under the plan."[57]   Article 3 of the Plan provides that Claims and Interests in Classes 1, 2, 6, and 9 are Unimpaired under, and conclusively presumed to accept, the Plan.  Furthermore, Claims and Interests in Classes 7 and 8 may be Unimpaired under, and may be conclusively presumed to accept, the Plan.[58]

51.   <u>Specification of Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)</u>.  Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."[59]   As provided in Article 3 of the Plan, Claims and Interests in Classes 3, 4, 5, and 10 are designated as Impaired under the Plan.  In accordance with Section 1123(a)(3), Article 3 of the Plan specifies the treatment afforded to the Impaired Classes of Claims.  Furthermore, Claims and Interests in Classes 7 and 8 may be Impaired under, and may be conclusively deemed to reject, the Plan.[60]

52.   <u>Same Treatment of Claims or Interests Within Each Class – 11 U.S.C. § 1123(a)(4)</u>. Section 1123(a)(4) of the Bankruptcy Code requires that the treatment of each claim or interest in each particular class be the same as the treatment of all other claims or interests in such class unless the holder of a particular claim or interest agrees to less favorable treatment.[61]   The Plan complies with Section 1123(a)(4) by ensuring that the treatment of each Claim or Interest in each particular Class is the same as the treatment of all other Claims or Interests in such Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest.

---

[57]   11 U.S.C. § 1123(a)(2).

[58]   The Plan provides that Claims and Interests in Classes 7 and 8 may be either Impaired or Unimpaired.

[59]   11 U.S.C. § 1123(a)(3).

[60]   *See* Footnote 58.

[61]   11 U.S.C. § 1123(a)(4).

53.   <u>Adequate Means for Implementation of Plan – 11 U.S.C. § 1123(a)(5).</u>   Section

1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's

implementation," and gives several examples of what may constitute "adequate means."[62]   In

accordance with Section 1123(a)(5) of the Bankruptcy Code, the Plan, including Article 5 of the

Plan, provides adequate means for its implementation, including, among other things: (a) the

continued corporate existence of the Debtors and the vesting of assets in the Reorganized Debtors

under Article 5.2 of the Plan; (b) the adoption of the New Corporate Governance Documents that

will govern the Reorganized Debtors and the appointment of the new board of directors of the

Reorganized Debtors, as provided in Article 5.11 of the Plan, respectively, and as set forth in the

Plan Supplement; (c) the issuance of New Common Stock for distribution in accordance with the

terms of the Plan, as detailed in Article 5.13 of the Plan; (d) the entry by the Reorganized Debtors

into the New Notes Documents, Disposition Agreement, and Renesas Warrants Agreement, as

detailed in Articles 5.4, 5.7, and 5.8 of the Plan; (e) consummation of the New 2L Convertible

---

[62]   *See* 11 U.S.C. § 1123(a)(5). Section 1123(a)(5)  requires a plan to provide for "adequate means" for the plan's implementation, "such as—

    (A)  retention by the debtor of all or any part of the property of the estate;

    (B)  transfer of all or any part of the property of the estate to one or more entities, whether organized before or after confirmation of such plan;

    (C)  merger or consolidation of the debtor with one or more persons;

    (D)  sale of all or any part of the property of the estate . . . among those having an interest in such property of the estate;

    (E)  satisfaction or modification of any lien;

    (F)  cancellation or modification of any indenture or similar instrument;

    (G)  curing or waiving of any default;

    (H)  extension of a maturity date or a change in an interest rate or other term of outstanding securities;

    (I)  amendment of the debtor's charter; or

    (J)  issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose."

Notes Rights offering, as detailed in Article 5.5 of the Plan; (f) the cancellation of existing securities and agreements (to the extent not already cancelled and extinguished), including any certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest, in each case, to the extent provided in the Plan, as detailed in Article 5.9 of the Plan; (g) the release and discharge of all Liens, except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, as detailed in Article 5.10 of the Plan; (h) the preservation of certain causes of action by the Reorganized Debtors pursuant to Article 5.2 of the Plan; (i) the various discharges, releases, injunctions, indemnifications and exculpations provided in Article 10 of the Plan; (j) the process for implementation of the Incentive Plans and continuation of certain employee benefits, as described in Articles 5.12 and 8.5 of the Plan; and (k) the assumption or rejection of executory contracts and unexpired leases to which any Debtor is a party, as detailed in Article 8 of the Plan.[63] Accordingly, the Plan provides adequate means for its implementation in a manner consistent with Section 1123(a)(5) of the Bankruptcy Code.

54.     Prohibition on the Issuance of Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6). Under Section 1123(a)(6) of the Bankruptcy Code, a plan must "provide for the inclusion in the charter of the debtor, if the debtor is a corporation, . . . of a provision prohibiting

---

[63]     *See* Plan, Art. 5.

the issuance of nonvoting equity securities . . . ."  11 U.S.C. § 1123(a)(6).  The New Corporate Governance Documents of the Debtors will prohibit the issuance of non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code.[64]  As a result, the Plan complies with Section 1123(a)(6) of the Bankruptcy Code to the extent applicable.

55.     Selection of Directors and Officers — 11 U.S.C. § 1123(a)(7).  Section 1123(a)(7) of the Bankruptcy Code provides that a plan shall "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director or trustee under the plan and any successor to such officer, director or trustee."[65]

56.     In accordance with Section 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan and the Reorganized Debtors' formation documents, bylaws and similar constituent documents, the manner of selection of officers and directors or managers, as appliable, of the Reorganized Debtors is consistent with the interests of creditors and equity security holders and with public policy.  The Debtors disclosed in the Plan Supplement the known proposed members of Reorganized Parent's board of directors and their affiliations.[66]  Additionally, the Debtors' existing officers are expected to continue as officers of the Reorganized Debtors following the Effective Date.[67]  Each of the insiders is compensated with an annual salary and the opportunity to earn additional awards through various incentive plans, as described in the Wages Motion and

---

[64]   *See* Fourth Plan Supplement, Exhibit K [Docket No. 267].

[65]   11 U.S.C. § 1123(a)(7).

[66]   *See* Plan Supplement, Ex. J; *see also* Hugo Declaration, ¶ 42.

[67]   For the avoidance of doubt, no employees are relatives of officers such that they would qualify as "insiders" under Section 101(31) of the Bankruptcy Code.

the Plan.[68]  In addition, as described in the Plan, the Reorganized Debtors will adopt the Incentive

Plans after the Effective Date.[69]  Accordingly, the Plan satisfies the requirements of Section

1123(a)(7) of the Bankruptcy Code.

> **3.      The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

57.      Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions

that may be incorporated into a chapter 11 plan.[70]  Among other things, Section 1123(b) of the

Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or

interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases,

(c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the

estates, and (d) include any other appropriate provision not inconsistent with the applicable

provisions of chapter 11.[71]

58.      The Plan is consistent with Section 1123(b) of the Bankruptcy Code.  Specifically,

under Article 3 of the Plan, Classes 1, 2, 6, and 9 are Unimpaired because the Plan leaves unaltered

the legal, equitable, and contractual rights of, or otherwise provides treatment in accordance with

Section 1124(2) of the Bankruptcy Code to, the Holders of Claims and Interests within such

Classes.[72]  On the other hand, Classes 3, 4, 5, and 10 are Impaired because the Plan modifies the

rights of the Holders of Claims or Interests within such Classes as contemplated by Section

---

[68]   The "**Wages Motion**" means the *Emergency Motion of Debtors (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, and (B) Maintain Employee Benefits Programs and Pay Related Obligations; and (II) Granting Related Relief* [Docket No. 11].

[69]   *See* Plan, Art. 5.12.

[70]   *See* 11 U.S.C. § 1123(b).

[71]   *See* 11 U.S.C. § 1123(b)(1)–(3), (6).

[72]   *See* Plan, Art. 3.

1123(b)(1) of the Bankruptcy Code.[73]  Classes 7 and 8 may be either Impaired or Unimpaired because the Plan may modify the rights of the Holders of Claims or Interests within such Classes as contemplated by Section 1123(b)(1) of the Bankruptcy Code.[74]  As permitted by Section 1123(b)(2) of the Bankruptcy Code, for the reasons set forth below, Article 8 of the Plan provides for the assumption, subject to certain exceptions set forth in Article 8 of the Plan, of all of the Debtors' executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code.[75]  Finally, for the reasons set forth below, the release, exculpation, and injunction provisions contained in Article 10 of the Plan are consistent with Section 1123(b) of the Bankruptcy Code.

### 4. The Assumption or Rejection of Executory Contracts and Unexpired Leases Under the Plan Is Appropriate Pursuant to Section 365 and Section 1123(b)(2) of the Bankruptcy Code.

59.     As set forth in Section 1123(b)(2) of the Bankruptcy Code, a plan may provide for the assumption, rejection or assignment of any executory contract or unexpired lease not previously rejected.[76]  Pursuant to Article 8 of the Plan, and except as otherwise provided therein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed assumed and amended (as necessary to implement the terms of the Restructuring Transaction), as of the Effective Date, unless such contract or lease: (a) has been assumed, assumed and assigned, or rejected by the Debtors by prior order of the Bankruptcy Court; (b) is the subject of a motion to reject filed by the Debtors pending on the Effective Date; (c) is identified as a rejected Executory Contract or Unexpired Lease by the Debtors on the Schedule of Rejected Executory Contracts and Unexpired Leases, (d) is rejected or terminated pursuant to the

---

[73]   *See id.*

[74]   *See id.*

[75]   *See* Plan, Art. 6.

[76]   11 U.S.C. § 1123(b)(2).

terms of the Plan; or (e) is the subject of a pending Cure Dispute.  The Plan provides that entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions or rejections, as applicable, pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.[77]

60.     Under the Plan, the Debtors reserve the right to amend or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases in their discretion before the Effective Date.

61.     The Plan provides that all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within twenty-one (21) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a Class 6 General Unsecured Claim.

62.     Section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."[78]  Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.[79]  Indeed, courts recognize that to impose more exacting scrutiny than the

---

[77]  *See* Plan, Section 8.1(b).

[78]  11 U.S.C. § 365(a).

[79]  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 57 U.S. 370,  (2019) (recognizing business judgment standard); *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (same); *In re Eagle Bus Mfg.*, 134 B.R. at 597 (confirming plan in which decisions regarding assumption or rejection of executory contracts and unexpired leases were based on sound business judgment and in best interests of the estate); *see also In re Idearc, Inc.*, 423 B.R. at 162 (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986) (for the proposition that courts will approve a debtor's assumption or rejection of an executory contract or unexpired lease unless evidence is

business judgment standard would slow a debtor's reorganization, thereby increasing its cost and undermining the "Bankruptcy Code's provision for private control" of the estate's administration.[80]

63.     The assumption or rejection by the Debtors of their Executory Contracts and Unexpired Leases in accordance with and subject to the terms and conditions of the Plan is both beneficial and necessary to the Debtors' and Reorganized Debtors' business operations upon and subsequent to emergence from chapter 11.[81]  The assumption or rejection of each of the executory contracts and unexpired leases proposed to be assumed or rejected pursuant to Section 365 of the Bankruptcy Code and the Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors, their Estates and their creditors.[82]  Based upon, among other things, the Reorganized Debtors' anticipated financial wherewithal after the Effective Date, each Reorganized Debtor that is assuming an Executory Contract or Unexpired Lease pursuant to the Plan will be fully capable of performing under the terms and conditions of the respective contract or lease to be assumed, or assumed and assigned, on and after the Effective Date.[83]

64.     Finally, the assumption by the Debtors of (a) the Indemnification Obligations pursuant to Article 8.4 of the Plan and (b) all the D&O Policies pursuant to Article 8.6 of the Plan, is of fundamental importance to the Debtors' reorganization process, a sound exercise of the Debtors' business judgment, and in the best interest of the Debtors and their Estates.[84]

---

presented that the debtor's decision to assume or reject "[was] so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.")).

[80]   *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

[81]   *See* Hugo Declaration, ¶ 63.

[82]   *See id.*

[83]   *See id.*

[84]   *See* Hugo Declaration, ¶ 64.

### 5.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.

65.    Section 365(b)(1) and Section 1123(b)(2) of the Bankruptcy Code provide that a debtor may not assume an executory contract or unexpired lease unless, among other things, it cures any defaults at the time of assumption.[85]  Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[86]

66.    The Plan complies with Section 1123(d) of the Bankruptcy Code.  Article 8.2 of the Plan provides for the satisfaction of any monetary amounts by which each executory contract and unexpired lease to be assumed is in default by payment of the default amount in cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree in accordance with Section 365(b)(1) of the Bankruptcy Code.

### 6.    The Plan's Release, Exculpation, and Injunction Provisions Comply with the Bankruptcy Code.

67.    The Plan includes certain releases of the Debtors and third-parties, an exculpation provision, and an injunction provision.[87]  These provisions comply with the Bankruptcy Code and applicable law because, among other things, they are fair and equitable, are given for valuable consideration, are the product of extensive good faith, arm's-length negotiations by sophisticated entities that were represented by able counsel and financial advisors, were a material inducement for parties to enter into the Restructuring Support Agreement, and are in the best interests of the Debtors and the Chapter 11 Cases.[88]  In addition, the Third-Party Release contained in the Plan is

---

[85]   11 U.S.C. § 365(b)(1); 11 U.S.C. § 1123(b)(2).

[86]   11 U.S.C. § 1123(d).

[87]   *See* Plan, Art. 9.

[88]   *See* Hugo Declaration, ¶¶ 19-35.

consensual and consistent with Fifth Circuit precedent.  None of the release, exculpation, or injunction provisions are inconsistent with the Bankruptcy Code and, thus, the requirements of Section 1123(b) of the Bankruptcy Code are satisfied.

> ### a.   The Debtor Release Complies with the Bankruptcy Code and Is Appropriate.

68.     Article 10.6(b) of the Plan provides for the Debtors to release the Released Parties, as contemplated by Section 1123(b)(3)(A) of the Bankruptcy Code.  Section 1123(b)(3)(A) provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[89]   Accordingly, pursuant to Section 1123(b)(3)(A), the Debtors may release estate causes of action as consideration for concessions made by its various stakeholders pursuant to the Plan.[90]  In considering the appropriateness of such releases, courts in the Fifth Circuit generally consider whether the release is (a) "fair and equitable" and (b) "in the best interests of the estate."[91]

> ### (i)   The Debtor Release is Fair and Equitable

69.     While courts sometimes conflate the two prongs of the foregoing analysis, the "fair and equitable" prong is generally interpreted, consistent with that term's usage in Section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority

---

[89]   11 U.S.C. § 1123(b)(3)(A).

[90]   *See*, *e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan."); *see also In re Heritage Org.*, *L.L.C.,* 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 738-39 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities,* No. 06-cv-744-A, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[91]   *In re Mirant Corp.*, 348 B.R. at 738; *see also In re Heritage Org.*, 375 B.R. at 259.

rule.[92]  Courts generally determine whether a release is "in the best interest of the estate" by reference to the following factors:

    (a)    the probability of success of litigation;

    (b)    the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment;

    (c)    the interest of creditors with proper deference to their reasonable views; and

    (d)    the extent to which the settlement is truly the product of arm's-length negotiations.[93]

Ultimately, courts afford a debtor some discretion in determining for itself the appropriateness of granting plan releases of estate causes of action.[94]

70.  Article 10.6(b) of the Plan provides for releases by the Debtors, the Reorganized Debtors, and their Estates of any and all Causes of Action, including any derivative claims, that the Debtors could assert against the Released Parties[95] (the "***Debtor Release***").  The Debtor Release easily meets the controlling standard.  The Plan, including the Debtor Release, complies

---

[92] *In re Mirant Corp.*, 348 B.R. at 738.

[93] *The Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citation omitted); *In re Mirant Corp.*, 348 B.R. at 739-40 (citing *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355-56 (5th Cir. 1997)).

[94] *See In re Gen. Homes*, 134 B.R. at 861 ("[t]he court concludes that such a release is within the discretion of the Debtor.").

[95] "***Released Party***" means, collectively, each of: (a) the Debtors; (b) the Reorganized Debtors; (c) Consenting Senior Secured Noteholders, (d) Consenting Convertible Noteholders, (e) the Senior Secured Notes Trustee, (f) Renesas; (g) the Backstop Parties and Initial Backstop Parties; and (h) with respect to each of the foregoing persons in clauses (a) through (g), all Related Parties.  Notwithstanding the foregoing, any Person that opts out of the releases set forth in the Plan shall not be deemed a Released Party thereunder.

"***Related Parties***" means with respect to a Person, that Person's current and former affiliates, and such Person's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, investment managers, investment advisors, representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, each in their capacity as such.

with the Bankruptcy Code's absolute priority rule because (a) Classes 1, 2, 6 and 9 are Unimpaired, (b) Classes 3, 4 and 5 have voted to accept the Plan, (c) the Holders of Claims and Interests in Classes 7 and 8 are Affiliates and/or party to the Restructuring Support Agreement, pursuant to which they agreed to support the Plan, and (d) with respect to Holders of Existing Equity Interests in Class 10, no Holder of a Claim or Interest junior to the Claims and Interests in Classes 4 or 5 will receive or retain on account of such Claims or Interests any property under the Plan.[96] Therefore, the release is "fair and equitable" to all Classes.[97]

### (ii)    The Debtor Release is in the Debtors' Best Interests

71.    In addition to being fair and equitable, the Debtor Release is in the best interest of the Estates.[98]  To begin, based on their review, the Debtors are not aware of any claims being released that might reasonably be expected to yield value for their Estates that outweighs the benefits provided under the Plan, the Restructuring Support Agreement, and the Restructuring Transactions.  As discussed in Article IV of the Disclosure Statement, in May 2025, the board of Wolfspeed, Inc. (the "**Board**") formed a Special Investigation Committee (the "**Special Committee**").  The Special Committee was granted broad authority to conduct an investigation into whether the Debtors possess any material and potentially viable direct or derivative claims for relief or causes of action (the "**Potential Claims**") and, if so, to determine whether the pursuit or

---

[96]  Claims in Class 9 (510(b) Claims) are subordinated under Section 510(b) of the Bankruptcy Code "to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."  *See* 11 U.S.C. § 510(b).

[97]  *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) ("[T]he absolute priority rule provides that a *dissenting class* of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.") (internal citation omitted) (emphasis added); *see also In re Mirant Corp.*, 348 B.R. at 738 ("Because 'fair and equitable' translates to the absolute priority rule, in order for a settlement to meet that test it must be consistent with the requirement that *dissenting classes* of creditors must be fully satisfied before any junior creditor receives anything on account of its claim.") (emphasis added).

[98]  *See* Hugo Declaration, ¶¶ 20-26; Jensen Declaration, ¶¶ 16-17, 23.

maintenance of such claims or causes of action is in the best interests of the company (the "**Investigation**").  The Special Committee was composed of Mark Jensen and Paul V. Walsh – two independent directors who are disinterested with respect to the subject matter of the Investigation (the "**Disinterested Directors**").  The Special Committee engaged outside counsel, Katten Muchin Rosenman LLP ("**Katten**"), to identify the Potential Claims and to conduct the Investigation.

72.     As part of the Investigation, the Disinterested Directors, with the assistance of Katten, conducted a thorough, privileged and confidential investigation into the transactions and conduct leading up to the Debtors' chapter 11 filing.[99]  The Disinterested Directors determined, based in part on their own review of the factual record, as well as the findings and recommendations of Katten, that any Potential Claims (i) were either not cognizable due to the absence of certain key legal predicates or (ii) even if proven to exist—and even without time, cost, or risk adjusting—did not have a value that would warrant their pursuit or maintenance on behalf of the Debtors' Estates under the existing facts and circumstances including, but not limited to, the terms, conditions, and benefits of the Restructuring Support Agreement and the Plan.  Ultimately, based on the Investigation, the Special Committee determined that the Debtor Release contemplated by the Plan was fair, reasonable, appropriate, and in the best interests of the Debtors, their Estates, and all of the Debtors' stakeholders and should be granted as a critical provision of the Plan and the agreements reached in connection with the Restructuring Support Agreement.[100]

73.     Thus, the Special Committee concluded that the Potential Claims likely offered no additional value to the Debtors or their Estates, particularly in light of the risk, cost, time, and limited upside associated with their pursuit, in contrast with the value-maximizing benefits offered

---

[99]     *See generally* Jensen Declaration.

[100]    *See Id.*

under the Plan and the Restructuring Support Agreement.[101]  On September 4, 2025, the Special Committee shared the findings of its Investigation with the Board and reported that, based upon such findings, the Special Committee had concluded that the Debtor Release contemplated by the Plan was fair, reasonable, appropriate, supported by adequate consideration, and in the best interests of the Debtors, their Estates, and all of the Debtors' stakeholders and should, accordingly, be approved by the Board as an essential Plan element.

74.     In reaching the conclusion that the Debtor Release is in the best interest of the Estates, the Special Committee also found that each Released Party has played an integral role in the Chapter 11 Cases, made substantial concessions that underpin the consensual resolution of the Chapter 11 Cases that will allow the Debtors to expeditiously exit bankruptcy with a de-leveraged capital structure, and/or may be unwilling to support the Plan without the Debtor Release.[102]  The Special Committee further found that the Plan, including the Debtor Release, was negotiated by sophisticated entities that were represented by able counsel and financial advisors.[103]

75.     For all of the foregoing reasons, the Debtors respectfully submit that the Debtor Release is consistent with and justified under the controlling Fifth Circuit standard and should be approved.

---

[101]   *See* Jensen Declaration ¶¶ 20-21.

[102]   *See* Hugo Declaration, ¶¶ 21-26; *see also In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) ("While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'") (quoting *In re Transcon. Energy Corp.*, 764 F.2d 1296 (9th Cir. 1985)).

[103]   *See* Hugo Declaration, ¶ 20.

b.      **The Consensual Third-Party Release Complies with the Bankruptcy Code and Is Appropriate.**

76.     The third-party release provision contained in Article 10.6(b) of the Plan provides that each Releasing Party,[104] including each Holder of a Claim or Interest in a Class who does not affirmatively elect to opt out of the releases contained in the Plan, is deemed to release the claims it holds against the Debtors, the Reorganized Debtors, and the other Released Parties (the "***Third-Party Release***").   While the Supreme Court has held that the Bankruptcy Code prohibits non-consensual third-party releases, outside of certain circumstances not applicable here, the Supreme Court did not call into question the permissibility of consensual third-party releases,[105] and the Fifth Circuit has long allowed consensual third-party releases.[106]   Indeed, as noted by a bankruptcy

---

[104]   "***Releasing Parties*** *means,* collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) Consenting Senior Secured Noteholders; (d) Consenting Convertible Noteholders; (e) Renesas; (f) the Backstop Parties and Initial Backstop Parties; (g) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (h) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; (i) each Related Party of each Entity in clauses (a) through (h), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (h) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (h); provided, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Releasing Party;" provided, further, that any Related Party of any Consenting Creditor (including in such Consenting Creditor's capacity as an Entity in clauses (f) through (h)), including any separate branch, trading desk, fund and/or business group of a Consenting Creditor (including in such Consenting Creditor's capacity as an Entity in clauses (f) through (h)) shall not be deemed to be a Releasing Party themselves, unless such Related Party has itself signed the Restructuring Support Agreement, and further provided that the Notes Trustees shall be Releasing Parties solely in their respective capacities as Notes Trustee and not individually or in any other capacity.

[105]   *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 226-27 (2024).

[106]   See, e.g., *In re Robertshaw US Holding Corp.*, 662 B.R. at 322 (Bankr. S.D. Tex. 2024) (noting the permissibility of consensual third-party releases);, *e.g.*, *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.'  Bankruptcy courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans."); *See also In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex.  2011) ("the Fifth Circuit does allow permanent injunctions *so long as there is consent.*") (emphasis in original).

court in this Circuit, "most courts allow consensual non-debtor releases to be included in a plan."[107] Here, the solicitation process gave, and the Plan expressly allows for, the ability of affected parties in interest to object to (formally or informally) and/or opt out of the Third-Party Release. Accordingly, the Third-Party Release is justified under Fifth Circuit precedent as consensual.

77.     The Fifth Circuit, like other circuits, has not directly defined what constitutes a "consensual" third-party release.   Nonetheless, bankruptcy courts in the Fifth Circuit largely analyze whether third-party releases are consensual by focusing on the facts and circumstances of the specific *process*—i.e., whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look it over [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."[108]

78.     The notice furnished by the Debtors to parties in interest, the opportunity to review afforded to such parties, and the general disclosure in the Chapter 11 Cases meets the established requirements for the Third-Party Release to be considered consensual.   Indeed, the Debtors clearly and conspicuously, in all-bold text, included the full text of the Third-Party Release language in the Ballots, the Release Opt-Out Forms, and the Notice of Non-Voting Status, which were sent to all potential Releasing Parties.[109]   Additionally, the Debtors made this information available free of charge on the case website maintained in the Chapter 11 Cases by the Notice and Claims Agent.[110]   In each of the foregoing, the Debtors explicitly provided the potential Releasing Parties with clear directions for how to opt out of the Third-Party Release.   And notably, the Debtors know

---

[107]   *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007).

[108]   Conf. Hr'g Tr. 47:7-11, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) [Docket No. 730]; *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323-24 (Bankr. S.D. Tex. 2024) (noting procedures for providing notice and opportunity to opt out of third party releases).

[109]   *See* Prepetition Certificate of Service and Post Petition Solicitation Affidavit.

[110]   *See* https://dm.epiq11.com/Wolfspeed

the process worked because, as reflected in the Vote Certification, certain parties did, in fact, timely elect to opt out of the Third-Party Release by submitting Ballots or Release Opt-Out Forms, as applicable, to the Notice and Claims Agent.[111]

79.     Furthermore, the Debtors included language in the Ballots that made clear that, even if a creditor opted out of the Third-Party Release, such creditor would still receive the consideration and treatment for its Claim provided under the Plan.[112]  Importantly, under the Plan, the Releasing Party granting the Third-Party Release could opt out of the Third-Party Release without the need to object to or vote against confirmation of the Plan.  Said differently, a party could opt out of the Third-Party Release without impacting its recovery under the Plan and regardless of whether that party voted to accept or reject the Plan.[113]  This procedure was laid out in detail in the Solicitation Procedures Motion and the notices approved by the Court in the Solicitation Procedures Order and provided to the Releasing Parties.

80.     Further, the Release Opt-Out Form is only one way by which a party can effectively opt out of the Third-Party Release.  As set forth in the Plan, any party can also file an objection on the docket maintained in the Chapter 11 Cases and, upon doing so, such party will not be held to

---

[111]  *See* Vote Certification.

[112]  *See* bold, conspicuous language in the box on the first page of each Ballot providing: "Please be advised that your decision to opt out <u>does not</u> affect the amount of distribution you will receive under the Plan. Specifically, your recovery under the Plan will be the same if you opt out…"

[113]  The U.S. Trustee's suggestion that the Third-Party Release is not consensual because parties voting in favor of the Plan are deemed "Releasing Parties" is unpersuasive in light of the fact that the Debtors included the language requested by the U.S. Trustee which unambiguously provides that distributions are not tied to opt outs (nor does the Plan propose a so-called death trap in which creditors who vote to reject the Plan forfeit the right to a distribution).

be a Releasing Party.[114]  These procedures for opting out of the Third-Party Release are consistent

with what this Court determined "has long been settled in this District" for constituting consent.[115]

81.     Suffice it to say, the confluence of steps that the Debtors took in connection with

the Third-Party Release meets the applicable consent standard under which "[h]undreds of chapter

11 cases have been confirmed in this District . . ."  This standard looks to whether there has been

adequate notice of Third-Party Release and the consequences of electing not to opt out and whether

the Thirds-Party Release is narrowly tailored to the circumstances of the Chapter 11 Cases.[116]

82.     The Fifth Circuit has also shed light on the issue of consent through a series of

decisions addressing the *res judicata* effect of a confirmed chapter 11 plan that contains a third-

party release provision.[117]  For example, in *Republic Supply*, the Fifth Circuit found that the

Bankruptcy Code does not preclude a third-party release provision where "it has been accepted

and confirmed as an integral part of a plan of reorganization,"[118] and ultimately held that such

provision was binding and enforceable.[119]  The Fifth Circuit addressed the same issue on three

occasions thereafter, analyzing the specificity of the third-party release to determine its *res

judicata* effect.[120]  *Republic Supply* and its Fifth Circuit progeny ultimately stand for the

proposition that "[c]onsensual nondebtor releases that are specific in language, integral to the plan,

---

[114]  *See* Plan Art. 1.191.

[115]  *In re Robertshaw US Holding Corp.*, 662 B.R. at 323.

[116]  *Id.* at 323-24

[117]  *See Hernandez v. Larry Miller Roofing, Inc.*, 628 Fed. App'x 281, 286-88 (5th Cir. 2016); *FOMPuerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*, 255 Fed. App'x 909, 911-12 (5th Cir. 2007); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

[118]  *Republic Supply*, 815 F.2d at 1050.

[119]  *Id.* at 1053.

[120]  *See generally Hernandez*, 628 Fed. App'x. 281 (comparing the specificity of the third-party release provisions at issue in *Republic Supply*, *Applewood*, and *Dr. Barnes Eyecenter*).

a condition of the settlement, and given for consideration do not violate" the Bankruptcy Code.[121] This rule is consistent with the theory that "[t]he validity of a consensual release is primarily a question of contract law because such releases are no different from any other settlement or contract."[122]

83.    The Third-Party Release meets the *Republic Supply* standard.  First, the Third-Party Release is consensual.  As set forth above, parties in interest were provided fair and extensive notice of the Chapter 11 Cases, the Plan (including the Third-Party Release), and the deadline to object to confirmation of the Plan and related releases.  Further, all Holders of Claims in the Voting Classes were provided with an opportunity to opt out of the Third-Party Release on their Ballots, and all non-Affiliate Holders of Claims and Interests in Non-Voting Classes were provided with an opportunity to opt out of the Third-Party Release on the Release Opt-Out Forms included with the Notice of Non-Voting Status.  Any Holders of Claims in the Voting Class or Non-Voting Classes that timely submitted a valid Release Opt-Out Form or otherwise objected to granting the Third-Party Release (formally or informally) will not be deemed to grant the Third-Party Release.[123]

84.    In sum, all potential Releasing Parties were given ample opportunity and means to opt out of the Third-Party Release, all parties in interest were given ample notice of the Third-Party Release and all potential Releasing Parties were given ample opportunity to demonstrate

---

[121]   *In re Wool Growers*, 371 B.R. at 776 (citing *Republic Supply*, 815 F.2d at 1050; *FOM Puerto Rico*, 255 Fed. App'x at 911-12).

[122]   *Id.* at 775 (*citations omitted*).

[123]   *See* Plan, Art. A.157.

their consent to the Third-Party Release by taking the simple and easy-to-follow steps necessary to elect to opt out of the Third-Party Release, thus demonstrating their consent or non-consent.[124]

85.     Second, the language in the Plan and the solicitation materials is sufficiently specific so as to put the Releasing Parties on notice of the Third-Party Release.  The Third-Party Release describes in detail the nature and type of Claims being released, including Claims with respect to:

> (1) the governance, management, transactions, ownership, or operation of the Debtors or the Non-Debtor Affiliates (2) the purchase, sale, or rescission of any Security of the Debtors or the Non-Debtor Affiliates, (3) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (4) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate and any other Entity (including Consenting Creditors), (5) the Prepetition Credit Documents; (6) the Debtors' and Non-Debtor Affiliates' in- or out-of-court restructuring efforts, (7) intercompany transactions, (8) the formulation, preparation, dissemination, negotiation, solicitation, entry into, Filing, or consummation of this Plan, the Plan Supplement the Disclosure Statement, the Restructuring Support Agreement and related prepetition transactions, the Definitive Documents, the Rights Offering Documents, the Corporate Governance Documents, the Chapter 11 Cases, or any Restructuring Transaction, (9) any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the Definitive Documents, the Rights Offering Documents, or the Corporate Governance Documents, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, (10) the distribution, including any disbursements made by a Distribution Agent, of property under this Plan, or any other related agreement, or (11) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing and taking place on or before the Effective Date.[125]

---

[124]   *See* Vote Certification.

[125]   Plan, Article 10.6(b).

Each of the Ballots and the Release Opt-Out Forms contained the same clear disclosure providing the nature and types of Claims being released, thus providing sufficient specificity to the Releasing Parties of the nature and types of Claims being released.  The clear language of the Plan and the language sent to the Releasing Parties in the Ballots and Release Opt-Out Forms transparently placed the Releasing Parties on notice of the types of Claims being released.  And notably, this language is consistent with other third-party releases that have been approved by this Court.

86.    Third, the Third-Party Release is integral to the Plan and a condition to the global settlements embodied therein.  As described above and in the Hugo Declaration, the provisions of the Plan and Restructuring Support Agreement, including the Third-Party Release, were integral to the global settlement, and such parties may be unwilling to support the Plan without the Third-Party Release.[126]  Indeed, the Restructuring Support Agreement, which set forth the global settlement embodied in the Plan, required that the parties would incorporate release provisions into the Plan.[127]

87.    Fourth, the Third-Party Release is to be provided in exchange for significant consideration.  All parties in interest benefit from the Restructuring Transactions contemplated by the Restructuring Support Agreement and the Plan—including the distributions under the Plan and the reduction of debt—which will allow the Debtors to emerge as reorganized entities better positioned for long-term growth to the benefit of the Debtors' employees, vendors, and commercial counterparties.  That accomplishment is a direct result of the contributions of and, in some cases, material concessions made by, the Released Parties.  Such contributions include, among other things, (a) compromising Claims and accepting impaired recoveries; (b) participating in and

---

[126]  *See* Hugo Declaration, ¶ 30.
[127]  *See* Disclosure Statement, Ex. B.

agreeing to backstop the New 2L Convertible Notes Rights Offering; (c) permitting the use of encumbered assets and cash collateral during the Chapter 11 Cases; (d) negotiating and supporting the Plan, (e) assisting the Debtors in their efforts to obtain regulatory approvals; and (f) in the case of the Debtors' directors, officers, and employees, their immense efforts on behalf of the Debtors both prior to and throughout the Chapter 11 Cases.[128]  Furthermore, Holders of Claims and Interests who do not opt out of the Third-Party Release will be considered Released Parties, receiving a release from Releasing Parties under the Plan.

88.    The Consenting Creditors engaged with the Debtors in extensive good faith negotiations and spent many months working with the Debtors to develop and implement a value-maximizing restructuring, culminating with the upcoming hearing on confirmation of the Plan.[129] In short, the contributions and efforts of the Released Parties in formulating the Plan have allowed the Debtors to achieve a value-maximizing outcome and strongly support approval of the Third-Party Release.

89.    Finally, as noted above, "[h]undreds of chapter 11 cases have been confirmed in this District" with third-party releases contained in a plan, and can thus be bound by such releases using the procedures employed here.[130]  Here, the Plan goes further by providing (i) Holders of Claims in the Voting Classes with the opportunity to opt-out of the Third-Party Release, regardless of whether they voted to accept or reject the Plan, by indicating their election to opt-out on their Ballot, and (ii) Holders of Claims and Interests in Non-Voting Classes with the opportunity to opt-out of the Third-Party Release by indicating their election to opt-out on the Release Opt-Out Form.

---

[128]    *See* Hugo Declaration, ¶ 31.

[129]    *See* Hugo Declaration, ¶ 30.

[130]    *In re Robertshaw US Holding Corp.*, 662 B.R. at 323.

Thus, the Third-Party Release is a permissible, consensual release because the Holders of Claims and Interests who elect not to opt-out of the Third-Party Release have manifested their consent through their *choice* not to exercise their right to opt-out of such releases through any of the various methods clearly set forth in their Ballots, the Release Opt-Out Form, and the Plan (and it bears emphasis that doing so was as easy as checking a box on a form).

> **c.      The Exculpation Provision Complies with the Bankruptcy Code and is Appropriate.**

90.      Article 10.7 of the Plan provides that each Exculpated Party—*i.e.*, the Debtors and their Estates—shall be released and exculpated from any Claims or Causes of Action for any act taken or omitted to be taken between the Petition Date and the Effective Date relating to the Chapter 11 Cases, except for acts or omissions that are found to have been the product of willful misconduct, actual fraud, or gross negligence (the "***Exculpation Provision***").  Unlike the Third-Party Release, the Exculpation Provision does not affect the liability of Exculpated Parties *per se*, but rather sets a standard of care of willful misconduct, actual fraud, or gross negligence in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.[131]  A bankruptcy court may approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[132]  Accordingly, an exculpation provision represents a legal conclusion resulting from certain findings a bankruptcy court must reach in confirming a plan.[133]  Once the court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries

---

[131]  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

[132]  *See* 11 U.S.C. § 1129(a)(3).

[133]  *See* 11 U.S.C. § 157(b)(2)(L).

involved in the formulation of that chapter 11 plan.[134]  Exculpation provisions appropriately prevent future collateral attacks against debtors.  Accordingly, the Exculpation Provision in the Plan is appropriate because it provides protection to the Exculpated Parties, who served as fiduciaries during the restructuring process.

91.     The Exculpation Provision is an integral component of the global settlement embodied in the Plan and is the product of good faith, arm's-length negotiations.[135]   The Exculpation Provision is narrowly tailored to the Debtors and their Estates, excludes acts of willful misconduct, actual fraud, and gross negligence, and relates only to acts or omissions in connection with or arising out of the administration of the Chapter 11 Cases.[136]  Accordingly, the Exculpation Provision should be approved.

> ### d.     The Injunction Provision and Gatekeeping Provision Comply with the Bankruptcy Code and is Appropriate.

92.     The injunction provision set forth in Article 10.5 of the Plan (the "***Injunction Provision***") implements the Plan's discharge, release, and exculpation provisions, in part, by permanently enjoining all Persons from commencing or maintaining any action against the Debtors or the Reorganized Debtors, as applicable, on account of or in connection with or with respect to any Claims or Interests discharged, released, exculpated, or settled under the Plan.  Thus, the Injunction Provision is a key provision of the Plan.  Accordingly, to the extent the Court finds that

---

[134]   *In re PWS Holding Corp.*, 228 F.3d at 246 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity" for actions within the scope of their duties).

[135]   *See* Hugo Declaration, ¶ 19.

[136]   *See* Hugo Declaration, ¶ 32; Plan, Art. 10.7.

the Plan's exculpation and release provisions are appropriate, the Injunction Provision should be approved.[137]

93.     In addition, the Plan provides for a "gatekeeping" provision to implement the Plan's exculpation and release provisions.  Specifically, Article 10.5 of the Plan provides that, for any Person or Entity to commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of Claims or Causes of Action subject to the Debtor Release, the Third-Party Release, or the Plan's exculpation provision, the Court must (a) first determine, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (b) specifically authorize a Person or Entity to bring such Claim or Cause of Action, as applicable, against any of the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties; *provided*, that the foregoing shall only apply to Claims or Causes of Action brought against a Released Party if the Person or Entity bringing such Claim or Cause of Action is a Releasing Party (the "***Gatekeeping Provision***").  The Gatekeeping Provision is consistent with the one authorized in *In re Highland Capital* and ones contained in recent plans confirmed in this District.[138]  Further, the scope of the Gatekeeping Provision is limited to Claims and Causes of Action that are

---

[137]  *See*, *e.g.*, *In re Camp Arrowhead*, 451 B.R. at 701-02 ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent*.  Without an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing. . . .") (citing *In re Pacific Lumber Co.*, 584 F.3d at 253; *In re Pilgrim's Pride Corp.*, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010)).

[138]  *See NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 437–38 (5th Cir. 2022) ("***Highland I***").  As discussed in more detail below, the U.S. Trustee's reliance on Highland II (defined below) to challenge the scope of the Gatekeeping Provision fails because the Gatekeeping Provisions only applies to parties other than the Debtors and the Exculpated Parties to the extent such parties are deemed to have consensually agreed to be bound by the Third-Party Release.  Highland II only addressed the scope of the Gatekeeping Provision with respect to non-consensual exculpation and injunction provisions.

appropriately enjoined under the Plan making it permissible under *Highland II*.[139]  In addition, the Gatekeeping Provision is limited to parties that have performed valuable services in connection with the Debtors' restructuring, including negotiating and supporting the Restructuring Support Agreement, the Plan, and the other Definitive Documents, among other aspects of the Restructuring Transactions.[140]  The value-maximizing outcome set forth in the Plan is a direct result of the efforts of the Debtors, the Reorganized Debtors, and the Released Parties. Accordingly, the Gatekeeping Provision is appropriate and should be approved.

**B.    The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2).**

94.    Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply "with the applicable provisions of this title."[141]  Whereas Section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, Section 1129(a)(2) of the Bankruptcy Code is concerned with the applicable activities of a plan proponent under the Bankruptcy Code.[142]  In determining whether a plan proponent has complied with this section, courts focus on whether the proponent has adhered to the disclosure and solicitation requirements of Sections 1125 and 1126 of the Bankruptcy Code.[143]

95.    As set forth above and as evidenced by the Vote Certification and the Solicitation Affidavit the Debtors have complied with all solicitation and disclosure requirements set forth in

---

[139]  *Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 132 F.4th 353 (5th Cir. 2025) ("***Highland II***")

[140]  *See* Hugo Declaration, ¶¶ 34-35.

[141]  11 U.S.C. § 1129(a)(2).

[142]  *See* 7 Collier on Bankruptcy ¶ 1129.02[2] (16th ed.).

[143]  The legislative history to Section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under Sections 1125 and 1126.  H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order governing notice, disclosure, and solicitation in connection with the Plan and the Disclosure Statement.  In addition, the Debtors and their professionals acted in good faith in all respects in connection with the solicitation of votes on the Plan and the tabulation of such votes.[144]  Accordingly, the requirements of Section 1129(a)(2) of the Bankruptcy Code have been satisfied.[145]

### C.   The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3).

96.      Section 1129(a)(3) of the Bankruptcy Code provides that a court shall confirm a plan of reorganization only if the plan has been "proposed in good faith and not by any means forbidden by law."[146]  Section 1129(a)(3) does not define good faith, but it is generally held that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.[147]  "[T]he requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give the debtors a reasonable opportunity to make a fresh start."[148]  The plan proponent must also show

---

144   *See* Hugo Declaration, ¶¶ 7, 37.

145   *See In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (holding Section 1129(a)(2) satisfied where debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to Plan).

146   11 U.S.C. § 1129(a)(3).

147   *See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997).

148   *In re Cajun Elec. Power Coop.*, 150 F.3d at 519 (quoting *In re T-H New Orleans*, 116 F.3d at 802); *see also Brite v. Sun Country Dev. (In re Sun Country Dev.)*, 764 F.2d 406, 408 (5th Cir. 1985); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) ("The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code'" (citations omitted)).

that the plan has not been proposed by any means forbidden by law and that the plan has a reasonable likelihood of success.[149]

97.     The objectives and purposes of the Bankruptcy Code, and chapter 11 reorganization in particular, have been described by the United States Supreme Court as follows: "to revive the debtors' businesses and thereby preserve jobs and protect investors" and to "maximiz[e] the value of the bankruptcy estate[;]"[150] "to permit the successful rehabilitation of debtors;"[151] and "to provide jobs, to satisfy creditors' claims, and to produce a return for [debtors'] owners."[152] These opinions recognize the primary legislative goal of rehabilitating viable businesses.[153]

98.     The Plan accomplishes this goal in the Chapter 11 Cases by providing the means by which the Reorganized Debtors may continue to operate as viable entities.  The Debtors filed the Chapter 11 Cases to preserve the going concern value of their businesses and to maximize the value of their Estates.[154]  The Plan is the culmination of the Debtors' efforts and the product of extensive and arms'-length negotiations between and among the Debtors and the Consenting Creditors, and it provides a mechanism for preserving the going-concern value of the Debtors through emergence from chapter 11.  In addition, the Plan provides for the continued employment of the Debtors' employees and a full recovery to Holders of General Unsecured Claims.

---

[149] *See In re T-H New Orleans*, 116 F.3d at 802 (finding that a court may only confirm a plan for reorganization if the plan has been proposed in good faith and not by any means forbidden by law and that where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of Section 1129(a)(3) is satisfied); *see also In re Food City, Inc.*, 110 B.R. 808, 810 (Bankr. W.D. Tex. 1990) (explaining that the term "law" as used in this section, includes state law, and applies not to the substantive provision of a plan itself but rather to the means employed in proposing a plan.).

[150] *Toibb v. Radloff*, 501 U.S. 157, 163 (1991).

[151] *In re Bildisco*, 465 U.S. at 527.

[152] *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983).

[153] *See In re Bildisco*, 465 U.S. at 528.

[154] *See* First Day Declaration, ¶ 11.

99.     As will be further demonstrated at the Confirmation Hearing, the Debtors have satisfied the good faith requirement of Section 1129(a)(3) of the Bankruptcy Code.  The Debtors proposed the Plan with the legitimate and honest purpose of reorganizing a company burdened by an unsustainable debt load.  The terms of the Plan were negotiated in good faith with the Consenting Creditors, and their respective advisors, and achieve an outcome that is fundamentally fair to all stakeholders.[155]  Indeed, the broad-based and overwhelming support behind the Plan speaks to the good faith of the parties involved and the fairness of the Plan.

### D.     The Plan Provides That Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Approval – 11 U.S.C. § 1129(a)(4).

100.     Section 1129(a)(4) of the Bankruptcy Code provides that a court shall confirm a plan only if "[a]ny payment made or to be made by the proponent, [or] by the debtor, . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."[156]  In other words, the debtor must disclose to the court all professional fees and expenses, and such professional fees and expenses must be subject to court approval.[157]

101.     In accordance with Section 1129(a)(4) of the Bankruptcy Code, no payment for services or costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incidental to the Chapter 11 Cases, including Claims for professional fees, has been or will be made by any Debtor other than payments that have been authorized by order of the

---

[155]   *See* Hugo Declaration, ¶¶ 7, 13, 38-40.

[156]   11 U.S.C. § 1129(a)(4).

[157]   *See In re Cajun Elec. Power Coop.*, 150 F.3d at 514-15 (concluding that Section 1129(a)(4) is designed to assure payments for professional services are subject to the bankruptcy court's approval and determination of reasonableness); *see also In re McCommas LFG Processing Partners, LP*, 2007 Bankr. LEXIS 4053, at *45 (Bankr. N.D. Tex. 2007).

58

Bankruptcy Court. Article 2 of the Plan provides for the payment of various Administrative Claims, including Professional Fee Claims, which are subject to Court approval and the standards of the Bankruptcy Code. Accordingly, the provisions in the Plan comply with Section 1129(a)(4) of the Bankruptcy Code.

E.    **The Debtors Have Disclosed All Necessary Information Regarding the Reorganized Debtors' Directors and Officers and Insiders – 11 U.S.C. § 1129(a)(5).**

102.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor.[158] Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by Section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[159] In addition, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[160] Section 1129(a)(5)(A)(ii) directs the Court to ensure that the post-confirmation governance of the Reorganized Debtors is in "good hands," which courts have interpreted to mean: (a) that management has experience in the reorganized debtor's business and industry,[161] (b) that management has experience in financial and management matters,[162] (c) that the debtor and

---

[158]   *See* 11 U.S.C. § 1129(a)(5)(A)(i).

[159]   *See* 11 U.S.C. § 1129(a)(5)(B).

[160]   *See* 11 U.S.C. § 1129(a)(5)(A)(ii).

[161]   *See In re Rusty Jones, Inc.*, 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that section 1129(a)(5) was not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149-50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied Section 1129(a)(5)).

[162]   *See In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992) ; *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

creditors believe control of the entity by the proposed individuals will be beneficial,[163] and (d) that the post-confirmation governance does not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[164]  The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[165]

103.     The Debtors disclosed in the Plan Supplement the identity of the known directors of the New Board of Reorganized Parent who will serve as of the Effective Date.  In addition, the Debtors disclosed the identity of the officers of Reorganized Parent who will be employed as of the Effective Date in the Plan Supplement.  Furthermore, there are no employees who are insiders other than by virtue of being a director or officer.

104.     As noted above, certain of the individuals who will serve as directors and officers of the Reorganized Debtors are members of the Debtors' existing management team.  The Reorganized Debtors' appointment or continuance of officers, directors, and managers is "consistent with the interests of creditors and equity security holders and with public policy."[166] The proposed directors and officers of the Reorganized Debtors have significant knowledge and business and industry experience and will give the Reorganized Debtors continuity in running their businesses.  The Debtors submit that the requirements of Section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.

---

[163] *See In re The Landing Assocs.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors") (internal citation omitted); *see also In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990).

[164] *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[165] 7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed.).

[166] 11 U.S.C. § 1129(a)(5)(A)(ii).

F.      **The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6).**

105.    Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in the plan.  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and no rate changes under the Plan will require governmental regulatory approval.  As a result, the requirements of Section 1129(a)(6) of the Bankruptcy Code have been satisfied.

G.      **The Plan is in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7).**

106.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity holders.  This "best interests" test focuses on individual dissenting creditors, rather than classes of claims.[167]  The best interests test requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.[168]

107.    As Section 1129(a)(7) of the Bankruptcy Code makes clear, the Liquidation Analysis applies only to non-accepting holders of impaired claims or interests.[169]  If a class of claims or interests unanimously approves the plan, the best interests test is deemed satisfied for all members of that class.[170]  Under the Plan, Claims in Class 3, 4, and 5 are Impaired and allowed to vote on the Plan.  The Plan was accepted by Classes 3, 4, and 5.[171]  As such, although the best

[167]    *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

[168]    11 U.S.C. § 1129(a)(7).

[169]    *See* 11 U.S.C. § 1129(a)(7).

[170]    *In re Drexel Burnham Lambert*, 138 B.R. at 761; *see also In re Star Ambulance Serv., LLC*, 540 B.R. at 264.

[171]    *See* Vote Certification.

interests test is applicable only to each the rejecting Holder of Claims in Class 4, the Liquidation Analysis establishes (as described therein) that the best interests test is satisfied as to each Impaired Class.

108.    Based on the liquidation analysis performed by FTI Consulting, Inc., financial advisor to the Debtors, and annexed to the Disclosure Statement as Exhibit D (the "***Liquidation Analysis***"), including the methodology used and estimations and assumptions made therein, it is clear that the best interests test is satisfied as to Classes 3, 4, and 5.  A chapter 7 liquidation of the Debtors' Estates would result in a substantial loss of value otherwise available to Holders of Claims in Classes 3, 4, and 5 when compared to the proposed distributions under the Plan.[172]  In fact, a liquidation under chapter 7 as set forth in the Liquidation Analysis would materially and adversely affect the ultimate proceeds available for distribution to all Holders of Allowed Claims and Interests in the Chapter 11 Cases.  The Plan provides Holders of Claims in Classes 3, 4, and 5 with a recovery greater than what would be available in a liquidation under chapter 7 and, thus, the Plan satisfies the best interests test.

## H.    Acceptance of Impaired Voting Class –11 U.S.C. § 1129(a)(8).

109.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept a plan or not be impaired by a plan.[173]  A class of claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted the plan and need not be further examined under Section 1129(a)(8) of the Bankruptcy Code.[174]  A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in the number

---

[172]   *See* Disclosure Statement, Ex. D; Hugo Declaration, ¶¶ 44-46.

[173]   *See* 11 U.S.C. § 1129(a)(8).

[174]   *See* 11 U.S.C. § 1126(f).

of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan.[175]  As further discussed below, if any class of claims or interests rejects a plan, such plan must satisfy the "cramdown" requirements of Section 1129(b) of the Bankruptcy Code with respect to such claims or interests.

110.    As set forth in Articles 3 and 4 of the Plan, Classes 1, 2, and 6 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  The Holders of Claims in the Voting Classes were impaired and eligible to vote and overwhelmingly voted in favor of the Plan.  Meanwhile, Class 10 (Existing Equity Interests) was deemed to reject the Plan, and Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) are either Unimpaired and presumed to accept the Plan or Impaired and deemed to reject the Plan.  The Plan therefore does not satisfy Section 1129(a)(8) of the Bankruptcy Code with respect to Class 10, and possibly with respect to Classes 7 and 8 to the extent they are Impaired.  Yet, the Plan is nevertheless confirmable because, as discussed below, it satisfies Section 1129(b) of the Bankruptcy Code with respect to such rejecting Classes.

**I.    The Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9).**

111.    The Plan satisfies the requirements of Section 1129(a)(9) of the Bankruptcy Code, which requires that persons holding priority claims under the Bankruptcy Code receive specified cash payments.[176]  The treatment of Administrative Claims under the Plan is consistent with Section 1129(a)(9) of the Bankruptcy Code.

---

[175]  11 U.S.C. § 1126(c).

[176]  11 U.S.C. § 1129(a)(9).  Under Section 1129(a)(9), unless otherwise agreed, a plan must provide that:

the holder of a claim entitled to priority under Section 507(a)(2) or 507(a)(3) will receive cash for the allowed amount of the claims on the effective date of the plan;

**J.      At Least One Impaired Class Has Accepted the Plan – 11 U.S.C. § 1129(a)(10).**

112.    In general, Section 1129(a)(10) requires that, to the extent there is a class of impaired claims under a plan that at least one impaired class of claims must accept the plan, excluding the votes of any insiders.[177]  As shown in the Vote Certification, Classes 3, 4 and 5 voted to accept the Plan.[178]  As such, at least one impaired Class of Claims has voted in sufficient number and amount to accept the Plan, without regard to the votes of insiders.[179]  Accordingly, the Plan satisfies Section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plan is Feasible – 11 U.S.C. § 1129(a)(11).**

113.    Pursuant to Section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[180]  As described below, the Plan is feasible under Section 1129(a)(11) of the Bankruptcy Code.

---

the holder of a claim entitled to priority under Section 507(a)(1), (4), (5), (6), or (7) will receive either deferred cash payments for the allowed amount or cash for the allowed amount for the claim on the effective date of the plan;

the holder of a tax claim entitled to priority under Section 507(a)(8) will receive regular installment payments in cash (i) of the total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order of relief under Section 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under Section 1122(b)); and

the holder of a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under Section 507(a)(8), but for the secured status of that claim, will receive cash payments on account of that claim in the same manner and over the same period, as prescribed in subparagraph (C).

[177]   11 U.S.C. § 1129(a)(10).

[178]   *See* Vote Certification.

[179]   *See* Vote Certification.

[180]   11 U.S.C. § 1129(a)(11).

114.    To establish that a plan is feasible, "the [bankruptcy] court need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required."[181] Indeed, "[a]ll the bankruptcy court must find is that the plan offer[s] 'a reasonable probability of success.'"[182]  While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence, which means presenting proof that a given fact is "more likely than not."[183]  The courts have fashioned a series of factors that may be considered in the determination of whether a debtor's plan is feasible.  These factors, while varying from case to case, traditionally include: (a) the adequacy of the debtor's capital structure; (b) the earning power of its business; (c) economic conditions; (d) the abilities of the debtor's management; (e) the probability of the continuation of the same management; and (f) other related matters affecting successful performance under the provisions of the plan.[184]  As demonstrated below, consideration of these factors supports a finding that the Plan is feasible.

115.    Here, the Hugo Declaration and the financial projections attached to the Disclosure Statement as Exhibit E (the "***Financial Projections***") demonstrate that the Plan is feasible.  These Financial Projections demonstrate that the Debtors will have sufficient earnings to meet their obligations under the Plan.[185]  Although the Debtors' businesses operate in a competitive industry

---

[181]  *In re Briscoe Enters.*, 994 F.2d at 1165-66 (quoting *In re Lakeside Glob. II*, 116 B.R. at 507).

[182]  *In re T-H New Orleans,* 116 F.3d at 801 (quoting *In re The Landing Assocs.*, 157 B.R. at 820).

[183]  *In re Briscoe Enters.*, 994 F.2d at 1164; *see also In re T-H New Orleans*, 116 F.3d at 801.  Further, a number of courts have held that this standard constitutes a "relatively low threshold of proof."  *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the Plan as a viable undertaking.").

[184]  *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226-27 (Bankr. D.N.J. 2000) (citing *In re Temple Zion*, 125 B.R. 910, 915 (Bankr. E.D. Pa. 1991)); *In re Toy & Sports Warehouse*, 37 B.R. at 151 (citing *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J. 1980)); *see also In re T-H New Orleans*, 116 F.3d at 801 (discussing the factors that the bankruptcy court examined in its decision that the debtor's plan was feasible).

[185]  Disclosure Statement, Ex. E; *see also See* Hugo Declaration, ¶ 47.

and market, and although it is impossible to predict with certainty the precise future profitability of the Debtors' businesses or industries and markets in which the Debtors operate, confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, the Reorganized Debtors, or any successors to the Reorganized Debtors under the Plan.[186]  The proposed Plan, negotiated in good faith between the Debtors and their major creditor constituencies, has more than a reasonable likelihood of success because the transactions contemplated under the Plan will enable the Debtors to continue their current operations while generating positive free cash flow while eliminating over $4.6 billion of prepetition funded debt.[187]

116.    In formulating the Plan, the Debtors and their financial advisors sought to ensure that the Plan would provide sufficient free cash flow to allow the Debtors to continue to operate their business successfully after emergence and to satisfy all of their obligations under the Plan. By substantially reducing the Debtors' prepetition debt and consummating the New 2L Convertible Notes Rights Offering, the Reorganized Debtors will be better positioned to service ongoing debt obligations and generate cash flow to reinvest in their businesses.  Indeed, the Plan ensures that the Debtors' capital structure is aligned with their businesses and long-term growth strategy.   Accordingly, the Plan provides for a workable reorganization, with more than a reasonable likelihood of success, and, therefore, satisfies Section 1129(a)(11) of the Bankruptcy Code.

---

[186]   *See* Hugo Declaration, ¶ 47-50.

[187]   *See id.* at ¶ 70.

**L.     All Statutory Fees Have Been or Will Be Paid – 11 U.S.C. § 1129(a)(12).**

117.    Section 1129(a)(12) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."[188]  Article 2 of the Plan provides for the payment by each of the Debtors of all fees payable pursuant to Section 1930(a) of the Judicial Code for each quarter (including any fraction thereof) until the earliest to occur of (a) the final decree closing such Debtors' Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.   Thus, the Plan meets the requirements of Section 1129(a)(12) of the Bankruptcy Code.

**M.     The Plan Provides for the Assumption of Any Retiree Benefit Obligations – 11 U.S.C. § 1129(a)(13).**

118.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization provide for the continued payment of certain retiree benefits "for the duration of the period that the debtor has obligated itself to provide such benefits."[189]  The Plan provides that all Employee Plans (which include programs applicable to retirees) that exist as of the Petition Date shall be assumed on the Effective Date as Executory Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code.   Therefore, Section 1129(a)(13) of the Bankruptcy Code, to the extent applicable to the Debtors, is satisfied.

---

[188]  11 U.S.C. § 1129(a)(12).

[189]  11 U.S.C. § 1129(a)(13).

**N.      Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code Are Inapplicable.**

119.      Based on the facts of the Chapter 11 Cases, Sections 1129(a)(14) through (16) of the Bankruptcy Code are not applicable to the Chapter 11 Cases.

**O.      Section 1129(b):  The Plan Satisfies the "Cramdown" Requirements**

120.      Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and Interests.  This mechanism is known colloquially as "cram down."  Section 1129(b) provides in pertinent part:

> [I]f all of the applicable requirements of [Section 1129(a) of the Bankruptcy Code] other than [the requirement contained in Section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.[190]

121.      Thus, under Section 1129(b) of the Bankruptcy Code, the Court may "cram down" a plan over rejection by impaired classes of claims or Interests so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.[191]

122.      Claims in Class 10 (Existing Equity Interests) are Impaired under the Plan, and the Holders of such Interests have been deemed to reject the Plan.  Additionally, Claims and Interests in Classes 7 and 8 may be Impaired, and the Holders of such Claims and Interests may be deemed to reject the Plan.  The Debtors, however, respectfully submit that the Plan may nonetheless be confirmed over the deemed rejection by such Classes pursuant to Section 1129(b) of the Bankruptcy Code, because the Plan does not discriminate unfairly and is fair and equitable with

---

[190]   11 U.S.C. § 1129(b)(1).

[191]   *See id.*

respect to all non-accepting Impaired Classes.  Moreover, the Voting Classes each voted in favor of the Plan, meaning the unfair discrimination and fair and equitable analysis is inapplicable to such Classes (though the Plan nonetheless would satisfy those requirements as to the Voting Classes if they were applicable).

### 1.    The Plan Does Not Discriminate Unfairly

123.    The Plan does not discriminate unfairly with respect to the Impaired Classes that were deemed to have rejected the Plan.  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[192]  Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.[193]  At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[194]  In other words, Section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination between classes; it prohibits only discrimination that is unfair.[195]  Accordingly, between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the claims or interests in each such class are dissimilar from those in the other

---

[192]  *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).

[193]  *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis"); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances").

[194]  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654-55 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

[195]  *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).

class,[196] or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment of otherwise similar claims or interests.[197]

124.    The Plan does not discriminate unfairly against Class 10 (Existing Equity Interests).[198]  No other Class is similarly situated to Class 10 because, unlike every other Class of Claims or Interests, holders of Existing Equity Interests hold a present, residual ownership stake in Wolfspeed, Inc. and have no right to payment from the estates.  The recovery provided to Class 10 is a gift (to which Class 10 is not entitled) from the Consenting Creditors, who agreed to allocate a portion of their own recoveries to allow existing shareholders to maintain a stake in the Reorganized Debtors in connection with the Restructuring Support Agreement.  510(b) Claims in Class 9 are dissimilar from Existing Equity Interests in Class 10 because they are contingent, unliquidated claims—the ultimate value of which, if any, is dependent on the outcome of ongoing securities litigation.  Because the legal character, risk profile, and economic expectations of holders of 510(b) Claims differ fundamentally from those of holders of Existing Equity Interests, these classes are not similarly situated, and disparate treatment under the Plan does not constitute "unfair" discrimination.[199]

125.    It must be noted that the Plan's differing treatment of Existing Equity Interests and 510(b) Claims does not prejudice the holders of Existing Equity Interests and is not unfair; rather, it is a more favorable outcome than the alternative.  If Existing Equity Interests and 510(b) Claims were afforded the same impaired treatment under the Plan, and were sharing in the same recovery,

---

[196]  *See, e.g.*, *Johns-Manville Corp.*, 68 B.R. at 636.

[197]  *See, e.g., In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

[198]  *See* Hugo Declaration, ¶ 53.

[199]  *See, e.g.*, *Johns-Manville Corp.*, 68 B.R. at 618, 636.

distributions to shareholders would be delayed until resolution of the litigation underlying the 510(b) Claims.[200]  Accordingly, the unimpairment of 510(b) Claims allows shareholders to receive their recoveries upon the Debtors' emergence from Chapter 11.  Further, despite their unimpairment under the Plan, the Debtors view the 510(b) Claims as meritless and expect to dispose of them in the ordinary course post-emergence.  This reflects the Debtors' belief that little to no liability will materialize, and is not a concession of any value.  By contrast, the Plan offers holders of Existing Equity Interests a real, non-contingent recovery that is neither speculative nor dependent on the outcome of separate litigation.

126.     Similarly, Claims in Class 7 (Intercompany Claims) and Interests in Class 8 (Intercompany Interests) are entirely unique from Claims or Interests in any other Class and, therefore, are appropriately placed in their own Classes.   The Debtors separately classified (a) Intercompany Claims from other Claims and (b) Intercompany Interests from other Interests to preserve the option to (x) reinstate or (y) set off, settle, distribute, contribute, merge, cancel, or release such Claims and Interests, respectively.  Such treatment and optionality allows the Debtors flexibility to determine whether it is more efficient to maintain their organizational structure and certain entity relationships when they are implementing the Restructuring Transactions rather than prior thereto.  Notably, this optionality does not affect any stakeholders' recovery under the Plan and is intended only for administrative convenience and efficiency in the restructuring process.

127.     Accordingly, because the Plan does not discriminate unfairly with respect to Classes that have been or may be deemed to reject the Plan, the Debtors respectfully submit that the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code.

---

[200]   *See In re WorldCom, Inc.*, 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (no unfair discrimination where, under the facts and circumstances, a reasonable basis exists for disparate treatment).

71

### 2.    The Plan Is Fair and Equitable

128.    Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if, under the plan, no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.[201]  Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[202]  Additionally, in order for a plan to be "fair and equitable," no creditor may be paid more than what it is owed (*i.e.*, no class of creditors may receive more than 100% of its claims).[203]

129.    With respect to the Classes that are deemed to reject the Plan (*i.e.*, Class 10 and potentially Classes 7 and 8), no Claim or Interest in a Class junior to such Classes will receive a recovery under the Plan on account of such Claim or Interest.[204]

130.    Moreover, no Holder of a Claim is receiving more than 100% of its claim.  As set forth in the Tracy Declaration and the valuation analysis attached to the Disclosure Statement as Exhibit F, the estimated potential range of the Reorganized Debtors' Enterprise Value (as defined in the Disclosure Statement) is approximately $2.35 billion to $2.85 billion, with a midpoint value of $2.60 billion.[205]  Accordingly, and as set forth below and in Article I.B. of the Disclosure Statement, no Holder of a Claim will receive under the Plan more than 100% of what it is owed.

---

[201]  *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

[202]  *See 203 N. LaSalle P'ship*, 526 U.S. at 459.

[203]  *See* 7 Collier on Bankruptcy ¶1129.03[4][a]; *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be.").

[204]  *See* Plan, Art. 3; Hugo Declaration, ¶¶ 54-59.

[205]  *See* Tracy Declaration, ¶ 11.

| Class and Designation | Approx. Percentage Recovery[206] |
|---|---|
| Class 1: Other Secured Claims | 100% |
| Class 2: Other Priority Claims | 100% |
| Class 3: Senior Secured Notes Claims | 86% |
| Class 4: Convertible Notes Claims | 25 to 30% |
| Class 5: Renesas Claims | 27 to 29% |
| Class 6: General Unsecured Claims | 100% |
| Class 7: Intercompany Claims | 0% / 100% |
| Class 8: Intercompany Interests | 0% / 100% |
| Class 9: 510(b) Claims | 100% |
| Class 10: Existing Equity Interests | N/A |

131.   For these reasons, the Plan is "fair and equitable" and, therefore, consistent with the requirements of Section 1129(b) of the Bankruptcy Code.

**P.   The Plan Is Not an Attempt to Avoid Tax Obligations – 11 U.S.C. § 1129(d).**

132.   Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act.  The Plan meets these requirements because the principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act, and there has been no filing by any governmental agency asserting such a purpose.

**Q.   The Waiver of a Stay of the Confirmation Order Is Appropriate.**

133.   Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

---

[206]   Approximate percentage recovery is illustrated prior to dilution from the Incentive Plans.

Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral).  Each rule also permits modification of the imposed stay upon court order.

134.    The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.  First, the Restructuring Support Agreement contains a milestone that the Plan to go effective no later than four months after the Petition Date, and the Debtors will need to take action to consummate the Plan during the time period between the entry of the Confirmation Order and the emergence milestone.  Moreover, the Chapter 11 Cases and the related transactions contemplated in the Plan have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.[207]  Additionally, each day the Debtors remain in chapter 11, they incur significant administrative and professional costs.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

## III.    THE U.S. TRUSTEE OBJECTION SHOULD BE OVERRULED

### A.    Purdue Does Not Support the U.S. Trustee's Objection

135.    The U.S. Trustee contends that the Third-Party Release constitutes an impermissible non-consensual release based on the U.S. Trustee's categorial assertion that the opt-out mechanism employed under the Plan, and, by extension, countless other plans confirmed in complex chapter 11 cases in this district, "does not constitute consent to a non-debtor release in a

---

[207]   *See generally* Hugo Declaration.

chapter 11 plan."[208]  Instead, the U.S. Trustee argues that the Court must apply state contract law principles to determine whether the Third-Party Release is consensual,[209] and the U.S. Trustee claims that under such preferred state contract law analysis, the opt-out mechanism employed by the Plan is "insufficient for this Court to make a finding of consent . . . ."[210]  Not so.  Third-party releases are permitted under Fifth Circuit precedent when the release is consensual.[211]  Indeed, bankruptcy courts within the Fifth Circuit "commonly exercise jurisdiction to approve [consensual third-party] releases…"[212]  Here, as discussed in detail above, the Third-Party Release and the opt-out process is fully consensual.[213]  Accordingly, the Third-Party Release is permissible under Fifth Circuit precedent.  The U.S. Trustee's claim that *Purdue* somehow warrants revisiting the long-established practice in this district is foreclosed by the Supreme Court's express statements to the contrary.

136.    In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), the Supreme Court held that the Bankruptcy Code does not allow for the inclusion of non-consensual, third-party releases in chapter 11 plans outside the context of Section 524(g) of the Bankruptcy Code. However, as clearly noted in its opinion, the Supreme Court limited its holding to the issue before it:

> As important as the question we decide today are ones we do not.  Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on

---

[208]  U.S. Trustee Objection, ¶ 15.

[209]  *Id.*

[210]  *Id.* ¶ 23.

[211]  *In re CJ Holding Co.*, 597 B.R. at 608-09 ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.'") (citation omitted).

[212]  *Id.*

[213]  *See* ¶¶ 78–84, *supra*.

> different legal grounds than the nonconsensual release at issue here. Nor do
> we have occasion today to express a view on what qualifies as a consensual
> release or pass upon a plan that provides for the full satisfaction of claims
> against a third-party nondebtor.[214]

137.    As this Court is well-aware, the Fifth Circuit has long-prohibited nonconsensual,

third-party releases in chapter 11 plans. Accordingly, "*Purdue* did not change the law in this

Circuit."[215]  Indeed, the U.S. Trustee admits as much.[216]  Despite paying lip service to the reality

that *Purdue* did not change the law in the Fifth Circuit, the U.S. Trustee makes the puzzling

assertion that *Purdue* somehow mandates revisiting whether "imposing non-debtor releases based

on a failure to opt out is permissible."[217]  The Supreme Court expressly stated the opposite: *Purdue*

neither calls into question consensual third-party releases nor offers a view as to what qualifies as

a consensual release. As this Court observed, "[t]hese words must be read literally."[218]

138.    Evidently unphased, the U.S. Trustee invites the Court to expand *Purdue*, in

contravention of the Supreme Court's own statements, to upend the existing practice in the

Southern District of Texas of providing consent to a third-party release through an opt-out (as

opposed to an opt-in). In truth, the U.S. Trustee Objection has *nothing* to do with what *Purdue*

requires. It is based on the U.S. Trustee's desire to see *Purdue* expanded to compel a result that is

inconsistent with longstanding Fifth Circuit practice. As this Court recognized in *Robertshaw*, the

---

[214]  *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204, 224-25 (2024).

[215]  *In re Robertshaw US Holding Corp.*, 662 B.R. 300 at 323 (Bankr. S.D. Tex. 2024); *id.* 324 ("Hundreds of Chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out. And, again, *Purdue* did not change the law in this Circuit."); Conf. Hr'g Tr. 32:3-4, *In re Indep. Contract Drilling, Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127] ("Case law in the Fifth Circuit allows the use of injunctions in consensual third- party releases.").

[216]  U.S. Trustee Objection, ¶ 12 (recognizing it "has long been the conclusion held by the Fifth Circuit" that nonconsensual third-party releases are not authorized by the Bankruptcy Code).

[217]  U.S. Trustee Objection, ¶ 15.

[218]  *In re Robertshaw US Holding Corp.*, 662 B.R. at 323.

"[U.S.] Trustee wants to use the *Purdue* holding as an opportunity to advance its long-held position that consensual third-party releases in a plan should require an opt-in feature, rather than an opt-out." *Robertshaw*, .662 B.R at 323.  No such expansion is warranted.  Indeed the Supreme Court expressly stated that its decision neither called into question the validity of consensual releases nor expressed any view on what constitutes a consensual release which, ironically, are precisely the issues the U.S. Trustee seeks to have this Court revisit based on *Purdue*.  As this Court observed in *Robertshaw*, "what constitutes consent, including opt-out features and deemed consent for not opting out, has **long been settled in this District**."[219]  Accordingly, the U.S. Trustee Objection should be overruled.

139.    Further, the U.S. Trustee's arguments have been presented, and unequivocally rejected, numerous times in this District and in others.[220]  For example, in *In re Robertshaw*, this

---

[219] *Id.* (emphasis added).

[220] *See, e.g.*, Conf. Hrg Tr. 23: 3-7, *In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. Jun. 23, 2025) [Docket No. 914] ("the opt outs work.  They're consistent with Fifth Circuit case law as I understand it.  And I do find that the concept of consent and not speaking when you have the opportunity to speak, is consent, under federal law."); Conf. Hr'g Tr. 92:18-19, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) [Docket No. 251] ("I think that . . . the release provision was appropriate."); Conf. Hr'g Tr. 43:4-7, *In re The Container Store Group, Inc.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) [Docket No. 201] ("I think that, based on the facts in this case and the process that was run, that the releases are -- because of the opportunity for all the parties to have opted out, are consensual."); Conf. Hr'g Tr. 31:25-32:13, *In re Independence Contract Drilling, Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127] ("*Purdue* does not address the use of injunctions in consensual third party releases, as the one before the Court today.  Case law in the Fifth Circuit allows the use of injunctions in consensual third party releases… Therefore, for all of these reasons, the Court overrules the objections and will confirm the Plan."); Conf. Hr'g Tr. 20:20-23, *In re Vroom, Inc.*, No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025) [Docket No. 128] ("I'm comfortable that [the third-party release] runs afoul of no law and that these should be approved and that they[]… don't run afoul of *Purdue*."); Conf. Hr'g Tr. 32:18-35:9, *In re Intrum AB*, No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) [Docket No. 275] (approving third party releases for which consent was confirmed through opt outs); Conf. Hr'g Tr. 66:3-6, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) [Docket No. 2680] ("When I look at everything, I'm going to approve the Plan under the law.  I think it complies with every provision under the law.  I think the opt-outs worked."); Corrected Findings of Fact, Conclusions of Law, and Order (I) Confirming Further Modified Second Amended Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. *et al.* and (II) Granting Related Relief, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025) [Docket No. 2550]; Memorandum Decision on Plan Confirmation at 28; *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) [Docket No. 959] ("[T]he consensual third-party releases in the Plan are appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out.  There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan. . . . And, again, Purdue did not change the law in this Circuit."); Conf. Hr'g Tr.

Court upheld an opt-out process similar in all material respects to what was used in this case over the U.S. Trustee's objection.  The Third-Party Release and opt-out procedures in the Chapter 11 Cases are almost identical to the provisions and procedures approved in *Robertshaw*, *Independence Contract Drilling*, *The Container Store*, *Cutera*, and *DocuData Solutions*, and the U.S. Trustee does not present any new arguments as to why the result should be any different here.  That failure is not surprising given the factual similarities between those cases and the Chapter 11 Cases.

### B.      The U.S. Trustee's Reliance on State Contract Law is Without Support

140.    The U.S. Trustee's position that state contract law should apply here, instead of federal bankruptcy law, is unsupported.  The U.S. Trustee argues that "state law governs" in "determining the validity of most claims" in bankruptcy[221] and thus should apply in determining consent to the third party releases contained in the Plan.  This generalized assertion fails to take into account that the bankruptcy court does not determine the validity of any claims or evaluate their substance in considering third-party releases.  Nor does this approach—which rests on the idea that the claims themselves were "created and defined by state law" before the "petition in

---

14:10-13, *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. July 23, 2024) [Docket No. 869] (overruling the Office of the U.S. Trustee's objections, predicated on *Purdue*, with respect to plan releases, *the opt out mechanism*, and gatekeeper provisions); *see also In re Spirit Airlines, Inc.*, 668 B.R. 689, 721 (Bankr. S.D.N.Y. 2025) (approving consensual third-party release with opt-out mechanism); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (confirming a plan that provided that creditors were deemed to have consented to the plan's third party release provisions where: (a) the creditor voted to reject or accept the plan and failed to "opt-out", (b) the creditor failed to return his/her ballot, or (c) the creditor's claims were unimpaired, and therefore, were not entitled to vote).

[221]    *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 444, 450 (2007); *see* U.S. Trustee Objection, ¶17.

bankruptcy [was] filed,"[222]—apply to the third-party releases here, which will be created and defined exclusively as part of the Plan formed under federal bankruptcy law.[223]

141.    More fundamentally, as the court in *In re GOL Linhas Aéreas Inteligentes S.A.* recently held, "[t]he right which creditors are giving up by consensually releasing claims against third parties . . . is a *personal constitutional* right which is protected by *federal* Constitutional law, and which is therefore subject to waiver."[224]   Accordingly, when bankruptcy courts approve the opt-out structure for third-party releases, they "are not creating substantive rights or doing equity in impermissible ways, as the UST puts it—they are following longstanding constitutional doctrines."[225]   The *GOL* court also noted that if the U.S. Trustee's position were adopted, bankruptcy courts would potentially "need to engage in untold numbers of individualized choice-of-law analyses" to determine which state law to apply.[226]   "This would in no way facilitate the uniform development of bankruptcy law in the United States, and would be extremely difficult, costly, and time-consuming to determine and apply."[227]

142.    Further, the U.S. Trustee argues that third-party releases in plans should be viewed as a collection of "separate [settlement] agreements," each of which is governed by state contract law.[228]   But treating each third-party release as a "separate bilateral contract entirely unrelated to

---

[222]   *Travelers*, 549 U.S. at 451 (citations omitted).

[223]   *See Kellogg v. United States (In re West Tex. Mktg. Corp.)*, 54 F.3d 1194, 1196 (5th Cir. 1995) ("[T]he validity of any interest that may have accrued prior to the filing of the petition is resolved generally by state law.  But, once the petition is filed, federal law controls." (citation omitted)).

[224]   *In re GOL Linhas Aéreas Inteligentes S.A.,* Case No. 24-10118 (MG), 2025 WL 1466055, at *20 (Bankr. S.D.N.Y. May 22, 2025), *appeal docketed,* No. 25-04610 (S.D.N.Y. June 3, 2025).

[225]   *Id.*

[226]   *Id.* at *21

[227]   *Id.* (internal citation omitted).

[228]   U.S. Trustee Objection, ¶ 18.

the Plan" is "divorced from . . . reality[.]"[229]  The Plan's Third-Party Releases are not free-floating settlement agreements, they are an "integral" part of—and an "essential means of implementing"—the Plan under the Bankruptcy Code.[230]  The creditors providing third-party releases here are doing so only by virtue of the Plan, which is a creature of the Chapter 11 Cases that the creditors are involved in.  "[T]he plan . . . serves as the mechanism to have the release take effect. . . ."[231]  Determining whether a creditor has provided consent to a particular term contained in the Plan "is a matter of federal bankruptcy law, with an already existing and well-developed body of case law on consent in the context of a collective bankruptcy proceeding."[232]

143.    Lastly, the U.S. Trustee argues that if state contract law doesn't apply, federal contract law should, and the result would be the same as if state contract law applied.  This assertion, regardless of whether it is true or not, is of no consequence.  As explained above, federal bankruptcy law governs the confirmation of chapter 11 plans and the appropriateness of third-party releases.  When approving chapter 11 plans and third-party releases, bankruptcy courts ensure that the plans and releases comport with the Bankruptcy Code and federal bankruptcy law, not federal contract law.

---

[229]   *In re Spirit Airlines, Inc.*, 668 B.R. 689, 718 (Bankr. S.D.N.Y. 2025); *see In re LaVie Care Ctrs., LLC*, No. 24-55507, 2024 WL 4988600, slip op. at *14 (Bankr. N.D. Ga. Dec. 5, 2024) ("[T]he basis for the enforcement of consensual releases has not as far as this Court has been able to determine been described anywhere as a 'contract' for them, or an 'agreement' to them.").

[230]   Hugo Declaration ¶¶ 19, 30-31.

[231]   *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022) (citation omitted), *abrogated in part on other grounds by Purdue*, 603 U.S. 204.

[232]   *Spirit Airlines*, 668 B.R. at 716.

**C.** **The Injunction Provision and Gatekeeping Provision Are Each Consistent with Fifth Circuit Law and Plans Confirmed in this District**

144.    The U.S. Trustee also objects to the Plan's injunction provision, noting that the Bankruptcy Court "may not approve the provisions at Art. 10.5."[233]   As set forth in paragraph 90 *supra*, the only Exculpated Parties under the Plan are the Debtors and their Estates.   Thus, the scope of the Exculpated Parties is firmly within the bounds of *Highland I*. Specifically, in *Highland I*, the Fifth Circuit noted that the exculpation provision as drafted by the *Highland I* debtor was inappropriate and revised the provision by "strik[ing] all exculpated parties from the Plan except [the debtor], the Committee and its members, and the Independent Directors."[234]

145.    The U.S. Trustee further objects to the Injunction Provision and Gatekeeping Provision set forth at Article 10.5 of the Plan and discussed at Paragraphs 92 through 93 *supra*. However, contrary to the U.S. Trustee's assertions, both of these provisions are consistent with applicable law and practice in the Fifth Circuit and this District.   The Injunction Provision is merely the means by which the Third-Party Release and Debtor Release (among others) are enforced. Without an enforcement mechanism, the Plan's release and discharge provisions are essentially a nullity.   This argument from the U.S. Trustee is simply a back door through which it attempts to, once again, attack the Third-Party Release itself.   As this Court has noted, "[c]ase law in the Fifth Circuit allows the use of injunctions in consensual third party releases."[235]   Also, as set forth above

---

[233]   U.S. Trustee Objection ¶ 49.

[234]   *Highland I*, 48 F.4th at 438.

[235]   Conf. Hr'g Tr. 32:3-4, *In re Independence Contract Drilling, Inc*., No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127]; *see also In re CJ Holding Co.*, 597 B.R. at 608 (collecting cases); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions so long as there is consent.").

in paragraph 92 of this memorandum, the Injunction Provision is a key part of the Plan that is integral to its function.

146.    In addition, the Injunction Provision and the Gatekeeping Provision are consistent with the Fifth Circuit's clarifying opinion in *Highland II*,[236] and the U.S. Trustee's arguments are unpersuasive.[237]   In *Highland I*, the Fifth Circuit approved the injunction and gatekeeping provisions related to claims that were being properly exculpated under the plan.[238]   Later, in *Highland II*, the Fifth Circuit clarified that the scope of such provisions may be no broader than the underlying claims being exculpated.[239]   Here, the Injunction Provision and Gatekeeping Provision also apply to the Third-Party Release; however, such application is consistent with *Highland I* and *Highland II*.   The claims released by the Third-Party Release are subject to the same injunction that applies to the claims subject to the Exculpation Provision.   And, critically, the Gatekeeping Provision has been narrowed to "only apply to Claims or Causes of Action brought against a Released Party if such Person or Entity Bringing such Claim or Cause of Action is a Releasing Party."[240]   Each of the Exculpation Provision, Injunction Provision and Gatekeeping

---

[236]   *Highland II*, 132 F.4th  at 353.

[237]   Conf. Hr'g Tr. 94:24 – 95:2, *In Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) [Docket No. 251] ("I don't think *Highland II* . . .addresses whether you can have an injunction and a gatekeeping function in support of a consensual release.") (cleaned up).

[238]   *Highland I* 48 F.4th at 439.  ("We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.")

[239]   *Highland II*, 123 F.4th at 359.  ("Even before *Purdue Pharma*, this court had held the same: that any provision that ***non-consensually releases*** non-debtors from liability for debts and/or conduct, and any injunction that acts to shield non-debtors from such liability, must be struck from a bankruptcy confirmation plan.") (emphasis added).

[240]   *See* Plan Art. 10.5.  This is a notable difference between the Gatekeeping Provision at issue here and the one struck down in *In re AIO US, Inc.*, No. 24-11836 (CTG), 2025 WL 2426380, at *37 (Bankr. D. Del. Aug. 21, 2025), which was not similarly limited.  The Gatekeeping Provision at issue here is consistent with *Highland II* because its scope is co-terminus with the scope of the claims actually enjoined under the Plan and the parties actually bound by the injunction.  Thus, the Gatekeeping Provision does not go beyond the Injunction Provision but simply aids in enforcing the Injunction Provision consistent with what is allowed in this circuit.

Provision are linked and only apply to claims that this Court has the power to enjoin.[241]   As a result, the Injunction Provision and Gatekeeping Provision are each consistent with others contained in recent plans confirmed in this Court and have been further narrowed to confirm with *Highland II.*

147.     Accordingly, *Highland II* is simply not relevant to the facts of the Chapter 11 Cases. In that case, the Fifth Circuit emphasized that their analysis applied to *nonconsensual* releases.  As discussed in detail above, the Third-Party Release under the Plan is consensual, and *Highland II* does not provide a basis to claim that injunction provisions or "gatekeeping" provisions cannot apply to consensual third-party releases.  As the bankruptcy court noted in *The Container Store*, "[w]hile *Highland I* and *II* involve exculpation provisions, which are inherently non-consensual, this case involves a consensual release.  Therefore, the *Highland II* holding that the injunction be narrowed to include the same parties as the exculpation clause, should not have an impact on this case, where the Third-Party Release is consensual."[242]   As noted previously, the Injunction Provision and Gatekeeping Provision are narrowly tailored to apply to claims or causes of action against Exculpated Parties and to claims or causes of action against Released Parties but only to the extent that the person or entity bringing such claim is a Releasing Party.

148.     The value-maximizing outcome set forth in the Plan is a direct result of the efforts of the Debtors and the Released Parties.  Accordingly, the Exculpation Provision, the Injunction Provision, and the Gatekeeping Provision are appropriate and should be approved, and the U.S. Trustee Objection should be overruled.

---

[241]   *Highland II*, 132 F.4th at 360-61 (stating that the Fifth Circuit linked its "treatment of the Exculpation Provision and the Injunction Provision and its Gatekeeper Clause.")

[242]   Order at 16, *In re The Container Store Group, Inc.*, No. 24-90627, (Bankr. S.D. Tex. Apr. 7, 2025) [Docket No. 280].

**CONCLUSION**

149.     For all of the reasons set forth herein, in the Confirmation Declarations, and the Vote Certification, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement on a final basis and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, and granting such other and further relief as is just and proper.

Dated:  September 5, 2025      Respectfully submitted,
      Houston, Texas

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:   taddavidson@hunton.com
        ashleyharper@hunton.com
        pguffy@hunton.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Alexander W. Welch (NY Bar No. 5624861)
Keith A. Simon (NY Bar No. 4636007)
Eric L. Einhorn (NY Bar No. 5568845)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:    ray.schrock@lw.com
        alex.welch@lw.com
        keith.simon@lw.com
        eric.einhorn@lw.com

*Attorneys for the Debtors*
*and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 5, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*

Timothy A. ("Tad") Davidson II
